**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

In re:

The Diocese of Rochester,                    Case No.: 19-20905
                                             Chapter 11

                    Debtor,

**AFFIDAVIT OF LISA M. PASSERO REGARDING THE DEBTOR'S ASSETS
AND OPERATIONS IN SUPPORT OF THE CHAPTER 11 PETITION
AND FIRST DAY PLEADINGS**

STATE OF NEW YORK        )
COUNTY OF MONROE         )  ss.:

Lisa M. Passero, being duly sworn, deposes and states as follows:

1.      I am a Certified Public Accountant and the Chief Financial Officer ("CFO") for the Diocese of Rochester (the "Diocese" or "Debtor"). I have served as CFO of the Diocese since 2007. Prior to working for the Diocese, I was the CFO and/or Director of Finance for several other national and international corporations. I am familiar with the assets, liabilities and sources of income for the Diocese.

2.      I make this Affidavit based upon: (a) my personal knowledge of certain facts stated herein, (b) information supplied to me by others associated with the Diocese, (c) my review of relevant documents, and (d) upon my experience and knowledge of Diocesan operations. If I were called to testify, I would testify to the facts as set forth herein. I am authorized by the Diocese to submit this Affidavit.

3.      On the date hereof (the "Petition Date"), the Diocese filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4.      To enable the Diocese to continue its operations, it has asked for various types of relief in its "first day" motions (collectively the "First Day Motions").  The First Day Motions seek relief aimed at facilitating a smooth transition into this Chapter 11 reorganization case, permitting the Diocese to continue its mission by maintaining employee compensation, maintaining the goodwill and morale of the employees, parishioners, clerics and others who rely on the programs and services provided by the Diocese and preserving and maintaining the property available to satisfy the Diocese's creditors.  I respectfully submit that all of the First Day Motions are vital to the Debtor's reorganization efforts and expedited approval of the First Day Motions is important to the Debtor's successful reorganization.

## OPERATIONS

5.      The Diocese of Rochester Pastoral Center ("PC") (a) provides *operational support* to the Catholic parishes and certain other non-debtor Catholic entities that operate within the territory of the Diocese (collectively, the "Entities")[1]; (b) conducts *school operations* through which it provides parish schools with financial and educational support and operates a middle school, Siena Catholic Academy ("SCA"); (c) provides comprehensive *risk management* services to the Entities; (d) administers a lay pension trust and a priest pension trust (collectively, the "***Pension Trusts***") for the benefit of most of the Entities' employees and priests; and (e) administers the Communis Fund of the Diocese of Rochester, Inc. ("***Communis***").

a.      *Operational Support*. The PC provides operational and functional support to the parish Entities in the areas of finance, building & properties, legal, human resources,

---

[1]  In addition to Catholic parishes, the term "Entities" as used in this Affidavit also includes Saint Bernard's School of Theology & Ministry and Rochester Catholic Press Association, Inc. ("Catholic Courier").  Please see the Accompanying Affidavit of the Reverend Daniel J. Condon sworn to on September 10, 2019 for a detailed description of the legal organization of the Diocese and the Entities.

3411576.8 9/10/2019

stewardship and communications, canonical tribunal, schools, evangelization and catechesis, pastoral services and clergy services. Information technology is also provided by contract to all Entities along with Mary's Place Refugee Outreach, Nativity Preparatory Academy, Catholic Charities of the Diocese of Rochester, Inc. ("Catholic Charities"), Providence Housing Development Corporation and Camp Stella Maris of Livonia, Inc.

b. ***School Operations***. As noted above, the Diocese operates SCA, a middle school located at 2617 East Avenue, Rochester, New York. The Diocese manages tuition payments, employee payroll, and other school related operating expenses for SCA. Additionally, the Diocese collects funds from most Catholic parishes located in Monroe County for the purposes of (i) funding the operations of the Diocesan Superintendent of Catholic School's office, and (ii) supporting parish schools that need financial assistance.

c. ***Risk Management***. The Diocese maintains and manages a risk management program for itself, parishes and other Catholic entities, inclusive of property, liability, Workers' Compensation, short-term disability, etc. The risk management program is more fully described in the Motion of the Diocese for an order authorizing maintenance of the Protected Self-Insurance Program.

d. ***Pension Trusts.*** The Diocese sponsors and administers the Lay Employees' Retirement Accumulation Plan (the "Lay Plan"), a multi-employer, non-qualified defined benefit pension plan generally covering most Entities' full-time employees. Currently, the Lay Plan provides benefits to 1,389 retirees. The Diocese also sponsors and administers a Priests' Retirement Plan (the "Priests' Plan"), a multi-employer, non-qualified defined benefit

3411576.8 9/10/2019

pension plan, covering all priests (current and former) incardinated in the Diocese of Rochester.[2] Currently the Priests' Plan provides benefits to 143 individuals.

e. ***Communis***. As more fully described in the First Day Affidavit of Daniel J. Condon, Communis was incorporated in 2005. The purpose of Communis is to receive funds from participants (which include the Diocese, parishes and other qualified organizations) that are pooled and collectively invested. All funds of the participants are held separately in clearly identified accounts. A Board of Directors oversees the operation of Communis selecting an investment advisor, adopting an investment policy, and reviewing performance. Alesco Advisors of Pittsford, New York, are the investment advisors. Bank of New York Mellon is the custodian of the funds in Communis.

## BUDGET AND REVENUE

6.     The Diocese is a not-for-profit Religious Corporation under New York State law. Gross revenue for the fiscal year ending on June 30, 2019 ("2018/2019") was $21,875,800. Gross revenue for the fiscal year ending on June 30, 2018 ("2017/2018") was $24,254,021.

7.     The Diocese anticipates that over the next month its income will be sufficient to meet its operating expenses.

## DEBTOR'S SOURCES OF INCOME

8.     There are four (4) primary sources of income used by the Diocese to support its operations: (i) an annual ***Catholic Ministries Appeal*** ("CMA") to all parishioners within the

---

[2] Incardination is the relationship that exists between a cleric and a diocese or institute of consecrated life. It is a lifelong relationship and commitment to provide service in a particular diocese or religious institute (ref. Canon 265 of the *Code of Canon Law*).

3411576.8 9/10/2019

Diocese; (ii) *fees and charges*; (iii) **grants and aid**; and (iv) **assets** *released from restriction*. In addition, the Diocese may, from time to time, take up special appeals and "capital campaigns" for specific purposes.

9.      ***Catholic Ministries Appeal.*** The CMA is a Diocesan-wide, unified appeal, occurring in the fall of each year, in which all parishes and parishioners are asked to provide critical financial support for the Diocese. Under the CMA a fundraising goal is set for each parish. If there are not enough parishioner donations to cover that goal, the individual parish is responsible to make up the deficiency.

10.      The programs supported by the CMA include: (a) Diocesan-wide services to the parishes and other Catholic institutions; (b) Catholic Charities; (c) educating youth in the Catholic faith; (d) supporting priests, deacons, pastoral leaders and vocations; and (e) funding operations and support services.

11.      The solicitation materials for the CMA provide a revenue target for the Diocese and describe each program and the revenue percentage that the program receives. The Diocese collected $6,803,471 in the 2018/2019 CMA. The revenue target for 2019/2020 CMA is $6,725,000.

12.      ***Fees and Charges.*** The Diocese maintains an Affiliation Agreement ("Agreement") with each parish. Each such Agreement acknowledges the common purpose served by the Diocese and the applicable parish.[3] The Diocese provides operational support as described above, which is vital to the operations of the parishes and other Catholic entities due to the increasingly complex statutory and regulatory responsibilities of employers and service

---

[3] The common purpose is that mission entrusted to the Church by Christ namely: to teach, to sanctify and to serve. The mission is realized in a variety of ways by the Diocese, each parish and the related entities.

3411576.8 9/10/2019

providers. The Agreement identifies types of services provided as well as an annual billing schedule for each fiscal year. The billing schedule is usually distributed in February.

13.     Among the services for which the Diocese charges fees to the parishes are human resource services, information technology, risk management, safe environment, activity fees (e.g. Catholic Youth Organization and the National Catholic Youth Conference), and various other services.

14.     Since Catholic Education is the work of the Church and not simply the work of the Diocese or a single parish, each parish that does not operate a Catholic school contributes a certain percentage of its regular collections to support Catholic education.

15.     The fees and charges described in paragraphs 12 through 14 above totaled approximately $6,804,498 in 2018/2019 and $6,907,214 in 2017/2018.

16.     As further described in the Motion of the Diocese for an Order Authorizing Maintenance of Self-Insurance Program, the Diocese invoices participating Entities for insurance premiums and certain costs associated with its Protected Self-Insurance Program amounting to $4,323,759 in 2018/2019 and $4,265,198 in 2017/2018. The Protected Self-Insurance Program is also noted on the annual billing schedule.

17.     In addition to the services provided to Catholic parishes, Information Technology services are provided to other Catholic entities pursuant to a contract and a fee is paid for such services.

18.     *Grants and Aid.* The Diocese applies for grants, receives gifts and bequests, conducts capital campaigns, and generates investment income to fund its operations. This amount was $3,944,072 in 2018/2019 and $6,362,980 in 2017/2018.

3411576.8 9/10/2019

19.     ***Assets Released from Restriction***. The Diocese receives various donations and bequests with specific designations on how those funds can be used and the amount of the underlying principal that can be used for the designated purpose. Generally, following the spending rule set forth in the New York Prudent Management of Institutional Funds Act (*See* New York Not-for-Profit Corporation Law at §§ 550-558), five percent (5%) of the rolling 20 quarter average of the restricted assets income may be used to fund specific programs supported by donor designated funds. This amount was $1,974,861 in 2018/2019 and $1,730,934 in 2017/2018.

## FINANCIAL UNCERTAINTY

20.     On January 28, 2019, the New York State Legislature passed the Child Victims Act (A.2683/S.2440) (the "CVA"). New York's Governor signed the legislation on February 14, 2019. This legislation modified the statute of limitations and created a one-year "window" during which victims of child sex abuse whose claim may have been time-barred may commence a timely civil action. In addition, the CVA extends the statute of limitations for claims that were not time-barred on its date of passage, permitting such child victims to commence timely civil actions until they reach 55 years of age.

21.     Since the mid-1980's, the Diocese has settled 44 claims related to child sexual abuse. From the opening of the CVA window on August 14, 2019 through the Petition Date, approximately 46 lawsuits involving 61 plaintiffs who are seeking damages as a result of alleged abuse have been commenced against the Diocese. In addition, as of the Petition Date, approximately 12 demand letters and or notices have been received from other claimants who

3411576.8 9/10/2019

have not yet commenced lawsuits against the Diocese. The Diocese anticipates that many more claims will be asserted before the CVA window closes. The Diocese may have insurance coverage for some of the CVA claims it will face.

## PURPOSE AND GOALS OF THE CHAPTER 11 FILING

22.     The Diocese does not seek Chapter 11 relief to shirk or avoid responsibility for any past misconduct by clergy or for any decisions made by Diocesan authorities when addressing that misconduct. The Diocese does not seek bankruptcy relief to hide the truth or deny any person a day in court. In fact, the Diocese is committed to pursuing the truth and has never prohibited any person from telling his/her story or speaking his/her truth in public. The Diocese has publicly disclosed perpetrators. The Diocese has made and requires criminal referrals to be made for all credible allegations of sexual abuse. The Diocesan Bishop, The Most Reverend Salvatore R. Matano, has apologized for the past misconduct of the personnel of the Diocese and meets with victims at every opportunity in an attempt to bring comfort to such individuals, as did his predecessor. The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people.

23.     The Diocese has commenced this Chapter 11 case in order to (a) provide an orderly claims administration process that will ensure a more equitable distribution of funds to creditors, including victims of sexual abuse; and (b) bring about a reorganization of the Diocese that will ensure that the mission of the Diocese (as described above) may continue to be fulfilled for the Catholic faithful that it serves.

3411576.8 9/10/2019

## FIRST DAY MOTIONS

24.     To further the Diocesan mission and continue operations, the Diocese respectfully requests that the following First Day Motions be granted.

### Employee Wages and Benefits

25.     The Debtor currently employs eighty-six (86) full-time employees and six (6) part-time employees (collectively, the "Employees") and provides medical and dental benefits to an additional sixty-eight (68) retired priests and two (2) former priests (the "Retired Clergy"). Seventy-four (74) of the Employees are salaried employees, and eighteen (18) are hourly employees. The Debtor also employs an independent contractor and ten (10) temporary workers employed through a staffing agency (collectively, the "Temporary Workers"). The Debtor's Employees serve both the PC and SCA. Six of the Employees are women of religious orders ("Women Religious") who receive employee benefits and paid time off. Such Women Religious do not receive a salary or wages; instead payment is made to their Religious Order. The Debtor's obligations also extend to the Retired Clergy who receive no wages but receive benefits through a Medicare Advantage plan and/or dental insurance.

26.     The vast majority of the Employees and Temporary Workers rely exclusively on the compensation and benefits they receive from the Debtor to provide for their daily living expenses and these Employees and Temporary Workers would be exposed to significant

3411576.8 9/10/2019

financial difficulties if the Debtor were not permitted to continue paying such compensation and benefits in the ordinary course of its business.

27.     In addition to customary Employee compensation and reimbursable expenses, the Debtor owes obligations to one priest who is not able to exercise an ecclesiastical office and to the Bishop Emeritus pursuant to Canon Law and guidance issued by the United States Conference of Catholic Bishops.

28.     To minimize the personal hardship that the Employees, Retired Clergy and Temporary Workers would suffer if prepetition Employee and related obligations are not paid when due or as expected, and to maintain morale and stability in the Diocese during this critical time, the Debtor seeks authorization to (a) pay and honor, in its sole discretion, certain prepetition claims for the following items, each as described below: *Compensation*, *Reimbursable Business Expenses* and *Benefit Plans*, together with all other benefits that the Debtor has historically provided to its Employees, Retired Clergy and Temporary Workers in the ordinary course of business (collectively, the "Employee Wages and Benefits"); (b) pay all administrative costs associated with Employee Wages and Benefits; (c) continue to pay and provide the Employee Wages and Benefits in the ordinary course of business on and following the Petition Date; and (d) withhold (as applicable) and remit *Deductions* and *Payroll Taxes* as described below.

29.     *Compensation.* The Debtor's Employees are paid bi-weekly in arrears. There are four (4) days of wages earned by the Employees prior to the Petition Date that constitute prepetition wages which are due to be paid on September 26, 2019. Based upon historical data, the average bi-weekly aggregate payroll for the Debtor's Employees is approximately $190,000.

3411576.8 9/10/2019

Based upon historical data, the average weekly aggregate costs for the Debtor's Temporary Workers is approximately $6,100. The Debtor estimates that approximately $74,000 in prepetition wages, salaries, overtime pay and other cash compensation and approximately $18,000 for Temporary Workers has accrued in the ordinary course prior to the Petition Date and remains unpaid (collectively, the "Unpaid Compensation"). The Debtor believes that it does not owe any Employee a prepetition amount in excess of the $13,650 cap on priority claim amounts imposed by section 507(a)(4) of the Bankruptcy Code. Accordingly, the Debtor is not seeking authority to pay any amount over the $13,650 cap to any Employee.

30.     ***Reimbursable Business Expenses***. Prior to the Petition Date and in the ordinary course of business the Diocese has reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Diocese ("Business Expenses"). As of September 9, 2019, the Debtor's unpaid Employee Business Expenses total less than $100. In addition, it is possible that certain Employees may have incurred prepetition Business Expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtor after the Petition Date.

31.     All of the Business Expenses are incurred on the Debtor's behalf and with the understanding that they will be reimbursed. Accordingly, to avoid harming Employees who may have incurred Business Expenses, by this Motion the Debtor requests the authority, to be exercised in its sole discretion, to: (a) continue paying Business Expenses in accordance with prepetition practices; (b) modify their prepetition policies relating thereto as they deem appropriate; and (c) pay all Business Expenses that relate to the prepetition period.

3411576.8 9/10/2019

32. **_Benefit Plans._** The Debtor provides eligible Employees and their eligible dependents with various employee benefits as follows (collectively, the "Benefit Plans"):

a. **_Medical Plan: Employees_** The Debtor's health coverage is provided by Excellus for its eligible Employees, and approximately 55 Employees elect this benefit. The Debtor pays Excellus Health Plan-Group ("Excellus") approximately $57,000 per month, in advance, in connection with the medical benefits plan. The Debtor pays approximately $43,500 of these monthly premiums. The remainder of the premium is collected from participating Employees through payroll deductions. As of the Petition Date, no health insurance premiums are owed to Excellus by the Debtor.

b. **_Medical Plan: Retired Clergy_** Retired Clergy are insured through a Medicare Advantage Plan, and the Debtor pays approximately $14,900 per month to Excellus to cover these premiums. For one Retired Clergy living out-of-state, the Debtor reimburses Medicare Advantage Plan insurance on a monthly basis in the amount of $179 per month to Univera Health Care-Direct. Another Retired Clergy is reimbursed directly for Medicare Advantage Plan Insurance in the amount of $209.42 per month. In addition to the above medical benefits, $1,100 per month is paid for five Retired Clergy living in the Sisters of Saint Joseph Assisted Living program (such amount is paid through ElderOne). As of the Petition Date, no premiums are owed to Excellus, Univera or ElderOne. The Debtor owes the reimbursement of $209.42 for September to one Retired Clergy.

c. **_Dental Plans_** The Debtor provides dental coverage through Excellus for its eligible Employees, and approximately 50 employees elect this benefit. The total monthly premium paid to Excellus is approximately $3,000 and paid in advance. The Debtor pays

3411576.8 9/10/2019

approximately $900 of these monthly premiums, and the remainder is collected from participating Employees through payroll deductions. The Debtor also pays approximately $2,300 per month for Retired Clergy dental insurance to Excellus. As of the Petition Date, no dental insurance premium is owed to Excellus by the Debtor.

        d. ***Vision Plan*** The Debtor sponsors a vision plan for its eligible employees through EyeMed. Approximately 33 Employees elect this benefit and the entire amount of their monthly premium, approximately $260, is paid by the Employees through payroll deductions. Additionally, the Debtor maintains Vision COBRA payments to EyeMed for terminated employees. The terminated employees reimburse the Debtor for the premium. Currently, the COBRA Vision premium is $27.84 for 3 terminated employees. As of the Petition Date, no vision insurance or COBRA vision insurance premiums are owed to EyeMed by the Debtor.

        e. ***Paid Time Off ("PTO")*** The Debtor provides PTO to its Employees, the amount and accrual rate of which is based generally on an Employee's length of service and level within the Debtor's organization. Ordinarily, when an Employee elects to take PTO, that Employee is paid his or her regular hourly or salaried rate. Employees are paid for unused PTO when they cease employment with the Debtor. The Debtor estimates that its Employees have accrued no greater than $223,000 of accrued but unused PTO as of the Petition Date. This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused PTO when they use the PTO in the ordinary course of business or when employment is ceased. Any such payout of PTO to a terminated Employee would be subject to the cap imposed by section 507(a)(4) of the Bankruptcy Code for any pre-petition portion of this payment. Moreover, the Debtor anticipates that its Employees will utilize

3411576.8 9/10/2019

any accrued PTO in the ordinary course of business, which will not increase cash flow requirements beyond the Debtor's normal payroll obligations.

f. ***New York State Short-Term Disability Insurance*** The Debtor provides short-term disability benefits for all of its Employees, and the Entities, as required by New York State law through Mutual of Omaha. The premiums are billed on a quarterly basis, and on average, the Debtor pays approximately $13,000 quarterly in arears. As of the Petition Date, the Debtor owes one quarter, approximately $12,051, which is due to be paid in October 2019.

g. ***Life Insurance*** The Debtor sponsors Basic Life insurance for its eligible Employees. Approximately sixty-eight (68) Employees receive 1x Salary Life Insurance and six (6) Employees receive 3x Salary Life Insurance. The Debtor pays Mutual of Omaha approximately $1,320 per month, in advance, for this benefit. As of the Petition Date, no life insurance premium is owed to Mutual of Omaha by the Debtor.

h. ***Long-Term Disability Insurance*** The Debtor sponsors long-term disability benefits covering approximately eighty (80) Employees. The Debtor pays approximately $1,100 per month, in advance, to Mutual of Omaha for this benefit. As of the Petition Date, no long-term disability insurance premium is owed to Mutual of Omaha by the Debtor.

i. ***Supplemental Life and Accidental Death & Dismemberment Insurance*** The Debtor sponsors supplemental life and accidental death & dismemberment insurance for its eligible Employees through Mutual of Omaha. Approximately nineteen (19) Employees have elected to purchase supplemental life and accidental death & dismemberment insurance. The monthly premium remitted to Mutual of Omaha is approximately $615 per month. The cost is

3411576.8 9/10/2019

collected from Employees through payroll deductions. As of the Petition Date, no supplemental life and accidental death & dismemberment insurance premium is owed to Mutual of Omaha by the Debtor.

  j. ***Director Supplemental Long-Term Disability Insurance*** The Debtor sponsors supplemental long-term disability insurance for Diocesan directors through Provident Life & Accident Insurance Co. and six (6) Employees receive this benefit. The Debtor pays $536.05 per month, in advance, to Provident Life & Accident Insurance Co for this benefit. As of the Petition Date, no director supplemental long-term disability insurance premium is owed to Provident Life & Accident Insurance Co by the Debtor.

  k. ***Paid Family Leave*** The Debtor pays paid family leave withholdings for its Employees and the Entities.  This is paid on a quarterly basis to Mutual of Omaha who administers the paid family leave for the Debtor and its affiliated entities. The Diocese makes the payment and is reimbursed by the affiliated entities on a quarterly basis. The approximate quarterly payment is $14,300. The Debtor owes the quarterly Paid Family Leave for its Employees and the Entities in the approximate amount of $8,300, as of the pay period end date August 23, 2019, which is due to be paid October 2019.

  l. ***Flexible Spending Plans*** The Debtor sponsors flexible spending plans (medical/dental and dependent care) for its Employees and Entities. Lifetime Benefit Solutions, Inc., manages the flexible spending plan and charges the Diocese an administrative fee of $2.75 per month for each participant. The approximate monthly cost for the administrative fees is $53 for Employees and $500 for Entities. The Debtor pays the administrative fees on a monthly basis and is reimbursed by the Entities on a quarterly basis. Additionally, the flexible spending

3411576.8 9/10/2019

employee reimbursements are advanced by the Debtor and reimbursed on a quarterly basis by the Entities. The approximate annual flexible spending withholdings for its Employees is $26,000 and $206,500 for the Entities. As of the Petition Date, approximately $550 is owed to Lifetime Benefit Solutions for the month of September.

m. ***403(b) Plan*** The Diocese offers employees[4] the opportunity to participate in a defined benefit qualified retirement plan under section 403(b) of the Internal Revenue Code. The Diocese matches one hundred percent (100%) up to two percent (2%) of a lay employee's individual compensation and up to $600 per clergy participant. Burke Group administers the plan. As of pay period end date, September 23, 2019, unpaid employer matches total approximately $293,600 for lay employees and $53,000 for clergy and are due to be deposited by the Debtor into these retirement accounts in March 2020.

n. ***Retirement Plans*** The Diocese sponsors and administers a Lay Employees' Retirement Accumulation Plan (the "Lay Plan"), a multi-employer, non-qualified defined benefit pension plan, generally covering all participating employers' full-time employees. The Diocese also sponsors and administers a Priests' Retirement Plan (the "Priests' Plan"), a multi-employer, non-qualified defined benefit pension plan covering all priests incardinated in the Diocese of Rochester. Each participating employer contributes 12% of its employee's gross wages to this plan. The Debtor also contributes 12% of Employee gross wages for its employees to this plan. The Diocese makes this contribution on a quarterly basis, and as of the Petition Date, approximately $132,250 will be due for this contribution, to be paid in

---

[4] This 403(b) Retirement Plan Benefit is provided to its employees and employees of parishes and the Rochester Catholic Press Association.

3411576.8 9/10/2019

October 2019. Additionally, the Diocese pays 12% of its Women Religious gross wages to their Religious Order for their retirement plan contribution. As of September 6, 2019, the Debtor owes $1,266.51 to the Sisters of St. Joseph and $3,316.24 to the Sisters of Mercy for their retirement plans contribution.

o. ***Workers' Compensation*** The Debtor provides workers' compensation benefits ("Workers' Compensation Benefits") to all Employees and Entities. These benefits are covered primarily under the Debtor's workers' compensation insurance program, which is insured and administered by Church Mutual Insurance Company. The annual workers' compensation premium is $341,428 and was paid on July 12, 2019, for the 2019/2020 fiscal year. This benefit is more fully described in the Debtor's Motion to Authorize Maintenance of the Protected Self-Insurance Program.

33. ***Deductions*** During each applicable pay period, the Debtor routinely withholds certain amounts from Employees' pay that the Debtor is required to transmit to third parties. Some examples of such withholdings include FSA contributions,[5] 403(b) contributions, United Way donations, child support payments, wage garnishments, and other pre-tax and after-tax deductions payable pursuant to certain of the benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, legally-ordered deductions, fees and assessments and miscellaneous deductions) (collectively, the "Deductions").

34. The Debtor forwards the Deductions to the appropriate third-party recipients. On average, the Debtor deducts approximately $22,000 in non-tax items from its Employees' paychecks each pay period. Due to the commencement of the Chapter 11 case, certain

---

[5] The Debtor pays administrative fees to Lifetime Benefit Solutions for the Entities in the amount of approximately $553. The Debtor is reimbursed by the Entities for approximately $500 of this amount.

3411576.8 9/10/2019

Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date.

35.     ***Payroll Taxes*** Further, the Debtor is required by law to withhold from its Employee's wages amounts related to federal and state income taxes and Social Security and Medicare taxes for remittance to the appropriate federal or state taxing authority (collectively the "Withheld Amounts"). The Debtor must match from its own funds Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes"). The Debtor is current with respect to all Payroll Taxes as of the pay period end date September 6, 2019.

36.     The Debtor believes that the Deductions and Payroll Taxes, to the extent that they remain in the Debtor's possession, constitute monies held in trust and therefore are not property of the Debtor's bankruptcy estate. Accordingly, by this Motion the Debtor seeks authorization, but not direction, to forward any unpaid Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities and to continue to forward the Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

37.     To facilitate the other relief requested herein, the Debtor requests that the Court authorize and direct all banks and other financial institutions at which the Debtor maintains an account, to receive, process, honor and pay (provided that sufficient funds are on deposit in the applicable accounts to cover such payments) any and all pre-petition and post-petition checks issued or to be issued, and fund transfers requested or to be requested, by the Debtor on account of Employee Wages and Benefits that were not honored or paid as of the Petition Date, whether

3411576.8 9/10/2019

presented or requested prior to or after the Petition Date. The Debtor also seeks the authority to issue new pre-petition checks, or effect new fund transfers, to satisfy the Employee Wages and Benefits to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

**Protected Self-Insurance Program**

38.     On or about June 1, 1977, the Diocese formally initiated a Protected Self-Insurance Program (the "PSIP") to ensure that the Diocese and certain Non-Debtor Catholic Entities[6] (collectively, the "Participating Entities") had adequate insurance protection at a reasonable price by leveraging insurance costs at a diocesan level. The PSIP has operated continuously since that time.

39.     Under the PSIP, insurance is purchased from third parties and the program is administered for the Participating Entities. Waldorf Risk Solutions ("Waldorf") is the third-party administrator and broker of record for the PSIP. Premiums for the PSIP are collected from the Participating Entities. In 2019/2020, approximately $4,350,000 in premiums were budgeted as being necessary to fund this program (the "PSIP Funds"). PSIP Funds are used to pay for the third-party insurance policy premiums, deductibles and other administrative costs. The PSIP funds are deposited into the Debtor's main operating account at M&T Bank, and separately identified and accounted for. As needed, these funds are transferred to the PSIP account managed by Waldorf to pay per occurrence deductibles up to the amount of the insurance policy

---

[6] The Non-Debtor Catholic Entities that participate in the PSIP have changed over time. For example, Catholic Charities left the PSIP in 2009 and is covered by separate insurance. The PSIP currently includes the Diocese, the presently 86 parishes within the geographical area of the Diocese and certain other non-Debtor Catholic entities as described in Footnote 1.

3411576.8 9/10/2019

self-retention, along with other PSIP related costs. If there are any significant excess funds at the end of the fiscal year, they are deposited in a segregated account in Communis.

40. The PSIP currently provides insurance coverage, subject to the limits of liability, including but not limited to general liability, direct property loss, indirect property loss, short term disability, workers' compensation, boiler and machinery, sexual misconduct, fiduciary liability, cyber liability, terrorism liability, directors and officers and excess liability insurance for the Participating Entities.

41. The various types of losses covered by the PSIP are subject to various per occurrence deductibles with a $500,000 annual stop loss aggregate (consisting of $250,000 aggregate for property claims and $250,000 aggregate for general liability claims).

42. There are different deductibles for the various types of insurance provided under the PSIP. For liability coverage and property damage, the deductible is currently $100,000 per loss, up to an annual stop loss aggregate for all losses suffered by all Participating Entities of $500,000 ($250,000 property and $250,000 general liability). For losses above the per loss and aggregate limits, the insurance carrier is expected to pay the losses up to the limit of liability in accordance with the terms of the subject policy. The collected premiums are used to pay claims and risk management related costs (including defense costs) up to the applicable deducible for each claim and, ultimately, up to the amount of the annual stop loss aggregate.

43. Premiums for Participating Entities are generally set annually based on various allocation methodologies including replacement values, payroll dollars, square footage, acreage, and/or number of students. The methodologies strive for consistency and a fair allocation of

3411576.8 9/10/2019

PSIP costs across all Participating Entities. The premium revenues for 2019/2020 cover a variety of risk management related costs as detailed below:

| PSIP BUDGET | | $4,350,000 |
|---|---|---|
| Insurance Premiums to Third Parties | $2,267,000 | |
| Brokerage Fees | $150,000 | |
| Risk Management/Loss Control/Training | $540,000 | |
| Legal Fees/USSCB/Audit Fees | $300,000 | |
| Stop Loss Aggregate | $500,000 | |
| **Total Budgeted Costs** | **$3,757,000** | |
| Balance for Unanticipated Costs and Expenses | | $593,000 |

44.    As of the Petition Date, the 2019/2020 third party insurance premiums have been paid in full.

45.    The PSIP provides a practical, cost-effective way to procure and maintain broad insurance coverage for the Participating Entities under a single program.  If the PSIP is not continued, the Participating Entities, including the Diocese, will be forced to purchase separate insurance policies covering each entity and their respective properties. The Diocese believes that it will cost the Diocese and the other Participating Entities substantially more to obtain their own insurance (with or without a retention or deductible) than their share of the funding for the current PSIP and that certain types of coverage may not be available in the marketplace on an individual basis.

3411576.8 9/10/2019

46. The Diocese seeks to continue to maintain the PSIP for itself and on the behalf of the Participating Entities in accordance with past practice and in the ordinary course of business. The Diocese believes that the maintenance of the PSIP is in the best interest of the estate and its creditors.

47. The Diocese and Participating Entities were substantially self-insured prior to July 1, 2009, including Workers' Compensation. Since that time, Participating Entities have dollar one workers' compensation insurance for complete coverage of all claims post July 1, 2009. Currently coverage is provided by Church Mutual Insurance Company.

48. With regard to pre-July 1, 2009 Workers' Compensation claims, the Debtor maintains a legacy workers' compensation fund at Key Bank, which is maintained by a third-party administrator, FutureComp (formally USI Insurance Services, Key Insurance & Benefits Services and First Niagara Risk Management). This Workers' Compensation fund is supported by a letter of credit in the amount of $844,000 at M&T Bank.

49. Currently the Debtor is required, pursuant to the New York State Workers' Compensation Board orders, to pay three (3) Debtor claimants and five (5) Catholic Charities claimants on average a total of $8,629 per month ("Legacy Payments").

**Utilities**

50. The Debtor receives utility services from several utility companies (the "Utility Companies") [7] for multiple facilities. These facilities include the Pastoral Center, St. William House, SCA, Hispanic Migrant Ministry Center, and senior diocesan clergy residences. None

---

[7] A list of the Utility Companies and the service addresses are set forth in the Debtor's Motion for Preliminary and Final Orders (A) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service on Account of Prepetition Amounts Due, (B) Determining Adequate Assurance of Payment for Post-Petition Utility Services Under 11 U.S.C. § 366, and (C) Establishing Procedures for Determining Adequate Assurance of Payment.

3411576.8 9/10/2019

of the Utility Companies holds pre-petition deposits. Prior to the Petition Date, the Debtor timely remitted payments on monthly utility service obligations. Adequate funds have been budgeted for payment of historical post-petition utility services.

### Maintain Bank Accounts and Forms

51.     The Diocese employs a cash management system in its ordinary course of business to manage its operations. The Diocese's primary banking relationship is with M&T Bank, where it maintains its operating account (the "Operating Account"), as well as an internet banking account ("Internet Account") used to accept credit card donations, an account to manage payments to and from SCA (the "Siena Account"), and an account to manage the Debtor's charitable gift annuity program (the "CGA Account", collectively the "M&T Accounts"). The Debtor also utilizes a Lockbox service with M&T Bank. Lockbox receipts are directly deposited into the Operating Account as they are received. The Debtor has two additional bank accounts, one at JPMorgan Chase Bank, N.A. (the "Chase Account") and one at Key Bank, N.A. (the "Key Account"), each of which is used to make payments associated with the Protected Self-Insurance Program (together the "Self-Insurance Accounts" and collectively with the M&T Accounts "Bank Accounts").

52.     The Operating Account. The Operating Account is the Debtor's primary account, from which it pays operating and payroll expenses and holds the majority of its operating cash. Among the various categories of sub accounts in the Operating Account are unrestricted funds, funds allocated to schools, PSIP funds, donor restricted funds, and second collections, which are

3411576.8 9/10/2019

primarily required to be remitted to the United States Conference of Catholic Bishops (collectively, the "Cash Management System").

53.    Internet Account. The Internet Account is a function of the Debtor's Internet banking capabilities used to accept credit cards. The Internet Banking Account maintains a zero balance at the end of each day when the funds contained therein are swept to the Operating Account.

54.    Siena Account. The Siena Account at M&T Bank is used by the Debtor to hold non-tuition deposits and to reimburse the Debtor for expenses such as school lunches and field trips.

55.    CGA Account and CGA Investment Account. The Diocese maintains a charitable gift annuity program pursuant to N.Y. Insurance Law § 1110, which allows the Diocese to make annuity agreements with donors under which the Debtor receives gifts in exchange for its agreement to make annuity payments to donors. The Debtor maintains an investment account at Wilmington Trust, (the "CGA Investment Account") for the purpose of investing and holding donated funds and funds from which annuity payments are made in accordance with the requirements of Insurance Law § 1110. The purpose of the CGA Account, which maintains a zero balance, is to receive transfers of annuity payment funds from the CGA Investment Account and disburse those annuity payments to annuitants. The Debtor moves funds from the CGA Investment Account to the CGA Checking Account quarterly to cover disbursements from that account.

56.    The Chase Account. The Debtor maintains the Chase Account to hold and pay out funds under its PSIP that are paid through its third-party administrator, Waldorf Servicing,

3411576.8 9/10/2019

LLC. The Debtor is seeking to continue its self-insurance program through a separate motion and seeks to continue the use of this account in connection with that application. The Debtor moves funds into the Chase Account from the Operating Account to cover disbursements from that account.

57.    The Key Account.  The Debtor maintains the Key Account for the purpose of making payments on its legacy insurance claims, which are primarily related to Workers' Compensation.  Funds received for payment of legacy Workers' Compensation claims are kept in the Operating Account and transferred to the Key Account to cover payment of checks when written.  The Debtor is seeking to continue its self-insurance program through a separate motion and seeks to continue the use of this account in connection with that application.

58.    I understand that the Cash Management System is similar to fund accounting systems used by other dioceses in the United States.  The Cash Management System benefits the Debtor by permitting it to: (a) centralize and track cash receipts and disbursements, enabling management to control funds; (b) ensures cash availability; and (c) reduces administrative expenses by facilitating the movement of funds.

59.    I believe that the preservation of the Cash Management System is essential to the Debtor's continued operations.  The Debtor relies on its Cash Management System to fund and sustain its operations.  It has proven to be an efficient and effective system to manage the Debtor's cash flow.  In accordance with its past practices, the Debtor will continue to maintain its current records with respect to all transactions involving the Cash Management System. Given its central role in funding the Debtor's vital operating expenses, the Debtor's inability to

- 25 -

3411576.8 9/10/2019

continue using the Cash Management System would bring a severe and irreparable disruption to its operations impeding its ability to carry out its mission.

60.     The Debtor seeks to confirm that the United States Trustee's requirement to close prepetition Bank Accounts and open new post-petition accounts will be inapplicable to the Bank Accounts. Closing bank accounts would cause enormous disruptions in the Debtor's operations and fulfilling its mission. As described above, the Debtor's bank accounts are central to its established Cash Management System that the Debtor needs to maintain a smooth system of collections and disbursements in the ordinary course of its business. If the Debtor had to open new accounts as of the Petition Date, it would unnecessarily distract the Debtor's key business office personnel in an office that is already understaffed. Changing the bank accounts would also cause disruptions in essential deposit activity, disrupting the mainstream of revenue that the Diocese receives from the CMA, therefore, causing harm to the Debtor's operations. As a result, I believe it is essential for the Debtor to maintain its prepetition Bank Accounts.

61.     The Diocese further requests that it be authorized to continue to use all correspondence and existing business forms (including, but not limited to, letterhead, purchase orders, envelopes, charitable solicitation material, and checks) before the Petition Date, without reference to the Debtor's status as a debtor in possession. The Diocese anticipates that its Chapter 11 filing will receive widespread publicity so entities doing business with the Diocese will most likely know that the Diocese is a debtor in possession. If the Diocese were required to change its current business forms, the new forms may cause confusion to the Diocesan employees, vendors and donors. The Debtor also believes that it would be costly and disruptive to cease using all existing forms and to purchase new stationery and business forms.

3411576.8 9/10/2019

62.     The Diocese requests that the Court waive the requirement of U.S.C. §345(b) to permit it to maintain deposits in its accounts in accordance with its existing deposit practices until such time as the Debtor obtains court approval to deviate from the guidelines imposed under §345(b) on a final basis. As described above, a substantial portion of the Diocese's assets are in Communis, and the Diocese respectfully asserts that to require that any of the funds be withdrawn or liquidated is not prudent or practical.

63.     In addition to its Bank Accounts, the Debtor has an irrevocable Standby Letter of Credit (the "Standby Letter of Credit") in the amount of $844,000, in favor of the Workers' Compensation Board with M&T Bank. The Standby Letter of Credit secures the Debtor's obligations to its legacy Workers' Compensation claimants. The Debtor's obligation to reimburse M&T Bank for any draw which may occur under the Standby Letter of Credit is a contingent obligation.

64.     Additionally, the Debtor has a credit card account with M&T Bank with 36 individual credit cards in the hands of various Debtor employees, the balance of which has traditionally been paid in full on a monthly basis in the ordinary course of business (the "M&T Credit Cards"). The various Credit Cards have differing credit limits (most are $2,000 limits, some are $5,000 limits, and one has a $10,000 limit). The aggregate credit limit for the Credit Cards is $100,000. Finally, the Debtor maintains two credit accounts with Wegmans, one for the Debtor's use and one specifically for use by Siena Catholic Academy (the "Wegmans Credit Accounts"). Both the M&T Credit Cards and the Wegmans Credit Accounts are unsecured. The Debtor wishes to continue using its existing Credit Cards and Wegmans Credit Accounts rather than obtaining new credit cards.

3411576.8 9/10/2019

**File the Matrix and Schedules w/CVA Names Under Seal**

65.    Many of the creditors in this Chapter 11 case are victims of child sexual abuse who have chosen to keep their identities private. Most victims who have filed suit have done so using pseudonyms and have obtained State Court orders authorizing their use of pseudonyms.

66.    Other child sexual abuse victim creditors have similarly expressed their intentions to remain anonymous. Most of the victims, through their attorneys, have advised the Debtor of potential claims but have only disclosed their names, expecting that their identities would be kept confidential by the Debtor.

67.    The Diocese has always honored a victim's request for confidentiality and has not publicly disclosed victims or commented publicly on any individual's case. In compliance with the *Charter for the Protection of Children and Young People,* issued by the United States Conference of Catholic Bishops in 2002, the Diocese has never requested, nor required, that an individual maintain confidentiality. Victims are free and encouraged to tell their story in the manner and pace which is helpful to them.

68.    The Diocese seeks this Court's permission to file all documents with victims' names in a redacted form, pursuant to State Court orders and its prior practices. Consistent with the Diocese's past practices, victims can always choose to disclose their names in any pleadings that they file with this Court.

For the reasons stated herein and each of the First Day Motions filed concurrently herewith, I respectfully request that the Court grant each of the First Day Motions in its entirety and award the Debtor such relief as is just and proper.

3411576.8 9/10/2019

I swear, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: September 10, 2019

_Lisa M Passero_
Lisa M. Passero
Chief Financial Officer

Sworn to before me this
10th day of September, 2019.

_Scott Mosman_
Notary Public

SCOTT MOSMAN
Notary Public, State of New York
No. 01MO4832081
Qualified in Monroe County
My Commission Expires April 30, 20 23

3411576.8 9/10/2019