**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

In re:

The Diocese of Rochester,

Debtor,

Case No.: 19-20905
Chapter 11 Case

**AFFIDAVIT OF REV. DANIEL J. CONDON REGARDING STRUCTURE AND PRE-FILING HISTORY OF THE DEBTOR AND IN SUPPORT OF THE CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

STATE OF NEW YORK )
COUNTY OF MONROE ) ss.:

Reverend Daniel J. Condon, being duly sworn, deposes and states as follows:

1. I am the Chancellor for the Diocese of Rochester (the "Debtor" or "Diocese"). I have served in such capacity since June 26, 2001. Prior to that, I served as a Parochial Vicar and Administrator for the Diocese, and as a pastor in several parishes within the territory of the Diocese. I am familiar with the mission, history, and structure of the Diocese.

2. I make this Affidavit based upon my personal knowledge of the facts set forth herein, upon information supplied to me by others associated with the Diocese, upon my review of relevant documents and upon my experience and knowledge of Diocesan operations. If I were called to testify, I would testify accordingly to the facts set forth herein. I am authorized by the Diocese to submit this Affidavit.

3. On the date hereof (the "Petition Date"), the Diocese filed a voluntary petition under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4. To enable the Diocese to continue its operations, it has asked for various types of relief in its "first day" motions (collectively the "First Day Motions"). I submit this Affidavit in

support of the First Day Motions. The First Day Motions seek relief aimed at facilitating a smooth transition into this chapter 11 reorganization, assisting the Diocese in contining its mission by maintaining employee compensation, maintaining the goodwill and morale of the employees, parishioners, clerics and others who rely on the programs and services provided by the Diocese, and preserving and maintaining the property available to satisfy the Diocese's creditors. I respectfully submit that all of the First Day Motions are vital to the Debtor's reorganization efforts, and expedited approval of the First Day Motions is important to the Debtor's successful reorganization. The First Day Motions and Financial Structure are further described in the First Day Affidavit of Lisa Passero sworn to on September 10, 2019 and submitted herewith.

## CANON LAW STRUCTURE AND ORGANIZATION

5. That the Catholic Church was founded by Jesus Christ to carry out the mission to teach, to sanctify, and to serve the needs of others is a matter of faith. The Catholic Church is a worldwide community with over 1.2 billion members who hold a common creed. Canon Law is a generic term applied to several sources of church law that together establish the internal organizational structure and procedures to be followed within the Catholic Church. Canon Law also identifies property rights and agency relationships among the variety of structures with the community of the Catholic Church. The Diocese is a Latin Catholic Diocese and subject to the *Code of Canon Law* promulgated by Pope John Paul II on January 25, 1983.[1] As used herein, "Church" means the universal Catholic Church.

[1] 1983 Code c.1-1752 (1983) (as amended, "1983 Code"). Within the Roman Catholic Church there are 24 *sui juris* churches. The Latin Church is the largest, it is subject to *Codex Iuris Canonici auctoritate Ionnisa Paulii PP. II promulgatus* (Vatican City: Libreria Editrice Vaticana, 1983). Hereinafter 1983 Code. Throughout the English translation used will be *Code of Canon Law, Latin-English Edition,* CLSA 1998.

6. While the Church is organized in a hierarchical structure it is not a monolithic corporate entity. The organizational structure is intended to serve the mission to teach, to sanctify, and to serve which is realized in a variety of instruments and organizations. The Church is organized by territorial districts, the most common of which is a diocese.[2] A diocese usually is defined by a geographic area and is created to serve the community of Latin Catholics who are present in that area. The bishop of a diocese is appointed by the Pope.[3]

7. The territory of Diocese is co-extensive with the counties of Monroe, Wayne, Yates, Ontario, Cayuga, Seneca, Tompkins, Tioga, Chemung, Schuyler, Livingston, and Steuben in New York State. The Bishop of the Diocese is the Most Reverend Salvatore R. Matano. Bishop Matano was installed as the Bishop of Rochester on January 3, 2014.

8. The Diocese maintains a number of administrative offices and ministries, necessary to advance the mission of teaching, sanctifying and serving. These include the Bishop's Office, Chancery, Marriage Tribunal, Finance, Information Technology, Human Resources, Stewardship and Communications, Evangelization and Catechesis, Catholic Schools, Pastoral Services, Safe Environment, Victims Assistance, Clergy Services and Archives.

9. Within the territory of a diocese are separately constituted parishes.[4] Like a diocese, a parish is usually defined territorially.[5]

10. A diocese and a parish properly constituted are each considered to be a "public juridic person."[6] These legal persons are similar to corporations. By its nature a juridic person is considered to be perpetual. A juridic person is distinct from any natural persons, and from other

---

*promulgatus* (Vatican City: Libreria Editrice Vaticana, 1983). Throughout the English translation used will be *Code of Canon Law, Latin-English Edition*, CLSA 1998.
[2] 1983 Code c. 369
[3] *Id.* at c. 377 §1
[4] *Id.* at c. 374
[5] *Id.* at c. 515
[6] Juridic personality is articulated in the 1983 Code in canons 113-123.

juridic persons, and it possesses certain legal rights including the ownership of property. Juridic persons possess property to carry out the mission to teach, to sanctify, and to serve in the manner appropriate to each of their competencies and responsibilities for the benefit of all the faithful. These purposes are broadly defined as the conduct of worship, the support of employees and ministers, and the works of the apostolate.[7]

11. The administration of property belongs to a juridic person's administrator,[8] such as a diocesan bishop over the property of a diocese or a pastor over the property of a parish. The administrator of the temporal goods of a public juridic person is to exercise this responsibility in concert with a Finance Council.[9] All property legitimately acquired by a public juridic person is considered to be ecclesiastical property. It is a fundamental canonical understanding that property owned by one public juridic person cannot be simultaneously owned by another.

12. The persons who populate a diocese or a parish are first of all those who are baptized and live in communion with the successor of Peter and those in communion with him.[10] Among the baptized are laypersons and clerics.[11] Clerics are also called sacred ministers and perform many of the liturgical services within the worship of the Church. Clerics are deacons, priests or bishops. There are other individuals who contribute to the mission of the Church by joining together through common life and the profession of the evangelical counsels of poverty, chastity, and obedience ("Religious").[12] Religious may be either laypersons or clerics. If a Religious is not a cleric, that person is referred to as a sister or brother.

---

[7] 1983 Code c.1254. The works of the apostolate include activities associated with easing human suffering, promoting the general welfare, and advancing the social mission of the Church: feeding the hungry, clothing the naked, welcoming the stranger, caring for the sick, offering education, and any other activity that can promote the good of an individual and society.

[8] *Id.* at c.1279 § 1.

[9] *Id.* at c.1280.

[10] *Id.* at c. 204.

[11] *Id.* at c. 207 § 1.

[12] *Id.* at c. 207 § 2.

13. While there are a variety of forms by which Religious are organized in institutes of consecrated life, they are most often referred to as religious orders.[13] These institutes, formed around the charism of a founder recognized by competent ecclesiastical authority, enjoy a certain level of autonomy apart from any diocese and conduct their internal operations independently of any diocese. This is most commonly seen in the conduct of their proper apostolates; often schools, healthcare, and monastic communities. Each institute of consecrated life is a public juridic person. They are bound to the Church in a special way, but they are not part of the hierarchical constitution of the Church. Members of an institute of consecrated life are not subject to the supervision or discipline of the bishop of the diocese wherein they are located, unless they are employed in a parish, school or other institution that is subject to a bishop's oversight.

14. Communities of Men Religious that are present in the Diocese are the Congregation of Saint Basil (Basilian Fathers), Benedictines, Trappists, Capuchin Franciscans of the Province of St. Mary, Carmelite Fathers, Missionaries of the Precious Blood, Redemptorists and Jesuits.

15. There are also several Communities of Women Religious in the Diocese, including the Sisters of St. Joseph, the Sisters of Mercy, Discalced Carmelites, Sisters of the Cenacle, School Sisters of Notre Dame and Mission Helpers of the Sacred Heart.

## NEW YORK CORPORATE STRUCTURE

### A. The Diocese

16. Under New York Law, the Diocese is an incorporated legal entity, separate from the parishes and other Catholic entities within its territory, with its own corporate structure and

[13] Institutes of Consecrated Life are covered in canons 573-746 of the 1983 Code.

governance. The Diocese was founded on March 3, 1868 and subsequently incorporated in New York State on March 11, 1887. The Certificate of Incorporation of the Diocese was amended in 1909 and 1967. The 1967 amendment provides that the three trustees of the Diocese are the Bishop, the Vicar-General and the Chancellor.

17. As noted above, the Diocese serves a 12-county region in western New York. There are currently 86 parishes (each, a "Parish," and collectively, the "Parishes") and approximately 300,000 Catholic individuals in the territory of the Diocese. These individuals are served by 93 Diocesan priests, 35 priests who are Religious that reside in the Diocese, 14 extern priests[14] and 96 deacons. Deacons are men ordained for the ministry of the word (catechetics and preaching), service to the poor, and liturgical assistance. Deacons may preside at baptisms, officiate at marriages, and provide for the funeral rites apart from the celebration of the Eucharist. The Diocese currently employees approximately 96 individuals, which includes both clergy and laity.

18. There is one Diocesan-operated middle school, Siena Catholic Academy in Brighton, New York.

## B. The Parishes

19. The secular legal embodiments of the parishes are non-member corporations ("Parish Corporations") formed under New York's Religious Corporation Law. The Parish Corporations are governed by a Board of Trustees which includes the Bishop, Vicar General of the Diocese, the Pastor of the Parish, and two lay members of the Parish. The Bishop of the Diocese is the president of each Parish Corporation, the Vicar General is the vice president, the Pastor is the secretary-treasurer, all serving *ex-officio*.

---

[14] An extern priest is priest incardinated in another diocese or institute of consecrated life who comes with the permission of the diocesan bishop to exercise ministry in the territory of the Diocese of Rochester. Incardination is the bond that exists between a cleric and a diocese or institute of consecrated life.

20. Each Parish Corporation is a public juridic person (see ¶9) that owns the real and personal property that is used in its ministry. Each Parish has a Finance Council, establishes its annual budget, maintains its own books and records, bank accounts and employee payroll. Each Parish has an annual meeting and elects lay trustees annually.

21. In 2018, throughout the 86 Parishes in the Diocese there were 588 marriages, 1578 infant baptisms, 1738 First Communions and 1470 persons were confirmed.

22. Within the Diocese, 17 Parish Corporations own and operate Catholic schools serving approximately 3,000 students. Numerous Parish Corporations own, maintain and operate cemeteries.

23. The Parish Corporations located within the Diocese are not under the fiscal or operating control of the Diocese.

24. The Parish Corporations have not sought bankruptcy relief and are not debtors in this bankruptcy proceeding.

**C. <u>The Non-Diocesan Schools</u>**

25. There are also eight non-Diocesan Catholic schools in the territory of the Diocese that are separately operated and governed by Religious or private not-for profit organizations. Such schools serve just under 3,000 students.

26. The other separately incorporated Catholic schools located within the Diocese are not under the fiscal or operating control of the Diocese.

27. The other separately incorporated Catholic schools have not sought bankruptcy relief and are not debtors in this bankruptcy proceeding.

## D. Other Non-Debtor Catholic Entities

28. There are several not-for-profit corporations that assist the Diocese and Parishes in their ministry ("Non-Debtor Catholic Entities"). All of the Non-Debtor Catholic Entities were created under New York Not-for-Profit Corporation law or other New York organizational statutes to carry out a variety of works of the apostolate. The Non-Debtor Catholic Entities below are Member corporations. The Members of each are the Diocesan Bishop, Vicar General, Chancellor, President of Catholic Charities, and either the Executive Director or Board Chairperson. The Non-Debtor Catholic Entities are not under the fiscal or operating control of the Diocese. The Non-Debtor Catholic Entities have not sought bankruptcy relief and are not debtors in this bankruptcy proceeding. They include the following:

### i. Catholic Charities

29. Catholic Charities of the Diocese of Rochester, Inc. ("Catholic Charities") was incorporated pursuant to Chapter 256 of the Laws of 1917 on June 28, 1917. The purpose of Catholic Charities is to aid, support, advise, and to conduct by itself or in cooperation with any religious, charitable, benevolent or educational corporation a wide variety of human services for the benefit of persons within the Rochester Diocese. Catholic Charities has ten regional and specialty agencies, including: Catholic Family Center, Catholic Charities Community and Residential Services, Catholic Charities of Livingston County, Catholic Charities of Steuben County, Catholic Charities of Chemung/Schuyler, Catholic Charities of the Finger Lakes, Catholic Charities of Wayne County, Catholic Charities of Tompkins/Tioga, Food Bank of the Southern Tier and Diocesan Services Office.

30. Catholic Charities provides assistance to people in need without regard to religious, racial, ethnic or economic background.

31. The affairs, property, business and policies of Catholic Charities are under the charge, control and direction of the Board of Directors, subject to the reserved powers of the Members.[15] Catholic Charities maintains its own books and records, bank accounts, and employee payroll.

ii. **Providence Housing**

32. Providence Housing Development Corporation ("Providence") was incorporated on June 22, 1994 as a not-for-profit corporation. Since that time several subsidiaries have been separately incorporated for its various projects.

33. Providence's purpose is to strengthen families and communities by assisting in the development of affordable housing and providing innovative solutions to meet that need. Since 1994, Providence has secured more than $145 million in project development funding from public and private sources and has created more than 980 units of affordable housing.

iii. **Catholic Courier**

34. Rochester Catholic Press Association, Inc. ("Catholic Courier") was incorporated on July 9, 1951 as a not-for-profit corporation. The Catholic Courier has published a paper for over 130 years and now reaches 130,000 households in the Diocese through print and digital publications. The Catholic Courier provides news concerning ongoing activities within the Church and the international, national, and state level with a focus on events in the Diocese, among the parishes and other Catholic agencies.

35. The affairs, property, business and policies of the Catholic Courier are under the charge, control and direction of the Board of Directors except for those matters subject to the reserved powers of the Members.

[15] Reserved powers pertain to the approval of changes to the mission and by-laws, a voice in the appointment of the Executive, transactions above a certain threshold that could threaten or burden the organization, the sale of all or substantially all of the assets of a corporation, and its dissolution.

iv. **Stella Maris**

36. Camp Stella Maris of Livonia, N.Y. ("Stella Maris") was incorporated on January 8, 1960 as a not-for-profit corporation. The Camp operates at a facility on the shore of Conesus Lake in Livonia, New York.

37. Among Stella Maris's purposes are to promote (under professional direction) the spiritual, moral and physical improvement of children of all classes, races and religions; to undertake to foster strong family relationships in conjunction with Catholic Charities; and to provide facilities, programs and activities for social, spiritual, and mental development of adolescents and youth. Stella Maris offers a week-long residential camp for campers ages 7-15, with leadership and counselor training for 15 and 16-year olds. On average 2,100 youth attend these programs every summer. Stella Maris also offers Day Camps, and year-round programs that provide opportunities for students during school breaks.

38. The affairs, property, business and policies of Stella Maris are under the charge, control and direction of the Board of Directors except for those matters subject to the reserved powers of the Members.

v. **Communis Fund**

39. Communis Fund of the Diocese of Rochester, Inc. ("Communis") was incorporated on December 12, 2005 as a not-for-profit corporation. The purpose of Communis is to receive funds from the Diocese, parishes and organizations which such entities desire to invest which shall be pooled and collectively invested. The benefit of such pooling of assets is for the ability to diversify investment which would be unavailable in a smaller account and to make use of an economy of scale in order to reduce management fees and other costs which might be incidental to investment of smaller amounts. Each participant enters into a written participation

agreement with Communis with respect to the delivery of funds for investment, the investment strategies for the funds as part of collectively invested pools of funds, fees of Communis for administration and management of the collective investment funds, and procedure for return of any proceeds of the invested funds including any investment return after payment of fees.

40. The Board of Directors is responsible for investment, reinvestment and custody of all investment assets of Communis, including but not limited to those held under participation agreements as provided by law. The Board selects investment advisors, monitors performance, and periodically reports to investors and at least annually to the Members. BNY Mellon is the custodian of the Communis funds. Alesco Advisors in Pittsford, New York serves as the investment manager.

41. Communis provides responsible administration and protection of temporal goods as required by Canon Law for the Diocese, Parish Corporations, and other charitable organizations operated in connection with the Diocese.

E. **St. Bernards**

42. St. Bernards School of Theology and Ministry ("St. Bernards") was incorporated on March 31, 1891 pursuant to chapter 519 of the Laws of 1848, as amended by Chapter 51 of the Laws of 1870, by the filing of a certificate of incorporation with the Monroe County Clerk. St. Bernards is a non-member not-for-profit corporation.

43. St. Bernards is governed by a Board of Trustees comprised of not less than five nor more than 25 persons, which includes the Bishop of the Diocese, the Vicar General of the Diocese, the Chancellor of the Diocese (each of such persons serving *ex-officio*), and the President of St. Bernards.

44. St. Bernards owns and operates a graduate school of theology and ministry. Students prepare for work in ministry, teaching, or higher education. St. Bernards offers courses, certificate programs, and graduate degree programs. Courses are provided through several modes of delivery: online, hybrid, videoconferencing or in-person.

45. St. Bernards is not under the fiscal or operating control of the Diocese. St. Bernards has not sought bankruptcy relief and is not a debtor in this bankruptcy proceeding.

## REASONS FOR BANKRUPTCY

46. The Diocese does not seek Chapter 11 relief to shirk or avoid responsibility for any past misconduct by clergy or for any decisions made by the Diocesan authorities when addressing that misconduct. The Diocese does not seek bankruptcy relief to hide the truth or deny any person a day in court. In fact, the Diocese is committed to pursuing the truth and has never prohibited any person from telling his or her story or speaking his or her truth in public. The Diocese has publicly disclosed perpetrators. The Diocese has made and requires criminal referrals to be made for all credible allegations of sexual abuse. Bishop Matano has apologized for the past misconduct of the personnel of the Diocese and meets with victims at every opportunity in an attempt to bring comfort to such individuals, as did his predecessor. The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people.

47. The Diocese is a not-for-profit religious corporation with limited resources, including limited insurance coverage which may be applicable to claims of persons seeking remedies under the Child Victims Act ("CVA"). The Debtor acknowledges its moral obligation to compensate all victims of abuse by church personnel fairly and equitably. Consistent with this moral obligation, it cannot allow any single plaintiff to recover a disproportionate share of the

limited funds available from the Diocese simply because the plaintiff's case goes to trial first. Similarly, the Debtor cannot ignore the valid claims of other creditors who stand on equal footing with the CVA claimants as general unsecured creditors of the Debtor.

48. Beyond the Debtor's obligation to all of its creditors, the Diocese has a fundamental and moral obligation to the Catholic faithful it serves, and to the donors who have entrusted the Diocese with the material fruits of their life's labor, to continue the ministries of the Church in fulfillment of the Debtor's canonical and secular legal purposes. In order to do this, the Diocese must survive.

49. The Debtor's goals in seeking Chapter 11 relief are two-fold: First, to protect and preserve its assets that are properly available for distribution to the Debtor's unsecured creditors along with whatever additional assets can be marshaled so that those assets are distributed equitably to all creditors. Second, the Diocese must continue the work of the Church to the fullest extent possible, using the resources dedicated to that purpose.

50. A swift exit from bankruptcy is of the utmost importance given the Debtor's limited resources and because it is a not-for-profit religious corporation. The Diocese is dependent upon the charity of its faithful to sustain its very existence. The bankruptcy may cast a shadow upon the Debtor, the Parish Corporations, and the various non-debtor Catholic entities and their numerous ministries. Some faithful may believe that, going forward, their charitable gifts to any Catholic entity will be diverted from their intended purpose and used to satisfy the claims of the Debtor's creditors rather than to fund the ongoing ministries of the Church that benefit the faithful and their community. The Debtor will use its best efforts to dispel this misconception by communicating openly and often about the Chapter 11 process. I respectfully

submit that the best way to alleviate any of these concerns is to emerge from Chapter 11 as soon as possible.

I swear, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: September 10, 2019

Rev. Daniel L. Condon
Chancellor

Sworn to before me this
10th day of September, 2019.

Notary Public

SCOTT MOSMAN
Notary Public, State of New York
No. 01MO4832081
Qualified in Monroe County
My Commission Expires April 30, 2023