UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

The Diocese of Rochester,

Debtor.

Case No. 19-20905

Chapter 11

**OBJECTION OF THE DEBTOR
TO THE MOTION OF THE CONTINENTAL INSURANCE COMPANY FOR
RELIEF FROM THE AUTOMATIC STAY TO FILE DECLARATORY JUDGMENT
ACTION REGARDING INSURANCE COVERAGE FOR SEXUAL ABUSE CLAIMS**

The Diocese of Rochester, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), by and through its undersigned counsel, hereby objects (this "Objection") to the *Motion of the Continental Insurance Company for Relief from the Automatic Stay to file Declaratory Judgment Action Regarding Insurance Coverage for Sexual Abuse Claims* [Docket No. 136] (the "Lift Stay Motion"). In support of this Objection, the Debtor respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Debtor's ability to propose a confirmable plan of reorganization in this bankruptcy proceeding will be dependent in large part upon the extent to which the Debtor can avail itself of coverage under various insurance policies issued by seven (7) different insurance carrier groups. The coverage provided under those policies is the largest potential source of recovery to provide recompense to sexual abuse claimants.

2. Now, only two months into the Debtor's bankruptcy, The Continental Insurance Company ("CNA") - a single insurer out of seven - is seeking to short-circuit the collective bankruptcy process to separately litigate in a different forum issues of law and fact that will be relevant to coverage under all of the applicable insurance policies and critical to the Debtor's

3452075.5

reorganization efforts. This Court should deny CNA's Lift Stay Motion because it is premature, unnecessary and not supported by "cause" within the meaning of section 362 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*, the "Bankruptcy Code").

3. Most importantly, stay relief is not appropriate because all litigable issues CNA seeks to pursue on its own in state court can be competently and efficiently addressed and dispensed with by this Court in the context of the adversary proceeding [Adv. Case No. _____] recently commenced by the Debtor in this Court by the filing of a complaint [Adv. Docket No. 1] against all of its insurers seeking to facilitate a global resolution of all insurance coverage issues (the "Global Coverage Adversary").

## BACKGROUND

4. On September 12, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 the Bankruptcy Code with the United States Bankruptcy Court for the Western District of New York (the "Court"), commencing the Debtor's chapter 11 case (this "Chapter 11 Case"). The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for a trustee or examiner has been made in this Chapter 11 Case. On September 26, 2019, the Office of the United States Trustee filed notice of the appointment of an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee"). As of the date of the filing of this Motion, no other official committees have been appointed or designated.

5. Information regarding the Diocese's history, business operations, operational structure, facts supporting this Motion and the events leading up to the Chapter 11 Case can be found in the *Affidavit of Daniel J. Condon in Support of Chapter 11 Petition and First Day*

2

3452075.5

*Pleadings* and the *Affidavit of Lisa M. Passero in Support of Chapter 11 Petition and First Day Pleadings* (collectively, the "First Day Affidavits"), each of which was filed on the Petition Date and is incorporated herein by reference.

6. As set forth in the First Day Affidavits, this Chapter 11 Case was precipitated by an influx of lawsuits naming the Debtor as a defendant with respect to claims arising from alleged sexual abuse following New York State's enactment of the Child Victims Act (the "CVA"), as well as the threat of additional actions and claims based on alleged sexual abuse (the "Underlying Actions and Claims").

7. The Debtor has identified approximately seven (7) different insurance carrier groups (each, an "Insurer" and collectively the "Insurers") who issued to the Debtor, or later acquired responsibility for, one or more primary general liability, umbrella and/or excess liability insurance policies (each a "Policy" and collectively the "Policies") which provide coverage to the Debtor with respect to the Underlying Actions and Claims.

8. Upon information and belief, each of the Policies requires the Insurers to pay on behalf of the Debtor all sums that the Debtor becomes legally obligated to pay as a result of bodily injury, as long as any part of the injury took place, and with regard to certain Policies a claim was made, during the applicable policy period.

9. Upon information and belief, each of the Policies also requires the Insurers to pay defense costs and expenses, including attorney's fees, incurred by the Debtor in the investigation and defense of the Underlying Actions and Claims. This obligation applies even if the allegations against the Diocese are without merit.

10. The Debtor acknowledges that the Policies represent a significant source of potential recovery for abuse victims and that achieving certainty with respect to the scope and

3

3452075.5

Case 2-19-20905-PRW, Doc 218, Filed 11/14/19, Entered 11/14/19 15:29:56, Description: Main Document, Page 3 of 20

extent of coverage available under the Policies is among the more important preconditions to the Debtor's ability to propose a confirmable plan of reorganization in this Chapter 11 Case. Accordingly, prior to the Petition Date, the Debtor notified each of the Insurers of its potential claims under the Policies and requested that the Insurers confirm coverage for both defense and liability with respect to the Underlying Actions and Claims. Following such notification, both prior to and continuing after the Petition Date, the Debtor has attempted to engage with the Insurers to confirm the availability of coverage under the Policies and to discuss any objections or defenses to coverage that might be raised by the Insurers. The Debtor and its attorneys have engaged in initial phone calls and/or conducted in-person meetings with representatives from several Insurers.

11. While many of the Insurers have advanced similar reservations with respect to the availability of coverage under the Policies as a result of, among other things, the passage of time since the alleged incidents giving rise to the Underlying Actions and Claims and the Debtor's alleged knowledge of such incidents, the discussions the Debtor has had to date have been, for the most part, constructive. Accordingly, the Debtor was optimistic that it would be able to avoid the cost of litigating coverage issues and instead negotiate a global consensual resolution with all of the Insurers regarding the availability of coverage for the Underlying Actions and Claims. Even now, having filed the Global Coverage Adversary, the Debtor intends to confer with the Insurers in order to identify and propose a mutually acceptable independent mediator to oversee and assist with settlement negotiations.

12. Unfortunately, and despite the Debtor's attempts to proactively reach out, CNA and its counsel failed to engage in any meaningful discussions with the Debtor to address coverage issues on a consensual and global basis. Instead, through the Lift Stay Motion, CNA

4

3452075.5

Case 2-19-20905-PRW, Doc 218, Filed 11/14/19, Entered 11/14/19 15:29:56, Description: Main Document , Page 4 of 20

now seeks to litigate an issue that it acknowledges will be central to the Debtor's ability to reorganize in this Chapter 11 Case in a separate declaratory judgment action in New York State Supreme Court (Monroe County) (the "<u>NYS Court</u>"). As set forth below, the Debtor respectfully submits that CNA has failed to establish "cause" to justify relief from the automatic stay under section 362 of the Bankruptcy Code and controlling Second Circuit precedent. Moreover, the institution of the Global Coverage Adversary renders any perceived need for stay relief moot by providing a single forum in which all insurance coverage issues can be litigated efficiently in a uniform and comprehensive manner before this Court.

13. As set forth herein, CNA has not established "cause" justifying stay relief. However, in recognition of the importance that resolving coverage issues under the Policies will have on the ultimate outcome of this Chapter 11 Case, and because the Debtor anticipates that the issues raised by CNA in its proposed complaint annexed to the Stay Relief Motion will have a direct impact upon coverage questions with the six (6) other Insurers and their respective Policies, the Debtor has taken the proactive step of filing the Global Coverage Adversary in this Court seeking a declaratory judgment regarding coverage with respect to all of the Policies, thereby providing a single forum to efficiently adjudicate any disputes between the Debtor and the Insurers regarding coverage under the Policies.

14. The Debtor submits that this Court is best-suited to hear and determine all issues relating to the availability of coverage under the Policies and any other disputes that may arise between the Debtor and the Insurers.

15. Having all insurance coverage issues litigated in a single forum in this Court will allow each of the Insurers, the Committee, and all creditors and other potential parties in interest to monitor and, if necessary, participate in such litigation. Lastly, given the importance of the

insurance issues to the Debtor's reorganization efforts, the Debtor respectfully submits that this Court, which will be more familiar with the Debtor's Chapter 11 Case than any other tribunal, is the most appropriate forum to hear and determine all issues between the Debtor and the Insurers.

16. Upon information and belief, the Committee supports the Debtor's Objection as set forth herein and will be filing its own papers in opposition to the Lift Stay Motion.

## **OBJECTION**

17. The Debtor objects to the relief sought in the Lift Stay Motion because the request by CNA is premature and unnecessary, because CNA has not established "cause" for the Court to grant relief from the automatic stay pursuant to section 362 of the Bankruptcy Code and the controlling Second Circuit precedent set forth in *Sonnax Industries Inc. v. Tri Component Products Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280 (2d Cir. 1990), and because the issues CNA seeks relief from the automatic stay to litigate will be appropriately addressed in the context of the Debtor's pending Global Coverage Adversary.

**I.     The Debtor is entitled to the continued protection
of the automatic stay and CNA's Lift Stay Motion is premature.**

18. Section 362(a)(1) of the Bankruptcy Code provides that the filing of a chapter 11 petition "operates as a stay, applicable to all entities, of (1) the commencement or continuation, . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of a case under this title." 11 U.S.C. § 362(a)(1). The automatic stay provides a debtor with a "breathing spell" which is "designed to give the debtor time to organize its affairs." *Teachers Ins. & Annuity Assoc. v. Butler*, 803 F.2d 61, 64-65 (2d Cir. 1986). It affords "one of the fundamental debtor protections provided by the

bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't. of Env. Prot.*, 474 U.S. 494, 503 (1986).

19. This Chapter 11 Case has been pending for just over two months. During that period, the Debtor has diligently pursued a reorganization strategy and attempted to address the very issues CNA seeks relief from the automatic stay to litigate. As described above, the Debtor and its representatives have proactively sought to engage with CNA and the other Insurers on a collective basis regarding insurance coverage issues common to each of the Policies. This is precisely the sort of non-judicial and global resolution of issues that are inherent in the formulation of many chapter 11 plans and which the automatic stay is meant to encourage. The Court should reject CNA's attempt to short-circuit this negotiation process by allowing CNA to individually litigate issues common to all of the Debtor's Policies in a separate forum.

20. In light of the short pendency of this Chapter 11 Case and the Debtor's efforts to date to address issues common to both CNA and the other Insurers, the Debtor respectfully submits that CNA's Lift Stay Motion is premature and should be denied.

**II.   CNA has not met its burden of demonstrating cause to lift the
       automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code.**

21. As the Second Circuit recognized in *Sonnax*, section 362(d)(1) of the Bankruptcy Code provides that the appropriate standard required to justify granting a party relief from the automatic stay to pursue a judicial proceeding. *Sonnax* 907 F.2d at 1285. That section provides, in relevant part:

> "(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . (1) for cause, . . ."

11 U.S.C. § 362(d)(1).

3452075.5

22. "Section 362(d)(1) requires an initial showing of cause by the movant. . . [i]f the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *Sonnax*, 907 F.2d at 1285. The Bankruptcy Code does not define the term "cause," however, the Second Circuit has approved of a number of factors that courts should consider when assessing whether "cause" exists to justify stay relief to allow litigation outside of the bankruptcy court. *Id.* at 1286. Those factors are:

(1) whether relief would result in a partial or complete resolution of the issues;
(2) lack of any connection with or interference with the bankruptcy case;
(3) whether the other proceeding involves the debtor as a fiduciary;
(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
(5) whether the debtor's insurer has assumed full responsibility for defending it;
(6) whether the action primarily involves third parties;
(7) whether litigation in another forum would prejudice the interests of other creditors;
(8) whether the judgment claim arising from the other action is subject to equitable subordination;
(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
(10) the interests of judicial economy and the expeditious and economical resolution of litigation;
(11) whether the parties are ready for trial in the other proceeding; and
(12) impact of the stay on the parties and the balance of harms.

*Id*.

23. In support of its Lift Stay Motion, CNA relies primarily on three of the *Sonnax* factors, specifically the tenth, seventh, and twelfth factors. *See* Lift Stay Motion at ¶¶ 13-18.

8

3452075.5

However, properly analyzed in the context of this Chapter 11 Case and in light of the pending Global Coverage Adversary, none of the three factors relied upon by CNA, nor the remaining nine factors, on balance, support a finding of "cause" to grant relief from the automatic stay.

### A. Factor 10 - The interests of judicial economy and the expeditious and economical resolution of litigation favor keeping the automatic stay in place and litigating any disputes in this Court.

24. CNA suggests that judicial economy is favored by litigating its coverage issues in the NYS Court solely because that court can enter final judgment whereas, because CNA proposes to limit its action to issues of state law, CNA takes the position that this Court lacks the authority to enter final judgment. As discussed in more detail below, the Debtor believes that CNA has grossly oversimplified the analysis of whether or not this Court can enter final judgment in a dispute over coverage under the Policies. Even if CNA's position is ultimately correct, that should hardly be the only factor considered in determining how the Debtor's insurance issues can be most effectively litigated. Significantly more important, in the Debtor's view, is the efficiency to be gained by litigating the coverage issues of all seven (7) Insurers in a single unified action that can simultaneously address the many common issues of fact and law that will be presented in each dispute, as opposed to doing so in more than half a dozen individual actions in multiple courts. The Global Coverage Adversary provides this Court with a pending declaratory judgment action that will allow for the resolution of all insurance issues in an efficient and uniform manner.

25. One of the primary benefits of a chapter 11 proceeding is that it provides a single forum for adjudication and resolution of the numerous issues affecting a debtor's business and its ability to reorganize, including, as applicable here, issues with respect to debtor's rights to insurance coverage and its duties and obligations under the Policies. As indicated above, the

Debtor is attempting to broker a global resolution with its insurers which will serve as a significant source of funding for a chapter 11 plan. The automatic stay provided by the Bankruptcy Code is intended to foster just this kind of negotiation between interested parties, and the Debtor should be allowed a reasonable opportunity to pursue this strategy through mediation of the claims asserted in the Global Coverage Adversary.[1]

26. Even if it turns out that a global resolution cannot be consensually achieved and litigation becomes necessary to resolve coverage disputes under the Policies, the Debtor submits that such litigation can be handled much more efficiently in this Court via the Global Coverage Adversary than in piecemeal litigation elsewhere. Although each of the Policies is a separate contract with a different counterparty, upon information and belief most of the Policies were written on standard forms and therefore contain similar if not identical language. There are accordingly a number of common issues of law and fact that will be critical to interpreting each of the Policies and the operative terms utilized therein, as well as adjudicating any defenses or objections to coverage that may be raised by CNA or any of the other Insurers.[2] Also, in some instances, there may be disputes between and among the various Insurers as to whose coverage is primary, which can also be most efficiently resolved in a single action in this Court. Litigation

---

[1] Indeed, in *In re Purdue Pharma, L.P.* the United States Bankruptcy Court for the Southern District of New York recently recognized the efficiencies that can be achieved by having all interested parties to come together in a single forum to address their disputes when Judge Drain entered a series of orders temporarily enjoining certain governmental entities from continuing to pursue claims against the Debtor and its affiliates in various state court actions in order to facilitate negotiations regarding a chapter 11 plan of reorganization. S.D.N.Y Case No. 19-23649, Adv. Pro. 19-08289 [Docket Nos. 82, 89 and 105].

[2] For example, the Debtor anticipates that a critical factor in determining the amount of available coverage under all of the Policies will be the interpretation and meaning of the term "occurrence" as it pertains to injuries suffered as a result of abuse. In light of the fact that the Policy language is similar if not identical from one Policy to the next, that term should be given consistent application across all Policies. Several issues such as the interpretation of "bodily injury," the proper calculation of the amount of limits at issue, the legal standard for fact-based defenses such as "expected or intended" are all common questions that will have to be resolved and are important to the Debtor and all implicated Insurers.

with each of the seven (7) Insurers in individual cases and possibly even spanning across separate fora would be time consuming, unwieldly, and would potentially risk inconsistent and even contradictory results from one case to the next. On the contrary, this Court is fully competent to hear and determine all issues that may arise between the Debtor on the one hand and one or more Insurers on the other and can efficiently resolve these issues for all of the Policies in the context of the pending Global Coverage Adversary.

27. Not only are certain issues common to one or more Insurers, some are likely to be contested between the Insurers such that permitting CNA to litigate separately would prejudice the other Insurers. For example, although the Debtor believes New York law is clear that each incident of abuse is a separate occurrence, *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 21 N.Y.3d 139, 150 (2013), the Insurers are likely to disagree even amongst themselves. Because CNA issued years of primary policies, many with reasonably low limits of liability, it is likely to seek a ruling that there was a single occurrence and, therefore, the Debtor can only access its limits once. Other Insurers, however, issued policies that include a self-insured retention (that functions like a deductible) and are therefore likely to support an argument for multiple occurrences, thereby requiring the Debtor to satisfy the self-insured retention for each occurrence separately before reaching insurance proceeds. Additionally, CNA may seek to dispute which policy period certain claims fall under – a heavily fact-dependent question that an Insurer in the neighboring policy period is more likely to dispute than the Debtor is. A single, comprehensive action is thus more efficient and more equitable than permitting CNA to litigate these issues without permitting the other Insurers to participate.

28. Also, as the court overseeing the Debtor's Chapter 11 Case, this Court will be more familiar with the Debtor, its business and history, and the facts and circumstances

3452075.5

Case 2-19-20905-PRW, Doc 218, Filed 11/14/19, Entered 11/14/19 15:29:56, Description: Main Document , Page 11 of 20

surrounding the Underlying Actions and Claims than any other court or finder of fact. Accordingly, this Court is in the best position to resolve any coverage disputes in an efficient and consistent manner.

29. CNA suggests in its Lift Stay Motion that litigation of insurance coverage issues in this Court would be inefficient because CNA claims that such issues are not "core" and that this Court therefore lacks the authority to enter final judgment. Lift Stay Motion at ¶ 16. Although the Debtor does not concede this point, and indeed submits that Second Circuit case law suggests otherwise,[3] the Debtor submits that, even if CNA were right, that does not necessarily mean these issues could be more efficiently resolved in another forum. First, pursuant to 28 U.S.C. § 157(c)(2), the parties can always submit to the jurisdiction of this Court to enter a final order. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015). Second, pursuant to 28 U.S.C. § 157(c)(1), this Court can submit findings of fact and conclusions of law to the District Court for *de novo* review and entry of final judgment. As a third option, if CNA or any of the other defendants in the Global Coverage Adversary are unwilling to consent to this Court's jurisdiction and concerned that it would be inefficient for this Court to issue proposed findings of fact and conclusions of law for the District Court's review, they could always seek to have the standing reference to this Court withdrawn and have the Global Coverage Adversary heard in the District Court.

---

[3] *See*, *e.g.*, *United States Lines, Inc. v. American S.S. Owners Mut. Protection & Indemn. Ass'n. (In re United States Lines)*, 197 F.3d 631 (2d Cir. 1999) (declaratory action by Trust in its capacity as successor to debtor under confirmed chapter 11 plan seeking to establish insurer's coverage obligations was a "core" proceeding where determination of availability of insurance was necessary to effectuate an equitable distribution of the bankruptcy estate and potential insurance proceeds represented the only funds available to pay mass tort personal injury claims; *accord Cohen v. National Union Fire Ins. Co. (In re County Seat Stores)*, 2002 U.S. Dist. LEXIS 1555 (S.D.N.Y. Jan. 31, 2002) (action to determine coverage under D&O policy was "core" where the bankruptcy court would have great difficulty administering an orderly and equitable distribution of the estate's assets without determining whether coverage was available).

12

30. Accordingly, and especially in light of the pending Global Coverage Adversary which will address all of the issues that CNA seeks to litigate in its proposed declaratory judgment action in the NYS Court, the Debtor respectfully submits that judicial economy is best served, and an expeditious resolution of the dispute at issue can be most efficiently achieved, by maintaining the automatic stay in place and allowing the Global Coverage Adversary to go forward in this Court.

### B. Factor 7 – Litigation in another forum would potentially prejudice the interests of creditor beneficiaries of the Policies, other Insurers and third parties.

31. CNA suggests that litigation of its claims in the NYS Court will not prejudice the interests of creditors who may have an interest in the Policies. That is incorrect.

32. For the same reason that all of the Debtor's insurance issues are more efficiently resolved in the pending Global Coverage Adversary before this Court, all parties (other than CNA) with an interest in the Debtor's coverage disputes will be forced to incur greater costs, and potentially risk inconsistent or conflicting decisions, if CNA is allowed to litigate its coverage dispute separately from that of the other Insurers. This is true not only of abuse claimant creditors who may be the direct beneficiaries of any recovery under the Policies, but also with respect to other Insurers who will be forced to monitor and/or seek to intervene in any litigation by CNA to protect against issues of collateral estoppel, and with respect to parishes and other third parties who may have an interest in the Policies as co-insureds. Requiring each of these parties to monitor and participate in multiple litigation matters, when they could be more efficiently and consistently adjudicated in a single action, will clearly require the expenditure of additional time and funds, to the prejudice of such creditors and other Insurers and third parties.

3452075.5

33. Moreover, the Committee, which represents the creditor constituency with the most direct interest in any recovery under the Policies, has filed its own objection to the Lift Stay Motion and, upon information and belief, the majority of Insurers other than CNA support the Debtor's preferred approach of attempting to resolve all insurance issues consensually and litigating, if necessary, any disputes as part of the Global Coverage Adversary.

**C. Factor 12 – The balance of harms favors keeping the automatic stay in place.**

34. CNA suggests in its Lift Stay Motion that the balance of the harms favors lifting the stay by attempting to craft a false dichotomy between keeping the stay in place and resolving issues related to coverage under the CNA Policies. By seeking to maintain the stay, the Debtor is certainly not "putting off the inevitable" as CNA argues, but is instead seeking to adjudicate all insurance coverage disputes, including those with respect to CNA's Policies, in a single forum in the most efficient manner possible via prosecution of the pending Global Coverage Adversary, thereby eliminating the need for any party to seek relief in any other court. The Debtor respectfully submits that mediation of all coverage issues under the auspices of the Global Coverage Adversary will encourage multilateral negotiations and significantly reduce the number of open issues for trial, thus resulting in increased efficiencies and a reduced risk of inconsistent or conflicting decisions. Accordingly, the Debtor respectfully submits that the balance of harms clearly weighs in favor of maintaining the automatic stay in place.

35. Moreover, CNA has not identified any real harm that it would suffer if the automatic stay remains in place, especially in view of the pending Global Coverage Adversary before this Court. The CNA Policies at issue relate to coverage for incidents occurring between 1943 and 1977. There should be no dispute at this point in time that whatever CNA's liability under the Policies may be, it has been fixed for over four (4) decades. Moreover, CNA will not

14

3452075.5

be required to make payment with respect to those Policies absent either its agreement to enter into a voluntary settlement with the Debtor or a decision in the Global Coverage Adversary in favor of the Debtor. Therefore CNA suffers no harm by the continuation of the automatic stay.

**D. Factor 2 – The proposed action by CNA is directly connected with the Debtor's Chapter 11 Case and will interfere with the Debtor's ongoing efforts to address its insurance coverage issues.**

36. CNA admits, as it must, that issues regarding the availability and extent of the Debtor's coverage under the Policies are critical to the Debtor's Chapter 11 Case and reorganizational efforts. CNA then attempts to downplay this connection by arguing that the issues it seeks to litigate are "not dependent in anyway [sic] upon any bankruptcy issue." Lift Stay Motion at ¶ 21.

37. While CNA may be correct that litigation of insurance issues will turn primarily on questions of state law, it does not follow that such litigation, even if limited to issues of state law, will not interfere with the Debtor's Chapter 11 Case. As discussed throughout this Objection, the Debtor is attempting to resolve issues common to all of its seven (7) Insurers. The Debtor had hoped that those coverage issues could be addressed without resort to litigation. Unfortunately, CNA's decision to immediately seek stay relief rather than engaging with the Debtor would seem to indicate that CNA is not interested in reaching a consensual resolution of these issues with respect to its Policies. If CNA is allowed to pursue this litigation independently, while the Debtor continues to engage in negotiations with its other Insurers, any coverage determinations made by the NYS Court may adversely impact the course of those negotiations. Instead, the Debtor respectfully submits that the best approach to resolving its insurance issues with the least disruption to this Chapter 11 Case would be to keep the automatic stay in place while the Debtor continues to negotiate with CNA and the other Insurers with the

15

assistance of a court-appointed mediator. To the extent those negotiations reach an impasse, any outstanding issues can be addressed as part of the pending Global Coverage Adversary.

> **E.  Factor 1 – A complete resolution of the issues is best achieved by maintaining the automatic stay in place.**

38. Either this Court or the NYS Court could capably resolve any coverage disputes between CNA and the Debtor. However, only this Court, through the Global Coverage Adversary, can at the same time address very similar issues that will likely arise with respect to the Policies issued by each of the Debtor's six (6) other Insurers. Accordingly, a complete resolution of all insurance coverage issues is best achieved by maintaining the automatic stay in place and resolving any issues which cannot be consensually resolved in the Global Coverage Adversary.

> **F.  Factor 4 – There is no specialized tribunal established to hear insurance coverage claims and this Court is fully capable of evaluating the relevant legal and factual issues**

39. CNA concedes that "there is no specialized tribunal established to hear state law insurance coverage disputes" while postulating that "[a] non-bankruptcy court is likely to be able to consider such a dispute skillfully and efficiently." Lift Stay Motion at ¶ 22. While this is perhaps true, the availability of another forum that might be able to competently resolve an issue does not establish cause to lift the automatic stay. CNA does not assert that the NYS Court is in any way *more* capable than this Court would be in ruling on insurance coverage claims, and in the absence of any specialized tribunal, "Bankruptcy courts are often called upon to apply state laws in resolving claims against the estate." *Grayson v. Worldcom, Inc. (In re Worldcom, Inc.)*, 2006 U.S. Dist. LEXIS 55284 (S.D.N.Y. August 4, 2006) (affirming bankruptcy court's denial of

motion for relief from the automatic stay where no specialized tribunal was established or necessary to adjudicate movant's state-law claims).

40. Moreover, although CNA suggests that the "commercial division" of the NYS Court possesses the requisite sophistication to adjudicate the coverage issues it intends to raise, upon a review of the New York Uniform Civil Rules for the Supreme Court it is not clear that any insurance dispute between the Debtor and CNA would be assigned to the commercial division. *See* 22 N.Y. C.R.R. 202.70(c) ("The following will not be heard in the Commercial Division . . . (2) cases seeking a declaratory judgment as to insurance coverage for personal injury . . .). Accordingly, there is good reason to believe that this Court is better equipped than a NYS Court of general jurisdiction to evaluate the complicated legal and factual issues which will arise in the context of any litigation over the Debtor's insurance coverage. Additionally, keeping any litigation in federal court will allow this Court to monitor its progress and ensure that it does not become unnecessarily protracted or delayed and thereby adversely affect the Debtor's ability to timely reorganize its affairs.

### G. Factor 6 – The action proposed by CNA is one directly against the Debtor, but could have collateral implications for third parties

41. As CNA admits, the fact that it is seeking to assert claims directly against the Debtor, as opposed to seeking relief primarily from third parties, weighs against lifting the automatic stay. Lift Stay Motion at ¶ 23. Moreover, as described above, an action by CNA solely against the Debtor, if it were allowed to proceed as requested by CNA in the NYS Court, could have collateral implications for third parties who would not necessarily have an opportunity to participate in CNA's action. Accordingly, the Debtor respectfully submits that this factor weighs against stay relief.

**H. Factor 11 – Trial readiness concerns do not weigh in favor of granting relief from the automatic stay.**

42. The only pending action at this time is the Global Coverage Adversary, through which the Debtor intends to address the very same issues that CNA seeks to litigate in the NYS Court. Accordingly, this is not a situation where the Debtor is seeking to delay resolution of an issue, or where the imposition of the automatic stay will cause logistical or other hardships for any party with respect to trial preparation and readiness, and this factor does not support a finding of cause to lift the automatic stay.

**I. Factors 3, 5, 8 and 9 – The remaining *Sonnax* factors are inapplicable and do not support a finding of cause to lift the automatic stay.**

43. The remaining *Sonnax* factors can be characterized as "one-way" factors in the sense that they relate to various factual scenarios which, if present, could influence a court toward or against a finding of cause to lift the automatic stay but which do not by their mere absence suggest the opposite result. Because the factual scenarios contemplated by those factors are not present here, these remaining factors are inapplicable to the Court's determination as to whether cause exists to lift the automatic stay.

**III. The pending Global Coverage Adversary obviates any need for stay relief.**

44. In addition to the fact that an analysis of the *Sonnax* factors makes it clear that "cause" does not exist to justify granting CNA relief from the automatic stay, such relief is also wholly unnecessary because the issues CNA seeks to address in its proposed declaratory action in the NYS Court are duplicative of, and will necessarily be addressed and adjudicated in connection with, the Global Coverage Adversary recently filed by the Debtor.

45. Where, as here, a motion seeks relief from the automatic stay in order to pursue litigation concerning issues which are already pending, and can be capably litigated, in the

18

bankruptcy court or another forum, courts have denied stay relief. *See*, *e.g.*, *In re Lehman Brothers Holdings Inc.*, 435 B.R. 122, 137-39 (S.D.N.Y. 2010) (affirming bankruptcy court's denial of stay relief when issue to be litigated was already on appeal to the Ninth Circuit); *In re Enron Corp.*, 306 B.R. 465, 476-77 (Bankr. S.D.N.Y. 2004) (finding no "cause" to justify lifting the automatic stay where "[t]he issues to be determined . . . appear to be similar to issues already raised in connection with these bankruptcy cases."). Indeed, on facts very similar to those presently before the Court, the *Enron* court determined that stay relief was not appropriate where the party seeking relief from the automatic stay sought to resort to a state court forum to litigate issues as to the validity certain contractual agreements that were substantially similar to the "issues that [the debtor] is seeking to resolve with all of its various counterparties" and where the debtors' interest in the outcome of litigation already pending in the form of an adversary proceeding in the bankruptcy court "represents one of the largest assets of the debtors' estates."). *Id*.

46. Moreover, the first-filed doctrine recognized by the Second Circuit favors a denial of the Lift Stay Motion and the resolution of all insurance coverage issues in this Court pursuant to the Global Coverage Adversary. "'[W]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience . . . or . . . special circumstances . . . giving priority to the second.'" *Adam v. Jacobs*, 950 F. 2d 89, 92 (2d Cir. 1991) (quoting *First City Nat'l Bank and Trust Co. v. Simmons*, 878 F.2d 76, 80 (2d Cir. 1989)). There is no reason of convenience or other special circumstances which would suggest that the NYS Court is a more appropriate forum for litigation over the CNA Policies than the pending Global Coverage Adversary in this Court. Accordingly, the Global Coverage Adversary, as the first-filed action, should be given priority and the Lift Stay Motion should be denied.

19

3452075.5

Case 2-19-20905-PRW, Doc 218, Filed 11/14/19, Entered 11/14/19 15:29:56, Description: Main Document , Page 19 of 20

**WHEREFORE**, in light of the foregoing, the Debtor respectfully submits that there is no cause to lift the automatic stay and that such relief is unnecessary and would interfere with, rather than promote, the efficient resolution of the Debtor's Chapter 11 Case. Accordingly, the Debtor respectfully requests that the Court enter an order denying the Lift Stay Motion and providing such further relief as the Court may deem just and proper.

Dated: November 14, 2019

BOND, SCHOENECK & KING, PLLC

By: /s/ Stephen A. Donato
Stephen A. Donato
Charles J. Sullivan
Grayson T. Walter
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
sdonato@bsk.com
csullivan@bsk.com
gwalter@bsk.com

Ingrid C. Palermo
350 Linden Oaks, Third Floor
Rochester, New York 14625-2825
Telephone: (585) 362-4700
ipalermo@bsk.com

*Proposed Attorneys for the Diocese of Rochester*