# EXHIBIT 6

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2290451

Book    Page    CIVIL

Return To:
LEANDER LAUREL JAMES IV

No. Pages: 25

Instrument: COMPLAINT

Control #:        201912100878
Index #:          E2019011585

Date: 12/10/2019

Time: 1:05:14 PM



St. John The Evangelist Church a/k/a St. John the Evangelist
Church of Greece, a religious corporation

Total Fees Paid:                    $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

ADAM J BELLO

MONROE COUNTY CLERK

SUPREME COURT STATE OF NEW YORK
COUNTY OF MONROE

----------------------------------------------x

▅▅▅▅▅▅▅▅▅▅▅

          *Plaintiff*,                    **VERIFIED COMPLAINT**
                                         INDEX N0.

        v.

ST. JOHN THE EVANGELIST CHURCH
(a/k/a "St. John the Evangelist Church of
Greece"), a religious corporation,

          *Defendant.*

----------------------------------------------x

        Plaintiff, ▅▅▅▅▅▅▅▅▅▅▅, by and through undersigned counsel, brings this action

against ST. JOHN THE EVANGELIST CHURCH (a/k/a "St. John the Evangelist Church of

Greece"), and alleges, on personal knowledge as to himself and on information and belief as to all

other matters, as follows:

## I.   JURISDICTION AND VENUE

    1.    This Court has personal jurisdiction over the Defendant pursuant to CPLR § 301

and § 302, because Defendant resides in the State of New York and committed tortious acts within

the State.

    2.    Jurisdiction is proper because this Complaint seeks monetary damages in excess of

$25,000.00, exclusive of interest, costs, and attorney's fees.

    3.    Venue is proper in this Court pursuant to CPLR § 503. The Defendant St. John the

Evangelist Church, a/k/a St. John the Evangelist Church of Greece, has its principal place of

business in Monroe County. The acts and omissions giving rise to this Complaint also occurred in

Monroe County.

1

4. Plaintiff brings this suit within the extended time period as provided for in Sections 208 and 214-G of the Civil Practice Law.

## II. PARTIES

5. Plaintiff███████████ is an adult resident of the State of New York, residing in Monroe County, New York and is otherwise *sui juris*.

6. Defendant St. John the Evangelist Church (hereinafter "St. John the Evangelist") is a Roman Catholic parish within and under the authority of The Diocese of Rochester and is a religious corporation organized pursuant to the Religious Corporations law with a principal place of business at 2400 West Ridge Road, Rochester, New York 14626, in Monroe County, New York. Said Defendant can be served by delivering the summons and complaint to Bishop Salvatore Matano, the president of the corporation and, therefore, an officer of the same, or to said Defendant's attorney, Philip G. Spellane of Harris Beach PLLC at 99 Garnsey Road, Pittsford, New York 14534, whom said Defendant has also authorized to accept service of process.

7. The provisions of Section 1602 of the CPLR do not apply to the within action including nondelegable duty and/or the doctrine of respondeat superior.

## III. FACTUAL ALLEGATIONS

### a) Plaintiff ███████████ Introduction to Fr. Robert O'Neill; the Abuse

8. At all times material, Plaintiff ███████████ revered and trusted the Roman Catholic Church, The Diocese of Rochester, the Bishop of The Diocese of Rochester, priests, Fr. O'Neill, and all Roman Catholic clergy. Plaintiff was raised in a devout Roman Catholic family, regularly celebrated mass, received the sacraments, and participated in church-related activities. His family attended St. John the Evangelist Church in Rochester, New York. Plaintiff was baptized, received first communion and gave first confession, all at St. John the Evangelist.

2

Plaintiff was taught to believe priests, including Fr. O'Neill, were special, sacred, pure and better than lay people. He was taught to trust priests, to do what they said and to never disparage them.

9.    At the time of the events described herein, Defendant St. John the Evangelist was the legal owner and/or tenant/occupier of the church located at 2400 West Ridge Road, Rochester, New York 14626.

10.    At the time of the events described herein, in approximately 1979, Fr. Robert F. O'Neill was a priest in residence at Defendant St. John the Evangelist. Although he was serving on the Diocesan Tribunal at the time, Fr. O'Neill lived in the Rectory of St. John the Evangelist and often attended and performed Mass there. Fr. O'Neill is listed in the 1980 Official Catholic Directory as being a priest in residence at St. John the Evangelist in Greece, New York. Due to publication delay, the Official Catholic Directory for 1980 reflects 1979 priest assignments.

11.    Plaintiff             first met Fr. O'Neill at St. John the Evangelist while attending Mass with his family. Fr. O'Neill was standing in the back of the church. After the service, he approached Plaintiff and initiated a conversation about the Church and the Catholic faith, discussing communion, confession and prayer with Plaintiff.

12.    A few weeks later, Plaintiff again saw Fr. O'Neill in the back of St. John the Evangelist while attending Mass with his family. Fr. O'Neill again approached him, this time inviting him to dinner at the Rectory. Plaintiff accepted; he was intimidated by the priest but considered it an honor to be chosen. The next weekend, Plaintiff went to dinner at the Rectory at Defendant St. John the Evangelist. Fr. O'Neill made steaks and offered Plaintiff wine; Plaintiff was approximately fourteen years old at the time of this dinner. Fr. O'Neill had several glasses of whiskey. Before dinner, Fr. O'Neill engaged the Plaintiff in prayer and again talked to Plaintiff about prayer, confession, and communion.

3

13. Several weeks later, Fr. O'Neill again approached Plaintiff at St. John the Evangelist; this time, he invited Plaintiff to join him and several other boys on a trip to a cabin near Chaumont, New York. Plaintiff's parents trusted Fr. O'Neill and allowed Plaintiff to go the following Friday. Fr. O'Neill picked Plaintiff up from his house in a big, red Buick along with other boys. On the way to the cabin, Fr. O'Neill stopped in Oswego to buy food and beer for himself and the boys.

14. When they got to the cabin, Plaintiff and the other boys did yard work while Fr. O'Neill prepared "happy hour," which consisted of cheese, crackers, and beer. The boys then went outside to swim and hang out while Fr. O'Neill prepared dinner. After dinner, everyone went for a walk in the woods. When they got back to the cottage, they played games and drank until bedtime.

15. At the cabin, Fr. O'Neill performed many priestly functions. For example, Fr. O'Neill offered to hear confession for any of the boys. He also offered the boys communion, using a chalice and wafers on a flat, silver tray. Fr. O'Neill gave a twenty-minute Mass and led the boys in prayer. During these events, Fr. O'Neill wore a priest's white stole, which had religious symbols on it.

16. When it came time for bed, Fr. O'Neill instructed Plaintiff to sleep in his bed with him. About twenty minutes after Plaintiff laid down to sleep, Fr. O'Neill began touching him, moving his hands down Plaintiff's side and around to Plaintiff's penis. When Plaintiff moved onto his stomach in an effort to stop Fr. O'Neill from touching his penis, Fr. O'Neill put his finger inside Plaintiff's rectum. Fr. O'Neill masturbated himself next to Plaintiff, grunting and breathing heavily. This continued for approximately ten minutes and then Fr. O'Neill climaxed and fell asleep. The next morning, Fr. O'Neill drove Plaintiff and the rest of the boys home.

17.     Later that summer of 1979, Fr. O'Neill approached Plaintiff's mother about having Plaintiff accompany him on a trip to New York City. Fr. O'Neill was attending a church conference and said he had an extra ticket. Plaintiff didn't want to go with Fr. O'Neill, but his mother insisted.

18.     On their first night in New York City, Fr. O'Neill took Plaintiff to an erotic revue called "Oh! Calcutta!" This play is known for being sexually explicit and has extended scenes of total nudity. On their way back to the hotel from the play, Fr. O'Neill pointed out to Plaintiff anything he saw that was sexually related. When they passed by an erotic shop, Fr. O'Neill asked Plaintiff if he wanted to go in and look around. Plaintiff was confused and uncomfortable.

19.     When they got back to the hotel, Fr. O'Neill began drinking and insisted that Plaintiff also have a drink. Fr. O'Neill also insisted that they use one bed to hold their luggage and the other for sleeping. When it came time for bed, Fr. O'Neill repeated the abuse he inflicted upon Plaintiff at the cabin. Fr. O'Neill touched Plaintiff under his clothing, stroking Plaintiff's genitals while masturbating himself. When Plaintiff moved to his stomach, Fr. O'Neill inserted his finger in Plaintiff's rectum. Fr. O'Neill masturbated himself until climax and then fell asleep.

20.     As with the trip to his cabin, Fr. O'Neill engaged in traditional priestly duties while with Plaintiff on the trip to New York City. He attempted to give confession to Plaintiff, but Plaintiff refused to participate, anticipating that Fr. O'Neill would try to talk about sexual topics. Fr. O'Neill also said prayers before he and Plaintiff ate anything. As part of their site-seeing excursions, Fr. O'Neill took Plaintiff to a large Catholic church near the theater where they saw "Oh! Calcutta!"

21.     As a direct and proximate result of Fr. O'Neill's offensive and unwanted sexual touching, Plaintiff              has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress,

5

embarrassment, loss of self-esteem, humiliation, psychological injuries, loss of ability to engage in gainful activity, loss of income and other damages, past and future.

22.     As a direct and proximate result of Fr. O'Neill's offensive and unwanted sexual touching, Plaintiff                    has been prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of his life.

23.     As a direct and proximate result of Fr. O'Neill's offensive and unwanted sexual touching, Plaintiff                    has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

24.     Around 2002, when the below-mentioned allegations about Fr. O'Neill came to light in the public, Plaintiff reported to his mother that Fr. O'Neill had sexually assaulted him as a minor. At that time, he also informed The Diocese of Rochester, who paid for him to receive counseling. Plaintiff spoke with a victim assistance coordinator at The Diocese who admitted that The Diocese had knowledge that Fr. O'Neill had engaged in sexually abusive behavior with boys. After approximately three months, The Diocese cut off payment to          therapist without warning.

## a) Defendant St. John the Evangelist's Responsibility for the Abuse Committed by Fr. O'Neill

25.     At all times relevant to the allegations set forth herein, Fr. O'Neill was a priest employed, trained, supervised, and managed by the Defendant St. John the Evangelist Church and was an employee and/or agent for said Defendant. All acts and omissions of Fr. O'Neill were done in the course and scope of his employment and/or agency for Defendant St. John the Evangelist.

26.     The Diocese of Rochester ordained Fr. Robert F. O'Neill as a Roman Catholic priest on June 2, 1962. Upon ordination, The Diocese of Rochester assigned Fr. O'Neill to serve

6

as associate pastor at Church of the Nativity of the Blessed Virgin Mary in Brockport, New York. He remained in that position until 1967 when The Diocese of Rochester transferred Fr. O'Neill to Holy Cross Church in Rochester, New York.

27. Fr. O'Neill served as an associate pastor at Holy Cross Church and leader of the Charlotte Teen Council until June 1973, when he was elected to the Diocesan Tribunal. The Diocesan Tribunal is a judicial forum tasked with adjudicating parishioner rights under canon law, particularly marital disputes, including marital/sexual issues. Fr. O'Neill became the Officialis, or Chief Judge, of the Diocesan Tribunal in June 1974. Fr. O'Neill served on the Diocesan Tribunal for many years while also performing pastoral duties at various parishes within The Diocese of Rochester. Upon information and belief, while Fr. O'Neill was serving on the Diocesan Tribunal and living in residence at St. John the Evangelist Church, he also performed pastoral duties for St. John the Evangelist.

28. In June 1980, Fr. O'Neill was elected Vice President of the Diocesan Priests' Council. He became the Council's President in June 1981.

29. In April 1983, Fr. O'Neill was elected President of the New York State Priests' Council. While Fr. O'Neill was serving in these adjudicatory roles for The Diocese of Rochester and the State Priests' Council, Fr. O'Neill lived in residence at various parishes within The Diocese of Rochester, including at St. Boniface Church and, beginning in 1979, at Defendant St. John the Evangelist Church.

30. In June 1987, The Diocese of Rochester assigned Fr. O'Neill to work as a pastor at the Church of the Annunciation, located at 1754 Norton St., Rochester, NY, 14609. Fr. O'Neill was also affiliated with Bishop Kearney High School and the local Boy Scout of America programs at this time.

31.     In 1993, the Diocese appointed Fr. O'Neill to a second six-year term as pastor at Church of the Annunciation. He briefly took a sabbatical between March and June of 1995 for undisclosed reasons.

32.     In 1996, The Diocese of Rochester assigned Fr. O'Neill to serve as co-administrator of St. Philip Neri Church while also continuing his duties as pastor at Church of the Annunciation.

33.     In 1998, The Diocese of Rochester transferred Fr. O'Neill to serve as the administrator of St. Christopher Church in Chili, NY and in April 1999, The Diocese appointed Fr. O'Neill as pastor of St. Christopher Church.

34.     In June 2001, The Diocese of Rochester removed Fr. O'Neill from his pastorate, citing his declining health as the reason for his removal. Fr. O'Neill officially retired in May 2002.

35.     Around that same time, in May 2002, three men accused Fr. O'Neill of sexual misconduct and sexual abuse when the men were children during the 1970s and 1980s. After investigating these claims and deeming them credible, The Diocese of Rochester placed restrictions on Fr. O'Neill. He could no longer participate in any ministry, wear clerical clothing, or reside in parish or Diocesan housing. Seven additional survivors of Fr. O'Neill joined the lawsuit in June 2002.

36.     Through this lawsuit, details about the Diocese's and the parishes' knowledge of Fr. O'Neill's crimes were uncovered by the press. Notably, two minor parishioners accused Fr. O'Neill of sexual misconduct between 1977 and 1981; the fathers of these parishioners jointly sent a letter to Dennis Hickey, the Auxiliary Bishop of The Diocese of Rochester from 1968 to 1990.

37.     According to Michael Tedesco, the spokesman for The Diocese of Rochester at the time the above-mentioned lawsuit was filed, the Diocese investigated a complaint about Fr. O'Neill in the 1970's involving inappropriate behavior with a minor. The Diocese sent O'Neill

away for treatment at an undisclosed location but did not remove him from ministry nor place any restrictions on his access to and interaction with minors.

38.     The Diocese of Rochester received parishioner complaints about Fr. O'Neill for years. In 1972, parishioners at Holy Cross Church approached The Diocese of Rochester with concerns that O'Neill was heavily drinking and acting inappropriately with boys. Fr. O'Neill was removed from his position at Holy Cross shortly thereafter and elected to the Diocesan tribunal.

39.     Three boys molested by Fr. O'Neill and another priest in The Diocese of Rochester approached former Bishop Matthew Clark in approximately 1980 and explained to Bishop Clark in detail that Fr. O'Neill had sexually molested them. At that time, Fr. O'Neill was a priest in residence at Defendant St. John the Evangelist.

40.     Fr. O'Neill reportedly had many people stay with him in residence at his assigned churches throughout his ministerial career, including at least one teenage boy during the 1980s, when he was in residence at Defendant St. John the Evangelist. Defendant St. John the Evangelist had knowledge that the boy was staying on Church property with Fr. O'Neill.

41.     A parishioner at St. Christopher's Church in Chili complained to The Diocese of Rochester about Fr. O'Neill in 1998. At that time, she reportedly received assurances from The Diocese of Rochester that The Diocese had instructed Fr. O'Neill to refrain from taking children to his cottage.

42.     In December 2002, the above-mentioned lawsuit against The Diocese of Rochester and Fr. O'Neill was dismissed on statute of limitation grounds. Due to the recent passage of the Child Victims Act in New York, the previous statute of limitations for child sexual abuse cases does not apply to this action.

43.     Fr. Robert F. O'Neill died in 2005.

44.     On information and belief, Fr. O'Neill was a notorious sexual predator who sexually violated many boys while under the employment and/or agency of Defendant St. John the Evangelist.

45.     By holding Fr. O'Neill out as safe to work with children, and by undertaking the custody, supervision of, and/or care of the minor Plaintiff, Defendant entered a special relationship with the minor Plaintiff. As a result of Plaintiff being a minor, and by Defendant's undertaking the care and guidance of the then vulnerable Plaintiff, Defendant held a position of empowerment over Plaintiff.

46.     Furthermore, Defendant, by holding itself out as being able to provide a safe environment for children, solicited, and/or accepted this position of empowerment. This empowerment prevented the Plaintiff from effectively protecting himself, and Defendant thus entered a special relationship with Plaintiff. By holding itself out as a safe, moral, and trusted institution to Plaintiff's parents, Defendant induced Plaintiff's parents to entrust their child to Defendant and thereby deprived Plaintiff of the protection of his family.

47.     At all times material, Fr. O'Neill's sexual abuse of Plaintiff was foreseeable. The problem of clergy sexual abuse of minors is well-documented throughout the history of the Roman Catholic Church. As far back as 1051, St. Peter Damian wrote in the *Book of Gomorrah* that clergy who defiled boys should be dismissed from holy orders. (*Book of Gomorrah*, Ch. 6). Later, St. Peter Damian wrote in his *Rule of the Monastery of Compludo*, about the punishment for "A cleric or monk who seduces youths or young boys" being public flogging, loss of tonsure and six months in jail, among other punishment. In 1143 or 1144, a professor at the University of Bologna named Gratian, known as the "Father of the Science of Canon Law," identified in his work the *Decretum*, the sexual sin by a priest that he called *stuprum pueri*, which is the sexual use of boys by an adult

male.

48.     In 1961, the Vatican issued an instruction on the training of candidates for the priesthood, which was based upon the 1917 Code of Canon Law which stated:

> Advancement to religious vows and ordination should be barred to those who are afflicted with evil tendencies to homosexuality or pederasty, since for them the common life and priestly ministry would constitute serious dangers.

49.     This knowledge that Catholic clergy were sexually abusing minors continued through the middle ages and into recent history.  In 1962, Pope John XXIII approved the publication *De Modo Procedendi in Causis Solicitationis*, a special procedural law for solicitation of sex in the confessional.  This document contained prohibitions prohibiting clergy from having sex with minors under the age of sixteen.  This document was distributed to every bishop and major religious superior in the world and was to be kept by them with the deepest secrecy.  In addition, this document reflected the Catholic church's insistence on maintaining the highest degree of secrecy regarding the worst sexual crimes perpetrated by clergy.

50.     In 1947, a priest named Fr. Gerald Fitzgerald founded a religious order of priests called the Servants of the Paracletes.  This religious order was founded in order to assist and treat Catholic clergy who experienced mental health problems.  By 1952, Fr. Fitzgerald wrote that he had already treated a handful of priests who had sexually abused minors.  By 1963, the Paracletes were treating so many sexually abusive clergy that they developed a shorthand code, "code 3," to describe the offense.  By 1966, the Paracletes began specializing in treatment of pedophile and ephebophile Catholic clergy.

51.     As early as 1971, the issue of sexual misconduct by clergy was being discussed in the Commonwealth of Massachusetts.  Bishop Bernard Flanagan, Bishop of Worchester (Massachusetts) testified that as early as February 1971, there had been discussions about sexual

11

misconduct among priests. According to Bishop Flanagan, "I think by 1971 I had heard of other cases of this type [sic] sexual misconduct and I knew that they were taking place in other dioceses too."

52.     That same year, Dr. Conrad Baars and Dr. Anna Terruwe presented a scholarly paper titled The Role of the Church in the Causation, Treatment and Prevention of the Crisis in the Priesthood" to the 1971 Synod of Bishops at the Vatican and to the U.S. Conference of Catholic Bishops about psychiatric problems in Catholic clergy and how psychosexual immaturity manifested itself in heterosexual and homosexual activity. In 1990, psychologist and priest, A.W. Richard Sipe, published a study involving 1,500 priests that concluded that six (6) percent of priests were sexually involved with minors.

53.     In 1985, the public prosecution of a priest in Lafayette, Louisiana led to the creation of the 100-page document titled *"The Problem of Sexual Molestation by Roman Catholic Clergy: Meeting the Problem in a Comprehensive and Responsible Manner"* by Fr. Thomas Doyle, F. Ray Mouton and Fr./Dr. Michael Peterson. This document was distributed to every Catholic Bishop and religious order ordinary in the United States. A significant portion of this document describes how significant the sexual abuse of children by Catholic clergy had become.

54.     Upon information and belief, before Plaintiff was sexually abused by Fr. O'Neill, Defendant St. John the Evangelist had actual or constructive knowledge of material facts regarding Fr. O'Neill's sexual misconduct, impulses, and behavior.

55.     Despite clear indications of danger, Defendant took no steps to discover the specific nature of Fr. O'Neill's problems or to determine whether he was fit to work with children or to protect children from him, thereby increasing the likelihood that Plaintiff would be harmed.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### NEGLIGENCE/GROSS NEGLIGENCE

56. Plaintiff repeats and re-alleges each and every allegation set forth in all paragraphs as if fully set forth herein.

57. Defendant St. John the Evangelist allowed Fr. O'Neill to have unsupervised and unlimited access to minor children while in a position of authority over them, including at Defendant St. John the Evangelist in Greece, New York, located within the geographical confines of The Diocese of Rochester.

58. At all times material, Fr. O'Neill was employed by Defendant St. John the Evangelist and was an agent of the same.

59. At all times material, Fr. O'Neill remained under the direct supervision, employ and control of Defendant.

60. Upon information and belief, before Plaintiff was sexually abused by Fr. O'Neill, Defendant had actual or constructive knowledge of material facts regarding Fr. O'Neill's sexual misconduct, impulses and behavior, and had actual or constructive knowledge that he posed a sexual risk of harm to children.

61. Despite clear indications of danger, Defendant took no steps to discover the specific nature of Fr. O'Neill's problems or to determine whether he was fit to work with children or to protect children from him, thereby increasing the likelihood that Plaintiff would be harmed.

62. Plaintiff ⬛ was raised in a devout Roman Catholic family, regularly celebrated mass, received the sacraments, and participated in church-related activities. Plaintiff, therefore, developed great admiration, trust, reverence, and respect for the Roman Catholic Church

13

and its agents, The Diocese of Rochester and its agents, including the Bishop, St. John the Evangelist and its agents, priests at St. John the Evangelist and Fr. O'Neill.

63.      Defendant held Fr. O'Neill out as a qualified Roman Catholic priest who was safe with children and undertook the education, religious instruction, and spiritual and emotional guidance of Plaintiff. Accordingly, Plaintiff placed trust in Defendant so that Defendant and its agents gained superiority and influence over Plaintiff. Defendant entered into a special relationship with Plaintiff and his family.

64.      Defendant knew or should have known that some of the leaders and people working at Catholic institutions within The Diocese of Rochester, including St. John the Evangelist Church, were not safe for children.

65.      Defendant knew or should have known that it lacked sufficient information about whether its leaders and people working at Catholic institutions within The Diocese of Rochester, including St. John the Evangelist Church, were safe around children.

66.      Defendant knew or should have known that there was a risk of child sex abuse for children participating in Catholic programs and activities within The Diocese of Rochester, including at St. John the Evangelist Church.

67.      Defendant knew or should have known that it lacked sufficient information about whether there was a risk of child sex abuse for children participating in Catholic programs and activities at St. John the Evangelist Church.

68.      Defendant knew or should have known that it had other agents who had sexually molested children. Defendant knew or should have known that child molesters have a high rate of recidivism. Defendant knew or should have known that there was a specific danger of child sex abuse for children participating in Defendant's youth programs.

69.     Defendant held its leaders and agents, including Fr. O'Neill, out as people of high morals and as possessing immense power. They taught families and children to obey, respect, and revere these leaders and agents.

70.     Defendant solicited youth and families to its programs and schools, including Plaintiff. It specifically marketed to youth and families in order to recruit youth and families to its programs.

71.     Defendant held out the people that worked in the programs, including Fr. O'Neill, as safe for children/youth.

72.     Defendant made negligent representations to Plaintiff and his family while Plaintiff was a minor. Plaintiff and his family relied upon these representations, which resulted in Plaintiff being put in a vulnerable situation with Fr. O'Neill and subject to his sexual misconduct and harm.

73.     Defendant owed Plaintiff a duty of reasonable care because it assumed duties owed to Plaintiff and had superior knowledge about the risk that Fr. O'Neill posed to Plaintiff, the risk of abuse in general in its programs, and/or the risks that its facilities posed to minor children. Defendant had the duty to protect the moral purity of Plaintiff and other Roman Catholic children attending its services and programs.

74.     Defendant owed Plaintiff a duty of reasonable care because it assumed that duty and because it solicited youth and parents for participation in its church and youth programs, including Plaintiff.

75.     Defendant owed Plaintiff a duty of reasonable care because it undertook custody of minor children, including Plaintiff.

76.     Defendant owed Plaintiff a duty of reasonable care because it promoted its facilities and programs as being safe for children, including Plaintiff.

77. Defendant owed Plaintiff a duty of reasonable care because it held out its agents including Fr. O'Neill, to the public, including Plaintiff, as safe to work with children.

78. Defendant owed Plaintiff a duty of reasonable care because it encouraged parents and children, including Plaintiff, to spend time with its agents; and/or encouraged its agents, including Fr. O'Neill, to spend time with, interact with, and recruit children.

79. Defendant had a duty to Plaintiff to protect him from harm because Defendant's actions created a foreseeable risk of harm to Plaintiff.

80. Defendant breached its duties by exposing Plaintiff to a known pedophile and ephebophile.

81. Defendant breached its duties by exposing Plaintiff to a priest Defendant knew or should have known was a pedophile and ephebophile.

82. Defendant breached its duties by recruiting, hiring, and maintaining Fr. O'Neill in a position of authority over children, including Plaintiff.

83. Defendant breached its duties by exposing Fr. O'Neill to children, including Plaintiff.

84. Defendant breached its duties by leaving Fr. O'Neill alone with children unsupervised, including Plaintiff.

85. Defendant breached its duties by inducing Plaintiff and his parents to entrust Plaintiff to Fr. O'Neill.

86. Defendant breached its duties by failing to follow policies and procedures designed to prevent child sex abuse and/or failing to implement sufficient policies and procedures to prevent child sex abuse.

87. Defendant breached its duties by failing to take reasonable measures to make sure

16

that policies and procedures to prevent child sex abuse were working.

88.     Defendant breached its duties by failing to adequately inform families and children, including Plaintiff, of the known risks of child sex abuse within its parish and youth programs.

89.     Defendant breached its duties by holding out its employees and agents, including Fr. O'Neill, as safe and wholesome for children to be with.

90.     Defendant breached its duties by failing to investigate risks of child molestation.

91.     Defendant breached its duties by failing to properly train the workers at its church and within its programs.

92.     Defendant breached its duties by failing to have any outside agency test its safety procedures.

93.     Defendant breached its duties by failing to protect the children in its programs from child sex abuse and failing to adhere to the applicable standard of care for child safety.

94.     Defendant breached its duties by failing to investigate the amount and type of information necessary to represent its institution, programs, and leaders and people as safe.

95.     Defendant breached its duties by failing to respond to and/or investigate information of improper conduct with children of their employee and agent, Fr. O'Neill.

96.     Defendant breached its duties by failing to properly train its employees to identify signs of child molestation by fellow employees.

97.     Defendant breached its duty to use ordinary care in determining whether its facilities were safe and/or to determine whether it had sufficient information to represent its facilities as safe.

98.     Defendant breached its duty of care by recruiting, hiring, and maintaining Fr. Robert O'Neill at its facilities.

99. Defendant breached its duty of care by maintaining a dangerous condition on the premises of its facilities (i.e., a priest Defendant knew or should have known posed a risk of pedophilic harm to children).

100. Defendant breached its duty of care by holding out its facilities as a safe and moral place for children, knowing the facilities were not safe nor moral.

101. Defendant breached its duty of care by failing to have sufficient policies and procedures to prevent abuse at its facilities.

102. Defendant breached its duty of care by failing to investigate risks at its facilities.

103. Defendant breached its duty of care by failing to properly train the workers at its facilities and failing to have any outside agency test its safety procedures.

104. Defendant breached its duty of care by failing to investigate the amount and type of information necessary to represent its facilities as safe.

105. Defendant breached its duty of care by failing to train its employees properly to identify signs of child molestation by fellow employees.

106. Defendant breached its duties to Plaintiff by holding out clergy members, including Fr. O'Neill, as safe, moral, and trustworthy people and by failing to warn Plaintiff and his family of the risk that Fr. O'Neill posed and the known risks of child sexual abuse by clerics in general.

107. Defendant breached its duties to Plaintiff by failing to warn Plaintiff about any of the knowledge that Defendant had about child sex abuse perpetrated by clergy or Fr. O'Neill.

108. Defendant breached its duties to Plaintiff by failing to report Fr. O'Neill's abuse of children to the police and law enforcement.

109. Defendant further breached its duties by hiding a pedophile and engaging in a cover-up of abuse perpetrated by Fr. O'Neill.

110. At all times material, Fr. O'Neill's sexual abuse of Plaintiff was foreseeable. As discussed above, the problem of clergy sexual abuse of minors is well-documented throughout the history of the Roman Catholic Church.

111. As a direct and proximate result of Defendant's negligence, gross negligence, and breaches of duty, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, psychological injuries, loss of ability to engage in gainful employment, loss of income and other losses and damages, past and future.

112. As a direct result of Defendant's negligence, gross negligence, and breaches of duty, Plaintiff was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life.

113. As a direct and proximate result of Defendant's negligence, gross negligence and breaches of duty, Plaintiff has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

WHEREFORE, Plaintiff demands judgment against Defendant St. John the Evangelist Church for compensatory damages, costs and such other and further relief as this Court deems proper.

## SECOND CAUSE OF ACTION

### RESPONDEAT SUPERIOR/VICARIOUS LIABILITY

114. Plaintiff repeats and re-alleges each and every allegation set forth in all paragraphs as if fully set forth herein.

115. Among other duties, Fr. O'Neill was employed by, or an agent of, Defendant St. John the Evangelist. He was employed to minister the sacraments and operate programs, including

youth, altar boy and spiritual counseling programs at St. John the Evangelist.

116. Defendant created a master-servant relationship with Fr. O'Neill, employing him to interact with and supervise children participating in programs at St. John the Evangelist.

117. At all times material, Fr. O'Neill was on duty as a priest 24 hours per day, 7 days per week.

118. At all times material, Fr. O'Neill remained under the direct supervision, employ, and control of the Defendant.

119. At all times material, Defendant had the right to control the manner and means of Fr. O'Neill's performance.

120. At all times material, Defendant paid Fr. O'Neill's salary and paid for Fr. O'Neill's health insurance and other benefits.

121. At all times material, Defendant furnished an office and other materials, supplies and tools required for Fr. O'Neill to perform in his position as a priest.

122. At all times material, Defendant controlled the premises where Fr. O'Neill performed as a priest.

123. At all times material, Defendant had the power to terminate the employment of Fr. O'Neill.

124. Defendant allowed Fr. O'Neill to have unsupervised and unlimited access to young children at St. John the Evangelist.

125. The unwanted contact by Fr. O'Neill upon Plaintiff occurred during his regular working hours, while performing duties of a priest on behalf of his employer.

126. The sexual contact by Fr. O'Neill occurred in the course and scope of his employment with Defendant.

127.    The sexual contact by Fr. O'Neill was generally foreseeable to Defendant.

128.    Upon information and belief, before Plaintiff was sexually abused by Fr. O'Neill, Defendant had actual or constructive knowledge of material facts regarding Fr. O'Neill's sexual misconduct, impulses, and behavior but failed to act on that knowledge and exposed Plaintiff as a child to Fr. O'Neill, thereby increasing the likelihood that Plaintiff would be harmed.

129.    The sexual contact by Fr. O'Neill was closely connected to what he was employed to do as a priest with Defendant, and/or was otherwise naturally incidental to his job duties.

130.    Fr. O'Neill's conduct was motivated, at least in part, by a desire to serve his employer's business interests or otherwise meet the objectives of his employment, however misguided.

131.    Alternatively, Fr. O'Neill's conduct constituted an authorized, minor deviation from his employment that was authorized and/or ratified by Defendant.

132.    As a direct and proximate result of Fr. O'Neill's conduct, Plaintiff has suffered damages as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendant St. John the Evangelist, for compensatory damages, costs and such other and further relief as this Court deems proper.

### THIRD CAUSE OF ACTION

#### NEGLIGENT HIRING, RETENTION, AND SUPERVISION

133.    Plaintiff repeats and re-alleges each and every allegation set forth in all paragraphs as if fully set forth herein.

134.    At all material times, Defendant St. John the Evangelist, by and through its agents, managers, employees, and directors owed a duty to Plaintiff to use reasonable care to protect his safety, care, well-being and health while he was under the care and custody or in the presence of

the Defendant. These duties encompassed the use of reasonable care in the hiring, retention and supervision of Fr. O'Neill and otherwise providing a safe environment for children.

135.     Prior to the sexual misconduct perpetrated by Fr. O'Neill upon Plaintiff, Defendant St. John the Evangelist knew, or in the exercise of reasonable care, should have known, of the general problem of Catholic clergy engaging in sexual misconduct with children.

136.     Prior to the sexual misconduct perpetrated by Fr. O'Neill upon Plaintiff, Defendant St. John the Evangelist knew, or in the exercise of reasonable care, should have known, that Fr. O'Neill was unfit for the duties assigned to him, that he did not exhibit appropriate behavior with children, and he otherwise posed a risk of perpetrating unwanted sexual contact upon children, including Plaintiff.

137.     Given actual or constructive knowledge of Fr. O'Neill's dangerous propensities, the Defendant had a duty to act reasonably in all decisions relating to his hiring, supervision, and retention as an employee.

138.     Defendant failed to exercise reasonable care in one or more of its decisions to hire, supervise, and retain Fr. O'Neill and therefore exposed Plaintiff to an unreasonable risk of harm.

139.     Defendant affirmed and ratified Fr. O'Neill's misconduct with Plaintiff. Given the actual and constructive knowledge of the likelihood that Fr. O'Neill and/or other clergy would engage children in unwanted sexual contact, the unwanted sexual contact of Plaintiff was reasonably foreseeable to Defendant.

140.     Defendant St. John the Evangelist, and its agents, had superior knowledge of the likelihood that Fr. O'Neill would engage in unwanted sexual contact with children that he encountered in his position as a priest and had a duty to take precautions to lessen the risk that Plaintiff would be the victim of unwanted sexual contact.

141. At all relevant times, Defendant St. John the Evangelist's acts and omissions created an environment which fostered unwanted sexual contact and exploitation against the people it had a duty to protect, including Plaintiff.

142. At all relevant times, Defendant had inadequate policies and procedures to protect children entrusted to its care and protection, including Plaintiff, which substantially contributed to the creation of a dangerous environment.

143. As a direct and proximate result of the negligence, gross negligence, and breaches of duty of Defendant, Plaintiff suffered damages, including but not limited to severe and permanent psychological, emotional and physical injuries, shame, humiliation and the inability to lead a normal life, and has incurred and/or will incur costs for treatment in the future. These injuries are permanent and ongoing in nature.

WHEREFORE, Plaintiff demands judgment against Defendant St. John the Evangelist Church for compensatory damages, costs and such other and further relief as this Court deems proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Rochester, New York

Dated:  December 2, 2019                                    JAMES, VERNON & WEEKS, P.A.

By: _____

Leander James, ljames@jvwlaw.net
Craig Vernon, cvernon@jvwlaw.net
James, Vernon & Weeks, PA
20 Vesey Street, New York, NY 10007

1626 Lincoln Way, Coeur d'Alene, ID 83814
(888) 667-0683

Patrick Noaker, patrick@noakerlaw.com
1600 Utica Ave. S, 9th Fl.
St. Louis Park, MN 55416
(952) 491-6798

## VERIFICATION

STATE OF NEW YORK        )
                         )
COUNTY OF MONROE         )  ss:

████████████████ affirms under penalty of perjury, that he has read the foregoing
COMPLAINT and knows the contents thereof; that the same is true to the affirmant's own
knowledge, except at to those matters therein stated to be on information and belief and as to these
matters affirmant believes them to be true.

Dated:   Rochester, New York
         Dec 4th_____, 2019               ████████████████████████████

