**EXHIBIT 12**

NEW YORK STATE SUPREME COURT
WAYNE COUNTY

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

███████,

                              Plaintiff,

-against-

ST. MICHAEL CHURCH AND SCHOOL and SISTERS OF MERCY OF THE AMERICAS NEW YORK, PENNSYLVANIA, PACIFIC WEST COMMUNITY,

                              Defendants.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Index No.: _____/__

Date Filed:

**SUMMONS**

Plaintiff designates Wayne County as the place of trial.

The basis of venue is one defendant's residence.

**Child Victims Act Proceeding
22 NYCRR 202.72**

TO THE ABOVE-NAMED DEFENDANTS:

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: May 27, 2020

                              Respectfully Yours,

                              MARSH LAW FIRM PLLC

                              By _/s/ James R. Marsh_____
                              James R. Marsh
                              Jennifer Freeman
                              Robert Lewis
                              jamesmarsh@marsh.law
                              jenniferfreeman@marsh.law
                              robertlewis@marsh.law
                              31 Hudson Yards, 11th Floor
                              New York, NY 10001-2170
                              Phone: 212-372-3030

PFAU COCHRAN VERTETIS AMALA PLLC

By _____
Vincent T. Nappo
Anelga Doumanian
vnappo@pcvalaw.com
adoumanian@pcvalaw.com
31 Hudson Yards, 11th Floor
New York, NY 10001-2170

Attorneys for Plaintiff

NEW YORK STATE SUPREME COURT
WAYNE COUNTY

███████████,

                Plaintiff,

-against-

ST. MICHAEL CHURCH AND SCHOOL and SISTERS OF MERCY OF THE AMERICAS NEW YORK, PENNSYLVANIA, PACIFIC WEST COMMUNITY,

                Defendants.

Index No.:

**COMPLAINT**

**Child Victims Act Proceeding
22 NYCRR 202.72**

Plaintiff ███████, by and through his attorneys, the Marsh Law Firm PLLC and Pfau Cochran Vertetis Amala PLLC, respectfully alleges for his complaint the following:

## I.    INTRODUCTION

1. For decades, the defendants knew or should have known that priests, clergy, religious brothers, religious sisters, teachers, school administrators, employees, volunteers, and others were using their positions within the Catholic Church to groom and to sexually abuse children. Despite that knowledge, the defendants failed to take reasonable steps to protect children from being sexually abused and actively concealed the abuse. Based on their wrongful conduct, a reasonable person could and would conclude that they knowingly and recklessly disregarded the abuse of children and chose to protect their reputation and wealth over those who deserved protection. The result is not surprising: for decades hundreds, if not thousands, of children were sexually abused by Catholic clergy and others who served the Catholic Church, including the defendants. The plaintiff in this lawsuit is one of those children who was sexually abused because of the defendants' wrongful conduct.

## II.   PROCEEDING IN ACCORDANCE WITH CPLR 214-G AND 22 NYCRR 202.72

2. This complaint is filed pursuant to the Child Victims Act (CVA) 2019 Sess. Law News of N.Y. Ch. 11 (S. 2440), CPLR 214-G, and 22 NVCRR 202.72. The CVA opened a historic one-year one-time window for victims and survivors of childhood sexual abuse in the State of New York to pursue lapsed claims. Prior to the passage of the CVA, plaintiff's claims were time-barred the day plaintiff turned 22 years old. The enactment of the CVA allows plaintiff, for the first time in plaintiff's life, to pursue restorative justice in New York State.

## III.   PARTIES

3. Plaintiff ███████ is an adult male who currently resides in Palmyra, New York.

4. While he was a minor, plaintiff ███████ was a victim of one or more criminal sex acts in the State of New York, including sexual acts that would constitute a sexual offense as defined by the Child Victims Act.

5. At all relevant times defendant St. Michael Church and School ("St. Michael's") was a not-for-profit religious corporation organized under New York law.

6. St. Michael's is currently a not-for-profit religious corporation organized under New York law with its principal office in Newark, New York.

7. At all relevant times St. Michael's conducted business as "St. Michael Church and School," "St. Michael Parish and School," "St. Michael Church," "St. Michael Parish," "St. Michael School," "Church of St. Michael," "Parish of St. Michael," "School of St. Michael," "St. Michael Catholic Church and School," "St. Michael Catholic Parish and School," "St. Michael Catholic Church," "St. Michael Catholic Parish," "St. Michael Catholic School," "Catholic Church of St. Michael," "Catholic Parish of St. Michael," "Catholic School of St. Michael," "St. Michael Roman Catholic Church and School," "St. Michael Roman Catholic Parish and School," "St.

Michael Roman Catholic Church," "St. Michael Roman Catholic Parish," "St. Michael Roman Catholic School," "Roman Church of St. Michael," "Roman Catholic Parish of St. Michael," "Roman Catholic School of St. Michael," "St. Michael's," or "St. Michael."

8. At all relevant times St. Michael's was a parish with a church and school located in Newark, New York.

9. To the extent St. Michael's closed or was merged with another entity, such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit. Any and all such entities, past and present, are collectively referred to herein as "St. Michael's."

10. Father Eugene Emo ("Father Emo") was a priest of St. Michael's who served Catholic families on behalf of St. Michael's, including plaintiff ▇▇▇▇▇ and his family.

11. During the time Father Eugene Emo served at St. Michael's, he used his position as a priest of St. Michael's to groom and to sexually abuse plaintiff ▇▇▇▇▇.

12. To the extent that St. Michael's was a different entity, corporation, or organization during the period of time during which Father Emo used his position as a priest to sexually abuse ▇▇▇▇, such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as St. Michael Church and School.

13. To the extent St. Michael's is a successor to a different entity, corporation, or organization which existed during the period of time during which Father Emo used his position as a priest to sexually abuse ▇▇▇▇, such predecessor entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as St. Michael Church and School.

14. All such St. Michael's-related entities, corporations, or organizations are collectively referred to herein as "St. Michael's."

15. At all relevant times defendant Sisters of Mercy of the Americas New York, Pennsylvania, Pacific West Community ("Sisters of Mercy") was a not-for-profit religious corporation organized under New York law with its principal office in Buffalo, New York.

16. At all relevant times the Sisters of Mercy conducted business as "Sisters of Mercy of the Americas New York, Pennsylvania, Pacific West Community" "Sisters of Mercy NyPPaW," "Sisters of Mercy of the Americas," and the "Sisters of Mercy."

17. The Sisters of Mercy is a Catholic religious order whose members, employees, and/or agents served various Catholic institutions and families, including St. Michael's, plaintiff ▮▮▮▮▮▮▮, and his family.

18. The members, employees, and/or agents of the Sisters of Mercy were generally referred to as sisters and the Sisters of Mercy would receive compensation for the services that its agents provided to others, including the services they provided to St. Michael's.

19. Father Eugene Emo was an agent of the Sisters of Mercy who served Catholic families on behalf of the Sisters of Mercy, including plaintiff ▮▮▮▮▮▮▮ and his family.

20. During the time Father Eugene Emo served the Sisters of Mercy, he used his position as an agent of the Sisters of Mercy to groom and to sexually abuse plaintiff ▮▮▮▮▮▮▮.

21. To the extent that the Sisters of Mercy was a different entity, corporation, or organization during the period of time during which Father Emo used his position at St. Michael's to sexually abuse ▮▮▮, such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as Sisters of Mercy of the Americas New York, Pennsylvania, Pacific West Community.

22. To the extent the Sisters of Mercy is a successor to a different entity, corporation, or organization that existed during the period of time when Father Emo used his position at St.

4

Michael's to sexually abuse ▇▇▇, such predecessor entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as Sisters of Mercy of the Americas New York, Pennsylvania, Pacific West Community.

23. All such Sisters of Mercy-related entities, corporations, or organizations are collectively referred to herein as the "Sisters of Mercy."

### IV. VENUE

24. Venue is proper because St. Michael's is a domestic corporation authorized to transact business in New York with its principal office located in Newark, New York.

25. Venue is proper because Wayne is the county in which a substantial part of the events or omissions giving rise to plaintiff's claims occurred.

26. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

27. The amount of damages sought exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

### V. STATEMENT OF FACTS

28. At all relevant times St. Michael's owned a parish, church, and school in Newark, New York.

29. At all relevant times St. Michael's held itself out to the public as the owner of St. Michael's.

30. At all relevant times St. Michael's employed and/or utilized individuals who served Catholic families, including plaintiff ▇▇▇▇▇ and his family.

31. At all relevant times St. Michael's, through its agents, servants, and employees, managed, maintained, operated, and controlled St. Michael's, and held out to the public its agents, servants and employees as those who managed, maintained, operated, and controlled St. Michael's.

5

32. At all relevant times St. Michael's was responsible for and did the staffing and hiring at St. Michael's.

33. At all relevant times St. Michael's was responsible for and did the recruitment and staffing of the employees, agents, and volunteers at St. Michael's.

34. At all relevant times St. Michael's materially benefited from the operation of St. Michael's, including the services of Father Emo and the services of those who managed and supervised Father Emo.

35. At all relevant times Father Emo was an employee, agent, and/or priest of St. Michael's.

36. At all relevant times Father Emo was on the staff of, was an agent of, and/or served as an employee of St. Michael's.

37. At all relevant times Father Emo was acting in the course and scope of his employment and/or agency with St. Michael's.

38. At all relevant times the Sisters of Mercy provided St. Michael's with some of its agents to provide services at St. Michael's.

39. At all relevant times the Sisters of Mercy held itself out to the public as the owner and/or operator of St. Michael's.

40. At all relevant times agents of the Sisters of Mercy provided services to Catholic families, including plaintiff [REDACTED] and his family.

41. At all relevant times the Sisters of Mercy, through its agents, managed, maintained, operated, and controlled St. Michael's, and held out to the public its agents as those who managed, maintained, operated, and controlled St. Michael's.

42. At all relevant times the Sisters of Mercy was responsible for and did the staffing and hiring at St. Michael's.

43. At all relevant times the Sisters of Mercy was responsible for and did the recruitment and staffing of volunteers at St. Michael's.

44. At all relevant times the Sisters of Mercy materially benefited from the operation of St. Michael's, including the services of Father Emo and the services of those who managed and supervised Father Emo.

45. At all relevant times Father Emo was an agent of the Sisters of Mercy at St. Michael's.

46. At all relevant times Father Emo acted as an agent of the Sisters of Mercy.

47. At all relevant times Father Emo was acting in the course and scope of his agency with the Sisters of Mercy.

48. At all relevant times Father Emo was an agent of the Sisters of Mercy that it assigned to St. Michael's and/or that it allowed to serve at St. Michael's.

49. The agents of the Sisters of Mercy who provided services to St. Michael's, including Father Eugene Emo and those who managed and supervised him, were subject to the authority and control of the Sisters of Mercy and St. Michael's.

50. St. Michael's derived benefits from the agents of the Sisters of Mercy who provided services to St. Michael's, including Father Eugene Emo and those who managed and supervised him.

51. At all relevant times Father Emo had an office on the premises of St. Michael's.

52. When plaintiff _____ was a minor, he and his parents were members of St. Michael's, incluidng when ____ was a parishioner, altar boy, and student of the defendants.

53. St. Michael's and the Sisters of Mercy, through their agents, servants, and employees, held Father Emo out to the public, to ▇, and to his parents, as their agent and/or employee.

54. St. Michael's and the Sisters of Mercy, through their agents, servants, and employees, held Father Emo out to the public, to ▇, and to his parents, as having been vetted, screened, and approved by those defendants.

55. ▇ and his parents reasonably relied upon the acts and representations of St. Michael's and the Sisters of Mercy, through their agents, servants, and employees, and reasonably believed that Father Emo was an agent and/or employee of those defendants who was vetted, screened, and approved by those defendants.

56. ▇ and his parents trusted Father Emo because St. Michael's and the Sisters of Mercy held him out as someone who was safe and could be trusted with the supervision, care, custody, and control of ▇.

57. ▇ and his parents believed that St. Michael's and the Sisters of Mercy would exercise such care as would a parent of ordinary prudence in comparable circumstances when those defendants assumed supervision, care, custody, and control of ▇.

58. When ▇ was a minor, Father Emo used his position with the defendants to sexually abuse him.

59. ▇ was sexually abused by Father Emo when he was approximately 12 to 13 years old.

60. The sexual abuse occurred numerous times and included, but was not limited to, Father Emo fondling ▇ genitals, Father Emo pressing his genitals on ▇ face, Father Emo putting ▇ in handcuffs, and Father Emo performing oral sex on ▇.

61. Based on the representations of St. Michael's and the Sisters of Mercy that Father Emo was safe and trustworthy, ▮ and his parents allowed ▮ to be under the supervision of, and in the care, custody, and control of, St. Michael's and the Sisters of Mercy, including during the times when ▮ was sexually abused by Father Emo.

62. Based on the representations of St. Michael's and the Sisters of Mercy that Father Emo was safe and trustworthy, ▮ and his parents allowed ▮ to be under the supervision of, and in the care, custody, and control of, Father Emo, including during the times when ▮ was sexually abused by Father Emo.

63. Neither ▮ nor his parents would have allowed him to be under the supervision of, or in the care, custody, or control of, St. Michael's, Sisters of Mercy, or Father Emo if St. Michael's or the Sisters of Mercy had disclosed to ▮ or his parents that Father Emo was not safe and was not trustworthy, and that he in fact posed a danger to ▮ in that Father Emo was likely to sexually abuse ▮.

64. No parent of ordinary prudence in comparable circumstances would have allowed ▮ to be under the supervision of, or in the care, custody, or control of, St. Michael's, the Sisters of Mercy, or Father Emo if St. Michael's or the Sisters of Mercy had disclosed to ▮ or his parents that Father Emo was not safe and was not trustworthy, and that he in fact posed a danger to ▮ in that Father Emo was likely to sexually abuse him.

65. From approximately 1973 through approximately 1974, Father Emo exploited the trust and authority vested in him by the defendants by grooming ▮ to gain his trust and to obtain control over him as part of Father Emo's plan to sexually molest and abuse ▮ and other children.

66. Father Emo used his position of trust and authority as an employee and/or agent of St. Michael's and of the Sisters of Mercy to groom ▇ and to sexually abuse him multiple times, including when ▇ was under the supervision of, and in the care, custody, or control of, St. Michael's, the Sisters of Mercy, and Father Emo.

67. The sexual abuse of ▇ by Father Emo occurred at certain locations, including at Father Emo's cabin in Cohocton, New York, which Father Emo was able to gain access to ▇ by virtue of his position as a priest of the defendants.

68. Father Emo's sexual abuse of ▇ occurred during activities that were sponsored by, or were a direct result of activities sponsored by, St. Michael's and the Sisters of Mercy, including during weekend outings when Father Emo would give ▇ spiritual counseling. During such activities the defendants had care, custody, or control of ▇.

69. At all relevant times the defendants, through their agents, servants, and employees, knew or should have known that Father Emo was a known sexual abuser of children.

70. At all relevant times it was reasonably foreseeable to the defendants, through their agents, servants, and employees, that Father Emo's sexual abuse of children would likely result in injury to others, including the sexual abuse of ▇ and other children by Father Emo.

71. At certain times between 1973 and 1974, the defendants, through their agents, servants, and employees, knew or should have known that Father Emo was sexually abusing ▇ and other children at St. Michael's and elsewhere.

72. The defendants, through their agents, servants, and employees, knew or should have known that the sexual abuse by Father Emo of ▇ was ongoing.

73. The defendants, through their agents, servants, and employees, knew or should have known before and during Father Emo's sexual abuse of ▇ that priests, clergy, religious

10

brothers, religious sisters, teachers, school administrators, employees, volunteers, and/or other persons serving the Catholic Church, including individuals who served St. Michael's and/or the Sisters of Mercy, had used their positions with those defendants to groom and to sexually abuse children.

74. The defendants, through their agents, servants, and employees, knew or should have known before and during Father Emo's sexual abuse of ▇ that such priests, clergy, religious brothers, religious sisters, teachers, school administrators, employees, volunteers, and/or other persons could not be "cured" through treatment or counseling.

75. The defendants, through their agents, servants, and employees, concealed the sexual abuse of children by Father Emo in order to conceal their own bad acts in failing to protect children from him, to protect their reputation, and to prevent victims of such sexual abuse by him from coming forward during the extremely limited statute of limitations prior to the enactment of the CVA, despite knowing that Father Emo would continue to molest children.

76. The defendants, through their agents, servants, and employees, consciously and recklessly disregarded their knowledge that Father Emo would use his position with the defendants to sexually abuse children, including ▇.

77. The defendants, through their agents, servants, and employees, disregarded their knowledge that Father Emo would use his position with them to sexually abuse children, including ▇.

78. The defendants, through their agents, servants, and employees, acted in concert with each other or with Father Emo to conceal the danger that Father Emo posed to children, including ▇, so that Father Emo could continue serving them despite their knowledge of that danger.

79. The defendants, through their agents, servants, and employees, knew that their negligent, reckless, and outrageous conduct would inflict severe emotional and psychological distress, as well as personal physical injury, on others, including ▆ and he did in fact suffer severe emotional and psychological distress and personal physical injury as a result of their wrongful conduct.

80. The defendants, through their agents, servants, and employees, concealed the sexual abuse of children by priests and others in order to conceal their own bad acts in failing to protect children from being abused, to protect their reputation, and to prevent victims of such sexual abuse from coming forward during the extremely limited statute of limitations prior to the enactment of the CVA, despite knowing that those priests and other persons would continue to molest children.

81. By reason of the wrongful acts of each of the defendants as detailed herein, ▆ sustained physical and psychological injuries, including but not limited to, severe emotional and psychological distress, humiliation, fright, dissociation, anger, depression, anxiety, family turmoil and loss of faith, a severe shock to his nervous system, physical pain and mental anguish, and emotional and psychological damage, and, upon information and belief, some or all of these injuries are of a permanent and lasting nature, and ▆ has and/or will become obligated to expend sums of money for treatment.

## VI.   CAUSES OF ACTION

### A.   FIRST CAUSE OF ACTION – NEGLIGENCE

82. Plaintiff ▆ repeats and re-alleges all of his allegations above and below.

83. Each defendant had a duty to take reasonable steps to protect plaintiff ▆ a child, from foreseeable harm when he was under their supervision and in their care, custody, and control, including when Father Emo sexually abused him.

12

84. Each defendant also had a duty to take reasonable steps to prevent Father Emo from using the tasks, premises, and instrumentalities of his position with them to target, groom, and sexually abuse children, including ▮.

85. These circumstances created a special relationship between each defendant and ▮ that imposed on each of them a duty to exercise the degree of care of a parent of ordinary prudence in comparable circumstances.

86. Each defendant breached the foregoing duties by failing to exercise reasonable care to prevent Father Emo from using his position with the defendants to sexually abuse ▮ when he was in their care, custody, or control.

87. In breaching their duties, including hiring, retaining, and failing to supervise Father Emo, giving him access to children, entrusting their tasks, premises, and instrumentalities to him, failing to train their personnel in the signs of sexual predation and to protect children from sexual abuse and other harm, failing to warn ▮ his parents, and other parents of the danger of sexual abuse, and failing to create a safe and secure environment for ▮ and other children who were under their supervision and in their care, custody, and control, each defendant created a risk that ▮ would be sexually abused by Father Emo. Each defendant through its actions and inactions created an environment that placed ▮ in danger of unreasonable risks of harm under the circumstances.

88. In breaching their duties, including hiring, retaining, and failing to supervise Father Emo, giving him access to children, entrusting their tasks, premises, and instrumentalities to him, failing to train their personnel in the signs of sexual predation and to protect children from sexual abuse and other harm, failing to warn ▮, his parents, and other parents of the danger of sexual abuse, and failing to create a safe and secure environment for ▮ and other children who were

13

under their supervision and in their care, custody, and control, each defendant acted willfully and with conscious disregard for the need to protect ▮ Each defendant through their actions and inactions created an environment that placed ▮ in danger of unreasonable risks of harm under the circumstances.

89. It was reasonably foreseeable that each defendant's breach of these duties of care would result in the sexual abuse of ▮

90. As a direct and proximate result of the acts and omissions of each defendant, Father Emo groomed and sexually abused ▮, which has caused ▮ to suffer general and special damages as more fully described herein.

**B. SECOND CAUSE OF ACTION – OUTRAGE AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

91. Plaintiff ▮ repeats and re-alleges all of his allegations above and below.

92. Each defendant engaged in reckless, extreme, and outrageous conduct by providing Father Emo with access to children, including plaintiff ▮, despite knowing that he would likely use his position to groom and to sexually abuse them, including ▮ Their misconduct was so shocking and outrageous that it exceeds the reasonable bounds of decency as measured by what the average member of the community would tolerate and demonstrates an utter disregard by them of the consequences that would follow.

93. As a result of this reckless, extreme, and outrageous conduct, Father Emo gained access to ▮ and sexually abused him.

94. Each defendant knew that this reckless, extreme, and outrageous conduct would inflict severe emotional and psychological distress, including personal physical injury, on others, and ▮ did in fact suffer severe emotional and psychological distress and personal physical

injury as a result, including severe mental anguish, humiliation and emotional and physical distress.

### VII. CPLR 1603 – NO APPORTIONMENT OF LIABILITY

95. Pursuant to CPLR 1603, the foregoing causes of action are exempt from the operation of CPLR 1601 by reason of one or more of the exemptions provided in CPLR 1602, including but not limited to, CPLR 1602(2), CPLR 1602(5), 1602(7) and 1602(11), thus precluding defendants from limiting their liability by apportioning some portion of liability to any joint tortfeasor.

### VIII. PRAYER FOR RELIEF

96. Plaintiff ███████ demands judgment against the defendants named in his causes of action, together with compensatory and punitive damages to be determined at trial, and the interest, cost and disbursements pursuant to his causes of action, and such other and further relief as the Court deems just and proper.

97. Plaintiff specifically reserves the right to pursue additional causes of action, other than those outlined above, that are supported by the facts pleaded or that may be supported by other facts learned in discovery.

Dated: May 27, 2020

MARSH LAW FIRM PLLC

By _____
James R. Marsh
Jennifer Freeman
Robert Lewis
jamesmarsh@marsh.law
jenniferfreeman@marsh.law
robertlewis@marsh.law
31 Hudson Yards, 11th Floor
New York, NY 10001-2170
Phone: 212-372-3030

PFAU COCHRAN VERTETIS AMALA PLLC

By _____
Vincent T. Nappo
vnappo@pcvalaw.com
Anelga Doumanian
adoumanian@pcvalaw.com
31 Hudson Yards, 11th Floor
New York, NY 10001-2170

Attorneys for Plaintiff