# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NEW YORK

In re:

DIOCESE OF ROCHESTER,

Debtors.

Chapter 11

Case No. 19-20905

## SETTLING INSURERS' BRIEF IN SUPPORT OF THEIR STANDING TO OBJECT TO DEBTOR'S MOTION FOR APPROVAL OF ITS RESTRUCTURING SUPPORT AGREEMENT WITH THE COMMITTEE

The insurers identified in footnote 1 (collectively, the "Insurers" or "Settling Insurers")[1] hereby explain why they have standing to object to Debtor's *Motion for Entry of An Order (I) Approving the RSA, (II) Authorizing the Diocese to Enter Into and Perform Under the RSA, (III) Approving the Committee Settlement, and (IV) Granting Related Relief* ("RSA Motion," Dkt. No. 1790).

### Preliminary statement

Debtor's restructuring support agreement with the Committee (the "RSA") is the second of "two mutually exclusive competing settlement agreements" that Debtor has entered into.[2] Previously, Debtor had entered into settlement agreements (the "Insurance Settlements")

---

[1] The Settling Insurers are: The Continental Insurance Company ("CNA"); Interstate Fire & Casualty Company and National Surety Corporation (together, "Interstate"); and Certain Underwriters at Lloyd's, London, Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Company Ltd), RiverStone Insurance (UK) Limited (as successor in interest to Terra Nova Insurance Company Ltd and as successor in interest to Sphere Drake Insurance Ltd), Sompo Japan Nipponkoa Insurance Company of Europe Limited (formerly known as The Yasuda Fire & Marine Insurance Company), and Dominion Insurance Company Ltd., who subscribed, severally and not jointly as their interests appear, to Package, Excess Broadform, and other Policies providing insurance to the Diocese of Rochester and parishes and other entities related to the Diocese (collectively, "LMI").

[2] Nov. 22, 2022 Transcript at 8:18-19 (statement by the Court).

with each of the Settling Insurers, and filed a motion (the "Insurance Settlement Motion") seeking this Court's approval of the Insurance Settlements. Under the RSA, however, Debtor renounces the Insurance Settlements, agrees to not pursue its pending Insurance Settlement Motion, and commits itself to seeking confirmation of a plan of reorganization that is not only inconsistent with, but indeed is also directly contrary to, the Insurance Settlement Agreements.

In other words, the RSA requires Debtor to repudiate its prior settlements with the Insurers, reverse course, and go in the complete opposite direction. Worse, the direction Debtor has now bound itself to travel includes a Stipulated Judgment protocol that concedes liability and sets claim values now, pre-confirmation, and specifically targets CNA to pay the Stipulated Judgments. And if the RSA Motion is granted, Debtor must propose a plan that seeks to impose increased liability on the Insurers through prolonged and expensive coverage litigation.

Debtor's assertion that the Insurers lack standing to seek discovery of any kind in connection with the RSA Motion[3] is, therefore, fundamentally incorrect. The Insurers have standing for many reasons, not least of them that the RSA Motion itself has already caused direct pecuniary harm to the Insurers by requiring Debtor to adjourn proceedings on both the Insurance Settlement Motion and objections, joined by LMI and CNA, to 74 proofs of claim that Debtor contends lack merit. The Insurers would receive significant value from the Insurance Settlements, and they have already expended substantial resources supporting Debtor's Insurance Settlement Motion. Debtor has made clear it will no longer seriously pursue approval of the Insurance Settlements, and will instead seek approval to propose a plan that not

---

[3]     *Id.* at 3:23-4:4, 4:10-15, 7:3-4 (arguments by Mr. Donato).

only renounces the previous settlements, but also is specifically designed to increase the Insurers' quantum of liability and abridge their contractual rights. Put simply, approval of the RSA Motion would directly—and adversely—affect the Insurers' rights and pecuniary interests, whereas denial of the RSA Motion would redress the harm. For these reasons, and as set forth in greater detail below, the Insurers have a right to be heard in opposition to the RSA Motion, and the Court should enter an order finding that the Insurers have standing.[4]

## Background

### A. Procedural background

Debtor commenced this Chapter 11 case on September 12, 2019.[5] On November 14, 2019, Debtor filed an adversary proceeding complaint against the Settling Insurers alleging claims for breach of contract and declaratory judgment.[6] Debtor sought a declaration of its and the Insurers' respective rights, duties, and liabilities under the insurance policies issued by the Insurers to Debtor, plus damages.

On May 20, 2022, Debtor filed the Insurance Settlement Motion, seeking this Court's approval, under Bankruptcy Rule 9019 and § 363 of the Bankruptcy Code, of the Insurance Settlements, which would resolve all disputes between Debtor and the Insurers.[7] The settlements provided for the Insurers to pay a total of $107.25 million into a claimant trust to be

---

[4]     It bears emphasis that the Court is not now determining the merits of either the RSA Motion or the grounds for Insurers' opposition thereto. Rather, all that is presently before the Court is whether the Settling Insurers are entitled to present their merits arguments to the Court, and to obtain discovery to support their merits arguments.

[5]     *See In re Diocese of Rochester*, No. 2-19-20905-PRW, Dkt. No. 1. All referenced filings are in the base bankruptcy case unless otherwise noted.

[6]     *See Diocese of Rochester v. Cont'l Ins. Co. (In re Diocese of Rochester)*, Adv. Proc. No. 19-ap-02021 (the "Insurance Adversary Proceeding").

[7]     *See* Insurance Adversary Proceeding Dkt. No. 190. *See also* Dkt. No. 1538 (same, filed on June 23, 2022 in the base case).

established under a plan of reorganization to be filed by Debtor. In combination with a $40.5 million contribution to be made by Debtor, the total consideration to be contributed to the trust under the Insurance Settlement Motion was $147.75 million. In exchange for their contribution of $107.25 million, the Insurers would receive releases and the protection of a channeling injunction.

The Committee objected to the Insurance Settlement Motion on June 30, 2022.[8] The parties agreed to a discovery schedule in connection with the Insurance Settlement Motion, including document production and discovery.[9] Before Debtor filed the RSA Motion, the Insurers had produced a total of approximately 17,500 pages in response to document requests served by the Committee. Depositions of various insurer witnesses had been scheduled when the RSA Motion was filed. The Insurers incurred substantial costs to make their document productions, prepare witnesses for deposition, and prepare for depositions of the Committee and others. Debtor and the Insurers retained and designated expert witnesses for the hearing on the Insurance Settlement Motion, and Debtor obtained an order from the Court approving the manner and form of notice for the motion.[10]

On July 22, 2022, Debtor objected to 74 proofs of claim.[11] Debtor asserted that the claimants were not entitled to any recovery from the estate for a variety of reasons, chiefly that the claimants were alleging abuse by persons not affiliated with Debtor or non-debtor diocesan parties. LMI and CNA filed joinders in Debtor's claim objections on August 9, 2022

---

[8]     *See* Dkt. No. 1555.

[9]     *See* Stipulated Scheduling Order, Dkt. No. 1552.

[10]    Dkt. No. 1763.

[11]    *See* Dkt. Nos. 1576-1641, 1643-1644.

and September 30, 2022, respectively.[12]

On November 3, 2022, Debtor filed the RSA Motion, seeking approval of the RSA.[13]  Among other things, the RSA obligates Debtor to (i) propose a plan of reorganization (the "RSA Plan") containing provisions dictated by the RSA, (ii) seek entry of a Confirmation Order that confirms the RSA Plan and contains specific findings regarding an Allocation Protocol that has not yet been disclosed, and (iii) use "commercially reasonable efforts . . . in negotiating and seeking Court Approval of the Stipulated Judgments."[14]  The RSA also contains a negative covenant prohibiting Debtor, without the Committee's prior written consent, from entering into any insurance settlements.[15]

Shortly after Debtor filed the RSA Motion, the Settling Insurers served document requests, interrogatories, and requests for admission on Debtor and document requests and interrogatories on the Committee.  On November 14, 2022, Debtor moved to toll the deadlines relating to the Insurance Settlement Motion until after the RSA Motion is heard.[16]  On November 18, 2022, Debtor advised the Settling Insurers that "it does not intend to respond to" the discovery because, it says, the Settling Insurers "lack standing" to oppose the RSA Motion.[17]

**B.    Debtor's Insurance Settlement Motion**

On May 20, 2022, Debtor filed the Insurance Settlement Motion, seeking

---

[12]    *See* Dkt. Nos. 1670 and 1733.

[13]    Dkt. No. 1790 (the "RSA Motion").

[14]    Dkt. No. 1790-2 (the "RSA") at 3.

[15]    *Id.* at 3-4.

[16]    Dkt. 1809.  *See also* Case Management Order, Dkt. 1838 (suspending deadlines related to the Insurance Settlement Motion).

[17]    November 18, 2021 e-mail from Mr. Donato to Mr. Plevin and others, titled "RE: Diocese of Rochester:  Service of Insurers' discovery regarding Debtor's RSA Motion."

- 5 -

approval of its settlements with each of the Settling Insurers.[18]  Pursuant to the Insurance

Settlements, Debtor agreed to cooperate with the Insurers in pursuing court approval of the

Insurance Settlements and proposing and confirming a plan consistent with their terms.[19]

The Insurance Settlements provided many valuable and concrete benefits to the

Settling Insurers.  In exchange for a combined payment of $107.25 million, the Settling Insurers'

potential liability to provide coverage for Sexual Abuse Claims would be fully resolved.[20]  In the

Insurance Settlements, Debtor agreed to withdraw all outstanding tenders of Sexual Abuse

Claims and bound itself not to tender Sexual Abuse Claims in the future, nor make any request

that the Insurers fund judgments, settlements, or defense costs, under any acknowledged or

alleged policies.[21]  The Insurers' policy limits would be considered fully and properly exhausted,

and the Insurers' respective "obligation[s] to pay, handle, object, or otherwise respond" to any

claim would be terminated.[22]  The Insurers would also receive the protections of § 363(f) and

(m) of the Bankruptcy Code, including findings that the consideration paid by the Insurers to

buy back their policies was fair and reasonable and the Insurers were good-faith purchasers.[23]

The Sexual Abuse Claims would be channeled to a trust for payment funded by the Insurers'

---

[18]  The Insurance Settlement Motion is Dkt. No. 1538.  The Insurance Settlements are Dkt.
Nos. 1538-1, 1538-2, 1538-3 (the "Interstate Settlement"), and 1538-4 (the "CNA Settlement").  The
relevant terms and provisions of the Insurance Settlements are materially the same.  Throughout, the
Insurers refer to terms and provisions in the CNA Settlement, which is substantially the same as the
Interstate Settlement, and note any material differences among the Insurance Settlements where
applicable.

[19]  *See* Insurance Adversary Proceeding Dkt. No. 190 at 40-41.

[20]  *See* Insurance Settlement Motion ¶¶ 1, 39, 72.

[21]  CNA Settlement § 2.11.

[22]  *Id.*

[23]  *Id.* § 4.4.

contributions (along with a contribution from Debtor). The trust would defend and indemnify the Insurers if a claimant or someone else asserted a channeled claim.[24]

Under the Insurance Settlements, the protections from Sexual Abuse Claims afforded to the Insurers would also apply to claims for coverage that might be asserted against the Insurers by non-debtor diocesan parties, such as parishes and other entities claiming entitlement to coverage for Sexual Abuse Claims. The Insurers would also receive releases from any extracontractual claims Debtor or the non-debtor diocesan parties could have asserted.

In addition, the Insurers would be protected, under the Insurance Settlements, from contribution claims by any other insurers, with Debtor agreeing to voluntarily reduce any judgment or settlement with those other insurers, if needed, to avoid a contribution, subrogation, or indemnification claim against the Settling Insurers.[25]

The value to the Settling Insurers of protection from Sexual Abuse Claims is clear. The Insurers would no longer have to defend or pay such claims in the tort system, where, Debtor advised the Court, the Insurers "might be required to pay . . . potentially massive jury verdicts which a few individual plaintiffs might obtain if allowed to liquidate their claims in state court."[26] Debtor told the Court that the Insurers were receiving an appropriate discount for the "approximately one-quarter to one-third" of sexual abuse claims that are, "from either an insurance recovery and/or legal liability perspective, low- or no-value claims."[27] Debtor's assertion was based on, among other reasons, the fact that these proofs of claim:

---

[24]     *Id.* §§ 2.2.7, 7.2.

[25]     *Id.* § 7.1.1.

[26]     Insurance Settlement Motion ¶ 58. Interstate and LMI do not have a duty to defend but, instead, a right to associate with the Debtor in the defense of the claims.

[27]     *Id.* ¶ 26.

(i)     were not timely filed;

(ii)    allege abuse perpetrated by individuals whom Debtor did not employ or over whom Debtor did not exercise control;

(iii)   allege abuse at facilities over which Debtor does not exercise control;

(iv)    allege abuse at churches not affiliated with Debtor or the Catholic Church;

(v)     allege abuse by third parties associated with non-Debtor entities;

(vi)    allege claims where plaintiffs are unlikely to satisfy the requisite burden of proof;

(vii)   allege abuse for which liability is questionable or for which potential damages are limited; or

(viii)  are otherwise susceptible to a speedy dismissal.[28]

The settlements also provided the Insurers with certainty and predictability regarding their financial obligations under their policies and protection from having to defend Debtor and the non-debtor diocesan parties in prolonged underlying litigation.

In addition, the Insurance Settlements resolved disputes over the Settling Insurers' coverage defenses and eliminated the need to litigate coverage in the Adversary Proceeding. As Debtor recognized in the Insurance Settlement Motion, the coverage litigation featured "numerous and complex legal and factual issues that would need to be resolved before a court could" decide whether the policies provide coverage, and if so, the extent of coverage available.[29] This would have been expensive and time-consuming litigation. But under the Insurance Settlements, Debtor would be obligated to dismiss the Adversary Proceeding with prejudice.

The Insurance Settlements include many protections to ensure the Settling

---

[28]    *Id.* ¶ 26.

[29]    *Id.* ¶ 50.

Insurers received the benefit of their bargain. Debtor was required to propose a plan of reorganization, and seek entry of a confirmation order, "in all respects consistent with" the terms of the Insurance Settlements. Debtor was also required to "(i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order."[30] The Insurance Settlements required that the proposed plan and confirmation order must not deprive the Insurers of any right or benefit or otherwise adversely affect the Insurers' interests.[31] Last, if anyone acted to prevent enforcement of the Insurance Settlements' provisions, Debtor and the Insurers "mutually agree[d] to cooperate fully in opposing" that action—a promise Debtor has now abandoned.[32]

When Debtor filed the Insurance Settlement Motion seeking approval of the Insurance Settlements, Debtor told the Court that it had "considered several alternative strategies for monetizing its insurance assets." These included litigation against the Insurers "or assigning its insurance policies to the Trust for post-confirmation coverage litigation." But "[u]ltimately, the Diocese determined that the interests of survivors in this case would be best served by achieving certainty with respect to a very substantial insurance contribution rather than risking the cost, extensive delay, and uncertain outcome of litigation in pursuit of the theoretical possibility of a larger recovery at some point in the distant future."[33] Debtor also

---

[30]  CNA Settlement § 2.3.2.

[31]  CNA Settlement § 2.2.

[32]  CNA Settlement § 8.1.

[33]  Insurance Settlement Motion ¶ 4.

noted that if any of the coverage defenses the Settling Insurers were likely to assert were successful, its "ability to compensate survivors" would be "significantly hamper[ed]."[34] Further, Debtor argued, "while protracted litigation would without question result in increased costs, reducing the funds available for distribution to survivors, there is no guarantee that the result of litigation would be more favorable than the proposed settlement terms."[35]

In the Insurance Settlement Motion, Debtor noted that the Committee "may not support the proposed settlements."[36] In fact, Debtor entered into each Insurance Settlement "with the knowledge and understanding that the Committee ha[d] not indicated its support or consent to this Settlement Agreement and that the Committee and Tort Claimants may object to approval of this Settlement Agreement or confirmation of the Plan."[37] Still, Debtor argued, the Insurance Settlements should be approved:

> The Diocese is prepared to demonstrate at an evidentiary hearing that, after assessing the countervailing risks and benefits to all parties of further litigation, the proposed settlement proceeds, combined with the additional $40,500,000 to be contributed by the DOR Entities under the Plan, is sufficient and appropriate to adequately and fairly compensate the survivors for their injuries, and that the Diocese's decision in agreeing to settle its coverage claims against the Settling Insurers more than satisfies the reasonableness standard of Bankruptcy Rule 9019 and the business judgment test under section 363 of the Bankruptcy Code.[38]

In sum, Debtor advised the Court, "the proposed settlements provide a very reasonable compromise that is in the best interest of abuse survivors."[39]

---

[34]    *Id.* ¶ 5.

[35]    *Id.*

[36]    *Id.* ¶ 58.

[37]    CNA Settlement § 6.1.3; Interstate Settlement § 6.1.3.

[38]    *Id.*

[39]    *Id.* at ¶ 59. Debtor went on to argue that "while the Court may consider the perspective of the Committee and individual abuse claimants, the Diocese respectfully submits that neither the

## C.     The RSA and the RSA Plan

Rather than abide by the cooperation requirements in its Insurance Settlements (and the policies), and notwithstanding the many arguments Debtor previously made to the Court about how reasonable and appropriate the Insurance Settlements were, Debtor now is opposing its own settlements.  On November 3, 2022, Debtor filed the RSA Motion, appending as Exhibit 2 a Restructuring Support Agreement and a plan term sheet (the "RSA").[40]  Debtor has not formally withdrawn the Insurance Settlement Motion.  But it has, by executing the RSA, entered into a wholly inconsistent settlement agreement that binds Debtor to propose a plan (the "RSA Plan") that is fundamentally incompatible with the Insurance Settlements, and the Debtor has breached the Insurance Settlements by assisting the Committee and claimants in establishing claims against the Insurers contrary to its representations and warranties in the Insurance Settlements.  Worse, Debtor is claiming that the Settling Insurers do not even have the right to be heard with respect to its renunciation of the Insurance Settlements through the RSA.

The RSA Plan would establish a settlement trust to which Sexual Abuse Claims would be channeled.  The similarities to the Insurance Settlements end there.  The RSA Plan trust would be funded by a cash contribution by Debtor only, in the amount of $55 million, barely one-third of the $147.75 million the Settling Insurers and Debtor would jointly contribute under the Insurance Settlements.  In place of the Insurers' $107.25 million contribution, the RSA paints a target on the Insurers' backs.  The RSA Plan provides the opposite of the finality

---

claimants nor the Committee has a veto power and the Court can nevertheless approve the proposed settlements over their objections, if any."  *Id.* at ¶ 60.

[40]     Dkt. No. 1790-2.

and certainty enshrined in the Insurance Settlements and, by way of three litigation vehicles—Stipulated Judgments, Litigation Awards, and Insurance Claims—seeks to significantly increase the Insurers' potential liability, thereby guaranteeing years of expensive litigation.

Stipulated Judgments. The RSA provides that Debtor and the Committee, assisted by one or more Judgment Mediators, will agree to as many as 38 Stipulated Judgments. For a claim to qualify as a Stipulated Judgment, there must be "an applicable insurance policy from CNA [that] affords coverage."[41] Stipulated Judgment values are also tied to the alleged CNA policies. The RSA caps a Stipulated Judgment at the lesser of the CNA policy limits allegedly available for the claim or $7.5 million, with the CNA policy limits calculated as the per-occurrence policy limit, assuming each act of alleged abuse is a separate occurrence.[42] Subject to the cap, the agreed value of each Stipulated Judgment will hinge on evidence and expert testimony submitted by Debtor or the Committee to the Judgment Mediator. CNA, despite being the party handed the bill, is barred from participating in the mediation and will not be permitted to submit evidence about the viability or value of the claims. CNA almost certainly will be kept in the dark about critical details, like how claims are chosen to be Stipulated Judgments or how the values are calculated, by strategic use of the mediation privilege. The Stipulated Judgments will be presented to this Court for approval under Rule 9019 and then, once approved, assigned to the trust for enforcement in the tort system. Stipulated Judgments may be enforced only against CNA.[43] The apparent goal of this scheme is to preclude CNA from being able to contest Debtor's liability once these judgments are in hand, leaving CNA

---

[41]     RSA at 37.

[42]     *Id.* at 38.

[43]     *Id.* at 34.

- 12 -

with only challenges to the reasonableness of the stipulated amounts—and because the stipulations will have been reached in a one-sided mediation from which CNA will be excluded, CNA will effectively be barred from contesting reasonableness or showing that the Stipulated Judgments were reached collusively.

Litigation Awards. The RSA excepts from the channeling injunction claimants who wish to proceed in the tort system. These "Litigation Claimants" must seek the trust's permission and the trust must "consult with the Diocese and/or any Protected Party against whom such Claim is asserted" before authorizing the Litigation Claim.[44] The RSA encourages Litigation Claimants to litigate rather than settle—contrary to well-established public policy favoring settlements—by providing Claim Enhancements based on how far down the path the lawsuit is, in terms of discovery and trial, when it is settled. These Enhancements will pay, for example, an additional 50% if settlement is reached after the first day of trial and an additional 100% if settlement is reached following entry of judgment.[45]

Insurance Claims. Under the RSA, claims against Insurers and rights under insurance policies issued by the Insurers are assigned to the trust.[46] In addition, Debtor's and the parishes' rights, if any, under Debtor's insurance policies will belong to the trust, including claims for breach of contract and bad faith against the Insurers. The Insurers can try to renegotiate their existing settlements to obtain the protections of the channeling injunction, but under the RSA Plan, Debtor is not free to settle with an Insurer unless it obtains the Committee's consent.

---

[44]     *Id.* at 43.

[45]     *Id.* at 44.

[46]     *Id.* at 47.

In addition to these three primary vehicles that multiply the Insurers' potential liability, Debtor also agreed to increase its own liability via the RSA Plan. First, contrary to Debtor's cooperation obligations under the policies, the RSA requires Debtor to withdraw its pending objections to 74 Sexual Abuse Claims.[47] Debtor's dozens of objections were based on evidence establishing that the abuses alleged in those 74 claims were perpetrated by individuals at schools or religious orders outside of the Diocese, such that neither Debtor nor the non-debtor diocesan parties could potentially be liable for such abuse. The RSA requires Debtor to toll deadlines and adjourn hearings relating to its claim objections and provides that all Sexual Abuse Claims—including the 74 claims the Debtor told the Court lacked merit—will be deemed allowed under the RSA Plan. If the RSA Plan is confirmed and becomes effective, the claim objections will be deemed withdrawn with prejudice. Debtor has already adjourned the hearing on its claim objections, without seeking the consent of the Insurers who filed joinders in the objections. Second, some 40 proofs of claim were submitted after the bar date—yet the RSA provides that those claims will also be deemed allowed under an RSA Plan. Thus, the RSA would result in more than 110 non-meritorious claims being deemed allowed and submitted to Insurers for payment.

Finally, the RSA Plan would disallow contribution claims against Debtor arising out of a Sexual Abuse Claim, including claims by the Settling Insurers against Debtor for contribution based on its uninsured and underinsured periods. Such claims are, however, recognized by New York law.[48]

---

[47]     *Id.* at 50.

[48]     *See, e.g.*, *Keyspan Gas E. Corp. v. Munich Reins. Am.*, Inc., 143 A.D.3d 86, 92-93 n.8 (2016), *aff'd*, 31 N.Y.3d 51 (2018) (when a policy provides for pro rata allocation, the insured bears the risk for periods when it did not have coverage).

Upon the RSA Plan's effective date, the Insurance Settlement Motion would be deemed withdrawn with prejudice.  So, if the RSA Motion is granted and the RSA Plan is confirmed, the Insurance Settlements would be vaporized.

## Argument

## I.    The RSA Motion harms the Settling Insurers by directly undercutting their previously negotiated settlement agreements.

The issue presently before the Court is whether the Settling Insurers have standing to object to the RSA Motion, a significant motion that seeks to fundamentally alter the direction of this case.  Until the RSA Motion was filed, Debtor was actively seeking approval of the Insurance Settlements which provided the Insurers with resolution of their financial exposure and certainty.  Now, under the RSA, Debtor is required to cease pursuing the Insurance Settlements (which has already happened) and to pursue the RSA Plan, which is mutually exclusive with the Insurance Settlements.  As set forth below, the RSA Plan is designed to increase the quantum of liability the Insurers face and alter their contractual rights.  As such, the RSA Motion directly and adversely impacts the Insurers' pecuniary interests in concrete ways, which is sufficient to give the Insurers standing to oppose the RSA Motion.[49]

### A.    Bankruptcy standing and federal standing are broad, easily satisfied standards.

Neither bankruptcy standing nor Article III standing are high hurdles to clear.  "Section 1109(b) grants a broad right to all parties in interest to participate in the case."[50]  The

---

[49]    There can be no doubt that the Insurance Settlements and the RSA Plan are mutually inconsistent.  The RSA itself says so.  *See* RSA at 8 (§ 6(A)iv.d) (providing that the Diocese may terminate the RSA if this Court finds that the Diocese is bound by the Insurance Settlements).

[50]    *In re Quigley Co.*, 391 B.R. 695, 702 (Bankr. S.D.N.Y. 2008).  Section 1109(b) of the Bankruptcy Code provides a party in interest with standing to "appear and be heard on any issue in a case in this chapter."

Bankruptcy Code does not define the term "party in interest," but courts in the Second Circuit construe the concept "broadly 'to insure fair representation of all constituencies impacted in any significant way by a Chapter 11 case.'"[51]  As the bankruptcy court in the Southern District of New York has observed, § 1109(b) is "interpreted to mean that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains."[52]  Similarly, a party "who is the primary source of funding or whose exposure would be increased as the result of a settlement or other binding agreement" has standing.[53]  In short, standing under § 1109(b) extends to all entities with a "practical stake in the outcome of the proceedings."[54]

Article III requires only that a party have "such a personal stake in the outcome of the controversy as to assure . . . concrete adverseness."[55]  First, a party must establish "injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."[56]  This is not a demanding requirement: "the injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice."[57]

---

[51]    *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009), quoting *In re Johns-Manville Corp.*, 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984).

[52]    *In re Quigley Co.*, 391 B.R. at 703 (internal citations and quotations omitted).

[53]    *In re Motors Liquidation Co.*, 580 B.R. 319, 350 (Bankr. S.D.N.Y. 2018).

[54]    *In re Amatex Corp.*, 755 F.2d 1034, 1041-42 (3d Cir. 1985) ("party in interest" is an "elastic concept").

[55]    *Baker v. Carr*, 369 U.S. 186, 204 (1962).

[56]    *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks, footnotes, and citations omitted).

[57]    *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 105 (2d Cir. 2013) (internal citation and quotations omitted).  *See also Gen. Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc.*, 197 F.3d 83, 87 (3d Cir. 1999) (all a litigant needs to show to establish its standing is an "identifiable trifle" of injury).

- 16 -

Second, there must be a causal connection between the injury and the conduct complained of, defined as whether the injury is "fairly traceable" to the challenged action.[58] Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[59] The federal standing doctrine also encompasses the concept of prudential standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction."[60] This is interpreted in the Second Circuit to mean that a party "must assert his own legal rights and interests."[61]

The Insurers easily satisfy these requirements. The RSA Motion, if it is granted, will cause the Insurers to suffer concrete and particularized injury in fact, directly traceable to the RSA Motion, and redressable by denying the relief requested in the RSA Motion. The Insurers are asserting their own rights, not anyone else's. The RSA Motion also threatens obvious future harm to the Insurance Settlements by obligating Debtor to pursue a plan that is completely inconsistent with the Insurance Settlements. For all these reasons, the Insurers have standing to object.

In the early days of mass tort bankruptcies, some bankruptcy courts were reluctant to afford insurers standing to be heard in response to motions or plans that threatened to harm insurers' financial interests. Subsequently, circuit courts have repeatedly held that where a motion or plan may affect insurers, they have standing to be heard. For example, in *Global Industrial Technologies*, the Third Circuit recognized insurers' standing, stating, "when a federal

---

[58]      *Lujan*, 504 U.S. at 560-61 (internal quotation marks, footnotes, and citations omitted).

[59]      *Id.* at 560-61 (internal quotation marks, footnotes, and citations omitted).

[60]      *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004).

[61]      *In re Quigley Co.*, 391 B.R. at 702.

court gives its approval to a plan that allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed. In short, they at least have bankruptcy standing."[62] Similarly, in *Thorpe Insulation*, the Ninth Circuit ruled that insurers have standing where "the real-world impacts" of a plan "increases insurance exposure and likely liabilities of" insurers.[63] And in *Congoleum*, the Third Circuit ruled that insurers had standing to oppose an application to retain special insurance counsel because the application was "an important preliminary motion" that "will affect the resolution of issues that may directly affect the rights of insurers" and "it is highly unlikely that any of the parties other than the insurers . . . would challenge the application."[64] All three decisions reversed lower court rulings and remanded the cases so that the insurers could present their arguments and evidence in the bankruptcy court; the fact that the insurers had initially been denied standing thus resulted in the ultimate resolutions of the cases being delayed.

### B. The RSA Motion harms the Insurers by interfering with their settlements.

The Insurance Settlement Motion has been pending since May 20, 2022. For the past seven months, the parties to the Insurance Settlements—including, until recently, Debtor—actively pursued approval of the motion. A discovery schedule was set, to culminate in an evidentiary hearing beginning on January 24, 2023. The Insurers served discovery, produced documents in response to requests by the Committee, prepared for both offensive and defensive depositions, and retained experts, among other things. The RSA Motion brought those efforts to an immediate halt. By entering into the RSA, Debtor breached the Insurance Settlements.

---

[62]     *In re Global Industrial Technologies, Inc.*, 645 F.3d 201, 204 (3d Cir. 2011).

[63]     *In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012).

[64]     *In re Congoleum Corp.*, 426 F.3d 675, 685, 687 (3d Cir. 2005).

And approval of the RSA would ensure that the Insurance Settlement Motion is withdrawn and the Insurance Settlements abandoned for all time.

First, the RSA Motion requires that, upon execution of the RSA, Debtor will "toll all deadlines and adjourn all hearings" with respect to the Insurance Settlement Motion, unless otherwise ordered by the Court and "until the first to occur of (i) the Court entering an order denying approval of the Restructuring Support Agreement, (ii) the Court entering an order denying confirmation of the Plan, or (iii) the Effective Date."[65] As this Court knows, Debtor has already complied with this provision of the RSA: on November 14, 2022, Debtor moved to toll all deadlines relating to the Insurance Settlement Motion until after the RSA Motion is heard.[66] Thus, the RSA Motion has already had a direct, negative impact on the Insurers' economic interests, by pausing all efforts to approve their settlements.

Second, once Debtor has sought and obtained confirmation of the RSA Plan, the Insurance Settlement Motion will be deemed withdrawn with prejudice. Debtor's actions in pursuit of the RSA Motion confirm that Debtor's aim is not just to pause bankruptcy court consideration of the Insurance Settlements, but to scuttle them altogether. Debtor has gone so far as to deny it is bound by the Insurance Settlements because it purportedly did not sign them[67]—despite previously telling this Court that it and the non-debtor diocesan parties "have reached agreement" with the Insurers, filing the Insurance Settlement Motion, stipulating to a discovery and hearing schedule, seeking and obtaining a court order approving the form and

---

[65] RSA at 50.

[66] Dkt. No. 1809. *See also* Case Management Order (Dkt. 1838) (suspending deadlines related to the Insurance Settlement Motion).

[67] Transcript of Nov. 22, 2022 Hearing at 6:4-5 (statement of Mr. Donato).

manner of notice of the Insurance Settlement Motion, designating an expert to testify on its behalf at the hearing to approve the Insurance Settlement Motion, and otherwise moving forward with efforts to obtain approval of the settlements.[68]

The Insurers have an economic interest in carrying forward and obtaining bankruptcy court approval of their Insurance Settlements. These settlements provide the Settling Insurers with valuable releases and the certainty that they have met their obligations through very large lump-sum payments exceeding $107 million in the aggregate. "Monetary harm is a classic form of injury-in-fact," and the RSA Motion imposes monetary harm by depriving the Settling Insurers of the benefit of the bargain they struck in the Insurance Settlements.[69] The RSA, if approved, all but ensures that the Insurers' settlements are dead. This injury is fairly traceable to the RSA because it is a direct instruction to Debtor to renounce the Insurance Settlements. There are no intervening or independent causes. Indeed, right

---

[68] *See* Insurance Settlement Motion ¶ 1 ("Following extensive negotiations in mediation, the Diocese, together with its parishes and other non-debtor Catholic entities that share insurance coverage with the Diocese (collectively with the Diocese, the 'DOR Entities'), *have reached agreement*, subject to approval by the Court, to resolve all disputes with the Settling Insurers regarding the availability and extent to which any policies of insurance issued by the Settling Insurers (the 'Subject Policies') provide coverage for sexual abuse claims asserted against the DOR Entities") (emphasis added). Also, the Settling Insurers provided Debtor with signature pages contemporaneously with reaching the Insurance Settlements and in advance of Debtor's filing of the Insurance Settlement Motion. The Settling Insurers have no evidence that Debtor intended to rely on this specious argument—that the contracts Debtor agreed to and submitted to the Court were unenforceable because Debtor had not signed them—when Debtor filed its Rule 9019 motion extolling their merits and seeking their approval. However, this is another area in which discovery is appropriate and necessary. Among other things, the Insurers would seek to obtain discovery that Debtor's Board of Trustees—"consisting of the Bishop, the Vicar General and the Chancellor of the Diocese" (Insurance Settlement Motion ¶ 14)—approved the Insurance Settlements before Debtor filed the Insurance Settlement Motion and intended for Debtor to be bound by them. The Insurers would also seek discovery regarding any reason Debtor did not sign the agreement, including whether Debtor intentionally sought to lull the Insurers and the Court into believing there was a deal while attempting to preserve the ability to later argue that there was not.

[69] *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005) (defendant's actions forcing plaintiffs "to spend money against their will" established standing).

before Debtor filed the RSA Motion, the parties were engaged in discovery over the Insurance Settlement Motion.  Finally, the injuries are plainly redressable:  denial of the RSA Motion would mitigate the harm to the Insurers by unwinding Debtor's renunciation of the Insurance Settlements.

       **C.**      **The RSA Motion binds Debtor to pursue a diametrically opposite plan to the Insurance Settlements.**

If this Court approves the RSA Motion, Debtor will be bound to pursue the RSA Plan, which is entirely inconsistent with the Insurance Settlements.  There is simply no conceivable way for Debtor's plan to honor the terms of both the RSA and the Insurance Settlements:  as this Court has observed, the two are mutually incompatible.  Because the Insurers have an economic interest in seeing their settlements approved and effectuated, it follows that any action to undercut those settlements causes the Insurers economic harm.

The most obvious and irreconcilable way in which the RSA differs from the Insurance Settlements is with respect to finality.  Under the Insurance Settlements, the Insurers would pay $107.25 million in cash to obtain certainty that their obligations have been resolved. The RSA Plan guarantees the opposite, forcing the Insurers into protracted and expensive coverage litigation, saddling them with ongoing defense obligations in the tort system, and possibly compelling them to make indemnity payments that potentially could exceed $107.25 million.

Specifically, the Insurance Settlements granted full releases to the Insurers from all future liability.  The Insurers would be released from all policy obligations and all extracontractual claims such as bad faith.  In addition, all Sexual Abuse Claims would be channeled to the trust and the Insurers would receive the protection of a channeling injunction. The Insurers would receive additional protection via indemnity and judgment reduction

provisions in the Insurance Settlements.

In contrast, under the RSA Plan, the Insurers would not be released from any liability and, indeed, would become targets. First, claims against the Insurers are the centerpiece of the RSA Parties' scheme to fund the trust with more than the $107.25 million committed by the Insurers under the Insurance Settlements. Such claims include claims for indemnification, reimbursement of defense costs, and bad faith arising out of alleged wrongful claims handling, failure to settle, and other theories. The trust will no doubt pursue these claims vigorously, and the Insurers will be forced to defend themselves. Such litigation is virtually guaranteed to last many years. Second, the RSA Plan liberally exempts claims from the channeling injunction. The trust will enter into collusive Stipulated Judgments, using mediation as a means to conceal discussions that will occur behind closed doors. The trust will also authorize individual claimants to pursue their claims in the tort system, and CNA will have to defend such claims or face potential liability for default judgments. Apart from the tort litigation, coverage litigation over whether the Insurers are obligated to indemnify any settlements or judgments will separately require years of costly litigation.

The Insurance Settlements and the RSA Plan also fundamentally differ with respect to the financial contributions of the Insurers. Under the Insurance Settlements, the Insurers would contribute $107.25 million in cash at the plan's effective date. This carefully considered amount was based on a litany of factors, including claim-level analysis, available defenses to liability, and coverage defenses. It was, as Debtor advised the Court in the Insurance Settlement Motion, extensively negotiated in mediation. Fundamentally, the settlement amount reflected a reasoned judgment about the value of the claims and the Insurers' potential contractual exposure to pay them.

- 22 -

Although the RSA Plan requires no present payment from the Insurers, it includes several mechanisms to attempt to force the Insurers to pay substantially more later, whether for Insurance Claims (if the trust successfully prosecutes them) or on a claim-by-claim basis for Stipulated Judgments or Litigation Awards. It cannot reasonably be contested that these mechanisms are intended to increase "the quantum of liability that the insurers would be called upon to absorb" under an RSA Plan.[70] Were it otherwise, the Committee, which objected to the Insurance Settlements because of its view that the settlements "drastically undervalue[d]" the claims,[71] would not have agreed to the RSA. The threat of future indemnity obligations in excess of the amount the Insurers agreed to pay under the Insurance Settlements "represents an imminent and concrete injury," directly traceable to the RSA Motion and fully redressable by its denial.[72]

As amply demonstrated, the RSA Motion is a *de facto* renunciation of the Insurance Settlements. As such, it violates Second Circuit law as stated in *Liberty Towers Realty*, which holds that "debtors may not unilaterally rescind settlement agreements."[73] In that case, the debtor entered into a settlement agreement with a creditor and the agreement was submitted to the bankruptcy court for approval pursuant to Rule 9019. At the hearing, the debtor withdrew support for the settlement agreement. The bankruptcy court approved it nevertheless, and the debtor appealed. The district court affirmed the bankruptcy court, holding that

---

[70]    *In re Global Industrial Technologies, Inc.*, 645 F.3d at 212-13 (insurers had standing even when their "ultimate liability [was] contingent" on the outcome of the plan, where the plan threatened on increase the quantum of liability the insurers could be forced to pay).

[71]    Committee Objection, Dkt. No. 1555, ¶ 23.

[72]    *Virginia Sur. Co. v. Northrop Grumman Corp.*, 144 F.3d 1243, 1246 (9th Cir. 1998).

[73]    *Liberty Towers Realty, LLC v. Richmond Liberty LLC*, 734 F. App'x 68, 70 (2d Cir. 2018).

"settlements requiring court approval are binding on all parties to the extent allowable under state law until the court considers and rejects the settlement."[74] The Second Circuit agreed, explaining that, to the extent a debtor believes it has received a better offer after settlement but before the settlement has been approved,

> Rule 9019 provides a mechanism for debtors to respect all of their obligations. The debtor can abide by its obligations under the settlement agreement, including, if necessary, filing a motion for settlement approval. Then, to protect the interest of its creditors, the debtor can present the post-settlement offer to the bankruptcy court in connection with the Rule 9019 proceedings. The court will then have the opportunity to evaluate whether this better offer warrants rejecting the settlement agreement.[75]

Here, Debtor did not follow the procedure mandated by the Second Circuit in *Liberty Towers Realty.*

Obviously, Debtor is choosing a different path by bringing forward only the RSA Motion. The Second Circuit is clear, however, that Debtor may not proceed in this manner. Moreover, these precedents are significant for another reason, which is that they implicitly recognize that counterparties to an abandoned settlement have a protectable interest in seeing their settlements move forward.[76]

---

[74]    *Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 569 B.R. 534, 542 (E.D.N.Y. 2017), *aff'd*, 734 F. App'x 68 (2d Cir. 2018).

[75]    *Id.* at 542-43. *See also In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996) (stating that, where a trustee "was faced with a conflict between her fiduciary duty to the creditor body as a whole" and her duty to abide by a settlement agreement, "the trustee should inform the court and the parties of any changed circumstances since the entry into the stipulation of settlement" so that the court can "determine what course of action will be in the best interest of the estate").

[76]    *See Liberty Towers Realty, LLC*, 734 F. App'x at 70 ("Allowing a party to withdraw from a settlement pending court approval would deter parties from entering into settlements in the first place, would permit parties to abuse the bankruptcy process, and would run contrary to generally applicable contract and settlement principles in this Circuit"). *See also United States v. Bank of New York*, 14 F.3d 756, 759 (2d Cir. 1994) ("When a party makes a deliberate, strategic choice to settle, she cannot be relieved of such a choice merely because her assessment of the consequences was incorrect"); *In re Seminole Walls & Ceilings Corp.*, 388 B.R. 386, 392 (M.D. Fla. 2008) ("the parties to a

## II. The RSA Motion specifically targets CNA to pay inflated Stipulated Judgments with no opportunity to contest liability.

### A. The Stipulated Judgments would concede liability and set inflated claim values in secret.

Under the RSA, Debtor and the Committee will work with one or more Judgment Mediators "to agree on not more than 38 Stipulated Judgments."[77] A Sexual Abuse Claim can only be a candidate for a Stipulated Judgment if "there is a reasonable basis for an assertion of liability against the Diocese." Essentially, a claimant may submit what amounts to a *prima facie* case for liability, which Debtor has no incentive to contest because its financial obligation under the RSA Plan is limited to its fixed trust contribution. Then, Debtor, the Committee, and the claimant would "present the Judgment Mediator with expert testimony and other evidence" regarding the value of the claimant's Sexual Abuse Claim. Both the claimant and the Committee will drive values as high as possible, and Debtor has no incentive to hold down claim values because it does not bear any financial responsibility for Stipulated Judgments. The entity asked to pay the Stipulated Judgments, CNA, will have no input, in derogation of its contractual right to defend and settle claims potentially within its coverage.[78]

The use of a mediator is designed to allow the RSA parties to cloak these liability and value determinations in secrecy by invoking the mediation privilege. The RSA parties intend that when the Stipulated Judgments are presented for this Court's approval, CNA will have no information as to how the Stipulated Judgments were selected, what allegations or

---

settlement agreement may not unilaterally repudiate it after approval of it has been sought pursuant to Rule 9019").

[77] RSA at 37.

[78] CNA would also be stripped of its right under New York CPLR § 3121 to insist on an independent medical examination of the claimants to assist in contesting damages.

evidence purportedly supported liability, or how the judgment amount was determined. This is an unreasonable infringement of the contractual rights CNA would have outside of bankruptcy under its policies, including the right to control the defense and settlement of the claims and to require the cooperation of the insured (as opposed to suffering collusion by the insured with claimants and the Committee). The result is the potential that CNA will have to pay claims that would not be paid in the tort system, or that would be paid only at lower values, thereby increasing the liability CNA may have to absorb due to the terms of the RSA.[79]

Debtor and/or the Committee may argue that CNA disclaimed coverage for some or all of the claims that become the subject of Stipulated Judgments and thereby waived its right to control the defense of such claims, but there are two problems with such an argument. First, CNA would dispute any such argument by Debtor, and the Court cannot accept Debtor's or the Committee's contention that CNA denied coverage for a particular claim without giving CNA a full and complete chance to contest that argument. The Stipulated Judgment protocol forecloses that possibility, however, because the selection of claims to become Stipulated Judgments, which is premised on the assertion that CNA did, in fact, deny coverage, would be done in secret. By the time a Stipulated Judgment would be before this Court for approval, CNA's alleged coverage disclaimer would be baked in. Second, the Stipulated Judgment

---

[79] The use of "Judgment Mediators" is clearly intended to cloak the negotiations among the Debtor (who has no incentive to contest liability or seek low claim values), the Committee, and the claimant under the protection of the mediation privilege. But the function to be served by the "Judgment Mediator," to whom "expert testimony and other evidence" will be presented, appears more adjudicative. In any event, CNA reserves the right to seek full and complete disclosure of all information exchanged among the parties and/or any Judgment Mediator. Bankruptcy courts in analogous circumstances have declined to allow the mediation privilege to be used to cloak claim-related negotiations in secrecy. *See, e.g.*, Transcript of Telephonic Ruling, *In re Boy Scouts of America*, No. 20-10343-LSS, Dkt. No. 6798 at 11-15 (Bankr. D. Del. Oct. 25, 2021) (denying debtors' motion to shield, from discovery, oral and written communications regarding trust distribution procedures, based on the mediation privilege).

protocol assumes that the effect of a coverage disclaimer is waiver, which is a *sub silentio* coverage determination that cannot be made by a bankruptcy court – particularly without giving the affected insurer an opportunity to be heard in an adversary proceeding.

**B.    The Stipulated Judgments lock in legally invalid coverage determinations under the CNA Policies.**

The Stipulated Judgment protocol described in the RSA incorporates coverage determinations into the judgment amounts, which alters CNA's contractual rights in addition to increasing the amounts it may be obligated to pay.  First, the value of each Stipulated Judgment is capped at the lesser of "Available CNA Policy Limits" allegedly triggered by the claimant or $7.5 million.  According to the RSA, "Available CNA Policy Limits" means the combined per-occurrence limits for all triggered CNA policies, "calculated on the basis of one occurrence for each act of alleged sexual abuse."  In other words, the RSA purports to define the relevant "occurrence"—an insurance law concept that is often hotly disputed—as "each act of alleged sexual abuse" and concludes that CNA owes a separate limit for each separate act. "Occurrence" is a defined term in most insurance policies, however, and its meaning must be in accord with the policy language.  Courts interpret the term "occurrence" differently depending on how the policy language defines the term.[80]  Yet, the RSA would effectively cement the Committee's preferred, coverage-maximizing definition into the value of 38 Stipulated Judgments, regardless of policy language or applicable case law.

Second, Stipulated Judgments may only be enforced against CNA.  However,

---

[80]    Debtor and/or the Committee and claimants will likely cite *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 21 N.Y.3d 139 (2013), for the proposition that alleged acts of abuse constitute multiple occurrences.  In that event, CNA would cite to case law reaching a different conclusion where the policies in question contained additional language found in the CNA policies.  *See, e.g., Mt. McKinley Ins. Co. v. Corning Inc.*, 96 A.D.3d 451, 452-53 (2012); *Verlus v. Liberty Mut. Ins. Co.* 2015 WL 7170484, at *4 (S.D.N.Y. Nov. 12, 2015).

New York is a "*pro rata* state," meaning that CNA is entitled to have other insurers that issued

policies covering a particular claim share in the liability for that claim.[81] Moreover, New York

law requires an insured such as the Debtor to absorb its *pro rata* share of responsibility for any

years where it is self-insured, uninsured, or underinsured.[82] The RSA Motion therefore abridges

CNA's right to insist on proration of its liability for any claim that triggers another insurer's

policy years, or years where Debtor was self-insured, uninsured, or underinsured.

Third, Stipulated Judgments by definition are claims for which CNA "denied

coverage." However, the RSA provides no opportunity for CNA to contest whether it did, or

did not, deny coverage for a particular claim, or what the effect any disclaimer has under

applicable law. Approving Stipulated Judgments on this basis would, again, improperly bake in

coverage determinations.

At a minimum, CNA has standing to object to these provisions which directly

impact CNA's financial interests.

### C. The RSA provides for Stipulated Judgments to be approved immediately, before confirmation proceedings related to the RSA Plan.

The Stipulated Judgments are not plan provisions that will come into effect only

---

[81] *Roman Catholic Diocese of Brooklyn*, 21 N.Y.3d at 154 ("Plainly, the policy's coverage is limited only to injury that occurs within the finite one-year coverage period of the policy. To that end, assuming that the minor plaintiff suffered 'bodily injury' in each policy year, it would be consistent to allocate liability across all implicated policies, rather than holding a single insurer liable for harm suffered in years covered by other successive policies"); *Consolidated Edison Co. of New York v. Allstate Ins. Co.*, 98 N.Y.2d 208, 224 (2002) ("Pro rata allocation under these facts, while not explicitly mandated by the policies, is consistent with the language of the policies. Most fundamentally, the policies provide indemnification for liability incurred as a result of an accident or occurrence during the policy period, not outside that period") (internal citation omitted).

[82] *See, e.g.*, *Keyspan Gas E. Corp. v. Munich Reins. America*, 31 N.Y.3d 51, 59-63 (2018) (holding that policyholder bears financial responsibility for time periods when it was uninsured, even where insurance was not available in the marketplace); *Liberty Mut. Ins. Co. v. Jenkins Bros.*, 203 A.D.3d 579 (2022) (same, following *Keyspan*).

after an RSA Plan is confirmed. They are right-now provisions that will be pursued immediately if the Court approves the RSA. The Stipulated Judgments are to be agreed during the bankruptcy case and submitted to the Court for approval pursuant to Rule 9019, independent of plan confirmation proceedings.[83] Then, if approved, the Stipulated Judgments will be assigned to the trust as of the RSA Plan effective date. For all of the reasons discussed above, the Stipulated Judgments would inflate and expand CNA's potential liability. Because the RSA Motion sets the Stipulated Judgment process in motion, CNA has standing to object to it.

## III. The RSA binds Debtor to propose a plan that harms the Insurers economically and interferes with their contractual rights.

Multiple aspects of the RSA Plan would have a direct, adverse pecuniary impact on the Insurers and are designed to increase the quantum of liability they face. As the Third Circuit explained in finding that insurers have standing, "[w]hen a federal court gives its approval to a plan that allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed. In short, they at least have bankruptcy standing."[84]

### A. The RSA Plan would allow claims for which Debtor has no liability.

Previously, Debtor filed 74 claim objections, supported by the Affidavit of Daniel J. Condon, Chancellor for the Diocese of Rochester.[85] As set forth in the objections and the

---

[83] The RSA specifically contemplates that Stipulated Judgments will be agreed to and executed by the Diocese, the Committee, and claimants before the Plan is even filed. *See* RSA at 7 (§ 6(A)ii.b) (providing that the RSA may be terminated if "[t]he form of the Plan . . . has not been agreed to by the Committee and the Diocese and filed with the Court on or before the date which is 45 days following the date on which all Stipulated Judgments contemplated under the Term Sheet have been agreed to and executed by the Diocese, the Committee, and the applicable Stipulation Claimants").

[84] *Global Industrial Technologies*, 645 F.3d at 204.

[85] Dkt. No. 1648.

Condon Affidavit, the objected-to proofs of claim allege abuse by perpetrators associated with schools or religious orders for which Debtor and the non-debtor diocesan parties have no liability (*e.g.*, non-Catholic schools). As Debtor explained in its claim objections, it is not legally responsible for these claims and, therefore, the claims should not be paid by the estate or from a plan settlement trust. They should, rather, be disallowed.

Initially, that is the request Debtor made, noticing a hearing on its claim objections first for October 12, 2022, then adjourned to November 16, 2022. CNA and LMI both joined Debtor's claim objections. However, Debtor agreed in the RSA to adjourn the claim objections without date. Under the RSA Plan, upon the effective date, the Debtor's claim objections will be deemed withdrawn with prejudice. Further, the RSA Plan would allow all Sexual Abuse Claims—including those that Debtor objected to because they have no connection to Debtor or non-debtor diocesan parties.

According to the plan term sheet incorporated into the RSA, an Allocation Protocol will be developed to provide for the "fair and equitable treatment" of Sexual Abuse Claims. Even if the Allocation Protocol assigns these claims zero value, channeling them to the trust in the first place will result in costs being incurred. These claims should be objected to and disallowed by the Court because Debtor has no liability for these claims. Debtor's agreement to deem them allowed unquestionably increases the quantum of liability the Insurers face.

Similarly, more than 40 proofs of claim were submitted after the bar date. The RSA Plan would allow these untimely proofs of claim. This further increases the quantum of liability that may be imposed on the Insurers.

As the Third Circuit held in *Global Industrial Technologies*, insurers have standing to oppose actions by a debtor that would increase the quantum of liability the insurers are asked to

pay. That principle requires recognition that the Insurers have standing to oppose the RSA Motion.

**B.    The RSA Plan breaches the Insurers' rights to control the defense of claims and obtain cooperation from Debtor in defending against such claims.**

Under the RSA Plan, so-called Litigation Claimants would not only be allowed to proceed in the tort system, but incentivized to do so. The trust provides for Claim Enhancement payments, which affirmatively pay claimants more if they pursue a claim in court. The trust pays such claimants even more if they refuse to settle their cases and continue to litigate through trial to judgment: a Litigation Claimant can obtain a Claim Enhancement of up to 100% of his or her claim if the case proceeds to judgment in the tort system. This procedure interferes with the Insurers' right to control the defense and settlement by eliminating claimants' normal incentives to accept reasonable settlements. At a minimum, the purpose of the Litigation Award and Claim Enhancement provisions is to increase the quantum of the Insurers' liability, and the Insurers have standing to contest an RSA that puts such provisions in place.

The Litigation Awards also breach Debtor's contractual duty to cooperate and, as such, abridge the Insurers' rights. Under the RSA Plan, the trust will authorize Litigation Claimants to pursue their claims only in consultation with "the Diocese and/or any Protected Party against which" the claim is asserted.[86] The clear import of this provision is that Debtor and/or the parishes will agree to being sued on claims that would otherwise be channeled to the trust. As a result, CNA will be dragged into the tort system, where Litigation Claimants will be paid a premium by the trust to litigate to judgment rather than settle. Such provisions are

---

[86]    RSA at 43.

irreconcilable with the Insurers' right to have Debtor, their insured, cooperate in its own defense. Moreover, such provisions run contrary to public policy favoring settlements and the bankruptcy purpose to resolve claims in a collective proceeding.

Because breach of the duty to cooperate voids coverage, the trust may assert that it will assume the cooperation obligation as "necessary" to preserve insurance rights.[87] The RSA Plan, however, makes this functionally impossible. It does not allow the trust to cooperate, whether it says it will assume that obligation or not, because it requires the trust to provide Claim Enhancements to claimants who continue to litigate against the Insurers. Invoking the duty to cooperate, *while at the same time paying claimants extra to not settle*, is meaningless lip service.

### C.  The RSA Plan deprives the Insurers of their contribution rights.

The RSA Plan provides for "Inbound Contribution Claims," defined as contribution claims asserted against Debtor or a Diocese Participating Party (which includes parishes but excludes the Insurers) arising out of a Sexual Abuse Claim. Such contribution claims are deemed impaired under the RSA Plan and, on the Effective Date, will be disallowed and extinguished. Such treatment impairs potentially valuable contribution rights belonging to the Insurers. As noted, New York is a *pro rata* state, meaning insureds such as Debtor are liable, on a prorated basis, for periods where they are self-insured, uninsured, or underinsured.[88] Debtor has asserted it purchased coverage beginning in 1943, but the earliest policy it can identify, allegedly issued by CNA, incepted on March 1, 1952. Debtor therefore bears the risk for the period 1943 to March 1, 1952, and perhaps beyond, and must pay its fair share of any claim alleging abuse during that period. It cannot foist that liability onto CNA *in toto* by simply

---

[87]     *Id.* at 40.

[88]     *Liberty Mut. Ins. Co. v. Jenkins Bros.*, 203 A.D.3d 579 (2022).

providing that contribution claims are extinguished.

CNA also disputes whether non-debtor diocesan parties such as the parishes are entitled to coverage under all of its alleged policies. CNA's position, supported by evidence, is that the alleged policies issued from March 1, 1952 to June 1, 1969 would have insured only the Diocese, and not the parishes. If CNA is right, then the parishes are uninsured for any claim alleging abuse before June 1, 1969, and they would have to contribute to paying any claim triggering that period.

LMI subscribed to certain policies, issued from June 1, 1977 to July 1, 1988, that are subject to a $75,000 self-insured retention; LMI is not obligated to respond to a claim unless the self-insured retention is paid. Without the LMI policies, Debtor and/or the non-debtor diocesan parties will owe contribution for claims alleging abuse during this period. For example, if a claimant alleges damages from abuse on two consecutive days—May 31, 1977, during a CNA policy period, and June 1, 1977, during a period of self-insurance—CNA would have a contribution claim against Debtor for the portion of abuse that occurred on June 1, 1977.

Interstate issued policies that provide second-level excess indemnity coverage for the period September 1, 1978 to July 1, 1986. Assuming all of the terms and conditions of the Interstate policies are met, the Interstate policies provide coverage on a per occurrence basis excess of both (i) the Diocese's $75,000 SIR and (ii) the $125,000 limits of the LMI policies. Interstate is not obligated to respond to a claim unless the combined total of $200,000 in SIR and the underlying LMI limits, for each occurrence, are exhausted.

All of these potential contribution claims by the Insurers against Debtor and the non-debtor diocesan parties would be extinguished under the RSA Plan, which the RSA Motion binds Debtor to propose. This is another direct, adverse pecuniary impact on the Insurers.

Indeed, even if contribution claims are maintained under a modified RSA Plan, the RSA Plan underfunds the trust (at least initially) and an inadequately funded trust risks impairing insurers' contribution claims all the same, as recognized by the Ninth Circuit in *Thorpe Insulation.*[89]

At the least, the Insurers have established the potential that their economic and contractual rights may be impaired by the RSA Motion because it binds Debtor to propose the RSA Plan. To the extent Debtor disputes the impact of the RSA Motion on the Insurers, or the mechanics of the RSA Plan provisions as laid out in the Term Sheet, discovery is necessary. Discovery will flesh out these issues and allow the Court to base its standing ruling on evidence. After all, standing is a fact-specific inquiry. It is both advisable and consistent with federal court precedent for a litigant's standing to be determined on the basis of an evidentiary record.[90]

## IV. The RSA is not "insurance neutral."

"Insurance neutrality" describes the fact that a bankruptcy plan cannot be confirmed, or a bankruptcy court motion granted, if it modifies or abridges Insurers' contractual rights under their policies and Insurers are not allowed to present their objections to the plan or motion. If a plan or motion is not neutral as to an insurer's rights, the insurer will have

---

[89] *In re Thorpe Insulation Co.*, 677 F.3d at 887 (ruling that where non-settling insurers negotiated the right to recover from the trust on a claim against a settling insurer, "inadequacy in the trust threatens to diminish the value of" those claims).

[90] *See, e.g.*, *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 102 (2d Cir. 2003) ("Clearly, a court may conduct an evidentiary hearing prior to trial where a jurisdictional issue such as standing is at stake"); *In re Martin Paint Stores*, 199 B.R. 258, 261 (Bankr. S.D.N.Y. 1996), *aff'd*, 207 B.R. 57 (S.D.N.Y. 1997) (bankruptcy court made its determination as to the objecting party's standing after holding an evidentiary hearing on the objections); *In re Burns & Roe Enters., Inc.*, 2009 WL 438694, at *12 (D.N.J. Feb. 23, 2009) (court's ruling on the standing of debtor's insurer was deferred until after the confirmation hearing was completed and insurer was permitted to present evidence and cross examine witnesses in support of its arguments); Transcript of July 24, 2009 Hearing, Dkt. No. 6816, *In re Pittsburgh Corning, Co.*, No. 00-22876 (Bankr. W.D. Pa.) at 53:19-23 (bankruptcy judge stating, "I did not make those [insurer standing] rulings until after it was clear to me at the confirmation hearing that the insurers had no standing").

bankruptcy standing to object.[91]  And regardless of whether a plan is "insurance neutral," bankruptcy courts "do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms."[92]

Here, Debtor's effort to hide behind vague and superficial references to future insurance neutrality, contained in a term sheet and untethered to the actual language of a proposed plan, cannot deprive the Insurers of standing.

### A.  Future promises of "insurance neutrality" are illusory.

Here, the RSA's use of the phrase "insurance neutral" is a red herring.  The RSA promises that the *plan* will be insurance neutral, but the Insurers are objecting now to the RSA Motion.  There are aspects of the RSA itself—including its interference with the Insurance Settlements, and the Stipulated Judgment protocol, which would go into effect immediately upon approval of the RSA Motion—that are clearly not insurance neutral and would immediately abridge the Insurers' rights.  The RSA requires Debtor to propose a plan that is fundamentally inconsistent with the Insurance Settlements and to violate its cooperation obligations under the policies by agreeing to Stipulated Judgments without input from CNA.  The RSA itself has direct, immediate, and adverse pecuniary impacts on the Insurers, and they accordingly have standing to object regardless of the promise of future neutrality under a future RSA Plan.

But even if insurance neutrality were being considered in the context of an actual plan, it still is insufficient to simply recite that the plan will be "insurance neutral."  As the Ninth

---

[91]  *See, e.g.*, *In re Boy Scouts of America*, 642 B.R. 504, 667 (Bankr. D. Del. 2022) ("if a plan is not 'insurance neutral,' insurance companies have standing (at either the bankruptcy or the appellate level, as applicable) to be heard").

[92]  *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989).

Circuit noted in *Thorpe Insulation*, in assessing whether a plan is insurance neutral, a court "must look to the real-world impacts of the plan to see if it increases insurance exposure and likely liabilities."[93] The *Thorpe Insulation* court explained that, "[t]hough the plan recites that it is insurance neutral, this characterization in and of itself does not settle the issue."[94] Instead, the Ninth Circuit ruled, a "plan is not insurance neutral when it may have a substantial economic impact on insurers."[95]

In *Thorpe Insulation*, the Ninth Circuit found four ways in which the economic realities of the plan increased insurers' liability, despite purported insurance neutrality language. One, relevant to the RSA Motion, was the plan's provision that the trust would establish claim values and seek payment of those claims from the insurers, with the insurers having no input into the claim values. The result, the court acknowledged, was that "the actual amount of payments due from insurance companies [was] increased by the plan from what those liabilities would be absent the plan," meaning the plan had "monetary impact in the real world of insurance, and is not insurance neutral."[96] Similarly here, the RSA's boilerplate language that the Insurers' rights will not be affected or diminished is meaningless in the face of actual economic impact.

Consensual insurance neutrality provisions evolve based on the particular circumstances presented by a bankruptcy case. The issues presented by this plan are different than those presented in other cases. It is important for the Court to have the actual insurance

---

[93]     *In re Thorpe Insulation Co.*, 677 F.3d at 885.

[94]     *Id.* at 885.

[95]     *Id.*

[96]     *Id.* at 886.

neutrality language before it for evaluation, in addition to all the plan provisions, related plan documents, and a full evidentiary record, before it could possibly conclude that the RSA and the RSA Plan are "insurance neutral." Here, no such language has been made available and there is no evidentiary record, including on the formulation of the RSA Plan. Without such language and a full evidentiary record, vague promises of future "insurance neutrality" cannot be given any credit, and cannot negate the Settling Insurers' standing to object to the RSA Motion.

**B.      The RSA Plan, as described in the term sheet appended to the RSA Motion, will not be "insurance neutral."**

No plan is yet before the Court, but the RSA Motion describes in detail what the RSA Plan will look like if the RSA Motion is approved. Certain aspects of the future RSA Plan are not insurance neutral by their terms. It is doubtful that Debtor could propose insurance neutrality language that would eliminate these concerns, but in any event no such language is before the Court. Therefore, the Court can neither assume nor find that the RSA Plan would be insurance neutral at this juncture.

First and foremost, the RSA Plan would require that Debtor formally withdraw the Insurance Settlement Motion, thus conclusively renouncing the Insurance Settlements.[97] That step is indisputably harmful to the rights and interests of the Settling Insurers.

Second, before it could possibly be considered "insurance neutral," the RSA Plan cannot contain any provision stating that an insurer must object, during the confirmation process, to any proposed assignments of the insurance policies or rights under the policies or be deemed to have irrevocably consented to the assignments and forever barred from asserting

---

[97]      RSA at 50.

them as a defense to coverage.[98]  Such a provision is not insurance neutral because it pre-judges the validity of the assignment and the ability of the trust to pursue Insurance Claims, despite provisions in the policies that prohibit assignment and limit coverage to those that qualify as insureds.  Binding the Insurers to a particular construction of plan provisions, or barring them from objecting to the assignment, would violate their contractual rights.[99]

Third and related, the RSA Plan will contain protocols that require Debtor and the trust to cooperate with claimants, not with the Insurers.  Debtor will respond that the RSA Plan allows the trust to assume whatever obligations are needed to preserve coverage, but this does not matter because, under the RSA Plan, breach of the cooperation obligation is inevitable regardless of who holds the obligation to cooperate with the Insurers.  Debtor breaches the duty to cooperate by helping pick which claims will be pursued in the tort system and by entering into Stipulated Judgments, and the trust breaches by paying those claimants to litigate rather than settle.  Under such a regime, Debtor and the trust lack any incentive to contest liability, and the perverse incentives created by the RSA assure that liability will go up merely because this Court granted the RSA Motion.

Fourth, by way of the RSA Plan, Debtor is assenting to the allowance of claims that it previously objected to on the basis that it has no liability.  The RSA Plan will treat as allowed, against the estate, claims alleging abuse for which neither Debtor nor non-debtor

---

[98]     *See* RSA at 40 ("If a party in interest fails to timely file an objection to the proposed assignment by the deadline for filing objections to confirmation of the Plan, that party in interest shall be deemed to have irrevocably consented to the assignment and will be forever barred from asserting that the assignment in any way affects the ability of the Trust to pursue Insurance Claims from the Non-Settling Insurers, and each of them, or Insurance Coverage").

[99]     *See In re Boy Scouts of America*, 642 B.R. 504, 669 (Bankr. D. Del. 2022) ("Each [insurance policy] contract will need to be interpreted under applicable law in the context of a specific dispute").

diocesan parties are liable. The RSA also deems allowed claims that would be barred from recovery under the applicable bar date order. At the same time, Debtor is shielding itself from liability for contribution for self-insured, uninsured, or underinsured periods by purporting to extinguish the Insurers' contribution claims against Debtor. These provisions serve to enlarge the Insurers' potential liability for the claims.

## Conclusion

This is not an exploration of the merits of either the RSA Motion or the grounds for Insurers' opposition thereto. This is merely an inquiry into whether the Settling Insurers clear the low bar to be entitled to present their merits arguments to the Court, to obtain discovery to support their merits arguments, and to present evidence to the Court. The RSA Motion, if granted, would cause the Insurers to suffer immediate and direct pecuniary injury that would be fully redressed if the Court were to deny approval of the RSA Motion. That is all the Insurers must show to have standing to present their objections to the Court.

For the reasons set forth above, the Settling Insurers respectfully request that the Court issue an order finding that they have standing to object to the RSA Motion and to obtain discovery in support of their objections.

DATED: December 30, 2022

Respectfully submitted,

By: _/s/ Jeffrey A. Dove_
Jeffrey A. Dove
BARCLAY DAMON LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202
Telephone: (315) 413-7112
Facsimile: (315) 703-7346
jdove@barclaydamon.com

- and -

Mark D. Plevin (admitted *pro hac vice*)
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California 94111
Telephone: (415) 986-2800
mplevin@crowell.com

David Christian (admitted *pro hac vice*)
DAVID CHRISTIAN ATTORNEYS LLC
105 West Madison Street, Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

Miranda H. Turner (admitted *pro hac vice*)
Rachel A. Jankowski (admitted *pro hac vice*)
Thomas Matthew (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
mturner@crowell.com, rjankowski@crowell.com,
tmatthew@crowell.com

*Attorneys for The Continental Insurance Company,*
*successor by merger to Commercial Insurance Company of*
*Newark, New Jersey and Firemen's Insurance Company of*
*Newark, New Jersey*

By: */s/ Siobhain P. Minarovich*
Siobhain P. Minarovich
(admitted *pro hac vice*)
Paul Gorfinkel
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556-0926
Telephone: (516) 357-3000
Siobhain.Minarovich@rivkin.com
Paul.Gorfinkel@rivkin.com

- and –

Harris B. Winsberg
(admitted *pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree St NE, Suite 3600
Atlanta, Georgia 30308
Telephone: (404) 420-4313
hwinsberg@phrd.com

Todd C. Jacobs
(admitted *pro hac vice*)
John E. Bucheit
(admitted *pro hac vice*)
BRADLEY RILEY JACOBS PC
500 W. Madison, Suite 1000
Chicago, Illinois 60654
Telephone: (312) 281-0295
tjacobs@bradleyriley.com
jbucheit@bradleyriley.com

*Attorneys for Interstate Fire & Casualty Company
and National Surety Corporation*

By: /s/ Russell W. Roten
Russell W. Roten (admitted *pro hac vice*)
Jeff D. Kahane (admitted *pro hac vice*)
Andrew Mina (admitted *pro hac vice*)
DUANE MORRIS LLP
865 S. Figueroa Street, Suite 311
Los Angeles, California 90017-5450
(213) 689-7400
rwroten@duanemorris.com
jkahane@duanemorris.com

Sommer L. Ross (admitted *pro hac vice*)
DUANE MORRIS LLP
1201 N. Market Street, Suite 501
Wilmington, Delaware 19801-1160
(302) 657-4951
slross@duanemorris.com

Catalina J. Sugayan (admitted *pro hac vice*)
CLYDE & CO US LLP
55 West Monroe Street, Suite 3000
Chicago, Illinois 60603
(312) 635-7000
catalina.sugayan@clydeco.us

*Attorneys for Certain Underwriters at Lloyd's, London, Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Company Ltd), RiverStone Insurance (UK) Limited (as successor in interest to Terra Nova Insurance Company Ltd and as successor in interest to Sphere Drake Insurance Ltd), Sompo Japan Nipponkoa Insurance Company of Europe Limited (formerly known as The Yasuda Fire & Marine Insurance Company), and Dominion Insurance Company Ltd., who subscribed, severally and not jointly as their interests appear, to Package, Excess Broadform, and other Policies providing insurance to the Diocese of Rochester and parishes and other entities related to the Diocese*