# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NEW YORK

In re:

DIOCESE OF ROCHESTER,

Debtors.

Chapter 11

Case No. 19-20905

---

## SETTLING INSURERS' SUMMARY OBJECTION TO
## DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
## THE RESTRUCTURING SUPPORT AGREEMENT

Pursuant to the Scheduling Order entered by the Court on December 9, 2022 (Dkt. No. 1872), the insurers identified in footnote 1 (collectively, the "Settling Insurers" or the "Insurers")[1] hereby submit this Summary Objection, as defined in the Scheduling Order, to Debtor's *Motion for Entry of An Order (I) Approving the RSA, (II) Authorizing the Diocese to Enter Into and Perform Under the RSA, (III) Approving the Committee Settlement, and (IV) Granting Related Relief* (the "RSA Motion," Dkt. No. 1790).

This Summary Objection is preliminary in nature, submitted only to frame the issues, and is without prejudice to, *inter alia*, the Insurers' rights to (i) conduct discovery

---

[1] The Settling Insurers are: The Continental Insurance Company ("CNA"); Interstate Fire & Casualty Company and National Surety Corporation (together, "Interstate"); and Certain Underwriters at Lloyd's, London, Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Company Ltd), RiverStone Insurance (UK) Limited (as successor in interest to Terra Nova Insurance Company Ltd and as successor in interest to Sphere Drake Insurance Ltd), Sompo Japan Nipponkoa Insurance Company of Europe Limited (formerly known as The Yasuda Fire & Marine Insurance Company), and Dominion Insurance Company Ltd., who subscribed, severally and not jointly as their interests appear, to Package, Excess Broadform, and other Policies providing insurance to the Diocese of Rochester and parishes and other entities related to the Diocese (collectively, "LMI").

concerning the RSA Motion, (ii) file memoranda of law more thoroughly identifying and supporting the Insurers' objections to the RSA Motion, including by reference to any discovery obtained in the future, (iii) submit affidavits, declarations, and other evidence supporting the Insurers' objections to the RSA Motion, and (iv) present evidence (including live witness testimony) and argument at any hearing scheduled by the Court to hear the RSA Motion.

## Preliminary statement

The RSA Motion should not be approved. It proposes a settlement that is fundamentally inconsistent with earlier settlements Debtor reached with each of the Insurers (collectively, the "Insurance Settlements"). Under those settlements, the Insurers agreed to pay a total of $107.25 million in exchange for, among other things, resolution of all disputes between Debtor and the Insurers over the scope, availability, and amount of coverage for sex abuse claims against the Diocese. In its motion asking this Court to approve the Insurance Settlements, Debtor represented to the Court that "that it is exercising sound business judgment by entering into the proposed settlements as a key component of funding the Trust."[2]

In particular, Debtor sought approval of the Insurance Settlements on the grounds, *inter alia*, that "[e]ntering into the settlement agreements is in the best interests of the Diocese's estate," "the potential upside of continued [insurance coverage] litigation at this point is significantly outweighed by the potential downside, especially in light of the substantial settlement offers currently before the Court," and the proposed settlements would "(i) provide a concrete financial benefit to the estate, specifically earmarked for Survivor Claims; (ii) eliminate

---

[2]     Motion to Approve Proposed Insurance Settlements to Fund Survivor Compensation Trust (Dkt. No. 1538, the "Insurance Settlement Motion") at 13. *See also id.* at 21 ("the Diocese's decision in agreeing to settle its coverage claims against the Settling Insurers more than satisfies the reasonableness standard of Bankruptcy Rule 9019 and the business judgment test under section 363 of the Bankruptcy Code").

the underlying uncertainty of litigation; and (iii) avoid the expenditure of estate resources on expensive and time-consuming coverage litigation."[3]

Now, contrary to its previous representations and arguments, Debtor seeks to abandon the Insurance Settlements so that it can instead enter into a restructuring support agreement with the Committee (the "RSA"). But the RSA is not a proper exercise of Debtor's business judgment. Debtor's new settlement trades a guaranteed $107.25 million contribution by the Insurers to a claimant trust, together with the avoidance of all risks and costs related to litigation with the Insurers, for the near-certain promise of prolonged and costly litigation with the Insurers (specifically, confirmation litigation, tort system litigation, and coverage litigation with the Insurers). Accordingly, Debtor's decision to abandon the Insurance Settlements in favor of the RSA does not meet the applicable test of reasonableness and therefore cannot be approved.

The unreasonableness of Debtor's decision is further compounded by the fact that, in the Second Circuit, a debtor may not unilaterally rescind settlement agreements for which it has already sought approval under Rule 9019. Debtor's bait and switch with respect to the Insurance Settlements is not a proper exercise of business judgment because, among other things, it exposes Debtor and its estate to a massive administrative claim that must be paid in full, in cash, before any plan that is compliant with the terms of the RSA could go into effect. The Insurers' administrative claim likely forecloses any finding of feasibility, a prerequisite to plan confirmation, and establishes that any plan seeking to implement the RSA likely will not meet the good-faith requirement of Bankruptcy Code § 1129(a)(3), another reason any such plan

---

[3]     *Id.* at 14, 17.

could not be confirmed.

The RSA Motion is also objectionable in its own right. If approved, the RSA would result in the immediate implementation of a protocol for Stipulated Judgments that abridges CNA's policy rights and seeks to enlarge CNA's potential financial obligations for the Sexual Abuse Claims. The RSA also amounts to a *sub rosa* plan that Debtor is asking the Court to approve without the full and fair vetting of its terms required by §§ 1125-1129 of the Bankruptcy Code. The terms that are hinted at in the RSA, moreover, would prejudice the Insurers by abridging their contractual rights and potentially enlarging their quantum of liability for Sexual Abuse Claims. A plan such as the one contemplated by the RSA cannot be confirmed, and an RSA that binds Debtor to propose that plan should be rejected by the Court.

## Background

Debtor commenced this Chapter 11 case on September 12, 2019. On November 14, 2019, Debtor filed an adversary proceeding complaint against the Settling Insurers alleging claims for breach of contract, declaratory judgment, and damages.[4] Debtor sought a declaration of its and the Insurers' respective rights, duties, and liabilities under the insurance policies issued by the Insurers to Debtor, plus damages.

On May 20, 2022, Debtor filed the Insurance Settlement Motion, requesting this Court's approval, under Bankruptcy Rule 9019 and § 363 of the Bankruptcy Code, of the Insurance Settlements, which would resolve all disputes between Debtor and the Insurers.[5] The settlements provided for the Insurers to pay a total of $107.25 million into a claimant trust to be

---

[4]    *See Diocese of Rochester v. Cont'l Ins. Co. (In re Diocese of Rochester)*, Adv. Proc. No. 19-ap-02021 (the "Insurance Adversary Proceeding").

[5]    *See* Insurance Adversary Proceeding, Dkt. No. 190. *See also* Dkt. No. 1538 (same, filed on June 23, 2022 in the base case).

- 4 -

established under a plan of reorganization to be filed by Debtor. In combination with a $40.5 million contribution to be made by Debtor, the total consideration to be contributed to the trust under the Insurance Settlement Motion was $147.75 million. The Insurance Settlements would resolve all existing and potential future disputes between Debtor and the Insurers, including disputes that could delay or preclude confirmation of a plan.

The Committee objected to the Insurance Settlement Motion on June 30, 2022.[6] The parties agreed to a discovery schedule in connection with the Insurance Settlement Motion, including document production and discovery.[7] Before Debtor filed the RSA Motion, the Insurers had produced a total of approximately 17,500 pages in response to document requests served by the Committee. Depositions of various insurer witnesses were on calendar when the RSA Motion was filed. The Insurers incurred substantial costs to make their document productions, prepare witnesses for deposition, and prepare for depositions of the Committee and others. Debtor and the Insurers retained and designated expert witnesses for the hearing on the Insurance Settlement Motion, and Debtor obtained an order from the Court approving the manner and form of notice for the motion.[8]

On July 22, 2022, Debtor objected to 74 proofs of claim.[9] Debtor asserted that the claimants were not entitled to any recovery from the estate for a variety of reasons, chiefly that the claimants were alleging abuse by persons not affiliated with Debtor or non-debtor diocesan parties. LMI and CNA filed joinders in Debtor's claim objections on August 9, 2022

---

[6] *See* Dkt. No. 1555.

[7] *See* Stipulated Scheduling Order, Dkt. No. 1552.

[8] Dkt. No. 1763.

[9] *See* Dkt. Nos. 1576-1641, 1643-1644.

and September 30, 2022, respectively.[10]

On November 3, 2022, Debtor filed the RSA Motion, seeking approval of the RSA.[11]  Among other things, the RSA obligates Debtor to (i) propose a plan of reorganization (the "RSA Plan") containing provisions dictated by the RSA, (ii) seek entry of a Confirmation Order that confirms the RSA Plan and contains specific findings regarding an Allocation Protocol that has not yet been disclosed, and (iii) use "commercially reasonable efforts . . . in negotiating and seeking Court Approval of the Stipulated Judgments."[12]  The RSA also contains a negative covenant prohibiting Debtor, without the Committee's prior written consent, from entering into any insurance settlements.[13]  The RSA would also bind the individual members of the Committee to support the RSA Plan, to vote in favor of the Plan, and to not take any actions to interfere with confirmation of the RSA Plan.[14]

Shortly after Debtor filed the RSA Motion, the Settling Insurers served document requests, interrogatories, and requests for admission on Debtor and document requests and interrogatories on the Committee.  On November 14, 2022, Debtor moved to toll the deadlines relating to the Insurance Settlement Motion until after the RSA Motion is heard.[15]  On November 18, 2022, Debtor advised the Settling Insurers that "it does not intend to respond to"

---

[10]      *See* Dkt. Nos. 1670 and 1733.

[11]      *See* Dkt. No. 1790 (the "RSA Motion").

[12]      Dkt. No. 1790-2 (the "RSA") at 3.

[13]      *Id.* at 3-4.

[14]      *Id.* at 5-6.

[15]      Dkt. 1809.  *See also* Case Management Order, Dkt. 1838 (suspending deadlines related to the Insurance Settlement Motion).

the discovery because, it says, the Settling Insurers "lack standing" to oppose the RSA Motion.[16]

On November 22, 2022, the Court entered the Scheduling Order.  The order required each Insurer wishing to oppose the relief requested in the RSA Motion to file, by 3:00 p.m. on December 30, 2022, both (i) a brief in support of their standing to object to the RSA Motion and (ii) "an objection setting forth a summary, in outline form, of the arguments it intends to make in opposition to the RSA Motion (a 'Summary Objection')."  This is the Insurers' Summary Objection; their separate brief in support of their standing is filed contemporaneously herewith.

### Settling Insurers' Preliminary Objections[17]

1.    **The RSA Motion is not a proper exercise of Debtor's business judgment.**

Debtor cannot meet its burden to establish that the RSA, the second of the "two mutually exclusive competing settlement agreements" it has proposed, is a proper exercise of its business judgment.[18]

In the Insurance Settlement Motion, Debtor rightfully touted the merits of the Insurance Settlements, and argued that "that it [was] exercising sound business judgment by entering into the proposed settlements."[19]  But Debtor now has now chosen to seek approval of an RSA that (i) abandons the Insurance Settlement Agreements, (ii) would provide persons

---

[16]    November 18, 2021 e-mail from Mr. Donato to Mr. Plevin and others, titled "RE: Diocese of Rochester:  Service of Insurers' discovery regarding Debtor's RSA Motion."

[17]    The Settling Insurers submit these objections without the benefit of having been able to take any discovery, notwithstanding that they served both Debtor and the Committee with discovery almost immediately after the RSA Motion was filed.   The Insurers reserve all rights to supplement their opposition to the RSA Motion following any discovery they are permitted to take, including by making new arguments disclosed or supported by such discovery.  *See* Scheduling Order at 2 n.3.

[18]    Nov. 22, 2022 Transcript at 8:18-19 (statement by the Court).

[19]    Insurance Settlement Motion at 13.

asserting Sexual Abuse Claims almost $100 million less in guaranteed cash than the Insurance

Settlements would, (iii) would result in years of costly litigation between Debtor, the trust, and

claimants, on the one hand, and the Insurers, on the other hand,[20] and (iv) would create a

massive administrative claim that may well preclude confirmation of the plan contemplated by

the RSA (the "RSA Plan"). The RSA Plan will also trigger extensive coverage litigation, because

the Insurers cannot stand idly by and assent to the enlargement of their financial obligations (if

any) for the Sexual Abuse Claims. Debtor will assert that the policy rights have been assigned to

the Trust, but that too is something the Insurers are entitled to litigate, and Debtor will be

involved.

There are no "changed circumstances" here justifying the Debtor's about-face.

Debtor well knew, when it entered into the Insurance Settlements and filed the Insurance

Settlement Motion, that the Committee might not support the settlements. Debtor told the

Court, "The Diocese believes that the Committee may not support the proposed settlements

and instead may argue that the $107,250,000 in aggregate settlement proceeds is insufficient in

comparison to amounts the insurers might be required to pay as a result of potentially massive

jury verdicts which a few individual plaintiffs might obtain if allowed to liquidate their claims in

state court."[21] In fact, Debtor entered into the Insurance Settlements "with the knowledge and

understanding that the Committee ha[d] not indicated its support or consent to this Settlement

Agreement and that the Committee and Tort Claimants may object to approval of this

---

[20]     Although Debtor would technically receive a discharge under the RSA Plan, claims would be liberally exempted from the plan's channeling injunction to be pursued in the tort system. Debtor's continued involvement with these suits is assured. At the least, the RSA Plan requires Debtor to cooperate to the extent the trust deems Debtor's cooperation necessary to preserve coverage; but Debtor will continue to be burdened by ongoing litigation, even if it is merely a nominal defendant.

[21]     Insurance Settlement Motion at 20-21.

Settlement Agreement or confirmation of the Plan."[22]  Still, Debtor had a ready response to any such argument by the Committee:

> The Diocese is prepared to demonstrate at an evidentiary hearing that, after assessing the countervailing risks and benefits to all parties of further litigation, the proposed settlement proceeds, combined with the additional $40,500,000 to be contributed by the DOR Entities under the Plan, is sufficient and appropriate to adequately and fairly compensate the survivors for their injuries, and that the Diocese's decision in agreeing to settle its coverage claims against the Settling Insurers more than satisfies the reasonableness standard of Bankruptcy Rule 9019 and the business judgment test under section 363 of the Bankruptcy Code.[23]

In short, entering into the Insurance Settlements was, as Debtor repeatedly told the Court, a proper exercise of its business judgment.  Entering into the RSA, which this Court correctly characterized as a "mutually exclusive competing settlement agreement[ ]," is therefore, by definition, not a proper exercise of business judgment.  This is particularly so when the new agreement provides nearly one-third less in upfront cash, consigns Debtor and the claimants to prolonged and expensive litigation and years of uncertainty, and makes it virtually impossible to confirm the RSA Plan.  Debtor's decision to pursue the RSA Motion at such great cost is therefore not a proper exercise of business judgment.

## 2.      The RSA Motion is an improper rescission of a settlement agreement Debtor brought before this Court for approval.

The RSA Motion is a *de facto* repudiation of the Insurance Settlements.  As such, it is contrary to Second Circuit law, which holds that "debtors may not unilaterally rescind settlement agreements" that are pending before a bankruptcy court for approval under Bankruptcy Rule 9019.[24]  Although Debtor has not formally rescinded the Insurance

---

[22]      CNA Settlement § 6.1.3; Interstate Settlement § 6.1.3.

[23]      *Id.* at 21.

[24]      *Liberty Towers Realty, LLC v. Richmond Liberty LLC*, 734 F. App'x 68, 70 (2d Cir. 2018).  *See also In re Seminole Walls & Ceilings Corp.*, 388 B.R. 386, 392 (M.D. Fla. 2008) ("the parties to a

Settlements, the RSA requires it to "toll all deadlines and adjourn all hearings" with respect to the Insurance Settlement Motion unless otherwise ordered by the Court, "until the first to occur of (i) the Court entering an order denying approval of the Restructuring Support Agreement, (ii) the Court entering an order denying confirmation of the Plan, or (iii) the Effective Date."[25] Debtor has already carried out this mandate. If Debtor can obtain confirmation of the RSA Plan, the Insurance Settlement Motion will then be deemed withdrawn with prejudice.[26]

Debtor's tactics ignore that "settlements requiring court approval are binding on all parties to the extent allowable under state law until the court considers and rejects the settlement."[27] As the district court for the Eastern District of New York has explained, to the extent a debtor believes it has received a better offer after settlement but before approval,

> Rule 9019 provides a mechanism for debtors to respect all of their obligations. The debtor can abide by its obligations under the settlement agreement, including, if necessary, filing a motion for settlement approval. Then, to protect the interest of its creditors, the debtor can present the post-settlement offer to the bankruptcy court in connection with the Rule 9019 proceedings. The court will then have the opportunity to evaluate whether this better offer warrants rejecting the settlement agreement.[28]

---

settlement agreement may not unilaterally repudiate it after approval of it has been sought pursuant to Rule 9019"); *United States v. Bank of N.Y.*, 14 F.3d 756, 759 (2d Cir. 1994) ("When a party makes a deliberate, strategic choice to settle, she cannot be relieved of such a choice merely because her assessment of the consequences was incorrect").

[25]     RSA at 50.

[26]     *Id.*

[27]     *Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 569 B.R. 534, 542 (E.D.N.Y. 2017), *aff'd*, 734 F. App'x 68 (2d Cir. 2018).

[28]     *Id.* at 542-43. *See also In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996) (stating that, where a trustee "was faced with a conflict between her fiduciary duty to the creditor body as a whole" and her duty to abide by a settlement agreement, "the trustee should inform the court and the parties of any changed circumstances since the entry into the stipulation of settlement" so that the court can "determine what course of action will be in the best interest of the estate"); *Liberty Towers Realty, LLC*, 734 F. App'x at 70 ("Allowing a party to withdraw from a settlement pending court approval would deter parties from entering into settlements in the first place, would permit parties to abuse the bankruptcy process, and would run contrary to generally applicable contract and settlement principles in this Circuit").

The RSA Motion cannot be approved under the present circumstances. Instead, the Court must consider the Insurance Settlement Motion and determine whether it should be approved. In connection with such consideration, the Court can also consider whether the RSA is a "better offer" that warrants disapproving the Insurance Settlements. But the Court may not do what Debtor wants, which is to skip over the Insurance Settlements and proceed to consider the RSA first.[29]

### 3.     The RSA is an improper *sub rosa* plan.

"A settlement which has the effect of dictating the terms of the debtor's plan of reorganization prior to the confirmation process cannot be approved."[30] However, that is precisely what the RSA seeks to accomplish, by appending and incorporating a 28-page term sheet that details exactly how an eventual plan must be structured and obligating Debtor to propose it. "To be found to dictate the terms of a plan however, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote."[31]

Here, the term sheet appended to the RSA (and incorporated into the RSA) disposes of all claims against the estate. It defines Administrative Claims, Priority Claims, Pass-Through Claims, General Unsecured Claims, Sexual Abuse Claims, Inbound Contribution

---

[29]     In the *Diocese of Camden* bankruptcy case, in which the debtor, like Debtor here, settled with its insurers and then sought to replace its insurance settlement with a different settlement negotiated with a committee, the New Jersey bankruptcy court followed the procedure discussed in *Liberty Towers* (and required in the Third Circuit by *In re Martin*) and heard argument and evidence regarding the Rule 9019 motion to approve the insurance settlement before it heard argument and evidence concerning the proposed replacement settlement.

[30]     *In re Tower Automotive Inc.*, 241 F.R.D. 162, 168 (S.D.N.Y. 2006). *See also In re Capmark Financial Group Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010), citing *In re Tower Automotive*, 241 F.R.D. at 168 ("A settlement constitutes a *sub rosa* plan when the settlement has the effect of dictating the terms of a prospective chapter 11 plan").

[31]     *Id.*

- 11 -

Claims, and Claims by Protected Parties and explains how each class of claims will be treated and paid under an RSA Plan.[32]  In other words, the RSA does not resolve just the claims asserted by the individual Committee members, or even all Sexual Abuse Claims (all of which "shall be deemed allowed by operation of the Plan"[33]), but it goes well beyond by purporting to dictate how others' claims will be classified, treated, and paid.  Further, the RSA seeks to "dispose of" essentially all issues in the case by providing that a claimant trust will be established, which claimants will be paid and when, which claimants may proceed in the tort system under what circumstances, how insurance assets will be assigned and pursued, the extent of Debtor's discharge, and the identities of all Exculpated Parties.  The term sheet also provides for the transfer of Debtor's Insurance Claims against the Insurers to the trust, and provides that if a party in interest fails to file an objection to the proposed assignment before the deadline for filing confirmation objections, such party in interest "shall be deemed to have irrevocably consented to" the transfer and  "will be forever barred" from raising such arguments in the future (including, for example, in any post-bankruptcy coverage litigation).  The RSA also mandates that Debtor withdraw the Insurance Settlement Motion with prejudice upon the effective date of the RSA Plan.

There is almost nothing left for a plan to address that is not already fully addressed in the RSA.  The RSA would "short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa*" before the

---

Case 2-19-20905-PRW,   Doc 1896,   Filed 12/30/22,   Entered 12/30/22 13:20:44,
Description: Main Document , Page 12 of 26

confirmation process even begins.[34]  The RSA Motion therefore cannot be granted.[35]

### 4.     The RSA is an improper solicitation.

Post-petition restructuring support agreements have been found to violate the disclosure and solicitation requirements of § 1125 where the "the agreements at issue included specific performance provisions, expressly providing that monetary damages could not compensate a breach of the agreement, meaning the creditors could not later reconsider their preliminary decision after receiving adequate information."[36]  The RSA here contains such a specific performance provision,[37] and provides for termination only (i) upon *mutual* agreement of the Committee and Debtor, (ii) based on Debtor's breach, (iii) if various timing-related milestones are not achieved, or (iv) if Debtor proposes an alternative plan other than the RSA Plan.[38]  These are not meaningful outlets for claimants to "later reconsider their preliminary decision after receiving adequate information."[39]

Indeed, the purpose of the adequate information disclosure mandated by § 1125 of the Bankruptcy Code is to enable creditors to make informed decisions when they vote to

---

[34]     *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983). *See also In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990).

[35]     In opposing the Insurance Settlement Motion, the Committee argued that the Insurance Settlements together constituted an impermissible *sub rosa* plan, an argument expressly rejected by Debtor and some of the Insurers.  Unlike the RSA, the Insurance Settlements did not purport to classify all of the claims against the estate and specify how such claims would be treated and paid—hallmarks of a plan, rather than the settlement of disputes.  The Insurance Settlements merely specified the terms upon which Debtor's claims against the Insurers would be resolved.  The Committee's previous arguments notwithstanding, the Insurance Settlements did not amount to a *sub rosa* plan, but the RSA is one.

[36]     *In re Residential Cap., LLC*, 2013 WL 3286198, at *20 (Bankr. S.D.N.Y. June 27, 2013).

[37]     *See* RSA at 9 (§ 8).

[38]     RSA at 7-8 (§ 6(A)).

[39]     *In re Residential Cap., LLC*, 2013 WL 3286198, at *20.

approve or reject a plan. Here, the typical creditor is a layperson and victim of childhood sexual abuse. The RSA parties, including the individual members of the Committee, have agreed to support the RSA without adequate disclosure that, for example, the RSA Plan shifts to the Sexual Abuse Claimants all risk that the trust corpus will be capped at $55 million if the trust cannot recover insurance proceeds, compared to the $147.75 million previously committed to pay claimants under the Insurance Settlements. There is no explanation in the RSA Plan or elsewhere of the following RSA provision, which presumably will be described in more detail in a forthcoming disclosure statement:

> The commitment by the Committee and the members of the Committee to support and vote in favor of the Plan shall not in any way be conditioned upon, nor subject to, the availability of insurance coverage from any Non-Settling Insurer(s); in the event no such coverage is available, the DOR Entities' Cash Contribution and any Outbound Contribution Claims would be the sole source of funding for the Plan.[40]

Nevertheless, Committee members would be bound by the RSA's specific performance provisions to continue their support for the RSA, even if "adequate information" in a court-approved disclosure statement establishes that the Insurance Settlements provide greater and/or more certain, and faster, payments for claimants. Those provisions are suggestive of a restructuring support agreement that prematurely locks up creditor votes and, as such, is an improper solicitation.

---

[40]  RSA at 39. Any disclosure statement will presumably contain a section advising claimants of the risk that the Insurers' coverage defenses will be successful, resulting in a zero recovery from the Settling Insurers. Debtor's Insurance Settlement Motion contains the following assessment of that risk, after three pages describing the Insurers' coverage defenses:

> The Diocese disputes the legal and factual basis for many of the defenses asserted by the Settling Insurers. Nevertheless, if the Settling Insurers were to prevail on some or all of their defenses in the Coverage Action it would severely limit their liability to the DOR Entities and *could even prevent any recovery in its entirety*, consequently shrinking the pool of assets available to satisfy Survivor Claims.

Insurance Settlement Motion at 12 (emphasis added).

**5.** **The RSA Motion establishes a Stipulated Judgment protocol that targets CNA to pay inflated settlement amounts with no opportunity to contest liability.**

Under the RSA, Debtor and the Committee will work with one or more Judgment Mediators "to agree on not more than 38 Stipulated Judgments."[41]  A claim is eligible to be a Stipulated Judgment only if "the Committee and the Diocese agree that (a) there is a reasonable basis for an assertion of liability against the Diocese, (b) an applicable insurance policy from CNA affords coverage for liability claims against the Diocese, and (c) CNA has denied coverage."[42]  The value of a Stipulated Judgment is capped at the lesser of "Available CNA Policy Limits" for the claim or $7.5 million.[43]  Debtor, the Committee, and the claimant would "present the Judgment Mediator with expert testimony and other evidence" regarding the value of a Stipulated Judgment. The entity that would be obligated to pay the Stipulated Judgment, CNA, will have no input, in derogation of its contractual right to defend and settle claims potentially within its coverage.

The use of a Judgment Mediator indicates an improper intent to invoke mediation privilege to shield these liability and value determinations from scrutiny.  The Stipulated Judgments will be presented to this Court for approval under Rule 9019 and then, once approved, assigned to the trust for enforcement in the tort system.  Stipulated Judgments may be enforced only against CNA.[44]

This protocol is designed to enlarge CNA's potential liability and abridge its policy rights.  Rather than having to actually prove his claim, a Stipulated Judgment claimant essentially only has to make a *prima facie* showing of liability to parties who have no interest in

---

[41]     RSA at 37.

[42]     *Id.*

[43]     *Id.* at 38.

[44]     *Id.* at 34.

contesting the claim and no responsibility to pay the claim. These parties can agree on any claim value they want, up to a sky-high cap. The sole paying entity, CNA, will have no input or information as to how the Stipulated Judgments were selected, what allegations or evidence supported the stipulated liability, or how the judgment amount was determined. This is an unreasonable infringement of rights CNA would have under its policies outside of bankruptcy, including the right to control the defense and settlement of claims, to contest liability, to require evidence of reasonable claim values, and to obtain the cooperation of the insured. The result is the potential that CNA will have to pay claims that would not be paid in the tort system, or that would be paid only in lower amounts, thereby increasing the liability CNA may have to absorb beyond that which it would be exposed to in the tort system.

**6.      The Stipulated Judgment protocol incorporates improper coverage determinations.**

The Stipulated Judgment protocol implicitly locks in particular coverage determinations favored by the Committee, which is improper and alters CNA's contractual rights in addition to increasing the amounts it may be obligated to pay.

First, the value of each Stipulated Judgment is tied to the definition of "Available CNA Policy Limits," which means the combined per-occurrence limits for all triggered CNA policies, "calculated on the basis of one occurrence for each act of alleged sexual abuse." That statement does not accurately reflect New York law, but in any event CNA would, outside of bankruptcy, be entitled to litigate the meaning of "occurrence" based on the actual language of its policies (which Debtor bears the burden to establish). The RSA would elide CNA's rights and predetermine the per-occurrence rule under the guise of valuing the Stipulated Judgments.[45]

---

[45]      Debtor and/or the Committee and claimants will likely cite *Roman Catholic Diocese of Brooklyn*

Second, Stipulated Judgments may only be enforced against CNA. However, New York is a "*pro rata* state," meaning that CNA is entitled to have other insurers that issued policies covering a particular claim share in the liability for that claim.[46] Moreover, New York law requires an insured such as the Debtor to absorb its pro rata share of responsibility for any years where it is self-insured, uninsured, or underinsured, or where coverage is excluded.[47] CNA is therefore entitled to proration of its liability for any claim that triggers another insurer's policy years, or years where Debtor was self-insured, uninsured or underinsured. But the Stipulated Judgment protocol is designed to preclude any litigation of those issues.

Third, Stipulated Judgments by definition are claims for which CNA "denied coverage." However, the RSA provides no opportunity for CNA to contest whether it did, or did not, deny coverage for a particular claim, or what the effect any disclaimer has under applicable law. Approving Stipulated Judgments on this basis would, again, improperly bake in coverage determinations.

---

*v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 991 N.E.2d 666, 676 (N.Y. 2013) for the proposition that alleged acts of abuse constitute multiple occurrences. In that event, CNA would cite to case law reaching a different conclusion where the policies in question contained additional language found in the CNA policies. *See, e.g., Mt. McKinley Ins. Co. v. Corning Inc.*, 96 A.D.3d 451, 452-53 (2012); *Verlus v. Liberty Mut. Ins. Co.* 2015 WL 7170484, at *4 (S.D.N.Y. Nov. 12, 2015).

[46] *Roman Catholic Diocese of Brooklyn*, 991 N.E.2d at 676 ("Plainly, the policy's coverage is limited only to injury that occurs within the finite one-year coverage period of the policy. To that end, assuming that the minor plaintiff suffered 'bodily injury' in each policy year, it would be consistent to allocate liability across all implicated policies, rather than holding a single insurer liable for harm suffered in years covered by other successive policies"); *Consolidated Edison Co. of New York v. Allstate Ins. Co.*, 774 N.E.2d 687 (N.Y. 2002) ("Pro rata allocation under these facts, while not explicitly mandated by the policies, is consistent with the language of the policies. Most fundamentally, the policies provide indemnification for liability incurred as a result of an accident or occurrence during the policy period, not outside that period") (internal citation omitted).

[47] *See, e.g., Keyspan Gas E. Corp. v. Munich Reins. America*, 31 N.Y. 3d 51, 59-63 (2018) (holding that policyholder bears financial responsibility for time periods when it was uninsured, even where insurance was not available in the marketplace); *Liberty Mut. Ins. Co. v. Jenkins Bros.*, 203 A.D.3d 579 (2022) (same, following *Keyspan*).

For these reasons, the RSA Motion cannot be granted.

**7. The RSA Plan incorporates other improper coverage determinations.**

The RSA Plan is to provide that the assignment of rights under the insurance policies "shall not be construed" as an assignment of the policies themselves or an expansion of the persons or entities entitled to claim coverage under the policies. In addition, a party must timely object to the proposed assignment or be deemed to have "irrevocably consented" to the assignment and be "forever barred" from asserting the proposed assignment as a defense to coverage.[48] These provisions include implicit coverage determinations about the validity of the assignment of policy rights, despite provisions in the policies that expressly prohibit assignment without the insurer's consent, and about the ability of the trust to assume and pursue Insurance Claims, despite the fact that the policy language limits coverage to those who qualify as insureds.

Binding the Insurers to a particular construction of plan provisions, or barring them from objecting to the assignments, would violate their contractual rights. Accordingly, the RSA Motion should not be granted.

**8. The RSA binds Debtor to propose a plan that increases the Insurers' risks and potential quantum of liability.**

If this Court approves the RSA Motion, Debtor will be obligated to pursue the RSA Plan. Multiple aspects of an RSA Plan that is consistent with the term sheet will improperly increase the Insurers' potential liability and risks.

First, the RSA Plan would purport to assign insurance rights (if any) to the trust, despite anti-assignment provisions in the policies.[49] This increases the Insurers' risks because,

---

[48]     RSA at 40.

[49]     RSA at 40.

even if the plan says the trust will assume policy obligations like the duty to cooperate, the trust will in fact have no incentive to cooperate in keeping settlement values low or combatting potentially fraudulent claims or claims for which there should be no liability.

Second, the RSA Plan would pay claims for which Debtor has no liability. Debtor has identified 74 separate claims where the allegations of abuse were lodged against perpetrators who were not associated with Debtor or any parishes, but rather were employed or controlled by schools outside the Diocese or other religious orders. Before it entered into the RSA, Debtor filed objections to 74 claims like these and submitted evidence in the form of the Affidavit of Daniel J. Condon, Chancellor for the Diocese of Rochester, showing that Debtor was not responsible for these claims.[50] Debtor argued it has no legal liability for these claims and, therefore, the claims should not be paid by the estate or from a settlement trust.

Debtor has now adjourned the hearing on these claim objections, which the RSA bound it to do. Under the RSA Plan, upon the effective date, Debtor's claim objections will be deemed withdrawn with prejudice. Because the RSA Plan requires that all claims be allowed, it would therefore allow more than six dozen Sexual Abuse Claims as to which Debtor believes it is not liable, channeling those claims into the trust, where they will presumably be paid some amount that the Insurers will be asked to indemnify. In addition, more than 40 proofs of claim were submitted after the bar date; the RSA Plan would also allow and pay these untimely claims,

---

[50]     Dkt. No. 1648. Specifically, Debtor asserted that these proofs of claim must be disallowed because, among other reasons, the claims: (i) were not timely filed; (ii) allege abuse perpetrated by individuals over whom Debtor did not employ or exercise control; (iii) allege abuse at facilities over which Debtor does not exercise control; (iv) allege abuse at churches not affiliated with Debtor or the Catholic Church; (v) allege abuse by third parties associated with non-Debtor entities; (vi) allege claims where plaintiffs are unlikely to satisfy the requisite burden of proof; (vii) allege abuse for which liability is questionable or for which potential damages are limited; or (viii) are otherwise susceptible to a speedy dismissal.

and then seek indemnification from the Insurers.

Third, under the RSA Plan, the Insurers will be deprived of their contractual right to obtain the cooperation of the insured. The trust provides for Claim Enhancement payments, which affirmatively pay claimants more if they pursue a claim in court. The trust pays such claimants even more if they refuse to settle their cases and continue to litigate through trial to judgment: a Litigation Claimant can obtain a Claim Enhancement of up to 100% of his or her claim if the case proceeds to judgment in the tort system. This procedure interferes with the Insurers' right to control the defense and settlement by eliminating claimants' normal incentives to accept reasonable settlements. Here, the trust will consult Debtor regarding which claims by "Litigation Claimants" can be pursued in the tort system, rather than channeled to the trust, but the Insurers who will be asked to defend and pay such claims would have no involvement or right to be consulted.[51] By providing for consultation with "the Diocese and/or any Protected Party against which" the claim is asserted,[52] Debtor and/or the parishes will be agreeing to being sued on claims that would otherwise be channeled to the trust. As a result, the Insurers will be dragged into the tort system to defend, where Litigation Claimants will be paid a premium by the trust to litigate to judgment rather than settle. Such provisions are irreconcilable with the Insurers' right to have the Debtor, their insured, cooperate in its own defense.

**9.     The RSA Plan deprives the Insurers of contribution rights.**

The RSA Plan provides for "Inbound Contribution Claims," defined as contribution claims asserted against the Diocese or a Diocese Participating Party (which includes parishes but excludes Insurers) arising out of a Sexual Abuse Claim. These claims are deemed

---

[51]     RSA at 43-45.

[52]     *Id.* at 43.

impaired under the RSA Plan and, on the Effective Date, will be disallowed and extinguished. Such treatment impairs potentially valuable contribution rights belonging to the Insurers. As noted, New York is a *pro rata* state, meaning insureds such as Debtor are liable, on a prorated basis, for periods where they are self-insured, uninsured, or underinsured.[53]

Debtor has asserted it purchased coverage beginning in 1943, but the earliest policy it can identify, allegedly issued by CNA, incepted on March 1, 1952. Debtor therefore bears the risk for the period 1943 to March 1, 1952, and perhaps beyond, and it therefore must pay its fair share of any claim alleging abuse during that period.

CNA also disputes whether non-debtor diocesan parties such as the parishes are entitled to coverage under all of its alleged policies. CNA's position, supported by evidence, is that the alleged policies issued from March 1, 1952 to June 1, 1969 would have insured only the Diocese, and not the parishes. If CNA is right, then the parishes are uninsured for any claim alleging abuse before June 1, 1969 and would have to contribute to paying any claim triggering that period. These potential contribution claims are extinguished under the RSA Plan, which the RSA Motion binds Debtor to propose.

Similarly, LMI subscribed to certain policies, issued from June 1, 1977 to July 1, 1988, that are subject to a $75,000 self-insured retention; LMI is not obligated to respond to a claim unless the self-insured retention is paid. Without the LMI policies, Debtor and/or the non-debtor diocesan parties will owe contribution for claims alleging abuse during this period. For example, if a claimant alleges damages from abuse on two consecutive days—May 31, 1977, during a CNA policy period, and June 1, 1977, during a period of self-insurance—CNA would

---

[53] *See, e.g.*, *Liberty Mut. Ins. Co. v. Jenkins Bros.*, 203 A.D.3d 579 (2022).

have a contribution claim against Debtor for the portion of abuse that occurred on June 1, 1977. Yet the RSA, and the RSA Plan, make no provision for payment of self-insured retentions or related contribution claims.

Finally, Interstate issued policies that provide second-level excess indemnity coverage for the period September 1, 1978 to July 1, 1986. Assuming all of the terms and conditions of the Interstate policies are met, the Interstate policies provide coverage on a per occurrence basis excess of both (i) the Diocese's $75,000 SIR and (ii) the $125,000 limits of the LMI policies. Interstate is not obligated to respond to a claim unless the combined total of $200,000 in SIR and the underlying LMI limits, for each occurrence, are exhausted.

**10. Discovery is essential to enable the Insurers to identify, and flesh out, other objections to the RSA.**

The RSA, including the incorporated plan term sheet, is not completely clear in many respects, including (by way of example): (i) how claimants would assert claims (including purported direct action claims against Insurers),[54] (ii) whether claimants or the trust would pursue recovery from CNA based on Stipulated Judgments,[55] (iii) how Litigation Awards are treated,[56] and (iv) how the Claim Enhancements are applied and paid.[57] Without being able to obtain discovery from Debtor, the Committee, and possibly others, regarding the meaning of terms in the RSA, the Insurers are unable to determine whether they have additional objections

---

[54]     *See, e.g.*, RSA at 36 ("Except to the extent a Litigation Claimant may, pursuant to the Plan, recover *directly* from a Non-Settling Insurer, the Trust shall be the sole source of compensation for, all Sexual Abuse Claims").

[55]     *See, e.g., id.* ("The Trust will take an assignment of Insurance Claims and any Stipulated Judgments and have authority to pursue all insurance rights and claims assigned to it").

[56]     *See id.* at 45.

[57]     *See id.* at 44-46.

to the RSA and, if so, what those objections are. It is therefore imperative that the Insurers be afforded the opportunity to take appropriate discovery and to supplement these Summary Objections based on what is learned during the discovery process.

### Joinder in others' Summary Objections

The Settling Insurers reserve their right to join in, and adopt, all or part of any Summary Objections filed by any other party in interest.

### Conclusion

The RSA Motion is not an appropriate exercise of Debtor's business judgment. It walks away from $107.25 million of guaranteed up-front trust funding by the Insurers, choosing instead to substitute significant litigation risk, long delays, high costs, and great uncertainty. By requiring Debtor to abandon the Insurance Settlements, the RSA also gives rise to a significant administrative claim that will preclude plan feasibility and ensure that any RSA Plan cannot meet the good-faith requirement for plan confirmation. Moreover, the RSA is an improper *sub rosa* plan and an improper solicitation of plan votes. Further, the RSA requires Debtor to enter into a Stipulated Judgment protocol that targets CNA, places the holders of Sexual Abuse Claims at risk of recovering nothing, and improperly incorporates substantive insurance coverage determinations without a trial. Last, the RSA and the RSA Plan would deprive the Insurers of contribution rights to which they are entitled under New York law.

For the reasons summarized above, the RSA should not be approved.

As noted above, the foregoing is, consistent with the Scheduling Order, merely a Summary Objection to the RSA Motion, not a comprehensive memorandum of law. This Summary Objection was prepared without the benefit of discovery even though the Insurers have standing to conduct appropriate discovery. The Settling Insurers reserve their rights to

elaborate upon these Summary Objections in a comprehensive memorandum of law, supported by evidence, once the Insurers have been afforded the discovery to which they are entitled.

DATED:  December 30, 2022

Respectfully submitted,

By:___/s/ *Jeffrey A. Dove*_____
Jeffrey A. Dove
BARCLAY DAMON LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York  13202
Telephone: (315) 413-7112
Facsimile: (315) 703-7346
jdove@barclaydamon.com

Mark D. Plevin (admitted *pro hac vice*)
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California  94111
Telephone:  (415) 986-2800
mplevin@crowell.com

David Christian
DAVID CHRISTIAN ATTORNEYS LLC
105 West Madison Street, Suite 1400
Chicago, Illinois  60602
Telephone:  (312) 282-5282
dchristian@dca.law

Miranda H. Turner (admitted *pro hac vice*)
Rachel A. Jankowski (admitted *pro hac vice*)
Thomas Matthew (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  (202) 624-2500
mturner@crowell.com, rjankowski@crowell.com,
tmatthew@crowell.com

*Attorneys for The Continental Insurance Company,*
*successor by merger to Commercial Insurance Company of*
*Newark, New Jersey and Firemen's Insurance Company of*
*Newark, New Jersey*

- 24 -

By: /s/ Siobhain P. Minarovich
Siobhain P. Minarovich
(admitted *pro hac vice*)
Paul Gorfinkel
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York  11556-0926
Telephone: (516) 357-3000
Siobhain.Minarovich@rivkin.com
Paul.Gorfinkel@rivkin.com

Harris B. Winsberg
(admitted *pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree St NE, Suite 3600
Atlanta, Georgia  30308
Telephone: (404) 420-4313
hwinsberg@phrd.com

Todd C. Jacobs
(admitted *pro hac vice*)
John E. Bucheit
(admitted *pro hac vice*)
BRADLEY RILEY JACOBS PC
500 W. Madison, Suite 1000
Chicago, Illinois  60654
Telephone: (312) 281-0295
tjacobs@bradleyriley.com
jbucheit@bradleyriley.com

*Attorneys for Interstate Fire & Casualty Company
and National Surety Corporation*

By: /s/ Russell W. Roten
Russell W. Roten (*pro hac vice*)
Jeff D. Kahane (*pro hac vice*)
Andrew Mina (*pro hac vice*)
DUANE MORRIS LLP
865 S. Figueroa Street, Suite 311
Los Angeles, California 90017-5450
(213) 689-7400
rwroten@duanemorris.com
jkahane@duanemorris.com

Sommer L. Ross (*pro hac vice*)
DUANE MORRIS LLP
1201 N. Market Street, Suite 501
Wilmington, Delaware  19801-1160
(302) 657-4951
slross@duanemorris.com

Catalina J. Sugayan (*pro hac vice*)
CLYDE & CO US LLP
55 West Monroe Street, Suite 3000
Chicago, Illinois  60603
(312) 635-7000
catalina.sugayan@clydeco.us

*Attorneys for LMI*

906942770