# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Ref. Docket No. 5466** |
|  | **Hearing Date: July 29, 2021 at 10:00 a.m. (ET)**<br>**Objection Deadline: July 22, 2021 at 4:00 p.m. (ET)** |

**CERTAIN INSURERS' OBJECTION TO
DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363(b)
AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO
ENTER INTO AND PERFORM UNDER THE RESTRUCTURING SUPPORT
AGREEMENT AND (II) GRANTING RELATED RELIEF**

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND .............................................................................................. 7

    I.     THE RESTRUCTURING SUPPORT AGREEMENT ......................................... 7

    II.    THE FOURTH AMENDED PLAN ............................................................ 8

    III.   THE TRUST DISTRIBUTION PROCEDURES ............................................. 9

OBJECTION ................................................................................................. 13

    I.     THE STANDARD OF REVIEW ................................................................ 13

    II.    THE RSA PROVIDES NO COGNIZABLE BENEFITS TO THE
           DEBTORS, PRECLUDING A FINDING THAT THE BUSINESS
           JUDGMENT RULE HAS BEEN SATISFIED .............................................. 17

        A.    The RSA Fails to Obtain the Core Relief Expected in a
              Restructuring Support Agreement: Support for a Plan ........................... 18

        B.    The Plan Required by the RSA Provides Incomplete Relief That
              Impairs the BSA's Ability to Survive as a Going Concern ..................... 19

        C.    The RSA Improperly Requires Payment of the Coalition's Legal
              Fees and Expenses Without Satisfying the 503(b) Substantial
              Contribution Standard ............................................................... 20

            i.    The Applicable Standard for Payment of the Coalition's
                 Fees is the 503(b) Substantial Contribution Standard.................. 20

            ii.   In Order to Obtain Payment Under Section 503(b) of the
                 Bankruptcy Code, the Coalition Must First Demonstrate
                 That it is a "Creditor Group" and Disclose Which Creditors
                 it Represents ................................................................... 26

            iii.  There Has Been No Attempt to Show the Coalition Has
                 Made a Substantial Contribution and the Record Does Not
                 Support Such a Finding.............................................................. 28

        D.    The RSA Requires the Debtors to Pursue a Plan that is Likely Not
              Confirmable Because it is Affirmatively "Insurance Prejudicial"
              Rather Than Insurance Neutral .................................................... 31

**TABLE OF CONTENTS**
**(Continued)**

Page

i.   The Insurance Neutrality Standard ............................................... 31

ii.  The RSA Requires the Debtors to Pursue a Plan that
     Prospectively Adjudicates Abuse Claims in Violation of the
     Insurance Policies ......................................................... 33

iii. The RSA Requires the Debtors to Pursue a Plan that
     Rewrites the Terms of the Insurance Policies to Eliminate
     Bargained for Protections of the Insurers ..................................... 34

iv.  Like in GIT, any Plan Consistent With the Debtors'
     Obligations Under the RSA Is Not Insurance Neutral for
     the Independent Reason that it Materially Increases the
     Quantum of Liability the Insurers are Required to Cover ........... 37

v.   The RSA Requires the Debtors Pursue a Plan that
     Impermissibly Transfers Non-Debtor Insurance Contracts
     to the Settlement Trust in Violation of Such Non-Debtor
     Contracts ................................................................. 38

II.  BECAUSE THE RSA CEDES COMPLETE CONTROL OF THE CASE
     AND THE TDPS TO THE ABUSE CLAIMANT REPRESENTATIVES,
     THE RSA PARTIES HAVE NOT ACTED IN GOOD FAITH.......................... 39

III. THE DEBTORS ARE FAR BETTER SERVED BY MAINTAINING
     FLEXIBILITY TO PURSUE OTHER PLANS AND POTENTIAL
     SETTLEMENTS.............................................................. 41

RESERVATION OF RIGHTS ................................................. 43

CONCLUSION.............................................................. 43

ii

Case 2-19-20905-PRW,    Doc 1900-3,    Filed 12/30/22,    Entered 12/30/22 14:43:28,
Description: Exhibit Exhibit 2, Page 4 of 60

# TABLE OF AUTHORITIES

Page(s)

CASES

*In re 641 Assocs., Ltd.*,
    1993 WL 332646 (E.D. Pa. August 26, 1993)........................................................31

*In re Abbots Dairies of Penn., Inc.*,
    788 F.2d 143 (3d Cir. 1986)........................................................16

*In re ACandS, Inc.*,
    311 B.R. 36 (Bankr. D. Del. 2004) ........................................................40

*In re Am. Cap. Equip., LLC*,
    668 F.3d 145 (3d Cir. 2012)........................................................37

*Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*,
    97 B.R. 220 (Bankr. E.D. Pa. 1989), *aff'd*, *Amatex Corp. v. Stonewall Ins. Co.*,
    102 B.R. 411 (E.D. Pa. 1989) ........................................................31

*Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*,
    388 B.R. 548 (Bankr. D. Del. 2008) ........................................................15

*Burtch v. Opus, LLC (In re Opus E., LLC)*,
    528 B.R. 30 (Bankr. D. Del. 2015), *aff'd*, 2016 WL 1298965 (D. Del. Mar. 31, 2016),
    *aff'd*, 698 F. App'x 711 (3d Cir. 2017) ........................................................16

*In re Cajun Elec. Power Coop., Inc.*,
    230 B.R. 715 (Bankr. M.D. La. 1999) ........................................................31, 34

*Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.)*,
    152 B.R. 661 (M.D. Fla. 1993) ........................................................34

*In re Chaparral Energy, Inc.*,
    Case No. 16-11144 (LSS) (Bankr. D. Del. Dec. 13, 2016) ........................................................24

*Cissel v. Am. Home Assur. Co.*,
    521 F.2d 790 (6th Cir. 1975), *cert. denied,* 423 U.S. 1074 (1976)........................................................31

*In re Combustion Eng'g, Inc.*,
    391 B.R. 190 (3d Cir. 2004)........................................................30, 32

*In re Crippin*,
    877 F.2d 594 (7th Cir. 1989) ........................................................31, 34

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*In re Delaware & Hudson R. Co.*,
124 B.R. 169 (D. Del. 1991) ................................................16

*In re Exaeris Inc.*,
380 B.R. 741 (Bankr. D. Del. 2008) ................................................16

*In re Federal-Mogul Glob. Inc.*,
684 F.3d 355 (3d Cir. 2012) ................................................31

*Fuller-Austin Insulation Co. v. Highlands Ins. Co.*,
135 Cal. App. 4th 958 (2006) ................................................32, 33

*In re Global Indus. Techs., Inc.*,
645 F.3d 201 (3d Cir. 2011) ................................................32, 37

*In re Innkeepers USA Trust*,
442 B.R. 227 (Bankr. S.D.N.Y. 2010) ................................................13, 41

*In re Latam Airlines Grp S.A.*,
620 B.R. 722 (Bankr. S.D.N.Y. 2020) ................................................13

*Lebron v. Mechem Fin. Inc.*,
27 F.3d 937 (3d Cir. 1994) ................................................28

*In re Lehman Bros. Holdings Inc.*,
508 B.R. 283 (S.D.N.Y. 2014) ................................................21

*In re Mallinckrodt PLC*,
Case No. 20-12522 (JTD) (Bankr. D. Del.) ................................................22

*Moody v. Amoco Oil Co.*,
734 F.2d 1200 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984) ................................................31, 34

*In re Mountain Creek Resort, Inc.*,
616 B.R. 45 (Bankr. D. N.J. 2020) ................................................26

*In re New Cotai Holdings, LLC*,
Case No. 19-22911 (RDD (Bankr. S.D.N.Y. May 11, 2020) ................................................25

*In re O'Brien Envtl. Energy, Inc.*,
181 F.3d 527 (3d Cir. 1999) ................................................21

*Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*,
322 B.R. 560 (M.D. Pa. 2005) ................................................39

iv

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*In re Panda Temple Power, LLC*,
Case No. 17-10839 (LSS) (Bankr. D. Del. Oct. 3, 2017) ......................................................24

*Pereira v. Cogan*,
267 B.R. 500 (S.D.N.Y. 2001) ..........................................................................................16

*In re Pittsburgh Corning Corp.*,
453 B.R. 570 (Bankr. W.D. Pa. 2011) .................................................................................32

*In re Purdue Pharma, LP*,
Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.) .......................................................................24

*In re RS Legacy Corp.*,
2016 WL 1084400 (Bankr. D. Del. Mar. 17, 2016).................................................................28

*In re SPM Mfg. Corp.*,
984 F.2d 1305 (1st Cir. 1993) .......................................................................................31, 34

*In re TCI 2 Holdings*,
428 B.R. 117 (Bankr. D.N.J. 2010) .....................................................................................22

*In re Wallace & Gale Co.*,
Case No. 85-4-0092 (Bankr. D. Md.) ...................................................................................31

*In re Thorpe Insulation Co.*,
677 F.3d 869 (9th Cir. 2012) .......................................................................................31, 32

*In re Triangle USA Petroleum Corp.*,
Ch. 11 Case No. 16-11566 (MFW) (Bankr. D. Del. Aug. 2, 2016).........................................18

*U.S. Tr. v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*,
No. 02 Civ. 2854 (MBM), 2003 WL 21738964 (S.D.N.Y. July 28, 2003) ........................24, 25

*In re Ultimate Escapes Holdings, LLC*,
2015 WL 1590132 (Bankr. D. Del. Feb. 5, 2015) ..................................................................14

*In re USG Corp.*,
290 B.R. 223 (Bankr. D. Del. 2003) ....................................................................................40

**STATUTES**

11 U.S.C. § 503(b)(4) ..........................................................................................................20

v

Case 2-19-20905-PRW,   Doc 1900-3,   Filed 12/30/22,   Entered 12/30/22 14:43:28,
Description: Exhibit Exhibit 2, Page 7 of 60

The undersigned insurance carriers (collectively referred to herein as "***Certain Insurers***") file this objection ("***Objection***") to the *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5466] (the "***Motion***").[2]  In support of this Objection, Certain Insurers respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Motion must be denied for a number of reasons.  The Debtors are unable to make their required showing that entry into the restructuring support agreement (the "***RSA***") satisfies the deferential business judgment rule, much less the more stringent "entire fairness" standard, which, under the circumstances, applies.[3]  The decision-makers who negotiated and executed the RSA on the Debtors' behalf suffer from debilitating conflicts of interest.  They also failed to educate themselves on the relevant terms of the settlement embodied in the RSA beyond the benefits it provided to the Local Councils.  As a result, the Debtors abdicated their fiduciary duties to all creditors and have instead filed a Motion seeking to bind themselves to an agreement that provides few, if any, benefits to the Debtors, and to support a plan of reorganization that is unconfirmable as a matter of law under applicable Third Circuit precedent.

2.      At a high level, the "bargain" between the Debtors and the Abuse Claimant Representatives in the RSA is as follows:

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3]    Not only was nearly every single member of the National Executive Board affiliated in some way with the Local Councils, but it appears the Local Councils have the exclusive authority to nominate and then elect 100% of the members of the National Executive Board.  *See* Transcript of July 15, 2021 Deposition of Roger C. Mosby ("***Mosby Dep. Tr.***") at 244:23-245:13; 245:16-249:2.  Excerpts from the Mosby Dep. Tr. are attached hereto as **Exhibit A**.

| What Debtors Received | What Abuse Claimant Representatives Received |
|---|---|
| • Promise that Abuse Claimant Representatives will recommend their clients vote in favor of Plan—including full releases for Debtors and Local Councils (non-Debtors) <br><br> • Agreement to reduce the Debtors' contribution to compensate for the costs likely to be incurred in connection with appeals of the Confirmation Order and delay of the Effective Date <br><br> • Temporary positive press regarding deal with Abuse Claimants Representatives | • $950,000 per month in professional fee reimbursement for the Coalition following RSA effective date + $10.5 million payment of professional fees on Plan Effective Date <br><br> • Increased Expedited Distribution of $3,500 (from $1,500) per claimant, to claimants that provide no evidentiary support and even if claim is time barred (~$208 million payment in the aggregate if each of the 59,500 presumptively barred claimants accept) <br><br> • Plaintiff-friendly TDPs that purport to be binding on all parties, including insurers, with claim values untethered to BSA's experience, minimal proof requirements, and payment of time-barred claims <br><br> • Insurers excluded from process of determining allowability and value of claims (unilaterally determined by Settlement Trustee and the Settlement Trust Advisory Committee (the "***STAC***")) and have no ability to assume the defense of the claims in the tort system <br><br> • Insurers are purportedly responsible for the full value of claim amounts unilaterally determined by the Settlement Trustee and the STAC, even if Settlement Trust pays smaller amount <br><br> • Right to select every member of the STAC and selection of Settlement Trustee who was previously disqualified as a mediator due to his relationship with the FCR <br><br> • Bankruptcy Court required to bless the TDPs and each unilaterally determined claim valuation ***now*** (even though claim determinations will not be made until sometime in the future by a trustee hand-picked by and loyal to the claimants), so that the unilaterally determined claim valuations can be presented to a coverage court as a purported "judgment" made by a federal court <br><br> • Priority of Direct Abuse Claims over recoveries of the Indirect Abuse Claims held by the Chartered Organizations and no restrictions on the ability to continue to liquidate their claims against the Chartered Organizations in the tort system |

3.      What has happened here is clear: the Debtors have attempted to purchase a release

for themselves and the Local Councils in exchange for handing the keys to the case to the Abuse

Claimant Representatives and without regard for their obligations as chapter 11 debtors or for the

duties owed to their insurers and the Chartered Organizations.  But the Debtors are not actually receiving the benefit of their bargain—and even if they were, the price is far too steep for what the Debtors will purportedly receive.

4.    As an initial matter, there is no guarantee that the Abuse Claimants will vote in favor of the Plan—and without that, the Debtors have received nothing of value.  Unlike a typical restructuring support agreement where claimants themselves sign on the dotted line, here the signatories to the RSA are the TCC (which controls no votes[4]), the FCR (which controls no votes), and the Coalition and certain state court counsels who only *purport* to control votes.  Putting aside whether any lawyer (in any scenario) can actually deliver on a promise that his or her clients will ultimately agree to vote in favor of a plan, and whether such a promise by a lawyer without consulting with each of his or her clients is ethical, the facts and circumstances of this case make that promise even more uncertain.  As described below, in addition to the Coalition's continued refusal to disclose the number of Abuse Claimants it actually represents, it is clear there is significant opposition to the RSA by Abuse Claimants that are not part of the Coalition.[5]  For this reason alone, the main benefit that the Debtors purport to be receiving under the RSA is illusory.

5.    Assuming that the Abuse Claimant Representatives are capable of delivering sufficient votes in support of the Plan, however, the Plan does not provide the Debtors the complete relief necessary to ensure that the operations of the Debtors will continue as a going concern.  The core of the Debtors is not merely the Local Councils, but also the Chartered Organizations that are

---

[4]    While the Abuse Claimants who are members of the TCC voted to approve and have their counsel sign the RSA, they are not signatories to the RSA themselves and have no obligation to vote to approve the Plan.

[5]    July 7, 2021 Hr'g Tr. at 34:18-24 ("I will represent to you that there are probably, among the group of us, about 50 law firms who have been taking a very close look at the disclosure statement, the RSA, the most recent proposed plan, the previously proposed plan and . . . we have some serious concerns and objections that we intend to raise at the disclosure hearing.").

3

left out of the RSA and will be subject to ongoing litigation (unless and until the Abuse Claimant Representatives, in their discretion, agree otherwise).  As discussed on the record at the July 7 hearing, certain of the key partners of the BSA, including the Catholic Church and Methodist Church, are evaluating whether they will be willing and able to continue to support the mission of the BSA at all if the current plan is not modified to include releases for all Chartered Organizations.[6]

6.      In addition, the relief requested in the RSA should be denied because it includes a transparent attempt by the Debtors and the Coalition to sidestep the substantial contribution requirement in section 503(b) of the Bankruptcy Code that must be satisfied before the Coalition's fees and expenses can be paid from estate assets. The attempt to rely solely on the Debtors' business judgment to pay such fees is misguided, without support from the Bankruptcy Code, and defies controlling Third Circuit precedent and precedent from other Circuits on this precise issue. While it is permissible for a debtor to rely on its business judgment to use property of the estate in the ordinary course of business, Section 363(b) does not authorize a debtor (or the Court) to transform an obligation of certain of the Abuse Claimants' State Court Counsel to pay their bankruptcy counsel into an administrative expense of the Debtors' estates simply because it is convenient.

7.      Even if the Debtors could overcome the hurdles outlined above, the RSA faces yet another insurmountable challenge: it forces the Debtors to pursue a plan that is patently not

---

[6]      July 7, 2021 Hr'g Tr. at 60:14-61:3 (statement of Mr. Ryan, counsel for the United Methodist Ad Hoc Committee and the Roman Catholic Ad Hoc Committee) ("And what is going to occur, Your Honor, is that every chartered organization is going to have to make a decision, how do we continue to do business with an organization like Boy Scouts? How do we volunt[eer] our time, volunteer our property on a weekly basis to tens of thousands of troops and hundreds of thousands of scouts, with an organization that proposes to treat us as this plan proposes to treat chartered organizations? No chartered organization wants to make that decision, but we're being forced into that corner and forced into that corner under the timeline and the plan that Boy Scouts and the tort claimants are proposing. It's going to make the decision self-fulfilling. What organization would choose to do business with Boy Scouts, being treated like this going forward?").

4

Case 2-19-20905-PRW,   Doc 1900-3,   Filed 12/30/22,   Entered 12/30/22 14:43:28,
Description: Exhibit Exhibit 2, Page 11 of 60

insurance neutral, and, therefore, not confirmable under bankruptcy law.  While the Debtors will likely argue that this is a confirmation objection that should not be considered in connection with this Motion, the question of whether this Court should permit the Debtors to bind themselves to pursue a plan that is unconfirmable as a matter of law is ripe and should be considered in the context of this contested matter.

8.      Much more than just a doctrine of standing, insurance neutrality is a fundamental protection required under the Bankruptcy Code.  Insurance neutrality is rooted in the uncontroversial premise that insurance policies are no different than any other contract, such that the contractual rights of the debtor's counterparties may not be abridged unless a provision of the Bankruptcy Code authorizes that abridgement.  Thus, the mere fact that the insured availed itself of bankruptcy protection does not provide it with the unilateral right to modify prepetition rights and/or expand the obligations of its insurers.  Here, the language of the RSA, including the Trust Distribution Procedures (the "*TDPs*") attached thereto, *expressly* requires the Debtors to propose a Plan designed to prejudice the Debtors' insurers by altering their prepetition rights and obligations.  It does this by, among other things: (i) altering the insurers' rights under their policies to defend claims in an adversarial proceeding in which legal judgments are entered following consideration and testing of evidence, a key part of the insurers' contractual bargain with BSA and a foundational principle of the bundle of economic rights reflected in the policy contracts; (ii) taking away the insurers' rights to consent to settlements, another key element of the contractual insurance bargain; (iii) purporting to bind the insurers to claim valuations set by the Abuse Claimant Representatives, in derogation of the insurers' contractual rights to assume the defense and litigate claim valuation and/or the reasonableness of any claim settlement; (iv) guaranteeing that *every* Abuse Claim will receive a distribution regardless of whether there is any proof (a) of

at least negligence, a necessary element of any Abuse Claim under applicable law (or even that the claimant was, in fact, involved at all in scouting), (b) that the Abuse Claim triggers coverage under one or more of the policies, or (c) that the Abuse Claim is compensable under applicable statutes of limitation and/or the bar date established in these Chapter 11 Cases and (v) expanding the "quantum of liability" that the insurers would otherwise face in the tort system by as much as $100 billion.[7]  Under binding Third Circuit precedent, any one of these infirmities would render the Plan unconfirmable as a matter of law.  Taken together, they show that approval of the Motion and pursuit of confirmation for this Plan is an exercise in futility.

9.    Even more troubling, the RSA requires the Debtors to ask this Court to modify fundamental insurer rights and protections in ***non-Debtor*** insurance policies issued to Local Councils and Contributing Chartered Organizations—insured parties that have not availed themselves of bankruptcy protection—including by asking this Court to override anti-assignment clauses in such non-Debtor policies.  The Court has no authority to modify non-Debtor contracts, and any suggestion to the contrary has no basis in established precedent.

10.    For each of these reasons, the RSA requires the Debtors to propose a plan that is plainly not insurance neutral, and one that is not confirmable as a matter of law.  At a minimum, it will create significant risks of additional costs, delay and uncertainty on the part of the estates.

---

[7]    The Abuse Claimant Representatives have been explicit that they intend to use these Chapter 11 Cases to attempt to expand insurer liability by approximately $100 billion dollars.  Indeed, at the May 19, 2021 hearing, counsel to the TCC stated (based on no evidence whatsoever) that the TCC believes the substantial and unexplained increase in claims in this case was just "the tip of the iceberg" and that Abuse Claim liability exceeded the Debtors' current estimated range of $2 billion to $7 billion by approximately $100 billion.  *See* May 19, 2021 Hr'g Tr. at 73:24-74:24 (statement of Mr. Stang, TCC counsel) ("84,000 people have come forward to say that they were abused, and I can tell you from my experience, and I think everyone on this call knows, that is the tip of the iceberg. . . . We believe the estimated value of claims in this case is not less than $102 billion.").  Of note, the Amended Disclosure Statement states that, in the view of the Debtors' consultant Bates White, approximately 83% of the Abuse Claims filed in these Chapter 11 Cases to date are "presumptively barred."  Amended Disclosure Statement § V.N.

6

11.     Perhaps most troubling of all is that there is simply no need for the Debtors to sign the RSA and thereby create the unsolvable problems identified above.  The Debtors should instead maintain the flexibility to negotiate settlements with insurers and Chartered Organizations, without ceding control of these cases (and those settlements) to the Abuse Claimant Representatives as the RSA effectively requires.  For this reason, and the reasons set forth below, the relief requested in the Motion should be denied.

## BACKGROUND

## I.    THE RESTRUCTURING SUPPORT AGREEMENT

12.     On July 1, 2021, the Debtors filed the Motion requesting authority to enter into the RSA.  The RSA is signed by (i) the Debtors, (ii) the Abuse Claimant Representatives, and (iii) the ad hoc committee of local councils (the "***Local Councils***," collectively, the "***RSA Parties***").  The RSA was not signed by a single Abuse Claimant, Chartered Organization, or Insurance Company, and no Abuse Claimant has obligated himself to vote in favor of the plan contemplated by the RSA.  The key terms of the RSA include the following:

- The Debtors are prohibited from proposing a plan inconsistent with the TDPs.  *See* RSA § II.B.(i).  The TDPs impair the rights of both the Debtors' insurers and their Chartered Organizations and are designed to prevent scrutiny of any Direct Abuse Claims prior to allowance and payment thereof.  *See infra* § II.A.

- The Debtors must include a number of findings and orders in any confirmation order (the "***Findings and Orders***") that deprive the Debtors' Insurance Companies of their rights and coverage defenses under the Insurance Policies.  *See* RSA § II.A.(i).

- The Debtors must obtain the consent of the Abuse Claimant Representatives and certain other parties to settle with an Insurance Company or Chartered Organization.  *See* RSA § II.B.; Ex. A., Contributing Chartered Organization Settlement Contribution.

- The Abuse Claimant Representatives are vested with complete control over the Settlement Trust and the TDPs, including by allowing the Coalition and TCC to develop the terms of the TDPs (without meaningful input from the Debtors or even awareness of the material terms thereof),[8] to select every member of the STAC and by

---

[8]    *See, e.g.,* Mosby Dep. Tr. at 129:5-15 ("I have no personal knowledge of who personally drafted [the TDPs].");

7

requiring the selection of Eric D. Green as Settlement Trustee.  *See* RSA Ex. A, Settlement Trust Trustee; Settlement Trust Advisory Committee.

- The Debtors are required to abandon the Hartford Settlement, and seek a determination from the Court that the Debtors have no obligations thereunder, depriving the Settlement Trust of Hartford's $650 million contribution.  *See Id.* § II.A.(viii).

- The Debtors must pay the Coalition's legal fees and expenses up to a $10.5 million cap for fees and expenses incurred prior to entry into the RSA, plus up to $950,000 per month moving forward.  *See Id.* § II.A.(vi).

## II.    THE FOURTH AMENDED PLAN

13.    On July 2, 2021, the Debtors filed the *Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5368] (the "***Plan***") to implement the terms of the RSA and an amended disclosure statement for the Plan [D.I. 5485] (the "***Amended Disclosure Statement***").   Consistent with the required Findings and Orders, the provisions in the Plan that purportedly maintain the status quo under the Insurance Policies (the "***Insurance Provisions***") have been significantly curtailed, relative to prior versions of the Plan, such that the Plan is, as required by the RSA, unambiguously not insurance neutral.  Specifically, the Insurance Provisions now expressly provide that "the findings made by the Bankruptcy Court in the Confirmation Order or the findings made by the District Court in the Affirmation Order" may modify the terms of, and the insurers' rights and obligations under, any Insurance Policy.[9]

---

133:11-16 ("Q: . . . [C]laimants aren't required to show negligence at all to receive the base matrix amount? But if they show negligence they actually get bonus points, don't they? A: Again, I'm not – I'm not that familiar with [the TDPs]").  Transcript of July 19, 2021 Deposition of Daniel Ownby ("***Ownby Dep. Tr.***") at 94:9-95:7 ("Q: Mr. Ownby, who drafted the trust allowance – the trust allowance procedures?  . . . Q: Mr. Ownby, who was it that came up with the procedures for allowing and assigning values to claims that's part of the plan that's associated with the Restructuring Support Agreement?  A: I – I don't know. . . . Q: did you have an understanding as to whether or not claims that were barred under a state statute of limitations would nonetheless be paid or not? . . . A: I was unaware of how the structure of a state with statutes would or would not be paid.").  Excerpts from the Ownby Dep. Tr. are attached hereto as **Exhibit B**.

[9]    Plan § X.M.1 (emphasis added):

> ***Except for the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order or the findings made by the District Court in the Affirmation Order***, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights or obligations under an

8

14.     The Plan also implements the Findings and Orders required by the RSA as new conditions precedent to confirmation that are designed to impair insurer rights. *See* Plan § IX.A.3. Specifically, new conditions precedent to confirmation include that the Bankruptcy Court make findings that (i) the Plan, the Plan Documents (including the TDPs), and the Confirmation Order are binding on ***all*** parties in interest and (ii) the value of each Abuse Claim, as will be determined by the Settlement Trustee at some point in the future (unilaterally, under the TDPs drafted by the Abuse Claimant Representatives) is "fair and reasonable." *Id.*; RSA § II.A.(i).  These conditions precedent, coupled with the curtailed Insurance Provisions, render the Plan, and any other plan consistent with the RSA, unambiguously not insurance neutral and not confirmable.[10]

## III.    THE TRUST DISTRIBUTION PROCEDURES

15.     In the TDPs attached as Exhibit B to the RSA (which will purportedly be binding on all insurers pursuant to a required Finding and Order in the RSA), as a price for the Abuse Claimant Representatives' support, the Debtors have made a number of changes that significantly prejudice the insurers by impairing their contractual rights and coverage defenses.

16.     Pursuant to the TDPs, substantially all Abuse Claims shall be liquidated by settlement with the Settlement Trust rather than litigation, and all settlement offers are to be made solely by the Settlement Trustee based on pre-determined Claims Matrix values.  *See* TDPs §§ VII.B-F, IX.A-C.  Contrary to the terms of the Insurance Policies, which generally provide the

---

Insurance Policy to the extent such rights and obligations are otherwise available under applicable law.

[10]  In fact, the Debtors themselves appear to concede that the Insurance Provisions do not make the Plan insurance neutral.  For instance, the *Proposed Amendments to Disclosure Statement for the Third Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5371] (the "***June 18 Disclosure Statement Amendments***") explicitly stated that the Insurance Provisions that would have applied under the BSA Toggle Plan were insurance neutral, but it did not characterize the Insurance Provisions that would have applied under the Global Resolution Plan (which are identical to the Insurance Provisions under the Plan) in a similar fashion.  *See* June 18 Disclosure Statement Amendments §§ X.A.23, X.A.24. Instead, the June 18 Disclosure Statement (and the Amended Disclosure Statement) discloses the risks associated with the "extremely costly and time-consuming" litigation that is "likely" if the Plan is confirmed with the current Insurance Provisions.  *See* June 18 Disclosure Statement Amendments § X.A.23; Amended Disclosure Statement § X.A.24.

9

Case 2-19-20905-PRW,   Doc 1900-3,   Filed 12/30/22,   Entered 12/30/22 14:43:28,
Description: Exhibit Exhibit 2, Page 16 of 60

insurers with express consent rights over settlements by the insured, the TDPs deny Non-Settling Insurance Companies any role in determining whether to make settlement offers to satisfy Abuse Claims, and in what amounts.  While the TDPs provide that the Settlement Trustee "shall seek reimbursement for each Insured Abuse Claim . . . from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law" and that the Settlement Trustee "shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan," they are silent as to what rights, if any, Non-Settling Insurance Companies have with respect to any Abuse Claims for which the Settlement Trustee seeks reimbursement.  *See* TDPs § X.

17.    Moreover, the Debtors have stripped the TDPs of various provisions that existed in prior versions that would have allowed the Settlement Trustee to adjust an "Allowed Claim Amount"[11] downward based on certain mitigating factors, including by:

- deleting the Settlement Trustee's ability to zero out time-barred claims;[12]

- deleting language that previously gave the Settlement Trustee discretion to apply potential mitigating factors not explicitly listed in the TDPs;[13]

- deleting incomplete or suspicious evidence as a mitigating factor and deleting the prior requirement that, "[i]f the Settlement Trustee believes the evidence provided is deliberately false or misleading," the Settlement Trustee could not pay the claim;[14] and

- deleting, as a mitigating factor, a Protected Party's lack of knowledge that an alleged perpetrator was likely to commit acts of abuse.[15]

---

[11]  "*Allowed Claim Amount*" means "an allowed liability amount for each Allowed Abuse claim."  TDPs § I.A.

[12]  *Compare Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2592], Exhibit A (the "*Second Amended Plan TDPs*") § 5.4 *with* TDPs § VIII.F, Schedule 1.

[13]  *Compare* Second Amended Plan TDPs § 5.4 *with* TDPs § VIII.E.

[14]  *See supra* n.12.

[15]  *See supra* n.12.

10

18.     In addition, the TDPs do not require any showing of negligence on the part of the Protected Party in order for an Abuse Claim to be allowed; instead, evidence of negligence is treated as effectively a "bonus" that will increase the Scaling Factor (as defined in the TDPs) for a claim.  TDPs § VIII.D.(ii)d.  Such treatment turns otherwise applicable state law regarding both tort law and insurance coverage on its head, as no plaintiff in the tort system can recover without showing at least negligence and no insurance policy can be implicated absent a showing of negligence on the part of the insured.

19.     Further, a holder of a Direct Abuse Claim may elect to receive an "Expedited Distribution" of $3,500 (an increase of 233% from the expedited distribution proposed in the version of the Plan filed by the Debtors prior to the RSA), with no questions asked.  The only requirement that must be satisfied to receive an Expedited Distribution is that the holder has timely filed a non-duplicative proof of claim that is signed by the holder.  *See* TDPs § VI.A; *see also* Plan § III.B.10.  Neither the Plan nor the TDPs require (or event permit) the Settlement Trustee to evaluate the validity of such claims before paying the Expedited Distribution, including whether they would be time-barred or otherwise invalid under applicable state law.[16]  In fact, the TDPs expressly provide that the "Abuse Claimants that elect to receive the Expedited Distribution will not have to submit any additional information to the Settlement Trust in order to receive payment of the Expedited Distribution."  *See* TDPs § VI.A.

---

[16]  To make an Expedited Distribution election, holders of Direct Abuse Claims are only required to "timely submit" a "properly and substantially completed, non-duplicative Abuse Claim Proof of Claim."  *See* TDPs § VI.A.  Under the TDPs, any Direct Abuse Claim for which a proof of claim was filed before the bar date or otherwise determined to be timely by the Bankruptcy Court is deemed a "timely submitted" Abuse Claim Proof of Claim, without any further action by the Abuse Claimant and regardless of whether or not the Direct Abuse Claim would be time-barred or otherwise invalid under applicable state law.  *Id.*§ IV.A.  There is no provision to permit the Settlement Trustee even to question these claims, which is wholly inconsistent with the treatment of claims under the Bankruptcy Code.

11

20.     Accordingly, by eliminating certain mitigating factors and the Settlement Trustee's discretion to zero out any time-barred claims, the TDPs provide substantial recoveries for Abuse Claims that may have no factual or legal support or may face other legal hurdles if they were liquidated in the tort system.  According to the Debtors' own consultants, such claims account for the vast majority—approximately 83%—of all Abuse Claims that have been filed to date.  *See* Amended Disclosure Statement § V.N.  Assuming the validity of these percentages, any plan contemplated by the RSA will ensure that recoveries of holders of legitimate Abuse Claims will be grossly diluted by distributions to parties holding illegitimate claims.

21.     Notwithstanding these indisputable flaws in the Abuse Claims allowance process, the TDPs also provide that the Allowed Claim Amount determined by the Settlement Trustee constitutes a Protected Party's (*i.e.*, the Debtors' and/or Local Councils') liability, and state that the Settlement Trustee shall be able to seek coverage for the full Allowed Claim Amount.  The Settlement Trustee can make such a determination regardless of whether there is evidence of ***any*** negligence by a Protected Party and/or whether the applicable Insurance Policies obligate insurers to pay the full Allowed Claim Amount, as opposed to the amount actually paid by the Settlement Trust, or no amount at all.  *See* TDPs §§ VIII.A; IX.C; XII.G.

22.     And, it is not just the Debtors' insurers' rights that are impaired by the TDPs.  The Debtors have also agreed to subordinate the recoveries of the Chartered Organizations for their Indirect Abuse Claims to the recoveries of the holders of Direct Abuse Claims.  *See* TDPs § IV.B. Accordingly, pursuant to the RSA, the Debtors have not only granted concessions to the Abuse Claimant Representatives that harm their insurers, they have also agreed (i) that no Chartered Organization will be entitled to any protections from Abuse Claim liability absent the consent of

12

every Abuse Claimant Representative, and (ii) to expressly subordinate the recoveries of Chartered

Organizations to the claims of the clients of the Abuse Claimant Representatives.[17]

## OBJECTION

## I.    THE STANDARD OF REVIEW

23.    The Debtors assume, without explanation, that the business judgment rule is

applicable to their determination to enter into the RSA.  This somewhat deferential rule is not

applicable, however, in situations where a debtor's decision-makers suffer from debilitating

conflicts of interest; in those situations a heighted standard known as the "entire fairness" standard

applies to the court's evaluation of the transaction.  *See, e.g.*, *In re Latam Airlines Grp S.A.*, 620

B.R. 722, 769-770 (Bankr. S.D.N.Y. 2020) ("By definition, the business judgment rule is not

applicable to transactions among a debtor and an insider of the debtor.  Those kinds of transactions

are inherently suspect because they are rife with the possibility of abuse.") (quotation marks

omitted); *In re Innkeepers USA Trust*, 442 B.R. 227, 232-34 (Bankr. S.D.N.Y. 2010) (finding that

"the heightened scrutiny/entire fairness standard . . . may apply" to plan support agreement with

an insider, and denying approval thereof because it failed to satisfy even the business judgment

test).

24.    Here, the Local Councils exercised complete and total control over the Debtors'

corporate governance, electing, through their representatives, 100% of the members of the

Debtors' National Executive Board (the functional equivalent of the board of directors) who were

---

[17]  It appears that this was part of the price the Abuse Claimant Representatives were able to extract from the Debtors and Local Councils in order to secure Abuse Claimant Representative support.  Because the Debtors have ceded all authority to settle with the Chartered Organizations or their insurers to the Abuse Claimant Representatives (who must unanimously consent to any such settlement), the Debtors' agreement to (i) support TDPs that will inflate Direct Abuse Claim liability and (ii) subordinate the indemnification claims of the Chartered Organizations to such inflated claims, has the real world effect of tilting the playing field (and negotiating advantage) in favor of the Abuse Claimant Representatives in negotiating such settlements.

13

responsible for evaluating and approving the RSA.    Mosby Dep. Tr. at 244:5-12 ("[R]epresentatives from each of the councils, based upon some membership criteria, have national representatives that participate in national elections.  The national board is elected each year by that group of people.").  In addition, substantially all of the members of the Debtors' "National Executive Committee" (a subset of the National Executive Board that independently approved the RSA), were affiliated with a Local Council.  *Id.* at 245:24-248:8.

25.    Despite discovery requests from Certain Insurers, the Debtors have not disclosed whether and to what extent they attempted to address these inherent conflicts in the RSA approval process, asserting that all such details are somehow "privileged."  But, the fact that the terms of the RSA are extremely favorable to the Local Councils, nearly all of whom are insiders in light of their complete control over the Debtors' corporate governance—to the detriment of the Chartered Organizations—calls into question whether the Debtors were acting in their own best interests or in furtherance of the Local Councils' interests in shielding themselves from liability rather than the best interests of scouting and the estates when entering into the RSA.  Indeed, according to the Debtors' CEO, when evaluating the RSA, ***no consideration*** was given to the impact ongoing litigation would have on the Chartered Organizations.  *Id.* at 192:4-193:18.  And, the insider Local Councils receive significant benefits under the RSA, benefits that appear to be provided precisely because they are insiders in light of the disparate treatment given to the Chartered Organizations.

26.    Under these facts, it appears the Debtors' directors were hopelessly conflicted and served the interests of the Local Councils rather than of the Debtors in negotiating and approving the RSA, mandating application of the entire fairness test.  *In re Ultimate Escapes Holdings, LLC*, 2015 WL 1590132, at *8 (Bankr. D. Del. Feb. 5, 2015) ("The applicable standard turns on whether the corporate fiduciaries (i) were disinterested and independent (the business judgment rule), (ii)

14

faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness).") (internal quotation marks omitted).

27.     In addition, the business judgment standard is unavailable where, as here, the Debtors' directors and officers appear to have failed to familiarize themselves with even the most basic terms of the RSA, beyond the fact that it would benefit the Local Councils by shielding them from the effects of Abuse Claim liability.  Indeed, it appears that the Debtors' directors and officers failed to even consider any of the terms of the RSA beyond the size of the contributions by the Debtors and the Local Councils and the benefits provided to the Local Councils, including, among other things, failing to consider (i) that the TDPs required by the RSA guarantee that the Settlement Trust will distribute estate assets to holders of Abuse Claims the Debtors' professionals believe are not entitled to compensation or even who drafted them,[18] (ii) the selection of the Abuse Claimant Representatives handpicked Settlement Trustee,[19] (iii) the impact on the Chartered Organizations and the go-forward success of scouting,[20] and (iv) the degree of control over these

---

[18]  *See, e.g.,* Mosby Dep. Tr. at 129:5-15 ("I have no personal knowledge of who personally drafted [the TDPs]."); 133:11-16 ("Q: . . . [C]laimants aren't required to show negligence at all to receive the base matrix amount? But if they show negligence they actually get bonus points, don't they? A: Again, I'm not – I'm not that familiar with [the TDPs]").  Transcript of July 19, 2021, Deposition of Daniel Ownby ("***Ownby Dep. Tr.***") at 94:9-95:7 ("Q: Mr. Ownby, who drafted the trust allowance – the trust allowance procedures?  . . . Q: Mr. Ownby, who was it that came up with the procedures for allowing and assigning values to claims that's part of the plan that's associated with the Restructuring Support Agreement?  A: I – I don't know. . . . Q: did you have an understanding as to whether or not claims that were barred under a state statute of limitations would nonetheless be paid or not? . . . A: I was unaware of how the structure of a state with statutes would or would not be paid."); 102:13-20 ("Q: How much time did you spend as chair familiarizing yourself with the – the claims matrix that's adopted as part of the Restructuring Agreement . . . A: I don't think I saw the matrix prior to agreeing to it.").

[19]  *See, e.g.,* Ownby Dep. Tr. at 98:3-13 ("Q: - who is Eric Green? A: . . . I believe he is the person in the RSA that is the trustee . . . I don't know exactly what the duties and responsibilities or obligations of the trustee are but I think there's an Eric Green named in the RSA, and I don't know if Roger and team worked on, but it was not something the board discussed."); Mosby Dep. Tr. at 144:24-145:1 ("Q: Who offered the name Eric Green for the role as settlement trustee? A: I don't know.").

[20]  *See, e.g.,* Mosby Dep. Tr. at 192:4-193:18.

15

Chapter 11 Cases and the liquidation and payment of Abuse Claims that the Debtors, as estate fiduciaries, were ceding to the Abuse Claimant Representatives.[21]  Daniel Ownby, the Chair of the National Executive Board testified that he did not even review the RSA until *after* it was approved and signed.[22]  The Debtors' decision-makers' failure to satisfy even their most basic duty of care in reviewing the key terms of the RSA provides yet another reason why approval of the RSA should be subject to the entire fairness standard.  *See Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 569 (Bankr. D. Del. 2008) ("[I]f the directors individually and the board collectively fail to inform themselves fully and in a deliberate manner, then they lose the protection of the business judgment rule and the court is required to scrutinize the challenged transaction under an entire fairness standard of review.") (citations and internal quotations omitted).

28.     Meeting the entire fairness standard is "a daunting task, involving a standard so exacting that it ordinarily, but not invariably, results in a finding of liability." *Pereira v. Cogan*, 267 B.R. 500, 508 (S.D.N.Y. 2001) (internal quotation marks omitted).  "The 'entire fairness' standard is Delaware's most onerous standard and requires that the [movant] prove that the transaction was the product of both fair dealing and fair price." *Burtch v. Opus, LLC (In re Opus E., LLC)*, 528 B.R. 30, 66 (Bankr. D. Del. 2015), *aff'd*, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017).  But, because, as in *Innkeepers*, the Debtors cannot satisfy even the business judgment standard applicable under section 363(b) in the absence of such inherent conflicts, any debate over what standard should apply is ultimately a moot point.

---

[21]  *See, e.g.,* Mosby Dep. Tr. at 141:2-144:6.
[22]  *See* Ownby Dep. Tr. at 115:6-8 ("I've reviewed the Restructuring Support Agreement after it was signed.  I did not review it prior to it being signed.").

16

## II.    THE RSA PROVIDES NO COGNIZABLE BENEFITS TO THE DEBTORS, PRECLUDING A FINDING THAT THE BUSINESS JUDGMENT RULE HAS BEEN SATISFIED

29.    In order for the RSA to be approved under section 363(b) of the Bankruptcy Code, the Debtors must provide proof that (i) there is a sound business purpose for entry into the RSA, (ii) the consideration the Debtors are receiving for entry into the RSA is fair, (iii) they have provided adequate and reasonable notice, and (iv) the RSA Parties have acted in good faith.  *See In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (refusing to approve sale because the debtor failed to satisfy its burden of demonstrating any of these four requirements).  "The element of good faith is of particular importance."  *Id.*; *see also In re Abbots Dairies of Penn.*, *Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) ("we hold that when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser.").  The Debtors bear the burden of proof.  *See*, *e.g.*, *In re Delaware & Hudson R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).  The Debtors have failed to satisfy any aspect of this standard, other than adequate and reasonable notice (after they were ordered to do so by the Bankruptcy Court), and accordingly, the Motion should be denied.

30.    The Debtors commenced these Chapter 11 Cases "to achieve dual objectives: (a) timely and equitably compensating victims of abuse in Scouting and (b) ensuring the BSA emerges from bankruptcy with the ability to continue its vital charitable mission."  *Debtors Informational Brief* [D.I. 4] at pgs. 6-7.  The RSA achieves neither objective.  Instead, the RSA:  (i) fails to provide certainty on a path to the Plan effective date, because it does not guarantee the receipt of sufficient votes in favor of a Plan (or any plan); (ii) significantly prejudices the Chartered Organizations, all of which are essential to the continued success of the BSA and its vital charitable mission; (iii) improperly diverts estate assets to Coalition professionals for prior actions that were facially adverse to (rather than in assistance of) the Debtors; and (iv) ensures contentious

17

proceedings with the Chartered Organizations and insurers before any plan could be confirmed or go effective, thereby foreclosing the possibility of timely compensating abuse victims. All these reasons preclude any showing that (A) entering into the RSA was a valid exercise of the Debtors' business judgment, and (B) the Debtors are receiving fair consideration in exchange for the significant concessions in the RSA.

### A. The RSA Fails to Obtain the Core Relief Expected in a Restructuring Support Agreement: Support for a Plan

31.    The RSA fails to provide the Debtors with even the most basic consideration expected under a restructuring support agreement—certainty that the Plan will enjoy the support of the Abuse Claimants themselves. Indeed, the RSA is not signed by a single Abuse Claimant, and it does not obligate a single Abuse Claimant to vote in favor of the Plan. Instead, it merely obligates certain of the Abuse Claimant Representatives, the State Court Counsel,[23] to ***recommend that their clients*** vote in favor of the Plan. *See* RSA § IV.A.(i).

32.    This concern is not merely theoretical. Indeed, at the July 7 status conference, Mr. Zalkin on behalf of his Abuse Claimant clients stated: "I will represent to you that there are probably, among the group of us, about 50 law firms who have been taking a very close look at the disclosure statement, the RSA, the most recent proposed plan, the previously proposed plan and . . . we have some serious concerns and objections that we intend to raise at the disclosure hearing." July 7, 2021 Hr'g Tr. at 34:18-24.

33.    Accordingly, because the Debtors do not even know if the Plan will be supported by the Abuse Claimants themselves, they are not receiving any benefit in exchange for the substantial concessions made to the Abuse Claimant Representatives. This requires that the

---

[23]   Notably, despite the fact that the Coalition purports to represent at least 11,875 Abuse Claimants (rather than such claimants' State Court Counsel), the Coalition appears to have no obligation under the RSA to recommend its clients vote to accept any plan consistent with the RSA.

18

Motion be denied. *In re Triangle USA Petroleum Corp.*, Ch. 11 Case No. 16-11566 (MFW) (Bankr. D. Del. Aug. 2, 2016) [D.I. 194] (denying motion to assume plan support agreement after finding that non-debtor parties to the agreement "are not committing to anything. They're not committing to do a backstop. They're not committing to funding the new money rights offering. They're not even committing to vote in favor of a specific plan . . . I think there's sufficient basis to deny approval of the PSA at this point, because, quite frankly, it's an illusory agreement.").

**B.     The Plan Required by the RSA Provides Incomplete Relief That Impairs the BSA's Ability to Survive as a Going Concern**

34.     Throughout these bankruptcy proceedings, the Debtors have continually noted the importance of their partnerships with the Chartered Organizations, stating at the July 7 status conference that, "[w]ith respect to the other [non-LDS] chartered organizations, we do value them as go-forward partners. They are essential. They [are the] lifeblood of scouting." July 7, 2021 Hr'g Tr. at 68:2-4. Yet, the RSA fails to provide any protections from Abuse Claim liability for these organizations that are so critical to the BSA's operations. What is more, the Debtors have also agreed to expressly subordinate all indemnity or contribution claims of the Chartered Organizations (Indirect Abuse Claims) to the Direct Abuse Claims. *See* TDPs § IV.B.

35.     Pursuant to the RSA, the Debtors are prohibited even from treating the Chartered Organizations Indirect Abuse Claims equally with Direct Abuse Claims, let alone from including any protections for Chartered Organizations of the type the Debtors have secured for their affiliates, without the unanimous consent of the Abuse Claimant Representatives. If all the Abuse Claimant Representatives do not consent to such releases (and, therefore, the Chartered Organizations remain subject to litigation in the tort system), any of the contribution or indemnity claims the Chartered Organizations may hold against the estate will be expressly subordinated to the recoveries of Direct Abuse Claimants, despite the fact that the Debtors believe nearly all Direct

19

Abuse Claims are either presumptively barred or otherwise not entitled to a recovery from the estate. *See* Amended Disclosure Statement § V.N.

36.    As stated by counsel to the Catholic Church and Methodist Church ad hoc committees at the July 7 status conference, this treatment has not gone unnoticed.  Indeed, these organizations, whose views are likely representative of the views of the other approximately 40,000 Chartered Organizations that did not appear at the conference, raised the specter of a breakdown in their support of BSA's mission and operations post-bankruptcy if the Plan imposed by the RSA is not modified.  Leaving out the "lifeblood of scouting" appears risky, at best, for the Debtors—and certainly does not support a finding that entry into the RSA is within the business judgment of the Debtors.

### C.    The RSA Improperly Requires Payment of the Coalition's Legal Fees and Expenses Without Satisfying the 503(b) Substantial Contribution Standard

#### i.    *The Applicable Standard for Payment of the Coalition's Fees is the 503(b) Substantial Contribution Standard*

37.    The RSA requires the Debtors to (1) pay the Coalition's legal fees and expenses up to $10.5 million ***incurred before entry into the RSA*** on the effective date of the plan contemplated by the RSA and (2) pay all reasonable and documented fees of the Coalition up to a $950,000 cap per month moving forward.  RSA Section II.A.(vi).  There is no disclosure of the total amount of Coalition fees incurred to date, and no restriction whatsoever on the Coalition seeking additional fees from the Settlement Trust.  Indeed, the RSA expressly preserves the possibility that "amounts otherwise payable in excess" of the limits above will be payable by the Settlement Trust.  *Id.*  In the RSA Motion, the Debtors incorrectly argue that payment of the Coalition's fees and expenses is subject only to the business judgment standard because the request is being made by the Debtors, and not by the Coalition itself.  Motion at ¶¶ 27-28.  It is improper for the Debtors to use Section

20

363(b) to ignore the clear process set forth by Congress for the payment of unsecured creditor fees and expenses under Section 503(b).

38.     Section 503(b)(3)(D) allows as an administrative expense the necessary expenses incurred by "a ***creditor***, an indenture trustee, an equity security holder, ***or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title*** . . . in making a substantial contribution" to a chapter 11 case. (emphasis added). Section 503(b)(4) allows as an administrative expense reasonable compensation for professional services rendered by an attorney for an entity whose expense is allowable under section 503(b)(3)(D), "based on the time, the nature, the extent and the value of such services . . . ." 11 U.S.C. § 503(b)(4).

39.     These two sections of the Bankruptcy Code provide the only means for payment of fees and expenses of an unsecured creditor (or creditor group), and courts have repeatedly denied attempts to utilize section 363 of the Bankruptcy Code in their stead. For instance, in *Lehman Brothers*, the district court reversed the bankruptcy court's decision permitting payment of an unsecured committee members' professional fees and expenses under the debtors' plan where the plan failed to justify the payment of such expenses under Section 503(b). *In re Lehman Bros. Holdings Inc.*, 508 B.R. 283, 293 (S.D.N.Y. 2014). In so ruling, the district court held that a plan provision that calls for "payment of administrative expenses" cannot be used to "circumvent the requirements of section 503(b) merely by using a different label." *Id*. at 294. Nonetheless, to the extent that unsecured creditors could "qualify under § 503(b)(3)(D) by virtue of having made a 'substantial contribution' to the bankruptcy case, they may have their professional fee expenses paid under § 503(b)(4)." *Id*. at 296. The court reasoned that, "allowing payments under the plan beyond claims and expenses could lead to serious mischief," such as violations of the absolute

21

priority rule, by permitting payments to junior creditors prior to senior creditors being paid in full, or without their consent.

40.    In *O'Brien*, the Third Circuit reached the same conclusion, holding that a bankruptcy court cannot "create a right to recover from the bankruptcy estate where no such right exists." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 532 (3d Cir. 1999). In that case, the movant (an unsuccessful potential purchaser seeking payment of a breakup fee and expense reimbursement) and the debtors appealed the bankruptcy court's decision to rely on Section 503(b) to determine whether the movant was entitled to payment. The movant and debtors argued that payment of breakup fees was permissible, and did not need to meet the requirements of Section 503(b), when "a debtor believes in its business judgment that such fees will benefit the estate." *See id*. at 533. The Third Circuit rejected the appeal and affirmed the bankruptcy court, holding that a bankruptcy court could not permit payment unless it was specifically authorized by the Bankruptcy Code.

41.    Following *O'Brien* the bankruptcy court held in *In re TCI 2 Holdings* that "§ 503(b) is the only source for approval of the payment of fees such as the fees proposed to be paid to" an ad hoc committee of noteholders, and an indenture trustee, creditors, and their professionals. 428 B.R. 117, 147 (Bankr. D.N.J. 2010). The court ruled that the proponents of the plan had "failed to establish legal authority for by-passing the requirements of section 503(b) in providing for the payment of fees and expenses to the non-debtor entities proposed to receive such payments," and ordered the parties seeking payment of their fees to apply under Section 503(b). *Id.* at 146. The *TCI 2 Holdings* court, relying on the Third Circuit's controlling decision in *O'Brien*, thus correctly counsels that a debtor may not use a plan or RSA to evade the strict requirements of Section 503(b).

42.    In the face of this clear precedent, none of which is even mentioned in the Motion, the Debtors surprisingly cite *In re Mallinckrodt PLC*, Case No. 20-12522 (JTD) (Bankr. D. Del.) in support of their argument that courts "have authorized debtors to perform under postpetition reimbursement agreements with respect to the fees and expenses of an ad hoc committee pursuant to section 363." *See* Motion at pg. 22 n.10 and accompanying text.  But the *Mallinckrodt* ruling provides no assistance to the Debtors, and the provisions they cite are completely undermined when one reads the entirety of the ruling.

43.    The Debtors argue that, in a December 14, 2020 bench ruling,[24] the *Mallinckrodt* court stated "I agree with the debtors that Section 363 provides the procedural mechanism for a debtor to seek the authority to make payments to unsecured creditor groups that if the group, itself, sought payment it would need to be made pursuant to Section 503."  Motion at pgs. 22-23 n.9. While, on the surface, this snippet would appear to support the Debtors' arguments in favor of applying the section 363 business judgment standard to payment of the Coalition fees, the next 15 lines of the MNK Bench Ruling provide no support to the Debtors and require a different result:

> I agree with the Debtors that Section 363 provides the procedural mechanism for a debtor to seek the authority to make payments to unsecured creditor groups that if the group, itself, sought payment it would need to be made pursuant to Section 503. ***That leaves open the question, however, as to what standard I should apply in deciding whether to allow those payments.***

> The debtors argue it is the general business judgment standard that applies in any application made by a debtor under Section 363 to use debtor's assets outside the ordinary course and the court should defer to the debtor's business judgment. On that point I disagree with the debtors.

> I find that in the circumstances where a debtor is seeking to pay post-petition fees and expenses of a general unsecured creditor the standard to be applied in approving those payments is the standard provided for in Section 503, ***that is are the payments in recognition of a substantial contribution provided by that creditor to the bankruptcy estate***.

---

[24]   Transcript attached hereto as **Exhibit C** (the "***MNK Bench Ruling***").

23

MNK Bench Ruling at 34:1-20 (emphases added).  Indeed, when read in context, the MNK Bench Ruling unambiguously requires the substantial contribution standard to be satisfied regardless of which party makes the request.

44.    Following the *Mallinckrodt* court's denial of the debtors' and unsecured creditor groups' attempted end-run around section 503(b) and the substantial contribution standard, the Mallinckrodt debtors later made a new request for the payment of such fees which acknowledged the court's ruling "that payments can only be made for work that benefits the estate as a whole, not individual creditors."  *See Mallinckrodt* [D.I. 1092].  Among other revisions to ensure the substantial contribution standard was satisfied, the debtors' new request (i) explicitly excluded any fees "incurred in furtherance of litigation against the Debtors, the filing of claim objections by ad hoc group members, and the prosecution of group members' individual claims," limiting payment to "work associated with implementing the hard-fought settlements and the RSA transactions that the Debtors have already reached, which will minimize litigation and pave the way for an efficient restructuring of the Debtors, to the benefit of the estates," *id.* at ¶ 56, and (ii) required that all such payments be subject to the interim compensation order entered in that case, "including by filing regular fee statements and applications and subjecting their fees to 20% holdbacks."  *Id.* at ¶ 55.  The Mallinckrodt debtors argued that, with these added protections and limitations, "fees and expenses to be paid under the Reimbursement Agreements are those that will benefit the estate as a whole, and not just the creditors receiving reimbursement."  *Id.* at ¶ 59.  The court ultimately granted the modified request in a subsequent bench ruling, but only after finding that "[t]he proposed order presented by the debtors complies with my previous ruling regarding what would be required for reimbursements . . . in that it assures that the reimbursements will be for work that

24

Case 2-19-20905-PRW,   Doc 1900-3,   Filed 12/30/22,   Entered 12/30/22 14:43:28, Description: Exhibit Exhibit 2, Page 31 of 60

benefits the debtors' estates as a whole, rather than individual creditor groups." *Mallinckrodt* Jan. 19 Tr. at 10:5-11.

45.     The two other main cases relied on by the Debtors, *In re Purdue Pharma, LP*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), and *U.S. Tr. v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, No. 02 Civ. 2854 (MBM), 2003 WL 21738964, (S.D.N.Y. July 28, 2003), are also not helpful to the Debtors' argument.[25]

46.     As an initial matter, the Debtors conveniently ignore *Bethlehem Steel's* express holding that "Section 363(b) does not permit a debtor-in-possession to use funds solely to benefit a creditor.  If the payment of creditor fees are simply aimed at helping the creditor promote its own self-interest the payment would not be permitted under Section 363(b)."  *In re Bethlehem Steel Corp.*, 2003 WL 21738964, at *10; MNK Bench Ruling at 35:2-6.  The *Bethlehem Steel* court only approved fees up to a cap of $1.4 million for work performed when the union would be working constructively with the debtors.  *Id.* at *5.  This could not be more different than a request for payment of up to $10.5 million in fees incurred while the Coalition was clearly adverse to the

---

[25]  The only other cases cited in the Motion purportedly establishing authority to pay a creditor group's fees under section 363(b) do not help the Debtors.  In *In re Panda Temple Power, LLC*, the court approved the assumption of a postpetition energy management contract, which provided that certain fees and expenses would be paid on a going-forward basis. Case No. 17-10839 (LSS) (Bankr. D. Del. Oct. 5, 2017) [D.I. 334] ("The New EMA is a postpetition contract that should be treated as a contract assumed by the Debtors pursuant to section 365 of the Bankruptcy Code with any liability under the New EMA afforded administrative expense priority under section 503 of the Bankruptcy Code.").  Even if *Panda Temple* were relevant, it, like the rest of the Debtors cited cases, was entered on an uncontested basis.  *See In re Panda Temple Power, LLC*, Case No. 17-10839 (LSS) (Bankr. D. Del. Oct. 3, 2017) Certificate of No Objection Regarding Motion of Debtors Pursuant to 11 U.S.C. Sections 105(a), 363 and 365 for Authority to Enter into the Energy Management Agreement with EDF Energy Services, LLC [D.I. 357]; *In re Chaparral Energy, Inc.*, Case No. 16-11144 (LSS) (Bankr. D. Del. Dec. 13, 2016) Certification of Counsel Regarding Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing Their Entry Into and Performance Under the Plan Support Agreement and Granting Related Relief [D.I. 642] (reporting informal, unrelated comments from the United States Trustee, and no other objections); *In re Hercules Offshore, Inc.*, Case No. 16-11144 (LSS) (Bankr. D. Del. Aug. 23, 2015)  Certification of Counsel Regarding Revised Proposed Order Authorizing the Debtors to (i) Assume the Restructuring Support Agreement with Certain Senior Noteholders, (II) Pay and Reimburse Related Fees and Expenses [D.I. 91]; *In re New Cotai Holdings, LLC*, Case No. 19-22911 (RDD) (Bankr. S.D.N.Y. May 11, 2020) Certificate of No Objection with Respect to the Debtors' Motion for Order (I) Authorizing Entry into the Plan Support Agreement and (II) Granting Related Relief [D.I. 362].  Accordingly, none of these cases had occasion to examine the applicable standard of relief.

25

Debtors. More importantly, as noted by Judge Dorsey in *Mallinckrodt*, the *Purdue Pharma* and *Bethlehem Steel* courts each ultimately applied the substantial contribution standard, noting the numerous protections and limitations on payments required by those courts. MNK Bench Ruling at 35:7-36:6.[26]

47.    Accordingly, the Motion both (i) ignores controlling Third Circuit precedent requiring satisfaction of the substantial contribution standard and (ii) only cites to cases that have held that, while section 363 may be the correct "procedural mechanism" for a debtor to request payment of an unsecured creditor group's fees, the debtor still must satisfy the substantial contribution standard.

> ii.    *In Order to Obtain Payment Under Section 503(b) of the Bankruptcy Code, the Coalition Must First Demonstrate That it is a "Creditor Group" and Disclose Which Creditors it Represents*

48.    As a threshold matter, before the Court can analyze whether the Coalition has made a substantial contribution to the estate, the Coalition and the Debtors must demonstrate that the Coalition is in fact a "creditor group" and disclose which creditors it represents. *See In re Mountain Creek Resort, Inc.*, 616 B.R. 45, 50 (Bankr. D. N.J. 2020) (finding that "the four categories of entities that may apply for reimbursement of administrative expenses [under section 503(b)(3)(D)] are: (1) creditors; (2) indenture trustees; (3) equity security holders; and (4) creditor

---

[26]    As further grounds for distinguishing these cases, in both *Purdue Pharma* and *Bethlehem Steel* the official committees that had been appointed could not adequately represent the interests of the creditor group seeking payment from the estate. In *Purdue*, the debtors sought payment of fees for an ad hoc group of governmental entities on the basis that their interests diverged from that of unsecured creditors generally so they were not adequately represented by the UCC. *See Purdue Pharma* [D.I. 482] at ¶ 9 ("States and other government actors may reasonably choose to pursue public policy goals that diverge from the views of the UCC and its private constituent members. Although the UCC is the fiduciary of all unsecured creditors, the voting members of the UCC lack the unique police powers of the members of the Ad Hoc Committee. The UCC is therefore not in a position to credibly leverage the power possessed by governmental entities in negotiations with the Debtors' shareholders"). And, in *Bethlehem Steel* the fees were for the debtors' largest union to renegotiate its labor and benefits agreements. 2003 WL 21738964, at *1. For this reason the fees were for work unrelated to that creditor constituency's attempt to recover on its unsecured claims, and the union was similarly not adequately represented by the unsecured creditors' committee. There is no argument that the members of the Coalition are not adequately represented by the TCC in this case.

26

and equity holder committees other than official committees appointed under § 1102 of the Bankruptcy Code," and holding that an interested party that was not a creditor was ineligible for compensation). This is a burden that must be satisfied by the moving party requesting payment of fees. *Id.* ("The claimant seeking reimbursement of administrative expenses bears the burden of proof.").

49.     The statements made by the Coalition and the Debtors on this point throughout these Chapter 11 Cases appear to be inconsistent. The Motion asserts that the "Coalition represents approximately 60,000 abuse survivors." Motion at ¶ 28. But this assertion is contradicted by the Amended Disclosure Statement which, while not a model of clarity, appears to state that the Coalition represents only 11,875 Abuse Claimants:

> The Coalition was formed in connection with several law firms ("State Court Counsel") representing holders of Abuse Claims. ***The Coalition is made up of approximately 11,875 Abuse survivors*** having signed an "Affirmative Consent" which consents to becoming a member of the Coalition and authorizes their respective State Court Counsel to instruct the Coalition's professionals in connection with these Chapter 11 Cases. Additionally, the Coalition has asserted that the State Court Counsels represent approximately 65,000 Abuse survivors collectively and many of such additional Persons are expected to sign "Affirmative Consents."

Disclosure Statement at Art. V.F.5. (emphasis added).

50.     Putting aside this significant inconsistency, the more troubling issue is that the Coalition has not even demonstrated that it represents ***any creditors at all***. Instead—as the TCC uncovered in their objection to the Coalition's participation in the mediation—it appears, based on Brown Rudnick's engagement letter (the "***BR Engagement Letter***"), that the Coalition represents the interests of the State Court Counsel and not the Abuse Claimants themselves, who may be unaware of either the Coalition's existence or the terms of Brown Rudnick's engagement. Specifically, according to the TCC:

27

The BR Engagement Letter is addressed to each of the Law Firms and executed solely by them. There is no evidence that any client of a particular Law Firm (a) received a copy of the BR Engagement Letter, (b) knew of, let alon[e] consented to, the terms and conditions of the BR Engagement Letter, or (c) received advice concerning the terms and conditions of the BR Engagement Letter including, by way of example, that Brown Rudnick could and would be directed by unrelated law firms.

[Docket No. 1231] at p. 10.

51.     And the Chair of the Debtors' National Executive Board testified that he thought the Coalition represented the interests of State Court Counsel and not the Abuse Claimants themselves, stating "[t]here's a lot of lawyers and so I think there's – there's claimants and they're represented by lawyers and those lawyers are represented by lawyers that make up the Coalition. That's how I understand it."  Ownby Dep. Tr. at 188:11-15.

52.      Unless the Coalition can demonstrate that it is a creditor group, rather than a group representing the interests of State Court Counsel, it is premature to begin any analysis into whether the Coalition has made a substantial contribution.

> iii.    *There Has Been No Attempt to Show the Coalition Has Made a Substantial Contribution and the Record Does Not Support Such a Finding*

53.     As noted above, the Motion does not even attempt to argue that the Coalition has made a substantial contribution to the estate, instead arguing only that by "reimbursing the Coalition, the Debtors are making a business decision that significantly benefits the Debtors' estates and creditors (abuse survivors or otherwise) as a whole by providing a pathway to plan confirmation."  Motion at ¶ 28.  This is likely because the Debtors know they cannot carry their burden of demonstrating that the Coalition has in fact made a substantial contribution.

54.     Section 503(b)(4) permits payment to a professional retained by an unsecured creditor, in respect of its substantial contribution claim, only "based on the time, the nature, the extent and the value of such services" rendered on behalf of such unsecured creditor entitled to its

28

expenses as a substantial contribution under section 503(b)(3)(D).  In determining whether a substantial contribution has been made, "[a] creditor is presumed to act in a self-interested manner, and as an initial matter, must show that its efforts went beyond self-protection. . . . The benefit conferred to the estate must be more than an incidental one that typically arises from the creditor protecting its own interests."  *In re RS Legacy Corp.*, 2016 WL 1084400, at *4 (Bankr. D. Del. Mar. 17, 2016); *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) (the relevant inquiry for substantial contribution is "whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors," and "[i]nherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests. Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection.").  Further, a showing of a substantial contribution "unequivocally mandates results."  *In re RS Legacy Corp.*, 2016 WL 1084400, at *6 ("Unlike section 330(a) where courts consider whether the services were reasonably likely to result in benefit to the estate at the time they were performed, section 503(b)(3)(D) requires a *post hoc* analysis of the actual benefit conferred to the case.").

55.    The $10.5 million of fees that the Coalition is seeking to have reimbursed on the effective date of the Plan were incurred from the period of July 24, 2020 up to July 1, 2021, the purported date of execution of the RSA.  During this period, the Coalition incurred fees in pursuit of the following actions:

- Opposing requests by other parties that the Coalition supplement its Rule 2019 disclosures. *See, e.g.,* [D.I. 1225, 1432, 1445, 2135].

- Objecting to the Debtors' Supplemental Bar Date Motion, whereby the Debtors sought to prevent Abuse Claimants from being misled or confused regarding the bar date and claims process. *See* [D.I. 1190, 1264].

29

- Vigorously opposing the Rule 2004 Discovery, thereby depriving parties of the information necessary to determine whether the Debtors' belief that the vast majority of Abuse Claims are not entitled to a recovery from the estate is correct. *See* [D.I. 2043, 2184].

- Objecting to the Debtors' Disclosure Statement for the Second Amended Plan. *See* [D.I. 3569].

- Objecting to the Debtors' request to extend exclusivity, asserting they should be permitted to propose a competing plan. *See* [D.I. 2672].

- Objecting to the Debtors' proposed Lehr Settlement Agreement. *See* [D.I. 3854].

Such efforts could not, even under the most generous lens, be viewed as benefitting the

Debtors' estates.

56.    With respect to the ongoing payments of $950,000 per month, any argument that

the actions of the Coalition will benefit the estates would similarly fail. The RSA represents a

clear win for the Coalition itself, but it comes at a high cost to the estate and the rights of all parties

in interest. Before entering into the RSA, the Debtors had a clear path to exit these Chapter 11

Cases quickly, allowing them to pay Abuse Claimants quickly and continue their charitable

mission. The Coalition has convinced the Debtors to abandon that path and cede control of the

case to the Abuse Claimant Representatives who, upon approval of the RSA, would have complete

authority over whether the estates settle with any other party and the drafting and development of

the TDPs. They have even convinced the Debtors to stop scrutinizing Abuse Claims,

notwithstanding the Debtors' belief that most of such claims are presumptively barred and not

entitled to a recovery, and have forced the Debtors to propose a plan that is very likely

unconfirmable. While these are remarkable achievements that serve the Coalition's interests, far

from "transcending self-protection," they are emphatically self-serving, and come at the expense

of all other parties in interest. All of this should foreclose a finding that the Coalition has made or

30

Case 2-19-20905-PRW,    Doc 1900-3,    Filed 12/30/22,    Entered 12/30/22 14:43:28,    Description: Exhibit Exhibit 2, Page 37 of 60

will make a substantial contribution.  At a minimum, because the substantial contribution standard "unequivocally mandates results," any substantial contribution analysis is premature, and must await confirmation of the Plan.

**D.    The RSA Requires the Debtors to Pursue a Plan that is Likely Not Confirmable Because it is Affirmatively "Insurance Prejudicial" Rather Than Insurance Neutral**

57.    The RSA requires the Debtors to pursue a plan that is expressly not insurance neutral, greatly reducing the likelihood that such plan will be confirmed.  As such, the Debtors' entry into the RSA is effectively a road to nowhere.

*i.    The Insurance Neutrality Standard*

58.    In *Combustion Engineering*, the progenitor of the insurance neutrality doctrine, the Third Circuit held that insurance neutrality required a plan to protect "the prepetition rights and obligations of both the debtor and the insurers under the Plan by preserving for 'any Entity . . . any and all claims, defenses, rights or causes of action' under subject insurance policies and settlements."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004).  This holding derives from the common sense principle that a debtor should not be able to misuse its bankruptcy proceeding to rewrite prepetition contracts to the detriment of its non-debtor counterparties.  *See, e.g.*, *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("bankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms"); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984); *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999).[27]

---

[27]    That a debtor may not misuse bankruptcy to rewrite its prepetition contracts is not a novel concept – bankruptcy courts have long recognized that they cannot alter or enlarge insurers' contractual obligations even outside the

31

59.     The Third Circuit was also clear that, while anti-assignment clauses in debtor insurance contracts may be overridden to implement a section 524(g) plan,[28] plans that attempt to override anti-assignment clauses in ***non-debtor*** insurance contracts are not insurance neutral and the bankruptcy court has no authority under any circumstance to override such clauses, even in the same contracts, as to ***non-debtors***.  *See Combustion Eng'g*, 391 F.3d at 218-19 ("To the extent the subject insurance policies are jointly held by [the debtor] and a non-debtor, . . . the § 541 preemption of anti-assignment provisions applies only to [the debtor's] interest in the shared policies.").

60.     Since *Combustion Engineering*, courts considering plans proposed by mass tort debtors have held that such plans were not insurance neutral, and, therefore, denied confirmation in the following situations:

(i)     The insurance provisions in a plan were ambiguous.  *See, e.g., In re Pittsburgh Corning Corp.*, 453 B.R. 570, 584 (Bankr. W.D. Pa. 2011);

(ii)    The real world impact of the plan would be to rewrite the terms of the insurance policies.  *See, e.g., Thorpe Insulation*, 677 F.3d at 885 ("a plan is not insurance neutral when it may have a substantial impact on insurers," which was the case due

---

context of insurance neutrality.  *See, e.g.*, *Cissel v. Am. Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975) (bankruptcy trustee could not obtain recovery from insurer for claims filed against the estate absent a judgment or a written settlement agreement between the policyholder, the claimant, and the insurance company); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989), *aff'd sub nom.*, *Amatex Corp. v. Stonewall Ins. Co.*, 102 B.R. 411, 414 (E.D. Pa. 1989) (refusing to compel insurers to make lump-sum payments to debtor "contrary to the terms of their policies"); *In re Wallace & Gale Co.*, Case No. 85-4-0092 (Bankr. D. Md.), July 22, 1998 Hr'g Tr.  at 119-21 (refusing to confirm a plan that violated insurer's contractual rights in asbestos bankruptcy); *Moody* 734 F.2d at 1213 (holding that the Bankruptcy Code is not intended to expand debtor's rights against others more than they exist at the commencement of the case); *In re 641 Assocs., Ltd.*, 1993 WL 332646 at *8 (E.D. Pa. August 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contractual rights.").

[28]    *See In re Federal-Mogul Glob. Inc.*, 684 F.3d 355, 382 (3d Cir. 2012) ("we hold that the anti-assignment provisions in the relevant insurance policies are preempted by § 1123(a)(5)(B) ***to the extent they prohibit transfer to a § 524(g) trust***") (emphasis added).  Certain Insurers contend that there is no basis for a bankruptcy court to override anti-assignment clauses in debtor insurance contracts outside of the limited context of section 524(g), which expressly requires that a trust be established to assume and pay the debtor's asbestos liabilities.  *See, e.g.*, *In re Thorpe Insulation Co.*, 677 F.3d 869, 883 (9th Cir. 2012) (holding that "the anti-assignment provisions contained in the contracts between Appellants and Appellees stand as an obstacle to completion of a successful § 524(g) plan, and therefore are preempted by federal bankruptcy law").  There is no analog in the Bankruptcy Code to section 524(g) for sexual abuse claims.

32

to various exceptions to the insurance neutrality language so that the plan could "economically affect [the insurers] in substantial ways."); *or*

(iii)    The impact of the bankruptcy proceeding would materially alter the quantum of liability insurers would be subject to under their insurance policies. *See In re Global Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011) ("*GIT*") ("'Insurance neutrality' is a meaningful concept where, as in *Combustion Engineering*, a plan does not materially alter the quantum of liability that the insurers would be called to absorb.").

      ii.    *The RSA Requires the Debtors to Pursue a Plan that Prospectively Adjudicates Abuse Claims in Violation of the Insurance Policies*

61.    As noted above, the RSA obligates the Debtors to seek an express finding in the Confirmation Order that the Plan, the Plan Documents (including the TDPs), and the Confirmation Order "shall be binding on all parties in interest."  RSA § II.A.(i)(A).  A finding that any ruling by the Bankruptcy Court is "binding on all parties in interest" risks misuse of such ruling in post-confirmation coverage litigation.  This is exactly what occurred in *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, where the debtor characterized its chapter 11 plan, which allowed present and future asbestos claims in an aggregate amount, as "a binding resolution of its liability," notwithstanding its prior representations to the contrary.  135 Cal. App. 4th 958, 983 (2006).

62.    That the Abuse Claimant Representatives have co-opted the Debtors and convinced them to misuse the Plan, Plan Documents, and Confirmation Order to seek to nullify the insurers' contractual rights and coverage defenses is evident from another Finding and Order required by the RSA: that any Allowed Claim Amount (as determined by the Settlement Trustee, in his sole discretion) is "fair and reasonable" based on the evidentiary record offered to the Court at confirmation.  *See* RSA § II.A.(i)(B).  In other words, if the Motion is approved, the Debtors cannot propose any plan unless such plan requires the Court to approve any and all Allowed Claim Amounts based on the evidentiary record before the Court at the time of confirmation, even though

33

the actual liquidation of the Abuse Claims will occur in the future, in some cases years after confirmation of the Plan.  *See* RSA § II(B)(ii).

63.    Such provisions clearly violate the terms of the Insurance Policies, which obligate the insurers to provide coverage (assuming coverage exists) in only two circumstances:  (a) entry of an adverse judgment following "an actual trial;" or (b) a settlement to which the insurer has expressly consented.

        iii.    *The RSA Requires the Debtors to Pursue a Plan that Rewrites the Terms of the Insurance Policies to Eliminate Bargained for Protections of the Insurers*

64.    As this Court has recognized, nothing in the Bankruptcy Code authorizes debtors to treat insurers differently from other contract counterparties just because they are insurers.[29] Accordingly, common sense and case law dictate that if a plan would modify insurers' contractual rights, such a plan cannot be confirmed as a matter of law.  *See, e.g.*, *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("bankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms"); *see also Moody*, 734 at 1213 ("The filing of the chapter 11 petition cannot expand debtors' rights as against [a contract counterparty]."); *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. at 737 (plan that "seeks to bind [cooperative members] for 25 years to treatment which they do not want and for which they did not contract" was proposed in bad faith and violated

---

[29]    *See* May 19, 2021 Hr'g Tr. at 168:25-169:3, 159:5-7, 9-11 (THE COURT: "And then there's a separate concept of can I do anything to their contract, how is it different than any other contract, right? It's the same as any other contract. . . . Certain things the Bankruptcy Code says you can change, like assignability. Other things, I can't touch a landlord's contract, . . . I can't touch an insurance contract. That's not insurance neutrality, that's contracts[.]"); *id.* at 228:8-12 (THE COURT: "I don't view an insurance contract any different than any other contract, right? In the sense that the plan shouldn't do anything to it that the bankruptcy code doesn't say can be done to it.").

34

section 1129(a)(3) of the Bankruptcy Code); *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.)*,

152 B.R. 661, 664-65 (M.D. Fla. 1993) (even a policyholder that has filed for bankruptcy must

"prove, on a case-by-case basis," as a condition of obtaining coverage, that its losses result from a

covered claim as defined by the policy "and occurred during the period of insurance coverage").[30]

65.     Pursuant to the typical terms and conditions of insurance policies, insurers have

rights which include, but are not limited to, the right to control the defense of the claim, the right

to approve the settlement of the claim, the right to only pay for losses in which the insured is

legally obligated to pay, and the right to apply policy exclusions to the loss.

66.     Yet, if the Motion is approved, the Debtors must seek approval of a plan and TDPs

that will ***not*** preserve the insurers' contractual rights and coverage defenses.  Not only are over

82,500 Abuse Claims being channeled from the tort system to be resolved by the Settlement Trust,

but no Non-Settling Insurance Company will have any right to participate in the post-confirmation

claim resolution process.  Indeed, as the TDPs are drafted, no Non-Settling Insurance Company

has the right to consent to, or even participate in, the decision to make any settlement offers, or the

size thereof, prior to payment.  Instead, the Settlement Trustee appears to have sole authority over

evaluating Abuse Claims, making settlement offers to Abuse Claimants, and, upon their

acceptance thereof, making payment.  *See* TDPs §§ VII.B-F; IX.A-C.

67.     In addition, the TDPs provide that holders of Direct Abuse Claims may elect to

receive an "Expedited Distribution" of $3,500 without any scrutiny or evaluation, even by the

Settlement Trustee, of whether such claims are time-barred or otherwise invalid under applicable

state law.  This is particularly problematic given the Debtors' statement in the Amended Disclosure

Statement that they believe at least 72% of the filed Abuse Claims are "presumptively barred" and

---

[30]  *See also supra* n.27.

35

another 11% are otherwise not entitled to any compensation.[31]  If the Debtors are correct, this would mean that over 68,500 claims are not entitled to compensation.  The holders of such claims can be expected to elect the Expedited Distribution and receive their Allowed Claim Amount of $3,500 from the Settlement Trust.  And, if that occurs, the Settlement Trust will pay over $239 million on account of alleged Abuse Claims that are not entitled to compensation.[32]  This, combined with the RSA's requirement that the Debtors obtain a finding in any Confirmation Order that all Allowed Claim Amounts and the procedures leading thereto are "fair and reasonable," *see* RSA § II.A.(i)(B), amount to an attempt by the Debtors and Abuse Claimant Representatives to bind the Debtors' insurers to pay over $239 million in liability for likely invalid claims that are not subject to review by anyone, ever, not even the Abuse Claimant Representatives' handpicked Settlement Trustee.

68.     Even more troubling, the RSA leaves open the possibility that substantially more claims can be filed in the future—in complete disregard of the bar date established in these chapter 11 cases.  Section IV.A of the TDPs provides that, even if a Direct Abuse Claim was not filed prior to the bar date, it can *still* be considered timely so long as (i) the Direct Abuse Claim is asserted

---

[31]  Amended Disclosure Statement § V.N (emphasis added):

> While there are approximately 82,500 unique, timely Abuse Claims, Bates White viewed **the majority of these claims as presumptively barred** and many more as failing to provide key information that Bates White concluded would be necessary to establish payment within the tort system or potentially under the TDPs and Settlement Trust Agreement. **Within this set, Bates White focused its valuation on the approximately 14,000 claims that are not presumptively barred** and identify, by name, either in full or in part, an alleged abuser. These claims are the most similar to those that were resolved by the BSA, often in conjunction with its Insurance Companies, prior to these Chapter 11 Cases.

[32]  This amount may be significantly higher due to the changes to the TDPs, which removed prior protections that would have, among other things, allowed the Settlement Trustee to zero out claims barred by statute of limitations and required a showing of some culpability on the part of a Protected Party in order for an Abuse Claim to be allowed. *See supra* ¶¶ 16-17.  Because these safeguards have been removed (which, frankly, are fundamental to the otherwise applicable claims dispute procedures available in a bankruptcy case), if the TDPs remain in the form required by the RSA, an economically rational holder of an illegitimate Abuse Claim may instead decide not to elect for an Expedited Distribution because the Settlement Trustee's ability to adjust settlement offers downward from the Base Matrix Values is, in reality, illusory.

against a Local Council or another Protected Party, and (ii) it would not be barred "under applicable state law." *See* TDPs § IV.A. Because of this provision, it is impossible to predict the total number of claims that will ultimately be submitted to and administered by the Settlement Trust. What is clear, however, is that the current total of 82,500 independent claims is an underestimation of the total Direct Abuse Claims that will ultimately be asserted against the Settlement Trust if the RSA is approved. And, like the Direct Abuse Claims that have already been filed, every single one of the yet to be asserted Direct Abuse Claims will be entitled to payment from the Settlement Trust without any scrutiny of such claims by anyone.

        iv.     *Like in GIT, any Plan Consistent With the Debtors' Obligations Under the RSA Is Not Insurance Neutral for the Independent Reason that it Materially Increases the Quantum of Liability the Insurers are Required to Cover*

69.     The Third Circuit held in *GIT* that a plan that materially alters the quantum of liability an insurer may be called upon to indemnify under a prepetition contract is not insurance neutral. This is because such increase would have the effect of rewriting the terms of a prepetition contract by fundamentally altering the risk an insurer may be subject to thereunder. *See supra* § II.D.i. Indeed, in *GIT*, the Third Circuit held that "the promise of an APG Silica Trust appears to have staggeringly increased—by more than 27 times—the pre-petition liability exposure. Thus, on the record here, it cannot fairly be said that the *GIT* plan is 'insurance neutral' in the same sense as was the plan at issue in *Combustion Engineering*." *GIT*, 645 F.3d at 212.

70.     The magnitude of the increase of claims is significantly **greater** in these Chapter 11 Cases than in *GIT*: the increase is more than 300,000% here (275 prepetition claims compared to 82,500 claims currently asserted) as opposed to 2,700% in *GIT* (169 prepetition claims compared to over 4,600 claims asserted). Such an extreme increase bears no relationship whatsoever to the rate at which claims against the Debtors were increasing prior to the Petition Date. *See Debtors'*

*Informational Brief* [D.I. 4] at 3; Amended Disclosure Statement § III.E.  And, as described above, the TDPs ensure that the 82,500 Direct Abuse Claims currently pending against the Debtors underestimates the total number of Abuse Claims the Settlement Trust will be subject to by an amount that is currently unknown.  *See supra* ¶ 68.  For this reason, as in *GIT*, the Plan is not insurance neutral, and is unconfirmable as a matter of law.[33]

> v.     *The RSA Requires the Debtors Pursue a Plan that Impermissibly Transfers Non-Debtor Insurance Contracts to the Settlement Trust in Violation of Such Non-Debtor Contracts*

71.     As described above, the Third Circuit in *Combustion Engineering* unequivocally held that a plan cannot override a contractual anti-assignment provision in a debtor's insurance policy for the benefit of a non-debtor.  Because the Local Councils have not filed their own bankruptcy proceedings there is no argument that any Local Council rights under insurance policies may be assigned to the Debtors' estates or to any post-confirmation trust created by the Plan, absent insurer consent.

72.     Despite this, the Plan explicitly includes in the "Local Council Settlement Contribution" all rights and interests any Local Council may have under any insurance policy "to the maximum extent permitted under applicable law."[34]   Further, the definition of "Insurance

---

[33]   The Court need not wait until the confirmation hearing on the Plan to decide this issue, it has authority to do so now.  This is because "the court's equitable powers under 11 U.S.C. § 105 surely enable it to control its own docket and thus, a court should not proceed with [] time consuming and expensive hearings . . . when the plan may not be confirmable because it does not comply with confirmation requirements."  *In re Am. Cap. Equip., LLC*, 668 F.3d 145, 154 (3d Cir. 2012) (citations and quotation marks omitted).  Although this holding was in the context of a disclosure statement hearing, the rationale is the same because the RSA requires the Debtors to pursue a plan that is patently unconfirmable.

[34]   "***Local Council Settlement Contributions***" includes "to the maximum extent permitted under applicable law, any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Local Council Insurance Policies, the Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries; . . ." Plan § I.A.138.

38

Assignment" in the Plan includes the Local Council Insurance Policies regardless of whether they are assignable under applicable law, as well as other non-Debtor insurance rights.[35]  And, the RSA provides that the required Findings and Orders that must be in the Confirmation Order include a finding by the Court that "the Bankruptcy Code authorizes the Insurance Assignment as provided in the Amended Plan notwithstanding any terms of any policies" (including the Local Councils' rights under the policies) "or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights."  RSA § II.A.(i)(D).  Accordingly, any plan permitted by the RSA appears to violate *Combustion Engineering*.

73.    To be confirmable, the Plan must be amended to clarify that no non-Debtor insurance policy and no non-Debtor rights under any insurance policy (including any policies naming both the Debtors and any Local Councils as insureds) can be assigned absent insurer consent.  But, if the RSA is approved, the Debtors will not be able to make such amendments without the consent of all of the Abuse Claimant Representatives.

## II.    BECAUSE THE RSA CEDES COMPLETE CONTROL OF THE CASE AND THE TDPS TO THE ABUSE CLAIMANT REPRESENTATIVES, THE RSA PARTIES HAVE NOT ACTED IN GOOD FAITH

74.    The Motion touts the Debtors' "accomplishment" in reaching an agreement with all major creditor constituencies despite "the previous distance between the parties' positions."  Motion ¶ 1.  While it is true that the Debtors and the Abuse Claimant Representatives were far apart prior to the execution of the RSA, an agreement was only possible because the Debtors conceded on every material issue.  Indeed, the RSA satisfies the Abuse Claimant Representatives'

---

[35]  "***Insurance Assignment***" refers to "the assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, (d) the Insurance Coverage, and (e) all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves). The Insurance Assignment does not include (i) any rights or obligations under or with respect to any Non-Abuse Insurance Policies and D&O Liability Insurance Policies or (ii) any Local Council Reserved Rights." *Id.* § I.A.122.

extensive wish list, including significant revisions to the TDPs to prevent scrutiny by anyone into any Abuse Claims, complete control over the remainder of these Chapter 11 Cases by holding a consent right over all future settlements between the Debtors and any Insurer or Chartered Organization, and complete control over the payment and liquidation of Abuse Claims through control over both the TDPs and the Settlement Trust.[36]

75.    This abdication of the Debtors' fiduciary duties to all creditors will ultimately preclude the good faith finding required by section 1129(a)(3) of the Bankruptcy Code when the Debtors seek confirmation of the Plan.  *See Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 571 (M.D. Pa. 2005) (holding that the debtors have an "obligation to their creditors to propose a plan that is fair to all creditors and not to let one creditor class dominate the formulation of a plan.").  In *ACandS, Inc.*, this court found a plan was not proposed in good faith, and thus could not be confirmed, because the debtor had agreed to provide the asbestos claimant representatives with complete control over the settlement trust, including, like here, drafting the trust documents and selecting the settlement trustee.  The court held that, "given the unbridled dominance of the [prepetition asbestos] committee in the debtor's affairs and actions during the prepetition period, its continued influence flowing from its majority status on the postpetition creditors committee, and the obvious self-dealing that resulted from

---

[36]    The Debtors lack of good faith is further evidenced by their correspondence with Certain Insurers regarding the RSA.  Indeed, the Debtors first sent Certain Insurers what they claimed was a "draft" of the RSA the evening of June 25, 2021, requesting comments by June 28, 2021 at 5:00 pm ET.  Timely comments were provided by some of the Certain Insurers and subsequently ignored by the Debtors, who incredibly claimed on July 2, 2021 that Certain Insurers had failed to provide comments.  But, it appears that, prior to sharing a "draft" of the RSA with Certain Insurers, the Debtors' National Executive Committee had already approved a final version of the RSA which prohibited them from settling with Certain Insurers absent Abuse Claimant Representative consent.  *See* Transcript of July 14, 2021, Deposition of Brian Whittman at 179:22-180:12.  Excerpts from the Whittman transcript are attached hereto as **Exhibit D**.  This misconduct and gamesmanship on the part of the Debtors is evidence of their lack of good faith and appears to constitute a clear breach of the Debtors' cooperation obligations under their insurance policies.

control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the bankruptcy code." *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004).

76.    The Debtors' abdication here, which allows the Abuse Claimant Representatives complete control over the liquidation and payment of Abuse Claims, is particularly egregious where (according to the Debtors), at least 83% of all Abuse Claims filed against them to date are not entitled to any recovery from the estates. *See* Amended Disclosure Statement § V.N.  In other words, the Debtors have agreed to an RSA that they know will result in estate assets being used to pay Abuse Claims that are either "presumptively barred" or otherwise appear to be entitled to no recovery from the estate. While the RSA may attempt to ensure the Debtors and Local Councils are shielded from such misuse of these Chapter 11 Cases, the Court should not countenance such a result or approve an RSA that would lead to such inappropriate recoveries. *See In re USG Corp.*, 290 B.R. 223, 225 (Bankr. D. Del. 2003) ("[I]f the debtor maintains that its creditors are not legitimate and that, properly analyzed, claims against it do not exceed its assets, the Court must assist as well. The statements in counsels' brief compel the Court to state the obvious. In an asbestos bankruptcy, the Court will, within the constraints of the law, reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation. The court will protect those who have been truly harmed.").

## III.    THE DEBTORS ARE FAR BETTER SERVED BY MAINTAINING FLEXIBILITY TO PURSUE OTHER PLANS AND POTENTIAL SETTLEMENTS

77.    As discussed above, the RSA does not provide any meaningful benefits to the estates.  At best, it merely requires the Abuse Claimant Representatives to support the Plan, and requires certain of the Abuse Claimant Representatives to attempt to convince their clients to vote in favor of the Plan.  And in exchange for this very limited (and likely illusory) promise, the

41

Case 2-19-20905-PRW,    Doc 1900-3,    Filed 12/30/22,    Entered 12/30/22 14:43:28,
Description: Exhibit Exhibit 2, Page 48 of 60

Debtors have bound themselves to prosecute an unconfirmable plan and effectively cease independent negotiations with insurers and Chartered Organizations.

78.     Given these facts, granting the Motion would only serve to further distance the Debtors from their other constituencies—to the detriment of all parties.  Such a scenario is itself grounds for denial of the Motion.  *See In re Innkeepers USA Trust,* 442 B.R. 227, 232-34 (Bankr. S.D.N.Y. 2010) (denying debtor's motion to approve plan support agreement under business judgment standard and entire fairness standard and holding that "in light of the substantial limitations in the PSA on the Debtors' ability to engage in discussions regarding a restructuring with any of their other major creditors, I cannot conclude that the Debtors exercised due care in electing to move forward with the current plan term sheet . . . the PSA breeds contempt rather than fostering negotiations.  This is not what chapter 11 is supposed to be about").

79.     The Debtors would be better served by this Court rejecting the Motion and permitting the Debtors to resume negotiations with all parties in interest.  Even if the Debtors were to ultimately decide (against what is a wise exercise of their business judgment and certainly not appropriate under an "entire fairness" standard), and be permitted by this Court, to pursue a plan along the lines of the Plan, it would not need the comfort of the RSA.  The Abuse Claimant Representatives would support the terms of the Plan regardless of whether the RSA obligates them to do so, since the Plan satisfies their extensive wish list.  Indeed, as disclosed at the July 7 status conference, the Abuse Claimant Representatives are already attempting to convince hold-out plaintiffs' counsel to support the Plan, even without the comfort of an order approving the RSA, arguing that "plan confirmation would operate as a judgment enforceable against the insurers." July 7, 2021 Hr'g Tr. at 26:23-27:4.

42

80.    Accordingly, the RSA serves no legitimate purpose, and the Motion should be denied.

## RESERVATION OF RIGHTS

81.    Certain Insurers reserve the right to join in any argument or objection made by any other parties relating to the Motion.  Moreover, nothing contained herein shall be deemed an admission by Certain Insurers as to the existence of, or coverage under, any insurance policies alleged to have been issued by Certain Insurers.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Certain Insurers respectfully request that the Court (i) deny the Motion and (ii) grant such other and further relief as the Court deems just and proper.

43

Dated: July 22, 2021
Wilmington, Delaware

Respectfully submitted,

By: */s/ Deirdre M. Richards*

**FINEMAN KREKSTEIN & HARRIS PC**
Deirdre M. Richards (DE Bar No. 4191)
1300 N. King Street
Wilmington, DE 19801
Telephone:      (302) 538-8331
Facsimile:      (302) 394-9228
Email: drichards@finemanlawfirm.com

-and-

**FORAN GLENNON PALANDECH PONZI &
RUDLOFF P.C.**
Susan N.K. Gummow (admitted *pro hac vice*)
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
Telephone:    (312) 863-5000
Facsimile:    (312) 863-5009
Email: sgummow@fgppr.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (admitted *pro hac vice*)
James Hallowell (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035
Email: mrosenthal@gibsondunn.com
jhallowell@gibsondunn.com
kmartorana@gibsondunn.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Matthew G. Bouslog (admitted *pro hac vice*)
3161 Michelson Drive
Irvine, California 92612
Telephone:    (949) 451-3800
Facsimile:    (949) 451-4220
Email: mbouslog@gibsondunn.com

*Attorneys for the AIG Companies*

**REGER RIZZO & DARNALL LLP**

*/s/ Louis J. Rizzo, Jr., Esquire*
Louis J. Rizzo, Jr., Esquire (#3374)
1521 Concord Pike, Suite 305
Brandywine Plaza West
Wilmington, DE 19803
(302) 477-7100
Email:  lrizzo@regerlaw.com

*Attorney for Defendants,*
*Travelers Casualty and Surety Company,*
*Inc. (f/k/a Aetna Casualty & Surety*
*Company), St. Paul Surplus Lines Insurance*
*Company and Gulf Insurance Company*

*/s/ Maria Aprile Sawczuk*
**GOLDSTEIN & MCCLINTOCK LLLP**
Maria Aprile Sawczuk (DE #3320)
501 Silverside Road
Wilmington, DE 19809
302-444-6710
marias@goldmclaw.com

-and-

**LOEB & LOEB LLP**
Laura McNally
Emily Stone
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155
lmcnally@loeb.com
estone@loeb.com

*Attorneys for The Continental Insurance Company*
*and Columbia Casualty Company*

*/s/ Robert D. Cecil, Jr.*
Robert D. Cecil, Jr. (No. 5317)
Tybout, Redfearn & Pell
501 Carr Road, Suite 300
Wilmington, Delaware 19809
Phone: (302) 658-6901
E-mail: rcecil@trplaw.com

Mark D. Plevin (admitted pro hac vice)
Kevin D. Cacabelos (admitted pro hac vice)
Crowell & Moring LLP
Three Embarcadero Center, 26th Floor
San Francisco, California  94111
Phone: (415) 986-2800
E-mail:  mplevin@crowell.com,
kcacabelos@crowell.com

Clifford J. Zatz (admitted pro hac vice)
Tacie H. Yoon (admitted pro hac vice)
Rachel A. Jankowski (admitted pro hac vice)
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Phone: (202) 624-2500
Email:  czatz@crowell.com, tyoon@crowell.com,
rjankowski@crowell.com

*Attorneys for American Zurich Insurance Company,
American Guarantee and Liability Insurance
Company, and Steadfast Insurance Company*

  */s/ Michael J. Joyce*
Michael J. Joyce, Esquire (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
(302)-388-1944
mjoyce@mjlawoffices.com

-and-

Kevin Coughlin, Esquire (*Pro Hac Vice*)
Lorraine Armenti, Esquire (*Pro Hac Vice*)
Michael Hrinewski, Esquire (*Pro Hac Vice*)
**COUGHLIN MIDLIGE & GARLAND, LLP**
350 Mount Kemble Ave.
PO Box 1917
Morristown, NJ 07962
973-267-0058 (Telephone)
973-267-6442 (Facsimile)
larmenti@cmg.law
mhrinewski@cmg.law

-and-

Britton C. Lewis, Esquire (*Pro Hac Vice*)
**CARRUTHERS & ROTH, P.A.**
235 N. Edgeworth St.
P.O. Box 540
Greensboro, NC  27401
(336) 478-1146 (Telephone)
(336) 478-1145 (Facsimile)
bcl@crlaw.com


*Counsel to Arrowood Indemnity Company*

*/s/ Matthew G. Summers*
Matthew G. Summers (DE No. 5533)
Chantelle D. McClamb (DE No. 5978)
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4428
Facsimile: (302) 252-4466
E-mail: summersm@ballardspahr.com
        mcclambc@ballardpshar.com

-and-

Harry Lee*
John O'Connor*
Brett Grindrod*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-8078
Facsimile: (202) 429-3902
E-mail: hlee@steptoe.com
        joconnor@steptoe.com
        bgrindrod@steptoe.com
(*Admitted *pro hac vice*)

*Attorneys for Clarendon America Insurance
Company*

TROUTMAN PEPPER HAMILTON SANDERS LLP

By: /s/ *David M. Fournier*
David M. Fournier (DE No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:     404.885.3000
Facsimile:     404.885.3900

*-and-*

Harris B. Winsberg (admitted *pro hac vice*)
Bank of America Plaza
600 Peachtree Street NE
Suite 3000
Atlanta, GA  30308-2216
Telephone:     404.885.3000
Facsimile:     404.885.3900

*-and-*

NICOLAIDES FINK THORPE MICHAELIDES SULLIVAN LLP
Matthew S. Sorem (admitted *pro hac vice*)
10 S. Wacker Dr.
21st Floor
Chicago, IL 60606
Telephone:     312.585.1433
Facsimile:     312.585.1401

*-and-*

MCDERMOTT WILL & EMERY LLP
Margaret H. Warner (admitted *pro hac vice*)
Ryan S. Smethurst (admitted *pro hac vice*)
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone:     202.756.8228
Facsimile:     202.756.8087

*Attorneys for Allianz Global Risks US Insurance Company*


TROUTMAN PEPPER HAMILTON SANDERS LLP

By: /s/ *David M. Fournier*
David M. Fournier (DE No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:    404.885.3000
Facsimile:    404.885.3900

*-and-*

Harris B. Winsberg (admitted *pro hac vice*)
Bank of America Plaza
600 Peachtree Street NE
Suite 3000
Atlanta, GA  30308-2216
Telephone:    404.885.3000
Facsimile:    404.885.3900

*-and-*

BRADLEY RILEY JACOBS PC
Todd C. Jacobs (admitted *pro hac vice*)
John E. Bucheit (admitted *pro hac vice*)
500 West Madison Street
Suite 1000
Chicago, IL 60661
Telephone:    312.281.0295

*Attorneys for National Surety Corporation and Interstate Fire & Casualty Company*

POST & SCHELL, P.C.

*/s/ Paul Logan*
Paul Logan (No. 3339)
300 Delaware Avenue
Suite 1380
Wilmington, DE  19801
Phone:  (302) 251-8856
Fax:  (302) 251-8857
E-mail:  plogan@postschell.com

IFRAH PLLC
George R. Calhoun (*pro hac vice*)
1717 Pennsylvania Ave., N.W.
Suite 650
Washington, DC  20006
Phone:  (202) 840-8758
E-mail:  george@ifrahlaw.com

*Attorneys for Argonaut Insurance Company*

CHOATE, HALL & STEWART, LLP
SEITZ, VAN OGTROP & GREEN, P.A.

/s/ R. Karl Hill
R. Karl Hill (Del. Bar No. 2747)
222 Delaware Avenue
Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-0600
Email: khill@svglaw.com

-and-

Douglas R. Gooding (admitted *pro hac vice*)
Jonathan D. Marshall (admitted *pro hac vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

Kim V. Marrkand (admitted *pro hac vice*)
Laura Bange Stephens (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO PC
One Financial Center
Boston, MA 0211
Telephone: (617) 542-6000
kmarrkand@mintz.com
lbstephens@mintz.com

*Counsel to Liberty Mutual Insurance Company*


Kathleen M. Miller (No. 2898)
Smith, Katzenstein & Jenkins LLP
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE  19899 [Courier 19801]
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
Email: kmiller@skjlaw.com

and

Lloyd A. Gura*
Pamela J. Minetto*
Mound Cotton Wollan & Greengrass LLP
One New York Plaza 44th Floor
New York, NY 10004
Tel: (212) 804-4282
Email: lgura@moundcotton.com
pminetto@moundcotton.com
(*Admitted pro hac vice)

*Attorneys for Indian Harbor Insurance Company,*
*on behalf of itself and as successor in interest to*
*Catlin Specialty Insurance Company*

*/s/ Kathleen M. Miller*
SMITH, KATZENSTEIN & JENKINS LLP
Kathleen M. Miller (No. 2898)
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

and

WILEY REIN LLP
Gary P. Seligman (admitted *pro hac vice*)
Ashley L. Criss (admitted *pro hac vice*)
1776 K Street NW
Washington, DC 20006
gseligman@wiley.law
acriss@wiley.law

*Attorneys for General Star Indemnity Company*

*/s/ Bruce W. McCullough*
BODELL BOVÉ, LLC
Bruce W. McCullough  (No.  3112)
1225 N. King Street, Suite 1000
P.O. Box 397
Wilmington, DE 19899-0397
Telephone: (302) 655-6749,
Facsimile: (302) 655-6827
Email: bmccullough@bodellbove.com

- and -

CLYDE & CO US LLP
Bruce D. Celebrezze (*pro hac vice*)
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone:  (415) 365-9800
Facsimile:  (415) 365-9801
Email:   bruce.celebrezze@clydeco.us

Konrad R. Krebs (*pro hac vice*)
200 Campus Drive | Suite 300
Florham Park, NJ 07932
Telephone:  (973) 210-6700
Facsimile:  (973) 210-6701
Email:   konrad.krebs@clydeco.us

- and –

DAVID CHRISTIAN ATTORNEYS LLC
David Christian (*pro hac vice*)
105 W. Madison St., Suite 1400
Chicago, IL 60602
Telephone: (862) 362-8605
Email:   dchristian@dca.law

*Attorneys for Great American Assurance Company,*
*f/k/a Agricultural Insurance Company;*
*Great American E&S Insurance Company,*
*f/k/a Agricultural Excess and Surplus Insurance*
*Company; and Great American E&S Insurance*
*Company*

### DILWORTH PAXSON LLP

By: */s/ Thaddeus J. Weaver*
        Thaddeus J. Weaver (Id. No. 2790)
        704 King Street, Suite 500
        P.O. Box 1031
        Wilmington, DE  19899-1031
        (302) 571-8867 (telephone)
        (302) 655-1480 (facsimile)
        tweaver@dilworthlaw.com

        William E. McGrath, Jr. (PHV)
        2 Research Way
        Princeton, NJ 08540
        (609) 987-6679 (telephone)
        (609)987-6651

*Attorneys for Munich Reinsurance America, Inc.,*
*formerly known as American Re-Insurance Company*