# EXHIBIT 3

Case 2-19-20905-PRW, Doc 1900-4, Filed 12/30/22, Entered 12/30/22 14:43:28, Description: Exhibit Exhibit 3, Page 1 of 104

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. D.I.: 5466, 5674, 5676, 5677, 5680, 5681, 5682, 5683, 5684, 5685, 5686, 5687, 5690, 5692, 5693, 5695, 5699, 5702, 5707, 5708, 5709, 5711, 5722, 5725, 5726, 5727, 5743, 5744, 5745** |

## DEBTORS' OMNIBUS REPLY IN FURTHER SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... v

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ...................................................................................................................... 7

I.      The Debtors' Decision to Enter into the RSA Is Governed by and Satisfies the
        Business Judgment Rule. ........................................................................................ 7

        A.      The Debtors' Decision to Enter into the RSA Is Entitled to Great
                Deference. ...................................................................................................... 7

        B.      The Objections to the RSA Are Insufficient to Overcome the Debtors'
                Business Judgment. ..................................................................................... 11

                1.      The Debtors Considered Alternatives. ....................................... 12

                2.      The RSA Does Not Pose a Threat to the Debtors. ...................... 13

                3.      The Benefits to the Estate Are Not Illusory. ............................. 14

                4.      The Debtors Have Not Abdicated Their Ability to Settle. .......... 16

                5.      The Debtors Have Obtained Local Council Commitments. .......... 18

        C.      The Narrow Finding of Good Faith, Solely as It Relates to the Negotiation
                and Proposal of the RSA, if Necessary, Is Appropriate and Does Not
                Preclude Good-Faith Arguments under Section 1129(a)(3) in Connection
                with Plan Confirmation. ............................................................................... 18

        D.      Heightened Scrutiny Under the Entire Fairness Standard Is Inapplicable,
                But Also Would Be Satisfied. ...................................................................... 24

                1.      The Objecting Insurers Lack Standing to Raise an Entire Fairness
                        Challenge to the RSA. ................................................................ 24

                2.      Entire Fairness Applies Only to a Transaction Between a Company and an
                        Insider. ....................................................................................... 27

                3.      The Objecting Insurers Fail to Meet Their Burden of Establishing that the
                        Debtors' Decision Makers Suffered from Any Conflict of Interest. ........ 29

                        (a)     The Directors Are Not Conflicted Because They Were
                                Elected By or Associated with Local Councils. ........................... 30

                        (b)     The Directors Are Not Conflicted Because They Receive
                                No Remuneration from the Local Councils or the Debtors. ......... 31

                        (c)     The Directors Are Not Conflicted Because They Receive
                                Releases. ........................................................................................ 33

                4.      The RSA Transaction Was Entirely Fair. .................................. 35

II.    Confirmation-Related Objections Are Not Presently Ripe for Consideration.................. 37

    A.    Third-Party Releases ................................................................................... 38

    B.    Insurance Neutrality................................................................................... 40

    C.    It Is Premature to Consider Objections Relating to the Anti-Assignment
        Provisions of the Debtors' Insurance Policies. ....................................... 42

    D.    Anti-Assignment Provisions of Local Council and Chartered Organization
        Insurance Policies .................................................................................... 43

    E.    Post-Confirmation Channeling Injunction............................................... 44

    F.    Trust Distribution Procedures .................................................................. 45

        1.    Debtors Have Not Ceded Control of the TDP to the Plaintiff
            Representatives. ....................................................................... 45

        2.    Indirect Abuse Claims Treatment ........................................... 46

        3.    Turnover Provisions................................................................. 47

        4.    Trust Distribution Procedures Valuations................................ 47

        5.    Power of Settlement Trustee .................................................... 48

        6.    Lack of Future Claims Fund .................................................... 49

        7.    Expedited Distribution Procedures ......................................... 50

    G.    The Court Has Subject Matter Jurisdiction over Claims of Local Councils
        and Chartered Organizations Related to Scouting. ................................. 52

    H.    Any Argument About Equitable Mootness Is Unfounded and Premature. ........... 54

III.    Payment of the Coalition Professionals' Fees and Expenses Under the RSA Will
    Benefit the Estates.................................................................................................. 55

    A.    Payment of the Coalition's Fees and Expenses Is Properly Authorized
        Under Section 363 of the Bankruptcy Code. ........................................... 55

    B.    The Debtors Have Made Substantial Changes to the Revised Proposed
        Order to Accommodate Informal and Formal Objections. .................... 59

    C.    The Coalition Has a Unique Role in These Chapter 11 Cases, and Has
        Provided and Will Continue to Provide Significant Benefit to the Estates. .......... 60

    D.    The Coalition Has Made a Substantial Contribution to the Debtors'
        Chapter 11 Cases Such that Payment of the Coalition Professionals' Fees
        and Expenses Is Warranted Under Section 503(b), if Applicable. ....................... 63

IV.    The Hartford Settlement Agreement Is Not Enforceable Under Third Circuit Law
    Until Approved by the Court. ............................................................................... 66

    A.    The Debtors Are Not Repudiating the Agreement; Instead, as Required by
        the RSA, They Are Seeking a Determination from the Court as to Whether
        They Have Any Obligation to Seek Approval of the Hartford Settlement........... 66

iii

Case 2-19-20905-PRW,    Doc 1900-4,    Filed 12/30/22,    Entered 12/30/22 14:43:28,
Description: Exhibit Exhibit 3, Page 4 of 104

B.    Governing Law Does Not Require the Debtors to Seek Approval of a Plan Incorporating the Hartford Settlement in the Face of Opposition that No Longer Makes Approval of Such a Plan Possible and Is No Longer in the Best Interests of the Estates and Creditors................................................................ 67

C.    Contrary to Hartford's Assertion, There Has Been a Change in Circumstances Since Entry into the Hartford Settlement ...................................... 70

D.    The Best Interests of All Creditors Standard Controls in All Respects Concerning the Debtors' Obligations Under the Hartford Settlement.................. 74

E.    Arguments Related to Lack of an Express Fiduciary Out Provision Are a Red Herring and Make No Sense in the Context of These Cases.......................... 75

F.    If the Court Determines that the Hartford Settlement Is Not Enforceable Hartford Is Not Entitled to Damages. ..................................................................... 76

G.    The Debtors Did Not Relinquish Their Fiduciary Duties ..................................... 77

H.    It Is Irrelevant to Argue About the Lack of an Explicit Fiduciary Out Because There Is No Better Alternative. ................................................................ 78

I.    An Adversary Proceeding Is Not Required for the Court to Make a Determination Regarding the Hartford Settlement ............................................... 81

V.    Responses to Certain Individual Objections ..................................................................... 85

A.    Knights' Objection............................................................................................... 85

B.    Old Republic Insurance Company's Objection .................................................... 86

CONCLUSION.............................................................................................................................. 88

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AC Acquisitions Corp. v. Anderson, Clayton & Co.*,
519 A.2d 103 (Del. Ch. 1986)...................................................................................26

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*,
203 F.3d 914 (5th Cir. 2000) ...................................................................................83

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ...................................................................................29, 30

*Behradrezaee v. Fashtara*,
910 A.2d 349 (D.C. Cir. 2006) ...............................................................................29

*Blaustein v. Lord Baltimore Capital Corp.*,
2013 Del. Ch. LEXIS 108 (Del. Ch. Apr. 30, 2013), *aff'd*, 84 A.3d 954 (Del. 2014)............30

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*,
181 F.3d 527 (3d Cir. 1999)...................................................................................58

*Celotex Corp. v. Edwards*,
514 U.S. 300 (1995)...............................................................................................52

*Chapter 7 Tr. of Student Fin. Corp. v. Pepper Hamilton LLP (In re Student Fin. Corp.)*,
Case Nos. 04-56423, 04-1551 JJF, 05-165-JJF, 2007 U.S. Dist. LEXIS 95882 (D. Del. May 25, 2007) ...................................................................................22

*Church Joint Venture, L.P. v. Blasingame (In re Blasingame)*,
Case No. 15-00021, 2016 Bankr. LEXIS 3590 (Bankr. W.D. Tenn. Sept. 23, 2016).......82, 83

*City Sanitation v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*,
656 F.3d 82 (1st Cir. 2011)......................................................................................9

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
60 B.R. 612 (Bankr. S.D.N.Y. 1986)........................................................................7

*Corp. Claims Mgm't v. Shaiper (In re Patriot Nat'l Inc.)*,
592 B.R. 560 (Bankr. D. Del. 2018) ...................................................................81, 82

*Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*,
242 B.R. 147 (D. Del. 1999) ...................................................................................7

v

Case 2-19-20905-PRW,   Doc 1900-4,   Filed 12/30/22,   Entered 12/30/22 14:43:28,
Description: Exhibit Exhibit 3, Page 6 of 104

*Davis v. Elliot Mgmt. Corp.* (*In re Lehman Bros. Holdings Inc.*),
   508 B.R. 283 (S.D.N.Y. 2014)...................................................................................58

*EBC I, Inc. v. Am. Online, Inc.* (*In re EBC I, Inc.*),
   356 B.R. 631 (Bankr. D. Del. 2006) ........................................................................81

*Frank v. Elgamal*,
   2014 Del. Ch. LEXIS 37 (Del. Ch. Mar. 10, 2014)...................................................30

*Freedman v. Adams*,
   Case No. No. 4199-VCN, 2012 Del. Ch. LEXIS 74 (Del. Ch. Mar. 30, 2012).....................32

*Frys Metals, Inc. v. Gibbons* (*In re RFE Indus., Inc.*),
   283 F.3d 159 (3d Cir. 2002)....................................................................................74

*Fuller-Austin Insulation Co. v. Highlands Ins. Co.*,
   135 Cal. App. 4th 958 (Cal. Ct. App. 2006) ............................................................47

*Fulton State Bank v. Schipper* (*In re Schipper*),
   109 B.R. 832 (Bankr. N.D. Ill. 1989), *aff'd*, 933 F.2d 513 (7th Cir. 1991) ............77

*Gagliardi v. Trifoods Int'l*,
   683 A.2d 1049 (Del. Ch. 1996)................................................................................32

*GAMCO Asset Mgmt. v. iHeartMedia Inc.*,
   Case No. 12312, 2016 Del. Ch. LEXIS 174 (Del. Ch. Nov. 23, 2016) ...................27

*Gavin v. Tousignant* (*In re Ultimate Escapes Holdings, LLC*),
   551 B.R. 749 (D. Del. 2016)....................................................................................29

*Gillman v. Cont'l Airlines* (*In re Cont'l Airlines*),
   203 F.3d 203 (3d Cir. 2000)................................................................................5, 38

*Guttman v. Huang*,
   823 A.2d 492 (Del. Ch. 2003).............................................................................27, 28

*H-W Wexford LLC v. Encorp, Inc.*,
   832 A.2d 129 (Del. Ch. 2003)..................................................................................33

*Hampshire Grp., Ltd. v. Kuttner*,
   Case No. 3607, 2010 Del. Ch. LEXIS 144 (Del. Ch. July 12, 2010) .....................25

*In re A.P.I. Inc.*,
   331 B.R. 828 (Bankr. D. Minn. Oct. 15, 2005) ......................................................25

*In re AbbVie Inc. Stockholder Derivative Litig.*,
   Case No. 9983-VCG, 2015 Del. Ch. LEXIS 192 (Del. Ch. July 21, 2015)............33

*In re AbitibiBowater, Inc.*,
  Case No. 09-12296 (KJC) (Bankr. D. Del. June 18, 2010) ....................................................7

*In re Adelphia Commc'ns Corp.*,
  441 B.R. 6 (Bankr. S.D.N.Y. 2010) ................................................................................55, 56

*In re Alumni Hotel Corp.*,
  203 B.R. 624 (Bankr. E.D. Mich. 1996) ..............................................................................63

*In re ASARCO LLC*,
  441 B.R. 813 (S.D. Tex. 2010) .............................................................................................56

*In re Barnes*,
  309 B.R. 888 (Bankr. N.D. Tex. 2004)..................................................................................45

*In re Bayou Grp., LLC*,
  431 B.R. 549 (Bankr. S.D.N.Y. 2010) ..................................................................................63

*In re Catholic Diocese of Wilmington, Inc.*,
  Case No. 09-13560 (Bankr. D. Del. Aug. 8, 2011)..........................................................51, 80

*In re Chaparral Energy, Inc.*,
  Case No. 16-11144 (LSS) (Bankr. D. Del. Dec. 14, 2016) ..................................................57

*In re Christian Brothers' Inst.*,
  Case No. 11-22820 (Bankr. S.D.N.Y. Jan. 13, 2014)...........................................................44

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004)............................................................................................41, 53

*In re Congoleum Corp.*,
  No. 03-51524, 2008 Bankr. LEXIS 2375 (Bankr. D.N.J. Sept. 2, 2008) ..............................42

*In re Corky Foods Corp.*,
  85 B.R. 903 (S.D. Fla. 1988) ................................................................................................84

*In re Council*,
  Case No. 06-1537, 2006 U.S. Dist. LEXIS 50729 (E.D. Pa. July 21, 2006).........................30

*In re Del. & Hudson Ry. Co.*,
  124 B.R. 169 (D. Del. 1991)...................................................................................................7

*In re Dendreon Corp.*,
  Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014)...................................................57

*In re DuPage Boiler Works, Inc.*,
  98 B.R. 907 (Bankr. N.D. Ill. 1989) .....................................................................................84

*In re Duro Dyne Nat'l Corp.*,
 No. 19-cv-15433-MAS (D.N.J. Oct. 23, 2020) .......................................................42

*In re Ely*,
 Case No. 19-20818, 2020 Bankr. LEXIS 1164 (Bankr. W.D. Mo. Apr. 29, 2020)................24

*In re Energy Future Holdings Corp.*,
 648 F. App'x 277 (3d Cir. 2016) ...........................................................................9

*In re Fed.-Mogul Glob.*,
 684 F.3d 355 (3d Cir. 2012).................................................................................42

*In re Fed.-Mogul Glob., Inc.*,
 385 B.R. 560 (Bankr. D. Del. 2008) .......................................................................42

*In re Flintkote Co.*,
 Case No. 04-11300 (JKF) (Bankr. D. Del. Feb. 9, 2015) ..........................................48

*In re Garlock Sealing Tech., LLC*,
 Case No. 10-BK-31607 (Bankr. W.D.N.C. April 03, 2017)........................................48

*In re Gen. Motors Class H S'holders Litig.*,
 734 A.2d 611 (Del. Ch. 1999)...............................................................................31

*In re Genco Shipping & Trading Ltd.*,
 509 B.R. 455 (Bankr. S.D.N.Y. 2014)....................................................................20

*In re GUE Liquidation Cos., Inc.*,
 Case No. 19-11240 (LSS) (Bankr. D. Del. Oct. 23, 2019) ........................................38

*In re Hercules Offshore, Inc.*,
 Case No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015)........................................57

*In re Innkeepers USA Tr.*,
 442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...............................................................16, 28

*In re Innkeepers USA Tr.*,
 448 B.R. 131 (Bankr. S.D.N.Y. 2011) ....................................................................37

*In re Insys Therapeutics, Inc.*,
 No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) .................................................42

*In re Integrated Res., Inc.*,
 147 B.R. 650 (Bankr. S.D.N.Y. 1992)..................................................................7, 20

*In re John Q. Hammons Hotels Inc. S'holder Litig.*,
 Case No. 758, 2009 Del. Ch. LEXIS 174 (Del. Ch. Oct. 2, 2009) ..........................28

*In re Kaiser Aluminum Corp.*,
    343 B.R. 88 (Bankr. D. Del. 2006) ......................................................42

*In re Karpe*,
    84 B.R. 926 (Bankr. M.D. Pa. 1988) ...................................................68

*In re KKR Fin. Holdings LLC S'holder Litig.*,
    101 A.3d 980 (Del. Ch. 2014).............................................................30

*In re Kowalczyk*,
    600 B.R. 806 (Bankr. N.D. 2019) .......................................................24

*In re LATAM Airlines Grp. S.A.*,
    620 B.R. 722 (S.D.N.Y. 2020)............................................................28

*In re Leslie Controls, Inc.*,
    437 B.R. 493 (Bankr. D. Del. 2010) ...................................................26

*In re Leslie Controls, Inc.*,
    No. 10-12199 (CSS) (Bankr. D. Del. Oct. 28, 2010)..........................42

*In re M&G USA Corp.*,
    Case No. 17-12307 (BLS) (Bankr. D. Del. May 6, 2019) .....................64

*In re Mallinckrodt PLC*,
    Case No. 20-12522 (JTD) (Bankr. D. Del. Feb. 1, 2021).....................64

*In re Master Mortg. Inv. Fund*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994).................................................5

*In re Medford Crossings N., LLC*,
    No. 07-25115, 2011 Bankr. LEXIS 185 (Bankr. D.N.J. Jan. 20, 2011) ...............................37

*In re Millennium Lab Holdings II, LLC*,
    575 B.R. 252 (Bankr. D. Del. 2017) ...................................................38

*In re Millennium Lab Holdings II, LLC*,
    945 F.3d 126 (3d Cir. 2019)................................................................54

*In re Molycorp, Inc.*,
    Case No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) .................37, 38

*In re Molycorp S'holder Derivative Litig.*,
    Case No. 7282, 2015 Del. Ch. LEXIS 152 (Del. Ch. May 27, 2015)....................30

*In re MPM Silicones, LLC*,
    Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014)................57

*In re New Cotai Holdings, LLC*,
    Case No. 19-22911 (RDD) (Bankr. S.D.N.Y. May 19, 2020)................................................57

*In re Nuo Therapeutics, Inc.*,
    Case No. 16-10192 (MFW) (Bankr. D. Del. June 20, 2016)...................................................64

*In re Ofty Corp.*,
    44 B.R. 479 (Bankr. D. Del. 1984) .......................................................................................25

*In re Panda Temple Power, LLC*,
    Case No. 17-10839 (LSS) (Bankr. D. Del. Oct. 5, 2017) ......................................................57

*In re PNB Holding Co. S'holders Litig.*,
    Case No. 28-N, 2006 Del. Ch. LEXIS 158 (Del. Ch. Aug. 18, 2006)....................................32

*In re Purdue Pharma, L.P.*,
    Case No. 19-23649 (RDD) (Bankr. S.D.N.Y June 14, 2021)................................................41

*In re RCS Capital Corp.*,
    Case No. 16-10223 (MFW) (Bankr. D. Del. Mar. 16, 2016)..................................................65

*In re ReoStar Energy Corp.*,
    Case No. 10-47176, 2012 Bankr. LEXIS 2418 (Bankr. N.D. Tex. May 30, 2012)................24

*In re Residential Cap., LLC*,
    Case No. 12-12020 (MG), 2013 Bankr. LEXIS 2601 (Bankr. S.D.N.Y.
    June 27, 2013) ........................................................................................................15, 20, 37

*In re Revco D.S., Inc.*,
    118 B.R. 468 (Bankr. N.D. Ohio 1990)..................................................................................26

*In re RJR Nabisco, Inc. S'holders Litig.*,
    Case No. 10389, 1989 Del. Ch. LEXIS 9 (Del. Ch. Jan. 31, 1989).......................................25

*In re RMS Titanic, Inc.*,
    Case No. 16-2230, 2016 Bankr. LEXIS 4560 (Bankr. M.D. Fla. July 22, 2016)...................84

*In re Roman Catholic Church of the Diocese of Tucson*,
    Case No. 04-04721.................................................................................................................51

*In re Roth Am., Inc.*,
    975 F.2d 949 (3d Cir. 1992)..............................................................................................66, 75

*In re RS Legacy Corp.*,
    Case No. 15-10197 (BLS) (Bankr. D. Del. Nov. 24, 2015)...................................................65

*In re Saxby's Coffee Worldwide, LLC*,
    436 B.R. 331 (Bankr. E.D. Pa. 2010) ....................................................................................37

x

*In re Specialty Prods. Holding Corp.*,
  Case No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) ....................................48

*In re Summit Metals, Inc.*,
  477 B.R. 484 (Bankr. D. Del. 2012) ...................................................................26

*In re Synthes, Inc.*,
  50 A.3d 1022 (Del. Ch. 2012).............................................................................32

*In re TCI 2 Holdings, LLC*,
  428 B.R. 117 (Bankr. D.N.J. 2010) ....................................................................58

*In re Three Strokes Ltd. P'ship*,
  397 B.R. 804 (Bankr. N.D. Tex. 2008)...............................................................84

*In re TK Holdings, Inc.*,
  Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 3, 2018) ..............................38, 44

*In re TK Holdings Inc.*,
  No. 17-11375 (BLS) (Bankr. D. Del. Feb. 20, 2018) ...........................................42

*In re Tribune Co.*,
  Case No. 08-13141 (KJC), Case No. 08-13141 (KJC), 2011 Bankr. LEXIS 299 (Bankr. D.
  Del. Feb. 3, 2011) ..............................................................................................23

*In re USEC, Inc.*,
  Case No. 14-10475 (CSS) (Bankr. D. Del. Apr. 21, 2014) ...................................57

*In re Vivus, Inc.*,
  Case No. 20-11779 (LSS) (Bankr. D. Del. Mar. 15, 2021) ...................................64

*In re W.R. Grace & Co.*,
  729 F.3d 332 (3d Cir. 2013).................................................................................45

*In re Washington Mut. Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................38

*In re Whitehall Jewelers Holdings, Inc.*,
  Case No. 08-11261, 2008 Bankr. LEXIS 2120 (Bankr. D. Del. July 28, 2008)....................84

*In re Windstream Holdings, Inc.*,
  Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. Feb. 25, 2019) ...............................21

*In re Yarway Corp.*,
  Case No. 13-11025 (BLS) (Bankr. D. Del. April 8, 2015)....................................48

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) .....................................................................38

Case 2-19-20905-PRW    Doc 1900-4    Filed 12/30/22    Entered 12/30/22 14:43:28,
Description: Exhibit Exhibit 3, Page 12 of 104

*Jensen v. Froio* (*In re Jensen*),
    369 B.R. 210 (Bankr. E.D. Pa. 2007) ....................................................................24

*JPMorgan Chase Bank, N.A. v. Charter Communs. Operating, LLC* (*In re Charter Communs.*),
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ..................................................................34

*Keeler v. Acad. of Am. Fransciscan Hist., Inc.* (*In re Keeler*),
    257 B.R. 442 (Bankr. D. Md. 2001) ....................................................................80

*Lebron v. Mechem Fin., Inc.*,
    27 F.3d 937 (3d Cir. 1994) .........................................................................63, 64

*M3 Holdings LLC v. Haslam* (*In re Haslam*),
    Case No. WW-07-1391, 2008 Bankr. LEXIS 4716 (B.A.P. 9th Cir. Mar. 31, 2008) ............24

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988) ..............................................................................43

*Manus Corp. v. NRG Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*),
    188 F.3d 116 (3d Cir. 1999) ............................................................................83

*Metro. Prop. & Liab. Ins. Co. v. Kirkwood*,
    729 F.2d 61 (1st Cir. 1984) ..............................................................................26

*Meyers v. Martin* (*In re Martin*),
    Case Nos. 94-1717 and 94-4157, 1995 U.S. Dist. LEXIS 9177 (E.D. Pa. June 28, 1995) .....76

*Myers v. Martin* (*In re Martin*),
    91 F.3d 389 (3d Cir. 1996) ......................................................................... passim

*N.J. Bldg. Laborers Pension Fund v. Ball*,
    Case No. 11-1153-LPS-SRF, 2014 U.S. Dist. LEXIS 32582 (D. Del. Mar. 13, 2014) ..........32

*Nu Image, Inc. v. Miller* (*In re Our Alchemy, LLC*),
    Case No. 16-11596, 2017 Bankr. LEXIS 1969 (Bankr. D. Del. July 17, 2017) .....................25

*Orman v. Cullman*,
    794 A.2d 5 (Del. Ch. 2002) ..........................................................................28, 29

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984) ............................................................................52

*Princeton Ins. Co. v. Vergano*,
    883 A.2d 44 (Del. Ch. 2005) ............................................................................23

*PRLP 2011 Holdings, LLC v. Manuel Mediavilla, Inc.* (*In re Manuel Mediavilla, Inc.*),
    568 B.R. 551 (B.A.P. 1st Cir. 2017) (per curiam) ....................................................78

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968)..................................................................................................73

*Rafool v. Goldfarb Corp.* (*In re Fleming Packaging Corp.*),
   Case No. 04-8166, 2008 Bankr. LEXIS 558 (Bankr. C.D. Ill. Mar. 7, 2008) ........................76

*Rinehart v. Stroud Ford, Inc.* (*In re Stroud Ford, Inc.*),
   205 B.R. 722 (Bankr. M.D. Pa. 1996) ........................................................66, 67, 75

*Salim v. Nisselson* (*In re Big Apple Volkswagen, LLC*),
   571 B.R. 43 (S.D.N.Y. 2017)...................................................................................77

*Savage & Assocs. P.C. v. Mandl* (*In re Teligent, Inc.*),
   459 B.R. 190 (Bankr. S.D.N.Y.)..............................................................................83

*Schwartz v. Kraeger* (*In re Robert H. Kraeger Co.*),
   Case No. 99-0026, 1999 Bankr. LEXIS 615 (Bankr. E.D. Pa. May 24, 1999) ....................25

*Sebastian v. Schmitz* (*In re WorldSpace, Inc.*),
   Case No. 15-25, 2016 U.S. Dist. LEXIS 129497 (D. Del. Sept. 22, 2016) ...........................26

*Shabbouei v. Lauren*,
   Case No. 2018-0847-JRS, 2020 Del. Ch. LEXIS 121 ...........................................33

*Smith v. Van Gorkom*,
   488 A.2d 858 (Del. 1985) ................................................................................7, 20

*State Farm Fire & Cas. Co. v. Middleby Corp.*,
   C.A. Nos. 09C-08-216 PLA, 09C-08-217 PLA, 2011 Del. Super. LEXIS 79
   (Del. Super. Ct. Feb. 8, 2011) ................................................................................30

*Thorpe by Castleman v. CERBCO*,
   676 A.2d 436 (Del. 1996) .......................................................................................31

*U.S. Bank Tr. Nat'l Ass'n v. AMR Corp.* (*In re AMR Corp.*),
   730 F.3d 88 (2d Cir. 2013).....................................................................................81

*U.S. Trustee v. Bethlehem Steel Corp.* (*In re Bethlehem Steel Corp.*),
   Case No. 02-Civ. 2854, 2003 U.S. Dist. LEXIS 12909 (S.D.N.Y.
   July 23, 2003) ....................................................................................55, 56, 57, 58

*Warhanek v. Bidzos*,
   Case No. 12-263-RGA-SRF, 2013 U.S. Dist. LEXIS 133099 (D. Del. Sept. 18, 2013)........32

*Whyte v. Williams* (*In re Williams*),
   152 B.R. 123 (Bankr. N.D. Tex. 1992)...................................................................77

*Wilmington Hosp. v. New Castle Cnty.*,
788 A.2d 536 (Del. Ch. 2001) .................................................................22

*Yassian v. Goodrich* (*In re Rodeo Canon Dev. Corp.*),
Case No. CC-10-1089, 2010 Bankr. LEXIS 5036 (B.A.P. 9th Cir. Oct. 28, 2010) ...............81

## STATUTES AND OTHER AUTHORITY

11 U.S.C. § 102(3) ...........................................................................56

11 U.S.C. § 105(a) .....................................................................7, 8, 17

11 U.S.C. § 363 ........................................................................ passim

11 U.S.C. § 363(b) ..................................................................... passim

11 U.S.C. § 502(e) ...........................................................................46

11 U.S.C. § 503 ...............................................................................64

11 U.S.C. § 503(b) .................................................................... passim

11 U.S.C. § 503(b)(3)(D) ............................................................63, 64, 65

11 U.S.C. §509(c) ............................................................................46

11 U.S.C. § 524(g) ...........................................................................52

11 U.S.C. § 1123(a)(5) ...................................................................41, 43

11 U.S.C. § 1129(a)(3) ...................................................................18, 19

11 U.S.C. § 1129(a)(16) .......................................................................42

## OTHER AUTHORITIES

Delaware Lawyers' Rule of Professional Conduct 3.3(a)(2) ........................................30

Fed. R. Bankr. P. 7001 ............................................................80, 81, 82, 83, 84

Fed. R. Bankr. P. 9019 .....................................................................9, 77

H. Rep. No. 95-595 (1977) ...................................................................52

Local Rule 9019 ...........................................................................22, 23

Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), submit this omnibus reply to the objections, joinders, and reservations of rights (the "Objections") filed by the objecting parties (collectively, the "Objectors"),[1] and in further support of their motion [D.I. 5466] (the "Motion")[2] to authorize the Debtors to enter into and perform under the RSA, including, in connection therewith, determining that the Debtors have no obligation to seek approval of the Hartford Settlement.  In consultation with the RSA Parties, the Debtors have revised the Proposed Order, filed concurrently with this omnibus reply (the "Revised Proposed Order").  In support of this reply, the Debtors submit the supplemental declaration of Brian Whittman, a Managing Director with Alvarez & Marsal North America, LLC (the "Supplemental Whittman Declaration"), and the declaration of Devang Desai (the "Desai Declaration"), a volunteer member of the National Executive Board of the BSA (the "NEB"), the National Executive Committee (the "NEC"), and the Bankruptcy Task Force (the "BTF"), which are filed concurrently herewith.  In further support hereof, the Debtors respectfully state as follows.[3]

## **PRELIMINARY STATEMENT**

1.     The RSA marks a turning point in these cases—an achievement of monumental proportions and an important building block for the Debtors and supporting parties to achieve

---

[1]   Attached hereto as **Exhibit A** is a chart summarizing the arguments contained in each of the Objections to the Motion and the Debtors' response to those arguments.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the RSA, including the Term Sheet attached thereto as Exhibit A, the Amended Plan, or in the Motion, as applicable.

[3]   As additional support for this reply, the Debtors incorporate by reference the declaration of Roger C. Mosby [D.I. 5469] (the "Mosby Declaration") and the initial declaration of Brian Whittman [D.I. 5470] (the "Whittman Declaration" and, together with the Supplemental Whittman Declaration, the "Whittman Declarations"), filed in support of the Motion.

broad-based consensus for confirmation of a plan of reorganization that timely and equitably compensates Abuse Survivors while ensuring that the charitable mission of the BSA continues. The RSA is the result of exhaustive efforts in Court-sanctioned mediation among more than twenty-five parties, which predominantly took place over the four months that preceded the filing of the Motion. Under the guidance of the three Court-appointed Mediators, Hon. Kevin J. Carey (Ret.), Paul A. Finn, and Timothy V.P. Gallagher, the Debtors and other mediation parties have worked, and continue to work, to navigate the complex issues involved in these cases. The mediation remains ongoing and, contrary to assertions otherwise by certain of the Objectors, further settlements with and mechanisms to include Chartered Organizations as Protected Parties under the proposed Amended Plan are not only contemplated under the terms of the RSA, but are required.[4] While settlements with Insurance Companies are not required to achieve confirmation of the Amended Plan, the Debtors continue to encourage discussions between the Insurance Companies and the RSA Parties, and the Mediators have scheduled in-person and virtual mediation sessions on August 3–5 to address issues relating to the Insurance Companies and Chartered Organizations.

2.      With the guidance of the Mediators, the terms of the RSA were reached only after months of hard-fought, good-faith, and largely adversarial negotiations between and among the Debtors and the Plaintiff Representatives. As set forth herein and in the declarations submitted in support hereof, the Debtors exercised reasonable business judgment in entering into the RSA by thoroughly and carefully assessing the risks posed by and benefits afforded to the estates under the RSA. The mischaracterization of the RSA by certain of the Objectors as a deal that was struck in

---

[4]    As noted by Mr. Mason at the most recent omnibus hearing on July 21, 2021, the "local council contributions . . . are expressly contingent on satisfactory resolution of the issues surrounding chartered organizations." July 21, 2021 Hr'g Tr. 9:21–23.

secret in an effort to favor certain parties in interest to the exclusion of others is not only false, but a blatant attempt to undermine the mediation process.

3.      Instead, the RSA outlines a proposed plan of reorganization that is supported by representatives of the majority of the holders of Direct Abuse Claims, the TCC, the Future Claimants' Representative and the AHCLC.  The Amended Plan contemplated by the RSA is also supported by the UCC and JPM.  Importantly, the RSA and Amended Plan provide a framework to include additional parties in interest in the settlements contained therein.

4.      The RSA represents an important step toward resolving central, make-or-break disputes in these chapter 11 cases and propels the Debtors closer to a consensual plan process.  A number of parties have filed objections and reservations of rights with respect to the Amended Plan contemplated by the terms of the RSA; however, nothing in the Motion seeks approval of the Amended Plan or the related Disclosure Statement. The Debtors do not intend (nor are they required) to litigate confirmation issues at the hearing on the Motion, and the proposed order approving the RSA makes that clear.  Specifically, the proposed order contains a broad reservation of parties' rights to fully prosecute any and all confirmation objections at the appropriate time. Indeed, the Amended Plan and Disclosure Statement will each be subject to future hearings on appropriate notice affording all parties in interest an opportunity to be heard.  Still, in order to respond to the Objections, particularly those Objections that question the Debtors' business judgment in entering into the RSA, the Debtors will briefly address the Objectors' confirmation-related concerns herein.

5.      Moreover, the RSA Motion should be granted as a sound exercise of their reasonable business judgment.  The Debtors' decision to enter into the RSA was reasonable, as was the process that produced such decision.  The Objectors ask the Court to apply a heightened

standard of entire fairness. The Objectors lack standing to make the request and the standard is totally inapplicable. The transactions contemplated by the RSA are not between insiders and do not involve a conflicted board or self-dealing. Nevertheless, regardless of the standard applied to the Motion, the Debtors have ample justification to enter into the RSA.

6.     In connection with its consideration of the RSA, the Court also has ample authority to determine the obligations of the Debtors, if any, to pursue the Hartford Settlement in the face of unanimous and unwavering creditor opposition. Specifically, Hartford urges the Court to "direct [the] BSA to proceed to seek confirmation of the Global Resolution Plan . . . or Toggle Plan."[5] Hartford Obj. at 38. This result, Hartford argues, is required under the terms of the Hartford Insurance Settlement Agreement and applicable law. The Court should reject Hartford's position, which is based on a tortured and erroneous reading of controlling Third Circuit law. The ruling Hartford seeks would improperly elevate the Debtors' alleged duty to pursue a settlement agreement with one creditor above the Debtors' fiduciary duty to the creditor body as a whole, thereby subverting the foundational principles of chapter 11 and upending decades of mass-tort plans confirmed with broad-based plaintiff support.

7.     At the time the Hartford Settlement was announced on April 15, 2021, the Debtors expected that the Hartford Settlement—or some amended version of it—would be a preliminary building block toward a plan of reorganization that would garner the support of survivors of sexual abuse. Now, more than three months later, the Hartford Settlement has become entirely illusory. There is no circumstance under which the Hartford Settlement, in its current form, will ever become a part of any confirmed plan of reorganization in these cases. The Plaintiff Representatives

---

[5]     Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively, "Hartford") filed their objection (the "Hartford Objection") at D.I. 5681.

and State Court Counsel representing survivors of sexual abuse are unanimously opposed to the Hartford Settlement. They have never wavered from this position, and it has become manifestly clear that their resounding "no" will never become "yes." Accordingly, the Debtors have no choice but to accept the reality that survivors would indeed reject any plan containing the Hartford Settlement in overwhelming numbers, rendering any effort to proceed in that way an exercise in futility.

8.      If the Global Resolution Plan containing the Hartford Settlement were rejected by abuse survivors (which it would be), the Court could not approve third-party releases in favor of Local Councils and certain other Protected Parties. *See Gillman v. Cont'l Airlines* (*In re Cont'l Airlines*), 203 F.3d 203, 217 n.17 (3d Cir. 2000) (citing *In re Master Mortg. Inv. Fund*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)). As a result, if Hartford prevails in its Objection (which it should not), the Debtors would have no alternative but to proceed with confirmation of the BSA Toggle Plan.[6] Although the BSA Toggle Plan would allow the BSA to emerge from bankruptcy, that result would be extremely unfavorable, as it would discharge the Debtors for Abuse Claims but leave the Local Councils exposed to civil liability in the tort system. *See* Whittman Dep. 62:1–4, Ex. B (stating that "suboptimal would not be a strong enough word" to describe the Hartford Settlement "because of the risks to the BSA [and] the risks to the BSA's mission"). And, of course, neither the Hartford Settlement nor any other insurance settlement would exist under the BSA Toggle Plan. Thus, by forcing the Debtors to solicit votes on the Global Resolution Plan, Hartford would achieve the ultimate pyrrhic victory. The Debtors would be bound by the Hartford Settlement, which would serve only to ensure that (i) the Debtors fail to achieve the comprehensive

---

[6]     The Global Resolution Plan and the BSA Toggle Plan are the alternative plans described in the *Third Amended Plan for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5368].

resolution of Scouting-related Abuse Claims that they have been seeking for nearly eighteen months in bankruptcy and (ii) Hartford never pays any of its $650 million settlement amount to the Settlement Trust.

9.      This result would favor no one except those plaintiffs who win the post-bankruptcy race to the courthouse and the Insurance Companies, who will continue to litigate claims in the tort system and coverage disputes in state court for years to come.  But this need not be the result. The Debtors, in the exercise of their business judgment and in the interests of the estates and all creditors, have proposed a better option.  Consistent with applicable Third Circuit law, the Debtors have informed the Court of the changed circumstances since they entered into the Hartford Settlement more than three months ago and are seeking a determination from the Court that they may pursue a plan of reorganization that does not include the Hartford Settlement.  If the Court grants this relief, which the Debtors submit is appropriate, the Debtors will pursue the Amended Plan contemplated by the RSA, which is supported by each Plaintiff Representative and by State Court Counsel representing approximately 60,000 abuse survivors.  The Amended Plan is a clear and viable pathway for the Debtors to achieve a comprehensive resolution of Abuse Claims.  If the Court denies the Debtors' relief, the Debtors would be required to confirm the BSA Toggle Plan, which, as noted above, would achieve none of the Debtors' restructuring objectives.  In either scenario, the Hartford Settlement ceases to exist.  But only under the Debtors' current proposal (as may be modified before confirmation to include the support of other constituents) will these cases be considered a success.

10.      For the reasons stated above and described in more detail herein, the Debtors respectfully request that the Court overrule the Objections, authorize the Debtors to enter into the RSA, and determine that the Debtors have no obligations under the Hartford Settlement.

## ARGUMENT

**I.    The Debtors' Decision to Enter into the RSA Is Governed by and Satisfies the Business Judgment Rule.**

11.    By the Motion, the Debtors are seeking authority to enter into the RSA pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, under which a debtor may "after notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  In the Third Circuit, courts have authorized a debtor's use of property of the estate outside the ordinary course of business when such use has a "sound business purpose." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153–54 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

**A.    The Debtors' Decision to Enter into the RSA Is Entitled to Great Deference.**

12.    Once a debtor articulates a valid business justification, a presumption arises that the debtor's decision was made "on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Further, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. *See* Hr'g Tr. at 9, *In re AbitibiBowater, Inc.*, Case No. 09-12296 (KJC) (Bankr.

D. Del. June 18, 2010) ("[I]t's not the debtor's burden or this Court's duty to prove or determine, respectively, that the proposed offering and backstop is the best or could be made better, only that *the exercise of the debtor's business judgment was proper and resulted in a fair agreement*." (emphasis added)).  As addressed in the opening papers and below, the Debtors have a valid business justification for entering into the RSA.

13.    The Debtors exercised reasonable business judgment in entering into the RSA and approving its terms.[7]  *First*, as set forth in detail in the Motion, the Whittman Declarations, and the Desai Declaration, the Debtors have established a reasonable business justification for entering into and performing under the RSA.  Specifically, the RSA (a) builds the necessary consensus with the support of counsel representing the interests of at least 60,000 Abuse Survivors to pave the way to a confirmable Amended Plan, (b) provides for significantly increased contributions from the BSA and Local Councils compared to prior versions of the plan proposed by the Debtors, and (c) resolves or stays costly, complex, and time-consuming litigation, including the Restricted Assets Adversary, the Estimation Matters, the extension of the "Standstill Period" under the Preliminary Injunction Order, and the Exclusivity Motion.

14.    *Second*, as detailed in the Desai Declaration, the numerous meetings of the BSA's NEB, NEC, and BTF demonstrate that the BSA engaged in thorough and considered deliberations, in consultation with its advisors, in connection with its decision to enter into the RSA.  Desai Decl. ¶¶ 13–28.  The BTF is a task force authorized by the National Chair of the BSA the purpose of

---

[7]    The Debtors note that the Objecting Claimants assume the applicability of Bankruptcy Rule 9019 to the approval of the RSA.  *See* Objecting Claimants Obj. ¶¶ 5, 9, 11, 42, 55, 93.  The Debtors are not seeking to enter into the RSA pursuant to Bankruptcy Rule 9019, but to the extent it is applicable, the standard for approval of settlements under this rule is met.  The standard under Bankruptcy Rule 9019 is deferential to a debtor's judgment and merely requires the Court to ensure that the settlement is fair and equitable and does not fall below the lowest point in the range of reasonableness in terms of benefit to the estate.  *See In re Energy Future Holdings Corp.*, 648 F. App'x 277, 280–81 (3d Cir. 2016); *City Sanitation v. Allied Waste Servs. of Mass., LLC* (*In re Am. Cartage, Inc.*), 656 F.3d 82, 91–92 (1st Cir. 2011).

which is to assist the NEC in fulfilling its governance duties by: (a) working with the BSA's General Counsel and staff to monitor the progress of the bankruptcy case and provide guidance on behalf of the NEC as appropriate; (b) assisting the NEC in being currently informed and executing its governance role with respect to the chapter 11 bankruptcy proceedings; and (c) performing such other duties as may be requested by the National Chair or are necessary or appropriate in light of the business judgment rule as it applies to the NEC in connection with the bankruptcy. Desai Decl. ¶ 12. Since its formation, the BTF's role has been to carefully consider and discuss restructuring options with the Debtors' legal and financial advisors, including in-depth discussion of proposed settlements and the related benefits and risks to the Debtors and their charitable mission. Desai Decl. ¶ 13. After engaging in these discussions, the BTF periodically provides updates to the NEC and NEB regarding the restructuring and the status of settlement negotiations, and makes recommendations to the NEC or NEB, as applicable, regarding proposed actions that it believes should be taken in furtherance of the Debtors' restructuring. Desai Decl. ¶ 14.

15.     As is detailed in the Desai Declaration, over the past nine months, from November 2020[8] to June 2021, the NEB, NEC, and BTF met a total of 57 times, with each of these meetings generally lasting for at least ninety minutes and frequently over two hours. Desai Decl. ¶ 15. Of these meetings, the BTF held 30 separate meetings (in addition to five joint meetings of the NEC and BTF) to receive and discuss updates on the Debtors' restructuring and the progress of the mediation and to discuss and formulate the Debtors' restructuring strategy. Desai Decl. ¶ 15. In addition, the NEB and the NEC met on at least 22 separate occasions (in addition to 5 joint

---

[8]    At various points during the chapter 11 cases, representatives for the survivors informed BSA's advisors that they were unwilling to negotiate the terms of a global resolution prior to the bar date established by the Bankruptcy Court. The Bankruptcy Court set November 16, 2020 as the bar date for abuse claims in these chapter 11 cases. As a result, commencing around November 2020, the parties in the chapter 11 cases began focusing their attention on negotiating a plan of reorganization.

meetings of the NEC and BTF) to receive updates on the Debtors' restructuring and the progress of the mediation and to discuss and approve certain actions recommended by the NEC or BTF, as applicable.  Desai Decl. ¶ 16.

16.     The BTF's consideration of the RSA was an iterative process that developed over time during the Debtors' mediation with parties in interest in these chapter 11 cases.  Over the course of the mediation, the NEB, NEC, and BTF discussed and considered the various components of the proposed resolutions that were ultimately embodied in the RSA and the positions of the key stakeholders in the restructuring process.  They also provided guidance or authorization to BSA's CEO and General Counsel and its legal and financial advisors on negotiating parameters during the ongoing mediation.  Desai Decl. ¶ 20.  During these meetings, the NEB, NEC and BTF reviewed presentations prepared by the Debtors' advisor team describing the various potential terms and provisions of the settlements that now constitute the terms of the RSA and highlighting the advantages and disadvantages of entering into such agreements.  Desai Decl. ¶ 20; Supp. Whittman Decl. ¶¶ 6–12.  The factors considered included, among others, the parties included in the RSA, the ability to make further settlements with Chartered Organizations and Insurance Companies and any related limitations, the contributions from the BSA and Local Councils, the costs required under the RSA, the conditions applicable to the Settlement Trust and the TDP, the alternatives to entering into the RSA, and the risks of achieving a successful confirmation of a plan of reorganization.  Desai Decl. ¶ 20.  The Debtors' advisors also gave numerous presentations to the NEB, NEC, and BTF, in which the parties also discussed the payment of the Coalition Professional fees, the restructuring timeline, the Hartford Settlement, Chartered Organizations, and various insurance issues, including related to proposed plans of reorganization and the terms of the RSA.  Supp. Whittman Decl. ¶ 8.  Following many of the board

meetings, the NEB, NEC, or BTF, as applicable, held executive sessions to consider the discussions around the RSA without the advisors present.  Supp. Whittman Decl. ¶ 6.  The agreements embodied in the RSA were approved only after careful deliberation of these and other considerations.  Desai Decl. ¶ 20; Supp. Whittman Decl. ¶ 12.

17.    Based upon these extensive deliberations, as substantiated by the Desai Declaration and the Whittman Declarations, the BSA's board irrefutably determined to enter into the RSA on an informed basis.  The Objectors are primarily adversaries of the estate seeking to prevent reorganization, not increase recoveries.  In any case, even if they disagreed with Debtors' reasoned and considered judgment as to the advantages and disadvantages of the RSA, it is the Debtors' judgment that matters, not the purported judgment of the Objectors, which do not act as fiduciaries of the estate, but rather are acting as adversaries.  The assertion that the Debtors failed to consider alternatives or weigh their options lack evidentiary support and are without merit.  The facts strongly support a finding by the Court that the Debtors' decision to enter into the RSA, and the process that led to it, occurred on an informed basis.[9]

**B.    The Objections to the RSA Are Insufficient to Overcome the Debtors' Business Judgment.**

18.    Certain of the Objectors incorrectly argue that, for various reasons, the Debtors did not exercise reasonable business judgment in entering into the RSA because: (a) the evidence offered in support of the Debtors' business judgment does not demonstrate that alternatives were

---

[9]    Certain Insurers and the Objecting Claimants also assert that the standard for approval of sales pursuant to section 363(b) is not met.  Certain Insurers Obj. ¶ 29; Objecting Claimants Obj. ¶ 9.  This standard is an extension of the business judgment standard, but it is inapplicable where a debtor seeks to enter into a support agreement (as opposed to a sale) based on its reasonable business judgement.  Through the RSA, the Debtors are not proposing an asset sale—rather, they have entered into an agreement in furtherance of the Debtors' reorganization.  The Court should not review the RSA as if it were an asset sale.  In any event, even if the Court were to apply such standard, as discussed herein, the Debtors have met the requirements because (1) there is a sound business purpose for entry into the RSA, (2) the consideration in the RSA is fair, (3) adequate notice has been provided (as conceded by both Objectors), and (4) the RSA Parties have acted in good faith in connection with the RSA.

considered or that options were weighed;[10] (b) the treatment of Chartered Organizations currently contemplated under the RSA and lack of consultation with the Chartered Organizations in negotiating the RSA threatens the BSA's reorganization prospects;[11] (c) the benefits of the RSA are illusory for the Debtors' estates;[12] (d) the Debtors have relinquished their ability to settle with Insurance Companies or Chartered Organizations under the RSA;[13] and (e) the Debtors have not obtained any Local Council commitments under the RSA.[14]   Each of these contentions is without merit.

### 1.    The Debtors Considered Alternatives.

19.    As described above and in the Whittman and Desai Declarations, the Debtors engaged in a diligent process pursuant to which they examined all options available.  Those options included, among other things, reorganization structures incorporating third party releases as well as reorganization structures that did not include third party releases for Local Councils and Chartered Organizations.  In the exercise of their sound business judgment, the Debtors determined that the RSA and the plan contemplated by the RSA presented the best path forward and a building block from which to gain broad consensus among their creditors.

---

[10]    *See* Objection to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief [D.I. 5682], and *Errata* [D.I. 5726] (the "Objecting Claimants' Objection") ¶¶ 13-14; Certain Insurers' Objection to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief [D.I. 5684] (the "Certain Insurers Objection") ¶ 27.

[11]    *See Joint Objection of the Roman Catholic Ad Hoc Committee and the United Methodist Ad Hoc Committee to the Debtors' Motion for Authorization to Enter into and Perform Under Restructuring Support Agreement and for Related Relief and Joinder in Limited Objection and Reservation of Rights of the Church of Jesus Christ of Latter-Day Saints* [D.I. 5676] (the "RCAHC/UMAHC Objection") ¶¶ 33–36; *Century's Objections to the Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5707] (the "Century Objection") ¶¶ 26–30.

[12]    *See* Century Obj. at 16–19; Certain Insurers Obj. ¶¶ 4, 77–78.

[13]    *See* Century Obj. at 33–34; Certain Insurers Obj. ¶¶ 5, 74–75.

[14]    *See* Century Obj. at 29–30.

## 2.      The RSA Does Not Pose a Threat to the Debtors.

20.     The Roman Catholic and United Methodist Ad Hoc Committees, joined by certain other Chartered Organizations, and Century argue that the current treatment of Chartered Organizations under the RSA is inadequate and the lack of consultation with the Chartered Organizations in negotiating the RSA threatens the BSA's reorganization prospects. RCAHC/UMAHC Obj. ¶ 36;[15] Century Obj. at 18.  These Objections ignore that the RSA is only one step toward confirmation and a building block toward resolution with other parties in interest, including, most importantly, Chartered Organizations who are partners in the mission of Scouting. Whittman Decl. ¶ 8.  The Term Sheet to the RSA expressly contemplates that "[t]he Parties shall work in good faith to develop a protocol for addressing participation by Chartered Organizations in the benefits of the Channeling Injunction.  Such settlements may occur prior to the Effective Date with the consent of all Parties."  *See* RSA Ex. A, Term Sheet, at 15–16.  Indeed, as noted above, additional mediation dates have already been set aside for August 3–5 to mediate Chartered Organizations and other issues.  The Debtors determined, in the sound exercise of their business judgment, that negotiations with the Chartered Organizations would continue in earnest following the execution of the RSA and that binding the parties to the RSA on their agreement to the dozens of material provisions achieved through months of mediation was essential prior to progressing to the issues raised by the Chartered Organizations.  Moreover, the fact that the Debtors have not yet reached an agreement with the Chartered Organizations is not a basis for extinguishing the agreements that it has achieved with its most important constituents.

---

[15]    Archbishop of Agaña, a Corporation Sole [D.I. 5690]; Diocese of Buffalo, N.Y. [D.I. 5692]; Roman Catholic Diocese of Ogdensburg, New York [D.I. 5693]; Diocese of Rochester [D.I. 5695]; and Roman Catholic Diocese of Syracuse, New York [D.I. 5699] join the RCAHC/UMAHC Objection.

### 3.    The Benefits to the Estate Are Not Illusory.

21.    The insurers party to the Certain Insurers Objection and Century (collectively, the "Objecting Insurers") argue that the benefits of the RSA are illusory for the Debtors' estates and the RSA is without consideration because the Debtors have not received a guarantee under the RSA that the holders of Direct Abuse Claims will vote in favor of the Amended Plan, where only State Court Counsel, the TCC, and the Future Claimants' Representative have signed the RSA and not the claimants themselves.  *See* Certain Insurers Obj. ¶ 4; Century Obj. at 16–19.[16]  These arguments are a red herring.

22.    The RSA contains not only the signatures of the State Court Counsel who are party to the RSA, but each such State Court Counsel has expressly represented and warranted to the BSA that it represents the number of holders of timely filed Direct Abuse Claims listed on Schedule 1 to the RSA.  This totals approximately 60,000 holders of Direct Abuse Claims.[17] Pursuant to the RSA, each State Court Counsel has committed to "use reasonable efforts to advise and recommend to their respective clients (who hold Direct Abuse Claims) to vote to accept the Amended Plan so long as the Amended Plan and the Plan Documents have not been modified to become inconsistent with the Amended Plan and this Agreement."  *See* RSA § IV.A(i). Additionally, the State Court Counsel are required to timely submit master ballots or to use reasonable efforts to cause their clients to timely submit ballots with respect to the Amended Plan. RSA §§ IV.A(iii)–(iv).  These representations and commitments provide the Debtors with assurances that the State Court Counsel who are party to the RSA represent a supermajority of

---

[16]    Old Republic Insurance Company ("Old Republic") [D.I. 5687] and Arch Insurance Company [D.I. 5702] join the Certain Insurers' Objection.

[17]    Century also asserts that there is "no way to verify" the assertion given the lack of any information produced by the Coalition and other State Court Counsel. Century, as a "Permitted Party" under the Bar Date Order [D.I. 695], has access to all underlying Direct Abuse Claims filed in this case and has readily available information in this regard.

Abuse Survivors and that such Abuse Survivors will be encouraged to vote in favor of the Amended Plan.  To assert that there is no consideration for the Debtors unless 60,000 individual Abuse Survivors sign the RSA asks the Debtors to jump through impractical and unnecessary hoops.  The terms of the RSA are enforceable without obtaining and filing 60,000 signatures.  This objection also ignores the other benefits the Debtors are receiving under the RSA: among other things, the stay or resolution of the Restricted Assets Adversary, the Estimation Matters, the Preliminary Injunction, and the Exclusivity Objection, as well as a global resolution framework with the Local Councils that will enable the Debtors to preserve the mission of Scouting.  *See* Whittman Decl. ¶ 7.  The Debtors exercised sound business judgment in determining that these benefits render the RSA in the best interests of the Debtors' estates.

23.    This structure has been implemented in other cases with a large body of creditors and has been approved by other courts.  For example, in *PG&E*, the court approved a restructuring support agreement entered into by the debtors, the official committee of tort claimants, and the attorneys for holders of fire victim tort claims representing approximately 70% in number of prepetition fire claims pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, over the objection of various parties in interest.  *See PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal. Dec. 19, 2019) [D.I. 5038, 5174]; *see also In re Residential Cap., LLC*, Case No. 12-12020 (MG), 2013 Bankr. LEXIS 2601 (Bankr. S.D.N.Y. June 27, 2013) (approving plan support agreement over the objection of various parties, which was signed by the debtors, counsel to the official committee of unsecured creditors, and, among others, attorneys representing a group of consenting claimants).

24.    These examples reflect the practical reality that it is common for estate fiduciaries such as the TCC and the Future Claimants' Representative to sign a support agreement.  To state

that these parties "control[] no votes," Certain Insurers Obj. ¶ 4, ignores the critical role these fiduciaries play in representing the collective interests of abuse survivors in these chapter 11 cases and advocating for such interests.  Indeed, the TCC and Future Claimants' Representative were appointed to safeguard the interests of all tort claimants, including future tort claimants, ensuring that they are adequately represented in the bankruptcy case through consulting with the Debtors concerning the administration of the bankruptcy case, investigating the acts, conduct, assets, liabilities, and financial condition of the Debtors, and the operations of the Debtors.  These fiduciaries are also charged with advising tort claimants about the terms of any plan that is formulated and whether to vote to accept or reject the plan.

### 4.      The Debtors Have Not Abdicated Their Ability to Settle.

25.      The Objecting Insurers also argue that the Debtors relinquished their ability to settle with Insurance Companies or Chartered Organizations under the RSA.  Century Obj. at 33; Certain Insurers Obj. ¶¶ 74–80.  Century asserts that the Debtors have "*forfeited* to the TCC, Coalition, and the FCR the authority to negotiate any such settlements" and have provided the Plaintiff Representatives with a "veto right" that will not foster negotiations with these parties, while Certain Insurers add that the Debtors have abdicated their fiduciary duties to all creditors by ceding "complete control over the remainder of these Chapter 11 Cases" to the Plaintiff Representatives. *See* Century Obj. at 33–34; Certain Insurers Obj. ¶¶ 5, 74–75.  The Objectors cite to *Innkeepers USA Trust* in support of these arguments, arguing that it is "on all fours" because the debtors in that case only obtained the support of one lone creditor among the "critical mass" of creditors needed to support the restructuring, and because the plan support agreement in that case imposed "substantial limitations . . . on the Debtors' ability to engage in discussions regarding a restructuring with any of their other major creditors."  *Innkeepers USA Tr.*, 442 B.R. at 232, 236. The *Innkeepers* decision is inapposite for the reasons that follow.

26.    The Objectors fail to note that in *Innkeepers*, the plan support agreement did not have the support of the unsecured creditors' committee and was opposed by an ad hoc equity committee, among other parties.  *Id.* at 229–30.  Certain Objectors mischaracterize the RSA as having only the isolated support of the Plaintiff Representatives and fail to recognize that, in addition to State Court Counsel representing approximately 60,000 Abuse Survivors, the TCC, and the Future Claimants' Representative, the AHCLC is party to the RSA and the Amended Plan contemplated by the RSA is supported by the Creditors' Committee and JPM.  The RSA and Amended Plan do not put the Debtors on an island with only the Plaintiff Representatives supporting the terms.  As described above, mediation sessions are scheduled to follow the hearing on the Motion, where the RSA Parties will seek to expand support for the RSA, and the Debtors have extended an open invitation and are making significant efforts to reach agreement with, among others, Chartered Organizations.[18]

27.    Century also suggests that the RSA provides the Plaintiff Representatives with a "veto right" over settlements with the Insurance Companies and Chartered Organizations such that settlement negotiations with these constituencies will not be possible.  Century Obj. at 19, 34.  But the RSA does not restrict in any way the Debtors' and other RSA Parties' ability to *negotiate* with these parties.  Rather, the RSA recognizes the practical reality of these cases that it is unworkable

---

[18]    For example, the Church of Jesus Christ of Latter-day Saints did not object to the Debtors' entry into the RSA, but instead reserved its rights with respect to "the proposed Disclosure Statement and Plan and *continues to seek engagement with the RSA Parties regarding the Plan's treatment of Chartered Organizations.*"  Limited Objection and Reservation of Rights of the Church of Jesus Christ Latter-day Saints, a Utah Corporation Sole, to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief [D.I. 5674], ¶ 1 (emphasis added); *see also, e.g.*, July 21, 2021 Hr'g Tr. 9:21–10:16 ("All of these local council contributions . . . are expressly contingent on satisfactory resolution of the issues surrounding chartered organizations. . . . [T]he ad hoc committee and the BSA have had good initial engagement with some of the key chartered organizations and would encourage any chartered partner that is listening right now and that wants to be involved to reach out to the ad hoc committee, or the BSA, or to both so that we can talk.  You are, indeed, a critical part of this global resolution.").

for the Debtors to reach an agreement with one or more Chartered Organizations or Insurance Companies without garnering the support of Abuse Survivors.  The Debtors require the support of the Abuse Survivors in order to confirm a plan that comprehensively addresses Scouting-related Abuse Claims.

### 5.    The Debtors Have Obtained Local Council Commitments.

28.    Century argues that the Amended Plan is not feasible because the Debtors have not obtained a commitment from the Local Councils to make the $500 million cash and property component of their contribution under the RSA.  The RSA commits the AHCLC to use reasonable efforts to persuade Local Councils to make this aggregate contribution, which Century characterizes as "flims[y]."  Century Obj. at 29.  Nonetheless, this promise is not illusory—as reported by Mr. Mason at the omnibus hearing held on July 21, 2021, the AHCLC "expects that local councils will be able to achieve the $500 million," as "[s]tanding here today nearly all of the over 250 independent local councils have submitted letters of intent to contribute cash and property to meet the contribution amount."  July 21, 2021 Hr'g Tr. 8:14–9:15.  The AHCLC expects to have 100% participation by the time of the Disclosure Statement hearing or sooner.  *Id.* at 9:10–13.  A plan feasibility argument is premature at this stage of the proceedings.

**C.    The Narrow Finding of Good Faith, Solely as It Relates to the Negotiation and Proposal of the RSA, if Necessary, Is Appropriate and Does Not Preclude Good-Faith Arguments under Section 1129(a)(3) in Connection with Plan Confirmation.**

29.    Certain of the Objectors take issue with the narrowly tailored good-faith finding in

the Revised Proposed Order.  *See* TCJC Limited Obj. ¶¶ 6–7;[19] Episcopal Church Joinder;[20]

Century Obj. at 34.  The Revised Proposed Order, filed contemporaneously herewith, contains a

good faith finding *only* with respect to the RSA.  Century claims that the Debtors could use the

requested finding to pre-approve the Amended Plan.  Century Obj. at 34 ("The only apparent

reason the Debtors are seeking [the findings] is in the hopes that they can lay the groundwork for

an argument that Amended Plan was proposed in good faith under Bankruptcy Code section

1129(a)(3), or that the Debtors complied with their contractual obligations to cooperate with their

insurers.").

      30.    This conclusion is belied by the clear and express terms of the Revised Proposed

Order.  The Revised Proposed Order provides that (1) "[t]he RSA Parties have been engaged in

extensive arm's-length negotiations and Court-ordered mediation regarding the terms of a plan,"

(2) "[a]s a result of the negotiations among the RSA Parties, on July 1, 2021, the RSA Parties

reached the agreements embodied in the RSA," (3) that "[t]he RSA was negotiated at arm's length,

in good faith," and (4) the Debtors "have determined, in the valid exercise of their business

judgment, that entry into the RSA is in the best interests of the Debtors' estates and their creditors."

*See* Revised Proposed Order, Ex. A, ¶¶ A–D.  These proposed findings are based on record

evidence upon which the Court may grant the relief requested by the Motion.  Overlooking this,

the Objectors conflate clear, narrow provisions that bear only upon RSA negotiations and the

---

[19]    *See* Limited Objection and Reservation of Rights of the Church of Jesus Christ Latter-Day Saints, a Utah Corporation Sole, to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief [D.I. 5674] (the "TCJC Objection").

[20]    *See* Joinder and Reservation of Rights of the Episcopal Church to Limited Objection And Reservation of Rights of the Church of Jesus Christ Latter-Day Saints, a Utah Corporation Sole, to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief [D.I. 5677] (the "Episcopal Church Joinder")

proposal of the resolutions contained therein, on the one hand, with premature and distinct findings of good faith related to the Amended Plan under section 1129(a)(3), on the other hand.  Good faith in the context of the RSA should not be misconstrued with findings of good faith related to the Amended Plan pursuant to section 1129(a)(3), which is not before the Court at this time.

31.      Entry into the RSA is authorized under section 363(b) of the Bankruptcy Code.  As set forth above, the Debtors' entry into the RSA is a sound exercise of the Debtors' reasonable business judgment, which, in the Third Circuit, gives rise to the presumption that the Debtors' decision was made on an informed basis, *in good faith*, and in the honest belief that the action was in the Debtors' best interest.  *See Integrated Res.*, 147 B.R. 650 at 656 (*quoting Smith v. Van Gorkom*, 488 A.2d at 872).  Even absent this presumption, as further described herein, the RSA is a heavily negotiated resolution supporting by each of the Debtors' major creditor constituencies and is the product of several months of Court-sanctioned mediation sessions.  As set forth in the Whittman and Mosby Declarations, the agreements contained in the RSA were the product of intense, hard-fought, arms-length negotiations and reflected a valid exercise of the Debtors' sound business judgement.  As such, the record evidence warrants a finding of good faith and justifies approval of the Debtors' entry into the RSA.  *See, e.g.*, *In re Genco Shipping & Trading Ltd.,* 509 B.R. 455 (Bankr. S.D.N.Y. 2014) (approving settlement that created "tremendous value" for estate and was negotiated at arms'-length and in good faith); *Residential Cap.*, 2013 Bankr. LEXIS 2601, at *19, *71 (approving settlement that reflected "how the chapter 11 process should work" after months-long mediation resolved "scores of issues").  Out of an abundance of caution and in an effort to ensure that the RSA Parties receive the benefit of the agreements contained the RSA, the Revised Proposed Order provides for findings of good faith only in connection with this Court's approval of the RSA under section 363(b).

32.     The Debtors agree that any issue of good faith that may relate to the proposal of the Amended Plan is premature and properly reserved for the Confirmation Hearing, and paragraph 3 of the Revised Proposed Order (which is unchanged from the initial version of the proposed order) expressly and broadly reserves the rights of all parties on this point:

> Notwithstanding any other provision herein, the Court makes no finding or ruling in this Order (a) as to the exhibits to the RSA, the Disclosure Statement, or the Plan for any purpose (other than the authorization to enter into and perform under the RSA), or (b) as to the standard of review or any factor required for approval of the exhibits to the RSA, the Disclosure Statement, or the Plan, or with respect to confirmation of the Plan.  The rights and objections of all parties are reserved with respect to such matters (other than as expressly provided in the RSA as to the Debtors and the RSA Parties).

The Debtors believe that the plain language of the Revised Proposed Order is more than adequate to resolve the Objectors' expressed concerns regarding any requested finding of good faith.

33.     Certain Objectors take further aim at the mediation, claiming that "the process by which the Debtors negotiated and considered the RSA was flawed." Century Obj. at 30.  The process by which the Debtors negotiated the terms of the RSA was the same process ordered by the Court and supervised by its appointed Mediators.  The Debtors engaged in mediation earnestly and in good faith.  As this Court rightly observed, mediations often progress in stages.  July 7, 2021 Status Conference Hr'g Tr. 65:23-66:3 (The Court: "I don't know what happened in mediation and I, certainly from my experience, they all happen differently and they're negotiations, depending on how many parties are involved -- and there are a significant number of parties involved here -- do take place in stages.").  As is customary in a multi-party mediation (with more than 25 mediation parties), the Mediators themselves schedule separate meetings with certain parties, and groups of parties, during the mediation, in stages, to bridge gaps in negotiations and facilitate a dialogue and exchange of ideas.  As the RSA was the product of extensive arms-length negotiations supervised by experienced, Court-appointed Mediators, and provides the

Debtors with a clear path to emerge from bankruptcy, it would be unreasonable and inconsistent with the record evidence to conclude that the Debtors' entry into the RSA was an act of bad faith.

34.    Century claims that, "despite their requests to be involved, insurers were systematically excluded from every meeting between the Debtors and claimants representatives concerning the RSA and the TDPs and Amended Plan associated with it. . ." Century Obj. at 31. While Century has repeatedly sought to disrupt and delay the Debtors' restructuring for its own self-interested reasons, it is not entitled to be party to every meeting, communication, or settlement negotiation with every Mediation Party at all times. *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. Feb. 25, 2019) [D.I. 2243] (court holding that "I can find no case and I can think of no case where there would be a good faith requirement to negotiate with all parties in interest at all times during a bankruptcy case").  Nor is it required to be invited to every such communication.  As the Court observed during the July 21, 2021 omnibus hearing, "[t]he phone goes two ways."  July 21, 2021 Hr'g Tr. 13:19–20.

35.    Nor are the Debtors acting in bad faith by invoking certain privileges, including attorney-client and mediation privilege.  Specifically, the mediation is governed by Delaware law. Under Rule 9019 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), "the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation." Del. L. Bankr. R. 9019-5d(i). This rule is also expressly incorporated by reference in the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 812] (the "Mediation Order").  *See* Mediation Order ¶ 7 ("The provisions of Local Rule 9019-5d pertaining to 'Confidentiality of Mediation Proceedings' shall govern the Mediation[.]").

36.     In keeping with this rule, courts in this district recognize that "[t]he judicial system encourages the resolution of disputes by mediation and settlement. It is axiomatic that the assurance of confidentiality for communications made during the course of settlement negotiations is a critical component of the process." *Chapter 7 Tr. of Student Fin. Corp. v. Pepper Hamilton LLP* (*In re Student Fin. Corp.*), Case Nos. 04-56423, 04-1551 JJF, 05-165-JJF, 2007 U.S. Dist. LEXIS 95882, at *5 (D. Del. May 25, 2007); *see also Wilmington Hosp. v. New Castle Cnty.*, 788 A.2d 536, 541 (Del. Ch. 2001) ("[c]onfidentiality of all communications between the parties or among them and the mediator serves the important public policy of promoting a broad discussion of potential resolutions to the matters being mediated. Without the expectation of confidentiality, parties would hesitate to propose compromise solutions out of the concern that they would later be prejudiced by their disclosure"); *Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 62 (Del. Ch. 2005) (citing "Delaware's recognition that confidentiality is vital to the effectiveness of mediation" and finding that "[t]he process works best when parties speak with complete candor, acknowledge weaknesses, and seek common ground, without fear that, if a settlement is not achieved, their words will be later used against them in the more traditionally adversarial litigation process.").

37.     Century incorrectly cites *Tribune* for the proposition that the Debtors' negotiations are not subject to mediation privilege. Century Obj. at 31.  However, in *Tribune* the court rejected a blanket lifting of mediation privilege citing the need for confidentiality in mediations and instead only allowed limited discovery outside the negotiations.  *See In re Tribune Co.*, Case No. 08-13141 (KJC), Case No. 08-13141 (KJC), 2011 Bankr. LEXIS 299 (Bankr. D. Del. Feb. 3, 2011) (protecting communication among mediation parties concerning mediation to the extent such communications were exchanged on any mediation day and allowing for only limited discovery of communications prior to mediation or outside the presence of a mediator on a day that was not

a mediation day).    Century has sought work product and communications specific to the negotiation and to which mediation privilege applies in violation of Local Rule 9019-5.  The Debtors invocation of that privilege is codified in the Local Rules and supported by applicable law and therefore cannot be an act of bad faith, as Century argues.

### D. Heightened Scrutiny Under the Entire Fairness Standard Is Inapplicable, But Also Would Be Satisfied.

38.    Unable to show that the RSA is not a valid exercise of the Directors' business judgment, the Objecting Insurers incorrectly argue that the RSA should be judged under a heightened standard of scrutiny in light of alleged conflicts between the Local Councils and the Debtors' decision-makers.  Certain Insurers Obj. ¶¶ 23–24; Century Obj. 2, 9–15.  As an initial matter, the Objecting Insurers lack standing to make the objection.  Additionally, the Objecting Insurers' arguments fail as a matter of fact and law.  The entire fairness standard potentially applies only to conflicted transactions between a company and an insider.  Here, the RSA transaction was an independent, arm's-length transaction, with both the Debtors and the AHCLC on the same side of the transaction negotiating against Plaintiff Representatives.  In addition, the Local Councils are not insiders, and the Objecting Insurers have failed to identify any value or benefit that was diverted from the Debtors' estate to the Local Councils.  Furthermore, the Objecting Insurers have failed to meet their burden to establish that any—much less the required majority of—the BSA directors lacked independence or were self-interested.

### 1. The Objecting Insurers Lack Standing to Raise an Entire Fairness Challenge to the RSA.

39.    The Objecting Insurers have no standing to raise an entire fairness objection.  It is well recognized that "[a] party's standing in a bankruptcy case [] is not an all-or-nothing proposition. Rather, it must be determined on a particularized basis as to each theory raised." *M3 Holdings LLC v. Haslam* (*In re Haslam*), Case No. WW-07-1391, 2008 Bankr. LEXIS 4716, at

*12 (B.A.P. 9th Cir. Mar. 31, 2008); *see also In re Ely*, Case No. 19-20818, 2020 Bankr. LEXIS 1164, at *813 (Bankr. W.D. Mo. Apr. 29, 2020) (same); *In re Kowalczyk*, 600 B.R. 806, 813 (Bankr. N.D. 2019) ("[A] party bringing a grievance before a federal court must have a particularized personal stake in each issue it raises—even in a bankruptcy context."); *In re ReoStar Energy Corp.*, Case No. 10-47176, 2012 Bankr. LEXIS 2418, at *2 (Bankr. N.D. Tex. May 30, 2012) ("[B]ecause [the objectors], though clearly parties in interest, have asserted in their objections matters of concern only to constituencies of which they are not members, the court has discounted their objections to that extent."); *Jensen v. Froio* (*In re Jensen*), 369 B.R. 210, 230 (Bankr. E.D. Pa. 2007) ("[A]n entity may be [a] real party in interest and have standing in one respect while [it] may lack standing in another respect." (quoting *In re Ofty Corp.*, 44 B.R. 479, 481 (Bankr. D. Del. 1984)); *In re A.P.I. Inc.*, 331 B.R. 828, 857 (Bankr. D. Minn. Oct. 15, 2005) (finding that the court must "analyz[e] the standing of an objector by its specific stake in each issue that it raises").

40.     Entire fairness is a standard applicable to breach of fiduciary duty claims based on interested party transactions. *See Hampshire Grp., Ltd. v. Kuttner*, Case No. 3607, 2010 Del. Ch. LEXIS 144, at *38 (Del. Ch. July 12, 2010) ("When a corporate director or officer engages in self-dealing, the traditional entire fairness standard would apply."); *In re RJR Nabisco, Inc. S'holders Litig.*, Case No. 10389, 1989 Del. Ch. LEXIS 9, at *40 (Del. Ch. Jan. 31, 1989) ("[I]f the board is financially interested in the transaction, the appropriate form of judicial review is to place upon the board the burden to establish the entire fairness of the transaction."). The Objecting Insurers have no claim or right to bring a claim for breach of fiduciary duty. Rather, any claim alleging breach of fiduciary duty by a BSA director belongs to the Debtors' estates and cannot be brought by an individual creditor. *See Nu Image, Inc. v. Miller* (*In re Our Alchemy, LLC*), Case No. 16-

11596, 2017 Bankr. LEXIS 1969, at *14 (Bankr. D. Del. July 17, 2017) ("A single creditor does not have standing to assert claims for breach of fiduciary duty against a trustee for damages alleged to have been caused to the creditor body at large."); *Schwartz v. Kraeger* (*In re Robert H. Kraeger Co.*), Case No. 99-0026, 1999 Bankr. LEXIS 615, at *13 (Bankr. E.D. Pa. May 24, 1999) (finding that, with respect to fiduciary claims against trustee, individual creditors "lacked standing because their claims properly belonged to the estate and could only be brought through a proper derivative action").

41.     In order to bring a derivative claim on behalf of the Debtors' estates, a creditor must first obtain permission from the Bankruptcy Court, which the Objecting Insurers have not done. *In re Summit Metals, Inc.*, 477 B.R. 484, 502 (Bankr. D. Del. 2012) ("Absent authorization by the bankruptcy court, the Trustee is the only party who can assert a claim for damages on behalf of the bankruptcy estate"); *Sebastian v. Schmitz* (*In re WorldSpace, Inc.*), Case No. 15-25, 2016 U.S. Dist. LEXIS 129497, at *29 (D. Del. Sept. 22, 2016) (A creditor seeking derivative standing has the burden of demonstrating (1) the existence of a colorable claim; (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to pursue the claim). Nor could the Objecting Insurers obtain standing to pursue estate claims.  To the contrary, the Objecting Insurers are acting for themselves to minimize their coverage obligations in conflict with the estate.  *See Metro. Prop. & Liab. Ins. Co. v. Kirkwood*, 729 F.2d 61, 63 (1st Cir. 1984) (finding that insurer's interest in avoiding coverage "conflicts directly with that of the estate"); *In re Leslie Controls, Inc.*, 437 B.R. 493, 502 (Bankr. D. Del. 2010) (finding that insurers and debtors were adverse on the issue of coverage).  The Objecting Insurers are also ineligible for a grant of standing because they are weaponizing objections for leverage.  *See In re Revco D.S., Inc.*, 118 B.R. 468, 476 (Bankr. N.D. Ohio 1990) (denying derivative standing to insurer which was "not an

adequate representative of the creditors" and "the impetus for the derivative suit [was] a bargaining

tool to force the Debtors to include [the insurer] in plan negotiations.").

> ### 2. Entire Fairness Applies Only to a Transaction Between a Company and an Insider.

42.    The mere fact that the AHCLC and the BSA are both signatories to the RSA does

not turn the RSA into an interested transaction.  The entire fairness standard applies to conflicted

transactions between a company and an insider to protect stockholders against a diversion of value

to an insider.  *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 111 (Del. Ch.

1986).  Thus, the standard does not apply where the company and the purported insider are on the

same side of the transaction with a third party.  *Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch.

2003) (finding that entire fairness analysis does not apply where the transaction was not between

directors and the corporation but instead between the directors and third parties, "reject[ing] this

attempt to extend concepts designed to fit classic self-dealing transactions into another context that

is quite different.").

43.    Here, the Debtors and the Local Councils were on the same side of the transaction,

which they each negotiated against the Plaintiffs' Representatives.  Obviously, the Debtors could

not control the Plaintiff Representatives for the benefit of the Local Councils.  And the Objecting

Insurers do not and cannot identify any value that the RSA diverted from the Debtors to the Local

Councils.  Indeed, the RSA does not obligate the Debtors to transfer any financial consideration to

the Local Councils.  Rather, the Local Councils have agreed to contribute $500 million of money

and property that will be transferred to the Settlement Trust from certain Local Councils to pay

Abuse Claims.  In addition, a special-purpose entity will issue a note worth up to $100 million to

the Settlement Trust to pay Abuse Claims.  The special-purpose entity will make payments on the

$100 million note from funds contributed by Local Councils.  Those funds are not being transferred

to the BSA. *See* Motion, Ex. A, Term Sheet, Local Council Settlement Contribution at 8. Those amounts were negotiated between the AHCLC and the Plaintiff Representatives. In exchange for that contribution, the Plaintiff Representatives agreed to support third-party releases of the Local Councils. And there is plainly no conflict between the Plaintiff Representatives, on the one hand, and the BSA and the Local Councils, on the other.

44.      The Objecting Insurers have utterly failed to explain, much less establish, any divergence between the interests of the BSA and the Local Councils with respect to the RSA.[21] Courts routinely reject application of the entire fairness test to a transaction that is set up as the RSA is with the BSA and the Local Councils sitting on the same side of the transaction, with the Plaintiff Representatives, an unrelated third party, on the other side. *See GAMCO Asset Mgmt. v. iHeartMedia Inc.*, Case No. 12312, 2016 Del. Ch. LEXIS 174, at *53 (Del. Ch. Nov. 23, 2016) (finding that entire fairness test did not apply where corporation and shareholders "were clearly not on both sides of the transactions" with third party); *Guttman,* 823 A.2d at 502 (finding that entire fairness standard did not apply where parties were not "sitting at both sides of the negotiating table" but instead dealt with third party buyers); *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) (declining to apply entire fairness where the controlling shareholder "did not stand on both sides" of the challenged transaction negotiated with an unaffiliated third party).[22] The Objecting

---

[21]     As noted above, there is no conflict of interests between the BSA and the local councils with respect to the RSA because their interests are aligned and thus there is no legal basis to apply the entire fairness standard of review. Moreover, the BSA has diligently monitored any potential conflicts between local councils and the BSA, when issues arose concerning potential contributions of local councils to a trust for abuse victims that could be viewed as potentially adverse to the local councils, NEB members who held roles on local council boards were asked to either resign from the local council board or recuse themselves from decisions that could impact local councils. Desai Decl. ¶ 8.

[22]     The cases cited by the Objecting Insurers to support a heightened scrutiny addressed inside transactions and, therefore, are inapposite. In *LATAM Airlines*, the court applied the entire fairness standard because the Debtors' two largest shareholders provided one of the loans for the DIP credit agreement, putting them on opposite sides of the transaction from the Debtors. *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 730 (S.D.N.Y. 2020). This is the opposite of the RSA, where the directors are not on both sides of the transaction, as the BSA and Local Councils each separately negotiated a contributions to the Settlement Trust with Plaintiffs' Representatives.

Insurers have failed to cite a single one of these governing cases or any case applying entire fairness to a transaction where the parties at issue were on the same side, as here.

### 3. The Objecting Insurers Fail to Meet Their Burden of Establishing that the Debtors' Decision Makers Suffered from Any Conflict of Interest.

45. As the RSA transaction is not an insider transaction for which the entire fairness standard could apply, the Court need not consider the Objecting Insurers' baseless allegations concerning the directors' independence and self-interest. Nonetheless, as discussed below, the Objecting Insurers' arguments independently fail on that basis as well.

46. "The burden is on the party challenging the decision to establish facts rebutting the [business judgment] presumption." *Behradrezaee v. Fashtara*, 910 A.2d 349, 361 (D.C. Cir. 2006) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)); *Gavin v. Tousignant* (*In re Ultimate Escapes Holdings, LLC*), 551 B.R. 749, 762 (D. Del. 2016) (finding the business judgment rule is the "default standard of review" and the burden is on the party challenging a transaction to rebut the presumption). The business judgment presumption can be rebutted only by establishing facts that individual members of the board were interested in the outcome of the transaction or lacked independence to consider objectively whether the transaction was in the best interest of the company. *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002). The Objecting Insurers fail as a matter of law to make the required showing that the Directors were either interested or lacked independence.

---

Moreover, the Objecting Insurers do not and cannot allege that any BSA board member is receiving financial consideration for approving the RSA. In *Innkeepers*, the debtors' parent was to receive 50% of the debtors' equity, a detail that was not disclosed to debtors' largest creditor until just a few days before the petition date. *In re Innkeepers USA Tr.*, 442 B.R. 227, 233–34 (Bankr. S.D.N.Y. 2010). Unlike *Innkeepers*, the Debtors are not-for-profit entities and the BSA does not hold any equity in the Local Councils. Moreover, there is not any undisclosed benefit in the RSA. The Local Councils are making a $600 million contribution to the Plaintiffs in exchange for a release, and the BSA is separately making up to a $250 million contribution.

(a)    **The Directors Are Not Conflicted Because They Were Elected By or Associated with Local Councils.**

47.    The Objecting Insurers' central argument that the BSA Board members are "controlled" by the Local Councils merely because such Board members were elected by Local Councils, or because the members of the NEC are affiliated with the Local Councils, is frivolous. Certain Insurers Obj. ¶ 24; Century Obj. at 12. Courts have repeatedly held that the mere fact that a party appointed or elected a director is not sufficient to call into question the independence of the director, or to establish any conflict. As the Delaware Supreme Court explained in the seminal case of *Aronson v. Lewis*, "it is not enough to charge that a director was nominated or elected at the behest of those controlling the outcome of the election to raise a question concerning the independence of a particular director. That is the usual way a person becomes a director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence." *Aronson*, 473 A.2d at 805; *see also In ez EZCORP Inc.*, Case No. 9962, 2016 Del. Ch. LEXIS 14, at *132 (Del. Ch. Jan 25, 2016) ("A director's nomination or election by an interested party is, standing alone, insufficient to raise a reasonable doubt about his or her independence."); *In re Molycorp S'holder Derivative Litig.*, Case No. 7282, 2015 Del. Ch. LEXIS 152, at *27 n.55 (Del. Ch. May 27, 2015) ("Being appointed by a powerful or controlling shareholder does not make one conflicted."); *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014) ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."); *Frank v. Elgamal*, 2014 Del. Ch. LEXIS 37, at *71 (Del. Ch. Mar. 10, 2014) ("Merely because a director is nominated and elected by a large or controlling stockholder does not mean that he is necessarily beholden to his initial sponsor."); *Blaustein v. Lord Baltimore Capital Corp.*, 2013 Del. Ch. LEXIS 108, at *66 n.114 (Del. Ch. Apr. 30, 2013) (finding that

allegations that a director was appointed to the board by and has consistently voted with the alleged controller are insufficient to challenge the director's independence), *aff'd*, 84 A.3d 954 (Del. 2014).

48.     This principle has been re-affirmed so many times that it is egregious (but telling) that the Objectors do not cite to, much less distinguish, a single one of these on-point authorities refuting their central and incorrect argument.  The Objecting Insurers cannot avoid the law by not citing it.  *State Farm Fire & Cas. Co. v. Middleby Corp.*, C.A. Nos. 09C-08-216 PLA, 09C-08-217 PLA, 2011 Del. Super. LEXIS 79, at *16 (Del. Super. Ct. Feb. 8, 2011) ("[C]ounsel would be well-advised to bear in mind the obligations to disclose known adverse legal authority under Delaware Lawyers' Rule of Professional Conduct 3.3(a)(2)"); *In re Council*, Case No. 06-1537, 2006 U.S. Dist. LEXIS 50729, at *10 (E.D. Pa. July 21, 2006) ("[T]he Court finds it highly unfortunate that resources were devoted to extended motion practice concerning a question to which the answer becomes immediately clear upon a brief review of relevant precedent.").

> **(b)    The Directors Are Not Conflicted Because They Receive No Remuneration from the Local Councils or the Debtors.**

49.     The test for determining whether a director is conflicted and lacks independence is typically tied to whether a director has a "financial" and "economic" interest in a transaction.  The rationale is that a director could be motivated to act contrary to the company's interests where he or she is financially motivated to do so.  *See, e.g., In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999) (finding that to challenge a director's independence, a plaintiff must allege a benefit that is "of a sufficiently material importance, in the context of the directors's economic circumstances, as to have made it improbable that [she] could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest");

*Thorpe by Castleman v. CERBCO*, 676 A.2d 436, 443 (Del. 1996) (finding the entire fairness test is inapplicable where directors "had no financial incentive" not to obtain fair price).

50.     Here, not only have the Objecting Insurers failed to explain how the interests of the BSA and the Local Councils diverged with respect to the RSA, the Objecting Insurers simply ignore that the Directors had no financial interest or conflict that would motivate them to act contrary to the interests of the BSA in connection with approving the RSA.  Plaintiffs have failed to identify any Director that receives any compensation from a Local Council, so they have failed to identify any incentive for them to act in a manner contrary to the Debtors' interests and in favor of the Local Councils. Likewise, the Directors are not beholden to the Local Council for electing them to the Debtors because they also receive no remuneration from the Debtors.  To the contrary, the Directors here are volunteers, giving their valuable time to the Debtors for free, so their loyalties cannot be not impugned.   *See, e.g.*, Desai Decl. ¶¶ 2, 6, 19; BSA Corporate Charter § 4 ("[I]t's [BSA's] objection and purposes being solely of a benevolent character and not for pecuniary profit to its members).

51.     Courts have repeatedly declined to find a conflict where, as here, the directors lack any financial interest or conflict as to the challenged decisions.  *See N.J. Bldg. Laborers Pension Fund v. Ball*, Case No. 11-1153-LPS-SRF, 2014 U.S. Dist. LEXIS 32582, at *13 (D. Del. Mar. 13, 2014) ("[T]he Directors have no financial interest . . . and as such, they are not interested in the challenged transactions"); *Warhanek v. Bidzos*, Case No. 12-263-RGA-SRF, 2013 U.S. Dist. LEXIS 133099, at *13 (D. Del. Sept. 18, 2013) (finding lack of self-interest whether the challenged decision "offers no financial benefit to directors," noting that "the interest at issue must be material to the director, and materiality is assessed based upon the individual director's economic circumstances.") (quoting *Freedman v. Adams*, Case No. No. 4199-VCN, 2012 Del. Ch. LEXIS

74, at *17 (Del. Ch. Mar. 30, 2012)); *Gagliardi v. Trifoods Int'l*, 683 A.2d 1049, 1053 n.6 (Del.

Ch. 1996) (rejecting argument that directors were conflicted where plaintiffs failed to identify "a

financial conflict of interest with respect to the [challenged] transaction"); *see also  In re Synthes,*

*Inc.*, 50 A.3d 1022, 1034 (Del. Ch. 2012) (finding that for the entire fairness test to apply, plaintiffs

"must plead that [the defendant] had a conflicting interest in the [m]erger in the sense that he

derived a *personal financial* benefit to the exclusion of, and detriment to, the minority

stockholders") (emphasis added); *In re PNB Holding Co. S'holders Litig.*, Case No. 28-N, 2006

Del. Ch. LEXIS 158, at *41 (Del. Ch. Aug. 18, 2006) (for the entire fairness test to apply, the court

must determine "whether a director received a *personal financial* benefit not shared equally by

stockholders") (emphasis added).

### (c)    The Directors Are Not Conflicted Because They Receive Releases.

52.    Lacking any financial self-interest or conflicts among the Directors, the Objecting

Insurers baselessly argue that the fact that the NEC, the BSA Directors and the Local Councils

will receive releases under the Amended Plan constitutes a purported conflict that "must trigger

heightened scrutiny." Century Obj. at 12–14, 19–21; Certain Insurers Obj. ¶ 25–26. The Objecting

Insurers' argument fails as a matter of law and logic.

53.    Courts have consistently rejected the argument that an agreement is an interested

party transaction due to the presence of director releases.  *See Shabbouei v. Lauren*, Case No.

2018-0847-JRS, 2020 Del. Ch. LEXIS 121, at *19 (Del. Ch. Apr. 2, 2020 ("[T]he argument that a

general release obtained on behalf of a board a directors in a settlement is a basis to characterize

the settlement as an 'interested party transaction' has been squarely rejected by this court"); *In re*

*AbbVie Inc. Stockholder Derivative Litig.*, Case No. 9983-VCG, 2015 Del. Ch. LEXIS 192, at *16

(Del. Ch. July 21, 2015) ("[T]he inchoate benefit to Abbott's directors at the time of the Release .

. . is too attenuated to reasonably support an inference that the Release was a self-dealing transaction").

54.    Indeed, almost every settlement in the history of settlements includes releases for a party that pays consideration. *H-W Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 149 (Del. Ch. 2003) ("It is more or less universally the case that when a corporation pays value to settle a claim, it demands and receives releases in favor of its directors, officers and other agents, in order to preclude the possibility of having to defend against any additional claims arising out of the matters at issue in the settlement. There would be little sense in a rule providing that the presence of such prophylactic measures in a settlement agreement results in that agreement being treated as an interested party transaction."). Again, the Insurers failed to cite any of that governing law.

55.    Further, the notion that the BSA Board was motivated to pursue the RSA because they receive a release is senseless because the previous plans of reorganization both provided the Board with releases. *See Second Mediators' Report* [D.I. 2624], Ex. A (the "Hartford Settlement") § IV.B; BSA Toggle Plan [D.I. 5368], at 167.  Thus, the presence of releases in connection with the RSA could not be of any deliberative significance.  The releases also benefit the Debtors because the Directors are entitled to indemnification from the Debtors.  *See* Desai Decl., BSA Bylaws Art. XIII (Indemnification).  And the Directors are also not conflicted because they are exculpated from liability.  D.C. Code § 29-406.31(d) (2021).

56.    In addition, the releases are in the best interest of the Debtors' estates.  As the Directors have the right to indemnification from the BSA and insurance coverage, if director releases were not provided, the Debtor would not actually resolve all of the claims against it. *JPMorgan Chase Bank, N.A. v. Charter Communs. Operating, LLC* (*In re Charter Communs.*), 419 B.R. 221, 257, 261 (Bankr. S.D.N.Y. 2009) (rejecting application of "entire fairness" standard

and finding that settlement which required that the plan provide releases to debtor directors and officers was in the best interests of the estate and "procedurally efficient," particularly where "most of the Debtor Releasees have indemnification rights such that any claims by the Debtors against them would ultimately lead to claims being asserted against the Debtors").

57.    That the Local Councils will also receive releases likewise does not demonstrate a conflict because the Directors gain nothing from the Local Council releases.  And the Local Councils will pay $600 million in exchange for the releases.  There could be no settlement without the third party release, the very value exchanged for the Local Councils' payment.

### 4.    The RSA Transaction Was Entirely Fair.

58.    Although the RSA transaction is not properly evaluated under the entire fairness standard, the RSA transaction nonetheless is entirely fair to the estates and all relevant constituencies and, therefore, should be approved under any standard.  At core, the Objecting Insurers fail to discharge their burden to prove that the RSA transaction is unfair to any relevant party (or anyone else).  *In re LATAM Airlines Grp., S.A.*, 620 B.R. 722, 771 (Bankr. S.D.N.Y. 2020) ("To demonstrate that they have satisfied the 'entire fairness' standard, the Debtors must show that the Revised Credit Agreement . . . results from fair dealing and reflects a fair price."); *In re Residential Capital, LLC*, 2013 Bankr. LEXIS 2601, at *64 (Bankr. S.D.N.Y. June 27, 2013) ("In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." (quotation marks omitted)).

59.    As to process, the Debtors detail above the extensive, months-long negotiation and mediation among multiple parties, all advised by separate and independent financial and legal advisors.

60.     As to price, the Objecting Insurers notably do not make any relevant arguments at all.  The Objecting Insurers do not argue that the overall consideration the Local Councils agreed to contribute to the Settlement Trust is inadequate, or that either the BSA or the Local Councils should be contributing different amounts than as agreed.  More particularly, the Objecting Insurers' baseless entire fairness argument lacks any explanation of how the Local Councils are getting an unfair benefit and in what amount.  While the Certain Insurers half-heartedly allege that the Chartered Organizations are being treated differently from Local Councils, (Certain Insurers' Obj. ¶ 25)—which has nothing to do with the Objecting Insurers, they simply ignore the fact that Local Councils have agreed to provide $600 million of consideration to the Settlement Trust whereas the Chartered Organizations are not contributing anything.  Moreover, as set forth in the Term Sheet, the Plaintiffs' Representatives agreed that "the Parties shall work in good faith to develop a protocol for addressing participation by Chartered Organizations in the benefits of the Channeling Injunction."  D.I. 5466, Term Sheet at 15.

61.     Crucially, and as extensively discussed above, the RSA and Amended Plan serve as the best basis for working towards a reorganization that would allow the Debtors to emerge from bankruptcy with the least amount of business risk going forward, while providing substantial recoveries to the Abuse Survivors.  The entire fairness of the RSA is shown by the fact that it has been agreed to by each of the major creditor constituencies. The Objecting Insurers, who are not creditors, but rather issued Insurance Policies that are assets of the Estate—and they are in conflict with the estates in trying to minimize their obligations to the estates, should not be heard to raise purported "fairness" objections that are not shared by the Abuse Survivors and other major creditor constituencies.

## II.        Confirmation-Related Objections Are Not Presently Ripe for Consideration

62.        Several Objectors take issue with certain terms and provisions of the Amended Plan and Plan Documents, in an attempt to attack the RSA.  *See*, *e.g.*, Century Obj. at 24-26; Objecting Claimants Obj. ¶¶ 48–49.  Objectors cite, among other things, the third-party release and insurance neutrality provisions of the Amended Plan, the assignment of insurance rights to the Settlement Trust, the scope of the Channeling Injunction, and certain issues in the TDP as reasons the Amended Plan endorsed by the parties through the RSA will not be confirmed.  These are all confirmation issues that will be supported by the Debtors and determined at the Confirmation Hearing.  Although the Motion requests authorization to enter into the RSA, it does not request that the Court approve any provision of the Amended Plan contemplated by the RSA.  Prior to confirmation, these provisions have no binding effect on any entity other than the RSA Parties themselves.  *See*, *e.g.*, *Residential Cap.*, 2013 Bankr. LEXIS 2601, at *8, *72–73 ("Approval of the [plan support agreement] does not bind the objecting parties or the Court from challenging (in the case of the objectors) or rejecting (in the case of the Court) a plan substantially on the terms set forth in the PSA. . . . Most of the objections that have been made are confirmation objections not properly raised or considered at this time.").  This proposition alone dispenses with a substantial portion of the Objections, and the Debtors have expressly reserved for plan-related objections and arguments to be considered in connection with confirmation.

63.        The Objectors' arguments that the RSA contemplates an Amended Plan that is patently unconfirmable are without merit.  Effectively, the Objectors want the Court to draw its conclusions in the reverse—to presently conclude that the Amended Plan contemplated by the RSA will never be confirmed, and then to use this as a basis to deny approval of the RSA.  While this is a predictable strategy, the Amended Plan contemplated by the RSA is not before the Court, and a mini-trial on confirmation is not appropriate in the context of the Motion.  It is well settled

that it is not appropriate to address plan-related issues prior to the Confirmation Hearing.  The Debtors will make their confirmation case at the appropriate time.

### A.     Third-Party Releases

64.     Several Objectors, including Hartford, the Objecting Claimants, and Century, have objected to the propriety of the third-party releases to be proposed as part of the Amended Plan. *See* Hartford Obj. at 34; Objecting Claimants Obj. ¶¶ 56-61; Century Obj. at 26.  Courts in this district and others have established that the propriety of releases and a channeling injunction[23] is an issue to be addressed at confirmation, not before.[24]  As the Debtors will argue at confirmation, the third-party releases in favor of the Local Councils and other Protected Parties and the Channeling Injunction will satisfy the applicable Third Circuit standard for approval.

65.     In the Third Circuit, non-consensual third-party releases are permissible if they satisfy the *Continental* hallmarks of "fairness and necessity to the reorganization," which must be supported by specific factual findings.  *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017) (citing *Gillman v. Cont'l Airlines* (*In re Cont's Airlines*), 203 F.3d 203, 214 (3d Cir. 2000)).  In determining whether such a release satisfies this standard, courts apply the *Master Mortgage* factors:

---

[23]   Hr'g Tr. 67:12, 14-15, *In re Molycorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) [D.I. 1050] (stating that "releases are a confirmation issue"); *see also In re Innkeepers USA Tr.*, 448 B.R. 131, 148 (Bankr. S.D.N.Y. 2011) (holding objections asserting that "release provisions [were] overly broad and should not be approved absent consent of each releasing party" were "best categorized as confirmation objections").  And as the case law cited by the Objecting Claimants confirms, this is a matter for confirmation—not an objection to the RSA.  *In re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331 (Bankr. E.D. Pa. 2010) (evaluating post-confirmation hearing memoranda of law regarding confirmation of plan); *In re Medford Crossings N., LLC*, No. 07-25115, 2011 Bankr. LEXIS 185 (Bankr. D.N.J. Jan. 20, 2011) (ruling on post-confirmation hearing motion for directed verdict that plan is unconfirmable).

[24]   *See In re GUE Liquidation Cos., Inc.*, Case No. 19-11240 (LSS) (Bankr. D. Del. Oct. 23, 2019), Hr'g Tr. at 60:20–62:23 (stating that issues related to releases would be determined at confirmation); *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 3, 2018) Hr'g Tr. at 199:9-13 (declining to rule on appropriateness of releases at the hearing, as such issues are "classically [for] a confirmation hearing"); *In re Molycorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) Hr'g Tr. at 67:12–15 (noting that potential issues with releases should be dealt with at confirmation).

(1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*Id.* (quoting *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)). "These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *In re Washington Mut. Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011).

66.    It would be premature at this stage to determine whether the Channeling Injunction and releases satisfy the *Continental* hallmarks and the *Master Mortgage* factors. Facts material to such a determination continue to be developed. Such facts include the outcome of creditors' votes, the identity of interest of each Protected Party with the Debtors, the total value of contributions to be made to the Settlement Trust and, consequently, the total value of distributions to be made to affected creditors. Indeed, the Amended Plan expressly contemplates that additional parties may qualify to become Protected Parties by making substantial contributions to the Settlement Trust. The Debtors' entry into the RSA helps to obtain the votes necessary to confirm a plan containing third-party releases and a channeling injunction, and the Debtors will demonstrate at the Confirmation Hearing that the Protected Parties have made the required substantial contribution.

67.    The Objecting Claimants also argue that the BSA cannot take the position that releases and injunctions for non-debtors, including the Local Councils and other Protected Parties, is necessary to its reorganization because (a) the BSA previously proposed the BSA Toggle Plan, (b) not a single Chartered Organization (out of more than 40,000) is currently proposed to receive a release under the RSA, and (c) the RSA provides that such relief is optional to any Chartered

Organization that may negotiate to become a "Protected Party." Objecting Claimants Obj. ¶ 58. Since the outset of these cases, however, the Debtors have advocated for a global resolution of Scouting-related sexual abuse claims that would address liabilities of the Debtors and the many non-debtor Local Councils and Chartered Organizations that administer and carry out Scouting programming nationwide. This is because the ability of the BSA to continue its mission depends upon these organizations. The BSA Toggle Plan was always sub-optimal and developed to provide a path out of bankruptcy only if no global resolution could be forged. Moreover, under the BSA Toggle Plan, the Debtors were contributing far less to the Settlement Trust to compensate for the fact that without third party injunctions for non-debtors, the continued existence of at least some, if not many, of the Local Councils would be uncertain at best, thus creating greater risk to the Debtors' ability to achieve their business plan. Likewise, a plan that provides no framework for resolving claims against Chartered Organizations could endanger the relationships with such organizations such that they may no longer make their facilities available for Scouting units. For these reasons, the RSA provides that the RSA Parties will work in good faith to develop a protocol for addressing Chartered Organizations under the Amended Plan. As such, under the proposed Amended Plan, as will be demonstrated further at plan confirmation, the third party injunctions are indeed essential to the reorganization.

### B.    Insurance Neutrality

68.    Several Objectors, including the Objecting Insurers and Old Republic, have objected to the Motion on the grounds that the Amended Plan is not insurance neutral because it nullifies certain contractual rights and coverage defenses.[25] Century Obj. at 7; Certain Insurers

---

[25]    *See* Old Republic's Objection and Joinder to Certain Insurers' Objection to the Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief [D.I. 5687] (the "Old Republic Objection").

Obj. ¶ 57; Old Republic Obj. ¶ 7.   As stated above, this issue is properly addressed at the Confirmation Hearing, as the Motion does not request approval of any insurance provisions of the Plan.

69.     Regardless, the concerns of these Objectors are addressed by the terms of the Amended Plan and RSA.  Consistent with binding Third Circuit precedent, the Amended Plan contains the following language to protect the pre-petition rights of all Insurance Companies:

> Except for the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made by the District Court in the Affirmation Order, ***nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights or obligations under an Insurance Policy*** . . . of any Non-Settling Insurance Company . . .").

*See* Amended Plan § X.M.1 (emphasis added).

70.     Moreover, similar findings to those set forth in the RSA are currently before the court in *In re Purdue Pharma*.[26]  In any event, the Court will determine all disputed issues with respect to the Insurance Policies at confirmation, and not in conjunction with the RSA, which is simply a contract to support the Amended Plan.

---

[26]    *See In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y June 14, 2021) [D.I.3185], Plan § 5.10 ("Nothing in the Plan, the Plan Documents or the Confirmation Order shall alter, supplement, change, decrease or modify the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies; provided that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies, and thus the rights or obligations of any of the Insurance Companies, the Debtors and the applicable post-Effective Date Entities, including the Master Disbursement Trust, arising out of or under any Purdue Insurance Policy, including any MDT Insurance Policy, whether before or after the Effective Date, are subject to the Bankruptcy Code and applicable law (including any actions or obligations of the Debtors thereunder), the terms of the Plan and the Plan Documents, the Confirmation Order (including the findings contained therein or issued in conjunction therewith, including but not limited to any findings pursuant to Sections 5.2 and 5.6(i) of the Plan) and any other ruling made or order entered by the Bankruptcy Court.").

C.    **It Is Premature to Consider Objections Relating to the Anti-Assignment Provisions of the Debtors' Insurance Policies.**

71.    In its Objection, Century asserts that the RSA cannot be approved because it is premised on an "unconfirmable plan" that seeks to "override the anti-assignment clause in an insurance contract without the insurer's consent." Century Obj. at 24. To be clear, the Motion does not seek approval of any insurance assignment provisions of the Plan. As such, this issue is not ripe for judicial consideration and should be addressed at the Confirmation Hearing. Century is nevertheless incorrect. As the Debtors will demonstrate at confirmation, the Court has the power to assign the insurance policies despite any anti-assignment provisions thereof. Numerous courts, including the Third Circuit, have held that the transfer of a debtor's insurance rights to a personal injury trust is valid and enforceable pursuant to section 1123(a)(5) of the Bankruptcy Code, notwithstanding any anti-assignment provisions in such insurance policies.[27]

72.    In its objection, Century relies on *Federal-Mogul*, arguing that the Third Circuit permits *for-profit* debtors to override anti-assignment clauses in debtor insurance contracts in limited circumstances. Century Obj. at 24 (citing *In re Fed.-Mogul Glob.*, 684 F.3d 355, 382 (3d Cir. 2012)). Whereas, Bankruptcy Code section 1129(a)(16) requires *non-profit* debtors to comply with applicable non-bankruptcy law when transferring any property by "keep[ing] in place the state law restrictions on such nonprofit entities." Century Obj. at 24 (quoting 7 Collier on Bankruptcy ¶ 1129.02[16] (16th ed. 2021)).

---

[27]    *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004) (providing that "even if the subject insurance policies purported to prohibit assignment of [the debtor's] insurance proceeds, these provisions would not prevent the assignment of proceeds to the bankruptcy estate"); *In re Fed.-Mogul Glob., Inc.*, 385 B.R. 560, 567 (Bankr. D. Del. 2008) ("[Section] 1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies may be assigned to a trust or other entity."); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 94-95 (Bankr. D. Del. 2006) (holding that insurance policies are property of the estate under section 541 and "[s]ection 1123(a)(5)(B) expressly permits the assignment of a debtor's interest in insurance policies to a trust or other entity, even if the subject insurance policies contain a prohibition on assignment"); *In re Congoleum Corp.*, No. 03-51524, 2008 Bankr. LEXIS 2375, at *6 (Bankr. D.N.J. Sept. 2, 2008) ("[A] plan of reorganization may assign insurance policies to a personal injury trust despite the existence of anti-assignment clauses in those policies.").

73.     However, in *Federal-Mogul*, the Third Circuit did not differentiate between for-profit and non-profit debtors.  In fact, the Third Circuit held that the debtors' plan did *not* violate anti-assignment provisions in relevant insurance policies where there was no evidence of collusion, the insurers had "no economic incentive to prevent [the] assignment, particularly whereas here, the events creating exposure to asbestos liability ha[d] already occurred," and "there [would] be no additional risk to the insurance companies by virtue of the assignments." *Federal-Mogul*, 684 F.3d at 379.  Indeed, numerous other mass tort cases have confirmed plans that assign rights under insurance policies containing anti-assignment provisions.[28]

74.     The Debtors will further demonstrate the appropriateness of the insurance assignment provisions of the Amended Plan at the Confirmation Hearing, but, at this stage, the Court should overrule any objection to the insurance assignment provisions as it relates to the approval of the RSA.

**D.     Anti-Assignment Provisions of Local Council and Chartered Organization Insurance Policies**

75.     The Roman Catholic and United Methodist Ad Hoc Committees have objected to the assignment of Local Council and Chartered Organization rights under Abuse Insurance Policies due to anti-assignment provisions included in such policies.  RCAHC/UMAHC Obj. ¶¶ 10–11.  As stated above, this issue is unripe and should be addressed at the Confirmation Hearing—the Motion does not seek approval of any insurance assignment provisions of the Amended Plan.

---

[28]     *See In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) [D.I. 1115] (confirming chapter 11 plan where debtors' insurance rights and policies were assigned to a trust and any anti-assignment contractual provisions were preempted); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 20, 2018) [D.I. 2116] (same); *In re Duro Dyne Nat'l Corp.*, No. 19-cv-15433-MAS (D.N.J. Oct. 23, 2020) [D.I. 1332] (same); *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Oct. 28, 2010) [D.I. 382] (same).

76.     Nevertheless, the Debtors believe that *Johns-Manville* supports their position on assignment of rights under shared insurance policies.  *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 90–91 (2d Cir. 1988).  Even so, the Debtors and other parties to the RSA are committed to continue to work with the Chartered Organizations to resolve their concerns, as set forth in the RSA.

77.     Moreover, the arguments by the Objecting Insurers and the Objecting Claimants related to objections that a plan cannot transfer non-debtor policy rights is similarly unsupported. Century Obj. at 24; Certain Insurers Obj. ¶¶ 71–73; Objecting Claimants Obj. ¶¶ 34–42.  The text of section 1123(a)(5) does not limit its preemptive scope only to debtor contracts.  *See* 11 U.S.C. § 1123(a)(5) (providing adequate means for a plan's implementation "notwithstanding *any otherwise applicable nonbankruptcy law*" (emphasis added)).  Regardless, such arguments are not relevant to the approval of a restructuring support agreement and are more appropriately raised at confirmation.

### E.     Post-Confirmation Channeling Injunction

78.     The Objecting Claimants assert that the Debtors cannot extend the protections of the Channeling Injunction to benefit parties who are not Protected Parties at the time of the Confirmation Hearing.  *See*, *e.g.*, Objecting Claimants Obj. ¶¶ 40, 63–71.  But as the Debtors will demonstrate at the Confirmation Hearing, the provisions of the Amended Plan that will permit additional parties to become Protected Parties following the Effective Date with the approval of the Settlement Trustee are permissible, and consistent with relief granted by other courts.[29]

---

[29]     *See*, *e.g.*, *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) [D.I. 2120] (confirming plan authorizing certain OEMs to elect to become "Participating OEMs" receiving protection of channeling injunction during specified post-effective date opt-in periods); *In re Christian Brothers' Inst.*, Case No. 11-22820 (Bankr. S.D.N.Y. Jan. 13, 2014) [D.I. 652] (confirming plan authorizing a person or entity to become a Participating Party after the effective date of the plan upon approval by the bankruptcy court and the consent of the trustee).

F.    **Trust Distribution Procedures**

1.    **Debtors Have Not Ceded Control of the TDP to the Plaintiff Representatives.**

79.    Certain Objectors, including the Objecting Insurers, have argued that that the RSA cedes complete control of the case and the TDP to the Plaintiff Representatives, and therefore, the RSA Parties have not acted in good faith.  Certain Insurers Obj. ¶ 74; Century Obj. at 18.  The evidence submitted does not support this conclusion.  To the contrary, as is detailed in the Whittman Declarations and the Desai Declaration, the terms of the RSA and all related documents, including the TDP, were heavily negotiated at arm's length and in good faith.  Moreover, under the RSA the Debtors still maintain control over all aspects of the plan process, subject in certain specified instances to the consent of the other RSA Parties.  The Debtors have thus not "ceded" any control over their cases, process or Plan Documents, but have rather negotiated—pursuant to the Court-ordered mediation—the RSA with their largest creditor constituencies in these cases.

80.    Once again, the Objectors that raise this alleged issue are conflating what they perceive (incorrectly) to be a lack of good faith in the Amended Plan—issues that they will be able to raise as 1129(a)(3) objections at confirmation—with whether the RSA itself was negotiated in good faith.  No Objector has provided any evidence to suggest that the Debtors or any other party failed to act in good faith in negotiating the RSA.  Bad faith does not exist simply because a party-in-interest disagrees with the structure of the plan.  *See In re W.R. Grace & Co.*, 729 F.3d 332, 347 (3d Cir. 2013) ("We reject [objecting asbestos claimants'] implication that [the debtor's] failure to negotiate directly with [the claimant] undercuts the overall [p]lan's fundamental fairness . . . . [We] note that a creditor's disagreement about the handling of its claim does not that necessarily evince bad faith by the [p]lan's proponents."); *see also In re Barnes*, 309 B.R. 888, 893 (Bankr. N.D. Tex. 2004) ("[T]he fact that a plan proposed by a debtor is not the one that the creditors would have

proposed does not make the plan one that has not been filed in good faith."). This objection is premature and inaccurate, and should be considered only at the appropriate time—plan confirmation.

## 2. Indirect Abuse Claims Treatment

81. Several Objectors argue that the Amended Plan unfairly discriminates against holders of Indirect Abuse Claims. *See* Certain Insurers' Obj. ¶ 22; TCJC Obj. ¶ 1; RCAHC/UMAHC Obj. ¶ 3; Century Obj. at 7–8. These issues relate to the terms of the TDP, which are part of the Amended Plan documents—issues that are not before the Court and are not ripe for consideration.

82. In any case, the proposed TDP merely tracks the statutory language under the Bankruptcy Code, providing that Indirect Abuse Claims must be eligible to receive compensation under applicable provisions of the Bankruptcy Code, including sections 502 and 509(c). TDP § IV.B. If any of the Indirect Abuse Claims should be subject to subordination or disallowance pursuant to section 502(e) or section 509(c) of the Bankruptcy Code, the Amended Plan and TDP cannot contravene the requirement of the Bankruptcy Code, or improve recovery for the Indirect Abuse Claimants to the detriments of other stakeholders. The Coalition, TCC, and Future Claimants' Representative have outlined numerous Bankruptcy Code provisions and precedent case law that require subordination of Indirect Abuse Claims under these circumstances.[30]  *See* Joinder [D.I. 5678]. The mechanism by which Chartered Organizations can become Protected Parties under the Amended Plan remains to be finalized, and the Debtors have been working with

---

[30]   *See* Joinder of the Coalition of Abused Scouts for Justice, the Official Committee of Tort Claimants, and the Future Claims Representative to, and Brief in Support of, Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief [D.I. 5680] (the "Plaintiff Representatives' Brief").

their professionals and interested parties to develop a comprehensive plan that will maximize the recovery for the estate and creditors and lead to resolutions and support from Chartered Organizations.

### 3.    Turnover Provisions

83.    The TCJC's limited objection and reservation of rights and the Roman Catholic and Methodists joinder thereto pertains to the provisions in the RSA that would require Chartered Organizations to provide privileged information to the Settlement Trust as a condition to participating in a global resolution under the Plan.  TCJC Obj. ¶ 2.  At this time, the TCJC is not a Protected Party. And while the Document Agreement is still being negotiated, there will be requirements to become a Protected Party that are not monetary in nature, such as the turnover provisions.  For the Settlement Trust to function as envisioned and to settle and liquidate Abuse Claims, it will need certain information that the Protected Parties have with respect to Abuse Claims.  The turnover provisions are reasonable in light of the protections afforded Protected Parties under the Amended Plan.

### 4.    Trust Distribution Procedures Valuations

84.    The Objecting Claimants argue that the procedures for valuing claims in the TDP shortcut insurance liability and present a "massive risk."  Objecting Claimants Obj. ¶¶ 43–45.  The Objecting Claimants rely heavily on the California appellate decision in *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958 (Cal. Ct. App. 2006).  Objecting Claimants Obj. ¶¶ 46–47.

85.    The TDP establish the methodology for resolving Abuse Claims and specify liquidated values for compensable claims based on the nature of the underlying Abuse and the BSA's historical resolution of similar claims in the tort system.  *See* Disclosure Statement Art. VII.

86.     The Debtors will demonstrate at confirmation that the procedures for valuing claims in the TDP are proper, and that the findings required under the RSA will not result in a *Fuller-Austin* or *Flintkote* outcome.[31]

### 5.    Power of Settlement Trustee

87.     The Objecting Claimants allege that the powers vested in the Settlement Trustee[32] are improper and exceed the authority of the Court by delegating its statutory authority and judicial duties to the Settlement Trustee and Settlement Trust Advisory Committee.  Objecting Claimants Obj. ¶¶ 48, 55.  Furthermore, the Objecting Claimants argue that the post-confirmation addition of Protected Parties by the Settlement Trustee is unlawful because it ignores any requirement that releases be approved by the constituency of those affected by the decision.  Objecting Claimants Obj. ¶ 53.

88.     The Settlement Trustee's discretion under the Amended Plan is in line with precedent trust agreements in other mass torts chapter 11 cases.[33]  The Settlement Trust Agreement under the Amended Plan, to be filed, is not novel or unusual.[34]  The Objecting Claimants' objection

---

[31]   With respect to arguments related to the findings required by the RSA, the Coalition, TCC, and Future Claimants' Representative have addressed those in detail.  *See* Joinder [D.I. 5678].

[32]   Certain Objectors have also challenged the proposed Settlement Trustee, which is an issue that should be resolved at confirmation.

[33]   The Settlement Trust Agreement enumerates the Settlement Trustee's powers, duties, and limitations. These include, among others: the power to distribute assets of the Settlement Trust to holders of Abuse Claims pursuant to the terms and conditions and the procedures for distributions established in the Trust Distribution Procedures; to assist the Litigation Trustee to prosecute Settlement Trust Causes of Action, the Insurance Actions, and the Insurance Coverage Actions on behalf of holders of Abuse Claims; to enforce the Settlement Trust's rights in the Settlement Trust Assets, including through judicial proceedings or bankruptcy/insolvency proceedings; and to make, sign, execute, acknowledge, and deliver any documents that may be necessary or appropriate to effectuate the purposes of the Settlement Trust or to maintain and administer the Settlement Trust.  *See* Third Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, Ex. B-1, Settlement Trust Agreement § 4.1 [D.I. 5484].

[34]   *See, e.g.*, *In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) [D.I. 5117-1] ("Subject to the Plan and this Trust Agreement, the Trustees shall have the power to take any and all actions that they may consider necessary, appropriate or desirable to fulfill the purpose of the Trust, including each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware."); *In re Flintkote Co.*, Case No. 04-11300 (JKF) (Bankr. D. Del. Feb. 9, 2015) [D.I. 8706-1] ("Except as required by applicable law, the Plan or this Trust

is ultimately a criticism of the substance of the TDP and is not appropriate at this phase of the proceedings and can only be resolved at confirmation.[35]  At the Confirmation Hearing, the Debtors intend to demonstrate that the Settlement Trustee will resolve claims in accordance with the Settlement Trust Documents in such a way that holders of Abuse Claims are treated fairly, equitably, reasonably in light of the finite assets available to satisfy such claims, and otherwise comply in all respects with the requirements of the Bankruptcy Code.

### 6.    Lack of Future Claims Fund

89.    The Objecting Claimants contend that lack of a future claims fund renders the Amended Plan patently unconfirmable as the RSA seeks to provide a release and injunction of future claims against non-debtors without ensuring that those future claimants will receive a substantially similar recovery as the current creditors.  Objecting Claimants Obj. ¶ 78.

90.    At the outset of these Chapter 11 Cases, the BSA determined that it was essential and appropriate to engage an independent third-party representative for holders of Future Abuse Claims.  After considering possible candidates for the role, the BSA selected James L. Patton, Jr. in early 2019 to serve as the future claimants' representative.[36]  As the Objecting Claimants point out in their objection, the BSA acknowledged that "it is important to the Debtors' restructuring efforts that the interests of any Future Claimants be adequately represented through these chapter

---

Agreement, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder."); *In re Yarway Corp.*, Case No. 13-11025 (BLS) (Bankr. D. Del. April 8, 2015) [D.I. 859-1] ("Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of the Asbestos PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental hereto and any trust power now or hereafter permitted under the laws of the State of Delaware."); *In re Garlock Sealing Tech., LLC*, Case No. 10-BK-31607 (Bankr. W.D.N.C. April 03, 2017) [D.I. 5795-3] (same).

[35]    The Debtors reserve all rights with respect to any Objections regarding the Settlement Trust and TDP not addressed herein as such Objections should be addressed at confirmation.

[36]    On April 24, 2020, the Court entered an order approving Mr. Patton to act as legal representative for holders of Future Abuse Claims [D.I. 486].

11 cases." Objecting Claimants' Obj. ¶ 81 (citing D.I. 223).  Moreover, the Settlement Trust

Agreement provides for the continuation of the Future Claimants' Representative to represent the

interests of holders of Future Abuse Claims.[37]

Ignoring the fact that the Objecting Claimants' objection raises a confirmation issue to be decided

later, the Debtors, in conjunction with the Future Claimants' Representative himself do not believe

that a fund is necessary in these cases for  Future Abuse Claimants.  Direct Abuse Claims include

Future Abuse Claims and their treatment under the Amended Plan is the same.  *See* Amended Plan,

TDP, § IV.C.  The Objecting Claimants' Objection that the "lack of a future claims fund renders

the plan patently unconfirmable" is, once again, a plan confirmation issue that must be resolved at

confirmation.

### 7.    Expedited Distribution Procedures

91.    Contrary to the objections of the Objecting Insurers, the Expedited Distribution

does not guarantee payment for all Abuse Claimants.  *See* Century Obj. at 8, 25; Certain Insurers

Obj. ¶¶ 19–20, 67.

92.    In order to receive an Expedited Distribution under the Trust Distribution

Procedures, the Direct Abuse Claimant must have timely submitted a "properly and substantially

completed, non-duplicative Abuse Claim Proof of Claim or Future Abuse Claim" that the claimant

---

[37]    As explained in the Amended Plan and Disclosure Statement, "Future Abuse Claim" means any Direct Abuse Claim against any Protected Party that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose; provided, however, that with respect to any Contributing Chartered Organization, the term "Future Abuse Claim" shall be limited to any such Direct Abuse Claim that satisfies either (a) or (b) and is attributable to, arises from, is based upon, relates to, or results from, Abuse that occurred prior to the Petition Date in connection with the Contributing Chartered Organization's sponsorship of one or more Scouting units. *See* Amended Plan, § I.117; *see also* Disclosure Statement, § IV.A.

has signed, "attesting to the truth of its contents under penalty of perjury" or supplemented "to provide such verification." *See* TDP § VI.A.  The addition of the attestation requirement to the revised TDP further safeguards the option against fraud and abuse. *See* Second Amended Plan [D.I. 2595], TDP § 3.1 (not requiring attestation).  Additionally, in order to properly make the Expedited Distribution Election, the Direct Abuse Claimant must not only have timely submitted a proof of claim under Article IV.A, but the proof of claim must be properly and substantially complete.  Finally, to receive a payment the Direct Abuse Claimant must execute a release, which shall include a release of the Settlement Trust, the Protected Parties, and all Chartered Organizations. *See* TDP § IV.B. This requirement, among other things, provides the Settlement Trust the ability to confirm the identity of the claimant that has properly and substantially complete proof of claim under oath, and further safeguards the option against fraud and abuse.  The Objecting Insurers' have not demonstrated that the "the only people who will avail themselves of this option" are fraudulent claimants.  Century Obj. at 25.

93.    As with other objections to the TDP, this objection is a confirmation issue and need not be determined in connection with approval of the Motion.  As the Debtors will demonstrate at confirmation, the Expedited Distribution is a "quick pay" option that is essentially a convenience class treatment.   Moreover, the Expedited Distribution will help reduce the administrative costs to the Settlement Trust that would otherwise reduce the amount available to compensate holders of Direct Abuse Claims, and likely substantially delay the time it will take for the Settlement Trust to evaluate and compensate Abuse Claims.   In short, the multi-step process of evaluating, validating and potentially reconsidering every Direct Abuse Claim will take time and cost money. The sheer number of Abuse Claims—in excess of 80,000—presents enormous review and process challenges, and being able to pay holders that so elect a modest recovery to ease these challenges

will help the Settlement Trust be more efficient and compensate holder of Abuse Claims faster. Indeed, the Expedited Distributions preserve the Debtors' estates, including for holders of Abuse Claims who do not elect to participate in the Expedited Distribution, and Courts have approved similar provisions. *See In re Roman Catholic Church of the Diocese of Tucson*, Case No. 04-04721 Bankr. D. Ariz. Sep. 21, 2005) [D.I. 887], Debtors' Third Amended and Restated Plan of Reorganization, ¶¶ 2.127, 12.4 (providing for payment of $15,000 for claims that had been objected to on statute of limitation grounds but were otherwise credible, without requiring evidentiary standards); s*ee also In re Catholic Diocese of Wilmington, Inc.*, Case No. 09-13560, (Bankr. D. Del. Aug. 8, 2011) [D.I. 1493], Conformed Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc., ¶ 10.6 (providing for payments of $75,000 or $25,000 for holders of abuse claims who had elected treatment as "Survivor Convenience Claims"). The Objections to the Expedited Procedures are thus not only premature, but also unfounded.

G. **The Court Has Subject Matter Jurisdiction over Claims of Local Councils and Chartered Organizations Related to Scouting.**

94. Despite the Objecting Claimants' assertions otherwise, the Court has jurisdiction over the matters contemplated in the RSA. The Objecting Claimants argue that the Court "does not have the authority or jurisdiction to demand that nonderivative claims against these non-debtor third parties be channeled [into a trust under 11 U.S.C. § 524(g)]." Objecting Claimants' Obj. ¶ 17. Setting aside the section 524(g) issues, which are not applicable to this case, the channeling of Abuse Claims against Local Councils and Chartered Organizations to the Settlement Trust as contemplated in the RSA is well within the jurisdiction of this Court. At a minimum, the Court has sufficient "related to" jurisdiction.

95.     The Third Circuit's test—which has been adopted by the Supreme Court—for determining whether a civil proceeding is "related to" the bankruptcy is "whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original).  While Congress did not delineate the scope of "related to" jurisdiction, "its choice of words suggests a grant of some breadth." *Celotex*, 514 U.S. at 307.  "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with *all matters* connected with the bankruptcy estate." *Pacor*, 743 F.2d at 994 (emphasis added); *see also* H. Rep. No. 95-595, at 43-48 (1977).

96.     Abuse Claims against Local Councils and Chartered Organizations necessarily relate to the Debtors and involvement in Scouting specifically.  To be clear, claims against Local Councils and Chartered Organizations that have no connection to Scouting will not be channeled to the Settlement Trust.  Historically, Abuse Claims asserted against a Local Council or Chartered Organization have also asserted liability against the Debtors.  There exists an identity of interests and shared insurance, and the nature of the actions asserted against all parties is intertwined.  Thus, the claims that will be channeled to the Settlement Trust directly implicate the Debtors and their estates, easily satisfying the *Pacor* test, as the outcome of those proceedings would have a clear effect on Debtors' estate.  Moreover, many Chartered Organizations have asserted rights to indemnity from the Debtors.  *In re Combustion Eng'g, Inc.*, 391 F.3d at 226 (holding that "'related to' jurisdiction [exists] over actions [against] nondebtors involv[ing] contractual indemnity obligations between the debtor and nondebtor that automatically result in indemnification liability against the debtor").  The Objecting Claimants fail to articulate how Abuse Claims, including indemnification claims or other attendant liability thereto, do not fall within the ambit of "related

to" jurisdiction.  Instead, the Objecting Claimants seek to characterize Abuse Claims that will be channeled into the Settlement Trust as somehow being wholly independent and "nonderivative" of the Debtors.  But Local Councils do not have any function outside of Scouting, and claims against the Local Councils invariably implicate Scouting.  Likewise, the definition of "Abuse Claims" specifically limits claims against Chartered Organizations to claims "in connection with the Contributing Chartered Organization's sponsorship of one or more Scouting units." *See* Amended Plan, § I.A.  Moreover, the effect of litigation and potential judgments entered against the Local Councils and Chartered Organizations would impact the day-to-day operation of the Debtors as they depend on the support provided by Local Councils and Chartered Organizations to carry out their charitable mission.  Thus, as the Debtors will demonstrate at the Confirmation Hearing and need not establish now, ample grounds support the Court's exercise of jurisdiction over this matter.

### H.    Any Argument About Equitable Mootness Is Unfounded and Premature.

97.    The Objecting Claimants argue that "BSA would be forced to rely on the doctrine of equitable mootness to prevent its unraveling on appeal."  Objecting Claimants Obj. ¶¶ 90–93.  This argument is both absurd and, to the extent it may be valid—which it is not—premature.  The Objecting Claimants' equitable mootness argument is premised on the presumption that this Court would confirm an unconfirmable plan of reorganization.  By the Objecting Claimants' own admission, equitable mootness is a doctrine "by which an *appellate* court deems it prudent for practical reasons to forbear deciding an appeal when to grant the relief requested will undermine the finality and reliability of consummated plans of reorganization."  Objecting Claimants Obj. ¶ 91 (emphasis added) (quoting *In re Tribune Media Co.*, 799 F.3d 272, 277 (3d Cir. 2015)).  The Objecting Claimants assert that equitable mootness applies where the plan has been consummated and the relief requested will "(a) fatally scramble the plan and/or (b) significantly harm third parties

who have justifiably relied on plan confirmation." Objecting Claimants Obj. ¶ 91 (citing *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 140 (3d Cir. 2019)). Here, the Amended Plan has not been confirmed or consummated—thus equitable mootness is wholly irrelevant to this Court's analysis.

98.     The Objecting Claimants *admit* that "equitable mootness is ultimately a post-confirmation issue." Objecting Claimants Obj. ¶ 92. Thus, by the Objecting Claimants' own admission, an argument based on equitable mootness is baseless and premature where there is no consummation of a plan. It would be premature at the plan confirmation stage, and it is premature now.

## III.     Payment of the Coalition Professionals' Fees and Expenses Under the RSA Will Benefit the Estates.

### A.     Payment of the Coalition's Fees and Expenses Is Properly Authorized Under Section 363 of the Bankruptcy Code.

99.     Several Objectors—including the Objecting Insurers and the U.S. Trustee—assert that the Debtors are not authorized to reimburse the Coalition's professional fees based on the argument that the Coalition has not made a "substantial contribution" as required under section 503(b) of the Bankruptcy Code. Certain Insurers Obj. ¶¶ 37–56; U.S. Trustee Obj. ¶¶ 15–33; *see generally* Century Coalition Fee Objection.[38] However, as explained below, the Court may properly approve the payment of the Coalition Professionals' fees and expenses pursuant to section 363(b) of the Bankruptcy Code in connection with the approval of the RSA.

100.     Section 503(b) of the Bankruptcy Code is not the exclusive avenue for payment of the professional fees of a creditor group. As the court in *Adelphia* recognized, in reviewing

---

[38]     *See* Century's Objection to the Payment of the Coalition's Lawyers in Accordance with the Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief [D.I. 5709] (the "Century Coalition Fee Objection").

whether creditors' legal fees were authorized outside of section 503(b) and pursuant to section 1129(a) as provided in the debtors' chapter 11 plan, "section 503(b) does not provide, in words or in substance, that it is the *only* way by which fees of this character may be absorbed by an estate." *In re Adelphia Commc'ns Corp.*, 441 B.R. 6, at *12 (Bankr. S.D.N.Y. 2010); *see also U.S. Trustee v. Bethlehem Steel Corp.* (*In re Bethlehem Steel Corp.*), Case No. 02-Civ. 2854 (MBM), 2003 U.S. Dist. LEXIS 12909, at *39 (S.D.N.Y. July 23, 2003) ("The authorization of certain types of payments under § 363(b) is not prohibited simply because there is another section of the Bankruptcy Code related to the same type of payment."). The *Adelphia* court noted that this view is further supported by the construction of section 503(b)—the word "including" precedes the permissible list of administrative claims that may be paid under section 503(b), which is "not limiting." *Adelphia*, 441 B.R. at *12 n.18 (citing 11 U.S.C. §§ 102(3), 503(b)).

101.    Despite the Objectors' attempts to distinguish it, the facts of *Bethlehem Steel* are analogous to the Debtors' request to authorize payment of the Coalition's fees under section 363(b) in connection with approval of the RSA.   There, the debtors sought to reimburse certain professional fees and expenses of a union that represented eighty percent (80%) of the debtors' employees pursuant to a motion seeking authority to reimburse the union under sections 363(b) and 105(a). *Bethlehem Steel*, 2003 U.S. Dist. LEXIS 12909, at *3–4.  The debtors argued that section 363(b) was appropriate if the debtors demonstrated a valid business reason for the transaction.   Payment of the union's fees was necessary for the union to fully participate in negotiations to modify the collective bargaining agreements, which were critical to the debtors' successful reorganization.    *Id.* at *24.  The *Bethlehem Steel* court declined to adopt the U.S. Trustee's assertion that section 503(b) provided the exclusive avenue for payment for a creditor to have its professional fees reimbursed and instead held that section 503(b) does not preclude a

debtor's reliance on section 363(b) to authorize its reimbursement of a creditor's professional fees. *Id.* at *23, *35.

102.    The court explained that section 503(b) and 363(b) serve two distinct purposes in bankruptcy proceedings, and are temporally distinct—section 363(b) is prospective, and "governs the use of funds by the debtor . . . *while it operates its business* after the bankruptcy petition is filed." *Id.* at *36.  In contrast, section 503(b) permits a creditor that has *already incurred* expenses to request retrospective payment from the estate.  *Id.* at *35–36; *see also In re ASARCO LLC*, 441 B.R. 813, 824 (S.D. Tex. 2010) ("[T]he purposes of [sections 363(b) and 503(b)] are distinct in nature, even though some fee application could qualify for approval under both standards.").

103.    However, the temporal distinction noted above does not preclude the approval of certain retrospective fees as a component of the significant resolutions agreed to in the RSA.  The case law and the Bankruptcy Code do not mandate that any retrospective relief related to fees automatically requires a *post hoc* analysis of the fees under section 503(b).  In *Bethlehem Steel*, for example, the court authorized reimbursement of professional fees on both a retrospective *and prospective* basis.  Specifically, the bankruptcy court entered an order authorizing the debtor to reimburse fees and expenses of the union representing its employees incurred over a period beginning on October 15, 2001 and ending on April 15, 2002.  *Bethlehem Steel*, 2003 U.S. Dist. LEXIS 12909, at *1–2 (order affirmed on appeal to the district court).

104.    Courts have routinely approved a debtor's decision to pay creditors' fees and expenses under section 363 of the Bankruptcy Code without requiring a showing of substantial contribution,[39] and have authorized debtors to perform under postpetition reimbursement

---

[39]    *See, e.g.*, *In re Panda Temple Power, LLC*, Case No. 17-10839 (LSS) (Bankr. D. Del. Oct. 5, 2017) [D.I. 365] (authorizing debtors to reimburse certain third-party costs and expenses as a sound exercise of business judgment under sections 105(a) and 363(b), as doing so would yield significant cost savings to debtors' estates); *In re Chaparral Energy, Inc.*, Case No. 16-11144 (LSS) (Bankr. D. Del. Dec. 14, 2016) [D.I. 652] (approving payment

agreements with respect to the fees and expenses of an ad hoc committee pursuant to section 363.[40]

Chapter 11 debtors paying the professional fees of consenting parties has become commonplace

in restructuring support agreements.

105.    The case the Objectors rely on to support their argument that the exclusive avenue

for approval of reimbursement of the Coalition's professional fees is section 503(b), but are

inapposite.[41]  The Objectors cite *O'Brien* for the position that a bankruptcy court cannot "create a

right to recover from the bankruptcy estate where no such right exists."  *Calpine Corp. v. O'Brien*

*Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 532 (3d Cir. 1999); *see*

Certain Insurers Obj. at ¶ 40; Century Coalition Fee Obj. at ¶ 12.  However, *O'Brien* only dealt

---

of reasonable fees and expenses of ad hoc committee, among other parties, in connection with assumption of and to the extent set forth in postpetition restructuring support agreement); *In re Hercules Offshore, Inc.*, Case No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015) [D.I. 95] (approving payment of unsecured creditors' professional fees in connection with the assumption of a restructuring support agreement); *see also In re New Cotai Holdings, LLC*, Case No. 19-22911 (RDD) (Bankr. S.D.N.Y. May 19, 2020) [D.I. 373] (same).

[40]   *See, e.g.*, *In re Dendreon Corp.*, Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) [D.I. 215] (overruling U.S. Trustee's objection that creditors must seek reimbursement for fees and expenses under sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code and approving payment of unsecured noteholders' professionals' fees and expenses, including those already incurred, pursuant to plan support agreements under section 363(b) subject to the provision of invoices to the committee and U.S. Trustee); *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014) [D.I. 507] (approving payment of creditors' fees and expenses, including those costs already incurred, in connection with assumed restructuring support agreement as an "actual and necessary cost and expense to preserve the Debtors' estates" without further application to the court); *In re USEC, Inc.*, Case No. 14-10475 (CSS) (Bankr. D. Del. Apr. 21, 2014) [D.I. 190] (approving the assumption of plan support agreements and the payment of creditor fees and expenses, including those already incurred, without the need for further application or approval by the bankruptcy court).

[41]   The Objectors rely on *Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.)*, 508 B.R. 283 (S.D.N.Y. 2014) and *In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010)—neither of which are analogous to the Debtors' request here.  In *Lehman Brothers*, the individual members of the unsecured creditors committee each hired their own attorneys, who billed approximately $26 million for work in connection with the committee. *Id.* at 287.  The bankruptcy court denied the individual committee members' request to have their professional fees paid as administrative expenses on the basis that "§ 503(b) does not authorize payment of professional fee expenses solely on the basis of official committee membership.  Similarly, it is true that BAPCPA amended § 503(b)(4) to prevent reimbursement for professional fee expenses on the basis of committee membership alone." *Id.* at 295-96.  In *TCI 2*, provisions of the debtor's plan required the reorganized debtors to pay the ad hoc committee's advisors, the indenture trustee's fees and expenses, and the backstop parties' fees and expenses—"all without application by or on behalf of any such parties, without notice and a hearing, and without court approval." *Id.* at 146.  The bankruptcy court denied the fees and held that the requesting parties must each apply for fee reimbursement under § 503(b). *Id.* at 169.  As evidenced by the Motion, the Debtors have submitted an application and are requesting court approval to reimburse the Coalition's fees.  The Debtors have also proposed changes in the Revised Proposed Order that will provide oversight to the fee payment process.

with the fees of an unsuccessful potential purchaser who sought break-up fees. *Id.* at 532. On appeal, the Third Circuit affirmed the decision of the Bankruptcy Court, holding that the break-up fee was not allowed because the movant's requested fees were not necessary to preserve the value of the bankruptcy estate. *Id.* at 535; *see also Bethlehem Steel*, 2003 U.S. Dist. LEXIS 12909, at *34 ("*O'Brien* deals with the case of an unsuccessful bidder seeking payment of a fee from the estate after the bidding has concluded. *O'Brien* did not address whether, under § 363, a bankruptcy court can authorize a debtor in possession to enter into a reimbursement agreement . . . ."). The fees and expenses requested here by the Debtors and the Coalition are *not* break-up fees and, as further explained below, will significantly benefit the Debtors' estates and creditors (abuse survivors or otherwise) as a whole by providing a pathway to plan confirmation.

### B. The Debtors Have Made Substantial Changes to the Revised Proposed Order to Accommodate Informal and Formal Objections.

106. The Debtors have added a number of additional protections to the Revised Proposed Order to alleviate any concerns over scope and oversight of the fees and expenses proposed to be paid under the RSA. First, the Revised Proposed Order limits the scope of the Debtors' authorization to pay the Coalition Professionals' and State Court Counsel's fees by expressly prohibiting, on a go-forward basis, any fees, expenses, or other amounts that are (i) in connection with or in furtherance of preparing for, commencing, or prosecuting litigation against the Debtors, or (ii) in connection with matters that are outside the scope of actions taken in support of the RSA or confirmation of the Amended Plan described therein, including further negotiations in support of the Amended Plan or further global consensus, and documentation of documents and ancillary agreements related to or in connection with the Amended Plan (the "Scope"). *See* Revised Proposed Order ¶ 5.

107.    Second, the Revised Proposed Order now requires the Coalition Professionals to follow the same interim compensation procedures as professionals of the Debtors and other estate fiduciaries with respect to fees and expenses incurred on or after July 1, 2021, including submitting fee statements that comply with the U.S. Trustee's guidelines, which will be subject to the review and procedures of the fee examiner appointed in these chapter 11 cases.    The standard for authorization of the Coalition Professionals' fees and expenses shall be (a) whether such fees and expenses are (i) reasonable and documented and (ii) within the Scope; and (b) whether the Coalition Professionals have used good faith efforts not to duplicate the work of professionals retained by the TCC or the Future Claimants' Representative.  *See* Revised Proposed Order ¶ 6.

### C.    The Coalition Has a Unique Role in These Chapter 11 Cases, and Has Provided and Will Continue to Provide Significant Benefit to the Estates.

108.    The Coalition is a key party in these chapter 11 cases, providing the Debtors with a single counterpart that is empowered to negotiate on behalf of approximately 60,000 abuse survivors whose support the Debtors will need for any viable plan of reorganization that implements a global resolution of Scouting-related abuse claims.    The Debtors have determined, in the exercise of their business judgment, that compensating the Coalition for reasonable, documented and contractual fees and expenses will enable the Coalition to remain engaged as a representative of Abuse Survivors that can ensure the Debtors attain the necessary support to confirm the Amended Plan in accordance with the RSA.    The Coalition and the Coalition Professionals have already provided, and will continue to provide, significant benefits to the Debtors' estates by helping to maximize value to be distributed to creditors, providing more certainty in negotiations about the ability to deliver the votes necessary to confirm the Amended Plan and thus implement a settlement, and reducing costs by providing a coordinated point of

contact for such a large group of plaintiffs rather than being forced to engage with dozens or more groups.  *See* Supp. Whittman Decl. ¶ 15.

109.    Further, the Coalition's work and participation has generated concrete benefits for the Debtors and all of the estates' creditors.  The Coalition compiled and voluntarily provided certain of its members' abuse claims data to the Mediators and the Debtors.  The Debtors, in turn, provided this information to its insurers, including without limitation to Century Indemnity Company, prior to its admission as a formal mediation party and prior to the expiration of the bar date.  This facilitated an earlier review and analysis of Direct Abuse Claims for the Debtors and their advisors than would otherwise have been possible, and generated value by expediting the claims analysis process forward.  Supp. Whittman Decl. ¶ 16.

110.    Since its admission as a mediation party, the Coalition has been a valuable negotiating partner and mediation participant, that was indispensable in bringing the TCC and Future Claimants' Representative together to support the RSA.  The Coalition Professionals and the TCC's professionals worked together with the Debtors' professionals to perform diligence regarding diligence and discuss the BSA and Local Councils' proposed contributions to the Settlement Trust.  Through this process, the Coalition—working with the TCC and the Future Claimants' Representative—secured significantly increased contributions to the Settlement Trust.  These contributions maximize recoveries not only to the Coalition's Abuse Survivor constituency but to *all* Abuse Survivors.  *See* Supp. Whittman Decl. ¶ 17.

111.    BSA's proposed contribution has more than doubled from its original planned contribution disclosed in the April 13, 2021 plan to the present—increasing from $115.6 million to an estimated $220.0 to $252.4 million, depending on time of emergence and performance through emergence.  The Local Councils have proposed to increase their Settlement Trust

contribution from $425 million in the April 13, 2021 plan to an estimated $600 million. The Coalition's efforts have thus resulted in a quantifiable benefit of approximately $310 million for all Abuse Survivors under the Amended Plan, regardless of Coalition affiliation. As opposed to only benefitting its members, the Coalition's work provides collective benefits to all survivors. *See* Supp. Whittman Decl. ¶ 18.

112.    The Coalition, alongside the TCC and Future Claimants' Representative, has conferred significant value on the estates by agreeing to seek a stay of the Estimation Matters and to stand down on its objection to the Exclusivity Motion. These steps provide substantial value in the form of significant litigation cost savings to the estate, as well as in avoiding the expenditure of time and significant distraction to the Debtors' management and advisors. This also demonstrates good faith by the Coalition meaningfully assist the Debtors' efforts to preserve estate value for the benefits of Abuse Survivors and other creditors. *See* Supp. Whittman Decl. ¶ 19.

113.    Moreover, the size of the Coalition's membership and its ability to collaborate with the State Court Counsel representing that membership has provided the Debtors and other mediation parties some assurance that negotiated agreements with Abuse Survivors could garner sufficient survivor support to accomplish the Debtors' global resolution plan strategy. This provides the Debtors and other parties in interest in these cases with critical reassurance that representatives of a substantial number of Abuse Survivors support the Amended Plan, in turn encouraging their clients to vote in favor of the Amended Plan. *See* Supp. Whittman Decl. ¶ 20.

114.    The formation and work of the Coalition has alleviated a significant, time-consuming, and costly administrative burden on the estates. By forming a single counterparty alongside the TCC and the Future Claimants' Representative, the Coalition enabled the Debtors to negotiate with a single centralized party, rather than attempting to negotiate with many individual

counsel to, or individually with, at least 60,000 Abuse Survivors.  This alone has provided

significant financial and practical benefits to the estates.  *See* Supp. Whittman Decl. ¶ 24.

115.    Given the size of the Abuse Survivor constituency, the Coalition Professionals are

critical to the continuation and completion of the work required for these chapter 11 cases to

proceed effectively and expand creditor support for the RSA and Amended Plan.  For this same

reason the Coalition Professionals' involvement in these cases is not duplicative of the TCC's.  It

would be more difficult and costly to the estate for this work to be performed without the assistance

of the Coalition and the Coalition Professionals.  The Coalition Professionals are also critical to

maintaining the timeline within which the Debtors need to exit chapter 11.  Moreover, without the

Coalition's support, the Debtors' ability to pursue confirmation of the Amended Plan and the

related restructuring transactions may be jeopardized.  *See* Supp. Whittman Decl. ¶ 25.

**D.    The Coalition Has Made a Substantial Contribution to the Debtors' Chapter 11 Cases Such that Payment of the Coalition Professionals' Fees and Expenses Is Warranted Under Section 503(b), if Applicable.**

116.    The Debtors' request to pay the reasonable, documented, and contractual

professional fees and expenses of the Coalition Professionals for making a substantial contribution

to the chapter 11 cases is also consistent with section 503(b)(3)(D) of the Bankruptcy Code, to the

extent the Court determines that such standard applies to the relief requested.  Section 503(b)(3)(D)

grants an administrative expense priority to the actual, necessary expenses incurred by a creditor

in making a substantial contribution in a case under chapter 11.  11 U.S.C. § 503(b)(3)(D).  The

Bankruptcy Code does not define "substantial contribution" or provide criteria to be used in

determining if a substantial contribution has been made.  Rather, whether a substantial contribution

has been made is a question of fact.  *See, e.g.*, *In re Bayou Grp., LLC*, 431 B.R. 549, 560 (Bankr.

S.D.N.Y. 2010) ("The substantial contribution inquiry is factual, with the movant bearing the

burden by preponderance of the evidence."); *In re Alumni Hotel Corp.*, 203 B.R. 624, 630 (Bankr.

E.D. Mich. 1996) ("Whether the applicant has rendered a substantial contribution which entitles him to an allowance is a question of fact for the court to determine.").

117.    In the Third Circuit, for a contribution to meet the "substantial contribution" requirement, the contribution must go beyond what the applicant would have done in pursuit of its own self-interest, absent any expectation of reimbursement.  *See Lebron v. Mechem Fin., Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) ("Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection.").  When assessing whether a creditor's fees should be granted administrative expense priority, "[a] creditor should be presumed to be acting in his or her own interest unless the court is able to find that his or her actions were designed to benefit others who would foreseeably be interested in the estate." *Id.* at 946.

118.    The Coalition is an ad hoc group of sexual abuse survivors.  For the reasons detailed above, the Coalition's provision of invaluable claims-related information was beneficial to the mediation process, and the Coalition has been critical in securing significantly increased contributions to the Settlement Trust from the BSA and Local Councils for the benefit of all Abuse Survivors.  This has resulted in a direct quantifiable benefit of approximately $310 million for *all* abuse survivors, not just Coalition members.  There are 82,500 timely-filed sexual abuse claims in these chapter 11 cases—representing the interests of a substantial subset of such a large, diverse constituency in a manner that may provide collective benefits to all survivors more than constitutes a substantial contribution.[42]  Moreover, without the Coalition's support, the Debtors' ability to pursue confirmation of the Amended Plan and the related restructuring transactions may be jeopardized.  This is simply too great of a risk for the Debtors at this critical point in these chapter

---

[42]    This discussion also supports the payment of the fees under section 363(b) as articulated by the court in *Mallinckrodt*, because the payment of the fees will benefit the Debtors' estates as a whole. *In re Mallinckrodt PLC*, Case No. 20-12522 (JTD) (Bankr. D. Del. Feb. 1, 2021) [D.I. 1250].

11 cases, and the Debtors submit that the cost to the estates of payment of the Coalition Professionals' fees and expenses is more than justified here. Courts in this District have approved the payment and reimbursement of creditors' professional fees under section 503 of the Bankruptcy Code when such creditors have made a substantial contribution that collectively benefits a significant constituency, providing collective benefits beyond self-interest.[43]

119.    The Debtors also note that the reimbursement of creditors' fees has been authorized on a go-forward basis under section 503(b)—a *post hoc* analysis of substantial contribution is not required. In *In re RCS Capital Corp.*, Judge Walrath overruled an objection by the U.S. Trustee that reimbursement of creditors' professional fees could only be applied retroactively upon confirmation of the plan contemplated by a restructuring support agreement. *In re RCS Capital Corp.*, Case No. 16-10223 (MFW) (Bankr. D. Del. Mar. 16, 2016), Hr'g Tr. 40:24–41:12 ("I disagree with the United States Trustee that I need to wait and see if the plan is confirmed before I can approve such fees. . . . I can approve [the fees], in advance, if I determine that it is necessary to allow the sale to proceed and, in this case, to allow a plan to proceed . . . ."). The court determined that the path provided by the restructuring support agreement alone was sufficient to

---

[43] *See, e.g.*, *In re Vivus, Inc.*, Case No. 20-11779 (LSS) (Bankr. D. Del. Mar. 15, 2021) [D.I. 469] (granting creditor's request under section 503(b)(3)(D) because creditor's actions—which directly led to the appointment of an equity committee and, ultimately, a plan—benefitted equityholders and the entire estate); *In re M&G USA Corp.*, Case No. 17-12307 (BLS) (Bankr. D. Del. May 6, 2019) [D.I. 2939] (approving lienholder group's request for payment of administrative expense under section 503(b)(3)(D) where lienholder group represented interests of hundreds of creditors asserting mechanic's lien claims against the debtors and made significant contribution to the estate by negotiating an additional $32 million cushion in the DIP facility reserve that ultimately allowed for the sale of substantially all of the debtors' assets free and clear from the claims of mechanic's lienholders); *In re Nuo Therapeutics, Inc.*, Case No. 16-10192 (MFW) (Bankr. D. Del. June 20, 2016) [D.I. 468] (granting ad hoc committee counsel's fee application where ad hoc committee counsel made a substantial contribution to the debtors' case by working with various parties to negotiate the terms of the plan and assisted the debtors in raising necessary financing to enable plan confirmation); *In re RS Legacy Corp.*, Case No. 15-10197 (BLS) (Bankr. D. Del. Nov. 24, 2015) [D.I. 3622] (approving ad hoc committee's request for allowance and payment of fees and expenses under section 503(b)(3)(D) based on substantial contribution of ad hoc committee, where committee provided a single voice representing the concerns of over 700 dealer and franchise store owners and increased the value of the debtors' dealer and franchise store network).

meet the standard of section 503(b), and rejected the assertion that the benefit to the debtor's estate

could not be recognized until after all transactions and were completed. *Id.* Hr'g Tr. 40:11–23.

IV.     **The Hartford Settlement Agreement Is Not Enforceable Under Third Circuit Law Until Approved by the Court.**

A.     **The Debtors Are Not Repudiating the Agreement; Instead, as Required by the RSA, They Are Seeking a Determination from the Court as to Whether They Have Any Obligation to Seek Approval of the Hartford Settlement.**

120.     Hartford objects to the Debtors request for a determination that the Debtors have

no obligation to pursue approval of the Hartford Settlement.  Hartford's objection stands on the

false premise that the Debtors have repudiated the Hartford Settlement and failed comply with any

obligations thereunder.  The Debtors have not repudiated the Hartford Settlement or breached any

term thereof.  At the time they entered into the Hartford Settlement on April 15, 2021, the Debtors

believed it was in the best interest of the estates and creditors.  But over the weeks and months that

ensued, the abuse claimant representatives' opposition to the Hartford Settlement never wavered.

This unwavering opposition, and the inability of the abuse claimant representatives to reach a

satisfactory alternative resolution with Hartford, has led the Debtors to the inexorable conclusion

that continuing to pursue confirmation of a plan incorporating the Hartford Settlement is no longer

in the best interest of the  estates and creditors and would be a futile effort that would serve only

to squander estate resources.  Thus, the Debtors are seeking, in the most expeditious manner, while

minimizing costs to the estate, a determination from this Court that the Debtors are not obligated

to continue to pursue approval of the Hartford Settlement.

121.     As an initial matter, the Hartford Settlement has not been approved by the Court.

Until that time, it is not enforceable. *See In re Roth Am., Inc.*, 975 F.2d 949, 954 (3d Cir. 1992)

(holding that a memorandum agreement was not a transaction in the ordinary course of business

and that "the district court did not err in holding that notice and a hearing in the bankruptcy court

on that agreement was required for it to be enforceable"). The Debtors recognize that there is not a consensus on the issue of whether a settlement agreement is enforceable before it has been approved by the bankruptcy court. *Rinehart v. Stroud Ford, Inc.* (*In re Stroud Ford, Inc.*), 205 B.R. 722, 724 (Bankr. M.D. Pa. 1996) ("The courts are split as to the enforceability of these settlement agreements before court approval.") (collecting cases). The Debtors believe, however, that when an agreement contemplates the sale or use of estate property outside the ordinary course (as the Hartford Settlement does), the better-reasoned view is that such agreement is not enforceable until approved by the bankruptcy court. Otherwise, a debtor would be free to unilaterally commit itself to acts it is not authorized to undertake pending court approval, thereby undermining the safeguards established in section 363 of the Bankruptcy Code.

122. Regardless of whether the Hartford Settlement is, in fact, binding pending court approval, such a determination is not necessary, and it is important to note that the Debtors have not abandoned or repudiated the Hartford Settlement. Far from it. The Debtors have complied with the affirmative obligations of the Hartford Settlement to the extent possible, including the filing of a plan of reorganization incorporating the Hartford Settlement.

123. The Debtors agree that the RSA and the Hartford Settlement, by their respective terms, cannot both be approved. They are mutually exclusive.

**B.    Governing Law Does Not Require the Debtors to Seek Approval of a Plan Incorporating the Hartford Settlement in the Face of Opposition that No Longer Makes Approval of Such a Plan Possible and Is No Longer in the Best Interests of the Estates and Creditors.**

124. The changed circumstances that have arisen since the Hartford Settlement was entered into have placed the Debtors in conflict with the duties they owe to all creditors in these chapter 11 cases. *See Myers v. Martin* (*In re Martin*), 91 F.3d 389, 394 (3d Cir. 1996) (holding that, "faced with a conflict between her fiduciary duty to the creditor body as a whole and the

alleged duty to go forward with a settlement" the court could not require a trustee to "choose between these conflicting legal obligations"). The opposition to the Hartford Settlement voiced by the Plaintiff Representatives at certain hearings, in pleadings and in a letter to the Debtors has compelled the Debtors to seek a determination now as to whether they must continue to seek approval of the Hartford Settlement notwithstanding the Debtors' inability to achieve a global resolution of these cases while the Hartford Settlement remains a part of the plan. *Stroud Ford*, 205 B.R. at 726 (holding that while the objection made by another bidder to a sale subject to section 363 would not normally have standing, "the validity of the objection would appear to have little to do with the need for a court order disposing of same and thus providing the debtor-in-possession with the power to act" (citing *In re Karpe*, 84 B.R. 926 (Bankr. M.D. Pa. 1988))). When there is a change in circumstances, as is the case here, controlling case law directs that the bankruptcy court "must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate." *Martin*, 91 F.3d at 394. The Debtors have done this.

125. There is nothing in *Martin* that requires the Debtors to seek confirmation of a plan prior to informing the Court of changed circumstances, as Hartford erroneously suggests in its Objection. While in *Martin,* a motion to approve had already been filed with the bankruptcy court when the court was informed of the change in circumstances (*Martin*, 91 F.3d at 391-92), the *Martin* court did not address whether a motion to approve must be submitted prior to informing the bankruptcy of changed circumstances. Nor is it clear why the filing of an approval motion would affect a court's analysis if the change of circumstances have already occurred. Here, instead of going through a months-long exercise to test whether the Global Resolution Plan containing the Hartford Settlement could be confirmed, the Debtors are seeking a determination regarding their

obligations now—at the time the changed circumstances have presented themselves—regarding what is in the best interests of the estates and creditors. And such relief can be granted as presented; as discussed further below, resolving this issue in an adversary proceeding is neither required nor appropriate.

126.    Lending support to this urgency, this Court has repeatedly impressed upon the constituents in these cases the need for a global resolution of these chapter 11 cases. May 19, 2021 Hr'g Tr. 265:10–265:13 ("There is no question that a consensual resolution is best within the realistic constraints of time and what can be achieved. I encourage the parties to continue to talk."); *Id.* 100:24–101:3 ("[T]o solicit a plan that has no abuse survivor support is not an attractive option, but neither is engaging in protracted litigation that has the potential to -- has the potential to end the Boy Scouts as it currently exists."); *see also* Mar. 17, 2021 Hr'g Tr. 48:24–49:7 ("Progress needs to be made. Victims need to be compensated appropriately and the Boy Scouts' mission needs to continue."). In order to preserve the organization, timely compensate abuse survivors, reduce professional fees and resolve the complicated legal issues, the Debtors have sought a global resolution since the inception of these cases. *See, e.g.*, *Declaration of Brian Whittman in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 16]. Indeed, at the most recent status conference, in the face of the monumental announcement of the RSA, the Court again tasked parties with continuing to negotiate towards a fully consensual plan of reorganization. July 7, 2021 Hr'g Tr. 74:16–75:3 ([T]he agreement among [the RSA] parties is a significant achievement . . . I would hope that the time [prior to the Disclosure Statement hearing] could be used to bring others into the fold to discuss or to begin or continue discussions because there's no question that a consensus plan is preferable.").

127.     Pursuit of the Hartford Settlement is directly at odds with these objectives.  As in *Martin*, circumstances have changed materially since the Debtors entered into the Hartford Settlement.  Now, the Hartford Settlement leaves the Debtors with two alternatives: moving towards a confirmable plan in accordance with the RSA, which provides for support from a significant majority of holders of Direct Abuse Claims, or remaining bound to the Hartford Settlement to the exclusion of any plan that achieves a global resolution of Scouting-related abuse liabilities.[44]  Due to creditor opposition, either alternative would lead to confirmation of a plan that fails to include the Hartford Settlement, as the BSA Toggle Plan would not include any insurance settlements.  Only the RSA would produce a successful result in these cases.  For that reason, the Court should determine that the Debtors have no obligations under the Hartford Settlement.

C.     **Contrary to Hartford's Assertion, There Has Been a Change in Circumstances Since Entry into the Hartford Settlement**

128.     Hartford has argued that there is no change in circumstances because the Debtors knew at the time they entered into the settlement that the Plaintiff Representatives opposed the resolution of Hartford's coverage obligations set out in the Hartford Settlement. Hartford Obj. at 31–32. First, Hartford's argument ignores the fact that the Debtors were able to reach an agreement with the Plaintiffs' Representatives on the terms of the RSA that provides the Debtors with the opportunity to successfully emerge from bankruptcy.  Obtaining the support of abuse survivors is particularly important in light of the direction provided by the Court at the May 19, 2021 hearing.

---

[44]     The timing is crucial.  The Debtors' exclusive right to solicit a chapter 11 plan will expire on October 18, 2021. If the RSA is not approved or the Debtors are forced to continue to pursue a plan that include the Hartford Settlement, there is a high likelihood that one or more of the Plaintiff Representatives will seek to file a competing chapter 11 plan, which leaves the Debtors in an even worse position – funding the solicitation of competing plans. As indicated, no competing plan will include the Hartford Settlement. Forcing the Debtors to continue to pursue a plan that has no creditor support without any leverage based on timing defies common sense. Additionally, there are pending objections to the Debtors' motion to extend exclusivity that the Court is considering, the withdrawal of which are conditioned on approval of the RSA. *See* Tort Claimants' Committee Objection [D.I. 2506]; Coalition and the Future Claimants' Representative Objection [D.I. 2672].

*See* May 19, 2021 Hr'g Tr. 100:24-25 (Court: "I will say to solicit a plan that has no abuse survivor support is not an attractive option…").

129.    Second, the fact that the Plaintiffs Representatives did not join in supporting the Debtors' entry into Hartford Settlement, and opposed it when it was announced, does not mean that the Debtors anticipated that the Hartford Settlement would, more than three months later, remain an absolute barrier to reaching a settlement with holders of Direct Abuse Claims.  As Mr. Whittman explained, the Debtors were surprised by the "intensity, scope and duration of the [Direct Abuse Claimants'] opposition" to the Hartford Settlement.  *See* Whittman Dep. 44:19–22 Ex. B.  The Debtors would not have entered into the Hartford Settlement had they known this intractable situation would be the outcome.  The Hartford Settlement was a part of a plan that the Debtors believed would be a starting point, and the Debtors hoped it would be a catalyst for additional settlements with other parties so that a global resolution could be forged.  In other words, the Debtors expected that the Hartford Settlement would become acceptable to the Plaintiff Representatives as part of a plan that incorporated several "building block" settlements that, taken together, would garner the support of a significant majority of abuse claimants.  Despite the Debtors' efforts, this expectation did not come to fruition.

130.    On June 9, 2021, the Plaintiffs Representatives sent a letter unequivocally refusing to support any plan incorporating the Hartford Settlement even after the occurrence of extensive mediation sessions that the Debtors believed would resolve the issues.  This was a shift in the negotiations.  There was no longer room for negotiation of a plan that would include both the Hartford Settlement and garner the support of holders of Direct Abuse Claims.  The Plaintiff Representatives were willing to negotiate a plan that would not include the Hartford Settlement, which is reflected in the RSA.  At that point, the Debtors were compelled by their duty to all

creditors and the controlling holding of *Martin* to inform the Court of these developments and seek a determination from the Court.

131.    From the time the Hartford Settlement was announced in April until the RSA was signed on July 1, 2021, the Debtors worked tirelessly to negotiate the terms of further settlements. The Debtors made significant progress in these efforts, such that the terms of a global resolution that has the support of the Plaintiff Representatives are agreed upon and memorialized in the RSA. The unfortunate reality, however, is that the terms of the RSA, which the Debtors believe is in the best interests of all creditors, cannot be reconciled with the Hartford Settlement.

132.    Remarkably, Hartford argues that soliciting and seeking confirmation of a plan that incorporates the Hartford Settlement is not futile because it would be accompanied by the BSA Toggle Plan—which does not incorporate the Hartford Settlement.  Hartford Obj. at 34. The Toggle Plan is a last resort that would, by its nature, (i) not resolve claims against Local Councils and Chartered Organizations that provide significant support and resources to aid the Debtors' charitable mission and (ii) not result in a global resolution or a resolution with *any* other party in interest. The Debtors would instead continue to litigate expensive, time-consuming issues with every party-in-interest, including the Plaintiff Representatives, the Insurance Companies and potentially the Local Councils and Chartered Organizations.  It is telling that Hartford is relying on the Debtors' former proposal of the BSA Toggle Plan as a basis to force the Debtors to solicit votes on a Global Resolution Plan, which would be overwhelmingly rejected by holders of Abuse Claims.  If the Debtors were forced to solicit a plan that incorporated the BSA Toggle Plan, that plan would inevitably be rejected by holders of Abuse Claims.  Accordingly, the Hartford Settlement would fall away, and Hartford would not be required to make any contribution toward satisfying Abuse Claims in these cases.  This guarantees that Hartford would keep its $650 million

and retreat to the tort system, where it would be litigating abuse claims for years to come and further delaying payment to holders of compensable claims.

133.    Caught in this quandary, the facts of *Martin* provide relevant guidance.  In *Martin*, a settlement in the form of a stipulation was submitted by a chapter 7 trustee before learning of changed circumstances.  *Id.* at 392.  Those changed circumstances were such that the settlement pending before the bankruptcy court was no longer in the best interests of the debtors, their creditors, and estates.[45]  As the Debtors have done here, the trustee in *Martin* chose not to take further action to support the settlement, leaving the determination of whether the settlement should be approved in the hands of the bankruptcy court.  The Third Circuit expressly held that the trustee's actions were appropriate, stating: "We reject the proposition that a trustee is required to champion a motion to approve a stipulation that is no longer in the best interest of the estate." *Id.* at 394. Similarly, the Debtors should not be "required to champion" an unconfirmable plan that incorporates the Hartford Settlement.

134.    Here, too, consistent with the *Martin* decision, the Debtors seek guidance from the Court.  As discussed in greater detail herein, the Debtors believe that the Hartford Settlement cannot currently, and will never, meet the applicable standards to be approved by the Court.  For these reasons, the Debtors should be authorized to enter into the RSA without any obligations under the Hartford Settlement.[46]

---

[45]    In *Martin*, the change in circumstances consisted of a jury award in favor of the debtors of approximately $150,000 as compared with the initial settlement pending approval that included a mutual release of claims thereby releasing the action that resulted in the jury award.  *Martin*, 91 F.3d at 391–92.

[46]    The court explicitly agreed that the trustee need not take further action for the approval of the settlement, just as the Debtors have done here.  *Martin*, 91 F.3d at 392 ("The trustee may even opt not to argue in favor of the stipulation, as was done here, if she no longer believes the settlement to be in the best interest of the estate.").

D.    **The Best Interests of All Creditors Standard Controls in All Respects Concerning the Debtors' Obligations Under the Hartford Settlement.**

135.    The factors used to determine whether a settlement agreement should be approved are "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Martin*, 91 F.3d at 393 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968)).  Moreover, the determination of whether a settlement should be approved is made in light of present circumstances. *Frys Metals, Inc. v. Gibbons* (*In re RFE Indus., Inc.*), 283 F.3d 159, 165 (3d Cir. 2002) (holding that the bankruptcy court should examine the settlement in light of the present circumstances).

136.    The fourth and final factor—the paramount interest of the creditors—is crucial here.  As the Debtors noted in the Motion, where circumstances have changed following a pending settlement motion, there may be a conflict between a trustee's "alleged duty to go forward with a settlement agreement favoring one creditor but otherwise detrimental to the estate" and the "fiduciary relationship with <u>all</u> creditors of the estate."  *Martin*, 91 F.3d at 394 (emphasis in original).

137.    Despite Hartford's tortured attempts to argue otherwise, the Third Circuit in *In re Martin* gave a crystal-clear directive: in determining whether a settlement should be approved, the settlement must be in the best interests of all creditors.  *Id.* at 395.  Hartford has not provided any indication that the Hartford Settlement would be in the best interests of all creditors, much less meet the other standards necessary to obtain court approval. Instead, Hartford touts the Toggle Plan as being somehow in best interests of all creditors. Hartford Obj. at 33–34.

138.    In circumstances similar to *Martin,* there are two mutually exclusive alternatives. On the one hand, approval of the RSA would cement the support of the Plaintiff Representatives, bring additional contributions to the Settlement Trust, and provide a comprehensive framework for the confirmation of a plan and operation of the Settlement Trust.  On the other hand, the Hartford Settlement, if approved and successfully incorporated into a confirmed plan (which is an impossibility), would bring an amount certain into the Debtors' estates and resolve potential litigation in the future with Hartford—but at the cost of forgoing the global resolution embodied in the RSA.  Here, the Debtors believe that their fiduciary duties cut decidedly in favor of all creditors, particularly since the Hartford Settlement is illusory.

### E.    Arguments Related to Lack of an Express Fiduciary Out Provision Are a Red Herring and Make No Sense in the Context of These Cases.

139.    Hartford asserts, among other things, that because the Hartford Insurance Settlement does not have a "fiduciary out" provision, the Debtors are not only bound to the Hartford Settlement prior to approval, but they must also blindly pursue solicitation and confirmation of a plan—regardless of the Debtors' fiduciary duties and the overwhelming opposition to the Hartford Settlement that has emerged.  Hartford Obj. at 23–24.

140.    Among other things, Hartford's position ignores the clear mandate of section 363. As the Third Circuit in *Martin* explained: section 363 is implicated when an "act venture[s] beyond the domain of transactions that the [debtors] encountered in the ordinary course of business prior to the filing of bankruptcy, thereby implicating Section 363." *Martin*, 91 F.3d at 395 (citing *In re Roth Am., Inc.*, 975 F.2d 949, 954 (3d Cir. 1992)).  And when section 363 is implicated, a debtor is "prohibited from acting unilaterally; this schema is intended to protect both debtors and creditors (as well as trustees) by subjecting a trustee's actions to complete disclosure and review by the creditors of the estate and by the bankruptcy court." *Id.* This is a bedrock principle applied by

bankruptcy courts. *See, e.g.*, *Stroud Ford*, 205 B.R. at 727 ("When a debtor-in-possession contracts, it binds not only itself but it obligates the entire estate for the ramifications of its decisions. Fairness dictates that such an obligation should only be effective after notice and a hearing, if necessary. In this case, a hearing was necessary because a timely objection was filed. The debtor-in-possession was therefore free to disregard the terms of its commitment prior to court disposition of the objection.").

141.    The Hartford Settlement has, and continues to be, subject to the Court's approval as it contemplates the sale and use of the Debtors' property outside the ordinary course of business. Likewise, such approval is dependent upon the proposed settlement being in the best interests of all creditors standard in accordance with *In re Martin*—which the Hartford Settlement cannot meet.  An implied "fiduciary out" or implied "best interests" analysis is present in every debtor contract; if another deal that is better for creditors presents itself prior to approval of a settlement, the Debtors must be free to pursue the better deal.  This is particularly the case here, where failing to do so would prevent the Debtors from achieving their restructuring objectives.  The Hartford Settlement falls well short of being in the best interest of creditors at this time and would block the Debtors' only viable path to confirmation of a global settlement by eviscerating the settlement embodied in the RSA.[47]

**F.     If the Court Determines that the Hartford Settlement Is Not Enforceable Hartford Is Not Entitled to Damages.**

142.    Hartford's threat of seeking damages rings hollow.  It argues that a breach of the Debtors' post-petition commitment to seek approval of plan incorporating the Hartford Settlement

---

[47]    Moreover, Hartford's argument that the Debtors are bound to the terms of the Hartford Settlement because there was not a fiduciary out provision ignores that the stipulation in *In re Martin* appears to have had no fiduciary out or other means to terminate.  *See Meyers v. Martin* (*In re Martin*), Case Nos. 94-1717 and 94-4157, 1995 U.S. Dist. LEXIS 9177, at *4–5 (E.D. Pa. June 28, 1995).  Yet, the lack of a fiduciary out provision did not prevent its rejection by the Court.  *Martin*, 91 F.3d at 395–96.

would expose the estate to substantial administrative expense claims for damages.  The Debtors have not breached the Hartford Settlement and, if the Court determines it should not be approved as it is not in the interest of all creditors, then the terms of the Hartford Settlement will not be enforceable against the Debtors, rendering a breach an impossibility. *Rafool v. Goldfarb Corp. (In re Fleming Packaging Corp.)*, Case No. 04-8166, 2008 Bankr. LEXIS 558, at *9–10 (Bankr. C.D. Ill. Mar. 7, 2008) (holding that "a compromise or settlement that is disapproved by the court is null and void . . . A tentative compromise which is not approved is of no legal effect.  All terms of the compromise are nullified."); s*ee also Salim v. Nisselson (In re Big Apple Volkswagen, LLC)*, 571 B.R. 43, 58 (S.D.N.Y. 2017) (affirming order granting motion to dismiss and holding that because the settlement was not enforceable without court approval, the plaintiff's "breach of contract claim fails as a matter of law.").

### G.    The Debtors Did Not Relinquish Their Fiduciary Duties

143.    Contrary to Hartford's assertion, the Debtors have not relinquished the authority to uphold their fiduciary duties.[48]  Far from it. Indeed, both the Debtors and Hartford entered into the Hartford Settlement knowing that the terms contemplated therein were subject to bankruptcy court approval.  As discussed above, section 363 prohibits the Debtor from unilaterally entering into a transaction outside the ordinary course of business.  *Martin*, 91 F.3d at 395.  Instead, the transaction must be disclosed to creditors and the bankruptcy court, which will examine whether it should or should not be approved.  This process safeguards the rights of creditors and takes the

---

[48]    There is no doubt that the Debtors have fiduciary duties.  Even if the Debtors wished to forgo their fiduciary duties—which they do not—there is no support for the idea that the bankruptcy process would allow them to do so.  *Whyte v. Williams (In re Williams)*, 152 B.R. 123, 127 (Bankr. N.D. Tex. 1992) ("The debtor in possession is a fiduciary for the bankruptcy estate.  Although prior to a bankruptcy filing management's fiduciary duty went to the corporation's shareholders, with a debtor in possession that fiduciary duty changes by running to the creditors as well as the shareholders."); *Fulton State Bank v. Schipper (In re Schipper)*, 109 B.R. 832, 835 (Bankr. N.D. Ill. 1989) ("A debtor-in-possession holds its powers in trust for the benefit of the creditors and has the duty to protect and conserve property in his possession for their benefit"), *aff'd*, 933 F.2d 513 (7th Cir. 1991).

unilateral determination out of the hands of the Debtors.  Specifically, when there are alleged

conflicting obligations as there are here, a determination must be made by the bankruptcy court.

*Id.* at 394 ("We cannot require a trustee herself to choose between these conflicting legal

obligations. Rather, Rule 9019(a) demonstrates the legislature's intent to place this responsibility

with the bankruptcy court. In order to make such a determination.").  Thus, in circumstances such

as these, where there are materially changed circumstances, the bankruptcy court resolves the

matter.  Hartford cites a case from the First Circuit: *PRLP 2011 Holdings, LLC v. Manuel

Mediavilla, Inc.* (*In re Manuel Mediavilla, Inc.*), 568 B.R. 551 (B.A.P. 1st Cir. 2017) (per curiam)

as being "on all fours" with the issues at hand.  Hartford Obj. at 26.  Yet, it is clearly

distinguishable.  In *Mediavilla*, the debtors failed to disclose a settlement agreement that had been

entered into with its secured creditor a few days prior to the entry of an order on the matter. *Id.* at

561–62.  The bankruptcy court denied the creditor's motion to vacate the order, "without a hearing

or explanation."  *Id.* at 564.  Subsequently, the bankruptcy court confirmed the debtors' plan

without ruling on a pending motion to enforce the settlement.  *Id.* at 565–66.  Not surprisingly, on

appeal the Bankruptcy Appellate Panel held that the bankruptcy court abused its discretion by

implicitly denying the motion to enforce the settlement.  *Id.* at 573.  Here, the Debtors do not seek

to sidestep the Hartford Settlement.  Contrary to Hartford's assertion, the Debtors have not

relinquished the authority to uphold their fiduciary duties.

> **H.      It Is Irrelevant to Argue About the Lack of an Explicit Fiduciary Out Because
> There Is No Better Alternative.**

144.      The Motion seeks approval of the RSA, which embodies the best path forward for

the Debtors, their creditors, and estates.  The idea that the Hartford Settlement is an alternative to

the settlement embodied in the RSA is based on the incorrect premise that Abuse Survivors might

ultimately support the settlement.  As discussed above, there is no reasonable basis for the Debtors

to conclude that this would ever happen.

145.    The Debtors have three alternatives, of which one provides a confirmable plan that

both compensates Abuse Survivors to the greatest extent possible and allows for the charitable

mission of the BSA to continue without impediment.[49]

(i)    The Global Resolution Plan, which incorporates the terms and provisions of the Hartford Settlement will be rejected by an overwhelming majority of holders of Direct Abuse Claims.[50]

(ii)    The BSA Toggle Plan, the alternative to the Global Resolution Plan that includes the Hartford terms and conditions, is not supported by any creditor constituency, including the Local Councils. While it remains a viable option, confirming this plan would forgo the increased and significant contributions afforded creditors under the Amended Plan presented in conjunction with the RSA from the Debtors as well as any contributions from Local Councils and potential contributions from Contributing Chartered Organizations or Settling Insurance Companies. The BSA Toggle Plan does not provide a restructuring path for Local Councils and Chartered Organizations.  Without the benefit of the releases and channeling injunction, the continued existence of at least some, if not many, of the Local Councils would be uncertain at best.  Likewise, a plan that provides no framework for resolving claims against Chartered Organizations could endanger the relationships with such organizations such that they may no longer make their facilities available for Scouting unit meetings.  The Debtors' charitable mission would likely be hampered without the day-to-day support that both of these groups provide.  The Toggle Plan remains a course of last resort and is rendered wholly unnecessary if there is an alternative that would allow preserving the organization of Scouting, including Local Councils and the relationships with Chartered Organizations.

(iii)    The third and final option on the table at this juncture, the Amended Plan presented in conjunction with the Motion, is the only real alternative for the

---

[49]    Hartford, in a moment of extreme optimism, proposes that a plan incorporating the Hartford Settlement could simply tack on the portion of the Local Council contribution reflected in the RSA.  Hartford Obj. at 34.  But this is not a real option.  Hartford's suggested solution treats each term of the RSA as an interchangeable part and lacks an appreciation for what the RSA represents.  The Local Councils did not agree to the terms in the RSA in a vacuum.  The terms of the RSA are the product of concessions by all of the RSA Parties and represents a significant achievement that the Debtors believe they are duty-bound to put before the Court.

[50]    It should also be noted that a condition to effectiveness of the Harford Settlement is receipt of releases from all 251 Local Councils, which will not be granted.  *See* Hartford Settlement § I.A.2.

Debtors and their creditors.  It is the result of countless months of negotiations with the numerous parties in this case and reflects meaningful concessions from each of the RSA Parties. In contrast to the Global Resolution Plan that incorporates the terms and provisions of the Hartford Settlement and the BSA Toggle Plan, the RSA resulted in a firm commitment to a substantial contribution of $500 million of money and property that will be transferred to the Settlement Trust from certain Local Councils to pay Abuse Claims.  In addition, a special-purpose entity will issue a note worth up to $100 million to the Settlement Trust to pay Abuse Claims. The special-purpose entity will make payments on the $100 million note from funds contributed by Local Councils. This is an increase of over 40% as compared to the $425 million previously proposed in connection with the Global Resolution Plan.  While the goal had always been to obtain a meaningful contribution from Local Councils in a non-BSA Toggle Plan scenario, it only came to fruition in the context of the settlement embodied in the RSA.  Likewise, the Debtors' proposed contribution has more than doubled from its original planned contribution disclosed in the April 13, 2021 plan to the present—increasing from $115.6 million to an estimated $250 million under the RSA Plan, depending on time of emergence and performance through emergence.  This is more than two-fold increase is the result of continuing negotiations with parties in mediation, particularly the RSA Parties.  The other RSA Parties have made concessions related to amounts contributed from the Debtors and Local Councils.  Additionally, the Tort Claimants' Committee and the Coalition, to the extent applicable, also made a large concession by agreeing to stay all pending litigation, including the Restricted Assets Adversary.[51]  Finally, the RSA Parties have agreed to develop a protocol to address the participation of Chartered Organizations in the Channeling Injunction.  To underpin the importance of preserving the relationships with Chartered Organizations, the Local Councils have specified that their contributions are dependent on a real, actionable solution with the Chartered Organizations.

Not only is the Amended Plan proposed in accordance with the RSA the best alternative, it is the only good alternative.

---

[51]    This litigation could have been extremely time consuming and expensive for the Debtors and their estates.  In a similar action (though significantly less complicated and with fewer assets at issue), a dispute concerning the property of a non-debtor involved two phases, a trial, certified appeals to the Third Circuit, motions for judgment on the pleadings and related briefing.  *See In re Catholic Diocese of Wilmington, Inc.*, Case No. 09-13560, Adv. Pro. No. 09-52866 (Bankr. D. Del. 2009).

## I.   An Adversary Proceeding Is Not Required for the Court to Make a Determination Regarding the Hartford Settlement

146.   The Court has authority, here and now, to determine whether the Debtors are required to continue prosecuting the Hartford Settlement.   Contrary to Hartford's Objection, an adversary proceeding is not required and would only serve to delay determination of the issue. Bankruptcy Rule 7001(9) only requires that a request for declaratory judgment be brought via adversary proceeding for the types of relief covered in subsections (1)-(8) of Bankruptcy Rule 7001. Fed. R. Bankr. P. 7001.   If the declaratory relief sought is outside of the relief specified in Bankruptcy Rule 7001, an adversary proceeding is unnecessary.   *Keeler v. Acad. of Am. Fransciscan Hist., Inc.* (*In re Keeler*), 257 B.R. 442 (Bankr. D. Md. 2001); *see also* 10 COLLIER ON BANKRUPTCY ¶ 7001.10 (16th ed. 2020) ("If declaratory relief falls outside of the types covered by those specified clauses, an adversary proceeding is unnecessary.").   And in that case, the Court has authority to determine the relief sought in the context of a contested matter.   "On its face, Rule 7001(9) limits the type of declaratory relief requiring an adversary proceeding to determinations "relating to" any of the types of relief listed in the first eight enumerated clauses of Rule 7001." *Yassian v. Goodrich* (*In re Rodeo Canon Dev. Corp.*), Case No. CC-10-1089, 2010 Bankr. LEXIS 5036, at *21-22 (B.A.P. 9th Cir. Oct. 28, 2010).

147.   Hartford asserts that determination of rights or obligations under a contract are inherently "interests in property" within the ambit of Rule 7001(2).   Hartford Obj. at 19.   Yet, the cases Hartford cites differ so meaningfully from the instant issue, rendering them inapposite and unsupportive.   None of these cases address "interest in property" as contemplated by Rule 7001(2). *EBC I, Inc. v. Am. Online, Inc.* (*In re EBC I, Inc.*), 356 B.R. 631 (Bankr. D. Del. 2006) and *U.S. Bank Tr. Nat'l Ass'n v. AMR Corp.* (*In re AMR Corp.*), 730 F.3d 88 (2d Cir. 2013) both involve pre-petition payment obligations to a creditor exchange for the right to some good or service.   In

*EBC I*, the court assessed in connection with transfer claims whether the debtor's rights under a pre-petition contract with a creditor for payment for online advertising constituted property under section 548, relying in part on Virginia law to reach its holding. *EBC I*, 356 B.R. at 639. The Second Circuit in *AMR Corp.* likewise faced a different situation than here, observing in passing that contract rights were property rights for the purpose of determining whether the creditor noteholder could properly rescind acceleration of a loan after the automatic stay had had taken effect. *AMR*, 730 F.3d at 102–03. Lastly, the court in *Corp. Claims Mgm't v. Shaiper* (*In re Patriot Nat'l Inc.*), 592 B.R. 560 (Bankr. D. Del. 2018) tackled whether a pre-petition Non-Interference Agreement executed between defendant former employee and plaintiff employer and which protects plaintiffs' intellectual property from misappropriation constituted "property of the estate." *Id.* at 572.

148.   By contrast, the determination of the whether the Hartford Settlement could or should be approved and whether there is an obligation to pursue it should bind the Debtors in the face of changed circumstances is not "a proceeding to determine the validity, priority, or extent of a lien, or other interest in property . . ." under Rule 7001(2) as Hartford insists. Fed. Bankr. R. 7001.   Additionally, Hartford argues that motions asking a bankruptcy court to declare an agreement valid or invalid, or enforceable or unenforceable, seek declaratory relief subject to Rule 7001.   Again, the cases Hartford cite fail to support or authorize such a sweeping rule.   As an initial matter, neither of the cases Hartford cites actually holds in favor of Hartford's position, contrary to statements in its Objection.   Hartford asserts that the Bankruptcy Court of the Western District of Tennessee held in *Church Joint Venture, L.P. v. Blasingame* (*In re Blasingame*), Case No. 15-00021, 2016 Bankr. LEXIS 3590 (Bankr. W.D. Tenn. Sept. 23, 2016), that a "motion to enforce settlement agreement was a request for declaratory relief subject to Rule 7001(9) where

counterparty disputed that a binding agreement had been reached and court approval of the agreement had not yet been sought." Hartford Obj. at 19. Hartford, however, misses the distinction made in *Blasingame* between declaratory relief with respect to the recovery of money or property on the one hand, and declaratory relief concerning a purported agreement to settle a civil proceeding concerning the recovery of money or property on the other. The Court distinguished the latter from those requiring an adversary proceedings. *Id.* at 22. In missing this distinction, Hartford overly simplifies the court's nuanced ruling in *Blasingame*, which clarified the bankruptcy court's jurisdictional authority to hear disputes related to (1) the enforcement of a settlement agreement and (2) the binding nature of the settlement agreement. Contrary to the Hartford Objection, *Blasingame* came to the opposite conclusion while also finding it lacked jurisdiction over the matter:

> [R]equests for declaratory relief with respect to the recovery of money or property are adversary proceedings. Fed. R. Bankr. P. 7001(9). The relief requested in the Joint Motion is, however, a request for declaratory relief concerning a purported agreement to settle a civil proceeding concerning the recovery of money or property. . . **Any request of that type should have been brought, if at all, in the main bankruptcy case** because it concerns the administration of the bankruptcy estate rather than the particular dispute that is the subject of this adversary proceeding.

*Blasingame*, 2016 Bankr. LEXIS 3590, at *22 (emphasis added).

149. Further, *Savage & Assocs. P.C. v. Mandl* (*In re Teligent, Inc.*), 459 B.R. 190 (Bankr. S.D.N.Y.), is also inapplicable. There, the movant sought declaratory relief from an entity that was not a party to the proceedings. *Id.* at 195 ("Here, Savage seeks a declaratory judgment binding K&L in an adversary proceeding to *which it is not even a party*" (emphasis added)).

150. The eight clauses of Bankruptcy Rule 7001 do not cover the applicable relief sought here, and consequently, there is no need for an adversary proceeding under Bankruptcy Rule 7001(9). Given that this type of relief is not listed in Bankruptcy Rule 7001, it ordinarily may be

sought by motion as a contested matter. *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist.* (*In re Applewood Chair Co.*), 203 F.3d 914, 918 (5th Cir. 2000) (holding that a creditor's motion for clarification of an order approving the sale of estate property was properly filed as a motion rather than an adversary proceeding); *see also Manus Corp. v. NRG Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 188 F.3d 116 (3d Cir. 1999) (finding that the relief sought did not fall under Rule 7001 and thus, such relief may properly proceed by motion rather than by way of complaint as an adversary proceeding).

151.   While Hartford attempts to shoehorn the matter under Bankruptcy Rule 7001(2) "seeking to determine the validity, priority, or extent of a lien or other interest in property" the characterization just does not fit. Hartford Obj. at 19. Examples of "interests in property" within the meaning of Bankruptcy Rule 7001(2) include a dispute regarding whether a debtor has the right or title to sell disputed property[52] or a determination of whether a debtor's partnership interest has a present negative value.[53] Here, there is no dispute regarding validity, priority or extent of property at hand. The Court has been asked to make a determination with respect to a settlement agreement not a property dispute.

152.   Courts have consistently granted declaratory relief in the context of contested matters unrelated to those actions listed in Bankruptcy Rule 7001(1)–(8). *In re Three Strokes Ltd. P'ship*, 397 B.R. 804, 807 (Bankr. N.D. Tex. 2008) ("Specifically, not all requests for a determination of a legal issue in a bankruptcy case require an adversary proceeding."); *In re DuPage Boiler Works, Inc.*, 98 B.R. 907, 912 (Bankr. N.D. Ill. 1989) ("[E]ven if [the order

---

[52]   *In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261, 2008 Bankr. LEXIS 2120, at *16–18 (Bankr. D. Del. July 28, 2008); *In re RMS Titanic, Inc.*, Case No. 16-2230, 2016 Bankr. LEXIS 4560, at *10–11 (Bankr. M.D. Fla. July 22, 2016).

[53]   *In re Corky Foods Corp.*, 85 B.R. 903, 904 (S.D. Fla. 1988).

requested by the trustee] were [a declaratory judgment], it is not a declaratory judgment 'relating to any of the foregoing,' viz., the forms of relief specified in clauses (1) through (8). Accordingly, the instant motion is a possible and proper procedure and the issue may be disposed of [through] this contested proceeding.").

153.     Therefore, the issue of whether the Debtors are required to continue prosecuting the Hartford Settlement may be determined as it has been presented in the Motion, as a contested matter.

## V.     Responses to Certain Individual Objections

### A.     Knights' Objection

154.     The Knights object to the "pooling" of insurance proceeds to satisfy claims arising in multiple coverage years. *See* Knights Obj. ¶ 22. The proposed treatment of Non-Abuse Litigation Claims in the Amended Plan is as favorable (or more so) as the proposed treatment under the Third Amended Plan which predates the proposed RSA. This fact serves to emphasize what should be obvious: these objections are an issue for confirmation and are not required to be considered in connection with the Settlement and RSA.

155.     Nonetheless, the Amended Plan does not unfairly treat Non-Abuse Litigation Claims. Each holder of a Non-Abuse Litigation Claim shall, subject to the terms and conditions of the Amended Plan, "retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (x) available insurance coverage or the proceeds of any Insurance Policy, including any Abuse Insurance Policy or Non-Abuse Insurance Policy, (y) applicable proceeds of any Insurance Settlement Agreements, and (z) co-liable non-debtors (if any) or their insurance coverage." Amended Plan § III.B.9.

156.     The Settlement Trust's reasonable consent right over post-Effective Date settlements of Non-Abuse Litigation Claims is not unfair to holders of such Claims. Up to the

Effective Date, the holders of Non-Abuse Litigation Claims may settle their claims with the Debtors, subject to Court approval and the reasonable consent of the Coalition, TCC, and Future Claimants' Representative.  Upon the occurrence of the Effective Date, the holders of Non-Abuse Litigation Claim may recover up to the full amount of their claims, in the first instance from any available, unsettled Specified Insurance Policies and settle such Claims with the reasonable consent of the Settlement Trust.  The Settlement Trust will pay amounts out of the proceeds of Specified Insurance Policies (potentially across multiple coverage years) only to the extent that the holder of a Non-Abuse Litigation Claim cannot, as a result of the Settlement Trust's release of the Specified Insurance Policies covering the relevant year of loss, recover the full amount of any judgment or settlement of such Claim reasonably consented to by the Settlement Trust from any Specified Insurance Policy under which such holder is seeking to recover.  Amended Plan § IV.D.3.  These provisions are intended to ensure that holders of Non-Abuse Litigation Claims retain the ability to recover in full from insurance on account of such Claims, consistent with the terms of the JPM/UCC Settlement but in such a way that allows the Settlement Trust to take assignment of the Specified Insurance Policies for the benefit of holders of Abuse Claims as well as holders of Non-Abuse Litigation Claims.

### B.    Old Republic Insurance Company's Objection

157.    Old Republic objects because the RSA requires the Debtors to support the Amended Plan, which would modify or eliminate the bargained-for agreement between Old Republic and the Debtors in policies issued by Old Republic to the Debtors and a program agreement entered into by Old Republic and the BSA.  Old Republic Obj. ¶¶ 4, 5, 7, 11–14.  Old Republic's objections to the RSA are misplaced for two reasons.  First, while the Program Agreement provides Old Republic with "final authority with respect to claims management," the Program Agreement does not specifically obviate Old Republic's obligation under the insurance

policies to secure the consent of the Named Insured before settling.  Therefore, while Old Republic has the "final authority" on claim matters, it could only exercise that final authority under the Program Agreement once it fulfilled its obligations under the policies to receive the Named Insured's consent to settle.

158.    Second, Old Republic's rights under the Program Agreement and the policies are subject to the implied covenant of good faith and fair dealing.  Old Republic would not have the rights to settle claims against the Named Insured for unreasonably high settlement values, and then seek to subsequently recover those unreasonably high values from the Named Insured.  Similarly, the Settlement Trustee's consent is also subject to the implied covenant of good faith and fair dealing, which would prohibit the Settlement Trustee from withholding its consent to reasonable settlements.  Therefore, Old Republic's concerns about the RSA are without merit as the implied covenant of good faith and fair dealing (a) limits the scope of Old Republic's settlement rights under the Program Agreement and the policies, and (b) ensures that the Settlement Trustee will consent to reasonable settlements of Non-Abuse Litigation Claims.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court overrule the Objections and enter the Revised Proposed Order, substantially in the revised form filed concurrently with this omnibus reply, granting the relief requested in the Motion and any further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  July 26, 2021
        Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@morrisnichols.com
       aremming@ morrisnichols.com
       ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice)*
Blair M. Warner (admitted *pro hac vice)*
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
       mlinder@whitecase.com
       laura.baccash@whitecase.com
       blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION