# EXHIBIT 2

DRAFT

**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 2-19-20905-PRW |
| The Diocese of Rochester, | Chapter 11 |
| Debtor. | |
| THE DIOCESE OF ROCHESTER, | Adversary Proceeding No. |
| Plaintiff, | **ADVERSARY PROCEEDING** |
| | **COMPLAINT** |
| v. | |
| THE CONTINENTAL INSURANCE COMPANY, | |
| Defendant. | |

## COMPLAINT

Plaintiff the Diocese of Rochester (the "Diocese" or "Plaintiff") brings this adversary proceeding against Defendant The Continental Insurance Company ("CIC", "CNA", or "Defendant"), and in support thereof states the following:

## BACKGROUND

1.      This is a civil action for injunctive relief, damages, and attorneys' fees under New York General Business Law Section 349 for deceptive acts and practices arising out of CNA's materially misleading conduct directed towards the public at large, the Diocese, the Official Committee of Unsecured Creditors ("Committee"), and other survivors of sexual abuse. CNA's

deceptive acts and business practices are ongoing and continue to cause substantial harm to the Diocese.

2.      On February 14, 2019, New York Governor Andrew Cuomo signed into law the Child Victims Act ("CVA"). The CVA revives liability for claims based on sexual abuse that were previously barred by the statute of limitations, opening a "window" for claimants to commence civil actions alleging sexual abuse from many years ago. The "window" for bringing lawsuits opened on August 14, 2019, and ran through August 14, 2021.

3.      Hundreds of claims have been brought against the Diocese alleging that the Diocese was negligent in failing to prevent childhood sexual abuse by individuals over whom they had responsibility.

4.      On September 12, 2019, shortly after the CVA was passed, the Diocese commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Case No. 2-19-20905 PRW in the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Case").

5.      The Committee was appointed to represent unsecured creditors in the Bankruptcy Case. The Committee is comprised of sexual abuse survivors who have filed suit against the Diocese and/or submitted proofs of claim in the bankruptcy process.

6.      The Diocese tendered claims by sexual abuse survivors to its insurers. The Diocese was insured by CIC, an insurance company wholly owned by CNA, between January 13, 1943, and June 1, 1977, under various primary and excess insurance policies.

7.      Recognizing that the CVA would trigger many lawsuits that would raise insurance issues, the New York State Department of Financial Services ("DFS") issued a circular letter ("Circular No. 11") addressed to property and casualty insurers throughout the state reminding them of New York public policy and the insurers' legal obligations with respect to the CVA claims.

Circular No. 11 emphasized that insurers were required to comply with well-established principles when handling CVA-related claims, including having as their "basic goal the prompt and fair settlement of all claims."

8. DFS advised that insurers are expected to "cooperate fully with the intent of the Child Victims Act," including when "insurance coverage applies to CVA-related claims." *Id.* at 34. Insurers were encouraged to "act in utmost good faith" and "to take the initiative to be cooperative *so that victims may be compensated*." *Id.* (emphasis added).

9. However, despite the DFS requirements, and contrary to the Insurance Law, CNA denied nearly all CVA claims tendered to it by the Diocese, resulting in the mass denial of over 270 of the survivors' claims ("the Mass Denial"), misleading the Diocese as to coverage under its policies.

10. CNA's denials resulted in massive exposure for the Diocese. CNA then attempted to leverage the difficult position that it had created for the Diocese by seeking to foist on survivors a nonconsensual settlement of their claims. *See* Dkt. 1538 at 2 ("Settlement Motion"), Dkt. 1542 at 1, 8–11 ("CNA's Joinder"). CNA misled all parties—including the Diocese—by suggesting that the survivors' claims had much less settlement and litigation value than they actually have.

11. CNA's Settlement Motion grossly undervalued the claims of the survivors, reducing claims that could result in hundreds of millions of dollars of damages under the CNA policies to a small fraction of their actual value. CNA's attempt to force the Settlement Motion on the survivors violated CNA's duty to pay claims fairly, promptly, and equitably.

12. More recently, CNA failed even to timely respond when it was copied on reasonable, within-policy-limits demands to its insured, the Diocese, with respect to numerous sexual abuse claims.

13.     And, now, CNA has told the Court that it intends to impose on the survivors a stark choice: (1) face years of litigation; or (2) take whatever CNA offers in the competing plan of reorganization that it has announced its intention to file. This too is misleading. The Diocese and the survivors are not faced with just those two options. CNA has an obligation to pay claims fairly, promptly, and equitably, and not use litigation and delay as a means to drive down claim values.

14.     The Bankruptcy Code cannot be used to whitewash CNA's illegal conduct and allow CNA to file a plan of reorganization that is in direct violation of CNA's legal obligations. CNA operates as a regulated business and insurance company and is required under New York law to pay claims fairly, promptly, and equitably. CNA cannot compel policyholders or claimants to institute litigation to recover amounts due under its policies by offering substantially less than what is owed.

15.     Despite its obligation under New York law to pay claims promptly and fairly, at each step in the bankruptcy process CNA has sought to minimize its own exposure by unfairly and unreasonably undervaluing the sexual abuse claims against the Diocese. CNA's deceptive and misleading business practices and acts have impeded the Diocese's ability to emerge from bankruptcy.

16.     As a result of the harms imposed by these unfair business practices, the Diocese files this Complaint alleging a violation of New York General Business Law Section 349 and seeks an injunction against CNA's deceptive business practices, including an injunction against CNA filing any competing nonconsensual plan of reorganization in the Bankruptcy Case, damages, and attorney's fees.

## THE PARTIES

*Plaintiff*

17.     Plaintiff is a Roman Catholic diocese in New York, with the episcopal see and principal place of business in Rochester, New York. The Diocese was established in March, 1868 by Pope Pius IX and encompasses 12 counties in Western New York

*Defendant*

18.     CNA is a financial services and insurance company organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois. It owns numerous U.S.-based property and casualty insurance companies, including CIC, and is one of the largest U.S. commercial property and casualty insurance companies.

19.     CIC is authorized to write, sell, and issue insurance policies, including commercial general liability policies providing bodily injury coverage, in New York. At all times material hereto, CIC conducted and transacted business through the selling and issuing of insurance policies within New York. CNA is now the successor-in-interest to numerous insurance policies sold by CIC to the Diocese of Rochester in New York.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding is related to the Chapter 11 case, *In re Diocese of Rochester*, pending in the United States Bankruptcy Court for the Western District of New York, Case No. 20-12345.

21.     This Court has personal jurisdiction over CNA because CNA has significant contacts with the State of New York, including past sale of insurance policies to New York consumers and ongoing duties relative to those policies.

22.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a) and 1391(b) because a substantial part of the events or omissions giving rise to the dispute occurred in this District, including the issuance of the respective insurance policies and/or certificates at issue.

## I.     FACTUAL BACKGROUND

### A.     *The New York Child Victims Act*

23.     On February 14, 2019, New York State Governor Andrew Cuomo signed into law the Child Victims Act ("CVA").Among the CVA's provisions was a "look-back window," which waived the statute of limitations for filing civil sexual abuse lawsuits for approximately one year. Initially, claimants were required to file a claim within a one-year period, at any point between August 14, 2019, and August 14, 2020. That period was extended by a year, to August 14, 2021, because of the COVID-19 pandemic.

24.     The response by survivors in New York was immense. Hundreds of individuals have brought claims alleging negligence against the Diocese and various entities of the Diocese, such as parishes and schools, in relation to alleged sexual abuse.

### B.     *DFS Puts New York Insurers on Notice of CVA Claims*

25.     Recognizing that the CVA would trigger many lawsuits that would raise insurance issues, the New York State Department of Financial Services ("DFS") issued circular letters addressed to property and casualty insurers throughout the state.

26.     Circular No. 11, issued on September 12, 2019, provided a roadmap for insurers of DFS' expectations regarding insurers' fair claims practices, unfair claims practices, recordkeeping, assessment of exposures, and adjustment of loss and loss expense reserves. New York Dept. of Fin. Serv., Insurance Circular Letter No. 11 (Sept. 12, 2019), available at https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2019_11.

27.     Insurers are expected to "cooperate fully with the intent of the Child Victims Act," including when "insurance coverage applies to CVA-related claims." *Id.*

28.     DFS emphasized that insurers are required to comply with well-established principles when handling CVA-related insurance claims:

1.     Have as your basic goal the prompt and fair settlement of all claims.

2.     Assist the claimant in the processing of a claim.

3.     Do not demand verification of facts unless there are good reasons to do so. When verification of facts is necessary, it should be done as expeditiously as possible.

4.     Clearly inform the claimant of the insurer's position regarding any disputed matter.

5.     Respond promptly, when response is indicated, to all communications from insureds, claimants, attorneys, and any other interested persons.

*Id.* (citing § 216.0 of 11 NYCRR Part 216 (Insurance Regulation 64)).

29.     Insurers were encouraged to "act in utmost good faith" and "to take the initiative to be cooperative so that victims may be compensated." *Id.*

30.     Likewise, in compliance with New York law, insurers were to "fairly review such policies, interpreting such contracts so as to resolve any ambiguities in the policyholders' favor." *Id.*

31.     DFS also reminded insurers of New York law's prohibitions on unfair claims practices, which carry substantial penalties and may result in disciplinary action. These include: "1. knowingly misrepresenting to insurance claimants pertinent facts or policy provisions relating to the coverage at issue; and 2. not attempting in good faith to effectuate prompt, fair and equitable settlements of insurance claims submitted in which liability has become reasonably clear." *Id.* (citing N.Y. Ins. Law § 2601(a) ("Section 2601"); 11 NYCRR Part 216).

32.     Circular No. 11 broadly restated the prohibitions of New York Insurance Law § 2601, which bars insurers that do business in New York from engaging in "unfair claim settlement practices."

33.     Violations of Section 2601 can give rise to claims under N.Y. General Business Law Section 349 ("Section 349"). Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York.]" N.Y. Gen. Bus. Law § 349. Section 349 allows a plaintiff to state a claim for recovery if the defendant's conduct is (1) consumer-oriented, (2) materially misleading, and if (3) the plaintiff suffered injury because of deceptive act or practice. *See id.*

## C.     *The Diocese of Rochester is Named as a Defendant in Hundreds of CVA Actions*

34.     Among the thousands of claims initiated under the CVA were hundreds of claims filed by survivors against the Diocese of Rochester.

35.     These lawsuits alleged abuse by Diocesan employees at various times from the 1940s to the 2010s. Dozens of individuals were accused of horrific acts of sexual abuse in these proofs of claim and complaints. The proofs of claim and complaints in the underlying claims allege thousands of individual instances of abuse.

36.     In addition to the Diocese of Rochester, many of the underlying claims named additional catholic entities related to the Diocese, including various parishes, catholic schools, catholic religious organizations, and other entities.

37.     The Diocese of Rochester filed for bankruptcy on September 12, 2019, less than a month into the CVA window. Three other New York Dioceses followed suit within the next two years, including the Diocese of Rockville-Center, the Diocese of Syracuse, and the Diocese of Buffalo.

**D.**     ***The Diocese of Rochester is Insured by CIC***

38.     The Diocese was insured by CIC through numerous policies of insurance that were issued to the Diocese and various Diocesan entities between January 17, 1943, and June 1, 1977 (collectively, the "Policies").

39.     Based on the Diocese's current understanding, the Policies include at least the following:

a.   Policy No. LG66109 issued by Commercial Casualty Insurance Co., with a policy period from January 17, 1943, to January 17, 1946, and policy limits of $25,000 per accident and $25,000 per person;

b.   Policy No. LG117457 issued by Commercial Casualty Insurance Co., with a policy period from January 17, 1946, to January 17, 1949, and policy limits of $25,000 per accident and $25,000 per person;

c.   Policy No. LZ15353 issued by Commercial Casualty Insurance Co., with a policy period of August 4, 1950, to August 4, 1951, and policy limits of $50,000 per accident and $25,000 per person;

d.   Policy No. LZ18051 issued by Commercial Insurance of Newark, NJ, with a policy period of March 1, 1952, to March 1, 1955, and policy limits of $50,000 per accident and $25,000 per person;

e.   Policy No. LZ19348 issued by Commercial Insurance of Newark, NJ, with a policy period of March 1, 1955, to March 1, 1956, and policy limits of $300,000 per accident and $100,000 per person;

f.   Policy No. LZ24003 issued by Commercial Insurance of Newark, NJ, with a policy period of March 1, 1956, to March 1, 1957, and policy limits of $300,000 per accident and $100,000 per person;

g.  Policy No. LZ24008 issued by Commercial Insurance of Newark, NJ, with a policy period of March 1, 1957, to March 1, 1958, and policy limits of $300,000 per accident and $100,000 per person;

h.  Policy No. LZ24018 issued by Commercial Insurance of Newark, NJ, with a policy period of March 1, 1958, to March 1, 1959, and policy limits of $300,000 per accident and $100,000 per person;

i.  Policy No. LZ24028 issued by Commercial Insurance of Newark, NJ, with a policy period of March 1, 1959, to March 1, 1960, and policy limits of $300,000 per accident and $100,000 per person;

j.  Policy No. LZ32604 issued by Commercial Insurance of Newark, NJ, with a policy period of March 1, 1960, to March 1, 1961, and policy limits of $300,000 per accident and $100,000 per person;

k.  Policy No. LZ32617 issued by Commercial Insurance of Newark, NJ, with a policy period of March 1, 1961, to March 1, 1962, and policy limits of $300,000 per accident and $100,000 per person;

l.  Policy No. LZ47272 issued by Commercial Insurance of Newark, NJ, with a policy period of March 1, 1962, to March 1, 1963, and policy limits of $300,000 per accident and $100,000 per person;

m.  Policy No. LZ48500 issued by Commercial Insurance of Newark, NJ, with a policy period of March 1, 1963, to March 1, 1965, and policy limits of $300,000 per accident and $100,000 per person;

n.  Policy No. LAZ32300, issued by Fireman's Insurance Co. of Newark, NJ, with a policy period of March 1, 1965, to March 1, 1967, and policy limits of $300,000 per accident and $100,000 per person;

o. Policy No. L0955300, issued by Fireman's Insurance Co. of Newark, NJ, with a policy period of March 1, 1967, to March 1, 1968, and policy limits of $300,000 per occurrence and $100,000 per person;

p. Policy No. L1239300, issued by Fireman's Insurance Co. of Newark, NJ, with a policy period of March 1, 1968, to June 1, 1969, and policy limits of $300,000 per occurrence and $100,000 per person;

q. Policy No. VBP5346801, issued by Commercial Insurance of Newark, NJ, with a policy period of June 1, 1969, to June 1, 1972, and policy limits of $300,000 per occurrence and $100,000 per person;

r. Excess Policy No. LX1216325, issued by Fireman's Insurance Co. of Newark, NJ, with a policy period of June 1, 1969, to June 1, 1972, and policy limits of $3,000,000 per occurrence excess $300,000;

s. Policy No. VBP5346812, issued by Commercial Insurance of Newark, NJ, with a policy period of June 1, 1972, to June 1, 1975, and policy limits of $300,000 per occurrence and $100,000 per person;

t. Upon information and belief, an excess policy issued by Fireman's Insurance Co. of Newark, NJ, with a policy period of June 1, 1972, to June 1, 1975, and policy limits of $3,000,000 per occurrence excess $300,000;

u. Policy No. VBP5346818, issued by Commercial Insurance of Newark, NJ, with a policy period of June 1, 1975, to June 1, 1977, and policy limits of $500,000 per occurrence;

v. Excess Policy No. LX2675182, issued by Fireman's Insurance Co. of Newark, NJ, with a policy period of June 1, 1975, to June 1, 1976, and policy limits of $3,000,000 per occurrence excess $500,000; and,

w.  Excess Policy No. LX6538036, issued by Fireman's Insurance Co. of Newark, NJ, with a policy period of June 1, 1976, to June 1, 1977, and policy limits of $3,000,000 per occurrence excess $500,000.

40.     Commercial Casualty Insurance Co. was renamed to Commercial Insurance of Newark, N.J., in April of 1951.

41.     Commercial Insurance of Newark, NJ, and Fireman's Insurance Co. of Newark, NJ, merged with other insurers into CIC on December 31, 2006, with all their obligations under the Policies. CIC is wholly owned by CNA.

42.     Numerous parishes and non-parish catholic entities are co-insureds with the Diocese and are insured by CNA under the Policies.

43.     The Policies are standard-form policies marketed by CIC's predecessors to consumers in New York.

44.     The Policies do not contain any self-insured retention limits.

45.     The Policies do not contain any sexual abuse or sexual misconduct exclusions.

46.     CNA has an ongoing duty to defend and indemnify the Diocese under these policies. As emphasized by DFS in Circular No. 11, CNA also has an affirmative duty to engage in fair claims practices, including the fair, prompt, and equitable payment of claims.

**E.      *CNA Wrongfully Denies Coverage En Masse For Virtually All CVA Claims***

47.     The Diocese timely provided notice to CNA of all of the hundreds of underlying claims that implicate the CNA Policies.

48.     CNA owes coverage under the CNA Policies because the underlying claims state causes of action in negligence for bodily injury against the Diocese and/or Diocese affiliated entities.

49.     In disregard of New York public policy and Circular No. 11, however, CNA issued wholesale, blanket denials for at least 270 of the underlying claims brought against the Diocese. In denying the claims, CNA raised a laundry list of justifications, many of which were contained in boilerplate denial letters irrespective of the unique and factually specific nature of each claim. CNA's responses illustrate a refusal to resolve these claims in good faith and to effectuate a fair and reasonable settlement for the benefit of survivors.

50.     This mass denial not only violated CNA's duty to pay claims fairly, promptly, and equitably, it also was misleading.  It suggested CNA has coverage defenses and an ability to deny claims that it does not have. Indeed, CNA is even now attempting to reel back this position because of the consequences it faces from those unlawful actions.

51.     The mass denial was also consumer-oriented because it involved the rights of numerous claimants and because it violated New York public policy enunciated to protect those claimants.

F.      *CNA Has Engaged in Other Unfair Settlement Practices*

52.      After the Diocese entered bankruptcy, its insurance assets became part of the bankruptcy estate. Settlements between the insured and the insurer must be approved by the bankruptcy court overseeing the proceedings.

53.     The Diocese swiftly engaged in settlement negotiations with its insurers, including CNA, to secure funds to compensate the survivors.

54.     On June 23, 2022, the Diocese submitted a motion to approve a proposed insurance settlement to fund a survivor compensation trust. *See In re The Diocese of Rochester*, No. 2-19-20905-PRW, Dkt. 1538, at 2 ("Settlement Motion"). The Settlement Motion, however, was based on CNA's misleading valuations of the underlying claims. *Id.*

55. The Diocese's insurers, including CNA, sought joinder to the Settlement Motion. *E.g.*, *In re Diocese of Rochester*, No. 2-19-20905-PRW, Dkt. 1542, at 1 ("CNA Joinder").

56. The Committee filed an objection to the Settlement Motion. *See In re The Diocese of Rochester*, No 2-19-20905-PRW, Dkt. 1555.

57. The Settlement Motion and the CNA Joinder reflect unreasonable claims valuation practices that were foisted upon the Diocese by CNA following CNA's mass denial of claims. Rather than base their valuations of the underlying claims on the facts contained therein, CNA has instead emphasized questionable late notice defenses, expected or intended defenses, and baseless assertions that the sexual abuse claimants cannot prove their cases under New York negligence theories. CNA Joinder at 8–11.

58. In fact, it is abundantly clear that all proposed settlements by CNA have failed to account for the actual exposure faced by CNA for the underlying claims despite the horrific nature of the abuse. *See* Settlement Motion at 2; CNA Joinder at 6–11.

59. CNA's proposed settlement figures do not reflect an accurate or reasonable accounting of the Diocese's actual exposure in these actions.

60. CNA has improperly devalued these claims by taking advantage of the fact that the Diocese is in bankruptcy.

61. CNA is aware of the pressure on the Diocese to emerge from bankruptcy as soon as possible and focus on its mission. CNA has exacerbated that pressure by mass denying the underlying abuse claims. CNA has sought to leverage the difficult position it created for the Diocese by presenting the Diocese with a binary choice: either accept CNA's misleading valuations of the underlying claims or contest these valuations and draw out the bankruptcy process.

62.     As a result, the Diocese has been denied the full benefit of its insurance coverage under New York law, hundreds of sexual abuse survivors have been denied prompt, fair, and equitable settlements, and the purpose of the CVA has been thwarted.

63.     CNA's conduct is widespread, consumer-oriented, misleading, and has injured the Diocese. CNA's conduct thus constitutes deceptive business practices and acts that violate Section 2601 and are independently actionable under Section 349.

**G.      CNA's Proposed Filing of a Competing Plan of Reorganization Constitutes an Unfair Business Practice**

64.     CNA has announced that it intends to file a competing plan of reorganization to the Diocese and Committee's proposed Joint Plan of Reorganization filed with the Court on March 24, 2013. *In re Diocese of Rochester*, Dkt. No. 2191 at 3.

65.     The law of the Second Circuit is clear that any such plan cannot be approved unless it receives overwhelming support of the survivors. CNA knows that it has no realistic possibility of obtaining overwhelming survivor support for its non-negotiated, non-consensual insurance plan. CNA's proposed competing plan constitutes misleading conduct because it undervalues the underlying claims and further delays the Diocese's emergence from bankruptcy.

66.     CNA has no basis to file a plan except to continue its campaign of misleading the Diocese and delaying what is supposed to be the prompt, fair, and equitable payment of hundreds of sexual abuse claims. Accordingly, the proposed plan is consumer-oriented, misleading, and harms the Diocese, adding to the list of CNA's deceptive business practices and acts.

**H.      CNA's Deceptive Business Practices and Actions Have Harmed and Will Continue to Harm the Diocese**

67.     CNA has engaged in materially misleading claims valuation practices, setting unreasonably low valuations for the underlying claims pending against the Diocese in bankruptcy.

CNA's proposed settlement figure would amount to an average of approximately $189,000 per claim—far too low given CNA's exposure, the number of claims that fall within its coverage period, and the average per-claimant settlement amounts offered by the settling insurers.

68.     CNA has engaged in materially misleading settlement practices, taking advantage of the Diocese's incentives to settle to exit Chapter 11 bankruptcy more quickly. CNA has routinely misrepresented the actual value of survivors' claims to reduce its own liability at the expense of its own policyholder. CNA's conduct also directly harms the sexual abuse survivors, as the proceeds of the insurance policies will be used to fund the survivor's compensation trust in the bankruptcy.

69.     CNA has further materially misled the Diocese and all other parties to the Bankruptcy Case regarding the purported strength of CNA's coverage defenses, and has used that position to unfairly devalue survivors' claims.

70.     CNA has sought to obstruct the confirmation of the Diocese's and Committee's Joint Plan of Reorganization to the point of threatening to file its own competing plan, an action that will delay the discharge of the Diocese from bankruptcy and delay payments to survivors from the proposed survivor compensation trust.

71.     As a result of the harms caused by CNA's deceptive business practices and actions, the Diocese files this Adversary Complaint alleging a violation of Section 349, seeking an injunction against CNA filing a Plan of Reorganization, damages, and attorney's fees.

**CLAIMS FOR RELIEF**

**COUNT I**
**DAMAGES PURSUANT TO N.Y. GENERAL BUSINESS LAW SECTION 349**

72.     Plaintiff repeats and realleges Paragraphs 1–71 as if fully set forth herein.

73.     The Diocese was insured by CNA between January 13, 1943, and June 1, 1977, under various primary and excess insurance policies.

74.     CNA denied coverage for virtually all underlying sexual abuse claims after they were tendered by the Diocese. CNA's mass denial relied on a laundry list of justifications, many of which were contained in boilerplate denial letters irrespective of the unique and factually specific nature of each claim. The mass denial was misleading, as throughout, CNA suggested that it has coverage defenses and an ability to deny claims that it does not have. CNA's mass denial resulted in massive exposure for the Diocese in the underlying claims.

75.     CNA's denials resulted in massive exposure for the Diocese. CNA then attempted to leverage the difficult position that it had created for the Diocese by seeking to foist on survivors a nonconsensual settlement of their claims. *See* Dkt. 1538 at 2 ("Settlement Motion"), Dkt. 1542 at 1, 8–11 ("CNA's Joinder"). CNA misled all parties—including the Diocese—by suggesting that the survivors' claims had much less settlement and litigation value than they actually have.

76.     CNA's Settlement Motion grossly undervalued the claims of the survivors, reducing claims that could result in hundreds of millions of dollars of damages under the CNA policies to a small fraction of their actual value. CNA's attempt to force the Settlement Motion on the survivors violated CNA's duty to pay claims fairly, promptly, and equitably.

77.     More recently, CNA failed even to timely respond when it was copied on reasonable, within-policy-limits demands to its insured, the Diocese, with respect to numerous sexual abuse claims.

78.     CNA has deliberately undervalued the underlying claims because they have been brought against a bankrupt insured. Furthermore, CNA has used the position of the Diocese— which seeks to emerge from Chapter 11 as quickly as possible—to CNA's own advantage by

misleading the Diocese as to the true value of the underlying claims and pressuring the Diocese accept those unreasonably low settlement values.

79.     CNA has engaged in unreasonable, misleading settlement practices and its deceptive actions aimed at thwarting the fulfillment of its obligation and delaying payment have harmed the interests of the Diocese, as well as the sexual abuse survivors, violating Section 2601, and creating a cause of action under Section 349.

80.     Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state" and allows that "any person who has been injured by reason of any violation of [section 349] may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages . . ., or both such actions." N.Y. Gen. Bus. Law § 349(a), (h).

81.     A plaintiff may state a claim under Section 349 if the defendant's conduct is (1) consumer-oriented, (2) materially misleading, and (3) the plaintiff suffered injury because of the deceptive act or practice.

82.     Section 349 permits injunctions, damages, punitive damages, and attorneys fees as remedies for CNA's deceptive conduct:

> "**[A]ny person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice**, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. **The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars**, if the court finds the defendant willfully or knowingly violated this section. **The court may award reasonable attorney's fees to a prevailing plaintiff.**"

*Id.* § 349(h) (emphasis added).

83.     The Diocese is a "person" within the meaning of this statute and has standing to state a claim because:

a. CNA has engaged in "consumer-oriented conduct" by selling standard-form insurance policies in the state of New York;

b. CNA's conduct has been "materially misleading" in its claims valuation and settlement practices, including its threat to propose its own plan of reorganization; and,

c. CNA's conduct has caused "injury" to the Diocese.

*See id.*

84. Further, the Diocese's claim impacts matters of considerable public interest in New York, including whether insurer practices regarding CVA claims meet the standards required by DFS. *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("It is clear that 'the gravamen of the complaint must be consumer injury or harm to the public interest.' . . . The critical question, then, *is whether the matter affects the public interest in New York*, not whether the suit is brought by a consumer or a competitor.") (quoting *Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F. Supp. 1084, 1089 n. 6 (S.D.N.Y. 1988)) (emphasis added)).

85. CNA's conduct is "consumer-oriented" in selling standard-form insurance policies to consumers, including the Diocese, within the state of New York. CNA's conduct has a broad impact on consumers at large, including other New York dioceses in bankruptcy and sexual abuse survivors in those bankruptcies.

86. CNA's conduct is also consumer oriented because it is designed to thwart clearly articulated New York public policy designed to protect the intended beneficiaries of standard-form insurance policies sold throughout the state, including sexual abuse survivors.

87. In addition, CNA's conduct of engaging in unreasonable claims valuation practices and unreasonable settlement practices is "materially misleading." These practices have deceived and misled the Diocese by taking advantage of the Diocese's position in bankruptcy to effect

artificially low settlement values and delaying the Diocese's emergence from bankruptcy through its obstruction of the confirmation of a Plan of Reorganization. CNA has put its own interest ahead of its insured to the detriment of both the insured and the survivors.

88.     CNA's conduct is further deceptive in that, by unreasonably denying, undervaluing, and/or delaying resolution of covered claims, CNA dishonestly misrepresents the nature of the coverage it is required to provide for the underlying CVA claims. Finally,

89.     CNA's conduct is also materially misleading in that, while unreasonably denying, undervaluing, and/or delaying resolution of claims, CNA also purports to hold itself out as complying with its duties under the Insurance Law—in reality, CNA's conduct violates the Insurance Law.

90.     CNA's conduct has damaged the Diocese in an amount to be proven at trial.

**COUNT II**
**INJUNCTIVE RELIEF PURSUANT TO N.Y. GENERAL BUSINESS LAW**
**SECTION 349(h)**

91.     Plaintiff repeats and realleges Paragraphs 1–90 as if fully set forth herein.

92.     New York General Business Law Section 349(h) permits injunctions against unlawful or deceptive business practices and actions.

93.     The injury to the Diocese, other insured entities, and the survivors is irreparable and cannot be remedied solely by the award of money damages. The Diocese's ability to successfully emerge from bankruptcy is hindered unless CNA fulfills its statutory duty to effect prompt, fair and equitable settlements of the underlying claims. Similarly, the survivors' claims will not be fully resolved, and the survivors will continue to suffer harm and, in some cases, die without adequate compensation, unless CNA settles the underlying claims promptly, fairly, and equitably.

94.     Plaintiff seeks an injunction from this Court enjoining CNA from filing a separate, nonconsensual Plan of Reorganization before this Court.

## COUNT III
## ATTORNEY'S FEES AND COSTS PURSUANT TO N.Y. GENERAL BUSINESS LAW SECTION 349(h)

95.     Plaintiff repeats and realleges Paragraphs 1–94 as if fully set forth herein.

96.     New York General Business Law Section 349(h) authorizes the award of "reasonable attorney's fees to a prevailing plaintiff."

97.     The Diocese is likely to incur significant attorney's fees and costs in challenging CNA's unlawful conduct and is entitled to an award of attorney's fees under this section.

## REQUEST FOR RELIEF

WHEREFORE, the Diocese respectfully requests that the Court enter judgment in its favor and against Defendant as follows:

a.      Entering judgment on Count I in favor of the Diocese and awarding damages as allowed by law and in an amount to be determined at trial; and

b.      Entering judgment on Count II in favor of the Diocese and enjoining CNA against filing any competing plan of reorganization before this Court in the Bankruptcy Case;

c.      Entering judgment on Count III in favor of the Diocese and Ordering Defendant to pay attorneys' fees and costs of suit; and

d.      Ordering such other and further relief as may be just and proper.

Dated: _____, 2023                            Respectfully submitted,

_____

*Counsel to the Diocese of Rochester*