UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                              :
In re                                         :        Chapter 11
                                              :
The Diocese of Rochester,                     :        Case No. 19-20905-PRW
                                              :
                                   Debtor.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

**OMNIBUS OBJECTION OF THE UNITED STATES TRUSTEE TO
COMPETING MOTIONS OF THE DEBTOR AND CONTINENTAL INSURANCE
COMPANY FOR ENTRY OF ORDERS (I) APPROVING DISCLOSURE
STATEMENTS; (II) APPROVING SOLICITATION PACKAGES
AND DISTRIBUTION PROCEDURES; (III) APPROVING THE FORMS
OF BALLOTS AND ESTABLISHING PROCEDURES FOR VOTING
ON COMPETING PLANS; (IV) APPROVING THE FORM, MANNER,
AND SCOPE OF CONFIRMATION NOTICES; (V) ESTABLISHING
CERTAIN DEADLINES IN CONNECTION WITH APPROVAL OF THE
DISCLOSURE STATEMENTS AND CONFIRMATION OF THE
COMPETING PLANS; AND (VI) GRANTING RELATED RELIEF**

**TO:    THE HONORABLE JUDGE WARREN,
            UNITED STATES BANKRUPTCY  JUDGE:**

William K. Harrington, the United States Trustee for Region 2 (the "**United States**

**Trustee**"), respectfully submits this objection (the "**Omnibus Objection**") both to the Motion

of the Diocese of Rochester (the "**Debtor**") for the Entry of an Order (I) Approving

Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III)

Approving the Forms of Ballots and Establishing Procedures for Voting on Joint Amended

Plan; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (V)

Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and

Confirmation of the Joint Amended Plan; and (VI) Granting Related Relief (the "**Debtor**

**Motion**"), and to the competing Motion (the "**CNA Motion**"); collectively referred to

hereinafter as the **"Motions"**) of Continental Insurance Company ("**CNA**") for similar relief.

1

ECF Doc. Nos. 2285, 2284.[1]  The Debtor Motion and CNA Motion respectively seek

approval of the Debtor's Amended Disclosure Statement (the "**First Amended Debtor**

**Disclosure Statement**") and CNA Amended Disclosure Statement (the "**CNA Disclosure**

**Statement**"; collectively referred to hereinafter as the **"Disclosure Statements"**)[2], In support

thereof, the United States Trustee respectfully states as follows:

## I.     PRELIMINARY STATEMENT

The primary purpose of a disclosure statement is to provide sufficient information to

enable creditors to make an informed decision with respect to a proposed plan of reorganization.

The Disclosure Statements, here, utterly fail to satisfy this obligation because they fail to provide

basic information regarding potential creditor recoveries, and fail to provide information in a

manner that is readily understandable to the creditors.  Furthermore, the Plans (as defined below)

related to the Disclosure Statements contain provisions that render them unconfirmable,

including, among others, expansive, abusive and inappropriate non-consensual third-party

releases and exculpation provisions.  Despite the inclusion of such provisions in the Plans, the

parties provide little to no information regarding the legal and factual justification for the same,

including, among others, the authority and jurisdiction of this Court to grant such releases and

---

[1] Unless otherwise defined herein, all capitalized terms not defined herein shall have the meaning ascribed to them in the First Amended Debtor Disclosure Statement and First Amended Debtor Plan, as well as the CNA Disclosure Statement and First Amended CNA Plan, as defined below.

[2] Because the Disclosure Statements and competing Plans – as well as the Debtor Motion and the CNA Motion -- are strikingly similar in many respects, this Omnibus Objection will refer and cite only to the First Amended Debtor Disclosure Statement, the First Amended Debtor Plan, and the Debtor Motion, unless a specific reference to the CNA Disclosure Statement, the First Amended CNA Plan, or the CNA Motion either contradicts or does not appear in the First Amended Debtor Disclosure Statement, First Amended Debtor Plan, or Debtor Motion.  To be clear, unless otherwise specified, any and all objections set forth herein to provisions of the First Amended Debtor Disclosure Statement, the First Amended Debtor Plan, and the Debtor Motion should be construed as objections to similar or matching provisions of the CNA Disclosure Statement, the First Amended CNA Plan, and the CNA Motion as well.  The United States Trustee reserves the right to object to any supplemental filings by either the Debtor, the Committee, or CNA, as well as the right to object to confirmation of either of the competing Plans.

2

broad exculpations, the identity of all of the parties receiving these releases, the specific

consideration provided by each released party for such releases, the identity of all of the claims

being released, and any justification for the release of conduct that has not yet occurred and for

parties not yet in existence.

Specifically, as discussed more fully herein, the United States Trustee objects to the

Motions and the Disclosure Statements for the following reasons:

a.      The Disclosure Statements fails to contain basic and essential information
regarding the creditors expected recoveries and the timing associated with such
recoveries.

b.      The Disclosure Statements relate to plans that are not confirmable because
the plans contain expansive, abusive, overly broad, and inappropriate non-
consensual releases.

c.      The Disclosure Statements fail to provide adequate information as to the
legal or factual justification for such non-consensual releases, including, among
others, the authority for the Court to grant the same, the identity of the released
parties, the specific consideration provided for such releases, or the specific claims
covered by such releases.  *See* 11 U.S.C. § 1129(a)(3).

d.      In the Motions, the parties inappropriately seek to bind creditors to such
releases without their consent, including non-voting creditors.  *See* 11 U.S.C. §
1129(a)(3).

e.      The Disclosure Statements contain overly broad and inappropriate
exculpation and indemnification provisions for numerous parties without proper
justification including for parties that our not yet in existence and for conduct that
has not yet occurred. *See* 11 U.S.C. § 1129(a)(3).

f.      The Disclosure Statements fail to advise parties that the approval of non-
consensual third-party releases are a non-core proceeding under *Stern v. Marshall*,
564, U.S. 462 (2011), and the bankruptcy court lacks constitutional authority to
finally approve such releases.

g.      The Motions appear to limit the manner and timing associated with notice
to certain creditors.

h.      The Disclosure Statements are not written in plain English designed to
enable abuse survivors and other creditors easily to understand the competing
plans' provisions.

3

i.      The Debtor Motion fails to set forth a procedure to send out both plans and to provide in the ballots an opportunity for voting creditors to choose between the competing Plans.

j.      The First Amended Debtor Plan improperly seeks to exclude certain disbursements from the calculation of the Debtor's quarterly fee obligations under 28 U.S.C. § 1930.

k.      The First Amended Debtor Disclosure Statement is unclear as to whether *all* provisions of the RSA are to be incorporated into the First Amended Debtor Plan.

In sum, the First Amended Debtor Disclosure Statement and accompanying documents fall far short of the level of disclosure required under the Bankruptcy Code.  In addition, the Plans that they support are not confirmable. Accordingly, the Motions should not be granted, and the Disclosure Statements should not be approved.

## II.      FACTUAL BACKGROUND

1.      On September 12, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the Western District of New York (the "**Court**").  ECF Doc. No. 1.

2.      On September 26, 2019, pursuant to Section 1102 of the Bankruptcy Code, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "**Creditors' Committee**") in this case.  ECF Doc. No. 68.

3.      The Debtor currently is operating its business and managing its affairs pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.      On November 3, 2022, the Debtor filed a Motion to Enter into and Perform under the [Restructuring Support Agreement (the "**RSA**")] and Approving the Committee Settlement, Motion to Approve Compromise under Rule 9019 (the "**RSA Motion**").  ECF Doc. No. 1790.  Five insurance companies and the United States Trustee filed separate objections to

4

the RSA Motion. *See* First Amended Debtor Disclosure Statement, Art. III.M, ECF Doc. No. 2218, pg. 36 of 104. To date, the Court has not ruled on the RSA Motion.

5.        This Court, in a Stipulation and Order Regarding Scheduling of Various Matters entered on October 23, 2023 (the "**Adjourned Matters Order**"), adjourned, among other motions, the RSA Motion without date, subject to "any Party's right to seek consideration of any such motion on a date that is no earlier than 15 days after completion of the hearings on the approval of the [First Amended Debtor Plan] and the [First Amended] CNA Plan." Adjourned Matters Order, ECF Doc. No. 2280, pg. 5 of 11.

6.        On March 24, 2023, the Debtor filed a Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization (the "**Original Debtor Disclosure Statement**"), along with a Chapter 11 Plan of Reorganization (the "**Original Debtor Plan**"). ECF Doc. Nos. 2046, 2047.

7.        On July 25, 2023, Continental Insurance Company ("**CNA**") filed a Response to the aforementioned Joint Status Report. ECF Doc. No. 2191.

8.        On August 31, 2023, CNA filed a competing Chapter 11 Plan of Reorganization for the Diocese of Rochester. ECF Doc. No. 2214.

9.        On September 13, 2023, the Debtor filed a First Amended Chapter 11 Plan of Reorganization (the "**First Amended Debtor Plan**"), along with the First Amended Debtor Disclosure Statement. ECF Doc. Nos. 2217, 2218.

10.        The First Amended Debtor Plan reflects an agreement reached by the Debtor, the Committee, and a group of "Settling Insurers." First Amended Debtor Disclosure Statement, Art. I, ECF Doc. No. 2218, pg. 13 of 104.

11.        On October 2, 2023, CNA filed a First Amended Chapter 11 Plan of Reorganization for the Diocese of Rochester (the "**First Amended CNA Plan;**" collectively

5

with the First amended Debtor Plan the **"Plans"**), along with the CNA Disclosure Statement. ECF Doc. Nos. 2246, 2247.

12.     The First Amended CNA Plan provides for a compensation fund of at least $201.35 million, including a "new offer from CNA of $75 million." CNA Disclosure Statement, Art. I, ECF Doc. No. 2247, pg. 8 of 51. The "new offer" "is not available under the plan proposed by the Diocese and the Committee." *Id.*

13.     On October 25, 2023, CNA filed a Motion for Entry of an Order Approving Disclosure Statement in Support of Continental Insurance Company's Chapter 11 Plan of Reorganization for the Diocese of Rochester, Approving Solicitation Procedures for Continental Insurance Company's Plan of Reorganization for the Diocese of Rochester, Approving Ballots and Establishing Procedures for Voting on Competing Plans, Approving the Form, Manner, and Scope of Notice for the Confirmation Hearing, and Granting Related Relief (the "**CNA Motion**").[3] ECF Doc. No. 2284.

14.     Also on October 25, 2023, the Debtor filed the instant Debtor Motion. ECF Doc. No. 2285.

15.     On November 7, 2023, CNA filed an Application for Allowance and Payment of Administrative Expense Priority Claims for Debtor's Breach of Continental Settlement Agreement (the "**CNA Administrative Claim**"). ECF Doc. No. 2314. A hearing on the CNA Administrative Claim motion is scheduled to be heard on January 30, 2024. If the CNA Administrative Claim is allowed in whole or in part, it might impact the First Amended Debtor

---

[3] The CNA Motion and First Amended CNA Plan followed a failed attempt by the Debtor and the Committee to reach a settlement with CNA regarding CNA's "defenses to coverage of Abuse Claims." First Amended Debtor Disclosure Statement, Art. 1, ECF Doc. No. 2218, pg. 13 of 104; Art. III, I, pg. 32 of 104.

Plan.

16.     The Court has scheduled a hearing for December 19, 2023, at 11:00 a.m., to consider both the CNA Motion and the Debtor Motion.

17.     The First Amended Debtor Plan provides that certain classes of creditors are not entitled to vote.  Specifically, holders of administrative claims, priority tax claims, non-tax priority claims, professional fee claims, the secured claim of the Bank of Castile, pass-through claims, and inbound contribution claims will not receive ballots.  First Amended Debtor Disclosure Statement, ECF Doc. No. 2218, pg. 18 of 104.  Only the holders of general unsecured claims (Class 4) and abuse claims (Class 5) are entitled to vote.  *Id.*

18.     The Debtor Motion states that holders of claims in classes other that Classes 3 and 4 "need not be provided with a Ballot, or copies of the Disclosure Statement, Joint Amended Plan, and Disclosure Statement Order. . . ."  Debtor Motion, ¶ 34, ECF Doc. No. 2285, pg. 15 of 71.

19.     CNA proposes that voting creditors[4] "be given the ability to vote to accept or reject each of the competing plans on the same ballot," as well as "the option to express a preference for one plan over the other."  CNA Motion, ¶ 36, ECF Doc. No. 2284, pg. 16 of 53.

20.     Article XIII of the First Amended Debtor Disclosure Statement sets forth the First Amended Debtor Plan's provision concerning, *inter alia*, third-party releases.  The release provision provides, in part, as follows:

> **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED
> IN THE PLAN OR THE CONFIRMATION ORDER, AND
> TO THE FULLEST EXTENT AUTHORIZED BY
> APPLICABLE LAW, ALL HOLDERS OF CLAIMS,**

---

[4] The Amended CNA Plan includes a voting class that does not appear in the First Amended Debtor Plan.  Class 6 creditors are holders of "Insurer Claims."  CNA Disclosure Statement, Art. I.A, ECF Doc. No. 2247, pg. 11 of 51.

7

**INCLUDING ABUSE CLAIMS (THE "RELEASING PARTIES"), SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING TO THE DIOCESE, THE PARTICIPATING PARTIES, THE ESTATE, THE CONDUCT OF THE DIOCESE'S AND THE PROTECTED PARTIES' BUSINESSES, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THE PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AMONG THE RELEASING PARTIES AND ANY RELEASED PARTY, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE.**

**THE FOREGOING RELEASE SHALL BE EFFECTIVE UPON THE OCCURRENCE OF THE EFFECTIVE DATE, EXCEPT THAT, SOLELY WITH RESPECT TO ANY ABUSE CLAIM THEY MAY HOLD, EACH ABUSE CLAIMANT WILL RELEASE THE DIOCESE OR ANY PARTICIPATING PARTY UPON THE OCCURRENCE OF THE ABUSE CLAIM DISCHARGE DATE APPLICABLE TO SUCH ABUSE CLAIM.**

**FOR THE AVOIDANCE OF DOUBT, PRIOR TO THE OCCURRENCE OF THE APPLICABLE ABUSE CLAIM DISCHARGE DATE AND SUBJECT TO THE LIMITATIONS SET FORTH IN THE PLAN, A DULY AUTHORIZED LITIGATION CLAIMANT OR THE TRUST MAY NAME THE DIOCESE OR ANY PARTICIPATING PARTY IN A CASE OR PROCEEDING TO ADJUDICATE WHETHER THE DIOCESE OR ANY PARTICIPATING PARTY HAS LIABILITY FOR AN ABUSE CLAIM AND THE AMOUNT OF ANY SUCH LIABILITY, BUT RECOURSE SHALL BE LIMITED TO THE PROCEEDS OF**

8

**ANY NON-SETTLING INSURER POLICIES AND ALL OTHER COSTS AND/OR DAMAGES THAT MAY BE RECOVERABLE AGAINST ANY NONSETTLING INSURERS.**

First Amended Debtor Plan, *Id.* at § 12.8, ECF Doc. No. 2218-1, pg. 72 of 84 (all caps and bold in original).

21.     The First Amended Debtor Plan defines "Released Parties" as follows:

*1.1.123 **Released Parties*** means (a) the Diocese and its Related Persons; (b) the Reorganized Diocese and its Related Persons, (c) the Participating Parties and their Related Persons; (d) a Settling Insurer, but only to the extent that such Settling Insurer's liability arises out of liabilities covered by the Settling Insurer Policies; and (e) a Settling Insurer's Related Persons, but only to the extent such Person's liability arises out of liabilities covered by the Settling Insurer Policies.

First Amended Debtor Plan, § 1.1.123, ECF Doc. No. 2218-1, pg. 23 of 84.

22.     The First Amended Debtor Plan defines "Related Parties" as follows:

*1.1.120 **Related Person*** means, with respect to any person or entity, such person's or entity's predecessors, successors, assigns, and present and former shareholders, members, affiliates, subsidiaries, employees, Agents, brokers, adjusters, managing agents, claims agents, underwriting agents, administrators, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such; *provided, however*, that no person or entity shall be a Related Person if such person or entity is an Excluded Party.[5]

*Id.* at § 1.1.120, ECF Doc. No. 2218-1, pg. 23 of 84.

---

[5] The First Amended Debtor Plan's defines "Excluded Party" as follows:

*1.1.64 **Excluded Party*** means, except to the extent there are a Participating Party: (a) any individual who personally committed an act of Abuse that resulted or would result in an Abuse Claim against the Diocese or a Participating Party, (b) the Holy See, (c) any religious order (notwithstanding whether such religious order may have operated a Parish or School that is a Participating Party), or (d) any other entity that is an affiliate of or associated with the Roman Catholic Church (other than the Diocese, the Reorganized Diocese, the Participating Parties and their respective Related Persons).

First Amended Debtor Plan, § 1.1.64, ECF Doc. No. 2218-1, pg. 16 of 84.

9

23.     The First Amended Debtor Plan conditions distributions to Class 4 Abuse

Claimants from the Trust on the signing by Class 4 Abuse Claimants of a "release [of] all Claims

against the Protected Parties."[6] *Id.* at § 2.3.4 (l), ECF Doc. No. 2218-1, pg. 34 of 84.

24.     The Notice of Non-Voting Status, attached to the Debtor Motion as Exhibit 6 "for

informational purposes only," provides, in part, as follows:

-   holders of administrative, priority tax, non-tax priority claims, professional fee
    claims, and U.S. Trustee fee claims hold unclassified claims and are not entitled to
    vote to accept or reject the First Amended Debtor Plan;

-   holders of Class 1 (the secured claim of the Bank of Castile), Class 2 (pass-through),
    and Class 5 (Inbound Contribution) claims are listed as unimpaired and presumed to
    accept the First Amended Debtor Plan.  These creditors are also "conclusively
    presumed to consent to certain releases, exculpations, and injunctive relief . . . unless
    [they] file an objection to confirmation" of the First Amended Debtor Plan."

Debtor Motion, Exh. 6, ECF Doc. No. 2285-1, pg. 40-41 of 41 (emphasis omitted).

25.     The Class 3 and 4 Ballots -- to be provided to holders of general unsecured claims

and Holders of Abuse Claims, respectively -- attached to the Debtor Motion as Exhibits 2 and 3,

respectively, provide as follows:

> **If the [First Amended Debtor] Plan is confirmed by the Bankruptcy
> Court, the terms of the [First Amended Debtor] Plan, including,
> without limitation, the releases and injunctions set forth in Section 12
> of the [First Amended Debtor] Plan will be binding on you whether or
> not you vote to accept or reject the [First Amended Debtor] Plan.**

ECF Doc. 2285-1, pg. 20 of 41, pg. 27 of 41 (emphasis in original).

26.     Although the Ballots give the voting creditors an opportunity to vote to accept or

reject to the First Amended Debtor Plan, they contain no opt-in or opt-out box for voting

---

[6] The "Protected Parties" are defined in the First Amended Debtor Plan as "the Diocese, the Reorganized Diocese,
the Participating Parties, the Settling Insurers, any Settling Insurer Covered Persons, and their respective Related
Persons."  First Amended Debtor Plan, § 1.1.118, ECF Doc. No. 2218-1, pg. 22 of 84.

creditors to check, should they wish to be exempted from the First Amended Debtor Plan's third-party releases. *See id.*

27. The First Amended Debtor Plan's exculpation provision (the "**Exculpation Provision**") reads as follows:

> **FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR, AND EACH EXCULPATED PARTY SHALL BE RELEASED FROM, ANY CLAIM BY ANY OTHER EXCULPATED PARTY, BY ANY HOLDER OF A CLAIM, OR BY ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION THAT OCCURRED DURING AND IN CONNECTION WITH THIS CHAPTER 11 CASE OR IN CONNECTION WITH THE PREPARATION AND FILING OF THIS CHAPTER 11 CASE, THE FORMULATION, NEGOTIATION, OR PURSUIT OF CONFIRMATION OF A PLAN, THE CONSUMMATION OF THE PLAN, AND THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF COMPETENT JURISDICTION AND PROVIDED THAT WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE COMMITTEE, THE DIOCESE, THE REORGANIZED DIOCESE AND THEIR RESPECTIVE OFFICERS, TRUSTEES, BOARDS, COMMITTEE MEMBERS, EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, EXPERTS, EXPERT WITNESSES, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY CODE AND THE CHANNELING INJUNCTION.**

*Id.* at § 12.10, ECF Doc. No. 2218-1, pg. 73 of 84 (all caps and bold in original).

28. The First Amended Debtor Plan defines "Exculpated Parties" as follows:

> *1.1.65* ***Exculpated Parties*** means the Diocese, the Reorganized Diocese, the

11

Diocese's Professionals, the Committee and its members in their capacities as members of the Committee, the Committee's Professionals, counsel to individual Committee members in their capacity as such, the Mediators, the Participating Parties, the Settling Insurers, and Related Persons of the Persons and Entities listed in this sentence; provided, however, that notwithstanding anything to the contrary herein, no Excluded Party may be an Exculpated Party.

*Id.* at § 1.1.65, ECF Doc. No. 2218-1, pg. 16 of 84.

29.     The First Amended Debtor Plan proposes a Channeling Injunction (the

"**Channeling Injunction**") that channels "all Abuse Claims against the Diocese and the

Parishes, Schools and Other Catholic Organizations that comprise the Participating Parties, to a

Trust. . . ." Debtor Motion, Exh. 4, "Confirmation Hearing Notice," ¶ 8, ECF Doc. No. 2285-1,

pg. 64 of 71.

30.     The Channeling Injunction applies to another defined category, Protected Parties,

which is comprised of

> the Diocese, the Reorganized Diocese, the Participating Parties, the Settling Insurers, any Settling Insurer Covered Persons, and their respective Related Persons.

First Amended Debtor Plan, § 1.1.118, ECF Doc. No. 2218-1, pg. 22 of 84; § 12.3, Pg. 67 of 84.

31.     With respect to quarterly fees payable to the United States Trustee pursuant to 28

U.S.C. § 1930(a)(6), as well as interest thereon under 31 U.S.C. § 3717, the First Amended

Debtor Plan provides, in part, as follows:

> In no event shall the payments made to the Trust pursuant to Sections 2, 5, 7 or 8 of this Plan by any Person other than the Diocese be considered "disbursements" under 28 U.S.C. § 1930, nor shall any payment made by the Trust to any Person be considered a disbursement under 28 U.S.C. § 1930.

*Id*. at § 2.1.5, ECF Doc. No. 2218-1, pg. 29 of 84.

## III. ARGUMENT

### A. Legal Standards

Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125; *see also In re Quiqley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information. . . .

11 U.S.C. § 1125(a)(1); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

Section 1125(b) of the Bankruptcy Code requires the Bankruptcy Court to find that the disclosure statement contains "adequate information" before a debtor is allowed to solicit its plan of reorganization or plan of liquidation to its creditors. 11 U.S.C. § 1125(b). The disclosure statement requirement of section 1125 is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d

414 (3d Cir. 1988)). "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)). The "adequate information" requirement is designed to help creditors in their negotiations with the Debtor over the plan. *See Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94 (3d Cir. 1988).

Section 1125 of the Bankruptcy Code is biased towards more disclosure rather than less. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling, for disclosure to voting creditors. *Adelphia*, 352 B.R. at 596 (citing *Century Glove,* 860 F.2d at 100). Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement as long as the additional information is accurate and its inclusion is not misleading. *Adelphia*, 352 B.R. at 596. The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan. *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999). The disclosure statement must inform the average creditor what it will receive and when and what contingencies might intervene. *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

Moreover, Section 1129(a)(2) conditions confirmation of a plan upon compliance with applicable Code provisions. The disclosure requirement of Section 1125 is one of those provisions. *See* 11 U.S.C. § 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000). Therefore, a disclosure statement should not be approved if the plan it describes is unconfirmable on its face, because approving the disclosure statement and proceeding to a confirmation hearing would be a fruitless exercise. *In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999); *In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.

1992); *In re H.K. Porter Co*., 156 B.R. 16 (W.D. Pa. 1993); *In re Monroe Well Service*, 80 B.R.

324 (Bankr. E.D. Pa. 1987); *In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D.

Fla. 1990); *John Hancock Mutual Life Insurance Company v. Route 37 Business Park*

*Associates*, 987 F. 2d 154 (3d Cir. 1993).

Here, the First Amended Debtor Disclosure Statement contains inadequate information

and describes an unconfirmable plan, as discussed below.

### B.     The Debtor Has Failed to Provide Adequate Information Establishing that the Proposed Releases and Exculpation Provisions are Appropriate.

1.  The First Amended Debtor Disclosure Statement Fails to
    Establish Why Releases Are Appropriate in This Case

The First Amended Debtor Plan, if confirmed, will provide a myriad of third parties with

broad releases that will deprive the Debtor's creditors of certain property rights without their

consent.  The third-party releases in the Plan are material terms and should be addressed fully in

the First Amended Disclosure Statement so that interested creditors can determine (i) exactly

what releases will be imposed upon them and (ii) the likelihood of the Debtor's success in

confirming a Plan with such broad third-party releases.  Unfortunately, other than vague

assurances that the Debtor believes the releases contained in the Plan are reasonable and fair, the

First Amended Disclosure Statement fails to explain in a clear and succinct manner what releases

are being imposed on creditors and what support is found in the Bankruptcy Code and Circuit

precedent for those broad third-party releases.

The First Amended Disclosure Statement should explain why the third-party releases in

the Plan are justified.  Specifically, assuming the Debtor persuades the Court that it has subject

matter jurisdiction to compel impaired creditors to provide non-consensual third-party releases,

the imposition of third-party releases, if it is deemed proper at all as the United States Trustee

15

contends that the Bankruptcy Code provides no authority for the imposition of the same, is

proper only in rare and unique circumstances. *In re SunEdison*, 576 B.R. 453, 461-62 (S.D.N.Y.

Bankr. 2017) (citing *Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia*

*Fiber Network, Inc.*), 416 F.3d 136, 141 (2d Cir. 2005) ("**Metromedia**")).  In *Metromedia*, the

Second Circuit articulated at least two reasons for its reluctance to approve these releases:

> First, the only explicit authorization in the Code for non-debtor releases is 11 U.S.C.
> § 524(g), which authorizes releases in asbestos cases when specified conditions are
> satisfied, including the creation of a trust to satisfy future claims, [and] …Second,
> a non-debtor release is a device that lends itself to abuse. By it, a non-debtor can
> shield itself from liability to third parties. In form, it is a release; in effect it may
> operate as a bankruptcy discharge without a filing and without the safeguards of the
> Code. The potential for abuse is heightened when releases afford blanket immunity.

*Id.* at 142. *See also In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009)

(footnotes omitted); *In re Motors Liquidation Co.*, 477 B.R. 198, 220 (Bankr. S.D.N.Y. 2011)

("Although (since the Code is silent on the matter) third-party releases aren't 'inconsistent with

the applicable provisions of this title,' the Second Circuit has ruled that they're permissible only

in rare cases, with appropriate consent or under circumstances that can be regarded as unique,

some of which the Circuit listed. But where those circumstances haven't been shown, third-party

releases can't be found to be appropriate").

2. Because Releasing Parties Have No Opportunity to Affirmatively Demonstrate Their
   Consent to the Same, , the Releases are Impermissibly Nonconsensual

The nonconsensual, non-debtor, third-party releases in the Plan require denial of

confirmation and therefore the First Amended Disclosure Statement cannot be approved because

it does not pass muster under Second Circuit precedent.  A release of claims held by non-debtors

against other non-debtors is "a dramatic measure to be used cautiously" and "is only proper in

rare cases." *Metromedia*, 416 F.3d at 142-43 (internal citation omitted).  "The plain admonition

of the Second Circuit Court of Appeals is that third-party releases are frequently a subject of

abuse and that they are appropriate only in narrow and unusual circumstances." *Chassix Holdings*, 533 B.R. at 78 (citing *Metromedia*, 461 F 3d. at 143).

Further, by virtue of the Channeling Injunction (discussed below) all abuse claims are channeled to the Trust and barred from future pursuit, and thus confirmation of the First Amended Debtor Plan is a functional release of any and all claims against the Participating Parties, Settled Insurer Parties, and a host of others but the First Amended Debtor Plan does not condition confirmation on affirmative consent from *all* affected creditors. Added to all of the foregoing is the glaring failure of the First Amended Debtor Disclosure Statement to disclose what each of the Released Parties is contributing in exchange for their release.

According to *Purdue Pharma,* given the potential for abuse, third-party releases must be imposed against a backdrop of equity, and courts should exercise particular care when evaluating a non-debtor release. *In Re Purdue Pharma L.P.*, 69 F.4th 45, 79 (2d Cir. 2023), *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (U.S. Aug. 10, 2023).[7] In evaluating releases, courts must consider the following seven factors to determine if a non-consensual non-debtor release is appropriate:

First, is there an identity of interest between the debtor and the released third parties?

Second, are the claims against the debtor and non-debtor factually and legally intertwined?

Third, is the scope of the release appropriate?

Fourth, is the release essential to the reorganization?

Fifth, has the non-debtor contributed substantial assets to the reorganization?

Sixth, did the impacted creditors overwhelmingly vote in support of the plan? And

Seventh, does the plan provide fair payment of enjoined claims?

---

[7] The matter was argued before the Supreme Court of the United States on December 4, 2023.

*Id.* at 78-79.

The Second Circuit requires "consideration of each factor" but also cautions that "there may even be cases in which all factors are present, but the inclusion of third-party releases in a plan of reorganization should not be approved." *Id*. at 79. The Court also required the bankruptcy court to "support each of these factors with specific and detailed findings." *Id.* The third-party release here fails to satisfy the seven-factor test.

The First Amended Debtor Disclosure Statement fails to disclose and explain the contributions (or lack thereof) of many of the Released Parties – many of whom are not identified in either the First Amended Debtor Disclosure Statement or the First Amended Debtor Plan -- and the Participating Parties. Although the First Amended Debtor Disclosure Statement sets forth the total amount of the cash contribution to be provided by the Diocese and other Participating Parties and payments paid collectively by the Settling Insurers, First Amended Debtor Disclosure Statement, Art. I, ECF Doc No. 2218, pg. 13 of 104, it does not disclose the amount paid by each of the Participating Parties. In fact, the Debtor takes great pains to list all of the groups of contributors to the Trust – the Diocese and Reorganized Diocese, the Parishes, the Schools, Other Catholic Organizations, the Settling Insurers, and "each of the foregoing Persons' respective Related Persons"[8] – and defines them all as "Protected Parties" that are to

---

[8] The First Amended Debtor Plan defines Related Persons as follows:

> *1.1.120* **Related Person** means, with respect to any person or entity, such person's or entity's predecessors, successors, assigns, and present and former shareholders, members, affiliates, subsidiaries, employees, Agents, brokers, adjusters, managing agents, claims agents, underwriting agents, administrators, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such; *provided, however*, that no person or entity shall be a Related Person if such person or entity is an Excluded Party.

First Amended Debtor Plan, § 1.1.120, ECF Doc. No. 2218-1, pg. 23 of 84.

benefit from the non-consensual releases, exculpation, and injunction provisions of the First Amended Debtor Plan.  *Id.* at pg. 14 of 104.  The First Amended Disclosure Statement, however, does not disclose the respective contributions of, for example, the Parishes, the Schools, or Other Catholic Organizations, either collectively or individually.  Moreover, the many "Related Persons" connected to each of the contributors to the plan are unidentified.  Thus, not only are the creditors given no opportunity either to check an "opt in" or "opt out" box with respect to the releases, but they do not even know whom they are releasing.[9]

Disclosure of the consideration, or lack thereof, being contributed by the Participating Parties in exchange for the third-party releases is required.  Such disclosure is fundamental to not only to the determination of the adequacy of First Amended Disclosure Statement but also to the confirmability of the First Amended Debtor Plan under *Purdue Pharma*.

The First Amended Debtor Disclosure Statement states that "[t]he Plan's injunctive provisions and releases are an integral part of the Plan and are essential to its implementation." First Amended Debtor Disclosure Statement, Art. XIII. L. ECF Doc. No. 2218, pg. 84 of 104. The simple, self-serving statement does not explain why the Plan's implementation hinges on the release of each of the many Released Parties – to say nothing of the panoply of Related Parties.

---

[9] Curiously, although the proposed First Amended Debtor Plan's third-party releases are fully non-consensual, holders of all but Class 3 and Class 4 Claims – namely, holders of administrative, priority tax, non-tax priority, professional fee, U.S. Trustee fee, secured (in the case of The Bank of Castile), pass-through, and Inbound Contribution claims -- will be "conclusively presumed to consent to certain releases, exculpation, and injunctive relief . . . unless [they] file an objection to confirmation."  Debtor Motion, Exh. 6, ECF Doc. No. 2285-1, pg. 40-41 of 41 (emphasis omitted).  Thus, these creditors are deemed to have consented to releases in the context of a Plan where the consent of the releasing parties is immaterial.

If, in fact, the Debtor should argue that it can impose releases upon holders of non-voting claims or interests, the Plan must make that clear and provide a way for the affected parties to affirmatively demonstrate knowing and informed consent to such releases.  This is especially true for creditors listed as "unimpaired."  As one court observed, "unimpaired creditors should not be deemed to have consented to the third party releases set forth in the Plan."  *In re Chassix Holdings, Inc.,* 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015).  Additionally, creditors that are deemed to reject the Plan cannot be construed to have accepted the releases.  *Id.*

The identities of the Released Parties and their respective Plan contributions (if any) are not disclosed in the First Amended Disclosure Statement.

Additionally, the *Purdue Pharma* factors are not met here, despite the Second Circuit's requirement that the factors be considered. *Purdue Pharma, L.P.*, 69 F.4[th] at 79. First, the Debtor has not shown that any of the numerous proposed released third parties have made essential contributions to the Plan. As the Second Circuit held, "if the only reason for the inclusion of a release is the non-debtor's financial contribution to a restructuring plan, then the release is not essential to the bankruptcy." *Id.* at 81. Second, there has been no proof that any of the proposed released parties have or will contribute substantial assets to the reorganization. In *Purdue Pharma*, the Second Circuit noted that the funds contributed to the plan were one of the largest contributions in bankruptcy anywhere.[10] *Id.* Here, the First Amended Debtor Disclosure Statement fails to identify what each released party is contributing to even make such an assessment. The Disclosure Statement should identify the proposed released parties and adequately explain their contributions and consideration they are making to the Plan and the reorganization.

Even if, however, the third-party release could satisfy the *Purdue* factors, approval of the release is a non-core proceeding under *Stern v. Marshall*, 564, U.S. 462 (2011), *Purdue Pharma*, 69 F.4th at 68, and the bankruptcy court therefore lacks constitutional authority to finally approve the release.[11] Accordingly, the bankruptcy court's decision, should it approve the third-

---

[10] The United States Trustee takes the position that whether the contributions were the largest in a case are not relevant to the analysis. Moreover, the arguments made and positions taken by the United States Trustee in this pleading are not an indication or waiver of his positions on relevant issues in other or future cases, particularly given the pending outcome of *William K. Harrington, United States Trustee, Region 2, v. Purdue Pharma L.P., et al.*, Case No. 23A_, filed in July 2023.

[11] There is no information contained in the First Amended Disclosure Statement setting forth a basis for the Debtor's apparent belief that this Court has subject matter jurisdiction to impose the third-party releases. Whether this Court has subject matter to bestow such broad releases is a material issue and an issue that should be addressed by the Debtor

party release, would only constitute findings of fact and conclusions of law for the district court's *de novo* review before the Plan could be confirmed.

### 3. The Channeling Injunction Improperly Functions as an Additional Third-Party Release

Another integral component of the First Amended Debtor Plan is the Channeling Injunction described at Section 12.3 which protects the Participating Parties, Settled Insurer Parties, and a host of others from liability, past and future, and is the functional equivalent of a release of claims against those non-debtor third parties because it bars non-debtor third parties, including but not limited to abuse claimants, from bringing claims.[12]  Participating Parties have quantifiable contributions to the Trust mentioned in the First Amended Debtor Disclosure Statement.  The First Amended Debtor Disclosure Statement does not address this Court's authority and jurisdiction to impose a channeling injunction against claimants who do not consent and sign the release, nor has the Debtor demonstrated that its proposed process yields true consent.  In sum, the Debtor has not offered an adequate basis - in fact or in law - for this Court to find that the First Amended Debtor Disclosure Statement provides adequate information regarding the Channeling Injunction.

---

in the Disclosure Statement so that interested creditors can determine (i) exactly what release are being imposed and on which creditors and (ii) the likelihood of Debtor's success of confirming a plan with such broad releases. *See In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008), *vacated & remanded on other grounds*, 557 U.S. 137 (2009), *aff'g in part & rev'g in part*, 600 F.3d 135 (2d Cir. 2010) and *Deutsche Bank AG v. Metromedia*, 416 F. 3d at 141; accord *In re Dreier LLP*, 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010); *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 695 (Bankr. S.D.N.Y. 2010).

[12] The channeling injunctions authorized in asbestos cases under section 524(g) offer protections that satisfy the Constitution's requirements that the extra-statutory, ad hoc third-party releases do not, including that (1) the liabilities channeled are derivative of the debtor and not direct claims held by one non-debtor against another non-debtor, i.e., the claims implicate the *res* of the estate; (2) claimants whose claims are channeled to a trust have super-majority voting rights (75% must approve); and (3) the appointment of a future claimants' representative preserves and protects the rights of future claimants.

21

The United States Trustee also opposes the Channeling Injunction because, like the releases described on the Class 3 and Class 4 ballots, it protects and insulates a myriad of non-debtor parties without the consent of all affected creditors. Although the First Amended Debtor Plan states that the Channeling Injunction bars the prosecution of "channeled claims against Protected Parties . . . in consideration of the undertakings of the protected parties herein, their contributions to the trustee, and other consideration, . . ." First Amended Debtor Plan, § 12.3, ECF Doc. No. 2218-1, pg. 67 of 84, the Plan does not identify the "consideration" provided by the Protected Parties. Accordingly, the Channeling Injunction should not be approved.

    4.    The Disclosure Statement Should Not Be Approved
            <u>Because the Exculpation Provision is Overly Broad</u>

The Exculpation Provision is overly broad and far beyond the scope of 11 U.S.C. § 1125(e).[13] *See* First Amended Debtor Plan, § 12.10, ECF Doc. No. 2218-1, pg. 73 of 84. The exculpation provision should be limited (and is not here), with respect to "claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court." *In re Aegean Marine Petroleum Network, Inc*. 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019). Accordingly, the Debtor should revise their exculpation provision so that it is consistent with 11 U.S.C. § 1125; otherwise, the United States Trustee objects to the exculpation provision as set forth below.

First, the Exculpation Provision covers not only specific transactions approved by the Court, but also appears to encompass virtually any action taken during – and even prior to -- these Chapter 11 cases. Section 1125(e) is the only section of the Bankruptcy Code that provides for exculpation. *See* 11 U.S.C. § 1125(e) (limiting liability in connection with certain good faith

---

[13] The arguments made and positions taken by the United States Trustee in this pleading are not an indication or waiver of his positions on relevant issues in other or future cases, particularly given the pending outcome of the appeal in *In re Voyager Holdings*, *Inc.*, No. 23 CIV. 02171 (JHR), 2023 WL 2731737 (S.D.N.Y. Apr. 1, 2023).

solicitation and plan participation efforts). There is no Bankruptcy Code provision that supports exculpating all the defined Exculpated Parties, *see* First Amended Debtor Plan, § 1.1.65, ECF Doc. No. 2218-1, pg. 16 of 84, in a manner as broadly as this Plan. *See Wash. Mut.*, 442 B.R. at 350-351 (limiting exculpation clause to estate fiduciaries for "actions in a bankruptcy case").

Second, the Exculpation Provision is not limited to acts or omissions during the case, but instead extends to post effective date activity that cannot be exculpated. First Amended Debtor Plan, § 12.10, ECF Doc. No. 2218-1, pg. 73 of 84 (exculpation covers conduct "[f]rom and after the Effective Date") (emphasis omitted). *See Id.* at 350 (exculpations cover "actions in the bankruptcy case") (citing *PWS Holding.,* 228 F.3d at 246). The temporal scope has no end date and therefore could be interpreted to provide prospective exculpation that extends past the Effective Date, especially as it covers entities that will not exist until after the Effective Date, such as the Reorganized Diocese. Exculpation clauses should not extend past the effective date of a plan, to avoid exculpating actions that have not yet occurred and are as yet unknown. *See In re Mallinckrodt PLC*, 639 B.R. 837, 883 (Bank. D. Del. 2022) (exculpation "only extends to conduct that occurs between the Petition Date and the effective date"). In addition, post-effective date entities cannot receive prospective immunity by exculpation, just as they cannot receive prospective immunity through a release. *See Wash. Mut.*, 442 B.R. at 348 ("The Liquidating Trust and its Trustee have not done anything yet for which they need a release. They will not even come into existence until the Plan is confirmed."). The Plan should not grant prospective releases to entities that do not yet exist on account of future conduct and claim that have yet to arise. While the "Exculpated Parties" provision of the Plan states that an "Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date," the Exculpation Provision does not contain the same temporal

scope.  To rectify this inconsistency in the Exculpation Provision, all post-effective date entities should be stricken from the list of Released Parties and should not be covered by the Plan's Exculpation Provision.

Third, the Exculpation Provision is inappropriate because the list of exculpated parties is overly broad. The list of exculpated parties includes many persons who cannot be classified as estate fiduciaries.  A proper exculpation operates to shield court-supervised fiduciaries from liability.  *Aegean Marine*, 599 B.R. at 721.  "The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtor's directors and officers." *In re Washington Mut., Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011). Exculpation provisions are based "to some extent . . . on the theory that court-supervised fiduciaries are entitled to qualified immunity for their actions." *Aegean*, 599 B.R. at 721.  "If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations."  *Id.*

Here, the Exculpated Parties include not only the Debtor and the Committee and each of its members, but also Participating Parties, Settling Insurers, "Related Persons of the Persons and Entities" listed in the Exculpated Parties provision, and the post-effective date entity, the Reorganized Diocese. Plan, § 1.1.65, ECF Doc. No. 2218-1, pg. 16 of 84.  *Roni LLC v. Arfa*, 74 A.D.3d 442, 444 (2010), *aff'd*, 18 N.Y.3d 846 (2011) ("a conventional business relationship between parties dealing at arm's length does not give rise to fiduciary duties.").  In fact, the range of Exculpated Parties is so broad that it likely includes parties who performed no duties essential, necessary, or at all, related to the Plan.  Moreover, although the First Amended Debtor Plan

includes non-fiduciaries among the Exculpated Parties, the First Amended Debtor Disclosure Statement provides no basis or justification for doing so. *See Wash. Mut.*, 442 B.R. at 350-351 (limiting exculpation clause to estate fiduciaries).

The Settled Insurers, for example, are indisputably not fiduciaries to the estate. A proper exculpation is a protection of court-supervised fiduciaries. *In re Aegean Marine Petroleum Network, Inc.* 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019). Exculpation provisions are based "to some extent . . . on the theory that court-supervised fiduciaries are entitled to qualified immunity for their actions." *Aegean Marine*, 599 B.R. at 721. "If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations." *Id.* There is no legal basis to provide the protection of an exculpation provision to the Settled Insurers or the other non-fiduciaries listed in the First Amended Debtor Plan's definition of Exculpated Parties.[14]

Fourth, in addition to excepting gross negligence, willful misconduct, fraud, or breach of fiduciary duty, the exculpation provision should also carve out claims for bad faith and legal malpractice, release of which is prohibited under section of the New York Rules of Professional Conduct, *i.e.*, N.Y. Comp. Codes R. & Res. Tit. 22 § 1200.8 Rule 1.8(h)(1).

Fifth, the United States Trustee also objects to the extent the Exculpation Provision shields Exculpated Parties who rely upon the advice of counsel.[15] Although reliance may be

---

[14] The Exculpation Clause protects the Exculpated Parties against claims of all classes of creditors. Holders of Class 1, Class 2, and Class 5 claims are listed as unimpaired and are presumed to accept the First Amended Debtor Plan. Thus, they are not eligible to vote on the Plan. These creditors are also "conclusively presumed to consent to certain releases, exculpations, and injunctive relief . . . unless [they] file an objection to confirmation" of the First Amended Debtor Plan." Debtor Motion, Exh. 6, ECF Doc. No. 2285-1, pg. 40-41 of 41 (emphasis omitted).

[15] In the context of the carve-outs for fraud, breach of contract, willful misconduct, and breach of fiduciary duty, the Exculpation Provision states that "any Exculpated Party shall be entitled to reasonably rely upon the advice of

raised as an affirmative defense, it should not be an absolute bar against liability. The Exculpated

Parties should have a claim against their legal advisors for any improper or mistaken advice, and

the Exculpation Provision should not protect such advice.

Sixth, the Trust created under the First Amended Debtor Plan includes a provision that

operates as an additional release and exculpation provision. Section 8.13 of the First Amended

Debtor Plan provides, in part, as follows:

> [n]o recourse shall ever be had . . . against the Trustee personally, or against any agent
> retained . . . by the Trustee" [except that] "the Trustee may be held liable for its recklessness,
> gross negligence, willful misconduct, knowing and material violation of law, breach of the
> fiduciary duty of loyalty, or fraud.

First Amended Debtor Plan, § 8.13, ECF Doc. No. 2218-1, pg. 54 of 84. This "no recourse"

provision provides for a release and exculpation of non-Debtor parties that are not yet in

existence and have not yet done anything to warrant such protections. This provision functions

as a release of and exculpation for prospective future conduct. Of note, the indemnification

provision at Section 8.14 of the First Amended Debtor Plan is really an overly broad exculpation

provision for "the Trustee and its [unidentified] Agents" that is overly broad, internally

inconsistent as to what is unprotected excluded conduct, applies to future conduct, and does not

exclude breach of fiduciary duty. The Motion, the First Amended Debtor Disclosure Statement,

and First Amended Debtor Plan do not explain why it is appropriate to provide such protections

to the Trust and others connected to the Trust. Moreover, although the ballots mention the third-

party releases, they do not refer to the release/exculpation for the Trust and its agents.

Seventh, abuse survivors can receive a distribution from the Trust under the First

Amended Debtor Plan only if they sign a release. First Amended Debtor Plan, § 2.3.4 (l), ECF

---

counsel with respect to its duties and responsibilities (if any) under the Plan." First Amended Debtor Plan, § 12.10,
ECF Doc. No. 2218-1, pg. 73 of 84 (emphasis omitted).

Doc. No. 2218-1, pg. 34 of 84.  Specifically, [e]ach Class 4 Claimant must release all Claims against the Protected Parties [defined in section 1.1.118 of the Plan]." *Id.*  The long list of Protected Parties consists of the Diocese, the Reorganized Diocese, the Settling Insurers, any Settling Insurer Covered Persons, and their respective Related Parties.  Plan, § 1.1.118, ECF Doc. No. 2218-1, pg. 22 of 84.  Thus, not only do abuse survivors have no way to opt out of the releases, but their ability to receive a distribution is conditioned on the survivors' signing of a release form in order to receive a distribution from the Trust.  *Id.* at § 2.3.4 (l), ECF Doc. No. 2218-1, pg. 34 of 84.

This is a Hobson's choice for abuse survivors - a choice between accepting the First Amended Debtor Plan with the releases or filing a formal objection to confirmation.  *See id.*[16] This is fundamentally unfair to the abuse survivors.  Any third-party release should be consensual, and such consent should be knowing, voluntary, and not coerced.  Here, if they wish to opt out of the releases, they cannot simply check a box; they must go through the labor and expense of filing a formal objection.  These releases are clearly non-consensual and must be rejected.

The Debtor is entitled to a discharge under Section 1141 if it confirms a plan that complies with Section 1129 and that pays creditors what they are entitled to receive.  That discharge provides the Debtor with protections from all pre-petition abuse claims and functions as a release.  Third parties who are not debtors have no statutory right to receive a discharge and are not entitled to receive a release that is the equivalent of a debtor discharge.  In prioritizing the

---

[16] The Notice of Non-Voting Status that the Debtor proposes to send to holders of administrative claims, priority tax claims, non-tax priority claims, professional fee claims, and U.S. Trustee fee claims, as well as holders of Class 1, 2, and 5 claims, states that all such creditors are "conclusively presumed to consent to certain releases, exculpations, and injunctive relief" unless they file an objection to confirmation.  Debtor Motion, Exh. 6, ECF Doc. No. 2285-1, pg. 40 of 41.  Curiously, the Class 3 and Class 4 Ballots contain no such admonition.  *See id.*, Exh. 3, 4, pg. 17-30 of 41.

protections of non-debtors over its obligations to pay abuse survivors, the Debtor is violating the

good faith requirement set forth in section 1129(a)(3) of the Bankruptcy Code.

### C. The First Amended Debtor Disclosure Statement Fails to Inform Voting Creditors the Amounts They Can Expect to Receive Under the First Amended Debtor Plan

Although the Amended Debtor Disclosure Statement informs creditors that the Trust will

be funded by an aggregate $55 million cash contribution by entities related to the Diocese, and

"at least $71,350,000 in monetary contributions made by Settling Insurers," plus an assignment

to the Trust of certain insurance claims, First Amended Debtor Disclosure Statement, Art. I.A.,

ECF Doc. No. 2218, pg. 14 of 104, it does not set forth a percentage amount or range of amounts

that voting creditors may expect to recover under the Plan.  Thus, the First Amended Debtor

Disclosure Statement does not contain what for many creditors is the most salient fact:  How

much will they receive under the Plan – and when will they receive it?  The CNA Disclosure

Statement provides that, under the First Amended CNA Plan, an additional $75 million will be

added to the amount proposed by the Debtor, but it too does not disclose the percentage

distribution that creditors may expect to receive under the First Amended CNA Plan.  The

creditors cannot be expected to make an informed decision regarding the competing plans

without this piece of crucial information.

### D. Both Motions Fail to Provide Creditors With Adequate Means to Make their Voices Heard with Respect to the Competing Plans

Not only are the proponents of a chapter 11 plan required to provide adequate

disclosure to voting creditors and other parties-in-interest, but they are also required to

give those parties a full and fair opportunity to respond to the plan.  *See Mullane v.*

*Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (requiring that notice be

"reasonably calculated, under all the circumstances, to apprise interest parties of the

pendency of the action and afford them an opportunity to present their objections");

*DePippo v. Kmart Corp.*, 335 B.R. 290, 295 (S.D.N.Y. 2005) (confirmed chapter 11 plan binds creditors, but only so long as they have received notice sufficient to satisfy due process). Here, however, the Debtor Motion and the CNA Motion appear to limit the number of abuse survivors and other creditors who are directly to receive the pleadings and other documents that they are being asked to consider. The Debtor Motion provides, in part, as follows:

> All Solicitation Packages for holders of Abuse Claims shall be served via the noticing address included on their proof of claim, if any, based on the information reflected on Stretto's claims register as of the Voting Record Date. For the avoidance of doubt, if such noticing address is the address of the Abuse Claimant's attorney, the Abuse Claimant will be served Solicitation Packages through such attorney unless such Abuse Claimant or attorney has notified the Diocese or Stretto that the representation has terminated. To avoid duplication and reduce expenses, the Diocese proposes to serve attorneys who represent more than one Class 4 Abuse Claimant with only one copy of the Solicitation Package (except that the Diocese will provide separate Ballots for each Class 4 Claimant as set forth herein).

Debtor Motion, ¶ 35, ECF Doc. No. 2285, pg. 15 of 30; *see also* CNA Motion, ¶ 33, ECF Doc. No. 2284, pg. 15 of 53. Thus, the Solicitation Packages are in certain cases not to be received directly by the voting creditors; these creditors will have to wait until – and unless – their respective attorneys relay them to their intended recipients. Neither the Debtor nor CNA provides adequate assurance that the creditors will have sufficient notice or time to respond to the information contained in the Solicitation Packages.

Moreover, significant portions of the Disclosure Statements are not written in plain English so that abuse survivors and other creditors can easily understand the competing Plans' provisions. Specifically, as noted above, the Disclosure Statements do

29

not give the creditors any idea of how much will be distributed to them, and when the distributions are to be made.

In addition, the Debtor Motion fails, *inter alia*, to set forth a procedure to send out both plans and to provide in the ballots an opportunity for voting creditors to choose between the competing plans.

### E. The Statutory Obligation to Pay Fees Due Pursuant to 28 U.S.C. § 1930(a)(6) and Post-Confirmation Reporting

The First Amended Debtor Plan provides for the payment of quarterly fees to the United States Trustee. *See* First Amended Debtor Plan, § 2.1.5, ECF Doc. No. 2218-1, pg. 29 of 84. However, the Plan also provides that that the Chapter 11 Quarterly Fees due and not paid as of the Effective Date will be paid "as soon as practicable after the Effective Date." *Id.* This provision violates 11 U.S.C. § 1129(a)(12), which specifically requires payment of Chapter 11 Quarterly Fees "on the effective date of the plan."[17]

In addition, the First Amended Debtor Plan provides that payments made (1) to the Trust under Sections 2, 5, 7 or 8 of the Plan by anyone other than the Diocese, and (2) by the Trust to anyone are not to be considered "disbursements" under 28 U.S.C. § 1930(a)(6). *Id.*

The Reorganized Debtor has an obligation to pay fees due pursuant to 28 U.S.C. § 1930(a)(6) ("Chapter 11 Quarterly Fees") based on all monies distributed or paid pursuant to the First Amended Debtor Plan. Chapter 11 Quarterly Fees are properly assessed on the following categories of disbursements:

---

[17] The Debtor itself notes this requirement in the First Amended Debtor Disclosure Statement. *See* Art. XVIII. A, ECF Doc. No. 2218, pg. 93 of 104.

Case 2-19-20905-PRW, Doc 2345, Filed 12/05/23, Entered 12/05/23 15:23:08, Description: Main Document , Page 30 of 33

(i)     disbursements of cash made by the Debtor, pursuant to the First Amended Debtor Plan and to the Trust, as well as disbursements directly by the Debtor to non-abuse creditors and other payments obligated by the Plan;[18]

(ii)    disbursements by the Trust of monies generated from the liquidation of real estate transferred to the Trust by the Debtor, including both disbursements to creditors and for fees and expenses associate with Trust administration; ***and***

(iii)   disbursements by the Trust of monies that did not originate with the Debtor and were contributed to the Trust by non-debtor third parties.

The First Amended Debtor Plan is the Debtor's mechanism to pay its creditors their rightful share, along with paying the costs of administration of the chapter 11 case.  The choice to utilize a plan-created entity (the Trust) to effectuate the payments to certain creditors does not alter the Debtor's statutory obligation to pay Chapter 11 Quarterly Fees that accrue and are imposed as a result of the monies that must be paid under the First Amended Debtor Plan.  Reorganized Debtor has an obligation to pay Chapter 11 Quarterly Fees based on *all* post-Effective Date disbursements made pursuant to the Plan, regardless of how the disbursements are accomplished.

Finally, the definition of Administrative Claim at Section 1.1.10 of the First Amended Debtor Plan inappropriately includes, "all fees and charges assessed against the Estate under chapter 123 of title 29 of the United States Code."  First Amended Debtor Plan, § 1.1.10, ECF Doc. No. 2218-1, pg. 11 of 84.  Chapter 11 Quarterly Fees are included among such "fees and charges."  *See* 28 U.S.C. 1930(a)(6).  This definition should be revised to remove any reference to Chapter 11 Quarterly Fees as they are statutory, rather than administrative claims and are not subject to the same obligations of administrative creditors.

---

[18] To be clear, no double counting of disbursements is being proposed. The cash being contributed by the Debtor to the Trust is a disbursement that will be counted and assessed fees at the time the Debtor makes the disbursement, not when the Trust distribute that same cash.

**F.    The Court Should Not Approve, by Implication
or Otherwise, the RSA Motion**

Although the First Amended Debtor Disclosure Statement indicates that the RSA "forms

the basis for the Plan, First Amended Debtor Disclosure Statement, Art. 1.A, ECF Doc. No.

2218, pg. 13 of 104, it does not clearly state whether *all* provisions of the RSA – a document

filed on November 3, 2022, over a year ago – are to be incorporated into the First Amended

Debtor Plan.  In addition, the Debtor Motion does not specifically seek Court approval of the

RSA, nor does the proposed Order approving the First Amended Debtor Disclosure Statement or

the ballots or notices attached to the First Amended Debtor Disclosure Statement refer to the

RSA.  *See* Debtor Motion, ECF Doc. No. 2285.  In fact, the Court has adjourned the RSA

Motion without date, subject to "any Party's right to pursue, among other motions, the RSA

Motion."  Adjourned Matters Order, ECF Doc. 2280, pg. 5 of 12.  Further, Debtor did not attach

a copy of the RSA as an Exhibit to the First Amended Disclosure Statement, the First Amended

Debtor Plan, or the Debtor Motion.[19]  To the extent that the Debtor seeks, by implication or

otherwise, Court approval of the RSA, the United States Trustee reserves his rights to pursue

and, if necessary, supplement his objection to the RSA.

## IV.    CONCLUSION

WHEREFORE, for all of the foregoing reasons, the United States Trustee respectfully

requests that the Court (i) sustain this Omnibus Objection, deny the Debtor Motion, (ii) deny the

CNA Motion, (iii) disapprove the First Amended Debtor Disclosure Statement, (iv) disapprove

the CNA Disclosure Statement, and (v) grant such other relief as is just and appropriate.

Additionally, the United States Trustee reserves his rights to supplement this Objection

and object at the hearing on the Debtor Motion, the CNA Motion, the First Amended Debtor

---

[19] For its part, CNA did not mention the RSA in any of its pleadings or attachments.

Disclosure Statement, and the CNA Disclosure Statement to other deficiencies and/or amendments, including supplemental disclosures and documents. The United States Trustee further reserves his rights to object to confirmation of the First Amended Debtor Plan, the First Amended CNA Plan or any future amendments or supplements thereto.

Dated:  New York, New York
        December 5, 2023

                                Respectfully submitted,

                                WILLIAM K. HARRINGTON
                                UNITED STATES TRUSTEE
                                Region 2

                        By:     /s/ Richard C. Morrissey
                                Richard C. Morrissey
                                Mark Bruh
                                Trial Attorneys
                                Office of the United States Trustee
                                Alexander Hamilton Custom House
                                One Bowling Green, Rm. 534
                                New York, New York 10004
                                Tel.: (212) 510-0500