**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

In re:

THE DIOCESE OF ROCHESTER,

          Debtor.

Case No. 19-20905

Chapter 11

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION
TO THE CONTINENTAL INSURANCE COMPANY'S MOTION FOR ENTRY
OF AN ORDER (I) APPROVING DISCLOSURE STATEMENT IN SUPPORT OF
CONTINENTAL INSURANCE COMPANY'S CHAPTER 11 PLAN OF
REORGANIZATION FOR THE DIOCESE OF ROCHESTER, (II) APPROVING
SOLICITATION PROCEDURES FOR CONTINENTAL INSURANCE COMPANY'S
PLAN OF REORGANIZATION FOR THE DIOCESE OF ROCHESTER,
(III) APPROVING BALLOTS AND ESTABLISHING PROCEDURES
FOR VOTING ON COMPETING PLANS, (IV) APPROVING THE FORM,
MANNER, AND SCOPE OF NOTICE FOR THE CONFIRMATION HEARING, AND
<u>(V) GRANTING RELATED RELIEF</u>**

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................ 1

OBJECTION ........................................................................................................................ 4

I.   Continental Lacks Standing To Confirm  A Plan Of Reorganization For The
     Diocese .................................................................................................................... 4

     A.   Continental is Not A "Party In Interest" Entitled to File A Plan ......................... 4

          1.   Continental, as the Debtor's Insurer,  Lacks Standing to File and
               Seek Confirmation of a Plan ................................................................... 6

          2.   Continental's Alleged Administrative Claim  Does Not Remedy Its
               Lack of Standing ................................................................................... 10

     B.   The CNA Plan Cannot Be Confirmed  Because It Is Not Filed in Good
          Faith ...................................................................................................... 12

II.  The CNA Disclosure Statement Should Not Be Approved  Because It Does Not
     Contain Adequate Information  As Required by Section 1125 of the Bankruptcy
     Code ...................................................................................................................... 13

     A.   Applicable Legal Standard ............................................................................ 13

     B.   Continental Fails to Disclose That Its Coverage Exposure Risk Is Far
          Greater Than Its Proposed Settlement. ......................................................... 15

          1.   Continental Fails to Disclose that the Diocese Has a High
               Likelihood of Success in the Insurance Litigation ................................. 17

          2.   Continental Does Not Disclose the Weakness of its Expected or
               Intended Defense ................................................................................. 17

          3.   Continental Does Not Disclose the High Likelihood the Diocese or
               Litigation Trust Will Prevail Over Continental's Notice Defense ........... 19

     C.   Continental Does Not Provide Adequate Information in the CNA
          Disclosure Statement ................................................................................... 22

CONCLUSION .................................................................................................................. 22

RESERVATION OF RIGHTS ............................................................................................ 23

# TABLE OF AUTHORITIES

## CASES

*875 Forest Ave. Corp. v. Aetna Cas. & Sur. Co.*,
  37 A.D.2d 11, 322 N.Y.S.2d 53 (1971) ................................................................. 21

*Agoado Realty Corp. v. United Int'l Ins. Co.,*
  95 N.Y.2d 141 (2000) ........................................................................................... 19

*Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.,*
  52 Cal. Rptr. 2d 690 (Cal. Ct. App. 1996) ........................................................... 18

*Auto. Ins. Co. of Hartford v Cook,*
  7 N.Y.3d 131 (2006) ............................................................................................. 19

*Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.,*
  882 F.3d 952, 960 (10th Cir. 2018) ...................................................................... 18

*Church Mut. Ins. Co. v. Am. Home Assur. Co. (In re Heating Oil Partners LP)*,
  422 Fed. Appx. 15 (2d Cir. 2011) ........................................................................... 4

*City of Johnstown, N.Y. v. Bankers Standard Insurance Co.,*
  877 F.2d 1146 (2d Cir. 1989) ............................................................................... 18

*Comcoach Corp.,*
  698 F.2d 571 (2d. Cir. 1983) .............................................................................. 4, 9

*Cont'l Cas. Co. v. Rapid–Am. Corp.,*
  80 N.Y.2d 640 (1993) ........................................................................................... 18

*Cont'l Ins. Co. v. Colangione,*
  484 N.Y.S.2d 929 (3d Dept. 1985) ....................................................................... 18

*Diocese of Winona v. Interstate Fire & Casualty Company,*
  89 F.3d 1386 (8th Cir. 1996) ................................................................................ 19

*Greater New York Mut. Ins. Co. v. I. Kalfus Co.,*
  45 A.D.2d 574, 360 N.Y.S.2d 28 (1974) .............................................................. 21

*Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.,*
  905 F.3d 84 (2d Cir. 2018) ................................................................................... 19

*In re Adelphia Communs. Corp.,*
  327 B.R. 143 (Bankr. S.D.N.Y. 2005) .................................................................. 14

*In re C.P. Hall, Co.,*
  750 F.3d 659 (7th Cir. 2014) ................................................................................. 7

*In re Cape Quarry, LLC,*
  2020 Bankr. LEXIS 3232 (Bankr. E.D. La. Nov. 16, 2020) .................................. 4

*In re Cardinal Congregate I,*
  121 B.R. 760 (Bankr. S.D. Ohio 1990) ................................................................. 13

*In re Delta Underground Storage Co.,*
  165 B.R. 596 (Bankr. S.D. Miss. 1994) ............................................................... 11

*In re Diocese of Camden,*
  2022 Bankr. LEXIS 2244 (Bankr. D.N.J. Aug. 12, 2022) ...................................... 7

*In re Egan,*
  33 B.R. 672 (Bankr. N.D. Ill. 1983) ...................................................................... 13

*In re El Comandante Mgmt. Co., LLC*,
  359 B.R. 410  (Bankr. D. P.R. 2006) ...................................................................... 4

*In re Innkeepers USA Trust*,
  448 B.R. 131 (Bankr. S.D.N.Y. 2011) ............................................................. 4, 6
*In re Ionosphere Clubs, Inc.*,
  101 B.R. 844 (Bankr. S.D.N.Y. 1989) ................................................................... 5
*In re Madison Hotel Assoc.*,
  749 F.2d 410 (7th Cir. 1984) ................................................................................ 12
*In re Malek*,
  35 B.R. 443 (Bankr. E.D. Mich. 1983) ................................................................. 13
*In re O.P. Inv. Grp., LLC*,
  No. 21-40722, 2021 Bankr. LEXIS 1217 (Bankr. E.D. Mich. May 4, 2021) ....... 14
*In re Pointer*,
  952 F.2d 82 (5th Cir. 1992) .................................................................................... 5
*In re Quigley Co.*,
  391 B.R. 695 (Bankr. S.D.N.Y. 2008) ........................................................... 6, 7, 9
*In re Stone Barn Manhattan LLC*,
  405 B.R. 68 (Bankr. S.D.N.Y. 2009) ...................................................................... 4
*In re The Roman Catholic Diocese of Rockville Centre*,
  Case No. 20-12345 (S.D.N.Y.) ....................................................................... 11, 20
*In re Trout*,
  108 B.R. 235 (Bankr. D.N.D. 1989) ...................................................................... 15
*In re Unichem Corp.*,
  72 B.R. 95 (Bankr. N.D. Ill. 1987) ........................................................................ 13
*In re Woodbridge Grp. of Cos., LLC*,
  592 B.R. 761 (Bankr. D. Del. 2018) ...................................................................... 14
*Indian Harbor Ins. Co.*,
  972 F.Supp.2d at 64 (internal citations omitted) ................................................... 19
*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
  843 F.2d 636 (2d Cir. 1988) ............................................................................. 5, 12
*Krys v. Official Comm. of Unsecured Creditors (In re Refco Inc.)*,
  505 F.3d 109 (2d Cir. 2007) .................................................................................... 5
*Liberty Mutual Fire Ins. Co. v. Hamilton Ins. Co.*,
  356 F. Supp. 3d 326 (S.D.N.Y. 2018) ..................................................................... 9
*McGroarty v. Great Am. Ins. Co.*,
  36 N.Y.2d 358 (1975) ............................................................................................ 18
*Merchants Mut. Ins. Co. v. Hoffman*,
  56 N.Y.2d 799, 437 N.E.2d 1155 (1982) ............................................................... 20
*Miller v. Cont. Ins. Co.*,
  40 N.Y.2d 675 (1976) ............................................................................................ 19
*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. The Roman Catholic Diocese of Brooklyn,* 2017
  WL 748834, at *7 (N.Y. Sup. Ct. Feb. 27, 2017) ................................................. 16
*New York v. Arrowood Indem. Co.*,
  No. 20-CV-11011 (VEC), 2022 WL 558182 (S.D.N.Y. Feb. 23, 2022) ................. 20
*NYAT Operating Corp. v. GAN National Insurance Co.*,
  46 A.D.3d 287 (1st Dept. 2007) ............................................................................. 18
*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*,
  390 U.S. 414 (1968) ............................................................................................... 14

*Pub. Serv. Mut. Ins. Co. v. Goldfarb*,
  53 N.Y.2d 392, 425 N.E.2d 810 (1981)...............................................................20
*RJC Realty Holding Corp.*,
  2 N.Y.3d at 165 (2004) ......................................................................................19
Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 21 N.Y.3d
  139, 149, 991 N.E.2d 666, 672 (2013) ...............................................................16
*Safeguard Ins. Co. v. Angel Guardian Home*,
  946 F. Supp. 221 (E.D.N.Y. 1996) ..........................................................16, 20, 21
*Singleton v. Wulff*,
  428 U.S. 106 (1976).............................................................................................5
*Southern Blvd., Inc. v. Martin Paint Stores (In re Martin Paint Stores)*,
  207 B.R. 57 (S.D.N.Y. 1997)................................................................................4
*Sparacino v. Pawtucket Mut. Ins. Co.*,
  50 F.3d 141 (2d Cir. 1995)..................................................................................19
*Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.)*,
  84 B.R. 167 (B.A.P. 9th Cir. 1988).....................................................................12
*Union Carbide Corp. v. Affiliated FM Ins. Co.*,
  955 N.Y.S.2d 572 (N.Y. App. Div. 2012) ..........................................................18
*Warth v. Seldin,*
  422 U.S. 490 (1975) .............................................................................................5

## STATUTES

11 U.S.C. § 1109(b) .............................................................................................4, 8
11 U.S.C. § 1125 .....................................................................................................23
11 U.S.C. § 1125(a) ................................................................................................13
11 U.S.C. § 1125(b) ................................................................................................13

## RULES

Fed. R. Bankr. P. 2002.............................................................................................15
Fed. R. Bankr. P. 9019.......................................................................................14, 15
Fed. R. Civ. P. 15(a)(2)...........................................................................................20

The Official Committee of Unsecured Creditors (the "**Committee**") of The Diocese of Rochester (the "**Debtor**" or "**Diocese**"), by and through its undersigned counsel, hereby submits its objection (the "**Objection**") to *The Continental Insurance Company's Motion for Entry of an Order (I) Approving Disclosure Statement in Support of Continental Insurance Company's Chapter 11 Plan of Reorganization for the Diocese of Rochester, (II) Approving Solicitation Procedures for Continental Insurance Company's Plan of Reorganization for the Diocese of Rochester, (III) Approving Ballots and Establishing Procedures for Voting on Competing Plans, (IV) Approving the Form, Manner, and Scope of Notice for the Confirmation Hearing, and (V) Granting Related Relief* (the "**CNA DS Motion**") seeking approval of the *Disclosure Statement in Support of Continental Insurance Company's Chapter 11 Plan of Reorganization for the Diocese of Rochester* [Docket No. 2247] (the "**CNA Disclosure Statement**") and approving the solicitation procedures relating to the *Continental Insurance Company's Corrected First Amended Plan of Reorganization for the Diocese of Rochester* [Docket No. 2254] (the "**CNA Plan**").[1] In support of its Objection, the Committee respectfully states as follows:

### Preliminary Statement

1. Continental seeks to limit its liability to the Diocese and survivors through the CNA Plan by (a) accepting settlements negotiated by the Committee with the Diocese and other insurers and (b) adding an additional $75 million (the "**CNA Cash Contribution**"), which is a drastic discount of the amount CNA should pay under the insurance policies it issued to the Diocese. Continental, despite sufficient limits under its policies, attempts to settle its liability for less than half of the per-claim amounts paid by the Diocese's other insurers. Continental seeks to pay only $75 million, but to even match the average per-claim payments of the other settling

---

[1] Capitalized terms used in this Objection are as defined in the CNA DS Motion or the CNA Disclosure Statement, as applicable.

insurers, the London Market Insurers and Interstate, Continental would have to contribute over $170 million.[2] Notably, reasonable jury verdict values on even ten percent of Continental's over 300 claims would easily exceed this $170 million amount. Continental's steeply-discounted settlement proposal is made all the worse by the fact that, because of its wrongful denial of coverage for the vast majority of the over 300 claims alleging abuse during the Continental policy period, Continental's combined potential liability for coverage and bad-faith vastly exceeds that of LMI and Interstate.

2. Continental began this case by wholesale denying approximately 270 claims. This move is highly unusual, and is in all likelihood unprecedented in a Diocesan chapter 11 case. Continental has continually refused to live up to its obligations under its policies. It's efforts to avoid liability continue with its effort to confirm a self-interested plan that is doomed to fail.

3. Two fundamental flaws bar the Court from approving the CNA Disclosure Statement.

4. *First*, Continental Insurance Company ("**Continental**" or "**CNA**"), as an insurer of the Debtor, is not a party in interest within the meaning of section 1121 of the Bankruptcy Code that is allowed to file and solicit approval of a plan. Therefore, CNA lacks standing to file and seek confirmation of a plan of reorganization for the Debtor. Continental should not be permitted to solicit a plan that, as a matter of law, the Bankruptcy Court cannot confirm.

---

[2] The Debtor's other principal insurers, LMI and Interstate insure approximately 173 sexual abuse claims (consisting of 159 timely and 14 late-filed claims). The average per-claim settlement based on those insurers' $69,500,000 settlement payment yields an average per-claim payment of $401,734. Importantly, however, the LMI and Interstate policies are subject to a $75,000 per occurrence self-insured retention ("SIR"), a feature the Continental policies do not have. The SIR needs to be satisfied before the LMI/Interstate policies will pay any amounts under those policies. Thus, using a conservative estimate of one $75,000 per occurrence applying to each of the 173 LMI/Interstate sexual abuse claims, results in an average per-claim amount of $476,734. When that amount is then applied to each of the 360 sexual abuse claims alleging abuse during the Continental period, it results in approximately $171.6 million. In contrast, Continental seeks to resolve its exposure for $75 million, or approximately $208,000 per claim.

5.     Standing cannot be based on a mere **hypothetical** impact on Continental's rights and interests.  Accordingly, to have standing to propose its own plan, Continental must show that any plan that could be proposed by the Debtor and Committee would necessarily directly impact Continental's rights and interests, and thus it is necessary for Continental to propose its own plan to prevent such a direct impact.  Continental has not and cannot make such a showing. Bankruptcy courts have confirmed insurance-neutral plans for years, demonstrating that the Debtor and Committee in this case can – and did – propose a plan that does not directly impact Continental's rights and interests.  Thus, Continental's efforts are more appropriately directed at challenging aspects of the Joint Plan that Continental contends are non-neutral, rather than proposing its own plan—a move that runs counter to a long history of bankruptcy plans proposed by actual parties in interest adequately protecting an insurer's rights and interests.  Continental should not be allowed to end-run the Bankruptcy Code's standing requirements to file a self-serving plan that underfunds Continental's obligations to the Debtor and its victims under insurance policies issued by Continental.

6.     As Continental lacks standing to file a plan, the CNA Plan cannot be confirmed as a matter of law.

7.     *Second*, even if the Court could consider it, the CNA Disclosure Statement fails to make adequate disclosure, as it fails to disclose the extent of Continental's potential exposure for the claims of survivors who filed a sexual abuse claim against the Diocese ("**Sexual Abuse Claimants**") and the Diocese's likelihood of success in its insurance coverage litigation against Continental.  Without such information, the Sexual Abuse Claimants and other creditors cannot

assess whether the amount being offered by Continental through the CNA Plan to settle Sexual

Abuse Claims is reasonable.[3]

**OBJECTION**

**I.    CONTINENTAL LACKS STANDING TO CONFIRM
A PLAN OF REORGANIZATION FOR THE DIOCESE**

   **A.    Continental is Not A "Party In Interest" Entitled to File A Plan**

8.     To be a party in interest for purposes of section 1121(c), the party must have "a

sufficient interest in the outcome of the case that would require representation, or a pecuniary

interest that will be directly affected by the case."[4]   The same party in interest standard applies

under section 1121(c).[5]

9.     When interpreting the phrase "party in interest," courts are governed by the

Bankruptcy Code's purpose.[6]  It is well-established in this Circuit that chapter 11's nature and

purpose, while conferring section 1109(b) a broad scope, nonetheless mandate deference to

jurisdictional and prudential limitations on standing:

> [I]t is important that a bankruptcy court is not too facile in granting
> applications for standing. Overly lenient standards may potentially
> overburden the reorganization process by allowing numerous
> parties to interject themselves into the case on every issue, thereby
> thwarting the goal of a speedy and efficient reorganization….
> Granting peripheral parties status as parties in interest thwarts the

---

[3]  Although the Committee strongly believes that CNA has no standing as a matter of law to file a plan, in the event the Court rules otherwise, the Committee reserves its rights to supplement this Objection.  The Committee has had productive discussions with the Diocese and CNA, and is optimistic that consensual streamlined solicitation procedures can be agreed upon.

[4]  *In re Innkeepers USA Trust*, 448 B.R. 131, 141 (Bankr. S.D.N.Y. 2011); *see, e.g.*, *Church Mut. Ins. Co. v. Am. Home Assur. Co. (In re Heating Oil Partners LP)*, 422 Fed. Appx. 15, 17 (2d Cir. 2011) (noting that whether a party has a pecuniary interest directly affected by the bankruptcy proceeding can be a consideration in determining whether the party is a party in interest); *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009).

[5]  *See, e.g.*, *In re El Comandante Mgmt. Co., LLC*, 359 B.R. 410, 417  (Bankr. D. P.R. 2006) ("The concept of 'party in interest' under sections 1109(b) and 1121(c) are the same.") (citing *Collier's*); *In re Cape Quarry, LLC*, 2020 Bankr. LEXIS 3232, *18 n.5 (Bankr. E.D. La. Nov. 16, 2020) (same; citing *El Comandante*).

[6]  *Comcoach Corp.*, 698 F.2d 571, 573 (2d. Cir. 1983); *Southern Blvd., Inc. v. Martin Paint Stores (In re Martin Paint Stores)*, 207 B.R. 57, 61 (S.D.N.Y. 1997).

> traditional purpose of bankruptcy laws which is to provide
> reasonably expeditious rehabilitation of financially distressed
> debtors with a consequent distribution to creditors who have acted
> diligently.[7]

10.     The Second Circuit has further held that, in addition to statutory standing requirements, constitutional requirements of standing under Article III impose limitations on bankruptcy courts.[8]

11.     Article III standing exists only when the litigant has "made out a 'case or controversy' between himself and the defendant within the meaning of Art. III."[9] "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[10] Prudential standing demands that the plaintiff "must assert ***his own*** legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."[11]

12.     Bankruptcy courts consistently limit insurers' standing as parties in interest in bankruptcy cases.  Continental, whose sole role in this case is as the Diocese's insurer, therefore

---

[7] *Krys v. Official Comm. of Unsecured Creditors (In re Refco Inc.)*, 505 F.3d 109, 118-19 (2d Cir. 2007) (quoting *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 850-51 (Bankr. S.D.N.Y. 1989) (internal citations and quotation marks omitted)); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 644 (2d Cir. 1988) ("The prudential concerns limiting third-party standing are particularly relevant in the bankruptcy context. Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that other party is present in the proceedings and is capable of representing himself. Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan.").

[8] *Kane*, 843 F.2d at 644; *see also In re Pointer*, 952 F.2d 82 (5th Cir. 1992) (plaintiff must always have suffered a distinct and palpable injury that is likely to be redressed if the requested relief is granted).

[9] *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (emphasis added).

[10] *Id.* at 498-99 (internal citations omitted); *accord Singleton v. Wulff*, 428 U.S. 106, 113 (1976) (the first question in the standing inquiry is "whether the plaintiff-respondents allege 'injury in fact,' that is, a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Art. III jurisdiction").

[11] *Warth*, 422 U.S. at 499.

is not a "party in interest." Further, Continental's alleged administrative expense claim does not bestow on it standing that it otherwise lacks.

### 1. Continental, as the Debtor's Insurer, Lacks Standing to File and Seek Confirmation of a Plan

13. Courts in the Second Circuit exclude from the scope of "party in interest" standing, parties, like insurers, who lack direct involvement in the debtor/creditor relationships that chapter 11 was designed to administer.[12]

14. Based on these principles, reported decisions on an insurer's standing to be heard on bankruptcy matters uniformly limit such standing solely to issues that have a direct impact on the insurer's own legal rights and obligations, not those of the insured or other third parties alone. In *In re Quigley Co.*,[13] for example, the court addressed insurer standing to object to a chapter 11 plan. The bankruptcy court had previously held that insurers could raise the issue of whether anti-assignment provisions in insurance policies would provide a defense to coverage under the policies if they were assigned to a trust without the affected insurers' consent. The court concluded that while the insurers could object to trust procedures on the grounds that they implicated rights and objections under the insurance policies, the insurers lacked standing to object to the plan based on how it would affect the rights of third parties, ***even if valid grounds to defeat confirmation would not otherwise be raised***: "Issues relating to classification, treatment, solicitation and voting come immediately to mind. These are 'creditor' issues that may be raised by the affected creditors, but not by non-creditors, such as the Insurers."[14]

---

[12] *See Innkeepers,* 448 B.R. at 144 (ruling that creditors must have a direct relationship and privity with the debtor (regardless of economic interest in the proceedings) to be a "party in interest").

[13] *In re Quigley Co.,* 391 B.R. 695 (Bankr. S.D.N.Y. 2008).

[14] *Id.* at 706 (citations omitted).

15. In a recent decision in the *Diocese of Camden*,[15] Judge Poslusny similarly limited the insurers' standing to challenge plan confirmation. Stating that standing would be limited to "the issues which threaten their legally protected interests,"[16] the court determined that the insurers had standing to object to the specific issues of assignment of the policies to the tort claimants' trust, good faith, and the structure of the trust. However, the court found that the insurers had not demonstrated that they had any legally protected interest related to the proposed injunction and releases under the plan or the solicitation and voting procedures of the plan. Relying on *Quigley*, the court reasoned:

> The injunction would not bar any claims the Insurers may have against the released parties, and therefore cannot impact the legally protected interests of the Insurers. As noted, a party cannot rest its claim on the legal rights or interests of third parties. … The Insurers are not voting creditors, and their claims are not impaired and therefore they have no legally protected interest in the classification, treatment, or solicitation of other creditors, nor do they have any interest in whether other creditors are barred from bringing claims against the Debtor in the future.[17]

16. Like *Quigley*, *In re C.P. Hall, Co.*[18] involved asbestos claims. As of the bankruptcy filing, the debtor alleged that it had $10 million remaining in insurance coverage from its primary insurer and $6 million in coverage under an excess policy. The debtor and its primary carrier sought court approval for a settlement for approximately $4 million. The excess insurer objected to the settlement on the grounds that the bankrupt insured should have litigated the coverage action against the primary carrier to judgment with the hope of securing the entire $10 million in coverage. By failing to do so, the excess carrier argued, the settlement increased

---

[15] *In re Diocese of Camden*, 2022 Bankr. LEXIS 2244 (Bankr. D.N.J. Aug. 12, 2022).

[16] *Id.* *18.

[17] *Id.* at *19.

[18] *In re C.P. Hall, Co.*, 750 F.3d 659 (7th Cir. 2014).

the likelihood that the excess carrier would be forced to honor its obligations under the excess policy.

17.     The Bankruptcy Court refused to consider the excess insurer's objection on the grounds that it lacked standing to object to the settlement. The District Court affirmed the Bankruptcy Court's ruling and held that the excess carrier did not have a pecuniary interest that would be directly and adversely affected by the settlement. The excess carrier appealed the District Court's decision to the Seventh Circuit. The excess insurer complained that the settlement posed an imminent threat to its financial assets. The Seventh Circuit characterized those financial concerns as "probabilistic" insofar as the excess insurer could not establish, with certainty, that rejection of the settlement would benefit the excess insurer.[19]

18.     The Seventh Circuit affirmed the District Court and held that, notwithstanding the breadth of section 1109(b), the excess insurer could not object to the settlement. The Seventh Circuit reasoned that to qualify as a party in interest with standing to appear in the bankruptcy case, the party must have a legally recognized interest in the debtor's assets.[20] Because the excess insurer was neither a creditor nor the debtor, the Seventh Circuit concluded that the excess insurer was not a "party in interest" under section 1109(b) of the Bankruptcy Code and hence lacked standing to object to the settlement.[21] Rather, the excess carrier was "just a firm that may suffer collateral damage from a ruling in a bankruptcy proceeding."

19.     Here, it is even clearer that Continental lacks standings because Continental *denied coverage entirely* for at least 270 of the underlying claims brought against the Debtor.[22]

---

[19] *Id.* at 661.

[20] *Id.*

[21] *Id.*

[22] Continental has regularly referenced its wide-spread denials of coverage to this Court. *See, e.g.,* CNA's Brief in Support of *Joinder* to the Debtor's Motion to Approve Proposed Insurance Settlements to Fund Survivor

In doing so, Continental rejected its obligations under the policies and cannot now purport to use the same coverage obligations it denied to confer it standing as a party in interest.[23]  Continental cannot deny coverage of the survivors' claims while at the same time seek to benefit from the Debtor's bankruptcy by filing its own self-serving, self-protective plan to limit its potentially massive liability to the Sexual Abuse Claimants based on an aggressive but legally unfounded coverage position.[24]

20.     Insurers are not parties-in-interest to **<u>object</u>** to plans except related to a very limited subset of issues.  There is no legal support for Continental's position that it has standing as a party-in-interest to **<u>file and seek confirmation</u>** of a plan.

21.     Even if Continental had standing to object to the plan proposed by the Debtor and the Committee, that is a far cry from having standing to propose its own plan, as it has done here. In order to have standing, Continental must show there will otherwise be a direct impact on the insurer's own legal rights and obligations.  But, in the context of proposing its own plan, that means that Continental has to show that any proposed  plan by the Debtor and the Committee will necessarily have a direct impact on Continental's own legal rights and interests.  Given the

---

Compensation Trust (Dkt. No. 1542) at 6 ("*CNA has denied coverage for many claims*, but has agreed to investigate or participate in the defense of the Diocese in certain claims and lawsuits subject to a full reservation of rights." (emphasis added)). Under New York law, an insurer that denies coverage "forfeit[s] its right to control the underlying litigation." *Liberty Mutual Fire Ins. Co. v. Hamilton Ins. Co.*, 356 F. Supp. 3d 326, 336–37 (S.D.N.Y. 2018) (internal citations and quotations omitted). Accordingly, Continental's belated November 15, 2022 offer to provide the Diocese with a defense years after the initial tender of the claims does not "cure" Continental's prior breach. The attempt to cure is, however, an admission of the invalidity of CNA's coverage position.

[23] Similarly, in *In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983), the mortgage lender to the debtor's landlord was not a "party in interest" entitled to file a motion for relief from the automatic stay to foreclose on the real property. The Second Circuit reasoned that the term "party in interest" for purposes of section 362 should be construed in relation to the purpose of the Bankruptcy Code of converting estate assets to cash and distributing the cash to creditors and that, since the lender was not a beneficiary of this purpose, it had no business intervening in the case.

[24] While certain courts have granted insurance companies standing to object to plans in the mass tort context, those cases limit the insurer's involvement to issues specific to the insurer's rights and obligations. *See In re Quigley Company, Inc.*, 391 B.R. 695 (Bankr. S.D.N.Y. 2008).  Permitting Continental to file a plan, however, would effectively grant Continental standing on all confirmation issues even those that do not directly affect Continental.

numerous insurance neutral bankruptcy plans that have been confirmed in the past, Continental cannot make such a showing.

**2. Continental's Alleged Administrative Claim Does Not Remedy Its Lack of Standing**

22. Further, Continental's purported administrative claim does not create standing. Continental asserts that it has an administrative claim based on its prior non-bankruptcy court approved agreement with the Debtor to settle Continental's liability to the Debtor through the buyback of its policies.[25]

23. Continental has no legitimate basis for an administrative claim particularly as Continental has superseded the terms of its proposed settlement with the Diocese by filing the CNA Plan itself with new proposed settlement terms. Continental argues that its plan "constitute[s] a settlement offer the survivors can choose to accept if they wish," but Continental is reserving its rights to enforce its settlement agreement with the Diocese.[26] In other words, Continental claims it has a binding contract with the Diocese for the buyback of its policies *but* it is not a repudiation of that contract to make a different offer for the sale of those same policies. Such a proposal is contrary to contract fundamentals; a party cannot sell the same thing to different parties. Continental cannot have it both ways. It cannot assert an administrative claim for a settlement that it has repudiated by filing the CNA Plan and simultaneously claim that the settlement it is repudiating gives it standing to file the CNA Plan itself.

24. In addition, in the *Diocese of Rockville Centre* bankruptcy, Chief Judge Glenn made clear his view that the alleged breach of a non-approved settlement agreement between the

---

[25] *See Application for Allowance and Payment of Administrative Expense Priority Claims for Debtor's Breach of Continental Settlement Agreement* [Docket 2314] (the "**CNA Application**").

[26] Continental's Response to the Committee's Request Regarding Debtor's Rule 9019 Motion ("**Continental Letter**"), Docket No. 2196.

Debtor and its insurance companies would not give rise to a viable administrative claim against

the estate:

> THE COURT: If the insurers think they're going to get an administrative claim, because you've reached a settlement that isn't approved by the Court, forget it.
> …
>
> THE COURT: I'm just telling you, if this case survives, and there's a settlement that comes on for approval, and it's not approved, you're not getting into[sic] approved. No one should have the expectation, no insurer should have an expectation, because you've negotiated an agreement with the Diocese, that is later rejected by this Court, that you're sometime, somehow, going to have an administrative claim. Get it clear, it's not going to happen.
>
> [INSURER COUNSEL]: I understand, Your Honor. My point on what was said about Camden and Rochester, it wasn't the settlement agreement the Diocese entering into a settlement agreement that caused an admin claim; it was the Diocese'[s] later conduct in repudiating the settlement agreements that caused –
>
> THE COURT: There isn't going to be a repudiation of an agreement that isn't approved by the Court. You understand that clearly?[27]

25. However, even if Continental had an actual administrative claim, that claim

would not confer standing for Continental to file a plan.  The existence of an administrative

expense claim alone does not confer standing when it is otherwise lacking.[28]  For example, in

*Delta Underground Storage*, the bankruptcy court held that, despite holding an administrative

claim, the debtor's insurance company lacked standing to object to a proposed settlement by the

debtor that, inter alia, provided for the debtor's substitution as plaintiff in an adversary

proceeding against the insurer.  The court reasoned that the insurance company's rights and

obligations under the policy were unaffected by the settlement and would be determined in the

context of the adversary proceeding and, moreover, that the existence of an administrative

---

[27] *In re The Roman Catholic Diocese of Rockville Centre,* Case No. 20-12345 (S.D.N.Y.), Sept. 26, 2023 Hearing Transcript, at  p. 28 2-5; 10-25, p.29 1-2.  A copy of relevant portions of the hearing transcript are attached as exhibit A hereto.

[28] *See In re Delta Underground Storage Co.*, 165 B.R. 596, 598-599 (Bankr. S.D. Miss. 1994).

expense claim – also not impacted directly by the settlement - does not automatically confer standing for all purposes.[29]

26.     Here too, Continental's alleged administrative expense claim does not transform it into a party-in-interest with the general standing conferred upon creditors in bankruptcy cases.

**B.     The CNA Plan Cannot Be Confirmed
        <u>Because It Is Not Filed in Good Faith</u>**

27.     A plan must be proposed in good faith to be confirmable.  11 U.S.C. § 1129(a)(3). To be proposed in "good faith" means the plan must achieve a result consistent with the objectives and purposes of the Bankruptcy Code.[30]  The court assesses good faith in proposing a plan of reorganization by looking at the totality of the circumstances surrounding the plan.[31]

28.     Continental, by the CNA Plan, proposes a unilateral and unacceptable settlement that offers insufficient compensation to the Sexual Abuse Claimants relative to the value of their claims.[32]

29.     The law of the Second Circuit is clear that any plan such as Continental's, one that includes non-consensual releases of third parties such as Continental, cannot be approved unless it receives overwhelming support of the survivors.  Continental knows that it has no realistic possibility of obtaining overwhelming survivor support for its non-negotiated, non-consensual insurance plan that materially reduces the amount that Continental may otherwise be required to pay on account of sexual abuse claims.

---

[29] *Id.*

[30] *In re Madison Hotel Assoc.*, 749 F.2d 410, 424-425 (7th Cir. 1984).

[31] *Id.*

[32] *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (plan must be proposed with "honesty and good intentions"); *Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.)*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) (plan proponent must have exhibited "a fundamental fairness in dealing with one's creditors").

30.     Continental has no basis to file a plan except to continue its campaign of misleading the Debtor, the Sexual Abuse Claimants and delaying what is supposed to be the prompt, fair, and equitable payment of hundreds of sexual abuse claims. Accordingly, the CNA Plan is misleading and not filed in good faith.

## II.     THE CNA DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE

31.     The proposed CNA Disclosure Statement does not contain sufficient information for creditors, including Sexual Abuse Claimants, to make an informed decision whether to accept or reject the Plan, and omits key information ne.cessary for the Sexual Abuse Claimants to determine whether to accept or reject the CNA Plan.  If the Bankruptcy Court permits the CNA Plan to go forward, it should not approve the CNA Disclosure Statement.  Continental must be required to amend the CNA Disclosure Statement to address this misleading and critical flaw.

### A.     Applicable Legal Standard

32.     Section 1125(b) of the Code requires that a disclosure statement contain "adequate information."  "Adequate information" is defined as "information of a kind, and in sufficient detail . . . [to enable] a hypothetical investor of the relevant class to make an informed judgment about the plan."[33]

33.     The supporting information in a disclosure statement must be factually based, and not based merely upon the plan proponent's beliefs and opinions; the sources and methodology utilized by the plan proponent must therefore be disclosed.[34]

---

[33] 11 U.S.C. § 1125(a); *see also In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987); *In re Malek*, 35 B.R. 443, 443 (Bankr. E.D. Mich. 1983) (citing numerous factors to determine whether adequate information has been provided).  This standard is purposefully malleable "so as to permit a case-by-case determination based on the prevailing facts and circumstances."  *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990).

[34] *See In re Egan*, 33 B.R. 672 (Bankr. N.D. Ill. 1983).

34.     One-sided disclosure of information relating to claims is not sufficient, and creditors need to be provided with information adequate to determine the value of key claims at issue.  The Court in *O.P. Inv. Grp*. held that in describing potential alternative treatment of a bank's claim the debtor was required to "state the dollar amounts of the Bank's bifurcated claim."[35]  The Court reasoned that neither the proposed disclosure statement nor plan "appears to state what is the value of the Bank's collateral, from which the amount of the Bank's 'Secured Claim' … can be determined."[36]  The court found the proposed disclosure "incomplete, and unduly opaque to all creditor-readers" and required the debtor to provide more specificity as to value.[37]

35.     As Continental is effectively proposing a settlement, its disclosure statement must at least meet the standards of disclosure under Bankruptcy Rule 9019[38] which requires a determination of "the probabilities of ultimate success should the claim be litigated."[39]

36.     This includes making an "educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.  Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation."[40]

---

[35] *See In re O.P. Inv. Grp., LLC*, No. 21-40722, 2021 Bankr. LEXIS 1217, at *3-4 (Bankr. E.D. Mich. May 4, 2021).

[36] *Id.*

[37] *Id.*

[38] "A bankruptcy court may approve settlements under Bankruptcy Rule 9019 or as part of a debtor's plan. The standards for approving settlements under Rule 9019 or as part of a plan are the same." *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 772 (Bankr. D. Del. 2018).

[39] *In re Adelphia Communs. Corp*., 327 B.R. 143, 158-59 (Bankr. S.D.N.Y. 2005).

[40] *Id.* (citing *to Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414 (1968)).

37.    Moreover, to make an informed decision of the merits of a settlement, "how it affects the parties in interest or the case generally," there must be full disclosure of the settlement terms. "Partial disclosure is tantamount to no disclosure at all and is a breach of the spirit and intent of Rules 9019 and 2002."[41]   While Continental may have disclosed the terms of the settlement it proposes, it fails to make disclosure of information essential to Sexual Abuse Claimants to evaluate that proposed settlement.

B.    **Continental Fails to Disclose That Its Coverage Exposure Risk Is Far Greater Than Its Proposed Settlement.**

38.    The CNA Disclosure Statement fails to disclose that Continental is exposed to the Diocese for potentially hundreds of millions of dollars in coverage. Instead, Continental focuses its disclosure on the settlement of its potential liability for a mere $75 million and inaccurately describes the risks inherent in litigation for the Diocese and the Sexual Abuse Claimants.[42]

39.    This one-sided, self-serving disclosure is not adequate within the meaning of the Bankruptcy Code as it fails to address Continental's potential coverage obligations and risks to *Continental* from litigation.

40.    Continental insured the Diocese from 1952 through 1977. Its policies have primary limits between $50,000 to $500,000 per occurrence[43] (with amounts increasing over the passage of time). In addition, the Diocese also purchased excess policies of $3 million per occurrence for many of these years.[44]   *Notably, these policies do not have aggregate limits and are not eroded by defense costs.*  As an example, under Continental's 1976 policies, there is up to

---

[41] *In re Trout*, 108 B.R. 235, 239 (Bankr. D.N.D. 1989).

[42] CNA Disclosure Statement Article XVII.

[43] As set forth in section II.B.1.a.below, a course of molestation of a single victim may result in multiple "occurrences" over multiple policy years.

[44] See Declaration of Attorney James R. Murray Regarding Insurance Coverage [Docket No. 8] ("**Murray Decl.**"), ¶ 10 & 9010 Motion, ¶ 17.

$3.5 million of coverage for each occurrence, notwithstanding the cost of defense. Under the same policies, each additional occurrence would increase available coverage by an additional $3.5 million.

41.     New York law provides that each act of abuse constitutes a separate occurrence. Thus, a claim that involves ten separate acts of abuse would trigger ten covered occurrences. Insurance coverage is not limited to a single occurrence per claim.[45]

42.     Additionally, under the Continental Policies, there are no self-insured retentions. Thus, there are claims where extremely high amounts of insurance are available. As an example, a claim with ten occurrences in December 1976 (where there was $3.5 million of coverage per occurrence), could, depending on the particular facts of the claim, have as much as *$35 million* of available coverage if each distinct act of abuse constitutes a covered occurrence. And, even under a conservative analysis of the "number of occurrences" issue, substantial coverage would exist for any claim that spans multiple policy periods.[46]  Thus, a claim that may be "worth" $1 million would have more than enough insurance to be paid in full.  Nevertheless, Continental seeks to settle its exposure for a mere $75 million for 360 claims.  Continental does not disclose the full extent of its potential exposure and instead represents that a mere $208,333 per claim is a reasonable settlement.

---

[45] *See, e.g., Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 21 N.Y.3d 139, 149, 991 N.E.2d 666, 672 (2013) (concluding that a priest's alleged sexual abuse of the same child taking place over a six-year period constituted multiple occurrences); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. The Roman Catholic Diocese of Brooklyn,* 2017 WL 748834, at *7,  2017 N.Y. Misc. LEXIS 687 at *14 (N.Y. Sup. Ct. Feb. 27, 2017) ("[T]he incidents of abuse suffered by each of the claimants constituted multiple occurrences and there was at least one 'occurrence' per claimant per policy period because the injuries suffered by each claimant were unique to that claimant in a given policy year and caused by separate incidents.").

[46] At a minimum, a separate occurrence is triggered by abuse that occurs under each policy period. *Safeguard Ins. Co. v. Angel Guardian Home*, 946 F. Supp. 221, 231 (E.D.N.Y. 1996) (determining that number of occurrences under liability insurance policies was equivalent to number of policy periods during which insured's actions led to exposure of the foster children to the sexually abusive conditions).

### 1. Continental Fails to Disclose that the Diocese Has a High Likelihood of Success in the Insurance Litigation

43.     While Continental speaks to the litigation risk to the Diocese and the Sexual Abuse Claimants, it fails to address the likelihood that the Debtor or a post-confirmation litigation trust will prevail against Continental's alleged defenses.  That is not surprising because the Diocese and/or litigation trust has a high likelihood of success against Continental in the insurance litigation.  Rather than comprehensively analyzing the available coverage and defenses, Continental's one-sided disclosure speaks only to the risk that the Diocese and/or litigation trust will not succeed.[47]

### 2. Continental Does Not Disclose the Weakness of its Expected or Intended Defense

44.     Continental fails to address the weakness of its defenses in the coverage action. For example, Continental's "expected or intended" defense should be given little, if any, weight and certainly does not justify the substantial discount embodied in CNA's Plan.  There is no basis to support the contention that the Diocese *intended* or *expected* its parishioners to be sexually abused, assaulted, or to sustain injury sufficient to defeat insurance coverage. Moreover, the expected or intended defense has to be applied on a claim-by-claim basis.  To date, Continental has relied only on generalized averments that the defense may apply to cases where a perpetrator abused multiple survivors.

45.     Notably, the underlying Child Victims Act ("**CVA**") claims against the Diocese and non-debtor Diocese Entities are based in negligence—*i.e.,* a failure to protect children—not on an intent by the Diocese to harm children.  New York law is clear that such allegations are insured notwithstanding an insurers' arguments that the injury was expected or intended.  In *RJC Realty Holding Corp. v. Republic Franklin Insurance Co.*, the New York Court of Appeals held

---

[47] *See CNA Disclosure Statement* Articles I and XVII.

that allegations of negligence in hiring or retaining an employee who commits a sexual assault constitute an "occurrence" that is not barred by an "expected or intended" exclusion.[48]

46.     The Diocese's generalized knowledge of the risk that pedophiles could abuse children is insufficient to establish an expected or intended defense.[49]

47.     Moreover, an insurer must prove that there was, in fact, intentional conduct committed by the insured to sustain an argument that an injury was caused by "intentional conduct."[50] The Second Circuit, applying New York law in *Johnstown*, held that:

> In general, what make injuries or damages expected or intended rather than accidental are *the knowledge and intent of the insured*. It is not enough that an insured was warned that damages might ensue from its actions, or that, once warned, an insured decided to take a calculated risk and proceed as before. Recovery will be barred only if the insured intended the damages, or if it can be said that the damages were, in a broader sense, "intended" by the insured because the insured knew that the damages would flow directly and immediately from its intentional act.[51]

48.     In New York, an insurer must prove that the insured *subjectively* intended to cause property damage or bodily injury in order to sustain an "expected or intended" coverage

---

[48] 2 N.Y.3d 158, 164-65 (2004); *see also NYAT Operating Corp. v. GAN National Insurance Co.*, 46 A.D.3d 287, 287 (1st Dept. 2007) ("[B]ecause [policyholder's] liability in the underlying action was based on its negligent hiring and retention of the employee, not respondeat superior, the sexual assault was a covered 'accident' within the meaning of the policy, and the exclusion for injuries expected or intended from the standpoint of the insured does not apply.") (internal citations omitted).

[49] *See Union Carbide Corp. v. Affiliated FM Ins. Co.*, 955 N.Y.S.2d 572 (N.Y. App. Div. 2012) (holding that the insured's calculated risk in selling asbestos products despite its awareness of possible injuries and claims did not trigger the exclusion); *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 52 Cal. Rptr. 2d 690, 723 (Cal. Ct. App. 1996) (holding that evidence of the insured's general knowledge of the dangers of asbestos was insufficient to apply the exclusion).

[50] *City of Johnstown, N.Y. v. Bankers Standard Insurance Co.*, 877 F.2d 1146 (2d Cir. 1989) (interpreting New York law).

[51] *Id.* at 1150 (citations omitted, emphasis added); *see also Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.,* 882 F.3d 952, 960, 962 (10th Cir. 2018) (quoting *Cont'l Cas. Co. v. Rapid–Am. Corp.*, 80 N.Y.2d 640, 649 (1993)) ("The New York Court of Appeals has held that damages are accidental so long as they are 'unexpected and unintentional'" and New York law construes "expected or intended" coverage terms "narrowly as barring coverage 'only when the insured intended the damages'"); *Cont'l Ins. Co. v. Colangione*, 484 N.Y.S.2d 929, 931 (3d Dept. 1985) (citations omitted) ("Ordinary negligence does not constitute an intention to cause damage; neither does a calculated risk amount to an expectation of damage. To deny coverage, then, the fact finder must find that the insured intended to cause damage."); *McGroarty v. Great Am. Ins. Co.*, 36 N.Y.2d 358, 363 (1975) ("Certainly one may intend to run a red light, but not intend that the catastrophic result of collision with another car occur. Calculated risks can result in accidents.").

defense.[52]   As such, a perpetrator's actions cannot be imputed to a negligent insured for the purposes of determining whether a given act was expected or intended.[53] Notably, "negligence implies an unintentional or unexpected event," and therefore **allegations of negligence inherently do not fall within expected or intended exclusions**."[54]   Thus, based on the allegations in the underlying CVA actions (which sound in negligence), binding New York law (which requires the insured's subjective intent to cause harm), as well as the facts adduced to date, Continental's "expected or intended" defense provides no basis for Continental's  drastic discount of its coverage exposure.

### 3. Continental Does Not Disclose the High Likelihood the Diocese or Litigation Trust Will Prevail Over Continental's Notice Defense

49.     The Diocese can demonstrate the reasonableness of the timing of its notice to Continental.  Under New York law, notice delays are excusable if the insured "can demonstrate 'that the insured either lacked knowledge of the occurrence or had a *reasonable belief of nonliability.*'" [55]   The Committee is unaware of any late-notice decisions involving the revival of previously barred claims—such as the CVA claims at issue here—but there are numerous

---

[52] *See Agoado Realty Corp. v. United Int'l Ins. Co.,* 95 N.Y.2d 141, 145 (2000)("[I]n deciding whether a loss is the result of an accident, it must be determined, *from the point of view of the insured*, whether the loss was unexpected, unusual and unforeseen." (emphasis in original)); *see also Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.,* 905 F.3d 84, 93 (2d Cir. 2018) (applying Connecticut law and distinguishing *Diocese of Winona v. Interstate Fire & Casualty Company*, 89 F.3d 1386 (8th Cir. 1996), in which the Eighth Circuit applied an objective standard in accordance with Minnesota law – noted to be an "outlier" standard).

[53] *See RJC Realty Holding Corp.,* 2 N.Y.3d at 165 (2004) (holding that a masseur's intention to assault a client could not be attributed to his employer, the insured); *Agoado Realty Corp.*, 95 N.Y.2d at 146 (2000) ("Indeed, although the murder is, for liability purposes, intentional from the standpoint of the assailant, its cause as set forth in the underlying complaint constitutes an accident from the standpoint of the insured, *i.e.*, negligent security.").

[54] *See, e.g., Auto. Ins. Co. of Hartford v. Cook,* 7 N.Y.3d 131, 138 (2006); *see also Miller v. Cont. Ins. Co.*, 40 N.Y.2d 675, 677 (1976) (ruling a heroin overdose an "accident" when no evidence indicated an intent for the injection to have fatal consequences: "'He [may have] used bad judgment, he [may have been] reckless, [but everything points to the fact that] he did not want to bring bereavement and sadness to his mother.'" (citations omitted; alterations in original)).

[55] *Indian Harbor Ins. Co.,* 972 F.Supp.2d at 64 (internal citations omitted); *see also Sparacino v. Pawtucket Mut. Ins. Co*., 50 F.3d 141, 144 (2d Cir. 1995) ("[A] reasonable belief in nonliability constitutes a valid excuse for failure of or delay in notification.").

analogous examples in which late notice was allowed due to the insured's reasonable belief of

non-liability:[56]

    a. Insured adoption agency had reasonable belief that it would not be held liable for events relating to abuse of child placed in foster home by insured, and thus, insured's delay in providing notice to insurer could be excused when—even though insured had received a phone call stating that the adoptive mother's boyfriend had sexually abused the child—insured's notes of conversation with the biological mother revealed "no foreshadowing of a lawsuit or of the theories of liability" that were eventually alleged in case regarding abusive adopted parents, and the insured engaged in "active efforts" to "remedy the situation and remove the children from the abusive environment with appropriate speed." [57]

    b. A policyholder provided timely notice where it notified insurers shortly after former foster child filed lawsuit, even though the plaintiff did not file his lawsuit until he reached the age of maturity—five years after the occurrence.[58] Because the policyholder paid all medical expenses of the child and the child indicated no intention to sue at the time of the incident, the court affirmed the determination that the policyholder provided notice "as soon as practicable" under the policy.[59]

    c. Insured dentist provided timely notice when—even though dentist was "aware long before [patient's] lawsuit" that the propriety of his conduct was at issue— dentist had "no knowledge that any civil claim would be brought against him until he was served with process by [patient]" accusing dentist of sexual abuse.[60]

    d. Baking equipment manufacturer also provided timely notice upon filing of lawsuit based on employee of buyer catching his arm in the manufacturer's equipment. Although manufacturer learned of injury sustained by employee a few days after the occurrence, buyer only asked manufacturer to check the reassembly of the

---

[56] Continental may point to one of the district court proceedings involving the *Diocese of Rockville Centre* as evidence of some type of purported judicial support for its late-notice defense. That case, however, provides no such support. In that action, one of the diocese's insurers, Arrowood, sought leave to file an amended counterclaim which added nine counterclaims, one of which involved late notice. Given the low bar needed to justify an amended pleading, *see* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires"), the Court determined only that allowing Arrowood to add a late-notice counterclaim would not be "futile*." Roman Cath. Diocese of Rockville Ctr., New York v. Arrowood Indem. Co*., No. 20-CV-11011 (VEC), 2022 WL 558182, at *15 (S.D.N.Y. Feb. 23, 2022). Arrowood itself later went into liquidation and that proceeding is now stayed. The Committee is confident that this argument will be rejected if it is considered on the merits.

[57] *Safeguard Ins. Co. v. Angel Guardian Home*, 946 F. Supp. 221, 228 (E.D.N.Y. 1996).

[58] *Merchants Mut. Ins. Co. v. Hoffman*, 56 N.Y.2d 799, 801, 437 N.E.2d 1155, 1156 (1982).

[59] *Id.*

[60] *Pub. Serv. Mut. Ins. Co. v. Goldfarb*, 53 N.Y.2d 392, 397, 425 N.E.2d 810, 813 (1981).

machine and did not alert manufacturer to employee's potential claim of liability.[61]

50.     In each of these examples, the courts examined whether the insured had knowledge that it was going to be held liable for the incident.  The courts did not examine whether the insured merely had knowledge that an incident had occurred.   In most instances in which the Diocese had knowledge of the abuse prior to the CVA's passage, the Diocese gained such knowledge after the claims had become time barred.  The Diocese, therefore, reasonably believed it would not be held liable for the incident and had no obligation to provide notice to its insurers at that time:

> The cases excusing an insured's failure to notify an insurer of an occurrence based on a good faith belief of non-liability are supported by the rationale that if insureds were required to notify insurers of every incident that poses even a remote possibility of liability, insurers would soon be swamped with notice of minor incidents that pose little danger of resulting even in an action by the injured party against the insured, let alone a claim by the insured against the insurer.[62]

51.     Furthermore, even in instances in which the statute of limitations had not expired when the Diocese learned of the abuse decades ago, the Diocese reasonably assumed non-liability at the time because, until the 2000s, there had been only a handful of sexual abuse lawsuits filed against any Catholic diocese, and even fewer six or seven figure payouts.[63] Therefore, the Diocese had a reasonable belief that these incidents would not lead to liability for which its insurers would have to provide coverage and Continental is unlikely to prevail on its late-notice defense.

---

[61] *Greater New York Mut. Ins. Co. v. I. Kalfus Co*., 45 A.D.2d 574, 577, 360 N.Y.S.2d 28, 31 (1974).

[62] *Safeguard Ins. Co. v. Angel Guardian Home*, 946 F. Supp. 221, 227 (E.D.N.Y. 1996); *see also  875 Forest Ave. Corp. v. Aetna Cas. & Sur. Co*., 37 A.D.2d 11, 13, 322 N.Y.S.2d 53, 55 (1971) ("[M]ere knowledge that an accident has occurred does not always give rise to a duty upon the insured to report such accident to his insurer.").

[63] *See, e.g., Angel Guardian Home*, 946 F. Supp. at 227 ("A reasonable belief in non-liability may stem from a belief in immunity from suit, but it may also be supported by a reasonable, good faith belief that a claim is unlikely).  *See also* Master List of Settlements and Awards in Chronological Order, Bishop Accountability, *available at* http://www.bishop-accountability.org/settlements/#list.

52.     Continental fails to address that, for its late notice defense to prevail, a court would have to reach the conclusion that introduction of the CVA by the New York State Legislature was a pointless exercise in legislation.  While no outcome is without some risk, for the purposes of analyzing which party has a high likelihood of success in litigating late notice, the purpose behind the CVA cannot be ignored.

**C.      Continental Does Not Provide Adequate Information in the CNA Disclosure Statement**

53.     Continental's failure to discuss the potential weaknesses of its defenses in the coverage action and the potential exposure that Continental faces in litigation renders its disclosure fatally deficient.  Sexual Abuse Claimants are given no basis on which to assess whether the unsolicited and unilateral settlement proposal by Continental is reasonable in light of Continental's potential liability for the payment of Sexual Abuse Claimants.

54.     Continental seeks to settle its exposure for a mere $75 million for 360 claims (comprising 335 timely and 25 late claims).  That is an average of only $208,333.  The Committee submits that Continental's exposure is potentially hundreds of millions of dollars—in other words, many multiples of Continental's current offer.

55.     Without being provided information about the possible recovery from the litigation against Continental, no reasonable Sexual Abuse Claimant can assess the adequacy of Continental's unilateral settlement offer to avoid the risk of litigation for the Sexual Abuse Claimants and for Continental.

**CONCLUSION**

56.     Continental lacks standing to confirm a plan of reorganization. As a result, the CNA Disclosure Statement should not be approved because the CNA Plan is patently unconfirmable as a matter of law.  In addition, Continental has not proposed the CNA Plan in

good faith and, thus, the CNA Plan is not confirmable on that ground as well. For these reasons, Continental should not be permitted to solicit the CNA Plan

57. Even if the Court determines that Continental's standing and good faith are issues to be decided at confirmation, it still cannot approve the CNA Disclosure Statement. The CNA Disclosure Statement omits any discussion of the potential risks and exposure to *Continental* if the claims against it are pursued. It is intended to lead the Sexual Abuse Claimants to unsupported and likely inaccurate conclusions about the risks and returns of accepting or rejecting the CNA Plan. That is, the CNA Disclosure Statement does not provide adequate information within the meaning of section 1125 for a Sexual Abuse Claimant to evaluate Continental's unilateral settlement proposal of a mere $75 million dollars, while Continental in fact faces exposure to Sexual Abuse Claimants in the hundreds of millions of dollars.

58. The Committee therefore respectfully requests that the Court deny approval of the CNA Disclosure Statement.

## <u>RESERVATION OF RIGHTS</u>

59. The Committee reserves the right to make any argument, present any facts, and oppose any argument or evidence with respect to the CNA Disclosure Statement, including arguments raised herein to the extent the Court deems them more properly presented as objections to confirmation.

WHEREFORE, for the reasons set forth above, on evidence presented at a hearing, the Committee respectfully requests that the Court deny the CNA Solicitation Motion and grant such other and further relief in favor of the Committee that it deems just and proper.

Dated:    December 5, 2023

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

_/s/_

James I. Stang (admitted _pro hac vice_)
Ilan D. Scharf
Iain A.W. Nasatir
Karen B. Dine
780 Third Avenue, 34th Floor
New York, NY  10017
Telephone:  (212) 561-7700
Facsimile:   (212) 561-7777
jstang@pszjlaw.com
ischarf@pszjlaw.com
inasatir@pszjlaw.com
kdine@pszjlaw.com

_Attorneys for the Official Committee of Unsecured Creditors_

**BURNS BAIR LLP**

Timothy W. Burns (admitted _pro hac vice_)
Jesse J. Bair (admitted _pro hac vice_)
10 E. Doty St., Suite 600
Madison, Wisconsin 53703
Telephone:  (608) 286-2808
tburns@bbblawllp.com
jbair@bbblawllp.com

_Special Insurance Counsel for the Official Committee of Unsecured Creditors_

## EXHIBIT A

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 20-12345-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                  United States Bankruptcy Court

12                  One Bowling Green

13                  New York, NY  10004

14

15                  September 26, 2023

16                  3:00 PM

17

18

19

20

21  B E F O R E :

22  HON MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  JONATHAN

1   HEARING re Motion to Authorize / An Order Granting Leave,

2   Standing, and Authority to Prosecute a Cause of Action on

3   Behalf of the Debtor and its Estate.   (Doc ## 2425,  2429,

4   2435, 2456, 2457, 2466 to 2469, 2500, 2501, 2510, 2511,

5   2513, 2515)

6

7   HEARING re Application for FRBP 2004 Examination Motion for

8   Entry of an Order Pursuant to Bankruptcy Rule 2004

9   Authorizing Examination of Witnesses and the Production of

10  Documents. (Doc ## 2388 to 2390, 2400, 2461, 2475, 2485,

11  2513, 2515)

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2

3    REED SMITH LLP

4         Special Insurance Counsel to the Diocese

5         Three Logan Square

6         1717 Arch Street, Suite 3100

7         Philadelphia, PA 19103

8

9    BY:  TIM LAW

10

11   PARKER HUDSON RAINER DOBBS LLP

12        Attorneys for Interstate Fire Casualty Company

13        303 Peachtree Street NW, Suite 3600

14        Atlanta, GA 30308

15

16   BY:  HARRIS WINSBERG

17

18   DUANE MORRIS

19        Attorneys for Certain Underwriters at Lloyd's London

20        and Certain London Market Insurers

21        865 South Figueroa Street, Suite 3100

22        Los Angeles, CA 90017

23

24   BY:  RUSSELL ROTEN

25
```

1    PACHULSKI STANG ZIEHL & JONES

2           Attorneys for the Committee

3           780 Third Avenue, 34th Floor

4           New York, NY 10017

5

6    BY:  KAREN DINE

7

8    PORZIO BROMBERG & NEWMAN

9           Attorneys for Arrowood

10          1675 Broadway, Suite 1810

11          New York, NY 10019

12

13   BY:  BRETT MOORE

14

15   ALSO PRESENT:

16   TIM BURNS

17   JESSE BAIR

18   CORRINE BALL

19   NATHANIEL ALLARD

20   JOHN BERRINGER

21   KENNEDY RHEA BODNAREK

22   STEPHENIE LANNIGAN BROSS

23   JOHN BUCHEIT

24   DYLAN CASSIDY

25   ANDREW CIRIELLO

1    SHARA CLAIRE CORNELL

2    WAYNE MATTHEW COX

3    JILLIAN DENNEHY

4    STEPHEN DONATO

5    THERESA DRISCOLL

6    AREILLE FELDSHON

7    ROBERT GERBER

8    TRUSHA GOFFE

9    WILLIAM HEUER

10   ADAM HOROWITZ

11   TODD JACOBS

12   AARON JAVIAN

13   ANN KRAMER

14   JUSTIN KRELL

15   BRITTANY MITCHELL MICHAEL

16   GEOFFREY MILLER

17   SIOBHAIN PATRICIA MINAROVICH

18   JAMES MOFFITT

19   IAIN NASATIR

20   CHRIS PERKINDS

21   THOMAS SLOME

22   ADAM SMITH

23   PATRICK STONEKING

24   CATALINA SUGAYAN

25   NORA ANNE VALENZA-FROST

1  CHELSIE WARNER

2  MATTHEW MICHAEL WEISS

3  JACOB WORLOW

4  GREG ZIPES

5  UDAY GORREPATI

6  EMILY LEVER

7  KAREN MORIARTY

8  VINCE SULLIVAN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    the mediation process in place.

2              THE COURT:  Thank you.

3              MR. WINSBERG:  The second point, Your Honor, is

4    that the claims -- we believe Your Honor picked up on this -

5    - are not right for adjudication.  There may result in

6    multiple hypotheticals that may or may not never occur.  And

7    just to give a couple in the chain, Your Honor, the Diocese

8    would have to enter into a settlement with the insurers.

9    The Diocese would have to, essentially, not do its homework

10   or exercise its fiduciary obligation.  Your Honor, pointed

11   out, there's no conflict of interest here that you would

12   typically sometimes see when derivative standing is sought.

13   And the Diocese would try to sign an agreement that's not in

14   the best interests of the estate.

15              The Committee, they would assume the Committee

16   would not accept this settlement.  And the Committee assumes

17   that this Court would not, could not and would not approve

18   this settlement.  And the Diocese would later repudiate the

19   settlement in favor of another deal --

20              THE COURT:  Well, there's no settlements are

21   repudiated --

22              MR. WINSBERG:  Right.

23              THE COURT:  -- until, unless the provider prove

24   it.

25              MR. WINSBERG:  Your Honor, so my point being, is

1     there's a long line of causal --

2              THE COURT:  If the insurers think they're going to

3     get an administrative claim, because you've reached a

4     settlement that isn't approved by the Court, forget it.

5              MR. WINSBERG:  The administrative claims, just

6     like Judge Poslusny has in Camden, and Judge --

7              THE COURT:  I don't care what --

8              MR. WINSBERG:  But those are for those courts to

9     decide.

10             THE COURT:  I'm just telling you, if this case

11    survives, and there's a settlement that comes on for

12    approval, and it's not approved, you're not getting into

13    approved.  No one should have the expectation, no insurer

14    should have an expectation, because you've negotiated an

15    agreement with the Diocese, that is later rejected by this

16    Court, that you're sometime, somehow, going to have an

17    administrative claim.  Get it clear, it's not going to

18    happen.

19             MR. WINSBERG:  I understand, Your Honor.  My point

20    on what was said about Camden and Rochester, it wasn't the

21    settlement agreement the Diocese entering into a settlement

22    agreement that caused an admin claim; it was the Diocese'

23    later conduct in repudiating the settlement agreements that

24    caused --

25             THE COURT:  There isn't going to be a repudiation

1    of an agreement that isn't approved by the Court.  You

2    understand that clearly?

3              MR. WINSBERG:  I understand, Your Honor.

4    (indiscernible) on why that should be denied, Your Honor, is

5    that the claims -- they don't state a claim under a 349,

6    which is the consumer protection statute.  We've covered the

7    admin claim.  That's what they had focused on.  Your Honor's

8    made its position clear on the admin claim --

9              THE COURT:  I made it clear to all the insurers.

10              MR. WINSBERG:  You made it clear to all the

11   insurers, Your Honor.  What I would say here, Your Honor, is

12   that harm is a business harm.  And the Courts are pretty

13   clear that's the kind of harm that's not consumer protection

14   oriented; it's the harm to the bankruptcy estate, so to

15   speak.  And Your Honor has made it clear to all the insurers

16   there would be no admin claim for repudiation.

17              So, with that, Your Honor, I'm happy to answer any

18   questions Your Honor has.

19              THE COURT:  Thank you very much.  Anybody else

20   want to be heard?  Come on up.

21              MR. ROTEN:  Good afternoon, Your Honor.  I'm

22   Russell Roten.  I'm with Duane Morris.  I represent certain

23   underwriters at Lloyd's London and certain London Market

24   Insurers.  We refer to ourselves as the London Market

25   Insurers, or LMI.

1        We endorse and echo the arguments and comments of

2  the Debtor and Interstate, that Your Honor just heard.  I

3  have a few specific points that I'd like to make.  And let

4  me start out by saying, Your Honor, we certainly understand

5  the administrative claim issue.  I'm going to touch on that,

6  but from a different perspective.  But first, let me make

7  just a couple of succinct points.

8        First of all, as Mr. Winsberg said, Section 349 is

9  a consumer protection statute that's not a private right of

10  action type statute.  And we have researched the case law in

11  New York, Your Honor, and there's no case where a Court has

12  ever provided a claimant or a committee standing to pursue a

13  claim under Section 349; it's never happened.

14        The second basis for the Committee's derivative

15  action, Your Honor, is Section 2601 of the New York

16  Insurance Law.  And as we pointed out in our brief, there is

17  no private right of action under that statute.  I can give

18  you the cases again, but they're in our brief.  And it,

19  specifically, we've cited a case that says the New York

20  State Superintendent of Insurance has this exclusive

21  jurisdiction to pursue any claim under that statute.  So,

22  the Committee has no right to go forward o either of the

23  statutes they're going forward on.  That's my first point.

24        The second point I want to make, Your Honor, I had

25  trouble understanding when I read the Committee's brief.  It