In re:

DIOCESE OF ROCHESTER,

Debtors.

Chapter 11

Case No. 19-20905

## THE CONTINENTAL INSURANCE COMPANY'S OMNIBUS RESPONSE TO OBJECTIONS BY DEBTOR, THE COMMITTEE, AND THE U.S. TRUSTEE TO CONTINENTAL'S DISCLOSURE STATEMENT

The Continental Insurance Company ("Continental") hereby responds to the objections to Continental's proposed disclosure statement (the "CNA DS," Dkt. No. 2247) filed by Debtor (the "Debtor Obj.," Dkt. No. 2351), (b) the Committee (the "Committee Obj.," Dkt. No. 2349), and (c) the United States Trustee (the "UST Obj.," Dkt. No. 2345).

### Preliminary statement

The CNA DS satisfies the "adequate information" standard of § 1125(b) of the Bankruptcy Code. It lives up to the most basic expectation of disclosure, which is to tell creditors what they can expect to get under a plan and when. In this regard, it is distinguishable from the Debtor's disclosure statement (the "Debtor DS," Dkt. No. 2218), which falls far short of satisfying the statutory standard.

In particular, the CNA DS tells Survivors exactly how much money will fund the Plan ($201.35M), that the funds will be distributed by the Trust pursuant to an Allocation Protocol (which has now been filed) without any need for litigation, and that the funds will be paid by the Trust shortly after the Abuse Claims Reviewer finishes scoring the claims. This fully answers the

"how much and when" question that is at the core of the "adequate information" standard.

The arguments raised by Debtor, the Committee, and the U.S. Trustee ("UST") are really nothing more than quibbles about details. Debtor and the Committee, who have filed their own joint plan, like their plan better than the CNA Plan. But the fact that the CNA Plan differs from theirs is not a disclosure deficiency.[1]

Bankruptcy courts have significant discretion in determining whether a disclosure statement contains adequate information.[2] Such a determination must be made "on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties."[3] The CNA DS offers a full and fair discussion of the choice put to Survivors by the two plans. The objections to the CNA DS by Debtor and the Committee represent nothing more than an effort to leave Survivors with only one choice.

With this omnibus response, Continental submits a revised CNA DS to provide

---

[1]     *See In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) (stating, in the context of reviewing disclosure statements for competing plan, "After reviewing both disclosure statements and the related objections, the Court believes it is clear that the various objections are based on the objecting parties' preference for one plan over the other rather than any real deficiencies in the disclosure statements. However, such preference is not a proper basis for denying approval of either disclosure statement.").

[2]     *See, e.g., In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D. N.J. 2005) ("Section 1125 affords the Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement"); *In re River Vill. Assocs.*, 181 B.R. 795, 804 (E.D. Pa. 1995) (explaining that the legislative history of § 1125(a)(1) provides that, "[b]oth the kind and form of information are left essentially to the judicial discretion of the court, guided by the specification in subparagraph (a)(1) that it be of a kind and in sufficient detail that a reasonable and typical investor can make an informed judgment about the plan. The information required will necessarily be governed by the circumstances of the case."). Moreover, the determination of whether adequate information exists "is subjective" and must be "made on a case by case basis." *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988). *See also Oneida Motor Freight*, 848 F.2d at 417 ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case").

[3]     *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988).

certain modifications, as described below.  Otherwise, the Court should reject the additional disclosures requested by Debtor, the Committee, and UST as unnecessary.

Response to Objections

I.    **Response to Debtor's "limited objection."**[4]

    A.    **The funding sources for the CNA Plan are not uncertain.**

Once confirmed, the CNA Plan will establish a survivor trust in the amount of $201.35 million, funded with (i) the DOR Entities Cash Contribution of $55 million from Debtor and other Protected Parties, (ii) $71.35 million from settling insurers Interstate, LMI/Underwriters, and Hartford, and (iii) $75 million from Continental.  As Debtor notes, "funding for the CNA Plan mirrors the funding of the trust under the Joint Plan, except that under the CNA Plan CNA's contribution is fixed at $75 million."[5]

However, Debtor says that some or all of the DOR Entities Cash Contribution of $55 million may not be available under the CNA Plan, that the Protected Parties (non-debtor members of the "Catholic Family") may not consent to sell their interests in insurance policies back to the Settling Insurers if the CNA Plan is confirmed, and that "this risk factor needs to be disclosed in" the CNA DS.[6]

Debtor's estate, of course, is subject to the jurisdiction and complete control of this Court.[7]  If the Court confirms the CNA Plan, then the confirmation order controls the

---

[4]    Debtor Obj. at 3.

[5]    *Id.* at 5.

[6]    *Id.* at 6.

[7]    *In re Public Service Co. of New Hampshire*, 88 B.R. 521, 529-30 (Bankr. D.N.H. 1988) ("Inside a chapter 11, the bankruptcy court has exclusive jurisdiction over the property of the debtor and over property of the estate").

- 3 -

disposition of Debtor's assets, including its cash and insurance rights; Debtor has no say in the matter. Debtor cannot bind itself to a single means of disposing its assets, where other possible outcomes might be more beneficial to creditors.[8] This is so even if such outcomes might not be Debtor's preference.[9]

Debtor argues that "the other members of the Catholic Family"—who are not debtors—may not agree, if the CNA Plan is confirmed rather than the Debtor Plan, to provide "the same level of funding" or their consent to any settlement and buyback of the insurance assets they allegedly share with Debtor.[10] Debtor presents no reason why the other members of Catholic Family would refuse to consent if the CNA Plan provides them—as it does—with the exact same channeling injunction protection for the same contributions they would make under the Debtor Plan.[11] Debtor also makes no attempt to provide any reason why Interstate, LMI/Underwriters, and Hartford might refuse to pay their agreed settlement amounts in exchange for channeling injunction protection under the CNA Plan, even though the Supplemental Settling Insurer Injunction under the CNA Plan is precisely the same as the corresponding injunction under the Debtor Plan. Debtor's unsupported arguments are, thus, far-fetched because they cannot be

---

[8]    *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 734 (Bankr. W.D. Ky.), *aff'd*, 233 B.R. 739 (W.D. Ky. 1998) (rejecting as illegal a no-shop contract that would bind debtor to a particular sale partner and price). This is the animating principle underlying *Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 734 Fed. Appx. 68 (2d Cir. 2018), which held that where a debtor subsequently "comes across a better offer or otherwise thinks the settlement is no longer in compliance with its fiduciary duties to creditors," the debtor "may argue against court approval of the settlement, but it may not withdraw unilaterally." *Id.* at 70.

[9]    *See, e.g.*, *In re Claar Cellars LLC*, 623 B.R. 578, 608 (Bankr. E.D. Wash. 2021) (confirming a competing liquidating plan over the debtor's objections).

[10]    Debtor Obj. at 5.

[11]    As noted in CNA's objections to Debtor's DS, Debtor fails to disclose how much, if anything, members of the Catholic Family are contributing to the $55 million DOR Cash Contribution. *See* CNA's objection to Debtor's DS (the "CNA Obj.," Dkt. No. 2348) at 17. *See also* UST Obj. at 21-22. It is possible Debtor itself is paying the entire $55 million.

reconciled with economic reality or the self-interests of the Catholic Family and the Settling Insurers.[12]

Nevertheless, in the revised disclosure statement filed contemporaneously herewith, Continental has added a risk factor discussing this point. That additional disclosure moots Debtor's argument on this point.

## B. The impact of post-confirmation litigation.

The Debtor Plan and the CNA Plan treat post-confirmation litigation differently. Unlike the Debtor DS, the CNA DS contains a thorough disclosure that satisfies the "adequate information" standard.

First, the Debtor DS does not disclose the "gatekeeping" criteria the Trustee will use in determining which Survivors may pursue litigation recoveries and which may not.[13] Thus, a Survivor who wishes to consider pursuing such litigation has no way of knowing whether he or she will be allowed to do so, or even how the Trustee would make such a decision. Second, the Debtor DS fails to disclose that only Survivors whose claims took place during Continental's coverage period are even eligible to be considered for permission to sue post-litigation.

In contrast, under the CNA Plan, any Survivor who wishes to reject their Trust Settlement Offer and assume the burdens and risks of litigation may do so, without the Trustee standing in his or her way. This allows each Survivor to decide how to proceed—not a Trustee applying unknown and undisclosed criteria (or, maybe, no criteria at all). Moreover, instead of the Trustee limiting who can sue in court, the CNA Plan allows each Survivor to vindicate their

---

[12]    To the extent any current Settling Insurer would prefer Non-Settling Insurer treatment, the CNA Plan contains provisions governing Non-Settling Insurers.

[13]    *See* CNA Obj. at 14-15.

- 5 -

Seventh Amendment rights to a jury trial if they wish to do so (which, however, requires them to reject the "sure thing" of a Trust Settlement Offer).

There is, thus, no factual basis for the proposed disclosures Debtor seeks to foist on Continental that (i) the provisions of the CNA Plan make it "likely" that "many more lawsuits" will "go[ ] forward" under the CNA Plan than under the Debtor Plan or (ii) the CNA Plan would result in "an overwhelming flood of lawsuits" resulting in "an enormous, potentially even insurmountable, administrative burden on" Debtor.[14] Because any such disclosure would not be factual, it would be improper. It is far more likely that Survivors would choose to take their respective shares of a much larger, $201.35 million pot than delay receipt of payment in order to undertake years of litigation with an uncertain outcome. But if they wish to litigate, the CNA Plan allows them to do so, without the Trustee applying unspecified criteria to decide who, among only those Survivors whose claims trigger Continental coverage, will be allowed to proceed.

## C. Disclosure regarding the value of insurance claims against Continental.

Debtor argues that Continental should disclose that the $75 million amount Continental is offering to pay under the CNA Plan essentially establishes a floor, such that Continental would be willing to pay at least that much, if not more, in a post-confirmation settlement with the Trustee. That argument is nothing more than rank speculation, and thus there need not be any disclosure around the points raised by Debtor's argument.

Continental is willing to pay $75 million now, in exchange for the terms of its plan, to obtain certainty and avoid the delays and costs of post-bankruptcy litigation. There is no factual basis for Debtor's assertion that Continental would agree, after incurring significant post-

---

[14] Debtor Obj. at 7.

bankruptcy litigation costs, to pay more than $75 million in a later settlement. Certainly, Debtor refers to nothing to support its argument.

Accordingly, no additional or further disclosure is needed. The CNA DS is indisputably clear that $75 million is the amount on offer to Survivors, if they vote to accept the CNA Plan.

**D.     Disclosure concerning Survivors' "average" recoveries under the CNA Plan.**

Debtor argues that Continental did not properly disclose that if the "average" claim value is more than $400,000, that means some Survivors may receive less. Such a disclosure is completely unnecessary, given that "average" literally means that some claims will be paid more and others will be paid less. Indeed, footnote 2 of the Committee's DS Objection demonstrates that no such disclosure is needed, given the accepted, non-technical meaning of the word "average."

Accordingly, the CNA DS need not contain any additional disclosure on this point.

**E.     Disclosure regarding whether Survivors must pursue litigation under the Debtor Plan.**

Contrary to Debtor's argument, the CNA DS makes no suggestion that Survivors "would be required" to participate in litigation in order to be paid under the Debtor Plan is just wrong.[15] Rather, Continental pointed out—correctly—that for a Survivor to receive his or her *full* measure of compensation under the Debtor Plan, he or she will need to either litigate themselves or wait for others to do so.[16] There is no path for a Survivor to recover *from Continental* under the Debtor Plan without some Survivors engaging in post-confirmation litigation.

---

[15]     *See* Debtor Obj. at 9.

[16]     CNA Obj. to Debtor DS at 9-10.

In other words, the purported "maximized" recoveries promised under the Debtor Plan can only be vindicated through successful litigation with Continental over both liability and coverage issues. Any Survivor seeking to become a Litigation Claimant or Stipulated Judgment holder must be prepared for discovery and depositions. So, while not all Survivors must engage in litigation, some must do so or there will be no payment required from Continental under the Debtor Plan. On this point, Survivors would be well served by a straightforward disclosure in the **Debtor DS** that recovery from Continental under the Debtor Plan is litigation-dependent, and the Court should deny approval of the Debtor DS unless it is modified to add such disclosure, which is presently lacking in the Debtor DS.

Notwithstanding that no additional disclosure is necessary in the CNA DS, Continental has included some additional disclosure on this point in its revised disclosure statement.

**F.     The CNA DS is entirely factual.**

Debtor makes a general and non-specific complaint that the CNA DS is an improper "sales brochure" for the CNA Plan, and that the CNA DS "fails to provide factual support for many of the qualitative statements it makes."[17] Debtor therefore asks that "all such unsupported facts or statements of opinion should be stricken before the CNA Disclosure Statement can be approved."[18]

However, Debtor fails to identify a single unsupported fact or statement of opinion that it contends must be stricken. Debtor has therefore failed to state a proper objection. Neither Continental nor the Court could have any way of knowing what further disclosures Debtor wants,

---

[17]     Debtor Obj. at 10.

[18]     *Id.*

since Debtor has not specified which statements it contends are objectionable.

Moreover, the statements in the CNA DS are factual and supported. Comparisons between the CNA Plan and the Debtor Plan merely reflect the differing provisions of the two plans, and are accurate. Statements in the CNA DS regarding how long it might take to get to verdict in an underlying abuse case and then in a follow-on insurance coverage case are supported by citations to statistics published by the New York State Unified Court System and the Federal Judicial Center. Rulings of this Court are also cited as support for certain statements.

In sum, this objection by Debtor is improperly vague and ambiguous, and should be rejected.

## II.     Response to Committee's objection.

Rather than focusing on alleged deficiencies in the CNA DS, the Committee instead seeks to preclude Survivors from having any opportunity to consider the CNA Plan. Specifically, the Committee kicks off its objections by recycling arguments about Continental's standing that it previously advanced in this case, but then abandoned. As shown below, Continental's standing is secure and indisputable, and the Committee's standing arguments should be rejected.

In addition, the Committee seeks a premature ruling on whether the CNA Plan was filed in good faith. But the law is clear that the good faith of a plan presents factual issues that must be addressed through an evidentiary presentation at the confirmation hearing, not at the disclosure statement stage.

One can only wonder why the Committee is so insistent that Survivors be blocked from considering whether they are better off under the CNA Plan than under the Debtor Plan. Perhaps the Committee fears that Survivors would vote in favor to the CNA Plan if they

understood that, under the Debtor Plan, only a subset of them will be able to access funds from Continental and, even then, only if they choose to pursue two lawsuits (a liability case and then a coverage case), with the attendant litigation risks. Maybe some Survivors would prefer to get their share of a guaranteed $75 million from Continental shortly after confirmation, without first enduring years of litigation that, in the end, may not result in their receiving anything more (or, even, anything at all). One thing is certain: only the Committee and State Court Counsel, tort lawyers entitled to large contingency fees on the backs of Survivors, have accepted these risks to date. Whether the Survivors themselves will accept the same risks is the very reason to put the CNA Plan to a vote.

### A.  Continental has standing to propose the CNA Plan.

As the Third Circuit explained in finding that insurers have standing to make plan confirmation objections, "[w]hen a federal court gives its approval to a plan that allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed. In short, they at least have bankruptcy standing."[19]

The Committee's disclosure statement objection is at least the third time it has invoked "lack of standing" to try to shut down Continental's efforts to protect its legitimate interests in this case. The Committee asserted Continental lacked standing to object to the RSA, an agreement that not only bound Debtor to propose a prejudicial plan but also served as a *de facto* repudiation of Continental's $63.5 million settlement with Debtor. The Committee also claimed Continental does not have standing to object to proofs of claim Continental is being

---

[19]     *Global Industrial Technologies*, 645 F.3d 201, 204 (3d Cir. 2011).

asked to pay. Presently, the Committee's position is that Continental, the acknowledged target

of the Debtor Plan, cannot take reasonable steps to protect itself, including by proposing to pay

$75 million to compensate Abuse Claims. The Committee is wrong, as courts have found that

insurers do have standing where the "real-world impacts" of a plan would "increase[ ] insurance

exposure and likely liabilities of" insurers.[20] The Committee's tired argument should be rejected,

as Continental unquestionably has Article III standing and bankruptcy standing.

### A. Neither Article III nor Section 1109 present obstacles to Continental's participation as a plan proponent.

#### 1. Continental has bankruptcy standing because its legally protected rights are affected.

To have bankruptcy standing, Continental must be a "party in interest" under

§ 1109(b) of the Bankruptcy Code, a term interpreted "to mean that anyone who has a legally

protected interest that could be affected by a bankruptcy proceeding is entitled to assert that

interest with respect to any issue to which it pertains."[21] "[C]ourts have consistently held that

party in interest status is an expandable concept depending on the particular factual context in

which it is applied."[22] In the Second Circuit, courts construe "party in interest" "broadly 'to

---

[20]    *In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012). *See also Global Industrial Technologies*, 645 F.3d at 212-13 (insurers had standing even when their "ultimate liability [was] contingent" on the outcome of the plan, where the plan threatened to increase the quantum of liability the insurers could be forced to pay); *In re Congoleum Corp.*, 426 F.3d 675, 685, 687 (3d Cir. 2005) (finding insurers had standing to oppose an application to retain special insurance counsel because the application "will affect the resolution of issues that may directly affect the rights of insurers" and "it is highly unlikely that any of the parties other than the insurers . . . would challenge the application").

[21]    *In re Quigley Co.*, 391 B.R. 695, 703 (Bankr. S.D.N.Y. 2008) (internal citations and quotations omitted).

[22]    *In re First Humanics Corp.*, 124 B.R. 87, 90 (Bankr. W.D. Mo. 1991), quoting *In re River Bend-Oxford Assocs.*, 114 B.R. 111, 113 (Bankr. D. Md. 1990). *See also In re Chandler Airpark Joint Venture I*, 163 B.R. 566, 569 (Bankr. D. Ariz. 1992) ("Under the Bankruptcy Code, the concept of who is an interested party is an expandable one").

insure fair representation of all constituencies impacted in any significant way by a Chapter 11 case.'"[23]  A party "who is the primary source of funding or whose exposure would be increased as the result of a settlement or other binding agreement" has standing.[24]  In short, standing under § 1109(b) extends to all entities with a "practical stake in the outcome of the proceedings."[25]

Where insurer standing has been challenged, bankruptcy courts have found that an insurer whose rights "might be affected by the bankruptcy" has standing to object "to the plan provisions that allegedly affect its interests,"[26] the same as any party "who is the primary source of funding or whose exposure would be increased."[27]  These "real-world impacts" are sufficient to permit insurer participation in a bankruptcy case.[28]

Although the Committee acknowledges that "party in interest" means the same

---

[23]     *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009), quoting *In re Johns-Manville Corp.*, 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984).

[24]     *In re Motors Liquidation Co.*, 580 B.R. 319, 350 (Bankr. S.D.N.Y. 2018).

[25]     *In re Amatex Corp.*, 755 F.2d 1034, 1041-42 (3d Cir. 1985) ("party in interest" is an "elastic concept").  *See also In re Zaleha*, 162 B.R. 309, 315 (Bankr. D. Idaho 1993) ("It is the existence of an interest potentially affected by the matter before the Court that determines standing").

[26]     *In re Keck, Mahin & Cate*, 241 B.R. 583, 596 (Bankr. N.D. Ill. 1999).

[27]     *In re Motors Liquidation Co.*, 580 B.R. 319, 350 (Bankr. S.D.N.Y. 2018) (discussing "a number of cases that reflect that the proposed target of an agreement may have standing to challenge aspects of that agreement . . . regardless of whether they are parties to it").

[28]     *In re Thorpe Insulation*, 677 F.3d at 885.  In another example, "bankruptcy courts have recognized that a liability insurer is a 'party in interest' where the debtor's insurer is responsible to pay claims brought against the debtor."  *In re Heating Oil Partners*, 2009 WL 5110838, at *5 (D. Conn. Dec. 17, 2009), *aff'd sub nom. In re Heating Oil Partners, LP*, 422 F. App'x 15 (2d Cir. 2011), citing *In re Standard Insulations, Inc.*, 138 B.R. 947, 950 (Bankr. W.D. Mo. 1992).  In *Standard Insulations*, where objections by the debtor's insurers to personal injury claims were met with an argument that the insurers lacked standing, the court found that because the "insurers are responsible for payment of injury claims," they were "parties in interest . . . and have standing to object to claims against the estate."  *Standard Insulations*, 138 B.R. at 950. *See also Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee*, 321 B.R. 147, 158 (D.N.J. 2005) (noting "that parties with potential responsibility to pay claims against debtors regularly have standing to participate in bankruptcy cases").

- 12 -

thing under § 1121(c) ("Who may file a plan") as it does under § 1109, the Committee nevertheless puts forth the invented standard that, to have standing to propose its own plan, Continental must show that "any proposed plan by the Debtor and the Committee will necessarily have a direct impact on Continental's own legal rights and interests."[29] While no law supports the Committee's standing test, Continental easily meets it, given that the Debtor Plan specifically targets Continental, through Stipulated Judgments and Litigation Claims, in an attempt to "enhance" claimant recoveries from Continental. Thus, under the Committee's own proffered test, Continental indisputably has standing to propose its own plan.

But the standard proposed by the Committee—that a party can only propose a plan if it is directly aggrieved by a debtor's plan—lacks any support in the law. Indeed, courts have held the opposite: that the "party in interest" standing determination in a competing plan process "must be made in light of the specific reorganization context for which the determination is sought."[30]

For example, in *In re First Humanics Corp.*, a third-party healthcare administrator that had been operating the debtor's business under a management agreement filed its own plan to compete with the debtor's plan, which would have terminated the management agreement. The court ruled that the relevant context included the third party's "substantial interest in debtor's reorganization process" and the facts that the solicitation of the competing plan would not unduly prejudice or delay any party, was not an effort to slow or block the debtor's reorganization process,

---

[29] Committee Obj. at 9.

[30] *In re First Humanics Corp.*, 124 B.R. 87, 89 (Bankr. W.D. Mo. 1991). *See also In re River Bend-Oxford Assocs.*, 114 B.R., 111 113 (Bankr. D. Md. 1990) ("Party in interest is an expandable concept depending on the particular factual context in which it is applied. The purpose is to permit the involvement of those persons and interests which will be affected by the reorganization process."), quoting *In re Amatex Corp.*, 755 F.2d at 1041-44.

was offered on the same timetable as the debtor's plan, and contained provisions that treated certain creditors more favorably than under the alternative plan.[31] These factors are all true of the CNA Plan. Indeed, "[b]y allowing [CNA] to go forward with its plan, the equally important policies of providing alternatives to voting creditors and maximizing returns to creditors are promoted"[32] and the "chapter 11 policy of 'creditor democracy'" is served.[33]

The Committee cites both *In re Diocese of Camden* and *Quigley,* on which *Camden* relies. But both cases **support** Continental's standing, since both recognize that insurers have standing to challenge "issues which threaten their legally protected interests."[34] Continental seeks no different treatment here: its legally protected interests, including its contractual rights under the insurance policies it issued to Debtor, are prejudiced by the Debtor Plan.[35]

Another case cited by the Committee, *C.P. Hall,* denied standing because the insurer had no direct pecuniary interest in a settlement between the debtor and a different insurer.[36] Here, by contrast, Continental has a direct pecuniary interest because it is being asked to pay hundreds of claims, including claims that, under the plain terms of the Debtor Plan, will be weaponized specifically against Continental through Stipulated Judgments and Litigation

---

[31]   *In re First Humanics Corp.*, 124 B.R. at 91.

[32]   *Id.*

[33]   *Matter of Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993).

[34]   *In re Diocese of Camden*, 2022 Bankr. LEXIS 2244 (Bankr. D.N.J. Aug. 12, 2022). *See also Quigley*, 391 B.R. at 703 (interpreting "party in interest" under § 1109(b) to mean "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains").

[35]   The basic foundations of the Debtor Plan—the "enhanced" Insurance Claims that will "maximize the potential recovery for **all** Abuse Claimants"—are overtly prejudicial to Continental in numerous ways. For a discussion of the myriad ways in which the Debtor Plan provisions prejudice Continental, *see* Settling Insurers' Brief in Support of their Standing to Object to Debtor's Motion for Approval of Its Restructuring Support Agreement with the Committee (Dkt. No. 1895).

[36]   *In re C.P. Hall*, 750 F.3d 659, 662-63 (7th Cir. 2014).

Claims in an attempt to obtain "enhanced" recoveries from Continental.[37]

In arguing (again) that Continental has waived its contractual rights, the Committee ignores (again) that, on November 15, 2022, Continental agreed to defend all of the claims against Debtor and the parishes, subject to a reservation of rights. The Committee has never directly acknowledged the potential significance of Continental having agreed to assume the defense, including that New York insurance case law suggests that Continental would be permitted to "cure" a previous coverage denial where there was no prejudice to the insured.

Indeed, New York cases that have considered similar questions relating to an insurer's waiver of its right to defend underlying claims have relied on lower-court findings that the insured was prejudiced by the insurers' initial denials of coverage, but there is no similar prejudice here.[38] Debtor filed for bankruptcy within a month of the CVA window opening, which automatically stayed all litigation against it at the very start of those cases. The stay has been in effect at all times during the pendency of this bankruptcy case. There has been minimal activity in the few pending lawsuits. No default judgments have been taken against Debtor. Because Debtor suffered no prejudice from the CNA's initial disclaimer of coverage as to some

---

[37]     Stipulated Judgments are, by definition in the Debtor Plan, to be pursued only against Continental. As to Litigation Claims, Debtor's DS Objection describes the "gatekeeping function" to be performed by the Trustee in allowing only those claims that implicate a non-settling insurer's policies to move forward—*i.e.*, claims against Continental's policies. Debtor DS Obj. at 6.

         *Innkeepers*, also cited by the Committee, is not informative. There, the bankruptcy court denied "party in interest" standing to an investor in a real estate mortgage investment conduit because the relationship as "merely an investor in a creditor" was too attenuated to confer standing. *In re Innkeepers USA Tr.*, 448 B.R. 131, 143 (Bankr. S.D.N.Y. 2011). Here, Continental will suffer direct pecuniary harm from provisions in the Debtor Plan.

[38]     *See, e.g.*, *Liberty Mut. Fire Ins. Co. v. Hamilton Ins. Co.*, 356 F. Supp.3d 326, 339 (S.D.N.Y. 2018) (court found that the insured would be prejudiced if the insurer were allowed to take up the defense after a "years'-long delay" because the insured would be forced to "retain new counsel at so late a stage in the proceedings"); *Krenitsky v. Ludlow Motor Co.*, 276 A.D. 511, 512 (1950) (the insured had already suffered default judgments by the time the insurer attempted to intervene in the matter).

claims, there is no reason to not give full effect to Continental's updated coverage position. The Committee's reliance on distinguishable case law is certainly not enough to support a ruling that Continental lacks standing under the circumstances here.

### 2. Article III provides no additional barrier.

Article III requires only that a party have "such a personal stake in the outcome of the controversy as to assure . . . concrete adverseness."[39] Clearly, that standard is met here.

First, Continental has suffered "injury in fact"—"invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical" in several ways, including the repudiation of its settlement agreement with Debtor and the prejudicial provisions of the Debtor Plan that expose Continental to outsize legal risk and, allegedly, hundreds of millions of dollars in claims.[40] Injury in fact is not a demanding requirement; indeed, "an identifiable trifle will suffice."[41]

Second, the injury must be "fairly traceable" to the challenged action.[42] And third, the injury must be likely to be redressed by a favorable decision.[43]

It is evident from consideration of just the Stipulated Judgments that Continental easily satisfies these elements: under the terms of the Debtor Plan, Continental will be precluded from challenging liability for up to 38 claims, as to which Debtor will concede liability despite

---

[39]    *Baker v. Carr*, 369 U.S. 186, 204 (1962).

[40]    *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks, footnotes, and citations omitted).

[41]    *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 105 (2d Cir. 2013) (internal citation and quotations omitted).  *See also Gen. Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc.*, 197 F.3d 83, 87 (3d Cir. 1999) (all a litigant must show to establish its standing is an "identifiable trifle" of injury).

[42]    *Lujan*, 504 U.S. at 560-61 (internal quotation marks, footnotes, and citations omitted).

[43]    *Id.* (internal quotation marks, footnotes, and citations omitted).

Continental's commitment to defend them; and Continental will then be asked to pay those Stipulated Judgments. By eliminating Continental's right to contest Debtor's liability for the Stipulated Judgment claims, the Debtor Plan would breach Continental's policies, harming Continental. An order denying confirmation of the Debtor Plan would redress that harm. As such, Continental has Article III standing to object to the Debtor Plan, which under the Committee's construct means that Continental also has standing, under § 1121(c), to propose the CNA Plan.[44]

### 3. Continental's administrative claim is not necessary to confer standing on Continental.

The Committee argues that Continental lacks standing based on its administrative claims because "Continental has superseded the terms of its proposed settlement with the Diocese by filing the CNA Plan itself with new proposed settlement terms."[45] However, the Court last week ruled that Debtor's Rule 9019 Motion concerning the Continental Settlement was not mooted by Continental's subsequent offer in the CNA Plan, because "[a] settlement agreement is not rendered a nullity by the conveyance of a yet unaccepted superior post-settlement offer."[46] The Court's rejection of the Committee's mootness argument disposes of the Committee's argument here.

---

[44] The federal standing doctrine also encompasses the concept of prudential standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). This is interpreted in the Second Circuit to mean that a party "must assert his own legal rights and interests." *In re Quigley Co.*, 391 B.R. at 702. In filing its competing plan, Continental is asserting its own rights and offering its own money. No issue regarding third-party standing is presented here.

[45] Committee Obj. at 10.

[46] *See* Decision and Order Denying Committee's Motion Requesting a Determination that Motion Seeking Approval of Settlement Agreement Between Diocese and CNA is Moot, Dkt. No. 2362 (the "Order and Decision").

*Rockville Centre*, cited by the Committee, is completely irrelevant. There is no settlement in that case. Rather, the possibility that the debtor in that case might settle with an insurer, then repudiate that settlement to enter into a different settlement with the committee, potentially leading to an administrative claim by the insurer, was part of the committee's parade of horribles in support of its request—which the court rejected—for derivative standing to pursue a claim under N.Y. General Business Law § 349 against that debtor's insurers.[47] Because there was no settlement at issue, no party cited *Liberty Towers* for the "well settled" principle that "parties to a settlement agreement may not unilaterally repudiate it after approval of it has been sought pursuant to Rule 9019."[48] Whatever conclusion the Committee would like this Court to draw from Judge Glenn's colloquy with counsel during argument has been rejected by this Court's Order and Decision.

## B. Whether the CNA Plan meets the "good faith" requirement in § 1129(a)(3) must be determined at the confirmation hearing, not at the disclosure statement stage

The Committee's argument on good faith—to the extent it is not simply a complaint that Continental's offer of $75 million is too small—is premature. Courts take up the question of a plan's good faith at confirmation, not at the disclosure statement stage.[49] Among

---

[47]    The *Rockville Centre* committee's request to pursue insurers for "misleading" conduct was similar to the Committee's request here, which it is not pursuing. *See* Dkt. No. 2203, 2280 at 3-4.

[48]    *See* Order and Decision at Dkt. No. 2362 at 4.

[49]    *See In re Prudential Energy Co.*, 59 B.R. 765, 768 (Bankr. S.D.N.Y. 1986) ("**At confirmation**, the Court is directed by § 1129(a) to determine if the proponent complied with the applicable provisions of the Code and if the Plan was proposed in good faith") (emphasis added). *See also In re Western Asbestos Co.*, 313 B.R. 832, 848 (Bankr. N.D. Cal. 2003 (agreeing with the contention that the "issue of good faith should be reserved for the confirmation hearing"); *U.S. Brass*, 194 B.R. at 428 (where a plan is not so fatally flawed on its face that confirmation is "impossible," whether a plan was proposed in good faith is "more properly addressed at confirmation and is not a basis for denying approval of" a disclosure statement).

- 18 -

other reasons, a determination of good faith is based on an evidentiary record that is assembled during a confirmation hearing but not a disclosure statement hearing.[50]

Moreover, the fact that the Committee does not like the CNA Plan hardly means that the CNA Plan was proposed in bad faith. In *In re WR Grace & Co.*, the Third Circuit stated, "a creditor's disagreement about the handling of its claim does not that necessarily evince bad faith by the [p]lan's proponents."[51] The fact that a plan "is not the one that the creditors would have proposed does not make the plan one that has not been filed in good faith."[52]

### C. The CNA DS makes sufficient disclosures regarding insurance coverage issues and defenses.

Disclosure statements must state what a creditor may expect to receive under a plan of reorganization, not what exposure a plan proponent might face in a hypothetical world where every disputed issue is resolved against it.

The Committee argues that the CNA DS fails to disclose Continental's policy periods, policy limits, and how much insurance the Committee contends may be available for particular hypothetical claims, but the Committee's focus is misplaced. Such information might be relevant under the *Debtor* Plan, as it might be important for Survivors whose claims trigger Continental coverage (and thus, are eligible to become Litigation Claimants or holders of Stipulated Judgments) to know whether they will be able to "enhance" their recoveries through post-confirmation litigation against Continental. Yet, the Debtor DS eschews any description of

---

[50] *See, e.g., In re Quigley Co.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (approving the debtor's disclosure statement despite finding that questions existed regarding good faith because such questions were "confirmation issues that require an evidentiary hearing").

[51] *In re WR Grace & Co.*, 729 F.3d 332, 347 (3d Cir. 2013).

[52] *In re Barnes*, 309 B.R. 888, 893 (Bankr. N.D. Tex. 2004). *See also In re Envirodyne Indus., Inc.*, 1993 WL 566565 (Bankr. N.D. Ill. Dec. 20, 1993) ("A plan has not necessarily been proposed in bad faith simply because a party does not like the treatment of its claims").

policy periods, allegedly applicable limits, or anticipated recoveries based on coverage issued by any of the insurers. Further, the Debtor DS does not disclose expected amounts based on the highly uncertain and fact-specific potential recoveries from post-confirmation litigation under the Debtor Plan.

It is particularly significant that the Debtor DS contains no disclosure concerning how each of the Settling Insurers under the Debtor Plan—Interstate, LMI/Underwriters, and Hartford—might have to pay if they had not settled with Debtor and the Committee. If such disclosure was required, the Committee should have either insisted that Debtor include such information in the Debtor DS or filed an objection to the Debtor DS. It did neither. But the Committee seeks exactly such disclosure from Continental in the CNA DS. The Committee naturally makes no attempt to reconcile its conflicting positions.

The Committee's objection also ignores the fact that how much a claimant receives under the CNA Plan solely depends on the terms or conditions of the CNA Plan, not on any post-confirmation litigation with Continental. There is, therefore, no need for the CNA DS to discuss how much a Survivor might recover from Continental absent the settlement embodied in the CNA Plan. The disclosure demanded by the Committee is therefore not only irrelevant to the CNA Plan, but would be misleading.[53]

In addition, Continental is not required to adopt the Committee's one-sided views as to how disputed legal issues might be decided, in order for its disclosure to be adequate. The

---

[53] While disclosure statements must contain "adequate information," debtors must also avoid over-complicating disclosure statements with additions that would not assist a party in the shoes of an average claimant voting on the plan. *See In re Waterville Timeshare Grp.*, 67 B.R. 412, 413 (Bankr. D. N.H. 1986) ("overly technical and extremely numerous additions to a disclosure statement suggested by an objecting party may themselves be self-defeating in terms of the resulting clarity and understandability of the document to the average investor").

- 20 -

Committee DS Objection discusses New York law on the definition of occurrence, the "expected and intended" defense to coverage, and late notice. Continental disputes the Committee's litigation positions on these complex issues, in particular because all of them are highly fact-dependent. For example:

Number of Occurrences. The Committee's argument fails to note that resolution of this issue depends on the specific policy language at issue—which it does not discuss. In *Roman Catholic Diocese of Brooklyn*, there was no policy language "indicating an intent to aggregate separate incidents into a single occurrence," but the court acknowledged that different language, including language "expressly providing that 'all such exposure to or events resulting from substantially the same general conditions during the policy period shall be deemed one occurrence," would lead to different results.[54] Such "deemer" language would require that multiple acts of abuse be treated as a single occurrence, to which only a single per-occurrence limit would be applicable. If issued, the Continental policies would have contained "deemer" language essentially identical to the language referred to in *Roman Catholic Diocese of Brooklyn*, which courts have concluded ***does*** evince an intent to aggregate events into a single occurrence.[55]

Expected-or-Intended. If Debtor were to carry its burden to establish the alleged policies were issued, Continental expects that the policies would define "occurrence" as "an accident," resulting in bodily injury during the policy period, that was "neither expected nor intended from the standpoint of the insured." Under New York law, Debtor would next have to

---

[54]    *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 991 N.E.2d 666, 672 (N.Y. 2013), quoting *Consolidated Edison Co. of New York v. Allstate Ins. Co.*, 98 N.Y.2d 208, 222 (2002).

[55]    *Verlus v. Liberty Mut. Ins. Co.* 2015 WL 7170484, at *4 (S.D.N.Y. Nov. 12, 2015); *State Farm Fire & Cas. Co. v. Elizabeth N.*, 9 Cal. App.4th 1232, 1238 (1992).

carry its burden of proving that it did not expect or intend the damages at issue.[56]  Insurance is not available if "the insured knew that the damages would flow directly and immediately from" its acts or omissions.[57]  These are inherently fact-specific questions.

Most of the Committee's cases are inapposite, relating to asbestos (*Union Carbide* and *Armstrong World*) or environmental contamination (*City of Johnstown*).[58]  Whether a company's decision to manufacture asbestos or a city's decision to operate a landfill led to damage that was expected or intended sheds little light on whether a diocese should be considered to have "expected" a priest to abuse children, where the diocese had received previous reports about the priest's sexual misconduct yet left him in ministry with access to other children.  On this point, the discussion in *Hartford Roman Catholic Diocesan Corporation* is instructive.  There, the Second Circuit considered allegations of abuse by different priests against four children.  To determine whether the diocese expected or intended the harm to the four children, the court said "we must consider when the abuse to the four underlying claimants occurred, when the Archdiocese became aware that the assailants were a threat to children, and what the Archdiocese did in response."[59]

In this case, Debtor produced evidence for numerous priests that allegations of abuse were reported, and in some instances documented, and that accused priests were counseled, referred for treatment, and/or transferred to other parishes, before certain Survivors suffered

---

[56]     *Consolidated Edison*, 98 N.Y.2d at 220.

[57]     *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1150 (2d Cir. 1989).

[58]      *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 955 N.Y.S.2d 572 (N.Y. App. Div. 2012); *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 52 Cal. Rptr. 2d 690, 723 (Cal. App. 1996); *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146 (2d Cir. 1989).

[59]     *Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.*, 905 F.3d 84, 90 (2d Cir. 2018).  *See also id.* at 90-92; *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386 (8th Cir. 1996) (similarly evaluating an expected-or-intended defense by reviewing, in detail, facts concerning the knowledge of a diocese and an archdiocese about the abuses committed by a particular priest before he began abusing the plaintiff in the underlying action).

abuse from those same priests. Such facts would likely establish, as to certain claims, an expected-or-intended defense under New York law. The Committee cannot show, and this Court cannot conclude, that as a matter of law Continental would not be able to succeed in establishing expected-or-intended defenses to coverage for at least some of the claims, and perhaps many of them, given how many priests are the subject of multiple Survivors' claims.

Late Notice. Under New York law, where—as here—an insurance policy requires that notice of an occurrence be given "as soon as practicable," the insured must provide notice of the occurrence "within a reasonable time under all of the attendant circumstances."[60] New York has long followed a "no prejudice" rule with respect to the issue of late notice, which applies to policies—like those allegedly issued by Continental to Debtor—that were issued before 2009.[61]

New York courts routinely find that even short delays in giving notice are unreasonable and, thus, untimely as a matter of law. For example, one New York appellate decision found a mere 40-day delay in giving notice to be unreasonable as a matter of law.[62] Many New York appellate decisions find three- to five-month delays in giving notice of an occurrence to be unreasonable.[63] In this case, Continental would be able to point to CVA suits that Debtor

---

[60] *Morris Park Contr. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 33 A.D.3d 763, 764 (2006), citing, *inter alia*, *Mighty Midgets v. Centennial Ins. Co.*, 47 N.Y.2d 12, 19 (1979).

[61] *Sec. Mut. Ins. Co. of N.Y. v. Acker-Fitzsimons Corp.*, 31 N.Y.2d 436, 440 (1972) ("Absent a valid excuse, a failure to satisfy the notice requirement vitiates the policy and the insurer need not show prejudice before it can assert the defense of noncompliance"); *Aspen Ins. UK Ltd. v. Nieto*, 137 A.D.3d 720, 721 (2016) ("Since the subject insurance policies were issued in 2008, prior to the amendment to Insurance Law § 3420 (for policies issued after January 17, 2009), the plaintiff did not have to show that it was prejudiced by the failure to provide timely notice").

[62] *See, e.g.*, *Young Israel Co-Op City v. Guideone Mut. Ins. Co.*, 52 A.D.3d 245, 246 (2008).

[63] *See, e.g.*, *Hermitage Ins. Co. v. Athena Mgmt. Corp.*, 115 A.D.3d 628, 629 (2014) (insured's three-month delay in notifying insurer of an accident barred coverage); *Nabutovsky v. Burlington Ins. Co.*, 81 A.D.3d 615, 616 (2011) (insured's three-month delay in giving notice held to be unreasonable). *See also Tower Ins. Co. v. Classon Heights, LLC*, 82 A.D.3d 632, 634 (2011) (finding insured's five-month delay in providing notice unreasonable as a matter of law); *Tower Ins. Co. v. Miles*, 74 A.D.3d 410 (2010) (finding

simply tendered late, long after learning of the Survivor's claim. Under New York's strict late-notice rule, Debtor's late notice likely would bar coverage of such suits.

The Committee also asserts on behalf of Debtor that Debtor had a reasonable belief that it would not have liability for the claims, but that is hard to square with the months-long legislative path and attendant publicity leading up to the passage of the CVA.[64] Whether Debtor had such a belief would, in any event, be a fact-specific determination.[65]

In sum, no additional disclosure is required in the CNA DS concerning the Committee's arguments that Continental has exposure greater than $75 million. What Survivors need to know from CNA's disclosure statement is how much CNA is offering to pay ($75 million), what the total pot will be ($201.35 million), and how they will be paid, and when (through the Trust, without any need for litigation against Continental, shortly after the Abuse Claims Reviewer scores all the claims using the criteria stated in the Allocation Protocol). Since the CNA DS provides all of this information, the Committee's arguments for disclosure regarding its coverage contentions is unnecessary and inappropriate.

## III.    Response to the UST's objection.

Although the UST's objection nominally is an objection to both the Debtor DS and the CNA DS, it actually targets the Debtor DS, making many of the same arguments made

---

insured's five-month delay in providing notice unreasonable as a matter of law); *Heydt Contr. Corp. v. American Home Assur. Co.*, 146 A.D.2d 497, 498-99 (2005) (finding insured's 4-½ month delay in providing notice unreasonable as a matter of law).

[64]    *See* CNN.com, New York passes Child Victims Act, allowing child sex abuse survivors to sue their abusers (Jan. 28, 2019), available at https://www.cnn.com/2019/01/28/us/new-york-child-victims-act/index.html (describing "more than a decade of opposition" to the law).

[65]    *Travelers Indem. Co. v. Northrop Grumman Corp.*, 413 F. Supp. 3d 263, 274 (S.D.N.Y. 2019) ("The sufficiency of an excuse ordinarily presents a question of fact to be determined at trial").

by Continental in its objection to the Debtor DS.[66]  Most of the arguments it makes with respect

to the Debtor DS are not applicable to the CNA DS.  And some of the UST's objections are not

well-taken as to either disclosure statement.  On the other hand, the UST raises important points

regarding third-party releases and the lack of disclosure in the Debtor DS concerning the potential

impact of *Purdue Pharma*.

## A. Disclosure regarding releases and exculpation.

The UST's objection to the third-party releases and exculpation provisions in both

Plans largely reflects its litigation position in *Purdue Pharma* rather than the Second Circuit's

decision in that case that is now under review at the Supreme Court.  Essentially, the UST demands

disclosure that its litigation position is correct and that the Second Circuit's ruling is not.  The

UST cites no case standing for the proposition that a disclosure statement must disclose the UST's

litigation position when that position was rejected by the applicable circuit court of appeals and is

pending further review in the Supreme Court.  Nor does the UST cite authority for the proposition

that a disclosure statement must discuss specific procedural points like whether this Court will be

issuing a channeling injunction if one of the two plans is confirmed or, alternatively, whether it

will merely be making a recommendation to the district court that it do so.

But Continental agrees with the UST that disclosure is required regarding the risk

that the Second Circuit's *Purdue Pharma* decision will be reversed by the Supreme Court.  In fact,

the CNA DS already contains such a disclosure.[67]  Continental's disclosure, which is not mirrored

---

[66]   Although the UST does note that the competing Plans and disclosure statements are "strikingly
similar in many respects," and urges that its objection apply to both the Debtor DS and the CNA DS (*see*
UST Obj. at 2 n.2), the UST for the most part discusses only the Debtor DS.

[67]   *See* CNA DS at 48.

- 25 -

in the Debtor DS (but which should be added),[68] is sufficient as stated. The UST also seeks additional disclosures from Debtor, including the amount proposed to be contributed to the DOR Cash Contribution by each of the Participating Parties.[69] Continental made the same point in its objections to the Debtor DS.[70] And although the CNA Plan mirrors the Debtor Plan in terms of the scope of releases and injunctions, Continental was unable to make certain related disclosures because it does not have access to the necessary information, which is in the sole possession of Debtor.[71]

The UST's lengthy discussion regarding its views on third-party releases and the Plans' exculpation provisions raises an important point, however—namely, whether any confirmation hearing in this case (and certain related confirmation-related litigation activity and discovery) should be stayed or deferred until after the Supreme Court rules in *Purdue Pharma*. Depending on how the Supreme Court rules, it is possible that the releases proposed to be given to nondebtor, non-insurer parties such as the Catholic Family may be prohibited; or the Supreme Court may establish a particular test or set of standards, different from those adopted by the Second Circuit in *Purdue Pharma*, that must be satisfied before such releases may be authorized. It

---

[68]     *See* CNA Obj. at 18-19.

[69]     *See* UST Obj. at 18-20.

[70]     CNA Obj. at 17-18.

[71]     Continental does not understand the UST to be questioning the statutory basis for the Plans' Supplemental Settling Insurer Injunction (*see, e.g.*, CNA Plan, § 12.4). It should be undisputed that such statutory authority exists under §§ 363(b) and (f) and 105 of the Bankruptcy Code. *See, e.g., MacArthur Co. v. Johns-Manville Co.*, 837 F.2d 89, 93 (2d Cir. 1988) (stating, "The injunctive orders issued by the Bankruptcy Court were necessary to effectuate the Court's . . . authority to make sure that claims to [the debtor's] insurance proceeds were . . . channeled to the settlement fund and could not be asserted directly against the insurers. The authority to issue the injunction is thus a corollary to the power to dispose of assets free and clear and to channel claims to the proceeds."). *See also In re Dow Corning Corp.*, 198 B.R. 214, 245 (Bankr. E.D. Mich. 1996) ("Courts have long recognized that inherent within the authority to sell estate property free and clear of liens is the power to enjoin creditors from pursuing the purchaser of such property").

- 26 -

might waste time and money for the parties to conduct discovery and briefing and for the Court to preside over a confirmation hearing in advance of knowing how the Supreme Court will rule in *Purdue Pharma*. For example, if the Supreme Court permits third-party releases but adopts a different test than the Second Circuit's seven-factor list, additional discovery might be needed, and the Court may need to reopen the record of the confirmation hearing to allow additional evidence regarding whether one or both of the competing plans meet the new test. The Court may, therefore, wish to adjourn some or all confirmation-related activity until the Supreme Court clarifies the law regarding third-party releases.

### B. Disclosure regarding the amounts creditors can expect to receive.

The UST argues that the Debtor DS fails to disclose how much Survivors can expect to receive under the Debtor Plan.[72] Continental agrees, and indeed objected to the Debtor DS on similar grounds. In particular, Continental noted that the Debtor DS failed to disclose that some of the purported "enhancements" provided under the Debtor Plan, including Stipulated Judgments and Litigation Claims, are actually available only to a subset of Survivors—those who were abused during Continental policy periods (and, even then, only those Survivors who are selected to have Stipulated Judgments or authorized by the Trustee to pursue Litigation Claims). The Debtor DS fails to note that Survivors whose claims do not potentially trigger Continental coverage are not entitled to pursue Stipulated Judgments and Litigation Claims.[73] There is, therefore, a significant prospect that hundreds of Survivors, whose claims do not potentially trigger Continental coverage, will be misled by the Debtor DS.

Although the UST asserts that the CNA DS "too does not disclose the percentage

---

[72] UST Obj. at 28.

[73] CNA Obj. at 13-15.

distribution that creditors may expect to receive under the First Amended CNA Plan,"[74] the concept of a "percentage recovery" is not applicable to the CNA Plan given the way it is structured. Under the CNA Plan, Trust Claims are not liquidated in amounts to which a percentage recovery is applied. Rather, the Abuse Claims Reviewer scores the claims given his evaluation of a Survivor's proof of claim under the criteria set forth in the Allocation Protocol. The result of such scoring is not a claim value but, rather, a point total. That point total is then used as the numerator in a fraction in which the denominator is the sum of all individual point totals determined by the Abuse Claims Reviewer. Based on the point allocations and the available funds, the Trust will make a Trust Settlement Offer to each Survivor that, if accepted, will be paid in full, without application of any payment percentage. All of this is fully explained in the CNA DS, and so no further disclosure on these points is required.[75]

### C. Balloting issues.

As the disclosure statement objections filed by Debtor, the Committee, and Continental all note, the parties are finalizing tentative agreements on a joint ballot and related solicitation procedures. Continental anticipates that the UST's concerns—which Continental shares—will be satisfactorily addressed by an agreement among Debtor, the Committee, and Continental. If not, Continental reserves the right to file a supplemental paper addressing any unresolved issues.

### D. RSA Motion.

Continental agrees with the UST that the RSA Motion should not be approved, by implication or otherwise.

---

[74] UST Obj. at 28.

[75] *See* CNA Revised DS at 20-24.

## Reservation of Rights

Continental reserves all objections to confirmation of the Debtor Plan, any subsequently filed plan, and any revised disclosure statement.

## Conclusion

Even though Continental believes that the CNA DS meets the "adequate information" requirement as originally filed, Continental is submitting herewith a revised disclosure statement that makes certain limited changes in response to the objections by Debtor, the Committee, and the UST. Continental respectfully requests that the Court approve the revised CNA disclosure statement and also enter an order approving the agreed solicitation procedures, so that Survivors will have the opportunity to vote as they see fit on the CNA Plan and, if the Debtor DS is approved, the Debtor Plan.

DATED:  December 12, 2023        Respectfully submitted,

By:    _/s/ Jeffrey A. Dove_____
Jeffrey A. Dove
BARCLAY DAMON LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York  13202
Telephone: (315) 413-7112
Facsimile: (315) 703-7346
jdove@barclaydamon.com

Mark D. Plevin (admitted *pro hac vice*)
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California  94111
Telephone:  (415) 986-2800
mplevin@crowell.com

David Christian (admitted *pro hac vice*)
DAVID CHRISTIAN ATTORNEYS LLC
105 West Madison Street, Suite 1400 (***moving to Suite 2300 effective 1/1/24***)
Chicago, Illinois  60602

Telephone:  (312) 282-5282
dchristian@dca.law

Miranda H. Turner (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  (202) 624-2500
mturner@crowell.com

*Attorneys for The Continental Insurance Company,*
*successor by merger to Commercial Insurance Company of*
*Newark, New Jersey and Firemen's Insurance Company of*
*Newark, New Jersey*

907413397