UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

THE DIOCESE OF ROCHESTER,

            Debtor.

Case No. 19-20905

Chapter 11

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' RESERVATION OF RIGHTS REGARDING THE CONTINENTAL INSURANCE COMPANY'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING DISCLOSURE STATEMENT IN SUPPORT OF CONTINENTAL INSURANCE COMPANY'S CHAPTER 11 PLAN OF REORGANIZATION FOR THE DIOCESE OF ROCHESTER, (II) APPROVING SOLICITATION PROCEDURES FOR CONTINENTAL INSURANCE COMPANY'S PLAN OF REORGANIZATION FOR THE DIOCESE OF ROCHESTER, (III) APPROVING BALLOTS AND ESTABLISHING PROCEDURES FOR VOTING ON COMPETING PLANS, (IV) APPROVING THE FORM, MANNER, AND SCOPE OF NOTICE FOR THE CONFIRMATION HEARING, AND (V) GRANTING RELATED RELIEF**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

I.     The CNA PLAN IS NOT CONFIRMABLE AS THE SETTLEMENT PROPOSED DOES NOT SATISFY THE STANDARDS OF BANKRUPTCY RULE 9019 OR *PURDUE*.................................................................................................. 5

    A.     Applicable Legal Standard................................................................................ 5

    B.     Continental Fails to Meet the Standards of Rule 9019 or *Purdue*. ........................ 7

RESERVATION OF RIGHTS ................................................................................................. 10

The Official Committee of Unsecured Creditors (the "**Committee**") of The Diocese of Rochester (the "**Debtor**" or "**Diocese**"), by and through its undersigned counsel, hereby submits this reservation of rights (the "**Reservation of Rights**") to *The Continental Insurance Company's Motion for Entry of an Order (I) Approving Disclosure Statement in Support of Continental Insurance Company's Chapter 11 Plan of Reorganization for the Diocese of Rochester, (II) Approving Solicitation Procedures for Continental Insurance Company's Plan of Reorganization for the Diocese of Rochester, (III) Approving Ballots and Establishing Procedures for Voting on Competing Plans, (IV) Approving the Form, Manner, and Scope of Notice for the Confirmation Hearing, and (V) Granting Related Relief* (the "**CNA DS Motion**") seeking approval of the *Amended Disclosure Statement in Support of Continental Insurance Company's Chapter 11 Plan of Reorganization for the Diocese of Rochester* [Docket No. 2497] (as the same may be amended or modified, the "**CNA Disclosure Statement**") and approving the solicitation procedures relating to the *Continental Insurance Company's Corrected First Amended Plan of Reorganization for the Diocese of Rochester* [Docket No. 2254] (as the same may be amended or modified, the "**CNA Plan**").[1] In support of its Reservation of Rights, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Committee continues to have fundamental objections to CNA's Plan.[2] However, this case is at a critical juncture, and the Committee believes that it is vital that there

---

[1] Capitalized terms used in this Reservation of Rights are as defined in the CNA DS Motion or the CNA Disclosure Statement, as applicable.

[2] *See Official Committee of Unsecured Creditors' Objection to the Continental Insurance Company's Motion for Entry of an Order (I) Approving Disclosure Statement in Support of Continental Insurance Company's Chapter 11 Plan of Reorganization for the Diocese of Rochester, (II) Approving Solicitation Procedures for Continental Insurance Company's Plan of Reorganization for The Diocese Of Rochester, (III) Approving Ballots and Establishing Procedures for Voting on Competing Plans, (IV) Approving the Form, Manner, and Scope of Notice for the Confirmation Hearing, and (V) Granting Related Relief* [Docket No. 2349] (the "<u>Initial Committee Objection</u>").

be no further delay in the approval of the competing disclosure statements so that the creditors, including survivors of childhood sexual abuse, may finally have their say regarding the proposed plans and so this case can be resolved and distributions made to survivors as soon as possible. Therefore, the Committee files this Reservation of Rights to preserve its objections to the CNA Plan but, to the extent that the Bankruptcy Court is prepared to permit solicitation with respect to the CNA Plan and the Diocese's Plan,[3] to allow such solicitation to begin.

2. Continental Insurance Company ("**Continental**" or "**CNA**") seeks to limit its liability to the Diocese and survivors through the CNA Plan by (a) accepting settlements negotiated by the Committee with the Diocese and other insurers and (b) adding an additional $75 million (the "**CNA Cash Contribution**"), which is a drastic discount of the amount Continental should pay under the insurance policies it issued to the Diocese. Continental, despite sufficient limits under its policies to fund the hundreds of millions of dollars of liability to Abuse Claimants, attempts to settle its liability for less than half of the per-claim amounts paid by the Diocese's other insurers. Continental seeks to pay only $75 million. But to merely to *match* the average per-claim payments of the other settling insurers, the London Market Insurers and Interstate, Continental would have to pay over $170 million.[4] Notably, reasonable jury verdict

---

[3] The *Third Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester* [Docket No. 2493] (as may be amended or modified, the "Diocese Plan") and the accompanying *Disclosure Statement in Support of the Third Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester* [Docket No. 2494] (as may be amended or modified, the "Diocese Disclosure Statement")

[4] The Debtor's other principal insurers, LMI and Interstate insure approximately 173 sexual abuse claims (consisting of 159 timely and 14 late-filed claims). The average per-claim settlement based on those insurers' $69,500,000 settlement payment yields an average per-claim payment of approximately $401,734. Importantly, however, the LMI and Interstate policies are subject to a $75,000 per occurrence self-insured retention ("SIR"), a feature the Continental policies do not have. The SIR needs to be satisfied before the LMI/Interstate policies will pay any amounts under those policies. Thus, using a conservative estimate of one $75,000 per occurrence applying to each of the 173 LMI/Interstate sexual abuse claims, results in an average per-claim amount of $476,734. When that amount is then applied to each of the 360 sexual abuse claims alleging abuse during the Continental period, it results in approximately $171.6 million. In contrast, Continental seeks to resolve its exposure for $75 million, or approximately $208,000 per claim.

values on even a small portion of Continental's over 300 claims would easily exceed this $170 million amount.  Continental's steeply-discounted settlement proposal is made all the worse by the fact that Continental's combined potential liability for coverage and bad-faith vastly exceeds that of LMI and Interstate because of (a) no self-insured retentions or aggregate limits in CNA's policies and (b) its wholesale denial of coverage for the vast majority of the over 300 claims alleging abuse during the Continental policy period.[5]

3. Continental began this case by outright denying approximately 270 claims.  This move is highly unusual and is in all likelihood unprecedented in a Diocesan chapter 11 case.  Continental has continually refused to live up to its obligations under its policies.  Its attempt to avoid liability continues with its effort to confirm a self-interested plan that is doomed to fail.

4. Three fundamental flaws will prevent the Court from confirming the CNA Plan.

5. *First*, Continental, as an insurer of the Debtor, is not a party in interest within the meaning of section 1121 of the Bankruptcy Code that is allowed to file and solicit approval of a plan.  Therefore, CNA lacks standing to file and seek confirmation of a plan of reorganization for the Debtor.  As Continental lacks standing to file a plan, the CNA Plan cannot be confirmed as a matter of law.  *See* Initial Committee Objection I. A.

---

[5] In the CNA Disclosure Statement, Continental alleges that Committee counsel in another Diocesan case took certain positions, including with respect to the risk of litigation against insurers that are inconsistent with the Committee's position in this case.  CNA Disclosure Statement at 11.  However, the circumstances of the two cases are very different.  In The Roman Catholic Diocese of Rockville Centre's bankruptcy case, the Debtor is soliciting a **non-consensual** plan without settlements from **any** insurance company in that case.  Moreover, the proposals in the Rockville Centre plan governing litigation of abuse claims and insurance coverage are completely different than the procedures proposed in the Diocese Plan.  Frankly, discussion of a complex plan filed in another case in the Disclosure Statements for this case will only make the decision more complicated because adding the discussion appears to ask survivors to review three plan: the Joint Plan; the CNA Plan; and the Rockville Centre plan. Committee counsel submits that there are no inconsistencies in the positions that it has taken in the two cases, and that there is no rule, principal or law that requires two different clients in different cases to take the same position merely because they are represented by the same counsel. In any event, the court in the Rockville Centre case ultimately *approved* the disclosure statement, as this Court should do here to allow creditors the chance to vote on the competing plans.

6. Second, the proposed CNA Contribution is not sufficient to justify the broad releases to be granted to CNA under the CNA Plan, and such contribution does not satisfy the standards set forth for a settlement with the Debtor pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Rule 9019") or to satisfy the standard of *Purdue*[6] for such releases.

7. Third, Continental's Plan is not filed in good faith.[7] Continental, by the CNA Plan, proposes a unilateral settlement that offers insufficient compensation to the Sexual Abuse Claimants relative to the value of their claims and Continental's exposure.[8] Continental's Plan is another step in its campaign to avoid funding an appropriate settlement and avoiding the guidance by New York's insurance commissioner to insurers that they provide prompt, fair, and equitable payment of Abuse Claims.

8. Both the CNA Plan and the Joint Plan have been pending for months. It is time to give Abuse Claimants the right to vote to approve or reject each plan.

---

[6] *In re Purdue Pharma L.P.*, 69 F.4th 45, 78-79 (2d Cir. 2023, *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (Aug. 10, 2023) ("Purdue").

[7] A plan must be proposed in good faith to be confirmable. 11 U.S.C. § 1129(a)(3).

[8] *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (plan must be proposed with "honesty and good intentions"); *Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.)*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) (plan proponent must have exhibited "a fundamental fairness in dealing with one's creditors").

I.  **THE CNA PLAN IS NOT CONFIRMABLE[9] AS THE SETTLEMENT PROPOSED DOES NOT SATISFY THE STANDARDS OF BANKRUPTCY RULE 9019 OR *PURDUE***

A.  **Applicable Legal Standard**

9. Continental is effectively proposing a settlement of the Debtor's and third parties' claims against it, and such a settlement must meet the standards of Bankruptcy Rule 9019[10] which requires a determination of "the probabilities of ultimate success should the claim be litigated."[11] "Before a court may approve a settlement in a plan, it must find that it is fair and equitable, and in the best interests of the estate." *Ditech Holding.*, 606 B.R. at 623(citations omitted).

10. In determining whether to approve a settlement under Rule 9019, the Second Circuit applies seven factors: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the

---

[9] The arguments regarding the CNA Plan not being confirmable, including, but not limited to Continental's lack of standing and bad faith, as set forth in the Initial Committee Objection, are incorporated by reference as if fully set forth herein.

[10] "A bankruptcy court may approve settlements under Bankruptcy Rule 9019 or as part of a debtor's plan. The standards for approving settlements under Rule 9019 or as part of a plan are the same." *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 772 (Bankr. D. Del. 2018); *see also In re Ditech Holding Corp.*, 606 B.R. 544, 622 (Bankr. S.D.N.Y. 2019)(same); *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co., Inc.),* 177 B.R. 791, 794 n. 4 (S.D.N.Y. 1995) (same).

[11] *In re Adelphia Communs. Corp.*, 327 B.R. 143, 158-59 (Bankr. S.D.N.Y. 2005).

product of arm's length bargaining.  *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal citations and quotations omitted).

11. To obtain approval of the settlement, Continental must satisfy, by a preponderance of the evidence, the requirements imposed by Rule 9019 and *Iridium*.  *See Velde v. First Int'l Bank & Trust (In re Y-Knot Constr., Inc.)*, 369 B.R. 405, 408 (B.A.P. 8th Cir. 2007).  Specifically, "[t]he settling parties must set forth the facts in 'sufficient detail that a reviewing court could distinguish it from mere boilerplate approval of the trustee's suggestions.'"  *In re Lion Capital Grp.*, 49 B.R. 163, 175-76 (Bankr. S.D.N.Y. 1985) (quoting *In the Matter of Boston & Providence Railroad Corp.*, 673 F.2d 11, 12 (1st Cir. 1982)).  Based on the record established, the bankruptcy court may then use its discretion to permit a settlement above the lowest level of reasonableness.  *Id.*  "Approval at that level, however, is not required.  The court in applying its discretion is not to act '. . . . arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.'"  *Id.* (quoting *Langnes v. Green*, 282 U.S. 531, 541 (1931)).

12. Additionally, in order for the CNA Plan to be confirmed with third party releases of Continental, Continental must obtain the "overwhelming support" of holders of Abuse Claims, which, at a minimum, is 75%.  *See In re Purdue Pharma L.P.*, 69 F.4th 45, 78-79 (2d Cir. 2023, *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (Aug. 10, 2023).  According to the Second Circuit Court of Appeals in *Purdue*, the parties granting such third-party releases must be receiving "fair payment of enjoined claims" from the Covered Parties.  *Purdue*, 69 F.4th at 79.

13. When evaluating whether third-party releases are permissible, courts evaluate seven factors outlined in *Purdue*, which are: (1) whether there is an identity of interests between the debtor(s) and released third parties, (2) whether claims against the debtor and nondebtor are factually and legally intertwined, (3) whether the scope of the releases is appropriate, (4) whether the releases are essential to the reorganization, (5) whether the non-debtor contributed substantial assets to the reorganization, (6) whether the impacted class of creditors "overwhelmingly" voted in support of the plan with the releases, and (7) whether the plan provides for the fair payment of enjoined claims. *See Id.* at 78-79.

**B.     Continental Fails to Meet the Standards of Rule 9019 or *Purdue*.**

14. Applying the *Iridium* factors here demonstrates that Continental's proposed settlement "falls below the lowest point in the range of reasonableness." Fed. R. Bankr. P. 9019(a). Moreover, the proposed settlement is not "right and equitable under the circumstances and the law" because (1) the settlement is not in the creditors' best interest, (2) the settlement is too low in light of the likelihood of the Diocese's success in litigation, (3) the settlement does not provide a tangible benefit for the estate, and (4) the settlement includes releases with an inappropriate nature and breadth. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).

15. Continental insured the Diocese from at least 1952 through 1977. Its policies have primary limits between $50,000 to $500,000 per occurrence[12] (with amounts increasing over the passage of time). In addition, the Diocese also purchased excess policies of $3 million

---

[12] As set forth in section II.B.1.a. below, a course of molestation of a single victim may result in multiple "occurrences" over multiple policy years.

per occurrence for many of these years.[13]  *Notably, these policies do not have aggregate limits and are not eroded by defense costs.*  As an example, under Continental's 1976 policies, there is up to $3.5 million of coverage for *each occurrence*, notwithstanding the cost of defense.  Under the same policies, each additional occurrence would increase available coverage by an additional $3.5 million.

16.     New York law provides that each act of abuse constitutes a separate occurrence.  Thus, a claim that involves ten separate acts of abuse would trigger ten covered occurrences.  Insurance coverage is not limited to a single occurrence per claim.[14]

17.     Additionally, under the Continental Policies, there are no self-insured retentions.  Thus, there are claims where extremely high amounts of insurance are available.  As an example, a claim with ten occurrences in December 1976 (where there was $3.5 million of coverage per occurrence), could, depending on the particular facts of the claim, have as much as *$35 million* of available coverage if each distinct act of abuse constitutes a covered occurrence. And, even under a conservative analysis of the "number of occurrences" issue, substantial coverage would exist for any claim that spans multiple policy periods.[15]  Thus, a claim that may be "worth" $1 million would have more than enough insurance to be paid in full.  Nevertheless, Continental

---

[13] See Declaration of Attorney James R. Murray Regarding Insurance Coverage [Docket No. 8] ("**Murray Decl.**"), ¶ 10 & 9010 Motion, ¶ 17.

[14] *See, e.g., Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 21 N.Y.3d 139, 149, 991 N.E.2d 666, 672 (2013) (concluding that a priest's alleged sexual abuse of the same child taking place over a six-year period constituted multiple occurrences); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. The Roman Catholic Diocese of Brooklyn,* 2017 WL 748834, at *7, 2017 N.Y. Misc. LEXIS 687 at *14 (N.Y. Sup. Ct. Feb. 27, 2017) ("[T]he incidents of abuse suffered by each of the claimants constituted multiple occurrences and there was at least one 'occurrence' per claimant per policy period because the injuries suffered by each claimant were unique to that claimant in a given policy year and caused by separate incidents.").

[15] At a minimum, a separate occurrence is triggered by abuse that occurs under each policy period. *Safeguard Ins. Co. v. Angel Guardian Home*, 946 F. Supp. 221, 231 (E.D.N.Y. 1996) (determining that number of occurrences under liability insurance policies was equivalent to number of policy periods during which insured's actions led to exposure of the foster children to the sexually abusive conditions).

seeks to settle its exposure for a mere $75 million for 360 claims. A mere $208,333 per claim is NOT a reasonable settlement.[16]

18. Continental seeks to settle its exposure for a mere $75 million for 360 claims (comprising 335 timely and 25 late claims). That is an average of only $208,333. The Committee submits that Continental's exposure is potentially hundreds of millions of dollars—in other words, many multiples of Continental's current offer.

19. In light of the extent of Continental's exposure and the strength of the Diocese's claims against Continental, this amount falls far below the range of reasonableness. The CNA Cash Contribution is not in the interests of the creditors or the Diocese as it does not provide sufficient value for the claims that the Debtor and the survivors are releasing against Continental.

20. Moreover, the CNA Cash Contribution is well below the amount that would satisfy the standards in *Purdue* for granting Continental broad releases from third parties.

21. *First*, as demonstrated by the Diocese's Plan, which does not include a release for Continental, the releases of Continental are not essential to the reorganization. *Second,* as discussed above, Continental, as a non-debtor, is not contributing substantial assets to the reorganization particularly in light of the value of the Diocese's claims against Continental. *Third*, the Committee submits that the CNA Cash Contribution does not provide for the fair payment of enjoined claims. *Finally*, if Continental fails to achieve the minimal amount of survivor support that would be required under the standards in *Purdue* to grant the third party releases, its plan will be patently unconfirmable. *See Purdue*, 69 F. 4th at 78-79.

---

[16] As set forth in the Committee's Initial Objection (II. B.), the Diocese has a high likelihood of success on the merits with respect to its claims against Continental.

## RESERVATION OF RIGHTS

22. Continental lacks standing to confirm a plan of reorganization and the CNA Plan is not filed in good faith. Even if Continental were found to have standing, the CNA Plan is not confirmable as it does not satisfy the standards of Bankruptcy Rule 9019 or *Purdue*. While the Committee does not object to the CNA Disclosure Statement so that both the CNA Plan and the Diocese Plan may go out for solicitation, the Committee reserves all its rights to object to the confirmation of the CNA Plan on any basis, including as described herein or on any other basis.

Dated: April 1, 2024

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Ilan D. Scharf*
James I. Stang (admitted *pro hac vice*)
Ilan D. Scharf
Iain A.W. Nasatir
Karen B. Dine
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
jstang@pszjlaw.com
ischarf@pszjlaw.com
inasatir@pszjlaw.com
kdine@pszjlaw.com

*Attorneys for the Official Committee of Unsecured Creditors*

**BURNS BAIR LLP**

Timothy W. Burns (admitted *pro hac vice*)
Jesse J. Bair (admitted *pro hac vice*)
10 E. Doty St., Suite 600
Madison, Wisconsin 53703
Telephone: (608) 286-2808
tburns@bbblawllp.com
jbair@bbblawllp.com

*Special Insurance Counsel for the Official Committee of Unsecured Creditors*