# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NEW YORK

In re:

DIOCESE OF ROCHESTER,

Debtors.

Chapter 11

Case No. 19-20905

## CONTINENTAL INSURANCE COMPANY'S OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT FOR ITS THIRD AMENDED PLAN

The Continental Insurance Company ("Continental" or "CNA") hereby objects to Debtor's proposed Disclosure Statement (the "Debtor DS," Dkt. No. 2494) for its Third Amended Plan (the "Debtor Plan," Dkt. No. 2493).[1]

The revisions to the Debtor DS cannot possibly be what the Court envisioned when it told the parties, at the end of the January 30 hearing, how the two competing disclosure statements should be revised.[2] Despite extensive discussion by the Court regarding the importance of making clear to Survivors what compensation they may reasonably expect under the Debtor Plan, the Debtor DS still lacks essential information that would inform Survivors of how much they can expect to receive, and when. In particular, Litigation Claims, which are intended to provide a substantial portion of Survivors' recoveries, remain poorly explained with

---

[1]     Continental incorporates its Objection to Debtor's Motion for Entry of an Order Approving Disclosure Statement and its Objection to Debtor's Disclosure Statement for Its Second Amended Plan (Dkt. Nos. 2348 and 2426).

[2]     *See* Decision and Order Declining to Approve Competing Disclosure Statements Filed By Continental Insurance Company and Jointly By the Debtor & Creditors' Committee (the "DS Order," Dkt. No. 2461).

respect to timing, expected value, and risk. By implication, the Plan Proponents must think that Litigation Claims will have a net value of more than $75 million, but the information provided is inadequate to allow Survivors to evaluate whether the Plan Proponents are right.

The Debtor DS also fails to make clear the degree to which the Debtor Plan would incentivize the filing of non-meritorious claims to draw from the millions of dollars the Debtor Plan would make available to late-filed claims, thus diluting the recoveries available to holders of timely claims. Further, disclosure regarding the specific contributions the nondebtor diocesan entities will make in exchange for releases remains insufficient. And the Debtor DS is misleading with respect to its description of the effect of self-insured retentions, its failure to disclose the enormous economic interests of State Court Counsel, and certain calculations of point allocation awards.

Approval of the Debtor DS should also be denied for another reason: the plan it describes is unconfirmable. Although Stipulated Judgments have been eliminated, as the Court directed on January 30, the provisions concerning Litigation Claims and Insurance Claims also impair CNA's rights, yet remain in the Plan. Similarly, the Court specifically directed Debtor and the Committee to remove provisions excepting the Insurance Assignment from the Plan's insurance neutrality provisions, yet the Plan still includes the impermissible exception. As such, the Debtor Plan cannot be confirmed, and the Debtor DS should not be sent out for solicitation, absent significant revisions to both. For these reasons, the Court should deny Debtor's motion, and decline to approve the Debtor DS.

## I. The Debtor DS does not provide adequate information to voting Survivors.

### A. Debtor's disclosures regarding Litigation Claims, a key component of Survivor compensation, remain opaque and, therefore, insufficient.

The Debtor Plan initially provides Survivors with only $105 million in available

cash compensation. Any additional recoveries will be funded by the successful prosecution of Litigation Claims, which Debtor continues to tout as the way to "maximize the potential recovery for all Abuse Claimants."[3] However, disclosure remains wholly inadequate to inform Survivors what compensation, if any, they can expect to receive from the pursuit of Litigation Claims, and when.

First, as a general matter, value has purportedly been "maximize[d]" under various iterations of the Debtor Plan despite significant changes to the actual avenues for recovery under various plan provisions. Previously, Stipulated Judgments together with Litigation Claims allegedly served to "maximize value," but this third amended version of the Debtor Plan excises Stipulated Judgments. Nevertheless, the Debtor DS claims, without explanation, that the Debtor Plan still provides the "opportunity for greater recovery for Creditors than that which is likely to be achieved under other alternatives."[4] The category of "other alternatives" includes the CNA Plan incorporating the $75 million CNA offer, but there is no disclosure provided that would allow Survivors to evaluate whether the pursuit of Litigation Claims is likely to lead to net recoveries in excess of $75 million.

Second, the Debtor DS does not adequately disclose facts that would allow Survivors to evaluate the tradeoffs inherent in pursuing Litigation Claims versus taking CNA's $75 million payment. Although the Debtor DS repeats the same statement from earlier disclosure statements, that litigation against CNA could be "protracted and expensive,"[5] those terms are vague to the point of being meaningless. And there are facts available. For example,

---

[3]    Debtor DS at 2.

[4]    Debtor DS at 5.

[5]    Debtor DS at 97.

the New York State Unified Court System reports that during 2022, over 3,600 new civil cases were filed in the state trial court in Monroe County, but only 17 civil cases went to verdict. The Federal Judicial Center published data indicating that, during the 12-month period ending June 30, 2023, the U.S. District Court for the Western District of New York conducted only five civil trials. These statistics suggest that what the Pachulski firm told claimants in *Rockville Centre* is true: that the resolution of disputed claims through post-bankruptcy litigation "could take years," and "[g]etting the insurance companies to pay is not as easy as the Diocese makes it sound."[6] Yet, no similar disclosure is made here, and the Debtor DS implies that the opposite is true. The Debtor DS should disclose these facts to Survivors who have already waited over four years for compensation, rather than mislead them by relying on generic terms like "protracted."

Third, the Debtor DS is not transparent about what "expensive" may mean to Litigation Claimants. While the Debtor DS now discloses that the Trust will initially reserve "at least" $18 million to litigate insurance coverage issues with CNA and fund operational expenses, there is no estimate of the costs Litigation Claimants themselves can be expected to incur, "***at their own expense***," to establish liability and damages via Litigation Claims.[7]

This information is particularly relevant now, given the changes to the Debtor Plan ***requiring*** Litigation Claimants who obtain judgments to assign those judgments to the Trust.[8] Previously, Litigation Claimants had the option to assign or retain whatever judgment they obtained in their favor. But now, judgments assigned to the Trust will be shared among all Survivors, but there is no disclosure anywhere of how much (if anything) the Litigation

---

[6]     Dkt. No. 2929 at 6 of 12 and 5 of 12, *In re The Roman Catholic Diocese of Rockville Centre, New York*, Case No. 20-12345-MG (Bankr. S.D.N.Y. Feb. 20, 2024).

[7]     Debtor DS at 34, 45 (emphasis added).

[8]     Debtor DS Redline (Dkt. No. 2499-2) at 38.

Claimant, who went out of pocket and personally participated in the case to obtain the judgment, will be permitted to keep. For disclosure to be adequate, the Debtor DS should inform would-be Litigation Claimants of their estimated costs of pursuing a suit to establish liability and damages and the rewards of doing so, which no longer includes the option to keep all of one's judgment.

Fourth, disclosure as to the liability and coverage defenses that would be asserted against Litigation Claims is utterly lacking. All the Debtor DS says—buried on page 97, long after most people would be too exhausted to have continued reading—is that CNA "is likely to assert factual and legal defenses to both their coverage obligations and to the underlying liability of the Diocese and other Participating Parties for Abuse Claims."[9] There is no disclosure of what those defenses are, or how likely they are to succeed. Such nondisclosure is inexplicable given that Debtor itself believes many of these claims are defensible: indeed, it previously objected to approximately 70 claims—approximately 15% of the total of all claims—as non-meritorious.[10] Among the claims to which Debtor objected were 38 claims that allegedly fall within the CNA policy periods and would, therefore, be eligible to be Litigation Claims. Debtor may have other defenses to liability beyond those asserted in its claim objections—for example, that it had no notice of a perpetrator's propensity to abuse, that the abuse was not a result of Debtor's negligence, or that certain claims may have been previously released or channeled by the Boy Scouts plan. Further, to the extent Debtor is found liable by a court, it is likely that some measure of damages will be allocated to other parties, including the perpetrator. Yet the Debtor DS says nothing about these defenses to liability, even those previously asserted by

---

[9]     Debtor DS at 97.

[10]    *See, e.g.*, Dkt. Nos. 1576-1641, 1643-1644.

Debtor itself.

In addition, CNA has coverage defenses. At the Court's behest, CNA has included in its disclosure statement a discussion of those defenses and the Committee's view that CNA is unlikely to prevail on them. But there is no analogous discussion of the flip side in the Debtor DS—*i.e.*, the chance that liability and coverage defenses will succeed—despite the fact that the Debtor Plan, not the CNA Plan, is the one that contemplates extensive post-bankruptcy litigation. The Debtor DS must be revised to add such a discussion.

Further, CNA has additional coverage defenses **because of** the Debtor Plan and its provisions prejudicing CNA. As CNA has pointed out in previous objections,[11] the "enhancements" provided by the Debtor Plan encourage Litigation Claimants to keep litigating against CNA, rather than agree to reasonable settlements. The Debtor Plan also may create lawsuits that otherwise could not exist, by purporting to authorize claimants to initiate new suits nominally against Debtor post-confirmation, despite the fact that the statute of limitations reviver window opened by the Child Victims Act has long since closed. These prejudicial provisions give CNA new coverage defenses, and the risk that CNA may prevail on those defenses (in addition to "standard" coverage defenses) should be disclosed.

Finally, how Survivors will share in the proceeds (if any) of Litigation Claims is still, even at this late juncture, a mystery. Although the Debtor Plan continues to provide that Litigation Awards are to be "paid under the Plan **and the Trust Allocation Protocol**,"[12] and the Debtor DS tells Survivors that they will receive proceeds from liquidation of Trust Assets

---

[11] CNA incorporates its prior objections to the Debtor DS and to, to the extent applicable, to the RSA. *See* Dkt. Nos. 1895, 2348, and 2438.

[12] Debtor Plan § 4.5.1(d) (emphasis added).

- 6 -

"pursuant to the procedures *contained in the Allocation Protocol*,"[13] the revised Allocation Protocol (Dkt. No. 2495-1) still does not mention Litigation Claims or Litigation Awards. In other words, both the Debtor Plan and the Debtor DS are completely silent regarding whether Survivors as a group will share in any proceeds from Litigation Claims and, if so, in what manner.

This is an incredibly significant omission that must be rectified before the Debtor DS can be approved. Because Litigation Claimants who settle with CNA have the option to either keep their settlements or assign them to the Trust, disclosure of how a Litigation Claimant's decision will affect other Survivors is necessary to permit Survivors to understand how they will, or won't, be affected by a Litigation Claimant's decision. In contrast to settlements, Litigation Claimants who obtain judgments following trial are *required* to assign their judgments to the Trust. Disclosure of how such judgment proceeds will or may be shared with other Survivors is all the more important for this reason, so that all Survivors can fully evaluate the supposed benefits to litigating under the Debtor Plan.

In short, Litigation Claims remain a key element of the Debtor Plan's effort to "maximize the potential recovery" to Survivors, but disclosure of Survivors' risks and anticipated rewards related to such Litigation Claims is woefully inadequate. The continued lack of disclosure directly contravenes the Court's clear directive to disclose sufficient information regarding Survivor compensation.

---

[13] Debtor DS at 3 (emphasis added). *See also id.* at 6 (the "actual amount payable on account of Class 4 Abuse Claims will be determined pursuant to the Allocation Protocol").

"Trust Assets" include Insurance Claims, which encompass the Debtor's and Participating Parties' rights (if any) to recover, from CNA, indemnity payments on account of Abuse Claims—*i.e.*, Litigation Awards. Debtor Plan §§ 1.1.146, 1.1.74.

**B.** **There is insufficient disclosure of the fact that the Allocation Protocol transfers millions of dollars from Survivors who filed timely proofs of claim to unknown late claimants and their lawyers.**

The revised Allocation Protocol maintains the previous structure of a First Group Abuse Claim Fund and a Second Group Abuse Claim Fund. Now, however, the Second Group Abuse Claim Fund will draw in 5% of "all amounts in excess of the DOR Entities' Cash Contribution Remainder to be distributed to Abuse Claimants by the Trust." At present, those amounts consist of the Settling Insurers' contribution of $71.35 million, 5% of which is $3,576,500. However, the Second Group Abuse Claim Fund will continue apparently to grow, taking 5% of future proceeds based on Litigation Claims or a future possible settlement with CNA. This means that the Second Group Abuse Claim Fund could wind up being larger than $3,576,500. The Debtor DS does not disclose this fact. It says only that the Trust will reserve $3,765,000 "for payment of Second Group Abuse Claims."[14]

The Second Group Abuse Claim Fund pays Second Group Abuse Claims based on point values, calculated as the total dollars in the Second Group Abuse Claim Fund divided by the total number of points awarded to all Second Group Abuse Claims. Debtor has provided no information about how many Second Group Abuse Claims it expects. However, if only a small number come forward, then Second Group point values could be substantially higher than First Group point values, with the result that Second Group Abuse Claims could receive higher payouts on average than timely-filed First Group Abuse Claims. CNA pointed this out in a previous objection to Debtor's DS,[15] and Debtor appears to have responded by inserting a provision into the Allocation Protocol limiting the point value of Second Group Abuse Claims

---

[14]    Debtor DS at 34.

[15]    CNA's Supplemental Objection (Dkt. No. 2438) at 6.

to no more than the point value for First Group Abuse Claims. Based on this provision, Second Group Abuse Claim compensation awards may be calculated at less than the total amount available in the Second Group Abuse Claim Fund. In other words, amounts may be left in the Second Group Abuse Claim Fund after Second Group Abuse Claims receive their distributions. There is no disclosure of where those unpaid amounts would go.

A more fundamental issue concerns who the Second Group Abuse Claim Fund is designed to compensate: presently unknown claims that could be filed as late as five years after the Debtor Plan is confirmed and goes effective, long after the expiration of both the CVA window and the bar date. Debtor has provided no foundation to suggest that a meaningful number of such claims are likely. Nevertheless, the Debtor Plan sets aside almost $4 million to pay them. There should be clear disclosure to voting Survivors of the fact that the Second Group Abuse Claim Fund incentivizes the filing of future unmeritorious claims that would be untimely if filed in the tort system, by providing compensation to the claimants—and to their attorneys.

Finally, the amounts initially reserved to pay litigation expenses and operating costs ("at least $18 million") and allocated to the First Group Abuse Claim Fund ("at least $105 million") and Second Group Abuse Claim Fund ("$3,576,500") totals $126.5765 million—more than $225,000 *in excess of* the Trust's total initial funding of $126.35 million.[16] This erroneous "disclosure" must be corrected.

**C.** **The Debtor DS should disclose parish contributions on a parish by parish basis.**

There are 240 separate entities listed in Exhibit A to the Debtor Plan, all of which

---

[16]    Debtor DS at 34.

are Participating Parties that will receive the benefit of the releases and injunctions described in the Debtor Plan. But instead of disclosing how much each such entity is contributing to the Plan—information that is necessary, under the Second Circuit's *Purdue Pharma* decision, to determine whether the third-party releases are appropriate[17]—all the Debtor DS discloses is that the Participating Parties together are contributing $30 million towards the Debtor Plan.

Such limited information on the aggregated amount across so many different entities is insufficient. Survivors and anyone else that may have a claim against a Participating Party have the right to know the amounts, if any, that each Participating Party is paying in exchange for all claims against them being permanently enjoined. The present disclosure is inadequate.

**D. The disclosure describing self-insured retentions is misleading.**

The description of the average per-claim amount being contributed on account of Abuse Claims triggering LMI and Interstate policies and, in particular, the purported effect of contractual self-insured retentions that Debtor is obligated to pay on account of any claim, is extremely misleading.[18] The calculations included in the Debtor DS inexplicably ***add*** the value of the $75,000 self-insured retention to the average per-claim calculation, as if someone will pay it, essentially telling Survivors that certain of the Settling Insurers are paying nearly 20% more per claim than they actually are. In reality, no one is paying the self-insured retentions, and the Debtor DS should not suggest otherwise. The recently added disclosure describing the effect of the self-insured retentions should be deleted.

---

[17]    *See In re Purdue Pharma L.P.*, 69 F.4th 45, 78 (2d Cir. 2023) ("*Fifth*, courts should consider whether the non-debtor contributed substantial assets to the reorganization").

[18]    Debtor DS at 3.

**E.  Comparisons of per-claimant average payments by insurers lack context or explanation and are therefore misleading**

Debtor purports to compare the average per-claim payments by LMI, Interstate, and CNA, suggesting that CNA's average per-claim payment lags behind the LMI/Interstate average.[19]  But the comparison is misleading because it lacks context.  One reason a particular insurer might pay less, on average, than another is that the first insurer has significantly less limits at risk.  From 1955 to 1975, the limits of CNA's coverage were only $300,000 per occurrence / $100,000 per person (except in 1969-1972, when CNA also issued a policy with limits of $3 million per occurrence).  In contrast, many of the LMI and Interstate policies issued from 1978 to 1986 provided limits of $4.8 million per occurrence or more (including some policies providing limits in excess of $15 million per occurrence).  While there is a difference in attachment points between the CNA policies and the LMI/Interstate policies, the difference in limits could be a complete explanation for the difference in the various carriers' per-claimant payments, since LMI and Interstate have significantly more exposure to individual claims than CNA does.

Further, as the Court is aware, the Committee sought Rule 2004 discovery in connection with an alleged breach by the Interstate Insurers of the Bar Date Order by providing Survivors' personal information from proofs of claim to unauthorized third parties.  The Committee and/or Debtor may believe they have claims against Interstate arising from the alleged breach.  In the *Diocese of Syracuse* bankruptcy case, for example, the proposed plan there defines "Interstate POC Disclosure" as "the unauthorized disclosure of certain confidential

---

[19]      Debtor DS at 3.

proofs of claim by Interstate," and assigns claims arising from it to the trust.[20] Interstate thus

may have additional exposure to liability, that CNA does not, because of Interstate's alleged

breach. Some portion of the Interstate settlement payment could be to resolve such claims,

which do not exist against CNA.

The point is that the comparison offered by the Debtor DS is overly simplistic and

therefore misleading. The per-claimant average payment by one carrier cannot be compared

with the per-claimant average payment by another carrier without providing appropriate context.

Because the Debtor DS does not provide such explanatory context, it is misleading and cannot

be approved unless the fourth paragraph on page 3 is stricken.

## F. The Debtor DS should disclose that State Court Counsel are the largest economic stakeholders in this case.

The Debtor DS advises Survivors that State Court Counsel representing

approximately 70% of Survivors have "acknowledged and accepted" the risks of the Debtor

Plan on behalf of their clients. However, the Debtor DS fails to disclose that State Court

Counsel, some of whom represent dozens of Survivors or more, have substantial personal

economic interests in the outcome of this case that they may be prioritizing over other risks and

concerns that likely are of significant concern to their clients, such as the timing of payments,

certainty as to the amounts that will be paid to Survivors, earlier closure, and the nature of

protracted litigation.

Nor does the Debtor DS disclose the inherent conflicts among differently

situated Survivors who are all represented by the same lawyer, including that some Survivors

---

[20] Dkt. No. 1565 at §§ 1.1.92 and 8.2.6, *In re Diocese of Syracuse*, Case No. 20-30663-5-WAK (Bankr. N.D.N.Y. Dec. 6, 2023).

have higher damages claims than others, or that some Survivors' claims potentially trigger CNA policies and thus will be permitted to pursue Litigation Claims while other Survivors may not pursue Litigation Claims because their claims do not potentially trigger CNA policies. The reality of State Court Counsel's economic interests in this case should be disclosed as a material factor that may affect such counsel's advice to Survivors to accept the Debtor Plan.

### G. Correction is needed to Debtor's example of point totals.

The example at the end of § 2.3.4(b)(iv)(D) of the Debtor DS, describing treatment of Abuse Claims and the award of points, provides the incorrect total of 60 points.[21] Instead, it should state that the Abuse Claims Reviewer "may not reduce [the assessment] to less than 40 points." This error must be corrected so that the example is not misleading.

## II. The Debtor DS should not be approved because the plan it describes is unconfirmable.

A disclosure statement should not be approved where the plan it describes is unconfirmable.[22] The Debtor Plan is unconfirmable for the reasons stated below. The Debtor DS therefore should not be approved.[23]

### A. The Plan's provisions relating to Litigation Claims impair CNA's rights.

Under the Debtor Plan and Allocation Protocol, Litigation Claims may proceed—but not in the same way that they would in the tort system absent Debtor's

---

[21]    Debtor DS at 37.

[22]    *See, e.g.*, *In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017) ("Courts will not approve a disclosure statement that describes a patently unconfirmable plan, that is, a plan that is incapable of confirmation as a matter of law"); *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) ("An unconfirmable plan is grounds for rejection of the disclosure statement; a disclosure statement that describes a plan patently unconfirmable on its face should not be approved").

[23]    Should there be a confirmation hearing on the Debtor Plan, CNA reserves the right to raise these and any other confirmation objections.

bankruptcy. The Claim Litigation Protocol[24] provides that the Trust will prepare a six-month schedule of Litigation Claims authorized to move forward, prioritizing "claims with the highest valuations" to go first. The Trust's control over which claims are permitted to proceed and which may not, and which claims must wait, impermissibly alters CNA's right to defend and its ability to manage litigation against its insured, and will undoubtedly have a prejudicial impact on CNA—as it is purposefully designed to do.

Indeed, the Debtor DS states outright that the "tools provided by the Plan to Abuse Claimants and the Trust will allow the Trust to pursue a favorable settlement with CNA,"[25] an admission that the purpose of the Plan's provisions regarding Litigation Claims is specifically to disadvantage CNA. These prejudicial features render the Debtor Plan unconfirmable.

**B.      Provisions relating to Insurance Claims impair CNA's rights.**

The Debtor Plan provides that the Abuse Claim Reviewer will be the sole arbiter of the liability of the Diocese or Participating Party for an Abuse Claim and the resulting Distribution to a Survivor on account of the claim. The Debtor Plan and Allocation Protocol do not provide any opportunity for CNA to object to Abuse Claims, to submit evidence in defense of liability, or to challenge the award of damages. To the extent the Trust pursues insurance coverage from CNA to indemnify the Trust's payment of Abuse Claims, these provisions of the Plan impair CNA's rights under its alleged insurance policies because CNA will be called upon to pay claims it was not provided any opportunity to defend.[26]

---

[24]      Dkt. No. 2495-3.

[25]      Debtor DS at 3.

[26]      *See* Debtor DS at 60 ("The Trust shall make Trust Distributions to the Abuse Claimants. The Trust shall pursue Insurance Claims against any Non-Settling Insurers."), 61 ("The Trust shall also have

Further, the Debtor Plan only requires "reasonable efforts" by the Diocese or Participating Parties to comply with post-confirmation insurance obligations. But the alleged CNA policies contain conditions precedent to coverage, including cooperation, that are mandatory. "Reasonable efforts" that fall short of satisfying these conditions preclude Debtor from obtaining coverage from CNA. To the extent the Debtor Plan purports to provide otherwise, by making mere "reasonable efforts" sufficient, the Debtor Plan rewrites the CNA Policies and impairs CNA's contractual rights in contravention of New York law.[27] Indeed, the Debtor DS acknowledges that the Allocation Protocol was developed by the Committee, in consultation with State Court Counsel, but with no input from Debtor. In other words, Debtor turned over decisions regarding liability and damages to the claimants themselves, itself an abdication of any effort to uphold its obligations to cooperate in its own defense.[28] The Court cannot condone this outcome under § 1129 of the Bankruptcy Code.

The insurance neutrality provisions in the Debtor Plan are not sufficient to preserve CNA's rights. Section 6.1 of the Debtor Plan purports to provide that Non-Settling Insurers will retain all legal and factual defenses to an Abuse Claim liquidated through the Allocation Protocol, but without allowing CNA to participate in the review of claims, allocation

---

the exclusive right to pursue Claims against Non-Settling Insurers related to the Diocese's and/or the Participating Parties' liability for Abuse Claims or the Non-Settling Insurers' obligations in respect of such Claims as set forth in the Allocation Protocol, regardless of whether an Abuse Claimant holds a Claim against the Trust, a Litigation Claim, or both").

[27] *Trident Int'l, Ltd. v. American S.S. Owners Mut. Prot. & Indem. Ass'n, Inc.*, 2008 U.S. Dist. LEXIS 56299, at *15 (S.D.N.Y. July 24, 2008) ("It is undisputed that where an insured fails to comply with a condition precedent to insurance coverage, the insurance contract is vitiated") (citing New York case law).

[28] Debtor DS at 41.

- 15 -

of points, and payment of compensation, the "neutrality" provision rings hollow.[29]  Normally, an insurer defending a claim participates *during* the defense, not after, to challenge assertions and present evidence before a finding of liability is locked in.  And a defending insurer can negotiate directly with a claimant to resolve the claim, if appropriate, before the claimant is handed an inflated award based on unchallenged liability.  Indeed, Debtor's recent amendments to § 6.1 delete provisions that previously gestured in the direction of protecting CNA's rights under the Allocation Protocol.[30]

Finally, the Court instructed Debtor to remove provisions from the Debtor Plan that constitute approval of the Insurance Assignment.[31]  However, the Debtor Plan still contains this provision:  "Non-Settling Insurers retain any defenses that they would be able to raise if the Claim for coverage for an Abuse Claim were brought by any Protected Party, *except any defense arising from the Insurance Claims Assignment*."[32]  This provision should be excised, too.

---

[29]    Determination of whether a plan is "insurance neutral" requires an analysis of the "real-world impacts" of plan provisions.  The labels given by a plan proponent to certain plan provisions are not determinative.  *See In re Thorpe Insulation, Inc.*, 677 F.3d 869 (9th Cir. 2012) ("Though the plan recites that it is insurance neutral, this characterization in and of itself does not settle the issue. Instead, we must look to the real-world impacts of the plan to see if it increases insurance exposure and likely liabilities of Appellants").

[30]    The deleted text read: "The rights and obligations of the Protected Parties *and every Non-Settling Insurer* under the terms of the Non-Settling Insurer Policies and at law *shall not be affected* by the Allocation Protocol and shall be treated as if the determination by the Abuse Claims Reviewer *had never occurred*."  *See* Debtor Plan Redline (Dkt. No. 2499-1) at 41 (emphases added).  That language was itself inadequate to overcome the impairment of insurer rights by virtue of the procedures in the Allocation Protocol that exclude insurer participation, but it was better than nothing.

[31]    *See* DS Order at 4 ("With regard to the Diocese/Committee Disclosure Statement and Plan—the inclusion of an 'exception' to the insurance neutrality provisions that states that the Court will enter a confirmation order finding that the insurance assignment does not trigger a coverage defense is overreaching and unacceptable, as counsel seemed to acknowledge at the hearing").

[32]    Debtor Plan, § 6.1 (emphasis added).

- 16 -

**C.** **The Debtor Plan serves as an improper de facto reviver of time-barred claims.**

The defined terms Future Claims and Second Group Abuse Claims are both simply catch-all categories for unjustifiably late claims, which the Debtor Plan sets aside millions of dollars to pay. To the extent the Trust will be permitted to pursue Insurance Claims against CNA on account of these claims, which could never succeed in the tort system because the CVA reviver window has closed, that is prejudicial to CNA as well—and a further reason that the Debtor Plan is not confirmable.

**III.** **The Court should not approve Debtor's separate summary of its disclosure statement**

Along with its proposed disclosure statement, Debtor also filed a proposed separate summary of the Debtor Plan.[33] Counsel for CNA have discussed this with counsel for Debtor and the Committee, and each side has a different understanding of the Court's preferences in this regard. CNA counsel understood that the Court wanted all discussion of the Plan and its attachments in a single document;[34] counsel for Debtor and the Committee say they believed the Court's previous suggestion of "plain English" summaries to accompany the disclosure statements applied to the currently-proposed, revised disclosure statements.

To the extent it is the Court's view is that a single disclosure statement without a summary is appropriate, CNA objects to Debtor's proposed separate summary. To the extent

---

[33] *See* Dkt. No. 2496-1.

[34] *See* DS Order at 3 ("Such information must be included in straightforward language within the four corners of each Disclosure Statement. The Court and Survivors should not have to piece together information from various documents."), 6 ("For purposes of disclosure, neither the Court nor the Survivors should be expected to distill down, decipher or connect-the-dots between multiple documents").

the Court believes a separate summary is appropriate, CNA requests that in addition to approving CNA's proposed disclosure statement, the Court also approve the separate summary that CNA is filing contemporaneously herewith.

Even if the Court believes separate summaries are appropriate, there are certain aspects of Debtor's proposed summary that are objectionable as inadequate or misleading disclosures. These are listed below:

- The summary states that "Continental insured the Diocese and Participating Parties from approximately 1943 to 1977."[35] Debtor knows, however, that whether Debtor or other nondebtor diocesan entities are insured under policies issued by CNA to Columbus Civic Center from 1943 to 1949 and from 1950 to 1951 is disputed, and that there is no evidence of CNA coverage from 1949 to 1950 and from 1951 to 1952. Accordingly, the above-quoted statement is misleading and therefore should be deleted or modified.

- The summary states, "The Committee believes that Continental is responsible to pay for Abuse Claims valued in the hundreds of millions of dollars. To date, Continental has proposed a settlement of $75 million. In the Committee's opinion, Continental's proposal is not sufficient because it drastically undervalues Continental's obligations under the insurance policies it issued to the Diocese and the Participating Parties for over 30 years."[36] These assertions are not factual and no support is given for them, and therefore they should not be approved as appropriate disclosure. The Court ordered CNA "to provide . . . information to Survivors about the potential exposure to CNA if Survivors are successful in proving liability on the part of the Diocese and in defeating the coverage defenses mentioned by CNA,"[37] and CNA complied with the Court's order. The Committee should not be permitted, even in a "summary," to make unsupported and unexplained assertions on the flip side of the same issue.

- Similarly, the summary asserts that New York law "[g]enerally" provides that "each separate act of abuse is an 'occurrence'" such that if an Abuse Claimant was abused 15 separate time during CNA policy periods, CNA would owe 15 limits of liability, or $4.5 million.[38] This is misleading in several ways. First, it suggests that each separate act of abuse is automatically worth $300,000, without taking into account such

---

[35] Dkt. No. 2496-1 at 5. *See also id.* at 16 ("Continental insured the Diocese approximately from 1943 to 1977").

[36] *Id.*

[37] DS Order at 4.

[38] Dkt. No. 2496-1 at 16.

factors as the severity of the abuse or the Debtor's liability defenses. Second, New York case law holds that policies with "deemer" or "batching" provisions are not subject to the purported "general" rule stated by Debtor, so that the "rule" cited by Debtor would not apply here if, as CNA contends, its policies contain batching language deeming all acts of abuse against a single claimant a single occurrence subject to just one per-occurrence limit.[39] The summary should disclose the existence of case law negating or providing for exceptions to the purported general rule and the inclusion of deemer language in the CNA policies, in which event the exemplar claimant would be entitled to recover $300,000 at most from CNA, not $4.5 million. Finally, the comparison of CNA's average payment with payments other insurers have agreed to make lacks context and is therefore misleading for the reasons stated above.

- The summary repeats the same math error as the Debtor DS, describing an allocation of funds that exceeds the $126.35 million Trust corpus.[40] This must be corrected for the reasons stated above.

- The summary describes "rights" allegedly held by the Diocese and Participating Parties against Continental, but does not indicate that Continental asserts or may assert defenses to coverage of claims.[41] The summary should, at a minimum, state that whether the Diocese and Participating Parties hold "rights" that are enforceable against CNA is disputed and such "rights" must be vindicated in litigation, absent a settlement among the parties.[42]

- As part of that same discussion, Debtor asserts that the Diocese and Participating Parties have "claims" against CNA arising from CNA's alleged "wholesale denial of almost 300 claims."[43] That is a misleading assertion for at least two reasons. First, Debtor knows that CNA has advised Debtor that CNA has agreed to defend the claims against Debtor. While Debtor apparently contends that CNA has waived those rights, Debtor should not be permitted to state, incorrectly and without explanatory context, that CNA has denied "almost 300 claims." Second, no "claim"

---

[39]     *See Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 991 N.E.2d 666, 672 (N.Y. 2013) (making clear that multiple incidents of abuse can be treated as separate occurrences only "absent policy language indicating an intent to aggregate separate incidents into a single occurrence," and distinguishing the language in the Diocese of Brooklyn's policies from policy language "expressly providing that 'all such exposure to or events resulting from substantially the same general conditions during the policy period shall be deemed one occurrence'"), quoting *Consolidated Edison Co. of New York v. Allstate Ins. Co.*, 774 N.E.2d 687, 693 (N.Y. 2002).

[40]     Dkt. No. 2496-1 at 5-6.

[41]     *See id.* at 9-10.

[42]     In discussing claims asserted by Continental, the summary provides the contrary viewpoint of Debtor and the Committee. *See id.* at 14.

[43]     *Id.* at 10.

could be asserted against CNA for "wholesale denial" of claims because there is no such cause of action. Rather, any claim would be limited to the particular circumstances of each individual alleged denial, and the Trust would need to prevail on the merits for each alleged denial—including overcoming the fact of CNA's express agreement to defend—in order to recover anything.

- The summary's discussion of Litigation Claims[44] is objectionable for the reasons stated above with respect to similar portions of the Debtor DS. Further, the summary contains no discussion of the fact that a Litigation Claimant who obtains a judgment is *required* to assign that judgment to the Trust; the summary describes only the *option* to assign *settlements*, which option is available only to Litigation Claimants who settle their Litigation Claims.

- The summary's description of CNA's competing plan is misleading, because it suggests that the CNA Plan provides a total fund of just $75 million, less than the Debtor Plan's initial funding of $126.35 million, when in fact the CNA Plan provides total funding of $201.35 million, which is $75 million *more* than the initial funding under the Debtor Plan.[45] The purported calculation of the "average" per-claim payments by CNA and the other insurers is also misleading for the reasons stated above, and for the additional reason that the other insurers' settlement amounts are not reserved to pay only the covered claims within their respective policy periods. Rather, as the summary states, "The Trust will make distributions of Trust Assets to all Abuse Claimants without considering whether an Abuse Claim is or is not covered by an insurance policy." In other words, claimants should *not* expect an average of "$450,000 average per covered claim" because the cash contributed by the Settling Insurers will be used to compensate all Survivors, not only those Survivors whose claims trigger Settling Insurer policies. This part of the summary should be revised to be accurate.

## IV.     Conclusion

For the reasons stated above, the Debtor DS should not be approved.

DATED:  April 1, 2024                    Respectfully submitted,

By:   */s/ Jeffrey A. Dove*
Jeffrey A. Dove
BARCLAY DAMON LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York  13202
Telephone: (315) 413-7112

---

[44]     *See id.* at 10-12.

[45]     *See id.* at 16.

- 20 -

Facsimile: (315) 703-7346
jdove@barclaydamon.com

Mark D. Plevin (admitted *pro hac vice*)
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California 94111
Telephone: (415) 986-2800
mplevin@crowell.com

David Christian
DAVID CHRISTIAN ATTORNEYS LLC
105 West Madison Street, Suite 2300
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

Miranda H. Turner (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
mturner@crowell.com

*Attorneys for The Continental Insurance Company,
successor by merger to Commercial Insurance Company of
Newark, New Jersey and Firemen's Insurance Company of
Newark, New Jersey*

907489082