In re:

The Diocese of Rochester,

            Debtor.

Case No. 19-20905

Chapter 11

# THE DIOCESE OF ROCHESTER'S (I) SUPPLEMENTAL STATEMENT IN SUPPORT OF ENTRY OF AN ORDER APPROVING DISCLOSURE STATEMENT AND (II) FURTHER LIMITED OBJECTION TO CONTINENTAL INSURANCE COMPANY'S AMENDED DISCLOSURE STATEMENT

The Diocese of Rochester, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Diocese"), hereby files this (i) supplemental statement in support of its request for entry of an order approving the *Disclosure Statement in Support of Third Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester* dated March 15, 2024 [Docket No. 2494] (the "Diocese Disclosure Statement"), and (ii) further limited objection to the *Amended Disclosure Statement in Support of Continental Insurance Company's Chapter 11 Plan of Reorganization for the Diocese of Rochester* dated March 15, 2024 [Docket No. 2497] (the "CNA Amended Disclosure Statement"), filed by Continental Insurance Company ("CNA") and respectfully submits as follows:

## Supplemental Statement In Support of Diocese Disclosure Statement

1. Since the Court issued its bench ruling declining to approve the disclosure statements proposed by each of the Diocese and CNA at a hearing held on January 30, 2024, the Diocese has worked closely with the Official Committee of Unsecured Creditors ("Committee") to revise their jointly proposed plan and the accompanying disclosure statement to address the concerns raised by the Court at the hearing and in the Court's subsequent written order docketed on February 16, 2024 [Docket No. 2460].

2. On March 15, 2024, the Diocese filed the *Third Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester* [Docket No. 2493] (as it may be amended, modified or supplemented from time to time, the "Joint Plan") and the updated Diocese Disclosure Statement.

3. Shortly after the Joint Plan and Diocese Disclosure Statement were filed, CNA filed the CNA Amended Disclosure Statement with respect to *Continental Insurance Company's Second Amended Chapter 11 Plan of Reorganization for The Diocese of Rochester* [Docket No. 2372] (the "CNA Plan").[1]

4. Specifically, the updated Diocese Disclosure Statement addresses the Court's concerns as follows:

| No. | Court's Concerns | Diocese's Response |
|---|---|---|
| 1. | Both Disclosure Statements lack plain language explanations of how Survivors will be treated under the Plan. | The Diocese and Committee filed the Summary of Third Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester (the "Plan Summary") [Docket No. 2496-1]. The Plan Summary is a plain English document drafted with input from Committee members that provides Abuse Claimants a general overview of the Joint Plan and straightforward examples of how distributions will be calculated. |
| 2. | Both Disclosure Statements lack adequate information because neither informs the average Survivor, clearly and succinctly, how much money he/she may receive, | It is difficult to advise each Abuse Claimant what their actual distribution will be because the facts and circumstances of each |

---

[1] The Diocese met and conferred with CNA to attempt to streamline the disclosure statement approval process. CNA requested to review a copy of the Diocese Disclosure Statement and accompanying materials prior to the March 15 filing deadline. In response, the Diocese agreed to provide its working drafts to CNA on the condition that CNA likewise would provide its revised drafts to the Diocese for review in order to avoid an unfair litigation advantage for either party. CNA refused this request to simultaneously exchange drafts and the Diocese respectfully declined CNA's request.

| No. | Court's Concerns | Diocese's Response |
|---|---|---|
|  | when he/she will receive it, and what contingencies there are to receiving a distribution. | unliquidated Abuse Claim are unique. However, the updated Diocese Disclosure Statement advises Abuse Claimants as to the factors to be used by the Abuse Claims Reviewer in evaluating each Abuse Claim and assigning each Abuse Claimant a point score, the calculation of upward and downward adjustments and the method for calculating distributions, as well as hypothetical distribution examples. The updated Diocese Disclosure Statement also advises as to the Plan Proponents' estimation of 2-4 months for an initial distribution after the Joint Plan becomes effective. *See* Disclosure Statement, Article IV.C.2.d (Page 34). |
| 3. | Neither Disclosure Statement provides information, clearly and succinctly, detailing how much of the settlement funding will be deducted to cover administrative expenses or to fund reserves—such as future claims, Diocese postconfirmation costs, "Enhanced Claims," or Trust expenses, so that it is plain for all to see how much of the "headline settlement amount" will actually be left for distribution to Survivors. The Court recalls that during the hearing, counsel to the Diocese conceded those administrative costs could approach $50 million, leaving considerably less than $126.35 million for Abuse Survivors under the Diocese/Committee Plan.[2] | The updated Diocese Disclosure Statement advises Abuse Claimants that "[t]he Plan establishes a Trust for the benefit of Abuse Claimants. The Trust will distribute funds to Abuse Claimants from the $126.35 million of settlement funds from the Diocese, the Participating Parties and the Settling Insurers, as well as any additional funds collected through litigation and/or settlement with CNA. The Trust will initially distribute at least $105 million and will reserve at least $18 million to fund operational expenses and costs of litigation with CNA and $3,576,500 as a reserve for payment of Second Group Abuse Claims." The Diocese |

---

[2] The Diocese respectfully submits that counsel suggested that the amount of potential post-confirmation administrative costs might conceivably approach $15 million, which the Court may have misheard as $50 million.

| No. | Court's Concerns | Diocese's Response |
|---|---|---|
|  |  | Disclosure Statement also clarifies that any claim enhancements for Litigation Claimants will be funded solely from incremental recoveries from CNA. *See* Disclosure Statement, Articles IV.C.2.d and V.E.1.d (Pages 34 and 46, respectively). |
| 4. | Both Disclosure Statements provide that distributions will be made to Survivors in the manner set out in the Allocation Protocol and Trust Agreement—both of which are filed separately as Exhibits to the Plan Supplement. (See ECF No. 2373, Ex. 1 & 3; ECF No. 2427, Ex. 1 & 5). Such information must be included in straightforward language within the four corners of each Disclosure Statement. The Court and Survivors should not have to piece together information from various documents. | The Diocese Disclosure Statement now incorporates the integral components of the Allocation Protocol and Trust Agreement, including the Evaluation Factors that will be considered in reviewing and assigning point values to Abuse Claims. *See* Diocese Disclosure Statement, Article IV.C.2.d.ii (Page 35). |
| 5. | Neither Plan proponent responded to the UST objection (ECF No. 2345) concerning the exclusion of quarterly fees from amounts funding the Plan, which the UST asserts to be improper under 28 U.S.C. § 1930. | The Diocese addresses this concern in Article XIX.N of the updated Diocese Disclosure Statement. (Page 98). |
| 6. | Neither Disclosure Statement adequately addresses the UST's objection concerning third-party releases, non-consensual releases, and the scope of exculpation and indemnification provisions to the proposed Plans, in an easily understood manner, so that Survivors can understand the ramifications to the proposed Plans if some or all of those provisions are found to be improper. What is "Plan B" should that occur? | The Diocese addresses these concerns in Article XIX.I of the updated Diocese Disclosure Statement. (Page 96). If the Supreme Court limits or prohibits courts from approving non-consensual third-party releases, and if Abuse Claimants in this Chapter 11 Case oppose such releases, the Plan may not be confirmed or confirmation could be reversed on appeal. |
| 7. | CNA's Disclosure Statement fails to provide any information to Survivors about the potential exposure to CNA if Survivors are successful in proving liability on the part of the Diocese and in defeating the coverage defenses mentioned by CNA. | Not applicable to Diocese Disclosure Statement. |

4

| No. | Court's Concerns | Diocese's Response |
|---|---|---|
| 8. | With regard to the Diocese/Committee Disclosure Statement, the Court will not approve a Disclosure Statement or Plan that includes "Stipulated Judgments"—or a similar term designed to do the same thing—a position that the Court has espoused for over a year. | The amended Joint Plan no longer incorporates stipulated judgments or similar devices. |
| 9. | With regard to the Diocese/Committee Disclosure Statement and Plan—the inclusion of an "exception" to the insurance neutrality provisions that states that the Court will enter a confirmation order finding that the insurance assignment does not trigger a coverage defense is overreaching and unacceptable, as counsel seemed to acknowledge at the hearing. | The amended Joint Plan provides that Non-Settling Insurers retain any and all coverage defenses without exception and seeks only a finding from the Court that the contemplated Insurance Claims Assignment complies with all applicable provisions of the Bankruptcy Code. *See* Joint Plan, sections 8.8.1.h (Page 47), 8.2.3.a (Page 44); *see also* Disclosure Statement, Articles IX.B.3.a (Pages 56-57), and IX.H.1.h (Page 60). |
| 10. | The Diocese/Committee Disclosure Statement fails to inform Survivors of the financial impact on Survivors who are not chosen to be "Litigation Claimants" or how much money the Trust must set aside to fund "Claim Enhancements." Further, there is no discussion of the legal basis to treat the members of the same class differently, seemingly in violation of § 1123(a)(4). | The updated Diocese Disclosure Statement discloses that Abuse Claimants with whose claims are covered by CNA (i.e., where the abuse occurred between 1943 and 1977), may elect to be Litigation Claimants and, subject to the terms of the Joint Plan and at their own expense, to litigate their Claims against the Diocese and the Participating Parties to establish liability and damages. It further discloses that the Joint Plan requires any judgments obtained by Litigation Claimants to be assigned to the Trust for enforcement against CNA for the benefit of all Trust beneficiaries. Litigation Claimants may be entitled to certain distribution enhancements, which are on account of the work and re-traumatization Litigation Claimants may endure in pursuing litigation, |

5

| No. | Court's Concerns | Diocese's Response |
|---|---|---|
| | | and which are funded entirely from incremental recoveries from CNA and therefore do not require the Trust to hold any extra amounts in reserve. *See* Disclosure Statement, Article V.E (Page 45).<br><br>The Diocese respectfully submits that such treatment does not violate section 1123(a)(4) because the claim enhancements will be funded solely out of additional monies the Trust recovers from CNA for the benefit of all Trust beneficiaries as a result of the extra efforts of Litigation Claimants, and such enhancements will not reduce the amounts available for distribution to other Abuse Claimants. *See* Disclosure Statement, Article V.E (Page 45-46). |
| 11. | There is conflicting language in the Diocese/Committee Disclosure Statement regarding the recovery or non-recovery of "Economic Damages" by abuse claimants. Identical language to that contained in the Allocation Protocol was objected to by Pachulski Stang Ziehl & Jones LLP, as Committee counsel, before Judge Glenn in the Diocese of Rockville Centre case a few weeks ago. And yet before this Court counsel is supporting the same language it found offensive in the Rockville Centre case. Why? | The updated Diocese Disclosure Statement and Joint Plan provide that all payments made under the Plan pursuant to the Allocation Protocol will be treated as payments on account of physical injury or physical sickness. While the Diocese cannot speak to the deliberations of a committee in a different case, it observes that each committee is comprised of different individuals and the context of the two cases is very different. Here the Diocese and the Committee have reached a joint settlement whereas the plan proposed by the Rockville Centre Diocese was strongly opposed by that Committee. |
| 12. | The Diocese/Committee Disclosure Statement fails to include financial information that would allow | Exhibit B to the updated Diocese Disclosure Statement discloses the |

6

| No. | Court's Concerns | Diocese's Response |
|---|---|---|
| | Survivors (and the Court) to assess whether "Protected Parties" such as parishes, schools and other organizations that seek to be released under the Plan are making a financial contribution that is fair/substantial, as compared to the liability being released. | financial assets available to Participating Parties and the expected contributions they will be making to the Trust. |
| 13. | The Diocese/Committee Disclosure Statement and Plan appear to give the Diocese prospective approval of an Exit Financing Facility, without any meaningful information and without Court approval. | The Joint Plan and Disclosure Statement contemplate that, if the Diocese elects to seek any exit financing, "the terms of such financing shall be submitted to the Bankruptcy Court at the Confirmation Hearing for approval pursuant to section 364 of the Bankruptcy Code." *See* Diocese Disclosure Statement, Article VIII.H (Page 55); *see also* Joint Plan, section 7.8 (Page 44). |
| 14. | The Diocese/Committee and counsel to the Sisters of Saint Joseph are to meet and confer for the purpose of drafting language to be included in the Disclosure Statement and Plan, addressing the concerns of the Sisters of Saint Joseph as a joint tortfeasor, which language is to be broad enough to protect any similarly situated joint tortfeasor. | The Diocese has met and conferred with the Sisters of Saint Joseph and has attempted to address the Sisters' concerns through the addition of new section 15.11 in the Joint Plan (Page 79). |
| 15. | The Diocese/Committee Disclosure Statement and Plan must address any postpetition abuse claims made against the Diocese, with a detailed discussion of how any such claim will be treated under the Plan and estimated for purposes of confirmation. | The Joint Plan addresses only Abuse Claims that arose prior to September 12, 2019, which is when the Diocese filed this Chapter 11 Case. The Diocese is not aware of any person asserting that the Diocese or any of the Participating Parties are liable for abuse occurring on or after that date, however, in the event such a claim is asserted in the future, it would not be subject to the releases and injunctions contemplated in the Plan. To the extent an Abuse Claimant does not assert their prepetition Abuse Claim prior to the Effective Date of the Joint Plan, |

| No. | Court's Concerns | Diocese's Response |
|---|---|---|
| | | their Abuse Claim would be treated as a "Future Claim" under the Joint Plan. |

5. In light of the foregoing Joint Plan and Disclosure Statement revisions, the Diocese respectfully submits that the Diocese Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code and respectfully requests that the Court enter an order approving the Diocese Disclosure Statement.

### Further Limited Objection to CNA Amended Disclosure Statement

6. The Diocese hereby incorporates by reference and repeats each of the limited objections set forth in parts I, II, III, V, and VI of its prior *Limited Objection to Continental Insurance Company's Motion for Entry of an Order Approving Disclosure Statement in Support of Continental Insurance Company's Chapter 11 Plan of Reorganization for the Diocese of Rochester, Approving Solicitation Procedures for Continental Insurance Company's Plan of Reorganization for the Diocese of Rochester, Approving Ballots and Establishing Procedures for Voting on Competing Plans, Approving the Form, Manner, and Scope of Notice for the Confirmation Hearing and Granting Related Relief* [Docket No. 2351].

7. Specifically, the Diocese notes that the CNA Amended Disclosure Statement still fails to provide adequate disclosure regarding the following:

   a. **The CNA Plan relies on $126.35 million in funding from sources which CNA does not control, and which CNA has not and cannot guarantee will be forthcoming.** The Diocese and its parishes and other related Catholic entities (collectively, the "Catholic Family") have significant concerns with several aspects of the CNA Plan and are not willing at this time to commit to provide the same level of funding, nor to settle their other

insurance policies, under the CNA Plan as currently proposed.[3] The CNA Amended Disclosure Statement should disclose that the only committed funding for the CNA Plan is CNA's own $75 million contribution.

b. **The CNA Plan allows for unlimited post-confirmation litigation against the Catholic Family without making adequate provision for the payment of litigation costs in violation of 11 U.S.C. §§ 1123(a)(5) and 1129(a)(11).** In addition to the fact that the CNA Plan fails to provide adequate means for its implementation and potentially imposes unfeasible administrative burdens on the Catholic Family, the CNA Amended Disclosure Statement includes disclosures that directly contradict the terms of the CNA Plan. The CNA Plan provides that the Trust will pay the DOR Entities' Post-Effective Date Costs, which are defined to include post-confirmation litigation defense costs. *See* CNA Plan at Sections 1.1.61; 4.4.1(f) and 8.9. The CNA Plan further provides for a reserve in the amount of $600,000 to cover all DOR Entities Post Effective Date Costs.[4] *See* CNA Plan at Section 8.9.1. Confoundingly, however, the CNA Amended Disclosure Statement now suggests, without evidence or explanation, that "[t]he DOR Entities' Post-Effective Date Costs *will be no more than $75,000*." *See* CNA Amended Disclosure Statement at p. 5. It goes on to state, contrary to the terms of the CNA Plan, that "[t]he Reorganized Diocese and any Participating Parties may defend any Tort Claim, but at their own expense." *Id*. The CNA Amended Disclosure Statement must be modified to disclose the basis for CNA's estimation that DOR Entities' Post-Effective Date Costs will be only $75,000, to reflect the actual provisions of the CNA Plan which provide for payment of the Catholic Family's Defense Costs, and to disclose the potential that the $600,000 in proposed funding for the DOR Entities Post-Effective Date Cost Reserve under the CNA Plan is likely inadequate.

c. **CNA has massive potential liability which likely exceeds the $75 million it has offered under the CNA Plan.** Despite the Court's observation that CNA's prior disclosure statement failed to provide abuse survivors with adequate information about CNA's exposure, the revised CNA Amended Disclosure Statement still lacks sufficient information. Rather than advise as to the potential worst case liability CNA could face, CNA describes the Committee's theories of liability and then attempts to refute those theories with CNA's litigation position. However, the Court specifically required that CNA disclose what it would be forced to pay if survivors and the Committee prevail in establishing liability against the Diocese and defeating coverage defenses. CNA attempts to dodge this requirement by

---

[3] At least with respect to non-debtor members of the Catholic Family, the Diocese respectfully submits that there are both Constitutional and jurisdictional impediments that would prevent confirmation of a plan of reorganization that forces such entities to fund a plan and compromise their insurance rights on an involuntary basis.

[4] In light of the unlimited nature of permitted post-confirmation litigation allowed under the CNA Plan, the Diocese respectfully submits that a $600,000 reserve to cover DOR Entities' Post-Effective Date Costs is clearly inadequate.

stating that "it is not possible to definitively state what CNA's worst-case exposure would be, given that the facts about the claims are not fully developed" but that is simply not true.[5] CNA has at its disposal access to all factual elements needed to calculate its worst-case scenario: (i) the number of survivor claims, (ii) the number of instances of abuse each survivor has alleged to have suffered, and (iii) the applicable per-occurrence policy limits in effect at the times abuse is alleged to have occurred. Assuming, as the Court has required, that survivors and the Committee prevail in establishing liability and defeating CNA's coverage defenses, CNA's worst-case exposure can be calculated by multiplying the number of occurrences that are alleged to trigger CNA's insurance coverage by the applicable CNA policy limits. *See Roman Catholic Diocese of Brooklyn, et al. v. National Union Fire Ins. Co. of Pittsburgh, PA, et al.*, 21 N.Y.3d 139 (NY 2013). The CNA Amended Disclosure Statement should provide this arithmetic calculation for comparison against CNA's proposed $75 million contribution.

d. **The Joint Plan does not require any survivor to engage in litigation.** The CNA Amended Disclosure Statement still misleadingly suggests that "in order to receive their full measure of compensation" under the Joint Plan, survivors will be required to file and participate in a lawsuit. *See* CNA Amended Disclosure Statement at p. 20-21. While the Joint Plan does contemplate the opportunity for post-confirmation litigation against CNA to enhance all survivor recoveries, such litigation is solely at each eligible Abuse Claimant's option and no Abuse Claimant will be denied the opportunity to fully participate in Trust distributions, including any additional recoveries received from CNA, on account of their decision not to pursue litigation.

e. **The CNA Amended Disclosure Statement continues to include multiple unsupported factual assertions, misstates and mischaracterizes the Joint Plan, and attempts to pass advocacy and opinion off as factual disclosure.** By way of example only, and without limitation, the chart below includes several examples of instances where the CNA Disclosure Statement makes unsupported assertions, mischaracterizes the Joint Plan's provisions and/or impact on survivors, and asserts argument cloaked as fact. CNA should be required to disclose the basis for its factual assertions, to describe the Joint Plan accurately, and to identify and disclose those instances where it is setting forth its own contentions as opposed to settled facts. Instances of the foregoing are set forth in the chart below:

---

[5] The Diocese notes that CNA is currently the proponent of a plan of reorganization that would settle all of CNA's liability for $75 million without any need for additional disclosure or factual development. Clearly, if the known facts are sufficient for CNA to argue that its proposed $75 million plan contribution is a reasonable settlement of its liability, CNA should also be able, using the same known facts, to articulate a worst-case exposure under its policies without the need for further disclosure or factual development.

10

| CNA Amended Disclosure Statement Language | Objection |
|---|---|
| The DOR Entities' Post-Effective Date Costs will be no more than $75,000. The Reorganized Diocese and any Participating Parties may defend any Tort Claim, but at their own expense. (p. 5) | CNA provides no basis for its assertion that DOR Entities' Post Effective Date Costs will be limited to $75,000. Additionally, this language contradicts the terms of the CNA Plan which require the Trust to pay for all DOR Entities' Post-Effective Date Costs, including costs of defending against post-confirmation litigation. |
| Under the Diocese Plan, many Survivors, whose abuse occurred outside the alleged CNA policy years of 1952 to 1977, will not be authorized to bring lawsuits at all, and they may or may not get to share in recoveries from other Survivors' lawsuits. That means Survivors in non-CNA years may receive a smaller recovery than other Survivors with similar claims. (p.6) | This does not accurately describe the Joint Plan's provisions. The Joint Plan provides that any judgment against CNA obtained by a Litigation Claimant will be assigned to the Trust for the benefit of all Trust beneficiaries, regardless of whether their claim falls within CNA's policy periods. It likewise provides that, if the Trust settles with CNA on a global basis, such recoveries will be shared among all Trust beneficiaries. Any enhancements paid to Litigation Claimants are paid solely out of additional recoveries from CNA. Such enhancements are on account of the work and re-traumatization Litigation Claimants may endure in pursuing litigation for the greater good of all survivors. |

| | |
|---|---|
| CNA believes the Debtor breached a 2022 Insurance Settlement Agreement with CNA and is pursuing a plan— the Diocese Plan—that is prejudicial to CNA's legal rights. If the Diocese Plan is confirmed, CNA would have appeal rights. An appeal would likely further delay Survivor compensation. (p.7) | It is not at all certain that CNA will have a right to appeal confirmation of the Joint Plan, or that an appeal would delay survivor compensation.<br><br>The Court has indicated its intention to rule on CNA's administrative claim prior to holding a hearing on confirmation of the Joint Plan. If the Court rules that CNA is not entitled to an administrative claim, and if the Court finds the Joint Plan is, as it is designed and intended to be, otherwise insurance neutral with respect to CNA's contractual rights under its policies, it is possible, indeed likely, that CNA will not have appellate standing to contest confirmation of the Joint Plan. Even if CNA does have appellate rights, however, it is uncertain that consummation of the Joint Plan would be stayed during the pendency of such an appeal, and, if not stayed, the Trust could still be funded and make distributions to survivors while CNA appeals the Joint Plan's Insurance Claim assignment provisions. |
| The policy language that CNA asserts would apply to its policies contains the same language that New York's highest court has said would treat multiple acts of abuse as a single occurrence, to which only a single per-occurrence limit would be applicable. That means a Survivor might only be able to collect the amount of a judgment up to one limit of an applicable CNA policy, even if it is only $50,000. (p. 10) | This statement suggests that New York's highest court has definitively ruled that the specific language at issue treats multiple acts of abuse as a single occurrence. That is not accurate. While CNA's litigation position may be that multiple acts of abuse should be aggregated and treated as a single occurrence under its policies, New York's Court of Appeals has previously held, in the context of claims premised on clergy sexual abuse, that each act of abuse should be treated as a separate occurrence. *See Roman Catholic Diocese of Brooklyn, et al. v. National Union Fire Ins. Co. of Pittsburgh, PA, et al.*, 21 N.Y.3d 139 (NY 2013). CNA should accurately disclose that the per occurrence limitation on recovery it suggests should apply is not settled New York law and that the weight of case law authority is to the contrary. |

| | |
|---|---|
| Insurance is not available if the Diocese knew about a priest's previous abuse but nevertheless allowed that priest to remain in ministry with access to children, leading to abuse of another child. (p. 10) | This statement suggests that CNA can categorically deny coverage in every instance where the Diocese may have had some level of knowledge about a perpetrator's prior bad acts, however the "expected or intended" defense to coverage is highly fact dependent. While it may be CNA's litigation position that any knowledge disqualifies coverage, such a blanket statement is not accurate and misleading. |
| In sum, it is not possible to definitively state what CNA's worst-case exposure would be, given that the facts about the claims are not fully developed and the amount of the Diocese's underlying liability has not been determined. (p. 10) | Notwithstanding CNA's refusal to do so, it is possible to calculate CNA's worst-case exposure as the Court has required.<br><br>If survivors prevail on liability, and CNA's coverage defenses and policy interpretation arguments fail, binding case law from the New York Court of Appeals teaches that CNA's worst-case exposure would be calculated by multiplying the number of occurrences of abuse by the applicable CNA policy limits. *See Roman Catholic Diocese of Brooklyn, et al. v. National Union Fire Ins. Co. of Pittsburgh, PA, et al.*, 21 N.Y.3d 139 (NY 2013). This arithmetic exercise results in a very large number, which is likely why CNA has declined to provide this information to survivors, notwithstanding the Court's prior direction. |
| CNA further believes that the treatment of Abuse Claimants under the CNA Plan provides higher and quicker guaranteed payments to Abuse Claimants than the Diocese Plan and also provides for resolution of CNA's claims for the Diocese's breach of the 2022 Insurance Settlement Agreement. (p. 12) | The Diocese maintains that CNA does not have any viable breach of contract claims for various reasons, including that no binding contract of settlement was ever formed, and even if one was, no breach ever occurred. Accordingly, any reference to the basis for CNA's administrative claim should make clear that CNA is asserting a claim based upon an *alleged* breach of contract, and that no such breach has been determined to have occurred. |

| | |
|---|---|
| The CNA Plan gives Survivors the choice to file a lawsuit nominally against the Diocese and/or Participating Parties. CNA does not expect those lawsuits will be defended, in which case the Survivor would likely be entitled to a default judgment and then have the opportunity to provide evidence to the court supporting a damage award. (p. 26) | CNA provides no basis for its "expectation" that the Diocese and/or Participating Parties will not defend lawsuits which, in many cases, will allege significant malfeasance on the part of Church clerics and employees, separate and apart from those individuals who are alleged to have actually perpetrated the abuse. Contrary to CNA's assumption, the Diocese and other members of the Catholic Family will almost certainly find it necessary to defend against at least some of the allegations leveled in such lawsuits.<br><br>Moreover, even if the Diocese were not inclined to contest the allegations in a particular lawsuit, a survivor with a default judgment would be entitled to discovery from the Diocese to prove their damages. The Diocese would necessarily incur costs in responding to such discovery, again making it clear that the $600,000 the CNA Plan purports to reserve for DOR Entities' Post-Effective Date Costs is insufficient. |
| [T]he criteria the Trust would use to determine whether to permit Litigation Claims is not disclosed in the Diocese Plan. (p. 39) | The criteria the Trust would use to select and authorize the prosecution of Litigation Claims under the Joint Plan is set forth in the Claim Litigation Protocol attached as Exhibit 2 to the Trust Agreement which was first filed on December 18, 2023 [Docket No. 2391] and updated on January 12, 2024 [Docket No. 2427] and March 15, 2024 [Docket No. 2495]. |

| | |
|---|---|
| [T]he value and timing of Litigation Claims depend on the outcome of two post-bankruptcy litigation proceedings. . . . Establishing liability may require responding to discovery (including giving sworn testimony in a pretrial deposition) and then testifying at a trial. It also may take months or years to schedule a trial date and try the case. . . . Thus, a Survivor choosing a litigation option under the Diocese Plan can expect, given the small number of civil cases tried and the above statistical information, that his or her case may not come to trial for $3\text{-}\frac{1}{2}$ to $5\text{-}\frac{1}{2}$ years from the end of the Diocese's bankruptcy, and possibly even later. (p. 39) | CNA relies on a number of statistics to speculate and suggest a likelihood of years of delay in getting to trial, but fails to advise survivors of the possibility of pre-trial settlement of Litigation Claims, either individually or on a global basis by the Trust. Statistically speaking, settlement of litigation is much more common than litigation to judgment after a trial and could be achieved significantly sooner than the timeline suggested by CNA. |

8. Notwithstanding the multiple infirmities of the CNA Amended Disclosure Statement, the Diocese understants that counsel for survivors are well aware of the terms and relative merits of both the Joint Plan and the CNA Plan. Based on discussions with the Committee, the Diocese is also confident that the majority of survivors prefer the Joint Plan to the CNA Plan. The Diocese is eager to move the plan confirmation process forward as expeditiously as possible, and recognizes the Court's desire to move the Joint Plan and the CNA Plan forward on the same timetable. Accordingly, if the Diocese Disclosure Statement is approved, solely for the purpose of avoiding further delay associated with correcting the CNA Amended Disclosure Statement, and reserving its rights to object to confirmation of the CNA Plan on any and all grounds, the Diocese will consent to CNA using the CNA Amended Disclosure Statement in its current form to solicit votes on the CNA Plan so long as CNA includes in conspicuous font on the front page of the CNA Amended Disclosure Statement the following disclaimer:

> **ALL DISCLOSURES AND STATEMENTS AS TO ANY ISSUE OF LAW OR FACT SET FORTH HEREIN, INCLUDING ARE MADE BY CONTINENTAL INSURANCE COMPANY ("CNA") ONLY AND HAVE NOT BEEN APPROVED OR ENDORSED BY THE DIOCESE OF**

ROCHESTER (THE "<u>DIOCESE</u>") OR BY ANY OF THE PARISHES AND OTHER CATHOLIC ENTITIES THAT COLLECTIVELY WITH THE DIOCESE COMPRISE THE "PARTICIPATING PARTIES" (THE "<u>CATHOLIC FAMILY</u>").

NEITHER THE DIOCESE NOR ANY MEMBER OF THE CATHOLIC FAMILY HAS CONSENTED TO THE TRANSACTIONS CONTEMPLATED BY THE CHAPTER 11 PLAN PROPOSED BY CNA AND DESCRIBED HEREIN (THE "<u>CNA PLAN</u>"), NOR HAS THE DIOCESE OR ANY MEMBER OF THE CATHOLIC FAMILY APPROVED OR ENDORSED THE DESCRIPTIONS AND CHARACTERIZATIONS SET FORTH HEREIN WITH RESPECT TO (I) THE CNA PLAN (II) THE COMPETING PLAN PROPOSED BY THE DIOCESE TOGETHER WITH THE COMMITTEE (THE "<u>JOINT PLAN</u>") OR (III) THE IMPACT CONFIRMATION OF SUCH PLANS MAY HAVE ON THE RIGHTS AND RECOVERIES OF ABUSE SURVIVORS WHO HAVE ASSERTED ABUSE CLAIMS IN THIS CHAPTER 11 CASE.

THE DIOCESE HAS PREPARED A SEPARATE DISCLOSURE STATEMENT WITH RESPECT TO THE JOINT PLAN WHICH HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF NEW YORK. ABUSE CLAIMANTS AND OTHER CREDITORS ELIGIBLE TO VOTE ON THE JOINT PLAN SHOULD READ AND CONSIDER THE DIOCESE'S DISCLOSURE STATEMENT IN CONNECTION WITH THEIR CONSIDERATION OF THE JOINT PLAN.

**WHEREFORE**, the Diocese respectfully submits that the Court enter an order (i) approving the Diocese Disclosure Statement as containing adequate information pursuant to Bankruptcy Code section 1125; (ii) denying the CNA Amended Disclosure Statement as inadequate pursuant to Bankruptcy Code section 1125 or, alternatively, approving the CNA Amended Disclosure Statement subject to the addition of the disclaimer set forth above; and (iii) granting such other and further relief as the Court deems just and proper.

16

17556194.3
17556194.4 4/1/2024
Case 2-19-20905-PRW, Doc 2531, Filed 04/01/24, Entered 04/01/24 14:51:02, Description: Main Document, Page 16 of 17

Dated: April 1, 2024
    Syracuse, New York        BOND, SCHOENECK & KING, PLLC

By:    */s/ Stephen A. Donato*
Stephen A. Donato, Esq.
Charles J. Sullivan, Esq.
Grayson T. Walter, Esq.
Office and Post Office Address:
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8000
Email: donatos@bsk.com
sullivc@bsk.com
walterg@bsk.com

*Counsel to The Diocese of Rochester*