# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF NEW YORK

In re:

DIOCESE OF ROCHESTER,

Debtor.

Chapter 11

Case No. 19-20905

## NOTICE OF FILING OF REDLINES

 **PLEASE TAKE NOTICE** that The Continental Insurance Company, successor by merger to Commercial Insurance Company of Newark, New Jersey and Firemen's Insurance Company of Newark, New Jersey ("Continental") hereby files this Notice of Filing of Redlines in connection with the *Third Amended Chapter 11 Plan of Reorganization for the Diocese of Rochester* [Dkt. No. 2552] dated April 9, 2024 (as it may be amended, modified, or supplemented from time to time) and the *Amended Disclosure Statement in Support of Continental Insurance Company's Second Amended Chapter 11 Plan of Reorganization for the Diocese of Rochester* [Dkt. 2497] dated March 15, 2024.

 **PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 1 is the *CNA Plan* redline.

 **PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 2 is the *Plan Summary* redline.

 **PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 3 is the *Allocation Protocol* redline.

 **PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 4 is a redline of the *CNA Allocation Protocol* compared to Debtor's *Allocation Protocol*.

SFACTIVE-907504124.1

**PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 5 is a redline of the *CNA Abuse Claim Release Agreement* compared to Debtor's *Abuse Claim Release Agreement*.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 6 is a redline of the *CNA Trust Agreement* compared to Debtor's *Trust Agreement*.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 7 is a redline of the *CNA List of Insurance Policies* compared to Debtor's *List of Insurance Policies*.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 8 is a redline of the *CNA List of Assumed Contracts and Leases* compared to Debtor's *List of Assumed Contracts and Leases*.

DATED:  April 9, 2024

Respectfully submitted,

By:    */s/ Jeffrey A. Dove*
Jeffrey A. Dove
BARCLAY DAMON LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202
Telephone: (315) 413-7112
Facsimile: (315) 703-7346
jdove@barclaydamon.com

Mark D. Plevin
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California 94111
Telephone:  (415) 986-2800
mplevin@crowell.com

David Christian
DAVID CHRISTIAN ATTORNEYS LLC
105 West Madison Street, Suite 2300
Chicago, Illinois 60602
Telephone:  (312) 282-5282

- 2 -

SFACTIVE-907504124.1

dchristian@dca.law

Miranda H. Turner
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
mturner@crowell.com

*Attorneys for The Continental Insurance Company,
successor by merger to Commercial Insurance
Company of Newark, New Jersey and Firemen's
Insurance Company of Newark, New Jersey*

# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>DIOCESE OF ROCHESTER,<br><br>Debtor. | Chapter 11<br><br>Case No. 19-20905 |

## CONTINENTAL INSURANCE COMPANY'S
## ~~SECOND~~THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION
## FOR THE DIOCESE OF ROCHESTER

### <u>Introduction</u>

The Continental Insurance Company ("CNA") proposes this plan of reorganization for debtor The Diocese of Rochester pursuant to § 1121(c) of the Bankruptcy Code. The capitalized terms used throughout this Plan shall have the meanings ascribed to them in Section I, below.

The Plan, among other things, provides for the equitable treatment and payment of Abuse Claims against the Diocese through the establishment of a Trust for the benefit of Holders of Abuse Claims. The Trust will be funded with a total of not less than $201.35 million dollars, including $75 million from CNA. Such funds, to be contributed by the Diocese and the Settling Insurers, including CNA, will be available for distribution to the Holders of Abuse Claims as of the Plan's Effective Date, without any need for tort litigation against the Diocese or insurance coverage litigation against the Settling Insurers. This amount is a significantly larger sum than would be certain to be available under the plan jointly proposed by the Diocese and the Committee, which requires Holders of Abuse Claims to engage in both tort system litigation and insurance coverage litigation in order to obtain funding from CNA.

Earlier in this bankruptcy case, the Diocese entered into a settlement with CNA in the amount of $63.5 million. The Committee objected to that settlement. In this Plan, the $75 million amount to be contributed by CNA exceeds the amount previously agreed to with the Diocese and, together with the other committed funding, provides an overall compensation fund of at least $201.35 million, which can be paid by the Trust to Abuse Claimants without delay.

The Committee has said that it, in consultation with State Court Counsel representing approximately 70% of all Abuse Claimants, has "acknowledged and accepted the risk inherent in pursuing post-confirmation recovery from Non-Settling Insurers in the absence of a settlement." Further, the Diocese has stated that the plan jointly proposed by the Diocese and the Committee:

provides for the assignment to the Trust of Insurance Claims against Non-Settling Insurers. The Non-Settling Insurers are likely to assert factual and legal defenses to both their coverage obligations and to the underlying liability of the Diocese and other Participating Parties for Abuse Claims. Litigation of the Insurance Claims against

Non-Settling Insurers could be protracted and expensive. **There is no guarantee that the Trust will prevail in its prosecution of the Insurance Claims against Non-Settling Insurers, or that such recovery, if any, will exceed the amounts that would otherwise be available from CNA**. . . . (Emphasis added.)

This Plan, by contrast, allows Abuse Claimants to speak for themselves regarding whether they prefer to accept the certainty of CNA's $75 million contribution to the Trust, without the risks, costs, and delays of litigation, or instead want to bear the risks, burdens, and delay they would face to obtain payment from CNA under the Diocese-Committee plan.

# Table of Contents

[to come]

## PLAN EXHIBITS

Exhibit A        List of Participating Parties

## PLAN SUPPLEMENT EXHIBITS

Exhibit 1        Allocation Protocol
Exhibit 2        Abuse Claim Release Agreement
Exhibit 3        Trust Agreement
Exhibit 4        List of Insurance Policies
Exhibit 5        Non-Monetary Commitments
Exhibit 6        List of Assumed Contracts and Leases
Exhibit 7        LMI Settlement Agreement
Exhibit 8        Underwriters Settlement Agreement
Exhibit 9        Interstate Settlement Agreement
Exhibit 10       First State Settlement Agreement

- 1 -

# SECTION 1.  DEFINITIONS AND INTERPRETATION

## 1.1  <u>Definitions.</u>

The following terms used herein shall have the respective meanings defined below:

*1.1.1*  ***Abuse*** means any actual or alleged sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, pedophilia, ephebophilia, or sexually- related physical, psychological, or emotional harm, or contacts, or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult, sexual assault, sexual battery, sexual psychological or emotional abuse, humiliation, or intimidation, or any other sexual misconduct.

*1.1.2*  ***Abuse Claim*** means any Claim that has been asserted, or could be asserted, against the Diocese or any Participating Party, arising in whole or in part, directly or indirectly from Abuse occurring prior to the Effective Date, and seeking monetary damages or any other relief, under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Diocese or any Participating Party, or any other person or entity for whose acts or failures to act the Diocese or any Participating Party is or was allegedly responsible, including, without limitation, all Adult Abuse Claims, Child Abuse Claims, and Future Claims, against the Diocese or any Participating Party, whether or not such Claims arise under, or were revived pursuant to, the CVA or the ASA, and whether or not a proof of claim has been Filed or an Abuse Action has been commenced with respect to such Claim.  Notwithstanding the foregoing, Abuse Claims do not include any claim that a Settling Insurer may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Insurer to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such.

*1.1.3*  ***Abuse Claim Release Agreement*** means an agreement releasing the Diocese and any Participating Party consistent with the terms of this Plan to be executed by Abuse Claimants as a condition of receiving a Distribution pursuant to this Plan, substantially in the form attached to the Plan Supplement as **<u>Exhibit 2</u>**.

*1.1.4*  ***Abuse Claimant*** means the holder of an Abuse Claim.

*1.1.5*  ***Abuse Claims Reviewer*** means the person or entity, including the designee of such person or entity, who will assess Abuse Claims under the Allocation Protocol.  <u>Roger L. Kramer shall be the Abuse Claims Reviewer unless the Bankruptcy Court declines to approve his appointment or hereafter appoints a replacement.</u>

*1.1.6*  ***Abuse Claims Settlement Fund*** means a fund established by the Trust to pay Abuse Claims.

*1.1.7*  ***Action*** means any lawsuit, proceeding, or other action in a court, or any arbitration.

*1.1.8*  ***Administrative Claim*** means a Claim against the Diocese for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, (a) any actual

and necessary costs and expenses, incurred after the Petition Date, of preserving the Estate and operating the business of the Diocese; (b) Professional Fee Claims; (c) any Claim specified in section 503(b)(9) of the Bankruptcy Code; and (d) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code.

   **1.1.9**  ***Administrative Claims Bar Date*** means the deadline for filing requests for payment of Administrative Claims, as follows: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

   **1.1.10**  ***Agent*** means: any past and present employee; officer; director; managing agent or other agent; shareholder; principal; teacher; staff; member; board member; administrator; priest; deacon; brother, sister, nun, or other member of a religious order; clergy; Person bound by a monastic vow; volunteer; attorney; claim handling administrator; and representatives of a Person, in each case in their capacities as such.

   **1.1.11**  ***Allocation Protocol*** means the protocol for allocation of the Abuse Claims Settlement Fund to provide fair and equitable treatment for all Abuse Claims, which will be attached to the Plan Supplement as **<u>Exhibit 1</u>**.

   **1.1.12**  ***Allowed*** means, with respect to any Non-Abuse Claim or any portion thereof, a Claim or portion thereof: (a) that has been allowed by a Final Order; (b) which is included on the Diocese's Schedules as not disputed, not contingent, and not unliquidated, for which no proof of claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Deadline; (c) as to which a proof of claim in a liquidated and non-contingent amount has been timely Filed and as to which no objection has been Filed by the Claims Objection Deadline or any objection has been settled or withdrawn, or has been denied by a Final Order; or (d) that is expressly allowed by the terms of this Plan. For the avoidance of doubt, it is expressly understood that Abuse Claims shall not be deemed allowed or disallowed by operation of the Plan.

   **1.1.13**  ***Appeal*** means the appeal of the Bankruptcy Court's *Decision and Order Denying Motion of Diocese Seeking to Enjoin the Prosecution of State Court Actions Against Independent Catholic Corporations and Dismissing Complaint* currently pending before the District Court in *The Diocese of Rochester v. AB 100 Doe, et al.*, Case No. 22-cv-06262-CJS.

   **1.1.14**  ***ASA*** means the New York Adult Survivors Act, which was codified in the New York Civil Practice Law & Rules 214-j. The Adult Survivors Act created a one-year window from November 24, 2022 to November 23, 2023 for the revival of previously time-barred civil claims concerning Abuse that occurred after the Claimant reached eighteen years of age.

   **1.1.15**  ***Avoidance Action*** means any (i) state law fraudulent transfer claim; (ii) claim pursuant to sections 502(d), 541-545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code against any Person; and (iii) claim pursuant to section 510 N.Y. Business Corporation Law or any law of similar effect.

   **1.1.16**  ***Ballot*** means the ballots accompanying the solicitation materials upon which Holders of Impaired Claims entitled to vote may, among other things, indicate their acceptance or rejection of this Plan in accordance with the procedures governing the solicitation of votes on this Plan.

1.1.17    **Bankruptcy Code** means title 11 of the United States Code, as now in effect or hereafter applicable to the Chapter 11 Case.

1.1.18    **Bankruptcy Court** means the United States Bankruptcy Court for the Western District of New York (Rochester Division) and any Court having competent jurisdiction to hear appeals or *certiorari* proceedings therefrom, or any successor thereto that may be established by any act of Congress, or otherwise, and which has competent jurisdiction over the Chapter 11 Case or the Plan.

1.1.19    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended.

1.1.20    **Bar Date** means August 13, 2020 at 11:59 p.m. (Eastern time), the deadline by which proof of claim forms for prepetition Claims, including Abuse Claims, were required to be Filed against the Diocese.

1.1.21    **Business Day** means any day of the calendar week, except Saturday, Sunday, a "legal holiday" as defined in Bankruptcy Rule 9006(a), any day on which commercial banks are authorized or required by law to close in Rochester, New York, and any day on which the Diocese's business offices are closed in observance of a religious holiday.

1.1.22    **Cash** means cash and cash equivalents including, without limitation, checks and wire transfers.

1.1.23    **Channeled Claim** means an Abuse Claim, an Inbound Contribution Claim, an Insurer Contribution Claim, a Medicare Claim, a Direct Action Claim, an Extra-Contractual Claim, or any other Claim against any Protected Party arising from or related in any way to an Abuse Claim or any of the Settling Insurer Policies, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, including without limitation all Claims by way of direct action, subrogation, contribution, indemnity, alter ego, statutory or regulatory action, or otherwise, Claims for exemplary or punitive damages, for attorneys' fees and other expenses, or for any equitable remedy.  A Channeled Claim includes any Claim against a Protected Party based on allegations that it is an alter ego of a Person that is not a Protected Party or that the Protected Party's corporate veil should be pierced on account of Claims against a Person that is not a Protected Party or based on any other theory under which the legal separateness of any Person and any other Person may be disregarded to impose liability for a claim on either such Person.  For the avoidance of doubt and notwithstanding anything to the contrary herein, Channeled Claims do not include any Claims to the extent they are asserted against Excluded Parties or Non-Settling Insurers; *provided*, *however*, any Claims which assert liability against an Excluded Party or Non-Settling Insurer in conjunction with a Protected Party shall be Channeled Claims to the extent they assert liability against such Protected Party.

1.1.24    **Channeling Injunction** is the injunction contained in Section 12.3 of this Plan.

1.1.25    **Chapter 11** means chapter 11 of the Bankruptcy Code.

1.1.26    **Chapter 11 Case** means the above-captioned bankruptcy case.

1.1.27 ***Claimant*** means any Person who alleges or alleged any Claim.

1.1.28 ***Claim*** means a claim, as that term is defined in section 101(5) of the Bankruptcy Code, including, without limitation, any claim, Action, assertion of right, complaint, cross-complaint, counterclaim, liabilities, obligations, rights, request, allegation, mediation, litigation, direct action, administrative proceeding, cause of action, Lien, encumbrances, indemnity, equitable indemnity, right of subrogation, equitable subrogation, defense, injunctive relief, controversy, contribution, exoneration, covenant, agreement, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorney's fee, obligation, order, affirmative defense, writ, demand, inquiry, request, directive, obligation, proof of claim in a bankruptcy proceeding or submitted to a trust established pursuant to the Bankruptcy Code, government claim or Action, settlement, and/or any liability whatsoever, whether past, present, or (to the extent it arises prior to the Effective Date) future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct, indirect or otherwise consequential, whether in law, equity, admiralty, under the Bankruptcy Code, or otherwise, whether currently known or unknown, whether compromised, settled, or reduced to a consent judgment, that may exist now or hereinafter for property damages, compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages), punitive damages, bodily injury, personal injury, public and private claims, or any other right to relief whether sounding in tort, contract, extra-contractual or bad faith, statute, strict liability, equity, nuisance, trespass, statutory violation, wrongful entry or eviction or other eviction or other invasion of the right of private occupancy, and any amounts paid in respect of any judgment, order, decree, settlement, contract, or otherwise.

1.1.29 ***Claim Objections*** means all objections to Abuse Claims Filed prior to the Effective Date.

1.1.30 ***Class*** means a class or category of Claims as classified and described in Section 2 of this Plan.

1.1.31 ***Class 1 Claim*** means the Secured Claim held by The Bank of Castile.

1.1.32 ***Class 2 Claim*** means a Pass-Through Claim.

1.1.33 ***Class 3 Claim*** means a General Unsecured Claim that is not an Abuse Claim.

1.1.34 ***Class 4 Claim*** means an Abuse Claim.

1.1.35 ***Class 5 Claim*** means an Inbound Contribution Claim.

1.1.36 ***Class 6 Claim*** means an Insurer Claim.

1.1.37 ***CNA*** means Continental Insurance Company, successor by merger to Commercial Insurance Company of Newark, New Jersey and Firemen's Insurance Company of Newark, New Jersey.

*1.1.38* **CNA Administrative Claim** means CNA's claim against the Diocese arising out of the Diocese's breach of the Prior Insurance Settlement Agreement.

*1.1.39* **CNA Cash Contribution** means the sum of $75 million United States dollars (US$75,000,000.00) to be contributed by Continental to the Trust on the Consummation Date.

*1.1.40* **CNA Protected Parties** means (a) CNA, (b) each of its past, present, and future parents, subsidiaries, affiliates, and divisions, (c) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions, and acquired companies, (d) each of the foregoing Persons' respective past, present, and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators, and (e) each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through, or in concert with them.

*1.1.41* **CNA Settlement** means the full and final settlement and release of all Claims by or against CNA asserted by any Entity, in consideration of the CNA Cash Contribution, as described in Section 5.1 of the Plan.

*1.1.42* **Committee** means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Case, as constituted from time to time, but does not mean the members of the Committee in their individual capacities.

*1.1.43* **Confirmation Date** means the date the Confirmation Order is entered by the clerk of the Bankruptcy Court on the Bankruptcy Court's docket.

*1.1.44* **Confirmation Hearing** means the hearing on confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

*1.1.45* **Confirmation Order** means the order entered by the Court confirming this Plan in accordance with Chapter 11 of the Bankruptcy Code.

*1.1.46* **Consummation Date** means (a) the later of 30 days after the Effective Date or 30 days after the Settling Insurers receive all information necessary to pay the Insurance Settlement Amounts, including without limitation a Form W-9, or (b) such other date as agreed by the Plan Proponent.

*1.1.47* **Court** means the Bankruptcy Court, the District Court, or any court with appellate jurisdiction over any order entered by the Bankruptcy Court and/or the District Court in the Chapter 11 Case, as applicable.

*1.1.48* **Creditor** means a holder of a Claim.

*1.1.49* **CVA** means New York Child Victim's Act, which was codified in the New York Civil Practice Law & Rules 214-g. The CVA created a one-year window from August 14, 2019 to August 13, 2020 for the revival of previously time-barred civil claims related to childhood sexual abuse, which was subsequently extended to August 13, 2021.

*1.1.50* **Diocese** means The Diocese of Rochester, the debtor and debtor in possession in this Chapter 11 Case.

*1.1.51* **Diocese Discharge** means the complete extinguishment of the liability of the Diocese in respect to any Claim or debt, as and to the extent further described in Section 12 of the Plan.

*1.1.52* **Diocese Protected Parties** means (a) the Diocese, (b) the Parishes, (c) any and all named insureds, additional insureds, insureds, and any Entity alleged to be covered under the Insurance Policies with respect to which the Diocese has authority to release Claims by a Final Order pursuant to §§ 105(a) or 363(f) of the Bankruptcy Code and/or confirming this Plan, (d) each of the past, present, and future holding companies, merged companies, related companies, divisions, and acquired companies of the Diocese, and each of their respective predecessors, successors, and assigns, each in their capacity as such, but excluding, however, (i) any individual who perpetrated an act of Abuse that forms the basis of an Abuse Claim with respect to that Abuse Claim solely in his capacity as an individual abuser, (ii) any archdiocese or diocese other than the Diocese itself, or (iii) any religious order.

*1.1.53* **Direct Action Claim** means any Claim by any Entity against any Settling Insurer that is identical or similar to, or relating to, any Abuse Claim, whether arising by contract, in tort, or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action against an insurer. Notwithstanding the foregoing, Direct Action Claims do not include any claim that a Settling Insurer may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Insurer to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such.

*1.1.54* **Disallowed** means, with respect to a Claim, or any portion thereof, that such Claim or portion thereof: (a) has been disallowed by either a Final Order or pursuant to a settlement or stipulation between the Diocese and the holder of the Claim; or (b)(i) is valued on the Diocese's Schedules at zero dollars ($0) or denominated as contingent, disputed or unliquidated and (ii) as to which a bar date has been established but no proof of claim has been Filed or deemed timely Filed pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.

*1.1.55* **Disputed** means, with respect to a Claim, or any portion thereof, that such Claim or portion thereof is neither an Allowed Claim nor a Disallowed Claim, and includes, without limitation, all Abuse Claims and Inbound Contribution Claims together with any Non-Abuse Claim that: (a) is not included on the Diocese's Schedules or is reflected on the Schedules as being valued at zero dollars, or as contingent, unliquidated or disputed; or (b) is the subject of an objection Filed in the Bankruptcy Court that has not been withdrawn or overruled by a Final Order of the Bankruptcy Court.

*1.1.56* **Disclosure Statement** means the Disclosure Statement to accompany this Plan dated _____, 2023 as altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

*1.1.57* **Distribution** means any payment to the holder of a Claim as provided in

this Plan.

1.1.58    **District Court** means the United States District Court for the Western District of New York.

1.1.59    **Donor Restrictions** means, with respect to any charitable assets in the Diocese's possession or control, any donor imposed restrictions upon the use of such assets.

1.1.60    **DOR Entities' Cash Contribution** means the sum of $55 million United States dollars (US$55,000,000.00), to be contributed by or on behalf of the Diocese and the Participating Parties to the Trust and used to fund the payment of Abuse Claims (except Future Claims) and Trust Expenses pursuant to the Plan and the Trust Agreement.

1.1.61    **DOR Entities' Post-Effective Date Costs** means all fees and expenses reasonably incurred by the Diocese, the Reorganized Diocese, or the Participating Parties in connection with ~~performing any of their respective duties or obligations under the Plan with respect to any Abuse Claims or Insurance Claims, including, without limitation, in connection with (a) responding to and defending against any legal action taken by any Tort Claimants with respect to Tort Claims, or (b)~~, or upon request by the Trustee or the Abuse Claims Reviewer, assisting with the administration of the Allocation Protocol.   For the avoidance of doubt, ~~such costs include any costs and expenses reasonably incurred by~~ the Diocese, the Reorganized Diocese, ~~or~~and the Participating Parties ~~in connection with such efforts, or in connection with any depositions, discovery, or other litigation matters relating in any way to the Abuse Claims or Insurance Claims, including, without limitation, any attorney's fees, expert fees, and other costs and expenses.~~will have the right to defend Tort Claims, but solely at their own expense.

1.1.62    **DOR Entities' Post-Effective Date Costs Procedures** means the procedures set forth in Section ~~8.11~~8.9 of the Plan for the payment of DOR Entities' Post-Effective Date Costs.

1.1.63    **DOR Entities' Post-Effective Date Cost Reserve** means a portion of the Trust Reserve held in a separate, segregated account established by the Trust exclusively for payment of DOR Entities' Post-Effective Date Costs, which shall be ~~funded in the initial amount of~~ $~~600,000~~75,000.

1.1.64    **Effective Date** means (a) the last Business Day of the month in which (i) all conditions to effectiveness of this Plan have been satisfied or waived in accordance with Section 11.1 and (ii) no stay of the Confirmation Order is in effect, *provided, however* that if the first date on which all conditions to effectiveness or of the Plan have been satisfied or waived occurs on or after the twentieth (20th) day of such month, the Effective Date shall occur on the last Business Day of the immediately following month, or (b) such other date as agreed by the Plan Proponent.

1.1.65    **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.66    **Estate** means the Estate of the Diocese created by the Diocese's Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.1.67    **Excess Recovery Amount** has the meaning ascribed to it in Section

4.4.1(c)(ii) of the Plan.

*1.1.68*      **Excluded Party** means, except to the extent they are a Participating Party: (a) any individual who personally committed an act of Abuse that resulted or would result in an Abuse Claim against the Diocese or a Participating Party, (b) the Holy See, (c) any religious order (notwithstanding whether such religious order may have operated a Parish or School that is a Participating Party), or (d) any other entity that is an affiliate of or associated with the Roman Catholic Church (other than the Diocese, the Reorganized Diocese, the Participating Parties and their respective Related Persons).

*1.1.69*      **Exculpated Parties** means, collectively: (a) the Diocese; (b) the Reorganized Diocese; (c) the Settling Insurers; (d) the Mediators; ~~and~~ (e) the Unknown Claimant Representative; and (f) with respect to each of the foregoing Persons or Entities in clauses (a) through (~~d~~e), such Person's or Entity's Related Persons, in each case in their capacity as such; provided, however, that notwithstanding anything to the contrary herein, no Excluded Party may be an Exculpated Party.

*1.1.70*      **Extra-Contractual Claim** means any Claim against any Settling Insurer, in its capacity as an Insurer, seeking any type of relief other than coverage or benefits under the Insurance Policies. Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging with respect to (i) any Insurance Policy; (ii) any Claim allegedly or actually covered under an Insurance Policy; or (iii) the conduct of a Settling Insurer with respect to (i) or (ii): (a) bad faith; (b) failure to provide insurance coverage under any Insurance Policy; (c) failure or refusal to compromise and settle any Claim insured under any Insurance Policy; (d) failure to act in good faith; (e) violation of any covenant or duty of good faith and fair dealing; (f) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (g) violation of any unfair claims practices act or similar statute, regulation or code; (h) any type of misconduct; or (i) any other act or omission of any type by a Settling Insurer for which the Claimant seeks relief other than coverage or benefits under an Insurance Policy. Extra-Contractual Claims include all Claims relating to the Settling Insurers' (x) handling of any Claims under the Insurance Policies, (y) conduct in negotiating the Prior Insurance Settlement Agreement, the Insurance Settlements, and/or the Plan, and (z) conduct in the settlement of any Claims. Notwithstanding the foregoing, Extra-Contractual Claims do not include any claim that a Settling Insurer may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Insurer to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such.

*1.1.71*      **Fee Notice** has the meaning ascribed to it in Section 8.9.2 of this Plan.

*1.1.72*      **File** or **Filed** means properly filed with the clerk of the Bankruptcy Court in the Chapter 11 Case, as reflected on the official docket of the clerk of the Bankruptcy Court for the Chapter 11 Case or the actual delivery of proofs of claim in paper or electronic form to Stretto in accordance with the terms of the Bankruptcy Court's *Order Establishing a Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 425].

*1.1.73*      **Final Judgment** has the meaning ascribed to it in Section 4.4.1(c) of this Plan.

*1.1.74*      **Final Order** means an order or judgment that has not been reversed,

vacated, or stayed and as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, or move to review, reargue, or rehear shall have been waived in writing or, in the event that an appeal, writ of *certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or reargument or rehearing has been denied, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion pursuant to sections 502(j) or 1144 of the Bankruptcy Code, or Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court or federal rules of civil procedure or practice may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

     *1.1.75*     **First State** means First State Insurance Company.

     *1.1.76*     **First State Protected Parties** means (a) First State; (b) each of its past, present, and future parents, subsidiaries, affiliates, and divisions; (c) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions, and acquired companies; (d) each of the foregoing Persons' respective past, present, and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators; and (e) each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through, or in concert with them.

     *1.1.77*     **First State Settlement** means the settlement in principle agreed to as between First State and the Diocese, pursuant to which First State will contribute $750,000.00 United States dollars (US$750,000.00) to the Trust, as set forth in the First State Settlement Documents.

     *1.1.78*     **First State Settlement Documents** means Exhibit 10 to the Plan Supplement.

     *1.1.79*     **General Unsecured Claim** means a Claim against the Diocese of any kind or nature including, without limitation, on account of trade credit, contract, personal injury (other than personal injury arising from or related to Abuse), or arising from the rejection of an executory contract or unexpired lease, that (a) is not secured by property of the Estate or otherwise entitled to treatment as a secured claim under section 506 of the Bankruptcy Code; (b) is not otherwise entitled to priority under sections 503 or 507 of the Bankruptcy Code; and (c) is not otherwise an Abuse Claim, Administrative Claim, Professional Fee Claim, Claim for U.S. Trustee Fees, Priority Tax Claim, Non-Tax Priority Claim, Secured Claim, or Pass-Through Claim.

     *1.1.80*     **Impaired** means, with respect to any Class, that such Class is "impaired" under the Plan within the meaning of section 1124 of the Bankruptcy Code.

     *1.1.81*     **Inbound Contribution Claim** means any Claim against the Diocese or any Participating Party asserting rights of contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, allocation, reallocation, reimbursement, or any other direct, indirect or derivative recovery, arising from or related to any Abuse Claim.

1.1.82 **_Injunctions_** means, collectively, the Discharge Injunction, the Channeling Injunction, and the Supplemental Settling Insurer Injunction.

1.1.83 **_Insurance Claims_** means all Claims, causes of action and enforceable rights of an Abuse Claimant, the Diocese and any Participating Party against any Non-Settling Insurer whether sounding in contract, tort, or otherwise, including equity and bad faith, held by: (a) the Diocese for any reason related to any Abuse Claim including those for (i) indemnity and payment of any Abuse Claim; (ii) any Non-Settling Insurer's failure or refusal to provide insurance coverage for any Abuse Claim under any Insurance Policy; (iii) any Non-Settling Insurer's tortious or wrongful claims handling including the failure or refusal of any Non-Settling Insurer to timely compromise and settle any Abuse Claims against the Diocese pursuant to any Insurance Policy; (iv) to the extent not otherwise encompassed by section (iii) above, any Non-Settling Insurer's failure or refusal to reasonably settle the Abuse Claims; and (v) the interpretation or enforcement of the terms of any Insurance Policy as it pertains to any of the foregoing; and/or (b) any of the Participating Parties or Settling Insurers for any reason related to any Abuse Claim against the Participating Party or Settling Insurer, whether independently or jointly liable with the Diocese on such Abuse Claim, including for (i) indemnity and payment of any Abuse Claim; (ii) any Non-Settling Insurer's failure or refusal to provide insurance coverage under any Insurance Policy for any Abuse Claim against the Diocese, a Participating Party or a Settling Insurer; (iii) any Non-Setting Insurer's tortious or wrongful claims handling including the failure or refusal of any Non-Settling Insurer to timely compromise and settle any Abuse Claims against the Diocese, a Participating Party, or a Settling Insurer pursuant to any Insurance Policy; (iv) to the extent not otherwise encompassed by section (iii) above, any Non-Settling Insurer's failure or refusal to reasonably settle the Abuse Claims; and (v) the interpretation or enforcement of the terms of any Insurance Policy as it pertains to any of the foregoing. The term "Insurance Claim" also includes any Claims or causes of action for reimbursement of DOR Entities' Post-Effective Date Costs under any Insurance Policy, but only to the extent such DOR Entities' Post-Effective Date Costs are actually paid by the Trust.

1.1.84 **_Insurance Claim Proceeds_** means any amount recovered by the Trust in respect of any Insurance Claims assigned pursuant to the terms of this Plan.

1.1.85 **_Insurance Coverage Adversary Proceeding_** means the adversary proceeding commenced by the Diocese before the Bankruptcy Court on November 14, 2019, captioned as _The Diocese of Rochester v. The Continental Insurance Company, Certain Underwriters at Lloyd's, London, Certain London Market Companies, The Dominion Insurance Company Limited, Stronghold Insurance Company Limited, CX Reinsurance Company Limited, Markel International Insurance Company Limited, Tenecom Limited, National Surety Corporation, Interstate Fire & Casualty Company, Colonial Penn Insurance Company, and HDI Global Specialty SE_, Adv. Pro. No. 19-02021.

1.1.86 **_Insurance Interest_** means the Diocese's and/or any Participating Party's interest in any Insurance Policy.

1.1.87 **_Insurance Policy_** means any known or unknown contract, binder, certificate, or policy of insurance or certificate of liability coverage that any Insurer issued, subscribed any interest in, or has underwritten any risk in, in effect on or before the Effective Date, which actually, allegedly, or potentially provides liability coverage for the Diocese and/or any Participating Party, or any of their respective Affiliates, successors, or assigns, with respect to any Abuse Claim.

1.1.88 **_Insurance Settlements_** means, collectively, the CNA Settlement, the First

- 11 -

State Settlement, the Interstate Settlement, the LMI Settlement, and the Underwriters Settlement.

      *1.1.89*      **Insurance Settlement Amount** means the settlement amount to be paid by each Settling Insurer pursuant to each Insurance Settlement to which it is a party, including, for the avoidance of doubt, the CNA Cash Contribution.

      *1.1.90*      **Insurer** means a Person (including all of its Affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in an Insurance Policy.

      *1.1.91*      **Insurer Contribution Claim** means any Claim by an Insurer against a Settling Insurer for defense, indemnity, reimbursement, contribution, subrogation, or similar relief that directly or indirectly relates to an Abuse Claim. Notwithstanding the foregoing, Insurer Contribution Claims do not include any claim that a Settling Insurer may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Insurer to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such.

      *1.1.92*      **Insurer Protected Parties** means the CNA Protected Parties, the First State Protected Parties, the Interstate Protected Parties, the LMI Protected Parties, and the Underwriters Protected Parties.

      *1.1.93*      **Interstate** means, collectively, Interstate Fire & Casualty Company and National Surety Corporation.

      *1.1.94*      **Interstate Protected Parties** means (a) Interstate; (b) each of its past, present, and future parents, subsidiaries, affiliates, and divisions; (c) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions, and acquired companies; (d) each of the foregoing Persons' respective past, present, and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators; and (e) each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through, or in concert with them.

      *1.1.95*      **Interstate Settlement** means the settlement in principle agreed to as between Interstate and the Diocese, pursuant to which Interstate will contribute $50,000,000.00 United States dollars (US$50,000,000.00) to the Trust, as set forth in the Interstate Settlement Documents.

      *1.1.96*      **Interstate Settlement Documents** means Exhibit 9 to the Plan Supplement.

      *1.1.97*      **Joint Tortfeasor** means any Person, who is not a Participating Party, and is alleged to be a joint tortfeasor with the Diocese and/or any Participating Party in connection with the Abuse relating to an Abuse Claim.

      *1.1.98*      **Lien** means any "lien" as defined in section 101(37) of the Bankruptcy Code.

1.1.99     **LMI** means Certain Underwriters at Lloyd's, London subscribing to Policy Nos. SL 3209 SL 3675, ISL 3090, ISL 3410, ISL 3861, SL 3380, SL 3556, SL 3693, SL 3830, ISL 3092, ISL 3643, ISL 3809, SL 3210, SL 3676, ISL 3091, and ISL 3567, Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Company Ltd), RiverStone Insurance (UK) Limited (as successor in interest to Terra Nova Insurance Company Ltd and as successor in interest to Sphere Drake Insurance Ltd), Sompo Japan Nipponkoa Insurance Company of Europe Limited (formerly known as The Yasuda Fire & Marine Insurance Company), and Dominion Insurance Company Ltd., who subscribed to Insurance Policies providing coverage to the Diocese and other Participating Parties.

1.1.100     **LMI Protected Parties** means (a) LMI; (b) each of its past, present, and future parents, subsidiaries, affiliates, and divisions; (c) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions, and acquired companies; (d) each of the foregoing Persons' respective past, present, and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators; and (e) each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through, or in concert with them.

1.1.101     **LMI Settlement** means the settlement in principle agreed to as between LMI and the Diocese, pursuant to which LMI will contribute $19.5 million United States dollars (US$19,500,000) to the Trust, as set forth in the LMI Settlement Documents.

1.1.102     **LMI Settlement Documents** means Exhibit 7 to the Plan Supplement.

1.1.103     **Mediators** means the Honorable Gregg W. Zive, United States Bankruptcy Judge for the District of Nevada, and Mr. Paul J. Van Osselaer.

1.1.104     **Medicaid** means medical assistance provided under a state plan approved under title XIX of the Social Security Act.

1.1.105     **Medicare** means the health insurance program for the aged and disabled under title XVIII of the Social Security Act.

1.1.106     **Medicare Beneficiary** means an individual who is entitled to Medicare benefits and/or who has been determined to be eligible for Medicaid.

1.1.107     **Medicare Claim** means any and all Claims by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other Agent or successor Person charged with responsibility for monitoring, assessing, or receiving reports made under the MMSEA and pursuing Claims under MSPA, relating to any payments in respect of any Abuse Claims, including Claims for reimbursement of payments made to Abuse Claimants, who recover or receive any Distribution from the Trust, and Claims relating to reporting obligations.

1.1.108     **MMSEA** means section 111 of the "Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173)" which imposes reporting obligations on those Persons with payment obligations under the MSPA.

1.1.109 **MSPA** means 42 U.S.C. § 1395y, *et seq.*, or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto.

1.1.110 **Non-Abuse Claim** means any Claim against the Diocese that is not an Abuse Claim or Inbound Contribution Claim.

1.1.111 **Non-Settling Insurance Assignment** means the assignment and transfer to the Trust of (a) the Insurance Claims, (b) the Non-Settling Insurer Policies, and (c) all rights and interests in the proceeds of (a) and (b).

1.1.112 **Non-Settling Insurer** means any Insurer that is not a Settling Insurer. CNA is not aware of the existence of any Non-Settling Insurers.

1.1.113 **Non-Settling Insurer Policy** means any Insurance Policy issued by a Non-Settling Insurer. CNA is not aware of the existence of any Non-Settling Insurer Policies.

1.1.114 **Non-Tax Priority Claim** means a Claim against the Diocese, other than an Administrative Claim, Priority Tax Claim, or Professional Fee Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

1.1.115 **Other Catholic Organization** means a Person that is, or allegedly is, insured or covered under a Settling Insurer Policy, but does not include the Diocese, a Parish, or a School.

1.1.116 **Outbound Contribution Claim** means any Claim or cause of action related to an Abuse Claim that may be asserted by the Diocese or any Participating Party against any Person that is not a Protected Party.

1.1.117 **Parish** means any past or present Roman Catholic parish located within the geographical territory of the Diocese or subject to the canonical jurisdiction of the Bishop of Rochester, together with any corporation or other entity recognized under civil law that holds title to temporal property for, or on behalf of, any such parish.

1.1.118 **Participating Party** means all Parishes, all Schools, and those Other Catholic Organizations and other entities listed on **Exhibit A** attached hereto. Neither the Reorganized Debtor nor any Settling Insurer shall be a Participating Party. For the avoidance of doubt, except to the extent they may be listed on **Exhibit A**, Excluded Parties are not Participating Parties.

1.1.119 **Pass-Through Claim** means any Disputed Non-Abuse Claim which the Diocese elects to treat as a Pass-Through Claim pursuant to the terms of the Plan.

1.1.120 **Payment Reserve** has the meaning ascribed to it in the Allocation Protocol.

1.1.121 **Person** means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, estate,

- 14 -

unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Diocese, the Reorganized Diocese and the Participating Parties.

       *1.1.122*      ***Petition Date*** means September 12, 2019.

       *1.1.123*      ***Plan*** means this Chapter 11 Plan of Reorganization dated August 31, 2023 as it may be altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

       *1.1.124*      ***Plan Documents*** means the Plan and the Disclosure Statement, all exhibits and schedules attached thereto, and all Plan Supplements, either in their present form or as each may be amended, supplemented or otherwise modified from time to time.

       *1.1.125*      ***Plan Proponent*** means CNA.

       *1.1.126*      ***Plan Supplement*** means one or more supplements to the Plan to be Filed with the Bankruptcy Court in advance of the Confirmation Hearing which shall contain the Allocation Protocol, the form of Abuse Claim Release Agreement, the form of Trust Agreement, a list of known Insurance Policies, the Diocese's non-monetary commitments, and any Insurance Settlement entered into prior to the Confirmation Date, all in form and substance acceptable to the Plan Proponent in its sole discretion, as well as a list of all executory contracts and leases designated by the Diocese in its sole discretion to be assumed or assumed and assigned to the Reorganized Diocese pursuant to the Plan.

       *1.1.127*      ***Post-Effective Date Insurance Obligations*** means those duties or obligations (if any) required of the Diocese and/or any Participating Party under any Insurance Policy issued by a Non-Settling Insurer, on and after the Effective Date.

       *1.1.128*      ***Prior Rule 9019 Approval Motion*** means that certain *Motion to Approve Proposed Insurance Settlements to Fund Survivor Compensation Trust* filed by the Diocese at Docket No. 1538 in the Chapter 11 Case and at Docket No. 190 in the Insurance Coverage Adversary Proceeding.

       *1.1.129*      ***Prior Insurance Settlement Agreement*** means the settlement agreement entered into between the Diocese and CNA that was the subject of the Prior Rule 9019 Approval Motion.

       *1.1.130*      ***Priority Tax Claim*** means any Claim against the Diocese entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, but only to the extent it is entitled to priority under such subsection.

       *1.1.131*      ***Professional Fee Claim*** means a Claim against the Diocese for compensation for legal or other professional services and related reimbursement of expenses under sections 327, 328, 330(a), 331 or 503(b) of the Bankruptcy Code.

       *1.1.132*      ***Professionals*** means all professionals employed in the Chapter 11 Case pursuant to sections 327, 328 or 1103 of the Bankruptcy Code.

       *1.1.133*      ***Protected Parties*** means the Diocese, the Reorganized Diocese, the

- 15 -

Participating Parties, the Insurer Protected Parties, any Settling Insurer Covered Persons, and their respective Related Persons.

1.1.134 **Redacted Information** means names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the Abuse Claimants, and the names of the guardians, conservators, and/or other personal representatives, as applicable.

1.1.135 **Related Person** means, with respect to any person or entity, in each case solely in its capacity as such, such person's or entity's (a) predecessors, successors, assigns, subsidiaries, and affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, Agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) respective heirs, executors, Estate, and nominees; *provided, however*, that no person or entity shall be a Related Person if such person or entity is an Excluded Party.

1.1.136 **Release** means the release of the Protected Parties from all Claims.

1.1.137 **Reorganized Diocese** means a new corporation, formed in accordance with Article 5 of the New York Religious Corporations Law, which pursuant to the Plan shall take title to the Residual Assets on and after the Effective Date. For the avoidance of doubt, the formation of the Reorganized Diocese shall not discharge or waive the Diocese's liability for any Tort Claim, for which a Tort Claimant may have recourse pursuant to the Plan and Plan Documents.

1.1.138 **Residual Assets** means, after payment of the Diocese's share of the DOR Entities' Cash Contribution, the Non-Settling Insurance Assignment, and the transfer of Outbound Contribution Claims to the Trust, and except for any Insurance Policies to be retained by the Diocese pursuant to Section 7.5, all residual property and assets of the Diocese and/or the Estate, including all charitable assets subject to Donor Restrictions, all property to which the Diocese holds legal title only, and all rights with respect to any Avoidance Actions or other causes of action belonging to the Diocese or its Estate.

1.1.139 **Schedules** means the schedules of assets and liabilities and the statement of financial affairs Filed by the Diocese in this Chapter 11 Case on November 19, 2019 [Docket No. 237], as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as amended or supplemented through the Effective Date.

1.1.140 **School** means a past or present Catholic school owned by the Diocese or any Participating Party, including those identified as such on **Exhibit A** attached hereto, but does not include schools owned by any Excluded Party.

1.1.141 **Secured** means, with respect to any Claim against the Diocese, a Claim to the extent (a) secured by a Lien on property of the Estate (i) as set forth in the Plan; (ii) as agreed to by the holder of such Claim and the Diocese; or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code but, with respect to both of the foregoing clauses (a) and (b), only to the extent of the value of the interest of such holder in the Estate's interest in the property securing

such Claim or the amount subject to setoff, as applicable.

1.1.142 **Settling Insurer** means each of CNA, First State, Interstate, LMI, and Underwriters. A Settling Insurer's predecessors, successors, and assigns shall receive the benefits and protections afforded to a Settling Insurer under the Plan, but only to the extent that: (i) such predecessor's liability was assumed by the Settling Insurer, and not independent of the liability of such Settling Insurer; and (ii) such successor's or assign's liability is derivative of the liability of the Settling Insurer and not independent of the liability of the Settling Insurer.

1.1.143 **Settling Insurer Covered Person** means any Person that has or may have a Claim to insurance coverage under a Settling Insurer Policy. For the avoidance of doubt and notwithstanding anything to the contrary herein, no Excluded Party may be a Settling Insurer Covered Person.

1.1.144 **Settling Insurer Policies** means, collectively, all Insurance Policies that are the subject of the Insurance Settlements, except to the extent such Insurance Policies provide coverage on a claims made basis with respect to occurrences on or after the Petition Date.

1.1.145 **Standby Letter of Credit** means the Irrevocable Letter of Credit in the principal amount of $460,842.00 issued by The Bank of Castile on behalf of the Diocese in favor of the New York Workers' Compensation Board to secure the Diocese's obligations to certain legacy workers' compensation claimants.

1.1.146 **Stretto** means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims and noticing agent for the Diocese.

1.1.147 **Supplemental Settling Insurer Injunction** is the injunction contained in Section 12.4 of this Plan.

1.1.148 **Tort Claim** means an Abuse Claim as to which the holder has elected to be treated as a Tort Claimant.

1.1.149 **Tort Claimant** means an Abuse Claimant who opts to commence a lawsuit naming the Diocese or any Participating Party to adjudicate whether the Diocese or Participating Party has liability for an Abuse Claim and the amount of any such liability, as set forth in Section 4.4, but recourse shall be limited as described in Section 4.4.

*1.1.150* **Tort Defendant** *means any Person who is named as a defendant in any lawsuit brought by any Abuse Claimant in which the Abuse Claimant seeks judgment and/or damages against such Person relating in any way to alleged Abuse.*

*1.1.151* ~~1.1.150~~ **Trust** means the trust to be established pursuant to the Plan and the Trust Agreement for the satisfaction of all Abuse Claims.

*1.1.152* ~~1.1.151~~ **Trust Agreement** means the trust agreement establishing and governing the Trust, as it may be amended.

*1.1.153* ~~1.1.152~~ **Trust Assets** means the following assets and any income, profits,

- 17 -

and proceeds derived from such assets subsequent to the transfer of such assets to the Trust: the right to receive the CNA Cash Contribution pursuant to the CNA Settlement; the right to receive the DOR Entities' Cash Contribution; the right to receive the proceeds of the First State Settlement; the right to receive the proceeds of the Interstate Settlement; the right to receive the proceeds of the LMI Settlement; the right to receive the proceeds of the Underwriters Settlement; and the right to receive the Non-Participating Insurance Assignment and all other property transferred to the Trust pursuant to this Plan, or otherwise acquired by the Trust following the Effective Date, together with any proceeds thereof. For the avoidance of doubt, the Trust Assets shall specifically exclude all of the Residual Assets.

      *1.1.154*      ~~*1.1.153*~~ **Trust Claim** means an Abuse Claim that is not a Tort Claim.

      *1.1.155*      ~~*1.1.154*~~ **Trust Claimant** means an Abuse Claimant that is not a Tort Claimant.

      *1.1.156*      ~~*1.1.155*~~ **Trust Distribution** means a Distribution by the Trust, in accordance with the provisions of the Plan, the Trust Documents, and the Confirmation Order. For the avoidance of doubt, the payment of Trust Expenses shall not be considered Trust Distributions.

      *1.1.157* ~~*1.1.156*~~      **Trust Documents** means, collectively, (a) the Trust Agreement, (b) the Allocation Protocol, and (c) any other agreements, instruments, and documents governing the establishment and administration of the Trust, which shall be materially consistent with the terms of the Plan, as the same may be amended or modified from time to time.

      *1.1.158* ~~*1.1.157*~~      **Trust Expenses** means the costs of administering the Trust, including (i) payments to the Trustee and professionals retained to represent the Trust in accordance with the terms of the Trust Agreement and (ii) the DOR Entities' Post-Effective Date Costs.

      *1.1.159*      ~~*1.1.158*~~ **Trust Reserve** means a reserve to be established by the Trustee from the DOR Entities' Cash Contribution, prior to making any Trust Distributions, sufficient to fund Trust Expenses, which shall include the DOR Entities' Post-Effective Date Cost Reserve, and which may be replenished or otherwise supplemented in the discretion of the Trustee in accordance with the provisions of the Trust Agreement.

      *1.1.160*      ~~*1.1.159*~~ **Trust Settlement Offer** has the meaning ascribed to it in Section 4.1 of this Plan.

      *1.1.161*      ~~*1.1.160*~~ **Trustee** means the trustee of the Trust, who initially will be a Person identified as such in the Confirmation Order and any successor trustee appointed pursuant to the terms of the Plan and/or Trust Agreement. The Trustee shall be selected by the Court following nominations by parties in interest in the Chapter 11 Case.

      *1.1.162*      ~~*1.1.161*~~ **Underwriters** means all underwriters, members, or Names at Lloyds, London (including former underwriters, members, or Names) who through their participation in syndicates subscribed to the following certificates: Certificate No. 18W2012, effective for the period from July 1, 2018 to July 1, 2019; Certificate No. 18XS133, effective for the period from July 1, 2018 to July 1, 2019; Certificate No. 19W2012, effective for the period from July 1, 2019 to July 1, 2020; Certificate No. 19XS133, effective for the period from July 1, 2019 to July 1, 2020; Certificate No.

20W2012, effective for the period from July 1, 2020 to July 1, 2021; Certificate No. 20XS133, effective for the period from July 1, 2020 to July 1, 2021; Certificate No. 21W2012, effective for the period from July 1, 2021 to July 1, 2022; Certificate No. 21XS133, effective for the period from July 1, 2021 to July 1, 2022.

*1.1.163* ~~*1.1.162*~~ **Underwriters Protected Parties** means (a) Underwriters; (b) each of its past, present, and future parents, subsidiaries, affiliates, and divisions; (c) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies, related companies, divisions, and acquired companies; (d) each of the foregoing Persons' respective past, present, and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators; and (e) each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through, or in concert with them.

*1.1.164* ~~*1.1.163*~~ **Underwriters Settlement** means the settlement in principle agreed to as between LMI and the Diocese, pursuant to which Underwriters will contribute $1.1 million United States dollars (US$1,100,000) to the Trust, as set forth in the Underwriters Settlement Documents.

*1.1.165* ~~*1.1.164*~~ **Underwriters Settlement Documents** means Exhibit 8 to the Plan Supplement.

*1.1.166* ~~*1.1.165*~~ **Unimpaired** means, with respect to any Class, that such Class is not Impaired.

*1.1.167* ~~*1.1.166*~~ **Unknown Abuse Claim** means an Abuse Claim for which (i) the earliest incident of Abuse occurred before the Petition Date, (ii) no Proof of Claim was filed or deemed filed on or before the Effective Date or which is not otherwise allowed by the Bankruptcy Court by the Effective Date, and (iii) which is held by a Person who at the time of the Claims Bar Date was under a disability or other condition recognized by New York law, or other applicable law, suspending the running of the statute of limitations period, that would toll the statute of limitations for such Claim.

*1.1.168* ~~*1.1.167*~~ **Unknown Abuse Claim Reserve** means the amount of $_____ set aside for the payment of Unknown Abuse Claims, as provided in the Trust Agreement.

*1.1.169* ~~*1.1.168*~~ **Unknown Abuse Claimant** means the holder of an Unknown Abuse Claim.

*1.1.170* ~~*1.1.169*~~ **Unknown Claimant Representative** means [Michael R. Hogan], for which application for appointment was made in the Chapter 11 Case by motion dated December 5, 2023 (Dkt. No. 2347).

*1.1.171* ~~*1.1.170*~~ **United States Trustee** means the Office of the United States Trustee for Region 2, which includes the Western District of New York.

*1.1.172* ~~*1.1.171*~~ **U.S. Trustee Fees** means all fees and charges assessed against the Estate of the Diocese under 28 U.S.C. § 1930 together with interest, if any, under 31 U.S.C. § 3717.

## 1.2 Interpretation: Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Section, Subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Disclosure Statement, and if not defined therein, in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, any reference in this Plan to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented or otherwise modified. If a time or date is specified for any payments or other Distribution under the Plan, it shall mean on or as soon as reasonably practicable thereafter. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral.

### 1.3 Exhibits.

All exhibits to the Plan (including those set forth in or attached as exhibits to the Plan Supplement) and any other Plan Documents are hereby incorporated by reference and made part of the Plan as if set forth fully herein.

### 1.4 Time Periods.

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

## SECTION 2. TREATMENT OF CLAIMS

### 2.1 Unclassified Claims.

*2.1.1* ***Administrative Claims.*** Administrative Claims are Claims for costs or expenses incurred in the administration of the Diocese's Chapter 11 Case, which are Allowed pursuant to section 503(b) of the Bankruptcy Code. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, including the CNA Administrative Claim, have not been classified and are treated as described in this Section 2.1 of the Plan. Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different and less favorable treatment than provided under the Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim as soon as practicable after the later of: (i) the Effective Date; or (ii) the date on which such Claim becomes an Allowed Administrative Claim. If this Plan is confirmed, the CNA Administrative Claim shall be deemed withdrawn as of the Effective Date. Notwithstanding anything in the Plan to the contrary, the holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by the holder of an Allowed Administrative Claim and the Diocese or the Reorganized Diocese.

With respect to any trade Claims arising after the Petition Date representing obligations incurred by the Diocese in the ordinary course of its business consistent with past practice, such trade Claims shall be paid in the ordinary course of business. As to other Allowed Administrative Claims, except as otherwise provided in the Plan, each holder of an Allowed Administrative Claim: (i) shall be paid by the Reorganized Diocese as soon as reasonably practicable after the Effective Date or on the date the Order allowing such Administrative Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Claim.

Administrative Claims representing obligations incurred by the Diocese after the date and time of the entry of the Confirmation Order shall not be subject to application to the Bankruptcy Court and may be paid by the Diocese or the Reorganized Diocese in the ordinary course of business and without Bankruptcy Court approval.

2.1.2 **Priority Tax Claims.** Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Diocese or the Reorganized Diocese, as applicable, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, however, that the Diocese reserves the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium. The holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising from, or in connection with any Priority Tax Claim and any demand for such penalty will be deemed Disallowed by the confirmation of the Plan.

2.1.3 **Non-Tax Priority Claims.** Unless the holder of an Allowed Non-Tax Priority Claim and the Diocese or the Reorganized Diocese (as applicable) agree to a different treatment, on, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which Non-Tax Priority Claim becomes an Allowed Claim, each holder of an such an Allowed Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, (i) Cash equal to the unpaid portion of such Allowed Claim or (ii) such other less favorable treatment as to which the Diocese or the Reorganized Diocese and the holder of such Allowed Claim shall have agreed upon in writing. The Trust shall not be responsible for payment of Non-Tax Priority Claims. Notwithstanding anything in the Plan to the contrary, the holder of an Allowed Non-Tax Priority Claim may be paid on such other date and upon such other terms as may be agreed upon by the holder of an Allowed Administrative Claim and the Diocese or the Reorganized Diocese.

2.1.4 **Professional Fee Claims.** In accordance with section 1123(a)(1) of the Bankruptcy Code, Professional Fee Claims have not been classified and are treated as described herein. All Professionals or other Persons requesting an award by the Bankruptcy Court of Professional Fee Claims (a) shall File their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 60

- 21 -

days after the Effective Date, and (b) shall be paid in full, in Cash, by the Reorganized Diocese (i) as soon as practicable after the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order; or (ii) upon such terms as may exist pursuant to order of the Bankruptcy Court or as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Diocese or the Reorganized Diocese, as applicable. The Diocese is authorized to pay its Professionals for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

Professional Fee Claims of Professionals employed by the Committee, which are incurred prior to the Effective Date of the Plan in connection with the implementation and consummation of the Plan, may be paid by the Diocese or the Reorganized Diocese, after notice and a hearing, or by the Trust from contributions by the Diocese or the Reorganized Diocese in addition to the amounts payable to Abuse Claimants under the Plan.

Professional Fee Claims of Professionals employed by the Diocese for services rendered prior to the Effective Date shall not be paid by the Trust.

2.1.5 **U.S. Trustee Fees.** U.S. Trustee Fees include all fees and charges assessed against the Diocese under 28 U.S.C. § 1930, together with interest, if any, under 31 U.S.C. § 3717. All U.S. Trustee Fees ~~not paid prior to the Effective Date~~ shall be paid by the Reorganized Diocese ~~as soon as practicable after~~on the Effective Date. ~~In no event shall the payments made to the Trust pursuant to Sections 2, 5, 7 or 8 of this Plan by any Person other than the Diocese be considered "disbursements" under 28 U.S.C. § 1930, nor shall any payment made by the Trust to any Person be considered a disbursement under 28 U.S.C. § 1930.~~

## 2.2 Classification and Specification of Treatment of Claims.

All Claims, except those described in Section 2.1, are placed in the following Classes of Claims, pursuant to section 1123(a)(1) of the Bankruptcy Code, which section specifies the treatment of such Classes of Claims and of their Impaired or Unimpaired status, pursuant to sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of the Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class. A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released, withdrawn, waived, or otherwise satisfied under this Plan. Unless this Plan expressly provides otherwise, when a Class includes a subclass, each subclass is a separate Class for all purposes under the Bankruptcy Code, including, without limitation, voting and Distribution.

Subject to all other applicable provisions of this Plan (including its Distribution provisions), classified Claims shall receive the respective treatments set forth below. This Plan will not provide any Distribution on account of a Claim to the extent that such Claim has been Disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties. Except as specifically provided in this Plan, this Plan will not provide any Distribution on account of a Claim, the payment of which has been assumed by a third party. Except as otherwise specifically provided in this Plan or by further order of the Bankruptcy Court, all treatment, allowances, or payments of Claims which have been specified or otherwise fixed or required by order of the Bankruptcy Court shall not be Impaired by this Plan and the rights of the holders of such Claims as provided in such orders shall not be altered by this Plan. Any holder of any

Claim in any Class may agree, pursuant to section 1123(a)(4) of the Bankruptcy Code, to a treatment of such Claim that is less favorable (but not more favorable) than any other Claim in such Class.

The categories of Claims listed below classify Claims for all purposes, including voting, confirmation of the Plan, and Distributions pursuant to the Plan:

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| N/A | Administrative Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | U.S. Trustee Fee Claims | No | Does Not Vote |
| 1 | Secured Claim of The Bank of Castile | No | Deemed to Accept |
| 2 | Pass-Through Claims | No | Deemed to Accept |
| 3 | General Unsecured Claims | Yes | Entitled to Vote |
| 4 | Abuse Claims | Yes | Entitled to Vote |
| 5 | Inbound Contribution Claims | Yes | Deemed to Reject |
| 6 | Insurer Claims | Yes | Entitled to Vote |

## 2.3    Classes of Claims.

### 2.3.1    *Class 1 – Secured Claim of The Bank of Castile*

**Classification:** Class 1 is composed of the Secured Claim held by The Bank of Castile in connection with the Standby Letter of Credit.

**Treatment:** The Diocese is current with respect to all obligations due under the Standby Letter of Credit. and will continue to pay those obligations in accordance with the terms of the Standby Letter of Credit. The Trust shall not be responsible for the payment of the Class 1 Claim.

**Voting:** The Class 1 Claim is Unimpaired, and therefore, the holder of the Class 1 Claim is deemed to have accepted the Plan and is not entitled to vote.

### 2.3.2    *Class 2 – Pass-Through Claims.*

**Classification:** Class 2 consists of all Pass-Through Claims.

**Treatment:** Upon the later to occur of the Effective Date and the date on which the Diocese designates a Claim as a Pass-Through Claim, the holder of such Pass-Through Claim shall be deemed to have granted relief from the automatic stay with respect to its Pass-Through Claim, such Pass-Through Claim shall not be subject to the Diocese Discharge, and the parties shall retain their respective rights, remedies, claims, and defenses as they existed on the Petition Date. The Diocese shall designate all Pass-Through Claims no later than sixty days after the Effective Date. The Trust shall not be responsible for the payment of any Pass-Through Claims.

**Voting:** Class 2 Pass-Through Claims are Unimpaired, and therefore, holders of

Class 2 Claims are deemed to have accepted the Plan and are not entitled to vote.

### 2.3.3    *Class 3 – General Unsecured Claims.*

**Classification:** Class 3 Claims consists of all General Unsecured Claims.

**Treatment:** Except to the extent the holder of an Allowed General Unsecured Claim agrees in writing to accept less favorable treatment as proposed by the Diocese or Reorganized Diocese, the Reorganized Diocese shall pay each holder of an Allowed General Unsecured Claim, Cash in two installments each equal to 50% of the Allowed amount of such General Unsecured Claim with the first payment to occur on, or as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, and the second payment to occur on, or as soon as reasonably practicable after the date that is six months after the date of the first payment. The foregoing payments shall be in full satisfaction, settlement, and release of, and in exchange for, such Allowed General Unsecured Claim. Notwithstanding anything to the contrary set forth above, no payments shall be made to any Protected Party on account of any General Unsecured Claim and all Protected Parties shall be deemed to have withdrawn any General Unsecured Claim with prejudice as of the Effective Date in consideration of the Channeling Injunction and Release provided in the Plan.

The Trust shall not be responsible for payment of General Unsecured Claims.

**Voting:** Class 3 General Unsecured Claims are Impaired, and therefore, each holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

### 2.3.4    **Class 4 – Abuse Claims**.

**Classification:** Class 4 Claims consists of all Abuse Claims.
**Treatment:**

    a.    On the Effective Date and subject to the Plan provisions, liability for all Class 4 Abuse Claims shall be permanently channeled to and assumed by the Trust without further act or deed and shall be resolved in accordance with the terms of this Plan and the applicable Trust Documents. Trust Distributions shall be made to holders of Abuse Claims on a fair and equitable basis, pursuant to and in accordance with the terms of this Plan and the applicable Trust Documents.

    b.    Class 4 Claimants shall have their Claims treated in accordance with the Allocation Protocol, *provided* that any Claims for punitive or exemplary damages will be treated as penalty Claims and will be Disallowed and receive no Distribution under the Plan. The Allocation Protocol shall provide for the fair and equitable treatment of all Abuse Claims. The Allocation Protocol shall specify that the Trust Assets, except for the initial funding of the Trust Reserve in accordance with Section 8.2.1 of the Plan and the Unknown Abuse Claim Reserve, shall be distributed to holders of Abuse Claims on a fair and equitable basis as promptly as practicable following the Effective Date.

- 24 -

c.  Except with respect to Tort Claims brought by Tort Claimants in accordance with the terms of this Plan and the applicable Trust Documents, the right of any Class 4 Claimant to a trial by jury or otherwise against the Diocese and/or any Protected Parties is waived and released upon the occurrence of the Effective Date, and any Class 4 Claim that is not a Tort Claim will be solely determined by the Abuse Claims Reviewer in accordance with the Allocation Protocol.

d.  If a Class 4 Claim is denied payment, in whole or in part, pursuant to the Allocation Protocol, the holder of such Class 4 Claim will have no rights against any of the Protected Parties relating to such Class 4 Claim.

e.  Nothing in this Plan affects, diminishes, or impairs any Class 4 Claimant's rights against any Joint Tortfeasor, including for that Joint Tortfeasor's comparative fault or joint and several liability for Abuse, if any. In any litigation against a Joint Tortfeasor, nothing in this Plan or the Plan Documents shall be deemed an adjudication of a Class 4 Claim for any purpose or a limitation on the recovery against such Joint Tortfeasor.

f.  The Diocese and the Reorganized Diocese shall cooperate with the Abuse Claims Reviewer and/or the Trustee as reasonably requested by the Abuse Claims Reviewer and/or the Trustee in connection with the administration of the Allocation Protocol, provided that any DOR Entities' Post-Effective Date Costs incurred in connection therewith are paid in accordance with the DOR Entities' Post-Effective Date Costs Procedures.

g.  Any Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the Diocese being in bankruptcy. For the avoidance of doubt, determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of the Diocese's or any Participating Party's liability or damages for Class 4 Claims, but nothing herein shall affect, diminish, or impair a Non-Settling Insurer's right to offset amounts an Abuse Claimant receives as a Trust Distribution.

h.  As of the Effective Date of the Plan, the liability of Protected Parties for all Class 4 Claims shall be fully assumed by the Trust, without any further order from the Bankruptcy Court or further action from any party, and pursuant to the Channeling Injunction set forth in Section 12.3 of the Plan. All Allowed Class 4 Claims shall be satisfied solely from the Trust as set forth in the Plan, the Trust Agreement, and the Allocation Protocol; *provided, however*, the Trust's assumption of responsibility with respect to Class 4 Claims shall not prevent Tort Claimants from asserting Tort Claims to the extent provided for herein.

i.  Following the Effective Date, no Entity, other than the Trustee or a Non-Settling Insurer may (a) object to any Class 4 Claim or (b) challenge the merit, validity, or amount of any Class 4 Claim; *provided, however*, that nothing in the Plan shall prevent the Diocese or any Participating Party from asserting any legal or

- 25 -

factual defenses they may have in response to any Tort Claim. Any objection or challenge to a Class 4 Claim pending as of the Effective Date is deemed withdrawn upon the Effective Date and shall not be refiled. With the exception of the Trustee's or a Non-Settling Insurer's objections or challenges to a Class 4 Claim, or the adjudication or settlement of a Tort Claim, Class 4 Claims shall be treated in accordance with the Allocation Protocol and shall not be subject to any other review or judicial consideration. Nothing in this Plan or the Plan Documents shall constitute an admission by any Protected Party as to the validity or amount of any Class 4 Claim, nor shall anything therein restrict the Diocese or the Participating Parties from complying with any Post-Effective Date Insurance Obligations.

j.      No Class 4 Claimant shall receive a Distribution from the Trust until such Class 4 Claimant has executed and delivered to the Trust the Abuse Claim Release Agreement attached to the Plan Supplement as **Exhibit 2**. Each Class 4 Claimant must release all Claims against the Protected Parties. The Trust must provide copies of all executed Abuse Claim Release Agreements to (a) the Protected Parties and (b) upon request, any Joint Tortfeasor that has executed a non-disclosure or confidentiality agreement.   For the avoidance of doubt, nothing herein shall require a Class 4 Claimant to release any Person that is not a Protected Party.

**Voting:** Class 4 Claims are Impaired, and each holder of a Class 4 Claim is entitled to vote to accept or reject the Plan. Only for purposes of voting, each Class 4 Claim that is not subject to a pending objection is deemed to be Allowed in the amount of $1.00.

### 2.3.5     *Class 5 – Inbound Contribution Claims.*

**Classification:** Class 5 Inbound Contribution Claims consist of any Claim asserted against the Diocese for indemnity, contribution, or reimbursement arising out of, or related to, the Claimant's liability to pay or defend any Abuse Claim.

**Treatment:** Class 5 Claims shall be Disallowed and extinguished and there will be no Distributions to the holders of Class 5 Claims on account of such Class 5 Claims.

**Voting:** Class 5 Inbound Contribution Claimants will not receive or retain any property under the Plan and therefore are deemed to have rejected the Plan. Class 5 will not vote on the Plan.

### 2.3.6     *Class 6 – Insurer Claims.*

**Classification:** Class 6 Insurer Claims consist of any Claims by CNA against the Diocese arising out of the Diocese's breach of the Prior Insurance Settlement Agreement, to the extent such Claims are deemed not to be unclassified Administrative Claims.

**Treatment:**   CNA agrees to accept the following treatment for its Class 6 Insurer Claims: if this Plan is confirmed, then on the Effective Date, in consideration of the mutual benefits of the Plan, including the protection of the injunctions and releases contained herein, CNA agrees to withdraw its Class 6 Insurer Claims; but if this Plan is not confirmed or is confirmed but does not go into effect, then CNA does not withdraw its Class 6 Insurer Claims and, instead, fully reserves

and preserves all rights to assert its Class 6 Insurer Claims against Debtor and the Estate. The foregoing shall be in full satisfaction, settlement, and release of, and in exchange for, such Allowed Insurer Claim.

**Voting:** Class 6 Claims are Impaired, and therefore, each holder of a Class 6 Claim is entitled to vote to accept or reject the Plan. Only for purposes of voting, each Class 6 Claim is deemed to be Allowed in the amount of $1.00.

## SECTION 3.    ACCEPTANCE OR REJECTION OF THE PLAN

### 3.1    Impaired Classes Vote.

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one- half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

### 3.2    Presumed Acceptance of the Plan.

Class 1 and Class 2 are Unimpaired under the Plan and are presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

### 3.3    Presumed Rejection of the Plan.

Class 5 will not receive or retain any property under this Plan and is, therefore, deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.

### 3.4    Voting Classes.

Classes 3, 4, and 6 are Impaired, and the holders of Claims in those Classes are entitled to vote to accept or reject this Plan.

### 3.5    Modification of Treatment of Class 3 Claims.

The Diocese or the Reorganized Diocese may modify the treatment of any Allowed Class 3 Claim in any manner adverse only to the holder of such Claim at any time after the Effective Date upon the consent of the holder of the Class 3 Claim whose Allowed Claim is being adversely affected, or as Allowed by Bankruptcy Court order prior to the Effective Date.

### 3.6    Elimination of Vacant Classes.

Any Class of Claims that does not have, as of the Confirmation Date, at least one Allowed Claim, or at least one Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of (i) voting on the acceptance or rejection of the Plan and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

- 27 -

**3.7** **"Cram Down" Request.**

The Plan Proponent requests confirmation of this Plan under § 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept this Plan pursuant to § 1126(c). The Plan Proponent reserves the right to modify this Plan to the extent that confirmation pursuant to § 1129(b) requires modification.

**SECTION 4. ABUSE CLAIMS**.

**4.1** **Assessment of Abuse Claims.**

Class 4 Claims will be assessed and paid in accordance with the Allocation Protocol, which is designed to provide an expeditious, efficient, and inexpensive method for settling and resolving Abuse Claims, and as set forth herein. The Abuse Claims Reviewer shall determine the eligibility and ~~amount~~points allocation of each Abuse Claim in accordance with the terms of this Plan and the applicable Trust Documents. Following ~~determination of eligibility,~~ the Abuse Claims ~~Reviewer~~Reviewer's determination of eligibility and points allocation, the Trustee shall make an offer (the "Trust Settlement Offer"), based on the determinations made by the Abuse Claims Reviewer, to each Abuse Claimant of an amount to fully resolve his or her Abuse Claim. If the Abuse Claimant accepts the Trust Settlement Offer, the Abuse Claimant becomes a Trust Claimant with a Trust Claim. Distributions to Trust Claimants on account of Trust Claims shall be made promptly from the Trust in accordance with the applicable Trust Documents.

If the Abuse Claimant rejects the Trust Settlement Offer, the Abuse Claimant becomes a Tort Claimant with a Tort Claim, as set forth in Section 4.4. The Trust shall hold in reserve an amount equal to the Trust Settlement Offer until the Tort Claimant's Tort Claim is resolved by a Final Judgment, at which point the Trust Settlement Offer shall be paid to the Abuse Claimant or released back to the Trust, as applicable, as specified in Section 4.4 and the applicable Trust Documents.

The Trust shall be the sole source of recovery for holders of Abuse Claims, including Trust Claims and Tort Claims, and no holder of an Abuse Claim shall have further recourse against the Trust, the Diocese, the Estate, the Reorganized Diocese, any Settling Insurer, or any Protected Party.

For the avoidance of doubt, Abuse Claims determined by the Abuse Claims Reviewer to be ineligible shall not be entitled to any distribution from the Trust.

**4.2** **Legal Effect of Estimation of Claims and Distributions Under the Allocation Protocol.**

The Abuse Claims Reviewer's determinations are for estimation and Distribution purposes only and shall not constitute findings or the fixing of facts or liability concerning the Abuse Claims with any binding legal effect. The determination of Abuse Claimants' qualifications, the estimation of Abuse Claims, and the payment of Trust Distributions shall not be construed as an admission of liability by the Diocese, any Participating Party, or the Trust with respect to any Abuse Claim and shall have no *res judicata* or collateral estoppel effect on the Diocese, the Reorganized Diocese, any

- 28 -

Participating Party, the Trust, or any Non-Settling Insurer. Trust Distributions do not release the Diocese nor are Trust Distributions an accord or novation of the Diocese's or any Protected Party's liability on account of the Abuse Claims.

The Trust's act of making a Distribution to an Abuse Claimant is immaterial to, and shall not be construed as, a determination or admission of the Diocese's or any Participating Party's liability for, or damages with respect to, any Abuse Claim. The determination of qualification, estimation of Abuse Claims, and the payment of Trust Distributions is not a settlement, release, accord, or novation of any Abuse Claim and cannot be used by any Joint Tortfeasor as a defense to any alleged joint liability. Neither the Abuse Claims Reviewer's review of an Abuse Claim and determination of eligibility nor payment of Trust Distributions shall constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation between or among the Diocese, the Participating Parties, Non-Settling Insurers, or any other Person. The Trust's estimation of Abuse Claims and payment of Trust Distributions does not create an admission of the fact of liability, or the extent of damages, on behalf of the Diocese and/or any Participating Parties.

**4.3**     **Trust Distributions to Abuse Claimants.**

An Abuse Claimant whom the Abuse Claims Reviewer determines to be entitled to a Distribution will receive a Distribution from the Trust in the amount(s) and at the time(s) provided for in the Allocation Protocol and Trust Documents. Any payment on an Abuse Claim constitutes a payment for damages on account of a personal physical injury or sickness arising from an occurrence, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended. For the avoidance of doubt, the Abuse Claimants' recoveries on their Claims shall be limited to their Trust Distributions, if any, under the Allocation Protocol and Trust Documents, and the Abuse Claimants shall not be entitled to collect personally, or otherwise, any additional amounts whatsoever on their Abuse Claims from the Diocese, the Reorganized Diocese, any Participating Party, or their respective assets, or from any Settling Insurers, Settling Insurer Policies, or Settling Insurers' assets, for any Abuse Claims that are Channeled Claims, even if they are denied a Trust Distribution.

**4.4**     **Litigation of Abuse Claims.**

     *4.4.1*     ***Tort Claims.***

        a.     Subject to the provisions of the Trust Documents, within 60 days after receiving the Trust Settlement Offer from the Abuse Claims Reviewer, a Tort Claimant may at the Tort Claimant's own expense commence a lawsuit naming the Diocese or any Participating Party as a defendant, for the purpose of adjudicating whether the Diocese or Participating Party has liability for an Abuse Claim and the amount of any such liability. A Tort Claim may be filed only in the U.S. District Court for the Western District of New York. The Trust has the option to defend any Tort Claim at the Trust's own expense, and the Diocese and/or Participating Party shall use reasonable efforts to cooperate.

        b.     If a court enters a final order or judgment determining that the Diocese and/or Participating Party (as applicable) does not have any liability on account of the Tort Claimant's Tort Claim, then the Tort Claimant shall not be

entitled to any Distribution from the Trust, including any Trust Settlement Offer.

c. If the Tort Claimant either (1) obtains a judgment in his or her favor on his or her Tort Claim and such judgment becomes a final order or (2) enters into a settlement with the Trustee (both (1) and (2) collectively, a "Final Judgment"), the Tort Claimant shall be entitled to a Distribution from the Trust as follows:

i. If the amount of the Final Judgment is less than or equal to the amount of the Trust Settlement Offer, the Trust shall promptly pay to the Tort Claimant the amount of the Final Judgment as full and final satisfaction of the Tort Claim.

ii. If the amount of the Final Judgment is greater than the amount of the Trust Settlement Offer, the Trust shall promptly pay to the Tort Claimant the amount of the Trust Settlement Offer. After all Tort Claims are resolved by Final Judgments, the Trust shall promptly pay to each Tort Claimant, from the Payment Reserve, the amount of his or her Final Judgment that is in excess of the Trust Settlement Offer (the "Excess Recovery Amount"); *provided*, that to the extent all Excess Recovery Amounts cannot be paid in full from the Payment Reserve, then the Trustee shall calculate and pay only each Tort Claimant's pro rata share of his or her respective Excess Recovery Amount; and *further provided*, that if any amounts remain in the Payment Reserve following payment of all Excess Recovery Amounts, the amount remaining in the Payment Reserve shall be transferred to the Trust.

iii. For the avoidance of doubt, a Tort Claimant shall not recover from the Trust any amounts greater than the amount of Final Judgment entered on, or agreed to with the Trustee with respect to, his or her Tort Claim.

iv. The Trustee shall have complete discretion whether to enter into a settlement of a Tort Claim with a Tort Claimant and, if so, the amount of such settlement. The Trustee shall have no obligation to enter into any such settlement.

d. Notwithstanding their availability in the tort system, no multiple, exemplary, statutory, enhanced, or punitive damages (*i.e.*, damages other than compensatory damages), and no interest, attorneys' fees, or costs (including statutory attorneys' fees and costs) shall be payable with respect to any Tort Claim.

e. A Tort Claimant forfeits any right to have his or her Abuse Claim liquidated as a Trust Claim.

f. All DOR Entities' Post-Effective Date Costs incurred in connection with Tort Claims shall be paid in accordance with the provisions of Section 8.9.

g. For the avoidance of doubt, pursuant to the Channeling Injunction

set forth in Section 12.3 below, each holder of a Class 4 Abuse Claim, whether a Trust Claim or a Tort Claim, shall have his or her Claim permanently channeled to the Trust, and thereafter shall be entitled to assert such Claim exclusively against the Trust, and such Claim shall be resolved in accordance with the terms, provisions, and procedures of the Trust Documents.

h.      Holders of Disallowed Abuse Claims shall have no recourse against the Trust, the Diocese, the Estate, the Reorganized Diocese, any Settling Insurer, or any Protected Party.

## 4.5    Unknown Abuse Claims.

*4.5.1* An Unknown Abuse Claimant may receive payment from the Unknown Abuse Claim Reserve at the discretion of the Abuse ~~Claim~~Claims Reviewer, as provided in the Allocation Protocol.

~~a. Fees payable to the Unknown Claimant Representative for review of the Unknown Abuse Claims shall be paid by the Diocese or the Reorganized Diocese in accordance with the DOR Entities' Post-Effective Date Costs Procedures.~~

a.      ~~b.~~ The Diocese and the Reorganized Diocese shall cooperate with the Unknown Claimant Representative, the Abuse Claims Reviewer, and/or the Trustee as reasonably requested in connection with the administration of the Unknown Abuse Claim Reserve, provided that any DOR Entities' Post-Effective Date Costs incurred in connection therewith are paid in accordance with the DOR Entities' Post-Effective Date Costs Procedures.

b.      ~~c.~~ Any Non-Settling Insurers remain fully liable for their obligations related in any way to the Unknown Abuse Claims, and their obligations are not reduced by the Diocese being in bankruptcy. For the avoidance of doubt, determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of the Diocese's or any Participating Party's liability or damages for Class 5 Claims, but nothing herein shall affect, diminish, or impair a Non-Settling Insurer's right to offset amounts an Unknown Abuse Claimant receives as a Trust Distribution.

## 4.6    Claim Withdrawal.

An Abuse Claimant may withdraw his or her Abuse Claim at any time on written notice to the Trustee.  If withdrawn, the Abuse Claim will be withdrawn with prejudice and may not be reasserted, and such Abuse Claimant shall still be bound by the Diocese Discharge and all injunctive provisions of this Plan, including the Channeling Injunction.

## 4.7    Medicare Procedures.

With respect to all Abuse Claims, the Trust shall maintain sufficient funds to pay any Medicare Claims.

- 31 -

*4.7.1* It is the position of Diocese that none of the Protected Parties or the Trust will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSP or MMSEA.

*4.7.2* Prior to making any Distribution on behalf of an Abuse Claim (including any Distribution disbursed to an Abuse Claimant's counsel), the Trustee shall obtain a certification of compliance with MMSEA by the Abuse Claimant from the Claimant's counsel, or, if the Abuse Claimant is *pro se,* the Trustee shall obtain a certification of compliance with MMSEA for such Abuse Claimant from a third party administrator engaged by and paid for by the Trust for the purpose of providing certifications of compliance with MMSEA for all such *pro se* Abuse Claimants. The cost of such certification shall be deducted from the Abuse Claimant's Distribution; provided, however, that to the extent such Abuse Claimant's distribution is not sufficient to pay for such costs, the Trust shall pay such costs. The certifications of compliance shall provide that the Abuse Claimant has or will provide for the payment and/or resolution of any obligations owing or asserted under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Claimant's Abuse Claim.

*4.7.3* The Trust shall defend, indemnify and hold harmless the Protected Parties from any Claims related to Medicare Claims or similar reporting and payment obligations, whether relating to past conditional payments made, future payments to be made, or otherwise arising out of, relating to, or in connection with Class 4 Abuse Claims, including any obligations owing or potentially owing under MMSEA or MSPA, and any Claims related to the Trust's obligations under this Plan, the Trust Documents, and the Plan Documents. The Trustee shall also have the obligation to cooperate with the Protected Parties in the assertion of the Channeling Injunction with respect to any Medicare Claims asserted against the Protected Parties. The Trustee shall not have personal liability for these obligations and the Trust shall not be required to create a reserve for these potential obligations. The Trust may seek recovery of any such payments from the applicable Abuse Claimant, including from any future Trust Distributions due to such applicable Abuse Claimant.

*4.7.4* The Trust Assets shall also be used for payment of indemnity and expenses relating to reimbursing the United States government or its contractors for conditional payments made pursuant to the MSPA applicable to any Medicare beneficiary who is an Abuse Claimant. The amount of such payment shall not exceed that Claimant's award under the Trust Documents. The Protected Parties shall not be responsible for and will not pay indemnity or expenses relating to reimbursing the United States Government or its contractors for conditional payments made pursuant to the MSPA applicable to any Medicare beneficiary who is an Abuse Claimant.

*4.7.5* The Trust shall terminate and the Trustee shall have no further obligations under this Plan or the Trust upon the termination occurrences as set forth in the Trust Agreement.

*4.7.6* Notwithstanding anything to the contrary herein, no party shall have any reporting obligation with respect to Class 4 Abuse Claims that arise from or relate to alleged Abuse that occurred prior to December 5, 1980.

# SECTION 5.     SETTLING INSURERS

**5.1**     **Insurance Settlements and Sales Free and Clear of Interests.**

*5.1.1*CNA Settlement.   On the Effective Date, the following shall constitute the CNA Settlement:

> a. CNA shall pay the CNA Cash Contribution to the Trust on or before the Consummation Date.   At CNA's election, payment of the CNA Cash Contribution to the Trust may be by check, wire, or ACH transfer.

> b. The Diocese shall, in exchange for the CNA Cash Contribution to the Trust, sell to CNA, pursuant to §§ 105(a), 363(b), 363(f), 363(m), and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as applicable, the Insurance Policies issued by CNA, with such sale being free and clear of all Liens, Claims, interests, charges, other encumbrances and liabilities of any kind.

> c. Upon providing the CNA Cash Contribution to the Trust, CNA shall, without the necessity of any further act or deed, receive the Releases, Injunctions, and other benefits provided to CNA under the Plan.  The delivery of the CNA Cash Contribution to the Trust shall be in full and final settlement of CNA's responsibilities, liabilities, and obligations to provide insurance coverage (including defense or indemnification) for all past, present, and future Claims, including Abuse Claims, that directly or indirectly arise out of or relate in any way to, or are asserted in connection with, the Insurance Policies issued by CNA, including any Channeled Claims, reimbursement obligations for Conditional Payments under the MSPA, or Claims that directly or indirectly arise from, relate in any way to, or are asserted in connection with, the Abuse Claims or the Chapter 11 Case.  All Claims, including Abuse Claims, Direct Action Claims, Extra-Contractual Claims, and Insurer Contribution Claims, by any Person or Entity against CNA shall be released as of the Effective Date, and CNA shall receive the benefit of the Injunctions described in Section 12.

> d. CNA shall fully and finally release its Class 6 Insurer Claims against the Diocese and the CNA Administrative Claim shall be deemed withdrawn.

> e. For the avoidance of doubt, other than the right to receive the CNA Cash Contribution, the Trust shall not have any Claim against CNA, nor shall any holder of an Abuse Claim have any Claim on account of an Abuse Claim against CNA.

*5.1.2*First State Settlement.   On the Effective Date, the First State Settlement Documents shall be approved pursuant to §§ 105(a), 363(b), 363(f), 363(m), and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as applicable.  The First State Settlement shall be in full and final settlement of First State's responsibilities, liabilities, and obligations for all Claims, including Abuse Claims, Direct Action Claims, Extra-Contractual Claims, and Insurer Contribution Claims, by any Entity against First State arising out of the Insurance Policies issued by First State. All such Claims shall be released as of the Effective Date, and First State shall receive the benefit of

- 33 -

the Injunctions described in Section 12. For the avoidance of doubt, other than as provided in the First State Settlement, the Trust shall not have any Claim against First State, nor shall any holder of an Abuse Claim have any Claim on account of an Abuse Claim against First State.

       *5.1.3*<u>Interstate Settlement</u>. On the Effective Date, the Interstate Settlement Documents shall be approved pursuant to §§ 105(a), 363(b), 363(f), 363(m), and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as applicable. The Interstate Settlement shall be in full and final settlement of Interstate's responsibilities, liabilities, and obligations for all Claims, including Abuse Claims, Direct Action Claims, Extra-Contractual Claims, and Insurer Contribution Claims, by any Entity against Interstate arising out of the Insurance Policies issued by Interstate. All such Claims shall be released as of the Effective Date, and Interstate shall receive the benefit of the Injunctions described in Section 12. For the avoidance of doubt, other than as provided in the Interstate Settlement, the Trust shall not have any Claim against Interstate, nor shall any holder of an Abuse Claim have any Claim on account of an Abuse Claim against Interstate.

       *5.1.4*<u>LMI Settlement</u>. On the Effective Date, the LMI Settlement Documents shall be approved pursuant to §§ 105(a), 363(b), 363(f), 363(m), and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as applicable. The LMI Settlement shall be in full and final settlement of LMI's responsibilities, liabilities, and obligations for all Claims, including Abuse Claims, Direct Action Claims, Extra-Contractual Claims, and Insurer Contribution Claims, by any Entity against LMI arising out of the Insurance Policies issued by LMI. All such Claims shall be released as of the Effective Date, and LMI shall receive the benefit of the Injunctions described in Section 12. For the avoidance of doubt, other than as provided in the LMI Settlement, the Trust shall not have any Claim against LMI, nor shall any holder of an Abuse Claim have any Claim on account of an Abuse Claim against LMI.

       *5.1.5*<u>Underwriters Settlement</u>. On the Effective Date, the Underwriters Settlement Documents shall be approved pursuant to §§ 105(a), 363(b), 363(f), and 363(m) of the Bankruptcy Code and Bankruptcy Rule 9019, as applicable. The Underwriters Settlement shall be in full and final settlement of Underwriters' responsibilities, liabilities, and obligations for all Claims, including Abuse Claims, Direct Action Claims, Extra-Contractual Claims, and Insurer Contribution Claims, by any Entity against Underwriters arising out of the Insurance Policies issued by Underwriters. All such Claims shall be released as of the Effective Date, and Underwriters shall receive the benefit of the Injunctions described in Section 12. For the avoidance of doubt, other than as provided in the Underwriters Settlement, the Trust shall not have any Claim against Underwriters, nor shall any holder of an Abuse Claim have any Claim on account of an Abuse Claim against Underwriters.

    **5.2**    <u>**Resolution of Claims Involving Settling Insurers.**</u>

       The Confirmation Order shall provide that within five days after payment of each Settling Insurer's respective Insurance Settlement Amount, the Diocese or the Trust, as the case may be, and the Settling Insurer shall effect dismissal with prejudice of their Claims against each other in the Insurance Coverage Adversary Proceeding, with each side to bear its own fees and costs.

    **5.3**    <u>**Further Assurances; Non-Material Modifications.**</u>

       From and after the Effective Date, the Diocese and the Settling Insurers shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements,

instruments, releases, and other agreements or documents necessary to effectuate or memorialize the Insurance Settlements without further order of the Bankruptcy Court. The Plan Proponent may make technical or immaterial alterations, amendments, modifications, waiver, or supplements to the terms of the Plan, and a Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or supplemented under Section 15.1 of the Plan, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such Class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to Section 15.1 of the Plan shall constitute an order in aid of consummation of the Plan and shall not require the resolicitation of votes on the Plan.

### 5.4    Waiver/Consent.

In consideration of the releases and Channeling Injunction, the Supplemental Settling Insurer Injunction and other covenants set forth herein, subject to the occurrence of the Effective Date, and upon receipt by the Trust of the Insurance Settlement Amounts, each of the Protected Parties: (a) irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims it has or might have not or in the future against the other Protected Parties with respect to any contribution, subrogation, indemnification, or other similar Claim arising from or relating to released Abuse Claims covered or alleged to be covered under the Settling Insurer Policies, and any Settling Insurer Policies; and (b) consents to the sale of the Diocese's and Participating Parties' Claims, if any, in the Settling Insurer Policies in accordance with the Insurance Settlements and to the contribution of the proceeds from such sale and settlement to the Trust, as provided in the Plan. Nothing in Section 12 of the Plan shall be construed to bar either (a) a Claim based on Abuse against a Person who is not a Protected Party, or (b) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing subsection (a) under an insurance policy other than a Settling Insurer Policy.

### 5.5    Rights Under Insurance Settlements.

The rights of the parties under any Insurance Settlements shall be determined exclusively under the applicable Insurance Settlement, the Final Order approving such Insurance Settlement (which may be included within the Confirmation Order), the Plan, and the Confirmation Order.

### 5.6    Timing.

The injunctions, releases, and discharges to which any Settling Insurer is entitled pursuant to such Insurance Settlement, the Plan, the Confirmation Order, the Final Order approving the Insurance Settlement (which may be included within the Confirmation Order), and the Bankruptcy Code shall become effective pursuant to the terms of such Insurance Settlement.

## SECTION 6.    MATTERS RELATING TO NON-SETTLING INSURERS

As of the date of the filing of this plan, CNA is not aware of the existence of any Non-Settling Insurers to which this Section 6 would apply. However, to the extent a Non-Settling Insurer is identified in the future, Section 6 provides for the treatment of such Non-Settling Insurers, which may be pursued by the Trust only, acting on behalf of Class 4 Claimants.

- 35 -

**6.1     Preservation of Rights and Obligations.**

Notwithstanding the treatment of Class 4 Abuse Claims described in Section 4, to preserve coverage under any Insurance Policy issued by a Non-Settling Insurer, Class 4 Claimants specifically reserve, and do not release, any Claims they may have against the Diocese, the Reorganized Diocese, or any other Protected Party to the extent, and only to the extent, that such Claims implicate coverage under any Non-Settling Insurer's Policy(ies), but recovery may only be pursued by the Trust and is limited to the proceeds of the Non-Settling Insurer's Policy(ies).  All other damages (including damages for Extra-Contractual Claims), awards, judgments over policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurer because of its conduct regarding coverage for, or defense or settlement of, any Abuse Claim, and any such damages or awards will solely have recourse against the Non-Settling Insurer and the Trust Assets in accordance with the Plan and the Trust Documents and shall have no recourse whatsoever at any time against any Protected Party or any property or interest in property of any Protected Party. The Class 4 Abuse Claims that may be covered under any Non-Settling Insurer's Policies will not be released or enjoined as against the Diocese, the Reorganized Diocese, or any other Protected Party until such claims are settled with the Diocese, the Reorganized Diocese, any other Protected Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.  Any Class 4 Abuse Claims that may be covered under any Non-Settling Insurer's Policies and are asserted against a Protected Party are subject to the indemnification obligations of Section 8.11.

If an Abuse Claim, including an Unknown Abuse Claim, is liquidated through the Allocation Protocol or as a Tort Claim as permitted by the Plan, the Allocation Protocol, or the Trust Agreement, then the Protected Parties, the Trust, and each Non-Settling Insurer shall retain any and all legal and factual defenses that may exist with respect to such Abuse Claim and, except as set forth in this Section, all coverage defenses.  The rights, duties, and obligations of each Non-Settling Insurer under the Non-Settling Insurer Policies with respect to Abuse Claims are not affected in any way by (a) the Diocese Discharge, (b) any Trust Distribution, or (c) the Non-Settling Insurance Assignment. Non-Settling Insurers retain any defenses that they would be able to raise if the Claim for coverage for an Abuse Claim were brought by any Protected Party.

The rights and obligations of the Protected Parties and every Non-Settling Insurer under the terms of the Non-Settling Insurer Policies and at law shall not be affected by the Allocation Protocol and shall be treated as if the determination by the Abuse Claims Reviewer had never occurred.  Each Non-Settling Insurer shall be entitled to all rights as are provided under the terms of its Non-Settling Insurer Policies as if the determination by the Abuse Claims Reviewer had never occurred.

Nothing in the Plan, the Confirmation Order, or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Abuse Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, relating to an Abuse Claim.  All such obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable non-bankruptcy law.

The Trust shall have no obligation to take any action to enforce an Insurance Policy of a Non-Settling Insurer, including any obligation to commence or prosecute any action against any

Non-Settling Insurer or to defend an action commenced by a Non-Settling Insurer, although the Trust may do so in its sole and absolute discretion.

### 6.2     Estimations/Assessments of Abuse Claims Are Not Binding.

Estimations of Abuse Claims for purposes of determination, qualification, assignment of points pursuant to the Allocation Protocol, and payment of Trust Distributions:

> a.     shall not (i) constitute an admission of liability by any Person with respect to such Abuse Claims, (ii) have any *res judicata* or collateral estoppel effect on any Person, (iii) constitute a settlement, release, accord, satisfaction, or novation of such Abuse Claims, (iv) be used by any third-party as a defense to any alleged joint liability, or (v) otherwise prejudice any rights of the Trust, the Diocese, the Reorganized Diocese, the Participating Parties, the Settling Insurers, the Non-Settling Insurers, or the Abuse Claimants in all other contexts or forums;

> b.     shall be without prejudice to any and all rights of the Trust, the Non-Settling Insurers, and the Abuse Claimants in all other contexts and forums; and

> c.     shall not be deemed to be a determination of liability of the Diocese or any Participating Party or a determination of whether, or the extent to which, such Abuse Claim is covered under any Non-Settling Insurer Policy.

### 6.3     Post-Effective Date Insurance Obligations.

Notwithstanding the Non-Settling Insurance Assignment, the Diocese, the Reorganized Diocese, and the Participating Parties shall use reasonable efforts to comply with any Post-Effective Date Insurance Obligations. If the Trust believes the Diocese, the Reorganized Diocese, or a Participating Party has failed to comply with any Post-Effective Date Insurance Obligation, the Trust shall give the Diocese, the Reorganized Diocese, or the Participating Party (as applicable) written notice identifying with specificity the Post-Effective Date Insurance Obligation at issue and the action the Trust believes must be taken in order to come into compliance. Subject to further order of the Court, the Diocese, the Reorganized Diocese, and the Participating Parties shall have at least 45 days following receipt of any such notice from the Trust to either (i) undertake the actions requested by the Trust or (ii) seek a determination from the Court as to the extent of their Post-Effective Date Insurance Obligations and whether the action requested by the Trust is required to comply therewith. The Court will retain jurisdiction to adjudicate such dispute or claim. Except in the case of willful misconduct by the Reorganized Diocese and any Participating Party, the Trust's sole remedy for any failure to comply with any Post-Effective Date Insurance Obligations shall be specific performance as ordered by the Court.

### 6.4     Non-Settling Insurance Assignment.

The Non-Settling Insurance Assignment shall be made to the Trust as follows:

> a.     On the Effective Date, and without further action by any party, the Diocese and each of the Participating Parties will be deemed to have assigned to the Trust all of their Insurance Claims and rights of recovery on account of such

Insurance Claims against the Non-Settling Insurers. The foregoing transfer shall be effective to the maximum extent permissible under applicable law and shall not be construed to entitle any Person or entity to insurance coverage other than those Persons or entities entitled to coverage under the terms of the Non-Settling Insurer Policies.

b. On the Effective Date, and without further action by any party, the Diocese will be deemed to have assigned to the Trust the Non-Settling Insurance Policies and the right to proceeds under such Non-Settling Insurer Policies. The foregoing transfer shall be effective to the maximum extent permissible under applicable law and shall not be construed to affect any Non-Settling Insurer's obligations or rights under any insurance policy or applicable law. Following the Effective Date, the Trust shall assume responsibility for, and be bound by, those obligations of the Diocese and Participating Parties under the Non-Settling Insurer Policies. At the Trust's request, the Diocese, the Reorganized Diocese, and the Participating Parties shall comply with any Post-Effective Date Insurance Obligations to preserve coverage under the Non-Settling Insurer Policies. Any DOR Entities' Post-Effective Date Costs incurred in connection with such efforts, shall be paid by the Trust in accordance with the DOR Entities' Post-Effective Date Costs Procedures described below.

**6.5    Trust Pursuit of Insurance Claims Against Non-Settling Insurers.**

The Trust shall be entitled to all recoveries on account of Insurance Claims against Non-Settling Insurers assigned to the Trust as set forth in the Plan and the Confirmation Order. The Trust may act in its own name, or in the name of any Abuse Claimant, the Diocese, and/or a Participating Party to enforce any right, title, or interest of any such party in the Insurance Claims assigned to the Trust. No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact the Diocese is in bankruptcy.

Any recovery by the Trust on Insurance Claims under Non-Settling Insurer Policies relating to the Diocese's and/or Participating Parties' liability for Abuse Claims shall become a Trust Asset and shall be distributed as provided in the Plan, the Trust Agreement, and the Allocation Protocol.

The Trust shall have full access to coverage under the Non-Settling Insurer Policies to the greatest extent permitted by applicable non-bankruptcy law, in the same manner and to the same extent as any Abuse Claimant, the Diocese, and any Participating Parties prior to the confirmation of the Plan and the Non-Settling Insurance Assignment. The Non-Settling Insurers shall retain any and all coverage defenses, but confirmation or effectuation of the Plan shall not trigger any coverage defense, or give rise to any additional coverage defense, that did not exist prior to the Diocese's filing for bankruptcy or Plan confirmation. No coverage defenses are created by the Diocese's bankruptcy or the negotiation, solicitation, or confirmation of the Plan, or the terms thereof, including any treatment of, or protections afforded to, the Diocese, the Reorganized Diocese, any Participating Party or Settling Insurer under the Plan.

The Non-Settling Insurance Assignment does not affect any right of the Diocese, the Reorganized Diocese, any Participating Party or any Non-Settling Insurer to contest any liability or the amount of damages in respect of any Abuse Claims.

- 38 -

### 6.6 Insurance Neutrality as to Non-Settling Insurers.

For the avoidance of doubt, solely with respect to the Non-Settling Insurers, except as set forth in Sections 6.5 and 8.6, nothing in this Plan, the Trust Agreement, the Confirmation Order, any Plan Document, any order approving a settlement, or any other order, judgment, conclusion of law, finding of fact, determination or statement (written or oral) of the Bankruptcy Court (or any other Court exercising jurisdiction over the Chapter 11 Case) to the contrary (including any other provision that purports to be preemptory or supervening or grants a release) shall: (i) affect, impair, or prejudice the rights and defenses of any Non-Settling Insurer against the Diocese or any other Participating Party under any Non-Settling Insurer Policies, including any factual or legal defenses to any claim for insurance; (ii) affect, impair, or prejudice the rights and defenses of any Protected Party, the Trust, or any other insureds under Non-Settling Insurer Policies in any manner, including any factual or legal defenses to any claim for insurance; (iii) constitute a settlement or resolution of the Diocese's and/or any Participating Party's liability to an Abuse Claimant; (iv) in any way operate to, or have the effect of, impairing or having any *res judicata*, collateral estoppel, or other preclusive effect on, any party's legal, equitable, or contractual rights or obligations under any Non-Settling Insurer Policy; or (v) otherwise determine the applicability or non-applicability of any provision of any Non-Settling Insurer Policy, and any such rights and obligations shall be determined solely under the Non-Settling Insurer Policy and applicable law.

Notwithstanding any provision in the Plan, the Plan Documents, or the Confirmation Order, nothing contained in any such documents or in this paragraph shall impose, or shall be deemed or construed to impose, any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Abuse Claim. Rather, a Non-Settling Insurer's obligations, if any, with respect to an Abuse Claim shall be determined solely by and in accordance with the applicable insurance policy(ies) issued by that Non-Settling Insurer. Nothing in the Plan, the Plan Documents, or the Confirmation Order shall diminish or impair, or be deemed to diminish or impair, the rights of any Non-Settling Insurer to assert any claim, defense, right, or counterclaim in connection with any Abuse Claim or Insurance Policy.

Without limiting the generality of the foregoing provisions of this Section 6, nothing in the Plan, the Plan Documents, or the Confirmation Order, shall, under any theory, (a) constitute a trial, a judgment, an adjudication on the merits, or evidence establishing the liability of any Non-Settling Insurer in subsequent litigation for any Claim, including, without limitation, any Abuse Claim, or under any insurance policy, (b) constitute, or be deemed to constitute, a determination of the reasonableness of the amount of any Claim, including any Abuse Claim, either individually or in the aggregate with other Claims, (c) be deemed to grant to any Person or Entity any right to sue any Non-Settling Insurer directly, in connection with a Claim, including any Abuse Claim, or any insurance policy, that such Person or Entity did not otherwise have under applicable nonbankruptcy law, (d) constitute a finding or determination that the Diocese or any Participating Party is a named insured, additional insured, or insured in any other way under any insurance policy, (e) constitute a finding or determination that any Non-Settling Insurer in fact issued any alleged insurance policy or that any alleged insurance policy has any particular terms or conditions, or (f) constitute a finding or determination that any Non-Settling Insurer has any defense or indemnity obligation with respect to any Claim or Abuse Claim. In addition, no payment made in accordance with this Plan shall be, or be deemed to be, a waiver of any rights of any Non-Settling Insurer under any insurance policy.

No Non-Settling Insurer shall be bound in any current or future litigation concerning an

Abuse Claim or an insurance policy by any factual findings or conclusions of law issued in connection with Confirmation of the Plan (including on appeal or in any subsequent proceeding necessary to effectuate the Plan), and no such findings of fact or conclusions of law shall have any *res judicata* or collateral estoppel effect on any claim, defense, right, offset, or counterclaim that has been asserted or that may be asserted in any current or subsequent litigation concerning an Abuse Claim or an insurance policy. Non-Settling Insurers shall retain, and be permitted to assert, (i) all of their defenses to coverage of Abuse Claims notwithstanding any provision of the Plan, the Plan Documents, or the Confirmation Order, other than with respect to the Non-Settling Insurance Assignment, and (ii) all of the Diocese's and Participating Parties' defenses to liability, both legal and equitable, in connection with any asserted Abuse Claim, and the Non-Settling Insurer's rights to assert all such underlying defenses and defenses to coverage of Abuse Claims will not be impaired in any way by the Plan, the Plan Documents, or the Confirmation Order.

### 6.7    Election to Become a Settling Insurer.

After the Effective Date and at any time before dissolution of the Trust, a Non-Settling Insurer may elect to become a Settling Insurer by entering into a settlement with the Trust on terms and conditions acceptable to the Trustee, and subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019. Upon approval of such settlement by the Bankruptcy Court, the Non-Settling Insurer would be released from liability subject to the terms of the Plan and such settlement, and receive the benefits of the Channeling Injunction.

The Trust shall use reasonable efforts, consistent with the terms of the Trust Agreement and its fiduciary duties to the Trust's beneficiaries, to enter into insurance settlement agreements with all Non-Settling Insurers (if any).

## SECTION 7.    MEANS FOR IMPLEMENTATION OF PLAN

### 7.1    Plan Implementation.

All Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, General Unsecured Claims, and Pass-Through Claims will be paid by the Diocese or the Reorganized Diocese. All Abuse Claims will be paid solely from the Trust to be established for the purpose of receiving, liquidating, and distributing Trust Assets in accordance with this Plan and the Allocation Protocol. The proposed Trust Agreement will be attached to the Plan Supplement as **Exhibit 3**. The Allocation Protocol will be attached to the Plan Supplement as **Exhibit 1** and is incorporated into the Trust Agreement.

### 7.2    Good Faith Settlement and Compromise.

The Plan (including its incorporation of the Insurance Settlements) and the Plan Documents constitute a good faith compromise and settlement of Claims and controversies based upon the unique circumstances of these Chapter 11 Cases, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction. The Plan, the Insurance Settlements, the Plan Documents, and the

Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Diocese, the Reorganized Diocese, the Protected Parties, or the Trust is a party.

### 7.3    Corporate Action.

All matters provided under this Plan involving the corporate structure of the Diocese or corporate action to be taken by or required of the Diocese, or the Reorganized Diocese, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement or further approval by the Bankruptcy Court or any other governmental entity. For avoidance of doubt, to the extent any corporate action or other transaction contemplated under this Plan would otherwise require approval under section 511 or 511-a of the New York State Not-For-Profit Corporation Law, the entry of the Confirmation Order shall constitute such approval.

### 7.4    Payments Effective Upon Tender.

Whenever the Plan requires payment to be made to a Creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Diocese, or the Reorganized Diocese to the Creditor to whom payment is due. If any Creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Diocese, or the Reorganized Diocese for the benefit of that Creditor pending final adjudication of the dispute. However, when and if the dispute is finally adjudicated and the Creditor receives the funds previously tendered and refused, the Creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the Creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the Creditor if the Trust, the Diocese, or the Reorganized Diocese failed to pay the tendered payment.

### 7.5    Agreements, Instruments, and Documents.

All organizational agreements, charter documents, instruments, and documents required under this Plan to be executed or implemented, together with such others as may be necessary, useful or appropriate in order to effectuate this Plan, shall be executed on or before the Effective Date or as soon thereafter as is practicable.

### 7.6    Continuation of Insurance Policies.

Except to the extent any Insurance Policies are canceled or bought back pursuant to Insurance Settlements or as otherwise provided by the terms of the Plan, all Insurance Policies (including, without limitation, any Insurance Policy not included in Insurance Settlements) shall, as applicable, either be deemed to be assumed by the Diocese pursuant to sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code to the extent such Insurance Policy is or was an executory contract of the Diocese, or continued in accordance with its terms pursuant to section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an executory contract of the Diocese, such that each of the parties' contractual, legal, and equitable rights under each such Insurance Policy shall remain unaltered. A list of all known Insurance Policies will be attached to the Plan Supplement as **Exhibit 4**. To the extent that any or all such Insurance Policies are considered to be executory contracts, then the Plan shall constitute a motion to assume such Insurance Policies

- 41 -

in connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to sections 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Diocese, the Estate, and all parties in interest in this Chapter 11 Case. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Diocese existing as of the Effective Date with respect to any Insurance Policy.

### 7.7    Bar Date for Professional Fee Claims.

Each Professional retained or requesting compensation in the Chapter 11 Case, pursuant to sections 330, 331, or 503(b) of the Bankruptcy Code, must File with the Bankruptcy Court a final application requesting the allowance of a Professional Fee Claim no later than 60 days after the Effective Date. All applications for the allowance of Professional Fee Claims that are not timely Filed shall be forever barred. Objections to such applications may be Filed in accordance with the Bankruptcy Rules. The Bankruptcy Court shall determine all such Professional Fee Claims.

### 7.8    Bar Date for Other Administrative Claims.

Except as provided for herein or in an order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Claims must File and serve on the Diocese requests for the payment of such Administrative Claims not previously Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claims Bar Date, or such Administrative Claims shall be automatically considered Disallowed Claims, forever barred from assertion, and unenforceable against the Diocese or the Reorganized Diocese, the Estate, or their property without the need for any objection by the Diocese or the Reorganized Diocese, or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Administrative Claims shall be deemed fully satisfied, released, and discharged.

### 7.9    Exit Financing.

The Diocese may, at its discretion, obtain financing to assist the Diocese in making its portion of the DOR Entities' Cash Contribution, which financing may be secured by the Diocese's interest in certain real property located at 1150 Buffalo Road, Rochester, New York, or such other property of the Diocese that is not otherwise contemplated to be transferred (other than to the Reorganized Diocese) pursuant to this Plan. Any security interest in collateral granted to a lender in connection with such financing shall, on and after the Effective Date, be enforceable against any interest the Reorganized Diocese may have in such collateral, to the same extent it may have been enforceable against the Diocese prior to the Effective Date. In the event the Diocese elects to pursue such financing, the terms of such financing shall be submitted to the Bankruptcy Court at the Confirmation Hearing for approval pursuant to section 364 of the Bankruptcy Code.

## SECTION 8.    THE TRUST

### 8.1    Establishment of Trust.

- 42 -

On the Confirmation Date, or as soon as practicable thereafter, the Trust shall be established in accordance with the Trust Documents for the exclusive benefit of the holders of Abuse Claims. The Trust will assume all liability for and rights concerning all Channeled Claims, including the rights to settle the Channeled Claims. The Trust will control the allocation and Distribution of the Abuse Claims Settlement Fund to Abuse Claimants pursuant to the terms of the Allocation Protocol, the Trust Agreement, the Plan, and the Confirmation Order. The Trustee shall establish and maintain a reserve for Trust Expenses, which shall be paid pursuant to the terms of the Trust Agreement.

### 8.2    Funding of the Trust.

       *8.2.1*    ***DOR Entities' Cash Contribution.***  On or before the Consummation Date, the Diocese and the Participating Parties shall cause the DOR Entities' Cash Contribution to be paid to the Trust to establish the Trust Reserve and the Unknown Abuse Claim Reserve, with any balance to be included in the Abuse Claims Settlement Fund.

       *8.2.2*    ***Insurance Settlement Amounts.***  On or before the later of (a) the dates set forth in their respective Insurance Settlements or (b) the Consummation Date, the Settling Insurers other than CNA will pay to the Trust the sums set forth in their respective Insurance Settlements. CNA shall pay the CNA Cash Contribution to the Trust in accordance with the terms of Section 5.1.1(a) of this Plan.

       *8.2.3*    ***Outbound Contribution Claims.***  Outbound Contribution Claims shall be automatically, and without further act or deed, assigned to the Trust on the Effective Date.

### 8.3    Vesting of Trust Assets.

On the Effective Date, all Trust Assets shall vest in the Trust, and the Protected Parties shall be deemed for all purposes to have transferred all of their respective right, title, and interest in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Protected Parties, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of the Trust Assets in accordance with this paragraph, the Protected Parties shall have no further interest in or with respect to the Trust Assets.

### 8.4    Non-Monetary Commitments.

In order to further promote healing and reconciliation, and in order to continue efforts to prevent Abuse from occurring in the future, the Reorganized Diocese agrees that, beginning within thirty days after the Effective Date (unless a different date is provided in the Confirmation Order), it will use reasonable efforts to undertake and observe certain non-monetary commitments as agreed upon with the Committee and set forth as **Exhibit 5** in the Plan Supplement.

### 8.5    Appointment of the Trustee.

The initial Trustee will be identified in the Confirmation Order. The Trustee shall commence serving as the Trustee on the Effective Date; *provided, however*, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Bankruptcy Court, and shall be entitled to seek compensation in accordance with

the terms of the Trust Agreement and the Plan.

### 8.6    Rights and Responsibilities of Trustee.

The Trustee shall be deemed to be a fiduciary of the Trust under the terms of the Trust Agreement and shall have all rights, powers, authority, responsibilities, and benefits under New York law specified in this Plan and as reflected in the Trust Agreement, including commencing, prosecuting, or settling causes of action, enforcing contracts, and asserting Claims, defenses, offsets, and privileges. If there is any inconsistency or ambiguity between the Confirmation Order and the Trust Agreement with respect to Trustee's authority to act, the provisions of the Trust Agreement shall control. Among other things, the Trustee: (1) shall liquidate and convert to Cash the Trust Assets, make timely Trust Distributions, and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under section 505(b) of the Bankruptcy Code for all returns Filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other Agents on behalf of the Trust, and at the Trust's sole expense, as reasonably necessary and to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

The Trustee shall make Trust Distributions to the Abuse Claimants. The Trustee shall have the right to pursue Insurance Claims against any Non-Settling Insurers. The Trustee shall pay Trust Expenses, including paying the Trustee and retained professionals, and funding DOR Entities' Post-Effective Date Costs pursuant to the DOR Entities' Post-Effective Date Costs Procedures. The Trustee shall set aside a reserve for the Unknown Abuse Claims Reserve. The Trustee may seek reimbursement from any Non-Settling Insurer.

The Confirmation Order shall state that, absent permission of the Bankruptcy Court, no cause of action shall be commenced in any forum, other than the Bankruptcy Court, against the Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Trustee.

### 8.7    Investment Powers; Permitted Cash Expenditures.

All funds held by the Trust shall be held in Cash or invested in short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Trust Agreement. The Trustee may expend such Cash in a manner consistent with the terms of the Trust Agreement and the Allocation Protocol.

### 8.8    Tax Matters.

The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Diocese is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference. The Trust shall not be deemed to be the same legal entity as the Diocese or the Reorganized Diocese, but only the assignee of certain assets of the Diocese and a representative of the Estate for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee shall File such income tax

and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 *et seq.*, and New York law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any. The Trustee, may in its discretion, establish a disputed claims reserve for the Trust, which shall be administered in accordance with applicable law.

**8.9**     <u>**DOR Entities' Post-Effective Date Costs Procedures.**</u>

    *8.9.1*     ***DOR Entities' Post-Effective Date Costs Reserve.*** The Trust shall establish the DOR Entities' Post-Effective Date Costs Reserve, which shall be funded in the amount of ~~not less than~~ ~~$600,000~~75,000 from the DOR Entities' Cash Contribution. The Trustee shall provide the Reorganized Diocese and all Participating Parties with a written statement as to the balance of the DOR Entities' Post-Effective Date Costs Reserve no later than the fifteenth day of each month until such time as the DOR Entities' Post-Effective Date Costs Reserve is exhausted.

    *8.9.2*     ***DOR Entities' Post-Effective Date Costs.*** All invoices for DOR Entities' Post-Effective Date Costs shall be submitted to the Trustee via email within 60 days following the end of the month in which DOR Entities' Post-Effective Date Costs are incurred (such submission, a "<u>Fee Notice</u>"). All Fee Notices provided to the Trustee may be redacted to prevent the disclosure of privileged information or trial strategy. The Trustee shall keep all Fee Notices confidential. For the avoidance of doubt, the Trustee may share such Fee Notices with any professional advisors who are not counsel of record to the Trust or the Trustee with respect to the Insurance Claims.

    The Trustee shall inform the Reorganized Diocese, the Participating Party, and any professional submitting a Fee Notice of any disputes regarding the requested fees and expenses within fifteen days of submission of a Fee Notice or shall pay the requested fees within such time. If any such dispute cannot be resolved within fifteen days or such other amount of time agreed upon by the parties, either may submit such dispute to the Bankruptcy Court for adjudication upon at least fifteen days' notice. The Bankruptcy Court shall review the applicable fees and expenses as to reasonableness in light of the work performed.

    Professionals shall charge rates and expenses that are no higher than their usual and customary rates for similar work performed by such professionals for clients generally at the time such services are provided, and such rates may be adjusted from time to time in accordance with the general practices of such professionals, but not more often than once in any twelve-month period.

    To the extent consistent with the advice of counsel, the Diocese and any Participating Parties will use reasonable efforts to retain joint professional representation in any case or cases brought by one Tort Claimant pertaining to the same Abuse Claim.

**8.10**     <u>**No Recourse Against Trustee.**</u>

    No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any Agent retained in accordance with the terms of the Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed

by the Trustee in implementation of the Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Trustee under the Plan for any purpose authorized by the Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as shall under the term of any such Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, breach of the fiduciary duty of loyalty, or fraud, and if liability on such grounds is established, recourse may be had directly against the Trustee. The Trust shall not be covered by a bond.

None of the Diocese, the Reorganized Diocese, or any Participating Party shall be liable for any acts or omissions by the Trust, the Trustee, or their respective Agents or Related Persons.

## 8.11   Indemnification by Trust.

The Trust shall defend, indemnify, and hold harmless the Trustee and its Agents to the fullest extent permitted under the laws of New York in the performance of their duties hereunder. For the avoidance of doubt, the Diocese, Reorganized Diocese, Participating Parties, the Settling Insurers, and their respective Agents shall not be deemed to be Agents of the Trust unless specifically authorized as such in writing by the Trustee.

The Trust shall indemnify and hold each of the Protected Parties harmless from and against any and all Channeled Claims, as well as indemnify and reimburse the Protected Parties for all fees, costs, and expenses incurred after the Effective Date and arising out of or related to Channeled Claims (including such fees, costs and expenses incurred in connection with discovery), to the extent set forth in the Trust Documents. Pursuant to this indemnification, each Protected Party has the right (a) to appoint defense counsel of its choosing, subject to consent by the Trustee, such consent not to be unreasonably withheld, and (b) control the defense and settlement of any such Channeled Claim, provided that the Protected Party keeps the Trustee reasonably informed and notifies the Trustee of any settlement.

## 8.12   Trust Liability.

Upon the occurrence of the Effective Date, the Trust shall automatically and without further act or deed assume all responsibility for preserving, managing, and distributing Trust Assets, and shall automatically and without further act or deed assume all liability, if any, of the Participating Parties and Settling Insurers in respect of the Abuse Claims, which shall become Channeled Claims in accordance with the terms of this Plan.

## 8.13   Termination.

The Trust shall terminate after its liquidation, administration, and Distribution of the Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth in the Trust Agreement.

# SECTION 9.    GENERAL CLAIMS ADMINISTRATION

### 9.1    Objections To Non-Abuse Claims.

Prior to the Effective Date, the Diocese shall have the authority to pursue any objection to the allowance of any Non-Abuse Claim. From and after the Effective Date, the Reorganized Diocese will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making any Distributions with respect to Non-Abuse Claims (including those Non-Abuse Claims that are subject to objection by the Diocese as of the Effective Date); *provided, however*, that nothing in this Section shall affect the right of any party in interest (including the Reorganized Diocese and the Trustee) to object to any Non-Abuse Claim to the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and this Plan. Unless otherwise provided in this Plan or by order of the Bankruptcy Court, objections to Non-Abuse Claims shall be Filed and served not later than 60 days after the later of: (i) the Effective Date, or (ii) the date such Claim is Filed (the "Claims Objection Deadline"). Such deadline or any Bankruptcy Court-approved extension thereof, may be extended upon request by the Reorganized Diocese by filing a motion without any requirement to provide notice to any Person, based upon a reasonable exercise of the Reorganized Diocese's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to this Plan.

### 9.2    Determination of Claims.

From and after the Effective Date, any Non-Abuse Claim as to which a proof of claim or motion or request for payment was timely Filed in this Chapter 11 Case, or deemed timely Filed by order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed, or amended, as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired, (and as to which no appeal or petition for review or rehearing was Filed or, if Filed, remains pending)), liquidated pursuant to: (i) an order of the Bankruptcy Court; (ii) applicable bankruptcy law; (iii) agreement of the parties without the need for Bankruptcy Court approval; (iv) applicable non-bankruptcy law; or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim, Filed by the Diocese, the Reorganized Diocese, or any other party in interest on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with this Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any Claims, rights, or causes of action that the Diocese or the Reorganized Diocese may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157.

### 9.3    No Distributions Pending Allowance.

Except in the case of Abuse Claims paid pursuant to the Allocation Protocol, no Distribution will be made with respect to a Disputed Claim, or any portion thereof, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

**9.4    Claim Estimation.**

To effectuate Distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Case, with respect to Disputed Claims (except Abuse Claims), the Diocese or the Reorganized Diocese, after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an order of the Bankruptcy Court or the District Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of:
(i) property that must be withheld from or reserved for Distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine: (y) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code, and (z) the timing and procedures for such estimation proceedings.

**9.5    Treatment of Contingent Claims.**

Except with respect to Abuse Claims, until such time as a contingent Claim or a contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to Distributions under the Plan.

**9.6    Controversy Concerning Impairment.**

If a controversy arises as to whether any Claim or any Class of Claims is Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before confirming the Plan.

**9.7    Treatment of Executory Contracts and Unexpired Leases.**

Subject to the requirements of section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Diocese except (i) Insurance Policies that have not been assumed and retained by the Diocese pursuant to Section 7.5, or (ii) executory contracts and unexpired leases that have been rejected by order of the Bankruptcy Court or are the subject of a motion to reject pending on the Confirmation Date, will be deemed to be assumed and assigned to the Reorganized Diocese on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed and assigned to the Reorganized Diocese objects to such assumption and assignment, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Diocese, except that the Trust shall pay any cure costs under any Insurance Policy assumed and retained by the Diocese pursuant to Section 7.5. In the event of a dispute regarding the amount of any cure payments, or the ability of the Diocese or the Reorganized Diocese (as applicable) to provide adequate assurance of future performance with respect to any executory contracts to be assumed by the Diocese, or assumed and assigned to the Reorganized Diocese, the Trust or the Reorganized Diocese (as applicable) will make any payments required by section 365(b)(1) of the Bankruptcy Code after the entry of a Final Order resolving such dispute. The contracts and leases which will be assumed and assigned to the Reorganized Diocese, and their respective cure costs, will be identified in **Exhibit 6** attached to the Plan Supplement.

# SECTION 10.   PROVISIONS GOVERNING DISTRIBUTIONS

### 10.1   Disbursing Agents.

The Reorganized Diocese shall be the disbursing agent for all aspects of the Plan except for Distributions made from the Trust.   With respect to the Trust, the Trustee shall be the disbursing agent and be responsible for all Distributions made under the Trust.

### 10.2   Manner of Payment.

Unless otherwise agreed by the Reorganized Diocese or the Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, all Distributions of Cash under the Plan may be made either by check via first class mail, postage prepaid, or by wire transfer from a domestic bank, at the option of the respective disbursing agent.

### 10.3   Distribution Only to Holders of Allowed Claims.

Except as otherwise provided in the Plan for Non-Abuse Claims, Distributions under the Plan and the Plan Documents will be made only to the holders of Allowed Claims. Until a Disputed Non-Abuse Claim becomes an Allowed Claim, the holder of that Disputed Non-Abuse Claim will not receive any Distribution otherwise provided to Non-Abuse Claimants under the Plan or the Plan Documents. If necessary in determining the amount of a *pro rata* Distribution due to the holders of Allowed Claims in any Class, the Reorganized Diocese will make the *pro rata* calculation as if all Disputed Non-Abuse Claims were Allowed Claims in the full amount claimed or in the estimated amount. When a Disputed Non-Abuse Claim in any Class becomes an Allowed Claim, the Reorganized Diocese will make a full or partial Distribution, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the order, if any, allowing such Claim and any required withholding of applicable federal and state taxes.

### 10.4   Disputed Claim Reserve.

To the extent that a disbursing agent makes a Distribution hereunder to a Class prior to the resolution of all Disputed Claims of such Class, the respective disbursing agent shall reserve an amount for any Disputed Claims in such Class equal to the amount that such holders of Disputed Claims in such Class would be entitled to receive under the Plan if such Disputed Claims were Allowed in the asserted amount of the Claim.

### 10.5   Transmittal of Distributions.

Except as otherwise provided in the Plan, in the Plan Documents, or in an order of the Bankruptcy Court, Distributions to be made under the Plan, Confirmation Order, or Trust Documents to Class 4 Claimants will be made by the Trustee, and Distributions to all other Claimants will be made by the Diocese or the Reorganized Diocese.

Trust Distributions to Class 4 Claimants will be made as follows:  (a) to the client trust account for the Claimant's attorney of record; (b) if the Class 4 Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim Filed with the claims agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to

the Reorganized Diocese or Trustee, as applicable, by such Claimant in writing; or (c) if no such proof of claim has been Filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Diocese or Trustee, as applicable, to the mailing address set forth in the Schedules Filed by the Diocese in this Chapter 11 Case.

Distributions to other Claimants will be made by wire transfer or by check via first class United States mail, postage prepaid, (a) to the client trust account for the Claimant's attorney of record; (b) if the Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim Filed with the claims agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Diocese, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been Filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Diocese, to the mailing address set forth in the Schedules Filed by the Diocese in the Chapter 11 Case.

If a Claimant's Distribution is not mailed or is returned to the Reorganized Diocese or to the Trustee because of the absence of a proper mailing address, the Reorganized Diocese or the Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such Claimant from information generally available to the public and from such party's own records, but shall not be liable to such Claimant for having failed to find a correct mailing address. The Trustee shall have no liability to a Class 4 Claimant on account of Distributions made to the client trust account of a Class 4 Claimant's attorney.

## 10.6   Timing of Distributions.

Unless otherwise agreed by the Reorganized Diocese or the Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day. Any Claimant that is otherwise entitled to an undeliverable Distribution and that does not, within thirty days after a Distribution is returned to the Reorganized Diocese or to the Trustee, as applicable, as undeliverable or is deemed to be an undeliverable Distribution, provide the Reorganized Diocese or the Trustee, as applicable, with a written notice asserting its Claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any Claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Reorganized Diocese, the Trust, the Trustee, or its property. Any undeliverable Distributions to be made by the Trust that are not claimed under this Section will become available for the Trust to distribute to other Abuse Claimants. Any other undeliverable Distributions shall be retained by the Reorganized Diocese in accordance with the Plan. Nothing in the Plan requires the Reorganized Diocese, the Trust, or the Trustee to attempt to locate any Claimant whose Distribution is undeliverable.

## 10.7   Time Bar to Check Payments.

If an instrument delivered as a Distribution to a Claimant by the Reorganized Diocese or the Trust is not negotiated within 90 days after such instrument is sent to the Claimant, then the instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and all Claims in respect of such voided check shall be discharged and forever barred. Any request for re-issuance of a check must be made on or before 90 days after issuance of a non-negotiated check.

Except as otherwise provided herein, any Distribution under the Plan which is not negotiated after 90 days following issuance shall be forfeited, and such Distribution, together with any interest earned thereon, and shall return to and revest in the Reorganized Diocese or to the Trust, as applicable.

**10.8    No Professional Fees or Expenses.**

No professional fees or expenses incurred by a Claimant will be paid by the Diocese, the Reorganized Diocese, or the Trustee with respect to any Claim except as specified in the Plan or the Trust Documents.

**10.9    No Interest on Claims.**

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Diocese and the holder of a Claim approved by an order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, the Confirmation Order, or the Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**10.10    Saturday, Sunday or Holiday.**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the following Business Day, but shall be deemed to have been completed as of the required date.

**10.11    Withholding Taxes.**

The Reorganized Diocese shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any Distribution under the Plan, the Reorganized Diocese will require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

**10.12    Setoffs and Recoupment.**

Subject to the terms of this Plan and pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Diocese or Reorganized Diocese, as appropriate, may but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan, any Claims of any nature whatsoever the Diocese may have against the holder of such Claim.

**10.13    No *De Minimis* Distributions.**

Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash (rounded to the nearest whole cent when and as necessary) will be issued to Claimants entitled to receive Distributions of Cash. Any Distribution of less than $25.00 will be considered *de minimis*, and holders of Allowed Claims that are entitled to Distributions of less than $25.00 will not receive any Distribution. Such funds will remain with, and revest in, the Reorganized Diocese. For avoidance of doubt, this Section 10.13 shall not apply to any Distributions to be made by the Trust, which shall be governed solely by the Trust Documents.

**10.14  Prepayment.**

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Diocese shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

## SECTION 11.  EFFECTIVE DATE

**11.1  Conditions Precedent to Effective Date.**

The Effective Date shall not occur unless each of the following conditions are satisfied or waived as set forth in Section 11.2 below:

*11.1.1  **Confirmation Order.*** The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Plan Proponent. Without limiting the generality of the foregoing, the Confirmation Order shall, at a minimum, contain findings by the Bankruptcy Court that:

a.  all of the requirements for confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code have been met and that the Plan should be confirmed;

b.  each of the Insurance Settlements is approved pursuant to §§ 105(a), 363(b), 363(f), 363(m), and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as applicable, and upon paying their respective Insurance Settlement Amounts to the Trust, each Settling Insurer shall, without the necessity of any further act or deed, be deemed to have (i) bought back all of the Insurance Policies issued by such Settling Insurer with such sale being free and clear of all Liens, Claims, interests, charges, other encumbrances and liabilities of any kind and (ii) received the Releases, Injunctions, and other benefits provided to such Settling Insurer under the Plan;

c.  the Allocation Protocol attached as an exhibit to the Plan Supplement has been proposed in good faith and is fair and reasonable with respect to the treatment afforded to all Abuse Claims;

d.  the Non-Settling Insurance Assignment is authorized by, and does not conflict with, any provision of the Bankruptcy Code or other applicable law, and is therefore approved;

e.  the Bankruptcy Court has jurisdiction to approve, and does approve, the transfer of the Residual Assets to, and vesting of title in, the Reorganized

- 52 -

Diocese in accordance with the provisions of section 511 or 511-a of the New York State Not-For-Profit Corporation Law, and no further approval by the New York Attorney General or the New York Supreme Court is required; and

f.  except as otherwise provided in this Plan, the Reorganized Diocese shall not be liable for any Claims against or liabilities of the Diocese or any of the Participating Parties, including under any theory of successor liability.

11.1.2  **Channeling and Insurer Injunctions.** The Confirmation Order shall approve and implement the Channeling Injunction and the Supplemental Settling Insurer Injunction set forth in Section 12 of the Plan.

11.1.3  **Plan Documents.** The Plan Documents shall be in form and substance acceptable to the Plan Proponent.

11.1.4  **Trust Formation.** The Trust shall have been formed, the Bankruptcy Court shall have entered an order appointing the Trustee, and the Trustee shall have executed the Trust Agreement.

11.1.5  **Reorganized Diocese Formation.** The Reorganized Diocese shall have been duly formed and in good standing under New York law, and shall have obtained any necessary governmental permits or approvals required to take title to the Residual Assets, and to conduct business as a tax-exempt entity pursuant to 26 U.S.C. § 501(c)(3), on and after the Effective Date in substantially the same manner as the Diocese has historically conducted its business. Notwithstanding the foregoing, this condition shall be waived if the Reorganized Diocese shall not have been duly formed and in good standing under New York Law within 60 days of the Confirmation Order becoming a Final Order.

11.1.6  **Final Orders.** The Confirmation Order, the order appointing the Trustee, and all orders approving Insurance Settlements (which may be included within the Confirmation Order) shall be Final Orders and no stay of any such orders shall then be in effect.

11.1.7  **No Material Amendments.** The Plan shall not have been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made with the consent of the Plan Proponent.

**11.2  Waiver of Conditions.**

Any condition to the occurrence of the Effective Date set forth in Section 11.1 of this Plan may be waived by the Plan Proponent.

**11.3  Notice of Effective Date.**

The Plan Proponent shall File a notice of the Effective Date with the Bankruptcy Court, and serve it on all Creditors and parties in interest, within five Business Days after the occurrence of the Effective Date.   Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

**11.4    Effect of Non-Occurrence of Condition.**

If the Effective Date does not occur within 365 days after the entry of the Confirmation Order, the Plan Proponent shall have the right to declare the Plan null and void in all respects, in which event nothing contained in the Plan or the Disclosure Statement will: (i) constitute a waiver or release of any Claims by or against the Protected Parties; (ii) prejudice in any manner the rights of the Protected Parties or the Trust; (iii) constitute an admission, acknowledgment, offer, or undertaking by the Protected Parties in any respect, including but not limited to, in any proceeding or case against the Diocese or any Participating Party; or (iv) be admissible in any action, proceeding or case against the Protected Parties in any court or other forum.

**11.5    Right to Modify the Plan Until Substantial Consummation.**

Until the Plan has been substantially consummated, the Plan Proponent shall have the right to modify the Plan to the extent permitted by Section 1127 of the Bankruptcy Code.

## SECTION 12.    EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE

**12.1    General Injunction and Discharge.**

*12.1.1    General Injunction.* **EXCEPT WITH RESPECT TO ABUSE CLAIMS AND INBOUND CONTRIBUTION CLAIMS ADDRESSED IN SECTION 12.2 BELOW, OR AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE DIOCESE, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY PARTICIPATING PARTY, OR THE DIOCESE'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF NON-ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(G), 502(H), AND 502(I) OF THE BANKRUPTCY CODE, WHETHER OR NOT (A) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (B) SUCH CLAIM IS ALLOWED UNDER THE PLAN, OR (C) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ARE PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE, FROM (W) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (X)**

THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM, (Y) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM AND (Z) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DIOCESE OR THE REORGANIZED DIOCESE OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM.

> *12.1.2* **General Discharge.** Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, the Diocese, the Estate, and the Reorganized Diocese will be discharged from all liability for any and all Claims other than Abuse Claims.

**12.2** <u>Injunction and Discharge of Abuse Claims and Inbound Contribution Claims.</u>

> *12.2.1* **Injunction of Abuse Claims and Inbound Contribution Claims.** EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 12.2.2 BELOW OR IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE ALL PERSONS SHALL BE PERMANENTLY STAYED, ENJOINED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE AGAINST THE DIOCESE, THE REORGANIZED DIOCESE, OR ANY PARTICIPATING PARTY, ANY ABUSE CLAIMS OR INBOUND CONTRIBUTION CLAIMS, KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY PARTICIPATING PARTY, OR THE DIOCESE'S OR ANY PARTICIPATING PARTY'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(G), 502(H), AND 502(I) OF THE BANKRUPTCY CODE, WHETHER OR NOT (A) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (B) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (C) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN.

IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER

**LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.**

**THE DISCHARGE AND INJUNCTIONS CONTAINED IN THE PLAN AND THE RELEASES PROVIDED UNDER THE PLAN DO NOT RELEASE OR IMPAIR AN ABUSE CLAIMANT'S RIGHT TO RECOVER ON ANY ABUSE CLAIM AGAINST (Y) ANY PERPETRATOR OF ABUSE FOR ACTS OF ABUSE THAT ARE INDEPENDENT OF THE LIABILITY OF THE DIOCESE OR ANY PARTICIPATING PARTY OR (Z) ANY JOINT TORTFEASOR.**

          12.2.2    ***Discharge of Diocese.*** Except as otherwise expressly provided in the Plan or Confirmation Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, the Diocese, the Estate, the Reorganized Diocese, and the Participating Parties will be discharged from all liability for any and all Abuse Claims and Inbound Contribution Claims.

          12.2.3    ***Preservation of Insurance Claims.*** The Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the fact that the Diocese is in bankruptcy. For the avoidance of doubt, determinations by the Abuse Claims Reviewer and/or any Distributions entitled to be received from the Trust shall not constitute a determination of the Diocese's and/or any Participating Party's liability for Abuse Claims, but nothing herein shall affect, diminish, or impair a Non-Settling Insurer's right to offset amounts an Abuse Claimant receives as a Trust Distribution. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Abuse Claims. Any such recoveries by the Trust from Non-Settling Insurers will be added to the Abuse Claims Settlement Fund to be distributed pursuant to the terms of the Allocation Protocol and the Plan. Nothing in this Plan shall be deemed to modify or abridge any rights of the Non-Settling Insurers under their respective Non-Settling Insurer Policies except to the extent consistent with the provisions of the Bankruptcy Code or other applicable law.

      **12.3**    <u>Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties.</u>

        **IN CONSIDERATION OF THE UNDERTAKINGS OF THE PROTECTED PARTIES HEREIN, THEIR CONTRIBUTIONS TO THE TRUST, AND OTHER CONSIDERATION AND, WHERE APPLICABLE, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE DIOCESE AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE PROTECTED PARTIES, AND TO SUPPLEMENT WHERE NECESSARY THE INJUNCTIVE EFFECT OF THE DISCHARGE AS PROVIDED IN SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND PURSUANT TO SECTIONS 105, 363, AND 1123 OF THE BANKRUPTCY CODE:**

        **A.**    **ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE AMOUNTS ESTABLISHED UNDER THIS PLAN AND THE TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS.**

- 56 -

**B.** ALL PERSONS WHO HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIMS AGAINST THE PROTECTED PARTIES, INCLUDING:

**(I)** COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES OR AGAINST THE PROPERTY OF ANY OF THE PROTECTED PARTIES;

**(II)** ENFORCING, ATTACHING, COLLECTING, OR RECOVERING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, BY ANY MANNER OR MEANS, ANY JUDGMENT, AWARD, DECREE, OR ORDER WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES;

**(III)** CREATING, PERFECTING, OR ENFORCING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, ANY LIEN OF ANY KIND RELATING TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF THE PROTECTED PARTIES;

**(IV)** ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST:

**(A)** ANY OBLIGATION DUE ANY OF THE PROTECTED PARTIES;

**(B)** ANY OF THE PROTECTED PARTIES; OR

**(C)** THE PROPERTY OF ANY OF THE PROTECTED PARTIES.

**(V)** TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THIS PLAN; AND

**(VI)** ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION, OR RECOUPMENT OF ANY KIND AGAINST AN OBLIGATION DUE TO ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES.

THE CHANNELING INJUNCTION IS AN INTEGRAL PART OF THIS PLAN AND IS ESSENTIAL TO THE PLAN'S CONSUMMATION AND

- 57 -

**IMPLEMENTATION. IT IS INTENDED THAT THE CHANNELING OF THE CHANNELED CLAIMS AS PROVIDED IN THIS SECTION 12.3 OF THE PLAN SHALL INURE TO THE BENEFIT OF THE PROTECTED PARTIES. IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING**.

12.3.1 ***Limited Exception to Injunctions.*** The injunctions set forth in Sections 12.2.1 and 12.3 above shall not prevent the prosecution of (a) Tort Claims pursued by a Tort Claimant at the Tort Claimant's expense against the Diocese or any Participating Party, to the limited extent authorized by Section 4.4.1 of this Plan, (b) Inbound Contribution Claims pursued by a Non-Settling Insurer against the Diocese or any Participating Party, or (c) Insurance Claims pursued by the Trustee on behalf of Abuse Claimants against Non-Settling Insurers.

Notwithstanding anything to the contrary herein, all collection efforts against any Protected Party shall be permanently enjoined and (a) any Final Judgment entered on a Tort Claim or recovery on account of an Inbound Contribution Claim shall be enforceable solely against the Trust and (b) any recovery on an Insurance Claim shall be enforceable solely against the Non-Settling Insurer by the Trust.

### 12.4 Supplemental Settling Insurer Injunction.

**PURSUANT TO SECTIONS 105(a), 363, 1123, AND 1129 OF THE BANKRUPTCY CODE, AND IN CONSIDERATION OF THE UNDERTAKINGS OF THE SETTLING INSURERS PURSUANT TO THE INSURANCE SETTLEMENTS, INCLUDING THE SETTLING INSURERS' PURCHASES OF THEIR SETTLING INSURER POLICIES FREE AND CLEAR OF ALL CLAIMS PURSUANT TO SECTION 363(f) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ANY AND ALL PERSONS WHO HAVE HELD, NOW HOLD, OR WHO MAY IN THE FUTURE HOLD ANY CLAIMS (INCLUDING ALL DEBT HOLDERS, ALL EQUITY HOLDERS, GOVERNMENTAL, TAX AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, PERPETRATORS, AND ALL OTHERS HOLDING INTERESTS OF ANY KIND OR NATURE WHATSOEVER, INCLUDING THOSE CLAIMS RELEASED OR TO BE RELEASED PURSUANT TO THE INSURANCE SETTLEMENTS) AGAINST ANY OF THE SETTLING INSURERS, INCLUDING (A) CLAIMS RELATING TO THE SETTLING INSURER POLICIES, INCLUDING ABUSE CLAIMS, INBOUND CONTRIBUTION CLAIMS, AND INSURER CONTRIBUTION CLAIMS, (B) THE PAYMENT OF ANY OF THE CLAIMS IDENTIFIED IN (A), INCLUDING MEDICARE CLAIMS, AND (C) EXTRA-CONTRACTUAL CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, TO ASSERT, ENFORCE OR ATTEMPT TO ASSERT OR ENFORCE ANY SUCH CLAIM OR INTEREST AGAINST THE SETTLING INSURERS OR THE SETTLING INSURER POLICIES.**

**THE SUPPLEMENTAL SETTLING INSURER INJUNCTION WILL BE EFFECTIVE WITH RESPECT TO A SETTLING INSURER ONLY AS OF THE DATE THAT THE TRUST RECEIVES THE INSURANCE SETTLEMENT AMOUNT PURSUANT TO THE TERMS OF THE APPLICABLE INSURANCE SETTLEMENT. THIS SUPPLEMENTAL SETTLING INSURER INJUNCTION BARS THE ABOVE-REFERENCED ACTIONS AGAINST THE SETTLING INSURERS AND THE SETTLING INSURER POLICIES, BUT AGAINST NO OTHER PERSON OR THING; _PROVIDED_, _HOWEVER_, NOTHING IN THIS SUPPLEMENTAL SETTLING INSURER INJUNCTION SHALL LIMIT, OR BE DEEMED OR OTHERWISE INTERPRETED TO LIMIT, THE SCOPE OF THE DISCHARGE OR CHANNELING INJUNCTION IN FAVOR OF THE PROTECTED PARTIES, INCLUDING THE SETTLING INSURERS. THE FOREGOING INJUNCTIVE PROVISIONS ARE AN INTEGRAL PART OF THE PLAN AND ARE ESSENTIAL TO ITS IMPLEMENTATION.**

**12.5** **Litigation/Settlement Between a Participating Party or Abuse Claimant and Non-Settling Insurers.**

*12.5.1* The Channeling Injunction shall channel all Inbound Contribution Claims, including Insurer Contribution Claims, to the Trust. The Settling Insurers shall not assert or pursue any Insurer Contribution Claims against any Non-Settling Insurer. If a Non-Settling Insurer asserts an Insurer Contribution Claim, such Non-Settling Insurer may only recover on its Insurer Contribution Claim against the Trust, and the Trust may assert the legal or equitable rights (if any) of the Settling Insurer in defense of the claim. If for any reason the Insurer Contribution Claims of Non-Settling Insurers are not channeled to the Trust, then the Trust shall indemnify any Settling Insurer against which a Non-Settling Insurer asserts an Insurer Contribution Claim.

**12.6** **Certain Litigation Matters.**

Upon the occurrence of the Effective Date, the Claim Objections, the Appeal, and the Prior Rule 9019 Approval Motion shall be deemed to be dismissed.

**12.7** **Injunction Against Interference with Plan.**

Upon entry of the Confirmation Order, all holders of Claims shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

**12.8** **Release by Holders of Claims.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, AS OF THE EFFECTIVE DATE, ALL HOLDERS OF CLAIMS, INCLUDING ABUSE CLAIMS (THE "RELEASING PARTIES"), SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE PROTECTED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING TO THE DIOCESE, THE PARTICIPATING PARTIES, THE ESTATE, THE CONDUCT OF THE DIOCESE'S AND THE PROTECTED PARTIES' BUSINESSES, THE**

FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THIS PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THIS PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AMONG THE RELEASING PARTIES AND ANY RELEASED PARTY, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE.

FOR THE AVOIDANCE OF DOUBT, SUBJECT TO THE LIMITATIONS SET FORTH IN THE PLAN, A TORT CLAIMANT OR THE TRUST MAY NAME THE DIOCESE OR ANY PARTICIPATING PARTY IN A CASE OR PROCEEDING TO ADJUDICATE WHETHER THE DIOCESE OR ANY PARTICIPATING PARTY HAS LIABILITY FOR AN ABUSE CLAIM AND THE AMOUNT OF ANY SUCH LIABILITY, BUT RECOURSE SHALL BE LIMITED TO THE TRUST OR TO THE PROCEEDS OF ANY NON-SETTLING INSURER POLICIES AND ALL OTHER COSTS AND/OR DAMAGES THAT MAY BE RECOVERABLE AGAINST ANY NON-SETTLING INSURERS, AS APPLICABLE.

12.9     Mutual Releases.

EXCEPT FOR OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED AND ASSIGNED TO THE REORGANIZED DIOCESE AND OBLIGATIONS ARISING UNDER THE PLAN, ON THE EFFECTIVE DATE, EACH OF THE PROTECTED PARTIES, THE TRUST, AND EACH ABUSE CLAIMANT SHALL BE DEEMED TO WAIVE, RELEASE, AND DISCHARGE ANY AND ALL CLAIMS AND CAUSES OF ACTION OF EVERY KIND AND NATURE THAT THEY MAY HAVE AGAINST EACH OTHER, AND THEIR RESPECTIVE RELATED PERSONS, EXCEPT THAT ABUSE CLAIMANTS SHALL NOT WAIVE THEIR RIGHTS TO DISTRIBUTIONS UNDER THE TRUST IN ACCORDANCE WITH THE TRUST AGREEMENT AND THE ALLOCATION PROTOCOL.

12.10     Exculpation; Limitation of Liability.

FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR, AND EACH EXCULPATED PARTY SHALL BE RELEASED FROM, ANY CLAIM BY ANY OTHER EXCULPATED PARTY, BY ANY HOLDER OF A CLAIM, OR BY ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION THAT OCCURRED DURING AND IN CONNECTION WITH THIS CHAPTER 11 CASE OR IN CONNECTION WITH THE PREPARATION AND FILING OF THIS CHAPTER 11 CASE, THE FORMULATION, NEGOTIATION, OR PURSUIT OF CONFIRMATION OF A PLAN, THE CONSUMMATION OF THIS PLAN, AND THE ADMINISTRATION OF THIS

- 60 -

**PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THIS PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, LEGAL MALPRACTICE, OR BREACH OF THE FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF COMPETENT JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO ITS DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THIS PLAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE DIOCESE, THE REORGANIZED DIOCESE AND THEIR RESPECTIVE OFFICERS, TRUSTEES, BOARDS, EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, EXPERTS, EXPERT WITNESSES, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY CODE AND THE CHANNELING INJUNCTION.**

### 12.11   Injunctions in Full Force and Effect.

All injunctions and/or stays provided for in the Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting any Settling Insurer that has purchased Settling Insurer Policies free and clear of all Claims pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, are permanent and will remain in full force and effect following the Effective Date of the Plan and are not subject to being vacated or modified.

### 12.12   Injunctions and Releases Integral.

The foregoing injunctive provisions and releases are an integral part of the Plan and are essential to its implementation. The currently pending court proceedings commenced by an Abuse Claimant, the continuation of which would violate Sections 12.1, 12.2, or 12.3 of this Plan, the releases provided for under the Plan, or the Insurance Settlements, shall be deemed to be dismissed with prejudice.

### 12.13   Timing.

The injunctions, releases, and discharges (including the Channeling Injunction and the Supplemental Settling Insurer Injunction) to which any Settling Insurer is entitled pursuant to such Settling Insurer's Insurance Settlement, the Plan, the Confirmation Order, the Final Orders approving the Insurance Settlements, and the Bankruptcy Code shall only become effective when the Trust receives payment in full from the corresponding Settling Insurer pursuant to the terms of this Plan and/or the Settling Insurer's Insurance Settlement, and the other conditions to the effectiveness of the Insurance Settlement are fully met.

### 12.14   Excluded Parties.

Notwithstanding anything to the contrary herein, the following shall apply to Excluded Parties: (a) no Claim by a Class 4 Claimant or Class 5 Claimant against an Excluded Party shall be a Channeled Claim, *provided*, *however*, any Claims which assert liability against an Excluded Party in conjunction with a Protected Party shall be Channeled Claims to the extent they assert liability against such Protected Party; (b) no Claim by a Class 4 Claimant or Class 5 Claimant against an

Excluded Party shall be released by operation of this Plan; (c) the injunctions provided in Sections 12.1 and 12.2 of this Plan shall not apply to Claims by any Class 4 Claimant or Class 5 Claimant against an Excluded Party; and (d) all Claims by any Class 4 Claimant or Class 5 Claimant against an Excluded Party are preserved and are not affected by the terms of this Plan.

### 12.15    Title to and Vesting of Assets.

All property of the Diocese and the Estate is dealt with by the Plan. Therefore, on the Effective Date, except as otherwise provided in this Plan, to the fullest extent allowed by sections 1123(a)(5), 1123(b)(2), 1123(b)(3), 1141(b), and 1141(c) of the Bankruptcy Code, all property of the Diocese and the Estate, and any property acquired by the Diocese pursuant to this Plan, shall vest in the Reorganized Diocese and such property shall be free and clear of all Liens, Claims, charges or other encumbrances whatsoever, except that any charitable assets subject to Donor Restrictions shall pass to the Reorganized Diocese subject to such Donor Restrictions. On and after the Effective Date, except as otherwise provided in this Plan, the Reorganized Diocese may operate and manage its affairs and may use, acquire, or dispose of such property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. The Diocese and the Reorganized Diocese may pay any charges incurred on or after the Effective Date for Professional Fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 12.16    Continued Corporate Existence; No Successor Liability.

*12.16.1*    The Diocese will continue to exist after the Effective Date as a separate entity in accordance with New York law having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence, or to change its corporate name, under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

*12.16.2*    On and after the Effective Date, the Reorganized Diocese may conduct business in the name of "The Diocese of Rochester" or any derivation thereof that may be approved by the Bishop of Rochester. At the request of the Reorganized Diocese, the Diocese shall take such steps as may be required to change its corporate name to remove any references to "The Diocese of Rochester."

*12.16.3*    Notwithstanding anything to the contrary in the Plan or otherwise, except to the extent necessary to honor any Donor Restrictions or to the extent it may expressly assume such obligations in writing on or after the Effective Date, the Reorganized Diocese shall not be liable for any Claims against, or other liabilities or obligations of the Diocese. The Reorganized Debtor shall not, and shall not be deemed under any state or federal law, or doctrine or theory of successor liability to: (a) be the successor of, or successor to, the Diocese; (b) have, de facto or otherwise, merged with or into the Diocese; (c) be a mere continuation or substantial continuation of the Diocese or the operations or business enterprises of the Diocese; or (d) be liable for any acts taken, or omitted to be taken, by the Diocese prior to the Effective Date. All Persons and entities holding Liens, Claims and encumbrances, and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in the Diocese or

- 62 -

the Residual Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Diocese, the Residual Assets, or the operation of the Residual Assets prior to the Effective Date shall be forever barred, estopped, and permanently enjoined from asserting against the Reorganized Debtor such Liens, Claims, encumbrances, and other interests, including rights or claims based on any theory of successor or transferee liability, provided, however, nothing herein shall prohibit any Person with standing to do so from taking any action to enforce Donor Restrictions.

### 12.17 Identity of Trustees of the Diocese and the Reorganized Diocese on and after the Effective Date.

In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the trustees of the Diocese and the Reorganized Diocese on and after the Effective Date shall be (i) The Most Reverend Salvatore R. Matano, Bishop of Rochester, (ii) Very Reverend Paul J. Tomasso, Vicar General and Moderator of the Curia, and (iii) Reverend Daniel J. Condon, Chancellor and Director of Legal Services, all of whom are affiliated with the Universal Roman Catholic Church.

### 12.18 Authority to Effectuate Plan.

Upon the Effective Date, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Diocese. The Diocese and the Reorganized Diocese shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action necessary to achieve consummation and carry out the Plan and to effectuate the transactions provided for thereunder.

### 12.19 Binding Effect.

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind all holders of Claims. Subject to the terms of the Plan, upon the Effective Date, every holder of a Claim shall be precluded and permanently enjoined from asserting against the Diocese or the Reorganized Diocese any Claim based on any document, instrument, judgment, award, order, act, omission, transaction, or other activity of any kind or nature that occurred before the Petition Date.

### 12.20 Dissolution of Committee.

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and Agents shall be released from any further duties and responsibilities in this Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 Case, including any orders regarding confidentiality issued by the Bankruptcy Court or mediators, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Fee Claims.

**SECTION 13.   [RESERVED]**

**SECTION 14.   RETENTION OF JURISDICTION**

**14.1      By the Bankruptcy Court.**

Pursuant to sections 105, 1123(a)(5) and 1142(b) of the Bankruptcy Code and 28 U.S.C. §§ 157 and 1334, on and after the Effective Date, the Bankruptcy Court shall retain (a) original and exclusive jurisdiction over the Chapter 11 Case, (b) original, but not exclusive jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Case, and (c) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Case and the Plan, including matters concerning the interpretation, implementation, consummation, execution, or administration of the Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

a.      over disputes concerning the ownership of Claims.

b.      over disputes concerning the distribution or retention of assets under the Plan.

c.      subject to the Plan Documents, over objections to Claims, motions to allow late-filed Claims, and motions to estimate Claims.

d.      over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Diocese, the Estate, or the Trust, or property abandoned or transferred by the Diocese, the Estate or the Trust.

e.      over motions to approve any insurance settlements entered into with a Non-Settling Insurer after the Effective Date.

f.      over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets.

g.      over matters related to the removal of the Trustee and the appointment of a successor Trustee.

h.      over matters relating to the subordination of Claims.

i.      to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated.

j.      to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order.

k.      to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or

- 64 -

pursuant to the Plan and any Insurance Settlement.

l.        over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith.

m.       over requests for allowance of payment of Claims entitled to priority under sections 507(a)(2) and 503(b) of the Bankruptcy Code an any objections thereto.

n.        over all applications for compensation under sections 327, 328, 329, 330, and 503(b) of the Bankruptcy Code.

o.        over matters concerning state, local, or federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

p.        over conflicts and disputes among the Trust, the Diocese, the Reorganized Diocese, and holders of Claims.

q.        over disputes concerning the existence, nature, or scope of the Diocese Discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date.

r.        to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Diocese or its property, the Reorganized Diocese or its property, the Estate or its property, the Trust or its property, the Trustee, the Professionals, or the Confirmation Order.

s.        to enter a final decree closing the Chapter 11 Case.

t.        to enforce all orders previously entered by the Bankruptcy Court.

u.        over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Case or the Plan.

## 14.2    <u>By the District Court.</u>

Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. § 1134, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case.

## 14.3    <u>Actions to Enforce the Plan.</u>

The Diocese, the Reorganized Diocese, and the Trust may, but are not required to, commence an Action to enforce the terms of the Plan or to collect amounts owed pursuant to the Plan and any settlements set forth in the Plan or later approved by the Bankruptcy Court, which are not paid in accordance with the terms of the Plan or such settlement.  Any such Action may be

- 65 -

commenced by filing a motion with the Bankruptcy Court. On and after the Effective Date, the Trust shall have the sole and exclusive right to enforce the terms of the Plan against the Diocese, the Reorganized Diocese and/or any Participating Party (except that the Diocese, the Reorganized Diocese, or any Participating Party may enforce the terms of the plan as against each other) and may seek any appropriate remedy in law or equity from the Bankruptcy Court which shall retain exclusive jurisdiction over any such Action.

### 14.4    Case Closure.

The existence and continued operation of the Trust shall not prevent the Bankruptcy Court from closing the Chapter 11 Case upon a motion by the Diocese, the Reorganized Diocese, or any other Person. The Trustee shall not take any actions to unreasonably keep the Chapter 11 Case open. The Trustee, in his sole discretion, may seek to reopen the Chapter 11 Case to administer assets of the Trust, including with respect to entering into settlement agreements with Non-Settling Insurers. If the Chapter 11 Case is reopened upon request of the Trustee, the Trust, the Diocese, and the Reorganized Diocese shall cooperate to assure that no disbursements are made from the Estate during the period when the Chapter 11 Case is reopened, and the case shall be closed at the earliest possibility.

## SECTION 15.  MISCELLANEOUS PROVISIONS

### 15.1    Amendment or Modification of this Plan.

The Plan Proponent may modify the Plan at any time prior to the Confirmation Hearing, in accordance with section 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to substantial consummation, the Plan Proponent may modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all Creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court. Notwithstanding the foregoing, those provisions of the Plan that implement and supplement the Insurance Settlements may not be severed, waived, amended, deleted, or otherwise modified without the prior written approval of all of the Settling Insurers affected by such severance, waiver, amendment, deletion, or modification.

### 15.2    Revocation or Withdrawal of this Plan.

The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan Proponent revokes or withdraws this Plan before the Confirmation Date, then this Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Plan Proponent or to prejudice in any manner the rights of the Plan Proponent in any further proceedings.

### 15.3    Reports.

Until a final decree closing the Chapter 11 Case is entered, the Diocese shall File all post-confirmation quarterly reports as required by the United States Trustee Operating Guidelines (with a copy served on the Office of the United States Trustee). The first report shall be Filed within thirty days after the end of the quarter in which the Effective Date occurs.

### 15.4 Notices.

All notices or requests in connection with this Plan shall be in writing and given by mail or overnight mail (with a contemporaneous e-mail copy, which shall not constitute notice) addressed to:

> To the Diocese or the Reorganized Diocese:
> Stephen A. Donato, Esq.
> Charles J. Sullivan, Esq.
> Grayson T. Walter, Esq.
> Bond, Schoeneck & King, PLLC
> One Lincoln Center
> Syracuse, New York 13202 Email:
> donatos@bsk.com
>       sullivc@bsk.com
>       walterg@bsk.com

> To the Plan Proponent
> Mark D. Plevin
> Miranda H. Turner
> Crowell & Moring LLP
> 1001 Pennsylvania Avenue, N.W.
> Washington, DC 20004
> Email: mplevin@crowell.com
>       mturner@crowell.com

> David Christian
> David Christian Attorneys LLC
> 105 West Madison Street, Suite 2300
> Chicago, Illinois 60602
> Email: dchristian@dca.law

> To the Trust or the Trustee
> At the address set forth in the Trust Agreement

All notices and requests to Persons holding any Claim in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in this Chapter 11 Case. Any such holder of a Claim may designate in writing any other address for purposes of this Section, which designation will be effective upon receipt by the Diocese.

### 15.5 Severability.

If, prior to confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation,

- 67 -

the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.

### 15.6 Validity and Enforceability.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the Confirmation Order, is valid and enforceable pursuant to its terms. Should any provision in this Plan be determined by the Bankruptcy Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of this Plan.

### 15.7 Controlling Documents.

In the event and to the extent that any provision of the Plan or the Trust Documents is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan or the Trust Documents, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Trust Documents (other than provisions relating to the Trustee's authority to act) is inconsistent with any provision of the Plan, the Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Trust Documents, the provisions of the Confirmation Order shall control and take precedence.

### 15.8 Filing of Additional Documents.

At any time before substantial consummation of the Plan, the Diocese, the Trust, the Reorganized Diocese, or the Plan Proponent, as appropriate, may File with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

### 15.9 Direction to a Party

On or after the Effective Date, the Trustee, the Diocese, or the Reorganized Diocese, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect the transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

### 15.10 Certain Actions

By reason of entry of the Confirmation Order prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers or Trustees of the Diocese under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution and implementation of other matters provided for under the Plan involving the Diocese or the organizational structure of the Diocese

shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers or Trustees of the Diocese.

**15.11    Preservation of Tort Defendants' Rights.**

Nothing in this Plan shall be deemed to affect in any way the ability of any Tort Defendant to exercise any claims, demands, causes of action, powers, defenses, setoffs, and other limitations, rights, remedies, and privileges of any nature or description ("Litigation Rights") that such Tort Defendant may have under applicable state and federal law in connection with any Tort Action; *provided, however*, that to the extent the exercise of such Litigation Rights would otherwise result in any affirmative obligation of the Diocese and/or any Participating Party to contribute to or satisfy any judgment or claim, the enforcement of such judgment or claim or any right of contribution regarding same as against the Diocese and/or any Participating Party shall be enjoined pursuant to Section 12 of the Plan.

Nothing in this Plan shall prevent any Tort Defendant from asserting in any Tort Action that any distribution made by, on behalf of the Diocese or a Participating Party, or made by reason or because of or related to this Plan to or on account of an Abuse Claimant should be treated as a payment by a joint tortfeasor to settle the Abuse Claimant's Claim for purposes of New York law, including, but not limited to General Obligations Law ("GOL") 15-108 and Civil Practice Law and Rules ("CPLR") Articles 14 and 16. Tort Defendants shall retain all rights as against any Abuse Claimant with respect to CPLR Articles 14 and 16 and GOL 15-108, *provided, however*, that to the extent of any conflict between state law and the injunctive provisions of this Plan with respect to the collection or enforcement of any claim against the Diocese or any Participating Party, the terms of this Plan shall control.

Nothing in this Plan shall prevent any Tort Defendant from seeking discovery and/or testimony from the Diocese, the Reorganized Diocese, the Protected Parties, or any Abuse Claimant in connection with any Tort Action, in accordance with applicable rules of civil procedure.

**15.12    ~~15.11~~ Waiver of Subordination.**

Notwithstanding any provision of the Plan to the contrary, all holders of Claims shall be deemed to have waived any and all contractual subordination rights which they may have with respect to the Distributions made pursuant to the Plan, and the Confirmation Order shall permanently enjoin, effective as of the Effective Date, all holders of Claims from enforcing or attempting to enforce any such rights against any Person receiving Distributions under the Plan.

**15.13    ~~15.12~~ Reservation of Rights.**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date has occurred.

**15.14    ~~15.13~~ Consummation of the Plan.**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be

immediately effective and enforceable and deemed binding upon the Plan Proponent, Diocese, the Reorganized Diocese, and any and all Claimants (irrespective of whether such Claimants voted or are deemed to have accepted the Plan, voted to reject the Plan, or failed to vote to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

### 15.15 ~~15.14~~ Plan as Settlement Communication

The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise Claims and/or causes of action that are disputed as to validity or amount (including Abuse Claims and the Insurance Coverage Adversary Proceeding), except as otherwise provided above. Accordingly, the Plan, the Disclosure Statement, and any communications regarding the Plan or the Disclosure Statement are subject in all respects to Rule 408 of the Federal Rules of Evidence and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity, or invalidity of, any Disputed Claim or cause of action. Except as expressly set forth in the Plan, nothing in the Plan is intended to constitute a compromise of Abuse Claims.

### 15.16 ~~15.15~~ Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan transactions consummated or to be consummated in connection therewith.

### 15.17 ~~15.16~~ Headings.

Headings are used in this Plan for convenience and reference only, and shall not constitute a part of this Plan for any other purpose.

### 15.18 ~~15.17~~ No Admissions.

Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed as an admission by the Diocese, the Reorganized Diocese, the Committee any Participating Party, or any Settling Insurer with respect to any matter set forth herein.

[*Signature pages follow*]

Dated: ~~December 11~~April 9, ~~2023~~2024      Respectfully submitted,

The Continental Insurance Company, successor by merger to Commercial Insurance Company of Newark, New Jersey and Firemen's Insurance Company of Newark, New Jersey

By: _____

   Catherine Glover

Its Senior Vice President, Claims

By:    */s/ Jeffrey A. Dove*____

Jeffrey A. Dove

BARCLAY DAMON LLP

Barclay Damon Tower

125 East Jefferson Street

Syracuse, New York 13202

Telephone: (315) 413-7112

jdove@barclaydamon.com

Mark D. Plevin

CROWELL & MORING LLP

Three Embarcadero Center, 26th Floor

San Francisco, California 94111

Telephone: (415) 986-2800

mplevin@crowell.com

David Christian

DAVID CHRISTIAN ATTORNEYS LLC

105 West Madison Street, Suite ~~1400~~2300

Chicago, Illinois 60602

Telephone: (312) 282-5282

dchristian@dca.law

Miranda H. Turner

CROWELL & MORING LLP

1001 Pennsylvania Avenue, N.W.

Washington, DC 20004

Telephone: (202) 624-2500

mturner@crowell.com

*Attorneys for The Continental Insurance Company, successor by merger to Commercial Insurance Company of Newark, New Jersey and Firemen's Insurance Company of Newark, New Jersey*

~~9074151559~~07479347.02

## Exhibit A

Participating Parties

Parishes
1.    Sacred Heart Cathedral, Rochester
2.    **Annunciation, Rochester
3.    **St. Ambrose, Rochester
4.    **St. Andrew, Rochester
5.    **St. Anthony of Padua, Rochester
6.    **St. Augustine, Rochester
7.    St. Anne, Rochester
8.    Blessed Sacrament, Rochester
9.    **Corpus Christi, Rochester
10.   St. Boniface, Rochester
11.   **St. Bridget, Rochester
12.   ** St. Cecilia, Rochester
13.   St. Charles Borromeo, Rochester
14.   **Christ the King, Rochester
15.   **Church of the Annunciation, Rochester
16.   Emmanuel Church of the Deaf, Rochester
17.   **St. Feehan, Rochester
18.   **St. Francis of Assisi, Rochester
19.   St. Frances Xavier Cabrini, Rochester
20.   St. George, Rochester
21.   **Guardian Angels, Rochester
22.   **St. Helen, Rochester
23.   Holy Apostles, Rochester
24.   Holy Cross, Rochester
25.   **Holy Ghost, Rochester
26.   **Holy Family, Rochester
27.   **Holy Name of Jesus, Rochester
28.   **Holy Redeemer, Rochester
29.   St. Francis Xavier, Rochester
30.   **Holy Redeemer/St. Francis Xavier, Rochester
31.   **Holy Rosary, Rochester
32.   **Immaculate Conception, Rochester
33.   Immaculate Conception/St. Bridget, Rochester
34.   **St. James, Rochester
35.   **St. John the Evangelist, Rochester
36.   St. John the Evangelist, Rochester
37.   **St. Joseph, Rochester
38.   Kateri Tekakwitha Roman Catholic, Rochester
39.   St. Lawrence, Rochester
40.   **St. Lucy, Rochester
41.   **Light of Christ Roman Catholic Parish, Rochester
42.   **St. Margaret Mary, Rochester

| | |
|---|---|
| 43. | St. Mark, Rochester |
| 44. | St. Mary, Rochester |
| 45. | **St. Michael, Rochester |
| 46. | St. Monica, Rochester |
| 47. | **Our Lady of the Americas, Rochester |
| 48. | **Our Lady of Good Counsel, Rochester |
| 49. | Our Lady of Lourdes, Rochester |
| 50. | **Our Lady of Mount Carmel, Rochester |
| 51. | **Our Lady of Mercy, Rochester |
| 52. | **Our Lady of Perpetual Help, Rochester |
| 53. | **Our Lady of Sorrows, Rochester |
| 54. | Our Lady of Victory-St. Joseph, Rochester |
| 55. | Our Lady Queen of Peace, Rochester |
| 56. | Our Mother of Sorrows, Rochester |
| 57. | The Parish of the Holy Family, Rochester |
| 58. | Peace of Christ, Rochester |
| 59. | **St. Patrick, Rochester |
| 60. | **Sts Peter & Paul, Rochester |
| 61. | St. Pius Tenth, Rochester |
| 62. | **St. Salome, Rochester |
| 63. | St. Stanislaus, Rochester |
| 64. | St. Theodore, Rochester |
| 65. | **St. Theresa of the Infant Jesus, Rochester |
| 66. | St. Thomas More, Rochester |
| 67. | **St. Thomas the Apostle, Rochester |
| 68. | **St. Catherine of Siena, Addison |
| 69. | Saints Isidore and Maria Torribia, Addison |
| 70. | **St. Margaret Mary, Appalachin |
| 71. | **St. Mathias, Atlanta |
| 72. | St. Alphonsus, Auburn |
| 73. | **St. Aloysius, Auburn |
| 74. | **St. Francis of Assisi, Auburn |
| 75. | Holy Family, Auburn |
| 76. | **St. Hyacinth, Auburn |
| 77. | St. Mary, Auburn |
| 78. | Saints Mary and Martha, Auburn |
| 79. | Sacred Heart, Auburn |
| 80. | Good Shephard Catholic Community, Aurora |
| 81. | St. Agnes, Avon |
| 82. | St. John Vianney, Bath |
| 83. | **St. Mary, Bath |
| 84. | **St. Stanislaus, Bradford |
| 85. | Nativity of the Blessed Virgin Mary, Brockport |
| 86. | **St. Columba, Caledonia |
| 87. | The Parish of Saint Martin De Porres, Caledonia |
| 88. | **Our Lady of Lebanon, Canandaigua |
| 89. | St. Benedict, Canandaigua |
| 90. | **St. Mary, Canandaigua |
| 91. | **St. Joachim, Canisteo |

| | |
|---|---|
| 92. | **St. William, Cameron Mills |
| 93. | **St. Joseph, Campbell |
| 94. | **St. Patrick, Cato |
| 95. | **St. Francis of Assisi, Catatonk |
| 96. | **St. Joseph, Cayuga |
| 97. | **St. Vincent De Paul, Churchville |
| 98. | **St. Felix, Clifton Springs |
| 99. | **St. Felix/St. Francis Parish Cluster, Clifton Springs |
| 100. | St. Peter's Roman Catholic Parish, Clifton Springs |
| 101. | **St. John the Evangelist, Clyde |
| 102. | St. Joseph the Worker, Clyde |
| 103. | **St. Pius V, Cohocton |
| 104. | **St. William, Conesus |
| 105. | All Saints, Corning |
| 106. | **Santa Maria de Mercede, Cuylerville |
| 107. | **St. Mary, Dansville |
| 108. | **St. Patrick, Dansville |
| 109. | **St. Andrew, Dundee |
| 110. | Holy Cross, Dryden |
| 111. | **St. Bridget, East Bloomfield |
| 112. | St. Jerome, East Rochester |
| 113. | **St. Charles Borromeo, Elmira |
| 114. | **St. Anthony, Elmira |
| 115. | **Blessed Sacrament, Elmira |
| 116. | **St. Casimir, Elmira |
| 117. | **St. Cecilia, Elmira |
| 118. | **Christ the Redeemer, Elmira |
| 119. | **St. John the Baptist, Elmira |
| 120. | **St. Mary, Elmira |
| 121. | **Our Lady of Lourdes, Elmira |
| 122. | The Parish of the Most Holy Name of Jesus, Elmira |
| 123. | **St. Patrick, Elmira |
| 124. | **Sts. Peter and Paul Catholic Parish, Elmira |
| 125. | Church of the Assumption, Fairport |
| 126. | Church of the Resurrection, Fairport |
| 127. | St. John of Rochester, Fairport |
| 128. | St. Luke the Evangelist, Geneseo |
| 129. | **St. Mary, Geneseo |
| 130. | **St. Francis De Sales, Geneva |
| 131. | Our Lady of Peace, Geneva |
| 132. | **St. Stephen, Geneva |
| 133. | **St. Hillary, Genoa |
| 134. | **St. Mary, Greenwood |
| 135. | St. Anthony, Groton |
| 136. | **Holy Name of Jesus, Groveland |
| 137. | St. Elizabeth Ann Seton, Hamlin |
| 138. | **St. Gabriel, Hammondsport |
| 139. | **Church of the Good Shepherd, Henrietta |
| 140. | St. Marianne Cope, Henrietta |

141. St. Leo, Hilton
142. St. Paul of the Cross, Honeoye Falls
143. St. Mary, Our Lady of the Hills, Honeoye
144. **St. Ann, Hornell
145. Our Lady of the Valley, Hornell
146. **St. Ignatius Loyola, Hornell
147. St. Mary Our Mother, Horseheads
148. **St. Francis Solanus, Interlaken
149. St. Catherine of Siena, Ithaca
150. Immaculate Conception, Ithaca
151. **Our Lady of the Lake, King Ferry
152. All Saints, Lansing
153. **St. Thomas Aquinas, Leicester
154. St. Rose, Lima
155. St. Matthew Catholic Church Society, Livonia
156. **St. Joseph, Livonia
157. **St. Michael, Livonia Center
158. **St. Michael, Lyons
159. **St. Patrick, Macedon
160. **St. Gregory, Marion
161. **St. Patrick, McLean
162. St. Catherine of Siena, Mendon
163. **St. Michael, Montezuma
164. **St. Patrick, Moravia
165. **Church of the Assumption, Mount Morris
166. **St. Patrick, Mount Morris
167. **St. Patrick, Mumford
168. **St. Januarius, Naples
169. **St. John the Evangelist, Newark Valley
170. St. Michael, Newark
171. St. Christopher, North Chili
172. **Holy Angels, Nunda
173. St. Benedict, Odessa
174. **St. Mary of the Lake, Ontario
175. St. Maximillian Kolbe, Ontario
176. **Holy Cross, Ovid
177. The Parish of Mary, Mother of Mercy, Interlaken
178. St. Ann, Owasco
179. Blessed Trinity, Owego
180. St. Patrick, Owego
181. **Immaculate Heart of Mary, Painted Post
182. **St. Anne, Palmyra
183. The Parish of St. Katharine Drexel, Palmyra
184. Holy Spirit, Webster
185. St. Joseph, Penfield
186. **St. Michael, Penn Yan
187. Our Lady of Lakes Catholic Community, Penn Yan
188. **Sacred Heart of Jesus, Perkinsville
189. **St. Francis, Phelps

190. Church of the Transfiguration, Pittsford
191. St. Louis, Pittsford
192. **St. Raphael, Piffard
193. **St. Patrick, Prattsburg
194. **St. Thomas the Apostle, Red Creek
195. **St, Lucy, Retsof
196. **St. Mary, Rexville
197. **St. Joseph, Rush
198. **St. Mary, Rushville
199. **St. Patrick, Savannah
200. **St. Bernard, Scipio Center
201. **St. Mary of the Assumption, Scottsville
202. **St. Patrick, Seneca Falls
203. **St. Dominic, Shortsville
204. **Epiphany, Sodus
205. **St. Rose of Lima, Sodus Point
206. St. John the Evangelist, Spencerport
207. **St. Theresa, Stanley
208. **St. James the Apostle, Trumansburg
209. **St. Michael's, Union Springs
210. **St. Pius the Tenth, Van Etten
211. St. Patrick, Victor
212. St. Francis and St. Clare, Waterloo
213. **St. Mary, Waterloo
214. St. Mary of the Lake, Watkins Glen
215. **St. James, Waverly
216. Holy Family Catholic Community, Wayland
217. **St. Joseph, Wayland
218. Holy Trinity, Webster
219. St. Paul, Webster
220. St. Rita, Webster
221. **St. John, Weedsport
222. **St. Joseph, Cato
223. Our Lady of the Snow, Weedsport
224. **St. Joseph, West Bloomfield
225. Catholic Community of Blessed Trinity, Wolcott
226. **St. Mary Magdalene, Wolcott
227. ** Most Precious Blood Church
228. The Cathedral Community Church of Rochester

Other Entities
1. Catholic Charities of the Diocese of Rochester, Inc.
2. Rochester Catholic Press Association, Inc. ("Catholic Courier")
3. Catholic Youth Organization of Catholic Charities of the Diocese of Rochester
4. Providence Housing Development Corporation
5. Camp Stella Maris of Livonia, N.Y.
6. St. Bernards School of Theology and Ministry
7. Villa of Hope (f/k/a St. Joseph's Villa)

8. De Paul Community Services (f/k/a De Paul Mental Health Clinic)

<u>Schools</u>
1. All Saints in Corning
2. Holy Family in Elmira
3. St. Joseph in Auburn
4. St. Francis/St. Stephen in Geneva
5. De Sales High School in Geneva

** Indicates a parish that is closed, has merged with another or is otherwise inactive at this time.

# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| DIOCESE OF ROCHESTER, | Case No. 19-20905 |
| Debtor. | |

**SUMMARY OF CONTINENTAL INSURANCE COMPANY'S ~~SECOND~~THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR THE DIOCESE OF ROCHESTER**

The Continental Insurance Company ("Continental" or "CNA") has proposed a Plan of Reorganization (the "CNA Plan") for the Diocese of Rochester to address the Diocese's liability to survivors of sexual abuse and other creditors. The materials in the package you have received with this summary of the CNA Plan include (i) the CNA Plan itself, (ii) the Disclosure Statement for the CNA Plan, and (iii) a ballot for voting to accept or reject the CNA Plan with instructions on how to complete and return the ballot. The CNA Plan includes exhibits that are part of the CNA Plan; you should review all of these documents because they contain information relevant to your decision to vote to accept or reject the CNA Plan.[1]

This summary of the CNA Plan is intended to assist you in deciding whether to accept or reject the CNA Plan. This summary is only a "plain English" explanation and summary of the CNA Plan and is qualified in its entirety by the full terms of the CNA Plan. The CNA Plan and

---

[1]    The defined terms used in this Plan Summary and in the CNA Disclosure Statement can be found in Article I of the CNA Plan, unless defined herein or in the CNA Disclosure Statement.

Disclosure Statement (along with their exhibits) are not modified by this document, which is provided as a means of explaining the CNA Plan for reference only. You should review the CNA Plan and Disclosure Statement in their entirety because the CNA Plan, if approved by the court, will control how your Abuse Claim is finally resolved against the Diocese, parishes, and certain other entities that may be responsible for your abuse. You may wish to consult an attorney to advise you regarding the terms of the CNA Plan and how it may affect your legal rights.

1.    **Why did CNA file the CNA Plan?**

CNA is one of the Diocese's insurers. Back in 2022, CNA and the Diocese agreed to a settlement whereby CNA would pay $63.5 million to a Trust for the benefit of Survivors. Bankruptcy law requires that such settlements must be approved by the bankruptcy court, and the Diocese filed court papers urging the bankruptcy court to approve the settlement with CNA. In those papers, the Diocese argued that the settlement with CNA met all the standards for bankruptcy court approval. The Official Committee of Unsecured Creditors (the "Committee") objected to the settlement.

Thereafter, the Diocese, the Committee, and CNA entered into mediation. No agreements were reached among the parties to the mediation. CNA concluded that the Committee's demands in the mediation were unsupported and unrealistic. CNA determined that it should file a plan of reorganization that included an increased offer, so that Survivors themselves could choose whether to accept the CNA Plan, which provides a global resolution with more upfront compensation available, or bear the risks of litigation under the plan proposed by the Diocese and the Committee (the "Debtor Plan"). CNA respectfully asks you to consider whether the CNA Plan may be more appealing to you than the terms of the Debtor Plan.

- 2 -

CNA prefers to not litigate against Survivors. That is why it has proposed its own plan and offered $75 million to compensate Survivors—$11.5 million more than the amount of its 2022 settlement which the Diocese argued was in the best interests of the bankruptcy estate and its creditors. However, CNA believes the Diocese breached that 2022 settlement with CNA and is now pursuing a plan—the Debtor Plan—that is prejudicial to CNA's legal rights. If the Debtor Plan is confirmed, CNA would have appeal rights and may have a damages claim against the Diocese for breach of contract. An appeal would likely further delay Survivor compensation.

**2.     What are the basic terms of the CNA Plan?**

The CNA Plan is an offer to Survivors of a total compensation fund of ***$201.35 million***, including ***$75 million*** from CNA, which Survivors will be able to access immediately after confirmation of the CNA Plan, the occurrence of the Effective Date, and the prompt evaluation of claims by the Abuse Claims Reviewer. The compensation fund under the CNA Plan will be funded by prior monetary commitments from the Diocese and the other Settling Insurers, plus an additional $75 million from CNA. The money contributed by the Diocese and the insurers is in exchange for releases and injunctive protection against existing Survivor claims and certain future claims.

Under the CNA Plan, each Survivor may opt to submit his or her claim to an Abuse Claim Reviewer and receive a prompt compensation offer. The offer will be based on the Abuse Claims Reviewer's evaluation of the nature and circumstances of the abuse suffered by the Survivor, the impact of the abuse on the Survivor. Survivors who wish to pursue their Abuse Claims in court may do so freely, without needing to obtain permission. Survivors who litigate will be paid on any

- 3 -

recovery from the compensation fund, subject to certain limitations described below and in the accompanying CNA Plan and Disclosure Statement.

**A.   What is the funding for the CNA plan?**

The CNA Plan is funded as follows:

- $75 million from CNA

- $55 million from the Diocese and non-debtor entities related to the Diocese

- $50 million from Interstate Fire & Casualty Company and National Surety Corporation

- $19.5 million from Certain London Market Insurers

- $1.1 million for Certain Underwriters at Lloyd's, London

- $750,000 from First State Insurance Company

The total funding for the CNA Plan is ***$201.35 million***. No post-bankruptcy litigation would be required to obtain this funding. The funding would be available to the Survivor Trust in full on the Effective Date of the Plan.

A small portion of the $201.35 million will be reserved for certain required payments, including costs of administering the Trust. Some funds will be reserved for making payments to Unknown Claimants, defined in the CNA Plan as Survivors who were under a legal disability excusing their failure to file a proof of claim by the Bar Date. The bankruptcy court has approved CNA's retention of retired Judge Michael Hogan as the legal representative of Unknown Claimants, to recommend how much should be set aside to pay these claims based on how many Unknown Claimants are expected. Overall, it is anticipated that the total reserves that will be set

- 4 -

aside under the CNA Plan will no more than $1.35 million, leaving at least $200 million for distribution to Survivors who filed timely proofs of claim during the bankruptcy case.

**B.    How will Survivor compensation be determined under the CNA plan?**

Individual Survivors' shares of the money available for distribution by the Trust will be based on a review and evaluation of the claims by the Abuse Claims Reviewer. CNA has selected Roger Kramer of Kramer Law LLC to be the Abuse Claims Reviewer. Mr. Kramer was also selected by the Diocese and the Committee to be the Abuse Claims Reviewer under the Debtor Plan.

If the CNA Plan is confirmed, Mr. Kramer will conduct his evaluation of the Abuse Claims pursuant to an Allocation Protocol that is attached to the CNA Plan. The terms of the CNA Plan's Allocation Protocol are nearly identical to the terms of the Debtor Plan's Allocation Protocol. Under the CNA Allocation Protocol, the Abuse Claims Reviewer will determine Survivor compensation as follows:

- Each Abuse Claim will be evaluated by the Abuse Claim Reviewer, who will assign a point total from 0 to 100 according to the following Evaluation Factors:

    1.    **Nature of Abuse**:

        a.    Duration;

        b.    Frequency/number of instances;

        c.    Degree of intrusiveness into child's body (*e.g.*, clothed/unclothed, masturbation by or of perpetrator, oral penetration, anal penetration, vaginal penetration);

        d.    Level or severity of force / violence / coercion / threats; control of

- 5 -

environment (*e.g.*, boarding school, orphanage, trip under supervision of perpetrator, day school, Perpetrator's employment relationship with the Diocese);

e. Number of Perpetrators of the Diocese that abused the Claimant; physical pain suffered;

f. Grooming;

g. Relationship of the Claimant to the Perpetrator;

h. Location of abuse, including but not limited to isolated location, rectory, church, cabin, orphanage, etc.; and/or

i. Additional factors that may be provided by the Claimant.

2. **Impact of the Abuse**:

a. School behavior problems;

b. School academic problems;

c. Getting into legal trouble as a minor;

d. Loss of faith;

e. Damage to family relationships / interpersonal difficulties;

f. Mental health symptoms, including but not limited to:

- Depression;

- Suicide attempt or suicidal ideation;

- Anxiety;

- Substance abuse;

- Sexual acting out;

- 6 -

- Runaway;

- Flashbacks;

- Nightmares;

g. Adult and current functioning:

- Criminal record as an adult;

- Underemployment/unemployment;

- Relationship problems;

- Substance abuse;

h. Physical health symptoms, including but not limited to:

- Physical manifestations of emotional distress;

- Gastrointestinal issues;

- Headaches, high blood pressure;

- Physical manifestations of anxiety;

- Erectile dysfunction;

- Heart palpitations;

- Sexually-transmitted infections;

- Physical damage caused by acts of abuse;

- Reproductive damage;

- Self-cutting; and/or

- Other self-injurious behavior;

i. The risk of the foregoing factors affecting the Abuse Claimant in the future based on the Abuse Claimant's age at the present time; and/or

- 7 -

j.   Additional factors that may be provided by the Abuse Claimant.

- The Trustee will calculate a Trust Settlement Offer for each Survivor.  That offer will be based on the Survivor's percentage share of the total points assigned to all Survivors, applied to the available compensation fund.  By way of example, if a total of 30,000 points are assigned to all Survivors, and Survivor A is assigned 90 points, Survivor A's percentage share would be 90 divided by 30,000, or 0.3%.  If the total available compensation fund (following establishment of certain reserves discussed herein) is $200 million, then Survivor A would be offered 0.3% of $200 million, or $600,000.  At the end of this summary are several tables providing additional information on how hypothetical individual Survivors will be paid under the CNA Plan based on certain assumptions.

- If a Survivor accepts the Trust Settlement Offer, the Survivor will promptly be paid the full amount of his or her accepted Trust Settlement Offer.  One of the lawyers for the law firm representing the Committee in this case has stated that, in a case like this one, the time from initial funding of the trust to initial distributions to survivors is often as short as a few months or even a few weeks.

**3.     Will my rights to sue in court for my abuse be limited?**

Survivors can choose to reject their Trust Settlement Offer in order to litigate against the Diocese in court, as follows:

- A Survivor who wishes to litigate may reject the Trust Settlement Offer and, instead, file and pursue a lawsuit (a "Tort Claim").  If the Survivor obtains a Final Judgment after

- 8 -

litigation of his or her Tort Claim, then the following payments may be made:

- o If the amount of the Final Judgment is less than or equal to the amount of his or her Trust Settlement Offer, the Survivor would promptly be paid the amount of the Final Judgment.

- o If the amount of the Final Judgment is greater than the amount of his or her Trust Settlement Offer, the Survivor would promptly be paid the amount of the Trust Settlement Offer. The amount by which a Final Judgment exceeds a Trust Settlement Offer is the Excess Recovery Amount. After all Tort Claims are litigated to Final Judgment, Survivors holding Final Judgments in excess of their Trust Settlement Offers would then be paid their respective Excess Recovery Amounts.

- o Excess Recovery Amounts will be paid from the Payment Reserve. Initial funding for the Payment Reserve will be $500,000. If there are insufficient funds to pay all Excess Recovery Amounts in full, then each Survivor will receive his or her respective percentage share of the available funds, determined based on their respective Excess Recovery Amounts compared to the sum of all Excess Recovery Amounts.

- If a Survivor obtains a Final Judgment in an amount less than the amount of his or her Trust Settlement Offer, then the Survivor will receive the amount of the Final Judgment award, and the difference between the lower Final Judgment and the higher Trust Settlement Offer will be transferred to the Payment Reserve and will be used to pay Excess Recovery Amounts as described above.

- 9 -

4. **Who is released under the CNA Plan?**

Because the Diocese will be contributing money to the Trust, it will be released from liability. Any recoveries against the Diocese will be limited to the Tort Claims discussed above. In addition, certain non-debtor parties who are would be making financial contributions to the Trust would also receive releases under the CNA Plan. These non-debtor parties include:

- The Participating Parties, defined as the Parishes, Schools, Other Catholic Organizations, and other entities listed on Exhibit A to the CNA Plan. Under the CNA Plan, the contributions being made on behalf of the Participating Parties are the same as under the Diocese's proposed plan.

- The Settling Insurers, including CNA. Under the CNA Plan, all known insurance will be settled. There are no known non-settling insurers.

- Certain parties will be exculpated (*i.e.*, protected from liability) from acts or omissions that occurred during or in connection with the bankruptcy case, including as to the formulation, negotiation, and pursuit of confirmation of the CNA Plan: the Diocese; the Reorganized Diocese; CNA and the other Settling Insurers; the Mediators; the Unknown Claimant Representative; the Abuse Claims Reviewer; and their related affiliates, as defined in the CNA Plan.

5. **How does the CNA Plan differ from the Debtor Plan?**

The CNA Plan offers Survivors the choice to secure $75 million in committed funding from CNA now, without any need for further litigation. The total amount available to Survivors under the CNA Plan is $201.35 million, less the reserves and administrative expenses that

Case 2-19-20905-PRW, Doc 2555, Filed 04/09/24, Entered 04/09/24 17:20:30, Description: Main Document , Page 94 of 189

CNA estimates will be no more than $1.35 million, leaving a total fund available to pay Survivors of at least $200 million.

The Debtor Plan would provide initial funding of $126.35 million—$75 million *less* than the CNA Plan—and zero in upfront funding from CNA. The Diocese estimates that at least $18 million will have to be reserved under the Debtor Plan for payment of Trust expenses such as funding lawsuits.

Survivors can be compensated from the Trust under both plans, and compensation awards would be based on similar Evaluation Factors under both plans. Both plans propose to use the same Abuse Claims Reviewer, Roger Kramer, who has served in this role in other diocesan bankruptcy cases. However, because CNA is not contributing any initial funding to the Debtor Plan, the initial average awards will be lower under the Debtor Plan, compared with the CNA Plan.

Instead of CNA's committed funding of $75 million, the Debtor Plan relies on post-bankruptcy litigation to recover from CNA. Specifically, under the Debtor Plan some Survivors, whose abuse occurred during periods when insurance issued by CNA was in effect, will be allowed by the Trust to sue the Diocese or Participating Parties (in name only) to try to obtain judgments, which they can then try to recover in a second lawsuit against CNA. Both litigations—first to obtain a judgment against the Diocese, and then to obtain coverage from CNA to pay the judgment—could take a long time, and there is a risk that Survivors may not prevail in either or both litigations.

- 11 -

Under the Debtor Plan, many Survivors—those whose abuse occurred outside the alleged CNA policy years of 1952 to 1977[12]—will not be eligible to bring lawsuits at all, and they may or may not get to share in recoveries from other Survivors' lawsuits. That means Survivors in non-CNA years may receive a smaller recovery than other Survivors with similar claims.

Because the CNA Plan does not require post-bankruptcy litigation in order for CNA to contribute to Survivor compensation, CNA expects the costs to administer the Trust under the CNA Plan will be very low. Because the Debtor Plan depends on litigation to recover against CNA, with some litigation costs funded by the Trust, the administrative costs under the Debtor Plan would likely be higher, potentially running up to many millions of dollars and many times the administrative costs under the CNA Plan.

Aside from the issue of how Survivors would obtain compensation from CNA, there are not many differences between the two plans. Both plans allow the Diocese to reorganize and continue its religious and charitable missions, while providing improved protocols for the protection of children. Both plans release the Diocese and Participating Parties from liability and eliminate the chance to seek punitive or exemplary damages.

The following chart summarizes the key similarities and differences between the two competing plans:

|  | CNA Plan | Diocese Plan |
|---|---|---|
| Larger initial compensation fund | ✔ |  |

---

[12] The Diocese and the Committee assert that CNA's coverage began in 1943. CNA disputes that claim, and believes its coverage did not begin before 1952.

| | | |
|---|:---:|:---:|
| CNA pays without the need for post-bankruptcy litigation | ✓ | |
| Trust compensation will be based on the nature and circumstances of the abuse and impact of the abuse | ✓ | ✓ |
| Higher immediately available average payments to Survivors | ✓ | |
| All Survivors who wish to litigate may do so, without seeking permission from the Trust | ✓ | |
| Lower expected administrative expenses | ✓ | |
| Diocese continues its religious and charitable missions | ✓ | ✓ |
| Improved protections for children | ✓ | ✓ |
| Diocese and Participating Parties released from liability | ✓ | ✓ |
| Punitive or exemplary damages not recoverable | ✓ | ✓ |
| Resolves CNA's claims for breach of the 2022 settlement agreement | ✓ | |
| No appeals from plan confirmation by CNA | ✓ | |

**6.      Does the Committee support the CNA Plan?**

The Committee does not support the CNA Plan. The Committee has stated that the $75 million CNA would pay under the CNA Plan is less than the Committee believes CNA would be required to pay after post-bankruptcy litigation is completed.

The Diocese has been in bankruptcy for more than four years, during which time no abuse lawsuits under the New York Child Victims Act have gone forward against the Diocese and

- 13 -

no Survivors have received compensation from the Diocese. Almost two years ago, the Committee objected to the Diocese's settlement with CNA which provided $63.5 million from CNA and, together with settlements from the Diocese's other insurers, provided a total compensation fund of $147.75 million for Survivors. But the Committee now supports a cash settlement fund of $126.35 million—$21.4 million *less* in committed funding than the 2022 settlements would have provided—along with the assignment of insurance rights against CNA to the Trust. A significant amount of the initial fund of $126.35 million under the Debtor Plan would be used to fund the post-bankruptcy litigation against CNA that is contemplated under the Debtor Plan.

CNA vigorously disputes that the insurance rights that the Debtor Plan would assign to the Trust are worth the amounts the Committee apparently ascribes to them, but obtaining definitive court rulings about the value of the insurance rights is expected to take years. Avoiding the risks and delays inherent in such litigation are among the reasons the Diocese cited to the bankruptcy court in seeking approval of its 2022 settlement with CNA. The accompanying CNA Disclosure Statement contains a lengthy discussion of CNA's and the Committee's competing contentions regarding the availability of insurance coverage from CNA. Moreover, under the law, a prerequisite to obtaining any insurance coverage from CNA is that a claimant must first establish in a court case that the Diocese is liable to the Survivor, and the amount of such liability. As described in the CNA Disclosure Statement, the Diocese has defenses to liability that it could assert in particular cases.

Of note, the law firm that represents the Committee in this case—Pachulski Stang Ziehl & Jones—is the same law firm that represents the claimants' committee in another New York diocesan bankruptcy, *In re Diocese of Rockville Centre*. On behalf of the committee in the *Rockville*

*Centre* case, the Pachulski firm objected to a plan of reorganization sponsored by the Diocese of Rockville Centre that is similar in important respects to the Debtor Plan that the Committee supports in this case.

For example, in *Rockville Centre* the Pachulski firm told claimants that resolving disputed claims through post-bankruptcy litigation—as the Debtor Plan provides in this case—"could take years," and "getting the insurance companies to pay is not as easy as the Diocese makes it sound." In addition, the Pachulski firm complained in the *Rockville Centre* case that "legal fees for the fights with the insurance companies will come out of" the settlement fund, and it criticized the Diocese of Rockville Centre because it "does not estimate how much the fights with the insurance companies will cost or how long that fights will take."

The Diocese of Rockville Centre's proposed plan would establish two separate trusts for different claims, depending on the years in which the abuse allegedly occurred. The result is that, as appears to be the case under the Debtor Plan in this case, some claimants may receive less than others with similar claims. The Pachulski firm in the *Diocese of Rockville Centre* case argued that such disparate treatment "is not fair to all Survivors."

In this case, CNA believes that Survivors should consider the warnings issued by the Pachulski firm in *In re Diocese of Rockville Centre* concerning a plan that, like the Debtor Plan in this case, requires years of litigation to increase the available funds in the Trust and may result in compensation awards that are "not fair to all Survivors."

**7. Are there risks associated with the CNA Plan?**

There are risks associated with the CNA Plan. While you should consult the CNA Disclosure Statement for a more detailed description of potential risks associated with the CNA

- 15 -

Plan, some of the more notable risks include the following:

First, like the Debtor Plan, the CNA Plan contains non-consensual releases in favor of certain third parties, the legality of which is currently under review by the U.S. Supreme Court in the *Purdue Pharma* case. If the U.S. Supreme Court issues a ruling in that case that bankruptcy courts are not permitted to confirm plans with such third-party releases, then the CNA Plan could not be confirmed as currently written, and would have to be revised or withdrawn. Similarly, if the U.S. Supreme Court issues a ruling in the *Purdue Pharma* case that bankruptcy courts are permitted to confirm plans with such third-party releases, but only if certain requirements are satisfied, then to the extent the CNA Plan does not already meet such requirements, the CNA Plan would have to be revised before it could be confirmed.

Second, the CNA Plan assumes that the non-debtor persons and entities making contributions toward the $55 million DOR Entities Cash Contribution will also do so if the CNA Plan is confirmed, since they would receive precisely the same protections under the CNA Plan in exchange for their contributions as they would under the Diocese Plan. Similarly, the CNA Plan assumes that each of the other insurers who have settled with the Diocese and the Committee (Interstate, LMI, Underwriters, and First State) will provide funding for the CNA Plan under the same terms as set forth in their settlement agreements with the Diocese, since the CNA Plan contains the same Supplemental Settling Insurer Injunction as does the Diocese Plan. However, the Diocese has asserted that certain members of the "Catholic Family" may decline to provide funding and/or consent to settlements with the non-CNA Settling Insurers if the CNA Plan is confirmed and the Debtor Plan is not. Although CNA believes that the non-CNA sources of funding under the Debtor Plan will provide the same funding if the CNA Plan is confirmed, because it would be in

- 16 -

their respective economic self-interests to do so, based on the Diocese's assertions there can be no assurance that the non-debtor persons and entities making contributions toward the $55 million DOR Entities Cash Contribution or the non-CNA Settling Insurers will, in fact, provide the expected funding for the CNA Plan.

## 8. CNA Recommendation

Each Survivor must determine for himself or herself whether they prefer the treatment offered by the CNA Plan to the treatment offered by the Debtor Plan. The CNA Plan offers Survivors the chance to choose for themselves which plan they prefer, based on their own personal circumstances and how much risk, delay, and uncertainty they are willing to bear.

CNA believes that the CNA Plan offers more certain compensation, sooner, and without any Survivor having to engage in risky, costly, and potentially lengthy litigation to receive payment from CNA. Also, all Survivors are treated the same under the CNA Plan, regardless of whether their abuse took place during a time when CNA and not some other insurer provided insurance to the Diocese. But, if a Survivor prefers a lower initial payout from a smaller fund with the possibility of an additional payout later, if post-bankruptcy lawsuits against the Diocese and CNA are successful, CNA recognizes that he or she may wish to vote for the Debtor Plan.

As such, CNA recommends that all Survivors carefully review the two competing plans and the two disclosure statements so that they can make an informed choice whether to accept or reject each plan and, if the Survivor chooses to accept both plans, whether to state a preference for one plan over the other.

90749567S907495675.02

- 17 -

## Tables Showing Hypothetical Survivor Recoveries

The two tables below show some examples of what a particular Survivor could expect to receive under certain point allocations, assuming that the total amount available to the Trust to distribute to claimants is $200 million and the total number of points awarded by the Abuse Claims Reviewer is either 30,000 points (first table) or 25,000 points (second table). For reference, the tables below assume 524 Survivors are participating. The average point scores (based on the total number of points (either 30,000 or 25,000) divided by 524 Survivors) for all Survivors are 57.25 (first table), and 47.71 (second table). As discussed in the above summary and in the CNA Plan and Disclosure Statement, each Survivor's actual point score will be determined by the Abuse Claims Reviewer using the Evaluation Factors under the Allocation Protocol.

**Table 1**

| Hypothetical Survivor's points, as awarded by the Abuse Claims Reviewer using the factors required under the Allocation Protocol (related to the nature of the abuse, the circumstances of the abuse, and the impact of the abuse on the Survivor) | Assumed total number of points awarded to all Survivors | Hypothetical Survivor's percentage share of total of 30,000 points awarded to all Survivors | Hypothetical Survivor's Trust Settlement Offer, based on assumptions that the total amount available to the Trust to distribute to claimants is $200 million and the total number of points awarded by the Abuse Claims Reviewer is 30,000 points) |
|---|---|---|---|
| 100 | 30,000 | 0.33% | $660,000 |
| 90 | 30,000 | 0.30% | $600,000 |
| 75 | 30,000 | 0.25% | $500,000 |
| 60 | 30,000 | 0.20% | $400,000 |
| 57.25 | 30,000 | 0.19% | $380,000 |
| 50 | 30,000 | 0.17% | $340,000 |
| 35 | 30,000 | 0.12% | $240,000 |
| 20 | 30,000 | 0.07% | $140,000 |
| 0 | 30,000 | 0.00% | $0 |

- 18 -

**Table 2**

| Hypothetical Survivor's points, as awarded by the Abuse Claims Reviewer using the factors required under the Allocation Protocol (related to the nature of the abuse, the circumstances of the abuse, and the impact of the abuse on the Survivor) | Assumed total number of points awarded to all Survivors | Hypothetical Survivor's percentage share of total of 25,000 points awarded to all Survivors | Hypothetical Survivor's Trust Settlement Offer, based on assumptions that the total amount available to the Trust to distribute to claimants is $200 million and the total number of points awarded by the Abuse Claims Reviewer is 25,000 points) |
|---|---|---|---|
| 100 | 25,000 | 0.40% | $800,000 |
| 90 | 25,000 | 0.36% | $720,000 |
| 75 | 25,000 | 0.30% | $600,000 |
| 60 | 25,000 | 0.24% | $480,000 |
| 50 | 25,000 | 0.20% | $400,000 |
| 47.71 | 25,000 | 0.19% | $380,000 |
| 35 | 25,000 | 0.14% | $280,000 |
| 20 | 25,000 | 0.08% | $160,000 |
| 0 | 25,000 | 0.00% | $0 |

# EXHIBIT 3

# THE DIOCESE OF ROCHESTER
# ALLOCATION PROTOCOL

## 1. **Definitions**

1.1    Capitalized Terms. Capitalized terms used in this Allocation Protocol shall have the meanings given them in the Plan, the Trust Agreement, or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated into this Allocation Protocol by reference.

1.2    Payment Reserve. "Payment Reserve" shall mean a reserve to be used to pay Excess Recovery Amounts, if any. The initial amount of the Payment Reserve shall be ~~determined by the Trustee in his or her sole discretion, within 60 days after the Trustee's appointment, and shall be in an amount of not more than~~ $500,000. The amount of the Payment Reserve as established in the preceding sentence may be increased so as to exceed the initial amount ~~determined by the Trustee~~ if, as provided in Section 6.2(b)(5) of this Allocation Protocol, additional amounts are transferred to the Payment Reserve because one or more Abuse Claimants' Final Judgments are less than their Trust Settlement Offers.

1.3    Perpetrator of the Diocese. "Perpetrator of the Diocese" shall mean a person: (1) who was an employee or other agent of the Diocese or any other Participating Party when such person committed an act of Abuse; or (2) for whom or for whose actions the Diocese or any other Participating Party (as defined in the Plan) was otherwise responsible.

## 2. **Purpose, Interpretation**

2.1    Purpose. This Allocation Protocol is designed to provide guidance to the Abuse Claims Reviewer in determining the amount of each Abuse Claim under the Plan by assigning to each such Claim a value pursuant to the Evaluation Factors below.

2.2    General Principles. As a general principle, this Allocation Protocol intends to set out a procedure that provides for Trust Distributions to be made to Survivors holding Abuse Claims on a fair and equitable basis, including that similar Abuse Claims receive substantially the same treatment. The range of values set forth in the Evaluation Factors below and the discretion given to the Abuse Claims Reviewer to determine and to adjust the value to be assigned to a particular Abuse Claim are intended to reflect the relative values of Abuse Claims.

2.3    Sole and Exclusive Method. The Evaluation Factors set forth below shall be the sole and exclusive method by which an Abuse Claimant may seek allowance and distribution of his or her Abuse Claim. Although the Evaluation Factors collectively comprise the methodology that must be applied in reviewing Abuse Claims, the Abuse Claims Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating an Abuse Claim.

2.4    Interpretation. The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of this Allocation Protocol.

2.5    Confidentiality and Privilege. All information that the Abuse Claims Reviewer receives from any source about any Abuse Claim shall be held in strict confidence and shall not be disclosed absent an order by the Bankruptcy Court or the written consent of the Abuse Claimant (or such Claimant's

SFACTIVE-907500916.1

counsel of record). All information the Abuse Claims Reviewer receives from any Abuse Claimant (including from his or her counsel) shall be subject to a mediation privilege and receipt of such information by the Abuse Claims Reviewer shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

**3.** **Abuse Claims Reviewer**

3.1 <u>Identification of Abuse Claims Reviewer</u>. ~~————~~Roger L. Kramer is the Abuse Claims Reviewer, subject to an order by the Bankruptcy Court. The Abuse Claims Reviewer shall conduct a review of each of the Abuse Claims and make determinations upon which Trust Distributions will be made subject to the Plan and Confirmation Order.

**4.** **Procedure**

4.1 <u>Allowance of an Abuse Claim</u>. An Abuse Claim shall be allowed if the Abuse Claims Reviewer determines that the Abuse Claimant proved his or her claim by a preponderance of the evidence. The Abuse Claims Reviewer may, after considering the credibility of the Abuse Claimant and the facts alleged and evidence submitted in support of an Abuse Claim, deny the Abuse Claim if denial is warranted in the Abuse Claims Reviewer's sole discretion. Abuse Claims denied by the Abuse Claims Reviewer shall not be entitled to any distribution from the Trust. If an Abuse Claim is allowed, the Abuse Claims Reviewer shall determine the amount of such Abuse Claim by assigning such Abuse Claim a point total pursuant to the Evaluation Factors set forth in Section 5 of this Allocation Protocol.

4.2 <u>Allowance of an Unknown Abuse Claim</u>. An Unknown Abuse Claim shall be allowed if the Abuse Claims Reviewer determines, by a preponderance of the evidence, that the claimant did not file a proof of claim (nor was a proof of claim deemed effective) on or before the Effective Date, the earliest incident of alleged Abuse occurred before the Petition Date, and the claimant was at the time of the Claims Bar Date under a disability or other condition recognized by New York law or other applicable law that would toll the statute of limitations for such Claim. If an Unknown Abuse Claim is allowed, the Abuse Claims Reviewer shall determine the amount of such Unknown Abuse Claim by assigning such Unknown Abuse Claim a point total pursuant to the Evaluation Factors set forth in Section 5 of this Allocation Protocol and taking into consideration the assigned point total, the point totals assigned to other Unknown Abuse Claims, the amount of the Unknown Abuse Claims Reserve, and the anticipated likelihood of other Unknown Abuse Claims being submitted in the future.

4.3 <u>Deceased Abuse Survivor</u>. The Abuse Claims Reviewer shall review the claim of a deceased Abuse Claimant without regard to the Abuse Claimant's death, except that the Abuse Claims Reviewer may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

4.4 <u>Determinations by the Abuse Claims Reviewer</u>. The Abuse Claims Reviewer shall notify each Abuse Claimant in writing of the points allocation based on the Evaluation Factors with respect to the Abuse Claimant's claim. The Abuse Claims Reviewer's determination shall be final unless the Abuse Claimant makes a timely request for the points allocation to be reconsidered by the Abuse Claims Reviewer in accordance with Section 4.5 of this Allocation Protocol. The Abuse Claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point allocation. The Abuse Claims Reviewer shall make final determinations as expeditiously as possible, while ensuring a

- 2 -

SFACTIVE-907500916.1

full and fair review process for all Abuse Claims.

4.5 <u>Requests for Reconsideration</u>. An Abuse Claimant may request reconsideration of either (a) the Abuse Claims Reviewer's denial of the Abuse Claimant's Abuse Claim or (ii) the points allocation awarded by the Abuse Claims Reviewer with respect to the Abuse Claimant's Abuse Claim, by delivering a written request for reconsideration to the Abuse Claims Reviewer within ~~14~~30 calendar days after the date of mailing of the notice of the points allocation determined by the Abuse Claims Reviewer. Each written request for reconsideration must be accompanied by a check, payable to the Trust, for the reconsideration fee of $~~500~~425. The Abuse Claimant may, with his or her request for reconsideration, submit additional evidence and argument in support of such request. The Abuse Claims Reviewer shall have the power to change the points allocation if the Abuse Claims Reviewer determines that cause exists to change the points allocation, and the Abuse Claimant's points allocation may go up or down as a result of his or her request for reconsideration. The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review, or appeal by any person or entity, including a court.

**5. Guidelines for Allocation for <u>Allowed</u> Abuse Claims**

5.1 <u>Information to be Considered</u>. The Abuse Claims Reviewer shall consider all of the facts and evidence presented by the Abuse Claimant in the Abuse Claimant's filed proof of claim. ~~Within 14 calendar days after confirmation of the Plan,~~ (as the same may have been amended from time to time). Abuse Claimants may ~~submit~~provide supplemental evidence and information to the Abuse Claims Reviewer in support of their Abuse Claims, which the Abuse Claims Reviewer shall also consider. The Abuse Claims Reviewer ~~shall have the ability to~~may request additional information from ~~any~~an Abuse Claimant. ~~The~~Failure to respond to such requests shall not be construed against the Abuse Claimant ~~may refuse, at his or her own risk, to comply with any such request~~.

Each Abuse Claimant can submit a written statement (a "Supplemental Submission") to the Abuse Claims Reviewer. The Abuse Claims Reviewer shall establish a deadline (the "Submission Deadline") of not less than 30 days for Abuse Claimants to submit Supplemental Statements to the Abuse Claims Reviewer. Notice of the Submission Deadline (the "Supplement Notice") shall provide, among other things, the method for submission of Supplemental Statements. All notices by the Abuse Claims Reviewer to Abuse Claimants, including the Supplement Notice, shall be sent to each Abuse Claimant's counsel of record via email and first class mail at the address(es) provided in the applicable Sexual Abuse Proof of Claim Form.

The Supplemental Submission shall be no longer than 10 pages, single sided, double spaced with 12-point font; provided, however, that an Abuse Claimant not represented by counsel may submit a handwritten Supplemental Submission not to exceed 10 single sided pages in length. A Supplemental Submission shall be submitted by the Submission Deadline unless the Abuse Claims Reviewer determines, in his sole discretion, there is good cause for delay. The Abuse Claims Reviewer, in his sole discretion, may allow an Abuse Claimant to exceed the page limit for the Supplemental Submission.

5.2 Evaluation. The Abuse Claims Reviewer shall consider whether the Abuse Claimant has proven by credible evidence that the Sexual Abuse was perpetrated by a Perpetrator of the Diocese. The Abuse Claims Reviewer shall give notice to the Abuse Claimant and the Trustee if he determines that the Abuse Claimant has not met the burden of proof and shall provide the Abuse Claimant a

- 3 -

SFACTIVE-907500916.1

reasonable opportunity to provide facts and/or legal basis to establish that the burden of proof has been met. The Diocese and any Protected Party (other than a Settling Insurer) must cooperate with any reasonable information or discovery request by an Abuse Claimant that is necessary to respond to the Abuse Claims Reviewer's determination that the Abuse Claimant has not met the burden of proof.

5.3   ~~5.2~~ Evaluation Factors.  Each Abuse Claim will be evaluated by the Abuse Claims Reviewer. Each Abuse Claim will be assigned points on a scale of up to 100 according to the following ~~system~~factors ("Evaluation Factors"), and the points shall determine the amount of distribution to each Abuse Claimant on a pro-rata basis:

a.   **Nature of Abuse** ~~& Circumstances. A point value ranging from 0 to 50 should be allocated for this factor. Considerations should include, but are not limited to, the following facts~~:

   (1)   ~~The duration and/or frequency of the abuse.~~Duration;

      ~~(2)  Type of abuse (e.g., penetration, attempted penetration, masturbation, oral sex, touching under the clothing, touching over the clothing, kissing, sexualized talk).~~

   (2)   Frequency/number of instances;

   (3)   Degree of intrusiveness into child's body (e.g., clothed/unclothed, masturbation by or of perpetrator, oral penetration, anal penetration, vaginal penetration);

   (4)   Level or severity of force/violence/coercion/threats; Control of environment (e.g., boarding school, orphanage, trip under supervision of perpetrator, day school, employment relationship with Perpetrator of the Diocese);

   (5)   Number of Perpetrators of the Diocese that abused the Claimant; Physical pain suffered;

   (6)   Grooming;

   (7)   ~~(3) Circumstances~~Relationship of the ~~abuse such as:~~Claimant to the Perpetrator;

      ~~a. grooming behaviors, including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or claimant, or use of or exposure to pornography;~~

   (8)   Location of abuse, including but not limited to isolated location, rectory, church, cabin, orphanage, etc.; and/or

   (9)   Additional factors that may be provided by the Claimant.

- 4 -

SFACTIVE-907500916.1

b.    **Impact of Abuse**:

   (1)  School behavior problems;

   (2)  School academic problems;

   (3)  Getting into legal trouble as a minor;

   (4)  Loss of faith;

   (5)  Damage to family relationships / interpersonal difficulties;

   (6)  Mental health symptoms, including but not limited to:

      a.   Depression;

      b.   Suicide attempt or suicidal ideation;

      c.   Anxiety;

      d.   Substance abuse;

      e.   Sexual acting out;

      f.   Runaway;

      g.   Flashbacks;

      h.   Nightmares; and/or

   (7)  Adult and current functioning:

      a.   Criminal record as an adult;

      b.   ~~coercion or threat or use of force or violence, stalking~~Underemployment/unemployment;

      c.   Relationship problems;

      d.   Substance abuse;

   (8)  Physical health symptoms, including but not limited to:

      ~~c. relationship of claimant to perpetrator including but not limited to whether claimant was a parishioner or student, held perpetrator in high regard, whether perpetrator was in position of trust, whether perpetrator had unsupervised access to claimant, and whether claimant valued relationship with perpetrator.~~

~~b. **Impact of the Abuse**.  A point value ranging from 0 to 40 should be allocated for this factor.  Overall, this factor permits consideration of how the Abuse impacted the Abuse~~

- 5 -

SFACTIVE-907500916.1

Claimant. ~~Some of these considerations may include the below facts, but the below list is not intended to be exhaustive:~~

> ~~a. Mental Health: This includes but is not limited to anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation, and suicide attempts.~~

> ~~b.~~ Physical ~~Health: This includes but is not limited to physical~~ manifestations of emotional distress~~, gastrointestinal issues~~;

a. <u>Gastrointestinal issues;</u>

b. ~~, headaches~~<u>Headaches</u>, high blood pressure~~, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical~~;

c. <u>Physical manifestations of anxiety;</u>

d. <u>Erectile dysfunction;</u>

e. <u>Heart palpitations;</u>

f. <u>Sexually-transmitted infections;</u>

g. <u>Physical</u> damage caused by acts of abuse~~, reproductive damage, self-cutting and other~~;

h. <u>Reproductive damage;</u>

i. <u>Self-cutting; and/or</u>

j. <u>Other</u> self-injurious behavior~~;~~

(9) <u>The risk of the foregoing factors affecting the Abuse Claimant in the future based on the Abuse Claimant's age at the present time; and/or</u>

(10) <u>Additional factors that may be provided by the Abuse Claimant.</u>

<u>The Abuse Claims Reviewer shall not consider the mere fact that an Abuse Claimant has been or is incarcerated in the review of the claim unless an element of the crime for which the Abuse Claimant was convicted includes fraud or misrepresentation. There will be no consideration of an Abuse Claimant's claims against any entity other than the Diocese or Participating Parties that may be liable to the Abuse Claimant.</u>

> ~~c. Spiritual Well-Being: This includes but is not limited to loss of faith in God, loss of faith and trust in religion, and spiritual distress.~~

d. ~~Interpersonal Relationships: This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation; damage to family relationships, and fear of children or parenting.~~

e. ~~Vocational Capacity: This includes but is not limited to under-employment and unemployment, difficulty with authority figures, difficulty changing and maintaining employment, and feeling of unworthiness or guilt related to financial success.~~

f. ~~Academic Capacity: This includes but is not limited to school behavior problems.~~

g. ~~Legal Difficulties: This includes but is not limited to criminal difficulties, bankruptcy, fraud.~~

~~e. **Claimant Involvement**. A point value ranging from 0 to 10 should be allocated for this section. The Abuse Claims Reviewer shall consider that all Abuse Claimants have benefited from the work and cost incurred by certain Abuse Claimants who participated in the legal and factual development of claims against the Diocese. The Abuse Claim Reviewer should consider factors including but not limited to whether the Abuse Claimant has filed a lawsuit; whether the Abuse Claimant and/or the Abuse Claimant's family has been deposed, participated in a mediation, or been interviewed; whether the Abuse Claimant has participated on the committee representing survivors; and whether the Abuse Claimant participated in publicizing the issue of clergy sex abuse in a manner that has benefitted all Abuse Claimants.~~

## 6. <u>Payment</u>

6.1 <u>Trust Settlement Offers</u>.

a. After all Abuse Claims have been evaluated pursuant to the Evaluation Factors, the Trustee shall calculate the Trust Settlement Offer for each Abuse Claim based on the Abuse Claimant's pro rata share of the total points assigned to all Abuse Claimants and the available funds for distribution, after accounting for necessary holdbacks including the Payment Reserve, the Trust Reserve, and the Unknown Abuse Claim Reserve.

b. Abuse Claimants may accept or reject their Trust Settlement Offers. An Abuse Claimant who accepts his or her Trust Settlement Offer is a Trust Claimant with a Trust Claim. An Abuse Claimant who rejects his or her Trust Settlement Offer is a Tort Claimant with a Tort Claim.

c. For Trust Claimants, the Trustee shall promptly make Trust Distributions in the amount of the respective Trust Settlement Offers.

6.2 <u>Tort Claims and Excess Recovery Amounts</u>.

a. For Tort Claimants (Abuse Claimants who have rejected their Trust Settlement

SFACTIVE-907500916.1

Offers), the Trustee shall hold in reserve an amount equal to each Tort Claimant's Trust Settlement Offer until the Tort Claimant's Tort Claim is resolved by a Final Judgment.

b. Following entry of Final Judgment:

(1) If the amount of the Final Judgment is less than or equal to the amount of the Trust Settlement Offer, the Trust shall promptly pay to the Tort Claimant the amount of the Final Judgment as full and final satisfaction of the Tort Claim. In such case, the difference between the Trust Settlement Offer and the amount of the Final Judgment shall not be paid to the Tort Claimant and, instead, shall be transferred to the Payment Reserve to pay Excess Recovery Amounts.

(2) If the amount of the Final Judgment is greater than the amount of the Trust Settlement Offer, the Trust shall promptly pay to the Tort Claimant the amount of the Trust Settlement Offer.

(3) After all Tort Claims are resolved by Final Judgments, the Trust shall promptly pay to each Tort Claimant, from the Payment Reserve, the amount of his or her Final Judgment that is in excess of the Trust Settlement Offer (the "Excess Recovery Amount"); *provided*, that to the extent all Excess Recovery Amounts cannot be paid in full from the Payment Reserve, then the Trustee shall calculate and pay only each Tort Claimant's pro rata share of his or her respective Excess Recovery Amount.

(4) To the extent all Excess Recovery Amounts cannot be paid in full from the Payment Reserve, then the Trustee shall calculate and pay each Tort Claimant's pro rata share of his or her respective Excess Recovery Amount.

(5) If a court enters Final Judgment determining that the Diocese and/or Participating Party (as applicable) does not have any liability on account of the Tort Claimant's Tort Claim, then the Tort Claimant shall not be entitled to any Distribution from the Trust, including any Trust Settlement Offer, in which event the funds reserved to pay that Tort Claimant's Trust Settlement Offer shall be transferred to pay Excess Recovery Amounts.

c. No multiple, exemplary, statutory, enhanced, or punitive damages, may be included in any component of a Trust Distribution.

6.3 <u>Undeliverable Distributions</u>. If, after the passage of 365 days after the Effective Date, the Trustee does not have a signed copy of a particular Abuse Claimant's required Abuse Claim Release Agreement, including due to the Abuse Claimant's refusal to sign or returned mail due to the lack of a current address for the Abuse Claimant, the funds allocated to that Abuse Claimant shall go back to the general corpus of the Trust and be available for pro rata supplemental distributions to Trust Claimants pursuant to Section 6.4 of this Allocation

- 8 -

Protocol or any other purpose permitted under the Trust Agreement.

6.4    <u>Supplemental Distributions</u>.   If, after all Abuse Claim eligibility determinations have been made, and all Trust Distributions have been paid to eligible Abuse Claimants (including, for the avoidance of doubt, all Trust Settlement Offers and Excess Recovery Amounts), the Trustee may in his or her sole discretion make a Supplemental Distribution of some or all of the remaining Trust funds pro rata to Trust Claimants based on their respective Trust Settlement Offers.

907415156907415156.02

SFACTIVE-907500916.1

# EXHIBIT 4

**EXHIBIT 1**

*Allocation Protocol*

**EXHIBIT 1**

ALLOCATION PROTOCOL
FOR ABUSE CLAIMS FILED IN THE
~~CHAPTER 11 CASE OF~~ THE DIOCESE OF ROCHESTER
ALLOCATION PROTOCOL

**1.    Definitions**

~~1.    **PURPOSE**~~

~~The purpose of this Allocation Protocol is to provide for the distribution of funds to Abuse Claimants.~~ **~~This protocol does not apply to the distribution of funds to any other creditors.~~**

~~2.    **DEFINITIONS**~~

1.1        ~~2.1~~    Capitalized Terms.

Capitalized terms used in this Allocation Protocol shall have the meanings given them in the ~~Third Amended Joint Plan of Reorganization for the Diocese of Rochester Dated March 15, 2024 (as it may be amended from time to time, the "**Plan**")~~ Plan, the Trust Agreement, or the Bankruptcy Code, unless otherwise defined ~~in this Allocation Protocol~~ herein, and such definitions are incorporated ~~herein~~ into this Allocation Protocol by reference.

1.2    Payment Reserve. "Payment Reserve" shall mean a reserve to be used to pay Excess Recovery Amounts, if any.  The initial amount of the Payment Reserve shall be $500,000.  The amount of the Payment Reserve as established in the preceding sentence may be increased so as to exceed the initial amount if, as provided in Section 6.2(b)(5) of this Allocation Protocol, additional amounts are transferred to the Payment Reserve because one or more Abuse Claimants' Final Judgments are less than their Trust Settlement Offers.

~~**"Abuse Claims Last Filing Date"** means a date that is five years after the Effective Date.~~

~~**"First Group Abuse Claim"** means either (a) an Abuse Claim filed against the Diocese on or prior to the Effective Date or (b) an Abuse Action filed against the Diocese and/or a Participating Party prior to the Effective Date.~~

~~**"First Group Abuse Claim Fund"** means that portion of the Abuse Claims Settlement Fund consisting of (a) the DOR Entities' Cash Contribution Remainder plus (b) ninety-five percent (95%) of all other amounts to be distributed to Abuse Claimants by the Trust pursuant to the~~

~~Plan.~~

~~**"First Group Late Claim"** means any First Group Abuse Claim filed after the Bar Date. For the avoidance of doubt, Abuse Claims filed on or before the Bar Date and amended thereafter are not included as First Group Late Claims.~~

~~**"First Group Late Claimant"** means the holder of a First Group Late Claim.~~

1.3    Perpetrator of the Diocese.  "Perpetrator of the Diocese" ~~Means~~shall mean a person: (1) who was an employee or other agent of the Diocese or any other Participating Party when such person committed an act of Abuse; or (2) for whom or for whose actions the Diocese or any other Participating Party (as defined in the Plan) was otherwise responsible.

**2.    Purpose, Interpretation**

2.1    Purpose.  This Allocation Protocol is designed to provide guidance to the Abuse Claims Reviewer in determining the amount of each Abuse Claim under the Plan by assigning to each such Claim a value pursuant to the Evaluation Factors below.

2.2    General Principles.  As a general principle, this Allocation Protocol intends to set out a procedure that provides for Trust Distributions to be made to Survivors holding Abuse Claims on a fair and equitable basis, including that similar Abuse Claims receive substantially the same treatment. The range of values set forth in the Evaluation Factors below and the discretion given to the Abuse Claims Reviewer to determine and adjust the value to be assigned to a particular Abuse Claim are intended to reflect the relative values of Abuse Claims.

~~**"Reviewed Claims"** means Abuse Claims that have been (a) reviewed by the Abuse Claims Reviewer and (b) awarded 1 or more points by the Abuse Claims Reviewer.~~

~~**"Second Group Abuse Claim"** means either (a) an Abuse Claim filed against the Diocese after the Effective Date, or (b) an Abuse Action filed against the Diocese and/or a Participating Party after the Effective Date. Second Group Abuse Claims include Future Claims.~~

~~**Second Group Abuse Claims Fund** means that portion of the Abuse Claims Settlement Fund consisting of five percent (5%) of all amounts in excess of the DOR Entities' Cash Contribution Remainder to be distributed to Abuse Claimants by the Trust pursuant to the Plan.~~

~~**"Submission Deadline"** means the earlier of (a) thirty (30) days after the Effective Date or (b) such other date established by order of the Court.~~

~~**3.    RULES OF INTERPRETATION AND GENERAL GUIDELINES**~~

2.3      ~~3.1~~      <u>Sole and Exclusive Method</u>.

The ~~Plan and the Trust Agreement contemplate that the Trust will be established for payment of Abuse Claims. The Plan and this Allocation Protocol shall together~~<u>Evaluation Factors set forth below shall</u> be the sole and exclusive method by which an Abuse Claimant may seek <u>allowance and</u> distribution ~~because of~~ <u>of his or her Abuse Claim.  Although the Evaluation Factors collectively comprise the methodology that must be applied in reviewing Abuse Claims, the Abuse Claims Reviewer may, as indicated below, take into account considerations in addition to those identified herein when evaluating</u> an Abuse Claim ~~against the Diocese~~.

~~3.2      Conflict with Plan.~~

2.4      <u>Interpretation.</u>   The terms of the ~~confirmed~~ Plan ~~(as it may be amended) or the Confirmation Order~~ shall prevail if there is any ~~conflict~~<u>discrepancy</u> between the terms of the Plan and the terms of this Allocation Protocol.

~~3.3      Non-Compensatory Damages and Other Theories of Liability.~~

~~It is understood and agreed that the payment under the Plan pursuant to this Allocation Protocol is on account of alleged past, current, and future personal physical injury or physical sickness, including but not limited to any alleged emotional distress originating from or attributable to that personal physical injury or physical sickness, within the meaning of 104(a)(2) of the Internal Revenue Code of 1986, as amended.~~

~~3.4      Withdrawal of Claims.~~

~~An Abuse Claimant can irrevocably withdraw an Abuse Claim at any time upon written notice to the Trustee and the Diocese. Once withdrawn, the Abuse Claim may not be reasserted against the Trust (including filing a Future Claim by an Abuse Claimant who withdrew his or her Abuse Claim).~~

~~3.5      Res Judicata Effect.~~

~~The Abuse Claims Reviewer's determination regarding an Abuse Claim shall have no preclusive, res judicata judicial estoppel or similar effect outside of this Case as to any  third party. The Abuse Claims Reviewer's determination shall not be used against any Abuse Claimant in any other matter, case or proceeding.~~

~~3.6      Successor to Abuse Claimant.~~

~~For the avoidance of doubt, a First Group Abuse Claim filed by or on behalf of an Abuse Claimant who died before receiving a distribution shall be reviewed and scored without penalty and shall be paid to the Abuse Claimant's successor, estate or survivors in accordance with applicable law. The executor or administrator of the estate or other person authorized under applicable law to administer the assets of the decedent (an "estate representative") shall provide documentation satisfactory in form and substance to the Trustee affirming such estate representative's authority to~~

~~administer the Abuse Claim on behalf of the decedent Abuse Claimant's estate within 90 days of the Trustee's request for such documentation. Second Group Abuse Claims filed on behalf of a deceased person shall be awarded zero points. Second Group Abuse Claims filed by an Abuse Claimant who dies before receiving a distribution shall be scored by the allocator without penalty and shall be paid to the Abuse Claimant's successor, estate or survivors in accordance with applicable law. The Abuse Claimant's estate representative shall provide documentation satisfactory in form and substance to the Trustee affirming such estate representative's authority to administer the Abuse Claim on behalf of the decedent Abuse Claimant's estate within 60 days of the Trustee's request for such documentation.~~

~~**3.7** **Confidentiality and Privilege.**~~

2.5     Confidentiality and Privilege.  All information that the Abuse Claims Reviewer receives from any source about any Abuse ~~Claimant~~Claim shall be held in strict confidence and shall not be disclosed absent an ~~Order of~~order by the Bankruptcy Court or the written consent of the Abuse Claimant (or such Claimant's counsel of record).  All information ~~that~~ the Abuse Claims Reviewer ~~received~~receives from any Abuse Claimant (including from his or her counsel ~~to such Claimant~~) shall be subject to a mediation privilege and receipt of such information by the Abuse Claims Reviewer shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

~~**4.** **ABUSE CLAIMS REVIEWER**~~

**3.**     **Abuse Claims Reviewer**

3.1     Identification of Abuse Claims Reviewer.  Roger L. Kramer is the Abuse Claims Reviewer ~~under the terms of this protocol and~~, subject to an order ~~of~~by the Bankruptcy Court.   The Abuse Claims Reviewer shall conduct a review of each of the Abuse Claims ~~(as~~and ~~when such Claims may be filed) and, according to the guidelines in section 5 below,~~ make determinations upon which ~~individual monetary distributions~~Trust Distributions will be made subject to the Plan and ~~the Trust Documents. The Abuse Claims Reviewer's review as to each Abuse Claimant shall be the final review, subject only to reconsideration as set forth in section 7 below~~Confirmation Order.

~~The Diocese shall provide electronic copies of all Sexual Abuse Proof of Claim forms (including any attachments thereto and as the same may have been amended from time to time)~~ to the Abuse Claims Reviewer.

~~**5.** **PROCEDURE FOR ALLOCATION**~~
~~- **AMONG ALLOWED ABUSE CLAIMS**~~

**4.**     **Procedure**

~~**5.1** **Proof of Abuse.**~~

4.1     Allowance of an Abuse Claim.  An Abuse Claim shall be allowed if the Abuse Claims Reviewer determines that the Abuse Claimant proved his or her claim by a preponderance of the evidence.  The Abuse Claims Reviewer may, after considering the credibility of the Abuse Claimant and the facts alleged and evidence submitted in support of an Abuse Claim, deny the Abuse Claim if

- 4 -

denial is warranted in the Abuse Claims Reviewer's sole discretion. Abuse Claims denied by the Abuse Claims Reviewer shall not be entitled to any distribution from the Trust. If an Abuse Claim is allowed, the Abuse Claims Reviewer shall determine the amount of such Abuse Claim by assigning such Abuse Claim a point total pursuant to the Evaluation Factors set forth in Section 5 of this Allocation Protocol.

4.2     Allowance of an Unknown Abuse Claim. An Unknown Abuse Claim shall be allowed if the Abuse Claims Reviewer determines, by a preponderance of the evidence, that the claimant did not file a proof of claim (nor was a proof of claim deemed effective) on or before the Effective Date, the earliest incident of alleged Abuse occurred before the Petition Date, and the claimant was at the time of the Claims Bar Date under a disability or other condition recognized by New York law or other applicable law that would toll the statute of limitations for such Claim. If an Unknown Abuse Claim is allowed, the Abuse Claims Reviewer shall determine the amount of such Unknown Abuse Claim by assigning such Unknown Abuse Claim a point total pursuant to the Evaluation Factors set forth in Section 5 of this Allocation Protocol and taking into consideration the assigned point total, the point totals assigned to other Unknown Abuse Claims, the amount of the Unknown Abuse Claims Reserve, and the anticipated likelihood of other Unknown Abuse Claims being submitted in the future.

4.3     Deceased Abuse Survivor.  The Abuse Claims Reviewer shall review the claim of a deceased Abuse Claimant without regard to the Abuse Claimant's death, except that the Abuse Claims Reviewer may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

4.4     Determinations by the Abuse Claims Reviewer. The Abuse Claims Reviewer shall notify each Abuse Claimant in writing of the points allocation based on the Evaluation Factors with respect to the Abuse Claimant's claim. The Abuse Claims Reviewer's determination shall be final unless the Abuse Claimant makes a timely request for the points allocation to be reconsidered by the Abuse Claims Reviewer in accordance with Section 4.5 of this Allocation Protocol. The Abuse Claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point allocation. The Abuse Claims Reviewer shall make final determinations as expeditiously as possible, while ensuring a full and fair review process for all Abuse Claims.

4.5     Requests for Reconsideration. An Abuse Claimant may request reconsideration of either (a) the Abuse Claims Reviewer's denial of the Abuse Claimant's Abuse Claim or (ii) the points allocation awarded by the Abuse Claims Reviewer with respect to the Abuse Claimant's Abuse Claim, by delivering a written request for reconsideration to the Abuse Claims Reviewer within 30 calendar days after the date of mailing of the notice of the points allocation determined by the Abuse Claims Reviewer. Each written request for reconsideration must be accompanied by a check, payable to the Trust, for the reconsideration fee of $425. The Abuse Claimant may, with his or her request for reconsideration, submit additional evidence and argument in support of such request. The Abuse Claims Reviewer shall have the power to change the points allocation if the Abuse Claims Reviewer determines that cause exists to change the points allocation, and the Abuse Claimant's points allocation may go up or down as a result of his or her request for reconsideration. The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review, or appeal by any person or entity, including a court.

**5.** **Guidelines for Allocation for Allowed Abuse Claims**

5.1 _Information to be Considered._ The Abuse Claims Reviewer shall consider all of the facts and evidence presented by the Abuse Claimant in the Abuse Claimant's filed proof of claim (as the same may have been amended from time to time). Abuse Claimants may provide supplemental evidence and information to the Abuse Claims Reviewer ~~pursuant to the below procedures.~~

in support of their Abuse Claims, which the Abuse Claims Reviewer shall also consider. The Abuse Claims Reviewer may request additional information from an Abuse Claimant. Failure to respond to such ~~request~~requests shall not be construed against the Abuse Claimant.

Each Abuse Claimant ~~may~~can submit a written statement (a "Supplemental Submission") to the Abuse Claims Reviewer ~~no later than the~~. The Abuse Claims Reviewer shall establish a deadline (the "Submission Deadline") of not less than 30 days for Abuse Claimants to submit Supplemental Statements to the Abuse Claims Reviewer. Notice of the Submission Deadline (the "Supplement Notice") shall provide, among other things, the method for submission of Supplemental Statements. All notices by the Abuse Claims Reviewer to Abuse Claimants, including the Supplement Notice, shall be sent to each Abuse Claimant's counsel of record via email and first class mail at the address(es) provided in the applicable Sexual Abuse ~~Claimant's proof of claim form~~Proof of Claim Form.

The Supplemental Submission shall be no longer than 10 pages, single sided, double spaced with 12-point font; provided, however, that an Abuse Claimant not represented by counsel may submit a handwritten Supplemental Submission not to exceed 10 single sided pages in length. A Supplemental Submission shall be submitted by the Submission Deadline unless the Abuse Claims Reviewer determines, in his sole discretion, there is good cause for delay. The Abuse Claims Reviewer, in his sole discretion, may allow an Abuse Claimant to exceed the page limit for the Supplemental Submission.

~~5.2~~ ~~**Guidelines for Allocation for Allowed Abuse Claims.**~~

~~(a)~~ ~~**Initial Evaluation.**~~

5.2 _Evaluation._ The Abuse Claims Reviewer shall consider whether the Abuse Claimant has proven by credible evidence that the Sexual Abuse ~~alleged by each Abuse Claimant~~ was perpetrated by a Perpetrator of the Diocese. The Abuse Claims Reviewer shall give notice to the Abuse Claimant and the Trustee if he determines that the Abuse Claimant has not met the burden of proof and ~~will~~shall provide the Abuse Claimant a reasonable opportunity to provide facts and/or legal basis to establish that the burden of proof has been met. The Diocese and any Protected Party (other than a Settling Insurer) must cooperate with any reasonable information or discovery request by an Abuse Claimant that is necessary to respond to the Abuse Claims Reviewer's determination that the Abuse Claimant has not met the burden of proof.

~~(b)~~ ~~**Evaluation Factors**~~

5.3 _Evaluation Factors._ Each Abuse Claim will be evaluated by the Abuse Claims Reviewer. Each Abuse Claim will be ~~scored~~assigned points on a scale of up to 100 ~~based on these~~

~~factors~~according to the following factors ("Evaluation Factors"), and the points shall determine the amount of distribution to each Abuse Claimant on a pro-rata basis:

a.   ~~(i)~~ **Nature of ~~the~~ Abuse**:

    (1) ~~(1)~~   Duration;

    (2) ~~(2)~~   Frequency/number of instances;

    (3) ~~(3)~~   Degree of intrusiveness into child's body (*e.g.,* clothed/unclothed, masturbation by or of perpetrator, oral penetration, anal penetration, vaginal penetration);

        (4)   ~~(4)~~   Level or severity of force/violence/coercion/threats;

    ~~(5)~~ Control of environment (*e.g.,* boarding school, orphanage, trip under supervision of perpetrator, day school, employment relationship with Perpetrator of the Diocese);

        (5)   ~~(6)~~   Number of Perpetrators of the Diocese that abused the ~~Abuse~~ Claimant;

    ~~(7)~~ Physical pain suffered;

    (6) ~~(8)~~   Grooming;

    (7) ~~(9)~~   Relationship of the ~~Abuse~~ Claimant to the ~~perpetrator~~Perpetrator;

    (8) ~~(10)~~   Location of abuse, including but not limited to isolated location, rectory, church, cabin, orphanage, etc.; and/or

    (9) ~~(11)~~   Additional factors that may be provided by the ~~Abuse~~ Claimant.

b.   ~~(ii)~~ **Impact of Abuse**:

    (1) ~~(1)~~   School behavior problems;

    (2) ~~(2)~~   School academic problems;

    (3) ~~(3)~~   Getting into legal trouble as a minor;

    (4) ~~(4)~~   Loss of faith;

    (5) ~~(5)~~   Damage to family relationships / interpersonal difficulties;

    (6) ~~(6)~~   Mental health symptoms, including but not limited to:

        a. ~~a.~~   Depression;

b. ~~b.~~ Suicide ~~Attempt and~~ <u>attempt or</u> suicidal ideation;

c. ~~c.~~ Anxiety;

d. ~~d.~~ Substance abuse;

e. ~~e.~~ Sexual acting out;

f. ~~f.~~ Runaway;

g. ~~g.~~ Flashbacks; ~~and/or~~

h. ~~h.~~ Nightmares; and/or

(7) ~~(7)~~ Adult and current functioning:

a. ~~a.~~ Criminal record as an adult;

b. <u>Underemployment/unemployment;</u>

c. ~~b.~~ Relationship problems;

d. ~~c.~~ Substance abuse; ~~and/or~~

(8) ~~(8)~~ Physical health symptoms, including but not limited to:

a. ~~a.~~ Physical manifestations of emotional distress;

b. ~~b.~~ Gastrointestinal issues;

c. ~~c.~~ ~~headaches~~<u>Headaches</u>, high blood pressure;

d. ~~d.~~ Physical manifestations of anxiety;

e. ~~e.~~ Erectile dysfunction;

f. ~~f.~~ Heart palpitations;

g. ~~g.~~ Sexually-transmitted infections;

h. ~~h.~~ Physical damage caused by acts of ~~Abuse~~<u>abuse</u>;

i. ~~i.~~ Reproductive damage;

j. ~~j.~~ Self-cutting; and/or

k. ~~k.~~ Other self-injurious behavior~~.~~<u>;</u>

(9) ~~(9)~~ The risk of the foregoing factors affecting the Abuse Claimant in the future

based on the Abuse Claimant's age at the present time; and/or

(10) ~~(10)~~    Additional factors that may be provided by the Abuse Claimant.

The Abuse Claims Reviewer shall not consider the mere fact that ~~a~~an Abuse Claimant has been or is incarcerated in the review of the claim unless an element of the crime for which the Abuse Claimant was convicted includes fraud or misrepresentation.

**5.3**    ~~Solely with respect to First Group Abuse Claims, the Abuse Claims Reviewer may grant an additional award of up to 10 points based on the Abuse Claimant's level of participation in public events related to the Abuse Claims, including but not limited to:~~

> a.    ~~leadership role in organizations dedicated to helping sexual abuse survivors;~~
>
> b.    ~~active participation in the chapter 11 process;~~
>
> c.    ~~active participation in litigation against the Diocese and/or a Participating Party regarding any Abuse Claim; and/or~~
>
> d.    ~~participation in criminal proceedings against a Perpetrator of the Diocese.~~

**5.4**    ~~Solely with respect to First Group Abuse Claims, the Trustee shall apply a multiple of 1.25 to the award determined by the Abuse Claims Reviewer to any Abuse Claimant that also filed a complaint against the Diocese, any Protected Party, and/or any other Roman Catholic entity on or prior to the Bar Date.~~

**5.5**    ~~The Trustee shall apply any further enhancements to the claims awards in accordance with the Plan, including Section 4.5.2 of the Plan.~~

**5.6**    ~~Any First Group Late Claimant must submit a written statement (no longer than 10 pages, single sided, double spaced with 12-point font) regarding the basis for filing their Claim after the Bar Date, including the basis for any excusable neglect therefor. The deadline to submit such statement shall be the Submission Deadline provided upon notice by the Abuse Claims Reviewer. The Abuse Claims Reviewer shall award zero (0) points for any First Group Late Claimant that fails to submit such statement. With respect to any First Group Late Claim filed between August 14, 2021 and March 15, 2023, the Abuse Claims Reviewer (a) shall reduce the points awarded for such Claim by 15% and (b) may, in his sole discretion based on the First Group Late Claimant's statement, reduce the points awarded to any such Claim by up to 60% inclusive of the reduction in part (a) of this sentence. With respect to any First Group Late Claim filed between March 16, 2023 and the Effective Date, the Abuse Claims Reviewer (a) shall reduce the~~

points awarded to such Claim by 40% and (b) may, in his sole discretion based on the First Group Late Claimant's statement, reduce the points awarded to any such Claim by up to 90% inclusive of the reduction in part (a) of this sentence. For example, if the Abuse Claims Reviewer assesses a First Group Late Claim at 100 points, he shall reduce the assessment to 85 points and may, in his sole discretion based on the First Group Late Claimant's statement, further reduce the assessment but he may not reduce it to less than 60 points.

**5.7** For the avoidance of doubt, the Abuse Claims Reviewer will conduct an evaluation of both First Group Abuse Claims and Second Group Abuse Claims. Second Group Abuse Claims shall be reviewed as they are filed until the Abuse Claims Last Filing Date.

**5.8** The Abuse Claims Reviewer shall allocate points only for Abuse Claims. Zero (0) points shall be allocated for any Claim that is not an Abuse Claim. Further, zero (0) points shall be allocated for any Claim that is on account of non-sexual assault, non- sexual battery, non-sexual corporal punishment and any other non-sexual act of physical, psychological, mental, or emotional abuse, humiliation, or intimidation or fraud, fraud in the inducement, misrepresentation, concealment, unfair practice, loss of consortium or any other non-Abuse tort.

**5.9** There will be no consideration of an Abuse Claimant's claims against any entity other than the Diocese or Participating Parties that may be liable to the Abuse Claimant.

**6.** **MONETARY DISTRIBUTION.**

The Abuse Claims Reviewer will arrive at a point total for each Abuse Claimant considering the above factors.

The Trustee shall calculate the value of an individual "point" after all Abuse Claims have been reviewed. The point value for First Group Abuse Claims will be determined by dividing the total dollars in First Group Abuse Claim Fund by the total number of points awarded to all First Group Abuse Claims. The point value for Second Group Abuse Claims will be determined by dividing the total dollars in Second Group Abuse Claim Fund by the total number of points awarded to all Second Group Abuse Claims, provided, however, that the point value for Second Group Abuse Claims shall not exceed the point value for First Group Abuse Claims.

First Group Abuse Claimants shall receive compensation from the First Group Abuse Claim Fund.

Second Group Abuse Claimants shall receive compensation solely from the Second Group Abuse Claim Fund.

**7.** **DETERMINATIONS BY THE ABUSE CLAIMS REVIEWER AND**

Case 2-19-20905-PRW, Doc 2555, Filed 04/09/24, Entered 04/09/24 17:20:30, Description: Main Document, Page 124 of 189

**REQUESTS FOR RECONSIDERATION AND APPEAL.**

The Trustee shall notify each Abuse Claimant in writing of the initial estimated monetary distribution regarding the Abuse Claimant's Claim, which distribution may be greater or smaller than the ultimate actual distribution to be received based on reserves established by the Trustee, the outcome of any reconsideration of claims, and the outcome of any post- confirmation litigation against Non-Settling Insurers. The Trustee shall mail this preliminary determination to the Abuse Claimant to the Abuse Claimant's counsel of record, or in the case of unrepresented parties, to the last address based on the Abuse Claimant's filed proof of claim. The Abuse Claims Reviewer's determination shall be final unless the Abuse Claimant makes a timely request for the point award to be reconsidered by the Abuse Claims Reviewer. The Abuse Claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point award. The Abuse Claimant may request reconsideration of the Abuse Claims Reviewer's point award by delivering a written request for reconsideration to the Abuse Claims Reviewer within 10 calendar days after mailing of the preliminary monetary distribution. The Abuse Claimant, with the request for reconsideration, may submit additional evidence and argument supporting such request upon a showing that such additional information could not have been provided under this protocol. Additionally, the Abuse Claimant must include a check for $425 with his or her request for reconsideration to cover the costs of the reconsideration. The Trustee shall waive the reconsideration fee if an Abuse Claimant submits to the Trustee a statement signed under the penalty of perjury that they are unable to pay the reconsideration fee. The Abuse Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

8. **RELEASE AND DISMISSAL OF PENDING LITIGATION.**

No Abuse Claimant shall receive a Distribution until such Abuse Claimant has executed and delivered to the Trust the Abuse Claim Release Agreement attached to the Plan as Exhibit 4. Each Abuse Claimant must release all Claims against the Protected Parties. Upon request, the Trust must provide copies of all executed Abuse Claim Release Agreements to the (a) Protected Parties and (b) to any Joint Tortfeasor that has executed a non-disclosure or confidentiality agreement acceptable in form and substance to the Trust. For the avoidance of doubt, nothing herein shall require an Abuse Claimant to release any Person that is not a Protected Party.

Upon the occurrence of the applicable Abuse Claim Discharge Date, the subject Abuse Claim asserted against the Diocese and/or any Protected Party shall be dismissed, with prejudice, and without fees and costs being recoverable against the Diocese, the Reorganized Diocese or any Protected Party.

**6.      Payment**

6.1     Trust Settlement Offers.

a.      After all Abuse Claims have been evaluated pursuant to the Evaluation Factors, the Trustee shall calculate the Trust Settlement Offer for each Abuse Claim based on the Abuse Claimant's pro rata share of the total points assigned to all Abuse Claimants and the available funds for distribution, after accounting for necessary holdbacks including the Payment Reserve, the Trust Reserve, and the Unknown Abuse Claim Reserve.

b.      Abuse Claimants may accept or reject their Trust Settlement Offers.  An Abuse Claimant who accepts his or her Trust Settlement Offer is a Trust Claimant with a Trust Claim.  An Abuse Claimant who rejects his or her Trust Settlement Offer is a Tort Claimant with a Tort Claim.

c.      For Trust Claimants, the Trustee shall promptly make Trust Distributions in the amount of the respective Trust Settlement Offers.

6.2     Tort Claims and Excess Recovery Amounts.

a.      For Tort Claimants (Abuse Claimants who have rejected their Trust Settlement Offers), the Trustee shall hold in reserve an amount equal to each Tort Claimant's Trust Settlement Offer until the Tort Claimant's Tort Claim is resolved by a Final Judgment.

b.      Following entry of Final Judgment:

(1)      If the amount of the Final Judgment is less than or equal to the amount of the Trust Settlement Offer, the Trust shall promptly pay to the Tort Claimant the amount of the Final Judgment as full and final satisfaction of the Tort Claim.  In such case, the difference between the Trust Settlement Offer and the amount of the Final Judgment shall not be paid to the Tort Claimant and, instead, shall be transferred to the Payment Reserve to pay Excess Recovery Amounts.

(2)      If the amount of the Final Judgment is greater than the amount of the Trust Settlement Offer, the Trust shall promptly pay to the Tort Claimant the amount of the Trust Settlement Offer.

(3)      After all Tort Claims are resolved by Final Judgments, the Trust shall promptly pay to each Tort Claimant, from the Payment Reserve, the amount of his or her Final Judgment that is in excess of the Trust Settlement Offer (the "Excess Recovery Amount"); *provided*, that to the extent all Excess Recovery Amounts cannot be paid in full from the Payment Reserve, then the Trustee shall calculate and pay only each Tort Claimant's pro rata share of his or her respective Excess Recovery Amount.

(4)      To the extent all Excess Recovery Amounts cannot be paid in full

from the Payment Reserve, then the Trustee shall calculate and pay each Tort Claimant's pro rata share of his or her respective Excess Recovery Amount.

(5) If a court enters Final Judgment determining that the Diocese and/or Participating Party (as applicable) does not have any liability on account of the Tort Claimant's Tort Claim, then the Tort Claimant shall not be entitled to any Distribution from the Trust, including any Trust Settlement Offer, in which event the funds reserved to pay that Tort Claimant's Trust Settlement Offer shall be transferred to pay Excess Recovery Amounts.

c. No multiple, exemplary, statutory, enhanced, or punitive damages, may be included in any component of a Trust Distribution.

6.3 Undeliverable Distributions. If, after the passage of 365 days after the Effective Date, the Trustee does not have a signed copy of a particular Abuse Claimant's required Abuse Claim Release Agreement, including due to the Abuse Claimant's refusal to sign or returned mail due to the lack of a current address for the Abuse Claimant, the funds allocated to that Abuse Claimant shall go back to the general corpus of the Trust and be available for pro rata supplemental distributions to Trust Claimants pursuant to Section 6.4 of this Allocation Protocol or any other purpose permitted under the Trust Agreement.

6.4 Supplemental Distributions. If, after all Abuse Claim eligibility determinations have been made, and all Trust Distributions have been paid to eligible Abuse Claimants (including, for the avoidance of doubt, all Trust Settlement Offers and Excess Recovery Amounts), the Trustee may in his or her sole discretion make a Supplemental Distribution of some or all of the remaining Trust funds pro rata to Trust Claimants based on their respective Trust Settlement Offers.

907415156.02

# EXHIBIT 5

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

In re:

The Diocese of Rochester,

_____ Debtor.

    Case No. 19-20905

    Chapter 11

## ABUSE CLAIM RELEASE AGREEMENT

In re:

The Diocese of Rochester,

_____ Debtor.
_____

Case No. 19-20905

Chapter 11

**ABUSE CLAIMAINT RELEASE AGREEMENT**

This Abuse ~~Claimant~~Claim Release Agreement (this "Agreement") is made and entered into by [_____] ("Claimant"), pursuant to the ~~First~~*Third* Amended ~~Joint~~ *Chapter 11 Plan of Reorganization for The Diocese of Rochester Dated* ~~September 13~~*April 9, ~~2023~~2024* (as it may be amended or supplemented, and in the form confirmed in the above-captioned Chapter 11 Case, the "Plan").[1]

WHEREAS, Claimant has asserted an Abuse Claim against The Diocese of Rochester (the "Diocese") and/or one or more Participating Parties;[2] and

WHEREAS, on [_____], 2024, the Court entered an order confirming the Plan; and

WHEREAS, the Effective Date of the Plan occurred on [_____], 2024;

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan and in ~~any~~the order confirming the Plan (the "Confirmation Order"). ~~An index~~ A list of such defined terms is attached for convenience as **Schedule 1** hereto. In the event of any inconsistency between this Agreement (including any schedule attached hereto) and the Plan and/or Confirmation Order, the Plan and/or Confirmation order shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

[2]    **Schedule 2** attached hereto sets forth a list of the Participating Parties.

NOW, THEREFORE, in consideration of the treatment to be provided to Claimant's Abuse Claim under the Plan, Claimant hereby irrevocably covenants and agrees as follows:

**PART~~PART~~ I**

~~**ACKNOWLEDGEMENT AND CERTIFICATION**~~
**ACKNOWLEDGEMENT AND CERTIFICATION**

1.     ~~1.~~   Subject to Paragraph 2 below, Claimant accepts and acknowledges that, under the Plan, Distributions from the Trust to holders of Abuse Claims will be determined solely by an individual ~~proposed by the Committee and~~ approved by the Bankruptcy Court (the "Abuse Claims Reviewer").  Claimant further accepts, acknowledges and understands that payments to Claimant from the Trust on account of Claimant's Abuse Claim (if any) will be determined by the Abuse Claims Reviewer in accordance with the Allocation Protocol attached to the Plan and that~~, unless Claimant is authorized under the Plan to proceed as a Litigation Claimant,~~ the Trust shall constitute the sole source of recovery for Claimant's Abuse Claim even if Claimant chooses to become a Tort Claimant.  By signing below, Claimant certifies that Claimant has reviewed and understands the Allocation Protocol and further understands that the decision of the Abuse Claims Reviewer is final and not subject to appeal or further review by any court or other adjudicative authority.  Claimant consents to the method set forth in the Plan and Allocation Protocol for determining Trust Distributions on account of Claimant's Abuse Claim ~~and understands and agrees that if Claimant is not authorized to proceed as a Litigation Claimant under the terms of the Plan Claimant may be waiving any right to a trial by jury or otherwise against the Diocese, the Reorganized Diocese, and the Protected parties.~~.

2.     Claimant accepts and acknowledges that if he or she rejects a Trust Settlement Offer and becomes a Tort Claimant, the Trust shall hold in reserve an amount equal to the Trust Settlement Offer until the Tort Claimant's Tort Claim is resolved by a Final Judgment, at which point the Trust Settlement Offer shall be paid to the Claimant or released back to the Trust as set forth in the Allocation Protocol.  By signing below, Claimant certifies that Claimant has reviewed and understands the Allocation Protocol and understands that if he or she becomes a Tort Claimant, (i) he or she forfeits any right to have his or her Abuse Claim liquidated as a Trust Claim and that notwithstanding their availability in the tort system, no multiple, exemplary, statutory, enhanced or punitive damages (*i.e.*, damages other than compensatory damages), (ii) no interest, attorneys' fees, or costs (including statutory attorneys' fees and costs) shall be payable with respect to his or her Tort Claim, and (iii) his or her Final Judgment will only be satisfied from the Trust in accordance with the Allocation Protocol.

3.     ~~2.~~   Claimant accepts and acknowledges that, except as expressly provided in the Plan, none of the Protected Parties will have or incur any liability to, or be subject to any right of action by, Claimant, any other party in interest, or any of their respective representatives, financial advisors, or affiliates, or any of their successors or assigns, for any act or omission in or relating to the Chapter 11 Case, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the pursuit of confirmation of the Plan, or the administration of the Plan or the Trust, and, in all respects, such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Chapter 11 Case.  Without limiting the generality of the foregoing, the Diocese and its advisors and professionals shall be entitled to and granted the benefits of section 1125(e) of the Bankruptcy Code.

4.     ~~3.~~   Claimant accepts and acknowledges that the Diocese, the Reorganized Diocese, the Trust, the Trustee, the Protected Parties, and professionals employed by the foregoing

shall not have any liability to any entity, including any governmental entity or insurer, on account of payments made to Claimant, including any liability under the MPSA. Claimant agrees to provide the Trustee with any information necessary to comply with reporting obligations arising under the MMSEA, and has provided or will provide for the payments/and or resolution of any obligations owing or potentially owing under the MSPA relating to Claimant's Abuse Claim and any Distribution from the Trust. Claimant acknowledges and agrees that if Claimant does have any obligations owing or potentially owing under the MSPA relating to any Abuse Claim or Distribution from the Trust, the Trustee may withhold from any payment directly or indirectly to Claimant funds sufficient to assure that any obligations owing or potentially owing under the MSPA relating to such Abuse Claim are paid to the applicable agency.

## PARTPART II
## GENERALGENERAL RELEASE OF CLAIMS AGAINST PROTECTED PARTIES

5. 4. Claimant, individually and on behalf of Claimant's heirs, successors, assigns, agents, and representatives, acknowledges that. Claimant has received and reviewed copies of the Plan, the Disclosure Statement, and each of the exhibits thereto, and has had an opportunity to consult with counsel of Claimant's choice regarding those documents and the substance of this Agreement, including, without limitation the release provisions set forth herein. Accordingly, Claimant, individually and on behalf of Claimant's heirs, successors, assigns, agents, and representatives, does now hereby:

    a. voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, fully, finally, and completely release, acquit, and forever discharge the Settling Insurers and the Settling Insurers' reinsurers and retrocessionaires with respect to Claimant's Abuse Claim and the Settling Insurer Policies, with such release and discharge being effective as of the occurrence of the Effective Date of the Plan;

    b. voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, fully, finally, and completely release, acquit, and forever discharge Protected Parties and Exculpated Parties, including the Settling Insurers, the Settling Insurers' reinsurers and retrocessionaires, the Diocese, the Reorganized Diocese, and the Participating Parties, of and from any and all past, present, and future Claims, and each such Persons' portion or share of my damages that, directly or indirectly, arise out of, relate to, or are connected with: (i) Claimant's Abuse Claim and any other Channeled Claims; (ii) Claims that directly or indirectly arise out of, relate to, or are in connection with the handling of Claimant's Abuse Claim and any other Channeled Claims; (iii) any Settling Insurer Policy; (iv) any Medicare Claims; and (v) all Claims that, directly or indirectly, arise from, relate to, or are connected with the Chapter 11 Case, with such release and discharge being effective as of the occurrence of the Effective Date, except that, with respect to the Diocese and the Participating Parties, such release and discharge shall become effective immediately and without further action but only upon the occurrence of the Abuse Claim Discharge Date applicable to Claimant's Abuse Claim;;

    c. voluntarily and irrevocably agree and covenant (i) that Claimant shall not sue or seek recovery or relief of any kind from the Protected Parties and Exculpated Parties, including the Settling Insurers, the Settling Insurers' reinsurers and retrocessionaires, the Diocese, the Reorganized Diocese, and the Participating Parties, in connection with any and all past, present, and future Claims that directly or indirectly arise out

of, relate to~~,~~ or are in connection with Claimant's Abuse Claim or any other Channeled Claims, or the handling of Claimant's Abuse Claim, Channeled Claims, the Settling Insurer Policies, any Medicare Claim, and the Chapter 11 Case~~;~~; *provided*, *however*, ~~that prior to the occurrence of the applicable Abuse Claim Discharge Date,~~ the foregoing shall not prevent Claimant ~~from taking such actions that may be necessary and appropriate, to liquidate any Stipulated Judgment or Litigation Claim that Claimant may be authorized to pursue under~~ the terms of the Plan ~~and collecting the proceeds therefrom solely from any Non-Settling Insurer, to the extent allowed under~~ the terms of the Plan,at his or her expense from commencing a lawsuit in the U.S. District Court for the Western District of New York or the New York Supreme Court for Monroe County naming the Diocese and/or Participating Party(ies) for the purpose of adjudicating the Diocese's or Participating Party's liability for the Abuse Claim and the amount of any such liability, in accordance with the procedure set forth in the Plan and Allocation Protocol; (ii) to forever and irrevocably discharge that fraction, portion, or percentage of damages Claimant may have suffered in connection with any Abuse which is by trial or other disposition determined to be the causal fault or responsibility, if any, of any Protected Party or Exculpated Party, including the Settling Insurers, the Settling Insurers' reinsurers and retrocessionaires, the Diocese, Reorganized Diocese, and the Participating Parties~~, *provided, however*, that such discharge with respect to the Diocese and the Participating Parties shall not occur until the occurrence of the applicable Abuse Claim Discharge Date~~; (iii) that the trial court in any future action that, directly or indirectly, arises out of, relates to, or is connected with the Claims released hereby will be bound by this Agreement, and that Claimant will not oppose any future defense counsel submitting this Agreement in such an action~~, *provided, however*, that all rights in such future action with respect to any Stipulated Judgment or Litigation Claim are expressly preserved through and until the occurrence of the applicable Abuse Claim Discharge Date,~~; (iv) that the releases set forth in this Agreement, when effective in accordance with the terms hereof, extinguish any potential liability of each and every Protected Party and Exculpated Party, including the Settling Insurers, the Settling Insurers' reinsurers and retrocessionaires, the Diocese, Reorganized Diocese, and the Participating Parties, for contribution or indemnity to any Person who has been or may be held liable to Claimant for any Abuse Claim or Channeled Claim~~;~~; and (v) to be bound by the injunctions set forth in the Plan, including those injunctions contained in Section 12 thereof, for the benefit of the Protected Parties.

~~5. Claimant further agrees and covenants, with respect to any Claim Claimant may have against the Diocese and/or any Participating Party that is preserved pending the occurrence of the Abuse Claim Discharge Date applicable to Claimant's Abuse Claim pursuant to Section 4 above, Claimant's recourse shall be strictly limited to the proceeds of any Non-Settling Insurer Policies and other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorneys' fees and costs, that may be recoverable from a Non-Settling Insurer, and Claimant may not take any collection or enforcement action against any property of the~~ Diocese or any

Participating Party other than to pursue claims against such Non-Settling Insurers.

## ~~PART~~PART III
## ~~REPRESENTATIONS, THIRD PARTY BENEFICIARIES AND SUCCESSORS~~
## REPRESENTATIONS, THIRD-PARTY BENEFICIARIES AND SUCCESSORS

6.  ~~6.~~    Claimant represents and warrants that Claimant is the sole holder of the Abuse Claim that Claimant has asserted against the Diocese and/or one or more Participating Parties and that Claimant has not assigned, transferred, or granted ~~to~~ any interest in such Claim to any other Person, nor has Claimant assigned or transferred to any Person any Claims Claimant may have against any Settling Insurers, other Protected Parties, or Exculpated Parties.

7.  ~~7.~~    The releases, discharges, covenants, and other undertakings made by Claimant pursuant to this Agreement shall be absolute and irrevocable. Each of the Protected Parties, including, without limitation, the Diocese, the Reorganized Diocese, the Participating Parties, and each Settling Insurer, shall be intended ~~third party~~third-party beneficiaries of this Agreement, and shall have the right to enforce the terms hereof in any court of competent jurisdiction.

8.  ~~8.~~    The provisions of this Agreement shall be binding upon Claimant, and upon Claimant's heirs, successors, assigns, agents, and representatives.

*[signature page follows]*

IN WITNESS WHEREOF, this Agreement has been executed by Claimant (or, in the case of death or legal disability, Claimant's duly-authorized legal representative acting under power of attorney) and delivered to the Trustee as of the date set forth below.

Dated: _____, 2024

_____
Signature

_____
Print or type full name of Claimant

_____
Claim Number (if known)

_____
Address

_____

_____
Claimant's full Social Security Number

# SCHEDULE I

Defined Terms from Plan

**[To be provided]**

***Abuse Claim*** means any Claim that has been asserted, or could be asserted, against the Diocese or any Participating Party, arising in whole or in part, directly or indirectly from Abuse occurring prior to the Effective Date, and seeking monetary damages or any other relief, under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Diocese or any Participating Party, or any other person or entity for whose acts or failures to act the Diocese or any Participating Party is or was allegedly responsible, including, without limitation, all Adult Abuse Claims, Child Abuse Claims, and Future Claims, against the Diocese or any Participating Party, whether or not such Claims arise under, or were revived pursuant to, the CVA or the ASA, and whether or not a proof of claim has been Filed or an Abuse Action has been commenced with respect to such Claim. Notwithstanding the foregoing, Abuse Claims do not include any claim that a Settling Insurer may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Insurer to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such.

***Abuse Claimant*** means the holder of an Abuse Claim.

***Abuse Claims Reviewer*** means the person or entity, including the designee of such person or entity, who will assess Abuse Claims under the Allocation Protocol.

***Allocation Protocol*** means the protocol for allocation of the Abuse Claims Settlement Fund to provide fair and equitable treatment for all Abuse Claims, which will be attached to the Plan Supplement as Exhibit 1.

***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or hereafter applicable to the Chapter 11 Case.

***Bankruptcy Court*** means the United States Bankruptcy Court for the Western District of New York (Rochester Division) and any Court having competent jurisdiction to hear appeals or certiorari proceedings therefrom, or any successor thereto that may be established by any act of Congress, or otherwise, and which has competent jurisdiction over the Chapter 11 Case or the Plan.

***Channeled Claim*** means an Abuse Claim, an Inbound Contribution Claim, an Insurer Contribution Claim, a Medicare Claim, a Direct Action Claim, an Extra-Contractual Claim, or any other Claim against any Protected Party arising from or related in any way to an Abuse Claim or any of the Settling Insurer Policies, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, including without limitation all Claims by way of direct action, subrogation, contribution, indemnity, alter ego, statutory or regulatory action, or otherwise, Claims for exemplary or punitive damages, for attorneys' fees and other expenses, or for any equitable remedy. A Channeled Claim includes any Claim against a Protected Party based on allegations that it is an alter ego of a Person that is not a Protected Party

or that the Protected Party's corporate veil should be pierced on account of Claims against a Person that is not a Protected Party or based on any other theory under which the legal separateness of any Person and any other Person may be disregarded to impose liability for a claim on either such Person. For the avoidance of doubt and notwithstanding anything to the contrary herein, Channeled Claims do not include any Claims to the extent they are asserted against Excluded Parties or Non-Settling Insurers; provided, however, any Claims which assert liability against an Excluded Party or Non-Settling Insurer in conjunction with a Protected Party shall be Channeled Claims to the extent they assert liability against such Protected Party.

***Channeling Injunction*** is the injunction contained in Section 12.3 of this Plan.

***Chapter 11 Case*** means the above-captioned bankruptcy case.

***Claimant*** means any Person who alleges or alleged any Claim.

***Confirmation Date*** means the date the Confirmation Order is entered by the clerk of the Bankruptcy Court on the Bankruptcy Court's docket.

***Confirmation Order*** means the order entered by the Court confirming this Plan in accordance with Chapter 11 of the Bankruptcy Code.

***Diocese*** means The Diocese of Rochester, the debtor and debtor in possession in this Chapter 11 Case.

***Distribution*** means any payment to the holder of a Claim as provided in this Plan.

***Effective Date*** means (a) the last Business Day of the month in which (i) all conditions to effectiveness of this Plan have been satisfied or waived in accordance with Section 11.1 and (ii) no stay of the Confirmation Order is in effect, provided, however that if the first date on which all conditions to effectiveness or of the Plan have been satisfied or waived occurs on or after the twentieth (20th) day of such month, the Effective Date shall occur on the last Business Day of the immediately following month, or (b) such other date as agreed by the Plan Proponent.

***Insurance Settlements*** means, collectively, the CNA Settlement, the First State Settlement, the Interstate Settlement, the LMI Settlement, and the Underwriters Settlement.

***Medicaid*** means medical assistance provided under a state plan approved under title XIX of the Social Security Act.

***Medicare*** means the health insurance program for the aged and disabled under title XVIII of the Social Security Act.

***MMSEA*** means section 111 of the "Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173)" which imposes reporting obligations on those Persons with payment obligations under the MSPA.

***Non-Settling Insurer*** means any Insurer that is not a Settling Insurer. CNA is not aware of the existence of any Non-Settling Insurers.

**Participating Party** means all Parishes, all Schools, and those Other Catholic Organizations and other entities listed on Exhibit A attached hereto. Neither the Reorganized Debtor nor any Settling Insurer shall be a Participating Party. For the avoidance of doubt, except to the extent they may be listed on Exhibit A, Excluded Parties are not Participating Parties.

**Person** means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Diocese, the Reorganized Diocese and the Participating Parties.

**Plan** means this Chapter 11 Plan of Reorganization dated August 31, 2023 as it may be altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**Plan Documents** means the Plan and the Disclosure Statement, all exhibits and schedules attached thereto, and all Plan Supplements, either in their present form or as each may be amended, supplemented or otherwise modified from time to time.

**Plan Proponent** means CNA.

**Reorganized Diocese** means a new corporation, formed in accordance with Article 5 of the New York Religious Corporations Law, which pursuant to the Plan shall take title to the Residual Assets on and after the Effective Date. For the avoidance of doubt, the formation of the Reorganized Diocese shall not discharge or waive the Diocese's liability for any Tort Claim, for which a Tort Claimant may have recourse pursuant to the Plan and Plan Documents.

**Settling Insurer** means each of CNA, First State, Interstate, LMI, and Underwriters. A Settling Insurer's predecessors, successors, and assigns shall receive the benefits and protections afforded to a Settling Insurer under the Plan, but only to the extent that: (i) such predecessor's liability was assumed by the Settling Insurer, and not independent of the liability of such Settling Insurer; and (ii) such successor's or assign's liability is derivative of the liability of the Settling Insurer and not independent of the liability of the Settling Insurer.

**Supplemental Settling Insurer Injunction** is the injunction contained in Section 12.4 of this Plan.

**Trust** means the trust to be established pursuant to the Plan and the Trust Agreement for the satisfaction of all Abuse Claims.

**Trust Agreement** means the trust agreement establishing and governing the Trust, as it may be amended.

**Trust Assets** means the following assets and any income, profits, and proceeds derived from such assets subsequent to the transfer of such assets to the Trust: the right to receive the CNA Cash Contribution pursuant to the CNA Settlement; the right to receive the DOR Entities' Cash Contribution; the right to receive the proceeds of the First State Settlement; the right to receive the proceeds of the Interstate Settlement; the right to receive the proceeds of the LMI Settlement; the right to receive the proceeds of the Underwriters Settlement; and the right to receive the Non-Participating Insurance Assignment and all other property transferred to the Trust pursuant to

this Plan, or otherwise acquired by the Trust following the Effective Date, together with any proceeds thereof. For the avoidance of doubt, the Trust Assets shall specifically exclude all of the Residual Assets.

***Trust Documents*** means, collectively, (a) the Trust Agreement, (b) the Allocation Protocol, and (c) any other agreements, instruments, and documents governing the establishment and administration of the Trust, which shall be materially consistent with the terms of the Plan, as the same may be amended or modified from time to time.

***Trustee*** means the trustee of the Trust, who initially will be a Person identified as such in the Confirmation Order and any successor trustee appointed pursuant to the terms of the Plan and/or Trust Agreement. The Trustee shall be selected by the Court following nominations by parties in interest in the Chapter 11 Case.

## SCHEDULE II

Participating Parties

**[To be provided]**

Parishes
1. Sacred Heart Cathedral, Rochester
2. **Annunciation, Rochester

3. **St. Ambrose, Rochester
4. **St. Andrew, Rochester
5. **St. Anthony of Padua, Rochester
6. **St. Augustine, Rochester
7. St. Anne, Rochester
8. Blessed Sacrament, Rochester
9. **Corpus Christi, Rochester
10. St. Boniface, Rochester
11. **St. Bridget, Rochester
12. ** St. Cecilia, Rochester
13. St. Charles Borromeo, Rochester
14. **Christ the King, Rochester
15. **Church of the Annunciation, Rochester
16. Emmanuel Church of the Deaf, Rochester
17. **St. Feehan, Rochester
18. **St. Francis of Assisi, Rochester
19. St. Frances Xavier Cabrini, Rochester
20. St. George, Rochester
21. **Guardian Angels, Rochester
22. **St. Helen, Rochester
23. Holy Apostles, Rochester
24. Holy Cross, Rochester
25. **Holy Ghost, Rochester
26. **Holy Family, Rochester
27. **Holy Name of Jesus, Rochester
28. **Holy Redeemer, Rochester
29. St. Francis Xavier, Rochester
30. **Holy Redeemer/St. Francis Xavier, Rochester
31. **Holy Rosary, Rochester
32. **Immaculate Conception, Rochester
33. Immaculate Conception/St. Bridget, Rochester
34. **St. James, Rochester
35. **St. John the Evangelist, Rochester
36. St. John the Evangelist, Rochester
37. **St. Joseph, Rochester
38. Kateri Tekakwitha Roman Catholic, Rochester
39. St. Lawrence, Rochester
40. **St. Lucy, Rochester
41. **Light of Christ Roman Catholic Parish, Rochester
42. **St. Margaret Mary, Rochester
43. St. Mark, Rochester
44. St. Mary, Rochester
45. **St. Michael, Rochester
46. St. Monica, Rochester
47. **Our Lady of the Americas, Rochester
48. **Our Lady of Good Counsel, Rochester
49. Our Lady of Lourdes, Rochester
50. **Our Lady of Mount Carmel, Rochester

51. **Our Lady of Mercy, Rochester
52. **Our Lady of Perpetual Help, Rochester
53. **Our Lady of Sorrows, Rochester
54. Our Lady of Victory-St. Joseph, Rochester
55. Our Lady Queen of Peace, Rochester
56. Our Mother of Sorrows, Rochester
57. The Parish of the Holy Family, Rochester
58. Peace of Christ, Rochester
59. **St. Patrick, Rochester
60. **Sts Peter & Paul, Rochester
61. St. Pius Tenth, Rochester
62. **St. Salome, Rochester
63. St. Stanislaus, Rochester
64. St. Theodore, Rochester
65. **St. Theresa of the Infant Jesus, Rochester
66. St. Thomas More, Rochester
67. **St. Thomas the Apostle, Rochester
68. **St. Catherine of Siena, Addison
69. Saints Isidore and Maria Torribia, Addison
70. **St. Margaret Mary, Appalachin
71. **St. Mathias, Atlanta
72. St. Alphonsus, Auburn
73. **St. Aloysius, Auburn
74. **St. Francis of Assisi, Auburn
75. Holy Family, Auburn
76. **St. Hyacinth, Auburn
77. St. Mary, Auburn
78. Saints Mary and Martha, Auburn
79. Sacred Heart, Auburn
80. Good Shephard Catholic Community, Aurora
81. St. Agnes, Avon
82. St. John Vianney, Bath
83. **St. Mary, Bath
84. **St. Stanislaus, Bradford
85. Nativity of the Blessed Virgin Mary, Brockport
86. **St. Columba, Caledonia
87. The Parish of Saint Martin De Porres, Caledonia
88. **Our Lady of Lebanon, Canandaigua
89. St. Benedict, Canandaigua
90. **St. Mary, Canandaigua
91. **St. Joachim, Canisteo
92. **St. William, Cameron Mills
93. **St. Joseph, Campbell
94. **St. Patrick, Cato
95. **St. Francis of Assisi, Catatonk
96. **St. Joseph, Cayuga
97. **St. Vincent De Paul, Churchville
98. **St. Felix, Clifton Springs

99. **St. Felix/St. Francis Parish Cluster, Clifton Springs
100. St. Peter's Roman Catholic Parish, Clifton Springs
101. **St. John the Evangelist, Clyde
102. St. Joseph the Worker, Clyde
103. **St. Pius V, Cohocton
104. **St. William, Conesus
105. All Saints, Corning
106. **Santa Maria de Mercede, Cuylerville
107. **St. Mary, Dansville
108. **St. Patrick, Dansville
109. **St. Andrew, Dundee
110. Holy Cross, Dryden
111. **St. Bridget, East Bloomfield
112. St. Jerome, East Rochester
113. **St. Charles Borromeo, Elmira
114. **St. Anthony, Elmira
115. **Blessed Sacrament, Elmira
116. **St. Casimir, Elmira
117. **St. Cecilia, Elmira
118. **Christ the Redeemer, Elmira
119. **St. John the Baptist, Elmira
120. **St. Mary, Elmira
121. **Our Lady of Lourdes, Elmira
122. The Parish of the Most Holy Name of Jesus, Elmira
123. **St. Patrick, Elmira
124. **Sts. Peter and Paul Catholic Parish, Elmira
125. Church of the Assumption, Fairport
126. Church of the Resurrection, Fairport
127. St. John of Rochester, Fairport
128. St. Luke the Evangelist, Geneseo
129. **St. Mary, Geneseo
130. **St. Francis De Sales, Geneva
131. Our Lady of Peace, Geneva
132. **St. Stephen, Geneva
133. **St. Hillary, Genoa
134. **St. Mary, Greenwood
135. St. Anthony, Groton
136. **Holy Name of Jesus, Groveland
137. St. Elizabeth Ann Seton, Hamlin
138. **St. Gabriel, Hammondsport
139. **Church of the Good Shepherd, Henrietta
140. St. Marianne Cope, Henrietta
141. St. Leo, Hilton
142. St. Paul of the Cross, Honeoye Falls
143. St. Mary, Our Lady of the Hills, Honeoye
144. **St. Ann, Hornell
145. Our Lady of the Valley, Hornell
146. **St. Ignatius Loyola, Hornell

147. St. Mary Our Mother, Horseheads
148. **St. Francis Solanus, Interlaken
149. St. Catherine of Siena, Ithaca
150. Immaculate Conception, Ithaca
151. **Our Lady of the Lake, King Ferry
152. All Saints, Lansing
153. **St. Thomas Aquinas, Leicester
154. St. Rose, Lima
155. St. Matthew Catholic Church Society, Livonia
156. **St. Joseph, Livonia
157. **St. Michael, Livonia Center
158. **St. Michael, Lyons
159. **St. Patrick, Macedon
160. **St. Gregory, Marion
161. **St. Patrick, McLean
162. St. Catherine of Siena, Mendon
163. **St. Michael, Montezuma
164. **St. Patrick, Moravia
165. **Church of the Assumption, Mount Morris
166. **St. Patrick, Mount Morris
167. **St. Patrick, Mumford
168. **St. Januarius, Naples
169. **St. John the Evangelist, Newark Valley
170. St. Michael, Newark
171. St. Christopher, North Chili
172. **Holy Angels, Nunda
173. St. Benedict, Odessa
174. **St. Mary of the Lake, Ontario
175. St. Maximillian Kolbe, Ontario
176. **Holy Cross, Ovid
177. The Parish of Mary, Mother of Mercy, Interlaken
178. St. Ann, Owasco
179. Blessed Trinity, Owego
180. St. Patrick, Owego
181. **Immaculate Heart of Mary, Painted Post
182. **St. Anne, Palmyra
183. The Parish of St. Katharine Drexel, Palmyra
184. Holy Spirit, Webster
185. St. Joseph, Penfield
186. **St. Michael, Penn Yan
187. Our Lady of Lakes Catholic Community, Penn Yan
188. **Sacred Heart of Jesus, Perkinsville
189. **St. Francis, Phelps
190. Church of the Transfiguration, Pittsford
191. St. Louis, Pittsford
192. **St. Raphael, Piffard
193. **St. Patrick, Prattsburg
194. **St. Thomas the Apostle, Red Creek

195. **St, Lucy, Retsof
196. **St. Mary, Rexville
197. **St. Joseph, Rush
198. **St. Mary, Rushville
199. **St. Patrick, Savannah
200. **St. Bernard, Scipio Center
201. **St. Mary of the Assumption, Scottsville
202. **St. Patrick, Seneca Falls
203. **St. Dominic, Shortsville
204. **Epiphany, Sodus
205. **St. Rose of Lima, Sodus Point
206. St. John the Evangelist, Spencerport
207. **St. Theresa, Stanley
208. **St. James the Apostle, Trumansburg
209. **St. Michael's, Union Springs
210. **St. Pius the Tenth, Van Etten
211. St. Patrick, Victor
212. St. Francis and St. Clare, Waterloo
213. **St. Mary, Waterloo
214. St. Mary of the Lake, Watkins Glen
215. **St. James, Waverly
216. Holy Family Catholic Community, Wayland
217. **St. Joseph, Wayland
218. Holy Trinity, Webster
219. St. Paul, Webster
220. St. Rita, Webster
221. **St. John, Weedsport
222. **St. Joseph, Cato
223. Our Lady of the Snow, Weedsport
224. **St. Joseph, West Bloomfield
225. Catholic Community of Blessed Trinity, Wolcott
226. **St. Mary Magdalene, Wolcott
227. ** Most Precious Blood Church
228. The Cathedral Community Church of Rochester

Other Entities
1. Catholic Charities of the Diocese of Rochester, Inc.
2. Rochester Catholic Press Association, Inc. ("Catholic Courier")
3. Catholic Youth Organization of Catholic Charities of the Diocese of Rochester
4. Providence Housing Development Corporation
5. Camp Stella Maris of Livonia, N.Y.
6. St. Bernards School of Theology and Ministry
7. Villa of Hope (f/k/a St. Joseph's Villa)
8. De Paul Community Services (f/k/a De Paul Mental Health Clinic)

Schools
1. All Saints in Corning
2. Holy Family in Elmira

3. St. Joseph in Auburn
4. St. Francis/St. Stephen in Geneva
5. De Sales High School in Geneva
** Indicates a parish that is closed, has merged with another or is otherwise inactive at this time.

# EXHIBIT 6

**TRUST AGREEMENT DATED AS OF ~~——~~_____, 2024**

**PURSUANT TO THIRD AMENDED**

**~~PURSUANT TO~~ CHAPTER 11 PLAN OF**

**REORGANIZATION**

**FOR THE DIOCESE OF ROCHESTER, NY DATED APRIL 9, 2024**

# Table of Contents

ARTICLE 1. AGREEMENT OF TRUST .......................................................................... 62

Section 1.1    Creation and Name. ................................................................................ 62

Section 1.2    Purposes. ................................................................................................. 62

Section 1.3    Transfer of Assets. ................................................................................... 62

Section 1.4    Acceptance of Assets. ............................................................................. 62

Section 1.5    Receipt of Proceeds. ................................................................................ 73

Section 1.6    Beneficiaries. ........................................................................................... 73

Section 1.7    Jurisdiction. .............................................................................................. 73

Section 1.8    Privileged and confidential information. ................................................. 73

Section 1.9    Relation-back election. ............................................................................ 73

Section 1.10    Employer identification number. ........................................................... 84

Section 1.11    Relationship to Plan. ............................................................................. 84

ARTICLE 2. POWERS AND TRUST ADMINISTRATION ........................................... 84

Section 2.1    Powers. ..................................................................................................... 84

Section 2.2    Limitations on the Trustee and TAC ...................................................... 117

Section 2.3 ................................................................................... Error! Bookmark not defined.

General Administration. ............................................................................................... 128

Section 2.4    Accounting. .............................................................................................. 128

Section 2.5    Financial Reporting. ................................................................................ 128

Section 2.6    Names and addresses. ............................................................................. 138

Section 2.7    Transfers of the Trust Assets. ................................................................. 139

ARTICLE 3. ACCOUNTS, INVESTMENTS, EXPENSES ........................................... 139

Section 3.1    Accounts. ................................................................................................. 139

Section 3.2   Investment Guidelines..............................................................149

Section 3.3   Payment of Trust Operating Expenses..........................................149

Section 3.4   Payment to Future Abuse Claims Trust ................................Error! Bookmark not defined.

ARTICLE 4. CLAIMS ADMINISTRATION ANDCLAIMS ADMINISTRATION AND DISTRIBUTIONS..............................................................................1410

Section 4.1   Claims Administration and Distributions.......................................1410

Section 4.2   Manner of Payment..................................................................1410

Section 4.3   Delivery of Distributions...........................................................1410

Section 4.4   Medicare Reimbursement and Reporting Obligations ....................1511

ARTICLE 5. TRUSTEE .............................................................................15

ARTICLE 5. TRUSTEE ..............................................................................11

Section 5.1   Initial Trustee.........................................................................1511

Section 5.2   Term of Service, Successor Trustee..............................................1511

Section 5.3   Appointment of Successor Trustee. .............................................1612

Section 5.4   Trustee Meetings.....................................................................1612

Section 5.5   Compensation and Expenses of Trustee........................................1713

Section 5.6   Trustee's Independence.............................................................1713

Section 5.7   Standard of Care; Exculpation....................................................1813

Section 5.8   Protective Provisions................................................................1915

Section 5.9   Indemnification.......................................................................2016

Section 5.10  Bond...................................................................................2117

ARTICLE 6.............................................................................................23

GENERAL PROVISIONS...........................................................................23

ARTICLE 6. ...........................................................................................17

DURATION OF TRUST ................................................................................................ 17

Section 6.1    Duration. ............................................................................................... 17

Section 6.2    Dissolution/Termination of Trust. ......................................................... 17

Section 6.3    No Termination by Beneficiaries. .......................................................... 17

Section 6.4    Continuance of Trust for Winding Up; Discharge and Release of Trustee. ....... 17

ARTICLE 7. .............................................................................................................. 18

GENERAL PROVISIONS ........................................................................................ 18

Section 6.17.1    Irrevocability. ................................................................................... 2318

Section 6.27.2    Term; Termination. ......................................................................... 2318

Section 6.37.3    Outgoing Trustee Obligations. ........................................................ 2419

Section 6.47.4    Taxes. .............................................................................................. 2419

Section 6.57.5    Modification. .................................................................................... 2520

Section 6.67.6    Severability. ..................................................................................... 2621

Section 6.77.7    Notices. ............................................................................................ 2621

Section 6.87.8    Successors and Assigns. .................................................................. 2621

Section 6.97.9    Limitation on Transferability; Beneficiaries' Interests. .................. 2722

Section 6.107.10    Exemption from Registration. ...................................................... 2722

Section 6.117.11    Entire Agreement; No Waiver. ..................................................... 2722

Section 6.127.12    Headings. ..................................................................................... 2823

Section 6.137.13    Governing Law. ........................................................................... 2823

Section 6.147.14    Settlor's Representative. .............................................................. 2823

Section 6.157.15    Independent Legal and Tax Counsel. .......................................... 2823

Section 6.167.16    Waiver of Jury Trial. ................................................................... 2924

Section 6.177.17    Effectiveness. ............................................................................... 2924

Section 6.187.18................................................................................................................Counterpart Signatures. 29

24

EXHIBIT 1  TRUST ALLOCATION PROTOCOL .................................................................. 31

# TRUST AGREEMENT

This Trust Agreement (this "**Trust Agreement**"), dated as of _____, 2024, and effective as of the Confirmation Date, is entered in accordance with the ~~First~~Third Amended ~~Joint~~ Chapter 11 Plan of Reorganization for the Diocese of Rochester Dated ~~September 13~~April 9, ~~2023~~2024 (as it may be amended, modified, or supplemented, the "**Plan**")~~,~~[1]~~,~~ by The Diocese of Rochester (the "**Diocese**," also known as the "**Debtor**" or the "**Settlor**," in its capacity as settlor of the Trust), ~~on the one hand,~~ and ~~Advisory Trust Group, LLC~~_____ as trustee (together with any successor serving in such capacity, the "**Trustee**") ~~and the Trust Oversight Committee, who are former members of the Official Committee of Unsecured Creditors (the "Committee") (together with any successors serving in such capacity, the "Oversight Committee"), on the other hand~~:~~,~~

## RECITALS

(A)     The Diocese has reorganized or will reorganize under the provisions of chapter 11 of the Bankruptcy Code in a case filed in the Bankruptcy Court, administered and known as In re The Diocese of Rochester, Case No. 19-20905 (Bankr. W.D.N.Y.) (the "**Chapter 11 Case**").

(B)     The Plan and the Confirmation Order in the Chapter 11 Case provide, among other things, for the creation of the Trust.

(C)     This Trust Agreement is deemed executed by the Confirmation Order to implement the Plan and to create the Trust (the "**Trust**") for the exclusive benefit of ~~the~~ holders of Abuse Claims.

(D)     The Bankruptcy Court held in the Confirmation Order that all the prerequisites for the Channeling Injunction have been satisfied, and such Channeling Injunction is fully effective and enforceable as provided in the Plan and Confirmation Order with respect to the Channeled Claims.

(E)     The Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Diocese in accordance with the Plan, the Trust Assets (as defined in Section 1.3) shall be transferred to and vested in the Trust free and clear of all liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtor or their affiliates, any creditor or any other entity, other than as provided in the Channeling Injunction with respect to the Channeled Claims and as provided in Section 1.3.

---

[1] All capitalized terms used but not otherwise defined herein shall have their respective meanings as set forth in the Plan or in the Confirmation Order, as applicable, or, if not defined therein, as set forth in the ~~Trust~~ Allocation Protocol (as defined in Section 1.2 below).

**NOW, THEREFORE**, it is hereby agreed as follows:

# ARTICLE 1.
# AGREEMENT OF TRUST

Section 1.1 *Creation and Name.* Diocese as Settlor hereby creates a trust known as the "**Rochester Abuse Claim Trust**" which is the Trust provided for and referred to in the Plan. The Trustee may transact the business and affairs of the Trust in the name of the Rochester Abuse Claim Trust and references herein to the Trust shall include the Trustee acting on behalf of the Trust. The Confirmation Order, the Plan, and this Trust Agreement, including the Exhibits hereto, including the Trust Allocation Protocol and the Claim Litigation Protocol as defined in Section 1.2, (collectively, the "**Trust Documents**"), constitute the governing instruments of the Trust. The Trustee is hereby authorized to execute and file a Certificate of Trust with the New York Secretary of State.

Section 1.2 *Purposes.* The purposes of the Trust are to: (i) to assume all liability for the Channeled Claims; (ii) to administer Abuse Claims; and (iii) to make Distributions to holders of Abuse Claims, in accordance with the Trust Allocation Protocol attached hereto to the Plan as **Exhibit 1** (the "Trust Allocation Protocol"); and (iv) to manage litigation of Abuse Claims, in accordance with the Claim Litigation Protocol attached hereto as Exhibit 2 (the "Claim Litigation Protocol"). In connection therewith, the Trust shall hold, manage, protect, and monetize the Trust Assets (as defined in Section 1.3 below) in accordance with the terms of the Trust Documents for the benefit of the Beneficiaries (as defined in Section 1.6(a) below). All Abuse Claims shall be resolved exclusively in accordance with the Trust Allocation Protocol and the Claim Litigation Protocol.

Section 1.3 *Transfer of Assets.* Pursuant to the Plan, the Diocese and the Participating Parties, and any Settling Insurers, shall pay all funds to the Trust by wire transfer or otherwise effectuate the transfers of assets required under the Plan. The Trust will receive and hold all right, title, and interest in and to the funds transferred (the "**Aggregate Settlement Consideration**" and, together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The Trust Assets shall be transferred to the Trust free and clear of any liens, encumbrances, charges, claims, interests, or other liabilities of any kind of the Debtor Diocese or its affiliates, any creditor, or any other person or entity, other than as provided in the Channeling Injunction with respect to Channeled Claims. The Diocese or Reorganized Diocese shall execute and deliver such documents to the Trust as the Trustee reasonably requests to transfer and assign any assets comprising all or a portion of the Trust Assets to the Trust

Section 1.4 *Acceptance of Assets.*

(a) In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly accepts the transfer to the Trust of the Trust Assets, subject to the terms of the Trust Documents and the Plan Documents. The Trust shall succeed to all of the Diocese Diocese's and Participating Parties' respective rights, title, and interest, including all legal privileges, in the Trust Assets, and neither the Diocese nor any other person or entity

transferring such will have any further equitable or legal interest in, or with respect to, the Trust~~, or the Trust~~ Assets, including the Aggregate Settlement Consideration.

(b)     Except as otherwise provided in the Plan, Confirmation Order, or Trust Documents, the Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as

rights of indemnification, contribution, subrogation, and similar rights, regarding Channeled Claims that the Diocese or the Reorganized Diocese have or would have had under applicable law.

(c)     No provision in the Trust Documents shall be construed or implemented in a manner that would cause the Trust to fail to qualify as a "qualified settlement fund" under the QSF Regulations (as defined in Section ~~8.4~~7.4(a) below).

(d)     Nothing in this Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction, the Supplemental Settling Insurer Injunction, or other terms of the Plan or Confirmation Order.

(e)     In the Trust Documents, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

Section 1.5     *Receipt of Proceeds*.

The proceeds of any recoveries from any ~~litigation or~~ claims of the Trust ~~(including the Actions)~~ will be deposited in the Trust's accounts and become the property of the Trust as Trust Assets.

Section 1.6     *Beneficiaries*.

(a)     The Trust is established for the benefit of the holders of Abuse Claims. (the "**Beneficiaries**").

(b)     The Beneficiaries shall be subject to the terms of this Trust Agreement and Trust Documents, including, without limitation, the ~~Trust~~ Allocation Protocol ~~and the Claim Litigation Protocol~~.

Section 1.7     *Jurisdiction*. The Bankruptcy Court shall have continuing jurisdiction with respect to the Trust; provided, however, the courts of the State of New York, including any federal court located therein, shall also have jurisdiction over the Trust only if and to the extent the Bankruptcy Court cannot exercise or properly abstains from exercising jurisdiction over the Trust.

Section 1.8     *Privileged and confidential information*.

The transfer or assignment of any information subject to an attorney-client or similar privilege to the Trustee shall not result in the destruction or waiver of any applicable privileges pertaining thereto.  Further, with respect to any such privileges: (a) they are transferred to or contributed

for the purpose of enabling the Trustee to perform his or her duties to administer the Trust and (b) they are vested solely in the Trustee and not in the Trust, or any other person, committee, or subcomponent of the Trust, or any other person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of a Channeled Claim.

Section 1.9    *Relation-back election*.

Upon request of the Trustee, the Settlor shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2), to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

Section 1.10    *Employer identification number*.

Upon or in anticipation of establishment of the Trust, the Trustee shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

Section 1.11    *Relationship to Plan*.

The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and the Confirmation Order and, therefore, this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan).  To the extent that there is conflict between the provisions of the Trust Documents and the provisions of the Plan or the Confirmation Order, each document shall have controlling effect in the following order: (1) the Confirmation Order; (2) the Plan; (3) this Trust Agreement; and (4) the ~~Trust~~ Allocation Protocol ~~and Claim Litigation Protocol~~.

## ARTICLE 2.
## POWERS AND TRUST ADMINISTRATION

Section 2.1    *Powers*.

(a)    The Trustee is empowered to take all actions, including such actions as may be consistent with those expressly set forth above, as the Trustee deems necessary to reasonably ensure that the Trust is treated as a "qualified settlement fund" under Section 468B of the Tax Code and the regulations promulgated pursuant thereto.  Further, the Trustee may, unilaterally and without court order, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

(b)    The Trustee is and shall act as the fiduciary to the Trust Assets in accordance with the provisions of the Trust Documents.  The Trustee shall administer the Trust, the Trust Assets, and any other amounts to be received under the terms of the Trust Documents in accordance with the purposes set forth in Section 1.2 above and in the manner prescribed by the Trust Documents.  Subject to the limitations set forth in the Trust Documents, the Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or advisable to fulfill the purposes of the Trust, including, without

limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of New York. Nothing in the Trust Documents or any related document shall require the Trustee to take any action if the Trustee reasonably believes that such action is contrary to law. In addition to all powers enumerated in the Trust Documents, including, but not limited to, the Trustee's powers and authority in respect of the interpretation, or application of definitions and rules of construction set forth in the Plan to the fullest extent set

forth therein, from and after the Effective Date, the Trust shall succeed to all of the rights and standing of the Diocese with respect to the Trust Assets in its capacity as a trust administering assets for the benefit of the Beneficiaries.

(c)     Except as required by applicable law or the Trust Documents, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(d)     Without limiting the generality of Sections 2.1(a) and (b) above, and except as limited in the Trust Documents and by applicable law, the Trustee shall have the power to:

(i)     supervise and administer the Trust in accordance with the Trust Documents, including the ~~Trust~~ Allocation Protocol ~~and the Claim Litigation Protocol~~;

(ii)     receive and hold the Trust Assets, and exercise all rights with respect thereto including the right to vote and sell any securities that are included in such funds;

(iii)     invest the monies held from time to time by the Trust in accordance with Section 3.2;

(iv)     sell, transfer, or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustee may determine proper and consistent with the other terms of the Trust Documents;

(v)     enter into leasing, financing, or other agreements with third parties, as determined by the Trustee, in his or her discretion, to be useful in carrying out the purposes of the Trust;

(vi)     determine and pay liabilities and pay all fees and expenses incurred in administering the Trust, managing the Trust Assets, and making Distributions in accordance with the Trust Documents (the "**Trust Operating Expenses**");

(vii)     establish accounts and reasonable reserves within the Trust, in her/his discretion, to be necessary, prudent, or useful in administering the Trust;

(viii)     sue, be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, however nothing herein shall be deemed to either

(a) affect, limit, or expand any party's rights to sue or otherwise commence a case or proceeding against a trustee in a case under chapter 11 of the Bankruptcy Code or (b) allow any party asserting a Abuse Claim and/or Channeled Claim to commence any action against the Trustee or the Trust with respect to such claim;

    (ix) appoint such officers and retain such employees, consultants, advisors, independent contractors, experts, and agents and engage in such legal, financial, administrative, accounting, investment, auditing, and alternative dispute resolution services and activities as the Trust requires, ~~which may be those formerly retained by the Committee,~~ and delegate to such persons such powers and authorities as this Trust Agreement provides or the

 fiduciary duties of the Trustee permits and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

    (x) pay reasonable compensation and reimbursement of expenses to any of the Trust's employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, administrative, accounting, investment, auditing, and alternative dispute resolution services and activities as the Trust requires;

    ~~(xi) compensate the Oversight Committee members for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;~~

    (~~xii~~xi) compensate the Trust's professionals for services, costs, and expenses incurred prior to the Effective Date in accordance with the terms of the Trust Documents;

    (~~xiii~~xii) execute and deliver such instruments as the Trustee considers advisable or necessary in administering the Trust;

    (~~xiv~~xiii) timely file such income tax and other tax returns and statements required to be filed and timely pay all taxes, if any, required to be paid from the Trust Assets and comply with all applicable tax reporting and withholding obligations;

    (~~xv~~xiv) require, in respect of any Distribution of Trust Assets, the timely receipt of properly executed documentation (including, without limitation, IRS Form W-9) as the Trustee determines in his or her discretion necessary or appropriate to comply with applicable tax laws;

    (~~xvi~~xv) resolve all applicable lien resolution matters with respect to Beneficiaries that may be subject to liens arising pursuant to the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) ("MMSEA") in accordance with the Plan; provided, however, that for claims where there is an open chapter 7 bankruptcy case, such lien resolution is subject to the approval of the chapter 7 bankruptcy trustee and applicable bankruptcy court; and provided further, however, that in such cases, the chapter 7 bankruptcy trustee shall have sole responsibility to seek court approval for such lien resolution;

(~~xvii~~xvi)      register as a responsible reporting entity ("**RRE**") and timely submit all reports under the reporting provisions of section 111 of MMSEA as required under Section ~~4.6~~4.4 below and the terms of the Plan;

(~~xviii~~xvii)      enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the Trust, provided such arrangements do not conflict with any other provision of the Trust Documents;

(~~xix~~xviii)      in accordance with Section 5.9 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.7(a) below) solely from the Trust Assets and to the fullest extent permitted by law;

(~~xx~~xix) delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable investment advisors or investment managers without liability for any action taken or omission made because of any such delegation;

(~~xxi~~xx) delegate any or all of the authority conferred with respect to the protection, preservation, and monetization of the non-cash Trust Assets;

(~~xxii~~xxi)      initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, all legal actions and other proceedings related to any asset, liability, or responsibility of the Trust;

(~~xxiii~~xxii)      enter into structured settlements and other similar arrangements with any Beneficiary (including a minor or other person in need of special consideration) or any attorney of any Beneficiary, upon such terms as the Trustee and such Beneficiary (or such Beneficiary's counsel or other authorized person) agree, in all cases in accordance with the ~~Trust~~ Allocation Protocol;

(~~xxiv~~xxiii)      take any and all actions appropriate or necessary in order to carry out the terms of the Trust Documents; and

(~~xxv~~xxiv)      except as otherwise expressly provided in the Trust Documents, exercise any other powers now or hereafter conferred upon or permitted to be exercised by a trustee under the laws of the State of New York.

(e)      The Trustee shall have the power to ~~(i) authorize the commencement or continuation of a lawsuit by an Abuse Claimant against the Diocese and/or Participating Parties in accordance with the Claim Litigation Protocol (a "Litigation Claim"), and (ii)~~ enter into any settlement that causes an Insurer to become a Settling Insurer (an "Insurance Settlement"), provided, however, the powers set forth in this Section 2.1(e) shall in each case be subject to the provisions of the Trust Documents ~~including Sections 5.13, 5.14 and 5.15(a) below~~.

(f)      The Trustee, in his or her sole discretion, may take all actions necessary or advisable for the enforcement of the non-monetary commitments of Diocese with respect to ~~child protection~~Child Protection as set forth in the Plan and Confirmation Order.

~~(g)    The Trustee shall consult with the Oversight Committee on the matters set forth in in the Trust Documents.~~

Section 2.2    *Limitations on the Trustee ~~and Oversight Committee~~*.

(a)    Notwithstanding anything in the Trust Documents to the contrary, the Trustee shall not do or undertake any of the following:

(i)    guaranty any debt;

(ii)    make or enter into any loan of Trust Assets;

(iii)    make any transfer or Distribution of Trust Assets other than those authorized by the Trust Documents;

(iv)    engage in any trade or business with respect to the Trust Assets or proceeds therefrom, other than managing such assets;

(v)    engage in any investment of the Trust Assets, other than as explicitly authorized by this Trust Agreement; and

(vi)    engage in any activities inconsistent with the treatment of the Trust as a "qualified settlement fund" within the meaning of Treasury Regulations issued under section 468B of the Tax Code.

(b)    Insurance Settlements.

The Trustee may effectuate proposed Insurance Settlements without Bankruptcy Court approval. ~~Notwithstanding the foregoing, if an Oversight Committee member dissents from approval of the proposed Insurance Settlement and wants the Trustee to seek Bankruptcy Court approval of the proposed settlement, such settlement shall be conditioned on the Bankruptcy Court finding that the proposed settlement is in the best interest of the Trust.~~

Section 2.3    *General Administration*.

The Trustee shall act in accordance with the Trust Documents.  The Trustee shall establish the location of the principal office of the Trust and may change the location of the principal office or establish other offices at other locations in his or her discretion.

Section 2.4    *Accounting*.

The fiscal year of the Trust shall begin on January 1 and shall end on December 31 of each calendar year, except that the first fiscal year shall run from the Confirmation Date to December 31.  The Trustee shall maintain the books and records relating to the Trust Assets and income and the payment of Trust Operating Expenses and other liabilities of the Trust.  The detail of these books and records and the duration of time during which the Trustee shall keep such books and records shall be such as to allow the Trustee to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard

accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Trust, including, without limitation, the assets and liabilities of the Trust as of the end of such fiscal year and the additions, deductions, and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Trustee shall maintain such books and records until the wind-up of the Trust's affairs and satisfaction of all of Trust liabilities.

Section 2.5    *Financial Reporting*.

(a)    Within one hundred twenty (120) days following the end of each calendar year, for as long as the Chapter 11 Case is open, the Trustee shall file with the Bankruptcy Court the Annual Report.

(b)    All materials filed with the Bankruptcy Court pursuant to this Section 2.5 need not be served on any parties in the Chapter 11 Case.

Section 2.6    *Names and addresses*.

The Trustee shall keep a register (the "**Register**") in which the Trustee shall at all times maintain the names and addresses of the Beneficiaries and the awards made to the Beneficiaries pursuant to the Trust Documents.  The Trustee may rely upon this Register for the purposes of delivering Distributions or notices.  In preparing and maintaining this Register, the Trustee may rely on the name and address of each Abuse Claimant as set forth in a proof of claim filed by such holder, or proper notice of a name or address change, which has been delivered by such Abuse Claimant to the Trustee.  The Trustee may deliver Distributions and notices to counsel for any Abuse Claimant identified in such Beneficiary's proof of claim or proper notice of a name or address change.

Section 2.7    *Transfers of the Trust Assets*.

To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or part, shall be subject to any legal or equitable claims of creditors of any Beneficiary or others, nor to legal process, nor be voluntarily or involuntarily transferred, assigned, anticipated, pledged, or otherwise alienated or encumbered except as may be ordered by the Bankruptcy Court or other competent court of jurisdiction.

## ARTICLE 3.
## ACCOUNTS, INVESTMENTS, EXPENSES

Section 3.1    *Accounts*.

(a)    The Trustee shall maintain one or more accounts ("**Trust Accounts**") on behalf of the Trust, including, at the Trustee's discretion, a disputed claims trust reserve, with one or more financial depository institutions (each a "**Financial Institution**").

(b)    The Trustee, at his or her discretion, may replace any retained Financial Institution with a successor Financial Institution at any time.

(c)     The Trustee may, from time to time, create such accounts and reasonable reserves within the Trust Accounts, including a disputed claim trust reserve, as authorized in this Section 3.1 and as he or she may deem necessary, prudent, or useful in order to provide for Distributions to the Beneficiaries and the payment of Trust Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**").  Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the Internal Revenue Code ("**IRC**") or Treasury Regulations.

Section 3.2     *Investment Guidelines*.

~~(a)~~     The Trustee may invest the Trust Assets and monetize such non-liquid assets in accordance with the Trust Documents.  This Section 3.2~~(b)~~ is intended to modify the application to the Trust of the "prudent person" rule, "prudent investor" rule, and any other rule of law that would require the Trustee to diversify the Trust Assets.

Section 3.3     *Payment of Trust Operating Expenses*.

All Trust Operating Expenses shall be payable out of the Trust Assets.  None of the Trustee, ~~the Oversight Committee,~~or the Beneficiaries, nor any of their officers, agents, advisors, professionals, or employees shall be personally liable for the payment of any Trust Operating Expense or any other liability of the Trust.

# ARTICLE 4.
# CLAIMS ADMINISTRATION AND DISTRIBUTIONS

Section 4.1     *Claims Administration and Distributions*. The Trust shall fairly and reasonably compensate Abuse Claims and shall pay up to the full value of such claims, solely in accordance with the Trust Documents, including the ~~Trust~~ Allocation Protocol ~~and the Claim Litigation Protocol~~.

Section 4.2     *Manner of Payment*.

Distributions from the Trust to the Beneficiaries may be made by the Trustee on behalf of the Trust or by a disbursing agent retained by the Trust to make Distributions on behalf of the Trust.

Section 4.3     *Delivery of Distributions*.

(a)     Distributions shall be payable to ~~the~~a Beneficiary (or to counsel for the Beneficiary) on the date approved for Distribution by the Trustee (the "**Distribution Date**") in accordance with the terms of the Trust Documents, including the ~~Trust~~ Allocation ~~Protocol and Claim Litigation~~ Protocol. With respect to each Abuse Claim approved for payment, Distributions shall be made only after all conditions to the Distribution with respect to each such Abuse Claim have been satisfied.  In the event that any Distribution to a Beneficiary is returned as undeliverable, no further Distribution to such Beneficiary shall be made unless and until the Trustee has been notified of the then current address of such Beneficiary, at which time

such Distribution shall be made to such Beneficiary without interest; provided, however, that all Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six ~~(6)~~ months from the applicable Distribution Date, subject to extension for good cause shown.  After such date, (i) all unclaimed Distributions shall revert to the Trust (notwithstanding any applicable federal or state escheat~~,~~ or abandoned or unclaimed property laws to the contrary), (ii) the Abuse Claim of such Beneficiary shall be released, settled, compromised, and forever barred as against the Trust, and (iii) all unclaimed property interests shall be distributed to other Beneficiaries in accordance with the Trust Documents, as if the Abuse Claim of such Beneficiary had been disallowed as of the date the undeliverable Distribution was first made.  The Trustee shall take reasonable efforts to obtain a current address for any Beneficiary with respect to which any Distribution is returned as undeliverable.

(b)	In the event the Trust holds cash after paying all Trust Operating Expenses and making all Distributions contemplated under the Trust Documents, such remaining cash shall be distributed to a nationally recognized charitable organization of the Trustee's choice to the extent economically feasible, which charitable organization shall be independent of the Trustee and, to the extent possible, shall have a charitable purpose consistent with the protection of children from sexual abuse or its ramifications.  No Trust Asset or any unclaimed property shall escheat to any federal, state, or local government or any other entity.

(c)	Notwithstanding any provision in the Trust Documents to the contrary, no payment (including any supplemental payment) shall be made to any Beneficiary on account of any Abuse Claim if the Trustee determines that the costs of making such Distribution is greater than the amount of the Distribution to be made.

Section 4.4	_Medicare Reimbursement and Reporting Obligations_.

(a)	The Trust shall register as ~~a Responsible Reporting Entity ("~~an RRE~~")~~ under the reporting provisions of section 111 of MMSEA ~~(as defined in the Plan)~~; provided, that this shall apply only to Channeled Claims that occurred after December 5, 1980.

(b)	The Trust shall timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Trust.  The Trust, in its capacity as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(c)	Before remitting funds to Claimants' counsel, or to the Claimant if such Claimant is acting pro se, in respect of any Channeled Claim, the Trustee shall obtain (i) a certification from said Claimant (or such Claimant's authorized decedent's estate representative) that said Claimant has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Channeled Claim and (ii) that the Claimant indemnifies the Trust for any such obligations.

**ARTICLE 5.**
**TRUSTEE**

Section 5.1     *Initial Trustee*. The initial Trustee shall be ~~Advisory Trust Group, LLC~~_____.

Section 5.2     *Term of Service, Successor Trustee*.

(a)     The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) below, (iii) his or her removal

pursuant to Section 5.2(c) below, and (iv) the termination of the Trust pursuant to Section 6.2 below.

(b)     The Trustee may resign at any time upon written notice ~~to the Oversight Committee and~~ filed with the Bankruptcy Court.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety ~~(90)~~ days after the date such notice is given, where practicable.

(c)     The Trustee may be removed by ~~consent of (i) at least two/thirds (2/3) majority of the Oversight Committee or (ii)~~ an order from the Bankruptcy Court, in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard.  Other good cause shall mean gross negligence, fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust, any substantial failure to comply with the administration of the Trust, or a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder. ~~For the avoidance of doubt, any removal of the Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.~~

Section 5.3     *Appointment of Successor Trustee*.

(a)     In the event of any vacancy in the office of the Trustee, including the death, resignation, or removal of any successor Trustee, such vacancy shall be filled by the ~~Oversight Committee as set forth herein. The Oversight Committee~~ Diocese in consultation with the Plan Proponent.  The Diocese will nominate an individual to serve as successor Trustee. ~~If the majority of the Oversight Committee then in office~~, subject to agreement by the Plan Proponent.  Once the Diocese and Plan Proponent agree upon a successor Trustee, then, subject to the approval of the Bankruptcy Court, such individual shall become the Trustee.

(b)     Immediately upon the appointment of any successor Trustee pursuant to Section 5.3(a) above, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor

Trustee.  No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)  Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) above, (iii) his or her removal pursuant to Section 5.2(c) above, and (iv) the termination of the Trust pursuant to Section 6.2 below.

Section 5.4  *Trustee Meetings*.

(a)  **Regular Meeting**.  The Trustee shall hold regular meetings with the Oversight Committee not less than quarterly, which may be held at such times and at such places as may be determined from time to time by the Trustee, including remotely.

(ba)  **Special Meetings**.  Special meetings of the Trustee with the Oversight CommitteeDiocese and the Plan Proponent may be called by the Trustee by giving written notice to the Oversight CommitteeDiocese and Plan Proponent not less than one (1)five business daydays prior to the date of the meeting.  Any such notice shall include the time, place, and purpose of the meeting, given by overnight courier, personal delivery, facsimile, electronic mail, or other similar means of communication.  Notice shall be addressed or delivered to the address as shown upon the records of the Trust or as may have been given to the Trustee for purposes of notice.  Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier.  Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(cb)  **Participation in Meetings by Telephone Conference**.  The Trustee may convene, and persons may participate in, a meeting by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all persons participating in such meeting can hear one another.  Participation in a meeting pursuant to this Section 5.4(c) shall constitute presence in person at such meeting.

(dc)  **Waiver of Notice**.  Notice of a meeting need not be given to any person who signs a waiver of notice, whether before or after the meeting.  All such waivers shall be filed with the Trust records or made a part of the minutes of the meeting.  Attendance at a meeting shall constitute a waiver of notice of such meeting.  Neither the business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

Section 5.5  *Compensation and Expenses of Trustee*. The Trustee shall receive compensation from the Trust for his or her services as Trustee. The initial amount of the Trustee's compensation shall be [●] and shall be adjusted annually thereafter as reasonably determined by the majority of the Oversight CommitteeTrustee.  The Trust shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by the Trustee in the course of carrying out his or her duties as Trustee in accordance with reasonable

policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustee.  The amounts paid to the Trustee for compensation and expenses shall be disclosed in the Annual Report.

Section 5.6    *Trustee's Independence*.

(a)    The Trustee shall not, during his or her service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Reorganized Diocese or its affiliated persons, or any Non-Settling Insurer.  No Trustee shall act as an attorney for, or otherwise represent, any Person who holds a claim in the Chapter 11 Case.

(b)    The Trustee shall be indemnified by the Trust in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)    Persons dealing with the Trust and the Trustee, with respect to the affairs of the Trust, shall have recourse only to the Trust Assets to satisfy any liability incurred by the Trust or the Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustee, the Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants, or lawyers shall have any personal obligation to satisfy any such liability.

Section 5.7    *Standard of Care; Exculpation*.

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean the Trustee, the Abuse Claims Reviewer, ~~the Oversight Committee,~~ and each of their respective members, officers, employees, agents, consultants, lawyers, advisors, or professionals (collectively, the "**Trust Indemnified Parties**").

(b)    No Trust Indemnified Party shall be liable to the Trust, any other Trust Indemnified Party, any Beneficiary, or any other Person for any damages arising out of the creation, operation, administration, enforcement, or termination of the Trust, except in the case of such Trust Indemnified Party's willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction.  To the fullest extent permitted by applicable law, the Trust Indemnified Parties shall have no liability for any action in performance of their duties under this Trust Agreement taken in good faith with or without the advice of counsel, accountants, appraisers, and other professionals retained by the Trust Indemnified Parties.  None of the provisions of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their respective rights and powers.  Any Trust Indemnified Party may rely, without inquiry, upon writings delivered to it under any of the Trust Documents, which the Trust Indemnified Party reasonably believes to be genuine and to have been given by a proper person.  Notwithstanding the foregoing, nothing in this Section 5.7 shall relieve the Trust Indemnified Parties from any liability for any actions or omissions arising out of ~~the~~their willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction; provided, that in no event will any such person be liable for punitive, exemplary, consequential, or special damages under any circumstances.

Any action taken or omitted by the Trust Indemnified Parties with the approval of the Bankruptcy Court, or any other court of competent jurisdiction, will conclusively be deemed not to constitute willful misconduct, bad faith, or fraud.

(c)     The Trust Indemnified Parties shall not be subject to any personal liability whatsoever, whether in tort, contract or otherwise, to any Person in connection with the affairs of the Trust or for any liabilities or obligations of the Trust except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud, and all Persons claiming against the Trust Indemnified Parties, or otherwise asserting claims of any nature in connection with affairs of the Trust, shall look solely to the Trust Assets for satisfaction of any such claims.

(d)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Beneficiaries, it is hereby understood and agreed by the parties hereto and the Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties, provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.7 and its subparts.

(e)     The Trust Indemnified Parties shall be indemnified to the fullest extent permitted by law by the Trust against all liabilities arising out of the creation, operation, administration, enforcement, or termination of the Trust, including actions taken or omitted in fulfillment of their duties with respect to the Trust, except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud.

(f)     The Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

Section 5.8     _Protective Provisions_.

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.8.

(b)     In the event the Trustee retains counsel (including at the expense of the Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder.  A successor to any Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege.  No Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)     To the extent that, at law or in equity, the Trustee has duties (including fiduciary duties) and liabilities relating hereto, to the Trust or to the Beneficiaries, it is hereby understood and agreed by the Parties and the Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustee, provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.7 herein.

(d)     No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction.

(e)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties, and powers hereunder.

(f)     In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants, and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered, or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

Section 5.9     *Indemnification*.

(a)     Without the need for further court approval, the Trust hereby indemnifies, holds harmless, and defends the Trust Indemnified Parties in the performance of their duties hereunder to the fullest extent that a trust, including a statutory trust organized under the laws of the State of New York, is entitled to indemnify, hold harmless, and defend such persons against any and all liabilities, expenses, claims, damages, or losses (including attorneys' fees and costs) incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to or after the Effective Date in connection with the formation, establishment, funding or operations of the Trust except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud.

(b)     Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are indemnified by the Trust shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by final order of the Bankruptcy Court that the Trust

Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Trust.

(c)     The Trustee may purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor, or consultant of any such person.

(d)     The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified.  Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time.  In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons, or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)     The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

Section 5.10     *Bond*. The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

## ARTICLE 6.
## DURATION OF TRUST

Section 6.1     *Duration*.

 Once the Trust becomes effective upon the Effective Date of the Plan, the Trust and this Agreement shall remain and continue in full force and effect until the Trust is dissolved or terminated.

Section 6.2     *Dissolution/Termination of Trust*. The Trust shall be dissolved at such time as (~~i~~a) all of the Trust Assets have been distributed pursuant to the Plan and this Agreement, (~~ii~~b) the Trustee determines that the administration of any remaining Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (~~iii~~c) all distributions required to be made by the Trustee under the ~~Plan and this Agreement~~Trust Documents have been made; provided, however, that in no event shall the Trust be dissolved later than seven ~~(7)~~ years from the Effective Date unless a court of competent jurisdiction determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of the Trust Assets. If at any time the Trustee determines, in reliance upon such professionals as the Trustee may retain, that the expense of continued administration of the Trust is likely to exceed the value of the remaining Trust Assets, the Trustee may apply to the Bankruptcy Court for authority to (~~iv~~w)

reserve any amount necessary to dissolve the Trust, (~~ii~~x) disburse any remaining cash for disposition under the Plan, and (~~iii~~y) donate any remaining assets to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation" as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Trust, and any insider of the Trustee, and (~~iii~~z) dissolve the Trust.

Section 6.3 _No Dissolution or Termination by Beneficiaries_. The Trust may not be dissolved or terminated at any time by the Beneficiaries.

Section 6.4 _Continuance of Trust for Winding Up; Discharge and Release of Trustee_. After the ~~termination~~dissolution of the Trust and solely for the purpose of liquidating and winding up the affairs of the Trust, the Trustee shall continue to act as such until his responsibilities have been fully performed. Except as otherwise specifically provided herein, upon the distribution of the Trust Assets including all excess reserves, the ~~Oversight Committee members, the~~ Trustee~~,~~ and the Trust's professionals and agents shall be deemed discharged under this Agreement and have no further duties or obligations hereunder. Upon a motion by the Trustee, the Bankruptcy Court may enter an order relieving the ~~Oversight Committee members and the~~ Trustee, his employees, and the Trust's professionals and agents of any further duties, discharging and releasing the Trustee from all liability related to the Trust, and releasing the Trustee's bond, if any.

## ARTICLE 7.
## ~~OVERSIGHT COMMITTEE~~

~~Section 7.1 _Appointment, Composition, and Governance of Oversight Committee_. The Oversight Committee shall consist of seven members, who are: selected from the members of the Committee or their designee. The Oversight Committee may, by majority vote, appoint such additional members to the Oversight Committee as they see fit.~~

~~Section 7.2 _Rights and Duties of Oversight Committee; Corresponding Limitations on Trustee's Actions_. The rights and duties of the Oversight Committee shall be those set forth in this Agreement. The Trustee shall limit its actions on behalf of the Trust in accordance with the limits established by those provisions.~~

~~Section 7.3 _Approval and Authorization on Negative Notice_. The Trustee may obtain approval or authorization required with respect to any matter in which the amount of up to $250,000 is in dispute under the Plan or this Agreement from the Oversight Committee on seven (7) business days' negative notice. The Trustee may obtain approval or authorization required with respect to any matter in which the amount of more than $250,000 is in dispute under the Plan or this Agreement from the Oversight Committee by an affirmative vote of two-thirds of the Oversight Committee. The Trustee may make requests on behalf of the Trust for approval or authorization by the Oversight Committee in writing, which may be made in the form of an e-mail. In the event any Oversight Committee member objects to the Trustee's request, the Trustee shall consult with the members of the Oversight Committee about how to proceed. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section or this Article.~~

Section 7.4 *Reimbursement of Oversight Committee Expenses*. The Trustee shall pay from the Trust Assets all reasonable costs and expenses of the Oversight Committee.

Section 7.5 *Oversight Committee Member's Conflicts of Interest*. The Oversight Committee members shall disclose any actual or potential conflicts of interest that such member has with respect to any matter arising during administration of the Trust to the other Oversight Committee members and the Trustee and such member shall be recused from voting on any matter on which such member has an actual or potential conflict of interest.

Section 7.6 *Resignation and Replacement of Oversight Committee Member*. A member of the Oversight Committee may resign at any time on notice (including e-mailed notice) to the other Oversight Committee members and the Trustee. The resignation shall be effective on the later of (i) the date specified in the notice delivered to the other Oversight Committee members and the Trustee or (ii) the date that is thirty (30) days after the date such notice is delivered. In the event of the resignation, death, incapacity, or removal of a member of the Oversight Committee, the Trustee may nominate and the remaining members of Oversight Committee may approve, by a majority vote, a replacement member of the Oversight Committee.

Section 7.7 *Absence of Oversight Committee*. In the event that the members of the Committee do not appoint an Oversight Committee, an Oversight Committee is not yet formed, no one is willing to serve on the Oversight Committee, or there shall have been no Oversight Committee members for a period of thirty (30) consecutive days, then the Trustee may, during such vacancy and thereafter, ignore any reference in this Agreement to an Oversight Committee, and all references to the Oversight Committee's rights and responsibilities in this Agreement will be null and void.

**ARTICLE 8.**

**GENERAL PROVISIONS**

Section 8.1 7.1 *Irrevocability*. To the fullest extent permitted by applicable law, the Trust is irrevocable. The Settlor shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund the Trust, and (ii) have any rights or role with respect to the management or operation of the Trust, or the Trustee's administration of the Trust.

Section 8.2 7.2 *Term; Termination*.

(a) The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the following provisions.

(b) The Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of the Trust because (i) all reasonably expected assets have been collected by the Trust, (ii) all Distributions have been made to the extent set forth in the Trust Allocation Protocol and the Claim Litigation Protocol, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Trust obligations and Trust Operating Expenses in a manner

consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)     Following the dissolution and Distribution of the Trust Assets, the Trust shall terminate, and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust to be filed in accordance with the Act.  Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(d)     After termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until ~~its~~his or her duties hereunder have been fully performed.  The Trustee shall retain the books, records, documents and files that shall have been delivered to or created by the Trustee until Distribution of all the Trust Assets.  For purposes of this provision, Trust Assets will be deemed distributed when the total amount remaining in the Trust is less than $50,000 and no further actions are pending or have yet to be brought.  At the Trustee's discretion, all of such books, records, documents, and files may be destroyed at any time following the later of~~:~~ (i) the first anniversary of the final Distribution of the Trust Assets~~,~~ and (ii) the date until which the Trustee is required by applicable law to retain such books, records, documents, and files; provided, however, that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents, or files relating to the Trust without giving Reorganized ~~Debtor~~Diocese the opportunity to take control of such books, records, documents, and/or files.

(e)     Upon termination of the Trust and accomplishment of all activities described in this agreement, the Trustee and ~~its~~his or her professionals shall be discharged and exculpated from liability (except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, or knowing and material violation of law or fraud of the Trustee or his agents or representatives).  The Trustee may, at the expense of the Trust, seek an ~~Order~~order of the Bankruptcy Court confirming the discharges, exculpations, and exoneration referenced in the preceding sentence.

Section ~~8.3~~ 7.3     *Outgoing Trustee Obligations*.

In the event of the resignation or removal of the Trustee, the resigning or removed Trustee shall:

(a)     execute and deliver by the effective date of resignation or removal such documents, instruments, records, and other writings as may be reasonably requested by the successor Trustee to effect such resignation or removal and the conveyance of the Trust Assets then held by the resigning or removed Trustee to the successor Trustee;

(b)     deliver to the successor Trustee all documents, instruments, records, and other writings relating to the Trust Assets as may be in the possession or under the control of the resigning or removed Trustee;

(c)     otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee; and

(d)      irrevocably appoint the successor Trustee (and any interim trustee) as ~~its~~his or her attorney-in-fact and agent with full power of substitution for ~~it and its~~the resigning or removed Trustee and his or her name, place, and stead to do any and all acts that such resigning or removed Trustee is obligated to perform under this Trust Agreement.  Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment.  The Bankruptcy Court also may enter such orders as are necessary to effect the termination of the appointment of the Trustee and the appointment of the successor Trustee.

Section ~~8.4~~ 7.4      Taxes.

(a)      The Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations promulgated under section 468B of the IRC, as amended (the "**QSF Regulations**"), with respect to which Reorganized ~~Debtor~~Diocese shall timely make an election to treat the Trust as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.

(b)      The Trustee shall be the "administrator" of the Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by the Trust out of the Trust Assets, which assets may be sold by the Trustee to the extent necessary to satisfy tax liabilities of the Trust, (ii) comply with all applicable tax reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of Trust as a qualified settlement fund and a grantor trust, within the meaning of the QSF Regulations, and (iv) take no action that could cause the Trust to fail to qualify as a qualified settlement fund and a grantor trust within the meaning of the QSF Regulations.  The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Trust for all taxable periods through the Dissolution Date.

(c)      As soon as reasonably practicable after the Effective Date, but in no event later than one hundred twenty (120) days thereafter, the Trust shall make a good faith valuation of the Trust Assets and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes. In connection with the preparation of the valuation contemplated hereby, the Trust shall be entitled to retain such professionals and advisors as the Trustee shall determine to be appropriate or necessary, and the Trustee shall take such other actions in connection therewith as he or she determines to be appropriate or necessary.

(d)      The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or Distribution.  All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed or paid for all purposes of this Trust Agreement.  The Trustee shall be authorized to collect such tax information (including tax identification numbers) as in his or her sole discretion is deemed necessary to effectuate the Plan, the Confirmation Order,

and this Trust Agreement.  In order to receive Distributions, all Beneficiaries shall be required to provide tax information to the Trustee to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes.  The Trustee may refuse to make a payment or Distribution unless or until such information is delivered; provided, however, that, upon the delivery of such information, the Trustee shall make such delayed payment or Distribution, without interest.  Notwithstanding the foregoing, if a person fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Trust.  In no event shall any such Distribution escheat to any federal, state or local government or any other entity.

Section 8.57.5 _Modification_.

(a)    Material modifications to this Trust Agreement, including Exhibits hereto, may be made only with the consent of the Trustee and the majority of the Oversight CommitteeReorganized Diocese, acting in consultation with the Plan Proponent and subject to the approval of the Bankruptcy Court; provided, however, that the Trustee may amend this Trust Agreement from time to time without the consent, approval, or other authorization of, but with notice on the Bankruptcy Court docket, to make minor corrective or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement, provided such minor corrective or clarifying amendments shall not take effect until ten (10) days after notice to on the Bankruptcy Court docket, subject to any objection by a Beneficiary.  Except as permitted pursuant to the preceding sentence, the Trustee shall not modify this Trust Agreement in any manner that is inconsistent with the Plan or the Confirmation Order without the approval of the Bankruptcy Court.  The Trustee shall file notice of any modification of this Trust Agreement with the Bankruptcy Court.

(b)    Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto, shall be modified or amended in any way that could jeopardize or impair (i) the applicability of section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, or (iii) the Trust's qualified settlement fund status and grantor trust status under the QSF Regulations.

Section 8.6 7.6      _Severability_. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 8.7 7.7      _Notices_. Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter

be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustee:

[to come]

with a copy (which shall not constitute notice) to:

[to come]

All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

Section 8.8 7.8 *Successors and Assigns*. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, and the Trustee, the Oversight Committee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Trust Agreement except, in the case of the Trust and the Trustee, as contemplated by Section 2.1 and Section 5.2 above.

Section 8.9 7.9 *Limitation on Transferability; Beneficiaries' Interests*. The Beneficiaries' interests in the Trust shall not: (a) be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, and any purported assignment, conveyance, pledge, or transfer shall be null and void ab initio; (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of the Trust or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of any Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Distributions; and (g) give rise to any rights to seek a partition or division of the Trust Assets. Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, the Beneficiaries shall have an undivided beneficial interest only in cash assets of but only to the extent such cash assets are declared by the Trustee to be distributable as Distributions in accordance with the Trust Documents. For the avoidance of doubt, the Beneficiaries shall have only such rights as expressly set forth in the Trust Documents.

Section 8.10 7.10 *Exemption from Registration*.

The Parties hereto intend that the rights of the Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in the Trust will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

Section 8.11 7.11 *Entire Agreement; No Waiver*.

The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

Section 8.12 7.12       *Headings*. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

Section 8.13 7.13       *Governing Law*.

This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of New York law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of Trust Assets, (g) the existence of rights or interests (beneficial or otherwise) in Trust Assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee or the Oversight Committee set forth or referenced in this Trust Agreement.

Section 8.14 7.14       *Settlor's Representative*.

Pursuant to the Trust Documents, the Reorganized Diocese is hereby irrevocably designated as the "**Settlor's Representative**" and is hereby authorized to take any action consistent with Reorganized Diocese's obligations under the Trust Documents that is reasonably requested of the Settlor by the Trustee pursuant to the Trust Documents.  Pursuant to the Trust Documents, the Settlor's Representative shall cooperate with the Trustee and the Trust's officers, employees and professionals in connection with the Trust's administration of the Aggregate Settlement Consideration, including, but not limited to, providing the Trustee or his or her officers, employees and professionals, upon written request (including e-mail), reasonable access to information related to the Aggregate Settlement Consideration, including, without limitation, delivery of documents in the possession of, or witnesses under the control of, Reorganized

Diocese to the extent that the Trustee could obtain the same by subpoena, notice of deposition or other permissible discovery request, without the need for a formal discovery request.

Section 8.15 7.15 _Independent Legal and Tax Counsel_.

All parties to this Trust Agreement have been represented by counsel and advisors of their own selection in this matter. Consequently, the parties agree that the language in all parts of this Trust Agreement shall in all cases be construed as a whole according to its fair meaning and shall not be construed either strictly for or against any party. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the IRS or the taxing authorities of any state or territory of the United States of America.

Section 8.16 7.16 _Waiver of Jury Trial_.

Each party hereto and each Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to a trial by jury in any legal proceeding arising out of or relating to this Trust Agreement.

Section 8.17 7.17 _Effectiveness_.

This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

Section 8.18 7.18 _Counterpart Signatures_.

This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

_[SIGNATURE PAGES TO FOLLOWsignature pages follow]_

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

**SETTLOR:**

The Diocese of Rochester

By: _____     _____

**TRUSTEE:**

By: _____     _____

~~**OVERSIGHT COMMITTEE MEMBERS:**~~

**EXHIBIT 1**

**TRUST ALLOCATION PROTOCOL**

# EXHIBIT 2

## CLAIM LITIGATION PROTOCOL

# ARTICLE 1. PROCEDURE FOR LITIGATION

Section 1.1    *Abuse Claims Covered by Non-Settling Insurers*

Attached as Exhibit ___ is a non-exclusive list of Abuse Claims and the Non-Settling Insurers who may have coverage obligations with respect thereto.

Section 1.2    *Notice of Interest in Litigation*.

Abuse Claimants who believe their claim is covered, in whole or in part, by Insurance Policies issued by one or more Non-Settling Insurer, notwithstanding whether the claim is identified on Exhibit ___ hereto, must submit to the Trustee written notice ("Litigation Election Claimants") of their election to move forward with litigation against the Diocese and/or Protected Parties, under the limitations and provisions of the Plan, by the Submission Deadline. To avoid doubt, all Abuse Claimants may pursue litigation against Co-Defendants without restriction by or notice to the Trustee.

Section 1.3    *Designation as Litigation Claimant*.

The Trustee, in consultation with the Diocese, will confirm which Litigation Election Claimants allege Sexual Abuse covered, in whole or in part, by Insurance Policies issued by one or more Non-Settling Insurer ("Litigation Claimants"). The Trustee shall give written notice to all Litigation Election Claimants whether their claims are covered, in whole or in part, by Insurance Policies issued by one or more Non-Settling Insurer. Litigation Election Claimants may appeal the Trustee's determination to the Bankruptcy Court.

Section 1.4    *Litigation Authorization*.

The Trustee may authorize Litigation Claimants, at such Litigation Claimants' expense, to pursue their Claims in any court of competent jurisdiction, only to determine any liability that the Diocese and/or any Protected Party may have regarding an Abuse Claim and the amount of that liability, provided, however, that Litigation Claimants, pursuant and subject to the Plan may seek recovery from a Non-Settling Insurer. Within sixty (60) days of the Submission Deadline, the Trustee shall, in consultation with the Advisory Committee, prepare a six-month schedule of the claims authorized to begin litigation and provide notice of such schedule to all Litigation Claimants ("Notice of Litigation Schedule"). The Trustee shall prioritize claims with the highest valuations according to the Committee's valuation expert, but may consider additional factors such as age of Litigation Claimant and legal merits of Litigation Claimant's case.

Section 1.5    *Just Cause for Expedition of Litigation*.

Litigation Claimants may, within 10 business days for receipt of the Notice of Litigation Schedule, submit a written statement to the Trustee explaining any specific cause requiring earlier authorization of their claims for pursuit of litigation. The Trustee, in consultation with the Advisory Committee, shall review such statements and, if needed, provide an amended Notice of

Litigation Schedule to all Litigation Claimants. If the Trustee does not schedule a Litigation Claimant to pursue his or her litigation on the Notice of Litigation Schedule, the Litigation Claimant may request mediation with the Trustee. If the mediation is unsuccessful, the Litigation Claimant may appeal to the Bankruptcy Court for just cause to be authorized to pursue his or her claim against the Diocese and/or Protected Party.

Section 1.6 *Litigation Claims Remain Subject to Plan*.

Litigation Claimants remain subject to the terms of the Plan notwithstanding anything to the contrary herein.

Section 1.7 *Withdrawal of Litigation Election*.

A Litigation Claimant may withdraw his or her election to be a Litigation Claimant at any time by written notice to the Trustee and the Reorganized Diocese. Upon providing such notice, the Litigation Claimant's determination not to proceed as a Litigation Claimant shall be irrevocable.

* * *

# EXHIBIT 7

## THE DIOCESE OF ROCHESTER
## LIST OF INSURANCE POLICIES

| Alleged Policy Period | Alleged Insurer | Alleged Policy No. |
|---|---|---|
| 1/17/1943-1/17/1946 | Commercial Casualty Insurance Co. | LG66109 |
| 1/17/1946-1/17/1949 | Commercial Casualty Insurance Co. | LG117457 |
| 8/4/1950-8/4/1951 | Commercial Casualty Insurance Co. | LZ15353 |
| 3/1/1952-3/1/1955 | Commercial Insurance Co. of Newark, N.J. | LZ18051 |
| 3/1/1955-3/1/1956 | Commercial Insurance Co. of Newark, N.J. | LZ19348 |
| 3/1/1956-3/1/1957 | Commercial Insurance Co. of Newark, N.J. | LZ24003 |
| 3/1/1957-3/1/1958 | Commercial Insurance Co. of Newark, N.J. | LZ24008 |
| 3/1/1958-3/1/1959 | Commercial Insurance Co. of Newark, N.J. | LZ24018 |
| 3/1/1959-3/1/1960 | Commercial Insurance Co. of Newark, N.J. | LZ24028 |
| 3/1/1960-3/1/1961 | Commercial Insurance Co. of Newark, N.J. | LZ32604 |
| 3/1/1961-3/1/1962 | Commercial Insurance Co. of Newark, N.J. | LZ32617 |
| 3/1/1962-3/1/1963 | Commercial Insurance Co. of Newark, N.J. | LZ47272 |
| 3/1/1963-3/1/1965 | Commercial Insurance Co. of Newark, N.J. | LZ48500 |
| 3/1/1965-3/1/1967 | Fireman's Insurance Co. of Newark, N.J. | LZ32300 |
| 3/1/1967-3/1/1968 | Fireman's Insurance Co. of Newark, N.J. | L0955400 |
| 3/1/1968-6/1/1969 | Fireman's Insurance Co. of Newark, N.J. | L1239300 |
| 6/1/1969-6/1/1972 | Commercial Insurance Co. of Newark, N.J. | VBP5346801 |
| 6/1/1969-6/1/1972 | Fireman's Insurance Co. of Newark, N.J. | LX1216325 |
| 6/1/1972-6/1/1975 | Commercial Insurance Co. of Newark, N.J. | VBP5346812 |
| 6/1/1975-6/1/1977 | Commercial Insurance Co. of Newark, N.J. | VBP5346818 |
| 6/1/1975-6/1/1976 | Fireman's Insurance Co. of Newark, N.J. | LX2675182 |
| 6/1/1976-6/1/1977 | Fireman's Insurance Co. of Newark, N.J. | LX6538036 |
| 6/1/1977-5/1/1980 | Lloyd's and London | SL3209/SLC5227 |
| 6/1/1977-5/1/1980 | Centennial Insurance Co. | 291687389 |
| 6/1/1977-6/1/1978 | Midland Insurance Co. | TBD |
| 6/1/1978-9/1/1978 | Midland Insurance Co. | UL390869 |
| 6/1/1978-9/1/1978 | First State Insurance Co. | 926708 |

| Alleged Policy Period | Alleged Insurer | Alleged Policy No. |
|---|---|---|
| 6/1/1978-6/1/1979 | Lloyd's and London | SL 3380/SLC5400 |

| Policy Period | Insurer | Policy No. |
|---|---|---|
| 9/1/1978-5/1/1980 | Interstate Fire & Casualty Co. | 183152618 |
| 6/1/1979-5/1/1980 | Lloyd's and London | SL3556/SLC5582 |
| 5/1/1980-7/1/1983 | Lloyd's and London | SL 3675/SLC5698 |
| 5/1/1980-7/1/1981 | Interstate Fire & Casualty Co. | 183-152618/1 |
| 5/1/1980-7/1/1981 | Lloyd's and London | SL3693/SLC5715 |
| 7/1/1981-7/1/1982 | Interstate Fire & Casualty Co. | 183-152618/2 |
| 7/1/1981-7/1/1983 | Lloyd's and London | SL3830/SLC5842 |
| 7/1/1982-7/1/1983 | Interstate Fire & Casualty Co. | 83-0169753 |
| 7/1/1983-7/1/1986 | Lloyd's and London | ISL3090/ICO4050 |
| 7/1/1983-7/1/1986 | Centennial Insurance Co. | 291713859 |
| 7/1/1983-7/1/1984 | Interstate Fire & Casualty Co. | 83-0169753 |
| 7/1/1983-7/1/1986 | Lloyd's and London | ISL3092/ICO4053 |
| 7/1/1983-7/1/1984 | National Surety Corp. | XLX 139 53 94 |
| 7/1/1984-7/1/1985 | Interstate Fire & Casualty Co. | 83-0169753 |
| 7/1/1984-7/1/1985 | National Surety Corp. | XLX 139 52 65 |
| 7/1/2019-7/1/2020 | Lloyd's & HDI Global Specialty SE | 19W2012 |
| 7/1/2019-7/1/2020 | Lloyd's & HDI Global Specialty SE | 19XS133 |
| 7/1/2020-7/1/2021 | Lloyd's & HDI Global Specialty SE | 20W2012 |
| 7/1/2020-7/1/2021 | Lloyd's & HDI Global Specialty SE | 20XS133 |
| 7/1/2021-7/1/2022 | Lloyd's & HDI Global Specialty SE & Convex Insurance UK Ltd & Endurance Worldwide Insurance Ltd & PartnerRe Ireland Insurance dac | 21W2012 |
| 7/1/2021-7/1/2022 | Lloyd's & HDI Global Specialty SE & Convex Insurance UK Ltd | 21XS133 |
| 7/1/2021-7/1/2022 | Lloyd's & HDI Global Specialty SE & Convex Insurance UK Ltd | 21XS133A |
| 7/1/2022-7/1/2023 | Lloyd's & HDI Global Specialty SE & Convex Insurance UK Ltd & Endurance Worldwide Insurance Ltd & PartnerRe Ireland Insurance dac | 22W2012 |

| Policy Period | Insurer | Policy No. |
|---|---|---|
| 7/1/2022-7/1/2023 | Lloyd's & HDI Global Specialty SE & Convex Insurance UK Ltd | 22XS133 |
| 7/1/2022-7/1/2023 | Lloyd's & HDI Global Specialty SE & Convex Insurance UK Ltd | 22XS133A |
| ~~Policy Period~~ | ~~Insurer~~ | ~~Policy No.~~ |
| 7/1/2023-7/1/2024 | Lloyd's & HDI Global Specialty SE & Convex Insurance UK Ltd & Endurance Worldwide Insurance Ltd & PartnerRe Ireland Insurance dac | 23W2012 |
| 7/1/2023-7/1/2024 | Lloyd's & HDI Global Specialty SE & Convex Insurance UK Ltd | 23XS133 |
| 7/1/2023-7/1/2024 | Lloyd's & HDI Global Specialty SE & Convex Insurance UK Ltd | 23XS133A |

# EXHIBIT 8

# THE DIOCESE OF ROCHESTER
## LIST OF ASSUMED CONTRACTS AND LEASES

| Description of Lease or Contract | Name | Address | Lease/Contract Expires | Documentation on file (contract / agreement / license / SOW) |
|---|---|---|---|---|
| Contract for Sage MIP | Abila, Inc | P.O. Box 737451, Dallas, TX 75373-7451 | 9/29/2024 | Engagement letter |
| HR Services/Benefits | ADP Work Force Now | P.O. Box 842875, Boston, MA 02284-2875 | on going | Major Accts Agreement |
| Agreement for Data Security Standard for IT | Bonadio & Co LLP | 171 Sully's Trail Ste 201, Pittsford, NY 14534 | on going | Engagement letter |
| Contract for snow and lawn care for St. Gregory location | Butch's Handyman Service LLC | PO Box 317, Lyons, NY 14489 | ongoing | Invoice |
| It Services Agreement | Camp Stella Maris | 4395 E. Lake Road, Livonia, NY 14487 | ongoing | Services Agreement |
| Real property lease agreement | Catholic Charities Inc | 1150 Buffalo Road, Rochester NY 14624 | 6/30/2024 | lease agreements |
| It Services Agreement | Catholic Charities Inc | 1150 Buffalo Road, Rochester NY 14624 | ongoing | Services Agreement |
| Annual Subscription Fee | Catholic Faith Technologies | 12603 Hemlock Ste C, Overland Park, KS, 66213 | 6/1/2024 | Services Agreement |
| Door Mat Cleaning Service | Cintas (formally Doritex Corporation) | P.O. Box 630910, Cincinnati, OH 45263 | ongoing | Services Agreement |
| Annual License-3500 Seats | Converge One (CISCO) | NW 5806, PO Box 1450, Minneapolis, MN 55485 | 3/1/2024 | Terms & Conditions |
| License Agreement for I ready School Study | Curriculum Associates LLC | P.O. Box 936600, Atlanta, GA 31193-6600 | 6/30/2024 | License Agreement |
| EAP SVC | Employee Network Inc | 4819 Emperor Blvd. Suite 310, Durham, NC 27703 | ongoing | Service Agreement |
| Employee Health Plan | Excellus | P.O. Box 5266, Binghamton, NY 13902-5266 | 12/31/2024 | Plan description-signed contract on file with Broker |
| Retired Priest Health Insurance | Excellus | P.O. Box 5266, Binghamton, NY 13902-5266 | 12/31/2024 | Contract quote-signed contract on file with Broker |
| Dental Insurance | Excellus | P.O. Box 5266, Dental Premium, Binghamton, NY 13902-5266 | 12/31/2024 | Plan description-signed contract on file with Broker |
| Retired Priest Dental Insurance | Excellus | P.O. Box 5266, Dental Premium, Binghamton, NY 13902-5266 | 12/31/2024 | Contract quote-signed contract on file with Broker |
| Eye Med | Fidelity Security Life Insurance | 162 Prospect Hill Rd, Ste 101A, Brewster, NY 10509-2374 | 12/31/2024 | Plan description |
| Dedicated website hosting | Hostgator | PO Box 947079, Atlanta, GA 30394-7079 | 5/1/2025 | Invoice |
| HR/Benefits | HR Works, Inc | 200 Willow Brook Office Park, Fairport, NY 14450 | ongoing | Service Agreement |
| Service and License Agreement for Annual Support SAN | Info Advantage | 155 Sanford St., Rochester, NY 14620 | 9/6/2026 | Invoice |
| Fortinet firewalls | Info Advantage | 155 Sanford St., Rochester, NY 14620 | ongoing | Invoice |
| Tape storage and service | Iron Mountain | P.O. Box 27128, New York, NY 10087-7128 | ongoing | Invoice |
| Contract for Cleaning services at PC | Keidel's Inc | PO Box 565, Rushville, NY 14544 | 5/31/2025 | Service Agreement |
| Contract for Cleaning services at SWH location | Keidel's Inc | PO Box 565, Rushville, NY 14544 | 5/31/2025 | Service Agreement |
| Annual Maintenance on for PC location | Lasertec | 8455 Kirk Dr, Colorado Springs, CO 80908 | 12/31/2024 | Invoice |
| HVAC Agreement for PC location | Leo J. Roth Corporation | 841 Holt Rd, Webster, NY 14580 | 9/30/2024 | Maintenance agreement |
| HVAC Agreement for SWH location | Leo J. Roth Corporation | 841 Holt Rd, Webster, NY 14580 | 9/30/2024 | Maintenance agreement |
| FSA Admin | Lifetime Benefit Solutions | Dept 116039, P.O. Box 5211, Binghamton, NY 13902-5211 | 12/31/2024 | Renewal Form |
| Postage Machine Maintenance | Lineage | 385 North French Road, Amherst, NY 14228 | 10/23/2024 | Service Agreement |
| Service Agreement for Maintenance on Folder Machine | Lineage | 385 North French Road, Amherst, NY 14228 | 2/26/2024 | Service Agreement |
| Adobe software | Logisoft | 600 Fishers Station Dr., Suite 137, Victor, NY 14564 | ongoing | Invoice |
| Insurance Asset Analysis | Marsh Risk Consulting | 550 S. Main St, Ste 525, Greenville, SC 29601 | ongoing | SOW |
| St. Gregory Marion | MicroClimate | 30 Industrial Park Circle, Suite 2, Rochester, NY 14624 | 5/31/2024 | Contract |
| St. Thomas Aquinas, Leicester | MicroClimate | 30 Industrial Park Circle, Suite 2, Rochester, NY 14624 | 5/31/2024 | Contract |
| Remote Management Tool | MMSOFT Design Ltd. Pulseway | 6-9 Trinity Street Dublin, Ireland DO2 EY47 | 6/28/2025 | Invoice |

| Description of Lease or Contract | Name | Address | Lease/Contract Expires | Documentation on file (contract / agreement / license / SOW) |
|---|---|---|---|---|
| E-Rate Consulting Services | Mondavi Design LLC | P.O. Box 607, Mendon, NY 14506-0607 | on going | SOW |
| Services Agreement for Chaplain Services | Monroe County Hospital | 435 E Henrietta Rd, Business Office, Rochester, NY 14620 | on going | Service Agreement |
| Services Agreement for Chaplain Services | Monroe County Jail | 130 S Plymouth Ave, Rochester, NY 14614 | on going | Service Agreement |
| Life Insurance | Mutual of Omaha Insurance | Payment Processing Ctr. P.O. Box 2147, Omaha, NE 68103-2147 | ongoing | Insurance proposal |

| Description of Lease or Contract | Name | Address | Lease/Contract Expires | Documentation on file (contract / agreement / license / SOW) |
|---|---|---|---|---|
| Service Agreement for Electric Service | New Wave Energy Corporation | P.O. Box 42, Bowmansville, NY 14026 | on going | Service Agreement |
| Service Agreement for Natural Gas Service | New Wave Energy Corporation | P.O. Box 42, Bowmansville, NY 14026 | on going | Service Agreement |
| PSIP third party Administrator Agreement | Omni Underwriting Managers LLC | P.O. Box 62937, Virginia Beach, VA 23466 | 6/30/2025 | Service Agreement |
| License/Service Agreement | ParishSOFT | Dept. 0208, P.O. Box 120208, Dallas, TX 75312-0208 | 6/30/2024 | Invoice |
| Service Agreement for UI Cost Control | People System | P.O. Box 4816, Syracuse, NY 13221-4816 | ongoing | Service Agreement |
| Vista License Agreement | Percept Group | P.O. Box 4662, Sedona, AZ 86340 | ongoing | Invoice |
| Annual Maintenance Support | Pontem Software | P.O. Box 988, Jackson, MI 49204 | 7/31/2024 | Invoice |
| Real Property Lease | Providence Housing Development Corp | 1150 Buffalo Road, Rochester, NY 14624 | 5/31/2024 | lease agreements |
| Real Property Lease | Providence Housing Development Corp | 1136 Buffalo Road, Rochester, NY 14624 | 12/31/2028 | lease agreements |
| It Services Agreement | Providence Housing Development Corp | 1150 Buffalo Road, Rochester, NY 14624-1890 | ongoing | Services Agreement in Lease |
| Lease Agreement for Postage Machine | Quadient Leasing USA | Dept. 3682, P.O. Box 123682, Dallas, TX 75312-3682 | 7/5/2028 | Lease Agreement |
| Real Property Lease | Rochester Catholic Press Association | 1150 Buffalo Road, Rochester NY 14624 | 6/30/2024 | lease agreements |
| It Services Agreement | Rochester Catholic Press Association | 1150 Buffalo Road, Rochester NY 14624 | ongoing | Services Agreement in Lease |
| Operational Support | Rochester Catholic Press Association | 1150 Buffalo Road, Rochester NY 14624 | ongoing | |
| Sage Intacct Nov. 30 2023- Jan 30 2024 | Sage | 300 Park Ave, Floor Suite 1400 San Jose, CA 95110 | 1/30/2025 | Subscription Agreement |
| Building Automation Contract - Fire Alarm | Siemens (Advantaged Services) | c/o Citibank P.O. Box 2134, Carol Stream, IL 60132-2134 | 10/31/2024 | Service Agreement |
| Building Automation Contract - HVAC | Siemens (Advantaged Services) | c/o Citibank P.O. Box 2134, Carol Stream, IL 60132-2134 | 12/31/2024 | Service Agreement |
| Catholic Family Center Parking | SJ Parking LLC | 259 Alexander St, Rochester, NY 14607 | ongoing | Application |
| Catholic Family Center Parking | Buckingham Properties LLC | P.O. Box 8006, Lockbox:788006, New York, NY 10008-8006 | ongoing | |
| Operational Support | St Bernard's School of Theology & Ministry | 120 French Road, Rochester, NY 14618 | ongoing | |
| Temporary Staffing Services Agreement | TalentEdge (formally RBA Staffing) | 150 State St, Ste 400, Rochester, NY 14614 | ongoing | Service Agreement |
| Elevator Monitoring Services Agreement for PC | Technical System Group | 1799 N. Clinton Ave, Rochester, NY 14621 | on-going | Contract |
| Feenics Hosting Agreement for PC | Technical System Group | 1799 N. Clinton Ave, Rochester, NY 14621 | on-going | Security Agreement |
| Elevator Monitoring Services Agreement for SWH | Technical System Group | 1799 N. Clinton Ave, Rochester, NY 14621 | | Elevator out of service |
| Monitoring Svc | Technical System Group | 1799 N. Clinton Ave, Rochester, NY 14621 | 2/18/2027 | Contract/Svc Agreement |
| Monitoring Svc | Technical System Group | 1799 N. Clinton Ave, Rochester, NY 14621 | 11/30/2024 | Services Agreement |
| Contract for Snow Removal for PC | Ted Hosmer Inc | P.O. Box 888, Henrietta, NY 14467 | 3/31/2024 | Contract |
| Contract for Lawn Mowing for PC | Ted Hosmer Inc | P.O. Box 888, Henrietta, NY 14467 | 11/30/2025 | Contract |
| Elevator Services Agreement for PC | TK Elevator Corp | PO Box 3796, Carol Stream, IL 60132 | 2/29/2024 | Contract |
| Lift Elevator Services Agreement for PC | TK Elevator Corp | PO Box 3796, Carol Stream, IL 60132 | 2/29/2024 | Contract |
| Master Trust Agreement for the Diocese of Rochester Priests' Retirement Plan | The Bank of New York | 240 Greenwich Street, New York, NY 10286 | on-going | |
| Master Trust Agreement for the Diocese of Rochester Lay Employees' Retirement Plan | The Bank of New York | 240 Greenwich Street, New York, NY 10286 | on-going | |
| Shared Service Agreement | The Communis Fund of the Diocese of Rochester, Inc. | 1150 Buffalo Road, Rochester NY 14624 | on-going | |
| The Diocese of Rochester - Lay Employees' Retirement Accumulation Retirement Plan | The Diocese of Rochester Lay Employees' | 1150 Buffalo Road, Rochester NY 14624 | on-going | |

| | Retirement | | | |
|---|---|---|---|---|
| The Diocese of Rochester - Priests 'Retirement Plan | The Diocese of Rochester Priests Retirement Plan | 1150 Buffalo Road, Rochester NY 14624 | on-going | |
| Copier Maintenance Contract | Toshiba Business Solutions | P.O. Box 927, Buffalo, NY 14240-0927 | on-going | Contract |
| Printer Maintenance Contract | Toshiba Business Solutions | P.O. Box 927, Buffalo, NY 14240-0927 | on-going | Contract |
| Lawn Care Services Agreement for PC location | TruGreen | 1790 Kirby Pkwy, Suite 300, Memphis, TN 38138 | ongoing | Service Agreement |
| Retired Priest Health Insurance | Unversa HealthCare Direct | 165 Court St, Rochester, NY 14647 | on-going | |
| Garbage Removal | Waste Management | PO Box 13648, Philadelphia, PA 19101-3648 | 2/5/2024 | |
| Garbage Removal | Waste Management | PO Box 13648, Philadelphia, PA 19101-3648 | ongoing | |
| IT Security Crowdstrike License | Winslow Tech Group | 303 Wyman St., Suite 210, Waltham, MA 02451 | 3/24/2024 | |
| Business Associate Agreement | Zoom Video Communications Inc | P.O. Box 888843, Los Angeles, CA 90088-8843 | 3/22/2024 | Business Associate Agreement |
| Video Licenses for Help Desk | Zoom Video Communications Inc | P.O. Box 888843, Los Angeles, CA 90088-8843 | ongoing | Business Associate Agreement |
| Affiliation Agreement | All Parishes | | | |