**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>DIOCESE OF ROCHESTER,<br><br>Debtor. | Chapter 11<br><br>Case No. 19-20905 |

**DISCLOSURE STATEMENT IN SUPPORT OF CONTINENTAL INSURANCE COMPANY'S FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR THE DIOCESE OF ROCHESTER**

**DATED APRIL 15, 2024**

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF NEW YORK FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF REORGANIZATION DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF § 1125(a) OF THE BANKRUPTCY CODE.

# IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[1]

The Continental Insurance Company ("CNA" or the "Plan Proponent") is providing you with the information in this Disclosure Statement because you may be a creditor entitled to vote on CNA's proposed Chapter 11 Plan of Reorganization for the Diocese of Rochester (the "CNA Plan" or the "Plan").

CNA believes that the Plan is in the best interests of creditors and other stakeholders. All creditors entitled to vote are urged to vote in favor of the Plan. A summary of the voting instructions is set forth in this Disclosure Statement and in the Disclosure Statement Order. More detailed instructions are contained on the ballots distributed to the creditors entitled to vote on the Plan.

**The deadline to vote on the CNA Plan is July 1, 2024 at 11:59 p.m. prevailing Eastern Time (the "Voting Deadline").**

**For your vote to be counted, your ballot must be duly completed, executed, and *actually received* by Stretto (the "Voting Agent") before the Voting Deadline.**

\*       \*       \*

**Please be advised that Section 12 of the CNA Plan contains release, exculpation, and injunction provisions. You should review and consider the CNA Plan carefully because your rights may be affected thereunder.**

The effectiveness of the CNA Plan is subject to material conditions precedent, some of which may not be satisfied or waived. *See* CNA Plan, Section 11. There is no assurance that these conditions will be satisfied or waived.

\*       \*       \*

This Disclosure Statement and any accompanying letters are the only documents to be used in connection with the solicitation of votes on the CNA Plan. Subject to the statutory obligations of the Unsecured Creditors Committee appointed in this bankruptcy case (the "Committee") to provide access to information to creditors, no person is authorized in connection with the CNA Plan or the solicitation of acceptances of the CNA Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein. If given or made, such information or representation may not be relied upon as having been authorized by the Debtor. Although the Debtor will make available to creditors entitled to vote on the CNA Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information

---

[1]     Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to such terms in the Plan.

herein is correct as of any time after the date hereof.

If the CNA Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims against the Diocese (including, without limitation, those holders of Claims who do not submit ballots to accept or reject the plan or who are not entitled to vote on the CNA Plan) will be bound by the terms of the CNA Plan and the transactions described in the CNA Plan.

**ALL CREDITORS ENTITLED TO VOTE ON THE CNA PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE CNA PLAN ATTACHED AS EXHIBIT 1 AND THE RISK FACTORS DESCRIBED UNDER ARTICLE 8 HEREIN, PRIOR TO SUBMITTING BALLOTS.**

\* \* \*

The summaries of the CNA Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the CNA Plan itself, the exhibits to it, and documents described therein as filed prior to approval of this Disclosure Statement or subsequently as Plan Supplement materials. In the event that any inconsistency or conflict exists between this Disclosure Statement and the CNA Plan, the terms of the CNA Plan will control. The CNA Plan, Disclosure Statement, and Plan Supplement documents will be available for review at https://case.stretto.com/rochesterdiocese/docket.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by CNA. CNA reserves the right to modify the CNA Plan consistent with § 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. The information contained in this Disclosure Statement, including information regarding the history, operations, and financial information of the Debtor, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations. There has been no independent audit of the financial information contained in this disclosure statement or in any exhibit, except as expressly indicated in this Disclosure Statement or in any exhibit. This Disclosure Statement was compiled from information obtained by CNA from numerous sources believed to be accurate to the best of CNA's knowledge, information, and belief. CNA's respective professionals have not independently verified any of the information set forth in this Disclosure Statement and are not responsible for any inaccuracies that may be contained in this Disclosure Statement or the CNA Plan.

This Disclosure Statement is forward-looking. Forward-looking statements are statements of expectations, beliefs, plans, objectives, assumptions, projections, and future events of performance. Among other things, this Disclosure Statement contains forward-looking statements with respect to anticipated future performance of the Diocese and a Trust to be created

- iii -

for the benefit of holders of Abuse Claims, as well as anticipated future determinations of Claims and Distributions on Claims.  These statements, estimates, and projections may or may not prove to be correct.  Actual results could differ materially from those reflected in these forward-looking uncertainties and to a wide variety of significant business, legal, and economic risks, including, among others, those described in this Disclosure Statement.  The Plan Proponent undertakes no obligation to update any forward-looking statement.  New factors emerge from time to time and it is not possible to predict all factors, nor can the impact of all factors be assessed.

SFACTIVE-907468414.5

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................1

SURVIVORS HAVE A CHOICE.................................................................................6

RISK FACTORS..............................................................................................................8

COMMITTEE'S POSITION REGARDING CNA'S FINANCIAL EXPOSURE...................9

ARTICLE I INTRODUCTION AND SUMMARY OF THE PLAN ......................................12

ARTICLE II SOURCES OF FUNDING UNDER THE CNA PLAN ....................................18

ARTICLE III THE TRUST AND ALLOCATION PROTOCOL............................................22

ARTICLE IV CLASSIFICATION OF CLAIMS AND TREATMENT....................................33

ARTICLE V ALTERNATIVES TO THE PLAN.................................................................39

ARTICLE VI EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE............44

ARTICLE VII MEANS FOR IMPLEMENTATION OF THE PLAN ...................................56

ARTICLE VIII GENERAL CLAIMS ADMINISTRATION AND DISTRIBUTIONS ........56

ARTICLE IX EFFECTIVE DATE ......................................................................................56

ARTICLE X RETENTION OF JURISDICTION .................................................................58

ARTICLE XI TAX CONSEQUENCES OF THE PLAN .....................................................58

ARTICLE XII ACCEPTANCE AND CONFIRMATION OF THE PLAN...........................58

ARTICLE XIII RISK FACTORS TO BE CONSIDERED....................................................59

ARTICLE XIV RECOMMENDATION AND CONCLUSION.............................................61

# EXECUTIVE SUMMARY

The CNA Plan is an offer to Survivors of a total compensation fund of <u>$201.35 million</u>, which Survivors will be able to access immediately after confirmation of the CNA Plan, the occurrence of the Effective Date, and the evaluation of claims by the Abuse Claims Reviewer. The compensation fund under the CNA Plan will be funded by prior monetary commitments from the Diocese and the other Settling Insurers, plus an additional $75 million from CNA. The money contributed by the Diocese and the insurers is in exchange for releases and injunctive protection against certain future claims.

Under the CNA Plan, each Survivor may opt to submit his or her claim to an Abuse Claim Reviewer and receive a prompt compensation offer. The offer will be based on the Abuse Claims Reviewer's evaluation of the nature and circumstances of the abuse suffered by the Survivor, the impact of the abuse on the Survivor. Survivors who wish to pursue their Abuse Claims in court may do so freely, without needing to obtain permission. Survivors who litigate will be paid on any recovery from the compensation fund, subject to certain limitations described herein.

A summary of the CNA Plan is just below. A more detailed description is provided later in this Disclosure Statement. The CNA Plan itself is provided along with this Disclosure Statement.

### *Terms of the CNA Plan*

- The CNA Plan is funded as follows:

  - $75 million from CNA

  - $55 million from the Debtor and non-debtor entities related to the Diocese

  - $50 million from Interstate Fire & Casualty Company and National Surety Corporation

  - $19.5 million from Certain London Market Insurers

  - $1.1 million for Certain Underwriters at Lloyd's, London

  - $750,000 from First State Insurance Company

- Beginning shortly after the Effective Date of the CNA Plan, the Abuse Claims Reviewer will determine Survivor compensation as follows:

  - Each Abuse Claim will be evaluated by the Abuse Claim Reviewer, who will assign a point total from 0 to 100 according to the following Evaluation Factors:

- 1 -

1. **Nature of Abuse**:
   a. Duration;

   b. Frequency/number of instances;

   c. Degree of intrusiveness into child's body (*e.g.*, clothed/unclothed, masturbation by or of perpetrator, oral penetration, anal penetration, vaginal penetration);

   d. Level or severity of force / violence / coercion / threats; control of environment (*e.g.*, boarding school, orphanage, trip under supervision of perpetrator, day school, Perpetrator's employment relationship with the Diocese);

   e. Number of Perpetrators of the Diocese that abused the Claimant; physical pain suffered;

   f. Grooming;

   g. Relationship of the Claimant to the Perpetrator;

   h. Location of abuse, including but not limited to isolated location, rectory, church, cabin, orphanage, etc.; and/or

   i. Additional factors that may be provided by the Claimant.

2. **Impact of the Abuse**:
   a. School behavior problems;

   b. School academic problems;

   c. Getting into legal trouble as a minor;

   d. Loss of faith;

   e. Damage to family relationships / interpersonal difficulties;

   f. Mental health symptoms, including but not limited to:
      - Depression;
      - Suicide attempt or suicidal ideation;
      - Anxiety;
      - Substance abuse;
      - Sexual acting out;
      - Runaway;

- 2 -

- Flashbacks;

- Nightmares;

g.    Adult and current functioning:

- Criminal record as an adult;

- Underemployment/unemployment;

- Relationship problems;

- Substance abuse;

h.    Physical health symptoms, including but not limited to:

- Physical manifestations of emotional distress;

- Gastrointestinal issues;

- Headaches, high blood pressure;

- Physical manifestations of anxiety;

- Erectile dysfunction;

- Heart palpitations;

- Sexually-transmitted infections;

- Physical damage caused by acts of abuse;

- Reproductive damage;

- Self-cutting; and/or

- Other self-injurious behavior;

i.    The risk of the foregoing factors affecting the Abuse Claimant in the future based on the Abuse Claimant's age at the present time; and/or

j.    Additional factors that may be provided by the Abuse Claimant.

- The Trustee will calculate a Trust Settlement Offer for each Survivor based on the Survivor's percentage share of the total points assigned to all Survivors, applied to the available compensation fund. By way of example, if a total of 30,000 points are assigned to all Survivors, and Survivor A is assigned 90 points, Survivor A's percentage share would be 90 divided by 30,000, or 0.3%. If the total available compensation fund (following establishment of certain reserves discussed below) is $200 million, then Survivor A would be offered 0.3% of $200 million, or $600,000.

- 3 -

SFACTIVE-907468414.5

- If a Survivor accepts the Trust Settlement Offer, the Survivor will promptly be paid the full amount of his or her accepted Trust Settlement Offer. One of the lawyers for the law firm representing the Committee in this case has stated that, in a case like this one, the time from initial funding of the trust to initial distributions to survivors is often as short as a few months or even a few weeks.

- Survivors will not be compensated for claims alleging punitive damages or for multiple, exemplary, statutory, or enhanced damages.

- Survivors can also choose to litigate against the Diocese in court, as follows:

  - A Survivor who wishes to litigate may reject the Trust Settlement Offer and, instead, file and pursue a lawsuit (a "Tort Claim"). If the Survivor obtains a Final Judgment after litigation of his or her Tort Claim, then the following payments may be made:

    o If the amount of the Final Judgment is less than or equal to the amount of his or her Trust Settlement Offer, the Survivor would promptly be paid the amount of the Final Judgment.

    o If the amount of the Final Judgment is greater than the amount of his or her Trust Settlement Offer, the Survivor would promptly be paid the amount of the Trust Settlement Offer. In addition, after all Tort Claims are litigated to Final Judgment, Survivors holding Final Judgments in excess of their Trust Settlement Offers would then be paid their respective Excess Recovery Amounts, meaning the amounts based on the difference between the Final Judgment and the Trust Settlement Offer. If there are insufficient funds to pay all Excess Recovery Amounts in full, then each Survivor will receive his or her respective percentage share of the available funds, determined based on their respective Excess Recovery Amounts.

  - Excess Recovery Amounts will be paid from the Payment Reserve. Initial funding for the Payment Reserve will be $500,000. If a Survivor obtains a Final Judgment in an amount less than the amount of his or her Trust Settlement Offer, then the Survivor will receive the amount of the Final Judgment award, and the difference between the lower Final Judgment and the higher Trust Settlement Offer will be transferred to the Payment Reserve, and will be used to pay Excess Recovery Amounts as described above.

  - Survivors who choose to litigate will not be compensated for any multiple, exemplary, statutory, enhanced, or punitive damages.

- 4 -

- The following amounts may be allocated to other reserves and expenses:

  - The Payment Reserve used to pay Excess Recovery Amounts, if any, which will have initial funding of $500,000.

  - The Unknown Abuse Claims Reserve to compensate unknown future claims, which will be determined by the court-appointed Unknown Claimant Representative, and which are estimated by the Plan Proponent to not exceed $500,000.

  - The fees of the Unknown Claimant Representative, who is proposed to be compensated at the hourly rate of $850 per hour, subject to a cap of $100,000 in total fees.

  - Trust Expenses to administer the Trust, such as payments to the Trustee and the Abuse Claims Reviewer, to compensate them for their work, in amounts estimated to not exceed $175,000 in total.

  - The DOR Entities' Post-Effective Date Costs, meaning the fees and expenses reasonably incurred by the Diocese or Participating Parties in connection with assisting with the administration of the Allocation Protocol. The DOR Entities' Post-Effective Date Costs will be no more than $75,000. The Reorganized Diocese and any Participating Parties may defend any Tort Claim, but at their own expense.

  - CNA is not aware of any Non-Settling Insurers, and therefore does not expect that the Trust will pursue any Insurance Claims against Non-Settling Insurers; accordingly, the CNA Plan does not set aside funding for the Trust to pursue such Insurance Claims.

  - These amounts total $1,350,000, meaning that the net amount available for the Trust to distribute to Survivors will be at least $200 million.

- The non-debtor parties receiving releases under the CNA Plan are:

  - The Participating Parties, defined as the Parishes, Schools, Other Catholic Organizations, and other entities listed on Exhibit A to the CNA Plan. Under the CNA Plan, the contributions being made on behalf of the Participating Parties is the same as under the Debtor's proposed plan.

  - The Settling Insurers. Under the CNA Plan, all known insurance will be settled. There are no known non-settling insurers.

- The following parties will be exculpated (*i.e.*, protected from liability) from all

- 5 -

acts or omissions that occurred during or in connection with the bankruptcy case, including as to the formulation, negotiation, and pursuit of confirmation of the CNA Plan: the Diocese; the Reorganized Diocese; CNA and the other Settling Insurers; the Mediators; the Unknown Claimant Representative; the Abuse Claims Reviewer; and their related affiliates, as defined in the CNA Plan.

## SURVIVORS HAVE A CHOICE

The CNA Plan offers Survivors the choice to secure $75 million in committed funding from CNA now, without any need for further litigation. The total amount available to Survivors under the CNA Plan is $201.35 million, less the reserves and administrative expenses that CNA estimates will be no more than $1.35 million, leaving a total fund available to pay Survivors of at least $200 million.

The alternative to the CNA Plan is the Diocese Plan. The Diocese Plan would provide initial funding of $126.35 million—$75 million less than the CNA Plan—and zero in upfront funding from CNA.

Survivors can be compensated from the Trust under both plans, and compensation awards would be based on similar Evaluation Factors under both plans. Both plans propose to use the same Abuse Claims Reviewer, Roger Kramer, who has served in this role in other diocesan bankruptcy cases. However, because CNA is not contributing any initial funding to the Diocese Plan, the initial average awards will be lower under the Diocese Plan, compared with the CNA Plan.

Instead of CNA's committed funding of $75 million, the Diocese Plan relies on post-bankruptcy litigation to recover from CNA. Specifically, some Survivors will retain the right to sue the Diocese or Participating Parties (in name only) to try to obtain judgments, which they can then try to recover in a second lawsuit against CNA. Both litigations—first to obtain a judgment against the Diocese, and then to obtain coverage from CNA to pay the judgment—could take a long time, and there is a risk that Survivors may not prevail.

Under the Diocese Plan, many Survivors, whose abuse occurred outside the alleged CNA policy years of 1952 to 1977, will not be authorized to bring lawsuits at all, and they may or may not get to share in recoveries from other Survivors' lawsuits. That means Survivors in non-CNA years may receive a smaller recovery than other Survivors with similar claims.

Because the CNA Plan does not require post-bankruptcy litigation in order for CNA to contribute to Survivor compensation, CNA expects the costs to administer the Trust to be very low. Because the Diocese Plan depends on litigation to recover against CNA, its administrative costs would likely be higher.

Aside from the issue of how Survivors would obtain compensation from CNA, there are not many differences between the two plans. Both plans allow the Diocese to reorganize

- 6 -

and continue its religious and charitable missions, while providing improved protocols for the protection of children. Both plans release the Diocese and Participating Parties from liability and eliminate the chance to seek punitive or exemplary damages.

CNA does not want to litigate against Survivors. That is why it has proposed its own plan and offered an additional $75 million to compensate Survivors. However, CNA believes the Debtor breached a 2022 Insurance Settlement Agreement with CNA and is pursuing a plan—the Diocese Plan—that is prejudicial to CNA's legal rights. If the Diocese Plan is confirmed, CNA would have appeal rights. An appeal would likely further delay Survivor compensation.

The following chart summarizes the key similarities and differences between the plans:

|  | CNA Plan | Diocese Plan |
|---|---|---|
| Larger initial compensation fund | ✔ | |
| CNA pays without the need for post-bankruptcy litigation | ✔ | |
| Trust compensation will be based on the nature and circumstances of the abuse and impact of the abuse | ✔ | ✔ |
| Higher immediately available average payments to Survivors | ✔ | |
| All Survivors who wish to litigate may do so, without seeking permission from the Trust | ✔ | |
| Lower expected administrative expenses | ✔ | |
| Diocese continues its religious and charitable missions | ✔ | ✔ |
| Improved protections for children | ✔ | ✔ |
| Diocese and Participating Parties released from liability | ✔ | ✔ |
| Punitive or exemplary damages not recoverable | ✔ | ✔ |
| Resolves CNA's claims for breach of the 2022 Insurance Settlement Agreement | ✔ | |

- 7 -

| No appeals from plan confirmation by CNA | ✓ | |
|---|---|---|

The Diocese has been in bankruptcy for more than four years, during which time no abuse lawsuits under the New York Child Victims Act have gone forward against the Diocese and no Survivors have received compensation from the Diocese. Nearly two years ago, on May 20, 2022, the Diocese announced a settlement with CNA in the amount of $63.5 million and, together with settlements from the Diocese's other insurers, proposed a total compensation fund of $147.75 million to be available for Survivors. The Committee objected then, but now supports a cash settlement fund of $126.35 million—$20 million *less* in committed funding—along with the assignment of insurance rights against CNA to the Trust.

CNA vigorously disputes that the insurance rights are worth the amounts the Committee apparently ascribes to them, but obtaining definitive court rulings about the value of the insurance rights is expected to take years.

The CNA Plan offers Survivors the chance to choose for themselves which plan they prefer, based on their own personal circumstances and how much risk and delay they are willing to bear. A vote in favor of the CNA Plan is a vote for more certain compensation, sooner, and without any Survivor having to engage in litigation to receive payment from CNA. But, if a Survivor prefers a lower initial payout from a smaller fund with the possibility of an additional payout later, if post-bankruptcy lawsuits against the Diocese and CNA are successful, he or she should vote for the Diocese Plan.

## RISK FACTORS

None of the payments described in the CNA Plan are secured by collateral and no interest shall be paid on amounts due after the Effective Date. This means such payments are subject to unsecured credit risk. If amounts are not paid, the Trustee will have to take action to collect. Additionally, because the payments are not accruing interest, the present value of such payments would be less.

For the CNA Plan to be confirmed with releases of the Participating Parties, under current law, CNA must obtain the "overwhelming support" of holders of Abuse Claims, which is at least 75%. Without such support, the Bankruptcy Court cannot approve the releases and injunctions of the Participating Parties described in the CNA Plan. Without the protection of such releases and injunctions, the Participating Parties may be unwilling to contribute funding to the Trust.

A thorough discussion of other risk factors relevant to the CNA Plan is included below at Article 8, and CNA refers Survivors to Article 8 to review all the risk factors described.

- 8 -

## COMMITTEE'S POSITION REGARDING CNA'S FINANCIAL EXPOSURE

An insurer such as CNA can only be obligated to pay for the insured's legal liability, as determined by a settlement approved by the insurer or by a final judgment entered after an actual trial. Absent a bankruptcy filing, an insured such as the Diocese would be expected to defend against claims asserted against it, including by asserting defenses such as those referenced below on pages 40-41 of this Disclosure Statement. It is not possible at this time to undertake a detailed evaluation of how much each claim might be worth for settlement or litigation purposes, because there has been no discovery of the facts of each claim and, thus, it cannot be determined at this time what defenses might be applicable. Whatever the ultimate amount of a claim following litigation, under no circumstances could an insurer be obligated with respect to a particular claim to pay anything other than the amount of an insurer-approved settlement or a judgment entered following trial.

The Committee contends that CNA owes potentially hundreds of millions of dollars in coverage and, therefore, that the CNA contribution of $75 million as part of the CNA Plan is inadequate. But the Committee provided no estimate of the value of claims, or the likelihood that CNA would be liable to pay, that could be used as the basis for determining CNA's potential insurance indemnification obligation.

According to the Committee, CNA insured the Diocese from 1952 through 1977 under primary policies with limits between $50,000 to $500,000 per occurrence and, in later years, under excess policies with limits of $3 million per occurrence. The Committee believes that the CNA policies do not have applicable aggregate limits and that policy limits are not reduced by payment of defense costs, meaning that the full policy limits would be available for each "occurrence." The Committee's position is that New York law requires that each act of abuse constitutes a separate occurrence, and therefore a claim by a Survivor that involves ten separate acts of abuse would trigger ten separate limits.

The Committee also asserts that CNA's defenses to coverage are not strong. In any coverage litigation following entry of a final judgment in favor of a particular claimant, CNA would be expected to assert all appropriate coverage defenses based on the policy language and the relevant facts, including some or all of the defenses discussed below on pages 10-11 and 40-41 of this Disclosure Statement. Key potential defenses would include the following: the claim does not involve abuse during the CNA policy periods; the claim does not involve "bodily injury" as defined by the policies and applicable state law; the Diocese knew of previous incidents of abuse involving the perpetrator, and therefore knew or should have known that failure to take appropriate actions (such as taking the perpetrator out of ministry) would lead to abuse of additional children, in which event coverage would be unavailable for the later incidents of abuse; and the Diocese failed to give CNA timely notice of the claim and any lawsuit filed against the Diocese.

The Committee contends that CNA's defenses described in the prior paragraph will be generally unavailable or ineffective. For example, the Committee contends that generalized

knowledge on the part of the Diocese that pedophiles could abuse children is not enough to establish that the Diocese knew or should have known that failure to take appropriate actions, such as taking the perpetrator out of ministry, would lead to abuse of additional children. In addition, the Committee does not credit CNA's late notice defense because it believes the Diocese would be able to demonstrate that it gave CNA timely notice of claims.

Based on these contentions, the Committee argues that CNA's total financial exposure to the Abuse Claims asserted in this case is an amount that is potentially in the hundreds of millions of dollars, making CNA's contribution of $75 million as part of the CNA Plan inadequate.

## CNA'S RESPONSE TO THE COMMITTEE'S POSITION
## REGARDING CNA'S FINANCIAL EXPOSURE

CNA disputes the Committee's contentions. CNA believes the Committee is wrong that New York law would treat each act of abuse as a separate occurrence. Instead, resolution of this issue depends on the specific policy language at issue. The policy language that CNA asserts would apply to its policies contains the same language that New York's highest court has said would treat multiple acts of abuse as a single occurrence, to which only a single per-occurrence limit would be applicable. That means a Survivor might only be able to collect the amount of a judgment up to one limit of an applicable CNA policy, even if it is only $50,000.

CNA also contends it has strong defenses to coverage. One defense is based on the Diocese's knowledge that particular priests previously abused other children. Insurance is not available if the Diocese knew about a priest's previous abuse but nevertheless allowed that priest to remain in ministry with access to children, leading to abuse of another child. It would be the Diocese's burden to prove that, given such knowledge, a reasonable person in the Diocese's position would not have expected that the priest would abuse other children in the future. There is evidence in this case for numerous priests that abuse was reported, and in some instances documented, and that accused priests were counseled, referred for treatment, and/or transferred to other parishes, but not taken out of ministry. Some Survivors later suffered abuse from these same priests. On such facts, CNA expects that coverage would not be available.

CNA also asserted the defense of late notice. CNA contends its policies would require that notice of claims be given as soon as practicable. New York courts considering such language routinely hold that even short delays in giving notice are unreasonable, even as short as 40 days. Under New York's strict late-notice rule, the Diocese's delays in giving notice to CNA, of either the claims themselves or lawsuits based on the claims, could bar coverage for many of the claims.

Finally, CNA understands that the Committee's position on the amount of CNA's potential exposure was based on the inclusion in the Diocese Plan of so-called Stipulated Judgments. Based on the definitions in the Diocese Plan, up to 38 Stipulated Judgments were to be entered, for amounts capped at the lesser of $7.5 million or the Available CNA Policy Limits.

- 10 -

The Committee contended that such Stipulated Judgments would have significantly increased CNA's overall exposure. The Court stated, however, that it will not approve any plan that includes Stipulated Judgments. Accordingly, CNA believes the Committee's position on CNA's potential exposure must be revised downward.

In sum, it is not possible to definitively state what CNA's worst-case exposure would be, given that the facts about the claims are not fully developed and the amount of the Diocese's underlying liability has not been determined. But CNA believes that its proposed contribution of $75 million is a reasonable amount given the number of claims asserting abuse during the CNA policy periods, the known facts about the claims, and the coverage defenses and issues that CNA would be able to assert as part of its arguments against coverage for some or all of the claims.

## COMMITTEE COUNSEL ACKNOWLEDGED THE RISKS TO CLAIMANTS OF A PLAN STRUCTURED SIMILARLY TO THE DIOCESE PLAN

The law firm of Pachulski Stang Ziehl & Jones represents the Committee in this case. The same law firm also represents the claimants' committee in another New York diocesan bankruptcy, *In re Diocese of Rockville Centre*. On behalf of the committee in the *Rockville Centre* case, the Pachulski firm objected to a plan of reorganization sponsored by the Diocese of Rockville Centre that is similar in important respects to the Diocese Plan that the Committee supports in this case.

For example, in *Rockville Centre* the Pachulski firm told claimants that resolving disputed claims through post-bankruptcy litigation—as the Diocese Plan provides in this case— "could take years," and "getting the insurance companies to pay is not as easy as the Diocese makes it sound." In addition, the Pachulski firm complained in the *Rockville Centre* case that "legal fees for the fights with the insurance companies will come out of" the settlement fund, and it criticized the Diocese of Rockville Centre because it "does not estimate how much the fights with the insurance companies will cost or how long that fights will take."

The Diocese of Rockville Centre's proposed plan would establish two separate trusts for different claims, depending on the years in which the abuse allegedly occurred. The result is that, as appears to be the case under the Diocese Plan in this case, some claimants may receive less than others with similar claims. The Pachulski firm in the *Diocese of Rockville Centre* case argued that such disparate treatment "is not fair to all Survivors."

Moreover, as the Bankruptcy Court noted in a February 16, 2024 order in this case, the Pachulski firm in the *Rockville Centre* case objected, on behalf of the Committee in that case, to provisions regarding the recovery or non-recovery of "Economic Damages" by abuse claimants that are identical to language contained in the Allocation Protocol in the Diocese Plan. The Court in this case noted this inconsistency, stating, "And yet, before this Court counsel is supporting the same language it found offensive in the Rockville Centre case. Why?" The provisions the Pachulski firm objects to in *Rockville Centre* are not part of the CNA Plan. They are, however, part

SFACTIVE-907468414.5

of the Diocese Plan which the Committee in this case is co-sponsoring along with the Diocese. Survivors should consider the warnings issued by the Pachulski firm in *In re Diocese of Rockville Centre* concerning a plan that, like the Diocese Plan in this case, requires years of litigation to increase the available funds in the Trust and may result in compensation awards that are "not fair to all Survivors."

*     *     *

This Disclosure Statement is intended to explain the CNA Plan and provide material, important, and necessary information to voting creditors so that they may make reasonably informed decisions in exercising their right to vote for acceptance of the CNA Plan. A copy of the CNA Plan is included with this Disclosure Statement. This Disclosure Statement also highlights and explains the material differences between the CNA Plan and the Diocese Plan. Other than as explained, the CNA Plan is generally intended to mirror the restructuring set forth in the Diocese Plan. But the differences in the two plans are significant in many respects that may impact the interests of Survivors.

Portions of this Disclosure Statement will refer directly to, or incorporate by reference, the Diocese's disclosure statement. If the CNA Plan and this Disclosure Statement are not consistent, the terms of the CNA Plan will control.

In the opinion of the Plan Proponent, the treatment of Claims under the CNA Plan provides the highest, soonest, and most certain recovery for Survivors and other Creditors compared to that which is likely to be achieved under other alternatives, including the Diocese Plan. **Accordingly, the Plan Proponent believes that confirmation of the CNA Plan is in the best interest of, and provides the highest and most expeditious recoveries to, holders of all Claims against the Diocese. All the Creditors entitled to vote are urged to vote to accept the CNA Plan.**

<h2 style="text-align:center">ARTICLE 1<br>INTRODUCTION AND SUMMARY OF THE PLAN</h2>

CNA believes the treatment of Creditors under the CNA Plan is more favorable than the treatment Creditors would receive if the Chapter 11 Case were converted to a case under Chapter 7 of the Bankruptcy Code. CNA further believes that the treatment of Abuse Claimants under the CNA Plan provides higher and quicker guaranteed payments to Abuse Claimants than the Diocese Plan and also provides for resolution of CNA's claims for the Diocese's breach of the 2022 Insurance Settlement Agreement. Therefore, CNA submits that the CNA Plan is in the best interests of all Creditors and recommends acceptance of the CNA Plan by holders of Class 3 General Unsecured Claims and Class 4 Abuse Claims.

For information concerning an overview of the Diocese's operations, its asserted need for reorganization, and the Chapter 11 Case, please refer to Articles 2 and 3 of the Diocese's

Disclosure Statement in Support of Fifth Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester Dated April _, 2024 [ECF No. xxxx, Case No. 2-19-20905].

The summary of significant elements of the CNA Plan below is provided for the convenience of all parties. The summary does not describe every element of the CNA Plan and is not intended as a substitute for a thorough and complete review of the CNA Plan. This summary is subject to, and is qualified in its entirety by reference to, the full text of the CNA Plan. All Creditors are encouraged to review the CNA Plan and this Disclosure Statement, including Exhibits, in their entirety for a more complete understanding of the CNA Plan's provisions and impact upon Creditors. To the extent any term or provision in this Disclosure Statement is inconsistent with a term or provision of the CNA Plan, the term or provision of the CNA Plan shall control.

## A. Material Terms of the CNA Plan

As discussed in more detail in Articles 2 and 3 below, the CNA Plan represents CNA's proposed resolution to this bankruptcy case. CNA believes that its proposed resolution is in the best interests of those Survivors who prefer to receive timely compensation for their claims and put this case behind them.

As set forth in further detail below, the material terms of the Plan are as follows:

| Treatment of Claims | As further detailed in the Plan, the Plan contemplates the following treatment of Abuse Claims, General Unsecured Claims, Inbound Contribution Claims, and Insurer Claims:[2]<br><br>• <u>Abuse Claims</u> – Each holder of an Abuse Claim may opt to become a Trust Claim and receive payment exclusively from the Trust, or to become a Tort Claim and receive payment from the Trust and the Payment Reserve, based on any Final Judgment such holder obtains. Distributions from the Trust shall be made on a fair and equitable basis, as provided in the Allocation Protocol.<br><br>• <u>General Unsecured Claims</u> – Each allowed General Unsecured Claim shall receive Cash in two installments each equal to 50% of the Allowed amount of such General Unsecured Claim.<br><br>• <u>Inbound Contribution Claims</u> – These are Claims asserted against the Diocese for indemnity, |
| --- | --- |

---

[2]     The CNA Plan also provides for treatment of the Secured Claim of The Bank of Castile and Pass-Through Claims.

SFACTIVE-907468414.5

| | |
|---|---|
| | contribution, or reimbursement arising out of, or related to, the Claimant's liability to pay or defend any Abuse Claim. Inbound Contribution Claims will be Disallowed and receive no distribution. |
| | • <u>Insurer Claims</u> – These are Claims by CNA against the Diocese arising out of the Diocese's breach of the 2022 Prior Insurance Settlement Agreement. If the CNA Plan is confirmed, then CNA will withdraw its Class 6 Insurer Claims on the Effective Date. |
| **Means of Implementation** | On the Confirmation Date, or as soon as practicable thereafter, the Trust will be established for the exclusive benefit of the holders of Abuse Claims. |
| | As of the Effective Date, the Trust will assume all responsibility for preserving, managing, and distributing Trust Assets. The Trust will assume all liability of the Diocese, Participating Parties, and Settling Insurers in respect of the Abuse Claims, and all Abuse Claims will become Channeled Claims. |
| | The Trust will be funded by the following contributions: |
| | • CNA Cash Contribution: $75 million |
| | • DOR Entities' Cash Contribution: $55 million |
| | • Interstate Settlement: $50 million |
| | • LMI Settlement: $19.5 million |
| | • Underwriters Settlement: $1.1 million |
| | • First State Settlement: $750,000 |
| | A Trustee will be appointed to make Trust Distributions to Abuse Claimants, based on an evaluation of all Abuse Claims by the Abuse Claims Reviewer. Under the CNA Plan, any compensation awarded for Abuse Claims will come from the Trust. |
| | The Trustee shall have the right to pursue Insurance Claims against Non-Settling Insurers (if any). The Trustee will set aside a reserve for the payment of Unknown Abuse Claims and Trust Expenses, including paying the Trustee and retained professionals and funding DOR Entities' Post-Effective Date Costs. |

SFACTIVE-907468414.5

| Releases | The CNA Plan provides for certain releases by the Debtor, the Participating Parties, and holders of Abuse Claims. |
|---|---|
| | The Debtor and Participating Parties will release all rights under insurance policies issued or allegedly issued by the Settling Insurers, including CNA. |
| | All Abuse Claimants must release all Claims against the Protected Parties, including the Diocese, Reorganized Diocese, Participating Parties, and Settling Insurers, in order to be paid a Trust Distribution. However, Abuse Claimants retain all rights to recover on any Abuse Claim against any Perpetrator of Abuse for acts of Abuse. |
| Exculpation | The Plan provides certain customary exculpation provisions relating to any liability for actions taken during the bankruptcy case, which include a full exculpation from liability in favor of the Diocese, the Reorganized Diocese, the Settling Insurers, the Unknown Claimant Representative, and any mediators, along with their respective (a) predecessors, successors, assigns, subsidiaries, and affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, Agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) their respective heirs, executors, Estate, and nominees. |

## B. Parties Entitled to Vote on the CNA Plan

Class 3 General Unsecured Claims, Class 4 Abuse Claims, and Class 6 Insurer Claims are entitled to vote on the CNA Plan.

Pursuant to Bankruptcy Rule 3018(a), all Class 4 Abuse Claims and Class 6 Insurer Claims shall be estimated at $1.00 for voting purposes only. The actual amount payable on account of Class 4 Abuse Claims will be determined pursuant to the Allocation Protocol. If the CNA Plan is confirmed, Class 6 Insurer Claims will be deemed withdrawn upon the Effective Date.

The Class 1 Secured Claim of The Bank of Castile and Class 2 Pass-Through Claims (if any) are Unimpaired under the CNA Plan and are deemed to accept the CNA Plan. Class 5 Inbound Contribution Claims are Impaired under the CNA Plan and are deemed to reject the CNA Plan. No holder of a Class 1, Class 2, or Class 5 is entitled to vote on the CNA Plan.

- 15 -

**C.**     **Solicitation Package**

Accompanying this Disclosure Statement are the following enclosures:

**1.**     **Order Approving Disclosure Statement**

A copy of the Bankruptcy Court's order dated **_____, 2024**, approving this Disclosure Statement and, among other things, establishing procedures for voting on the CNA Plan, scheduling the Confirmation Hearing, and setting the deadline for objecting to confirmation of the CNA Plan.

**2.**     **Notice of Confirmation Hearing**

A copy of the notice of the deadline for submitting ballots to accept or reject the CNA Plan and, among other things, the date, time, and place of the Confirmation Hearing, and the deadline for filing objections to confirmation of the CNA Plan.

**3.**     **Ballot**

A Ballot (and return envelope) for voting to accept or reject the CNA Plan. *See* Article 4 below for an explanation of which Creditors are entitled to vote.

**D.**     **Voting Procedures, Ballots, and Voting Deadline**

To be counted, your Ballot must be received, pursuant to the following instructions, by Bankruptcy Management Solutions, Inc. d/b/a Stretto ("Stretto"), on or before the Voting Deadline, which is **11:59 p.m. (Eastern Time) on July 1, 2024**:

    **If by first class mail, overnight courier or hand delivery:**

        The Diocese of Rochester – Ballot Processing c/o Stretto
        410 Exchange, Suite 100
        Irvine, California 92602

    **If by electronic, online submission:**

    Please visit https://case.stretto.com/rochesterdiocese/docket. Click on the "*E-Ballot*" section of the website for the Diocese's bankruptcy case and follow the directions on your Ballot to submit your E-Ballot. If you choose to submit your Ballot via Stretto's E-Ballot system, you should <u>not</u> also return a hard (paper) copy of your Ballot.

**IMPORTANT NOTE: You will need a unique E-Ballot ID Number that will be provided with your Ballot.**

- 16 -

**IF YOU HOLD A CLAIM ENTITLED TO VOTE:**

Please (i) complete the information requested on the Ballot, (ii) sign, date, and indicate your vote to accept or reject the CNA Plan, and (iii) return the completed Ballot in the enclosed pre-addressed, postage-paid envelope, or by one of the other methods described above, so that it is actually received by Stretto on or before the Voting Deadline.

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY FACSIMILE, TELECOPY, OR EMAIL BE ACCEPTED.**

**IF YOU HAVE QUESTIONS REGARDING THE BALLOT, DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, DID NOT RECEIVE AN ELECTRONIC COPY OF THE DISCLOSURE STATEMENT AND THE PLAN, OR NEED PHYSICAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DIOCESE'S SOLICITATION AND CLAIMS AGENT, STRETTO, BY EMAIL AT** TeamRochDiocese@stretto.com **OR BY CALLING 855.347.3773 AND REQUESTING TO SPEAK WITH A MEMBER OF THE DIOCESE'S SOLICITATION TEAM.**

Your vote is important. The Bankruptcy Court defines acceptance by a Class of Claims as acceptance by at least two-thirds in amount and a majority in number of Allowed Claims in the Class that vote. Votes are counted only with respect to claims (a) that are listed on the debtor's schedules other than as disputed, contingent, or unliquidated or (b) for which a proof of claim was filed on or before the claim filing deadline set by the Bankruptcy Court for the filing of proofs of claim. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the CNA Plan by the Claimant is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Only the Ballots of those Creditors who actually vote are counted for purposes of determining whether a Class voted to accept the CNA Plan. Your failure to vote will leave to others the decision to accept or reject the CNA Plan.

After carefully reviewing the CNA Plan and Disclosure Statement, each holder of a claim should vote on the enclosed ballot either to accept or reject the CNA Plan. A holder that has voted to accept both the CNA Plan and the Diocese Plan can also indicate on the ballot whether he or she prefers one plan to the other. Any ballot that does not appropriately indicate acceptance or rejection of the CNA Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by contacting the Diocese's solicitation and claims agent, Stretto, by email at TeamRochDiocese@stretto.com or by calling 855.347.3773 and requesting to speak with a member of the solicitation team.

E.    **Confirmation Hearing**

Section 1129(a) of the Bankruptcy Code establishes several conditions for the confirmation of a plan.  These conditions are too numerous to be fully explained here. Among the conditions for plan confirmation is that either each holder of a claim must accept the plan, or the plan must provide at least as much value as would be received upon liquidation of a debtor's estate under Chapter 7 of the Bankruptcy Code.  **The Plan Proponent believes that the CNA Plan satisfies all the applicable requirements of § 1129(a) of the Bankruptcy Code.**

The Bankruptcy Court has scheduled a Confirmation Hearing to consider approving the CNA Plan commencing on _____ _, **2024 at __a.m./p.m. (prevailing Eastern Time)** at the United States Bankruptcy Court for the Western District of New York in Rochester, New York.   The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled hearing date or upon the Plan Proponent filing a notice of adjournment.

Please refer to Articles 1.C and 3 of the Diocese's disclosure statement for additional information.

**ARTICLE 2**
**SOURCES OF FUNDING UNDER THE CNA PLAN**

The Plan Proponent believes the CNA Plan presents an opportunity for Survivors to obtain larger, more certain recoveries, and be paid sooner, than that which is likely to be achieved under other alternatives, including the Diocese Plan.

**Under the CNA Plan, Survivors will be eligible for compensation paid promptly from a fund totaling at least $200 million after accounting for anticipated expenses, on a fair and equitable basis as set forth in the Allocation Protocol.**

The Trust will be able to pay those Survivors who choose to not continue or commence litigation against the Diocese or Participating Parties the full amount of their Trust Settlement Offers immediately upon the Survivor's acceptance of the Trust Settlement Offer.

A.    **The Diocese Contribution**

The CNA Plan will establish a Trust for compensation of Abuse Claims.

**On or before the Consummation Date, the Diocese and the Participating Parties will pay the DOR Entities' Cash Contribution of $55 million to the Trust.**  The DOR Entities' Cash Contribution will be used to establish the Trust Reserve and the Unknown Abuse Claim Reserve, and any balance will be contributed to the Abuse Claims Settlement Fund. The Plan Proponent expects the Trust Reserve and Unknown Abuse Claim Reserve to be no more than $1.35 million, in total.

## B. The Settling Insurers' Contributions

Under the CNA Plan, all known insurers that issued insurance policies that may afford coverage for Abuse Claims are Settling Insurers.

The Insurance Settlement Amounts are as follows:

| Settling Insurer | Insurance Settlement Amount |
|---|---|
| CNA | $75,000,000 |
| Interstate | $50,000,000 |
| LMI | $19,500,000 |
| Underwriters | $1,100,000 |
| First State | $750,000 |
| **Total:** | **$146,350,000** |

**The Insurance Settlement Amounts will be paid in exchange for releases by the Diocese and Participating Parties of their rights under the insurance policies issued or allegedly issued by the Settling Insurers.** Pursuant to §§ 105(a), 363(b), 363(f), 363(m), and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as applicable, under the CNA Plan the Diocese will sell back each Insurance Policy to the respective Settling Insurer, with such sale being free and clear of all Liens, Claims, interests, charges, and other encumbrances and liabilities of any kind, and each Settling Insurer will pay its respective Insurance Settlement Amount to the Trust.

**The Settling Insurers will receive the benefits of the Releases and Injunctions described in the CNA Plan.** The Insurance Settlements will be in full and final settlement of the Settling Insurers' responsibilities, liabilities, and obligations to provide insurance coverage (including defense or indemnification) for all past, present, and future Claims, including Abuse Claims, that directly or indirectly arise out of or relate in any way to, or are asserted in connection with, the Insurance Policies, including any Channeled Claims, reimbursement obligations for Conditional Payments under the MSPA, or Claims that directly or indirectly arise from, relate in any way to, or are asserted in connection with, the Abuse Claims or the Chapter 11 Case. **This means that there will be no further recoveries against, or payments by, any of the Settling Insurers, including CNA, if the CNA Plan is confirmed.**

All Claims, including Abuse Claims, Direct Action Claims, Extra-Contractual Claims, and Insurer Contribution Claims, by any Person or Entity against the Settling Insurers shall be released as of the Effective Date.

- 19 -

SFACTIVE-907468414.5

Within five days after payment of each Settling Insurer's respective Insurance Settlement Amount, the Diocese or Trust (as applicable) and the Settling Insurer will dismiss with prejudice their Claims against each other in the Insurance Adversary Proceeding, with each party bearing its own costs and fees.

The rights of the Parties under any Insurance Settlements will be determined under the applicable Insurance Settlement, the Final Order approving such Insurance Settlement (which may be included in the Confirmation Order), the CNA Plan, and the Confirmation Order. The injunctions, releases, and discharges to which any Settling Insurer is entitled pursuant to such Insurance Settlement, the CNA Plan, the Confirmation Order, the Final Order approving the Insurance Settlement (which may be included within the Confirmation Order), and the Bankruptcy Code shall become effective pursuant to the terms of such Insurance Settlement.

## C.     Non-Settling Insurers

**As of the date of the filing of the CNA Plan, the Plan Proponent is not aware of the existence of any Non-Settling Insurers.** However, in case a Non-Settling Insurer is identified in the future, Section 6 of the CNA Plan provides for the treatment of such Non-Settling Insurers. Any claims against any such Non-Settling Insurers may be pursued by the Trust only, acting on behalf of Class 4 Claimants.

In order to preserve coverage under any Insurance Policy issued by a Non-Settling Insurer, Survivors specifically reserve, and do not release, any Claims they may have against the Diocese, the Reorganized Diocese, or any other Protected Party to the extent, and only to the extent, that such Claims implicate coverage under any Non-Settling Insurer's Policy(ies), but recovery may only be pursued by the Trust and is limited to the proceeds of the Non-Settling Insurer's Policy(ies). All other damages, awards, judgments over policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurer because of its conduct regarding coverage for, or defense or settlement of, any Abuse Claim, and any such damages or awards will solely have recourse against the Non-Settling Insurer and the Trust Assets in accordance with the CNA Plan and the Trust Documents and shall have no recourse whatsoever at any time against any Protected Party or any property or interest in property of any Protected Party.

On the Effective Date, (i) the Diocese and each of the Participating Parties will be deemed to have assigned to the Trust all of their Insurance Claims and rights of recovery on account of such Insurance Claims against the Non-Settling Insurers and (ii) the Diocese will be deemed to have assigned to the Trust the Non-Settling Insurance Policies and the right to proceeds under such Non-Settling Insurer Policies. Any recovery by the Trust on Insurance Claims under Non-Settling Insurer Policies relating to the Diocese's and/or Participating Parties' liability for Abuse Claims shall become a Trust Asset and shall be distributed as provided in the CNA Plan, the Trust Agreement, and the Allocation Protocol.

Nothing in the CNA Plan prevents a Non-Settling Insurer from becoming a

Settling Insurer by entering into a settlement with the Trust on terms and conditions acceptable to the Trustee and subject to the Bankruptcy Court's approval pursuant to Bankruptcy Rule 9019.

## D.     No Litigation Required

**The CNA Plan does not require that any Survivors litigate in order to obtain their full measure of compensation under the CNA Plan.** The CNA Plan will be fully funded as of the Effective Date. Although the Diocese and the Committee have stated that they believe the Diocese Plan "represents an opportunity to maximize the potential recovery for all Abuse Claimants," at the same time they acknowledge that the litigation required under the Diocese Plan may be "protracted and expensive" and, in the end, "may not result in additional recovery." Under the CNA Plan, by contrast, the total amount CNA will pay to compensate Survivors is presently known ($75 million) and will be immediately available, without any need for further litigation. The Plan Proponent expects that the large majority of Survivors will therefore see their Abuse Claims fully and finally resolved sooner, and paid a higher average amount, than under the Diocese Plan.

Unlike under the Diocese Plan, the amounts available for payment of Survivors will not depend on some Survivors and/or the Trust winning two post-confirmation litigations (first to establish whether, and if so to what extent, the Diocese is liable for the claims of certain Survivors and, second, to determine whether CNA's insurance policies provide coverage for such claims). The CNA Plan gives Survivors the choice to file a lawsuit nominally against the Diocese and/or Participating Parties. CNA does not expect those lawsuits will be defended, in which case the Survivor would likely be entitled to a default judgment and then have the opportunity to provide evidence to the court supporting a damage award. Any damage award that becomes a Final Judgment would entitle the Survivor to a share of the Payment Reserve, which will be initially funded with $500,000. A Survivor with a Final Judgment would not be required to also pursue an Insurance Claim to receive his or her share of the Payment Reserve.

Accordingly, Survivors have the option to litigate under the CNA Plan, but it is not required that they do so in order to receive their full measure of compensation under the CNA Plan. The Plan Proponent expects most Survivors would prefer to receive compensation from the Trust without filing a lawsuit.

## E.     Exit Financing

The Diocese may, at its discretion, obtain financing to assist the Diocese in making its portion of the DOR Entities' Cash Contribution, which financing may be secured by the Diocese's interest in certain real property located at 1150 Buffalo Road, Rochester, New York, or such other property of the Diocese that is not otherwise contemplated to be transferred (other than to the Reorganized Diocese) pursuant to this Plan. Any security interest in collateral granted to a lender in connection with such financing shall, on and after the Effective Date, be enforceable against any interest the Reorganized Diocese may have in such collateral, to the same extent it may have been enforceable against the Diocese prior to the Effective Date.

CNA will update this disclosure and the relevant CNA Plan provisions if more information becomes available from the Diocese.

## ARTICLE 3
## THE TRUST AND ALLOCATION PROTOCOL

**The Trust will be established by the Trust Agreement. All Survivors will have their Abuse Claims channeled to, and paid from, the Trust.**

## A.    The Trust Agreement

The Trust Agreement will be filed as Exhibit 3 to the CNA Plan. The key provisions of the Trust Agreement are the following:

- The Trust Agreement will establish a trust called the Diocese of Rochester Abuse Claim Trust (referred to herein as the "Trust"). The purposes of the Trust are to (i) assume all liability for the Channeled Claims, (ii) administer Abuse Claims, and (iii) make Distributions to holders of Abuse Claims, in accordance with the Allocation Protocol.

- The Debtor, Participating Parties, and Settling Insurers will make their payments, as required by the CNA Plan, to the Trust and the Trust will receive and hold all right, title, and interest in and to such paid-in funds. The Trust will succeed to all of the Diocese's and Participating Parties' respective rights, title, and interest, including all legal privileges, in the Trust Assets. The Trustee is, and shall act as, the fiduciary with respect to the Trust Assets.

- The Trust is established for the benefit of the holders of Abuse Claims. The Trust will fairly and reasonably compensate Abuse Claims and shall pay up to the full value of such claims, solely in accordance with the Trust Documents, including the Allocation Protocol.

- Except as limited in the Trust Documents and by applicable law, the Trustee shall have the power to, among other things, supervise and administer the Trust in accordance with the Trust Documents, invest the monies held from time to time by the Trust, sell, transfer, or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustee may determine proper and consistent with the other terms of the Trust Documents, establish accounts and reasonable reserves within the Trust, and determine and pay liabilities and pay all fees and expenses incurred in administering the Trust, managing the Trust Assets, and making Distributions.

- The Trustee will maintain books and records relating to the Trust Assets and income and the payment of Trust Operating Expenses and other liabilities of the Trust. The Trustee will produce an annual report containing special-purpose financial statements

- 22 -

of the Trust, including the assets and liabilities of the Trust as of the end of each fiscal year and the additions, deductions, and cash flows for such fiscal year, and file it with the Bankruptcy Court.

- The Trustee will keep a register in which names and addresses of the Beneficiaries and the awards made to the Beneficiaries are maintained.

- The Trust shall be dissolved at such time as (i) all of the Trust Assets have been distributed, (ii) the Trustee determines that the administration of any remaining Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (iii) all distributions required to be made by the Trustee under the Trust Documents have been made; provided, however, that the Trust must be dissolved within seven years from the Effective Date unless a court determines that an extension is necessary. In the event the Trust holds cash after paying all Trust expenses and making all Distributions, such remaining cash shall be distributed to a nationally recognized charitable organization of the Trustee's choice to the extent economically feasible, which charitable organization shall be independent of the Trustee and, to the extent possible, shall have a charitable purpose consistent with the protection of children from sexual abuse or its ramifications.

- However, the Trustee shall not, during his or her service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Reorganized Debtor or its affiliated persons, or any Non-Settling Insurer. No Trustee shall act as an attorney for, or otherwise represent, any Person who holds a claim in the Chapter 11 Case. CNA has not yet identified someone to act as the Trustee under the CNA Plan.

## B.  The Allocation Protocol

The Allocation Protocol was filed as Exhibit 1 to the CNA Plan. The key provisions of the Allocation Protocol are the following:

- The Abuse Claims Reviewer will review each Abuse Claim and determine whether the Abuse Claimant proved his or her claim by a preponderance of the evidence. If an Abuse Claim is allowed, the Abuse Claims Reviewer shall assign such Abuse Claim a point total pursuant to the Evaluation Factors.

- The Abuse Claims Reviewer may, after considering the credibility of the Abuse Claimant and the facts alleged and evidence submitted in support of an Abuse Claim, deny the Abuse Claim if denial is warranted in the Abuse Claims Reviewer's sole discretion. Abuse Claims denied by the Abuse Claims Reviewer shall not be entitled to any distribution from the Trust.

- The Abuse Claims Reviewer shall review the claim of a deceased Abuse Claimant without regard to the Abuse Claimant's death, except that the Abuse Claims Reviewer

SFACTIVE-907468414.5

may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

- An Unknown Abuse Claim shall be allowed if the Abuse Claims Reviewer determines, by a preponderance of the evidence, that the claimant did not file a proof of claim (nor was a proof of claim deemed effective) on or before the Effective Date, the earliest incident of alleged Abuse occurred before the Petition Date, and the claimant was at the time of the Claims Bar Date under a disability or other condition recognized by New York law or other applicable law that would toll the statute of limitations for such Claim. If an Unknown Abuse Claim is allowed, the Abuse Claims Reviewer shall assign such Unknown Abuse Claim a point total pursuant to the Evaluation Factors.

- The Abuse Claims Reviewer shall notify each Abuse Claimant in writing of his or her points allocation based on the Evaluation Factors with respect to the Abuse Claimant's claim. The Abuse Claims Reviewer's determination shall be final unless the Abuse Claimant makes a timely request for reconsideration. The Abuse Claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point allocation. The Abuse Claims Reviewer shall make final determinations as expeditiously as possible, while ensuring a full and fair review process for all Abuse Claims. An Abuse Claimant may request reconsideration, and submit additional evidence and argument in support of such request, for a fee of $425. The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review, or appeal by any person or entity, including a court.

- After all Abuse Claims have been evaluated pursuant to the Evaluation Factors, the Trustee will calculate the Trust Settlement Offer for each Abuse Claim, as described above on pages 3-4. The Trust Settlement Offer for each Survivor shall be based on the Survivor's percentage share of the total points assigned to all Survivors, applied to the available compensation fund.

  o By way of example, if a total of 30,000 points are assigned to all Survivors, and Survivor A is assigned 90 points, Survivor A's percentage share would be 90 divided by 30,000, or 0.3%. If the total available compensation fund is $200 million, then Survivor A would be offered 0.3% of $200 million, or $600,000.

  o By way of further example, if a total of 30,000 points are assigned to all Survivors, and Survivor B is assigned 60 points, Survivor B's percentage share would be 60 divided by 30,000, or 0.2%. If the total available compensation fund is $200 million, then Survivor B would be offered 0.2% of $200 million, or $400,000.

- The tables below show some additional examples of what a particular Survivor could expect to receive under certain point allocations, assuming that the total amount available to the Trust to distribute to claimants is $200 million and the total number of

- 24 -

points awarded by the Abuse Claims Reviewer is either 30,000 points (first table) or 25,000 points (second table). For reference, the tables below assume 524 Survivors are participating. The average point scores for all Survivors are 57.25 (first table), and 47.71 (second table). As discussed herein, each Survivor's actual point score will be determined by the Abuse Claims Reviewer using the Evaluation Factors under the Allocation Protocol.

SFACTIVE-907468414.5

**Table 1**

| Hypothetical Survivor's points, as awarded by the Abuse Claims Reviewer using the factors required under the Allocation Protocol (related to the nature of the abuse, the circumstances of the abuse, and the impact of the abuse on the Survivor) | Assumed total number of points awarded to all Survivors | Hypothetical Survivor's percentage share of total of 30,000 points awarded to all Survivors | Hypothetical Survivor's Trust Settlement Offer, based on assumptions that the total amount available to the Trust to distribute to claimants is $200 million and the total number of points awarded by the Abuse Claims Reviewer is 30,000 points) |
|---|---|---|---|
| 100 | 30,000 | 0.33% | $660,000 |
| 90 | 30,000 | 0.30% | $600,000 |
| 75 | 30,000 | 0.25% | $500,000 |
| 60 | 30,000 | 0.20% | $400,000 |
| 57.25 | 30,000 | 0.19% | $380,000 |
| 50 | 30,000 | 0.17% | $340,000 |
| 35 | 30,000 | 0.12% | $240,000 |
| 20 | 30,000 | 0.07% | $140,000 |
| 0 | 30,000 | 0.00% | $0 |

SFACTIVE-907468414.5

**Table 2**

| Hypothetical Survivor's points, as awarded by the Abuse Claims Reviewer using the factors required under the Allocation Protocol (related to the nature of the abuse, the circumstances of the abuse, and the impact of the abuse on the Survivor) | Assumed total number of points awarded to all Survivors | Hypothetical Survivor's percentage share of total of 25,000 points awarded to all Survivors | Hypothetical Survivor's Trust Settlement Offer, based on assumptions that the total amount available to the Trust to distribute to claimants is $200 million and the total number of points awarded by the Abuse Claims Reviewer is 25,000 points) |
|---|---|---|---|
| 100 | 25,000 | 0.40% | $800,000 |
| 90 | 25,000 | 0.36% | $720,000 |
| 75 | 25,000 | 0.30% | $600,000 |
| 60 | 25,000 | 0.24% | $480,000 |
| 50 | 25,000 | 0.20% | $400,000 |
| 47.71 | 25,000 | 0.19% | $380,000 |
| 35 | 25,000 | 0.14% | $280,000 |
| 20 | 25,000 | 0.08% | $160,000 |
| 0 | 25,000 | 0.00% | $0 |

- Survivors may accept or reject their Trust Settlement Offers. An Abuse Claimant who accepts his or her Trust Settlement Offer is a Trust Claimant with a Trust Claim. An Abuse Claimant who rejects his or her Trust Settlement Offer is a Tort Claimant with a Tort Claim.

- The Trustee shall promptly pay Trust Claimants who have accepted their Trust Settlement Offers the full amount of their accepted Trust Settlement Offers. That payment will be all of the compensation a Trust Claimant receives under the Plan.

SFACTIVE-907468414.5

- For Tort Claimants (Abuse Claimants who have rejected their Trust Settlement Offers, and who elect instead to pursue court litigation against the Diocese or other Protected Parties, subject to the provisions of the CNA Plan), the Trustee shall hold in reserve an amount equal to each Tort Claimant's Trust Settlement Offer until the Tort Claimant's Tort Claim is resolved by a Final Judgment. Following entry of Final Judgment:

    (1) If the amount of the Final Judgment is less than or equal to the amount of the Trust Settlement Offer, the Trustee shall promptly pay to the Tort Claimant the amount of the Final Judgment as full and final satisfaction of the Tort Claim. In such case, the difference between the rejected Trust Settlement Offer and the amount of the Final Judgment shall not be paid to the Tort Claimant but, instead, shall be transferred to the Payment Reserve to pay Excess Recovery Amounts.

    (2) If the amount of the Final Judgment is greater than the amount of the Trust Settlement Offer, the Trustee shall promptly pay to the Tort Claimant the amount of the Trust Settlement Offer.

    (3) After all Tort Claims have been resolved by Final Judgments, the Trustee shall promptly pay to each Tort Claimant, from the Payment Reserve, the amount of his or her Final Judgment that is in excess of the Trust Settlement Offer (the "Excess Recovery Amount"); provided, that to the extent all Excess Recovery Amounts cannot be paid in full from the Payment Reserve, then the Trustee shall calculate and pay only each Tort Claimant's pro rata share of his or her respective Excess Recovery Amount.

    (4) If a court enters Final Judgment determining that the Diocese and/or Participating Party (as applicable) does not have any liability on account of the Tort Claimant's Tort Claim, then the Tort Claimant shall not be entitled to any Distribution from the Trust, including any Trust Settlement Offer, in which event the funds reserved to pay that Tort Claimant's Trust Settlement Offer shall be transferred to the Payment Reserve to pay Excess Recovery Amounts.

- No punitive, multiple, exemplary, statutory, or enhanced damages may be included in any component of a Trust Distribution.

- The Trust shall be the sole source of recovery for holders of Abuse Claims, including Trust Claims and Tort Claims, and no holder of an Abuse Claim shall have further recourse against the Trust, the Diocese, the Estate, the Reorganized Diocese, any Settling Insurer, or any Protected Party.

- 28 -

SFACTIVE-907468414.5

- If, after all Abuse Claim eligibility determinations have been made, and all Trust Distributions have been paid to eligible Abuse Claimants (including all Trust Settlement Offers and Excess Recovery Amounts), there are any remaining funds in the Trust, the Trustee may in his or her sole discretion make a Supplemental Distribution of some or all of the remaining Trust funds on a pro rata basis to Trust Claimants based on their respective Trust Settlement Offers.

## C.    Evaluation Factors

The Allocation Protocol provides that each Abuse Claims Reviewer will assign each Abuse Claim between 0 and 100 points based on the Evaluation Factors, and the points assigned to each Abuse Claim shall determine, on a pro-rata basis, the amount of distribution to each Abuse Claimant.  The Evaluation Factors are the following:

1.    **Nature of Abuse**:

   a.    Duration;

   b.    Frequency/number of instances;

   c.    Degree of intrusiveness into child's body (*e.g.*, clothed/unclothed, masturbation by or of perpetrator, oral penetration, anal penetration, vaginal penetration);

   d.    Level or severity of force / violence / coercion / threats; control of environment (*e.g.*, boarding school, orphanage, trip under supervision of perpetrator, day school, employment relationship with Perpetrator of the Diocese);

   e.    Number of Perpetrators of the Diocese that abused the Claimant; physical pain suffered;

   f.    Grooming;

   g.    Relationship of the Claimant to the Perpetrator;

   h.    Location of abuse, including but not limited to isolated location, rectory, church, cabin, orphanage, etc.; and/or

   i.    Additional factors that may be provided by the Claimant.

2.    **Impact of the Abuse**:

   a.    School behavior problems;

   b.    School academic problems;

   c.    Getting into legal trouble as a minor;

- 29 -

d. Loss of faith;

e. Damage to family relationships / interpersonal difficulties;

f. Mental health symptoms, including but not limited to:

- Depression;

- Suicide attempt or suicidal ideation;

- Anxiety;

- Substance abuse;

- Sexual acting out;

- Runaway;

- Flashbacks;

- Nightmares;

g. Adult and current functioning:

- Criminal record as an adult;

- Underemployment/unemployment;

- Relationship problems;

- Substance abuse;

h. Physical health symptoms, including but not limited to:

- Physical manifestations of emotional distress;

- Gastrointestinal issues;

- Headaches, high blood pressure;

- Physical manifestations of anxiety;

- Erectile dysfunction;

- Heart palpitations;

- Sexually-transmitted infections;

- Physical damage caused by acts of abuse;

- Reproductive damage;

- Self-cutting; and/or

- Other self-injurious behavior;

i. The risk of the foregoing factors affecting the Abuse

- 30 -

Claimant in the future based on the Abuse Claimant's age at the present time; and/or

j.  Additional factors that may be provided by the Abuse Claimant.

The Abuse Claims Reviewer shall not consider the mere fact that an Abuse Claimant has been or is incarcerated in the review of the claim unless an element of the crime for which the Abuse Claimant was convicted includes any fraud or misrepresentation. There will be no consideration of an Abuse Claimant's claims against any entity other than the other than the Diocese or Participating Parties that may be liable to the Abuse Claimant.

## D.  Relevant Differences from the Diocese Plan

The key differences between the CNA Plan and the Diocese Plan concern how the Trust will be funded, the anticipated amount of Trust Expenses, and how claims will be paid:

- Under the CNA Plan, the cash funding of the Trust will total $201.35 million. CNA expects that at least $200 million will be available to compensate voting Survivors. In contrast, the Diocese's proposed plan will fund the Trust with only $126.35 million in cash; in addition, contingent claims against CNA under insurance policies allegedly issued by CNA would be assigned to the Trust under the Diocese Plan.

- Under the CNA Plan, there are no known Insurance Claims to assign to the Trust because there are no known Non-Settling Insurers. Thus, there will be no post-bankruptcy insurance litigation under the CNA Plan.

- Because there are no anticipated Insurance Claims to pursue under the CNA Plan, the Plan Proponent anticipates Trust Expenses will be lower than under the Diocese Plan, which requires the Trust to pay attorneys to pursue insurance litigation against CNA.

- For any Survivor who prefers to litigate his or her Abuse Claim, the CNA Plan provides that option. The Survivor does not need to seek permission from the Trust to do so. Under the Diocese Plan, a Survivor must obtain permission from the Trust, which may not be granted.

- Because Trust funding under the CNA Plan is fixed, the Trust can pay full Trust Distributions shortly after the Abuse Claims Reviewer finishes assigning point totals to the Abuse Claims (including addressing any requests for reconsideration). One of the lawyers from the law firm representing the Committee in this case has stated that, in a case like this one, it can take just a few weeks to issue payments following initial funding of the trust. But because Trust funding under the Diocese Plan depends on the outcome of post-bankruptcy litigation against the Diocese and then against CNA,

SFACTIVE-907468414.5

payment of full distributions under the Diocese Plan will necessarily be delayed, perhaps for years, until after the post-bankruptcy litigation is concluded.

**E.      Legal Effect of Claims and Distributions Under the Allocation Protocol**

The Abuse Claims Reviewer's determinations are for Distribution purposes only and shall not constitute findings or the fixing of facts or liability concerning the Abuse Claims with any binding legal effect.  The determination of eligibility, the Abuse Claims Reviewer's determination of the amount of Trust Settlement Offers, and the payment of Trust Distributions shall not be construed as an admission of liability by the Diocese, any Participating Party, any Tort Defendant or alleged Joint Tortfeasor, or the Trust with respect to any Abuse Claim, and shall have no *res judicata* or collateral estoppel effect on the Diocese, the Reorganized Diocese, any Participating Party, the Trust, or any Non-Settling Insurer.

The Trust's act of making a Distribution to a Survivor is immaterial to, and shall not be construed as, a determination or admission of the Diocese's or any Participating Party's liability for, or damages with respect to, any Abuse Claim.  The determination of qualification, amount of Trust Settlement Offers, and the payment of Distributions is not a settlement, release, accord and satisfaction, or novation of any Abuse Claim.  Neither the Abuse Claims Reviewer's review of an Abuse Claim and determination of eligibility nor payment of Distributions shall constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation between or among the Diocese, the Participating Parties, Non-Settling Insurers, or any other Person.  The Abuse Claims Reviewer's determination of the amount of Trust Settlement Offers and the Trust's payment of Trust Distributions do not create an admission of the fact of liability, or the extent of damages, on behalf of the Diocese and/or any Participating Parties.

**F.      Distributions to Abuse Claimants**

A Survivor whom the Abuse Claims Reviewer determines to be entitled to a Distribution will receive a Distribution from the Trust in the amount(s) and at the time(s) provided for in the Allocation Protocol and Trust Documents.  Any payment on an Abuse Claim constitutes a payment for damages on account of a personal physical injury or sickness arising from an occurrence, within the meaning of § 104(a)(2) of the Internal Revenue Code of 1986, as amended. For the avoidance of doubt, Survivors' recoveries on their Claims shall be limited to their Trust Distributions, if any, under the Allocation Protocol and Trust Documents, and no Survivor shall be entitled to collect personally, or otherwise, any additional amounts whatsoever on their Abuse Claims from the Diocese, the Reorganized Diocese, any Participating Party, or their respective assets, or from any Settling Insurers, Settling Insurer Policies, or Settling Insurers' assets, for any Abuse Claims that are Channeled Claims, even if they are denied a Trust Distribution.

**G.      Claim Withdrawal**

A Survivor may withdraw his or her Abuse Claim at any time on written notice to the Trustee.  If withdrawn, the Abuse Claim will be withdrawn with prejudice and may not be

reasserted, and the Survivor will still be bound by the Diocese Discharge and all injunctive provisions of the CNA Plan, including the Channeling Injunction.

## H.    Medicare Procedures

With respect to all Abuse Claims, the Trust shall maintain sufficient funds to pay any Medicare Claims. Prior to making any Distribution to a Survivor on behalf of an Abuse Claim, the Trustee shall obtain a certification of compliance with MMSEA by the Survivor from the Survivor's counsel, or, if the Survivor is *pro se,* the Trustee shall obtain a certification of compliance with MMSEA for such Survivor from a third-party administrator engaged by and paid for by the Trust for the purpose of providing certifications of compliance with MMSEA for all such *pro se* Survivors. The cost of such certification shall be deducted from the Survivor's Distribution; provided, however, that to the extent such Survivor's distribution is not sufficient to pay for such costs, the Trust shall pay such costs. The certifications of compliance shall provide that the Survivor has provided, or will provide, for the payment and/or resolution of any obligations owing or asserted under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance in connection with, or relating to, such Survivor's Abuse Claim.

For additional information on Medicare procedures, please refer to Article 5, Section H of the Disclosure Statement in Support of Fifth Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester Dated April __, 2024 [ECF No. xxxx, Case No. 2-19-20905].

## I.    Non-Monetary Commitments

In order to further promote healing and reconciliation, and in order to continue efforts to prevent Abuse from occurring in the future, the Reorganized Diocese will, beginning within thirty days after the Effective Date (unless a different date is provided in the Confirmation Order), use reasonable efforts to undertake and observe certain non-monetary commitments as agreed upon with the Committee and set forth as **Exhibit 7** in the Plan Supplement.

## ARTICLE 4
## CLASSIFICATION OF CLAIMS AND TREATMENT

## A.    Classes of Claims

As required by the Bankruptcy Code, the CNA Plan does not treat each Claim individually but rather categorizes Claims into classes. The vast majority of Claims have been placed in one of six separate Classes, with some Claims left unclassified, as the Bankruptcy Code requires. Treatment of a Claim depends on which class it is in. Abuse Claims are in Class 4.

The separate Classes are described in detail within this Disclosure Statement and in the CNA Plan, including whether each Class of Claims is Impaired or Unimpaired and whether such Class is entitled to vote.

- 33 -

| Class | Class Designation | Impaired | Entitled to Vote |
|-------|-------------------|----------|------------------|
| N/A | Administrative Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | U.S. Trustee Fee Claims | No | Does Not Vote |
| 1 | Secured Claim of The Bank of Castile | No | Deemed to Accept |
| 2 | Pass-Through Claims | No | Deemed to Accept |
| 3 | General Unsecured Claims | Yes | Entitled to Vote |
| 4 | Abuse Claims | Yes | Entitled to Vote |
| 5 | Inbound Contribution Claims | Yes | Deemed to Reject |
| 6 | Insurer Claims | Yes | Entitled to Vote |

1.      **Treatment of Unclassified Claims**

        The following summarizes the treatment of certain unclassified Claims, which are described in more detail in Section 2.1 of the CNA Plan. The Plan Proponent anticipates these unclassified Claims will be paid in full on the Effective Date or an appropriate date thereafter, other than the CNA Administrative Claim, which will be withdrawn as of the Effective Date of the CNA Plan.

        *a.      Administrative Claims.* Administrative Claims are Claims for costs or expenses incurred during the administration of the Diocese's Chapter 11 Case, which are Allowed pursuant to § 503(b) of the Bankruptcy Code. Unless the holder of an Allowed Administrative Claim agrees to accept different, less favorable treatment than provided under the CNA Plan, or by order of the Bankruptcy Court, Allowed Administrative Claims will be paid in full on the Effective Date or an appropriate date thereafter.

        The CNA Administrative Claim is an Administrative Claim arising out of the Diocese's earlier breach of its previous settlement with CNA for $63.5 million. If the CNA Plan is confirmed, the CNA Administrative Claim shall be deemed withdrawn as of the Effective Date.

        *b.      Priority Tax Claims.* Priority Tax Claims are Claims for certain taxes owed to the government. Unless the holder of a Priority Tax Claim agrees to accept different, less favorable treatment than provided under the CNA Plan, or by order of the Bankruptcy Court, Allowed Priority Tax Claims will be paid in full on the Effective Date or an appropriate date thereafter.

        *c.      Non-Tax Priority Claims.* The Plan Proponent understands that the Diocese does not anticipate that any unpaid Non-Tax Priority Claims will exist as of the Effective Date. In any event, the Trust shall not be responsible for Non-Tax Priority Claims. Unless the holder of a Non-Tax Priority Claim agrees to accept different, less favorable treatment than

- 34 -

SFACTIVE-907468414.5

provided under the CNA Plan, or by order of the Bankruptcy Court, any Allowed Non-Tax Priority Claims will be paid in full on the Effective Date or an appropriate date thereafter.

        **d.**     ***Professional Fee Claims.***  Professional Fee Claims are Claims by Professionals employed by the Diocese or by the Committee and incurred prior to the Effective Date. Professional Fee Claims of Professionals employed by the Committee may be paid by the Diocese or the Reorganized Diocese, after notice and a hearing, or by the Trust from contributions by the Diocese or the Reorganized Diocese in addition to the amounts payable to Abuse Claimants under the CNA Plan. Professional Fee Claims of Professionals employed by the Diocese for services rendered prior to the Effective Date shall not be paid by the Trust. Professionals or other Persons requesting Professional Fee Claims must obtain the approval of the Bankruptcy Court and shall be paid in full, in Cash, by the Reorganized Diocese (i) as soon as practicable after the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order or (ii) upon such terms as may exist pursuant to order of the Bankruptcy Court or as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Diocese or the Reorganized Diocese, as applicable.

        **e.**     ***U.S. Trustee Fees.***  U.S. Trustee Fees include all fees and charges assessed against the Diocese under 28 U.S.C. § 1930, together with interest, if any, under 31 U.S.C. § 3717. All U.S. Trustee Fees shall be paid by the Reorganized Diocese on the Effective Date.

    2.     <u>**Classified Claims**</u>

        The Claims are classified into six classes. Classes that are unimpaired under the CNA Plan are deemed to accept it and are not entitled to vote. Classes that are impaired under the CNA Plan, including Class 4 Abuse Claims, are entitled to vote to accept or reject the CNA Plan.

        **a.**     ***Class 1 – Secured Claim of The Bank of Castile***

        **Definition:** Class 1 consists of the Secured Claim held by The Bank of Castile in connection with the Standby Letter of Credit.

        **Unimpaired and Not Voting:** Class 1 is Unimpaired, and therefore, the holder of the Class 1 Claim is deemed to have accepted the CNA Plan and is not entitled to vote.

        **Treatment:** The Diocese is current with respect to all obligations due under the Standby Letter of Credit and will continue to pay those obligations in accordance with the terms of the Standby Letter of Credit. The Trust shall not be responsible for the payment of the Class 1 Claim.

        **b.**     ***Class 2 – Pass-Through Claims.***

        **Definition:** Class 2 consists of all Pass-Through Claims.

- 35 -

**Unimpaired and Not Voting:** Class 2 is Unimpaired, and therefore, holders of Class 2 Claims are deemed to have accepted the CNA Plan and are not entitled to vote.

**Treatment:** Upon the later to occur of the Effective Date and the date on which the Diocese designates a Claim as a Pass-Through Claim, the holder of such Pass-Through Claim shall be deemed to have granted relief from the automatic stay with respect to its Pass-Through Claim, such Pass-Through Claim shall not be subject to the Diocese Discharge, and the parties shall retain their respective rights, remedies, claims, and defenses as they existed on the Petition Date. The Diocese shall designate all Pass-Through Claims no later than sixty days after the Effective Date. The Trust shall not be responsible for the payment of any Pass-Through Claims.

### c. Class 3 – General Unsecured Claims.

**Definition:** Class 3 consists of all General Unsecured Claims.

**Impaired and Voting:** Class 3 is Impaired, and therefore, holders of Class 3 Claims are entitled to vote.

**Treatment:** Unless the holder of an Allowed General Unsecured Claim agrees in writing to accept less favorable treatment, the Reorganized Diocese shall pay, to each holder of an Allowed General Unsecured Claim, Cash in two installments each equal to 50% of the Allowed amount of such General Unsecured Claim, as set forth in the CNA Plan. The Trust shall not be responsible for payment of General Unsecured Claims.

The foregoing payments to Class 3 Claimants shall be in full satisfaction, settlement, and release of, and in exchange for, such Allowed General Unsecured Claim. Notwithstanding anything to the contrary set forth above, no payments shall be made to any Protected Party on account of any General Unsecured Claim, and all Protected Parties shall be deemed to have withdrawn any General Unsecured Claim with prejudice as of the Effective Date in consideration of the Channeling Injunction and Release provided in the CNA Plan.

**Voting:** Class 3 General Unsecured Claims are Impaired, and therefore, each holder of a Class 3 Claim is entitled to vote to accept or reject the CNA Plan.

### d. Class 4 – Abuse Claims.

**Definition:** Class 4 consists of all Abuse Claims.

**Impaired and Voting:** Class 4 is Impaired, and therefore, holders of Class 4 Abuse Claims are entitled to vote. For purposes of voting only, each Class 4 Claim is deemed to be Allowed in the amount of $1.00.

**Treatment of Abuse Claims:** On the Effective Date and subject to the provisions of the CNA Plan, the Trust shall be authorized to pay all Abuse Claims on a fair and equitable basis in accordance with the Allocation Protocol and Plan Documents, as promptly as

- 36 -

practicable following the Effective Date. Class 4 Claims shall be satisfied solely from the Trust as set forth in the CNA Plan, the Trust Agreement, and the Allocation Protocol.

Class 4 Abuse Claims will be evaluated by the Abuse Claims Reviewer, who will evaluate the Abuse Claims pursuant to the provisions of the Allocation Protocol. After the Abuse Claim Reviewer determines the eligibility and point total of an Abuse Claim, the Trustee will use the Abuse Claim Reviewer's determinations to make a Trust Settlement Offer to each Survivor of an amount to fully resolve his or her Abuse Claim. Unlike under the Diocese Plan, the Trust Settlement Offer will consist of the full Distribution each Survivor is owed from the Trust, without the need for additional litigation to determine the Diocese's liability and, then, insurance coverage obligations.

If a Survivor accepts the Trust Settlement Offer, then the Survivor has a Trust Claim and will receive prompt, complete, and final compensation in the form of a Distribution in the amount of the Trust Settlement Offer. The rights of Survivors with Trust Claims to a trial by jury are waived and released.

If a Survivor rejects the Trust Settlement Offer, then the Survivor has a Tort Claim and may pursue litigation, at his or her own expense, against the Diocese or any Participating Party as a defendant, for the sole purpose of adjudicating whether the Diocese or Participating Party has liability for the Survivor's Abuse Claim and the amount of any such liability, with the amount of his or her Trust Settlement Offer held in reserve until the Survivor's Tort Claim is resolved by a Final Judgment. Following entry of Final Judgment:

    (1)    If the amount of the Final Judgment is less than or equal to the amount of the Trust Settlement Offer, the Trustee shall promptly pay to the Tort Claimant the amount of the Final Judgment as full and final satisfaction of the Tort Claim. In such case, the difference between the rejected Trust Settlement Offer and the amount of the Final Judgment shall not be paid to the Tort Claimant but, instead, shall be transferred to the Payment Reserve to pay Excess Recovery Amounts.

    (2)    If the amount of the Final Judgment is greater than the amount of the Trust Settlement Offer, the Trustee shall promptly pay to the Tort Claimant the amount of the Trust Settlement Offer.

    (3)    After all Tort Claims are resolved by Final Judgments, the Trustee shall promptly pay to each Tort Claimant, from the Payment Reserve, the amount of his or her Final Judgment that is in excess of the Trust Settlement Offer (the "Excess Recovery Amount"); provided, that to the extent all Excess Recovery Amounts cannot be paid in full from the Payment Reserve, then the Trustee shall calculate and pay only each Tort Claimant's pro rata share of his or her respective Excess Recovery Amount.

    (4)    If a court enters Final Judgment determining that the Diocese and/or Participating Party (as applicable) does not have any liability on account of the Tort

Claimant's Tort Claim, then the Tort Claimant shall not be entitled to any Distribution from the Trust, including any Trust Settlement Offer, in which event the funds reserved to pay that Tort Claimant's Trust Settlement Offer shall be transferred to the Payment Reserve to pay Excess Recovery Amounts.

If a Class 4 Abuse Claim is denied payment, in whole or in part, then the holder of such Class 4 Claim will have no rights against any of the Protected Parties relating to such Class 4 Claim.

The Trust shall fund the Trust Reserve, the Payment Reserve, and the Unknown Abuse Claim Reserve as set forth in the CNA Plan. The total amount of these reserves is expected to be no more than $1.35 million, as described above on page 6. Otherwise, all proceeds of the Trust shall be distributed to holders of Abuse Claims, including both Trust Claims and Tort Claims, on a fair and equitable basis.

**Release of Claims:** In order to receive a Distribution from the Trust, all Class 4 Claimants must execute and deliver to the Trust an Abuse Claim Release Agreement, which will be attached to the Plan Supplement as **<u>Exhibit 2</u>**, releasing all Claims against the Protected Parties. For the avoidance of doubt, nothing herein shall require a Survivor to release any Person that is not a Protected Party.

**Rights Against Joint Tortfeasors Preserved:** Nothing in the CNA Plan affects, diminishes, or impairs any Survivor's rights against any Joint Tortfeasor, including for that Joint Tortfeasor's comparative fault or joint and several liability for Abuse, if any. In any litigation against a Joint Tortfeasor, nothing in the CNA Plan or the Plan Documents shall be deemed an adjudication of a Class 4 Claim for any purpose or a limitation on the recovery against such Joint Tortfeasor.

**Abuse Claims Channeled to the Trust:** All liability for all Class 4 Abuse Claims shall be permanently channeled to and assumed by the Trust.

**Limited Exception to Preserve Insurance Rights:** Notwithstanding anything else in the CNA Plan, all rights and obligations of Non-Settling Insurers shall be fully preserved and in no way affected, diminished, or impaired. As of the date of the filing of the CNA Plan, CNA is not aware of the existence of any Non-Settling Insurers.

**Punitive or Exemplary Damages Disallowed:** Any Claims for punitive or exemplary damages will be Disallowed and will not be paid by the Trust.

**Cooperation by the Diocese:** The Diocese must cooperate with the Abuse Claims Reviewer and/or the Trustee in connection with the administration of the Allocation Protocol. The Diocese's costs of cooperating will be paid in accordance with the DOR Entities' Post-Effective Date Costs Procedures.

**Claim Objections:**  After the Effective Date, no Entity, other than the Trustee or a Non-Settling Insurer, may (a) object to any Class 4 Claim or (b) challenge the merit, validity, or amount of any Class 4 Claim, except that the Diocese or a Participating Party may assert legal or factual defenses in response to any Tort Claim.  Any objection or challenge to a Class 4 Claim pending as of the Effective Date is deemed withdrawn and shall not be refiled.

### e.    Class 5 – Inbound Contribution Claims.

**Definition:**  Class 5 Inbound Contribution Claims consist of any Claim asserted against the Diocese for indemnity, contribution, or reimbursement arising out of, or related to, the Class 5 Claimant's liability to pay or defend any Abuse Claim.

**Impaired and Not Voting:**  Class 5 Inbound Contribution Claimants will not receive or retain any property under the CNA Plan and therefore are deemed to have rejected the CNA Plan.  Class 5 will not vote on the CNA Plan.

**Treatment:**  Class 5 Claims shall be Disallowed and extinguished and there will be no Distributions to the holders of Class 5 Claims on account of such Class 5 Claims.

### f.    Class 6 – Insurer Claims.

**Definition:**  Class 6 Insurer Claims consist of unsecured Claims by CNA against the Diocese arising out of the Diocese's breach of the 2022 Insurance Settlement Agreement with CNA, to the extent such Claims are deemed not to be unclassified Administrative Claims.

**Impaired and Voting:**  Class 6 is Impaired, and therefore, CNA is entitled to vote.  Only for purposes of voting, CNA's Class 6 Claim is deemed to be Allowed in the amount of $1.00.

**Treatment:**   If the CNA Plan is confirmed, then CNA agrees to withdraw its Class 6 Insurer Claim on the Effective Date.

## ARTICLE 5
## ALTERNATIVES TO THE PLAN

The Plan Proponent believes the CNA Plan is in the best interests of the Creditors and should, accordingly, be accepted and confirmed.  However, there are alternatives to the CNA Plan.

## A.    Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code

One alternative is the Diocese Plan.  The Diocese Plan would establish a compensation fund of $126.35 million in cash and would also assign to the Trust the right to pursue certain insurance claims against CNA.

- 39 -

The value of the insurance claims against CNA under the Diocese Plan is uncertain. The Diocese Plan provides for up to 38 Stipulated Judgments to be entered into by Survivors and the Diocese. The Diocese apparently believed that such Stipulated Judgments would be a means of increasing the amount of the Trust under the Diocese Plan. However, the Bankruptcy Court in this Chapter 11 Case has stated that Stipulated Judgments will not be approved. *See* Decision and Order, Dkt. No. 2461, at 3 (¶ 8). Thus, Stipulated Judgments will not be available to increase the amount of the Trust under the Diocese Plan.

The Diocese Plan would also allow some claimants to become Litigation Claimants, with the Trust's permission. The Diocese apparently believes that such Litigation Claims would be another means of increasing the amount of the Trust under the Diocese Plan. However, Litigation Claims are of uncertain value and timing:

First, it is unclear how many Litigation Claims the Trust would permit.

Second, the criteria the Trust would use to determine whether to permit Litigation Claims is not disclosed in the Diocese Plan.

Third, it appears that only those Survivors who suffered abuse during CNA policy periods, alleged to be approximately 1952 to 1977, would be potentially eligible to become Litigation Claimants asserting Litigation Claims.

Fourth, the value and timing of Litigation Claims depend on the outcome of two post-bankruptcy litigation proceedings. Pursuant to the Litigation Claims protocol in the Diocese Plan, a Litigation Claimant will first pursue a lawsuit at his or her own expense for the purpose of establishing the Diocese's and/or a Participating Party's liability for the Abuse. Establishing liability may require responding to discovery (including giving sworn testimony in a pretrial deposition) and then testifying at a trial. It also may take months or years to schedule a trial date and try the case. The Pachulski law firm, which represents the Committee in this bankruptcy case, has acknowledged this timeline in urging survivors in the *Diocese of Rockville Centre* case to vote against the diocese's plan there. Official statistics issued by the relevant court systems likewise suggest that it will take a long time for any such cases to proceed to trial. The New York State Unified Court System has published data showing that during 2022, only 17 civil cases went to verdict in the state trial court in Monroe County, which includes Rochester. By comparison, over 3,600 new civil cases were filed in Monroe County during 2022. The Federal Judicial Center published data indicating that, during the 12-month period ending June 30, 2023, the most recent period for which such information is available, the U.S. District Court for the Western District of New York (which includes the federal courts in both Rochester and Buffalo) conducted only five civil trials. The statistics do not disclose how long it took for those cases to come to trial, but for matters terminated during or after pretrial, the average time to resolution was 25.3 months (slightly more than two years). It is reasonable to expect that it would take even longer for cases to come to trial, particularly considering the small number of civil cases coming to trial. By way of comparison, the time for civil cases

to come to trial in other federal courts in the Second Circuit (New York, Connecticut, and Vermont) during the same time period ranged from 39.2 months in the District of Connecticut to 67.0 months in the Eastern District of New York. Thus, a Survivor choosing a litigation option under the Diocese Plan can expect, given the small number of civil cases tried and the above statistical information, that his or her case may not come to trial for 3-½ to 5-½ years from the end of the Diocese's bankruptcy, and possibly even later.

In the first lawsuit, the Diocese may contest both liability and damages. Which defenses are asserted would depend on the facts of the case, but could include, without limitation, some or all of the following:

- The Abuse did not occur as alleged;

- The Abuse was not foreseeable by the Diocese or Participating Party because the alleged perpetrator had no previous history of committing Abuse;

- Any injury from the Abuse was caused by superseding and intervening culpable conduct of others;

- The Abuse as alleged does not satisfy the statutory requirements to revive the claim under the Child Victims Act;

- The Diocese or Participating Party had no control over, or responsibility for, the perpetrator's acts (for example, if the perpetrator was not a Catholic priest and was not affiliated with a diocesan school or facility);

- The Diocese or Participating Party shared liability for the Abuse with others, such that any liability of the Diocese or Participating Party is limited to its equitable share of total liability as provided by Article 16 of New York's Civil Practice Rules;

- The Survivor was previously compensated and/or previously released his or her Abuse Claim;

- The Survivor's proof of claim was not filed before the Bar Date;

- The amount of the damages suffered by the Survivor is less than alleged in the complaint or proof of claim.

In the second lawsuit under the Diocese Plan, the Trust would pursue payment from CNA under its alleged insurance policies of the amount of any judgment entered on account of the Litigation Claim. Any potential recovery from CNA would be capped at the amount of the judgment in favor of the Litigation Claimant in the first lawsuit. In the second lawsuit, CNA would have the right to assert coverage defenses. Depending on the facts established in the first

- 41 -

lawsuit and those developed during any insurance litigation, CNA's coverage defenses could include, without limitation, the following:

- The Diocese and/or Participating Party cannot establish that certain of the alleged insurance policies, for which neither the Diocese nor CNA have been able to locate complete copies, were in fact ever issued;

- The Diocese and/or Participating Party cannot establish the terms and conditions of certain of the insurance policies, for which neither the Diocese nor CNA have been able to locate complete copies;

- Certain of the Participating Parties may not be entitled to coverage under certain of the insurance policies issued to the Diocese;

- The Diocese failed to comply with conditions precedent to coverage under the insurance policies, including the requirement that it provide prompt notice of the claim and/or the occurrence, the requirement that the Diocese cooperate with CNA in the defense of any claims, and the requirement that the Diocese avoid agreeing to voluntary obligations;

- The Diocese knew that the perpetrator had a history of Abuse and, therefore, the injury was not caused by an accident, was not fortuitous, or was expected or intended from the standpoint of the Diocese and/or Participating Party;

- The injury either does not qualify as "bodily injury" within the meaning of the alleged insurance policies, or any "bodily injury" did not occur during the policy period of any of the CNA policies;

- Any recovery is limited by the applicable limits of liability in any CNA policies that are proven; and

- All acts of Abuse to which a particular Survivor was subjected constitute a single "occurrence" for purposes of applying policy limits of liability.

The Committee has asserted that CNA has waived some or all of its coverage defenses. CNA disputes the Committee's position, and believes that there is no New York court decision that definitively addresses the issue. Litigating these coverage issues is likely to take months or years.

The Committee also disputes whether the coverage defenses enumerated above, or other defenses or issues, would be successful if asserted by CNA. In particular, the Committee argues that defenses based on late notice or the assertion that the Diocese expected or intended the harm to a Survivor would be unlikely to succeed, and that a court could find that a Survivor is entitled to be paid up to CNA's full policy limits in a particular period for each separate incident

- 42 -

of abuse. Based on its arguments, the Committee asserts that CNA's exposure is much larger than its proposed contribution of $75 million.

CNA disputes the Committee's positions and contends that it is likely to succeed on some or all of its defenses, depending on the facts of any particular case. Further, determination of these issues is likely to take years. CNA notes that the Diocese, in asking the Bankruptcy Court to approve a smaller, $63.5 million settlement with CNA, argued that coverage issues such as those discussed above "are multifaceted and many may be matters of first impression in this Court and under New York law" and that "[a]ny such litigation, including potential appeals, would significantly delay the Diocese's restructuring efforts (and hence, the Diocese's ability to compensate survivors) likely by several years if not decades."

Pursuing and prevailing in two separate lawsuits, one to establish liability and the second to establish coverage, is likely to require the personal involvement of those Survivors who choose to pursue such court cases and take many years to conclude, with no guarantee of higher recoveries for Survivors or other Creditors. For these reasons, the Plan Proponent does not believe the Diocese Plan is a preferable alternative to the CNA Plan, from the standpoint of certain Survivors. Each Survivor will have to decide for himself or herself whether the CNA Plan or the Diocese Plan better serves their personal best interests.

## B.    Dismissal of the Chapter 11 Case

If the CNA Plan is not confirmed, the Diocese or another party in interest may seek to dismiss the Chapter 11 Case. After appropriate notice and a hearing, the Bankruptcy Court could grant the request and dismiss the Chapter 11 Case. Dismissal of the Chapter 11 Case would have the effect of restoring, or attempting to restore, all parties to the position they were in immediately prior to the Petition Date.

Upon dismissal of the Chapter 11 Case, the protections afforded to the Diocese by the Bankruptcy Code would be lost, likely resulting in the expensive and time-consuming process of protracted litigations between the Diocese and individual Survivors and between the Diocese and its Insurers. In addition to the expense and delay, the Plan Proponent believes that these actions could lead to an inequitable recovery for Abuse Claimants, with the first Survivors to obtain and enforce judgments against the Diocese depleting the Diocese's assets, including the limits of its insurance coverage, and resulting in insufficient assets and insurance to satisfy later judgments. Therefore, the Plan Proponent believes that dismissal of the Diocese's Chapter 11 Case is not a preferable alternative to confirming the CNA Plan.

## C.    Chapter 7 Liquidation Is Not a Viable Alternative

Pursuant to 11 U.S.C. § 1112(c), if a debtor is "not a moneyed corporation," a debtor's Chapter 11 case cannot be converted to a Chapter 7 case without the debtor's consent. The Diocese, as a non-profit entity, is not a moneyed corporation, and cannot be forced to convert its Chapter 11 Case to a Chapter 7 case. Further, the Plan Proponent estimates that recoveries

for Survivors holding Class 4 Abuse Claims will be greater under the CNA Plan than in liquidation under Chapter 7 of the Bankruptcy Code because the total amount of assets available for Distribution is greater under the CNA Plan than in liquidation under Chapter 7, and because theoretical Distributions under a Chapter 7 case would likely be delayed. Thus, conversion to Chapter 7 is not a viable alternative to the CNA Plan.

**D.**     **Appointment of a Chapter 11 Trustee is Not a Viable Alternative**

As a result of limitations imposed by the First Amendment to the United States Constitution and the federal Religious Freedom and Restoration Act, a Chapter 11 trustee cannot be appointed to replace the Bishop's administration of the Diocese.

**ARTICLE 6**
**EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE**

Under the CNA Plan, the Diocese will receive a discharge and the benefit of an injunction under the Bankruptcy Code, and the Diocese, Participating Parties, Settling Insurers, and their respective Protected Parties will receive the benefit of a channeling injunction applicable to Abuse Claims, which channels all Abuse Claims to the Trust. There is also a Supplemental Settling Insurer Injunction to protect insurance assets, if any, provided by Non-Settling Insurers. The full text of the injunctions is set forth below.

**A.**     **General Injunction and Discharge**

1.     *General Injunction.* **EXCEPT WITH RESPECT TO ABUSE CLAIMS AND INBOUND CONTRIBUTION CLAIMS ADDRESSED IN SECTION 12.2 OF THE PLAN, OR AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE DIOCESE, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY PARTICIPATING PARTY, OR THE DIOCESE'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING**

- 44 -

OUT OF NON-ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN §§ 502(G), 502(H), AND 502(I) OF THE BANKRUPTCY CODE, WHETHER OR NOT (A) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER § 501 OF THE BANKRUPTCY CODE, (B) SUCH CLAIM IS ALLOWED UNDER THE PLAN, OR (C) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ARE PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE, FROM (W) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (X) THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM, (Y) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM AND (Z) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DIOCESE OR THE REORGANIZED DIOCESE OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM.

2.  *General Discharge.* Except as otherwise expressly provided in the CNA Plan or in the Confirmation Order, on the Effective Date, pursuant to § 1141(d) of the Bankruptcy Code, the Diocese, the Estate, and the Reorganized Diocese will be discharged from all liability for any and all Claims other than Abuse Claims.

**B.    Injunction and Discharge of Abuse Claims and Inbound Contribution Claims.**

1.  *Injunction of Abuse Claims and Inbound Contribution Claims.* **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 12.2.2 OF THE PLAN OR IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE ALL PERSONS SHALL BE PERMANENTLY STAYED, ENJOINED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE AGAINST THE DIOCESE, THE REORGANIZED DIOCESE, OR ANY PARTICIPATING PARTY, ANY ABUSE CLAIMS**

- 45 -

OR INBOUND CONTRIBUTION CLAIMS, KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY PARTICIPATING PARTY, OR THE DIOCESE'S OR ANY PARTICIPATING PARTY'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN §§ 502(G), 502(H), AND 502(I) OF THE BANKRUPTCY CODE, WHETHER OR NOT (A) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER § 501 OF THE BANKRUPTCY CODE, (B) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (C) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN.

IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.

THE DISCHARGE AND INJUNCTIONS CONTAINED IN THE PLAN AND THE RELEASES PROVIDED UNDER THE PLAN DO NOT RELEASE OR IMPAIR AN ABUSE CLAIMANT'S RIGHT TO RECOVER ON ANY ABUSE CLAIM AGAINST (Y) ANY PERPETRATOR OF ABUSE FOR ACTS OF ABUSE THAT ARE INDEPENDENT OF THE LIABILITY OF THE DIOCESE OR ANY PARTICIPATING PARTY OR (Z) ANY JOINT TORTFEASOR.

2. ***Discharge of Diocese.*** Except as otherwise expressly provided in the CNA Plan or Confirmation Order, on the Effective Date, pursuant to § 1141(d) of the Bankruptcy Code, the Diocese, the Estate, the Reorganized Diocese, and the Participating Parties will be discharged from all liability for any and all Abuse Claims and Inbound Contribution Claims.

- 46 -

3.    ***Preservation of Insurance Claims.*** The Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the fact that the Diocese is in bankruptcy. For the avoidance of doubt, determinations by the Abuse Claims Reviewer and/or any Distributions entitled to be received from the Trust shall not constitute a determination of the Diocese's and/or any Participating Party's liability for Abuse Claims, but nothing herein shall affect, diminish, or impair a Non-Settling Insurer's right to offset amounts an Abuse Claimant receives as a Trust Distribution. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Abuse Claims. Any such recoveries by the Trust from Non-Settling Insurers will be added to the Abuse Claims Settlement Fund to be distributed pursuant to the terms of the Allocation Protocol and the CNA Plan. Nothing in the CNA Plan shall be deemed to modify or abridge any rights of the Non-Settling Insurers under their respective Non-Settling Insurer Policies except to the extent consistent with the provisions of the Bankruptcy Code or other applicable law.  As noted above, CNA is presently not aware of the existence of any Non-Settling insurers.

C.    **Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties.**

**IN CONSIDERATION OF THE UNDERTAKINGS OF THE PROTECTED PARTIES HEREIN, THEIR CONTRIBUTIONS TO THE TRUST, AND OTHER CONSIDERATION AND, WHERE APPLICABLE, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE DIOCESE AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE PROTECTED PARTIES, AND TO SUPPLEMENT WHERE NECESSARY THE INJUNCTIVE EFFECT OF THE DISCHARGE AS PROVIDED IN §§ 524 AND 1141 OF THE BANKRUPTCY CODE, AND PURSUANT TO §§ 105, 363, AND 1123 OF THE BANKRUPTCY CODE:**

(a) **ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE AMOUNTS ESTABLISHED UNDER THIS PLAN AND THE TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS.**

(b) **ALL PERSONS WHO HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING OR ATTEMPTING TO**

- 47 -

ASSERT OR ENFORCE ANY CHANNELED CLAIMS AGAINST THE PROTECTED PARTIES, INCLUDING:

(i) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES OR AGAINST THE PROPERTY OF ANY OF THE PROTECTED PARTIES;

(ii) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, BY ANY MANNER OR MEANS, FROM ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES, ANY JUDGMENT, AWARD, DECREE, OR ORDER WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES;

(iii) CREATING, PERFECTING, OR ENFORCING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, ANY LIEN OF ANY KIND RELATING TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF THE PROTECTED PARTIES;

(iv) ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST:

1. ANY OBLIGATION DUE ANY OF THE PROTECTED PARTIES;

2. ANY OF THE PROTECTED PARTIES; OR

3. THE PROPERTY OF ANY OF THE PROTECTED PARTIES.

(c) TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THIS PLAN; AND

(d) ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION, OR RECOUPMENT OF ANY KIND AGAINST AN OBLIGATION DUE TO ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES.

**THE CHANNELING INJUNCTION IS AN INTEGRAL PART OF THIS PLAN AND IS ESSENTIAL TO THE PLAN'S CONSUMMATION AND IMPLEMENTATION. IT IS INTENDED THAT THE CHANNELING OF THE CHANNELED CLAIMS AS PROVIDED IN THIS SECTION 12.3 OF THE PLAN SHALL INURE TO THE BENEFIT OF THE PROTECTED PARTIES. IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.**

1. ***Limited Exception to Injunctions.*** The injunctions set forth in Sections 12.2.1 and 12.3 of the CNA Plan (and set forth above) shall not prevent the prosecution of (a) Tort Claims pursued by a Tort Claimant at the Tort Claimant's expense against the Diocese or any Participating Party, to the limited extent authorized by Section 4.4.1 of the CNA Plan, (b) Inbound Contribution Claims pursued by a Non-Settling Insurer against the Diocese or any Participating Party, or (c) Insurance Claims pursued by the Trustee on behalf of Abuse Claimants against Non-Settling Insurers.

    Notwithstanding anything to the contrary herein, all collection efforts against any Protected Party shall be permanently enjoined and (a) any Final Judgment entered on a Tort Claim or recovery on account of an Inbound Contribution Claim shall be enforceable solely against the Trust and (b) any recovery on an Insurance Claim shall be enforceable solely against the Non-Settling Insurer by the Trust.

**D.     Supplemental Settling Insurer Injunction.**

**PURSUANT TO §§ 105, 363, 1123, AND 1129 OF THE BANKRUPTCY CODE, AND IN CONSIDERATION OF THE UNDERTAKINGS OF THE SETTLING INSURERS PURSUANT TO THE INSURANCE SETTLEMENTS, INCLUDING THE SETTLING INSURERS' PURCHASES OF THEIR SETTLING INSURER POLICIES FREE AND CLEAR OF ALL CLAIMS PURSUANT TO § 363(f) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ANY AND ALL PERSONS WHO HAVE HELD, NOW HOLD, OR WHO MAY IN THE FUTURE HOLD ANY CLAIMS (INCLUDING ALL DEBT HOLDERS, ALL EQUITY HOLDERS, ALL PERSONS HOLDING A CLAIM, GOVERNMENTAL, TAX AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, PERPETRATORS, AND ALL OTHERS HOLDING INTERESTS OF ANY KIND OR NATURE WHATSOEVER, INCLUDING THOSE CLAIMS**

- 49 -

SFACTIVE-907468414.5

RELEASED OR TO BE RELEASED PURSUANT TO THE INSURANCE SETTLEMENTS) AGAINST ANY OF THE SETTLING INSURERS, INCLUDING (A) CLAIMS RELATING TO THE SETTLING INSURER POLICIES, INCLUDING ABUSE CLAIMS, INBOUND CONTRIBUTION CLAIMS, AND INSURER CONTRIBUTION CLAIMS, (B) THE PAYMENT OF ANY OF THE CLAIMS IDENTIFIED IN (A), INCLUDING MEDICARE CLAIMS, AND (C) EXTRA-CONTRACTUAL CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, TO ASSERT, ENFORCE OR ATTEMPT TO ASSERT OR ENFORCE ANY SUCH CLAIM OR INTEREST AGAINST THE SETTLING INSURERS OR THE SETTLING INSURER POLICIES.

THE SUPPLEMENTAL SETTLING INSURER INJUNCTION WILL BE EFFECTIVE WITH RESPECT TO A SETTLING INSURER ONLY AS OF THE DATE THAT THE TRUST RECEIVES THE INSURANCE SETTLEMENT AMOUNT PURSUANT TO THE TERMS OF THE APPLICABLE INSURANCE SETTLEMENT. THIS SUPPLEMENTAL SETTLING INSURER INJUNCTION BARS THE ABOVE-REFERENCED ACTIONS AGAINST THE SETTLING INSURERS AND THE SETTLING INSURER POLICIES, BUT AGAINST NO OTHER PERSON OR THING; _PROVIDED, HOWEVER_, NOTHING IN THIS SUPPLEMENTAL SETTLING INSURER INJUNCTION SHALL LIMIT, OR BE DEEMED OR OTHERWISE INTERPRETED TO LIMIT, THE SCOPE OF THE DISCHARGE OR CHANNELING INJUNCTION IN FAVOR OF THE PROTECTED PARTIES, INCLUDING THE SETTLING INSURERS. THE FOREGOING INJUNCTIVE PROVISIONS ARE AN INTEGRAL PART OF THE PLAN AND ARE ESSENTIAL TO ITS IMPLEMENTATION.

E.  **Litigation/Settlement Between a Participating Party or Abuse Claimant and Non-Settling Insurers.**

The Channeling Injunction shall channel all Inbound Contribution Claims, including Insurer Contribution Claims, to the Trust. If a Non-Settling Insurer asserts an Insurer Contribution Claim, (a) such Non-Settling Insurer may only recover on its Insurer Contribution Claim against the Trust, and the Trust may assert the legal or equitable rights (if any) of the Settling Insurer in defense of the claim, and (b) to the extent such Insurer Contribution Claim is determined to be valid, the liability (if any) of such Non-Settling Insurer to the Trust shall be reduced by the amount of such Insurer Contribution Claim.

F.  **Certain Litigation Matters.**

Upon the occurrence of the Effective Date, the Claim Objections, the Appeal, and the Prior Rule 9019 Approval Motion shall be deemed withdrawn with prejudice.

- 50 -

SFACTIVE-907468414.5

G.      **Injunction Against Interference with Plan.**

Upon entry of the Confirmation Order, all holders of Claims shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the CNA Plan.

H.      **Release by Holders of Claims.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, AS OF THE EFFECTIVE DATE, ALL HOLDERS OF CLAIMS, INCLUDING ABUSE CLAIMS (THE "RELEASING PARTIES"), SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE PROTECTED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING TO THE DIOCESE, THE PARTICIPATING PARTIES, THE ESTATE, THE CONDUCT OF THE DIOCESE'S AND THE PROTECTED PARTIES' BUSINESSES, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THIS PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THIS PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AMONG THE RELEASING PARTIES AND ANY RELEASED PARTY, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE.**

**FOR THE AVOIDANCE OF DOUBT, SUBJECT TO THE LIMITATIONS SET FORTH IN THE PLAN, A TORT CLAIMANT OR THE TRUST MAY NAME THE DIOCESE OR ANY PARTICIPATING PARTY IN A CASE OR PROCEEDING TO ADJUDICATE WHETHER THE DIOCESE OR ANY PARTICIPATING PARTY HAS LIABILITY FOR AN ABUSE CLAIM AND THE AMOUNT OF ANY SUCH LIABILITY, BUT RECOURSE SHALL BE LIMITED TO THE TRUST OR TO THE PROCEEDS OF ANY NON-SETTLING INSURER POLICIES AND ALL OTHER COSTS AND/OR DAMAGES THAT MAY BE RECOVERABLE AGAINST ANY NON-SETTLING INSURERS BY THE TRUST, AS APPLICABLE.**

- 51 -

I. __Mutual Releases.__

EXCEPT FOR OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED AND ASSIGNED TO THE REORGANIZED DIOCESE AND OBLIGATIONS ARISING UNDER THE PLAN, ON THE EFFECTIVE DATE, EACH OF THE PROTECTED PARTIES, THE TRUST, AND EACH ABUSE CLAIMANT SHALL BE DEEMED TO WAIVE, RELEASE, AND DISCHARGE ANY AND ALL CLAIMS AND CAUSES OF ACTION OF EVERY KIND AND NATURE THAT THEY MAY HAVE AGAINST EACH OTHER, AND THEIR RESPECTIVE RELATED PERSONS, EXCEPT THAT ABUSE CLAIMANTS SHALL NOT WAIVE THEIR RIGHTS TO DISTRIBUTIONS UNDER THE TRUST IN ACCORDANCE WITH THE TRUST AGREEMENT AND THE ALLOCATION PROTOCOL.

J. __Exculpation; Limitation of Liability.__

FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR, AND EACH EXCULPATED PARTY SHALL BE RELEASED FROM, ANY CLAIM BY ANY OTHER EXCULPATED PARTY, BY ANY HOLDER OF A CLAIM, OR BY ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION THAT OCCURRED DURING AND IN CONNECTION WITH THIS CHAPTER 11 CASE OR IN CONNECTION WITH THE PREPARATION AND FILING OF THIS CHAPTER 11 CASE, THE FORMULATION, NEGOTIATION, OR PURSUIT OF CONFIRMATION OF A PLAN, THE CONSUMMATION OF THIS PLAN, AND THE ADMINISTRATION OF THIS PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THIS PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF COMPETENT JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO ITS DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THIS PLAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE DIOCESE, THE REORGANIZED DIOCESE AND THEIR RESPECTIVE OFFICERS, TRUSTEES, BOARDS, EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, EXPERTS, EXPERT WITNESSES, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED BENEFITS OF § 1125(e) OF THE BANKRUPTCY CODE AND THE CHANNELING INJUNCTION.

- 52 -

**K.**   **Injunctions in Full Force and Effect.**

All injunctions and/or stays provided for in the CNA Plan, the injunctive provisions of §§§ 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting any Settling Insurer that has purchased Settling Insurer Policies free and clear of all Claims pursuant to §§ 105, 363, and 1123 of the Bankruptcy Code, are permanent and will remain in full force and effect following the Effective Date of the CNA Plan and are not subject to being vacated or modified.

**L.**   **Injunctions and Releases Integral.**

The foregoing injunctive provisions and releases are an integral part of the CNA Plan and are essential to its implementation. The currently pending court proceedings commenced by an Abuse Claimant, the continuation of which would violate Sections 12.1, 12.2, or 12.3 of the CNA Plan, the releases provided for under the CNA Plan, and/or the Insurance Settlements, shall be deemed to be dismissed with prejudice.

**M.**   **Timing.**

The injunctions, releases, and discharges (including the Channeling Injunction and the Supplemental Settling Insurer Injunction) to which any Settling Insurer is entitled pursuant to such Settling Insurer's Insurance Settlement, the CNA Plan, the Confirmation Order, the Final Orders approving the Insurance Settlements, and the Bankruptcy Code shall only become effective when the Trust receives payment in full from the corresponding Settling Insurer pursuant to the terms of the CNA Plan and/or the Settling Insurer's Insurance Settlement, and the other conditions to the effectiveness of the Insurance Settlement are fully met.

**N.**   **Excluded Parties.**

Notwithstanding anything to the contrary herein, the following shall apply to Excluded Parties: (a) no Claim by a Class 4 Claimant or Class 5 Claimant against an Excluded Party shall be a Channeled Claim, provided, however, any Claims which assert liability against an Excluded Party in conjunction with a Protected Party shall be Channeled Claims to the extent they assert liability against such Protected Party; (b) no Claim by a Class 4 Claimant or Class 5 Claimant against an Excluded Party shall be released by operation of the CNA Plan; (c) the injunctions provided in Sections 12.1 and 12.2 of the CNA Plan shall not apply to Claims by any Class 4 Claimant or Class 5 Claimant against an Excluded Party; and (d) all Claims by any Class 4 Claimant or Class 5 Claimant against an Excluded Party are preserved and are not affected by the terms of the CNA Plan.

**O.**   **Title to and Vesting of Assets.**

All property of the Diocese and the Estate is dealt with by the CNA Plan.  Therefore, on the Effective Date, except as otherwise provided in the CNA Plan, to the fullest extent

allowed by §§ 1123(a)(5), 1123(b)(2), 1123(b)(3), 1141(b), and 1141(c) of the Bankruptcy Code, all property of the Diocese and the Estate, and any property acquired by the Diocese pursuant to the CNA Plan, shall vest in the Reorganized Diocese and such property shall be free and clear of all Liens, Claims, charges, or other encumbrances whatsoever, except that any charitable assets subject to Donor Restrictions shall pass to the Reorganized Diocese subject to such Donor Restrictions. On and after the Effective Date, except as otherwise provided in the CNA Plan, the Reorganized Diocese may operate and manage its affairs and may use, acquire, or dispose of such property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the CNA Plan or the Confirmation Order. The Diocese and the Reorganized Diocese may pay any charges incurred on or after the Effective Date for Professional Fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

**P.    Continued Corporate Existence; No Successor Liability.**

1.    The Diocese will continue to exist after the Effective Date as a separate entity in accordance with New York law having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence, or to change its corporate name, under applicable state law, except as such rights may be limited and conditioned by the CNA Plan and the documents and instruments executed and delivered in connection therewith.

2.    On and after the Effective Date, the Reorganized Diocese may conduct business in the name of "The Diocese of Rochester" or any derivation thereof that may be approved by the Bishop of Rochester. At the request of the Reorganized Diocese, the Diocese shall take such steps as may be required to change its corporate name to remove any references to "The Diocese of Rochester."

3.    Notwithstanding anything to the contrary in the CNA Plan or otherwise, except to the extent necessary to honor any Donor Restrictions or to the extent it may expressly assume such obligations in writing on or after the Effective Date, the Reorganized Diocese shall not be liable for any Claims against, or other liabilities or obligations of, the Diocese. The Reorganized Debtor shall not, and shall not be deemed under any state or federal law, or doctrine or theory of successor liability, to: (a) be the successor of, or successor to, the Diocese; (b) have, de facto or otherwise, merged with or into the Diocese; (c) be a mere continuation or substantial continuation of the Diocese or the operations or business enterprises of the Diocese; or (d) be liable for any acts taken, or omitted to be taken, by the Diocese prior to the Effective Date. All Persons and entities holding Liens, Claims, and encumbrances, and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in the Diocese or the Residual Assets (whether legal or equitable, secured or unsecured,

- 54 -

matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Diocese, the Residual Assets, or the operation of the Residual Assets prior to the Effective Date shall be forever barred, estopped, and permanently enjoined from asserting against the Reorganized Debtor such Liens, Claims, encumbrances, and other interests, including rights or claims based on any theory of successor or transferee liability, *provided*, however, nothing herein shall prohibit any Person with standing to do so from taking any action to enforce Donor Restrictions.

**Q.  Identity of Trustees of the Diocese and the Reorganized Diocese on and after the Effective Date.**

In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the trustees of the Diocese and the Reorganized Diocese on and after the Effective Date shall be (i) The Most Reverend Salvatore R. Matano, Bishop of Rochester, (ii) Very Reverend Paul J. Tomasso, Vicar General and Moderator of the Curia, and (iii) Reverend Daniel J. Condon, Chancellor and Director of Legal Services, all of whom are affiliated with the Universal Roman Catholic Church.

**R.  Authority to Effectuate Plan.**

Upon the Effective Date, all matters provided under the CNA Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Diocese.  The Diocese and the Reorganized Diocese shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve consummation of, and carry out, the CNA Plan and to effectuate the transactions provided for thereunder.

**S.  Binding Effect.**

Except as otherwise expressly provided in the CNA Plan, on and after the Effective Date, the CNA Plan shall bind all holders of Claims.  Subject to the terms of the CNA Plan, upon the Effective Date, every holder of a Claim shall be precluded and permanently enjoined from asserting against the Diocese or the Reorganized Diocese any Claim based on any document, instrument, judgment, award, order, act, omission, transaction, or other activity of any kind or nature that occurred before the Petition Date.

**T.  Dissolution of Committee.**

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and Agents shall be released from any further duties and responsibilities in this Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and

- 55 -

protective orders entered during this Chapter 11 Case, including any orders regarding confidentiality issued by the Bankruptcy Court or mediators, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Fee Claims.

## ARTICLE 7
## MEANS FOR IMPLEMENTATION OF THE PLAN

Similar to the Diocese Plan, and as described in the Diocese's disclosure statement, under the CNA Plan all Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, General Unsecured Claims, and Pass-Through Claims will be paid by the Diocese or the Reorganized Diocese. Under the CNA Plan, all Abuse Claims will be paid solely from the Trust, in accordance with the Plan Documents and the Allocation Protocol. The Allocation Protocol is Exhibit 1 of the Plan Supplement to the CNA Plan and is incorporated into the Trust Agreement, which is Exhibit 3 of the Plan Supplement to the CNA Plan.

The substance of the Diocese's discussion of corporate action, payments effective on tender, agreements, instruments, and documents, continuation of insurance policies, bar dates for professional fee claims and other administrative claims, and exit financing are all hereby incorporated by reference, because the provisions of the CNA Plan on these issues is similar to the corresponding provisions of the Diocese Plan. For additional information on these provisions, please refer to Article 8 of the Disclosure Statement in Support of Fifth Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester Dated April _, 2024 [ECF No. xxxx, Case No. 2-19-20905].

## ARTICLE 8
## GENERAL CLAIMS ADMINISTRATION AND DISTRIBUTIONS

Please refer to Article 10 of the Disclosure Statement in Support of Fifth Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester Dated April _, 2024 [ECF No. xxxx, Case No. 2-19-20905], for a discussion of general claims administration, and Article 11 of the same document for a discussion of provisions governing distributions. The substance of the Diocese's discussion of general claims administration and the provisions governing distribution is hereby incorporated by reference.

## ARTICLE 9
## EFFECTIVE DATE

The Effective Date shall not occur, and the CNA Plan shall not be consummated, unless each of the following conditions are either satisfied, or waived by the Plan Proponent.

1. ***Confirmation Order***. The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Plan Proponent. Without limiting

- 56 -

the generality of the foregoing, the Confirmation Order shall, at a minimum, contain findings by the Bankruptcy Court that:

a.  All of the requirements for confirmation of the CNA Plan pursuant to § 1129 of the Bankruptcy Code have been met and that the CNA Plan should be confirmed;

b.  Each of the Insurance Settlements is approved pursuant to §§ 105(a), 363(b), 363(f), 363(m), and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as applicable, and upon paying their respective Insurance Settlement Amounts to the Trust, each Settling Insurer shall, without the necessity of any further act or deed, be deemed to have (i) bought back all of the Insurance Policies issued by such Settling Insurer with such sale being free and clear of all Liens, Claims, interests, charges, other encumbrances and liabilities of any kind and (ii) received the Releases, Injunctions, and other benefits provided to such Settling Insurer under the CNA Plan;

c.  The Allocation Protocol attached as an exhibit to the Plan Supplement has been proposed in good faith and is fair and reasonable with respect to the treatment afforded to all Abuse Claims;

d.  The Non-Settling Insurance Assignment is authorized by, and does not conflict with, any provision of the Bankruptcy Code or other applicable law, and is therefore approved;

e.  The Bankruptcy Court has jurisdiction to approve, and does approve, the transfer of the Residual Assets to, and vesting of title in, the Reorganized Diocese in accordance with the provisions of section 511 or 511-a of the New York State Not-For-Profit Corporation Law, and no further approval by the New York Attorney General or the New York Supreme Court is required; and

f.  Except as otherwise provided in the CNA Plan, the Reorganized Diocese shall not be liable for any Claims against or liabilities of the Diocese or any of the Participating Parties, including under any theory of successor liability.

2.  ***Channeling Injunction and Insurer Injunctions***.  The Confirmation Order shall approve and implement the Channeling Injunction and the Supplemental Settling Insurer Injunction set forth in Section 12 of the CNA Plan.

3.  ***Plan Documents***.  The Plan Documents shall be in form and substance acceptable to the Plan Proponent.

4.  ***Trust Formation***.  The Trust shall have been formed, the Bankruptcy Court shall have entered an order appointing the Trustee, and the Trustee shall have executed the Trust Agreement.

- 57 -

SFACTIVE-907468414.5

5. ***Reorganized Diocese Formation***. The Reorganized Diocese shall have been duly formed and in good standing under New York law, and shall have obtained any necessary governmental permits or approvals required to take title to the Residual Assets, and to conduct business as a tax-exempt entity pursuant to 26 U.S.C. § 501(c)(3), on and after the Effective Date in substantially the same manner as the Diocese has historically conducted its business. Notwithstanding the foregoing, this condition shall be waived if the Reorganized Diocese shall not have been duly formed and in good standing under New York Law within 60 days of the Confirmation Order becoming a Final Order.

6. ***Final Orders***. The Confirmation Order, the order appointing the Trustee, and all orders approving Insurance Settlements (which may be included within the Confirmation Order) shall be Final Orders and no stay of any such orders shall then be in effect.

7. ***No Material Amendments***. The CNA Plan shall not have been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made with the consent of the Plan Proponent.

If the Effective Date does not occur within 365 days after the entry of the Confirmation Order, the Plan Proponent shall have the right to declare the CNA Plan null and void in all respects. Until the CNA Plan has been substantially consummated, the Plan Proponent shall have the right to modify the CNA Plan to the extent permitted by Section 1127 of the Bankruptcy Code.

## ARTICLE 10
## RETENTION OF JURISDICTION

Please refer to Article 15 of the Disclosure Statement in Support of Fifth Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester Dated April \_, 2024 [ECF No. xxxx, Case No. 2-19-20905], for a discussion of the Bankruptcy Court's retention of jurisdiction. The substance of the Diocese's discussion of retention of jurisdiction is applicable to the CNA Plan and is hereby incorporated by reference.

## ARTICLE 11
## TAX CONSEQUENCES OF THE PLAN

Please refer to Article 16 of the Disclosure Statement in Support of Fifth Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester Dated April \_, 2024 [ECF No. xxxx, Case No. 2-19-20905], for a discussion of tax consequences. The substance of the Diocese's discussion of tax consequences is applicable to the CNA Plan and is hereby incorporated by reference.

## ARTICLE 12
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

Please refer to Article 17 of the Disclosure Statement in Support of Fifth Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester Dated April _, 2024 [ECF No. xxxx, Case No. 2-19-20905], which you will have received by mail, for a discussion of acceptance and confirmation of a bankruptcy plan. The substance of the Diocese's discussion of this subject is applicable to the CNA Plan and is hereby incorporated by reference.

## ARTICLE 13
## RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DIOCESE SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.**

### A.    Possible Objection to Classifications of Claims

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class. The Plan Proponent believes that the classification of Claims under the CNA Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion. To the extent that the Bankruptcy Court finds that a different classification is required for the CNA Plan to be confirmed and the reclassification adversely affects the treatment of the Claim or any Creditor, the Plan Proponent could be required to resolicit votes for or against the CNA Plan. The Bankruptcy Code also requires that the CNA Plan provide the same treatment for each Claim of a particular Class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Plan Proponent believes that the CNA Plan complies with the requirement of equal treatment, but to the extent the Court finds that the CNA Plan does not satisfy the equal treatment requirement, the Court could deny confirmation of the CNA Plan. Issues or disputes relating to classification or treatment could result in a delay of the confirmation or consummation of the CNA Plan and could increase the risk that the CNA Plan will not be consummated.

### B.    Failure to Satisfy Voting Requirements

The CNA Plan must obtain the requisite votes to accept it, in accordance with the requirements of the Bankruptcy Code, in order for the CNA Plan to be confirmed. The CNA Plan may not be confirmed without the affirmative acceptance of at least one Impaired Class. In the event that sufficient votes are not received, or the requisite Creditor consent is not obtained, the CNA Plan may be revised or withdrawn, an alternative plan of reorganization may be confirmed, or the Chapter 11 Case may be dismissed.

- 59 -

C.      **The CNA Plan May Not Be Confirmed**

Even if all voting Classes accept the CNA Plan, the CNA Plan may not be confirmed if the Bankruptcy Court determines that the CNA Plan does not meet the requirements for confirmation set forth in § 1129 of the Bankruptcy Code.  The Plan Proponent believes that the CNA Plan satisfies all of the relevant § 1129 requirements.  There can be no assurance, however, that the Bankruptcy Court will also conclude that all such requirements have been satisfied.

D.      **The Third-Party Releases in the CNA Plan May Render the CNA Plan Not Confirmable, Or Confirmable Only If Revised**

The CNA Plan contains non-consensual releases in favor of certain third parties, the legality of which is currently under review by the U.S. Supreme Court in the *Purdue Pharma* case.  If the U.S. Supreme Court issues a ruling in that case that bankruptcy courts are not permitted to confirm plans with such third-party releases, then the CNA Plan could not be confirmed as currently written, and would have to be revised or withdrawn.  Similarly, if the U.S. Supreme Court issues a ruling in the *Purdue Pharma* case that bankruptcy courts are permitted to confirm plans with such third-party releases, but only if certain requirements are satisfied, then to the extent the CNA Plan does not already meet such requirements, the CNA Plan would have to be revised before it could be confirmed.

E.      **The Plan Proponent's Assumptions and Estimates May Prove Incorrect**

The Plan Proponent has made certain assumptions regarding, and has attempted to estimate in good faith and to the best of its ability, the aggregate number and amount of Abuse Claims.  There can be no guarantee, however, that the Plan Proponent's assumptions and estimates regarding these figures will prove to be accurate.   In the event the Plan Proponent's assumptions and estimates prove incorrect, Survivor recoveries under the CNA Plan may be materially less than projected.

F.      **Non-Confirmation or Delay in Confirmation of the CNA Plan**

In the event a party objects to the CNA Plan, it is possible that the Bankruptcy Court may not approve confirmation of the CNA Plan, or that confirmation may be delayed.

G.      **Non-Consensual Confirmation**

In the event each Impaired Class of Claims does not accept the CNA Plan, the Bankruptcy Court may nevertheless confirm the CNA Plan at the Plan Proponent's request if the Bankruptcy Court determines that the so-called "cram down" requirements of § 1129 of the Bankruptcy Code, which are described above, are satisfied.  The Plan Proponent believes that the CNA Plan satisfies these requirements.

## H.    Risk of Non-Occurrence of the Effective Date

Although the Plan Proponent believes that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date in fact will occur.

## I.    Certain Funding Sources May Be Uncertain

The CNA Plan assumes that the non-debtor persons and entities making contributions toward the $55 million DOR Entities Cash Contribution will also do so if the CNA Plan is confirmed, since they would receive precisely the same protections under the CNA Plan in exchange for their contributions as they would under the Diocese Plan. Similarly, the CNA Plan assumes that each of the other insurers who have settled with the Diocese and the Committee (Interstate, LMI, Underwriters, and Hartford) will provide funding for the CNA Plan under the same terms as set forth in their settlement agreements with the Diocese, since the CNA Plan contains the same Supplemental Settling Insurer Injunction as does the Diocese Plan. However, the Diocese has asserted that certain members of the "Catholic Family" may decline to provide funding and/or consent to settlements with the non-CNA Settling Insurers if the CNA Plan is confirmed and the Diocese Plan is not. Although CNA believes that the non-CNA sources of funding under the Diocese Plan will provide the same funding if the CNA Plan is confirmed, because it would be in their respective economic self-interests to do so, based on the Diocese's assertions there can be no assurance that the non-debtor persons and entities making contributions toward the $55 million DOR Entities Cash Contribution or the non-CNA Settling Insurers will, in fact, provide the expected funding for the CNA Plan.

## ARTICLE 14
## RECOMMENDATION AND CONCLUSION

The Plan Proponent believes that the CNA Plan is in the best interests of all Creditors. The CNA Plan as structured allows Creditors to participate in Distributions believed to be in excess of those which would otherwise be available were the Chapter 11 Case dismissed and provides an opportunity to maximize insurance recoveries through settlements with the Settling Insurers, including CNA, and post-confirmation litigation of Insurance Claims against Non-Settling Insurers (if any). The CNA Plan also provides Survivors with a choice to obtain higher average compensation sooner than would be available under the Diocese Plan, because of CNA's commitment to pay $75 million to the Trust if the CNA Plan is confirmed.

While it is possible that CNA could become obligated to pay more than $75 million under the Diocese Plan, that could occur only if Survivors pursue and prevail in two separate risky and prolonged litigations, one to establish the Diocese's liability and the second to establish CNA's coverage, both in amounts that would require CNA to pay more, in total, than the $75 million CNA is committing to pay under the CNA Plan. That is likely to require the personal involvement of those Survivors who choose to pursue such litigations and such litigations likely will take many years to conclude, with no guarantee of higher recoveries for Survivors or other Creditors.

- 61 -

FOR ALL OF THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENT BELIEVES THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE PLAN PROPONENT RECOMMENDS THAT ALL CREDITORS ENTITLED TO VOTE ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY ARE RECEIVED BY THE SOLICITATION AND CLAIMS AGENT NO LATER THAN 11:59 P.M. PREVAILING EASTERN TIME ON JULY 1, 2024.

SFACTIVE-907468414.5

Dated: April 15, 2024

Respectfully submitted,

The Continental Insurance Company, successor by merger to Commercial Insurance Company of Newark, New Jersey and Firemen's Insurance Company of Newark, New Jersey

By: _____
     Catherine Glover
     Its Senior Vice President, Claims


By:    */s/ Jeffrey A. Dove*
Jeffrey A. Dove
BARCLAY DAMON LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York  13202
Telephone: (315) 413-7112
Facsimile: (315) 703-7346
jdove@barclaydamon.com

Mark D. Plevin
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California  94111
Telephone:  (415) 986-2800
mplevin@crowell.com

David Christian
DAVID CHRISTIAN ATTORNEYS LLC
105 West Madison Street, Suite 2300
Chicago, Illinois  60602
Telephone:  (312) 282-5282
dchristian@dca.law

Miranda H. Turner
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  (202) 624-2500
mturner@crowell.com

- 63 -

*Attorneys for The Continental Insurance Company, successor by merger to Commercial Insurance Company of Newark, New Jersey and Firemen's Insurance Company of Newark, New Jersey*

907468414.05