**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>DIOCESE OF ROCHESTER,<br><br>Debtor. | Chapter 11<br><br>Case No. 19-20905 |

**SUMMARY OF CONTINENTAL INSURANCE COMPANY'S FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR THE DIOCESE OF ROCHESTER**

The Continental Insurance Company ("Continental" or "CNA") has proposed a Plan of Reorganization (the "CNA Plan") for the Diocese of Rochester to address the Diocese's liability to survivors of sexual abuse and other creditors. The materials in the package you have received with this summary of the CNA Plan include (i) the CNA Plan itself, (ii) the Disclosure Statement for the CNA Plan, and (iii) a ballot for voting to accept or reject the CNA Plan with instructions on how to complete and return the ballot. The CNA Plan includes exhibits that are part of the CNA Plan; you should review all of these documents because they contain information relevant to your decision to vote to accept or reject the CNA Plan.[1]

This summary of the CNA Plan is intended to assist you in deciding whether to accept or reject the CNA Plan. This summary is only a "plain English" explanation and summary of the CNA Plan and is qualified in its entirety by the full terms of the CNA Plan. The CNA Plan and Disclosure Statement (along with their exhibits) are not modified by this document, which is

---

[1] The defined terms used in this Plan Summary and in the CNA Disclosure Statement can be found in Article I of the CNA Plan, unless defined herein or in the CNA Disclosure Statement.

- 1 -

provided as a means of explaining the CNA Plan for reference only. You should review the CNA Plan and Disclosure Statement in their entirety because the CNA Plan, if approved by the court, will control how your Abuse Claim is finally resolved against the Diocese, parishes, and certain other entities that may be responsible for your abuse. You may wish to consult an attorney to advise you regarding the terms of the CNA Plan and how it may affect your legal rights.

1. **Why did CNA file the CNA Plan?**

CNA is one of the Diocese's insurers. Back in 2022, CNA and the Diocese agreed to a settlement whereby CNA would pay $63.5 million to a Trust for the benefit of Survivors. Bankruptcy law requires that such settlements must be approved by the bankruptcy court, and the Diocese filed court papers urging the bankruptcy court to approve the settlement with CNA. In those papers, the Diocese argued that the settlement with CNA met all the standards for bankruptcy court approval. The Official Committee of Unsecured Creditors (the "Committee") objected to the settlement.

Thereafter, the Diocese, the Committee, and CNA entered into mediation. No agreements were reached among the parties to the mediation. CNA concluded that the Committee's demands in the mediation were unsupported and unrealistic. CNA determined that it should file a plan of reorganization that included an increased offer, so that Survivors themselves could choose whether to accept the CNA Plan, which provides a global resolution with more upfront compensation available, or bear the risks of litigation under the plan proposed by the Diocese and the Committee (the "Debtor Plan"). CNA respectfully asks you to consider whether the CNA Plan may be more appealing to you than the terms of the Debtor Plan.

CNA prefers to not litigate against Survivors. That is why it has proposed its own plan and offered $75 million to compensate Survivors—$11.5 million more than the amount of

its 2022 settlement which the Diocese argued was in the best interests of the bankruptcy estate and its creditors. However, CNA believes the Diocese breached that 2022 settlement with CNA and is now pursuing a plan—the Debtor Plan—that is prejudicial to CNA's legal rights. If the Debtor Plan is confirmed, CNA would have appeal rights and may have a damages claim against the Diocese for breach of contract. An appeal would likely further delay Survivor compensation.

**2. What are the basic terms of the CNA Plan?**

The CNA Plan is an offer to Survivors of a total compensation fund of ***$201.35 million***, including ***$75 million*** from CNA, which Survivors will be able to access immediately after confirmation of the CNA Plan, the occurrence of the Effective Date, and the prompt evaluation of claims by the Abuse Claims Reviewer. The compensation fund under the CNA Plan will be funded by prior monetary commitments from the Diocese and the other Settling Insurers, plus an additional $75 million from CNA. The money contributed by the Diocese and the insurers is in exchange for releases and injunctive protection against existing Survivor claims and certain future claims.

Under the CNA Plan, each Survivor may opt to submit his or her claim to an Abuse Claim Reviewer and receive a prompt compensation offer. The offer will be based on the Abuse Claims Reviewer's evaluation of the nature and circumstances of the abuse suffered by the Survivor, the impact of the abuse on the Survivor. Survivors who wish to pursue their Abuse Claims in court may do so freely, without needing to obtain permission. Survivors who litigate will be paid on any recovery from the compensation fund, subject to certain limitations described below and in the accompanying CNA Plan and Disclosure Statement.

**A. What is the funding for the CNA plan?**

The CNA Plan is funded as follows:

- $75 million from CNA

- $55 million from the Diocese and non-debtor entities related to the Diocese

- $50 million from Interstate Fire & Casualty Company and National Surety Corporation

- $19.5 million from Certain London Market Insurers

- $1.1 million for Certain Underwriters at Lloyd's, London

- $750,000 from First State Insurance Company

The total funding for the CNA Plan is ***$201.35 million***. No post-bankruptcy litigation would be required to obtain this funding. The funding would be available to the Survivor Trust in full on the Effective Date of the Plan.

A small portion of the $201.35 million will be reserved for certain required payments, including costs of administering the Trust. Some funds will be reserved for making payments to Unknown Claimants, defined in the CNA Plan as Survivors who were under a legal disability excusing their failure to file a proof of claim by the Bar Date. The bankruptcy court has approved CNA's retention of retired Judge Michael Hogan as the legal representative of Unknown Claimants, to recommend how much should be set aside to pay these claims based on how many Unknown Claimants are expected. Overall, it is anticipated that the total reserves that will be set aside under the CNA Plan will no more than $1.35 million, leaving at least $200 million for distribution to Survivors who filed timely proofs of claim during the bankruptcy case.

**B.     How will Survivor compensation be determined under the CNA plan?**

Individual Survivors' shares of the money available for distribution by the Trust will be based on a review and evaluation of the claims by the Abuse Claims Reviewer. CNA has selected Roger Kramer of Kramer Law LLC to be the Abuse Claims Reviewer. Mr. Kramer was

Case 2-19-20905-PRW, Doc 2592, Filed 04/24/24, Entered 04/24/24 10:56:51, Description: Main Document , Page 4 of 19
SFACTIVE-907495675.3

also selected by the Diocese and the Committee to be the Abuse Claims Reviewer under the Debtor Plan.

If the CNA Plan is confirmed, Mr. Kramer will conduct his evaluation of the Abuse Claims pursuant to an Allocation Protocol that is attached to the CNA Plan. The terms of the CNA Plan's Allocation Protocol are nearly identical to the terms of the Debtor Plan's Allocation Protocol. Under the CNA Allocation Protocol, the Abuse Claims Reviewer will determine Survivor compensation as follows:

- Each Abuse Claim will be evaluated by the Abuse Claim Reviewer, who will assign a point total from 0 to 100 according to the following Evaluation Factors:

    1. **Nature of Abuse**:

        a. Duration;

        b. Frequency/number of instances;

        c. Degree of intrusiveness into child's body (*e.g.*, clothed/unclothed, masturbation by or of perpetrator, oral penetration, anal penetration, vaginal penetration);

        d. Level or severity of force / violence / coercion / threats; control of environment (*e.g.*, boarding school, orphanage, trip under supervision of perpetrator, day school, Perpetrator's employment relationship with the Diocese);

        e. Number of Perpetrators of the Diocese that abused the Claimant; physical pain suffered;

        f. Grooming;

        g. Relationship of the Claimant to the Perpetrator;

    h. Location of abuse, including but not limited to isolated location, rectory, church, cabin, orphanage, etc.; and/or

    i. Additional factors that may be provided by the Claimant.

**2. Impact of the Abuse:**

    a. School behavior problems;

    b. School academic problems;

    c. Getting into legal trouble as a minor;

    d. Loss of faith;

    e. Damage to family relationships / interpersonal difficulties;

    f. Mental health symptoms, including but not limited to:

- Depression;
- Suicide attempt or suicidal ideation;
- Anxiety;
- Substance abuse;
- Sexual acting out;
- Runaway;
- Flashbacks;
- Nightmares;

    g. Adult and current functioning:

- Criminal record as an adult;
- Underemployment/unemployment;
- Relationship problems;
- Substance abuse;

h. Physical health symptoms, including but not limited to:

- Physical manifestations of emotional distress;
- Gastrointestinal issues;
- Headaches, high blood pressure;
- Physical manifestations of anxiety;
- Erectile dysfunction;
- Heart palpitations;
- Sexually-transmitted infections;
- Physical damage caused by acts of abuse;
- Reproductive damage;
- Self-cutting; and/or
- Other self-injurious behavior;

i. The risk of the foregoing factors affecting the Abuse Claimant in the future based on the Abuse Claimant's age at the present time; and/or

j. Additional factors that may be provided by the Abuse Claimant.

- The Trustee will calculate a Trust Settlement Offer for each Survivor. That offer will be based on the Survivor's percentage share of the total points assigned to all Survivors, applied to the available compensation fund. By way of example, if a total of 30,000 points are assigned to all Survivors, and Survivor A is assigned 90 points, Survivor A's percentage share would be 90 divided by 30,000, or 0.3%. If the total available compensation fund (following establishment of certain reserves discussed herein) is $200 million, then Survivor A would be offered 0.3% of $200 million, or $600,000. At the end of this summary are several tables providing additional information on how

hypothetical individual Survivors will be paid under the CNA Plan based on certain assumptions.

- If a Survivor accepts the Trust Settlement Offer, the Survivor will promptly be paid the full amount of his or her accepted Trust Settlement Offer. One of the lawyers for the law firm representing the Committee in this case has stated that, in a case like this one, the time from initial funding of the trust to initial distributions to survivors is often as short as a few months or even a few weeks.

3. **Will my rights to sue in court for my abuse be limited?**

Survivors can choose to reject their Trust Settlement Offer in order to litigate against the Diocese in court, as follows:

- A Survivor who wishes to litigate may reject the Trust Settlement Offer and, instead, file and pursue a lawsuit (a "Tort Claim"). If the Survivor obtains a Final Judgment after litigation of his or her Tort Claim, then the following payments may be made:
    - If the amount of the Final Judgment is less than or equal to the amount of his or her Trust Settlement Offer, the Survivor would promptly be paid the amount of the Final Judgment.
    - If the amount of the Final Judgment is greater than the amount of his or her Trust Settlement Offer, the Survivor would promptly be paid the amount of the Trust Settlement Offer. The amount by which a Final Judgment exceeds a Trust Settlement Offer is the Excess Recovery Amount. After all Tort Claims are litigated to Final Judgment, Survivors holding Final Judgments in excess of their Trust Settlement Offers would then be paid their respective Excess Recovery Amounts.

SFACTIVE-907495675.3

- o Excess Recovery Amounts will be paid from the Payment Reserve. Initial funding for the Payment Reserve will be $500,000. If there are insufficient funds to pay all Excess Recovery Amounts in full, then each Survivor will receive his or her respective percentage share of the available funds, determined based on their respective Excess Recovery Amounts compared to the sum of all Excess Recovery Amounts.
- If a Survivor obtains a Final Judgment in an amount less than the amount of his or her Trust Settlement Offer, then the Survivor will receive the amount of the Final Judgment award, and the difference between the lower Final Judgment and the higher Trust Settlement Offer will be transferred to the Payment Reserve and will be used to pay Excess Recovery Amounts as described above.

**4.    Who is released under the CNA Plan?**

Because the Diocese will be contributing money to the Trust, it will be released from liability. Any recoveries against the Diocese will be limited to the Tort Claims discussed above. In addition, certain non-debtor parties who are would be making financial contributions to the Trust would also receive releases under the CNA Plan. These non-debtor parties include:

- The Participating Parties, defined as the Parishes, Schools, Other Catholic Organizations, and other entities listed on Exhibit A to the CNA Plan. Under the CNA Plan, the contributions being made on behalf of the Participating Parties are the same as under the Diocese's proposed plan.
- The Settling Insurers, including CNA. Under the CNA Plan, all known insurance will be settled. There are no known non-settling insurers.
- Certain parties will be exculpated (*i.e.*, protected from liability) from acts or omissions

that occurred during or in connection with the bankruptcy case, including as to the formulation, negotiation, and pursuit of confirmation of the CNA Plan: the Diocese; the Reorganized Diocese; CNA and the other Settling Insurers; the Mediators; the Unknown Claimant Representative; the Abuse Claims Reviewer; and their related affiliates, as defined in the CNA Plan.

**5. How does the CNA Plan differ from the Debtor Plan?**

The CNA Plan offers Survivors the choice to secure $75 million in committed funding from CNA now, without any need for further litigation. The total amount available to Survivors under the CNA Plan is $201.35 million, less the reserves and administrative expenses that CNA estimates will be no more than $1.35 million, leaving a total fund available to pay Survivors of at least $200 million.

The Debtor Plan would provide initial funding of $126.35 million—$75 million *less* than the CNA Plan—and zero in upfront funding from CNA. The Diocese estimates that at least $18 million will have to be reserved under the Debtor Plan for payment of Trust expenses such as funding lawsuits.

Survivors can be compensated from the Trust under both plans, and compensation awards would be based on similar Evaluation Factors under both plans. Both plans propose to use the same Abuse Claims Reviewer, Roger Kramer, who has served in this role in other diocesan bankruptcy cases. However, because CNA is not contributing any initial funding to the Debtor Plan, the initial average awards will be lower under the Debtor Plan, compared with the CNA Plan.

Instead of CNA's committed funding of $75 million, the Debtor Plan relies on post-bankruptcy litigation to recover from CNA. Specifically, under the Debtor Plan some

Survivors, whose abuse occurred during periods when insurance issued by CNA was in effect, will be allowed by the Trust to sue the Diocese or Participating Parties (in name only) to try to obtain judgments, which they can then try to recover in a second lawsuit against CNA. Both litigations—first to obtain a judgment against the Diocese, and then to obtain coverage from CNA to pay the judgment—could take a long time, and there is a risk that Survivors may not prevail in either or both litigations.

Under the Debtor Plan, many Survivors—those whose abuse occurred outside the alleged CNA policy years of 1952 to 1977[2]—will not be eligible to bring lawsuits at all, and they may or may not get to share in recoveries from other Survivors' lawsuits. That means Survivors in non-CNA years may receive a smaller recovery than other Survivors with similar claims.

Because the CNA Plan does not require post-bankruptcy litigation in order for CNA to contribute to Survivor compensation, CNA expects the costs to administer the Trust under the CNA Plan will be very low. Because the Debtor Plan depends on litigation to recover against CNA, with some litigation costs funded by the Trust, the administrative costs under the Debtor Plan would likely be higher, potentially running up to many millions of dollars and many times the administrative costs under the CNA Plan.

Aside from the issue of how Survivors would obtain compensation from CNA, there are not many differences between the two plans. Both plans allow the Diocese to reorganize and continue its religious and charitable missions, while providing improved protocols for the protection of children. Both plans release the Diocese and Participating Parties from liability and eliminate the chance to seek punitive or exemplary damages.

---

[2] The Diocese and the Committee assert that CNA's coverage began in 1943. CNA disputes that claim, and believes its coverage did not begin before 1952.

The following chart summarizes the key similarities and differences between the two competing plans:

|  | CNA Plan | Diocese Plan |
|---|---|---|
| Larger initial compensation fund | ✓ |  |
| CNA pays without the need for post-bankruptcy litigation | ✓ |  |
| Trust compensation will be based on the nature and circumstances of the abuse and impact of the abuse | ✓ | ✓ |
| Higher immediately available average payments to Survivors | ✓ |  |
| All Survivors who wish to litigate may do so, without seeking permission from the Trust | ✓ |  |
| Lower expected administrative expenses | ✓ |  |
| Diocese continues its religious and charitable missions | ✓ | ✓ |
| Improved protections for children | ✓ | ✓ |
| Diocese and Participating Parties released from liability | ✓ | ✓ |
| Punitive or exemplary damages not recoverable | ✓ | ✓ |
| Resolves CNA's claims for breach of the 2022 settlement agreement | ✓ |  |
| No appeals from plan confirmation by CNA | ✓ |  |

6. **Does the Committee support the CNA Plan?**

The Committee does not support the CNA Plan. The Committee has stated that the $75 million CNA would pay under the CNA Plan is less than the Committee believes CNA

Case 2-19-20905-PRW, Doc 2592, Filed 04/24/24, Entered 04/24/24 10:56:51, Description: Main Document, Page 12 of 19

SFACTIVE-907495675.3

would be required to pay after post-bankruptcy litigation is completed.

The Diocese has been in bankruptcy for more than four years, during which time no abuse lawsuits under the New York Child Victims Act have gone forward against the Diocese and no Survivors have received compensation from the Diocese. Almost two years ago, the Committee objected to the Diocese's settlement with CNA which provided $63.5 million from CNA and, together with settlements from the Diocese's other insurers, provided a total compensation fund of $147.75 million for Survivors. But the Committee now supports a cash settlement fund of $126.35 million—$21.4 million **less** in committed funding than the 2022 settlements would have provided—along with the assignment of insurance rights against CNA to the Trust. A significant amount of the initial fund of $126.35 million under the Debtor Plan would be used to fund the post-bankruptcy litigation against CNA that is contemplated under the Debtor Plan.

CNA vigorously disputes that the insurance rights that the Debtor Plan would assign to the Trust are worth the amounts the Committee apparently ascribes to them, but obtaining definitive court rulings about the value of the insurance rights is expected to take years. Avoiding the risks and delays inherent in such litigation are among the reasons the Diocese cited to the bankruptcy court in seeking approval of its 2022 settlement with CNA. The accompanying CNA Disclosure Statement contains a lengthy discussion of CNA's and the Committee's competing contentions regarding the availability of insurance coverage from CNA. Moreover, under the law, a prerequisite to obtaining any insurance coverage from CNA is that a claimant must first establish in a court case that the Diocese is liable to the Survivor, and the amount of such liability. As described in the CNA Disclosure Statement, the Diocese has defenses to liability that it could assert in particular cases.

SFACTIVE-907495675.3

Of note, the law firm that represents the Committee in this case—Pachulski Stang Ziehl & Jones—is the same law firm that represents the claimants' committee in another New York diocesan bankruptcy, *In re Diocese of Rockville Centre*. On behalf of the committee in the *Rockville Centre* case, the Pachulski firm objected to a plan of reorganization sponsored by the Diocese of Rockville Centre that is similar in important respects to the Debtor Plan that the Committee supports in this case.

For example, in *Rockville Centre* the Pachulski firm told claimants that resolving disputed claims through post-bankruptcy litigation—as the Debtor Plan provides in this case— "could take years," and "getting the insurance companies to pay is not as easy as the Diocese makes it sound." In addition, the Pachulski firm complained in the *Rockville Centre* case that "legal fees for the fights with the insurance companies will come out of" the settlement fund, and it criticized the Diocese of Rockville Centre because it "does not estimate how much the fights with the insurance companies will cost or how long that fights will take."

The Diocese of Rockville Centre's proposed plan would establish two separate trusts for different claims, depending on the years in which the abuse allegedly occurred. The result is that, as appears to be the case under the Debtor Plan in this case, some claimants may receive less than others with similar claims. The Pachulski firm in the *Diocese of Rockville Centre* case argued that such disparate treatment "is not fair to all Survivors."

In this case, CNA believes that Survivors should consider the warnings issued by the Pachulski firm in *In re Diocese of Rockville Centre* concerning a plan that, like the Debtor Plan in this case, requires years of litigation to increase the available funds in the Trust and may result in compensation awards that are "not fair to all Survivors."

- 14 -

Case 2-19-20905-PRW, Doc 2592, Filed 04/24/24, Entered 04/24/24 10:56:51,
SFACTIVE-907495675.3    Description: Main Document , Page 14 of 19

**7. Are there risks associated with the CNA Plan?**

There are risks associated with the CNA Plan. While you should consult the CNA Disclosure Statement for a more detailed description of potential risks associated with the CNA Plan, some of the more notable risks include the following:

First, like the Debtor Plan, the CNA Plan contains non-consensual releases in favor of certain third parties, the legality of which is currently under review by the U.S. Supreme Court in the *Purdue Pharma* case. If the U.S. Supreme Court issues a ruling in that case that bankruptcy courts are not permitted to confirm plans with such third-party releases, then the CNA Plan could not be confirmed as currently written, and would have to be revised or withdrawn. Similarly, if the U.S. Supreme Court issues a ruling in the *Purdue Pharma* case that bankruptcy courts are permitted to confirm plans with such third-party releases, but only if certain requirements are satisfied, then to the extent the CNA Plan does not already meet such requirements, the CNA Plan would have to be revised before it could be confirmed.

Second, the CNA Plan assumes that the non-debtor persons and entities making contributions toward the $55 million DOR Entities Cash Contribution will also do so if the CNA Plan is confirmed, since they would receive precisely the same protections under the CNA Plan in exchange for their contributions as they would under the Diocese Plan. Similarly, the CNA Plan assumes that each of the other insurers who have settled with the Diocese and the Committee (Interstate, LMI, Underwriters, and First State) will provide funding for the CNA Plan under the same terms as set forth in their settlement agreements with the Diocese, since the CNA Plan contains the same Supplemental Settling Insurer Injunction as does the Diocese Plan. However, the Diocese has asserted that certain members of the "Catholic Family" may decline to provide funding and/or consent to settlements with the non-CNA Settling Insurers if the CNA Plan is

- 15 -

Case 2-19-20905-PRW, Doc 2592, Filed 04/24/24, Entered 04/24/24 10:56:51,
SFACTIVE-907495675.3     Description: Main Document , Page 15 of 19

confirmed and the Debtor Plan is not. Although CNA believes that the non-CNA sources of funding under the Debtor Plan will provide the same funding if the CNA Plan is confirmed, because it would be in their respective economic self-interests to do so, based on the Diocese's assertions there can be no assurance that the non-debtor persons and entities making contributions toward the $55 million DOR Entities Cash Contribution or the non-CNA Settling Insurers will, in fact, provide the expected funding for the CNA Plan.

## 8. CNA Recommendation

Each Survivor must determine for himself or herself whether they prefer the treatment offered by the CNA Plan to the treatment offered by the Debtor Plan. The CNA Plan offers Survivors the chance to choose for themselves which plan they prefer, based on their own personal circumstances and how much risk, delay, and uncertainty they are willing to bear.

CNA believes that the CNA Plan offers more certain compensation, sooner, and without any Survivor having to engage in risky, costly, and potentially lengthy litigation to receive payment from CNA. Also, all Survivors are treated the same under the CNA Plan, regardless of whether their abuse took place during a time when CNA and not some other insurer provided insurance to the Diocese. But, if a Survivor prefers a lower initial payout from a smaller fund with the possibility of an additional payout later, if post-bankruptcy lawsuits against the Diocese and CNA are successful, CNA recognizes that he or she may wish to vote for the Debtor Plan.

As such, CNA recommends that all Survivors carefully review the two competing plans and the two disclosure statements so that they can make an informed choice whether to accept or reject each plan and, if the Survivor chooses to accept both plans, whether to state a preference for one plan over the other.

Case 2-19-20905-PRW, Doc 2592, Filed 04/24/24, Entered 04/24/24 10:56:51, Description: Main Document, Page 16 of 19
SFACTIVE-907495675.3

907495675.03

- 17 -

Case 2-19-20905-PRW, Doc 2592, Filed 04/24/24, Entered 04/24/24 10:56:51, Description: Main Document , Page 17 of 19
SFACTIVE-907495675.3

**Tables Showing Hypothetical Survivor Recoveries**

The two tables below show some examples of what a particular Survivor could expect to receive under certain point allocations, assuming that the total amount available to the Trust to distribute to claimants is $200 million and the total number of points awarded by the Abuse Claims Reviewer is either 30,000 points (first table) or 25,000 points (second table). For reference, the tables below assume 524 Survivors are participating. The average point scores (based on the total number of points (either 30,000 or 25,000) divided by 524 Survivors) for all Survivors are 57.25 (first table), and 47.71 (second table). As discussed in the above summary and in the CNA Plan and Disclosure Statement, each Survivor's actual point score will be determined by the Abuse Claims Reviewer using the Evaluation Factors under the Allocation Protocol.

**Table 1**

| Hypothetical Survivor's points, as awarded by the Abuse Claims Reviewer using the factors required under the Allocation Protocol (related to the nature of the abuse, the circumstances of the abuse, and the impact of the abuse on the Survivor) | Assumed total number of points awarded to all Survivors | Hypothetical Survivor's percentage share of total of 30,000 points awarded to all Survivors | Hypothetical Survivor's Trust Settlement Offer, based on assumptions that the total amount available to the Trust to distribute to claimants is $200 million and the total number of points awarded by the Abuse Claims Reviewer is 30,000 points) |
|---|---|---|---|
| 100 | 30,000 | 0.33% | $660,000 |
| 90 | 30,000 | 0.30% | $600,000 |
| 75 | 30,000 | 0.25% | $500,000 |
| 60 | 30,000 | 0.20% | $400,000 |
| 57.25 | 30,000 | 0.19% | $380,000 |
| 50 | 30,000 | 0.17% | $340,000 |
| 35 | 30,000 | 0.12% | $240,000 |
| 20 | 30,000 | 0.07% | $140,000 |
| 0 | 30,000 | 0.00% | $0 |

Table 2

| Hypothetical Survivor's points, as awarded by the Abuse Claims Reviewer using the factors required under the Allocation Protocol (related to the nature of the abuse, the circumstances of the abuse, and the impact of the abuse on the Survivor) | Assumed total number of points awarded to all Survivors | Hypothetical Survivor's percentage share of total of 25,000 points awarded to all Survivors | Hypothetical Survivor's Trust Settlement Offer, based on assumptions that the total amount available to the Trust to distribute to claimants is $200 million and the total number of points awarded by the Abuse Claims Reviewer is 25,000 points) |
|---|---|---|---|
| 100 | 25,000 | 0.40% | $800,000 |
| 90 | 25,000 | 0.36% | $720,000 |
| 75 | 25,000 | 0.30% | $600,000 |
| 60 | 25,000 | 0.24% | $480,000 |
| 50 | 25,000 | 0.20% | $400,000 |
| 47.71 | 25,000 | 0.19% | $380,000 |
| 35 | 25,000 | 0.14% | $280,000 |
| 20 | 25,000 | 0.08% | $160,000 |
| 0 | 25,000 | 0.00% | $0 |

Case 2-19-20905-PRW, Doc 2592, Filed 04/24/24, Entered 04/24/24 10:56:51, Description: Main Document , Page 19 of 19
SFACTIVE-907495675.3