**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

In re:

THE DIOCESE OF ROCHESTER,                    Case No. 19-20905

                                  Debtor.      Chapter 11 Case

**DISCLOSURE STATEMENT IN SUPPORT OF MODIFIED SIXTH AMENDED
JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR
THE DIOCESE OF ROCHESTER**

**DATED JANUARY 10, 2024**

**BOND, SCHOENECK & KING, PLLC**
Stephen A. Donato, Esq.
Charles J. Sullivan, Esq.
Grayson T. Walter, Esq.
Office and Post Office Address:
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8000
Email: donatos@bsk.com
        sullivc@bsk.com
        walterg@bsk.com

*Counsel to The Diocese of Rochester*

18435954.v6

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[1]

THE DIOCESE OF ROCHESTER, THE DEBTOR AND DEBTOR IN POSSESSION IN THE ABOVE-CAPTIONED CHAPTER 11 CASE (THE "DIOCESE") AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (TOGETHER WITH THE DIOCESE, THE "PLAN PROPONENTS") JOINTLY SEEK CONFIRMATION OF THEIR JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE DIOCESE OF ROCHESTER (THE "PLAN"). A COPY OF THE PLAN IS ATTACHED HERETO AS **EXHIBIT A**.

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT"), THE PLAN, THE PLAN SUPPLEMENT, THE ACCOMPANYING BALLOTS, AND RELATED MATERIALS ARE BEING FURNISHED BY THE PLAN PROPONENTS, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE IN CONNECTION WITH THE SOLICITATION BY THE PLAN PROPONENTS OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE PLAN PROVIDES FOR THE REORGANIZATION OF THE DIOCESE'S FINANCIAL AFFAIRS AND FOR DISTRIBUTIONS TO CREDITORS HOLDING ALLOWED CLAIMS FROM THE DIOCESE'S ASSETS, THE ASSETS OF PARISHES, SCHOOLS, AND OTHER CATHOLIC ORGANIZATIONS, THE CONTRIBUTIONS OF SETTLING INSURERS, AND FOR THE CLAIMS AGAINST NON-SETTLING INSURERS TO BE ASSIGNED TO THE TRUST. THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE DIOCESE ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, INCLUDING UNDER "*RISK FACTORS TO BE CONSIDERED*" IN ARTICLE 19.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DIOCESE (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

NO PERSON MAY GIVE ANY INFORMATION ON BEHALF OF THE PLAN PROPONENTS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN, OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT FOR THE COMMITTEE CONSISTENT WITH ITS OBLIGATIONS ARISING UNDER 11 U.S.C. § 1103(c)(3). ALL OTHER STATEMENTS REGARDING THE

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to such terms in the Plan.

18435954.v6

Case 2-19-20905-PRW, Doc 2888, Filed 01/10/25, Entered 01/10/25 16:09:38, Description: Main Document , Page 2 of 128

PLAN AND THE TRANSACTIONS CONTEMPLATED THEREIN, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF IMPAIRED CLAIMS AGAINST THE DIOCESE TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN FILED CONTEMPORANEOUSLY HEREWITH, OTHER EXHIBITS ANNEXED HERETO, AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO THE END OF THE SOLICITATION PERIOD FOR THE PLAN. NO MATERIALS OTHER THAN THE ACCOMPANYING MATERIALS ATTACHED HERETO OR REFERENCED HEREIN HAVE BEEN APPROVED BY THE BANKRUPTCY COURT OR THE PLAN PROPONENTS FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (I) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN REMAIN MATERIALLY ACCURATE, AND (II) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT, EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE PLAN PROPONENTS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION, AND BELIEF. THE PLAN PROPONENTS' RESPECTIVE PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ARE NOT RESPONSIBLE FOR ANY INACCURACIES THAT MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE, AND THE PLAN PROPONENTS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION.

PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DIOCESE SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED, AND SHOULD BE AWARE THAT ACTUAL DISTRIBUTIONS MAY VARY FROM THE ESTIMATES CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DIOCESE, THE DIOCESE'S BUSINESS OPERATIONS, THE VALUE OF THE DIOCESE'S ASSETS, OR THE VALUES OF ANY BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DIOCESE OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DIOCESE, ANY PROTECTED PARTY, OR HOLDERS OF CLAIMS.

THIS DISCLOSURE STATEMENT IS FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF THE DIOCESE AND A TRUST TO BE CREATED FOR THE BENEFIT OF HOLDERS OF ABUSE CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATIONS OF CLAIMS AND DISTRIBUTIONS ON CLAIMS. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING UNCERTAINTIES AND TO A WIDE

18435954.v6

VARIETY OF SIGNIFICANT BUSINESS, LEGAL, AND ECONOMIC RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL FACTORS, NOR CAN THE IMPACT OF ALL FACTORS BE ASSESSED.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH THEIR OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO VOTING TO ACCEPT OR REJECT THE PLAN. HOWEVER, THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION OR DETERMINATION BY THE BANKRUPTCY COURT AS TO THE MERITS OF THE PLAN. EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING ALL EXHIBITS AND SCHEDULES TO THE PLAN AND DISCLOSURE STATEMENT) IN THEIR ENTIRETY BEFORE VOTING.

18435954.v6

# TABLE OF CONTENTS

**ARTICLE 1      INTRODUCTION** .................................................................................. 1

    **A.**    Summary of the Plan ................................................................................. 2
    **B.**    Summary of Voting Procedures ................................................................ 6
    **C.**    Overview of Chapter 11 ........................................................................... 8
    **D.**    Summary of Classification of Claims ..................................................... 10
    **E.**    Disclosure Statement Enclosures ........................................................... 11

**ARTICLE 2      THE DIOCESE AND ITS OPERATIONS** .................................... 11

    **A.**    Prepetition Operations ........................................................................... 11
    **B.**    Need for Reorganization ........................................................................ 13

**ARTICLE 3      THE CHAPTER 11 CASE** ............................................................... 15

    **A.**    The Chapter 11 Filing ........................................................................... 15
    **B.**    Administration of the Case .................................................................... 16
    **C.**    Appointment of the Committee .............................................................. 16
    **D.**    Retention of Professionals ..................................................................... 17
    **E.**    Schedules and Statement of Financial Affairs ....................................... 18
    **F.**    Post-Petition Operations and Select Financial Information .................... 18
    **G.**    Bar Date, Abuse Claims, and Boy Scouts of America Claims ............... 21
    **H.**    Reserved ................................................................................................ 24
    **I.**    Insurance Coverage Adversary Proceeding ........................................... 24
    **J.**    Stay of Litigation Against Parishes, Schools, and Other Catholic
        Organizations ........................................................................................ 26
    **K.**    Appointment of Second Mediator .......................................................... 27
    **L.**    The DOR Claim Objections .................................................................. 28
    **M.**    The Restructuring Support Agreement ................................................... 28
    **N.**    Court Facilitated Settlement Conference and LMI Settlement ............... 29
    **O.**    CNA Claim Objections and Committee Motion to Dismiss ................... 29
    **P.**    Interstate Motion to Resume Litigation of Insurance Adversary Proceeding ....... 30
    **Q.**    Adjournment of Contested Matters to Allow for Additional Mediation
        Efforts ................................................................................................... 30
    **R.**    Interstate and First State Settlements ..................................................... 30
    **S.**    CNA Competing Plan ............................................................................ 30
    **T.**    CNA Administrative Claim .................................................................... 31

**ARTICLE 4      SUMMARY OF THE PLAN** .......................................................... 31

    **A.**    Classification of Claims Generally ......................................................... 32
    **B.**    Creditor Recovery Under the Plan .......................................................... 32
    **C.**    Classification of Claims and Treatments ................................................ 32

**ARTICLE 5     ABUSE CLAIMS** ...................................................................... **47**

**A.**     Assessment of Abuse Claims................................................................ 47
**B.**     Legal Effect of Estimation of Claims and Distributions Under the
         Allocation Protocol ........................................................................... 48
**C.**     Insurance Settlements ......................................................................... 49
**D.**     Distributions to Abuse Claimants. ...................................................... 49
**E.**     Litigation of Abuse Claims Against Non-Settling Insurers.................. 52
**F.**     Dismissal of Pending Litigation.......................................................... 55
**G.**     Claim Withdrawal ............................................................................... 56
**H.**     Medicare Procedures ........................................................................... 56

**ARTICLE 6     SETTLING INSURERS** ............................................................ **56**

**A.**     Insurance Settlement Agreements........................................................ 56
**B.**     Sale Free and Clear of Interests of Settling Insurer Policies ............... 57
**C.**     Resolution of Claims Involving Settling Insurers................................ 57
**D.**     The Settling Insurer's Payments ......................................................... 57
**E.**     Further Assurances; Non-Material Modifications ................................ 57
**F.**     Waiver/Consent................................................................................... 58
**G.**     Rights Under Insurance Settlement Agreements ...**Error! Bookmark not defined.**
**H.**     Timing................................................................................................. 58

**ARTICLE 7     MATTERS RELATING TO NON-SETTLING INSURERS** ...................... **58**

**A.**     Preservation of Rights and Obligations ............................................... 58
**B.**     Estimations/Assessments of Abuse Claims Are Not Binding .............. 59
**C.**     Post-Effective Date Insurance Obligations.......................................... 59
**D.**     Trust Powers With Respect to Abuse Claims and Non-Settling Insurers............ 60
**E.**     Insurance Coverage Adversary Proceeding ......................................... 60

**ARTICLE 8     MEANS FOR IMPLEMENTATION OF THE PLAN**................................. **61**

**A.**     Plan Implementation ........................................................................... 61
**B.**     Corporate Action................................................................................. 61
**C.**     Payments Effective Upon Tender ........................................................ 61
**D.**     Agreements, Instruments, and Documents ........................................... 61
**E.**     Continuation of Insurance Policies ...................................................... 62
**F.**     Bar Date for Professional Fee Claims.................................................. 62
**G.**     Bar Date for Other Administrative Claims ........................................... 62
**H.**     Exit Financing .................................................................................... 63

**ARTICLE 9     THE TRUST** .................................................................................. **63**

**A.**     Establishment of the Trust .................................................................. 63
**B.**     Funding the Trust ................................................................................ 63
**C.**     Vesting of Trust Assets ....................................................................... 65
**D.**     Non-Monetary Commitments. ............................................................. 65

18435954.v6

Case 2-19-20905-PRW,   Doc 2888,   Filed 01/10/25,   Entered 01/10/25 16:09:38,
Description: Main Document  , Page 7 of 128

| | | |
|---|---|---|
| E. | Appointment of the Trustee | 66 |
| F. | Trust Advisory Committee | 66 |
| G. | Rights and Responsibilities of the Trustee | 66 |
| H. | Trust Pursuit of Insurance Claims | 67 |
| I. | Tax Matters | 71 |
| J. | DOR Entities' Post-Effective Date Costs Procedures | 71 |
| K. | No Recourse Against Trustee | 73 |
| L. | Indemnification by Trust | 73 |
| M. | Trust Liability | 74 |
| N. | Termination | 74 |

**ARTICLE 10    GENERAL CLAIMS ADMINISTRATION ................................. 74**

| | | |
|---|---|---|
| A. | Objections To Non-Abuse Claims | 74 |
| B. | Determination of Claims | 74 |
| C. | No Distributions Pending Allowance | 75 |
| D. | Claim Estimation | 75 |
| E. | Treatment of Contingent Claims | 75 |
| F. | Controversy Concerning Impairment | 76 |
| G. | Treatment of Executory Contracts and Unexpired Leases | 76 |

**ARTICLE 11    PROVISIONS GOVERNING DISTRIBUTIONS ..................... 76**

| | | |
|---|---|---|
| A. | Disbursing Agents | 76 |
| B. | Manner of Payment | 76 |
| C. | Distribution Only to Holders of Allowed Claims | 77 |
| D. | Disputed Claim Reserve | 77 |
| E. | Transmittal of Distributions | 77 |
| F. | Timing of Distributions | 78 |
| G. | Time Bar to Check Payments | 78 |
| H. | No Professional Fees or Expenses | 78 |
| I. | No Interest on Claims | 78 |
| J. | Saturday, Sunday or Holiday | 79 |
| K. | Withholding Taxes | 79 |
| L. | Setoffs and Recoupment | 79 |
| M. | No *De Minimis* Distributions | 79 |
| N. | Prepayment | 79 |

**ARTICLE 12    EFFECTIVE DATE .......................................................... 80**

| | | |
|---|---|---|
| A. | Conditions Precedent to Effective Date | 80 |
| B. | Notice of Effective Date ...........................**Error! Bookmark not defined.** |
| C. | Waiver of Conditions Precedent to the Effective Date | 81 |
| D. | Effect of Non-Occurrence of Conditions | 82 |

**ARTICLE 13    EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE ..... 82**

| | | |
|---|---|---|
| A. | General Injunction and Discharge | 82 |

18435954.v6

|  | **B.** | Injunction and Discharge of Abuse Claims and Inbound Contribution Claims | 83 |
|  | **C.** | Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties | 86 |
|  | **D.** | Supplemental Settling Insurer Injunction | 88 |
|  | **E.** | Litigation/Settlement Between a Participating Party or Abuse Claimant and Non-Settling Insurers | 88 |
|  | **F.** | Certain Litigation Matters | 92 |
|  | **G.** | Injunction Against Interference with Plan | 92 |
|  | **H.** | Release by Holders of Claims | 92 |
|  | **I.** | Mutual Releases | 93 |
|  | **J.** | Exculpation; Limitation of Liability | 94 |
|  | **K.** | Injunctions in Full Force and Effect | 94 |
|  | **L.** | Injunctions and Releases Integral | 94 |
|  | **M.** | Timing | 95 |
|  | **N.** | Excluded Parties and Non-Settling Insurers | 95 |
|  | **O.** | Title to and Vesting of Assets | 95 |
|  | **P.** | Continued Corporate Existence; No Successor Liability | 96 |
|  | **Q.** | Identity of Trustees | 96 |
|  | **R.** | Authority to Effectuate Plan | 97 |
|  | **S.** | Binding Effect | 97 |
|  | **T.** | Dissolution of Committee | 97 |

**ARTICLE 14    RESERVED** .................................................................... **97**

**ARTICLE 15    RETENTION OF JURISDICTION** ................................ **97**

|  | **A.** | By the Bankruptcy Court | 97 |
|  | **B.** | By the District Court | 99 |
|  | **C.** | Actions to Enforce the Plan | 99 |
|  | **D.** | Case Closure | 99 |

**ARTICLE 16    TAX CONSEQUENCES OF THE PLAN** ........................ **100**

|  | **A.** | Federal Income Tax Consequences to Holders of Unsecured Claims | 100 |
|  | **B.** | Federal Income Tax Consequences to the Diocese | 101 |
|  | **C.** | Tax Consequences to the Trust | 101 |

**ARTICLE 17    ALTERNATIVES TO THE PLAN** .................................. **102**

|  | **A.** | Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code | 102 |
|  | **B.** | Dismissal of the Chapter 11 Case | 102 |
|  | **C.** | Chapter 7 Liquidation Not a Viable Alternative | 102 |
|  | **D.** | Appointment of a Chapter 11 Trustee is Not a Viable Alternative | 103 |

**ARTICLE 18    ACCEPTANCE AND CONFIRMATION OF THE PLAN** ................... **103**

|  | **A.** | General Confirmation Requirements | 103 |

| | | |
|---|---|---|
| **B.** | Confirmation Hearing | 104 |
| **C.** | Confirmation | 104 |
| **D.** | Acceptance of Plan | 105 |
| **E.** | Confirmation Without Acceptance of All Impaired Classes | 105 |
| **F.** | Best Interests Test | 106 |
| **G.** | Feasibility | 107 |
| **H.** | Compliance with the Applicable Provisions of the Bankruptcy Code | 107 |

**ARTICLE 19     RISK FACTORS TO BE CONSIDERED ........ 107**

| | | |
|---|---|---|
| **A.** | Objection to Classifications of Claims | 108 |
| **B.** | Failure to Satisfy Voting Requirements | 108 |
| **C.** | The Plan May Not Be Accepted or Confirmed | 108 |
| **D.** | The Court May Enforce the Second Settlement Agreement with CNA | 108 |
| **E.** | The CNA Administrative Claim | 109 |
| **F.** | The Plan Proponents' Assumptions and Estimates May Prove Incorrect | 109 |
| **G.** | Non-Confirmation or Delay in Confirmation of the Plan | 109 |
| **H.** | Non-Consensual Confirmation | 109 |
| **I.** | Authority to Grant Third-Party Releases | 110 |
| **J.** | Risk of Non-Occurrence of the Effective Date | 110 |
| **K.** | Non-Settling Insurers May Raise Objections to Confirmation | 110 |
| **L.** | Post-Confirmation Litigation May Not Result in Additional Recovery | 110 |
| **M.** | Confirmation of the Plan may be delayed or denied by the District Court | 111 |
| **N.** | United States Trustee fees may be imposed on certain payments under the Plan | 111 |
| **O.** | State Court Counsel contingency fees | 112 |

**ARTICLE 20     MISCELLANEOUS PROVISIONS ........ 112**

| | | |
|---|---|---|
| **A.** | Amendment or Modification of the Plan | 112 |
| **B.** | Headings | 113 |
| **C.** | Severability of Plan Provisions | 113 |
| **D.** | Validity and Enforceability | 113 |
| **E.** | Revocation or Withdrawal of the Plan | 113 |
| **F.** | Controlling Documents | 113 |
| **G.** | Filing of Additional Documents | 114 |
| **H.** | Direction to a Party | 114 |
| **I.** | Certain Actions | 114 |
| **J.** | Preservation of Tort Defendants' Rights | 114 |
| **K.** | Plan as Settlement Communication | 115 |
| **L.** | Reports | 115 |
| **M.** | Governing Law | 115 |
| **N.** | No Admissions | 116 |

**ARTICLE 21      BANKRUPTCY RULE 9019 REQUEST**.................................................... **116**

**ARTICLE 22      RECOMMENDATION AND CONCLUSION**.......................................... **116**

<u>**EXHIBITS**</u>

Exhibit A          Chapter 11 Plan of Reorganization
Exhibit B          Participating Party Financial Information
Exhibit C          Liquidation Analysis
Exhibit D          Financial Projections

18435954.v6

Case 2-19-20905-PRW,    Doc 2888,    Filed 01/10/25,    Entered 01/10/25 16:09:38,
Description: Main Document  , Page 11 of 128

# ARTICLE 1

# INTRODUCTION

On September 12, 2019 (the "Petition Date"), the Diocese filed a voluntary chapter 11 petition with the United States Bankruptcy Court for the Western District of New York (Rochester Division) (the "Bankruptcy Court"). Since the Petition Date, the Diocese has remained in possession of its assets and has continued to own, operate, and manage its affairs pending the approval of a plan of reorganization in accordance with the provisions of Title 11 of the United States Code (as amended, the "Bankruptcy Code").

On September 25, 2019, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the Diocese's Chapter 11 Case. The Committee is comprised of eight individuals who assert Abuse Claims against the Diocese. The Committee supports approval and confirmation of the Plan and is a Plan Proponent and a signatory to the Plan.[2]

The Plan sets forth, among other things, the proposed treatment of Claims and other interests in accordance with the Bankruptcy Code. This Disclosure Statement is intended to explain the Plan and provide such information to Creditors as may be deemed material, important, and necessary so that they may make reasonably informed decisions in exercising their right to vote for acceptance of the Plan. A copy of the plan is included with this Disclosure Statement. If the Plan and this Disclosure Statement are not consistent, the terms of the Plan control. Capitalized terms used in this Disclosure Statement but not otherwise defined shall have the meanings ascribed to them in the Plan.

The Plan provides for the financial restructuring of the Diocese and the settlement of all, or substantially all, Claims against the Diocese, including, without limitation, the settlement of all Abuse Claims against the Diocese and the Participating Parties.[3]

As set forth in more detail below, the Plan provides for payment in full of all Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Professional Fee Claims, and U.S. Trustee Fee Claims, leaves unimpaired any Allowed Secured Claims or Pass-Through Claims, provides for deferred payments equal to the full Allowed amount of any General Unsecured Claims, and establishes the Abuse Claims Settlement Fund to be held by the Trust to compensate holders of Abuse Claims. Inbound Contribution Claims against the Diocese are disallowed and extinguished pursuant to the Plan.

---

[2] The Committee is not a signatory to this Disclosure Statement and makes no representations or warranties with respect to information set forth herein regarding the Diocese's history and financial projections. The Committee has reviewed and approved the description of the Plan and the statements contained herein pertaining to the Committee, its activities in this Chapter 11 Case, and the Committee's evaluation and recommendations as a Plan Proponent with respect to the Plan and alternatives to the Plan.

[3] The Plan establishes a Trust for the settlement of all Abuse Claims that arose prior to September 12, 2019 which is when the Diocese filed this Chapter 11 Case. Any Claims arising on or after September 12, 2019 but prior to confirmation of the Plan will be treated as either Administrative Claims, or Pass-Through Claims, in accordance with Plan Sections 2.1.1 and 2.3.2 respectively.

1

The Plan's treatment of Abuse Claims represents the culmination of more than four years of negotiation between the Diocese and the Committee in its capacity as an advocate on behalf of all Abuse Claimants and has been approved by the Committee in consultation with attorneys who collectively represent approximately percent (70%) of all Abuse Claimants who have asserted Abuse Claims against the Diocese ("State Court Counsel").

The Plan provides that funding for the Trust and the Abuse Claims Settlement Fund will be provided from, among other potential sources of recovery, a cash contribution by the Diocese and other Participating Parties in the aggregate amount of $55 million (the "DOR Entities' Cash Contribution"), and payments paid pursuant to Insurance Settlement Agreements with various Settling Insurers. The Diocese anticipates that approximately $25 million of the DOR Entities' Cash Contribution will be funded by the Diocese, with the remaining $30 million to be funded by the other Participating Parties. As of the date of this Disclosure Statement, the Diocese and the Committee have agreed to accept a total of $71,350,000 million in settlement payments from four Settling Insurers, LMI, Underwriters, Interstate, and First State, in exchange for entering into Insurance Settlement Agreements with respect to their respective Insurance Policies.

There is one Insurer, CNA, that has not settled with the Diocese and the Committee. The Plan provides CNA with the option to elect to become a Settling Insurer in return for a settlement payment to the Abuse Claims Settlement Fund of $171 million dollars and on such other terms and conditions as agreed by CNA, the Committee and the Diocese. If CNA elects to enter into an Insurance Settlement Agreement prior to the approval of the Disclosure Statement, the Plan provides that CNA will become a Settling Insurer and for settlement proceeds resulting therefrom to be used to further supplement the Abuse Claims Settlement Fund. To the extent that CNA does not make the CNA Settlement Election and no settlement is otherwise reached with the CNA, then CNA will remain a Non-Settling Insurer. The Plan provides for the assignment of Insurance Claims held by the Diocese or other Participating Parties to the Trust, and establishes a framework for post-confirmation litigation of Insurance Claims and Litigation Claims seeking recovery from any Non-Settling Insurer. The Committee has previously rejected a settlement offer from the CNA in the amount of $63.5 million, and Abuse Claimants overwhelmingly voted to reject a $75 million settlement offer made in connection with a chapter 11 plan proposed by CNA. The Committee, in consultation with State Court Counsel representing approximately seventy percent (70%) of all Abuse Claimants believes that $171 million would be an appropriate settlement amount for the CNA and has acknowledged and accepted the risk inherent in pursuing post-confirmation recovery from CNA in the event that CNA does not elect to become a Settling Insurer.

A.    **Summary of the Plan**

Survivors of Abuse are the focal point of the Plan. The tragedy of the Abuse that was inflicted in the past by certain priests or others purporting to do the missionary work of the Roman Catholic Church is impossible to overstate. Instead of fulfilling this mission, such perpetrators inflicted harm and suffering. The Abuse is inexcusable. It not only deeply impacted the survivors, but it also affected the faithful and the community that the Diocese serves.

2

Prior to the enactment of the New York Child Victims Act (A.2683/S.2440) (the "CVA") and the Adult Survivors Act (A.648/S.66) (the "ASA"), the Diocese devoted substantial resources and effort to provide support and compensation to survivors of Abuse, including providing counselling, therapy, and other support to those survivors. The Diocese also provided monetary compensation to a number of known survivors, including the payment of amounts awarded through its Independent Reconciliation and Compensation Program.

Following the enactment of the CVA, individuals alleging Abuse Claims began to file lawsuits against the Diocese. The Diocese has limited insurance and other resources available to compensate Abuse Claimants. A filing for bankruptcy relief was the only viable means to preserve and fairly distribute the Diocese's limited resources among the numerous Abuse Claimants. In order to compensate the Abuse Claimants, the Diocese and certain primary stakeholders, including the Committee and the Committee Members who are represented by State Court Counsel that collectively represent over 70% of all Abuse Claimants in this Chapter 11 Case, entered into a Restructuring Support Agreement (the "RSA") which forms the basis for the Plan. Pursuant to the RSA, the Diocese has assembled a Cash fund that will be used to compensate Abuse Claimants and to fund a litigation trust to pursue additional insurance recoveries.

The Plan establishes a Trust funded by (i) the DOR Entities' Cash Contribution in the aggregate amount of $55,000,000; (ii) at least $71,350,000 in monetary contributions made by Settling Insurers; and (iii) the assignment to the Trust of certain Insurance Claims against Non-Settling Insurers (the foregoing are, collectively, the "Trust Assets"). If the Non-Settling Insurer makes the CNA Settlement Election then there will be at least $242,350,000 in monetary contributions made by the Settling Insurers and included in the Trust Assets. The Trustee will liquidate the Trust Assets and distribute the proceeds to the Abuse Claimants, pursuant to the procedures contained in the Allocation Protocol.

Distributions to Abuse Claimants may be subject to fee agreements between an Abuse Claimant and their legal counsel. Abuse Claimants' legal counsel are obligated to comply with Rule 1.5 of the New York Rules of Professional Conduct and 22 CRR-NY 1015.15 in connection with any fees charged to Abuse Claimants.

The Plan Proponents believe that the Plan provides the best alternative to compensate Abuse Claimants for their Abuse Claims. All but one of the insurers has agreed on payment amounts to fund the Trust. The Trust will be funded in an initial amount of $126.35 million. The lone holdout insurer is CNA, which denied approximately 270 of the approximately 300 claims that fall within its coverage periods. CNA proposed a chapter 11 plan (the "CNA Plan") that provides for a payment of $75 million by CNA as a settlement of its liability in the Diocese. The Diocese's other principal insurers, LMI and Interstate, insure approximately 173 sexual abuse claims (consisting of 159 timely and 14 late-filed claims). The average per-claim settlement based on those insurers' $69,500,000 settlement payment yields an average per-claim payment of $401,734. Importantly, however, the LMI and Interstate policies are subject to a $75,000 per occurrence self-insured retention ("SIR"), a feature the CNA policies do not have. The SIR needs to be satisfied before the LMI/Interstate policies will provide coverage. Thus, using a conservative estimate of one $75,000 SIR per occurrence applying to each of the 173 LMI/Interstate sexual abuse claims, results in a settlement amount that implies an average per-

3

18435954.v6
Case 2-19-20905-PRW, Doc 2888, Filed 01/10/25, Entered 01/10/25 16:09:38, Description: Main Document , Page 14 of 128

claim insured valuation of $476,734. In contrast, CNA's proposed payment of $75 million results in an average per-claim insured value approximately half that of the LMI and Interstate settlement. CNA asserts that the disparity in per-claim settlement value may be attributable to a difference in available policy limits and/or potential (albeit unasserted) extracontractual claims against Interstate.

The Plan provides that CNA may elect to become a Settling Insurer in return for a payment of $171 million to the Abuse Claims Settlement Fund and such other terms and conditions as the Diocese, the Committee and CNA may agree. CNA must make the CNA Settlement Election before the hearing on the Disclosure Statement in order to become a Settling Insurer. If CNA makes the CNA Settlement Election, then the Trust will be funded in an initial amount of $297.35 million. Adding the CNA Settlement Payment to the payments of the other Settling Insurers results in an average per-claim insured value of $508,457. The Plan Proponents believe that if CNA makes the CNA Settlement Election, the resulting settlement fairly values CNA's exposure for the Abuse Claims asserted in this case in light of the time, expense and risk of continued litigation.

If CNA remains a Non-Settling Insurer, then, under the Plan, Abuse Claimants with claims within the CNA coverage period may pursue claims insured by CNA as Litigation Claimants as authorized by the Trustee in accordance with the Trust Documents. The Trust would retain the right to pursue causes of action of the Diocese against CNA and to settle with CNA on a global basis. The Plan Proponents believe that the tools provided by the Plan to Abuse Claimants and the Trust will allow the Trust to pursue a favorable settlement with CNA that fairly values its exposure for Abuse Claims asserted in this Chapter 11 Case.

The contribution by the Diocese and each of Participating Parties that would receive a release under the Plan was reached as the result of extensive negotiations regarding, among other things, the extent of liability faced by each entity, the ability of each entity to pay, and insurance coverage available for the types of Claims being satisfied by the trust. In exchange for the contributions to the Trust, (a) the Diocese and Reorganized Diocese, (b) the Parishes, (c) the Schools, (d) Other Catholic Organizations, and (e) the Settling Insurers (collectively, the "Protected Parties") shall receive certain releases, exculpation, and injunctions, all as more specifically set forth in this Disclosure Statement and the Plan. A summary setting forth the financial assets available to the Participating Parties to contribute to a settlement, as well as the aggregate contributions being made by the Participating Parties, is attached to this Disclosure Statement as **Exhibit B**.

> *__Exculpation.__ The Plan provides certain exculpation provisions which are typical and customary in chapter 11 plans. The provisions provide that the Diocese, the Reorganized Diocese, the Diocese's Professionals, the Committee, the Committee's Professionals, the Mediators, the Participating Parties, the Settling Insurers, and Related Persons of the foregoing Persons and entities will be released from certain of their acts and omissions that occurred from the Petition Date though Effective Date. None of these parties will be exculpated from claims arising from the*

4

> *gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty.*
>
> > ***Releases.*** *The Plan Provides that the Participating Parties will be granted releases and a channeling injunction regarding certain claims, including all Abuse Claims. If the Plan is confirmed, Abuse Claimants will not be able to recover directly from or pursue further litigation against the Participating Parties (except that some Litigation Claimants may be authorized to pursue Litigation Claims for limited purposes in accordance with the terms of the Plan), and Abuse Claimants' recoveries on account of their Abuse Claims will limited by the terms of the Plan.*
> >
> > ***Injunctions.*** *The Plan provides for certain injunctions, including a channeling injunction which will channel certain Claims, including all Abuse Claims against the Diocese or any of the Participating Parties, into the Trust. This means that any holder of a Claim that is channeled will no longer be permitted to pursue their Claim except as set forth in the Plan.*
> >
> > *The exculpation, releases, and injunctions contained in the Plan are an integral part of the Diocese's overall restructuring efforts and were an essential element of the negotiations among the parties and in obtaining the Protected Parties' support for the Plan.*

The releases contained in the Plan are an integral part of the Diocese's overall restructuring efforts and were an essential element of the negotiations among the parties and in obtaining the support of the Diocese and the Participating Parties for the Plan. Each Abuse Claimant has the ability to exempt itself from the releases and channeling injunction provisions of the Plan relating to the Participating Parties by affirmatively withholding consent for such releases and injunctions on the Abuse Claim Ballot. By indicating a withholding of consent, however, such Abuse Claimant will be deemed a Non-Participating Abuse Claimant and will be subject to the treatment set forth in Section 4.3 of the Plan.

**You may be deemed to grant releases to third parties under the Plan. Consenting Abuse Claimants under the Plan are deemed to have released the Diocese and the Participating Parties pursuant to Section 12.8 of the Plan, and Consenting Abuse Claims are subject to a channeling injunction pursuant to Section 12.3 of the Plan. A Consenting Abuse Claimant is any holder of an Abuse Claim who has not either (i) affirmatively indicated on their Abuse Claim Ballot that they are withholding their consent to the releases and injunctions provided for in the Plan with respect to the Protected Parties; or (ii) Filed a timely objection to confirmation of the Plan indicating that they are withholding their consent to the releases and injunctions provided for in the Plan with respect to the Protected Parties.**

18435954.v6

Holders of Class 4 Abuse Claims that do not affirmatively opt-out of the release and injunction provisions set forth in the Plan, in each case, will be deemed to consent to these terms.

**If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of claims and interests against the Diocese, including all Abuse Claimants, will be bound the by the terms of the Plan and the transactions contemplated thereby, including the release provisions contained therein (including holders of Claims who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan, but excluding holders of Abuse Claims who are entitled to, and do, opt out of the release and channeling injunction provisions contained in the Plan).**

The Plan further provides that the holders of Allowed Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Professional Fee Claims, Secured Claims, Pass-Through Claims, and General Unsecured Claims will be paid in full as set forth herein, that all Abuse Claims will be channeled to the Trust, that the Diocese will be able to restructure its financial affairs, and that the Reorganized Diocese will be able to continue the mission and ministry of the Church, which is critical to so many in Western New York – especially the elderly, poor, incarcerated, and vulnerable – after confirmation of the Plan. The Reorganized Diocese will also continue to address the spiritual needs of those who were harmed and the Catholic community the as a whole.

If the Diocese and Participating Parties determine, in their sole discretion, that the risk created by any number of elections of Abuse Claimants to be treated as Non-Participating Abuse Claimants is too great, the Participating Parties may reduce or eliminate their contributions and the Diocese may withdraw or decline to proceed with the confirmation of the Plan. Therefore, there is a risk that any Abuse Claimant's election to proceed as a Non-Participating Abuse Claimant may cause the Plan to fail. It is a condition to the Effective Date that all holders of Abuse Claims be Consenting Abuse Claimants.

In the opinion of the Plan Proponents, the treatment of Claims under the Plan provides an opportunity for greater recovery for Creditors than that which is likely to be achieved under other alternatives. **Accordingly, the Plan Proponents believe that confirmation of the Plan is in the best interests of, and provides the highest and most expeditious recoveries to, holders of all Claims against the Diocese. All Creditors entitled to vote, therefore, are urged to vote to accept the Plan.**

**B.      Summary of Voting Procedures**

1.      **Vote Solicitation and Deadline**.

To be counted, your Ballot must be received, pursuant to the following instructions, by Bankruptcy Management Solutions, Inc. d/b/a Stretto ("Stretto"), on or before **5:00 p.m. (Eastern Time) on March 11, 2025** (the "Voting Deadline"):

6

**If by first class mail, overnight courier or hand delivery:**

The Diocese of Rochester – Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, California 92602

**By electronic, online submission:**

Please visit **https://case.stretto.com/rochesterdiocese/docket**.
Click on the "***E-Ballot***" section of the Diocese's website and
follow the directions on your Ballot to submit your E-Ballot.  If
you choose to submit your Ballot via Stretto's E-Ballot system,
you should <u>not</u> also return a hard (paper) copy of your Ballot.

**IMPORTANT NOTE:  You will need a unique E-Ballot ID Number that will
be provided with your Ballot.**

**IF YOU HOLD A CLAIM ENTITLED TO VOTE:**

Please (i) complete the information requested on the Ballot; (ii) sign, date, and indicate your vote
to accept or reject the Plan; and (iii) return the completed Ballot in the enclosed pre-addressed,
postage-paid envelope, or by one of the other methods described above, so that it is actually
received by Stretto on or before the Voting Deadline.

**DO NOT RETURN ANY INVOICES, DEBT INSTRUMENTS, NOTES, OR
CERTIFICATES THAT YOU MAY HAVE WITH YOUR BALLOT.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE
COUNTED, NOR WILL ANY BALLOTS RECEIVED BY TELECOPY OR EMAIL BE
ACCEPTED.**

**IF YOU HAVE QUESTIONS REGARDING THE BALLOT, DID NOT RECEIVE
A RETURN ENVELOPE WITH YOUR BALLOT, DID NOT RECEIVE AN
ELECTRONIC COPY OF THE DISCLOSURE STATEMENT AND THE PLAN, OR
NEED PHYSICAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS,
PLEASE CONTACT THE DIOCESE'S SOLICITATION AND CLAIMS AGENT,
STRETTO, BY EMAIL AT TEAMROCHDIOCESE@STRETTO.COM OR BY
CALLING 855.347.3773 AND REQUESTING TO SPEAK WITH A MEMBER OF THE
DIOCESE'S SOLICITATION TEAM.**

2.      **Importance of Your Vote**.

Your vote is important.  The Bankruptcy Court defines acceptance by a Class of
Claims as acceptance of at least two-thirds in amount and a majority in number of Allowed
Claims in the Class that vote.  Only the Ballots of those Creditors who actually vote are counted
for purposes of determining whether a Class voted to accept the Plan.  Your failure to vote will
leave to others the decision to accept or reject the Plan.

18435954.v6

## C.  <u>Overview of Chapter 11</u>

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and interest holders with respect to any distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession". Upon filing a petition for chapter 11 relief and during the pendency of a case, the Bankruptcy Code imposes an automatic stay against creditors' attempts to collect or enforce, through litigation or otherwise, claims against the debtor. The automatic stay provisions of section 362 of the Bankruptcy Code, unless modified by court order, will generally prohibit or restrict attempts by creditors to collect or enforce any claims that arose prior to the commencement of the chapter 11 case against the debtor.

The Bankruptcy Code provides for the formation of an official committee of unsecured creditors in a chapter 11 case to represent the interests of Creditors in the case. On September 26, 2019, the United States Trustee appointed the Committee in the Chapter 11 Case to represent the interests of the Diocese's unsecured Creditors, including the Abuse Claimants.

The principal objective of a chapter 11 reorganization is the confirmation of a plan of reorganization. The plan sets forth the means for satisfying the claims of creditors and other stakeholders. The plan and a disclosure statement that contains information necessary to allow creditors, shareholders, and members to evaluate the plan are sent to creditors, shareholders and members whose claims or interests are impaired, who then vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if the class is "impaired" by the plan. Section 1124 of the Bankruptcy Code provides generally that a claim is impaired if the legal, equitable, or contractual rights of the claim are altered.

A plan may be confirmed under section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each class has noted to accept the plan. Votes will be counted only with respect to claims: (a) that are listed on the debtor's schedules other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the claim filing deadline set by the Bankruptcy Court for the filing of proofs of claim. However, any vote by a holder of a claim will not be counted if the claim has been disallowed or is the subject of an unresolved objection, absent an order from the Bankruptcy Court allowing the claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan. Pursuant to Bankruptcy Rule 3018(a), Class 4 Abuse Claims shall be estimated at $1.00 for voting purposes only. The actual amount payable on account of Class 4 Abuse Claims will be determined pursuant to the Allocation Protocol.

8

A holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily Allowed by the Diocese, or by an order of the Bankruptcy Court, in an estimated amount that it deems proper for the purpose of voting to accept or reject the Plan. In other words, only holders of Allowed Claims that are in Class 3 (General Unsecured Claims) or Class 4 (Abuse Claims) may vote to accept or reject the Plan. A Claim to which an objection has been Filed by the Diocese or any other party in interest that is pending at the time of the Confirmation Hearing or a Claim (i) that is listed on the Diocese's Schedules as disputed, unliquidated, or contingent, and (ii) with respect to which a superseding proof of claim has not been Filed, is not an Allowed Claim for voting purposes, unless the Claim is settled by agreement or the Bankruptcy Court Allows the Claim (in whole or in part) by Final Order. Upon request of a party in interest, the Bankruptcy Court may temporarily Allow or estimate a Disputed Claim for purpose of voting on the Plan. Ballots cast in respect of Claims other than Allowed Abuse Claims will not be counted. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the Claimant is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If an impaired class votes to reject the plan, the proponent of the plan may seek to "cram down" the plan by confirming it under section 1129(b) of the Bankruptcy Code. A plan proponent may cram down a plan upon a rejecting class only if at least one impaired class has voted to accept the plan, the plan does not discriminate unfairly, and the plan is fair and equitable with respect to each impaired class that has not voted to accept the plan. **The Plan Proponents believe that the Plan will satisfy the foregoing requirements as to any rejecting Class of Claims, and can therefore be confirmed despite any such rejection by any Class.**

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of a claim should vote on the enclosed ballot either to accept or reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by contacting the Diocese's solicitation and claims agent, Stretto, by email at TeamRochDiocese@stretto.com or by calling 855.347.3773 and requesting to speak with a member of the solicitation team.

**Class 3 General Unsecured Claims and Class 4 Abuse Claims are Impaired under the Plan and are entitled to vote on the Plan.**

**The Class 1 Secured Claim of The Bank of Castile, and Class 2 Pass-Through Claims (if any) are Unimpaired under the Plan and are deemed to accept the Plan. Class 5 Inbound Contribution Claims are Impaired under the Plan and are deemed to reject the Plan.**

Section 1129(a) of the Bankruptcy Code establishes several conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the chapter 11 process. Among the conditions for plan confirmation is that either each holder of a claim must accept the plan, or the plan must provide at least as much value as would be received upon liquidation of a debtor's estate under chapter 7 of the Bankruptcy Code. **The Plan Proponents**

9

**believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

The Bankruptcy Court has scheduled a Confirmation Hearing to consider approving the Plan commencing on **[XXXX], 2025 at 10:00 a.m. (prevailing Eastern Time)** at the United States Bankruptcy Court for the Western District of New York in Rochester, New York. The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled hearing date or upon the Diocese filing a notice of adjournment.

**D.      Summary of Classification of Claims**

Detailed elsewhere in this Disclosure Statement are descriptions of the technical aspects of the classification of Claims, the relative allocations of assets to holders of such Claims, the methodology as to how such assets are to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the Plan. However, the Plan Proponents believe that a broad overview of what, in their opinion, the Creditors are likely to receive under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims under the Plan. This summary is qualified in its entirety by reference to the Plan:

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| N/A | Administrative Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | U.S. Trustee Fee Claims | No | Does not Vote |
| 1 | Secured Claim of The Bank of Castile | No | Deemed to Accept |
| 2 | Pass-Through Claims | No | Deemed to Accept |
| 3 | General Unsecured Claims | Yes | Entitled to Vote |
| 4 | Abuse Claims | Yes | Entitled to Vote |
| 5 | Inbound Contribution Claims | Yes | Deemed to Reject |

As discussed in the Liquidation Analysis attached hereto as **Exhibit C**, the Plan Proponents estimate that recoveries for holders of Abuse Claims in Class 4 under the Plan will be greater than in liquidation under chapter 7 of the Bankruptcy Code because the total amount of assets available for Distribution is greater under the Plan than in liquidation under chapter 7. The portion of the DOR Entities' Cash Contribution and assignment of Insurance Claims made by the Diocese and the Parishes, Schools, and Other Catholic Organizations that comprise the Participating Parties will not be available to the Estate under chapter 7. The Plan Proponents also believe that theoretical Distributions under a chapter 7 case would likely be delayed due to the time it will take a chapter 7 trustee to assess the Diocese's assets, review and analyze Claims, and evaluate and litigate claims against third parties. Holders of Allowed Claims entitled to vote to accept or reject the Plan should review the Liquidation Analysis (including all footnotes thereto and documents referenced therein) in assessing whether to vote to accept or reject the Plan.

10

### E.     Disclosure Statement Enclosures

Accompanying this Disclosure Statement are the following enclosures:

#### 1.     Order Approving Disclosure Statement.

A copy of the Order of the Bankruptcy Court dated _____, **2025**, approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, scheduling the Confirmation Hearing, and setting the deadline for objecting to confirmation of the Plan (the "Order Approving Disclosure Statement").

#### 2.     Notice of Confirmation Hearing.

A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing, and the deadline for filing objections to confirmation of the Plan (the "Notice of Confirmation Hearing").

#### 3.     Ballot.

A Ballot (and return envelope) for voting to accept or reject the Plan. *See* Article 18.A.1 below for an explanation of which Creditors are entitled to vote.

## ARTICLE 2

## THE DIOCESE AND ITS OPERATIONS

### A.     Prepetition Operations

The Catholic Church is a worldwide community with over 1.2 billion members who hold a common creed.  The supreme authority of the Church is vested in the Pope, who, by virtue of his office, possesses supreme, full, immediate, and universal ordinary power in the Church.  The Pope exercises such power in concert with the College of Bishops of which he is the head.  The organizational structure is intended to serve the mission to teach, to sanctify, and to serve which is realized in a variety of instruments and organizations.  A "diocese" is a portion of the Christian faithful which is entrusted to a bishop for him to shepherd with the cooperation of the ordained clergy.  As a general rule, a diocese is territorial and encompasses all the Christian faithful within its geographical bounds.  The bishop of a diocese is appointed by the Pope.  The Bishop of the Diocese is the Most Reverend Salvatore R. Matano (the "Bishop").  Bishop Matano was installed as the Bishop of Rochester on January 3, 2014.  A diocese is divided into "parishes," which are communities of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a priest as its proper pastor under the authority of the diocesan bishop.  As a general rule, each parish is territorial and encompasses all the Christian faithful within its geographical bounds.

Canon Law is a generic term applied to several sources of church law that together establish the internal organizational structure and procedures to be followed within the Catholic Church.  Canon Law also identifies property rights and agency relationships among the variety of structures with the community of the Catholic Church.  The Diocese is a Latin Catholic

Diocese and subject to the *Code of Canon Law* promulgated by Pope John Paul II on January 25, 1983.[4] As used herein, "<u>Church</u>" means the universal Catholic Church. Under Canon Law, dioceses and parishes are public juridic persons having separate and distinct canonical legal existence from each other and from the Church.

Under New York Law, the Diocese is an incorporated legal entity, separate from the Parishes and Other Catholic Organizations within its territory, with its own corporate structure and governance. The Diocese was founded on March 3, 1868 and subsequently incorporated in New York State on March 11, 1887. The Certificate of Incorporation of the Diocese was amended in 1909 and 1967. The 1967 amendment provides that the three trustees of the Diocese are the Bishop, the Vicar-General, and the Chancellor.

The Diocese serves a twelve county region in Western New York and its territory is co-extensive with the counties of Monroe, Wayne, Yates, Ontario, Cayuga, Seneca, Tompkins, Tioga, Chemung, Schuyler, Livingston, and Steuben. Within the territory of a diocese are separately constituted parishes. Like a diocese, a parish is usually defined territorially. There are currently 86 separately incorporated Parishes and approximately 300,000 Catholic individuals in the territory of the Diocese. These individuals are served by 139 Diocesan priests, 22 priests who are Religious that reside in the Diocese, 16 extern priests[5] and 131 deacons. Deacons are men ordained for the ministry of the word (catechetics and preaching), service to the poor, and liturgical assistance. The Diocese also currently employs approximately 64 individuals, which includes both clergy and laity. Numerous Parish corporations own, maintain, and operate cemeteries. The Parish corporations located within the Diocese are not under the fiscal or operating control of the Diocese. The Parish corporations have not sought bankruptcy relief and are not debtors in this bankruptcy proceeding.

Within the Diocese, fifteen (15) Parish corporations own and operate schools serving approximately 3,000 students. On the Petition Date, there was one Diocesan-operated middle school, Siena Catholic Academy in Brighton, New York, which closed during the pendency of the Chapter 11 Case. There are also eight non-Diocesan Catholic schools in the territory of the Diocese that are separately operated and governed by Religious or private not-for-profit organizations. Such schools serve approximately 2,700 students. These other separately incorporated Catholic schools located within the Diocese are not under the fiscal or operating control of the Diocese.

The Diocese maintains Affiliation Agreements with all Parishes. Each Affiliation Agreement acknowledges the common purpose served by the Diocese and the applicable Parish and is the mechanism by which the Diocese provides operational support to the Parishes. Among the services for which the Diocese charges fees to the Parishes are human resource

---

[4] 1983 Code c.1-1752 (1983) (as amended, "<u>1983 Code</u>"). Within the Roman Catholic Church there are 24 *sui juris* churches. The Latin Church is the largest, it is subject to *Codex Iuris Canonici auctoritate Ionnisa Paulii PP. II promulgatus* (Vatican City: Libreria Editrice Vaticana, 1983). Hereinafter, the 1983 Code. Throughout this Disclosure Statement, the English translation used will be *Code of Canon Law, Latin-English Edition,* CLSA 1998.

[5] An extern priest is priest incardinated in another diocese or institute of consecrated life who comes with the permission of the diocesan bishop to exercise ministry in the territory of the Diocese of Rochester. Incardination is the bond that exists between a cleric and a diocese or institute of consecrated life.

18435954.v6

services, information technology, risk management, safe environment, activity fees (e.g. Catholic Youth Organization and the National Catholic Youth Conference), and various other services. The Affiliation Agreement identifies types of services provided as well as an annual billing schedule for each fiscal year.

There are several Other Catholic Organizations that assist the Diocese and the Parishes in their ministry, which include: (i) Catholic Charities of the Diocese of Rochester, Inc.; (ii) Providence Housing Development Corporation; (iii) Rochester Catholic Press Association, Inc; (iv) Camp Stella Maris of Livonia, N.Y.; and (v) St. Bernard's School of Theology and Ministry. These entities are not under the fiscal or operating control of the Diocese.

The Diocese is a not-for-profit Religious Corporation under New York law. Gross revenue for the fiscal years ending on June 30, 2020, June 30, 2021, June 30, 2022, and June 30, 2023, was $19,969,244, $34,052,715, $9,479,889, and $23,246,208 respectively. There are four (4) primary sources of income used by the Diocese to support its operations: (i) an annual Catholic Ministries Appeal ("CMA") to all parishioners within the Diocese; (ii) fees and charges; (iii) grants and aid; and (iv) assets released from restriction. In addition, the Diocese may, from time to time, take up special appeals and "capital campaigns" for specific purposes. The CMA is a Diocesan-wide, unified appeal, occurring in the fall of each year, in which all Parishes and parishioners are asked to provide critical financial support for the Diocese. The Diocese also applies for grants, receives gifts and bequests, conducts capital campaigns, and generates investment income to fund its operations. Finally, the Diocese receives various donations and bequests with specific designations on how those funds may be used and on how the amount of the underlying principal may be used.

The Diocese of Rochester Pastoral Center (the "Pastoral Center") (a) provides operational support to the Parishes and certain Other Catholic Organizations; (b) conducts school operations through which it provides Schools with financial and educational support; (c) provides comprehensive risk management services to the foregoing entities; (d) administers a lay pension trust and a priest pension trust for the benefit of most of the foregoing entities' employees and priests; and (e) administers the Communis Fund of the Diocese of Rochester, Inc., a not-for-profit corporation created on December 12, 2005 to receive funds from the Diocese, Parishes and Other Catholic Organizations which such entities desire to invest in a pooled investment fund. The Pastoral Center provides operational and functional support to the Parishes and Other Catholic Organizations in the areas of finance, building and properties, legal, human resources, stewardship and communications, canonical tribunal, schools, evangelization and catechesis, pastoral services, and clergy services. Information technology is also provided by contract to all Parishes and Other Catholic Organizations, along with Mary's Place Refugee Outreach, Nativity Preparatory Academy, Catholic Charities of the Diocese of Rochester, Inc., Providence Housing Development Corporation, and Camp Stella Maris of Livonia, Inc.

## B. Need for Reorganization

Over the last several decades, certain clergy members and employees of the Church have violated the sacred trust placed in them by children and their families and the Church by committing acts of Abuse. This conduct runs contrary to the teaching and traditions of the Church. The Diocese has worked for more than three decades to meet the needs of Abuse

13

survivors without filing for chapter 11 reorganization. Since the mid-1980s, the Diocese has settled 31 claims related to child Abuse and has directed substantial resources towards providing financial, psychological, pastoral, and spiritual support to survivors. The Diocese conducted an Independent Reconciliation and Compensation Program prior to the Petition Date pursuant to which 23 Abuse survivors agreed to monetary settlements totaling $2,680,320. The Diocese has publicly disclosed proven or acknowledged perpetrators. The Diocese makes referrals to law enforcement for all allegations of Abuse. Bishop Matano has apologized for the past misconduct of the personnel of the Diocese and meets with victims at every opportunity in an attempt to bring comfort to such individuals, as did his predecessor. The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people.

While the Diocese carried insurance during many periods in which Abuse is alleged to have occurred, and while the Diocese believes such insurance provides coverage for the Abuse Claims as they were asserted or likely would be asserted against the Diocese, prior to filing its Chapter 11 Case, the Diocese had been largely unsuccessful in obtaining any coverage for Abuse Claims asserted against the Diocese.

On January 28, 2019, the New York State Legislature passed the CVA. New York's Governor signed the legislation on February 14, 2019. The CVA modified New York's statute of limitations and created a one-year "window" during which victims of child sexual abuse whose claim may have been time-barred were permitted to commence a timely civil action. In addition, the CVA extended the statute of limitations for claims that were not time-barred on its date of passage, permitting such child victims to commence timely civil actions until they reach 55 years of age. The window for commencing previously time-barred actions under the CVA was subsequently extended to, and closed on, August 13, 2021. Since the Petition Date, survivors of alleged clergy Abuse have Filed 554 proofs of claims against the Diocese's Estate in the Chapter 11 Case. In addition, the vast majority of such claims are the subject matter of separate Abuse Actions that have been commenced in other courts against a Participating Party that is alleged to be jointly and severally liable with the Diocese on account of such claims.

On May 24, 2022, New York's Governor signed into law the ASA. The ASA created a one-year window during which survivors whose claims would otherwise have been subject to New York's statute of limitations may commence lawsuits based upon sexual offenses committed against them when they were eighteen (18) years of age or older at the time the Abuse occurred. The ASA window to sue on an Adult Abuse Claim opened on November 24, 2022.

As a result, the Diocese faced the prospect of addressing Abuse Claims asserted in amounts exceeding the Diocese's ability to pay, in which circumstance (a) survivors of Abuse could have been left with no compensation or other support, and (b) those within the Diocese (including non-Catholics) who depend on the services of the Church delivered through the Diocese could have been left without the material, monetary, and spiritual support the Diocese provides.

The Diocese is a not-for-profit religious corporation with limited resources, including limited insurance coverage which may be applicable to claims of persons seeking remedies for Abuse Claims. The Diocese acknowledges its moral obligation to compensate all victims of

14

Abuse by church personnel fairly and equitably. Consistent with this moral obligation, it cannot allow any single plaintiff to recover a disproportionate share of the limited funds available from the Diocese simply because that plaintiff's case goes to trial first. Similarly, the Diocese cannot ignore the valid claims of other Creditors who stand on equal footing with Abuse Claimants as general unsecured Creditors of the Diocese. Beyond the Diocese's obligation to all of its Creditors, the Diocese has a fundamental and moral obligation to the Catholic faithful it serves, and to the donors who have entrusted the Diocese with the material fruits of their life's labor, to continue the ministries of the Church through the Reorganized Diocese. The Diocese's goals in seeking chapter 11 relief were two-fold: First, to protect and preserve its assets that are properly available for Distribution to satisfy the claims of the Diocese's unsecured Creditors, along with whatever additional assets can be marshaled, so that those assets are distributed equitably to all Creditors. Second, to continue the work of the Church in Western New York to the fullest extent possible, using the resources dedicated to that purpose.

## ARTICLE 3

## THE CHAPTER 11 CASE

### A.      The Chapter 11 Filing

The Diocese commenced the Chapter 11 Case on the Petition Date by filing a voluntary petition for chapter 11 relief under the Bankruptcy Code [Docket No. 1]. The Diocese's case was assigned to the Honorable Paul R. Warren, United States Bankruptcy Judge for the Western District of New York. The Diocese has continued in possession of its assets and the management of its business as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On September 12, 2019, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and entered several orders in the Chapter 11 Case, each of which is available from the Clerk of the Bankruptcy Court or may be viewed, free of charge, at the case management website maintained by the Diocese's notice agent at https://case.stretto.com/rochesterdiocese. The Bankruptcy Court entered the following orders granting "first day" relief:

### 1.      Employee Wages and Benefits.

The Diocese Filed a motion seeking approval to pay certain prepetition employee wage and benefit obligations (the "Wage Motion"). Interim Orders granting the relief requested in the Wage Motion were entered on September 19, 2019 [Docket No. 42], October 25, 2019 [Docket No. 119], and November 22, 2019 [Docket No. 269].

### 2.      Pre-petition Self-Insurance Program.

The Diocese Filed a motion seeking authority to continue its prepetition self-insurance program (the "PSIP Motion"). An Interim Order granting the relief requested in the PSIP Motion was entered on September 19, 2019 [Docket No. 43] and a Final Order was entered on November 8, 2019 [Docket No. 199].

3.    **Utilities**.

The Diocese Filed a motion seeking to prohibit utility companies from altering, refusing, or discontinuing service and determining adequate assurance of future performance (the "Utilities Motion"). An Interim Order granting the relief requested in the Utilities Motion was entered on September 19, 2019 [Docket No. 44] and a Final Order was entered on November 1, 2019 [Docket No. 158].

4.    **Maintain Bank Accounts and Forms**.

The Diocese Filed a motion seeking approval to maintain its existing investment and bank accounts and its existing business forms (the "Cash Management Motion"). An Interim Order approving the Cash Management Motion was entered on September 19, 2019 [Docket No. 45] and a Final Order was entered on November 1, 2019 [Docket No. 159].

5.    **File Chapter 11 Matrix and Schedules Under Seal**.

The Diocese Filed a motion seeking approval to File all documents containing the names of alleged child Abuse victims in a redacted form (the "Motion to File Under Seal"). An Order approving the Motion to File Under Seal was entered on September 13, 2019 [Docket No. 29].

**B.    Administration of the Case**

After the Petition Date, and in accordance with sections 1107(a) and 1108 of the Bankruptcy Code, the Diocese continued its operations and managed its assets as a debtor in possession. As of the date of this Disclosure Statement, no trustee or examiner has been appointed in the Chapter 11 Case, nor has any motion for a trustee or examiner been made.

**C.    Appointment of the Committee**

On September 26, 2019, the Office of the United States Trustee appointed the Committee pursuant to sections 1102(a) and 1102(b) of the Bankruptcy Code to serve in the Chapter 11 Case. The Committee is composed of nine individuals who hold Abuse Claims against the Diocese.

The Committee retained the law firm of Pachulski, Stang, Ziehl & Jones, LLP ("PSZJ") to represent it in the Chapter 11 Case. Since its appointment, the Committee has taken an active role in the Chapter 11 Case and has been involved in virtually every major event that transpired during the chapter 11 process, including participating in mediation and drafting the Plan.

The Committee also performed its investigatory function by reviewing financial and operating information supplied by the Diocese and third parties, and by conducting an investigation to determine whether any other assets could be made available to pay Abuse Claims.

16

## D. Retention of Professionals

During the Chapter 11 Case, the Bankruptcy Court approved the retention and employment of the following professionals to assist in the administration of the Chapter 11 Case:

### 1. Bankruptcy Counsel to Diocese.

On October 8, 2019, the Diocese Filed an application to retain Bond, Schoeneck & King, PLLC ("Bond") as its bankruptcy counsel. An Order approving the retention of Bond was entered on November 20, 2019 [Docket No. 249].

### 2. Claims and Noticing Agent.

On September 12, 2019, the Diocese Filed an application to retain Stretto as its claims and noticing agent. An Order approving the retention of Stretto was entered on November 25, 2019 [Docket No. 288].

### 3. Special Litigation and Real Estate Counsel to Diocese.

On October 8, 2019, the Diocese Filed an application to retain Harris Beach PLLC ("Harris Beach") as its special counsel with respect to (i) the Abuse Claims; (ii) a certain subpoena dated September 6, 2018 issued to the Diocese by the New York State Office of the Attorney General; (iii) certain labor and employment matters; and (iv) specific real estate matters. An Order approving the retention of Harris Beach was entered on November 22, 2019 [Docket No. 273].

### 4. Special Insurance Counsel to Diocese.

On October 8, 2019, the Diocese Filed an application to retain Blank Rome LLP ("Blank Rome") as its special counsel with respect to the Diocese's various insurance policies and insurance coverage litigation. An Order approving the retention of Blank Rome was entered on November 27, 2019 [Docket No. 300].

### 5. Special Corporate Counsel to Diocese.

On October 8, 2019, the Diocese Filed an application to retain Nixon Peabody LLP ("Nixon") as its special corporate counsel with respect to, among other things, federal and state laws applicable to tax exempt organizations. An Order approving the retention of Nixon was entered on November 27, 2019 [Docket No. 301].

### 6. Special Counsel to the Diocese.

On August 19, 2021, the Diocese Filed an application to retain Gellert, Scali, Busenkell & Brown, LLC ("Gellert") to act as special counsel to the Diocese and represent its interests in the chapter 11 case filed by the Boy Scouts of America in the United States Bankruptcy Court for the District of Delaware (Case No. 20-10343). An Order approving the retention of Gellert was entered on October 25, 2021 [Docket No. 1319].

7.      **Claims Valuation Expert to the Diocese**.

On April 12, 2022, the Diocese Filed an application to retain Gnarus Advisors, LLC ("Gnarus") as claims valuation expert to the Diocese. An Order approving the retention of Gnarus was entered on April 27, 2022 [Docket No. 1485].

8.      **Accountants**.

On November 12, 2019, the Diocese Filed an application to retain Bonadio & Co, LLP ("Bonadio") as the accountants to the Diocese. An Order approving the retention of Bonadio was entered on November 27, 2019 [Docket No. 302].

9.      **Counsel Retained by the Committee**.

On October 18, 2019, the Committee Filed an application to retain PSZJ as its legal advisor. An Order approving the retention of PSZJ was entered on November 1, 2019 [Docket No. 160].

10.      **Financial Advisor Retained by the Committee**.

On August 5, 2020, the Committee Filed an application to retain Berkeley Research Group, LLC as its financial advisor. An Order approving the retention of Berkeley Research Group, LLC was entered on September 11, 2020 [Docket No. 761]

11.      **Special Insurance Counsel Retained by the Committee**.

On June 3, 2021, the Committee Filed an application to retain Burns Bowen Bair LLP as special insurance counsel to the Committee. An Order approving the retention of Burns Bowen Bair LLP was entered on June 22, 2021 [Docket No. 1113]

12.      **Claim Valuation Expert Retained by the Committee**.

On June 24, 2021, the Committee Filed an application to retain The Claro Group, LLP as claim valuation expert to the Committee. An Order approving the retention of The Claro Group, LLP was entered on July 17, 2021 [Docket No. 1217].

**E.      Schedules and Statement of Financial Affairs**

The Diocese Filed its Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs Schedules on October 4, 2019 [Docket No. 79].

**F.      Post-Petition Operations and Select Financial Information**

Since the Petition Date, the Diocese has continued to operate its ecclesiastical business. During a typical month, the Diocese's expenses total approximately $1,500,000.

Set forth below is a summary of the Diocese's Assets as of June 30, 2023:

1.   **Operating Cash**.

As of June 30, 2023, the Diocese had approximately $3.9 million in cash and cash equivalents, approximately $2.6 million of which was not subject to donor restrictions.

2.   **Real Estate**.

The Diocese currently owns three (3) parcels of real property with an aggregate value of approximately $4,251,000 as follows:

      a.   the Pastoral Center located at 1150 and 1136 Buffalo Road, Rochester, New York appraised at $3,815,000 as of June 30, 2019.

      b.   a church and parking lot used in migrant ministry and located at 3799 and 3810 Union Street, Palmyra, New York appraised at $271,000 as of June 30, 2019.

      c.   a church and rectory used in migrant ministry and located at 175 Main Street, Leicester, New York appraised at $165,000 as of April 15, 2021.

3.   **Personal Property**.

The Diocese currently owns personal property (accounts receivable, prepaid expenses including insurance, workers' compensation, furniture, and fixtures), with a scheduled value of $1,851,000 as of the Petition Date.

4.   **Investment Accounts**.

      a.   *General Investment Account.*   As of June 30, 2023, the Diocese had $25,557,000 on deposit in a general investment account at Tompkins Financial.  These monies are expected to be used to fund a significant portion of the DOR Entities' Cash Contribution described in greater detail below.

      b.   *The CGA Investment Account.*   The Diocese maintains a charitable gift annuity program pursuant to N.Y. Insurance Law § 1110, which allows the Diocese to make annuity agreements with donors.  Under the Diocese's charitable gift annuity program, donors make donations to the Diocese for the restricted purpose of funding annuity payments for the lifetime of a specified annuitant, with the understanding that, upon the death of the annuitant, the funds associated with the donation would be withdrawn from the program and used to support one or more Catholic entities or initiatives, as specified in the applicable gifting instrument.  In most instances, the donors direct that any remainder benefit be given to a specific Parish or religious order, or designate it for a specific purpose, rather than provide that it be given to the Diocese on an unrestricted basis.

The Diocese maintains an investment account at Tompkins Financial Advisors for the purpose of investing and holding the donated funds from which annuity payments are made in accordance with the requirements of Insurance Law § 1110 (the "CGA Investment Account").

18435954.v6

The CGA Investment Account has, as of June 30, 2023, an approximate balance of $101,000. The Diocese is currently a party to annuity agreements with nine (9) annuitants, pursuant to which the Diocese is obligated to make annuity payments aggregating approximately $20,000 annually.

As required by Insurance Law § 1110(b) the annuity funds in the CGA Investment Account are held as segregated separate and distinct funds, and may not be applied by the Diocese to pay its debts or obligations or for any purpose except payment of annuity benefits.

To comply with the requirements of Insurance Law § 1110(b), the Diocese has retained the services of Alesco Advisors to assist in managing investments within the CGA Investment Fund and to ensure that donated annuity funds are invested in accordance with the prudent investor standard defined in section 11-2.3 of the N.Y. Estates, Powers and Trusts Law.

The annuity payments the Diocese has committed to make from the CGA Investment Account are calculated based upon an actuarial evaluation of the amount donated, the annuitant's expected lifespan, and the projected availability of income from investments in the CGA Investment Account. If the Diocese is not able to obtain a reasonable investment return on the donated funds, its obligations to make annuity payments may exceed the funds available to make the payments.

c.      *The Communis Fund.* The Communis Fund ("Communis") is a not-for-profit corporation formed in 2005 to maintain investments on behalf of the Diocese and various other separately incorporated Catholic entities. Communis provides for the administration and protection of the Diocese's temporal goods in conformity with Canon Law and the New York State Prudent Management of Institutional Funds Act (*See* New York Not-for-Profit Corporation Law "NPCL" at §§ 550-558). Communis is exempt from certain federal and state securities laws pursuant to the Philanthropy Protection Act of 1995. The participants in Communis include: the Diocese, the Priests' Retirement Plan, Lay Employees' Retirement Plan, various Parishes, Catholic Charities of the Diocese of Rochester, and St. Bernard's School of Theology & Ministry. All investments of the participants are held separately in clearly identified accounts in the name of the participants.

Communis is governed by a board of directors elected by the Diocesan Bishop, the Vicar General, and the Chancellor of the Diocese, in their capacities as the members of the corporation. The board of directors oversees Communis' operations including, without limitation, by adopting Communis' investment policy, selecting an investment advisor and reviewing investment performance. Communis' investment activity is professionally managed by Alesco Advisors in accordance with the investment guidelines adopted by the board. The investment guidelines have been established to encourage steady growth over a long-term investment horizon. Pursuant to an Institutional Custody Agreement dated as of April 3, 2006, all securities and other investments in Communis are held by the Bank of New York Mellon ("BNY Mellon") which serves as both custodian and record keeper for Communis.

In addition to serving as an investment vehicle, Communis/BNY Mellon provides the Diocese with accounting support by separately monitoring and accounting for more than fifty distinct categories of endowed, use-restricted and trust funds held with Communis. As of June

20

18435954.v6
Case 2-19-20905-PRW,    Doc 2888,    Filed 01/10/25,    Entered 01/10/25 16:09:38,
Description: Main Document  , Page 31 of 128

30, 2023, Communis held approximately $47,407,000 in funds under management for the Diocese, ninety-eight percent (98%) of which are subject to donor-imposed restrictions on use or are held in trust for the benefit of third parties.

The Diocese is reliant, in part, on income generated from its investments in Communis to fund its annual budget. The Diocese follows the spending rules set forth in the New York Prudent Management of Institutional Funds Act and generally budgets to spend up to five percent (5%) of the rolling 20 quarter average of its invested funds on an annual basis.

**G.** **Bar Date, Abuse Claims, and Boy Scouts of America Claims**

1. **Bar Date**.

By an Order dated February 25, 2020 (the "Bar Date Order"), the Bankruptcy Court fixed August 13, 2020 (the "Bar Date") as the deadline for filing proofs of claim for all prepetition Claims, including Abuse Claims, against the Diocese. The Bar Date Order also established August 13, 2020 as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to File proofs of claim in the Chapter 11 Case. The Notice of Deadline for Filing Proofs of Claim (the "Bar Date Notice") approved by the Bankruptcy Court defines "Sexual Abuse Claim" as any claim arising from "contacts, or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult."

The Bar Date Notice was sent to all known Creditors of the Diocese. In addition, the Bar Date Notice was published, as required in the Bar Date Order, in national and regional newspapers, on television and radio stations, on the Diocese's social media accounts, in the *Catholic Courier*, through postings at Parishes and at other Catholic agencies, and through postings at governmental agencies, including the State of New York Office of the Attorney General, and at the district attorney's office, sheriff's office, county government center, and public health and substance abuse agencies in Monroe, Cayuga, Livingston, Wayne, Tioga, Tompkins, Ontario, Seneca, Schuyler, Yates, Steuben, and Chemung Counties.

Under the Bar Date Order and the Plan, unless otherwise ordered by the Bankruptcy Court or as provided in the Allocation Protocol, any Person who was required to File a timely proof of claim and failed to do so on or before the Bar Date will not be entitled, with respect to such Claim, to receive any payment or Distribution of property from the Diocese, its successors or assigns, and will be forever barred from asserting such Claim against the Diocese or its Estate.

The Diocese, its Professionals, and the Committee's Professionals have reviewed all the Claims Filed by Creditors. More than 554 proofs of claim were Filed by Abuse Claimants in the Chapter 11 Case. The Diocese believes that at least 41 of these proofs of claim are either duplicate claims or do not allege a claim arising from or related to Abuse. At least 42 Abuse Claims were filed after the Bar Date. Among the Abuse Claims Filed prior to the Bar Date, the Diocese believes at least 46 assert Claims based upon the actions or omissions of individuals or entities that are not affiliated with the Diocese and for which the Diocese believes neither it nor the Participating Parties have any legal liability. Notwithstanding the Diocese's position on liability, or whether Abuse Claims may be duplicative or filed after the Bar Date, the Abuse Claim Reviewer and/or the Trustee may determine that holders of such Abuse Claims may be

21

entitled to a Distribution in accordance with the Allocation Protocol.  Further, in the case of Litigation Claims, a court may find that the Diocese and/or Participating Parties are liable to Litigation Claimants even where the Diocese and/or Participating Parties believe they are not liable for such Claims.  Nothing herein shall be deemed an admission regarding any Person's liability for Abuse Claims.   In addition, various Parishes, Schools, and Other Catholic Organizations also Filed contingent claims for indemnification or contribution in the Chapter 11 Case, as they were sued in various Abuse Actions either as co-defendants along with the Diocese prior to the Petition Date or, following the Petition Date, in Abuse Actions relating to the same actions or occurrences of Abuse alleged in proofs of claim Filed in the Chapter 11 Case.

2. **Claims Involving the Boy Scouts of America**.[6]

On February 18, 2020, the Boy Scouts of America and Delaware BSA, LLC (collectively, "BSA") Filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") commencing a jointly administered chapter 11 bankruptcy case bearing the case number 20-10343 (the "BSA Bankruptcy Case").  The BSA Bankruptcy Case was Filed primarily to address thousands of unique abuse-related claims asserted against the BSA (the "BSA Abuse Claims"). In addition to alleging direct liability against BSA for abuse, many BSA Abuse Claims also implicate certain other organizations (known as "Chartered Organizations")[7] that facilitate the scouting programs of the BSA on a local level.  The Diocese and several of the Participating Parties may have been Chartered Organizations and are potentially implicated by certain BSA Abuse Claims.

There are nineteen Abuse Claims asserted against the Diocese and other Participating Parties (either through proofs of claim filed in the Chapter 11 Case or Abuse Actions filed in state court) that reference the BSA and allege scouting-related Abuse (the "DOR-BSA Abuse Claims").   On or around June 22, 2021, the Roman Catholic Ad Hoc Committee (the "RCAHC")[8] was formed to represent the interests of all Roman Catholic entities ("Roman Catholic Entities") nationwide that are Chartered Organizations, or are otherwise implicated by, the BSA Case.  The Diocese is a member of the RCAHC.

---

[6] Capitalized terms that are used in this section but not defined in the Diocese's Plan or elsewhere in this Disclosure Statement shall have the meanings ascribed to them in the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Docket No. 10296] (the "BSA Plan").  References to the BSA Bankruptcy Case docket will be cited in the following manner:  "[BSA Docket No. ___]".

[7] There are over 40,000 Chartered Organizations nationwide within the BSA organization, and they operate within one of the 253 non-debtor Local Councils that are responsible for administering the BSA's programs across the United States and its territories. Each Local Council covers a specific geographic area. The counties served by the Diocese are variously located within the Seneca Waterways Council, the Five Rivers Council, the Iroquois Trail Council, the Baden-Powell Council, and the Longhouse Council.

[8] The RCAHC is composed of the following entities: Catholic Mutual Relief Society of America, Roman Catholic Diocese of Sioux City, Roman Catholic Diocese of Joliet, Roman Catholic Diocese of Omaha, Roman Catholic Diocese of Winona-Rochester, Roman Catholic Archdiocese of Washington, D.C, Roman Catholic Archdiocese of Atlanta, Roman Catholic Archdiocese of New York, Roman Catholic Archdiocese of Chicago, Roman Catholic Diocese of Syracuse, Roman Catholic Diocese of Buffalo, and the Diocese of Rochester.

18435954.v6

On March 17, 2022, the RCAHC entered into a Settlement Agreement with BSA and its key constituents (the "RCAHC Settlement") which provides that all non-debtor Roman Catholic Entities would be treated as Participating Chartered Organizations under the BSA Plan. Roman Catholic Entities, such as the Diocese, that are currently debtors in their own chapter 11 cases are required to obtain orders from their own bankruptcy courts authorizing them to participate in the RCAHC Settlement. On November 10, 2022, the Bankruptcy Court entered an Order [Docket No. 1801] authorizing, but not directing, the Diocese to opt-in to treatment as a Participating Chartered Organization.

On September 8, 2022, the Delaware Court entered an order [BSA Docket No. 10316] (the "BSA Confirmation Order") confirming the BSA Plan. On December 20, 2022, the Diocese gave BSA notice of its election to opt-in to treatment as a Participating Chartered Organization under the BSA Plan.

The legal effect of certain provisions contained within the BSA Plan and the BSA Confirmation Order is a matter of dispute among various parties in interest in the BSA Bankruptcy Case. Further, the BSA Confirmation Order has been appealed by multiple parties. While there is a possibility that the BSA Confirmation Order will be modified or vacated on appeal, in the event it is upheld the Diocese believes that, as a Participating Chartered Organization, it will receive the following treatment under the BSA Plan:[9]

    a.    ***Protection from Direct BSA Abuse Claims***. All BSA Abuse Claims that arose on or after January 1, 1976 ("Post-1975 BSA Abuse Claims"), as well as all BSA Abuse Claims that arose prior to January 1, 1976 ("Pre-1976 BSA Abuse Claims") for which there is insurance issued by a Settling Insurance Company (as defined in the BSA Plan, a "BSA Settling Insurance Company"), will be channeled into a Settlement Trust established under the BSA Plan (the "BSA Settlement Trust"), and the Abuse survivors will release the Participating Chartered Organizations from such BSA Abuse Claims. Claims unrelated to scouting are not impacted by the BSA Plan. The BSA Plan also provides that all Participating Chartered Organizations will receive the protection of a twelve-month injunction from prosecution of BSA Abuse Claims beginning on the Effective Date of the BSA Plan (subject to further extension) to afford Participating Chartered Organizations an opportunity to negotiate an appropriate contribution with the Settlement Trust in order to become, and receive the enhanced treatment afforded to, Contributing Chartered Organizations under the BSA Plan. Contributing Chartered Organizations receive complete releases from all BSA Abuse Claims asserted against them, regardless of when the BSA Abuse Claim arose.

    b.    ***BSA and Local Council Insurance***. Participating Chartered Organizations will assign, to the BSA Settlement Trust, their rights as additional insureds under liability insurance policies covering BSA Abuse Claims issued to the BSA or Local Councils by BSA settling insurance companies (the "Participating Chartered Organization Insurance Assignments") and will voluntarily release their rights to any such insurance policies. All BSA Abuse Claims will be channeled into the BSA Settlement Trust. Participating Chartered

---

[9] Notwithstanding the Diocese's description of its understanding of the legal effect of the BSA Plan, nothing herein shall bind the Abuse Claims Reviewer, the Trustee or the Trust in the application of the Allocation Protocol to Abuse Claims.

Organizations must also assign to the BSA Settlement Trust, among other things, all causes of action against non-settling insurance companies related to Post-1975 BSA Abuse Claims; however, they will retain whatever rights they previously had (if any) in all pre-1976 insurance policies issued to the BSA and Local Councils.

   c. ***Chartered Organization Insurance***. BSA Abuse Claims against Participating Chartered Organizations will be released and channeled to the BSA Settlement Trust if a BSA Settling Insurance Company issued a liability policy (other than an automobile policy or director's and officer's policy) that does not specifically exclude Abuse or molestation to a Participating Chartered Organization, and a claimant alleges Abuse during the period of that policy. Although the Participating Chartered Organization will release the BSA settling insurance company for these BSA Abuse Claims, the Participating Chartered Organization will retain all rights for Abuse claims unrelated to scouting under policies issued by BSA settling insurance companies. They will also retain all rights for any claims (both related and unrelated to scouting) under independent insurance policies issued by non-settling insurance companies.

   d. ***Indirect Abuse Claims***. The Participating Chartered Organizations must voluntarily waive all claims against the BSA for contribution, indemnity, reimbursement, or subrogation, and any other claims which are derivative of abuse claims against BSA.

   The Diocese believes that twelve of the nineteen DOR-BSA Abuse Claims allege Post-1975 BSA Abuse Claims, and the remaining seven allege Pre-1976 BSA Abuse Claims that are not covered under insurance policies issued by BSA Settling Insurance Companies.

   Under the Plan, holders of DOR-BSA Abuse Claims may be compensated by the Trust without regard to treatment of such claims under the BSA Plan.

**H.** **Reserved**

**I.** **Insurance Coverage Adversary Proceeding**

   The Diocese determined that Insurance Policies issued by twelve of its Insurers may be implicated by the Abuse Claims.  The Abuse Claims have also been Filed, in many cases, against Parishes, Schools, and Other Catholic Organizations, including Non-Debtor Catholic Entities.

   The Insurers asserted various defenses to coverage of the Abuse Claims.  In response, on November 14, 2019, the Diocese commenced Adversary Proceeding No. 19-02021 (the "Insurance Adversary Proceeding") by filing a complaint against CNA, Interstate, LMI, Underwriters; The Dominion Insurance Company Limited; Stronghold Insurance Company Limited; CX Reinsurance Company Limited; Markel International Insurance Company Limited; Tenecom Limited; Colonial Penn Insurance Company; and HDI Global Specialty SE (collectively, the "Insurers") for breach of contract and declaratory judgment, seeking a declaration of the rights, duties, and liabilities of the parties pursuant to the terms of their respective insurance policies and damages.  By commencing the Insurance Adversary

24

18435954.v6

Case 2-19-20905-PRW, Doc 2888, Filed 01/10/25, Entered 01/10/25 16:09:38,
Description: Main Document , Page 35 of 128

Proceeding, the Diocese sought to determine the extent of coverage as to the Abuse claims asserted against the Diocese.[10]

On December 23, 2019, the Diocese moved for an order referring the issues raised in the Insurance Adversary Proceeding to mediation and for the appointment of a mediator to mediate all issues among the Diocese, the Committee, and the Insurers. On March 10, 2020, the Court entered an Order Directing Mediation and Appointing Mediator (the "Mediation Order") which (i) referred the claims asserted in the Insurance Adversary Proceeding to mediation; (ii) appointed the Honorable United States Bankruptcy Judge Gregg W. Zive as mediator; and (iii) directed the Diocese, the Insurers, the Committee, the *ad hoc* committee of Parishes and other Protected Parties to participate in the mediation process.

**Under the Plan, the Trust will succeed to the Diocese as plaintiff under the Insurance Adversary Proceeding.**

1. **The First Insurance Settlement and Claimant Lift Stay Motions**.

The Diocese, the Insurers, and the Committee thereafter engaged in several mediation sessions during late 2020 and early 2021. The mediation sessions culminated in the execution of a Settlement Agreement (the "First Settlement Agreement") between the Diocese, LMI and Interstate pursuant to which LMI and Interstate agreed to pay $15,000,000 and $20,000,000 respectively to the Estate for a complete buy-back of their insurance policies under which the Diocese and its related entities (the "DOR Entities") could claim coverage. In exchange for this payment, LMI and Interstate would receive, upon confirmation of the Diocese's chapter 11 plan, releases from the DOR Entities, an injunction enjoying all entities from asserting Abuse Claims against the subject insurance policies, LMI, Interstate or the DOR Entities, and the channeling of the Abuse Claims to the Trust.

The Committee was not a party to, and opposed, the First Settlement Agreement.

On May 27, 2021, the Diocese Filed a *Motion for Entry of an Order Approving Settlement Agreement With Certain Underwriters at Lloyd's, London, Certain London Market Companies, Interstate Fire & Casualty Company and National Surety Corporation* [Docket No. 1101; Insurance Adv. Docket No. 99] (the "First Settlement Motion") seeking approval of the First Settlement Agreement.

On June 8, 2021 and June 23, 2021, several Abuse Claimants each Filed a motion seeking relief from the automatic stay under section 362(d) of the Bankruptcy Code to pursue their Abuse Claims against the Diocese and other parties in state court (the "Claimant Lift Stay Motions").[11] The Committee Filed a Memorandum of Law in support of the Lift Stay Motions [Docket No. 1081].

---

[10] Colonial Penn Insurance Company was dismissed from the Insurance Adversary Proceeding once it was determined that no Abuse Claims implicate the Colonial Penn insurance policies in question.

[11] The Claimant Lift Stay Motions are filed at Docket Nos. 1037, 1039, 1041, 1042, 1045, 1047-1053, 1061, 1063, 1064, 1065, 1070, 1073, 1074, and 1075. The Committee filed a Joinder to the Claimant Lift Stay Motions at Docket No. 1079.

On July 12, 2021, the Bankruptcy Court entered an *Order Denying Motion to Approve Compromise, Without Prejudice and Directing Parties to Resume Mediation* [Docket No. 1213; Insurance Adv. Docket No. 153] which denied the First Settlement Motion, denied the Claimant Lift Stay Motions, and directed all parties to return to mediation.

2.  **The Second Insurance Settlement**.

The mediation sessions resumed and continued from August 2021 through May 2022. During May 2022, the Diocese negotiated proposed Settlement Agreements with LMI, Underwriters, Interstate and CNA (the "Second Settlement Agreements") pursuant to which those Insurers agreed to provide aggregate settlement proceeds of $107,250,000 to the Estate as set forth below:

| Insurer | Settlement Amount |
|---------|-------------------|
| LMI | $16,650,000 |
| Underwriters | $1,100,000 |
| Interstate | $26,000,000 |
| CNA | $63,500,000 |
| **TOTAL** | **$107,250,000** |

In addition to the $107,250,000 in proposed settlement proceeds from LMI, Underwriters, Interstate and CNA, the DOR Entities proposed to provide an additional $40,500,000, to make a total of $147,750,000 available to the Trust to compensate Abuse Claimants. In exchange for these payments, LMI, Underwriters, Interstate and CNA would receive, upon confirmation of the Diocese's chapter 11 plan, releases from the DOR Entities, an injunction enjoying all entities from asserting Abuse Claims against the subject insurance policies, LMI, Underwriters, Interstate, CNA, and the DOR Entities, and the channeling of the Abuse Claims into the Trust. On May 20, 2022, the Diocese Filed a *Motion to Approve Proposed Insurance Settlements to Fund Survivor Compensation Trust* [Insurance Adv. Pro. Docket No. 190] (the "Second Settlement Motion"). The Committee has objected to the Second Settlement Motion.

The parties engaged in preliminary discovery and negotiations regarding the Second Settlement Motion, the result of which were settlements with LMI, Underwriters and Interstate at levels acceptable to the Committee as described below. The Court has denied a motion by the Committee to deny the Second Settlement Motion as moot but, as of the date of this Disclosure Statement, has not heard or ruled upon the Second Settlement Motion.

**J.  Stay of Litigation Against Parishes, Schools, and Other Catholic Organizations**

Until May 7, 2022, all litigation in Abuse Actions against Participating Parties was stayed pursuant to an *Agreed Stipulation and Order Pursuant to 11 U.S.C. § 105(a) Staying Continued Prosecution of Certain Lawsuits* [Docket No. 452] (the "Stay Stipulation and Order"). The Stay Stipulation and Order enjoined the prosecution of Abuse Claims against all Participating Parties, and was the result of negotiations between the Diocese and the Committee. The Stay Stipulation and Order was intended to enable the parties to concentrate their efforts on achieving a global resolution of all Abuse Claims against the Diocese *and* the Participating Parties through the Plan.

26

The Stay Stipulation and Order was extended through consent of the Diocese and the Committee eleven times over the course of the Chapter 11 Case while the Diocese engaged in plan negotiations through mediation with its Insurers and the Committee [Docket Nos. 544, 638, 773, 880, 915, 971, 1132, 1236, 1344, 1413, and 1421]. The Stay Stipulation and Order expired on March 23, 2022.[12]

On April 6, 2022, the Diocese commenced an adversary proceeding by filing a *Verified Complaint Seeking Declaratory and Injunctive Relief Pursuant to 11 U.S.C. §§105 and 362 or a Preliminary Injunction Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure* (Adv. Pro. No. 22-02075) (the "Stay Adversary") and Filed a motion (the "Injunction Motion") seeking, among other things, entry of one or more orders (i) confirming that the automatic stay provided by section 362 of the Bankruptcy Code enjoins the prosecution of the Abuse Claims, to the extent they seek to recover against, collect, or to obtain possession or control of, any property of the Diocese's bankruptcy estate (including, without limitation, any rights to insurance coverage), and further (ii) enjoining the prosecution of the Abuse Claims against the Participating Parties pursuant to section 105(a) of the Bankruptcy Code, to the extent such prosecution is not already stayed by operation of the automatic stay.[13]

The Committee and various Abuse Claimants opposed the Injunction Motion. On May 23, 2022, the Bankruptcy Court issued a *Decision and Order Denying Motion of Diocese Seeking to Enjoin the Prosecution of State Court Actions Against Independent Catholic Corporations and Dismissing Complaint* [Stay Adv. Docket. No. 48] (the "May 23 Decision"), which among other things, denied the Injunction Motion, dismissed the Stay Adversary and raised significant concerns about the Diocese's pursuit of a non-consensual plan. On June 6, 2022, the Diocese appealed the May 23 Decision to the District Court. That appeal is currently pending in the District Court under Case No. 22-cv-06262 (the "Stay Appeal").

## K.     Appointment of Second Mediator

The Diocese, the Committee, and the Insurers thereafter requested that the Bankruptcy Court appoint Paul Van Osselaer to act as co-mediator with Judge Zive. On July 8, 2022, the Bankruptcy Court entered the *Consent Order Appointing Paul Van Osselaer as Additional Mediator* [Insurance Adv. Docket No. 200] and the mediation sessions resumed under the guidance of Judge Zive and Mr. Van Osselaer.

Since entry of the original Mediation Order, the Diocese, the Committee, and the Insurers have engaged in more than four years of mediation with dozens of virtual and in-person mediation meetings, interspersed with ongoing negotiations and communications among the mediation parties. In spite of the substantial efforts of, and expense incurred in connection with, mediation, the Diocese, the Committee, and the Non-Settling Insurers have been unable to

---

[12]  Paragraph 6 of the Stay Stipulation and Order provides a forty-five (45) day period, following the occurrence of the Termination Date (as such term is used therein), before any answer, motion to dismiss, or other responsive pleading(s) must be filed by the Protected Parties in any of the CVA Cases. Based upon the March 23, 2022 Termination Date, that 45-day period expired on May 7, 2022.

[13]  *See The Diocese of Rochester v. AB 100 DOE, et al.,* Adv. No. 22-ap-02075 [Stay Adv. Docket Nos. 1, 4] (May 6, 2022).

achieve agreement on a global settlement. In a final effort for a global settlement, the Diocese and the Committee included in the Plan the ability of the Non-Settling Insurer to elect to become a Settling Insurer for a settlement amount of $171,000,000.

## L.    The DOR Claim Objections

On July 22, 2022, the Diocese Filed objections to 68 Abuse Claims Filed in the Chapter 11 Case (collectively, the "DOR Claim Objections").[14] The basis for the DOR Claim Objections is the Diocese's assertion that the subject Abuse Claims do not allege facts sufficient to support a claim upon which relief can be granted under applicable New York Law because they concern allegations against either (i) entities not located within the Diocese; (ii) entities not controlled by the Diocese; or (iii) individuals who were never employed by the Diocese. LMI and CNA Filed Joinders to the DOR Claim Objections [Docket Nos. 1670 and 1733].

The hearings to consider the DOR Claim Objections have been adjourned several times, with the hearing being suspended indefinitely per Court order [Docket No. 2116]. Pursuant to the Plan, the DOR Claim Objections will be deemed withdrawn with prejudice as of the Effective Date of the Plan.

## M.    The Restructuring Support Agreement

The resumed mediation sessions resulted in the execution of the RSA on November 1, 2022. Pursuant to the RSA, the Diocese and the Committee agreed to pursue a plan of reorganization in which Abuse Claims will be satisfied from a trust to be funded by (i) the DOR Entities' Cash Contribution in the amount of $55,000,000; (ii) the proceeds received from Settling Insurers under Insurance Settlement Agreements; and (iii) the assignment of certain Insurance Claims against Non-Settling Insurers to the Trust. The RSA also provides for resolution of the litigation with the Committee in the Stay Adversary and the Diocese Appeal. The principal terms of the RSA have been incorporated into the Plan. To date, the Plan Proponents have agreed to settlements, subject to the execution of one or more Insurance Settlement Agreements, with (a) Underwriters, pursuant to which Underwriters will pay an Insurance Settlement Amount of $1.1 million, (b) LMI, pursuant to which LMI will pay an Insurance Settlement Amount of $19.5 million, (c) Interstate, pursuant to which Interstate will pay an Insurance Settlement amount of $50 million, and (d) First State, pursuant to which First State will pay an Insurance Settlement amount of $750,000.

On November 3, 2022, the Diocese filed a motion seeking entry of an order by the Bankruptcy Court approving the RSA [Docket No. 1790] (the "RSA Approval Motion"). Each of LMI, Underwriters, Interstate, CNA, First State, and the U.S. Trustee objected to the RSA Approval Motion. As of the date of this Disclosure Statement, the Bankruptcy Court has not heard or ruled upon the RSA Approval Motion.

---

[14] The DOR Claim Objections are filed at Docket Nos. 1576-1641 and 1643-1644 in the Chapter 11 Case.

## N. Court Facilitated Settlement Conference and LMI Settlement

In January 2023, the Bankruptcy Court convened a multi-day settlement conference among the Diocese, the Committee, and the Diocese's Insurers in an attempt to facilitate development of a global settlement of all Abuse Claims and Insurance Claims and to resolve the various objections to the Second Settlement Motion and the RSA Approval Motion. Judge Warren attended and facilitated settlement negotiations among the parties. A representative for the U.S. Trustee was also present.

While the parties were not able to achieve a global settlement, the Diocese and the Committee were able to reach a settlement to resolve all Insurance Claims against LMI in exchange for LMI's contribution of a $19,500,000 settlement payment.

## O. CNA Claim Objections and Committee Motion to Dismiss

On March 23, 2023, CNA filed objections to 38 Abuse Claims Filed in the Chapter 11 Case (collectively, the "CNA Claim Objections" and together with the DOR Claim Objections, the "Claim Objections").[15]

On April 11, 2023, the Committee filed a motion seeking entry of an order dismissing the CNA Claim Objections for lack of standing, lack of jurisdiction, or, in the alternative, staying the CNA Claim Objections [Docket No. 2063] (the "Committee Motion to Dismiss"). On May 1, 2023, CNA filed opposition to the Committee Motion to Dismiss [Docket No. 2110].

On May 3, 2023, the Court adjourned the hearing on the CNA Claim Objections and the indefinitely pending adjudication of the standing issues raised in the Committee Motion to Dismiss [Docket No. 2117]. The Court also adjourned, without date and subject to renewal on request by counsel, the Committee Motion to Dismiss [Docket No. 2119].

## P. Joint Chapter 11 Plan

On March 24, 2023, the Diocese and the Committee filed the *Joint Chapter 11 Plan of Reorganization for the Diocese of Rochester dated March 24, 2023* [Docket No. 2046] (the "Initial Joint Plan") together with an accompanying disclosure statement [Docket No. 2045] (the "Initial Disclosure Statement"). The Initial Joint Plan incorporated the terms of settlement with the Committee as set forth in the RSA, and the $19,500,000 settlement with LMI and $1,100,000 settlement with Underwriters.

On April 7, 2023, the Diocese filed a motion for entry of an order approving the Initial Disclosure Statement and approving proposed solicitation and noticing procedures [Docket No. 2058] (the "Solicitation Procedures Motion").

---

[15] The CNA Claim Objections are filed at Docket Nos. 2003-2040 in the Chapter 11 Case.

**Q. Interstate Motion to Resume Litigation of Insurance Adversary Proceeding**

On March 27, 2023, Interstate filed a motion seeking to terminate the judicial stay of the Insurance Adversary Proceeding and to resume litigation of that action [Ins. Adv. Docket No. 216] (the "Interstate Stay Termination Motion"). Both the Diocese and the Committee opposed the Interstate Stay Termination Motion [Ins. Adv. Docket Nos. 229 and 230].

On April 25, 2023, the Court entered a decision and order dissolving the judicial stay of deadlines in the Insurance Adversary Proceeding and terminating its prior mediation order [Ins. Adv. Docket No. 233] (the "Order Terminating Mediation").

On May 8, and May 15, 2023, the Court entered further case management orders temporarily vacating the Order Terminating Mediation to allow additional mediation efforts to proceed [Ins. Adv. Docket Nos. 237 and 241].

**R. Adjournment of Contested Matters to Allow for Additional Mediation Efforts**

On May 15, 2023, the Court adjourned consideration of the Solicitation Procedures Motion [Docket No. 2133] and deferred issuance of a decision and order on the Committee Motion to Dismiss without date to permit further efforts at mediation [Docket No. 2134].

**S. Interstate and First State Settlements**

After additional mediation sessions were held in early 2023, the Diocese and Committee agreed to resolve all Insurance Claims against Interstate in exchange for a settlement payment from Interstate of $50,000,000. The Diocese and the Committee separately agreed to resolve all Insurance Claims against First State in exchange for a settlement payment of $750,000. Accordingly, as of the date of this Disclosure Statement, LMI, Underwriters, First State, and Interstate are Settling Insurers under the Plan, with a combined Insurance Settlement Amount of $71,350,000, which when added to the $55,000,000 DOR Entities' Cash Contribution, will provide the Plan with $126.35 million of initial funding.

**T. CNA Prior Competing Plan**

On August 31, 2023, CNA filed *Continental Insurance Company's Chapter 11 Plan of Reorganization for The Diocese of Rochester* [Docket No. 2144] which was subsequently amended on December 12, 2023 [Docket No. 2372] and April 9, 2024 [Docket No. 2552] (as it may be further amended or modified from time to time, the "CNA Prior Competing Plan"). The CNA Competing Plan proposed to settle all Insurance Claims against CNA in exchange for a cash payment of $75,000,000 which, when combined with the DOR Entities' Cash Contribution and the settlement payments from other Settling Insurers, would provide a total of $201.35 million in funding for a trust to benefit Abuse Claimants, but would foreclose the possibility of additional recoveries from post-confirmation litigation against CNA as contemplated in the Plan. CNA prepared a separate disclosure statement describing the CNA Competing Plan in greater detail (the "CNA Disclosure Statement"). The CNA Prior Competing Plan was rejected by approximately 85% of the Abuse Claimants voting on the CNA Prior Competing Plan.

**U.**     **CNA Administrative Claim**

On November 7, 2023, CNA filed its *Application for Allowance and Payment of Administrative Expense Priority Claim for Debtor's Breach of Continental Settlement Agreement* [Docket No. 2314] (the "CNA Administrative Expense Application") and a commenced an adversary proceeding captioned *The Continental Insurance Company v. The Diocese of Rochester* (the "CNA Adversary Proceeding"). Through the CNA Administrative Expense Application and the CNA Adversary Proceeding, CNA asserts that it is entitled to damages as an administrative claim for a purported breach by the Diocese of the proposed CNA Second Settlement Agreement. The Plan Proponents deny that CNA is entitled to payment of an administrative claim because they do not believe the Second Settlement Agreement is enforceable. On October 7, 2024, the Court entered an Order dismissing the CNA Adversary Proceeding (the "CNA Adversary Dismissal Order"). CNA filed an appeal with respect to the CNA Adversary Dismissal Order on October 21, 2024. The appeal is currently pending.

**V.**     **Fifth Amended Plan and Supreme Court Decision in Purdue Pharma**

The Fifth Amended Joint Chapter 11 Plan of Reorganization for the Diocese of Rochester (the "Fifth Amended Plan") and the Disclosure Statement in Support of the Fifth Amended Plan (the "Prior Approved Disclosure Statement") contained a statement regarding the Second Circuit's decision in *In re Purdue Pharma L.P.*, 69 F.4th 45, 72-75 (2d Cir. 2023), which provided that bankruptcy courts had the statutory authority to grant non-consensual third-party releases pursuant to sections 105(a) and 1123(b)(6) of the Bankruptcy Code was timely appealed, and the Supreme Court had, at the time of the approval of the Prior Disclosure Statement, granted certiorari to consider the issue.

After the Prior Disclosure Statement, Fifth Amended Plan and other related balloting and plan documents were served and voting had commenced on the Third Amended Plan, on June 27, 2024, the Supreme Court issued its decision in *Harrington v. Purdue Pharma L.P.*, No. 23-124 (the "Purdue Decision"). In the Purdue Decision, the Supreme Court ruled that a bankruptcy court does not have the authority to issue nonconsensual releases discharging creditors' claims against non-debtor entities.

In the months since the Purdue Decision was rendered, the Diocese, Committee and Participating Parties worked to address the required revisions to the Fifth Amended Plan to address the Purdue Decision and negotiated revisions to the Fifth Amended Plan to provide that releases granted by Abuse Claimants to Participating Parties will be deemed consensual. It is a condition to the Effective Date that all holders of Abuse Claims be Consenting Abuse Claimants.

**ARTICLE 4**

**SUMMARY OF THE PLAN**

The Plan Proponents submit that the treatment of Creditors under the Plan is more favorable than the treatment Creditors would receive if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code. Therefore, the Plan Proponents submit that the

Plan is in the best interests of all Creditors and the Plan Proponents recommend acceptance of the Plan by holders of Class 3 General Unsecured Claims and Class 4 Abuse Claims.

**The summary of significant elements of the Plan below is provided for the convenience of all parties. The summary does not describe every element of the Plan and is not intended as a substitute for a thorough and complete review of the Plan. This summary is subject to, and is qualified in its entirety by reference to, the full text of the Plan. All Creditors are encouraged to review the Plan and this Disclosure Statement, including Exhibits, in their entirety for a more complete understanding of the Plan's provisions and impact upon Creditors. To the extent any term or provision in this Disclosure Statement is inconsistent with a term or provision of the Plan, the term or provision of the Plan shall control.**

## A.      Classification of Claims Generally

Section 101(5) of the Bankruptcy Code defines a claim as: (a) a "right to payment, whether or not such right is reduced to judgement, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall designate classes of claims against a debtor. Section 1122 of the Bankruptcy Code further requires that each class of claims contain only claims that are "substantially similar" to each other. The Diocese believes that it has classified all Claims in compliance with the requirements of Section 1122 and 1123. However, it is possible that the holder of a Claim may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Diocese would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class of which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of Claims may necessitate a re-solicitation.

## B.      Creditor Recovery Under the Plan

All classified Claims have been placed into one of five separate Classes. The Plan affirmatively states whether each Class of Claims is Impaired or Unimpaired and whether such Class is entitled to vote.

## C.      Classification of Claims and Treatments

As required by the Bankruptcy Code, all Claims are classified into several separate categories. While the vast majority of Claims have been placed into one of the five separate Classes, some Claims are left unclassified. The separate Classes are described in detail within this Disclosure Statement and in the Plan.

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| N/A | Administrative Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | U.S. Trustee Fee Claims | No | Does not Vote |
| 1 | Secured Claim of The Bank of Castile | No | Deemed to Accept |
| 2 | Pass-Through Claims | No | Deemed to Accept |
| 3 | General Unsecured Claims | Yes | Entitled to Vote |
| 4 | Abuse Claims | Yes | Entitled to Vote |
| 5 | Inbound Contribution Claims | Yes | Deemed to Reject |

1. **Unclassified Claims**.

a. *Administrative Claims*. Administrative Claims are Claims for costs or expenses incurred in the administration of the Diocese's Chapter 11 Case, which are Allowed pursuant to section 503(b) of the Bankruptcy Code. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims have not been classified and are treated as described in Section 2.1 of the Plan. Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different and less favorable treatment than provided under the Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim as soon as practicable after the later of: (i) the Effective Date; or (ii) the date on which such Claim becomes an Allowed Administrative Claim. Notwithstanding anything in the Plan to the contrary, the holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by the holder of an Allowed Administrative Claim and the Diocese or the Reorganized Diocese.

With respect to any trade Claims arising after the Petition Date representing obligations incurred by the Diocese in the ordinary course of its business consistent with past practice, such trade Claims shall be paid in the ordinary course of business. The Diocese estimates that unpaid post-petition ordinary course payables as of the Effective Date, excluding payroll and related expenses will total approximately $50,000 - $100,000. As to other Allowed Administrative Claims, except as otherwise provided in the Plan, each holder of an Allowed Administrative Claim: (i) shall be paid by the Reorganized Diocese as soon as reasonably practicable after the Effective Date or on the date the Order allowing such Administrative Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Claim.

Administrative Claims representing obligations incurred by the Diocese after the date and time of the entry of the Confirmation Order shall not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Diocese in the ordinary course of business and without Bankruptcy Court approval.

33

18435954.v6
Case 2-19-20905-PRW, Doc 2888, Filed 01/10/25, Entered 01/10/25 16:09:38,
Description: Main Document , Page 44 of 128

b.  *Priority Tax Claims*.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Diocese or the Reorganized Diocese, as applicable, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; *provided*, *however*, that the Diocese reserves the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.  The holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising from, or in connection with any Priority Tax Claim and any demand for such penalty will be deemed Disallowed by the confirmation of the Plan.

The Diocese does not anticipate that any Priority Tax Claims will exist as of the Effective Date.

c.  *Non-Tax Priority Claims*.  Unless the holder of an Allowed Non-Tax Priority Claim and the Diocese or the Reorganized Diocese (as applicable) agree to a different treatment, on, or as soon as reasonably practicable after, the later of (i) the Effective Date, or (ii) the date on which Non-Tax Priority Claim becomes an Allowed Claim, each holder of an such an Allowed Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, (a) Cash equal to the unpaid portion of such Allowed Claim or (b) such other less favorable treatment as to which the Diocese or the Reorganized Diocese and the holder of such Allowed Claim shall have agreed upon in writing.  The Trust shall not be responsible for payment of Non-Tax Priority Claims.  Notwithstanding anything in the Plan to the contrary, the holder of an Allowed Non-Tax Priority Claim may be paid on such other date and upon such other terms as may be agreed upon by the holder of an Allowed Administrative Claim and the Diocese or the Reorganized Diocese.

The Diocese does not anticipate that any unpaid Non-Tax Priority Claims will exist as of the Effective Date.

d.  *Professional Fee Claims*.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Professional Fee Claims have not been classified and are treated as described herein.  All Professionals or other Persons requesting an award by the Bankruptcy Court of Professional Fee Claims (i) shall: File their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 60 days after the Effective Date; and (ii) be paid in full, in Cash, by the Reorganized Diocese (a) as soon as practicable after the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order, or (b) upon such terms as may exist pursuant to order of the Bankruptcy Court or as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Diocese or the Reorganized Diocese, as applicable.  The Diocese is authorized to pay its Professionals for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

34

Professional Fee Claims of Professionals employed by the Committee, which are incurred prior to the Effective Date of the Plan in connection with the implementation and consummation of the Plan, may be paid by the Diocese or the Reorganized Diocese, after notice and a hearing, or by the Trust from contributions by the Diocese or the Reorganized Diocese in addition to the amounts payable to Abuse Claimants under the Plan.

Professional Fee Claims representing fees and expenses of Professionals employed by the Diocese for services rendered prior to the Effective Date shall not be paid by the Trust.

e.   *U.S. Trustee Fees*.  U.S. Trustee Fees include all fees and charges assessed against the Diocese under 28 U.S.C. § 1930, together with interest, if any, under 31 U.S.C. § 3717.  All U.S. Trustee Fees not paid prior to the Effective Date shall be paid by the Reorganized Diocese as soon as practicable after the Effective Date.  In no event shall the payments made to the Trust pursuant to Sections 2, 5, 7 or 8 of the Plan by any Person other than the Diocese be considered "disbursements" under 28 U.S.C. § 1930, nor shall any payment made by the Trust to any Person be considered a disbursement under 28 U.S.C. § 1930.

To date, the Diocese has paid U.S. Trustee Fees totaling approximately $[722,739.00] to the Office of the United States Trustee in connection with the Chapter 11 Case.  The requirement to pay U.S. Trustee Fees is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed chapter 11 cases.  The Reorganized Diocese shall have the exclusive right to pursue any cause of action, right to reimbursement for overpayment, or similar interest of the Diocese in amounts paid pursuant to 28 U.S.C. § 1930.

2.   **Classified Claims**.

a.   *Class 1 – Secured Claim of The Bank of Castile*.

**Classification**:  Class 1 is composed of the Secured Claim held by The Bank of Castile in connection with the Standby Letter of Credit.

**Treatment**:  Currently, the Diocese is required, pursuant to orders issued by the New York Workers' Compensation Board (the "WCB"), to make payment with respect to legacy claims for one Diocese claimant and two Catholic Charities' claimants totaling approximately $1,349.00 per month.  The Standby Letter of Credit secures the Diocese's obligations to the WCB and those claimants.  The Class 1 Claim is secured by the Diocese's interest in a checking account with The Bank of Castile bearing the account number "******6122" and having a balance of $460,842.00.  The Diocese is current with respect to all obligations due under the Standby Letter of Credit and will continue to pay those obligations in accordance with the terms of the Standby Letter of Credit.  The Trust shall not be responsible for the payment of the Class 1 Claim.

**Voting**:  The Class 1 Claim is Unimpaired, and therefore, the holder of the Class 1 Claim is deemed to have accepted the Plan and is not entitled to vote.

b.   *Class 2 – Pass-Through Claims.*

**Classification:**  Class 2 includes all Pass-Through Claims.

35

18435954.v6
Case 2-19-20905-PRW,   Doc 2888,   Filed 01/10/25,   Entered 01/10/25 16:09:38,
Description: Main Document  , Page 46 of 128

**Treatment:** Upon the later to occur of the Effective Date and the date on which the Diocese designates a Claim as a Pass-Through Claim, the holder of such Pass-Through Claim shall be deemed to have granted relief from the automatic stay with respect to its Pass-Through Claim, such Pass-Through Claim shall not be subject to the Diocese Discharge, and the parties shall retain their respective rights, remedies, claims, and defenses as they existed on the Petition Date. The Diocese shall designate all Pass-Through Claims no later than sixty days after the Effective Date. The Trust shall not be responsible for the payment of any Pass-Through Claims.

**Voting:** Class 2 Pass-Through Claims are Unimpaired, and therefore, holders of Class 2 Claims are deemed to have accepted the Plan and are not entitled to vote.

c.     *Class 3 – General Unsecured Claims.*

**Classification:** Class 3 Claims include all General Unsecured Claims. The Diocese estimates that the Class 3 Claims total approximately $50,000.

**Treatment:** Except to the extent the holder of an Allowed General Unsecured Claim agrees in writing to accept less favorable treatment as proposed by the Diocese or Reorganized Diocese, the Reorganized Diocese shall pay each holder of an Allowed General Unsecured Claim, Cash in two installments each equal to 50% of the Allowed amount of such General Unsecured Claim with the first payment to occur on, or as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, and the second payment to occur on, or as soon as reasonably practicable after the date that is six months after the date of the first payment. The foregoing payments shall be in full satisfaction, settlement, and release of, and in exchange for, such Allowed General Unsecured Claim. Notwithstanding anything to the contrary set forth above, no payments shall be made to any Protected Party on account of any General Unsecured Claim and all Protected Parties shall be deemed to have withdrawn any General Unsecured Claim with prejudice as of the Effective Date in consideration of the Channeling Injunction and Release provided in the Plan.

The Trust shall not be responsible for payment of General Unsecured Claims.

**Voting:** Class 3 General Unsecured Claims are Impaired, and therefore, each holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

d.     *Class 4 – Abuse Claims.*

**Classification:** Class 4 Claims include all asserted and unasserted Abuse Claims. More than 554 Abuse Claims have been asserted against the Diocese and the Participating Parties through proofs of claim filed in the Chapter 11 Case and/or through the commencement of Abuse Actions in other courts.

**Treatment:**

*The Plan establishes a Trust for the benefit of Abuse Claimants. The Trust will distribute funds to Abuse Claimants from the $126.35 million of settlement funds from the Diocese, the Participating Parties and the Settling Insurers, as well as any additional funds collected through litigation and/or settlement with CNA. The Trust will initially distribute at least $105 million and will reserve at least $17.5 million to fund operational expenses and costs of litigation with CNA and $3,576,500 as a reserve for payment of Unknown Abuse Claims.*

*If CNA makes the CNA Settlement Election, the Trust will distribute funds to the Abuse Claimants from the $297.35 million of settlement funds from the Diocese, the Participating Parties and the Settling Insurers. The Trust will initially distribute at least [$___] and will reserve at least [$__ million to fund operational expenses, and $3,576,500 as a reserve for payment of Unknown Abuse Claims].*

       i.     On the Effective Date and subject to the Plan provisions, the Trust shall assume liability for all Abuse Claims, including Adult Abuse Claims and Unknown Abuse Claims, in accordance with and under the Plan and Trust Documents. Distributions shall be made to holders of Abuse Claims on a fair and equitable basis, pursuant to and in accordance with the terms of the Plan and the Trust Documents. The Trust will initially distribute at least $105 million to Filed Abuse Claimants and will reserve at least $17.5 million to fund operational expenses and costs of litigation with CNA and sufficient funds to establish the Unknown Abuse Claim Fund.

*Funds will be distributed to survivors pursuant to an Allocation Protocol which is attached as an exhibit to the Plan. The Allocation Protocol provides a methodology for an independent Abuse Claim Reviewer to analyze survivors' Abuse Claims and assign a point score between 0 and 100 using a methodology that takes into account both the nature of the abuse inflicted and the impact of such abuse on survivors. The proposed Abuse Claim Reviewer selected by the Committee is Roger Kramer of Kramer Law LLC. Mr. Kramer has extensive experience mediating sexual abuse claims and serving as an abuse claims reviewer in diocesan chapter 11 cases.*

      ii.    Class 4 Claimants shall have their Claims treated in accordance with the Allocation Protocol, which shall provide as follows:

      (a) The Abuse Claims Reviewer shall review of each of the Abuse Claims (as and when such Claims may be filed) and, according to the guidelines set forth below, make determinations upon which individual monetary distributions will be made subject to the Plan and the Trust Documents. The Abuse Claims Reviewer's review as to each Abuse Claimant shall be the final review, subject only to reconsideration as set forth in the Allocation Protocol.

      (b) The Abuse Claims Reviewer shall consider all of the facts and evidence presented by the Abuse Claimant in the Abuse

37

18435954.v6
Case 2-19-20905-PRW, Doc 2888, Filed 01/10/25, Entered 01/10/25 16:09:38, Description: Main Document , Page 48 of 128

Claimant's filed proof of claim (as the same may have been amended from time to time). Abuse Claimants may provide supplemental evidence and information to the Abuse Claims Reviewer as follows:

1. The Abuse Claims Reviewer may request additional information from an Abuse Claimant. Failure to respond to such request shall not be construed against the Abuse Claimant.

2. Each Abuse Claimant can submit a written statement (a "<u>Supplemental Submission</u>") to the Abuse Claims Reviewer no later than the Submission Deadline. Notice of the Submission Deadline (the "<u>Supplement Notice</u>") shall provide, among other things, the method for submission of Supplemental Statements. All notices by the Abuse Claims Reviewer to Abuse Claimants, including the Supplement Notice, shall be sent to each Abuse Claimant's counsel of record via email and first class mail at the address(es) provided in the applicable Abuse Claimant's proof of claim form.

3. The Supplemental Submission shall be no longer than 10 pages, single sided, double spaced with 12-point font; provided, however, that an Abuse Claimant not represented by counsel may submit a handwritten Supplemental Submission not to exceed 10 single sided pages in length. A Supplemental Submission shall be submitted by the Submission Deadline unless the Abuse Claims Reviewer determines, in his sole discretion, there is good cause for delay. The Abuse Claims Reviewer, in his sole discretion, may allow an Abuse Claimant to exceed the page limit for the Supplemental Submission.

(c) The Abuse Claims Reviewer shall consider whether the Abuse Claimant has proven by credible evidence that the Abuse alleged by each Abuse Claimant was perpetrated by a Perpetrator of the Diocese. The Abuse Claims Reviewer shall give notice to the Abuse Claimant and the Trustee if he determines that the Abuse Claimant has not met the burden of proof and will provide the Abuse Claimant a reasonable opportunity to provide facts and/or legal basis to establish that the burden of proof has been met. The Diocese and any Protected Party (other than a Settling Insurer) must cooperate with any reasonable information or discovery request by an Abuse Claimant that is necessary to respond to the

38

Abuse Claims Reviewer's determination that the Abuse Claimant has not met the burden of proof.

(d) Each Abuse Claim will be evaluated by the Abuse Claims Reviewer. Each Claim will be scored on a scale of up to 100 based on the Evaluation Factors. The Abuse Claims Reviewer shall not consider the mere fact that a Claimant has been or is incarcerated in the review of the claim unless an element of the crime for which the Claimant was convicted includes fraud or misrepresentation.

1. Solely with respect to Filed Abuse Claims held by Consenting Abuse Claimants, the Abuse Claims Reviewer may grant an additional award of up to 10 points based on the Abuse Claimant's level of participation in public events related to the Abuse Claims, including but not limited to: (a) leadership role in organizations dedicated to helping sexual abuse survivors, (b) active participation in the chapter 11 process, (c) active participation in litigation against the Diocese and/or a Participating Party regarding any Abuse Claim, and/or (d) participation in criminal proceedings against a Perpetrator of the Diocese.

2. Solely with respect to Filed Abuse Claims held by Consenting Abuse Claimants, the Trustee shall apply a multiple of 1.25 to the award determined by the Abuse Claims Reviewer to any Abuse Claimant that also filed a complaint against the Diocese, any Protected Party, and/or any other Roman Catholic entity on or prior to August 13, 2021.

3. The Trustee shall apply any further enhancements to the claims awards for Litigation Claimants in accordance with Section 4.5.2 of the Plan.

4. Any Filed Late Claimant must submit a written statement (no longer than 10 pages, single sided, double spaced with 12-point font) regarding the basis for filing their Claim after the Bar Date, including the basis for any excusable neglect therefor. The deadline to submit such statement shall be the Submission Deadline provided upon notice by the Abuse Claims Reviewer. The Abuse Claims Reviewer shall award zero (0) points for any Filed Late Claimant that fails to submit such statement. With respect to any Filed Late Claim filed between August 14, 2021 and March 15, 2023, the

39

Abuse Claims Reviewer (a) shall reduce the points awarded for such Claim by 15% and (b) may, in his sole discretion based on the Filed Late Claimant's statement, reduce the points awarded to any such Claim by up to 60% inclusive of the reduction in part (a) of this sentence. With respect to any Filed Late Claim filed between March 16, 2023 and the Effective Date, the Abuse Claims Reviewer (a) shall reduce the points awarded to such Claim by 40% and (b) may, in his sole discretion based on the Filed Late Claimant's statement, reduce the points awarded to any such Claim by up to 90% inclusive of the reduction in part (a) of this sentence. For example, if the Abuse Claims Reviewer assesses a Filed Late Claim filed on September 1, 2021 at 100 points, he must reduce the assessment to no more than 85 points and may, in his sole discretion based on the Filed Late Claimant's statement, further reduce the assessment, but he may not reduce it to less than 40 points.

5. The Abuse Claims Reviewer shall allocate points only for Abuse Claims. Zero (0) points shall be allocated for any Claim that is not an Abuse Claim. Further, zero (0) points shall be allocated for any Claim that is on account of non-sexual assault, non-sexual battery, non-sexual corporal punishment and any other non-sexual act of physical, psychological, mental, or emotional abuse, humiliation, or intimidation or fraud, fraud in the inducement, misrepresentation, concealment, unfair practice, loss of consortium or any other non-Abuse tort.

(e) For the avoidance of doubt, the Abuse Claims Reviewer will conduct an evaluation of both Filed Abuse Claims and Unknown Abuse Claims. Unknown Abuse Claims shall be reviewed as they are asserted until the Abuse Claims Last Filing Date.

(f) There will be no consideration of an Abuse Claimant's claims against any entity other than the Diocese or Participating Parties that may be liable to the Abuse Claimant.

(g) Monetary Distribution:

1. The Abuse Claims Reviewer will arrive at a point total for each Abuse Claimant considering the Evaluation Factors.

40

18435954.v6

2. The Trustee shall calculate the value of an individual "point" after all Abuse Claims have been reviewed. The point value for Filed Abuse Claims held by Consenting Abuse Claimants will be determined by dividing the total dollars in the Filed Abuse Claim Fund by the total number of points awarded to all Filed Abuse Claims. The point value for Filed Abuse Claims held by Non-Participating Abuse Claimants will be determined by dividing the total dollars in the Diocese Abuse Claims Settlement Sub-Fund by the total number of points awarded to all Filed Abuse Claims. The point value for Unknown Abuse Claims will be determined by dividing the total dollars in the Unknown Abuse Claim Fund by the total number of points awarded to all Unknown Abuse Claims, provided, however, that the point value for Unknown Abuse Claims shall not exceed the point value for Filed Abuse Claims held by Consenting Abuse Claimants.

3. Filed Consenting Abuse Claimants shall receive compensation from the Filed Abuse Claim Fund *provided, however*, that Filed Abuse Claimants who are Non-Consenting Abuse Claimants shall only be entitled to receive compensation from the Diocese Abuse Claims Settlement Sub-Fund, and only in accordance with the distribution procedures set forth in Section 4.3.3 of the Plan.

4. Unknown Abuse Claimants shall receive compensation solely from the Unknown Abuse Claim Fund.

5. Following the occurrence of the Abuse Claims Last Filing Date, and after the Trust has made all required Distributions on account of each eligible Unknown Abuse Claim, any funds remaining in the Unknown Abuse Claim Fund shall be transferred to the Filed Abuse Claim Fund for distribution to Filed Abuse Claimants in accordance with the Allocation Protocol.

(h) The Trustee shall notify each Abuse Claimant in writing of the initial estimated monetary distribution regarding the Abuse Claimant's Claim, which distribution may be greater or smaller than the ultimate actual distribution to be received based on reserves established by the Trustee, the outcome of any reconsideration of claims, and the outcome of any post-confirmation litigation against Non-Settling Insurers. The Trustee shall mail this preliminary determination to the Abuse

41

18435954.v6

Claimant to the Abuse Claimant's counsel of record, or in the case of unrepresented parties, to the last address based on the Abuse Claimant's filed proof of claim. The Abuse Claims Reviewer's determination shall be final unless the Abuse Claimant makes a timely request for the point award to be reconsidered by the Abuse Claims Reviewer. The Abuse Claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point award. The Abuse Claimant may request reconsideration of the Abuse Claims Reviewer's point award by delivering a written request for reconsideration to the Abuse Claims Reviewer within 30 calendar days after mailing of the preliminary monetary distribution. The Abuse Claimant, with the request for reconsideration, may submit additional evidence and argument supporting such request upon a showing that such additional information could not have been provided under this protocol. Additionally, the Abuse Claimant must include a check for $425 with his or her request for reconsideration to cover the costs of the reconsideration. The Trustee shall waive the reconsideration fee if an Abuse Claimant submits to the Trustee a statement signed under the penalty of perjury that they are unable to pay the reconsideration fee. The Abuse Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

*The Trustee will make the initial distribution to Abuse Claimants as soon as practicable once all Abuse Claims have been scored pursuant to the Allocation Protocol and any requests for reconsideration have been addressed. Based on Mr. Kramer's prior history in other diocesan chapter 11 cases, the Committee expects that the process of implementing the Allocation Protocol will take approximately [2-4 months] after the Plan is confirmed and becomes effective.*

18435954.v6
Case 2-19-20905-PRW, Doc 2888, Filed 01/10/25, Entered 01/10/25 16:09:38, Description: Main Document , Page 53 of 128

*Once the claim review process is complete, the Trustee will make an initial distribution to Consenting Abuse Claimants. Settlement funds will be distributed to Consenting Abuse Claimants proportionally based on the scores awarded by the claim reviewer, subject to certain downward adjustments for late-filed claims, and upward adjustments for Consenting Abuse Claimants who filed timely lawsuits under the CVA and for Litigation Claimants if their litigation efforts result in a settlement with CNA. For example, any by way of illustration only, if the claims reviewer awards a cumulative total of 25,000 points among 500 Consenting Abuse Claimants (reflecting a hypothetical average award of 50 out of a possible maximum of 100 points),[16] and if the Trust is making an initial distribution of $100 million, the amount distributable to a Consenting Abuse Claimant who is not subject to any adjustments would be calculated as follows:*

$$\frac{points\ awarded}{25,000} * \$100,000,000 = distribution\ amount$$

| Points Assigned | Hypothetical Distribution Amount |
|---|---|
| 100 | $400,000 |
| 75 | $300,000 |
| 50 | $200,000 |
| 25 | $100,000 |
| 10 | $40,000 |

*If a Consenting Abuse Claimant filed a timely CVA lawsuit, they would receive a point enhancement multiple of 1.25 and their distribution would be calculated as follows:*

$$\frac{points\ awarded * (1.25)}{25,000} * \$100,000,000 = distribution\ amount$$

| Points Assigned | Hypothetical Distribution Amount |
|---|---|
| 100 | $500,000 |
| 75 | $375,000 |
| 50 | $250,000 |
| 25 | $125,000 |
| 10 | $50,000 |

---

[16] The actual cumulative total points awarded could be higher or lower depending upon the claim reviewer's evaluation of Abuse Claims.

> *Conversely, if the Consenting Abuse Claimant filed their claim after the Bar Date, they would be subject to point reduction of at least 15%, and as much as 90%, depending upon how late their claim was filed and the reason given for missing the Bar Date.[17]  Accordingly, if the claim reviewer determines to apply a 50% reduction on account of the lateness of the claim, the distribution to the Consenting Abuse Claimant would be calculated as follows:*
>
> $$\frac{points\ awarded * (.50)}{25,000} * \$100,000,000 = distribution\ amount$$
>
> | Points Assigned | Hypothetical Distribution Amount |
> |---|---|
> | 100 | $200,000 |
> | 75 | $150,000 |
> | 50 | $100,000 |
> | 25 | $50,000 |
> | 10 | $20,000 |

iii.     Any Claims for punitive or exemplary damages will be treated as penalty Claims and will be Disallowed and receive no Distribution under the Plan.

iv.     Except with respect to Litigation Claims brought by authorized Litigation Claimants in accordance with the terms of the Plan and Non-Participating PP Abuse Claims (which are preserved under the Plan), the right of any Class 4 Claimant to a trial by jury or otherwise against the Diocese and/or any Protected Parties is waived and released upon the occurrence of the Effective Date, and any Class 4 Claim they may hold will be solely determined by the Abuse Claims Reviewer in accordance with the Allocation Protocol.

v.     The Allocation Protocol was developed by the Committee, in consultation with State Court Counsel and was not developed by, or submitted for the approval of, any of the Protected Parties, nor are the Protected Parties deemed to have accepted or acquiesced in the adoption of the Allocation Protocol.  For the avoidance  of doubt, the Insurance Settlement Agreements do not indicate the Settling Insurers' support for the Allocation Protocol, and no party shall argue that the Settling Insurers agreed to or acquiesced in the terms or use of the Allocation Protocol in any proceeding; the Settling Insurers take no position on the Allocation Protocol.  If a Class 4 Claim is denied payment, in whole or in part, pursuant to the Allocation Protocol, the holder of such Class 4 Claim will have no rights against any of the Protected Parties relating to such Class 4 Claim, except to the extent a Non-Participating Abuse Claimant may retain their Non-Participating PP Abuse Claim in accordance with the terms of the Plan.

vi.     None of the Trust, the Diocese, or the Reorganized Diocese shall have any obligation to take any action to enforce an Insurance Policy of a Non-Settling Insurer, including any obligation to commence/prosecute any action against any Non-Settling Insurer or

---

[17] The Plan establishes a Trust for the settlement of all Abuse Claims that arose prior to September 12, 2019 which is when the Diocese filed this Chapter 11 Case.  Any Claims arising on or after September 12, 2019 but prior to confirmation of the Plan will be treated as either Administrative Claims, or Pass-Through Claims, in accordance with Plan Sections 2.1.1 and 2.3.2 respectively.

44

18435954.v6
Case 2-19-20905-PRW,   Doc 2888,   Filed 01/10/25,   Entered 01/10/25 16:09:38,
Description: Main Document , Page 55 of 128

to defend an action commenced by a Non-Settling Insurer, though the Trust (the Diocese, or the Reorganized Diocese), may do so in their sole and absolute discretion.

vii. The payment of the Class 4 Claims by the Trust will not, prior to the occurrence of the Abuse Claim Discharge Date, constitute a release, accord, or novation of the Diocese's or the Participating Parties' liability with respect to the Class 4 Claims; *provided*, *however*, for the avoidance of doubt: (i) the entirety of the Diocese's liability with respect to the Class 4 Claims shall be discharged under Bankruptcy Code section 1141(d), in accordance with Section 12.2, and all of the Participating Parties' liabilities with respect to any Consenting Abuse Claims are subject to the Channeling Injunction and the releases under the Plan; and (ii) all of the Settling Insurer's respective liabilities with respect to any Channeled Claims are subject to the Channeling Injunction and Supplemental Settling Insurer Injunction. Under no circumstances shall the Abuse Claims Reviewer's review of a Class 4 Claim affect the rights of a Non-Settling Insurer.

viii. Nothing in the Plan affects, diminishes or impairs any Class 4 Claimant's rights against any Joint Tortfeasor, including that Joint Tortfeasor's comparative fault or joint and several liability for Abuse, if any. In any litigation against a Joint Tortfeasor, nothing in the Plan or the Plan Documents shall be deemed an adjudication of a Class 4 Claim for any purpose or a limitation on the recovery against such Joint Tortfeasor *provided*, *however*, that all of the Settling Insurers' respective liabilities with respect to any Channeled Claims are subject to the Channeling Injunction and Supplemental Settling Insurer Injunction.

ix. The Diocese and the Reorganized Diocese shall cooperate with the Abuse Claims Reviewer and/or the Trustee as reasonably requested by the Abuse Claims Reviewer and/or the Trustee in connection with the administration of the Allocation Protocol, provided that any DOR Entities' Post-Effective Date Costs incurred in connection therewith are paid in accordance with the DOR Entities' Post-Effective Date Costs Procedures.

x. The Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the Trust Distributions Class 4 Claimants receive, or are entitled to receive, based on the Plan, Trust Agreement, or Allocation Protocol. For the avoidance of doubt, (i) determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of the Diocese's or any Participating Party's liability or damages for Class 4 Claims; and (ii) under no circumstances shall the Abuse Claims Reviewer's review of a Class 4 Claim affect, or be construed to affect, the rights of a Non-Settling Insurer. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Class 4 Claims. Any such recoveries by the Trust from Non-Settling Insurers will become Trust Assets to be distributed pursuant to Section 4.4 of this Plan and the Allocation Protocol.

xi. As of the Effective Date of the Plan, the liability of Protected Parties for all Consenting Abuse Claims and Non-Participating DOR Abuse Claims shall be fully assumed by the Trust, without any further order from the Bankruptcy Court or further action from any party, and pursuant to the Channeling Injunction set forth in Section 12.3 of the Plan. All Consenting Abuse Claims and Non-Participating DOR Abuse Claims shall be satisfied solely from the Trust as

45

set forth in the Plan, the Trust Agreement, and the Allocation Protocol; *provided, however*, such assumption of Consenting Abuse Claims shall not prevent Litigation Claimants from asserting Litigation Claims to the extent provided for herein; *provided further*, that the Channeling Injunction and Supplemental Settling Insurer Injunction prohibit any Person (including all Litigation Claimants) from asserting, enforcing, or attempting to assert or enforce any Channeled Claim against any Settling Insurer or any Settling Insurer's Related Persons.

xii.     No Person, other than the Committee or, following the Effective Date, the Trustee, may: (i) object to any Consenting Abuse Claim or (ii) challenge the merit, validity, or amount of any Consenting Abuse Claim, except that nothing in the Plan shall prevent the Diocese or any Participating Party, or with respect to any Consenting Abuse Claim implicating a Non-Settling Insurer Policy, a Non-Settling Insurer, from asserting any legal or factual defenses that the Diocese, a Participating Party, and/or Non-Settling Insurer may have in response to any Litigation Claim. Any objection or challenge to a Consenting Abuse Claim pending as of the Effective Date is deemed withdrawn and shall not be refiled. With the exception of the Trustee's objections or challenges to a Consenting Abuse Claim, or the adjudication or settlement of a Litigation Claim, Consenting Abuse Claims shall be treated in accordance with the Allocation Protocol and shall not be subject to any other review or judicial consideration. For the avoidance of doubt, nothing in the Plan or the Plan Documents shall in any way restrict the Diocese, any Participating Party, or any other Person from objecting to or otherwise contesting any Non-Participating Abuse Claim on any basis or in any forum. Nothing in the Plan or the Plan Documents shall constitute an admission by any Protected Party as to the validity or amount of any Class 4 Claim, nor shall anything therein (a) restrict the Diocese or the Participating Parties from satisfying any Post-Effective Date Preconditions to Coverage; or (b) modify the terms of any Non-Settling Insurer Policy with respect to any failure of the Diocese or the Participating Parties to satisfy any Post-Effective Date Preconditions to Coverage.

xiii.     No Class 4 Claimant shall receive a Distribution from the Trust until such Class 4 Claimant has executed and delivered to the Trust a Consenting Abuse Claim Release Agreement attached to the Plan Supplement as **Exhibit 2** or Non-Participating Abuse Claim Release Agreement attached to the Plan Supplement as **Exhibit 3**. Each Class 4 Claimant must release all Claims against the Protected Parties. The Trust must provide copies of all executed Abuse Claim Release Agreements (a) to the Protected Parties, and (b) upon request, to any Joint Tortfeasor that has executed a non-disclosure or confidentiality agreement. For the avoidance of doubt, nothing herein shall require a Consenting Abuse Claimant to release any Person that is not a Protected Party or any Non-Participating Abuse Claimant to release any Person other than the Diocese.

xiv.     To preserve coverage under any Non-Settling Insurer Policy, subject to the provisions of Section 12.2 of the Plan, each Consenting Abuse Claimant specifically reserves any Abuse Claims they may have against the Diocese or any Participating Party that implicate coverage under any Non-Settling Insurer Policy, but recourse is limited to the proceeds of the Insurance Claims that may be recoverable by the Trust from any Non-Settling Insurers. Consenting Abuse Claims will be released as against the Diocese and the Participating Parties only upon the occurrence of the applicable Abuse Claim Discharge Date as provided in Sections 12.2.3 and 12.8 of the Plan.

xv.    Subject to and conditioned upon entry of the Confirmation Order as contemplated in Section 11.1.1 of the Plan, Consenting Abuse Claimants in Class 4 shall automatically and without further action be deemed to irrevocably appoint the Committee as their attorney in fact and to grant to the Committee the authority to negotiate and agree to modifications of the treatment accorded to Class 4 claims, and the Plan generally on their behalf, between the Confirmation Date and the Effective Date, to the extent such modifications are necessary to satisfy or obtain the waiver of any of the conditions precedent to the Plan's Effective Date set forth in Sections 11.1.2 through 11.1.14, subject to the Committee's fiduciary duties to act on behalf of all creditors.

**Voting:**  Class 4 Abuse Claims are Impaired, and each holder of a Class 4 Claim is entitled to vote to accept or reject the Plan.  Only for purposes of voting, each Class 4 Claim is deemed to be Allowed in the amount of $1.00.

e.    ***Class 5 – Inbound Contribution Claims.***

**Classification:**  Class 5 Inbound Contribution Claims include any Claim asserted against the Diocese for indemnity, contribution, or reimbursement arising out of, or related to, the Claimant's liability to pay or defend any Class 4 Abuse Claim.  The only Class 5 Inbound Contribution Claims that the Diocese is aware of are those filed by the Parishes and other Participating Parties.

**Treatment:**  Class 5 Claims shall be Disallowed and extinguished and there will be no Distributions to the holders of Class 5 Claims on account of such Class 5 Claims. Notwithstanding the foregoing, none of the injunctive provisions of the Plan shall prohibit any holder of a Class 5 Claim who is also a Tort Defendant from asserting any defense they may have under applicable law in any Tort Action, provided that, in accordance with Section 12.3 of the Plan, no affirmative relief shall be available against any of the Protected Parties.

**Voting:**  Class 5 Inbound Contribution Claimants will not receive or retain any property under the Plan and therefore are deemed to have rejected the Plan.  Class 5 will not vote on the Plan.

## ARTICLE 5

## ABUSE CLAIMS

**A.**    **Assessment of Abuse Claims**

Class 4 Abuse Claims will be assessed and paid in accordance with the Allocation Protocol, which is designed to provide an expeditious, efficient, and inexpensive method for determining whether an Abuse Claimant is entitled to a Distribution from the Trust. The Diocese, the Participating Parties, and the Reorganized Diocese shall reasonably cooperate with the Abuse Claims Reviewer and the Trustee in connection with any inquiries by either related to the administration of the Allocation Protocol, but shall not be required to act in any way that prevents the satisfaction of any Post-Effective Date Preconditions to Coverage under any Non-Settling Insurer Policy, if any (including, if applicable, by cooperating with a Non-Settling Insurer). Under no circumstance shall the Abuse Claims Reviewer's review of an Abuse Claim

47

or a Distribution to an Abuse Claimant have any effect on the rights, defenses, or obligations of any Non-Settling Insurer.

**B.     Legal Effect of Estimation of Claims and Distributions Under the Allocation Protocol**

The Abuse Claims Reviewer's determinations are for estimation and Distribution purposes only and shall not constitute findings as to, or the fixing of, facts or liability concerning the Abuse Claims with any binding legal effect.  The determination of Abuse Claimants' qualifications, the estimation of Abuse Claims, and the payment of Trust Distributions shall not be construed as an admission of liability by the Diocese, any Participating Party, any Tort Defendant or alleged Joint Tortfeasor, or the Trust with respect to any Abuse Claim and shall have no *res judicata* or collateral estoppel effect on the Diocese, the Reorganized Diocese, any Participating Party, the Trust, or any Non-Settling Insurer.  Trust Distributions do not release the Diocese nor are Trust Distributions an accord or novation of the Diocese's or any Protected Party's liability on account of the Abuse Claims ; *provided, however*, that all of the Settling Insurers' respective liabilities with respect to any Channeled Claims are subject to the Channeling Injunction and Supplemental Settling Insurer Injunction.

The Trust's act of making a Distribution to an Abuse Claimant is immaterial to, and shall not be construed as, a determination or admission of the Diocese's, any Participating Party's, or any Non-Settling Insurers' liability for, or damages with respect to, any Abuse Claim.  The determination of qualification, estimation of Abuse Claims, and the payment of Distributions is not a settlement, release, accord, or novation of any Abuse Claim.  The determination of qualification, estimation of claims, and payment of partial Distributions does not impair a Litigation Claimant's right to obtain a judgment, including a judgment based on joint and several liability, against the Diocese and/or a Participating Party or any Non-Settling Insurer, for purposes of establishing the Diocese's and/or a Participating Party's liability with respect to their Litigation Claim, *provided*, *however*, (i) any such judgment awarded to a Litigation Claimant will be reduced by the amount of Trust Distributions already paid by the Trust to such Litigation Claimant on his or her Litigation Claim(s) and (ii) all of the Settling Insurers' respective liabilities with respect to any Channeled Claims (including Litigation Claims) are subject to the Channeling Injunction and Supplemental Settling Insurer Injunction.  Neither the Abuse Claims Reviewer's review of an Abuse Claim and determination of qualification, nor the Trust's estimation of an Abuse Claim or the payment of Distributions shall: (i) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation with the Diocese or the Participating Parties, Non-Settling Insurers, or any other Person, or (ii) constitute, or be deemed, a determination of the reasonableness of the amount of any Litigation Claim, either individually or in the aggregate with other Litigation Claims, in any coverage litigation with any Non-Settling Insurers.  The Trust's estimation of Abuse Claims and payment of Trust Distributions does not create an admission of the fact of liability, or the extent of damages, on behalf of the Diocese and/or any Participating Parties.

48

18435954.v6

## C.    Insurance Settlements

The Trust shall use reasonable efforts, consistent with the terms of the Trust Agreement and its fiduciary duties to the Trust's beneficiaries, to enter into an Insurance Settlement Agreement with any Non-Settling Insurer.

## D.    Release and Discharge of Abuse Claims.

Notwithstanding anything to the contrary in the Plan, each Abuse Claimant must, prior to receiving a Distribution from the Trust, execute and deliver to the Trustee (i) a Consenting Abuse Claim Release Agreement in the form attached to the Plan Supplement as **Exhibit 2** if such Abuse Claimant is a Consenting Abuse Claimant or (ii) a Non-Participating Abuse Claim Release Agreement in the form attached to the Plan Supplement as **Exhibit 3** if such Abuse Claimant is a Non-Participating Abuse Claimant, *provided, however,* to preserve coverage under Non-Settling Insurer Policies, Consenting Abuse Claimants specifically reserve, and do not release, subject to the occurrence of the applicable Abuse Claim Discharge Date, any and all Abuse Claims that they may have against the Protected Parties that implicate coverage under Non-Settling Insurer Policies, but recourse on such Abuse Claims prior to their release is limited to any Trust Distributions as set forth in the Plan, the Trust Agreement, and the Allocation Protocol, and the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable by the Trust from any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim, and any such judgments or awards will be handled in accordance with the Plan.

Consenting Abuse Claims will be released or enjoined as against the Protected Parties for any Abuse that may be covered under Non-Settling Insurer Policies only upon the occurrence of the applicable Abuse Claim Discharge Date, as set forth in Section 12.2.3 and 12.7 of the Plan. Consenting Abuse Claimants will expressly reserve their rights against other Persons (other than Protected Parties), including Joint Tortfeasors, who will remain severally liable with respect to any Consenting Abuse Claims.

Non-Participating DOR Abuse Claims will be released or enjoined as against the Diocese upon the Effective Date, *provided*, *however*, that Non-Participating Abuse Claimants shall retain their Non-Participating PP Abuse Claims.

Any Person that is, or was alleged to be, a Joint Tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of any Consenting Abuse Claim or Non-Participating DOR Abuse Claim shall not be liable for any Protected Party's share of causal liability or fault and no Protected Party shall be liable for the share of causal liability or fault of any other Protected Party or Joint Tortfeasor.

For the avoidance of doubt, with respect to all Non-Abuse Claims, except as otherwise provided in the Plan, the Diocese's liability on account of such Claims shall be discharged pursuant to the provisions of 1141(d).

18435954.v6

Case 2-19-20905-PRW,   Doc 2888,   Filed 01/10/25,   Entered 01/10/25 16:09:38,
Description: Main Document , Page 60 of 128

1. Distributions to Abuse Claimants.

   a. ***Distributions Generally.*** Abuse Claimants' recoveries under the Plan shall be limited to their Trust Distributions, if any, under the Allocation Protocol and Trust Documents. Abuse Claimants shall not be entitled to collect personally, or otherwise, any additional amounts whatsoever from the Diocese, the Reorganized Diocese, any Participating Party, or their respective assets, or from any Settling Insurers or Settling Insurers' assets, for any Abuse Claims that are Channeled Claims, even if they are denied a Trust Distribution.

   b. ***Distributions to Consenting Abuse Claimants.*** A Consenting Abuse Claimant whom the Abuse Claims Reviewer determines to be entitled to a Distribution, will receive a Distribution from the Trust in the amount(s) and at the time(s) provided for in the Allocation Protocol and Trust Documents; provided, however, no Consenting Abuse Claimant shall receive a Distribution from the Trust until such Consenting Abuse Claimant has executed and delivered to the Trust a Consenting Abuse Claim Release Agreement. Any payment on a Consenting Abuse Claim constitutes a payment for damages on account of a personal physical injury or sickness arising from an occurrence, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended. Distributions may commence only after the earlier of (a) sixty (60) days after the Effective Date or (b) the entry of a final decree in this Chapter 11 Case, unless the Plan Proponents agree otherwise in writing.

   c. ***Distributions to Holders of Non-Participating Abuse Claims.***

      (i) ***Default Distribution***. Each Non-Participating Abuse Claimant shall receive, in full and final satisfaction of their Non-Participating DOR Abuse Claim: (i) one thousand dollars ($1,000) and (ii) the opportunity to establish an entitlement to further Distributions from the Trust in accordance with Section 4.3.3 of the Plan and the Allocation Protocol. Each Non-Participating Abuse Claimant shall retain the right to assert any Non-Participating PP Claim they may have against any Participating Party, in accordance with, and subject to, the terms and provisions of the Plan.

      (ii) ***Establishing Liability.***

         (a) If a Non-Participating Abuse Claimant wishes to obtain a Distribution in excess of the default Distribution set forth in Section 3.a above, he or she must first execute and deliver to the Diocese a Non-Participating Litigation Claimant Agreement.

         (b) Non-Participating Abuse Claimants who deliver to the Diocese an executed Non-Participating Litigation Claimant Agreement may, subject to the terms of this Plan and the other Plan Documents, litigate their Non-Participating DOR Abuse Claim in any court of competent jurisdiction.

         (c) Notwithstanding any judgment or settlement obtained by a Non-Participating Abuse Claimant with respect to their Non-Participating DOR Abuse Claim, any recovery against the Diocese or the Reorganized Diocese by such Non-Participating Abuse

Claimant shall be limited to the Distributions provided for in this Plan and the Allocation Protocol.

(iii)    ***Additional Distribution Upon Successful Litigation.***

(a)    Once a Non-Participating Abuse Claimant's Non-Participating DOR Abuse Claim is fully adjudicated or settled on a final and non-appealable basis, and if (x) as a result of such adjudication or settlement the Diocese is determined to be liable to such Non-Participating Abuse Claimant on their Non-Participating DOR Abuse Claim in an amount greater than the default Distribution provided in Section 3.a above, and (y) the Trust has not been terminated in accordance with the terms of the Trust agreement on or before the date on which the Non-Participating Abuse Claimant first presents their final and non-appealable judgment or settlement to the Trustee, such Non-Participating Abuse Claimant shall be entitled to a further Distribution from the Trust.

(b)    Such further distribution shall be made on or before the date that is 120 days after the date on which the Non-Participating Abuse Claimant presents their final and non-appealable judgment or settlement to the Trustee and shall be in an amount equal to the lesser of (x) the amount of the Diocese's liability for the applicable Non-Participating DOR Abuse Claim as set forth in such judgment or settlement and (y) the amount determined as a result of the Abuse Claim Reviewer's assessment of the Non-Participating Claimant's Non-Participating DOR Abuse Claim pursuant to the Allocation Protocol, in each case less the default Distribution previously paid pursuant to Section 3.a.   For avoidance of doubt, Distributions to Non-Participating Abuse Claimants pursuant to clause (y) above shall be limited to (a) if the Non-Participating Abuse Claim was Filed on or prior to the Effective Date, the *pro-rata* portion of the Diocese Abuse Claims Settlement Sub-Fund allocable to such Non-Participating Abuse Claimant's Non-Participating DOR Abuse Claim, and (b) if the Non-Participating Abuse Claim is an Unknown Claim, the *pro rata* portion of the Unknown Abuse Claim Fund allocable to such Non-Participating Abuse Claimant's Non-Participating DOR Abuse Claim; holders of Non-Participating Abuse Claims shall not be entitled to receive any Distribution of any other Trust Assets, including, without limitation, any Trust Assets consisting of (a) the Participating Parties' Cash Contribution, (b) the Settling Insurers' Cash Contribution, (c) any payment by a Settling Insurer pursuant to an Insurance Settlement Agreement, (d) any Insurance Claim Proceeds, (e) proceeds of Litigation Awards, (f) proceeds of Outbound Contribution Claims, or (g) any other proceeds which the Trust may obtain pursuant to the terms of the Plan.

d.    ***Unknown Claimant Treatment Election.***    The Unknown Claimant Representative shall, by written notice Filed on the docket on or before the Voting Deadline, elect on behalf of all, but not less than all, Unknown Abuse Claimants, to treat their respective Unknown Abuse Claims as either Consenting Abuse Claims or Non-Participating Abuse Claims. If the Unknown Claimant Representative fails to File such notice on or before the Voting Deadline, the Unknown Claimant Representative shall be deemed to elect to treat Unknown Abuse Claims as Consenting Abuse Claims.

(i)    If the Unknown Claimant Representative elects to treat Unknown Abuse Claims as Consenting Abuse Claims, except to the extent that a Unknown Abuse Claimant agrees to less favorable treatment of such Claim, each Unknown Abuse Claimant shall

51

have the right to receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, their respective Unknown Abuse Claim, Distributions from the Unknown Abuse Claim Fund as provided in the Allocation Protocol and Trust Documents.

(ii)     If the Unknown Claimant Representative elects to treat Unknown Abuse Claims as Non-Participating Abuse Claims, except to the extent that a Unknown Abuse Claimant agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, their respective Non-Participating DOR Abuse Claim, each holder of a Unknown Abuse Claim shall, subject to the procedures set forth in Section 4.3.3 above, receive Distributions from the Unknown Abuse Claim Fund, and shall retain the right to assert any Non-Participating PP Claim they may have against any Participating Party, in accordance with, and subject to, the terms and provisions of the Plan.

## E.     Litigation of Consenting Abuse Claims Against Non-Settling Insurers

*Abuse Claimants with claims covered by CNA (i.e., where the abuse occurred between 1943 and 1977) may elect to be Litigation Claimants and, at their own expense, to litigate their claims against the Diocese and the Participating Parties to establish liability and damages. Any judgment a Litigation Claimant may obtain against the Diocese or a Participating Party may only be enforced against CNA. The Claim Litigation Protocol attached as an exhibit to the Trust Agreement provides that the Trustee will prioritize authorizing those Litigation Claimants with the highest valuations according to the Committee's valuation expert to move forward with litigation first, but may also consider additional factors such as the age of the Litigation Claimant and the legal merits of each Litigation Claimant's case. However, if CNA makes the CNA Settlement Election and becomes a Settling Insurer, then there will be no Litigation Claimants.*

1.     ***Litigation Claims.***

a.     At any time prior to the earlier to occur of the first anniversary of the Effective Date or the applicable Abuse Claim Discharge Date, the Trustee, in accordance with the Allocation Protocol and Trust Agreement, may authorize one or more Consenting Abuse Claimants, at such Claimants' expense, to proceed as a Litigation Claimant by commencing (or resuming prosecution of) an action in any court of competent jurisdiction solely for the purpose of determining any liability that the Diocese and/or any Participating Party may have with respect to their Litigation Claim, the amount of that liability, and to pursue Insurance Claims against Non-Settling Insurers. For the avoidance of doubt, no Non-Participating Abuse Claimant shall be authorized to serve as a Litigation Claimant.

b.     Prior to authorizing a Consenting Abuse Claimant to proceed as a Litigation Claimant, the Trustee shall (i) consult with the Diocese and/or any Participating Party against whom such Abuse Claimant's Claim is asserted and (ii) require the Abuse Claimant to execute a Litigation Claimant Agreement. The Trustee shall provide a copy of each Litigation Claimant Agreement to the Reorganized Diocese upon execution thereof, and to any other Protected Parties upon request.

52

18435954.v6

c.    All DOR Entities' Post-Effective Date Costs incurred in connection with Litigation Claims shall be paid in accordance with the provisions of Section 8.11 of the Plan.

d.    Consistent with the injunctions and discharge provided for in Section 12 of the Plan, any Litigation Award obtained in respect of any Litigation Claim may not be enforced against (a) any of the Protected Parties, (b) any of the non-insurance property or assets of the Diocese, or any Participating Party, (c) the Residual Assets and any other property or assets that are vested in the Reorganized Diocese pursuant to the Plan, and any property or assets otherwise acquired by the Reorganized Diocese, or (d) any of the Settling Insurers' assets. Any Litigation Award arising from a Litigation Claim shall be paid under the Plan and the Trust Allocation Protocol and shall be fully enforceable solely against, and paid by, any Non-Settling Insurer under the terms of that Non-Settling Insurer's Insurance Policy. Any recovery (including payment of a judgment or an unpaid judgment) from the prosecution of a Litigation Claim is deemed assigned to the Trust to the extent provided in the Plan, including as provided in the Allocation Protocol and Trust Documents. The Trust shall be authorized to pursue recovery of an unpaid judgment from any Non-Settling Insurer for the benefit of the Trust and all beneficiaries of the Trust. Notwithstanding the foregoing, a Litigation Claimant may settle his or her Litigation Claim prior to judgment with a Non-Settling Insurer in accordance with the terms of the Plan Documents including without limitation Section 4.5.4.d of the Plan. The Litigation Claimant shall have sole authority to negotiate and execute such settlement. If a Litigation Claimant settles their Litigation Claim and elects not to contribute the settlement proceeds to the Trust in accordance with Section 4.5.4.d of the Plan, such Litigation Claimant shall no longer be eligible to share in any Trust Distributions on account of future Insurance Claim or judgment recoveries by the Trust.

> *Litigation Claimants are eligible for claim enhancements if the Trust successfully settles its claims against CNA while their litigation is pending. Such enhancements are on account of the work and re-traumatization Litigation Claimants may endure in pursuing litigation. Enhancements for Litigation Claimants will be funded solely out of additional settlement monies the Trust recovers from CNA and will therefore not reduce the amounts available for distribution to other Abuse Claimants from the settlement payments made by the Diocese, Participating Parties and settling insurers. The Committee believes that litigation of claims will greatly enhance the Trust's ability to achieve an appropriate settlement with CNA.*

2.    ***Claim Enhancement.***    To the extent the Trustee enters into a Trust Insurance Settlement with respect to a Target Policy that covers a Litigation Claimant's Abuse Claim, such Litigation Claimant shall be entitled to an enhanced Distribution (the "<u>Claim Enhancement</u>") as set forth below to his or her allocation pursuant to the Allocation Protocol, which enhanced amount shall be payable from the proceeds of the applicable Trust Insurance Settlement. The Claim Enhancements are independent of one another, and are not intended to be cumulative. The Trustee shall reserve sufficient amounts to fund such enhanced payments prior to making any Distribution of Trust Insurance Settlement proceeds to Abuse Claimants who are not Litigation Claimants. The Claim Enhancement shall be applied as follows:

a.    A Litigation Claimant shall be entitled to an enhancement of ten percent (10%) if the Trust negotiates a Trust Insurance Settlement for a Target Policy of such Litigation

Claimant if the Trust Insurance Settlement is entered into prior to commencing litigation in such Litigation Claimant's case.

b. A Litigation Claimant shall be entitled to an enhancement of twenty-five percent (25%) if the Trust negotiates a Trust Insurance Settlement for a Target Policy of such Litigation Claimant if the Trust Insurance Settlement is entered into after litigation commences but prior to a deposition or interview of the Litigation Claimant by opposing counsel in such Litigation Claimant's case.

c. A Litigation Claimant shall be entitled to an enhancement of forty percent (40%) if the Trust negotiates a Trust Insurance Settlement for a Target Policy of such Litigation Claimant if the Trust Insurance Settlement is entered into after a deposition or interview of the Litigation Claimant by opposing counsel but before commencement of a trial in such Litigation Claimant's case.

d. a litigation Claimant shall be entitled to an enhancement of fifty (50%) if the Trust negotiates a Trust Insurance Settlement for a Target Policy of such Litigation Claimant if the Trust Insurance Settlement is entered into on or after the first day of a trial in such Litigation Claimant's case.

e. A Litigation Claimant shall be entitled to an enhancement of one hundred percent (100%) if the Trust negotiates a Trust Insurance Settlement for a Target Policy of such Litigation Claimant if the Trust Insurance Settlement is entered into after a Litigation Award entered in favor of the Litigation Claimant in such litigation becomes final and non-appealable.

3. **Withdrawal of Litigation Claim.** A Litigation Claimant may withdraw his or her election to be a Litigation Claimant at any time by written notice to the Trustee and the Reorganized Diocese. Upon providing such notice, the Litigation Claimant's determination not to proceed as a Litigation Claimant shall be irrevocable.

---

*Litigation Claimants who settle with CNA prior to any settlement between the Trust and CNA may elect to either retain such settlement or contribute it to the Trust. If the Litigation Claimant elects to contribute their settlement to the Trust, they will be entitled to share in any additional monies the Trust collects from CNA via settlement or litigation, but will not receive any claim enhancements. If they elect to retain their settlement, they will nevertheless be required to contribute 10% of the amount collected to the Trust on account of costs and expenses incurred by the Trust in connection with their Litigation Claim, and will not share in any additional monies the Trust collects from CNA.*

*Any judgment obtained by a Litigation Claimant shall be assigned to the Trust. The Trust will seek enforcement of the judgment and the Litigation Claimant shall be entitled to receive all claim enhancements.*

---

4. **Payment of Settled Litigation Claim.** A Litigation Claimant's allocated Trust Distributions shall be held in reserve by the Trustee until the earliest to occur of the following:

a.	a court of competent jurisdiction enters a Final Order determining that the Diocese and/or any Participating Party (as applicable) does not have any liability on account of such Litigation Claimant's Abuse Claim (any such order, a "<u>Denial Order</u>"), in which case such Litigation Claimant's Abuse Claim shall be Disallowed in its entirety and the Litigation Claimant shall not be entitled to any Distribution from the Abuse Claims Settlement Fund; provided, however, that such Litigation Claimant shall not be required to refund any Distribution received from the Trust prior to entry of a Denial Order;

b.	the Trust enters into a Trust Insurance Settlement with respect to the applicable Target Policy, in which case the Litigation Claimant's Abuse Claim shall be treated as a Channeled Claim under the Plan and the Trustee shall release such Litigation Claimant's Distribution (including any enhancement described above) from the Abuse Claims Settlement Fund;

c.	the Court enters a Litigation Award which becomes final and non-appealable, in which case the Litigation Claimant shall assign his or her Litigation Award to the Trust and participate in all Distributions from the Trust;

d.	the Litigation Claimant enters into a settlement with respect to his or her Abuse Claim, in which case: at the election of the Litigation Claimant: (i) the Trustee shall release such Litigation Claimant's Distribution from the Abuse Claims Settlement Fund, and the Litigation Claimant shall not be entitled to (1) any enhancement of his or her Distribution or (2) any Trust Insurance Settlement proceeds or other proceeds of judgments or Insurance Claims; or (ii) the Litigation Claimant shall assign his or her settlement proceeds to the Trust and participate in all Distributions from the Trust without enhancement.  Such election must be made within thirty (30) days of the effective date of the settlement or the Litigation Claimant shall be deemed to have elected option (i) of this paragraph.  Notwithstanding the forgoing, 10% of any such settlement proceeds shall be paid by the Litigation Claimant to the Trust on account of costs and expenses incurred by the Trust in connection with the Litigation Claimant's Claim; or

e.	if the Trustee, upon consultation with the Litigation Claimant, determines that there is no reasonable risk to the Litigation Claimant's ability to recover from a Non-Settling Insurer, then the Trustee may, in his or her discretion, release the Litigation Claimant's allocated Distribution to the Litigation Claimant; provided, however, that if such Litigation Claimant's claim against a Non-Settling Insurer is not viable because of such Distribution to the Litigation Claimant, then the Litigation Claimant shall not be entitled to any additional  recovery from the Trust or enhancement of his or her Distribution; *provided further*, *however*, that to the extent the Litigation Claimant may receive payment from proceeds of a subsequent Trust Insurance Settlement, any enhancement to the Litigation Claimant's award shall be paid solely from the proceeds of such subsequent Trust Insurance Settlement.

## F.	<u>Dismissal of Pending Litigation</u>

Upon the occurrence of the applicable Abuse Claim Discharge Date, the subject Abuse Claim asserted in any lawsuit against any Protected Party pending in state or federal court shall be dismissed, with prejudice, and without fees and costs being recoverable against any Protected

Party, except only that nothing in the Plan shall require Non-Participating Abuse Claimants to dismiss their Non-Participating PP Abuse Claims against Participating Parties.

## G.     Claim Withdrawal

An Abuse Claimant may withdraw his or her Abuse Claim at any time on written notice to the Trustee.  If withdrawn, the Abuse Claim will be withdrawn with prejudice and may not be reasserted, and such Abuse Claimant shall still be bound by the Diocese Discharge and all injunctive provisions of the Plan, including the Channeling Injunction to the same extent that such provisions applied to such Abuse Claimant's Abuse Claim prior to its withdrawal.

## H.     Medicare Procedures

With respect to all Abuse Claims, the Trust shall maintain sufficient funds to pay any Medicare Claims.

1.     With respect to all Abuse Claims, the Trust shall maintain sufficient funds to pay any potential reimbursements to Medicare in full. The Trust shall complete the following "Medicare Procedures" for Abuse Claims: (i) the Trustee shall determine whether each Survivor Claimant with a Date of Injury after December 5, 1980 is Medicare Eligible; (ii) upon request, the Trust shall provide to a Settling Insurer or the Diocese information sufficient to allow them to perform their own SSA queries to the extent they wish to do so; (iii) in the event that one or more Abuse Claimants with Dates of Injury after December 5, 1980 is/are identified as Medicare Eligible, the Trust shall complete a query to the CMS for each such Abuse Claimant to determine whether any Conditional Payment has been made to or on behalf of that Abuse Claimant arising from or relating to treatment for Abuse; (iv) if any Conditional Payment has been made to or on behalf of that Abuse Claimant, the Trustee shall, within the time period called for by the MSPA, reimburse the appropriate Medicare Trust Fund for the appropriate amount, and submit the required information for that Survivor Claimant to the appropriate agency of the United States government.  Prior to such time that any Conditional Payments are made to Medicare Eligible Abuse Claimants, the Trustee shall provide a report to the Settling Insurers of (a) all Abuse Claimants who are determined to be Medicare Eligible, (b) the amount of any Conditional Payment to such Medicare Eligible Abuse Claimants and (c) the amount of any reserve maintained by the Trust to reimburse Medicare for any Conditional Payment to such Medicare Eligible Abuse Claimants.

2.     The Trust shall defend, indemnify, and hold harmless the Protected Parties from any Medicare Claims arising out of or related to an Abuse Claim, and any Claims related to the Trust's obligations under the Plan.

## ARTICLE 6

## SETTLING INSURERS

## A.     Insurance Settlement Agreements

Each Insurance Settlement Agreement is effective and binding upon all Persons who have notice (including constructive notice, to the extent applicable), and any of the foregoing Persons'

56

18435954.v6
Case 2-19-20905-PRW,    Doc 2888,    Filed 01/10/25,    Entered 01/10/25 16:09:38,
Description: Main Document  , Page 67 of 128

successors and assigns (including, for the avoidance of doubt, the Trust and the Trustee), upon the entry of a Final Order approving the Insurance Settlement Agreement and satisfaction of all conditions precedent. Payments by each Settling Insurer to the Trust, and the releases by the Diocese and/or the Participating Parties of each Settling Insurer, pursuant to the Insurance Settlement Agreements shall occur and/or be effective according to the terms of each such Insurance Settlement Agreement. The Insurance Settlement Agreements shall survive the confirmation, effectiveness, and consummation of the Plan. The rights of the parties under any Insurance Settlement Agreement shall be determined exclusively under the applicable Insurance Settlement Agreement and those provisions of the Final Order approving such Insurance Settlement Agreement, the Plan, and the Confirmation Order. In the event of a conflict between (a) any Insurance Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the applicable Insurance Settlement Agreement shall control; and/or in the event of a conflict between (y) the Final Order approving an Insurance Settlement Agreement, on the one hand, and (z) the Confirmation Order, on the other, the terms of the applicable Final Order shall control.

**B.**     **Sale Free and Clear of Interests of Settling Insurer Policies**

As provided in each of the respective Insurance Settlement Agreements, each and every Settling Insurer Policy shall be sold to the issuing Settling Insurer, pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all liens and Claims of all Persons, to the extent provided for in each applicable Insurance Settlement Agreement.

**C.**     **Resolution of Claims Involving Settling Insurers**

The Confirmation Order shall provide that the Diocese or the Trust, as the case may be, and the Settling Insurer shall effect dismissal with prejudice of their Claims against each other in the Insurance Coverage Adversary Proceeding, with each side to bear its own fees and costs, in accordance with the terms and timeline(s) set forth in each Settling Insurer's respective Insurance Settlement Agreement.

**D.**     **The Settling Insurer's Payments**

The Settling Insurers will pay to the Trust the Insurance Settlement Amounts set forth, on the terms and within the time set forth in their respective Insurance Settlement Agreements.

**E.**     **Further Assurances; Non-Material Modifications**

From and after the Effective Date, the Diocese and the Settling Insurers shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the Insurance Settlement Agreements without further order of the Bankruptcy Court. The Diocese and a Settling Insurer may make technical or immaterial alterations, amendments, modifications, waiver, or supplements to the terms such Settling Insurer's Insurance Settlement Agreement, subject to the requirement thereof. The Diocese and the Settling Insurers, with the consent of the Committee, may also make technical or immaterial alterations, amendments, modifications, waiver, or supplements to the terms of the Plan, subject to the requirements of the respective Insurance Settlement Agreements. A Class of Claims that

has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or supplemented under Section 15.1 of the Plan, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such Class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to Section 15.1 of the Plan shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

## F.     Waiver/Consent

In consideration of the releases and Channeling Injunction, the Supplemental Settling Insurer Injunction and other covenants set forth herein, subject to the occurrence of the Effective Date and the satisfaction of the other conditions precedent to the effectiveness of the Insurance Settlement Agreements, and upon receipt by the Trust of the Insurance Settlement Amounts, each of the Protected Parties: (a) irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims it has or might have now or in the future against the other Protected Parties with respect to any contribution, subrogation, indemnification, or other similar Claim arising from or relating to Channeled Claims covered or alleged to be covered under the Settling Insurer Policies, and any Settling Insurer Policies; and (b) consents to the sale, as of the Confirmation Date, of the Diocese's and Participating Parties' Claims, if any, in the Settling Insurer Policies in accordance with the Insurance Settlement Agreements and to the contribution of the proceeds from such sale and settlement to the Trust, as provided in the Plan. Nothing in Section 12 of the Plan shall be construed to bar either (x) a Claim based on Abuse against a Person who is not a Protected Party, or (y) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing subsection (x) under an Insurance Policy other than a Settling Insurer Policy.

## G.     Timing

The injunctions, releases, and discharges to which any Settling Insurer is entitled pursuant to such Insurance Settlement Agreement, the Plan, the Confirmation Order, the Final Order approving the Insurance Settlement Agreement, and the Bankruptcy Code shall become effective pursuant to the terms of such Insurance Settlement Agreement.

## ARTICLE 7

## MATTERS RELATING TO NON-SETTLING INSURERS

## A.     Preservation of Rights and Obligations

If an Abuse Claim is liquidated through the Allocation Protocol, or in any state or federal court as may be permitted by the Plan, the Allocation Protocol, or the Trust Agreement, then the Protected Parties, the Trust, and each Non-Settling Insurer shall retain the right to assert any and all rights and defenses of the Protected Parties with respect to such Abuse Claim and all coverage defenses. The rights, duties, and obligations of each Non-Settling Insurer under the Non-Settling Insurer Policies with respect to Abuse Claims are not affected in any way by the Diocese Discharge.

58

The rights and obligations (if any) of the Protected Parties and every Non-Settling Insurer under the terms of the Non-Settling Insurer Policies and at law shall not be affected by the Allocation Protocol and shall be treated as if the determination by the Abuse Claims Reviewer had never occurred. Each Non-Settling Insurer shall be entitled to all rights and defenses as are provided under the terms of its Non-Settling Insurer Policies, as if the determination by the Abuse Claims Reviewer had never occurred.

Nothing in the Plan, the Confirmation Order, or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Abuse Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, relating to an Abuse Claim. All such obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable non-bankruptcy law.

## B. Estimations/Assessments of Abuse Claims Are Not Binding

Estimations of Abuse Claims for purposes of determination, qualification, assignment of points pursuant to the Allocation Protocol, and payment of Trust Distributions:

a. shall not (i) constitute an admission of liability by any Person with respect to such Abuse Claims; (ii) have any *res judicata* or collateral estoppel effect on any Person; (iii) constitute a settlement, release, accord, satisfaction, or novation of such Abuse Claims; or (iv) otherwise prejudice any rights of the Trust, the Diocese, the Reorganized Diocese, the Participating Parties, the Settling Insurers, the Non-Settling Insurers, or the Consenting Abuse Claimants in any other contexts or forums;

b. shall be without prejudice to any and all rights of the Trust, the Non-Settling Insurers, and the Consenting Abuse Claimants in any other contexts and forums; and

c. shall not be deemed to be a determination of liability of the Diocese or any Participating Party or a determination of whether, or the extent to which, such Abuse Claim is covered under any Non-Settling Insurer Policy.

## C. Post-Effective Date Preconditions to Coverage

Notwithstanding the Insurance Claims Assignment, the Diocese, the Reorganized Diocese, and the Participating Parties shall use reasonable efforts to satisfy any Post-Effective Date Preconditions to Coverage, for purposes of preserving and maintaining as much insurance coverage as possible for the sole and exclusive benefit of the Trust, subject to the Trust's payment of any DOR Entities' Post-Effective Date Costs in accordance with the terms of the Plan.

If the Trust believes the Diocese, the Reorganized Diocese, or a Participating Party has failed to satisfy any Post-Effective Date Precondition to Coverage, the Trust shall give the Diocese, the Reorganized Diocese, or the Participating Party (as applicable) written notice identifying with specificity the Post-Effective Date Preconditions to Coverage at issue and the

action the Trust believes must be taken in order to satisfy the same. Subject to further order of the Court, the Diocese, the Reorganized Diocese, and the Participating Parties shall have at least 45 days following receipt of any such notice from the Trust to either (i) undertake the actions requested by the Trust or (ii) seek a determination from the Court (which shall not be binding upon any Non-Settling Insurer) as to whether the action requested by the Trust is required to satisfy any Post-Effective Date Preconditions to Coverage. The Court will retain jurisdiction to adjudicate such dispute or claim. Except in the case of willful misconduct by the Reorganized Diocese and any Participating Party, the Trust's sole remedy for any failure to satisfy any Post-Effective Date Preconditions to Coverage shall be specific performance as ordered by the Court.

Nothing in the Plan shall impair, and each Non-Settling Insurer expressly retains, all contractual defenses to coverage, if any, available under any Non-Settling Insurer Policy arising from or relating to any actual or alleged failure by the Diocese, the Reorganized Diocese or any Participating Party to satisfy their respective Post-Effective Date Preconditions to Coverage, if any.

### D.     <u>Trust Powers With Respect to Abuse Claims and Non-Settling Insurers</u>

Solely as set forth in the Plan, Allocation Protocol, or the Trust Agreement, any Abuse Claimant or the Trust with consent of an individual Abuse Claimant, may enter into a settlement of an individual Abuse Claim allowed by applicable non-bankruptcy law, and may enter into an arrangement with the Abuse Claimant's counsel, provided such counsel will receive reasonable compensation from any recovery from a Non-Settling Insurer. Notwithstanding the foregoing, the foregoing sentence shall not apply to the Trust's negotiation and entry into a Trust Insurance Settlement.

The Trustee may use the Trust Assets to prosecute litigation against the Non-Settling Insurers.

If the Trust successfully resolves a Covered Claim or otherwise receives a recovery of insurance proceeds relating to any Abuse Claim from a Non-Settling Insurer, such proceeds shall become Trust Assets available to pay, and shall increase the amount available to pay, Consenting Abuse Claims, pursuant to the Allocation Protocol.

Upon the due execution and delivery of an Insurance Settlement Agreement, the entry of an order approving an Insurance Settlement Agreement, and the payment to the Trust of the settlement amount due thereunder, a Non-Settling Insurer shall become a Settling Insurer protected by the Channeling Injunction and the Supplemental Settling Insurer Injunction and become entitled to benefit from all releases executed by Claimants and the other rights and protections of a Settling Insurer under the Plan, the Trust Documents, and the orders approving Insurance Settlement Agreements.

### E.     <u>Insurance Coverage Adversary Proceeding</u>

As of the Effective Date, the Trust shall be substituted as the named plaintiff in the Insurance Coverage Adversary Proceeding and have all rights of the Diocese and the Participating Parties to pursue recoveries against any Non-Settling Insurers. For the avoidance

60

18435954.v6
Case 2-19-20905-PRW, Doc 2888, Filed 01/10/25, Entered 01/10/25 16:09:38, Description: Main Document , Page 71 of 128

of doubt, the Trust shall have no right to pursue recoveries in the Insurance Coverage Adversary Proceeding against any Settling Insurer or any Settling Insurer's Related Persons.

# ARTICLE 8

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Plan Implementation

All Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Secured Claims, General Unsecured Claims, and Pass-Through Claims will be paid by the Diocese or the Reorganized Diocese.  All Distributions to be made under the Plan on account of Abuse Claims will be paid solely from the Trust to be established for the purpose of receiving, liquidating, and distributing Trust Assets in accordance with the Plan,  the Allocation Protocol, and the Trust Agreement..  The Allocation Protocol is attached to the Plan Supplement as **Exhibit 1** and is incorporated into the Trust Agreement.  The proposed Trust Agreement is attached to the Plan Supplement as **Exhibit 4**.

### B.    Corporate Action

All matters provided under the Plan involving the corporate structure of the Diocese or corporate action to be taken by or required of the Diocese, or the Reorganized Diocese, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement or further approval by the Bankruptcy Court or any other governmental entity.  For avoidance of doubt, to the extent any corporate action or other transaction contemplated under the Plan would otherwise require approval under section 511 or 511-a of the New York State Not-For-Profit Corporation Law, the entry of the Confirmation Order shall constitute such approval.

### C.    Payments Effective Upon Tender

Whenever the Plan requires payment to be made to a Creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Diocese, or the Reorganized Diocese to the Creditor to whom payment is due.  If any Creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Diocese, or the Reorganized Diocese for the benefit of that Creditor pending final adjudication of the dispute.  However, when and if the dispute is finally adjudicated and the Creditor receives the funds previously tendered and refused, the Creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the Creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the Creditor if the Trust, the Diocese, or the Reorganized Diocese failed to pay the tendered payment.

### D.    Agreements, Instruments, and Documents

All organizational agreements, charter documents, instruments, and documents required under the Plan to be executed or implemented, together with such others as may be necessary,

61

useful or appropriate in order to effectuate the Plan, shall be executed on or before the Effective Date or as soon thereafter as is practicable.

## E.    Continuation of Insurance Policies

All Insurance Policies that are ***not*** Settling Insurer Policies shall, as applicable, either be deemed to be assumed by the Diocese pursuant to sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code to the extent such Insurance Policy is or was an executory contract of the Diocese, or continued in accordance with its terms pursuant to section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an executory contract of the Diocese, such that each of the parties' contractual, legal, and equitable rights under each such Insurance Policy shall remain unaltered.  To the extent that any or all such Insurance Policies that are not Settling Insurer Policies are considered to be executory contracts, then the Plan shall constitute a motion to assume such Insurance Policies in connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to sections 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Diocese, the Estate, and all parties in interest in this Chapter 11 Case. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Diocese existing as of the Effective Date with respect to any Insurance Policy.  The Diocese reserves the right to seek rejection of any Insurance Policy or other available relief prior to the Effective Date.

## F.    Bar Date for Professional Fee Claims

Each Professional retained or requesting compensation in the Chapter 11 Case, pursuant to sections 330, 331, or 503(b) of the Bankruptcy Code, must File with the Bankruptcy Court a final application requesting the allowance of a Professional Fee Claim no later than 60 days after the Effective Date.  All applications for the allowance of Professional Fee Claims that are not timely Filed shall be forever barred.  Objections to such applications may be Filed in accordance with the Bankruptcy Rules.  The Bankruptcy Court shall determine all such Professional Fee Claims.

## G.    Bar Date for Other Administrative Claims

Except as provided for herein or in an order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Claims must File and serve on the Diocese requests for the payment of such Administrative Claims not previously Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claims Bar Date, or such Administrative Claims shall be automatically considered Disallowed Claims, forever barred from assertion, and unenforceable against the Diocese or the Reorganized Diocese, the Estate, or their property without the need for any objection by the Diocese or the Reorganized Diocese, or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Administrative Claims shall be deemed fully satisfied, released, and discharged.

62

**H.**   **Exit Financing**

The Diocese may, at its discretion, obtain financing to assist the Diocese in making Diocese Cash Contribution, which financing may be secured by the Diocese's interest in certain real property located at 1150 Buffalo Road, Rochester, New York, or such other property of the Diocese that is not otherwise contemplated to be transferred (other than to the Reorganized Diocese) pursuant to the Plan.  Any security interest or Lien in collateral granted to a lender in connection with such financing shall, on and after the Effective Date, be enforceable against any interest the Reorganized Diocese may have in such collateral, to the same extent it may have been enforceable against the Diocese prior to the Effective Date.  In the event the Diocese elects to pursue such financing, the terms of such financing shall be submitted to the Bankruptcy Court at the Confirmation Hearing for approval pursuant to section 364 of the Bankruptcy Code.

## ARTICLE 9

## THE TRUST

**A.**   **Establishment of the Trust**

On the Confirmation Date, or as soon as practicable thereafter, the Trust shall be established in accordance with the Trust Documents for the exclusive benefit of the holders of Abuse Claims.  The Trust will assume all liability for and rights concerning all Channeled Claims, including the rights to settle the Channeled Claims.  The Trust will control the allocation and Distribution of the Abuse Claims Settlement Funds to Abuse Claimants pursuant to the terms of the Allocation Protocol, the Trust Agreement, the Plan, and the Confirmation Order.  The Trustee shall establish and maintain a reserve for Trust Expenses, which shall be paid pursuant to the terms of the Trust Agreement.

**B.**   **Funding the Trust**

1.   **Diocese Cash Contribution**.

On or before the Effective Date, the Diocese shall cause the Diocese Cash Contribution to be paid to the Trust to establish the Trust Reserve, with any balance to be included in the Abuse Claims Settlement Fund.  The Abuse Claims Settlement Fund may be supplemented from time to time from: (i) any payment by a Settling Insurer pursuant to an Insurance Settlement Agreement; (ii) any Insurance Claim Proceeds; (iii) proceeds of Litigation Awards; (iv) proceeds of Outbound Contribution Claims; and (v) any other proceeds which the Trust may obtain pursuant to the terms of the Plan.

2.   **Participating Parties' Cash Contribution.**

On or before the Effective Date, the Participating Parties shall cause the Participating Parties' Cash Contribution to be paid to the Trust for inclusion in the Abuse Claims Settlement Fund.

3.   **Settling Insurers' Cash Contribution**.

The Settling Insurers will pay to the Trust the Insurance Settlement Amounts set forth in their respective Insurance Settlement Agreements.

4. **Insurance Claims Assignment**.

Insurance Claims against any Non-Settling Insurer shall be transferred to the Trust as follows:

        a.      On the Effective Date, and without further action by any party, the Diocese and the Consenting Abuse Claimants will be deemed to have assigned to the Trust their respective rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers. Additionally, on the Effective Date, and without further action by any party, each of the Participating Parties will assign to the Trust the Participating Parties' rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers. The foregoing transfer shall be effective to the maximum extent permissible under applicable law and shall not be construed: (i) as an assignment of the insurance policies; or (ii) to entitle any Person to Insurance Coverage other than those Persons entitled to coverage under the terms of the Non-Settling Insurer Policies. For the avoidance of doubt, the Trust shall be solely responsible for satisfying, to the extent required under applicable law, any self-insured retention obligations on account of any Consenting Abuse Claim or arising out of any Non-Settling Insurer Policy. To the extent that the Trust pays any self-insured retention in connection with any Consenting Abuse Claim, such amount shall be paid by the Trust from the DOR Entities' Post-Effective Date Costs Reserve, and the Trust shall contemporaneously contribute funds to the DOR Entities' Post-Effective Date Costs Reserve in an amount equal to such self-insured retention paid. To the extent the Diocese pays any self-insured retention, the Trust shall reimburse from the DOR Entities' Post-Effective Date Costs Reserve the Diocese for any amounts actually paid by the Diocese prior to making any Trust Distribution for the Abuse Claim for which the Diocese paid the self-insured retention, and the Trust shall contemporaneously contribute funds to the DOR Entities' Post-Effective Date Costs Reserve in an amount equal to such self-insured retention paid. Nothing herein shall obligate any Non-Settling Insurers to advance any self-insured retention, unless otherwise required by applicable law. Likewise, nothing herein shall obligate the Trust or the Diocese to pay any self-insured retention that is not otherwise required by applicable law.

        b.      In the event that the Bankruptcy Court determines that the Insurance Claims Assignment is inconsistent with the Bankruptcy Code with respect to the Diocese, the Consenting Abuse Claimants and/or one or more of the Participating Parties, the Diocese, the Consenting Abuse Claimants, and each such Participating Party (as applicable) will retain their respective Insurance Claims. In such case, the Diocese or a Participating Party will assert any retained Insurance Claims to the extent reasonably requested by the Trust against any Non-Settling Insurer. The Diocese or Participating Party will retain counsel acceptable to the Trustee to prosecute any retained Insurance Claims (subject to any defenses

18435954.v6

the Non-Settling Insurers may have under applicable state law) and the Trust shall pay all attorney's fees, expert fees, and other costs and expenses incurred by the Diocese or the Participating Party in prosecuting the Insurance Claims. For avoidance of doubt, any efforts by the Diocese or a Participating Party to prosecute the Insurance Claims shall be an accommodation to the Trust and any costs and expenses incurred in connection therewith shall be paid by the Trust in full and shall not be subject to the DOR Entities' Post-Effective Date Costs Procedures described below. The Trust shall have a common interest with the Diocese in prosecuting Insurance Claims, and may appear and be heard in connection with the prosecution of such claims, at its own expense, unconditionally, subject only to any limitations of law and equity. The Diocese and the Participating Parties shall not settle any retained Insurance Claims without the prior written consent of the Trustee, which consent shall not be unreasonably delayed or denied. All recoveries on account of retained Insurance Claims will be paid to the Trust, net of any unreimbursed attorney's fees, expert fees and other costs and expenses associated with prosecuting such retained Insurance Claims.

c. For the avoidance of doubt, except as specifically set forth in Section 8.2.3 and in Section 6.3 of the Plan with respect to satisfying Post-Effective Date Preconditions to Coverage, the Diocese, the Reorganized Diocese, and the Participating Parties make no representations or warranties, and shall have no duty or obligations whatsoever, to the Trust with respect to the Insurance Claims. The Trust shall assume all risks with respect to the litigation, liquidation and collection of the Insurance Claims.

5. **Outbound Contribution Claims**.

Outbound Contribution Claims shall be automatically, and without further act or deed, assigned to the Trust on the Effective Date.

C. **Vesting of Trust Assets**

On the Effective Date, all Trust Assets shall vest in the Trust, and the Protected Parties shall be deemed for all purposes to have transferred all of their respective right, title, and interest in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Protected Parties, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of the Trust Assets in accordance with this paragraph, the Protected Parties shall have no further interest in or with respect to the Trust Assets other than the DOR Entities' Post-Effective Date Costs Reserve.

D. **Non-Monetary Commitments.**

In order to further promote healing and reconciliation, and in order to continue efforts to prevent Abuse from occurring in the future, the Reorganized Diocese agrees that, beginning within thirty days after the Effective Date (unless a different date is provided in the Confirmation Order), it will use reasonable efforts to undertake and observe certain non-monetary

commitments as agreed upon with the Committee and set forth as **Exhibit 7** in the Plan Supplement.

## E.    Appointment of the Trustee

The initial Trustee will be identified no fewer than ten Business Days before the Confirmation Hearing.  The Trustee shall commence serving as the Trustee on the Effective Date; *provided, however*, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Bankruptcy Court, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

## F.    Trust Advisory Committee

The Plan and Trust Agreement provide for the creation of a Trust Advisory Committee, which shall initially consist of those members of the Committee who agree to serve on the Trust Advisory Committee.  The members of the Trust Advisory Committee shall have only such limited rights, duties and powers as set forth in the Plan and Trust Agreement.  The process for appointing replacement members of the Trust Advisory Committee shall be provided in the Trust Agreement.  Upon termination of the Trust, or as otherwise provided in the Trust Agreement, the Trust Advisory Committee shall be deemed dissolved and discharged of and from all further authority, duties, responsibilities, and obligations with respect to or in connection with the Trust and the Chapter 11 Case.

Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Trust Advisory Committee, the members of the Trust Advisory Committee shall serve without compensation.  Reasonable expenses incurred by members of the Trust Advisory Committee may be solely paid by the Trust without need for approval of the Bankruptcy Court.  For the avoidance of doubt, none of the Diocese, the Reorganized Diocese, or any Participating Party shall be responsible for any fees, costs, or expenses associated with the Trust Advisory Committee.

## G.    Rights and Responsibilities of the Trustee

The Trustee shall be deemed to be a fiduciary of the Trust under the terms of the Trust Agreement and shall have all rights, powers, authority, responsibilities, and benefits under New York law specified in the Plan and as reflected in the Trust Agreement, including commencing, prosecuting or settling causes of action, enforcing contracts, and asserting Claims, defenses, offsets and privileges.  If there is any inconsistency or ambiguity between the Confirmation Order and the Trust Agreement with respect to Trustee's authority to act, the provisions of the Trust Agreement shall control.  Among other things, the Trustee:  (1) shall liquidate and convert to Cash the Trust Assets, make timely Distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may consult with the Trust Advisory Committee and retain professionals, including legal counsel, accountants, financial advisors, auditors, and other

66

Agents on behalf of the Trust, and at the Trust's sole expense, as reasonably necessary and to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

The Trust shall make Trust Distributions to the Abuse Claimants. The Trust shall pursue Insurance Claims against any Non-Settling Insurers. The Trust shall fund DOR Entities' Post-Effective Date Costs pursuant to the DOR Entities' Post-Effective Date Costs Procedures and may seek reimbursement from any Non-Settling Insurer.

The Confirmation Order shall state that, absent permission of the Bankruptcy Court, no cause of action shall be commenced in any forum, other than the Bankruptcy Court, against the Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Trustee.

## H.  Unknown Claimant Representative

The Unknown Claimant Representative's services shall be limited to evaluating the adequacy and fairness of the Plan's treatment of Unknown Abuse Claims and making the election described in Section 4.3.4 of the Plan. The Unknown Claimant Representative will be compensated for his services to the extent set forth in the order approving the Unknown Claimant Representative's Retention.

## I.  Trust Pursuit of Insurance Claims

### 1.  Trust's Rights to Pursue Insurance Claims.

Effective as of the Effective Date, the Insurance Claims are assigned and transferred to the Trust.

a.  The Trust shall be entitled to (i) all recoveries on account of Insurance Claims assigned to the Trust as set forth in the Plan, the Allocation Protocol, and the Confirmation Order, and (ii) to assert and/or assign to any Consenting Abuse Claimant or combination of Consenting Abuse Claimants, to the extent permitted by the Non-Settling Insurer Policies and applicable law, any and all Insurance Claims that currently exist or may arise in the future against Non-Settling Insurers.

b.  The Trust shall also have the exclusive right to pursue Insurance Claims against Non-Settling Insurers related to the Diocese's and/or the Participating Parties' liability for Channeled Claims or the Non-Settling Insurers' obligations in respect of such Channeled Claims. The foregoing transfer shall not be construed to entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers. For the avoidance of doubt, the Trust cannot present Non-Settling Insurers with a demand for Coverage or indemnification based upon Distributions made by the Trust to Abuse Claimants.

c.  The Trust may act in its own name, or in the name of any Consenting Abuse Claimant, the Diocese and/or a Participating Party to enforce any right, title, or interest of any such party in the Insurance Claims assigned to the Trust.

67

d.     No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact the Diocese is in bankruptcy or by any Distribution from the Trust to an Abuse Claimant.

e.     The Insurance Claims Assignment shall not affect any Non-Settling Insurer's duty to defend, but to the extent that the failure to defend or a separate agreement between the Diocese and/or a Participating Party and any Non-Settling Insurer gives rise to a monetary obligation to reimburse defense costs in lieu of a duty to defend, the Trust shall be entitled to the benefit of such monetary obligation or policy proceeds to the extent of any DOR Entities' Post-Effective Date Costs actually paid by the Trust.

f.     Any recovery by the Trust on Insurance Claims relating to the Diocese's and/or Participating Parties' liability for Abuse Claims shall become a Trust Asset and shall be distributed as provided in the Plan, the Trust Agreement, and the Allocation Protocol.

g.     The Trust's pursuit of the Participating Parties shall be limited to enforcing specific performance of the Insurance Claims Assignment and any other rights or interests expressly granted to the Trust under the Plan.  Neither the Trust nor the Trustee may pursue any Settling Insurer for any Claim released, waived, or relinquished under such Settling Insurer's Insurance Settlement Agreement; *provided*, the Trust may enforce its rights (if any) and/or each Settling Insurer's obligations under the applicable Insurance Settlement Agreement(s).

h.     The Trust shall have full access to coverage under the Non-Settling Insurer Policies as permitted by applicable non-bankruptcy law, and the Non-Settling Insurers shall retain any and all rights and defenses to coverage under the Non-Settling Insurer Policies and applicable non-bankruptcy law.

i.     The Insurance Claims Assignment does not affect any right of the Diocese, the Reorganized Diocese, any Participating Party or any Non-Settling Insurer to contest any liability or the amount of damages in respect of any Abuse Claims.

2.     **No Impact on Non-Settling Insurers**.

Nothing in the Plan, the Allocation Protocol, the Trust Documents, the Plan Documents, any Confirmation Order (including any provision in the Confirmation Order), or any judgment, order, finding of fact, conclusion of law, determination or statement (written or verbal, on or off the record) made by the Bankruptcy Court, the District Court, or entered by any other court exercising jurisdiction over the Bankruptcy Case, including in any judgment, order, writ or opinion entered on appeal from any of the foregoing, shall in any Action brought by or against a Non-Settling Insurer, including the Insurance Coverage Adversary Proceeding:.

a.     constitute an adjudication, judgment, trial, determination on the merits, finding, or conclusion of law establishing:

(i)     the liquidated liability (in the aggregate or otherwise) of (a) the Diocese, the Participating Parties, or the Trust, with respect to any Abuse Claims; or (b) any Non-Settling Insurer with respect to any Insurance Claim;

(ii)     the liability or obligation of the Diocese, Participating Parties, or Trust with respect to any Abuse Claim;

(iii)     that the aggregate value of the Abuse Claims is equal to the amount to be paid by the Diocese and/or the Participating Parties into the Trust;

(iv)     that it is reasonable, in good faith, or consistent with the terms and conditions of any Non-Settling Insurer Policy for any of the Diocese, the Participating Parties, or the Trust, to settle, allow, assign any value to, liquidate, and/or pay (or present to any Non-Settling Insurer for payment) any Abuse Claim on any terms or conditions contemplated by the Plan, the Allocation Protocol (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Abuse Claims thereunder), any other Plan Documents, or any other document or agreement;

(v)     that the Plan, any other Plan Document, or any other document or agreement (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Abuse Claims thereunder) are reasonable or consistent with any procedures that were used to evaluate, settle, or pay Abuse Claims against the Diocese and the Participating Parties before the Petition Date or under the terms and conditions of any Non-Settling Insurer Policy or applicable non-bankruptcy law;

(vi)     that the conduct of the Protected Parties, the Committee, or the Abuse Claimants, in connection with the negotiation, development, settlement and/or implementation of the Plan (including the aggregate value or amount of the DOR Entities' Cash Contributions), the other Plan Documents, or any related documents or agreements was, is, or will be consistent with the terms and conditions of any Non-Settling Insurer Policy or applicable non-bankruptcy law;

(vii)     that any Non-Settling Insurer was invited to participate in or participated in, consulted on, negotiated, and/or consented to the Allocation Protocol, the Trust Documents and other Plan Documents; and

b.     have any res judicata, collateral estoppel or other preclusive effect with respect to any matter set forth in Section 8.9.2.a of the Plan, or otherwise prejudice, diminish, impair, or affect (under principles of waiver, estoppel, or otherwise) any defense, Claim or right any Non-Settling Insurer may have under any Non-Settling Insurer Policy or applicable non-bankruptcy law with respect thereto. Without limiting the foregoing, but subject to Section 8.9.4 of the Plan, it is expressly agreed by all Neutrality Parties that the Neutrality Parties are not litigating any issue set forth in Section 8.9.1.a of the Plan or any other Non-Settling Insurer coverage defenses, rights, obligations, or other coverage issue of any kind in this Chapter 11 Case;

c.     constitute a decision on any matter at issue or which may be raised as an issue in any Action by or against a Non-Settling Insurer, including the Insurance Coverage Adversary Proceeding. Thus, any judgment, order, finding of fact, conclusion of law, determination or other statement of the Bankruptcy Court or issued or affirmed by the District Court in this Bankruptcy Case, or entered by any other court exercising jurisdiction over the

bankruptcy case, including any Confirmation Order or the Allocation Protocol and/or other Plan Documents and any finding, conclusion or determination entered in connection therewith, is not intended – and shall not be construed – to constitute a finding, conclusion or determination regarding any matter set forth in Section 8.9.2.a of the Plan or any other issue for any insurance coverage purpose whatsoever, and the Neutrality Parties shall not contend otherwise in any Action against a Non-Settling Insurer;

d.   subject to Sections 8.9.4 of the Plan, impair any Non-Settling Insurer's legal, equitable, or contractual rights under any Non-Settling Insurer Policy or with respect to Insurance Claims, or any policyholder's legal, equitable or contractual rights under any Non-Settling Insurer Policy or with respect to Insurance Claims. The Neutrality Parties shall retain, and be permitted to assert, in any Action against any Non-Settling Insurer, all Claims and/or defenses, including any coverage defenses related to the Abuse Claims, the Insurance Claims and/or the Non-Settling Insurer Policies, notwithstanding any provision of the Plan, Allocation Protocol, the Trust Documents, the other Plan Documents, the Confirmation Order, any findings of fact and/or conclusions of law with respect to the confirmation of the Plan, or any Final Order or opinion entered on appeal from the Confirmation Order; or

e.   subject to Section 8.9.4 of the Plan, impair any Non-Settling Insurer's Insurer Contribution Claims, which may be asserted as a defense or counterclaim against the Diocese, the Participating Parties or the Trust (as applicable) in any Action against any Non-Settling Insurer, including the Insurance Coverage Adversary Proceeding. To the extent the Insurer Contribution Claims of a Non-Settling Insurer are determined to be valid, the liability (if any) of such Non-Settling Insurer to the Trust shall be reduced by the amount of such Insurer Contribution Claims. For avoidance of doubt, and notwithstanding anything to the contrary in Section 8.7.1 of the Plan, all Insurer Contribution Claims shall be channeled to the Trust in accordance with Section 12.5.1 of the Plan and no Insurer Contribution Claim shall be the basis for any affirmative recovery against the Diocese, the Reorganized Diocese, or any Participating Party.

3.   ***Non-Settling Insurers' Remedies.***   Notwithstanding anything to the contrary in Section 8.8.2, the Non-Settling Insurers' remedies are limited to those available under applicable law and nothing in the Chapter 11 Case shall enhance any right(s) a Non-Settling Insurer may have under applicable law.

4.   ***Preservation of Plan Provisions.*** For the avoidance of doubt, the provisions of Section 8.9.2 of the Plan are intended solely to ensure that the Plan leaves intact and does not alter or affect any rights or interests of the Non-Settling Insurers with respect to the Non-Settling Insurer Policies.  Nothing set forth in Section 8.9.2 of the Plan is intended to, nor shall it, impair the effectiveness of any provision of the Plan, including, without limitation, the Diocese Discharge, the Channeling Injunction, or any other release or injunctive provisions set forth in the Plan, as such Plan provisions relate to any rights, Claims, actions, defenses, interests, transactions or other dealings between or among (i) one or more Neutrality Parties who are not Non-Settling Insurers or (ii) any Neutrality Party who is not a Non-Settling Insurer and any Person who is not a Neutrality Party.

## J.    Investment Powers; Permitted Cash Expenditures.

All funds held by the Trust shall be held in Cash or invested in short-term highly-liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Trust Agreement.  The Trustee may expend such Cash in a manner consistent with the terms of the Trust Agreement and the Allocation Protocol.

## K.    Tax Matters

The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.  The Diocese is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.  The Trust shall not be deemed to be the same legal entity as the Diocese or the Reorganized Diocese, but only the assignee of certain assets of the Diocese and a representative of the Estate for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code.  The Trust is expected to be tax exempt. The Trustee shall File such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 *et seq.*, and New York law and the regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.  The Trustee, may in its discretion, establish a disputed claims reserve for the Trust, which shall be administered in accordance with applicable law.

## L.    DOR Entities' Post-Effective Date Costs Procedures

### 1.    DOR Entities' Post-Effective Date Costs Reserve.

As set forth in the Plan and the Trust Agreement, the Trust shall establish the DOR Entities' Post-Effective Date Costs Reserve, which shall be funded in an initial amount of not less than $2,000,000 from the Diocese Cash Contribution.  The Trustee shall provide the Reorganized Diocese and all Participating Parties with a written statement as to the balance of the DOR Entities' Post-Effective Date Costs Reserve no later than the fifteenth day of each month until such time as the DOR Entities' Post-Effective Date Costs Reserve is exhausted.

The Trustee may increase the amount of, or replenish, the DOR Entities' Post-Effective Date Costs Reserve, in his or her sole and exclusive discretion.  If the Trustee does not replenish the DOR Entities' Post-Effective Date Costs Reserve such that the DOR Entities' Post-Effective Date Costs Reserve falls below $500,000, the Trustee shall immediately report the same to the Reorganized Diocese and all Participating Parties, and such parties shall meet and confer regarding (i) the Trustee's expectations with respect to the continued prosecution of Litigation Claims, (ii) the balance of any DOR Entities' Post-Effective Date Costs that are incurred but outstanding, and (iii) the parties' collective expectations as to any additional DOR Entities' Post-Effective Date Costs that are likely to be incurred in order to satisfy any remaining Post-Effective Date Preconditions to Coverage.

71

If the Trustee determines, in his or her sole discretion, not to replenish the DOR Entities' Post-Effective Date Costs Reserve such that the balance of the DOR Entities' Post-Effective Date Costs Reserve at any time falls below $300,000, the Trustee shall immediately report the same to the Reorganized Diocese and all Participating Parties and the Diocese, the Reorganized Diocese, and the Participating Parties shall be irrevocably released from any further obligations they would otherwise have under the Plan with respect to any Insurance Claims and/or Abuse Claims, including, without limitation, any requirement that they satisfy or attempt to satisfy any Post-Effective Date Preconditions to Coverage or to assist in the administration of the Allocation Protocol. For the avoidance of doubt, the Trust shall remain responsible for the payment of all DOR Entities' Post-Effective Date Costs incurred within one year following the date of such notice which are submitted in accordance with these procedures to the extent any funds remain in the DOR Entities' Post-Effective Date Costs Reserve. For further avoidance of doubt, all Non-Settling Insurers shall retain any defenses to coverage they may have as a result of any failure of the Diocese, the Reorganized Diocese, or any Participating Party to observe and perform any Post-Effective Date Insurance Obligation.

Nothing herein shall be construed to address the rights of any Non-Settling Insurer or the Trust, as assignee of Insurance Claims, upon any withdrawal of cooperation in defense of Claims by the Diocese and/or any Participating Party.

2.  **DOR Entities' Post-Effective Date Costs**.

All invoices for DOR Entities' Post-Effective Date Costs shall be submitted to the Trustee via email within 60 days following the end of the month in which DOR Entities' Post-Effective Date Costs are incurred (such submission, a "Fee Notice"). All Fee Notices provided to the Trustee may be redacted to prevent the disclosure of privileged information or trial strategy. The Trustee shall keep all Fee Notices confidential and shall not share any information contained in them (other than the amount of the fees) with any member of the Trust Advisory Committee, any Litigation Claimant, or their respective individual counsel, or any professional whose firm previously represented the Committee in the Chapter 11 Case or represents the Trust or the Trust Advisory Committee in connection with any Insurance Claims. For the avoidance of doubt, the Trustee may share such Fee Notices with any professional advisors who are not counsel of record to the Trust or the Trustee with respect to the Insurance Claims.

The Trustee shall inform the Reorganized Diocese, the Participating Party, and any professional submitting a Fee Notice of any disputes regarding the requested fees and expenses within fifteen days of submission of a Fee Notice or shall pay the requested fees within such time. If any such dispute cannot be resolved within fifteen days or such other amount of time agreed upon by the parties, either may submit such dispute to the Bankruptcy Court, or, if the Chapter 11 Case has been closed, to any other court of competent jurisdiction located in Monroe County, New York for adjudication upon at least fifteen days' notice. The reviewing court shall review the applicable fees and expenses as to reasonableness in light of the work performed.

Professionals shall charge rates and expenses that are no higher than their usual and customary rates for similar work performed by such professionals for clients generally at the time such services are provided, and such rates may be adjusted from time to time in accordance

18435954.v6

with the general practices of such professionals, but not more often than once in any twelve-month period.

To the extent consistent with the advice of counsel, the Diocese and any Participating Parties will use reasonable efforts to retain joint professional representation in any case or cases brought by one Litigation Claimant pertaining to the same Abuse Claim.

## M. <u>Participating Party Unknown Abuse Claim Costs</u>

If the Unknown Claims Representative elects to treat Unknown Abuse Claims as Non-Participating Abuse Claims, the Trust shall establish the Participating Party Defense Reserve, which shall be funded in an amount not less than $3,000,000. At the request of any Participating Party, and subject to the consent of the Reorganized Diocese, the Trust shall pay or reimburse any Participating Party Unknown Abuse Claim Costs actually incurred or paid by the requesting Participating Party.

## N. <u>No Recourse Against Trustee</u>

No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any Agent retained in accordance with the terms of the Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Trustee in implementation of the Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Trustee under the Plan for any purpose authorized by the Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as shall under the term of any such Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets. Notwithstanding the foregoing, the Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, breach of the fiduciary duty of loyalty, or fraud, and if liability on such grounds is established, recourse may be had directly against the Trustee. The Trust shall not be covered by a bond.

None of the Protected Parties shall be liable for any acts or omissions by the Trust, the Trustee, or their respective Agents or Related Persons.

## O. <u>Indemnification by Trust</u>

The Trust shall defend, indemnify, and hold harmless the Trustee and its Agents to the fullest extent permitted under the laws of New York in the performance of their duties under the Plan and the Trust Agreement. For the avoidance of doubt, the Diocese, Reorganized Diocese, Participating Parties, and their respective Agents shall not be deemed to be Agents of the Trust unless specifically authorized as such in writing by the Trustee.

The Trust shall defend, indemnify, and hold harmless any Settling Insurer as and to the extent set forth in such Settling Insurer's Insurance Settlement Agreement(s).

73

**P.**      **Trust Liability**

Upon the occurrence of the Effective Date, the Trust shall automatically and without further act or deed assume all responsibility for preserving, managing, and distributing Trust Assets.

Subject to and upon the occurrence of each applicable Abuse Claim Discharge Date, the Trust shall automatically and without further act or deed assume all liability, if any, of the Diocese, Participating Parties and Settling Insurers in respect of all Abuse Claims (other than Non-Participating PP Abuse Claims), which shall become Channeled Claims in accordance with the terms of the Plan.  On the Effective Date, the Trust shall automatically and without further act or deed assume all liability, if any, of the Settling Insurers in respect of the Channeled Claims.

**Q.**      **Termination**

The Trust shall terminate after its liquidation, administration, and Distribution of the Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth in the Trust Agreement.

## ARTICLE 10

## GENERAL CLAIMS ADMINISTRATION

**A.**      **Objections to Non-Abuse Claims and Non-Participating Abuse Claims**

Prior to the Effective Date, the Diocese shall have the authority to pursue any objection to the allowance of any Non-Abuse Claim or Non-Participating Abuse Claim.  From and after the Effective Date, the Reorganized Diocese will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making any Distributions with respect to Non-Abuse Claims and Non-Participating Abuse Claims (including those Non-Abuse Claims and Non-Participating Abuse Claims that are subject to objection by the Diocese as of the Effective Date); *provided*, *however*, that nothing in this Section shall affect the right of any party in interest (including the Reorganized Diocese and the Trustee) to object to any Non-Abuse Claim or Non-Participating Abuse Claim to the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and the Plan.  Unless otherwise provided in the Plan or by order of the Bankruptcy Court, objections to Non-Abuse Claims and Non-Participating Abuse Claims will be Filed and served not later than the Claims Objection Deadline.  The Claims Objection Deadline or any Bankruptcy Court-approved extension thereof, may be extended upon request by the Reorganized Diocese by filing a motion without any requirement to provide notice to any Person, based upon a reasonable exercise of the Reorganized Diocese's business judgment.  A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

**B.**      **Determination of Claims**

From and after the Effective Date, any Non-Abuse Claim as to which a proof of claim or motion or request for payment was timely Filed in this Chapter 11 Case, or deemed timely Filed

74

18435954.v6
Case 2-19-20905-PRW,   Doc 2888,   Filed 01/10/25,   Entered 01/10/25 16:09:38,
Description: Main Document , Page 85 of 128

by order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed, or amended, as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired, (and as to which no appeal or petition for review or rehearing was Filed or, if Filed, remains pending)), liquidated pursuant to: (i) an order of the Bankruptcy Court; (ii) applicable bankruptcy law; (iii) agreement of the parties without the need for Bankruptcy Court approval; (iv) applicable non-bankruptcy law; or (v) the lack of (a) an objection to such Non-Abuse Claim, (b) an application to equitably subordinate such Non-Abuse Claim, and (c) an application to otherwise limit recovery with respect to such Non-Abuse Claim, Filed by the Diocese, the Reorganized Diocese, or any other party in interest on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Non-abuse Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any Claims, rights, or causes of action that the Diocese or the Reorganized Diocese may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157; *provided, however*, that any Claims against the Settling Insurers that the Diocese or the Reorganized Diocese had, has, may have had, or may in the future have shall be waived and released in accordance with the terms of, and to the extent set forth in, the Settling Insurers' respective Insurance Settlement Agreements..

## C.     No Distributions Pending Allowance

Except in the case of Abuse Claims paid pursuant to the Allocation Protocol, no Distribution will be made with respect to a Disputed Claim, or any portion thereof, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

## D.     Claim Estimation

To effectuate Distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Case, with respect to Disputed Claims (except Consenting Abuse Claims), the Diocese or the Reorganized Diocese, after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an order of the Bankruptcy Court or the District Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of: (i) property that must be withheld from or reserved for Distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; *provided*, *however*, that the Bankruptcy Court or the District Court, as applicable, shall determine: (y) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code, and (z) the timing and procedures for such estimation proceedings.

## E.     Treatment of Contingent Claims

Except with respect to Abuse Claims, until such time as a contingent Claim or a contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to Distributions under the Plan.

18435954.v6

### F.     Controversy Concerning Impairment

If a controversy arises as to whether any Claim or any Class of Claims is Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before confirming the Plan.

### G.     Treatment of Executory Contracts and Unexpired Leases

Subject to the requirements of section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Diocese except (i) Insurance Policies that have not been assumed and retained by the Diocese pursuant to Section 7.5 of the Plan, or (ii) executory contracts and unexpired leases that have been rejected by order of the Bankruptcy Court or are the subject of a motion to reject pending on the Confirmation Date, will be deemed to be assumed and assigned to the Reorganized Diocese on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed and assigned to the Reorganized Diocese objects to such assumption and assignment, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Diocese, except that the Trust shall pay any cure costs under any Insurance Policy assumed and retained by the Diocese pursuant to Section 7.5 of the Plan. In the event of a dispute regarding the amount of any cure payments, or the ability of the Diocese or the Reorganized Diocese (as applicable) to provide adequate assurance of future performance with respect to any executory contracts to be assumed by the Diocese, or assumed and assigned to the Reorganized Diocese, the Trust or the Reorganized Diocese (as applicable) will make any payments required by section 365(b)(1) of the Bankruptcy Code after the entry of a Final Order resolving such dispute. The contracts and leases which will be assumed and assigned to the Reorganized Diocese, and their respective cure costs, are identified in **Exhibit 6** attached to the Plan Supplement. For the avoidance of doubt, none of the Settling Insurer Policies will be assumed or assigned to the Reorganized Diocese.

## ARTICLE 11

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Disbursing Agents

The Reorganized Diocese shall be the disbursing agent for all aspects of the Plan except for Distributions made from the Trust. With respect to the Trust, the Trustee shall be the disbursing agent and be responsible for all Distributions made under the Trust.

### B.     Manner of Payment

Unless otherwise agreed by the Reorganized Diocese or the Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, all Distributions of Cash under the Plan may be made either by check via first class mail, postage prepaid, or by wire transfer from a domestic bank, at the option of the respective disbursing agent.

## C. Distribution Only to Holders of Allowed Claims

Except as otherwise provided in the Plan for Abuse Claims which shall be neither Allowed nor Disallowed under the Plan (other than Non-Participating PP Abuse Claims which shall be Disallowed in their entirety), Distributions under the Plan and the Plan Documents will be made only to the holders of Allowed Claims. Until a Disputed Non-Abuse Claim becomes an Allowed Claim, the holder of that Disputed Non-Abuse Claim will not receive any Distribution otherwise provided to Non-Abuse Claimants under the Plan or the Plan Documents. If necessary in determining the amount of a *pro rata* Distribution due to the holders of Allowed Claims in any Class, the Reorganized Diocese will make the *pro rata* calculation as if all Disputed Non-Abuse Claims were Allowed Claims in the full amount claimed or in the estimated amount. When a Disputed Non-Abuse Claim in any Class becomes an Allowed Claim, the Reorganized Diocese will make a full or partial Distribution, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the order, if any, allowing such Claim and any required withholding of applicable federal and state taxes.

## D. Disputed Claim Reserve

Except with respect to Trust Distributions made to Abuse Claimants pursuant to the Allocation Protocol, to the extent that a disbursing agent makes a Distribution hereunder to a Class prior to the resolution of all Disputed Claims of such Class, the respective disbursing agent shall reserve an amount for any Disputed Claims in such Class equal to the amount that such holders of Disputed Claims in such Class would be entitled to receive under the Plan if such Disputed Claims were Allowed in the asserted amount of the Claim.

## E. Transmittal of Distributions

Except as otherwise provided in the Plan, in the Plan Documents, or in an order of the Bankruptcy Court, Distributions to be made under the Plan, Confirmation Order, or Trust Documents to Class 4 Claimants will be made by the Trust, and Distributions to all other Claimants will be made by the Diocese or the Reorganized Diocese. Distributions to Class 4 Claimants will be made: (i) to the client trust account for the Claimant's attorney of record; (ii) if the Class 4 Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim Filed with Stretto or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Trustee by such Claimant in writing; or (iii) if no such proof of claim has been Filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Diocese or Trustee, as applicable, to the mailing address set forth in the Schedules Filed by the Diocese in this Chapter 11 Case. Distributions to Claimants holding Non-Abuse Claims will be made by wire transfer or by check via first class United States mail, postage prepaid, (i) to the latest mailing address set forth in a proof of claim Filed with Stretto or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Diocese, as applicable, by such Claimant in writing, or (ii) if no such proof of claim has been Filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Diocese, to the mailing address set forth in the Schedules Filed by the Diocese in the Chapter 11 Case. If a Claimant's Distribution is not mailed or is returned to the Reorganized Diocese or to the Trustee because of the absence of a proper mailing address, the Reorganized Diocese or the

Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such Claimant from information generally available to the public and from such party's own records, but shall not be liable to such Claimant for having failed to find a correct mailing address. The Trustee shall have no liability to a Class 4 Claimant on account of Distributions made to the client trust account of a Class 4 Claimant's attorney.

## F.    Timing of Distributions

Unless otherwise agreed by the Reorganized Diocese or the Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day. Any Claimant that is otherwise entitled to an undeliverable Distribution and that does not, within thirty days after a Distribution is returned to the Reorganized Diocese or to the Trustee, as applicable, as undeliverable or is deemed to be an undeliverable Distribution, provide the Reorganized Diocese or the Trustee, as applicable, with a written notice asserting its Claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any Claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Reorganized Diocese, the Trust, the Trustee, or its property. Any undeliverable Distributions to be made by the Trust that are not claimed under this Section will become available for the Trust to distribute to other Abuse Claimants. Any other undeliverable Distributions shall be retained by the Reorganized Diocese in accordance with the Plan. Nothing in the Plan requires the Reorganized Diocese, the Trust, or the Trustee to attempt to locate any Claimant whose Distribution is undeliverable.

## G.    Time Bar to Check Payments

If an instrument delivered as a Distribution to a Claimant by the Reorganized Diocese or the Trust is not negotiated within 90 days after such instrument is sent to the Claimant, then the instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and all Claims in respect of such voided check shall be discharged and forever barred. Any request for re-issuance of a check must be made on or before 90 days after issuance of a non-negotiated check. Except as otherwise provided herein, any Distribution under the Plan which is not negotiated after 90 days following issuance shall be forfeited, and such Distribution, together with any interest earned thereon, and shall return to and revest in the Reorganized Diocese or to the Trust, as applicable.

## H.    No Professional Fees or Expenses

No professional fees or expenses incurred by a Claimant will be paid by the Diocese, the Reorganized Diocese, or the Trust with respect to any Claim except as specified in the Plan or the Trust Documents.

## I.    No Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Diocese and the holder of a Claim approved by an order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim,

18435954.v6

and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, the Confirmation Order, or the Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**J.      Saturday, Sunday or Holiday**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the following Business Day, but shall be deemed to have been completed as of the required date.

**K.      Withholding Taxes**

The Reorganized Diocese shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any Distribution under the Plan, the Reorganized Diocese will require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

**L.      Setoffs and Recoupment**

Subject to the terms of the Plan and pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Diocese or Reorganized Diocese, as appropriate, may but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan, any Claims of any nature whatsoever the Diocese may have against the holder of such Claim.

**M.      No *De Minimis* Distributions**

Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash (rounded to the nearest whole cent when and as necessary) will be issued to Claimants entitled to receive Distributions of Cash. Any Distribution of less than $25.00 will be considered *de minimis*, and holders of Allowed Claims that are entitled to Distributions of less than $25.00 will not receive any Distribution. Such funds will remain with, and revest in, the Reorganized Diocese. For avoidance of doubt, this Section XI.M shall not apply to any Distributions to be made by the Trust, which shall be governed solely by the Trust Documents.

**N.      Prepayment**

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Diocese shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

# ARTICLE 12

## EFFECTIVE DATE

### A.    Conditions Precedent to Effective Date

The Effective Date shall not occur, and the Plan shall not be consummated, unless each of the following conditions are satisfied or waived as set forth in Section 11 of the Plan:

1.    *Confirmation Order.* The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Plan Proponents and the Settling Insurers; *provided, however*, that the findings and determinations set forth in the following clauses a. and b. of this Section A.1 (or in any corresponding section or paragraph of the Plan or Confirmation Order) shall not be binding on the Settling Insurers. Neither the Insurance Settlement Agreements nor any of the Settling Insurers' actions or inactions in this Chapter 11 Case shall be deemed as support for such findings and determinations, the Insurance Claims Assignment and/or the Allocation Protocol, and no party shall argue that the Settling Insurers agreed to or acquiesced in such findings and determinations, the Insurance Claims Assignment and/lor Allocation Protocol in any proceeding. Rather, the Settling Insurers are designated as Protected Parties under the Plan, and as a result, the Settling Insurers take no position on such findings and determinations, the Insurance Claims Assignment, or the Allocation Protocol. Without limiting the generality of the foregoing, the Confirmation Order shall, at a minimum, contain findings by the Bankruptcy Court that:

      a.    the assignment of Insurance Claims, or alternatively, the retention and prosecution of such claims following confirmation by the Diocese and other Participating Parties as contemplated in the Plan is authorized by, and does not conflict with, any provision of the Bankruptcy Code, and is therefore approved;

      b.    all of the requirements for confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code have been met and that the Plan should be confirmed;

      c.    the Reorganized Diocese has been duly formed and is in good standing under New York law;

      d.    the Bankruptcy Court has jurisdiction to approve, and does approve, the transfer of the Residual Assets to, and vesting of title in, the Reorganized Diocese in accordance with the provisions of section 511 or 511-a of the New York State Not-For-Profit Corporation Law, and that no further approval by the New York Attorney General or the New York Supreme Court is required; and

      e.    that, except as otherwise provided in the Plan, the Reorganized Diocese shall not be liable for any Claims against or liabilities of the Diocese or any of the Participating Parties, including under any theory of successor liability.

2.    *Channeling and Insurer Injunctions.* The Confirmation Order shall approve and implement the Channeling Injunction and the Supplemental Settling Insurer Injunction set forth in Section 12 of the Plan.

3.     ***Plan Documents.***  Except for the Allocation Protocol, the Plan Documents shall be in form and substance acceptable to the Plan Proponents and the Settling Insurers.  The Allocation Protocol shall be in form and substance acceptable to the Plan Proponents.

4.     ***Trust Formation.***  The Trust shall have been formed, the Bankruptcy Court shall have entered an order appointing the Trustee, and the Trustee and the Diocese shall have executed the Trust Agreement.

5.     ***The DOR Entities' Cash Contribution.***  The DOR Entities' Cash Contribution shall have been made to the Trust.

6.     ***Insurance Settlement Agreements.***  Each Insurance Settlement Agreement agreed to prior to the Confirmation Date shall have been duly executed by all parties thereto and approved by the Bankruptcy Court, in each case in form and substance satisfactory to the Plan Proponents and applicable Settling Insurers.

7.     ***The Settling Insurers' Contribution.***  Each of the Settling Insurers shall have paid to the Trust the Insurance Settlement Amounts due under their respective Insurance Settlement Agreements, except to the extent the terms of such Insurance Settlement Agreements expressly provide that such payment will be made at a later date.

8.     ***Permits and Approvals.***  The Reorganized Diocese shall have obtained any necessary governmental permits or approvals required to take title to the Residual Assets, and to conduct business as a tax-exempt entity pursuant to 26 U.S.C. § 501(c)(3), on and after the Effective Date in substantially the same manner as the Diocese has historically conducted its business.

9.     ***Consent of all Abuse Claimants***.  All holders of Abuse Claims including, for the avoidance of doubt, Unknown Abuse Claims, shall be Consenting Abuse Claimants.

10.    ***Final Orders.***  The Confirmation Order, the order appointing the Trustee, and all orders approving Insurance Settlement Agreements shall be Final Orders and no stay of any such orders shall then be in effect.

11.    ***No Material Amendments.***  The Plan shall not have been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alternation, or modification has been made with consent of the Plan Proponents and any affected Settling Insurers, Participating Parties and Abuse Claimants, *provided*, *however*, that the Committee shall have authority to negotiate and agree to modifications to the treatment accorded to Class 4 Claims on behalf of all Consenting Abuse Claimants in accordance with Section 2.3.5.h of the Plan.

## B.    <u>Waiver of Conditions</u>

Any condition to the occurrence of the Effective Date set forth in Section 11.1 of this Plan may be waived only by the mutual written consent of the Diocese and the Committee, provided, however, that each Settling Insurer must consent to a waiver of any conditions affecting such Settling Insurer's rights or obligations, and each of the Participating Parties must

81

consent to a waiver of any conditions affecting such Participating Party's obligations, except that the Diocese may waive the condition set forth in Section 11.1.9 on behalf of the Participating Parties.  For avoidance of doubt, neither the Diocese, the Committee, the Settling Insurers, or the Participating Parties shall have any obligation to waive any of the conditions set forth in Section 11.1, and each may withhold such consent in their sole and absolute discretion.

## C.    Occurrence of Effective Date

If the Effective Date has not occurred within 90 days of the date on which the Confirmation Order becomes a Final Order, the Diocese or the Committee may elect to withdraw the Plan in their respective sole and absolute discretion.

## D.    Notice of Effective Date

The Diocese shall File a notice of Effective Date with the Bankruptcy Court and serve it on all Creditors and parties in interest, within five Business Days after the occurrence of the Effective Date.  Such notice shall include all relevant deadlines put into effect by the occurrence of the Effective Date.

## E.    Effect of Non-Occurrence of Conditions

If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (i) constitute a waiver or release of any Claims by or against the Protected Parties; (ii) prejudice in any manner the rights of the Protected Parties, or the Trust; (iii) constitute an admission, acknowledgment, offer, or undertaking by the Protected Parties in any respect, including but not limited to, in any proceeding or case against the Diocese or any Participating Party; or (iv) be admissible in any action, proceeding or case against the Protected Parties or Settling Insurers in any court or other forum.  Notwithstanding the foregoing, each Insurance Settlement Agreement (including any release or waiver of Claims in accordance with the terms thereof) shall continue and survive, in accordance with its terms and to the extent set forth therein.

## ARTICLE 13

## EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE

## A.    General Injunction and Discharge

1.    ***General Injunction***.  **EXCEPT WITH RESPECT TO ABUSE CLAIMS AND INBOUND CONTRIBUTION CLAIMS ADDRESSED IN SECTION 12.2 OF THE PLAN, OR AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE DIOCESE, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR**

INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, OR THE DIOCESE'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF NON-ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT (I) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ARE PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE, FROM (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (B) THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM, (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM AND (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DIOCESE OR THE REORGANIZED DIOCESE OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM.

2.     *General Discharge*.  Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, the Diocese, the Estate, and the Reorganized Diocese will be discharged from all liability for any and all Non-Abuse Claims.

**B.     Injunction and Discharge of Abuse Claims and Inbound Contribution Claims**

1.     *Injunction of Abuse Claims and Inbound Contribution Claims*.  **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 12.2.2 OF THE PLAN OR IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE ALL PERSONS SHALL BE PERMANENTLY STAYED, ENJOINED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE AGAINST THE DIOCESE, THE REORGANIZED DIOCESE, OR ANY PARTICIPATING PARTY, ANY ABUSE CLAIMS OR INBOUND CONTRIBUTION CLAIMS, KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR**

**INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY PARTICIPATING PARTY, OR THE DIOCESE'S OR ANY PARTICIPATING PARTY'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT (I) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN.**

**IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.**

**THE DISCHARGE AND INJUNCTIONS CONTAINED IN THE PLAN AND THE RELEASES PROVIDED UNDER THE PLAN DO NOT RELEASE OR IMPAIR AN ABUSE CLAIMANT'S RIGHT TO RECOVER ON ANY ABUSE CLAIM AGAINST ANY PERPETRATOR OF ABUSE FOR ACTS OF ABUSE THAT ARE INDEPENDENT OF THE LIABILITY OF THE DIOCESE OR ANY PARTICIPATING PARTY.**

2. ***Limited Exceptions to Injunctions.***

a. <u>Non-Participating PP Abuse Claims Excepted</u>. The injunctions set forth in Section 12.2.1 above, and Section 12.3 below, shall not apply to prevent a Non-Participating Abuse Claimant from pursuing or enforcing his or her Non-Participating PP Abuse Claim (if any) against a Participating Party.

b. <u>Certain Inbound Contribution Claims Excepted</u>. The injunctions set forth in Section B.1 above, and Section B.3 below, shall not apply to prohibit the pursuit or enforcement of an Inbound Contribution Claim against a Participating Party by any Person who affirmatively indicates, by Filing a timely written objection to confirmation of the Plan, that they will not consent to having such Inbound Contribution Claim (if any) enjoined as contemplated in the Plan. Any Person who holds an Inbound Contribution Claim against a Participating Party, whether or not Filed with the Bankruptcy Court or in any Abuse Action, and who fails to File a timely written objection to confirmation of the Plan shall be conclusively deemed to consent to the injunction set forth in Sections B.1 and B.3 and shall be bound thereby.

c. Preservation of Insurance Claims.

(i)     To facilitate the pursuit of Insurance Claims against Non-Settling Insurers, the injunctions set forth in the Plan shall not prevent the prosecution of Abuse Actions against the Diocese or any Participating Party (i) by one or more Litigation Claimants authorized by the Trustee to pursue their Litigation Claims, at such Litigation Claimants' expense, in any court of competent jurisdiction solely for the purpose of determining any liability that the Diocese and/or any Participating Party may have with respect to such Litigation Claimant's Litigation Claim, and the amount of that liability; (ii) as the Trustee may deem necessary in order to prosecute the Insurance Claims against Non-Settling Insurers; or (iii) as the Trustee may deem necessary in order to effectuate settlement of any Abuse Claims, *provided*, *however*, that all collection efforts against the Diocese and/or any Protected Party shall be enjoined and any Litigation Award obtained as a result of litigating such Abuse Actions shall be enforceable solely against Non-Settling Insurers and not against any Protected Party.  For the avoidance of doubt, the limited exception set forth in this Section B.2.c permits (subject to the terms hereof) only the prosecution of Abuse Actions against the Diocese and/or a Participating Party; all collection efforts against any Protected Party are permanently barred and enjoined, and any Litigation Award obtained as a result of litigating such Abuse Actions shall be enforceable solely against Non-Settling Insurers and not against any Protected Party (or any of their respective assets except for any Non-Settling Insurer Policy).

(ii)    To preserve coverage under any Non-Settling Insurer Policy, Abuse Claims will not be released or discharged as against the Diocese or any other Participating Party until the occurrence of the applicable Abuse Claim Discharge Date.  For the avoidance of doubt, prior to the occurrence of the applicable Abuse Claim Discharge Date and subject to the limitations set forth in the Plan, a duly authorized Litigation Claimant or the Trust may name the Diocese or any Participating Party in a proceeding to adjudicate whether the Diocese or any Participating Party has liability for a Litigation Claim and the amount of any such liability, but recourse shall be limited to the proceeds of any Non-Settling Insurer Policies and all other damages that may be recoverable against any Non-Settling Insurers.

d.     Notwithstanding anything to the contrary herein or in the Plan, (i) the Reorganized Diocese shall have no liability whatsoever for any Abuse Claims or Inbound Contribution Claims and any act by any Person to collect or enforce any Abuse Claim or Inbound Contribution Claim against the Reorganized Diocese shall be permanently enjoined; and (ii) subject to and upon payment of a Settling Insurer's Insurance Settlement Amount, the applicable Settling Insurer shall have no liability whatsoever for any Channeled Claim, and the Channeling Injunction and Supplemental Settling Insurer Injunction prohibit any Person (including all Litigation Claimants) from asserting, enforcing, or attempting to assert or enforce any Channeled Claim against any such Settling Insurer or any Settling Insurer's Related Persons.

3.     ***Discharge of Abuse Claims and Inbound Contribution Claims.***  Except as otherwise expressly provided in the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, the Diocese and its Estate will be discharged from: (i) all liability for any and all Inbound Contribution Claims on the Confirmation Date; and (ii) all liability for any and all Abuse Claims upon the occurrence of the applicable Abuse Claim Discharge Date.

The Abuse Claim Discharge Date with respect to each Abuse Claim shall be determined as follows:

a.      With respect to any Abuse Claim held by an Unknown Abuse Claimant or a Non-Participating Abuse Claimant, the Abuse Claim Discharge Date shall be the Effective Date.

b.      With respect to any Filed Abuse Claim held by a Consenting Abuse Claimant who is authorized, on or before the first anniversary of the Effective Date, to proceed as a Litigation Claimant, the Abuse Claim Discharge Date shall be the earlier of (a) the date on which all Litigation Claims asserted by such Litigation Claimant against the Diocese and/or any Participating Party have been fully adjudicated, settled or dismissed on a final and non-appealable basis or (b) the date on which the Abuse Claimant withdraws his or her election to be a Litigation Claimant in accordance with Section 4.5.3 of the Plan, (c) the date on which the Trust enters into a settlement with respect to all Non-Settling Insurer Policies that are Target Policies of such Litigation Claim.

c.      With respect to any Filed Abuse Claim held by Abuse Claimants who are not authorized by the Trustee to liquidate his or her Litigation Claim on or before the first anniversary of the Effective Date, the Abuse Claim Discharge Date shall be the first anniversary of the Effective Date.

d.      For the avoidance of doubt, (i) the Abuse Claim Discharge Date for any Abuse Claim shall be deemed to occur no later than the first day following the date on which the Trust has fully adjudicated, settled or dismissed on a final and non-appealable basis all Insurance Claims against any Non-Settling Insurers who issued Non-Settling Insurer Policies that are Target Policies of any Litigation Claimants' potential Litigation Claims, and (ii) the Abuse Claim Discharge Date for all Abuse Claims shall be deemed to occur no later than the first day following the date on which the Trust has fully adjudicated, settled or dismissed on a final and non-appealable basis all Insurance Claims against all Non-Settling Insurers.

4.      ***Preservation of Insurance Claims.***  The Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the fact that the Diocese is in bankruptcy or by the amount of Distributions Abuse Claimants receive, or may be entitled to receive, based on the Plan.  The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Abuse Claims as set forth in the Plan.  Any such recoveries by the Trust from Non-Settling Insurers will be added to the Abuse Claims Settlement Fund to be distributed pursuant to the terms of the Plan, the Allocation Protocol and the Trust Documents.  Nothing in the Plan shall be deemed to modify or abridge any rights of the Non-Settling Insurers under their respective Non-Settling Insurer Policies.

**C.      Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties**

1.      **IN CONSIDERATION OF THE UNDERTAKINGS OF THE PROTECTED PARTIES HEREIN, THEIR CONTRIBUTIONS TO THE TRUST, AND OTHER CONSIDERATION GIVEN, AND, WHERE APPLICABLE, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE DIOCESE AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE PROTECTED PARTIES, AND TO SUPPLEMENT WHERE NECESSARY THE**

86

**INJUNCTIVE EFFECT OF THE DISCHARGE AS PROVIDED IN SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE:**

a. **ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE AMOUNTS ESTABLISHED UNDER THE PLAN, THE ALLOCATION PROTOCOL, AND THE TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS.**

b. **ALL PERSONS WHO HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIMS AGAINST THE PROTECTED PARTIES, INCLUDING:**

(i) **COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES OR AGAINST THE PROPERTY OF ANY OF THE PROTECTED PARTIES;**

(ii) **ENFORCING, ATTACHING, COLLECTING, OR RECOVERING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, BY ANY MANNER OR MEANS, ANY JUDGMENT, AWARD, DECREE, OR ORDER WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES;**

(iii) **CREATING, PERFECTING, OR ENFORCING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, ANY LIEN OF ANY KIND RELATING TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF THE PROTECTED PARTIES;**

(iv) **ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST:**

(a) **ANY OBLIGATION DUE ANY OF THE PROTECTED PARTIES;**

(b) **ANY OF THE PROTECTED PARTIES; OR**

(c) **THE PROPERTY OF ANY OF THE PROTECTED PARTIES.**

(v)    TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN; AND

(vi)    ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION, OR RECOUPMENT OF ANY KIND AGAINST AN OBLIGATION DUE TO ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES.

2.    THE CHANNELING INJUNCTION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO THE PLAN'S CONSUMMATION AND IMPLEMENTATION.    IT IS INTENDED THAT THE CHANNELING OF THE CHANNELED CLAIMS AS PROVIDED IN SECTION 12.3 OF THE PLAN SHALL INURE TO THE BENEFIT OF THE PROTECTED PARTIES.    IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.

D.    **Supplemental Settling Insurer Injunction**

PURSUANT TO SECTIONS 105(a), 363, AND 1129 OF THE BANKRUPTCY CODE, AND IN CONSIDERATION OF THE UNDERTAKINGS OF THE SETTLING INSURERS PURSUANT TO THE INSURANCE SETTLEMENT AGREEMENTS, INCLUDING CERTAIN SETTLING INSURERS' PURCHASE OF THE APPLICABLE SETTLING INSURER POLICIES FREE AND CLEAR OF ALL CLAIMS PURSUANT TO SECTION 363(f) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ANY AND ALL PERSONS WHO HAVE HELD, NOW HOLD, OR WHO MAY IN THE FUTURE HOLD ANY CHANNELED CLAIMS ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, TO ASSERT, ENFORCE OR ATTEMPT TO ASSERT OR ENFORCE ANY SUCH CLAIM AGAINST (X) THE SETTLING INSURERS, (Y) THE SETTLING INSURERS' RESPECTIVE RELATED PERSONS, ASSETS, OR PROPERTY, OR (Z) ANY SETTLING INSURER POLICIES, INCLUDING BY:

1.    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY OF THE SETTLING INSURERS OR AGAINST THE PROPERTY OF ANY OF THE SETTLING INSURERS;

2.    ENFORCING,    ATTACHING,    COLLECTING,    OR RECOVERING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, BY ANY MANNER OR MEANS, ANY JUDGMENT, AWARD, DECREE, OR ORDER

AGAINST ANY OF THE SETTLING INSURERS OR THE PROPERTY OF ANY OF THE SETTLING INSURERS;

3. CREATING, PERFECTING, OR ENFORCING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, ANY LIEN OF ANY KIND AGAINST ANY OF THE SETTLING INSURERS, OR THE PROPERTY OF THE SETTLING INSURERS;

4. ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY SUCH CLAIM OF ANY KIND AGAINST:

A. ANY OBLIGATION DUE ANY OF THE PROTECTED PARTIES;

B. ANY OF THE PROTECTED PARTIES; OR

C. THE PROPERTY OF ANY OF THE PROTECTED PARTIES.

5. TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THIS PLAN; AND

6. ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION, OR RECOUPMENT OF ANY KIND AGAINST AN OBLIGATION DUE TO ANY OF THE SETTLING INSURERS, OR THE PROPERTY OF ANY OF THE SETTLING INSURERS.

THE SUPPLEMENTAL SETTLING INSURER INJUNCTION WILL BE EFFECTIVE WITH RESPECT TO A SETTLING INSURER ONLY AS OF THE DATE THAT THE TRUST RECEIVES THE INSURANCE SETTLEMENT AMOUNT FROM THAT SETTLING INSURER PURSUANT TO THE TERMS OF THE APPLICABLE INSURANCE SETTLEMENT AGREEMENT. THE SUPPLEMENTAL SETTLING INSURER INJUNCTION BARS PURSUIT OF THE ABOVE-REFERENCED CHANNELED CLAIMS AGAINST THE SETTLING INSURERS, THE SETTLING INSURERS' RELATED PERSONS, AND THE SETTLING INSURER POLICIES, BUT AGAINST NO OTHER PERSON OR THING; PROVIDED, HOWEVER, NOTHING IN THIS SUPPLEMENTAL SETTLING INSURER INJUNCTION SHALL LIMIT, OR BE DEEMED OR OTHERWISE INTERPRETED TO LIMIT, THE SCOPE OF THE DISCHARGE OR CHANNELING INJUNCTION IN FAVOR OF THE PROTECTED PARTIES. THE FOREGOING INJUNCTIVE PROVISIONS ARE AN INTEGRAL PART OF THE PLAN AND ARE ESSENTIAL TO ITS IMPLEMENTATION. THE SUPPLEMENTAL SETTLING INSURER INJUNCTION SHALL NOT APPLY TO A NON-SETTLING INSURER.

18435954.v6

### E. **Litigation/Settlement of Certain Claims**

Except as expressly set forth in Section 12.2.2 of the Plan or in the Confirmation Order, the Channeling Injunction shall channel all Inbound Contribution Claims and all Insurer Contribution Claims, to the Trust. For the avoidance of doubt, unless otherwise provided in the Plan, the Allocation Protocol, or Trust Documents, the channeling of an Inbound Contribution Claim or Insurance Contribution Claim does not entitle the holder of such Channeled Claim to a Trust Distribution.

If, for any reason any court does not recognize the channeling of the Insurer Contribution Claims of Non-Settling Insurers to the Trust, or such Insurer Contribution Claims are not channeled for any reason, then the following shall apply:

1. Settling Insurers shall retain their Insurer Contribution Claims; *provided*, *however*, that:

   a. Settling Insurers shall not pursue any Insurer Contribution Claim against any Non-Settling Insurer, (A) that asserts an Insurer Contribution Claim solely against the Trust; (B) whose Insurer Contribution Claim is satisfied and extinguished entirely by the application of Section 12.5 of the Plan, or (C) that does not assert an Insurer Contribution Claim against them;

   b. If a Non-Settling Insurer asserts its Insurer Contribution Claim only against the Trust, then Settling Insurers shall assign any Insurer Contribution Claims they may hold against such Non-Settling Insurer to the Trust, and the Trust shall be free to assert such Insurer Contribution Claims against such Non-Settling Insurer;

      (i) If a Non-Settling Insurer releases its Insurer Contribution Claims, if any such exist, that it may have against Settling Insurers, then such released Settling Insurers shall release their Insurer Contribution Claims against such releasing Non-Settling Insurer.

2. In any Action, including the Insurance Coverage Adversary Proceeding, involving the Diocese, a Participating Party, or the Trust (collectively, the "Alleged Insured") or an Abuse Claimant, as applicable, and one or more Non-Settling Insurers, where a Non-Settling Insurer has asserted, asserts, or could assert any Insurer Contribution Claim against any Settling Insurers, then any judgment or award obtained by such Alleged Insured or Abuse Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that such Settling Insurer is liable to pay such Non-Settling Insurer as a result of its Insurer Contribution Claim(the "Reduction Amount"), so that the Non-Settling Insurer's Insurer Contribution Claim is thereby satisfied and extinguished entirely. In any Action involving an Alleged Insured or Abuse Claimant against a Non-Settling Insurer, where such a Settling Insurer is not a party, such Alleged Insured or Abuse Claimant shall obtain a finding from that court or arbitrator(s), as applicable, establishing the Reduction Amount before obtaining an entry of judgment against such Non-Settling Insurer. Settling Insurers shall be required to cooperate in good faith with the Diocese and/or the Trust to take reasonable steps to defend against any Insurer Contribution Claim. In the absence of such good faith cooperation by any given Settling Insurer with respect to any given Insurer Contribution Claim, the Reduction Amount shall be zero. In the event that application of the Reduction Amount eliminates the Non-Settling Insurer's Insurer Contribution

Claim, then such Non-Settling Insurer shall fully reimburse the Settling Insurers their costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the court.

3.      If an Alleged Insured or Abuse Claimant and a Non-Settling Insurer enter into an agreement settling one or more Abuse Claims, such agreement shall include a provision whereby such Non-Settling Insurer releases Insurer Contribution Claims against Settling Insurers so long as Settling Insurers release their Insurer Contribution Claims against such Non-Settling Insurer. If such settlement agreement fails to include such a release provision, and the Non-Settling Insurer has asserted, asserts, or could assert an Insurer Contribution Claim against Settling Insurers, then any settlement amount in such settlement agreement shall be deemed automatically reduced by the Reduction Amount. In such event, the settling parties shall obtain a finding from the applicable court or arbitrator(s) of the Reduction Amount. If (a) the settlement agreement was entered into without litigation or arbitration such that no judge or arbitrator can determine the Reduction Amount, or (b) such a reduction is not otherwise made as described above, then any Insurer Contribution Claim by any Non-Settling Insurer against any Settling Insurer shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Insurer Contribution Claim is Filed. Settling Insurers shall be required to cooperate in good faith with the Diocese and/or the Trust to take reasonable steps to defend against any Insurer Contribution Claim by a Non-Settling Insurer. In the absence of such good faith cooperation by any given Settling Insurer with respect to any given Insurer Contribution Claim, the Reduction Amount shall be zero. In the event that application of the Reduction Amount eliminates the Non-Settling Insurer's Insurer Contribution Claim, then such Non-Settling Insurer shall fully reimburse the Settling Insurers their costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the court.

4.      If a Non-Settling Insurer asserts an Insurer Contribution Claim against any Settling Insurer, and

a.      the Trust fully indemnifies the Settling Insurer, then the Settling Insurer shall assign its Insurer Contribution Claim to the Trust; or

b.      the Trust partially, but not fully, indemnifies the Settling Insurer for such Claim, then the Settling Insurer shall retain its Insurer Contribution Claims and may assert those Claims against the Non-Settling Insurer asserting the Insurer Contribution Claim against the Settling Insurer. Any recovery by the Settling Insurer in excess of the amount necessary to satisfy the Trust's full indemnity obligation plus the Settling Insurer's litigation costs shall be turned over to the Trust.

c.      The above procedures shall bind, and inure to the benefit of all Settling Insurers.

5.      To ensure that the reduction contemplated in Section 12.5.2 of the Plan is accomplished, the Settling Insurers shall be entitled to: (i) notice, within a reasonable time, of the initiation of any future Action against or future settlement negotiations with any Non-Settling Insurer in which an Insurer Contribution Claim is asserted against any Settling Insurers, and

periodic notices thereafter on at least an annual basis of the status of such Action or negotiations; (ii) the opportunity to participate in the Action or settlement negotiations, but only to the extent necessary to accomplish the reduction contemplated in Section 12.5.2 of the Plan; (iii) the reasonable cooperation of the applicable Alleged Insured, at the sole cost and expense of Settling Insurers, so that the Settling Insurers can assert Section 12.5.2 of the Plan as a defense in any Action against any of them for any Insurer Contribution Claim; and (iv) have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment, award, or settlement reduction in order to protect the Settling Insurers from any Insurer Contribution Claim. The notice required above shall be given by (i) the Alleged Insured that is a party to such Action or settlement negotiations; or (ii) if no Alleged Insured is such a party, the Non-Settling Insurer that is a party to such Action or settlement negotiations; or (iii) if no Alleged Insured or Non-Settling Insurer is a party to such Action or settlement negotiations, the Abuse Claimant bound by the Plan.

6. The Trust shall use reasonable efforts to obtain, from all Settling Insurers, agreements with terms similar to those contained in Section 12.5 of the Plan.

## F. Certain Litigation Matters

Upon the occurrence of the Effective Date, the Claim Objections, the Appeal and the Second Insurance Settlement Motion shall be deemed withdrawn with prejudice.

## G. Injunction Against Interference with Plan

Upon entry of the Confirmation Order, all holders of Claims and all Non-Settling Insurers shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

## H. Release by Holders of Channeled Claims

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, ALL HOLDERS OF CHANNELED CLAIMS, INCLUDING CONSENTING ABUSE CLAIMS (THE "RELEASING PARTIES"), SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING TO THE DIOCESE, THE PARTICIPATING PARTIES, THE ESTATE, THE CONDUCT OF THE DIOCESE'S AND THE PROTECTED PARTIES' BUSINESSES, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THE PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL**

ARRANGEMENTS AMONG THE RELEASING PARTIES AND ANY RELEASED PARTY, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE.

THE FOREGOING RELEASE SHALL BE EFFECTIVE UPON THE OCCURRENCE OF THE EFFECTIVE DATE, EXCEPT THAT, SOLELY WITH RESPECT TO ANY ABUSE CLAIM THEY MAY HOLD, EACH CONSENTING ABUSE CLAIMANT WILL RELEASE THE DIOCESE OR ANY PARTICIPATING PARTY UPON THE OCCURRENCE OF THE ABUSE CLAIM DISCHARGE DATE APPLICABLE TO SUCH ABUSE CLAIM. FOR THE AVOIDANCE OF DOUBT, PRIOR TO THE OCCURRENCE OF THE APPLICABLE ABUSE CLAIM DISCHARGE DATE AND SUBJECT TO THE LIMITATIONS SET FORTH IN THE PLAN, A DULY AUTHORIZED LITIGATION CLAIMANT MAY NAME THE DIOCESE OR ANY PARTICIPATING PARTY IN A CASE OR PROCEEDING TO ADJUDICATE WHETHER THE DIOCESE OR ANY PARTICIPATING PARTY HAS LIABILITY FOR AN ABUSE CLAIM AND THE AMOUNT OF ANY SUCH LIABILITY, BUT RECOURSE IN SUCH CASE OR PROCEEDING SHALL BE LIMITED TO THE PROCEEDS OF THE INSURANCE CLAIMS. UNDER NO CIRCUMSTANCE MAY A LITIGATION CLAIMANT OR THE TRUST NAME, OR OTHERWISE PURSUE, ANY SETTLING INSURER OR ANY SETTLING INSURER'S RELATED PERSON (IN ANY ACTION OR OTHERWISE) FOR OR ON ACCOUNT OF A CHANNELED CLAIM FOLLOWING SUCH SETTLING INSURER'S PAYMENT OF THE APPLICABLE INSURANCE SETTLEMENT AMOUNT. NOTHING IN THIS SECTION SHALL BE DEEMED TO RELEASE ANY NON-PARTICIPATING PP ABUSE CLAIM A NON-PARTICIPATING ABUSE CLAIMANT MAY HAVE AGAINST A PARTICIPATING PARTY (IF ANY).

I.  **Mutual Releases**

EXCEPT FOR OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED AND ASSIGNED TO THE REORGANIZED DIOCESE, OBLIGATIONS ARISING UNDER THE PLAN AND, SOLELY WITH RESPECT TO THE DIOCESE AND THE PARTICIPATING PARTIES, ABUSE CLAIMS SUBJECT TO DELAYED RELEASE IN ACCORDANCE WITH SECTION 12.2.3 OF THE PLAN, ON THE EFFECTIVE DATE, EACH OF THE PROTECTED PARTIES, THE COMMITTEE, THE TRUST, AND EACH CONSENTING ABUSE CLAIMANT, SHALL BE DEEMED TO WAIVE, RELEASE, AND DISCHARGE ANY AND ALL CLAIMS AND CAUSES OF ACTION OF EVERY KIND AND NATURE THAT THEY MAY HAVE AGAINST EACH OTHER, EXCEPT THAT CONSENTING ABUSE CLAIMANTS SHALL NOT WAIVE THEIR RIGHTS TO DISTRIBUTIONS UNDER THE TRUST IN ACCORDANCE WITH THE TRUST AGREEMENT AND THE ALLOCATION PROTOCOL, AND SHALL BE DEEMED TO RELEASE THEIR ABUSE CLAIMS AGAINST THE DIOCESE AND THE PARTICIPATING PARTIES AS OF THE APPLICABLE ABUSE CLAIM DISCHARGE DATE; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT (I) CONSENTING ABUSE CLAIMANTS SHALL BE DEEMED TO RELEASE THEIR ABUSE CLAIMS WITH RESPECT TO EACH SETTLING INSURER

AND EACH SETTLING INSURER'S RELATED PERSONS ON THE DATE SUCH SETTLING INSURER REMITS ITS INSURANCE SETTLEMENT AMOUNT TO THE TRUST AND (II) ALL OTHER CLAIMS AND CAUSES OF ACTION ANY CONSENTING ABUSE CLAIMANT MAY HOLD AGAINST ANY OF THE PROTECTED PARTIES SHALL BE RELEASED ON THE EFFECTIVE DATE, AND PROVIDED, FURTHER, THAT PRIOR TO THEIR RELEASE ANY SUCH ABUSE CLAIMS SHALL ONLY BE ENFORCEABLE AND COMPENSABLE PURSUANT TO THE TERMS OF THE PLAN AND PLAN DOCUMENTS.

**J.**     **Exculpation; Limitation of Liability**

FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR ANY CLAIM BY ANY OTHER EXCULPATED PARTY, BY ANY HOLDER OF A CLAIM, OR BY ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION (I) THAT OCCURRED FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE IN CONNECTION WITH THIS CHAPTER 11 CASE OR (II) IN CONNECTION WITH THE FORMULATION, NEGOTIATION, OR PURSUIT OF CONFIRMATION OF A PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF COMPETENT JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO ITS DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THIS PLAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE COMMITTEE, THE DIOCESE, THE REORGANIZED DIOCESE AND THEIR RESPECTIVE OFFICERS, TRUSTEES, BOARDS, COMMITTEE MEMBERS, EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, EXPERTS, EXPERT WITNESSES, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY CODE AND THE CHANNELING INJUNCTION.

**K.**     **Injunctions in Full Force and Effect**

All injunctions and/or stays provided for in the Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting any Settling Insurer that has purchased Settling Insurer Policies, free and clear of all Claims pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, are permanent and will remain in full force and effect following the Effective Date of the Plan and are not subject to being vacated or modified.

**L.**     **Injunctions and Releases Integral**

The foregoing injunctive provisions and releases are an integral part of the Plan and are essential to its implementation. The currently pending Abuse Actions commenced by Consenting Abuse Claimants, the continuation of which would violate Sections 12.1, 12.2, or 12.3 of the Plan, the releases provided for under the Plan, or the Insurance Settlement

94

Agreements shall be dismissed with prejudice following the Trustee's receipt of a Consenting Abuse Claim Release Agreement executed by the applicable Abuse Claimant, except for Litigation Claims (or Abuse Claims that may become Litigation Claims), which will be released upon the applicable Abuse Claim Discharge Date in accordance with Sections 12.2.3 and 12.8 of the Plan.

## M.    Timing

The injunctions, releases, and discharges (including the Channeling Injunction and the Supplemental Settling Insurer Injunction) to which any Settling Insurer is entitled pursuant to such Settling Insurer's Insurance Settlement Agreement, the Plan, the Confirmation Order, the Final Orders approving the Insurance Settlement Agreements, and the Bankruptcy Code shall only become effective when the Trust receives payment in full of the Insurance Settlement Amount from the corresponding Settling Insurer pursuant to the terms of the Settling Insurer's Insurance Settlement Agreement, and all other conditions to the effectiveness of the Insurance Settlement Agreement are fully met.

## N.    Excluded Parties and Non-Settling Insurers

Notwithstanding anything to the contrary herein, the following shall apply to Excluded Parties and Non-Settling Insurers: (a) no Claim by an Abuse Claimant against an Excluded Party or Non-Settling Insurer shall be a Channeled Claim, *provided*, *however*, any Consenting Abuse Claims which assert liability against an Excluded Party or Non-Settling Insurer in conjunction with a Protected Party shall be Channeled Claims to the extent they assert liability against such Protected Party; (b) No Claim by an Abuse Claimant against an Excluded Party or Non-Settling Insurer shall be released by operation of the Plan; (c) the injunctions provided in Section 12.1 and 12.2 of the Plan shall not apply to Claims by any Abuse Claimant against an Excluded Party or Non-Settling Insurer; and (d) all Claims by any Abuse Claimant against an Excluded Party or Non-Settling Insurer are preserved and are not affected by the terms of the Plan.

## O.    Title to and Vesting of Assets

All property of the Diocese and the Estate is dealt with by the Plan. Therefore, on the Effective Date, to the fullest extent allowed by sections 1123(a)(5), 1123(b)(2), 1123(b)(3), 1141(b) and 1141(c) of the Bankruptcy Code, all property of the Diocese and the Estate, and any property acquired by the Diocese pursuant to the Plan shall vest in the Reorganized Diocese and such property shall be free and clear of all Liens, Claims, charges or other encumbrances whatsoever, except that any charitable assets subject to Donor Restrictions shall pass to the Reorganized Diocese subject to such Donor Restrictions. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Diocese may operate and manage its affairs and may use, acquire, or dispose of such property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. The Diocese and the Reorganized Diocese may pay any charges incurred on or after the Effective Date for Professional Fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

18435954.v6
Case 2-19-20905-PRW,    Doc 2888,    Filed 01/10/25,    Entered 01/10/25 16:09:38,
Description: Main Document  , Page 106 of 128

### P. Continued Corporate Existence; No Successor Liability.

1.      The Diocese will continue to exist after the Effective Date as a separate entity in accordance with New York law having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable New York law, without prejudice to any right to alter or terminate such existence, or to change its corporate name, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

2.      On and after the Effective Date, the Reorganized Diocese may conduct business in the name of "The Diocese of Rochester" or any derivation thereof that may be approved by the Bishop of Rochester.  At the request of the Reorganized Diocese, the Diocese shall take such steps as may be required to change its corporate name to remove any references to "The Diocese of Rochester."

3.      Notwithstanding anything to the contrary in the Plan or otherwise, except to the extent necessary to honor any Donor Restrictions or to the extent it may expressly assume such obligations in writing on or after the Effective Date, the Reorganized Diocese shall not be liable for any Claims against, or other liabilities or obligations of the Diocese.  The Reorganized Diocese shall not, and shall not be deemed under any state or federal law, or doctrine or theory of successor liability to: (i) be the successor of, or successor to, the Diocese; (ii) have, de facto or otherwise, merged with or into the Diocese; (iii) be a mere continuation or substantial continuation of the Diocese or the operations or business enterprises of the Diocese; or (iv) be liable for any acts taken, or omitted to be taken, by the Diocese prior to the Effective Date.  All Persons and entities holding Liens, Claims and encumbrances, and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in the Diocese or the Residual Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Diocese, the Residual Assets, or the operation of the Residual Assets prior to the Effective Date shall be forever barred, estopped, and permanently enjoined from asserting against the Reorganized Diocese such Liens, Claims, encumbrances, and other interests, including rights or claims based on any theory of successor or transferee liability, *provided*, *however*, nothing herein shall prohibit any Person with standing to do so from taking any action to enforce Donor Restrictions.

### Q. Identity of Trustees of the Diocese and Reorganized Diocese.

In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the trustees of the Diocese and the Reorganized Diocese on and after the Effective Date shall be (i) The Most Reverend Salvatore R. Matano, Bishop of Rochester, (ii) Very Reverend Paul J. Tomasso, Vicar General and Moderator of the Curia, and (iii) Reverend Daniel J. Condon, Chancellor and Director of Legal Services, all of whom have served in such capacities for the Diocese prior to and during this Chapter 11 Case and each of whom is affiliated with the Universal Roman Catholic Church.  For the avoidance of doubt, the foregoing individuals shall not be trustees of the Trust.

**R.**     **Authority to Effectuate Plan**

Upon the Effective Date, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Diocese. The Diocese and the Reorganized Diocese shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action necessary to achieve consummation and carry out the Plan and to effectuate the transactions provided for thereunder.

**S.**     **Binding Effect**

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind all holders of Claims. Subject to the terms of the Plan, upon the Effective Date, every holder of a Claim shall be precluded and permanently enjoined from asserting against the Diocese or the Reorganized Diocese any Claim based on any document, instrument, judgment, award, order, act, omission, transaction or other activity of any kind or nature that occurred before the Petition Date.

**T.**     **Dissolution of Committee**

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and Agents shall be released from any further duties and responsibilities in this Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 Case, including any orders regarding confidentiality issued by the Bankruptcy Court Mediators, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Fee Claims.

**ARTICLE 14**

**RESERVED**

**ARTICLE 15**

**RETENTION OF JURISDICTION**

**A.**     **By the Bankruptcy Court**

Pursuant to sections 105, 1123(a)(5) and 1142(b) of the Bankruptcy Code and 28 U.S.C. §§ 157 and 1334, on and after the Effective Date, the Bankruptcy Court shall retain (i) original and exclusive jurisdiction over the Chapter 11 Case, (ii) original, but not exclusive jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Case; and (iii) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Case and the Plan, including matters concerning the interpretation, implementation,

consummation, execution or administration of the Plan. Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

1.     over disputes concerning the ownership of Claims.

2.     over disputes concerning the distribution or retention of assets under the Plan.

3.     subject to the Plan Documents, over objections to Claims, motions to allow late-filed Claims and motions to estimate Claims.

4.     over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Diocese, the Estate, or the Trust, or property abandoned or transferred by the Diocese, the Estate or the Trust.

5.     over motions to approve Insurance Settlement Agreements entered into after the Effective Date by the Trustee.

6.     over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets.

7.     over matters related to the removal of the Trustee and the appointment of a successor Trustee.

8.     over matters relating to the subordination of Claims.

9.     to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated.

10.     to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order.

11.     to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or pursuant to the Plan and any Insurance Settlement Agreement.

12.     over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith.

13.     over requests for allowance of payment of Claims entitled to priority under sections 507(a)(2) and 503(b) of the Bankruptcy Code and any objections thereto.

14.     over all applications for compensation under sections 327, 328, 329, and 330 of the Bankruptcy Code.

15.     over matters concerning state, local, or federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

16. over conflicts and disputes among the Trust, the Diocese, the Reorganized Diocese, and holders of Claims.

17. over disputes concerning the existence, nature, or scope of the Diocese Discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date.

18. to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Diocese or its property, the Reorganized Diocese or its property, the Estate or its property, the Trust or its property, the Trustee, the Professionals, or the Confirmation Order.

19. to enter a final decree closing the Chapter 11 Case.

20. to enforce all orders previously entered by the Bankruptcy Court.

21. over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Case or the Plan.

**B. By the District Court**

Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. § 1134, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case.

**C. Actions to Enforce the Plan**

The Diocese, the Reorganized Diocese, and the Trust may, but are not required to, commence an Action to enforce the terms of the Plan or to collect amounts owed pursuant to the Plan and any settlements set forth in the Plan or later approved by the Bankruptcy Court, which are not paid in accordance with the terms of the Plan or such settlement. Any such Action may be commenced by filing a motion with the Bankruptcy Court. On and after the Effective Date, the Trust shall have the sole and exclusive right to enforce the terms of the Plan against the Diocese, the Reorganized Diocese and/or any Participating Party (except that the Diocese, the Reorganized Diocese, or any Participating Party may enforce the terms of the plan as against each other and the Trust) and may seek any appropriate remedy in law or equity from the Bankruptcy Court which shall retain exclusive jurisdiction over any such Action.

**D. Case Closure**

The existence and continued operation of the Trust shall not prevent the Bankruptcy Court from closing the Chapter 11 Case upon a motion by the Diocese, the Reorganized Diocese, or any other Person. The Trustee shall not take any actions to unreasonably keep the Chapter 11 Case open. The Trustee, in his sole discretion, may seek to reopen the Chapter 11 Case to administer assets of the Trust, including with respect to entering into settlement agreements with

99

Non-Settling Insurers. If the Chapter 11 Case is reopened upon request of the Trustee, the Trust, the Diocese, and the Reorganized Diocese shall cooperate to assure that no disbursements are made from the Estate during the period when the Chapter 11 Case is reopened, and the case shall be closed at the earliest possibility.

**ARTICLE 16**

**TAX CONSEQUENCES OF THE PLAN**

The following is a summary of certain U.S. federal income tax consequences of the Plan to certain holders of Claims. This summary is based on the Internal Revenue Code (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Treasury Regulations"), and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Diocese does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are not U.S. Persons (as such term is defined in the Tax Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

A.      **Federal Income Tax Consequences to Holders of Unsecured Claims**

In accordance with the Plan, all holders of General Unsecured Claims and Abuse Claims will receive Distributions on their Allowed Claims. Holders of General Unsecured Claims and Abuse Claims will realize a loss, if any, in an amount equal to that Claim, minus any recovery, on an adjusted tax basis.

100

The tax consequences to holders of General Unsecured Claims and Abuse Claims will differ and will depend on factors specific to the holder, including but not limited to: (i) whether the Claim, or a portion of the Claim, constitutes a Claim for interest or principal, (ii) the origin of the Claim, (iii) the type of consideration received in exchange for the Claim, (iv) whether the holder is a United States person or a foreign person for tax purposes, (v) whether the holder reports income on the accrual or cash basis method, and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The Plan Proponents anticipate that Distributions to Abuse Claimants will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and physical sickness, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended. The Plan Proponents have not, however, fully analyzed such tax issues and cannot (and do not hereby) make any assurances or representations regarding the anticipated tax treatment of Abuse Claims.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A GENERAL UNSECURED CLAIM OR AN ABUSE CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A GENERAL UNSECURED CLAIM AND ABUSE CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO THE HOLDER OF A GENERAL UNSECURED CLAIM OR ABUSE CLAIM AS A RESULT OF THE PLAN.

## B.  Federal Income Tax Consequences to the Diocese

The Diocese is a not-for-profit religious corporation having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the Diocese's status as a not-for-profit corporation, the Plan Proponents anticipate that the confirmation of the Plan will have no material federal income tax consequences on a cash basis for the Diocese or the Reorganized Diocese.

## C.  Tax Consequences to the Trust

The Trust may satisfy the requirements of a designated settlement fund under Section 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Trust as a designated settlement fund or a qualified settlement fund.

THE PLAN PROPONENTS EXPRESS NO OPINION REGARDING WHETHER THE TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. THE PLAN PROPONENTS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE OR AN OPINION OF COUNSEL REGARDING WHETHER THE TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. ACCORDINGLY, EACH CREDITOR IS URGED TO CONSULT THEIR OWN TAX ADVISOR REGARDING THE CHARACTERIZATION OF THE TRUST AND THE TAX CONSEQUENCES OF SUCH CHARACTERIZATION.

# ARTICLE 17

## ALTERNATIVES TO THE PLAN

The Plan Proponents believe the Plan is in the best interests of the Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following two alternatives may be available: (a) an alternative plan of reorganization may be proposed and confirmed, or (b) the Chapter 11 Case may be dismissed. As discussed below, two other options, liquidation under chapter 7 and the appointment of a chapter 11 trustee, are not viable alternatives in this Chapter 11 Case.

### A.     Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code

If the Plan is not confirmed, the Diocese or another party in interest may propose a different plan, which might involve an alternative means for reorganizing the Diocese. CNA has filed the CNA Competing Plan pursuant to which CNA would make a guaranteed contribution to the Trust and would receive releases and injunctions similar to what the Plan proposes for Settling Insurers. However, the Plan as proposed has the support of, among other entities, the Committee and the Protected Parties and the Committee opposes the CNA Competing Plan. Accordingly, the Plan Proponents believe that the terms of the Plan provide for the most favorable outcome for Creditors. The negotiation and drafting required for additional plans would likely add substantially greater administrative expenses with no guarantee of a better result for Creditors. For these reasons, the Plan Proponents do not believe that an alternative plan of reorganization is a preferable alternative to the Plan.

### B.     Dismissal of the Chapter 11 Case

If the Plan is not confirmed, the Diocese or another party in interest may seek to dismiss the Chapter 11 Case. After appropriate notice and a hearing, the Bankruptcy Court may grant the request and dismiss the Chapter 11 Case. Dismissal of the Chapter 11 Case would have the effect of restoring, or attempting to restore, all parties to the position they were in immediately prior to the Petition Date.

Upon dismissal of the Chapter 11 Case, the protection of the Bankruptcy Code would be lost, resulting in the expensive and time-consuming process of negotiation and protracted litigation between the Diocese and individual Abuse Claimants and between the Diocese and its Insurers. In addition to the expense and delay, the Plan Proponents believe that these actions would lead to an inequitable recovery for Abuse Claimants, with the first Abuse Claimants to obtain and enforce judgments against the Diocese depleting the Diocese's assets and resulting in insufficient assets to satisfy later judgments. Therefore, the Plan Proponents believe that dismissal of the Diocese's Chapter 11 Case is not a preferable alternative to confirming the Plan.

### C.     Chapter 7 Liquidation Not a Viable Alternative

Pursuant to 11 U.S.C. § 1112(c), if a debtor is "not a moneyed corporation", a debtor's chapter 11 case cannot be converted to a chapter 7 case without the debtor's consent. The Diocese, as a non-profit entity, is not a moneyed corporation, and may not be forced to convert

its Chapter 11 Case to a chapter 7 case. Thus, conversion to chapter 7 is not a viable alternative to the Plan.

**D.      Appointment of a Chapter 11 Trustee is Not a Viable Alternative**

As a result of limitations imposed by the First Amendment to the United States Constitution and the Religious Freedom and Restoration Act, a chapter 11 trustee cannot be appointed to replace the Bishop's administration of the Diocese.

## ARTICLE 18

## ACCEPTANCE AND CONFIRMATION OF THE PLAN

**A.      General Confirmation Requirements**

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Plan Proponents, including that (i) the Plan classifies Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan Proponents have complied with applicable provisions of the Bankruptcy Code; (iv) the Plan Proponents propose the Plan in good faith and not by any means forbidden by law; (v) the disclosures required by section 1125 of the Bankruptcy Code have been made; (vi) the Plan has been accepted by the requisite votes of Creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Diocese; (viii) the Plan is in the "best interests" of all holders of Claims in an Impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan; and (ix) all U.S. Trustee Fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.

1.      **Parties in Interest Entitled to Vote**.

Pursuant to the Bankruptcy Code, only Classes of Claims that are "Impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the holders of such Claims are modified, other than by curing defaults and reinstating the debt. Classes of Claims that are not Impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes of Claims that receive no Distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

2.      **Classes Impaired Under the Plan**.

Class 3 General Unsecured Claims and Class 4 Abuse Claims are the only Classes that are Impaired and entitled to vote under the Plan.

Acceptances of the Plan are being solicited only from those holders of Claims in Impaired Classes that will or may receive a Distribution under the Plan. Accordingly, the Diocese is soliciting acceptances only from holders of Class 3 General Unsecured Claims and Class 4 Abuse Claims.

3.  **Voting Procedures and Requirements**.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. YOU SHOULD COMPLETE, SIGN, AND RETURN THE BALLOT YOU RECEIVE IN ACCORDANCE WITH THE PROVISIONS SET FORTH IN ARTICLE 1(B) ABOVE.**

4.  **Ballots**.

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. If you are a holder of a Class 3 General Unsecured Claim or Class 4 Abuse Claim and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact the Diocese's counsel, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attention: Stephen A. Donato, or Stretto, the Diocese's Solicitation and Claims Agent, by email at TeamRochDiocese@stretto.com or by calling 855.347.3773 and requesting to speak with a member of the solicitation team.

**PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY, COMPLETE AND SIGN THE BALLOT AND RETURN IT TO THE DIOCESE'S SOLICITATION AND CLAIMS AGENT. TO BE COUNTED, SIGNED BALLOTS MUST BE RECEIVED ON OR BEFORE [March 11], 2025, AT 5:00 P.M., PREVAILING EASTERN TIME.**

B.  **Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing regarding whether the Diocese and the Plan have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for **_____, 2025 at 10:00 a.m. (prevailing Eastern Time)**, before the Honorable Paul R. Warren, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Western District of New York, United States Courthouse, in Courtroom 6, 100 State Street, Rochester, New York. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement in open court at the Confirmation Hearing of the date to which the Confirmation Hearing has been adjourned. Remote public access will not be provided by the Court. Judicial Conference policy prohibits audio access to proceedings that may involve testimony.

C.  **Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) be accepted by the requisite holders of Claims or, if not so

accepted, that it be "fair and equitable" and "not discriminate unfairly" as to each non-accepting Class of Claims, (ii) be in the "best interests" of each holder of a Claim that does not vote to accept the Plan in each Impaired Class under the Plan, (iii) be feasible, and (iv) comply with the applicable provisions of the Bankruptcy Code.

## D.     <u>Acceptance of Plan</u>

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims votes to accept the plan, except under certain circumstances. A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of that class vote to accept the plan. Only those holders of claims who actually vote count in these tabulations. Holders of claims who fail to vote, or whose votes are designated pursuant to section 1126(e) of the Bankruptcy Code, are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the bankruptcy court to be in the best interests of each holder of a claim or interest in such class. In addition, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests in section 1129(b) of the Bankruptcy Code discussed below.

## E.     <u>Confirmation Without Acceptance of All Impaired Classes</u>

The Bankruptcy Code contains provisions for confirming a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying other requirements of section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each class of claims that is impaired under, and has not accepted, the Plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims before any junior class receives any distribution. More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date, or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan on account of such junior claim or

interest; and (c) with respect to a class of interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal priority.

**IF A CLASS OF CLAIMS VOTING ON THE PLAN VOTES TO REJECT THE PLAN, THE PLAN PROPONENTS RESERVE THE RIGHT TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASS.**

## F. Best Interests Test

In order to confirm a plan, the Bankruptcy Court must independently determine that the plan is in the best interests of each holder of a claim in any impaired class who has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept the plan, the best interests test requires the Bankruptcy Court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim that has a value, as of the effective date of the plan, at least equal to the value of the distribution that each such member would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate what holders of Claims would receive if the Diocese were liquidated under a hypothetical chapter 7 case under the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be realized from such liquidation (the "Liquidation Fund"). The Liquidation Fund would consist of the net proceeds from the disposition of the Diocese's assets (after satisfaction of all valid liens) and the recoveries on causes of action, if any, held by the Estate. The Liquidation Fund would not include (i) the portion of the DOR Entities' Cash Contribution coming from Entities other than the Diocese, (ii) the assignment of Insurance Claims, (iii) any contributions by Setting Insurers, or (iv) restricted funds, which would be subject to a *cy pres* action involving the New York Attorney General. The Liquidation Fund would be reduced by the cost of the liquidation. The costs of a hypothetical liquidation under chapter 7 would include the fees and expenses of the chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the chapter 7 trustee, selling expenses and wind-down costs, any unpaid expenses incurred by the Diocese during its Chapter 11 Case (such as fees for attorneys, financial advisors and accountants) which would be Allowed in the chapter 7 proceedings, interest expense on secured debt and claims incurred by the Diocese during the pendency of the cases. These Claims would be paid in full out of the Liquidation Fund before the balance of the Liquidation Fund, if any, would be made available to holders of General Unsecured Claims and Abuse Claims. In addition, other Claims that would arise upon conversion to a chapter 7 case would dilute the balance of the Liquidation Fund available to holders of Claims. Moreover, additional Claims against the Estate would arise as a result of the

106

establishment of a new Bar Date for the filing of Claims in the chapter 7 case. The present value of the Distributions from the Liquidation Fund (after deducting the amounts described above) must then be compared with the present value of the property offered to each of the Classes of Claims under the Plan, to determine if the Plan is in the best interests of Claim holders.

The Diocese believes that a chapter 7 liquidation of its remaining Assets would result in a diminution of the value realized by holders of Claims. That belief is based upon, among other factors: (a) the reduced value of Diocese's remaining Assets in a chapter 7 case; (b) the additional administrative expenses involved in the appointment of a chapter 7 trustee, attorneys, accountants, and other chapter 7 professionals; (c) the substantial time that would elapse before Creditors would receive any Distribution in respect of their Claims, due to a chapter 7 trustee's need to become familiar with the Diocese's books and records and the chapter 7 trustee's administration of the case; and (d) the additional Claims that may be asserted against the Diocese.

## G. Feasibility

In connection with confirmation of the Plan, the Bankruptcy Court must determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the need for liquidation or further financial reorganization of the Diocese, except as proposed in the Plan.

In this case, the Diocese has prepared cash flow projections demonstrating that the Diocese, together with the Participating Parties, will be able to fund the DOR Entities' Cash Contribution, that the Diocese and the Reorganized Diocese will be able to meet their other respective obligations under the Plan, and that the Reorganized Diocese will have sufficient resources to support ongoing ministries and operations. A copy of the financial projections is attached hereto as **Exhibit D**. The cash flow projections demonstrate that the Diocese will be able to fund the Plan on the Effective Date and that the Reorganized Diocese will be able to make all payments required pursuant to the Plan so that no further financial restructuring will be necessary. Accordingly, the Diocese believes that the Plan satisfies the feasibility test.

## H. Compliance with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Plan Proponents have considered each of these provisions in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

## ARTICLE 19

## RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DIOCESE SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION,

**HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.**

## A.      Objection to Classifications of Claims

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class, only if such claim is substantially similar to the other claims in such class. The Plan Proponents believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed and the reclassification adversely affects the treatment of the Claim of any Creditor, the Plan Proponents could be required to re-solicit votes for or against the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular Class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Plan Proponents believe that the Plan complies with the requirement of equal treatment. To the extent that the Court finds that the Plan does not satisfy the equal treatment requirement, the Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay of the confirmation or consummation of the Plan and could increase the risk that the Plan will not be consummated.

## B.      Failure to Satisfy Voting Requirements

If the Plan Proponents obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Plan Proponents intend, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponents may be forced to pursue an alternative plan of reorganization or the Diocese may dismiss the Chapter 11 Case.

## C.      The Plan May Not Be Accepted or Confirmed

The Plan may not be confirmed without the affirmative acceptance of at least one Impaired Class. Even if all voting Classes accept the Plan, the Plan may not be confirmed if the Bankruptcy Court determines that the Plan does not meet the requirements for confirmation set forth in section 1129 of the Bankruptcy Code. The Plan Proponents believe that the Plan satisfies all of the relevant section 1129 requirements. There can be no assurance, however, that the requisite Creditor consent will be obtained or that the Bankruptcy Court will also conclude that all such requirements have been satisfied.

## D.      The Court May Enforce the Second Settlement Agreement with CNA

The Plan Proponents believe that the Second Settlement Agreement proposed by the Diocese, certain Participating Parties and CNA is not enforceable because, among other things, the Second Settlement Agreement with CNA (1) is conditioned on confirmation of a plan approving the agreement, (2) was not signed by any party thereto, and (3) is subject to

108

termination at the Diocese's option, which right the Diocese has provided notice of its intent to exercise. The Committee further contends that the Second Settlement Agreement with CNA is not enforceable because it is not a reasonable settlement given CNA's exposure under its policies because (y) CNA denied 270 claims and (z) the Second Settlement Agreement with CNA calls for average settlements that are less than $200,000 per claim when, in contrast, the Settling Insurers are paying sums that exceed $400,000 per claim. Thus, the Second Settlement Agreement with CNA is inadequate and unfair to survivors. On October 7, 2024, the Court dismissed the CNA Adversary Proceeding and held that the Second Settlement Agreement was not an enforceable contract against the Diocese. CNA has filed an appeal of the CNA Adversary Dismissal Order. If the CNA Adversary Dismissal Order is overturned on appeal and the Second Settlement Agreement is ultimately ruled to be enforceable, Abuse Claimants would likely be unable to pursue claims against CNA as Litigation Claimants and would not be able maximize the value of policies issued by CNA to the Diocese.

### E. The CNA Administrative Claim

On March 1, 2024, the Court entered a decision and order denying motions filed by the Diocese and the Committee to dismiss the CNA Adversary Proceeding and indicating an intent to set an expedited trial in advance of holding the Confirmation Hearing on the Plan. Following the trial, the Court ruled in the CNA Adversary Dismissal Order that CNA is not entitled to an administrative claim and dismissed the CNA Adversary Proceeding. CNA has appealed the CNA Adversary Dismissal Order. If it is ultimately held that CNA is entitled to payment of an administrative expense, such payment would likely have priority over unsecured claims and, if the amount of such claim is high enough, the Court may not confirm the Plan because the Diocese may be unable to pay an administrative claim to CNA while also paying its portion of the DOR Entities' Cash Contribution and having sufficient resources remaining for continued operations.

### F. The Plan Proponents' Assumptions and Estimates May Prove Incorrect

The Plan Proponents have made certain assumptions regarding, and have attempted to estimate in good faith and to the best of their ability, the aggregate number and amount of Claims in each Class, the projected expenses incurred to date or to be incurred in connection with the confirmation and administration of the Plan, and the assets which may be available for liquidation and Distribution under the Plan. There can be no guarantee, however, that the Plan Proponents' assumptions and estimates regarding these amounts will prove to be accurate. In the event the Plan Proponents' assumptions and estimates prove incorrect, Creditor recoveries under the Plan may be materially less than projected.

### G. Non-Confirmation or Delay in Confirmation of the Plan

In the event a party objects to the Plan, it is possible that the Bankruptcy Court may not approve confirmation of the Plan.

### H. Non-Consensual Confirmation

In the event the Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Plan Proponents' request if the cramdown requirements

described above are satisfied. The Plan Proponents believe that the Plan satisfies these requirements.

## I. Consent to Third-Party Releases

On June 27, 2024, the Supreme Court issued its decision in *Harrington v. Purdue Pharma L.P.*, No. 23-124 (the "Purdue Decision"). In the Purdue Decision, the Supreme Court ruled that a bankruptcy court does not have the authority to issue nonconsensual releases discharging creditors' claims against non-debtor entities.

As noted above, the Diocese, Committee and Participating Parties worked to address any revisions to the Third Amended Plan that may be required to address the Purdue Decision and believe that the releases granted by Consenting Abuse Claimants to Participating Parties in the Plan will be deemed consensual. It is a condition to the Effective Date that all holders of Abuse Claims be Consenting Abuse Claimants.

The third-party releases and Channeling Injunction contained in the Plan are an integral part of the Diocese's overall restructuring efforts and are an essential element in obtaining the Participating Parties' support for the Plan. Failure of Abuse Claimants to consent to the third-party releases and channeling injunctions may jeopardize Abuse Claimants from receiving any payment under the Plan. If Abuse Claimants withhold consent to the releases and Channeling Injunction contemplated under the Plan, there may not be adequate funding available for distribution to Abuse Claimants under the Plan because the contributions from the Participating Parties are contingent on the Participating Parties receiving the benefit of such releases. Should this scenario occur, a condition to the Effective Date will not be satisfied and the Plan may fail, which will significantly delay any recovery for Abuse Claimants.

## J. Risk of Non-Occurrence of the Effective Date

Although the Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will in fact occur.

## K. Non-Settling Insurer May Raise Objections to Confirmation

If CNA does not make the CNA Settlement Election, the Plan Proponents anticipate that CNA will object to confirmation of the Plan by asserting that the Plan impermissibly alters contractual rights, duties and obligations under its Insurance Policies. Furthermore, if CNA is successful in its appeal of the CNA Adversary Dismissal Order, CNA may argue that any administrative claim to which it may be entitled is so large as to render the Plan not feasible. Although the Plan Proponents do not believe there is any merit to such objections or assertions, if CNA were to prevail on such contentions, the Bankruptcy Court might find that the Plan is not feasible or otherwise not confirmable.

## L. Post-Confirmation Litigation May Not Result in Additional Recovery

The Plan provides for the assignment to the Trust of Insurance Claims against Non-Settling Insurers. CNA, as the sole Non-Settling Insurer, is likely to assert factual and legal

defenses to both their coverage obligations and to the underlying liability of the Diocese and other Participating Parties for Abuse Claims. Litigation of the Insurance Claims against CNA could take years and may require the Trust to expend several million dollars in litigation costs. Litigation Claimants who pursue Litigation Claims will also do so at their own expense. There is no guarantee that any Litigation Claimant will succeed in establishing liability of the Diocese or any Participating Party, that the Trust will prevail in its prosecution of Insurance Claims against Non-Settling Insurers, or that such recovery, if any, will exceed the amounts that would otherwise be available from CNA pursuant to the CNA Second Settlement Agreement or the CNA Competing Plan.

CNA has asserted that it has defenses that could impair coverage and the Trust's ability to recover anything on account of the Insurance Claims. For a discussion of CNA's alleged defenses, please refer to the CNA Disclosure Statement. In the event CNA successfully defends against the Insurance Claims, the DOR Entities' Cash Contribution and the settlement payments from Settling Insurers would be the sole source of recovery for Abuse Claims.

## M.     Confirmation of the Plan may be delayed or denied by the District Court

The United States Trustee has asserted that the Bankruptcy Court does not have jurisdiction to approve certain of the releases, exculpation, and injunctions contemplated in the Plan. If it is determined that the Bankruptcy Court lacks the authority to approve such provisions, the Plan Proponents anticipate that the Bankruptcy Court will issue proposed findings of fact and conclusions of law with respect to the confirmation of the Plan. The Bankruptcy Courts findings and conclusions would then be subject to *de novo* review by the District Court before the Plan can be confirmed, which may result in a delay in the occurrence of the Effective Date. It is difficult to estimate how long the District Court would take to render a decision with respect to confirmation of the Plan, however, in the recent BSA Bankruptcy Case which included similar plan concepts, the District Court for the District of Delaware took approximately six months to review and affirm the bankruptcy court's findings and conclusions and to issue a confirmation order.

## N.     United States Trustee fees may be imposed on certain payments under the Plan

Section 1930(a) of Title 28 of the United States Code prescribes filing fees that must be paid by "[t]he parties commencing a case under title 11." In cases administered under chapter 11 of the Bankruptcy Code (other than under subchapter V thereof), section 1930(a)(6) also assesses additional fees, payable to the United States Trustee, which are calculated according to the dollar value of quarterly "disbursements."

In accordance with this statutory requirement, the Diocese has already paid more than $668,690 in U.S. Trustee Fees during the course of this Chapter 11 Case in which the United States Trustee has not played a particularly active role.

Section 2.1.5 of the Plan makes provision for the payment of unpaid U.S. Trustee Fees in a manner which the Plan Proponents contend is consistent with the language and intent of 28 U.S.C. § 1930(a)(6). The Plan further clarifies that payments made to the Trust by Persons other than the Diocese (*i.e.* contributions by non-debtor Participating Parties made in exchange for the

releases and channeling injunctions provided under the Plan, or payments by Settling Insurers to buy back their policies and settle any coverage liabilities they may have) are not "disbursements" to be included in the calculation of U.S. Trustee fees for purposes of 28 U.S.C. § 1930(a)(6).

The United States Trustee has indicated an intent to seek to impose U.S. Trustee Fees not just on distributions made by the Diocese, but also on any Trust contributions made by other Protected Parties, as well as on post-confirmation distributions made by the Trust and the Reorganized Diocese, even though both the Trust and the Reorganized Diocese are separate legal entities that are not debtors in bankruptcy. The Plan Proponents believe the United States Trustee's attempt to impose U.S. Trustee Fees on payments by independent, non-debtor Persons, and to potentially tax assets on their way into, as well as and out of the Trust, has no basis in 28 U.S.C. § 1930(a)(6), and constitutes an impermissible overreach inconsistent with the well-reasoned recent decision of the Delaware bankruptcy court in *Paragon Offshore, PLC*, 629 B.R. 227 (Bankr. D. Del. 2021). Nevertheless, if it is determined at the Confirmation Hearing that the United States Trustee's overly-expansive reading of the statute is correct, additional fees may be imposed on certain payments contemplated under the Plan.

## O.     State Court Counsel contingency fees

Many Abuse Claimants have retained State Court Counsel to represent them in the prosecution of their Abuse Claims. In many instances, those State Court Counsel have agreed to be compensated on a contingency fee basis, meaning that State Court Counsel are paid only if they succeed in obtaining payment for their clients and, in such case, State Court Counsel's fee is calculated as a percentage of the amount recovered, net of certain expenses. Some State Court Counsel also represent multiple Abuse Claimants in this Chapter 11 Case and, accordingly, may earn multiple contingency fees on Trust Distributions to their respective clients. CNA asserts that State Court Counsel who represent multiple Abuse Claimants may have substantial personal economic interests in the outcome of this Chapter 11 Case. CNA further asserts that such State Court Counsel may be prioritizing such personal economic interests over other risks and concerns that may be of significant concern to their clients, and may also represent clients with conflicting interests. Each State Court Counsel is bound, however, to comply with the same Rules of Professional Conduct which regulate the practices all attorneys in New York and which require attorneys to zealously represent the interests of each and every one of their clients, to disclose any conflicts of interest that may arise and, where appropriate, to obtain conflict waivers from any affected client.

## ARTICLE 20

## MISCELLANEOUS PROVISIONS

## A.     Amendment or Modification of the Plan

The Plan Proponents may modify the Plan at any time prior to the Confirmation Hearing, in accordance with section 1127(a) of the Bankruptcy Code. After the Confirmation Date and prior to substantial consummation, the Plan Proponents may modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, by filing a motion on notice as required under the

applicable Bankruptcy Rules, and the solicitation of all Creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court. Notwithstanding the foregoing, those provisions of the Plan that implement and supplement the Insurance Settlement Agreements may not be severed, waived, amended, deleted or otherwise modified without the prior written approval of all of the Settling Insurers affected by such severance, waiver, amendment, deletion or modification.

## B.     Headings

The headings used in the Plan and in this Disclosure Statement are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

## C.     Severability of Plan Provisions

If, prior to confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.

## D.     Validity and Enforceability

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the Confirmation Order, is valid and enforceable pursuant to its terms. Should any provision in the Plan be determined by the Bankruptcy Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of the Plan.

## E.     Revocation or Withdrawal of the Plan

The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan Proponents revoke or withdraw the Plan before the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Diocese or the Committee or to prejudice in any manner the rights of the Diocese or the Committee in any further proceedings.

## F.     Controlling Documents

In the event and to the extent that any provision of the Plan or the Trust Documents is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan or the Trust Documents, as applicable, shall control and take precedence. In the event and to the extent that any provision of the Trust Documents (other than provisions relating to the Trustee's

authority to act) is inconsistent with any provision of the Plan, the Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Trust Documents, the provisions of the Confirmation Order shall control and take precedence.

## G. Filing of Additional Documents

At any time before substantial consummation of the Plan, the Diocese, the Trust, or the Reorganized Diocese, as appropriate, may File with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

## H. Direction to a Party

On or after the Effective Date, the Trustee, the Diocese, or the Reorganized Diocese, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect the transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

## I. Certain Actions

By reason of entry of the Confirmation Order prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers or trustees of the Diocese under the Plan, including (i) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan; and (ii) the adoption, execution and implementation of other matters provided for under the Plan involving the Diocese or the organizational structure of the Diocese shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers or trustees of the Diocese.

## J. Preservation of Tort Defendants' Rights

Nothing in the Plan, the Plan Supplement, Confirmation Order, or any other documents incorporated by reference in this Disclosure Statement, the Plan, or Plan Supplement, including, but not limited to the Allocation Protocol, shall be deemed to affect in any way the ability of any Tort Defendant to exercise any claims, demands, causes of action, powers, defenses, setoffs, and other limitations, rights, remedies, and privileges of any nature or description ("Litigation Rights") that such Tort Defendant may have under applicable state and federal law in connection with any Tort Action, provided, however, that to the extent the exercise of such Litigation Rights would otherwise result in any affirmative obligation of the Diocese and/or any Participating Party to contribute to or satisfy any judgment or claim, the enforcement of such judgment or claim or any right of contribution regarding same as against the Diocese and/or any Participating Party shall be enjoined pursuant to Section 12 of the Plan.

Nothing in the Plan, the Plan Supplement, Confirmation Order, or any other documents incorporated by reference in this Disclosure Statement, the Plan, or Plan Supplement, including, but not limited to the Allocation Protocol, shall prevent any Tort Defendant from asserting in any Tort Action that any distribution made by, on behalf of the Diocese or a Protected Party or made by reason or because of or related to the Plan to or on account of an Abuse Claimant should be treated as a payment by a joint tortfeasor to settle the Abuse Claimant's Claim for purposes of New York law, including, but not limited to General Obligations Law ("GOL") 15-108 and Civil Practice Law and Rules ("CPLR") Articles 14 and 16. Tort Defendants shall retain all rights as against any Abuse Claimant with respect to CPLR Articles 14 and 16 and GOL 15-108, provided, however, that to the extent of any conflict between state law and the injunctive provisions of the Plan with respect to the collection or enforcement of any claim against the Diocese or any Participating Party, the terms of the Plan shall control.

Nothing in this Plan, the Plan Supplement, Confirmation Order, or any other documents incorporated by reference in the Disclosure Statement, Plan, or Plan Supplement, including but not limited to the Allocation Protocol, shall prevent any Tort Defendant from seeking discovery and/or testimony from the Diocese, the Protected Parties, the Abuse Claims Reviewer (including, for the avoidance of doubt, in connection with a Supplemental Submission to the Abuse Claims Reviewer), the Trustee, or any Abuse Claimant in connection with any Tort Action, in accordance with applicable rules of civil procedure.

## K.    **Plan as Settlement Communication**

The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise Claims and/or causes of action that are disputed as to validity or amount (including Abuse Claims and the Insurance Coverage Adversary Proceeding), except as otherwise provided above.  Accordingly, the Plan, the Disclosure Statement, and any communications regarding the Plan or the Disclosure Statement are subject in all respects to Rule 408 of the Federal Rule of Evidence and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity, or invalidity, of, any Disputed Claim or cause of action.  Except as expressly set forth in the Plan, nothing in the Plan is intended to constitute a compromise of Abuse Claims.

## L.    **Reports**

Until a final decree closing the Chapter 11 Case is entered, the Diocese shall File all post-confirmation quarterly reports as required by the United States Trustee Operating Guidelines (with a copy served on the Office of the United States Trustee).  The first report shall be Filed within thirty days after the end of the quarter in which the Effective Date occurs.

## M.    **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan transactions consummated or to be consummated in connection therewith.

18435954.v6

**N.** **No Admissions.**

Notwithstanding anything herein or in the Plan to the contrary, nothing contained in the Plan shall be deemed as an admission by the Diocese, the Reorganized Diocese, any Participating Party, the Committee, or any Settling Insurer with respect to any matter set forth herein.

## ARTICLE 21

## BANKRUPTCY RULE 9019 REQUEST

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Plan Proponents jointly request approval of all compromises and settlements included in the Plan or contemplated.

## ARTICLE 22

## RECOMMENDATION AND CONCLUSION

The Plan Proponents believe that the Plan is in the best interests of all Creditors. The Plan as structured allows Creditors to participate in Distributions believed to be in excess of those which would otherwise be available were the Chapter 11 Case dismissed and provides an opportunity to maximize insurance recoveries through settlements with the Settling Insurers and post-confirmation litigation of Insurance Claims against Non-Settling Insurers.

FOR ALL OF THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE PLAN PROPONENTS STRONGLY RECOMMEND THAT ALL CREDITORS ENTITLED TO VOTE ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY ARE RECEIVED BY THE DIOCESE'S SOLICITATION AND CLAIMS AGENT NO LATER THAN 11:59:00 P.M. PREVAILING EASTERN TIME ON [XXXX], 2025.

*[Signature Page Follows]*

Dated: January 10, 2025
Rochester, New York

Respectfully submitted,

The Diocese of Rochester

By:    /s/     Lisa M. Passero
Lisa M. Passero, Chief Financial Officer

**BOND, SCHOENECK & KING, PLLC**

By:    /s/     Stephen A. Donato
Stephen A. Donato, Esq.
Charles J. Sullivan, Esq.
Grayson T. Walter, Esq.
Office and Post Office Address:
110 West Fayette Street
One Lincoln Center
Syracuse, New York  13202-1355
Telephone:  (315) 218-8000
Facsimile:  (315) 218-8100
Email: donatos@bsk.com
        sullivc@bsk.com
        walterg@bsk.com

*Counsel to The Diocese of Rochester*

18435954.v6