# EXHIBIT 1



# Nine New SOL Windows or Revival Laws in 2019

Adult survivors of child sex abuse now have access to justice via civil lawsuits in the following jurisdictions. Even if the SOL was already expired, claims of abuse are revived and survivors can file civil lawsuits for a set period of time pursuant to: (1) a permanently or temporarily open revival window, or (2) a new revival age limit for survivors.

| Jurisdiction | Date Opens<br>First day can file | Date Closes<br>Last day can file | Revival Law Description |
|---|---|---|---|
| **Washington D.C.** | May 3, 2019 | May 2, 2021 | **2-year window:**<br>2-year window opened on May 3, 2019 for expired claims against perpetrators, other individuals and entities. Window applies to all child sex abuse survivors up to age 40 and, in some circumstances, older victims and those sexually assaulted as adults. |
| **Montana** | May 7, 2019 | May 6, 2020 | **1-year window and revival up to age 27:**<br>1-year window opened on May 7, 2019 for expired claims against perpetrators and entities. Claims are revived for survivors until age 27, even after window closes. |
| **Arizona** | May 27, 2019 | Dec. 30, 2020 | **19-month window and revival up to age 30:**<br>19-month revival window opened on May 27, 2019 for expired claims against perpetrators, other individuals, private organizations and government. Claims are revived for survivors until age 30, even after window closes. |
| **Vermont** | May 28, 2019 | n/a | **Permanent window:**<br>Window that is permanently open revived all expired claims against perpetrators, other individuals, private organizations and government. |
| **Rhode Island** | July 1, 2019 | n/a | **Revival up to age 53:**<br>Revived SOL up to age 53 against perpetrators only. |
| **New York** | Aug. 14, 2019 | Aug. 13, 2020 | **1-year window:**<br>1-year window opened on August 14, 2019 for expired claims against perpetrators, other individuals, private organizations and government. |
| **New Jersey** | Dec. 1, 2019 | Nov. 30, 2021 | **2-year window and revival up to age 55:**<br>2-year window opened on December 1, 2019 for expired claims against perpetrators, other individuals, private organizations and government. Window applies to child sex abuse victims and those sexually assaulted as adults. Child sex abuse claims are revived until age 55, even after window closes. |
| **California** | Jan. 1, 2020 | Dec. 31, 2022 | **3-year window and revival up to age 40:**<br>3-year window opened on January 1, 2020 for expired claims against perpetrators, other individuals, private organizations and government. Claims are revived for survivors until age 40, even after window closes. |
| **North Carolina** | Jan. 1, 2020 | Dec. 31, 2021 | **2-year window:**<br>2-year window opened on January 1, 2020 for expired claims against perpetrators, other individuals and entities. |

# EXHIBIT 2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

THE ARCHDIOCESE OF NEW YORK, et al.,

     *Plaintiffs/Counterclaim Defendants,*

    v.

CENTURY INDEMNITY COMPANY, AS
SUCCESSOR TO CCI INSURANCE COMPANY,
AS SUCCESSOR TO INSURANCE CO. OF
NORTH AMERICA AND AS SUCCESSOR TO
INDEMNITY INSURANCE COMPANY OF
NORTH AMERICA, et al.,

     *Defendants/Counterclaimants,*

    and

AIU INSURANCE COMPANY, et al.,

     *Defendants.*

---

Index No.: 652825/2023

IAS Part 2

Hon. Lori S. Sattler

Mot. Seq. __

**Oral Argument Requested**

---

**THE ARCHDIOCESE OF NEW YORK AND ASSOCIATED POLICYHOLDERS'**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR AN ORDER**
**THAT THIS ACTION SHALL PROCEED IN THREE PHASES**

<table>
<tr><td>

**BLANK ROME LLP**
James R. Murray
Jared Zola
Robyn L. Michaelson
Dominique G. Khani
Stephen Wah
1271 Avenue of the Americas
New York, NY 10020

</td><td>

**BLANK ROME LLP**
James S. Carter (admitted *pro hac vice*)
Omid Safa (admitted *pro hac vice*)
1825 Eye Street NW
Washington, DC 20006

**HOGUET NEWMAN REGAL &**
**KENNEY, LLP**
Fredric S. Newman
Bradley J. Nash
One Grand Central Place
60 E 42nd Street, 48th Floor
New York, NY 10165

</td></tr>
</table>

abuse by Edwin Gaynor, one of the biggest alleged perpetrators, and Fr. Gerald Boyle.

*Phase Two*: The remaining CVA Actions on a rolling basis, as each are settled or otherwise resolved, grouped by alleged perpetrator.

*Phase Three*: The Insured's claims against Chubb for breach of the covenant of good faith and fair dealing and violations of General Business Law § 349.

Dividing the case into phases to focus first on the claims that are ripe for adjudication is a far more manageable and efficient way to proceed than attempting to tackle all 1,300 CVA Actions at once and avoids the risk of unfairly prejudicing the ongoing defense of the underlying CVA Actions against the Insureds. Chubb's decision to prematurely file this lawsuit before the CVA Actions are resolved should not be permitted to interfere with the Insureds' ongoing defense of those claims.

*First*, dividing this action into three phases will enable the Court to efficiently resolve coverage for the CVA Actions that are presently ripe for a decision, while allowing time to resolve those that are not. Although Chubb has begrudgingly defended the CVA Actions pursuant to its duty to defend (subject to a reservation of rights), Chubb to has failed honor its duty to indemnify settled claims and refused to pay settlements in the CVA Actions resolved to date. Instead, Chubb has hindered resolution of the CVA Actions, attempted to pressure and coerce the Insureds into abandoning their rights, and deprived the Insureds of insurance proceeds that should be available to compensate survivors in the underlying CVA Actions. Despite Chubb's improper and counter-productive behavior, the Insureds have agreed to a reasonable settlement in a handful of CVA Actions involving certain alleged perpetrators (the "Settled CVA Actions").

2

Under New York law, an insurer's duty to indemnify depends on the ultimate determination of liability in the underlying claims against an insured. Presently, the Insureds have only incurred liability in connection with the Settled CVA Actions. Accordingly, the Settled CVA Actions are the only claims ripe for decision on Chubb's duty to indemnify. Conversely, a decision with respect to Chubb's duty to indemnify Insureds for the CVA Actions that remain pending (the "Active CVA Actions") is premature. For this reason alone, it is proper for the parties and the Court to first resolve the coverage issues applicable to the Settled CVA Actions.

**_Second_**, phasing will streamline the case by encouraging the early resolution of threshold legal issues. Although New York law is clear that Chubb has the ultimate burden to prove this exclusion from coverage, Chubb's positions in this case indicate the insurer intends to challenge the well-established law in effort to reverse the burden and have the Insureds _disprove_ the applicability of Chubb's exclusionary language. Chubb's positions also indicate that the insurer seeks to argue that mere "general" knowledge of "the Church" is sufficient to establish the exclusion, rather having to show that the relevant executives of the relevant insured subjectively expected or intended the perpetrator to commit the abuse alleged in a CVA Action prior to the abuse taking place. While the Insureds strongly disagree with Chubb's positions, they present legal issues that can and should be resolved during the first phase of this case, without the need for discovery into all 1,300 claims. Early resolution of such threshold legal issues will help focus discovery, streamline the remainder of this coverage action, and potentially facilitate a negotiated resolution of the case. Additionally, early resolution of factual questions in Phase One related to the expected or intended issue with respect to a given alleged perpetrator will result in law of the

3

opinions, determine abstract, moot or hypothetical questions, or issue decisions that "can have no immediate effect[.]").

The central issue in this case is whether Chubb owes the Insureds a duty to indemnify liabilities arising from the 1,300 CVA Actions that allege abuse during the Chubb policy periods.[1] However, the Insureds have only incurred liability in connection with a handful of those claims—the Settled CVA Actions. Accordingly, only the Settled CVA Actions are ripe for decision.

In contrast to the duty to defend, which is determined by the four corners of the underlying complaint(s) and the insurance policies at issue, the duty to indemnify depends on the ultimate determination of liability in the underlying claims against the insured. *See, e.g.*, *Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419, 424 (1985) ("The duty to defend is measured against the allegations of pleadings but the duty to pay is determined by the actual basis for the insured's liability to a third person." (citation omitted)). In other words, Chubb's indemnification obligations to the individual Insureds only arise if (1) judgments are imposed in the CVA Actions; or (2) the Insureds reach settlements with the underlying claimants based on a reasonable anticipation of liability.

It is therefore a cornerstone of New York law that a coverage action addressing the duty to indemnify is premature where the issues of indemnification and coverage hinge on facts that will necessarily be decided in that underlying action. *See, e.g.*, *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 178 (1997) (declining to rule on the insurer's duty to indemnify before "any ultimate determination of the insurers' liability" because "the duty to pay is determined by the actual basis for the insured's liability"); *Mt. Hawley Ins. Co. v. Am. States*

---

[1] At present, Chubb is defending the Insureds in the CVA Actions. However, it has argued that there is no defense obligation to the extent the Court finds it has no duty to indemnify.

*Ins. Co.*, 92 N.Y.S.3d, 238, 239 (1st Dep't 2019) ("[I]ssues of fact as to liability in the underlying personal injury action render premature the conclusion that [the insurer] has a duty to indemnify[.]"); *Axis Surplus Ins. Co. v. GTJ Co., Inc.*, 139 A.D.3d 604, 605 (1st Dep't 2016) ("It is after the resolution of [the underlying] action where the extent of plaintiff's indemnification obligations can be fully determined.").

Consistent with this unbroken wall of authority, the only underlying claims at issue in this case that are ripe for a coverage decision are the Settled CVA Actions. *See id.* Conversely, any decision on Chubb's indemnification duty in relation to the Active CVA Actions is "premature," and hinges on facts that will necessarily be decided in those unresolved cases. Thus, a phasing order that contemplates first narrowly focusing discovery and litigation on the Settled CVA Actions[2] will allow the parties to move forward expeditiously, while simultaneously granting the Insureds time to resolve the Active CVA Actions.

**B.    Phasing Will Streamline the Case by Encouraging the Early Resolution of Threshold Legal Issues**

Proceeding in the first phase with the subset of ripe, resolved claims will better allow the parties to take discovery and the Court to make judgments regarding the merits of Chubb's primary defense to coverage—its alleged "expected or intended" defense—with respect to each CVA Action on a claim-by-claim basis. *See, e.g.*, *Century Indem. Co. v. Brooklyn Union Gas Co.*, No. 603405/2001, 2024 WL 4366102, at *1 (Sup. Ct. 2024) (noting court and parties' consensus to divide coverage action into multiple phases); *Raiport v. Gowanda Electronics Corp.*, 739 N.Y.S.2d

---

[2] While the active claims involving the alleged perpetrators specified above (*see supra*, Background, § II) are not ripe, the Insureds acknowledge that discovery regarding all Gaynor Matters and Boyle Matters may be pertinent during Phase One, given that facts relevant to some or all of the claims alleging abuse by a given alleged perpetrator may be relevant to the "expected or intended" inquiry.

11

332 F. Supp. 3d 818, 844 (S.D.N.Y. 2018); *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 955 N.Y.S.2d 572, 575 (1st Dep't 2012) ("awareness of possible injuries and claims does not amount to an expectation of damage"). Despite these well-established standards, Chubb seeks to champion alternative standards that are contrary to New York law and have been rejected by other courts. First, Chubb seeks to shift the burden of proof with respect to its "expected or intended" exclusions by arguing that the Insureds should have to *disprove* that they expected or intended the abuse in each CVA Action. Second, Chubb argues that a "general awareness" of a risk is purportedly sufficient to support its expected or intended defense.

While the Insureds strongly disagree with Chubb's positions, Chubb's positions present legal issues that can and should be resolved during the first phase of this case, without the need for discovery into all 1,300 claims. Resolving such threshold issues in the first phase of the case, with a specific focus on the Settled CVA Actions that are ripe, will help streamline the remainder of the case by narrowing the issues moving forward. Among other things, resolving such threshold issues is likely to highlight the overbreadth and irrelevance of much of the discovery that Chubb seeks regarding the alleged "generalized" knowledge of "the Church" rather than the specific, independently incorporated Insureds at issue in a particular CVA Action. Resolving such threshold issues may also help to facilitate a negotiated resolution in this coverage action to the extent the parties' positions are shown to be predicated on legal theories that are ultimately invalid and incognizable.

Phasing the case will also allow for the court to make factual determinations in the Settled CVA Actions that will apply to the Active CVA Actions as they are resolved. When Phase One culminates in a trial, the Court will instruct the jury as to the proper burden and standard that applies the expected or intended issue for each alleged perpetrator. The jury will then consider

13

whether or not the Insureds expected or intended that a certain alleged perpetrator would abuse a child as of a certain date. That date can then be used to determine coverage for other CVA Actions involving that alleged perpetrator. For example, when considering coverage for one Settled CVA Action alleging abuse by Edwin Gaynor, once the jury hears the evidence and makes that determination, it will be law of the case that the "expected or intended" language does or does not apply to all abuse allegedly happening on or after that date for the other CVA Actions involving Gaynor.

In other cases involving a large number of claims, this Court has recognized the wisdom of phasing when such threshold issues exist and resolving them would be more efficient and reduce the potential for undue prejudice. In *Century*, for example, the parties and the court determined that the coverage actions should be divided into multiple phases, each addressing coverage for costs incurred by the policyholder to perform government-mandated cleanup of former manufactured-gas plants across New York City. *See* 2024 WL 4366102, at *1. The agreement to phase was premised upon the "factual and legal complexities" involved in litigating coverage for the multitude of plants at once. *Id.*

Likewise, in *Raiport*, an action in which multiple plaintiffs alleged that defendants damaged their property and health, the court granted defendants' motion to phase the litigation so that threshold legal issues could be resolved first. *See* 739 N.Y.S.2d at 813. In that case, the defendants brought a motion to phase not only the trial, but also pretrial discovery, arguing that bifurcation of liability and damages would streamline the case by narrowing the issues and making settlement more likely. *See id.* at 812. Moreover, the defendants argued that, given the number of plaintiffs and the need to obtain discovery for each of them, limiting disclosure in the first phase would result in a quicker resolution than if all disclosure were conducted simultaneously. *Id.* The

14

Dated:    New York, New York
          January 28, 2025

Respectfully submitted,

**BLANK ROME LLP**

By: _/s/ James R. Murray_
    James R. Murray
    Jared Zola
    Robyn L. Michaelson
    Dominique G. Khani
    Stephen Wah
    1271 Avenue of the Americas
    New York, NY 10020
    Tel: (212) 885-5000
    Fax: (212) 885-5001
    Jim.Murray@BlankRome.com
    Jared.Zola@BlankRome.com
    Robyn.Michaelson@BlankRome.com
    Dominique.Khani@BlankRome.com
    Stephen.Wah@BlankRome.com

    James S. Carter (admitted _pro hac vice_)
    Omid Safa (admitted _pro hac vice_)
    1825 Eye Street NW
    Washington, D.C. 20006
    Tel: (202) 420-2200
    Fax: (202) 420-2201
    James.Carter@BlankRome.com
    Omid.Safa@BlankRome.com

    _Attorneys for the Archdiocese of New York_
    _and Associated Policyholders insured by_
    _insurance policies Chubb and the Additional_
    _Insurers sold_

## WORD COUNT CERTIFICATION

I hereby certify pursuant to Part 202.8-b of the Uniform Rules of for the Supreme Court and the County Court that, according to the word count tool on Microsoft Word, the total number of words in this brief, excluding the caption, table of contents, table of authorities, attorney's certification, and signature block, is 6,978 words.

Dated: January 28, 2025        _/s/ James R. Murray_____
      New York, New York        James R. Murray

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2025, I caused to be filed and served a true and correct copy of the foregoing The Archdiocese of New York's and Associated Policyholders' Motion for an Order That This Action Shall Proceed in Three Phases and all papers affixed thereto on all counsel of record via the Court's electronic filing system, NYSCEF.


Dated: January 28, 2025                    */s/ James R. Murray*
      New York, New York                 James R. Murray

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 13 of 143

29 of 29

# EXHIBIT 3

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-10244-1-rel |
| | . | |
| THE ROMAN CATHOLIC | . | U.S. Bankruptcy Court |
| DIOCESE OF ALBANY, NEW | . | 445 Broadway |
| YORK, | . | Albany, New York 12207 |
| | . | |
| Debtor. | . | January 29, 2025 |
| . . . . . . . . . . . . . . . | | 10:58 a.m. |

TRANSCRIPT OF DOC# 1349 - MOTION FOR RELIEF FROM STAY BY
SURVIVOR CLAIMANT M.F.; DOC# 1343 - MOTION FOR RELIEF FROM STAY
BY SURVIVOR CLAIMANT #27; DOC# 1342 - MOTION FOR RELIEF FROM
STAY BY SURVIVOR CLAIMANT; DOC# 1345 - MOTION FOR RELIEF FROM
STAY BY SURVIVOR CLAIMANT #48; DOC# 1344 - MOTION FOR RELIEF
FROM STAY BY SURVIVOR CLAIMANT #41; DOC# 1355 - MOTION FOR
RELIEF FROM STAY BY THE CLAIMANTS REPRESENTED BY THE MARSH LAW
FIRM PLLC AND PFAU COCHRAN VERTETIS AMALA PLLC

BEFORE HONORABLE ROBERT E. LITTLEFIELD, JR.
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Whiteman Osterman & Hanna, LLP |
| | By: FRANCIS J. BRENNAN, ESQ. |
| | 80 State Street, 11th Floor |
| | Albany, NY 12207 |
| | |
| For the Official | Lemery Greisler, LLC |
| Committee of Unsecured | By: PAUL A. LEVINE, ESQ. |
| Creditors: | 677 Broadway, 8th Floor |
| | Albany, NY 12866 |
| | |
| Audio Operator: | Theresa O'Connell |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

| | |
|---|---|
| For the Parish Steering Committee: | Elsaesser Anderson, Chtd.<br>By: FORD ELSAESSER, JR., ESQ.<br>535 High Street<br>Priest River, ID 83856 |
| | Woods Oviatt Gilman, LLP<br>By: TIMOTHY PATRICK LYSTER, ESQ.<br>1900 Bausch & Lomb Place<br>Rochester, NY 14604 |
| For the Official Committee of Tort Claimants: | Burns Bair, LLP<br>By: JESSE BAIR, ESQ.<br>10 E. Doty Street, Suite 600<br>Madison, WI 53703 |
| | Stinson LLP<br>By: EDWIN H. CALDIE, ESQ.<br>    LOGAN KUGLER, ESQ.<br>50 South Sixth Street, Suite 2600<br>Minneapolis, MN 55402 |
| For the Marsh/PCVA Claimants: | Pfau Cochran Vertetis Amala, PLLC<br>By: JASON P. AMALA, ESQ.<br>701 5th Avenue, Suite 4300<br>Seattle, WA 98104 |
| For Certain Personal Injury Claimants: | LaFave, Wein & Frament, PLLC<br>By: CYNTHIA S. LaFAVE, ESQ.<br>2400 Western Avenue<br>Guilderland, NY 12084 |
| | Jeff Anderson & Associates, P.A.<br>By: MICHAEL FINNEGAN, ESQ.<br>366 Jackson Street, Suite 100<br>St. Paul, MN 55101 |
| For Interstate Fire and Casualty Company: | Parker Hudson Rainer & Dobbs, LLP<br>By: MATTHEW MICHAEL WEISS, ESQ.<br>303 Peachtree Street, N.E., Suite 3600<br>Atlanta, GA 30308 |
| | White and Williams, LLP<br>By: SIOBHAIN MINAROVICH, ESQ.<br>810 Seventh Avenue, Suite 500<br>New York, NY 10019 |

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50, Description: Exhibit Exhibits 1-17, Page 16 of 143

APPEARANCES (Cont'd):

For Hartford Accident          Ruggeri Parks Weinberg, LLP
and Indemnity Company:         By:  JOSHUA D. WEINBERG, ESQ.
                               1875 K Street NW, Suite 600
                               Washington, DC 20006

For London Market             Duane Morris, LLP
Insurers:                     By:  BETTY LUU, ESQ.
                              865 South Figueroa Street, Suite 3100
                              Los Angeles, CA 90017

For the Diocese:              Tobin and Dempf, LLP
                              By:  MICHAEL L. COSTELLO, ESQ.
                              515 Broadway
                              Albany, NY 12207

TELEPHONIC APPEARANCES:

For Debtor, Special           Blank Rome, LLP
Insurance Counsel:            By:   JAMES R. MURRAY, ESQ.
                                    JAMES CARTER, ESQ.
                              1825 Eye Street NW
                              Washington, DC 20006

Certain Personal              Herman Law Firm, PA
Injury Creditors:             By:  JESSE SEIDEN, ESQ.
                              1800 N. Military Trail, Suite 140
                              Boca Raton, FL 33431

                              Jeff Anderson & Associates, P.A.
                              By:  TAYLOR STIPPEL SLOAN, ESQ.
                              366 Jackson Street, Suite 100
                              St. Paul, MN 55101

                              Horowitz Law
                              By:  ADAM HOROWITZ, ESQ.
                              110 E. Broward Blvd., Suite 1530
                              Fort Lauderdale, FL 33301

- - -

1       THE COURT:  Anything else from you, counsel?

2       MS. LaFAVE:  No, thank you, very much, Your Honor.

3       THE COURT:  Thank you.

4       MS. LaFAVE:  I appreciate your time.

5       UNIDENTIFIED ATTORNEY:  Your Honor, may I speak to --

6  oh, I'm sorry.

7       UNIDENTIFIED ATTORNEY:  This is our last counsel.

8       MR. FINNEGAN:  I'm the last speaker, Your Honor, on

9  the claimants' side.

10      COURTROOM DEPUTY:  Can you just state your name again

11 for the record?

12      MR. FINNEGAN:  Yup.  I'm Mike Finnegan, Your Honor,

13 with Jeff Anderson & Associates and along with Ms. Stippel

14 Sloan, who's on the phone, and Ms. LaFave represent three of

15 the claimants that are moving.  And I want to make three brief

16 points, Your Honor, and then answer one of your questions about

17 how to choose the cases.

18      The three brief points, Your Honor, first, is that

19 trials lead to resolutions.  The reason I say that is that we

20 were involved with Mr. Amala's office and others in

21 representing a number of survivors in the Diocese of Rockville

22 Centre.  And that case, similar to what's happened in a lot of

23 the other cases, went through mediation after mediation after

24 mediation without any resolution, to the point where there were

25 dueling motions to dismiss that case from the Committee and

WWW.JJCOURT.COM

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 18 of 143

1  from the Diocese.  We went through multiple different

2  mediators.  None of them could break the log jam.

3         It wasn't until the Diocese brought a motion on

4  preliminary injunction to stop all of the trial cases, the

5  parish cases from going forward.  Judge Glenn denied that and

6  then there are cases that were moved back to State Court, the

7  Supreme Court.  When that happened, there were four cases.

8         The first case that was set for trial was set for

9  trial by Justice Steinman in the State Court system.  He set

10 the first trial.  The date that he set it on was June of 2024.

11 He set the trial for October, this last fall.

12        So what we did is went to work immediately on that

13 case, finished all the discovery, got that case ready for trial

14 and he was not going to move that trial.  And at the same time

15 we were doing mediation and as it got closer, the case got

16 closer and closer to resolution overall in Rockville Centre and

17 by November of this last year we had a deal with the Diocese

18 and all of the solvent insurers that were involved in the case.

19        It's the only case so far, Your Honor, in New York,

20 New Jersey in a clergy abuse space that's had a case with those

21 components in it where we've had a fully consensual deal with

22 the solvent insurers.  There was one insurer that was a

23 non-solvent insurer that was a different situation.  But that

24 case went through.  That's why the case got confirmed.  The

25 money's going to be paid and survivors will be able to get

**WWW.JJCOURT.COM**

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 19 of 143

**C E R T I F I C A T I O N**

        I, KELLI R. PHILBURN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Kelli R. Philburn

KELLI R. PHILBURN

J&J COURT TRANSCRIBERS, INC.     DATE:  February 10, 2025

WWW.JJCOURT.COM

Case 2-19-20905-PRW,  Doc 2952-1,  Filed 02/18/25,  Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 20 of 143

# EXHIBIT 4

1

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                       EASTERN DISTRICT OF LOUISIANA
 2

 3   IN RE:                       :    Case No. 20-10846

 4   THE ROMAN CATHOLIC CHURCH    :    Chapter 11
     OF THE ARCHDIOCESE OF NEW
 5   ORLEANS,                     :    New Orleans, Louisiana
                                       Wednesday, September 30, 2020
 6        Debtor.                 :    3:02 p.m.

 7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8                     TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE MEREDITH S. GRABILL,
 9                  UNITED STATES BANKRUPTCY JUDGE

10   APPEARANCES (via telephone):

11   For the Debtor:             Jones Walker LLP
                                 BY:  MARK A. MINTZ, ESQ.
12                                    EDWARD DIRK WEGMANN, ESQ.
                                      LAURA F. ASHLEY, ESQ.
13                                    SAMANTHA OPPENHEIM, ESQ.
                                 201 St. Charles Ave., 51st Floor
14                               New Orleans, LA  70170

15   For the United States       Office of the U. S. Trustee
     Trustee:                    BY:  AMANDA B. GEORGE, ESQ.
16                               400 Poydras Street, Suite 2110
                                 New Orleans, LA  70130

17

18
     Audio Operator:             JENNIFER NUNNERY
19

20   Transcript prepared by:     JANICE RUSSELL TRANSCRIPTS
                                 1418 Red Fox Circle
21                               Severance, CO  80550
                                 (757) 422-9089
22                               trussell31@tdsmail.com

23

     Proceedings recorded by electronic sound recording; transcript
24   produced by transcription service.

25
</pre>

```
 1    APPEARANCES (via telephone continued):

 2    For Hancock Whitney Bank:        Carver Darden
                                       BY:  DAVID L. WAGUESPACK, ESQ.
 3                                     1100 Poydras Street, Suite 3100
                                       New Orleans, LA  70163-1102

 4
      For Hancock Whitney Bank as      Butler Snow LLP
 5    Trustee for the Public          BY:  DAVID S. RUBIN, ESQ.
      Facilities Authority Revenue    445 N. Blvd., Suite 300
 6    Refunding Bonds of Series       Baton Rouge, LA  70802
      2017:

 7
                                       Greenberg Traurig, LLP
 8                                     BY:  ANNETTE JARVIS, ESQ.
                                       222 South Main St., 5th Floor
 9                                     Salt Lake City, UT  84101.

10                                     Greenberg Traurig, LLP
                                       BY:  COLLEEN A. MURPHY, ESQ.
11                                     One International Plaza, # 2000
                                       Boston, MA  02110

12
      For Official Committee of        Locke Lord LLP
13    Unsecured Creditors:            BY:  C. DAVIN BOLDISSAR, ESQ.
                                              OMER F. KUEBEL, III, ESQ.
14                                     601 Poydras Street, Suite 2660
                                       New Orleans, LA  70130-6036

15
                                       Pachulski Stang Ziehl & Jones
16                                     BY:  LINDA CANTOR, ESQ.
                                       10100 Santa Monica Blvd.-13th Fl.
17                                     Los Angeles, CA  90067-4003

18    For James Doe and J. W. Doe:     Herman, Herman & Katz, LLC
                                       BY:  SOREN E. GISLESON, ESQ.
19                                     820 O'Keefe Avenue
                                       New Orleans, LA  70113

20
                                       RICHARD C. TRAHANT, ESQ.
21                                     2908 Hessmer Avenue
                                       Metairie, LA  70002

22
                                       Shearman-Denenea, L.L.C.
23                                     BY:  JOHN H. DENENEA, JR., ESQ.
                                       4240 Canal Street
24                                     New Orleans, LA  70119

25
```

```
 1   APPEARANCES (via telephone continued):

 2   For the Apostolates:          Heller Draper
                                    BY:  DOUGLAS S. DRAPER, ESQ.
 3                                  650 Poydras Street, Suite 2500
                                    New Orleans, LA  70130

 4
     For The Catholic Mutual        Bienvenu Foster
 5   Relief Society of America:     BY:  JOHN W. WATERS, JR., ESQ.
                                         DAVID E. WALLE, ESQ.
 6                                  1100 Poydras Street, Suite 2870
                                    New Orleans, LA  70163

 7
                                    Schiff Hardin LLP
 8                                  BY:  J. MARK FISHER, ESQ.
                                    233 S. Wacker Drive, Suite 7100
 9                                  Chicago Illinois  60606

10   For Paul Calamari:            EVAN P. HOWELL III, ESQ.
                                    1 Galleria Blvd., Suite 1900
11                                  Metairie, LA  70001

12   For Employers' Liability      DAVID M. DOLENDI, ESQ.
     Assurance Corporation:        180 North Stetson Ave., Ste. 3400
13                                  Chicago, Illinois  60601

14   For M. P. Doe:                DESIRÉE CHARBONNET, ESQ.
                                    365 Canal Street
15                                  New Orleans, LA  70130

16

17

18

19

20

21

22

23

24

25
```

1   these claimants as possible into the bankruptcy process.

2   So like I said, I, I'm not, I'm not sure where we're

3   at on insurance coverage, but I'm not willing to allow the

4   debtor to take the risk of incurring that kind of cost and

5   drawing that kind of cost out of the estate and away from all

6   of the other creditors, both the abuse, other abuse claimants

7   and the commercial claimants alike.  I'm, I'm just not willing

8   to let the, let the debtor take that risk.  You know, whether

9   the litigation in another forum would prejudice the interests

10  of other creditors and the balance of hurt, I just haven't

11  heard any compelling reason why these two claimants, J. W. Doe

12  and James Doe, should be allowed to be treated any differently

13  than all of the other abuse claimants whose claims are at least

14  as compelling as theirs.

15  You know, I think, maybe it was Mr. Waters that

16  pointed it out, but I'm, I'm glad somebody, I'm glad somebody

17  heard me last, last hearing.  It is absolutely undeniable that

18  the cases that are filed in Orleans Parish are sexual abuse

19  cases and as I -- as I -- as I gently advised the debtor in the

20  last hearing, the debtor would do well to acknowledge that,

21  that here.  This is not just a commercial case and I do believe

22  that the debtor has taken a step in acknowledging that fact in

23  its work in this case, for example, regarding the publication

24  protocol of the bar date.  I think the debtor, from, from what

25  I understand and what my hope is, the debtor has acknowledged

1   of confirming a plan.  It is highly likely that either this

2   Court or the district court will have to examine these

3   unliquidated claims in some amount of detail just to estimate

4   them for plan purposes under 502 and as I sit here today, it

5   doesn't seem efficient and it doesn't seem in the best interest

6   of all parties in interest to have the estimation process for

7   plan purposes and the adjudication process for distribution

8   purposes proceed at this time before two different courts.  And

9   like I said, all of this is to say that there, you know, there

10  are some interventions in bankruptcy law that are unique and

11  available under the Code that are very different from a

12  traditional litigation posture.

13          So all of that said, at this time based on the current

14  circumstances, not the least of which is the fact that there's

15  a pending motion to dismiss the whole case before this Court

16  right now, so given that and in weighing the hardships to the

17  parties, for all of the reasons that I just discussed, this

18  Court finds that lifting the automatic stay to allow J. W. Doe

19  and James Doe to reduce to judgment their abuse cases and their

20  claims in Orleans Parish Civil District Court is really not the

21  most efficient manner to proceed in the bankruptcy case at this

22  time.  It'll interfere with the reorganization process and it

23  will prejudice the other creditors in this case.  I think to

24  allow it, it would defeat the very purpose of the automatic

25  stay and the goals of the Bankruptcy Code.

1    before the Court or questions before the Court?

2        (No response)

3            THE COURT:  All right.

4            MR. GISLESON:  None for the movers.

5            MR. MINTZ:  Thank you, your Honor.

6            THE COURT:  All right.  Thank you.

7            We're adjourned.

8        (Proceedings concluded at 4:40 p.m.)

9

10

11

12

13

14                        CERTIFICATE

15        I, court approved transcriber, certify that the

16   foregoing is a correct transcript from the official electronic

17   sound recording of the proceedings in the above-entitled

18   matter.

19   /s/ *Janice Russell*                    October 9, 2020

20   Janice Russell, Transcriber                  Date

21

22

23

24

25

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

In Re:                              ) Case No. 23-40523
                                    ) Chapter 11
THE ROMAN CATHOLIC BISHOP OF        )
OAKLAND                             ) Oakland, California
                                    )Tuesday, January 21, 2025
                    Debtor.         ) 10:00 AM
_____     )
                                    1. HEARING ON APPROVAL OF
                                    DISCLOSURE STATEMENT. CONT'D
                                    FROM 12/18/24, 1/16/25

                                    2. MOTION TO AMEND MEDIATION
                                    ORDERS AND REQUIRING PARTIES
                                    TO ATTEND GLOBAL MEDIATION
                                    (DOC. 1612). CONT'D FROM
                                    1/16/25

                                    3. STATUS CONFERENCE. CONT'D
                                    FROM 11/27/24, 1/16/25

                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE WILLIAM J. LAFFERTY
                 UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:
For the Debtor:            ANN MARIE UETZ, ESQ.
                           Foley & Lardner LLP
                           500 Woodward Avenue
                           Suite 2700
                           Detroit, MI 48826
                           (313)234-2800

                           EILEEN R. RIDLEY, ESQ.
                           Foley & Lardner LLP
                           555 California Street
                           Suite 1700
                           San Francisco, CA 94104
                           (415)434-4507

**eScribers, LLC**

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 29 of 143

```
 1  For the Debtor (Cont'd):    MARK C. MOORE, ESQ.
                                 Foley & Lardner LLP
 2                               2021 McKinney Avenue
                                 Suite 1600
 3                               Dallas, TX 75201
                                 (214)999-4667
 4
                                MATTHEW D. LEE, ESQ.
 5                               Foley & Lardner LLP
                                 150 East Gilman Street
 6                               Suite 5000
                                 Madison, WI 53703
 7                               (608)258-4258

 8  For Official Committee of   JEFFREY D. PROL, ESQ.
    Unsecured Creditors:        Lowenstein Sandler LLP
 9                               One Lowenstein Drive
                                 Roseland, NJ 07068
10                               (973)597-2490

11  Special Insurance Counsel   JESSE J. BAIR, ESQ.
    for Official Committee of   TIMOTHY W. BURNS, ESQ.
12  Unsecured Creditors:        Burns Bair LLP
                                 10 East Doty Street
13                               Suite 600
                                 Madison, WI 53703
14                               (608)286-2302

15  For Continental Casualty    MARK D. PLEVIN, ESQ.
    Company:                    Crowell & Moring LLP
16                               Three Embarcadero Center
                                 26th Floor
17                               San Francisco, CA 94111
                                 (415)986-2800
18
    For Westport Insurance      TODD C. JACOBS, ESQ.
19  Corporation:                Parker, Hudson, Rainer & Dobbs LLP
                                 Two North Riverside Plaza
20                               Suite 1850
                                 Chicago, IL 60606
21                               (312)477-3306

22                              BLAISE S. CURET, ESQ.
                                 Sinnott, Puebla, Campagne & Curet,
23                               APLC
                                 2000 Powell Street
24                               Suite 830
                                 Emeryville, CA 94608
25                               (415)352-6200
```

**eScribers, LLC**

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 30 of 143

```
 1  For Office of the United    JASON BLUMBERG, ESQ.
    States Trustee:             United States Department of
 2                               Justice
                                 501 I Street
 3                               Suite 7-500
                                 Sacramento, CA 95814
 4                               (916)930-2100

 5  For RCC, RCWC, OPF, and     RYAN E. MANNS, ESQ. (ZOOM)
    Aventis:                    Norton Rose Fulbright US LLP
 6                               2200 Ross Avenue
                                 Suite 3600
 7                               Dallas, TX 75201
                                 (214)855-8304
 8
    For Pacific Indemnity       TANCRED V. SCHIAVONI, ESQ.
 9  Company:                    O'Melveny & Myers LLP
                                 7 Times Square
10                               New York, NY 10036
                                 (212)326-2000
11

12

13

14

15

16

17

18  Court Recorder:             PL WRIGHT
                                United States Bankruptcy Court
19                              1300 Clay Street
                                Oakland, CA 94612
20

21  Transcriber:                RIVER WOLF
                                eScribers, LLC
22                              7227 N. 16th Street
                                Suite #207
23                              Phoenix, AZ 85020
                                (800) 257-0885
24
    Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.
```

**eScribers, LLC**

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 31 of 143

1  more quickly than perhaps they were proceeding without that

2  incentive.

3         But I'm a little bit concerned that what I heard the

4  other day, and I thank Mr. Simons and others for their candor,

5  was that really only one of the six advertised potential

6  bellwether actions is potentially ready anytime soon.  That

7  undercuts the practical effect and the practical benefit of

8  this.

9         I'm also somewhat concerned about the fact that

10  there's a new presiding judge with respect to these matters and

11  that that person has yet to have a hearing with respect to the

12  consolidated matter.  And I'm both not sure how that judge

13  would otherwise want to handle matters.  And I want to be very

14  loathe about either dictating anything in that proceeding or

15  not understanding that once I grant relief from stay, I don't

16  want to ungrant (sic) it.  I think that doing it is going to be

17  consequential if and when I do it, and I don't want to do it

18  with any strings.

19         So at the moment, because of my uncertainty about how

20  fast we would get to anything that looked like a helpful data

21  point, for the moment, I'm going to deny the motion for relief

22  from stay, but it's very much without prejudice because things

23  may change, and it may be that it's something that will be very

24  helpful in the future.  I don't have the sense that it would be

25  helpful now.

**eScribers, LLC**

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 32 of 143

1                          I N D E X

2    RULINGS:                                PAGE LINE

3    OPF motion is denied without prejudice    16      6

4    Motion for relief from stay is denied     17     19

5    without prejudice

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**eScribers, LLC**

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 33 of 143

1                    C E R T I F I C A T I O N

2

3    I, River Wolf, certify that the foregoing transcript is a true

4    and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ RIVER WOLF, CDLT-265

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  January 27, 2025

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 6



500 College Road East, Suite 401
Princeton, New Jersey 08540

Wayne Binowski
Claims Consultant
Environmental and Mass Tort Claims
Telephone: (609) 524-6622
Facsimile: (609) 524-3659
Toll Free: (800) 388-4584
E-mail: wayne.binowski@cna.com

**VIA CERTIFIED MAIL – RETURN RECIEPT REQUESTED**

September 2, 2020

James Marsh, Esq.
Marsh Law Firm
151 East Point Road, Suite 102
White Plains, NY10601-5210
jamesmarsh@marsh.law

|  | Re: | Policyholder: | **Diocese of Rochester** |
|---|---|---|---|
|  |  | Proofs Of Claim: | **Mark Gooden and Scott A. Manza** |
|  |  | Claim #: | **E2B54478** |

Dear Mr. Marsh:

This letter acknowledges receipt of the Mark Gooden and Scott A. Manza filed Proofs of Claim which were submitted for coverage under the policies of insurance Continental Insurance Company ("CIC")[1] issued to the Roman Catholic Diocese of Rochester, New York (the "Diocese").

This letter shall serve to notify your office pursuant to the New York Insurance Law Statute 3420 that CIC denied any defense and indemnity obligation with respect to the Proofs of Claim because: (1) the policies CIC issued to the Diocese are the property of the Diocese's Chapter 11 bankruptcy estate, and as a result, CIC is precluded from accepting the tender of the Proofs of Claim by the Bankruptcy Code's automatic stay of actions that could diminish the assets of the Diocese's bankruptcy estate; and (2) the other alleged affiliated institutions, parishes, and corporations of the Diocese have not established that they qualify as an insured under the policies CIC issued to the Diocese.

In addition, the Proofs of Claim identified the perpetrators of the alleged abuse. CIC also denied a defense and indemnity obligation to the perpetrators because (1) the perpetrators are not an insured under the policies CIC issued to the Diocese and (2) liability alleged to arise out of the perpetrator's conduct did not involve an accident.

---

[1] Continental Insurance Company is successor by interest to (1) the Commercial Insurance Company of Newark, NJ; and (2) the Fireman's Insurance Company of Newark, NJ.

CIC has also reserved its rights to deny coverage on additional grounds to the extent that further factual investigation of the claims support additional coverage defenses.

Should you have any questions or comments, kindly contact me at your earliest convenience.

Very truly yours,

Wayne Binowski
Claim Consultant
Continental Insurance Company
(609)524-6622

# EXHIBIT 7



500 College Road East, Suite 401
Princeton, New Jersey 08540

Wayne Binowski
Claims Consultant
Environmental and Mass Tort Claims
Telephone:  (609) 524-6622
Facsimile:    (609) 524-3659
Toll Free:    (800) 388-4584
E-mail:       wayne.binowski@cna.com

**VIA E-MAIL**

August 27, 2020

Michael Pfau, Esq.
Pfau Cochran Vertetis Amala
Columbus House, 401 Columbia Street
Seattle, WA 98104
nyrochester@pcvalaw.com

| Re: | **Policyholder:** | **Diocese of Rochester** |
|---|---|---|
| | **Proofs Of Claim:** | **(1) John Pevc; (2) Ronald Kiley; (3) Miguel Labrador; (4) Alan Schusler; and (5) Joyce George-Knight** |
| | **Claim #:** | **E2B54478** |

Dear Mr. Pfau:

This correspondence acknowledges receipt of the (1) John Pevc; (2) Ronald Kiley; (3) Miguel Labrador; (4) Alan Schusler; and (5) Joyce George-Knight filed Proofs of Claim which were submitted for coverage under the policies of insurance Continental Insurance Company ("CIC")[1] issued to the Roman Catholic Diocese of Rochester, New York (the "Diocese").

This letter shall serve to notify your office pursuant to the New York Insurance Law Statute 3420 that CIC denied any defense and indemnity obligation with respect to the 5 filed Proofs of Claim because: (1) the policies CIC issued to the Diocese are the property of the Diocese's Chapter 11 bankruptcy estate, and as a result, CIC is precluded from accepting the tender of the 5 filed Proofs of Claim by the Bankruptcy Code's automatic stay of actions that could diminish the assets of the Diocese's bankruptcy estate; (2) the other alleged affiliated institutions, parishes, and corporations of the Diocese have not established that they qualify as an insured under the policies CIC issued to the Diocese; and (3) Policy Nos. LZ 18051, LAZ 32300, L 0955400 and L 1239300 do not provide coverage with respect to abuse alleged at the location(s) specified in the filed Proofs of Claim.

---

[1] Continental Insurance Company is successor by interest to (1) the Commercial Insurance Company of Newark, NJ; and (2) the Fireman's Insurance Company of Newark, NJ.

In addition, the 5 filed Proofs of Claim identified the perpetrators of the alleged abuse. CIC also denied a defense and indemnity obligation to the perpetrators because (1) they are not an insured under the policies CIC issued to the Diocese and (2) liability alleged to arise out of their conduct did not involve an accident.

CIC has also reserved its rights to deny coverage on additional grounds to the extent that further factual investigation of the claims support additional coverage defenses.

Should you have any questions or comments, kindly contact me at your earliest convenience.

Very truly yours,

*Wayne Binowski*

Wayne Binowski
Claim Consultant
Continental Insurance Company
(609)524-6622

**EXHIBIT 8**



**PFAU COCHRAN VERTETIS AMALA**
ATTORNEYS AT LAW

**SEATTLE**
701 FIFTH AVENUE, SUITE 4300
SEATTLE, WA 98104

**TACOMA**
909 A STREET, SUITE 700
TACOMA, WA 98402

**NEW YORK CITY**
31 HUDSON YARDS, 11TH FLOOR
NEW YORK, NY 10001

1 (800) 349-PCVA
www.pcva.law

**PARTNERS**
MICHAEL T. PFAU^6
DARRELL L. COCHRAN^67
THOMAS B. VERTETIS^567
JASON P. AMALA^16

MALLORY C. ALLEN^6
IAN M. BAUER^
ELIZABETH P. CALORA^
ANELGA DOUMANIAN^46
KEVIN M. HASTINGS^7
SELENA L. HOFFMAN^

CHRISTOPHER E. LOVE^
VINCENT T. NAPPO^6
LESLEY A. O'NEILL^256
COLLEEN DURKIN PETERSON^
STEVEN T. REICH^3
ANDREW S. ULMER^

**ASSOCIATES**
PATRICK A. BROWN^
ZABRINA B. DELGADO^
ALEXANDER G. DIETZ^
LUCAS B. FRANKEN^568
NICHOLAS A. GILLAN^

CAROLINE A. GOLSHAN^
BRIDGET T. GROTZ^
WILLIAM T. McCLURE^
MICHAEL D. McNEIL^

MARIAH E. OGDEN^1
MICHAEL T. SUH^7
JEREMIAH S. SURFACE^
BENJAMIN B. WATSON^

**LICENSED IN:**
^ Washington
1 CA, 2 GA, 3 ID,
4 MO, 5 NJ, 6 NY,
7 OR, 8 SC

**November 19, 2024**

<u>***Sent via Email***</u>
Stephen A. Donato
BOND, SCHOENECK & KING PLLC
One Lincoln Center
Syracuse, NY 13202
sdonato@bsk.com

Timothy P. Lyster
WOODS OVIATT GILMAN LLP
1900 Bausch & Lomb Place
Rochester, NY 14604
Tlyster@woodsoviatt.com

Philip G. Spellane
HARRIS BEACH PLLC
99 Garnsey Rd
Pittsford, NY 14534
pspellane@harrisbeach.com

     Re:    *Settlement Demand Regarding Mark Gooden* (Claimant No. 204)

Dear Counsel:

    As you know, my law firm, Pfau Cochran Vertetis Amala PLLC, along with the Marsh Law Firm, jointly represent Mark Gooden regarding the childhood sexual abuse he suffered at the hands of Father Eugene Emo while he was a parishioner, altar boy, and student of the Diocese of Rochester ("Diocese") and St. Michael's Church and School ("St. Michael's").

    As you also know, Mark submitted a Proof of Claim in the Bankruptcy of the Diocese of Rochester for his civil claims against the Diocese and St. Michael's ("the Defendants") for negligently allowing Father Emo to sexually abuse him between 1973 and 1974. Mark alleges the Defendants knew or should have known that Father Emo posed a danger to him but failed to take reasonable steps to protect him from Father Emo.



Mark previously offered to settle all of his claims arising from the sexual abuse by Father Emo, including his claims against the Defendants, for $5,500,000. We received no response to that offer. In order to make sure there is a clear record, Mark is renewing that offer, which we understand is an offer to resolve his claims within the applicable policy limits.

## Mark's Abuse and Damages

Mark was sexually abused by Father Emo between 1973 and 1974 when he was approximately 12 to 13 years old. The sexual abuse included Father Emo rubbing, fondling, and manipulating Mark's genitals both over and under his clothing; Father Emo pinning Mark down and handcuffing Mark as he sexually abused him; Father Emo rubbing and grinding his groin in Mark's face; and Father Emo performing oral sex on Mark. Father Emo sexually abused Mark approximately four times.

Mark is still processing the abuse by Father Emo, but he believes he has suffered a range of issues as a result of the abuse, including anxiety, anger, shame, guilt, substance abuse, sexual intimacy issues, sexual dysfunction, trust issues, problems with authority, marriage problems, poor academic performance, professional failures, sleep issues, loss of faith, and traumatic flashbacks.

Mark lost his faith in religion and struggles to hold any religious beliefs. He has experienced trust issues that have impacted his ability to create and maintain relationships, including romantic relationships. These issues eventually led to a divorce.

## Liability in Mark's Case

The Defendants knew or should have known that Father Emo posed a danger to children, including Mark, before Father Emo sexually abused Mark because the Defendants had received complaints about Father Emo's sexual abuse of children before Mark's abuse.

For example, in 1973, Bishop Thomas Hickey – the then-Bishop of the Diocese – received a complaint that Father Emo acted sexually with children while Father Emo was serving as a priest at St. Margaret Mary. The Defendants also received complaints that Father Emo was "inappropriately wrestling" minors and that he was taking minor children to a cabin. The Bishop met with Father Emo to discuss his inappropriate conduct, and instructed Father Emo to cease wrestling with children.

Despite receiving these complaints, the Diocese transferred Father Emo from St. Margaret Mary to St. Michael's, where he was allowed to continue serving as a priest and to have access to children, including Mark. Father Emo eventually used his position as a priest at St. Michael's to groom and to sexually abuse Mark.



As you know, the Defendants had a duty to use reasonable steps to prevent Father Emo from using his position as a priest to sexually abuse children, including Mark. The Defendants also had a duty to use reasonable steps to protect the children in their care, custody, or control from foreseeable harm, including the danger of being sexually abused.

A reasonable jury could conclude the Defendants breached those duties by failing to take any steps, let alone reasonable steps, to prevent Father Emo from using his position at St. Michael's to sexually abuse Mark while Mark was in their care, custody, or control. The same jury could also easily find that this negligence of the Defendants is what allowed Father Emo to sexually abuse Mark, and that Mark should be awarded a substantial amount in damages to compensate him for the abuse.

## Demand

Based on the foregoing, we are authorized to settle all of Mark's claims arising from the sexual abuse by Father Emo, including any and all of his claims against the Defendants, for $5,500,000.

It is our understanding that $5,500,000 is within the combined limits of the Defendants' applicable insurance policies. We believe that the offer is well below the amount that we believe a reasonable jury would award Mark at trial. Put another way, we believe a reasonable jury would award Mark an amount that exceeds the limits of the available insurance, but Mark is willing to settle his claim within the available insurance limits.

Accordingly, this offer is intended to give the Defendants and their insurers an opportunity to settle Mark's claims within the policy limits and to avoid the risk of a verdict and judgment in excess of the limits. A settlement would also protect the Defendants from a range of adverse effects that would come from Mark's claim going to trial and to a jury verdict. We understand the Diocese is hoping that its bankruptcy filing will put claims like Mark's claim behind it, but that will not happen unless and until its insurers comply with their contractual obligations and pay their limits to resolve Mark's claim.

If any defendant or an insurer disagrees with our analysis and believes that this is not an offer to settle Mark's claim within the available limits, please explain your reasoning so that the insurer(s) can fulfill their duty to make a good faith effort to settle Mark's claim within the available limits. To be clear, Mark will not consider settling all of his claims arising from the sexual abuse by Father Emo, including any and all of his claims against the Defendants, for less than $5,500,000 unless a defendant or an insurer explain, in writing, why they believe the limits are less than $5,500,000. This is particularly true as we believe a reasonable jury is likely to award Mark significantly more than $5,500,000.



On that note, in addition to the numerous jury verdicts rendered across the country in cases brought against institutions for childhood sexual abuse, two separate juries have recently awarded $25 million to individual plaintiffs in New York and New Jersey for lawsuits brought pursuant to each state's Child Victims Act.

In March of this year, our law firm obtained a $25 million jury verdict against New Jersey's Division of Youth and Family Services (DYFS) for the sexual abuse our client was forced to endure while in foster case. The jury found that DYFS was 99% liable for its gross negligence in failing to keep our client safe.[1]

More recently, a Suffolk County jury, one of the most conservative counties in New York State, awarded $25 million to a former student who was sexually abused by his teacher. The jury found the institutional defendant 100% liable.[2]

Simply put, cases like Mark's have resulted in enormous verdicts when allowed to proceed to trial, including those filed under the Child Victims Act. Mark's case is no different, and the Defendants face great exposure should this case proceed to trial.

This settlement offer will expire at **5:00pm ET on December 20, 2024**, at which time it is withdrawn and will not be renewed a third time. We have copied counsel of record for the Defendants' insurer, The Continental Insurance Company, successor by merger to Commercial Insurance Company of Newark, New Jersey and Firemen's Insurance Company of Newark, New Jersey ("CNA").

We are willing to make Mark available for a six-hour, sworn interview before this offer expires on December 20, 2024. If a defendant or an insurer believes that it needs additional information in order to evaluate this offer, please let us know immediately.

Finally, we do not believe that this offer violates any stay, particularly as this offer is within the limits and we are not aware of any aggregate limit that applies to Mark's claim. If a defendant or an insurer believes that this offer violates any stay, please let us know immediately so we can address that position with the bankruptcy court.

Sincerely,

Jason P. Amala

cc:     Mark Plevin, Esq. (mplevin@plevinturner.com)

---

[1] https://patch.com/new-jersey/newbrunswick/woman-sues-dyfs-sexual-abuse-awarded-25-million-jury
[2] https://abc7ny.com/post/bay-shore-union-free-school-district-ordered-pay-25m-damages-sex-abuse-case-thomas-bernagozzi/15498666/

# EXHIBIT 9



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

**SEATTLE**
701 Fifth Avenue, Suite 4300
Seattle, WA 98104

**TACOMA**
909 A Street, Suite 700
Tacoma, WA 98402

**NEW YORK CITY**
31 Hudson Yards, 11th Floor
New York, NY 10001

1 (800) 349-PCVA
www.pcva.law

**PARTNERS**
Michael T. Pfau^ ⁶
Darrell L. Cochran^ ⁶ ⁷
Thomas B. Vertetis^ ⁵ ⁶ ⁷
Jason P. Amala^ ¹ ⁶

Mallory C. Allen^ ⁶
Ian M. Bauer^
Elizabeth P. Calora^
Anelga Doumanian^ ⁴ ⁶
Kevin M. Hastings^ ⁷
Selena L. Hoffman^

Christopher E. Love^
Vincent T. Nappo^ ⁶
Lesley A. O'Neill^ ² ⁵ ⁶
Colleen Durkin Peterson^
Steven T. Reich^ ³
Andrew S. Ulmer^

**ASSOCIATES**
Patrick A. Brown^
Zabrina B. Delgado^
Alexander G. Dietz^
Lucas B. Franken^ ⁵ ⁶ ⁸
Nicholas A. Gillan^

Caroline A. Golshan^
Bridget T. Grotz^
William T. McClure^
Michael D. McNeil^

Mariah E. Ogden^ ¹
Michael T. Suh^ ⁷
Jeremiah S. Surface^
Benjamin B. Watson^

**Licensed in:**
^ Washington
1 CA, 2 GA, 3 ID,
4 MO, 5 NJ, 6 NY,
7 OR, 8 SC

**November 19, 2024**

<u>**Sent via Email**</u>
Stephen A. Donato
Bond, Schoeneck & King PLLC
One Lincoln Center
Syracuse, NY 13202
sdonato@bsk.com

Timothy P. Lyster
Woods Oviatt Gilman LLP
1900 Bausch & Lomb Place
Rochester, NY 14604
Tlyster@woodsoviatt.com

Philip G. Spellane
Harris Beach PLLC
99 Garnsey Rd
Pittsford, NY 14534
pspellane@harrisbeach.com

  Re: *Settlement Demand Regarding Miguel Labrador* (Claimant No. 320)

Dear Counsel:

  As you know, my law firm, Pfau Cochran Vertetis Amala PLLC, along with the Marsh Law Firm, jointly represent Miguel Labrador regarding the sexual abuse he suffered at the hands of Father Gerard Guli while he was a parishioner and altar boy of the Diocese of Rochester ("Diocese"), St. Michael's Church ("St. Michael's"), and St. Stanislaus Bishop and Martyr Parish ("St. Stanislaus").

  As you also know, Miguel submitted a Proof of Claim in the Bankruptcy of the Diocese of Rochester for his civil claims against the Diocese, St. Michael's, and St. Stanislaus ("the Defendants") for negligently allowing Father Guli to sexually abuse him between 1973 and 1978. Miguel alleges the Defendants knew or should have known that Father Guli posed a danger to him but failed to take reasonable steps to protect him from Father Guli.



Miguel previously offered to settle all of his claims arising from the sexual abuse by Father Guli, including his claims against the Defendants, for $13,000,000. We received no response to that offer. In order to make sure there is a clear record, Miguel is renewing that offer, which we understand is an offer to resolve his claims within the applicable policy limits.

## Miguel's Abuse and Damages

Miguel was sexually abused by Father Guli between 1973 and 1978 when he was approximately 14 to 18 years old. The sexual abuse included Father Guli removing Miguel's clothing; Father Guli fondling and manipulating Miguel's genitals; Father Guli performing oral sex on Miguel; and Father Guli swallowing Miguel's ejaculate. Father Guli sexually abused Miguel more than 30 times over approximately a 5-year period after Father Guli was able to gain access to Miguel by virtue of his role as a priest of the Defendants.

Miguel is still processing the abuse but has experienced anxiety, guilt, depression, substance abuse, sexual intimacy problems, sexual dysfunction, trust issues, problems with authority, marital problems, hypervigilance, poor performance in school, failure to reach his full potential, sleep problems, nightmares, flashbacks, and overprotectiveness of his children. The flashbacks to the abuse have impacted Miguel's ability to be sexually intimate with his wife as he recalls the memories of being abused.

Indeed, Miguel struggled with concentrating on his studies and battled feelings of depression during and after the abuse by Father Guli. He ultimately dropped out of high school and could not reach his full academic potential.

In addition, Miguel struggles to trust others, including those in a position of authority and especially religious figures in authority. He has lost his faith and is unable to participate in religious activities following the abuse by Father Guli. The lack of trust in others has contributed to Miguel feeling overprotective of his children and grandchildren as he struggles to trust others around them.

The anxiety and depression have also caused Miguel to engage in substance abuse as a form of self-medication, including use of alcohol and drugs.

## Liability in Miguel's Case

The Defendants knew or should have known that Father Guli posed a danger to children, including Miguel, before Father Guli sexually abused Miguel because the Defendants had received complaints about Father Guli's sexual abuse of children before Miguel's abuse.

For example, in 1962, the Defendants received a complaint that Father Guli had engaged in an "illicit act" with an eighth grader. One year later, in 1963, the Defendants



received additional complaints that Father Guli was involved in "two instances of homosexuality which came to the attention of the police."

Despite receiving these complaints, the Defendants continued to allow Father Guli to serve as their priest, agent, and employee at St. Michael's and St. Stanislaus – where he used his position as a priest, agent, and employee of the Defendants to gain access to Miguel and to sexually abuse him.

As you know, the Defendants had a duty to use reasonable steps to prevent Father Guli from using his position as a priest to sexually abuse children, including Miguel. The Defendants also had a duty to use reasonable steps to protect the children in their care, custody, or control from foreseeable harm, including the danger of being sexually abused.

A reasonable jury could conclude the Defendants breached those duties by failing to take any steps, let alone reasonable steps, to prevent Father Guli from using his position at St. Michael's to sexually abuse Miguel while Miguel was in their care, custody, or control. The same jury could also easily find that this negligence of the Defendants is what allowed Father Guli to sexually abuse Miguel, and that Miguel should be awarded a substantial amount in damages to compensate him for the abuse.

**Demand**

Based on the foregoing, we are authorized to settle all of Miguel's claims arising from the sexual abuse by Father Guli, including any and all of his claims against the Defendants, for $13,000,000.

It is our understanding that $13,000,000 is within the combined limits of the Defendants' applicable insurance policies. We believe that the offer is well below the amount that we believe a reasonable jury would award Miguel at trial. Put another way, we believe a reasonable jury would award Miguel an amount that exceeds the limits of the available insurance, but Miguel is willing to settle his claim within the available insurance limits.

Accordingly, this offer is intended to give the Defendants and their insurers an opportunity to settle Miguel's claims within the policy limits and to avoid the risk of a verdict and judgment in excess of the limits. A settlement would also protect the Defendants from a range of adverse effects that would come from Miguel's claim going to trial and to a jury verdict. We understand the Diocese is hoping that its bankruptcy filing will put claims like Miguel's claim behind it, but that will not happen unless and until its insurers comply with their contractual obligations and pay their limits to resolve Miguel's claim.

If any defendant or an insurer disagrees with our analysis and believes that this is not an offer to settle Miguel's claim within the available limits, please explain your reasoning so that the insurer(s) can fulfill their duty to make a good faith effort to settle Miguel's claim within the available limits. To be clear, Miguel will not consider settling all of his claims


arising from the sexual abuse by Father Guli, including any and all of his claims against the Defendants, for less than $13,000,000 unless a defendant or an insurer explain, in writing, why they believe the limits are less than $13,000,000. This is particularly true as we believe a reasonable jury is likely to award Miguel significantly more than $13,000,000.

On that note, in addition to the numerous jury verdicts rendered across the country in cases brought against institutions for childhood sexual abuse, two separate juries have recently awarded $25 million to individual plaintiffs in New York and New Jersey for lawsuits brought pursuant to each state's Child Victims Act.

In March of this year, our law firm obtained a $25 million jury verdict against New Jersey's Division of Youth and Family Services (DYFS) for the sexual abuse our client was forced to endure while in foster case. The jury found that DYFS was 99% liable for its gross negligence in failing to keep our client safe.[1]

More recently, a Suffolk County jury, one of the most conservative counties in New York State, awarded $25 million to a former student who was sexually abused by his teacher. The jury found the institutional defendant 100% liable.[2]

Simply put, cases like Miguel's have resulted in enormous verdicts when allowed to proceed to trial, including those filed under the Child Victims Act. Miguel's case is no different, and the Defendants face great exposure should this case proceed to trial.

This settlement offer will expire at **5:00pm ET on December 20, 2024**, at which time it is withdrawn and will not be renewed a third time. We have copied counsel of record for the Defendants' insurer, The Continental Insurance Company, successor by merger to Commercial Insurance Company of Newark, New Jersey and Firemen's Insurance Company of Newark, New Jersey ("CNA").

We are willing to make Miguel available for a six-hour, sworn interview before this offer expires on December 20, 2024. If a defendant or an insurer believes that it needs additional information in order to evaluate this offer, please let us know immediately.

//

//

//

---

[1] https://patch.com/new-jersey/newbrunswick/woman-sues-dyfs-sexual-abuse-awarded-25-million-jury
[2] https://abc7ny.com/post/bay-shore-union-free-school-district-ordered-pay-25m-damages-sex-abuse-case-thomas-bernagozzi/15498666/



Finally, we do not believe that this offer violates any stay, particularly as this offer is within the limits and we are not aware of any aggregate limit that applies to Miguel's claim. If a defendant or an insurer believes that this offer violates any stay, please let us know immediately so we can address that position with the bankruptcy court.

Sincerely,

Jason P. Amala

cc:    Mark Plevin, Esq. (mplevin@plevinturner.com)

# EXHIBIT 10



**GREGORY J. MCDONALD**
gjmcdonald@bsk.com
P: 585.362.4718
F: 585.362.4758

December 17, 2024

**VIA ELECTRONIC AND FIRST-CLASS MAIL**

Jason P. Amala, Esq.
Pfau Cochran Vertetis Amala
701 Fifth Avenue, Suite 4300
Seattle, WA 98104

Re:     *The Diocese of Rochester*

Dear Mr. Amala:

I write on behalf of The Diocese of Rochester (the "Diocese") in response to your November 19, 2024 demand letters with regard to the sexual abuse claims of two of your clients, Miguel Labrador and Mark Gooden, filed against the Diocese's bankruptcy estate.

Your letters demand that the Diocese agree to pay $13 million to settle the abuse claims alleged by Mr. Labrador and $5.5 million to settle the abuse claims alleged by Mr. Gooden – amounts below what you believe a reasonable jury would award them at trial. Your letters state that settlement demands are "intended to give the Defendants and their insurers an opportunity to settle [the] claims within the policy limits and to avoid the risk of a verdict and judgment in excess of the limits."  Your letters continue: "We understand the Diocese is hoping that its bankruptcy filing will put claims like [Messrs. Labrador's and Gooden's claims] behind it, but that will not happen unless and until its insurers comply with their contractual obligations and pay their limits to resolve [the] claims."

Your letters further express your belief that the demands do not violate any stay, and state, "[i]f a defendant or an insurer believes that this offer violates any stay, please let us know immediately so we can address that position with the bankruptcy court."

Under 11 U.S.C. §362(a)(3) and (6), the filing of the Diocese's bankruptcy petition operates as an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case."  The automatic stay remains in effect throughout the Chapter 11 Case.  Actions taken in violation of the automatic stay are void *ab initio. See, e.g., 48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir.1987) (holding that post-petition action to terminate

lease violated the automatic stay and was therefore void); *In re Sklar*, 626 B.R. 750, 761 (Bankr. S.D.N.Y. 2021) ("In the Second Circuit, actions commenced or continued in violation of the stay are void *ab initio*."). Here, the Diocese's insurance policies are assets of its bankruptcy estate and are protected by the automatic stay. *See In re The Diocese of Buffalo, N.Y.*, 618 B.R 400, 406-07 (Bankr. W.D.N.Y. 2020) ("The Diocese is correct in suggesting a possibility that the stay of 11 U.S.C. § 362(a)(3) may apply . . . where any recovery will dissipate estate assets."); *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) ("The possession or control language of Section 362(a)(3) has consistently been interpreted to prevent acts that diminish future recoveries from a debtor's insurance policies.").

It is the position of the Diocese that your two demand letters seeking payment from the Diocese's insurance policies for pre-Petition claims violate the automatic stay of 11 U.S.C. §362(a)(3) and (6) and are void and of no effect. *See, e.g.*, *In re Enron Corp.*, 300 B.R. 201, 212-13 (Bankr. S.D.N.Y. 2003) (holding that sending demand letters to debtor violates the automatic stay); *In re MPM Silicones, LLC*, 2014 WL 4436335, *19 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part and rev'd in part on other grounds*, 874 F.3d 787 (2d Cir. 2017) (holding that automatic stay bars sending rescission notices in effort to recover a greater claim against the debtor); *In re 400 Walnut Assocs. LP*, 454 B.R. 601 (Bankr. E.D. Pa. 2011) (holding that post-petition letter sent by landlord to debtor's subtenants demanding that rents be paid to it violated automatic stay). The demands coupled with the threats of continued litigation are attempts to circumvent the bankruptcy process and the Diocese's significant efforts to resolve all sexual abuse claims through the joint Chapter 11 plan filed with the Bankruptcy Court. The demands are also at odds with Judge Warren's Order requiring continued mediation among the Diocese, CNA and the Creditors Committee with mediators Judge Shelley Chapman and Paul Finn.

This letter has responded to your request that the Diocese advise you if it believes that the demand letters violate the automatic stay. To the extent that this letter does not address certain statements and allegations, the Diocese in no way implies that it agrees with your statements and allegations. The Diocese reserves, and does not waive, its rights and remedies in this matter.

Very truly yours,

BOND, SCHOENECK & KING, PLLC

Gregory J. McDonald

Member

cc:  Lisa M. Passero, CFO (via e-mail)
     Stephen A. Donato, Esq. (via e-mail)
     Charles J. Sullivan, Esq. (via e-mail)
     Timothy P. Lyster, Esq. (via e-mail)
     Mark D. Plevin, Esq. (via e-mail)

# EXHIBIT 11

# For These Victims, Death Came Before Bankruptcy Resolution

By **Daniel Connolly** | February 7, 2025, 7:00 PM EST · Listen to article



Kevin Higley and Natalie Higley in an undated family photo. (Courtesy of Natalie Higley)

Natalie Higley said she met her future husband, Kevin, on the school bus when they were teenagers growing up in a small town near Rochester, New York, in the 1980s. She said he was only 14 when he told her that after a recent church trip to a monastery, he had been raped by a Catholic priest.

"About two weeks after that trip, he told me what had happened, because it was really bothering him. And swore me to secrecy," she said. "And being young, and not knowing what to do, I didn't tell anybody either."

"And we chose to deal with it between ourselves. When he needed to talk, he talked to me."

The teenagers would stay together for life, marrying and raising two sons. Late in life, Kevin Higley became one of hundreds of sexual abuse survivors who brought claims against the Diocese of Rochester. And after the diocese declared bankruptcy in 2019, he served on an official committee of creditors and remained dedicated to trying to protect others from sexual abuse.

"The last couple years, he viewed that as his one and only job," Natalie Higley said.

That job is unfinished. Amid a complex legal fight involving an insurer, the Rochester diocese bankruptcy case has dragged on for nearly five-and-a-half years.

No compensation has been paid out to survivors. No reorganization plan has been approved. And Kevin Higley died in 2022.

His lawyer, Anelga Doumanian of Pfau Cochran Vertetis Amala PLLC, said some of her other clients have died, too.

"I can tell you that we represented 33 survivors total in the Diocese of Rochester," she told Law360.

"And five of them have passed away. So that's roughly 15%."

I talked with a client last week who was diagnosed with leukemia, and he has been given four years to live. Maybe he sees resolution.



Anelga Doumanian
Pfau Cochran
"I talked with a client last week who was diagnosed with leukemia, and he has been given four years to live. Maybe he sees resolution."

The deaths of creditors reflect a situation that goes beyond the Rochester case. Some advocates argue that the modern bankruptcy system offers opportunities to stall tort claims for years and that, as a result, creditors are dying before finding resolution.

**From Personal Injury Plaintiff to Bankruptcy Creditor**

Some of America's biggest legal controversies — including sexual abuse cases, opioid lawsuits, product liability cases and fraud cases — are being handled in the nation's bankruptcy courts.

Thousands of ordinary people have filed lawsuits in state and federal courts seeking compensation from various companies and institutions for alleged wrongdoing, only to see the defendants declare bankruptcy, which freezes their cases.

In bankruptcy court, injured plaintiffs are reclassified as bankruptcy creditors.

Many of these people are discovering that the U.S. bankruptcy system can yield bad results for creditors, subjecting them in some cases to small payouts and yearslong waits as the process plays out. In recent years, creditors have died by the hundreds as their cases grind through the bankruptcy system, plaintiffs' attorneys say.

"These people are victimized twice," said Michael Shepard with the Boston law firm [Shepard O'Donnell PC](), who represents asbestos victims suing companies that are now in bankruptcy. "You can't help but feel the bankruptcy court is complicit."

Meanwhile, the bankruptcy system offers handsome rewards to attorneys and other professionals who are sometimes compensated at rates of $2,000 per hour or more. Shepard and other critics complain that in some asbestos cases, supposedly "bankrupt" companies are actually earning lots of money and gaming the bankruptcy system to avoid paying victims.

"It's just the victims aren't getting paid, but everyone else is, including the lawyers," Shepard said, referring to attorneys representing the bankrupt entity, the creditors committee and other professionals.

Advocates also argue that bankruptcy proceedings can hinder victims of wrongdoing from achieving other forms of justice besides money: holding institutions to account, discovering the truth of what happened, and forcing changes to protect the public.

"When corporations file Chapter 11 in the wake of [large-scale tort litigation], what they seek is twofold: to bypass procedural justice and to shut down discussion of their purported wrongdoings,"

University of Georgia School of Law professor Pamela Foohey and Texas A&M University School of Law professor Christopher K. Odinet wrote in a 2023 paper.

Law360 was unable to locate national statistics on how often bankruptcy creditors die before resolution of their claims. Representatives of the Office of the U.S. Trustee, the American Bankruptcy Institute, and the Administrative Office of the U.S. Courts said they don't track this information.

The poor outcomes for creditors are not a new problem. For more than 100 years, critics have raised concerns that the U.S. bankruptcy system rewards the professionals who work in the system, protects the interests of deep-pocketed companies and other debtors filing for bankruptcy, and harms the creditors seeking compensation.

To be sure, some bankruptcy cases do result in significant benefits to creditors.

In December 2021, for instance, USA Gymnastics announced a $380 million settlement to address sexual abuse survivors' legal claims. The settlement also led USA Gymnastics to adopt changes aimed at preventing sexual abuse.

And in the resolution of a large-scale Ponzi scheme case that had duped investors, many of them elderly, a federal judge in 2019 ordered Woodbridge Group of Companies LLC and its former owner to pay more than $1 billion to settle claims.

Defenders of the current system argue that bankruptcy may be a faster, fairer way to handle mass tort claims than the main alternative: mass tort litigation in state or federal courts.

Lindsey Simon, an associate professor at Emory University School of Law, has written extensively about mass tort cases in bankruptcy.

She said she's not aware of any studies on creditor deaths in bankruptcy cases, but she said that if timelines in bankruptcy cases are dragging out so long that creditors are dead, it shows a problem.

"If that timeline is more of a feature than a bug, then I think we've missed something ... I think at a certain point, if bankruptcy is just used to hide out and wait before you have to face judgment, that's not what the system is designed to do."

### Trauma in Youth Disrupted Life for Years

Natalie Higley said her husband was highly intelligent with an outgoing and friendly personality, but that the rape deeply affected him during their decades of marriage.

The priest that he accused of rape, the Rev. Paul Cloonan, was removed from ministry in 1988, formally left the priesthood in 2005 and died in 2015, according to a diocese spokesperson.

Kevin Higley's lawyer said the firm is representing four people who alleged abuse by Cloonan, including Higley and one other person who has died.

In a 2019 interview with Rochester NPR affiliate WXXI, Kevin Higley said the incident had stuck with him for years.

"I go through three- to five-year cycles where I have really good years and everything comes crashing down again," he told the radio station. "I've had multiple careers I've lost over anxiety, depression."

Kevin Higley bounced from a stint in the Navy to jobs such as driving a Zamboni at an ice rink, managing a gun club, teaching high school science and managing RV resorts, his wife told Law360. The couple eventually settled in Lakeland, Florida, near Tampa.

Several times, he was doing well in a job, then resigned, she said. "It was like he couldn't allow himself to be completely happy, and he would just leave."

He would wake up screaming from nightmares, he was diagnosed with post-traumatic stress

disorder, and toward the end of his life he drank heavily, she said.

Natalie Higley said their life had many good moments, too. They raised two sons together — they're adults now. Kevin Higley enjoyed cooking, boating, fishing and traveling, especially taking their boys to amusement parks across the country. She said he was happiest when he was near his wife.

"This is going to sound bad, but we used to joke that I was like his service animal," she said. "That sounds bad, but I mean, we were tied at the hip. If we were together, he was good."

After New York state passed a law in February 2019 creating a one-year window to file lawsuits over long-ago abuse allegations, Kevin Higley joined a group of survivors to file a sexual abuse lawsuit against the Diocese of Rochester and related churches and institutions. He saw the lawsuit as a means to make sure that the kind of abuse he and others suffered never happened again, Natalie Higley said.

In September 2019, about one month after the suit was filed, however, the diocese sought Chapter 11 bankruptcy protection.

While the bankruptcy filing automatically froze Kevin Higley's lawsuit, his wife said he wasn't ready to give up.

"He never did this for the money," she said. "It was never that. It was for the prevention of somebody else having to go through what he went through, and he felt very strongly about that. So when they did go into bankruptcy, he was very upset, knowing that there was going to be no resolution in this case for many years."

As the litigation dragged on, his wife said he developed liver disease, which may have been related to his drinking or a period of his life when he was very overweight. He got a liver transplant. Shortly after the transplant, in February 2022, he died of a brain aneurysm at age 48.

He was thinking about the lawsuit until the very end, Natalie Higley said.

"And the day before he actually went brain-dead, he had told me that he was very, very sorry that he couldn't see this through," she said.

"And I kept telling him, 'No, no, it's going to be fine. It's going to be fine. You'll be back up in no time.' And he just kept saying he was sorry and that he loved me."

### Additional Deaths in the Rochester Bankruptcy



a man in a white navy sailor's uniform and a woman in a white wedding dress pose together on their wedding day

*Kevin Higley and Natalie Higley on their wedding day, July 25, 1992. (Courtesy of Natalie Higley)*

Kevin Higley was one of hundreds of people who have filed sexual abuse claims in the Rochester diocese bankruptcy. At least 554 abuse claims have been filed against the diocese since it sought bankruptcy in 2019, the diocese wrote **in a January document** filed in bankruptcy court.

Another attorney working on the Rochester case, Leander L. James of James Vernon & Weeks PA, said he originally represented 49 survivors.

"So, two of the 49 clients I represent in Rochester died before receiving justice and closure," he wrote in an email. "At least 12 of my clients in Rochester, to my knowledge, are battling serious health issues."

Jeff Anderson of Jeff Anderson & Associates PA also represents clients in the Rochester diocese case and other diocese cases.

He said several Catholic dioceses have declared bankruptcy in the name of the main diocese only, a step that leaves out assets such as real estate, investment funds and other property held in the names of individual parishes, hospitals, schools and other affiliated entities, thus preventing them from being liquidated to help pay claimants.

He said this leads to time-consuming fights, and he noted that many claimants have died.

"The consequence on the survivors is just nothing short of unbearable and intolerable, and it is a real, what we call re-victimization of them," Anderson told Law360.

A spokesperson for the Diocese of Rochester, Deacon Edward A. Giblin, said the diocese has already taken many steps to prevent sexual abuse and that it isn't the one holding up resolution of the bankruptcy case.

He said the diocese and three of its insurers had reached an agreement with a creditors committee, which represents the interests of most survivors, but that one of the diocese's other insurers, CNA, rejected the deal and proposed its own Chapter 11 plan.

"It is tragic that some survivors have passed away during the pendency of this proceeding," Giblin wrote in an email to Law360.

He wrote that the estate representatives of the survivors may continue to pursue their claims, but acknowledged that the situation causes real hardship.

"The diocese continues to pray earnestly for a just resolution, especially to ease the pain and suffering of the survivors, who have endured this very painful ordeal for entirely too long," he said.

Higley's attorney, Doumanian, blames insurance companies for stalling the process, saying that they've calculated that the longer they drag this out, the more people will die, which damages the value of the claimants' underlying state court cases, meaning the insurance company has to pay less.

**A key insurance company** involved in the Rochester bankruptcy, CNA, disputes this.

"CNA categorically denies any accusations that it is pursuing a strategy based on the aging of the survivor population," Mark Plevin, an attorney with Plevin & Turner LLP who is representing the insurer, wrote in a statement. He added that the company has already made multimillion-dollar payment offers and will continue to negotiate in good faith.

### Millions for Attorneys, Zero for Claimants

Natalie Higley said she's still pursuing a bankruptcy claim on her husband's behalf.

While Kevin Higley and creditors like him have received nothing in the Rochester diocese case, attorneys representing the diocese and other entities have racked up millions of dollars in fees. In a recent **billing statement**, the diocese's law firm, Bond Schoeneck & King PLLC, listed seven paraprofessionals and 20 attorneys billing at rates ranging from $140 to $526.50 per hour.

Bond Schoeneck is one of about six law firms, plus other business professionals, that have submitted bills for representing the diocese or other entities, such as the creditors committee.

Big fees matter because they come from the same funds that could be used to compensate creditors — and, in general, professionals are paid first, before creditors.

The Rochester professionals are earning so much money that the U.S. Trustee's office, a federal watchdog for the nation's bankruptcy courts, **recently asked** the judge to step in and reduce the spending. The watchdog agency said in a November filing that lawyers had received $13.3 million, and had asked the court to approve $3.1 million more for their work in recent months.

The court ultimately approved the additional millions for the professionals — but also agreed to appoint an expert to review the legal bills. In a filing, the judge wrote that **his own cursory review of timesheets** "raises concerns about whether professionals are exercising appropriate discretion in billing the estate."

Representatives of Bond Schoeneck and other professionals didn't respond to requests for comment.

Fees in some other sexual abuse cases are much bigger, using up even more money that could go to survivors. In the third quarter of 2024 alone, for instance, professionals in the **Boy Scouts of America** bankruptcy **ran up $295 million in fees**.

### Legal Fees Eat Up Cash in California Fraud Case

Fees for attorneys have used up most of the available cash in the bankruptcy of Litigation Practice Group, a California debt relief law firm that was **run by a disbarred lawyer** before collapsing in March 2023. The firm recruited tens of thousands of consumer clients from across the country, but in many cases performed little to no meaningful legal work to help reduce their debts.

Among those clients was Alphonzo Christian Jr., who spoke with Law360 in October 2023. The Virginia resident had retired from work as a fast-food manager and was facing about $20,000 in debt when he signed up with the firm.

In the hope of fixing his debts, Christian agreed to pay the Orange County law firm $338 per month. While the payments went on for more than a year, he said the firm did nothing to improve his debt situation.

After LPG filed for bankruptcy and its operations were taken over by a court-appointed lawyer, Christian filed a $5,700 claim for a refund of the money he paid to the firm.

I just got out of the hospital for congestive heart failure. And I'm an older guy, I'm 65 years old. And it's just crazy that I turned my money over in good faith ... and they didn't do a damn thing.



Alphonzo Christian Jr.

"I just got out of the hospital for congestive heart failure," he said. "And I'm an older guy, I'm 65 years old. And it's just crazy that I turned my money over in good faith ... and they didn't do a damn thing."

Christian never got the refund — he died in December 2023, according to a published obituary.

Even if he hadn't died, he would have received nothing, at least not yet. To date, unsecured creditors in the case have received no compensation.

A total of about 2,600 individuals and companies have filed bankruptcy claims seeking payments worth more than $400 million. This number does not include an unknown number of claimants who filed claims through a separate administrative system.

Meanwhile, a judge has approved fees of about $11.1 million and expenses of about $250,000 to attorneys and other professionals working on the case, according to court records, payments that have used up **the majority of the available money**.

Representatives of the trustee working on the case, Richard Marshack, have said they are recovering more money for the bankruptcy estate through litigation against the disbarred lawyer and other companies and individuals they accuse of taking money that rightfully belongs to the bankruptcy

estate.

"The trustee is working diligently to ensure that in the due course of the bankruptcy administration there will be a distribution to unsecured creditors," Yosina M. Lissebeck, an attorney with Dinsmore & Shohl LLP who works with the trustee, wrote in an email to Law360.

"If a creditor dies during the course of the bankruptcy, and they have a claim in the case, their estate will receive those funds."

**"The Crime of All This"**

In some cases, the possibility of creditors dying is more inherent.

In asbestos-related bankruptcies, for example, almost all creditors are doomed to die as a result of their exposure to the material, a known carcinogen used for decades in building materials and as insulation.

But plaintiffs' lawyers say asbestos companies are skillfully using the bankruptcy system to ensure cancer patients and their families get nothing.

Their outrage focuses on a legal maneuver dubbed the "Texas two-step." In short, a company that's facing lots of lawsuits splits itself in two.

One company — some call it "GoodCo" — holds onto the company's good assets and keeps running as normal. The other — some call it "BadCo" — keeps bad assets, such as legal liabilities, and declares bankruptcy.

---

### What Is the Texas Two-Step?

This modern, controversial legal innovation hinges on Texas' law allowing companies to split themselves in two with a divisive merger that separates assets and liabilities into two entities. The parent company, "GoodCo," can continue operating unencumbered by the massive exposures created by, for example, a mass tort case. The new, liability-holding company, "BadCo," is left holding that burden and gets immediately pushed into the bankruptcy system, freezing lawsuits against it.

|     Company A     |
| --- |

| Assets | | Liabilities |
| --- | --- | --- |
| GoodCo | | BadCo |
| Continued operations | | Bankruptcy |

---

One high-profile company to carry out the maneuver is Georgia-Pacific, which formerly manufactured asbestos-containing products.

In 2017, it spun off a "BadCo" called Bestwall, which **declared bankruptcy in North Carolina**.

Creditors quickly cried foul, saying Georgia-Pacific was a "multibillion-dollar corporate enterprise" that had carried out **a "sham" bankruptcy**.

According to a 2020 filing by the creditors committee, there were 64,000 asbestos-related claims pending against Georgia-Pacific at the time Bestwall was spun off and declared bankruptcy.

In the years since, asbestos creditors have repeatedly begged the bankruptcy court to dismiss the Bestwall bankruptcy as fraudulent, but they've lost each time.

In the more than seven years that the Bestwall bankruptcy has been pending, asbestos creditors have received zero — and they continue to die.

The story of the Bestwall creditors committee reflects this grim reality.

In November 2017, the judge overseeing Bestwall's bankruptcy **appointed a 10-member committee** to represent the interests of asbestos claimants.

Some members of the committee represented people who were already dead. Other members were terminally ill.

About two weeks after the committee's appointment, **Cresante Perreras** became the first of its members to die of asbestos-related cancer. He was 55, according to court records.

Over the ensuing years, committee members kept dying: **Stephen F. Lanphear**, **Jeffrey A. Watts**, **Richard S. Trumbull** and **Linda Hofferber** all passed away from asbestos-related causes, according to court records.

The last committee member's death recorded in court records came in 2022 when **the Rev. John Harvey Dixon** died of mesothelioma. He had been a church pastor and chaplain for numerous fire departments in Maryland and Virginia, according to his obituary.

Not only have all the living committee members died, one estate representative on the committee has died, too, said plaintiffs' attorney Shepard of Shepard O'Donnell.

That estate representative was Rick Bengston of Massachusetts, who died in 2021. His brother, Gary Bengston, had died of asbestos-related cancer in 2017.

"And that's the crime of all this," Shepard said.

One of the underlying issues, he said, is that Georgia-Pacific isn't really bankrupt.

They have the ability to pay every victim 100% of what they owe them, forever. This isn't an issue of them not having enough money. It's just an issue of them wanting a better deal, and they're using the bankruptcy court as the better deal court for them.



Michael Shepard
Shepard O'Donnell

"They have the ability to pay every victim 100% of what they owe them, forever. This isn't an issue of them not having enough money. It's just an issue of them wanting a better deal, and they're using the bankruptcy court as the better deal court for them."

Shepard said he's had somewhere around 40 mesothelioma victims with potential claims against Bestwall come into his office, talk with him about their cases, and die during the pendency of the Bestwall bankruptcy.

"And you know, that's my small firm in Boston. You multiply that times all the other firms around the country."

In an August appeals court brief, the asbestos creditors committee attempted to add up the deaths. Their conclusion: during the Bestwall bankruptcy, the number of current claimants or potential claimants who had died was **"more than 25,000."**

A spokesperson for Georgia-Pacific declined to comment.

Nor is Bestwall the only asbestos company to perform a Texas two-step — Shepard said he's also representing claimants who are seeking compensation in three other Texas two-step asbestos bankruptcies.

And in each of those three other cases, just like in Bestwall, every living member of the creditors committee has died, Shepard said.

The Bestwall case has attracted bipartisan criticism in Congress from diverse ideological figures including Sens. Josh Hawley, R-Mo., and Elizabeth Warren, D-Mass.

A bill to ban the Texas two-step **was reintroduced** in the Senate in December, but it did not advance before the new congressional session began last month. The prospects for the legislation in the current Congress are unclear.

### What's Worse For Creditors: Bankruptcy Or Other Mass Tort Litigation?

Despite stories of creditor deaths, some argue that the bankruptcy system is better than handling mass torts through state or federal courts.

One such defender is Ted Gavin, a former president of the American Bankruptcy Institute and managing director of Gavin/Solmonese LLC, which provides nonlegal restructuring advice to distressed companies and sometimes represents creditors.

"So if what you're looking to do is put money in the hands of people who hold claims because of some wrong that occurred, the bankruptcy system can do that much faster and much more efficiently than the mass tort system," Gavin said.

He said that's because the mass tort system is designed to decide guilt or innocence, then decide damages. In bankruptcy, by contrast, the focus is on evaluating how much money the debtor has, then decide who gets what.

Foohey, the University of Georgia School of Law professor, said she's unaware of any data either about the deaths of creditors in bankruptcy cases, or the relative speed of making payouts to victims in bankruptcy versus the mass tort court system.

"There is no way, in my opinion, to assert either that the bankruptcy system pays victims more quickly or less quickly," she said.

That said, she's critical of using the bankruptcy system to adjudicate sexual abuse and other claims. The first line of the paper she wrote with Texas A&M's Odinet reads: "Bankruptcy is being used as a tool for silencing survivors and their families."

The authors argued that institutions use bankruptcy to help cover up wrongdoing that would otherwise be exposed in civil court through the discovery process.

"Silencing people and sweeping the alleged harms under the proverbial rug become a byproduct of reassurances about making sure that victims are treated well," they wrote. "But it is the corporation and its leaders that benefit, not the people who they hurt."

### Heart-Shaped Urns

Another onetime defender of the bankruptcy system is Ed Neiger, a creditors rights attorney with the law firm ASK LLP.

In September 2021, he published an article in the New York Law Journal arguing that Johnson & Johnson should be allowed to use the bankruptcy system to resolve claims that allegedly asbestos-tainted talcum powder had caused cancer.

"In all likelihood, victims will recover almost as much, if not as much, as they would in a nonbankruptcy context, but the recovery will be quicker and easier," Neiger wrote at the time. "And, after all, isn't that most beneficial to the victims?"

That same year, J&J **tried to carry out** a Texas two-step bankruptcy.

But courts twice rejected the maneuver after finding the company wasn't actually financially distressed.

J&J launched its third Texas two-step bankruptcy attempt in September, **drawing objections** from a federal bankruptcy watchdog and other parties.

Meanwhile, Neiger has shifted his point of view.

He said he no longer thinks that bankruptcy court is necessarily better than a mass tort litigation program. Instead, he said that what really matters are the decisions the major players make during the case.

For instance, he's representing individuals who have been impacted by opioid addiction as they pursue claims in opioid manufacturer Purdue Pharma LP's bankruptcy case. A 2019 settlement that would have delivered billions to opioid victims and to states has been tied up in litigation for years after the federal government intervened to dispute a provision that would have shielded Purdue's owners, the Sackler family, from being sued individually.

The U.S. Supreme Court ultimately agreed last year that the deal should be invalidated, sending the parties back to the negotiating table.

At an October hearing, Chris Shore, an attorney representing about 60,000 claimants against Purdue Pharma, said that in the five years since Purdue filed for bankruptcy, **at least 700 members** of the ad hoc victims' group had died.

As the case has dragged on, Neiger said that victims have continued to suffer.

He mentioned clients like Cheryl Juaire, a mother in Massachusetts who has spoken publicly about how she lost one son, Corey Merrill, to an opioid overdose in 2011, then another son, Sean Merrill, to an overdose in 2021.

And then he just said, "Daddy, you are my favorite person. My favorite person in the world," and he just broke down. And you know, I'll never forget that day.



Ed Neiger
ASK LLP

Neiger said he attended the funeral for the second son, an adult who, at the time he died, had a 10-year-old son of his own. During the service, he said the boy had stood up in front of the mourners to read a eulogy he'd written about his father.

"And then he just said, 'Daddy, you are my favorite person. My favorite person in the world,' and he just broke down. And you know, I'll never forget that day."

He said another client had likewise already lost one child to opioid addiction when she came to him, and subsequently lost another.

As Neiger sees it, an efficient settlement process might have prevented deaths like this, because not only would it have provided funds to states to fight opioid abuse, it would have given families money that they could have used to pay for rehab.

He described a photo the second client had sent him of a memorial in her house.

"They're heart-shaped urns right next to each other," he said. "And in one heart-shaped urn, she has the ashes of one child, and in another heart-shaped urn, she has the ashes of another child."

--Additional reporting by Hilary Russ, Vince Sullivan, Rick Archer, Yun Park, Ryan Boysen, Clara Geoghegan and Alex Wittenberg. Editing by Orlando Lorenzo. Graphics by Jason Mallory.

*Have a story idea for Access to Justice? Reach us at* accesstojustice@law360.com.

**Hello! I'm Law360's automated support bot.**

How can I help you today?

For example, you can type:
I forgot my password
I took a free trial but didn't get a verification email
How do I sign up for a newsletter?

Ask a question!

Ask a question!

© 2025, Portfolio Media, Inc. | About | Contact Us | Advertise with Law360 | Careers at Law360 | Terms | Privacy Policy | Cookie Settings | Processing Notice | Ad Choices | Help | Site Map | Resource Library | Law360 Company | Testimonials

Already have access? **Click here to login**

# Get instant access to the one-stop news source for business lawyers

Register Now!

## Sign up now for free access to this content

Email (NOTE: Free email domains not supported)

First Name

Last Name

Job Title

Password (at least 8 characters required)

Confirm Password

Select at least one primary interest:

| | | |
|---|---|---|
| ☐ Access To Justice | ☐ Aerospace & Defense | ☐ Appellate |
| ☐ Banking | ☐ Bankruptcy | ☐ Benefits |
| ☐ California | ☐ Cannabis | ☐ Capital Markets |
| ☐ Class Action | ☐ Colorado | ☐ Commercial Contracts |
| ☐ Competition | ☐ Compliance | ☐ Connecticut |
| ☐ Consumer Protection | ☐ Corporate | ☐ Cybersecurity & Privacy |
| ☐ Delaware | ☐ Employment | ☐ Energy |
| ☐ Environmental | ☐ Fintech | ☐ Florida |
| ☐ Food & Beverage | ☐ Georgia | ☐ Government Contracts |
| ☐ Health | ☐ Illinois | ☐ Immigration |
| ☐ Insurance | ☐ Intellectual Property | ☐ International Arbitration |
| ☐ International Trade | ☐ Legal Ethics | ☐ Life Sciences |
| ☐ Massachusetts | ☐ Media & Entertainment | ☐ Mergers & Acquisitions |
| ☐ Michigan | ☐ Native American | ☐ New Jersey |
| ☐ New York | ☐ North Carolina | ☐ Ohio |
| ☐ Pennsylvania | ☐ Personal Injury & Medical Malpractice | ☐ Private Equity |
| ☐ Product Liability | ☐ Public Policy | ☐ Securities |
| ☐ Sports & Betting | ☐ Technology | ☐ Telecommunications |
| ☐ Texas | ☐ Transportation | ☐ Trials |
| ☐ Washington | ☐ White Collar | |

Law360 may contact you in your professional capacity with information about our other products, services and issues that we believe may be of interest.

You'll be able to update your communication preferences via the unsubscribe link provided within our communications.

We take your privacy seriously. Please see our Privacy Policy.

Register

Sign up for our Access to Justice newsletter

**You must correct or enter the following before you can sign up:**

Please provide a professional email: chris@pcvalaw.com

Select more newsletters to receive for free.

Law360 takes your privacy seriously. Please see our Privacy Policy.
No Thanks  Sign up now
**Thank You!**

**EXHIBIT 12**

NEW YORK STATE SUPREME COURT
WAYNE COUNTY

MARK GOODEN,

                              Plaintiff,

-against-

ST. MICHAEL CHURCH AND SCHOOL and SISTERS
OF MERCY OF THE AMERICAS NEW YORK,
PENNSYLVANIA, PACIFIC WEST COMMUNITY,

                              Defendants.

Index No.:

**COMPLAINT**

**Child Victims Act Proceeding
22 NYCRR 202.72**

Plaintiff Mark Gooden, by and through his attorneys, the Marsh Law Firm PLLC and Pfau

Cochran Vertetis Amala PLLC, respectfully alleges for his complaint the following:

## I.     INTRODUCTION

1.     For decades, the defendants knew or should have known that priests, clergy,

religious brothers, religious sisters, teachers, school administrators, employees, volunteers, and

others were using their positions within the Catholic Church to groom and to sexually abuse

children. Despite that knowledge, the defendants failed to take reasonable steps to protect children

from being sexually abused and actively concealed the abuse. Based on their wrongful conduct, a

reasonable person could and would conclude that they knowingly and recklessly disregarded the

abuse of children and chose to protect their reputation and wealth over those who deserved

protection. The result is not surprising: for decades hundreds, if not thousands, of children were

sexually abused by Catholic clergy and others who served the Catholic Church, including the

defendants. The plaintiff in this lawsuit is one of those children who was sexually abused because

of the defendants' wrongful conduct.

## II.     PROCEEDING IN ACCORDANCE WITH CPLR 214-G AND 22 NYCRR 202.72

2.     This complaint is filed pursuant to the Child Victims Act (CVA) 2019 Sess. Law News of N.Y. Ch. 11 (S. 2440), CPLR 214-G, and 22 NVCRR 202.72. The CVA opened a historic one-year one-time window for victims and survivors of childhood sexual abuse in the State of New York to pursue lapsed claims. Prior to the passage of the CVA, plaintiff's claims were time-barred the day plaintiff turned 22 years old. The enactment of the CVA allows plaintiff, for the first time in plaintiff's life, to pursue restorative justice in New York State.

### III.     PARTIES

3.     Plaintiff Mark Gooden is an adult male who currently resides in Palmyra, New York.

4.     While he was a minor, plaintiff Mark Gooden was a victim of one or more criminal sex acts in the State of New York, including sexual acts that would constitute a sexual offense as defined by the Child Victims Act.

5.     At all relevant times defendant St. Michael Church and School ("St. Michael's") was a not-for-profit religious corporation organized under New York law.

6.     St. Michael's is currently a not-for-profit religious corporation organized under New York law with its principal office in Newark, New York.

7.     At all relevant times St. Michael's conducted business as "St. Michael Church and School," "St. Michael Parish and School," "St. Michael Church," "St. Michael Parish," "St. Michael School," "Church of St. Michael," "Parish of St. Michael," "School of St. Michael," "St. Michael Catholic Church and School," "St. Michael Catholic Parish and School," "St. Michael Catholic Church," "St. Michael Catholic Parish," "St. Michael Catholic School," "Catholic Church of St. Michael," "Catholic Parish of St. Michael," "Catholic School of St. Michael," "St. Michael Roman Catholic Church and School," "St. Michael Roman Catholic Parish and School," "St.

2

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,   Description: Exhibit Exhibits 1-17, Page 71 of 143

4 of 18

Michael Roman Catholic Church," "St. Michael Roman Catholic Parish," "St. Michael Roman Catholic School," "Roman Church of St. Michael," "Roman Catholic Parish of St. Michael," "Roman Catholic School of St. Michael," "St. Michael's," or "St. Michael."

8.      At all relevant times St. Michael's was a parish with a church and school located in Newark, New York.

9.      To the extent St. Michael's closed or was merged with another entity, such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit. Any and all such entities, past and present, are collectively referred to herein as "St. Michael's."

10.     Father Eugene Emo ("Father Emo") was a priest of St. Michael's who served Catholic families on behalf of St. Michael's, including plaintiff Mark Gooden and his family.

11.     During the time Father Eugene Emo served at St. Michael's, he used his position as a priest of St. Michael's to groom and to sexually abuse plaintiff Mark Gooden.

12.     To the extent that St. Michael's was a different entity, corporation, or organization during the period of time during which Father Emo used his position as a priest to sexually abuse Mark, such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as St. Michael Church and School.

13.     To the extent St. Michael's is a successor to a different entity, corporation, or organization which existed during the period of time during which Father Emo used his position as a priest to sexually abuse Mark, such predecessor entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as St. Michael Church and School.

14.     All such St. Michael's-related entities, corporations, or organizations are collectively referred to herein as "St. Michael's."

15.     At all relevant times defendant Sisters of Mercy of the Americas New York, Pennsylvania, Pacific West Community ("Sisters of Mercy") was a not-for-profit religious corporation organized under New York law with its principal office in Buffalo, New York.

16.     At all relevant times the Sisters of Mercy conducted business as "Sisters of Mercy of the Americas New York, Pennsylvania, Pacific West Community" "Sisters of Mercy NyPPaW," "Sisters of Mercy of the Americas," and the "Sisters of Mercy."

17.     The Sisters of Mercy is a Catholic religious order whose members, employees, and/or agents served various Catholic institutions and families, including St. Michael's, plaintiff Mark Gooden, and his family.

18.     The members, employees, and/or agents of the Sisters of Mercy were generally referred to as sisters and the Sisters of Mercy would receive compensation for the services that its agents provided to others, including the services they provided to St. Michael's.

19.     Father Eugene Emo was an agent of the Sisters of Mercy who served Catholic families on behalf of the Sisters of Mercy, including plaintiff Mark Gooden and his family.

20.     During the time Father Eugene Emo served the Sisters of Mercy, he used his position as an agent of the Sisters of Mercy to groom and to sexually abuse plaintiff Mark Gooden.

21.     To the extent that the Sisters of Mercy was a different entity, corporation, or organization during the period of time during which Father Emo used his position at St. Michael's to sexually abuse Mark, such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as Sisters of Mercy of the Americas New York, Pennsylvania, Pacific West Community.

22.     To the extent the Sisters of Mercy is a successor to a different entity, corporation, or organization that existed during the period of time when Father Emo used his position at St.

Michael's to sexually abuse Mark, such predecessor entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as Sisters of Mercy of the Americas New York, Pennsylvania, Pacific West Community.

23. All such Sisters of Mercy-related entities, corporations, or organizations are collectively referred to herein as the "Sisters of Mercy."

## IV. VENUE

24. Venue is proper because St. Michael's is a domestic corporation authorized to transact business in New York with its principal office located in Newark, New York.

25. Venue is proper because Wayne is the county in which a substantial part of the events or omissions giving rise to plaintiff's claims occurred.

26. Venue is proper because plaintiff Mark Gooden currently resides in Palmyra, New York.

27. The amount of damages sought exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## V. STATEMENT OF FACTS

28. At all relevant times St. Michael's owned a parish, church, and school in Newark, New York.

29. At all relevant times St. Michael's held itself out to the public as the owner of St. Michael's.

30. At all relevant times St. Michael's employed and/or utilized individuals who served Catholic families, including plaintiff Mark Gooden and his family.

31. At all relevant times St. Michael's, through its agents, servants, and employees, managed, maintained, operated, and controlled St. Michael's, and held out to the public its agents, servants and employees as those who managed, maintained, operated, and controlled St. Michael's.

5

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50, Description: Exhibit Exhibits 1-17, Page 74 of 143

7 of 18

32.     At all relevant times St. Michael's was responsible for and did the staffing and hiring at St. Michael's.

33.     At all relevant times St. Michael's was responsible for and did the recruitment and staffing of the employees, agents, and volunteers at St. Michael's.

34.     At all relevant times St. Michael's materially benefited from the operation of St. Michael's, including the services of Father Emo and the services of those who managed and supervised Father Emo.

35.     At all relevant times Father Emo was an employee, agent, and/or priest of St. Michael's.

36.     At all relevant times Father Emo was on the staff of, was an agent of, and/or served as an employee of St. Michael's.

37.     At all relevant times Father Emo was acting in the course and scope of his employment and/or agency with St. Michael's.

38.     At all relevant times the Sisters of Mercy provided St. Michael's with some of its agents to provide services at St. Michael's.

39.     At all relevant times the Sisters of Mercy held itself out to the public as the owner and/or operator of St. Michael's.

40.     At all relevant times agents of the Sisters of Mercy provided services to Catholic families, including plaintiff Mark Gooden and his family.

41.     At all relevant times the Sisters of Mercy, through its agents, managed, maintained, operated, and controlled St. Michael's, and held out to the public its agents as those who managed, maintained, operated, and controlled St. Michael's.

42.     At all relevant times the Sisters of Mercy was responsible for and did the staffing and hiring at St. Michael's.

43.     At all relevant times the Sisters of Mercy was responsible for and did the recruitment and staffing of volunteers at St. Michael's.

44.     At all relevant times the Sisters of Mercy materially benefited from the operation of St. Michael's, including the services of Father Emo and the services of those who managed and supervised Father Emo.

45.     At all relevant times Father Emo was an agent of the Sisters of Mercy at St. Michael's.

46.     At all relevant times Father Emo acted as an agent of the Sisters of Mercy.

47.     At all relevant times Father Emo was acting in the course and scope of his agency with the Sisters of Mercy.

48.     At all relevant times Father Emo was an agent of the Sisters of Mercy that it assigned to St. Michael's and/or that it allowed to serve at St. Michael's.

49.     The agents of the Sisters of Mercy who provided services to St. Michael's, including Father Eugene Emo and those who managed and supervised him, were subject to the authority and control of the Sisters of Mercy and St. Michael's.

50.     St. Michael's derived benefits from the agents of the Sisters of Mercy who provided services to St. Michael's, including Father Eugene Emo and those who managed and supervised him.

51.     At all relevant times Father Emo had an office on the premises of St. Michael's.

52.     When plaintiff Mark Gooden was a minor, he and his parents were members of St. Michael's, incluidng when Mark was a parishioner, altar boy, and student of the defendants.

53. St. Michael's and the Sisters of Mercy, through their agents, servants, and employees, held Father Emo out to the public, to Mark, and to his parents, as their agent and/or employee.

54. St. Michael's and the Sisters of Mercy, through their agents, servants, and employees, held Father Emo out to the public, to Mark, and to his parents, as having been vetted, screened, and approved by those defendants.

55. Mark and his parents reasonably relied upon the acts and representations of St. Michael's and the Sisters of Mercy, through their agents, servants, and employees, and reasonably believed that Father Emo was an agent and/or employee of those defendants who was vetted, screened, and approved by those defendants.

56. Mark and his parents trusted Father Emo because St. Michael's and the Sisters of Mercy held him out as someone who was safe and could be trusted with the supervision, care, custody, and control of Mark.

57. Mark and his parents believed that St. Michael's and the Sisters of Mercy would exercise such care as would a parent of ordinary prudence in comparable circumstances when those defendants assumed supervision, care, custody, and control of Mark.

58. When Mark was a minor, Father Emo used his position with the defendants to sexually abuse him.

59. Mark was sexually abused by Father Emo when he was approximately 12 to 13 years old.

60. The sexual abuse occurred numerous times and included, but was not limited to, Father Emo fondling Mark's genitals, Father Emo pressing his genitals on Mark's face, Father Emo putting Mark in handcuffs, and Father Emo performing oral sex on Mark.

61.     Based on the representations of St. Michael's and the Sisters of Mercy that Father Emo was safe and trustworthy, Mark and his parents allowed Mark to be under the supervision of, and in the care, custody, and control of, St. Michael's and the Sisters of Mercy, including during the times when Mark was sexually abused by Father Emo.

62.     Based on the representations of St. Michael's and the Sisters of Mercy that Father Emo was safe and trustworthy, Mark and his parents allowed Mark to be under the supervision of, and in the care, custody, and control of, Father Emo, including during the times when Mark was sexually abused by Father Emo.

63.     Neither Mark nor his parents would have allowed him to be under the supervision of, or in the care, custody, or control of, St. Michael's, Sisters of Mercy, or Father Emo if St. Michael's or the Sisters of Mercy had disclosed to Mark or his parents that Father Emo was not safe and was not trustworthy, and that he in fact posed a danger to Mark in that Father Emo was likely to sexually abuse Mark.

64.     No parent of ordinary prudence in comparable circumstances would have allowed Mark to be under the supervision of, or in the care, custody, or control of, St. Michael's, the Sisters of Mercy, or Father Emo if St. Michael's or the Sisters of Mercy had disclosed to Mark or his parents that Father Emo was not safe and was not trustworthy, and that he in fact posed a danger to Mark in that Father Emo was likely to sexually abuse him.

65.     From approximately 1973 through approximately 1974, Father Emo exploited the trust and authority vested in him by the defendants by grooming Mark to gain his trust and to obtain control over him as part of Father Emo's plan to sexually molest and abuse Mark and other children.

66. Father Emo used his position of trust and authority as an employee and/or agent of St. Michael's and of the Sisters of Mercy to groom Mark and to sexually abuse him multiple times, including when Mark was under the supervision of, and in the care, custody, or control of, St. Michael's, the Sisters of Mercy, and Father Emo.

67. The sexual abuse of Mark by Father Emo occurred at certain locations, including at Father Emo's cabin in Cohocton, New York, which Father Emo was able to gain access to Mark by virtue of his position as a priest of the defendants.

68. Father Emo's sexual abuse of Mark occurred during activities that were sponsored by, or were a direct result of activities sponsored by, St. Michael's and the Sisters of Mercy, including during weekend outings when Father Emo would give Mark spiritual counseling. During such activities the defendants had care, custody, or control of Mark.

69. At all relevant times the defendants, through their agents, servants, and employees, knew or should have known that Father Emo was a known sexual abuser of children.

70. At all relevant times it was reasonably foreseeable to the defendants, through their agents, servants, and employees, that Father Emo's sexual abuse of children would likely result in injury to others, including the sexual abuse of Mark and other children by Father Emo.

71. At certain times between 1973 and 1974, the defendants, through their agents, servants, and employees, knew or should have known that Father Emo was sexually abusing Mark and other children at St. Michael's and elsewhere.

72. The defendants, through their agents, servants, and employees, knew or should have known that the sexual abuse by Father Emo of Mark was ongoing.

73. The defendants, through their agents, servants, and employees, knew or should have known before and during Father Emo's sexual abuse of Mark that priests, clergy, religious

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50, Description: Exhibit Exhibits 1-17, Page 79 of 143

12 of 18

brothers, religious sisters, teachers, school administrators, employees, volunteers, and/or other persons serving the Catholic Church, including individuals who served St. Michael's and/or the Sisters of Mercy, had used their positions with those defendants to groom and to sexually abuse children.

74.     The defendants, through their agents, servants, and employees, knew or should have known before and during Father Emo's sexual abuse of Mark that such priests, clergy, religious brothers, religious sisters, teachers, school administrators, employees, volunteers, and/or other persons could not be "cured" through treatment or counseling.

75.     The defendants, through their agents, servants, and employees, concealed the sexual abuse of children by Father Emo in order to conceal their own bad acts in failing to protect children from him, to protect their reputation, and to prevent victims of such sexual abuse by him from coming forward during the extremely limited statute of limitations prior to the enactment of the CVA, despite knowing that Father Emo would continue to molest children.

76.     The defendants, through their agents, servants, and employees, consciously and recklessly disregarded their knowledge that Father Emo would use his position with the defendants to sexually abuse children, including Mark.

77.     The defendants, through their agents, servants, and employees, disregarded their knowledge that Father Emo would use his position with them to sexually abuse children, including Mark.

78.     The defendants, through their agents, servants, and employees, acted in concert with each other or with Father Emo to conceal the danger that Father Emo posed to children, including Mark, so that Father Emo could continue serving them despite their knowledge of that danger.

79. The defendants, through their agents, servants, and employees, knew that their negligent, reckless, and outrageous conduct would inflict severe emotional and psychological distress, as well as personal physical injury, on others, including Mark, and he did in fact suffer severe emotional and psychological distress and personal physical injury as a result of their wrongful conduct.

80. The defendants, through their agents, servants, and employees, concealed the sexual abuse of children by priests and others in order to conceal their own bad acts in failing to protect children from being abused, to protect their reputation, and to prevent victims of such sexual abuse from coming forward during the extremely limited statute of limitations prior to the enactment of the CVA, despite knowing that those priests and other persons would continue to molest children.

81. By reason of the wrongful acts of each of the defendants as detailed herein, Mark sustained physical and psychological injuries, including but not limited to, severe emotional and psychological distress, humiliation, fright, dissociation, anger, depression, anxiety, family turmoil and loss of faith, a severe shock to his nervous system, physical pain and mental anguish, and emotional and psychological damage, and, upon information and belief, some or all of these injuries are of a permanent and lasting nature, and Mark has and/or will become obligated to expend sums of money for treatment.

## VI.    CAUSES OF ACTION

### A.    FIRST CAUSE OF ACTION – NEGLIGENCE

82. Plaintiff Mark Gooden repeats and re-alleges all of his allegations above and below.

83. Each defendant had a duty to take reasonable steps to protect plaintiff Mark Gooden, a child, from foreseeable harm when he was under their supervision and in their care, custody, and control, including when Father Emo sexually abused him.

84.     Each defendant also had a duty to take reasonable steps to prevent Father Emo from using the tasks, premises, and instrumentalities of his position with them to target, groom, and sexually abuse children, including Mark.

85.     These circumstances created a special relationship between each defendant and Mark that imposed on each of them a duty to exercise the degree of care of a parent of ordinary prudence in comparable circumstances.

86.     Each defendant breached the foregoing duties by failing to exercise reasonable care to prevent Father Emo from using his position with the defendants to sexually abuse Mark when he was in their care, custody, or control.

87.     In breaching their duties, including hiring, retaining, and failing to supervise Father Emo, giving him access to children, entrusting their tasks, premises, and instrumentalities to him, failing to train their personnel in the signs of sexual predation and to protect children from sexual abuse and other harm, failing to warn Mark, his parents, and other parents of the danger of sexual abuse, and failing to create a safe and secure environment for Mark and other children who were under their supervision and in their care, custody, and control, each defendant created a risk that Mark would be sexually abused by Father Emo.  Each defendant through its actions and inactions created an environment that placed Mark in danger of unreasonable risks of harm under the circumstances.

88.     In breaching their duties, including hiring, retaining, and failing to supervise Father Emo, giving him access to children, entrusting their tasks, premises, and instrumentalities to him, failing to train their personnel in the signs of sexual predation and to protect children from sexual abuse and other harm, failing to warn Mark, his parents, and other parents of the danger of sexual abuse, and failing to create a safe and secure environment for Mark and other children who were

13

under their supervision and in their care, custody, and control, each defendant acted willfully and with conscious disregard for the need to protect Mark. Each defendant through their actions and inactions created an environment that placed Mark in danger of unreasonable risks of harm under the circumstances.

89.     It was reasonably foreseeable that each defendant's breach of these duties of care would result in the sexual abuse of Mark.

90.     As a direct and proximate result of the acts and omissions of each defendant, Father Emo groomed and sexually abused Mark, which has caused Mark to suffer general and special damages as more fully described herein.

## B.     SECOND CAUSE OF ACTION – OUTRAGE AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

91.     Plaintiff Mark Gooden repeats and re-alleges all of his allegations above and below.

92.     Each defendant engaged in reckless, extreme, and outrageous conduct by providing Father Emo with access to children, including plaintiff Mark Gooden, despite knowing that he would likely use his position to groom and to sexually abuse them, including Mark. Their misconduct was so shocking and outrageous that it exceeds the reasonable bounds of decency as measured by what the average member of the community would tolerate and demonstrates an utter disregard by them of the consequences that would follow.

93.     As a result of this reckless, extreme, and outrageous conduct, Father Emo gained access to Mark and sexually abused him.

94.     Each defendant knew that this reckless, extreme, and outrageous conduct would inflict severe emotional and psychological distress, including personal physical injury, on others, and Mark did in fact suffer severe emotional and psychological distress and personal physical

injury as a result, including severe mental anguish, humiliation and emotional and physical distress.

## VII.    CPLR 1603 – NO APPORTIONMENT OF LIABILITY

95.    Pursuant to CPLR 1603, the foregoing causes of action are exempt from the operation of CPLR 1601 by reason of one or more of the exemptions provided in CPLR 1602, including but not limited to, CPLR 1602(2), CPLR 1602(5), 1602(7) and 1602(11), thus precluding defendants from limiting their liability by apportioning some portion of liability to any joint tortfeasor.

## VIII.    PRAYER FOR RELIEF

96.    Plaintiff Mark Gooden demands judgment against the defendants named in his causes of action, together with compensatory and punitive damages to be determined at trial, and the interest, cost and disbursements pursuant to his causes of action, and such other and further relief as the Court deems just and proper.

97.    Plaintiff specifically reserves the right to pursue additional causes of action, other than those outlined above, that are supported by the facts pleaded or that may be supported by other facts learned in discovery.

Dated:  May 27, 2020

Case 2-19-20905-PRW,    Doc 2952-1,    Filed 02/18/25,    Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 84 of 143
17 of 18

**MARSH LAW FIRM PLLC**

By _____

James R. Marsh
Jennifer Freeman
Robert Lewis
jamesmarsh@marsh.law
jenniferfreeman@marsh.law
robertlewis@marsh.law
31 Hudson Yards, 11th Floor
New York, NY 10001-2170
Phone: 212-372-3030

**PFAU COCHRAN VERTETIS AMALA PLLC**

By _____

Vincent T. Nappo
vnappo@pcvalaw.com
Anelga Doumanian
adoumanian@pcvalaw.com
31 Hudson Yards, 11th Floor
New York, NY 10001-2170

**Attorneys for Plaintiff**

# EXHIBIT 13

NEW YORK STATE SUPREME COURT
MONROE COUNTY

MIGUEL LABRADOR,

Plaintiff,

-against-

ST. MICHAEL'S CHURCH (D/B/A ST. FRANCES
XAVIER CABRINI PARISH), AND ST. STANISLAUS
BISHOP AND MARTYR PARISH (D/B/A SS. ISIDORE
and MARIA TORRIBIA PARISH),

Defendants.

Index No.:

**COMPLAINT**

**Child Victims Act Proceeding
22 NYCRR 202.72**

Plaintiff Miguel Labrador, by and through his attorneys, the Marsh Law Firm PLLC and

Pfau Cochran Vertetis Amala PLLC, respectfully alleges for his complaint the following:

## I.     INTRODUCTION

1.      For decades, the defendants knew or should have known that priests, clergy,

religious brothers, religious sisters, teachers, school administrators, employees, volunteers, and

others were using their positions within the Catholic Church to groom and to sexually abuse

children. Despite that knowledge, the defendants failed to take reasonable steps to protect children

from being sexually abused and actively concealed the abuse. Based on the defendants' wrongful

conduct, a reasonable person could and would conclude that they knowingly and recklessly

disregarded the abuse of children and chose to protect their reputations and wealth over those who

deserved protection. The result is not surprising: for decades hundreds, if not thousands, of children

were sexually abused by Catholic clergy and others who served the Catholic Church, including the

defendants. The plaintiff in this lawsuit is one of those children who was sexually abused because

of the defendants' wrongful conduct.

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 87 of 143

4 of 21

## II.     PROCEEDING IN ACCORDANCE WITH CPLR 214-G AND 22 NYCRR 202.72

2.      This complaint is filed pursuant to the Child Victims Act (CVA) 2019 Sess. Law News of N.Y. Ch. 11 (S. 2440), CPLR 214-G, and 22 NVCRR 202.72. The CVA opened a historic one-year one-time window for victims and survivors of childhood sexual abuse in the State of New York to pursue lapsed claims. Prior to the passage of the CVA, plaintiff's claims were time-barred the day plaintiff turned 22 years old. The enactment of the CVA allows plaintiff, for the first time in plaintiff's life, to pursue restorative justice in New York State.

### III.     PARTIES

3.      Plaintiff Miguel Labrador is an adult male who currently resides in Seguin, Texas.

4.      While he was a minor, plaintiff Miguel Labrador was a victim of one or more criminal sex acts in the State of New York, including sexual acts that would constitute a sexual offense as defined by the Child Victims Act.

5.      At all relevant times defendant St. Michael's Church (d/b/a St. Frances Xavier Cabrini Parish) ("St. Michael's") was a not-for-profit religious corporation organized under New York law.

6.      St. Michael's is currently a not-for-profit religious corporation organized under New York law with its principal office in Rochester, New York.

7.      To the extent St. Michael's merged with any other entity, such as St. Frances Xavier Cabrini, any such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit. Any and all such entities, past and present, are collectively referred to herein as "St. Michael's."

8.      At all relevant times St. Michael's conducted business as "St. Michael's Church," "St. Michael's Parish," "Church of St. Michael's," "Parish of St. Michael's," "St. Michael's Catholic Church," "St. Michael's Catholic Parish," "Catholic Church of St. Michael's," "Catholic

Parish of St. Michael's," "St. Michael's Roman Catholic Church," "St. Michael's Roman Catholic Parish," "Roman Catholic Church of St. Michael's," "Roman Catholic Parish of St. Michael's," "St. Michael's," "St. Frances Xavier Cabrini Church," "St. Frances Xavier Cabrini Parish," "Church of St. Frances Xavier Cabrini," "Parish of St. Frances Xavier Cabrini," "St. Frances Xavier Cabrini Catholic Church," "St. Frances Xavier Cabrini Catholic Parish," "Catholic Church of St. Frances Xavier Cabrini," "Catholic Parish of St. Frances Xavier Cabrini," "St. Frances Xavier Cabrini Roman Catholic Church," "St. Frances Xavier Cabrini Roman Catholic Parish," "Roman Catholic Church of St. Frances Xavier Cabrini," "Roman Catholic Parish of St. Frances Xavier Cabrini," "St. Frances Xavier Cabrini," "St. Frances Church," "St. Frances Parish," "Church of St. Frances," "Parish of St. Frances," "St. Frances Catholic Church," "St. Frances Catholic Parish," "Catholic Church of St. Frances," "Catholic Parish of St. Frances," "St. Frances Roman Catholic Church," "St. Frances Roman Catholic Parish," "Roman Catholic Church of St. Frances," "Roman Catholic Parish of St. Frances," "St. Frances," "St. Frances Xavier Church," "St. Frances Xavier Parish," "Church of St. Frances Xavier," "Parish of St. Frances Xavier," "St. Frances Xavier Catholic Church," "St. Frances Xavier Catholic Parish," "Catholic Church of St. Frances Xavier," "Catholic Parish of St. Frances Xavier," "St. Frances Xavier Roman Catholic Church," "St. Frances Xavier Roman Catholic Parish," "Roman Catholic Church of St. Frances Xavier," "Roman Catholic Parish of St. Frances Xavier," or "St. Frances Xavier."

9.      St. Michael's is a parish with a church located in Rochester, New York.

10.      Father Gerard Guli was a priest employed by St. Michael's to serve Catholic families in its geographic jurisdiction, including plaintiff Miguel Labrador and his family. During the time Father Gerard Guli was employed by St. Michael's, he used his position as a priest to groom and to sexually abuse plaintiff Miguel Labrador.

11.     To the extent that St. Michael's was a different entity, corporation, or organization during the period of time during which Father Guli used his position as a priest to sexually abuse Miguel, such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as St. Michael's Church (d/b/a St. Frances Xavier Cabrini Parish).

12.     To the extent St. Michael's is a successor to a different entity, corporation, or organization which existed during the period of time during which Father Guli used his position as a priest to sexually abuse Miguel, such predecessor entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as St. Michael's Church (d/b/a St. Frances Xavier Cabrini Parish).

13.     All such St. Michael's-related entities, corporations, or organizations are collectively referred to herein as "St. Michael's."

14.     At all relevant times defendant St. Stanislaus Bishop and Martyr Parish (d/b/a Ss. Isidore and Maria Torribia Parish) ("St. Stanislaus") was a not-for-profit religious corporation organized under New York law.

15.     St. Stanislaus is currently a not-for-profit religious corporation organized under New York law with its principal office in Bradford, New York.

16.     To the extent St. Stanislaus merged with any other entity, such as St. Catherine of Sienna Church, and St. Joseph the Worker Church, forming Ss. Isidore and Maria Torribia Parish in 2010, any such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit. Any and all such entities, past and present, are collectively referred to herein as "St. Stanislaus."

4

17.     At all relevant times St. Stanislaus conducted business as "St. Stanislaus Church," "St. Stanislaus Parish," "Church of St. Stanislaus," "Parish of St. Stanislaus," "St. Stanislaus Catholic Church," "St. Stanislaus Catholic Parish," "Catholic Church of St. Stanislaus," "Catholic Parish of St. Stanislaus," "St. Stanislaus Roman Catholic Church," "St. Stanislaus Roman Catholic Parish," "Roman Catholic Church of St. Stanislaus," "Roman Catholic Parish of St. Stanislaus," "St. Stanislaus," "St. Stanislaus Bishop and Martyr Church," "St. Stanislaus Bishop and Martyr Parish," "Church of St. Stanislaus Bishop and Martyr," "Parish of St. Stanislaus Bishop and Martyr," "St. Stanislaus Bishop and Martyr Catholic Church," "St. Stanislaus Bishop and Martyr Catholic Parish," "Catholic Church of St. Stanislaus Bishop and Martyr," "Catholic Parish of St. Stanislaus Bishop and Martyr," "St. Stanislaus Bishop and Martyr Roman Catholic Church," "St. Stanislaus Bishop and Martyr Roman Catholic Parish," "Roman Catholic Church of St. Stanislaus Bishop and Martyr," "Roman Catholic Parish of St. Stanislaus Bishop and Martyr," "St. Stanislaus Bishop and Martyr," "St. Catherine of Sienna Church," "St. Catherine of Sienna Parish," "Church of St. Catherine of Sienna," "Parish of St. Catherine of Sienna," "St. Catherine of Sienna Catholic Church," "St. Catherine of Sienna Catholic Parish," "Catholic Church of St. Catherine of Sienna," "Catholic Parish of St. Catherine of Sienna," "St. Catherine of Sienna Roman Catholic Church," "St. Catherine of Sienna Roman Catholic Parish," "Roman Catholic Church of St. Catherine of Sienna," "Roman Catholic Parish of St. Catherine of Sienna," "St. Catherine of Sienna," "St. Joseph the Worker Church," "St. Joseph the Worker Parish," "Church of St. Joseph the Worker," "Parish of St. Joseph the Worker," "St. Joseph the Worker Catholic Church," "St. Joseph the Worker Catholic Parish," "Catholic Church of St. Joseph the Worker," "Catholic Parish of St. Joseph the Worker," "St. Joseph the Worker Roman Catholic Church," "St. Joseph the Worker Roman Catholic Parish," "Roman Catholic Church of St. Joseph the Worker," "Roman Catholic

5

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50, Description: Exhibit Exhibits 1-17, Page 91 of 143

8 of 21

Parish of St. Joseph the Worker," "St. Joseph the Worker," "Ss. Isidore and Maria Torribia Church," "Ss. Isidore and Maria Torribia Parish," "Church of Ss. Isidore and Maria Torribia," "Parish of Ss. Isidore and Maria Torribia," "Ss. Isidore and Maria Torribia Catholic Church," "Ss. Isidore and Maria Torribia Catholic Parish," "Catholic Church of Ss. Isidore and Maria Torribia," "Catholic Parish of Ss. Isidore and Maria Torribia," "Ss. Isidore and Maria Torribia Roman Catholic Church," "Ss. Isidore and Maria Torribia Roman Catholic Parish," "Roman Catholic Church of Ss. Isidore and Maria Torribia," "Roman Catholic Parish of Ss. Isidore and Maria Torribia," "Ss. Isidore and Maria Torribia," "St. Isidore Church," "St. Isidore Parish," "Church of St. Isidore," "Parish of St. Isidore," "St. Isidore Catholic Church," "St. Isidore Catholic Parish," "Catholic Church of St. Isidore," "Catholic Parish of St. Isidore," "St. Isidore Roman Catholic Church," "St. Isidore Roman Catholic Parish," "Roman Catholic Church of St. Isidore," "Roman Catholic Parish of St. Isidore," "St. Isidore," "St. Maria Torribia Church," "St. Maria Torribia Parish," "Church of St. Maria Torribia," "Parish of St. Maria Torribia," "St. Maria Torribia Catholic Church," "St. Maria Torribia Catholic Parish," "Catholic Church of St. Maria Torribia," "Catholic Parish of St. Maria Torribia," "St. Maria Torribia Roman Catholic Church," "St. Maria Torribia Roman Catholic Parish," "Roman Catholic Church of St. Maria Torribia," "Roman Catholic Parish of St. Maria Torribia," or "St. Maria Torribia."

18.     St. Stanislaus is a parish with a church located in Bradford, New York.

19.     Father Gerard Guli was a priest employed by St. Stanislaus to serve Catholic families in its geographic jurisdiction, including plaintiff Miguel Labrador and his family. During the time Father Gerard Guli was employed by St. St. Stanislaus, he used his position as a priest to groom and to sexually abuse plaintiff Miguel Labrador

20.      To the extent that St. Michael's was a different entity, corporation, or organization during the period of time during which Father Guli used his position as a priest to sexually abuse Miguel, such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as St. Stanislaus Bishop and Martyr Parish (d/b/a Ss. Isidore and Maria Torribia Parish).

21.      To the extent St. Stanislaus is a successor to a different entity, corporation, or organization which existed during the period of time during which Father Guli used his position as a priest to sexually abuse Miguel, such predecessor entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit and is named in this lawsuit as St. Stanislaus Bishop and Martyr Parish (d/b/a Ss. Isidore and Maria Torribia Parish).

22.      All such St. Stanislaus-related entities, corporations, or organizations are collectively referred to herein as "St. Stanislaus."

### IV.      VENUE

23.      Venue is proper because St. Michael's is a domestic corporation authorized to transact business in New York with its principal office located in Rochester, New York.

24.      Venue is proper because St. Stanislaus is a domestic corporation authorized to transact business in New York with its principal office located in Bradford, New York.

25.      Venue is proper because Monroe is the county in which a substantial part of the events or omissions giving rise to plaintiff's claims occurred.

26.      The amount of damages sought exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

### V.      STATEMENT OF FACTS

27.      At all relevant times St. Michael's owned a parish and church.

7

Case 2-19-20905-PRW,    Doc 2952-1,    Filed 02/18/25,    Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 93 of 143
10 of 21

28.     At all relevant times St. Michael's held itself out to the public as the owner of St. Michael's.

29.     At all relevant times St. Michael's employed priests, clergy, employees, volunteers, and others who served Catholic families, including plaintiff Miguel Labrador and his family.

30.     At all relevant times St. Michael's, through its agents, servants, and employees, managed, maintained, operated, and controlled St. Michael's, and held out to the public its agents, servants and employees as those who managed, maintained, operated, and controlled St. Michael's.

31.     At all relevant times St. Michael's was responsible for and did the staffing and hiring at St. Michael's.

32.     At all relevant times St. Michael's was responsible for and did the recruitment and staffing of volunteers at St. Michael's.

33.     At all relevant times St. Michael's materially benefited from the operation of St. Michael's, including the services of Father Guli and the services of those who managed and supervised Father Guli.

34.     At all relevant times Father Guli was a priest of St. Michael's.

35.     At all relevant times Father Guli was on the staff of, was an agent of, and served as an employee of St. Michael's.

36.     At all relevant times Father Guli was acting in the course and scope of his employment with St. Michael's.

37.     At all relevant times Father Guli had an office on the premises of St. Michael's.

38.     At all relevant times St. Stanislaus owned a parish and church.

39.     At all relevant times St. Stanislaus held itself out to the public as the owner of St. Stanislaus.

8

Case 2-19-20905-PRW,    Doc 2952-1,    Filed 02/18/25,    Entered 02/18/25 18:26:50,    Description: Exhibit Exhibits 1-17, Page 94 of 143

11 of 21

40. At all relevant times St. Stanislaus employed priests, clergy, employees, volunteers, and others who served Catholic families, including plaintiff Miguel Labrador and his family.

41. At all relevant times St. Stanislaus, through its agents, servants, and employees, managed, maintained, operated, and controlled St. Stanislaus, and held out to the public its agents, servants and employees as those who managed, maintained, operated, and controlled St. Stanislaus.

42. At all relevant times St. Stanislaus was responsible for and did the staffing and hiring at St. Stanislaus.

43. At all relevant times St. Stanislaus was responsible for and did the recruitment and staffing of volunteers at St. Stanislaus.

44. At all relevant times St. Stanislaus materially benefited from the operation of Stanislaus, including the services of Father Guli and the services of those who managed and supervised Father Guli.

45. At all relevant times Father Guli was a priest of St. Stanislaus.

46. At all relevant times Father Guli was on the staff of, was an agent of, and served as an employee of St. Stanislaus.

47. At all relevant times Father Guli was acting in the course and scope of his employment with St. Stanislaus.

48. At all relevant times Father Guli had an office on the premises of St. Stanislaus.

49. When plaintiff Miguel Labrador was a minor, he and his parents were members of the defendants, including when Miguel was a parishioner and altar boy.

50. St. Michael's and St. Stanislaus, through their agents, servants, and employees, held Father Guli out to the public, to Miguel, and to his parents, as their agent and employee.

9

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50, Description: Exhibit Exhibits 1-17, Page 95 of 143

12 of 21

51.     St. Michael's and St. Stanislaus, through their agents, servants, and employees, held Father Guli out to the public, to Miguel, and to his parents, as having been vetted, screened, and approved by the defendants.

52.     Miguel and his parents reasonably relied upon the acts and representations of St. Michael's and St. Stanislaus, through their agents, servants, and employees, and reasonably believed that Father Guli was an agent or employee of the defendants who was vetted, screened, and approved by the defendants.

53.     Miguel and his parents trusted Father Guli because St. Michael's and St. Stanislaus held him out as someone who was safe and could be trusted with the supervision, care, custody, and control of Miguel.

54.     Miguel and his parents believed that St. Michael's and St. Stanislaus would exercise such care as would a parent of ordinary prudence in comparable circumstances when the defendants assumed supervision, care, custody, and control of Miguel.

55.     When Miguel was a minor, Father Guli sexually abused him.

56.     Miguel was sexually abused by Father Guli when he was approximately 14 to 18 years old.

57.     The sexual abuse occurred numerous times and included, but was not limited to, Father Guli fondling Miguel's genitals and Father Guli performing oral sex on Miguel.

58.     Based on the representations of St. Michael's and St. Stanislaus that Father Guli was safe and trustworthy, Miguel and his parents allowed Miguel to be under the supervision of, and in the care, custody, and control of, St. Michael's and St. Stanislaus, including during the times when Miguel was sexually abused by Father Guli.

10

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 96 of 143
13 of 21

59.     Based on the representations of St. Michael's and St. Stanislaus that Father Guli was safe and trustworthy, Miguel and his parents allowed Miguel to be under the supervision of, and in the care, custody, and control of, Father Guli, including during the times when Miguel was sexually abused by Father Guli.

60.     Neither Miguel nor his parents would have allowed him to be under the supervision of, or in the care, custody, or control of, St. Michael's, St. Stanislaus, or Father Guli if St. Michael's or St. Stanislaus had disclosed to Miguel or his parents that Father Guli was not safe and was not trustworthy, and that he in fact posed a danger to Miguel in that Father Guli was likely to sexually abuse Miguel.

61.     No parent of ordinary prudence in comparable circumstances would have allowed Miguel to be under the supervision of, or in the care, custody, or control of, St. Michael's, St. Stanislaus, or Father Guli if St. Michael's or St. Stanislaus had disclosed to Miguel or his parents that Father Guli was not safe and was not trustworthy, and that he in fact posed a danger to Miguel in that Father Guli was likely to sexually abuse him.

62.     From approximately 1973 through approximately 1978, Father Guli exploited the trust and authority vested in him by the defendants by grooming Miguel to gain his trust and to obtain control over him as part of Father Guli's plan to sexually molest and abuse Miguel and other children.

63.     Father Guli used his position of trust and authority as a priest of St. Michael's and St. Stanislaus to groom Miguel and to sexually abuse him multiple times, including when Miguel was under the supervision of, and in the care, custody, or control of, St. Michael's, St. Stanislaus, and Father Guli.

64. The sexual abuse of Miguel by Father Guli occurred at several locations, including in the rectory of St. Stanislaus, Father Guli's vehicle, and Father Guli's parents' home in Irondequoit, New York, which Father Guli was able to gain access to Miguel by virtue of his role as a priest of the defendants.

65. Father Guli's sexual abuse of Miguel occurred during activities that were sponsored by, or were a direct result of activities sponsored by, St. Michael's and St. Stanislaus, including during altar boy services and spiritual counseling sessions. During such activities the defendants had care, custody, or control of Miguel.

66. Prior to the times mentioned herein, Father Guli was a known sexual abuser of children.

67. At all relevant times the defendants, through their agents, servants, and employees, knew or should have known that Father Guli was a known sexual abuser of children.

68. At all relevant times it was reasonably foreseeable to the defendants, through their agents, servants, and employees, that Father Guli's sexual abuse of children would likely result in injury to others, including the sexual abuse of Miguel and other children by Father Guli.

69. At certain times between 1973 and 1978, the defendants, through their agents, servants, and employees knew or should have known that Father Guli was sexually abusing Miguel and other children at St. Michael's and elsewhere.

70. The defendants, through their agents, servants, and employees knew or should have known that the sexual abuse by Father Guli of Miguel was ongoing.

71. The defendants, through their agents, servants, and employees, knew or should have known before and during Father Guli's sexual abuse of Miguel that priests, clergy, employees, and

12

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50, Description: Exhibit Exhibits 1-17, Page 98 of 143
15 of 21

volunteers, and other persons serving the Catholic Church, including St. Michael's and St. Stanislaus, had used their positions to groom and to sexually abuse children.

72.     The defendants, through their agents, servants, and employees, knew or should have known before and during Father Guli's sexual abuse of Miguel that such priests, clergy, employees, and volunteers, and other persons could not be "cured" through treatment or counseling.

73.     The defendants, through their agents, servants, and employees, concealed the sexual abuse of children by Father Guli in order to conceal their own bad acts in failing to protect children from him, to protect their reputations, and to prevent victims of such sexual abuse by him from coming forward during the extremely limited statute of limitations prior to the enactment of the CVA, despite knowing that Father Guli would continue to molest children.

74.     The defendants, through their agents, servants, and employees, consciously and recklessly disregarded their knowledge that Father Guli would use his position with the defendants to sexually abuse children, including Miguel.

75.     The defendants, through their agents, servants, and employees, disregarded their knowledge that Father Guli would use his position with the defendants to sexually abuse children, including Miguel.

76.     The defendants, through their agents, servants, and employees, acted in concert with Father Guli and others to conceal the danger that Father Guli posed to children, including Miguel, so that Father Guli could continue serving them despite their knowledge of that danger.

77.     The defendants, through their agents, servants, and employees, knew that their negligent, reckless, and outrageous conduct would inflict severe emotional and psychological distress, as well as personal physical injury, on others, including Miguel, and he did in fact suffer

13

Case 2-19-20905-PRW,    Doc 2952-1,    Filed 02/18/25,    Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 99 of 143
16 of 21

severe emotional and psychological distress and personal physical injury as a result of their wrongful conduct.

78.     The defendants, through their agents, servants, and employees, concealed the sexual abuse of children by priests and others in order to conceal their own bad acts in failing to protect children from being abused, to protect their reputations, and to prevent victims of such sexual abuse from coming forward during the extremely limited statute of limitations prior to the enactment of the CVA, despite knowing that those priests and other persons would continue to molest children.

79.     By reason of the wrongful acts of the defendants as detailed herein, Miguel sustained physical and psychological injuries, including but not limited to, severe emotional and psychological distress, humiliation, fright, dissociation, anger, depression, anxiety, family turmoil and loss of faith, a severe shock to his nervous system, physical pain and mental anguish, and emotional and psychological damage, and, upon information and belief, some or all of these injuries are of a permanent and lasting nature, and Miguel has and/or will become obligated to expend sums of money for treatment.

## VI.     CAUSES OF ACTION

### A.     FIRST CAUSE OF ACTION – NEGLIGENCE

80.     Plaintiff Miguel Labrador repeats and re-alleges all of his allegations above and below.

81.     The defendants had a duty to take reasonable steps to protect plaintiff Miguel Labrador, a child, from foreseeable harm when he was under their supervision and in their care, custody, and control, including when Father Guli sexually abused him.

82.     The defendants also had a duty to take reasonable steps to prevent Father Guli from using the tasks, premises, and instrumentalities of his position with the defendants to target, groom, and sexually abuse children, including Miguel.

83.     These circumstances created a special relationship between the defendants and Miguel that imposed on the defendants a duty to exercise the degree of care of a parent of ordinary prudence in comparable circumstances.

84.     The defendants breached the foregoing duties by failing to exercise reasonable care to prevent Father Guli from using his position with the defendants to sexually abuse Miguel when he was in their care, custody, or control.

85.     In breaching their duties, including hiring, retaining, and failing to supervise Father Guli, giving him access to children, entrusting their tasks, premises, and instrumentalities to him, failing to train their personnel in the signs of sexual predation and to protect children from sexual abuse and other harm, failing to warn Miguel, his parents, and other parents of the danger of sexual abuse, and failing to create a safe and secure environment for Miguel and other children who were under their supervision and in their care, custody, and control, St. Michael's and St. Stanislaus created a risk that Miguel would be sexually abused by Father Guli. St. Michael's and St. Stanislaus through their actions and inactions created an environment that placed Miguel in danger of unreasonable risks of harm under the circumstances.

86.     In breaching their duties, including hiring, retaining, and failing to supervise Father Guli, giving him access to children, entrusting their tasks, premises, and instrumentalities to him, failing to train their personnel in the signs of sexual predation and to protect children from sexual abuse and other harm, failing to warn Miguel, his parents, and other parents of the danger of sexual abuse, and failing to create a safe and secure environment for Miguel and other children who were

under their supervision and in their care, custody, and control, St. Michael's and St. Stanislaus acted willfully and with conscious disregard for the need to protect Miguel. St. Michael's and St. Stanislaus through their actions and inactions created an environment that placed Miguel in danger of unreasonable risks of harm under the circumstances.

87. It was reasonably foreseeable that defendants' breach of these duties of care would result in the sexual abuse of Miguel.

88. As a direct and proximate result of the acts and omissions of the defendants, Father Guli groomed and sexually abused Miguel, which has caused Miguel to suffer general and special damages as more fully described herein.

## B. SECOND CAUSE OF ACTION – OUTRAGE AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

89. Plaintiff Miguel Labrador repeats and re-alleges all of his allegations above and below.

90. The defendants engaged in reckless, extreme, and outrageous conduct by providing Father Guli with access to children, including plaintiff Miguel Labrador, despite knowing that he would likely use his position with the defendants to groom and to sexually abuse them, including Miguel. The defendants' misconduct was so shocking and outrageous that it exceeds the reasonable bounds of decency as measured by what the average member of the community would tolerate and demonstrates an utter disregard by the defendants of the consequences that would follow.

91. As a result of this reckless, extreme, and outrageous conduct, Father Guli gained access to Miguel and sexually abused him.

92. The defendants knew that this reckless, extreme, and outrageous conduct would inflict severe emotional and psychological distress, including personal physical injury, on others,

and Miguel did in fact suffer severe emotional and psychological distress and personal physical injury as a result, including severe mental anguish, humiliation and emotional and physical distress.

### VII.  CPLR 1603 – NO APPORTIONMENT OF LIABILITY

93.    Pursuant to CPLR 1603, the foregoing causes of action are exempt from the operation of CPLR 1601 by reason of one or more of the exemptions provided in CPLR 1602, including but not limited to, CPLR 1602(2), CPLR 1602(5), 1602(7) and 1602(11), thus precluding defendants from limiting their liability by apportioning some portion of liability to any joint tortfeasor.

### VIII.  PRAYER FOR RELIEF

94.    Plaintiff Miguel Labrador demands judgment against the defendants named in his causes of action, together with compensatory and punitive damages to be determined at trial, and the interest, cost and disbursements pursuant to his causes of action, and such other and further relief as the Court deems just and proper.

95.    Plaintiff specifically reserves the right to pursue additional causes of action, other than those outlined above, that are supported by the facts pleaded or that may be supported by other facts learned in discovery.

Dated: June 2, 2020

MARSH LAW FIRM PLLC

By _____

James R. Marsh
Jennifer Freeman
Robert Lewis
jamesmarsh@marsh.law
jenniferfreeman@marsh.law
robertlewis@marsh.law
31 Hudson Yards, 11th Floor
New York, NY 10001-2170
Phone: 212-372-3030

PFAU COCHRAN VERTETIS AMALA PLLC

By _____

Vincent T. Nappo
vnappo@pcvalaw.com
Anelga Doumanian
adoumanian@pcvalaw.com
31 Hudson Yards, 11th Floor
New York, NY 10001-2170

Attorneys for Plaintiff

**EXHIBIT 14**



Feb 10, 2025

## CNA Announces Fourth Quarter 2024 Results

CNA FINANCIAL ANNOUNCES Q4 2024 NET INCOME OF $0.07 PER SHARE AND CORE INCOME OF $1.25 PER SHARE FULL YEAR 2024 NET INCOME OF $3.52 PER SHARE AND RECORD CORE INCOME OF $4.83 PER SHARE REGULAR QUARTERLY DIVIDEND INCREASED 5% TO $0.46 PER SHARE SPECIAL DIVIDEND OF $2.00 PER SHARE

Read the press release here.

### Fourth Quarter

- Net income of $21 million, includes $290 million after-tax loss from the previously announced pension settlement transaction, versus $367 million in the prior year quarter; core income of $342 million versus $362 million in the prior year quarter.
- P&C core income of $451 million versus $434 million, reflects higher investment income and higher underlying underwriting income partially offset by higher catastrophe losses.
  Life & Group core loss of $18 million versus core income of $4 million in the prior year quarter.
- Corporate & Other core loss of $91 million versus $76 million in the prior year quarter.
- Net investment income up 5% to $644 million pretax, includes a $17 million increase from fixed income securities and other investments to $550 million and a $16 million increase from limited partnerships and common stock to $94 million
- P&C combined ratio of 93.1%, compared with 92.1% in the prior year quarter, including 1.8 points of catastrophe loss impact compared with 1.0 point in the prior year quarter. P&C underlying combined ratio was 91.4%, consistent with the prior year quarter. P&C underlying loss ratio was 61.1% and the expense ratio was 30.0%.
- P&C segments, excluding third party captives, generated gross written premium growth of 9% and net written premium growth of 10% in the quarter. P&C renewal premium change of +4%, with written rate of +3% and exposure change of +1%.

### Full Year

- Net income of $959 million, includes $293 million after-tax loss from pension settlement transactions, versus $1,205 million in the prior year; record core income of $1,316 million, versus $1,284 million in the prior year.
- P&C core income of $1,549 million versus $1,505 million, reflects higher investment income and record high underlying underwriting income partially offset by higher catastrophe losses.
- Life & Group core loss of $23 million versus core loss of $48 million in the prior year.
- Corporate & Other core loss of $210 million versus core loss of $173 million in the prior year.

IMPORTANT NOTICE: CNA would like to place cookies on your computer to improve your use of this website. To learn more, see our Privacy Center.
By continuing to use this website you shall be deemed to have consented to our use of cookies and to have accepted our website Privacy Policy.

- P&C combined ratio of 94.9%, compared with 93.5% in the prior year, including 3.6 points of catastrophe loss impact compared with 2.6 points in the prior year. P&C underlying combined ratio was 91.5% compared with 90.9% in the prior year. P&C underlying loss ratio was 60.9% and the expense ratio was 30.2%.
- P&C segments, excluding third party captives, generated gross written premium growth of 8% and net written premium growth of 8%. P&C renewal premium change of +5%, with written rate of +4% and exposure change of 1%.

Stockholders' Equity:

- Book value per share of $38.82; book value per share excluding AOCI of $46.16, an 8% increase from year-end 2023 adjusting for $3.76 of dividends per share paid.
- Increased quarterly cash dividend 5% to $0.46 per share; special dividend of $2.00 per share.

CHICAGO, Feb. 10, 2025 /PRNewswire/ -- CNA Financial Corporation (NYSE: CNA) today announced fourth quarter 2024 net income of $21 million, or $0.07 per share, versus $367 million, or $1.35 per share, in the prior year quarter. Net income for the current quarter includes a $290 million after-tax loss from the previously announced pension settlement transaction. Net investment losses for the quarter were $31 million compared to net investment gains of $5 million in the prior year quarter. Core income for the quarter was $342 million, or $1.25 per share, versus $362 million, or $1.33 per share, in the prior year quarter.

Our Property & Casualty segments produced core income of $451 million for the fourth quarter of 2024, an increase of $17 million compared to the prior year quarter resulting from higher investment income and higher underlying underwriting income partially offset by higher catastrophe losses and an unfavorable impact from changes in foreign currency exchange rates. P&C segments, excluding third party captives, generated gross written premium growth of 9% and net written premium growth of 10%, due to new business growth of 8%, retention of 86% and renewal premium change of +4%.

Our Life & Group segment produced a core loss of $18 million for the fourth quarter of 2024 versus core income of $4 million in the prior year quarter. Our Corporate & Other segment produced a core loss of $91 million for the fourth quarter of 2024 versus $76 million in the prior year quarter.

Net income for the full year 2024 was $959 million, or $3.52 per share, versus $1,205 million, or $4.43 per share, in the prior year. Net income for the current year includes a $293 million after-tax loss from pension settlement transactions. Net investment losses for the full year were $64 million compared to $79 million in the prior year. Core income for the full year 2024 was $1,316 million, or $4.83 per share, versus $1,284 million, or $4.71 per share, in the prior year.

Our Property & Casualty segments produced core income of $1,549 million for the full year 2024, an increase of $44 million compared to the prior year primarily attributed to higher investment income and higher underlying underwriting income partially offset by higher catastrophe losses. P&C segments, excluding third party captives, generated gross written premium and net written premium growth of 8%, due to new business growth of 9% and written rate of +4%.

Our Life & Group segment produced a core loss of $23 million for the full year 2024 versus $48 million in the prior year. Our Corporate & Other segment produced a core loss of $210 million for the full year 2024 versus $173 million in the prior year.

CNA Financial declared a quarterly cash dividend of $0.46 per share and a special dividend of $2.00 per share, payable March 13, 2025 to stockholders of record on February 24, 2025.

About the Company

CNA is one of the largest U.S. commercial property and casualty insurance companies. Backed by more than 125 years of experience, CNA provides a broad range of standard and specialized insurance products and services for businesses and professionals in the U.S., Canada and Europe. For more information, please visit CNA at www.cna.com.

IMPORTANT NOTICE: CNA would like to place cookies on your computer to improve your use of this website. To learn more, see our Privacy Center.

By continuing to use this website you shall be deemed to have consented to our use of cookies and to have accepted our website Privacy Policy.

# EXHIBIT 15

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

IN RE:                    .      Case No. 20-30663-WAK
                          .
THE ROMAN CATHOLIC        .
DIOCESE OF SYRACUSE,      .      100 S. Clinton Street
NEW YORK,                 .      Syracuse, NY 13261
                          .
          Debtor.         .      September 28, 2023
. . . . . . . . . . . . . . .    1:03 p.m.


        TRANSCRIPT OF DOCKET NO. 1393 - MOTION FOR RELIEF
      FROM STAY FILED BY CERTAIN PERSONAL INJURY CREDITORS;
   DOCKET NO. 1395 - MOTION FOR RELIEF FROM STAY FILED BY MERSON
LAW SEXUAL ABUSE CLAIMANTS; DOCKET NO. 1400 - MOTION FOR RELIEF
        FROM STAY FILED BY PCVA LAW SURVIVOR CLAIMANTS

            BEFORE HONORABLE WENDY A. KINSELLA
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:           Bond Schoeneck & King, PLLC
                          By:  STEPHEN A. DONATO, ESQ.
                          One Lincoln Center
                          Syracuse, NY 13202

For Interstate            Parker, Hudson, Rainer & Dobbs, LLP
Insurers:                 By:  MATTHEW ROBERTS, ESQ.
                          303 Peachtree Street, N.E. Suite 3600
                          Atlanta, GA 30308

                          Parker, Hudson, Rainer & Dobbs, LLP
                          By:  TODD JACOBS, ESQ.
                          Two N. Riverside Plaza, Suite 1850
                          Chicago, IL 60606


    Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For Certain                  Duane Morris, LLP
Underwriters at              By:  RUSSELL ROTEN, ESQ.
Lloyd's London and           865 Figueroa Street, Suite 3100
Certain London Market        Los Angeles, CA 90017
Companies:

                             Clyde & Co. US, LLP
                             By:  CATHY SUGAYAN, ESQ.
                             55 West Monroe Street, Suite 3000
                             Chicago, IL 60603


TELEPHONIC APPEARANCES:

For Certain Personal         LaFave, Wein & Frament, PLLC
Injury Creditors:            By:  CYNTHIA S. LaFAVE, ESQ.
                             2400 Western Avenue
                             Guilderland, NY 12084

                             Jeff Anderson & Associates
                             By:  MICHAEL FINNEGAN, ESQ.
                                  TAYLOR STIPPEL, ESQ.
                             366 Jackson Street, Suite 100
                             St. Paul, MN 55101

For Merson Law Sexual        Merson Law, PLLC
Abuse Claimants:             By:  SARAH CANTOS, ESQ.
                             950 Third Avenue, 18th Floor
                             New York, NY 10022

For Interstate              Rivkin Radler, LLP
Insurers:                    By:  SIOBHAIN P. MINAROVICH, ESQ.
                             926 RXR Plaza
                             Uniondale, NY 11556

For The National            Womble Bond Dickinson
Catholic Risk                By:  EDWARD SCHNITZER, ESQ.
Retention Group, Inc.:       950 Third Avenue, Suite 2400
                             New York, NY 10022

For Travelers:              Dentons US, LLP
                             By:  LAUREN MACKSOUD, ESQ.
                             1221 Avenue of the Americas
                             New York, NY 10020

TELEPHONIC APPEARANCES (Cont'd):

For the Official            Stinson LLP
Committee of                By:  ROBERT T. KUGLER, ESQ.
Unsecured Creditors:             EDWIN H. CALDIE, ESQ.
                            50 South Sixth Street, Suite 2600
                            Minneapolis, MN 55402


For Special Insurance       Burns Bair
Counsel to the Official     By:  JESSE BAIR, ESQ.
Committee of Unsecured           TIM BURNS, ESQ.
Creditors:                  10 E. Doty Street, Suite 600
                            Madison, WI 53703


For Arrowood                Dentons US, LLP
Indemnity:                  By:  PATRICK MAXCY, ESQ.
                            233 South Wacker Drive, Suite 5900
                            Chicago, IL 60606


For Utica Mutual            Rivkin Radler
Insurance Company:          By:  PAUL GORFINKEL, ESQ.
                            926 RXR Plaza
                            Uniondale, NY 11556


For the United States       Office of the United States Trustee
Trustee:                    By:  ERIN CHAMPION, ESQ.
                            105 U.S. Courthouse, 10 Broad Street
                            Utica, NY 13501


For the Parish              Woods Oviatt Gilman, LLP
Steering Committee:         By:  TIMOTHY P. LYSTER, ESQ.
                            1900 Bausch & Lomb Place
                            Rochester, NY 14604

- - -

1  Woods Oviatt Gilman, on behalf of the parishes.

2          THE COURT:  I know we have several other people on

3  the phone.  Is there anyone else who'd like to note their

4  appearance?  Hearing no further appearances.

5          The first motion that's on the calendar, I believe,

6  Ms. LaFave, would be on behalf of Jeffrey Robert Anderson

7  claimants.  Why don't we start with you.  Perhaps we would go

8  through the motions for relief from stay one at a time and then

9  allow the relevant insurance companies to lodge their

10 objections as identified on the calendar today.

11         So, Ms. LaFave, Mr. Finnegan, why don't we begin with

12 you.

13         MR. FINNEGAN:  Thank you, Your Honor.  This is Mike

14 Finnegan for Jeff Anderson & Associates and for the six

15 survivors that are seeking relief today, also represented by

16 Cynthia LaFave and Taylor Stippel.  To make this as concise and

17 streamlined as possible, I'd like to make a few points relative

18 to the survivors here and then turn to Mr. Burns, who is

19 special counsel for the creditors' committee, and have him

20 discuss the insurance aspects of the motion.

21         Overall, Your Honor, there's good cause here to grant

22 the narrow relief of sending a limited number of demand

23 letters.  There are numerous reasons to support this but three

24 that are really important to the survivors here.

25         First, the survivors' experiences and the passage of

**WWW.JJCOURT.COM**

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 112 of 143

1  insurance companies have standing under 1109 as parties in

2  interest.  It is their pockets, it's their money, and as much

3  as they're the Diocese insurance policies, they have a vested

4  interest as the demand letters would be sent directly to them

5  in responding to that.

6        There's a question at the outset whether the 362(a)

7  analysis or the mediation stay is the correct stay that should

8  be lifted in this instance.  But either one of them in this

9  instance, in this case in particular, were designed to stop all

10 activities to allow the debtor and the parties to go to

11 mediation and focus on the reorganization process without the

12 distraction of other litigation throughout the case.  And that

13 was to keep a level playing field as well, not just for the

14 Diocese and the insurance companies, but that also kept a level

15 playing field for the survivors in these cases, which are in

16 excess of 400 claimants at this juncture.

17       Second, in considering the relief requested, the

18 Court believes it would be necessary to allow the insurance

19 companies to have discovery, or the reality is what the movants

20 have asked for is that they're going to make a demand.  The

21 response is going to be the demand is unreasonable without

22 discovery, and then whether that's bad faith or whatever, it's

23 simply a distraction from the process.

24       Moreover, not only would the estate accrue

25 administrative expenses in cooperating with their insurance

WWW.JJCOURT.COM

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 113 of 143

1 companies, but in many instances, the attorneys fees from the

2 insurance companies are decreasing the funds available under

3 the policies.

4       With all of that said, the Court, nevertheless,

5 looked to the <u>Sonnax</u> factors in this case. The Court believes

6 that those factors do not favor the granting of relief from

7 stay at this juncture. The Court believes the relief would not

8 result in partial or complete resolution of the claims and is

9 quite concerned regarding the floodgates and the perception of

10 the other 390 claimants and their state court attorneys that

11 believe perhaps these 10 or 11 claimants are getting a leg up

12 and are no longer playing by the mediation rules. They would

13 not necessarily understand that the lift stay is for the

14 limited purposes of simply sending a demand and does that

15 somehow advance their case and their claim more than the others

16 in the case.

17       There's also a huge connection with the bankruptcy

18 case and interference with it. It detracts from the mediation

19 process that's undergoing. It detracts from the reorganization

20 process and the plan that has now been promised on or about

21 November 5th by the Diocese. And the discovery and the process

22 involved in those demands would be expensive, would have to

23 result in delay, and could impede the negotiations and the good

24 faith that has gone on with the mediation process.

25       And let it be clear that while there certainly was

1 allegations between the parties, the survivors' attorneys, and

2 the insurance companies, no one has come before this Court to

3 ask that the mediation process be stopped or that there are

4 parties who are not negotiating in good faith in that process.

5 Lastly, or second to last, the interest of justice,

6 judicial economy, and expeditious resolution of litigation does

7 not believe that that would be advanced by the lifting of the

8 stay. The goal is the resolution for all parties and allowing

9 these 10 or 11 claimants to proceed would not allow that

10 economy and resolution of all claimants to be advanced.

11 Regardless of what the movants had alleged in the papers, the

12 Court just doesn't see that as advancing the ball for the

13 resolution of all of these claims and the case in total.

14 Lastly, the impact of the stay on the parties and the

15 balance of the harm, the 12 factors. The Court, again, does

16 not want it to be perceived by anyone participating in these

17 proceedings to somehow be saying the balance of the harms that

18 the survivors have endured is somehow not outweighed by the

19 benefit to the Diocese of this bankruptcy. The balance of the

20 harms, this is not the survivors' harms, but this is making

21 sure that those who are applying for relief from the other 390

22 claimants are treated fair and equitably.

23 This motion could be perceived as a race to the

24 courthouse by those claimants and the Court does not want that

25 out there and does not want the other survivors believing that

WWW.JJCOURT.COM

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 115 of 143

1  they're somehow being harmed again by this process, not keeping

2  a level playing field.

3       The Court also notes a concern that there is somehow

4  an impact on the insurance policies that could be made, that

5  the debtor somehow breached those policies in the event that

6  this demand process goes sideways and is occurring outside of

7  the context of the mediation and believes that if individual

8  demands need to be made in the mediation, that the mediator,

9  Mr. Van Osselear, can certainly facilitate a process for that.

10       I know there was a reference to global demands and

11  counters and all those things, and the Court certainly doesn't

12  want to drill down on any of the specifics with the mediation,

13  but I'm sure Mr. Van Osselear would be willing to entertain

14  whatever information or demands that these claimants would like

15  to make within the context of the mediation.

16       So with that said, the Court is going to deny the

17  three motions for stay relief filed by the certain personal

18  injury creditors at 1393, as well as the Merson's Law sexual

19  abuse claimants at 1395, as well as the last motion for relief

20  from stay, that is the PCVA Law survivor claimants at Docket

21  Number 14.

22       The Court will look to the movants for orders denying

23  those motions.  Certainly, to the extent that the Diocese needs

24  to approve those and the insurance companies that have opposed

25  those need to approve those orders, we'll certainly look to

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 116 of 143

1  counsel to submit those on those motions, presumably on

2  consent. And if there's an issue with settling those orders,

3  please feel free to file a letter on the docket and the Court

4  will restore them for a status conference or allow competing

5  orders or whatever that might be.

6         So with that said, those three motions are denied,

7  and the Court will now turn its attention to the motion to

8  extend the preliminary injunction.

9         (Proceedings concluded at 2:43 p.m.)

10                       * * * * *

11

12             **C E R T I F I C A T I O N**

13         We, LIESL SPRINGER and KAREN K. WATSON, court

14  approved transcribers, certify that the foregoing is a correct

15  transcript from the official electronic sound recording of the

16  proceedings in the above-entitled matter, and to the best of

17  our ability.

18

19  /s/ Liesl Springer

20  LIESL SPRINGER

21

22  /s/ Karen K. Watson

23  KAREN K. WATSON

24  J&J COURT TRANSCRIBERS, INC.        DATE:  October 2, 2023

25

WWW.JJCOURT.COM

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 117 of 143

# EXHIBIT 16

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK


IN RE:                          .    Case No. 23-10244
                                .
THE ROMAN CATHOLIC              .
DIOCESE OF ALBANY,              .    James T. Foley U.S. Courthouse
NEW YORK                        .    445 Broadway
                                .    Albany, NY 12207
            Debtor.             .
                                .    February 12, 2025
. . . . . . . . . . . . ..           10:44 a.m.


    TRANSCRIPT OF MOTION FOR RELIEF FROM STAY BY SURVIVOR
 CLAIMANT M.F.(DOC. NO. 1349); MOTION FOR RELIEF FROM STAY BY
SURVIVOR CLAIMANT #27 (DOC. NO. 1343); MOTION FOR RELIEF FROM
 STAY BY SURVIVOR CLAIMANT (DOC NO. 1342); MOTION FOR RELIEF
     FROM STAY BY SURVIVOR CLAIMANT #48 (DOC. NO. 1345);
        MOTION FOR RELIEF FROM STAY BY SURVIVOR
 CLAIMANT #41 (DOC. NO. 1344); MOTION FOR RELIEF FROM STAY BY
   THE CLAIMANTS REPRESENTED BY THE MARSH LAW FIRM PLLC AND
      PFAU COCHRAN VERTETIS AMALA PLLC (DOC. NO. 1355)

        BEFORE HONORABLE ROBERT E. LITTLEFIELD, JR.
        UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


APPEARANCES:

For the Debtor:            Whiteman Osterman & Hanna LLP
                           By:  FRANCIS J. BRENNAN, ESQ.
                           80 State Street, 11th Floor
                           Albany, NY 12207


Audio Operator:            Theresa O'Connell


 Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609)586-2311      Fax No. (609)587-3599**

APPEARANCES (Cont'd):

For the Official            Stinson LLP
Committee of Tort          By:  ROBERT T. KUGLER, ESQ.
Claimants:                      LOGAN KUGLER, ESQ.
                           50 South Sixth Street, Suite 2600
                           Minneapolis, MN 55402


For the Official           Lemery Greisler LLC
Committee of Unsecured     By:  MEGHAN M. BREEN, ESQ.
Creditors:                 50 Beaver Street
                           Albany, NY 12207


For Certain Personal       LaFave, Wein & Frament, PLLC
Injury Creditors:          By:  CYNTHIA S. LaFAVE, ESQ.
                           2400 Western Avenue
                           Guilderland, NY 12084

TELEPHONIC APPEARANCES:

For the Parish             Elsaesser Anderson, Chtd.
Steering Committee:        By:  FORD ELSAESSER, JR., ESQ.
                           PO Box 369
                           535 High Street
                           Priest River, ID 83856

                           Woods Oviatt Gilman LLP
                           By:  TIMOTHY PATRICK LYSTER, ESQ.
                           1900 Bausch & Lomb Place
                           Rochester, NY 14604

For London Market          Skarzynski Marick & Black LLP
Insurers:                  By:  NATHAN REINHARDT, ESQ.
                           663 West Fifth Street, 26th Floor
                           Los Angeles, CA 90071

                           Clyde & Co. LLP
                           By:  CATALINA J. SUGAYAN, ESQ.
                           30 S. Wacker Drive, Suite 2600
                           Chicago, IL 60606

For Certain Personal       Jeff Anderson & Associates
Injury Creditors:          By:  TAYLOR STIPPEL SLOAN, ESQ.
                           366 Jackson Street, Suite 100
                           St. Paul, MN 55101

**WWW.JJCOURT.COM**

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 120 of 143

TELEPHONIC APPEARANCES (Cont'd):

| | |
|---|---|
| For Interstate Fire<br>and Casualty Company: | Parker Hudson Rainer & Dobbs LLP<br>By:  MATTHEW MICHAEL WEISS, ESQ.<br>303 Peachtree Street, N.E.<br>Suite 3600<br>Atlanta, GA 30308 |
| For the U.S. Trustee: | Office of the U.S. Trustee<br>By:  LISA M. PENPRAZE, ESQ.<br>Leo W. O'Brien Federal Building<br>11A Clinton Avenue, Room 620<br>Albany, NY 12207 |
| For Hartford Accident<br>and Indemnity Company: | Ruggeri Parks Weinberg LLP<br>By:  JOSHUA D. WEINBERG, ESQ.<br>1875 K Street, NW, Suite 600<br>Washington, DC 20006 |
| For the National<br>Catholic Risk<br>Retention Group: | Womble Bond Dickinson<br>By:  EDWARD L. SCHNITZER, ESQ.<br>950 Third Avenue, Suite 2400<br>New York, NY 10022 |
| For Sacred Heart<br>Roman Catholic Church: | Cohn & Dussi LLC<br>By:  WILLIAM JOSEPH DELANEY, ESQ.<br>536 Atwells Avenue, Suite 1<br>Providence, RI 02909 |

- - -

1          THE COURT:  Mr. Brennan?

2          MR. BRENNAN:  Yes, Your Honor?

3          THE COURT:  In your papers, as I recall, you

4    indicated if the Court was inclined to grant the 362 motions,

5    that there should be some due diligence after that.  I'm not --

6    can you elaborate on that position?

7          MR. BRENNAN:  Sure, Your Honor.  We're in no way

8    conceding the relief requested.  But, in the event that the

9    Court was inclined to grant that relief, it's the debtor's

10   position that Judge Glenn's view of stay relief in Rockville

11   Centre was informative that the cases, if they were -- if there

12   were to be test cases, they should be representative of the

13   full potential range of outcomes, rather than cases that are,

14   for lack of a better term, cherry picked, and don't represent

15   that full panoply of potential outcomes.

16         THE COURT:  Well, Mr. Brennan, I find Judge Bucki's

17   decision on this very persuasive.  This is, as Judge Bucki

18   indicated, this isn't about corporate records and books and

19   papers.  It's about people and it's about credibility.  It's

20   about -- it's a whole different -- it's a whole different ball

21   of wax, as opposed to what we usually deal with in 362 in

22   corporate cases.

23         My concern is how would we do this?  I'm not ruling

24   today, but I'm leaning toward granting relief to set this

25   procedure up.  I don't know if necessarily the cases that have

WWW.JJCOURT.COM

Case 2-19-20905-PRW,  Doc 2952-1,  Filed 02/18/25,  Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 122 of 143

1  moved for relief from stay are all representative, to use your

2  language.  What would the Diocese have me do if I lifted the

3  stay as regards to selection of these cases?

4       MR. BRENNAN:  Well, I think at that point, Your

5  Honor, that it would necessitate a discussion between Diocese's

6  general counsel that's represented the Diocese in defense of

7  these matters.

8       THE COURT:  Mr. Costello?

9       MR. BRENNAN:  Mr. Costello.  Plaintiffs' counsel

10 representing the plaintiffs in those cases which may fit within

11 that range, and certainly counsel for the Committee, to be

12 involved as well.  And not to piggy back on Rockville Centre,

13 but I believe that's the cast of participants in those

14 discussions there.

15      THE COURT:  Mr. Kugler, how long would it take to

16 give an analysis of your clients?  It's seemingly, if I lift

17 the stay, we want something that is trial ready, and we don't

18 want people waiting.  If you're going to wait, you might as

19 well wait with everybody else.  This is an exercise to try and

20 educate all of us.  And it would have to be a very specific

21 subsection of cases that would go forth.

22      And I would cite to Sonnax factor 12 to at least take

23 care of the initial run of things.  Sonnax factor 12 might

24 prevent other cases down the road, that's for -- that's a

25 different case on a different day, but I think Sonnax factor

WWW.JJCOURT.COM

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 123 of 143

1          THE COURT:  Excellent again.

2          MR. KUGLER:  Yeah.

3          THE COURT:  Does anyone else have anything for the

4  record?

5                    (No audible response)

6          THE COURT:  If not, thank you all very much.  All of

7  you have a good day.

8          MS. BREEN:  Thank you.

9          MR. KUGLER:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11          COURTROOM DEPUTY:  Judge, that was our last 10:30

12  case.  The Court will disconnect and reconnect for the one

13  o'clock.

14                    *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

WWW.JJCOURT.COM

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 124 of 143

1 **C E R T I F I C A T I O N**

2        I, KIM WEBER, court approved transcriber, certify

3 that the foregoing is a correct transcript from the official

4 electronic sound recording of the proceedings in the above-

5 entitled matter, and to the best of my ability.

6

7 /s/ Kim Weber

8 KIM WEBER

9 J&J COURT TRANSCRIBERS, INC.    DATE:  February 18, 2025

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 17

<pre>
            UNITED STATES BANKRUPTCY COURT
            NORTHERN DISTRICT OF NEW YORK

IN RE:                  .    Case No. 23-10244-1-rel
                        .
THE ROMAN CATHOLIC      .    U.S. Bankruptcy Court
DIOCESE OF ALBANY, NEW  .    445 Broadway
YORK,                   .    Albany, New York 12207
                        .
          Debtor.       .    January 29, 2025
. . . . . . . . . . . . . .   10:58 a.m.
</pre>

    TRANSCRIPT OF DOC# 1349 - MOTION FOR RELIEF FROM STAY BY
SURVIVOR CLAIMANT M.F.; DOC# 1343 - MOTION FOR RELIEF FROM STAY
 BY SURVIVOR CLAIMANT #27; DOC# 1342 - MOTION FOR RELIEF FROM
 STAY BY SURVIVOR CLAIMANT; DOC# 1345 - MOTION FOR RELIEF FROM
 STAY BY SURVIVOR CLAIMANT #48; DOC# 1344 - MOTION FOR RELIEF
  FROM STAY BY SURVIVOR CLAIMANT #41; DOC# 1355 - MOTION FOR
RELIEF FROM STAY BY THE CLAIMANTS REPRESENTED BY THE MARSH LAW
    FIRM PLLC AND PFAU COCHRAN VERTETIS AMALA PLLC

     BEFORE HONORABLE ROBERT E. LITTLEFIELD, JR.
       UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:            Whiteman Osterman & Hanna, LLP
                           By:  FRANCIS J. BRENNAN, ESQ.
                           80 State Street, 11th Floor
                           Albany, NY 12207

For the Official           Lemery Greisler, LLC
Committee of Unsecured     By:  PAUL A. LEVINE, ESQ.
Creditors:                 677 Broadway, 8th Floor
                           Albany, NY 12866


Audio Operator:            Theresa O'Connell

 Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

_____

              **J&J COURT TRANSCRIBERS, INC.**
                  **268 Evergreen Avenue**
                **Hamilton, New Jersey 08619**
                **E-mail: jjcourt@jjcourt.com**

       **(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

| | |
|---|---|
| For the Parish Steering Committee: | Elsaesser Anderson, Chtd.<br>By:  FORD ELSAESSER, JR., ESQ.<br>535 High Street<br>Priest River, ID 83856 |
| | Woods Oviatt Gilman, LLP<br>By:  TIMOTHY PATRICK LYSTER, ESQ.<br>1900 Bausch & Lomb Place<br>Rochester, NY 14604 |
| For the Official Committee of Tort Claimants: | Burns Bair, LLP<br>By:  JESSE BAIR, ESQ.<br>10 E. Doty Street, Suite 600<br>Madison, WI 53703 |
| | Stinson LLP<br>By:  EDWIN H. CALDIE, ESQ.<br>     LOGAN KUGLER, ESQ.<br>50 South Sixth Street, Suite 2600<br>Minneapolis, MN 55402 |
| For the Marsh/PCVA Claimants: | Pfau Cochran Vertetis Amala, PLLC<br>By:  JASON P. AMALA, ESQ.<br>701 5th Avenue, Suite 4300<br>Seattle, WA 98104 |
| For Certain Personal Injury Claimants: | LaFave, Wein & Frament, PLLC<br>By:  CYNTHIA S. LaFAVE, ESQ.<br>2400 Western Avenue<br>Guilderland, NY 12084 |
| | Jeff Anderson & Associates, P.A.<br>By:  MICHAEL FINNEGAN, ESQ.<br>366 Jackson Street, Suite 100<br>St. Paul, MN 55101 |
| For Interstate Fire and Casualty Company: | Parker Hudson Rainer & Dobbs, LLP<br>By:  MATTHEW MICHAEL WEISS, ESQ.<br>303 Peachtree Street, N.E., Suite 3600<br>Atlanta, GA 30308 |
| | White and Williams, LLP<br>By:  SIOBHAIN MINAROVICH, ESQ.<br>810 Seventh Avenue, Suite 500<br>New York, NY 10019 |

APPEARANCES (Cont'd):

| | |
|---|---|
| For Hartford Accident and Indemnity Company: | Ruggeri Parks Weinberg, LLP<br>By: JOSHUA D. WEINBERG, ESQ.<br>1875 K Street NW, Suite 600<br>Washington, DC 20006 |
| For London Market Insurers: | Duane Morris, LLP<br>By: BETTY LUU, ESQ.<br>865 South Figueroa Street, Suite 3100<br>Los Angeles, CA 90017 |
| For the Diocese: | Tobin and Dempf, LLP<br>By: MICHAEL L. COSTELLO, ESQ.<br>515 Broadway<br>Albany, NY 12207 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Debtor, Special Insurance Counsel: | Blank Rome, LLP<br>By: JAMES R. MURRAY, ESQ.<br>JAMES CARTER, ESQ.<br>1825 Eye Street NW<br>Washington, DC 20006 |
| Certain Personal Injury Creditors: | Herman Law Firm, PA<br>By: JESSE SEIDEN, ESQ.<br>1800 N. Military Trail, Suite 140<br>Boca Raton, FL 33431 |
| | Jeff Anderson & Associates, P.A.<br>By: TAYLOR STIPPEL SLOAN, ESQ.<br>366 Jackson Street, Suite 100<br>St. Paul, MN 55101 |
| | Horowitz Law<br>By: ADAM HOROWITZ, ESQ.<br>110 E. Broward Blvd., Suite 1530<br>Fort Lauderdale, FL 33301 |

- - -

1  the carrier has actually participated.

2       The real data points that will come from this, Your

3  Honor, if you grant relief on Mr. Kilmer's claim, the carriers

4  and now to answer the question, I managed to get to the heart

5  of what the Court was asking today, I think, why do we need

6  this?  Because normally without the stay, an insurance company

7  like Mr. Kilmer's case is presented with an offer to settle the

8  case within its limits, within its contracts.  The carrier has

9  to make a choice like Mr. Kilmer's case.  Do they pay their

10 limits or do they not pay their limits?

11      Under New York Law, if they don't pay their limits,

12 the case goes to trial, it goes to verdict.  If they should

13 have paid their limits and they didn't, they have to protect --

14 their duty is to protect the debtor, the Diocese, the insured

15 from the jury trial.  That's their only duty is to protect

16 their insured from a judgment.  That's it, Your Honor.

17      So you make the offer to settle the case like Mr.

18 Kilmer's for $2 million, for the limits.  Again, I provided you

19 the facts.  I don't think there's really any question that a

20 jury could give Mr. Kilmer way in excess of $2 million for what

21 he suffered and what he went through.  So if they don't pay

22 their limits, what happens next?

23      Well, if there's not a stay in place, we go to trial.

24 And if the jury awards Mr. Kilmer $5 million, $10 million,

25 under New York Law, if the carrier should have paid its limits

1 and it didn't and it exposed its insured, here the debtor, to a

2 $10 million verdict, under New York Law the insurance company

3 can be held liable for the full 10 million. They can also be

4 held liable for fees and costs that the debtor incurred as a

5 result of them not paying their limits and punitive damages.

6 Those aren't remedies that I've imagined or come up

7 with. Those are the remedies under New York State Law. They

8 exist because it is the public policy of the state and,

9 frankly, every state in the country to incentivize insurers to

10 act reasonably and to settle cases for their limits, like Mr.

11 Kilmer's. That's not happening now because of the stay. They

12 literally have no incentive to settle. And if there's any

13 question, Mr. Bair alluded to this, if there's any question

14 about what's really going on here, I'm hesitant to share with

15 this Court what's happened in all these other bankruptcies, but

16 I do think it is -- the context is important.

17 Before 2019, there were approximately 15 bankruptcies

18 arising from childhood sexual abuse around the country. I was

19 involved with a lot of them, a lot of the folks in the room. I

20 first met Mr. Elsaesser in the Diocese of Spokane in 2004.

21 Those bankruptcies before 2019, every single one of them that

22 I'm aware of settled globally, global settlement with all

23 parties. That was before 2019.

24 Starting in 2019, since then, there have been, I

25 believe 17 bankruptcies arising from child sexual abuse. There

WWW.JJCOURT.COM

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 131 of 143

1 has not been a single global settlement with all the parties in

2 any of those bankruptcies, period. Hasn't happened. The

3 debtor says that's their goal. That's our goal, too. Has not

4 happened.

5 Perhaps, more importantly, if you read the fine print

6 and, again, this is in our papers, it's not disputed by anyone,

7 there hasn't been a single settlement in any of those

8 bankruptcies with the carriers who are facing the most claims,

9 the carriers with the biggest exposure. There have been little

10 settlements with little carriers that don't have much exposure.

11 We have not had a single large insurance settlement other than

12 Boy Scouts. That is the only one where we have settled with

13 the carrier with the largest exposure.

14 And it has been well reported that that is the worst

15 settlement on average in the history of the country by leaps

16 and bounds. And there's -- you can read about why that

17 happened. I won't go there.

18 Outside of that, Your Honor, turning back to the

19 motion we're asking for, the relief, what's the path, what path

20 are we going -- the Court asked today, would I draw the line,

21 right. When do we eventually do this? Well, one answer, Your

22 Honor, is we can look at Camden, Rochester, Syracuse, Madison

23 Square Boys & Girls Club, and Boy Scouts. Out of the 17

24 bankruptcies, I believe those are the only five that have plans

25 that have been voted on, approved and/or confirmed. Five out

1  of say 17, I think that's right.

2          Every single one of those plans, the only thing they
3  have in common is that they allow the plaintiffs, they give
4  them relief from stay to keep suing the debtor post-bankruptcy
5  to go after the insurance.  It's essentially, I know this isn't
6  the correct terminology in Bankruptcy Court, it's essentially
7  giving the plaintiffs relief from stay after confirmation.

8          But, as you've already identified, why would we
9  possibly waste all the time and money that we're spending now
10  to wait and hope that a year from now, a year and a half from
11  now, two years from now, you approve a plan that gives us
12  relief from stay and we start from scratch then?  That's when
13  we start this process?  It just doesn't make any sense.  All
14  paths, all we can tell is all paths, one way or the other, are
15  going to require relief from stay.

16          THE COURT:  Counsel, I get it.  The practical problem
17  is Chapter 11, in theory, is a wonderful remedy for this type
18  of situation except when you get into the middle of it and
19  something goes wrong.  And I'm getting the distinct feeling
20  something is or has gone wrong that we're languishing.  The
21  time factor is becoming onerous in the bankruptcy process, but,
22  once again, except for your examples that you gave, the State
23  Court system is no better for somebody that didn't have trial
24  ready papers and was good to go, in effect.  So what happens if
25  the Chapter 11 fails?

1   has not been a single global settlement with all the parties in
2   any of those bankruptcies, period.  Hasn't happened.  The
3   debtor says that's their goal.  That's our goal, too.  Has not
4   happened.
5           Perhaps, more importantly, if you read the fine print
6   and, again, this is in our papers, it's not disputed by anyone,
7   there hasn't been a single settlement in any of those
8   bankruptcies with the carriers who are facing the most claims,
9   the carriers with the biggest exposure.  There have been little
10  settlements with little carriers that don't have much exposure.
11  We have not had a single large insurance settlement other than
12  Boy Scouts.  That is the only one where we have settled with
13  the carrier with the largest exposure.
14          And it has been well reported that that is the worst
15  settlement on average in the history of the country by leaps
16  and bounds.  And there's -- you can read about why that
17  happened.  I won't go there.
18          Outside of that, Your Honor, turning back to the
19  motion we're asking for, the relief, what's the path, what path
20  are we going -- the Court asked today, would I draw the line,
21  right.  When do we eventually do this?  Well, one answer, Your
22  Honor, is we can look at Camden, Rochester, Syracuse, Madison
23  Square Boys & Girls Club, and Boy Scouts.  Out of the 17
24  bankruptcies, I believe those are the only five that have plans
25  that have been voted on, approved and/or confirmed.  Five out

1 of say 17, I think that's right.

2        Every single one of those plans, the only thing they

3 have in common is that they allow the plaintiffs, they give

4 them relief from stay to keep suing the debtor post-bankruptcy

5 to go after the insurance. It's essentially, I know this isn't

6 the correct terminology in Bankruptcy Court, it's essentially

7 giving the plaintiffs relief from stay after confirmation.

8        But, as you've already identified, why would we

9 possibly waste all the time and money that we're spending now

10 to wait and hope that a year from now, a year and a half from

11 now, two years from now, you approve a plan that gives us

12 relief from stay and we start from scratch then? That's when

13 we start this process? It just doesn't make any sense. All

14 paths, all we can tell is all paths, one way or the other, are

15 going to require relief from stay.

16        THE COURT: Counsel, I get it. The practical problem

17 is Chapter 11, in theory, is a wonderful remedy for this type

18 of situation except when you get into the middle of it and

19 something goes wrong. And I'm getting the distinct feeling

20 something is or has gone wrong that we're languishing. The

21 time factor is becoming onerous in the bankruptcy process, but,

22 once again, except for your examples that you gave, the State

23 Court system is no better for somebody that didn't have trial

24 ready papers and was good to go, in effect. So what happens if

25 the Chapter 11 fails?

WWW.JJCOURT.COM

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 135 of 143

1          MR. AMALA:  If it fails and dismissed?

2          THE COURT:  If it's failed and dismissed?

3          MR. AMALA:  I was very active with Judge Glenn in the

4  Diocese of Rockville Centre.  I'm sure the Court knows there

5  were pending motions to dismiss first by the Committee, then by

6  the debtor.  The answer, Your Honor, is that all of the cases

7  get sent back to State Court and, frankly, we are confronted

8  with the same situation you mentioned earlier.  Do I just send

9  hundreds of you back to State Court and then it's just chaos?

10  Is that going to happen here if you grant relief from stay?

11  Are hundreds of people going to ask for relief from stay?  The

12  answer's no.

13          This Court actually has the unique ability to keep a

14  leash on what's happening, what's being relieved from stay,

15  make sure they're appropriate cases and the trial court is more

16  than capable if we need them to give us additional trial dates.

17  I started looking, our two just happened to be next up in line.

18  We were very, very active with Judge Mackey and the trial

19  court.  Our firm is the one that got the Harmon appellate

20  decision that cause them to give us all the secret files on

21  their priests.  So that's why we picked our two.

22          I believe other cases were well along their way.  So

23  I think the answer you asked about kind of how do you keep a

24  leash on it and if you find there's cause for relief from stay,

25  doesn't that open the floodgates?  I don't think it does

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 136 of 143

1 because I think the Court would be saying I'm allowing you to

2 move forward because I agree that these cases will benefit

3 everyone. We have made very, very clear in our papers that we

4 will not do anything, anything with a settlement, with a

5 judgment without coming back to this Court and this Court will

6 decide what to do with it, hopefully with a consensual plan

7 where it benefits everyone.

8 I have other clients, Your Honor, that this is a

9 court of equity. You expressed concerns about the other

10 survivors. I appreciate that. I have other clients besides

11 Mr. Harmon and Mr. Kilmer. I have ethical obligations to my

12 clients. So I also have to be very careful that I'm not doing

13 something to try to benefit one to the detriment of another

14 which is why we try to make very clear in our papers this is to

15 the benefit of everyone. There will not be any use of anything

16 that happens here to solely benefit Mr. Kilmer or Mr. Harmon.

17 I thought it was ironic in our brief we said

18 hopefully a plan, if we do right by everyone and we're helpful,

19 which I think we will for the reasons I've articulated,

20 hopefully the plan people might agree to do some sort of

21 equitable pay for our costs or something in a consensual plan

22 upon which everyone would vote on and say, yes, that's

23 appropriate. If people don't think we helped everyone out,

24 fine.

25 I'm not conditioning relief from stay on some benefit

www.JJCOURT.COM

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 137 of 143

1  to anyone.  We're literally just trying to do this because I
2  have been involved in almost all of these bankruptcies.
3  Something has to give.  It changed in 2019.  I get why it
4  changed, but if we're going to be stuck in this position where
5  the carriers appreciate and understand, they have no duty to
6  participate in these mediations, zero.

7      There's nothing, and I mean this with all due
8  respect, Your Honor, there's nothing you can do about it,
9  there's nothing a different Court can do about it.  Their only
10 obligations, and I mean that with upmost respect, obviously,
11 their only obligations is to protect the debtor from trials.

12      THE COURT:  Practical problem, I'm not sure that just
13 because you say you're good to go with the State Court, the
14 trial system, there's a trial date coming up pretty quick, I'm
15 not sure that that necessarily is representative of what we're
16 trying to figure out to -- for the mediation.  It's all about
17 numbers and dollars and if you have two wonderful cases good to
18 go, I'm not sure that's representative of the 400 or whatever
19 it is in my court, that it almost seems like you need to pick
20 them at random.

21      MR. AMALA:  Well, Your Honor, I think Mr. Bair
22 alluded to this.  These -- the cases that have been proposed, I
23 believe he said there's six different perpetrators who molested
24 a lot of different plaintiffs, I think, Your Honor, it is
25 helpful with regard to those negotiations.  And, more

WWW.JJCOURT.COM

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 138 of 143

1 importantly, again, if we -- you granted relief from stay, our

2 intent would be to make another demand to settle these cases

3 within the limits and see how the carriers respond.

4       Importantly, Your Honor, if they finally pay, to

5 answer your question, if they pay their limits on these two

6 cases, that will be very helpful, very helpful to the parties

7 in negotiations because the carriers, as the Diocese says in

8 their papers, are asserting a myriad of coverage positions.

9 The second the carriers actually have to honor their duty to

10 protect the debtor from trial and they start paying on any of

11 these cases, it's going to be very difficult for them to

12 continue to assert coverage defenses across all these cases

13 because there is a lot of overlap.

14       I noted in my papers the debtor says that the

15 carriers want to say all sex abuse in the Diocese of Albany was

16 expected or intended, so there's no coverage on any of these

17 claims.  Well, we posit the question, is that really a position

18 they're taking in mediation.  And I'm not disclosing, this is

19 the debtor says, this is one of their big coverage defenses, we

20 don't have to pay anything.

21       Well, is that really a position that they're going to

22 take if you grant relief from stay?  That will help all of the

23 parties negotiate and get over this just part if no and

24 these -- just being able to assert these coverage positions

25 with no incentive to get real.  Again, because of the stay,

1  there's no risk that the debtor's going to have to go to trial.

2  There's no risk of a judgment which means they don't have any

3  incentive to settle.  If they start settling cases, that will

4  be very helpful because it would be very difficult for them to

5  assert the same coverage positions as to other cases where

6  they're saying the same thing.

7          THE COURT:  Well, we certainly have to figure out a

8  way, I don't know that this is it, figure out a way to

9  incentivize the process to get everyone to put their best foot

10  forward in a mediation session or some sort of session.  We

11  need to get off square one which is where unfortunately I think

12  we are right now.

13          MR. AMALA:  Yeah.  In closing, Your Honor, I'll just

14  say I guess I come back to, and especially with Your Honor, I'm

15  very cognizant of talking about what's happening in other

16  courts and other bankruptcies.  But to someone who's been very

17  involved in these other plans, again, at this point, every --

18  the only plans that have actually been confirmed or approved

19  all provide the same relief for the same reason which is until

20  these carriers are facing the need to protect the debtor from a

21  trial, they're just not negotiating.  I mean, why else would

22  all these plans provide that same relief which is what we're

23  asking for now?

24          I'm just the one who has clients who are dying, who

25  have witnesses who are dying.  It's incredibly unfair I won't

1 say every day that goes by, but for these things to drag on

2 while the plaintiffs die and while the witnesses die. And, at

3 the same time, they say you can't prove your case, we're going

4 to drag this out. Maybe you'll get to a trial in three or four

5 years. Oh, too bad for you, the witnesses who you needed at

6 the trial, some of these perpetrators, they're dead, too bad.

7 And, in the meantime, we were thinking we'd pay you X dollars a

8 pop for plaintiff. Too bad, another 50 of them died. That's

9 the reality of what we're facing and why we ask for this relief

10 earlier than the other bankruptcies.

11          THE COURT: Who gets the ball next?

12          MR. AMALA: Mr. -- I'm not sure, Your Honor. Thank

13 you, very much, Your Honor.

14          THE COURT: Thank you.

15          MR. CALDIE: Your Honor, Edwin Caldie on behalf of --

16 I announced myself improperly earlier as counsel for the

17 Official Committee. It's the Tort Claimants Committee.

18          I just wanted to offer one point in case it's helpful

19 in this context. You're talking a lot about selection of the

20 cases. One of the factors that should be considered as you're

21 sort of mulling that and trying to come up with the most

22 appropriate, effective way to do to that potentially is a big

23 factor in the selection of these cases is willingness,

24 willingness of two different parties, willingness of the

25 survivor claimant to actually come forward and voluntarily go

WWW.JJCOURT.COM

Case 2-19-20905-PRW, Doc 2952-1, Filed 02/18/25, Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 141 of 143

1 a period of two weeks.  I want to look at the papers again.  I

2 want to think about this.  If that changes, we will docket an

3 electronic entry.  If not, we'll be meeting in two weeks.

4             Does anyone have any questions, any issues?

5                     (No audible response)

6             THE COURT:  If not --

7             COURTROOM DEPUTY:  Just to be clear, February 12th at

8 10:30.

9             THE COURT:  February 12th at 10:30.

10            COURTROOM DEPUTY:  Thank you.

11            THE COURT:  Safe travels home to all of you, be it to

12 the West Coast or to the City or to Albany, within Albany.

13 Thank you, all, very much.

14            UNIDENTIFIED ATTORNEYS:  Thank you.

15            UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

16            COURTROOM DEPUTY:  And, Judge, that's our last matter

17 for today and the Court will disconnect.  Thank you.

18                     * * * * *

19

20

21

22

23

24

25

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 142 of 143

# C E R T I F I C A T I O N

I, KELLI R. PHILBURN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Kelli R. Philburn

KELLI R. PHILBURN

J&J COURT TRANSCRIBERS, INC.        DATE:  February 10, 2025

WWW.JJCOURT.COM

Case 2-19-20905-PRW,   Doc 2952-1,   Filed 02/18/25,   Entered 02/18/25 18:26:50,
Description: Exhibit Exhibits 1-17, Page 143 of 143