**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 19-20905 |
| The Diocese of Rochester, | Chapter 11 |
| Debtor. | |

**THE MARSH/PCVA CLAIMANTS' OPPOSITION TO CONTINENTAL INSURANCE COMPANY'S EMERGENCY MOTION TO PLACE LIFT-STAY MOTION UNDER SEAL AND FOR ADDITIONAL RELIEF**

The Claimants represented by The Marsh Law Firm PLLC and Pfau Cochran Vertetis Amala PLLC (the "Marsh/PCVA Claimants")[1] respectfully request the Court deny Continental Insurance Company's ("CNA") Emergency Motion to Place Lift-Stay Motion Under Seal and For Additional Relief. A proposed order denying this relief is attached to this motion as **Exhibit A.**

## **INTRODUCTION**

In requesting relief on the basis of "defamation"—a standard that requires it to demonstrate falsity—CNA does *not* dispute the truth of the Marsh/PCVA Claimants' core assertions in their Lift-Stay Motion, including that (1) it profits from investing its funds; (2) it faces exposure to more sexual abuse claims in this proceeding than any other insurer; (3) when its payment of sexual abuse claims is delayed, it is able to invest more funds; (4) it takes the position that, where the Debtor does not face a verdict or judgment against it in state court, it has no duty to pay reasonable settlement demands; (5) it takes the position that its coverage defenses cannot be adjudicated without factual determinations in the underlying sexual abuse lawsuits; (6) the Debtor does not face having a verdict and judgment against it while the automatic stay of the underlying sexual abuse claims remains in place; (7) the factual determinations on which CNA's coverage defenses depend cannot be resolved while the automatic stay of the underlying sexual abuse claims remains in place; (8) CNA has relied on its unresolvable coverage defenses for leverage in this proceeding[2]; (9) CNA tactically and financially benefits from the delay this proceeding creates in paying sexual abuse claims by being able to keep more of its funds invested; (10) it made record income from

---

[1] Claimants Gooden and Labrador timely filed Claim Nos. 204 and 320. The Marsh/PCVA Claimants also include 30 other Claimants: Nos. 195, 196, 197, 200, 201, 203, 205, 206, 207, 210, 213, 214, 225, 246, 250, 272, 276, 280, 313, 314, 322, 371, 381, 382, 396, 443, 442, 444, 446, and 454.

[2] It does so in its motion. Dkt. 2969 at 5 (blaming "the Committee or State Court Counsel [for] making demands . . . that fail to give weight to coverage issues").

1

its investments last year; and (11) it has taken actions that have delayed the resolution of this proceeding and has indicated its intent to do so in the future.

CNA does not dispute these core, critical facts because it cannot. Most if not all are, as CNA concedes "well-known" "matters of public record." Dkt. 2969 at 5, 12. Some are CNA's *own* public statements in pursuing its own agenda in this proceeding or attempting to entice potential investors. And still, others are the Court's own statements regarding the actual and potential harm to survivors from delay in these proceedings.

As other bankruptcy jurists have recognized, the paramount consideration for stay relief in mass tort Chapter 11 proceedings involving the claims of aging survivors abused decades ago is the balance of harms. Dkt. 2952-1 at 122-123. That inquiry necessarily requires a full, robust, and frank discussion not only of the existence of harm to survivors but also its extent and severity. It also requires an unflinchingly honest discussion of the challenges the bankruptcy system faces in resolving such claims, including the inherent advantages and benefits enjoyed by insurers like CNA facing exposure to a large number of claims.

These facts overwhelmingly demonstrate that the balance of harms weighs in favor of stay relief. The fact that they incidentally paint a portrait of CNA that it dislikes is no justification for hiding them from the public. Neither "mere embarrassment" nor an "unintended, potential secondary consequence of negative publicity" can overcome the constitutionally rooted, exceedingly high presumption of public access to court records. *In re Anthracite Cap., Inc.*, 492 B.R. 162, 176–77 (Bankr. S.D.N.Y. 2013) (internal quotations omitted). Courts will not seal "statements that offend the sensibilities of the objecting party if the challenged allegations describe acts or events relevant to the action.'" *In re Anthracite Cap., Inc.*, 492 B.R. at 176 (quoting In re Food Mgmt. Grp., LLC, 359 B.R. at 558).

2

CNA certainly takes umbrage at plain, unflinching examination of the harshness of these realities. Unable or unwilling to handle the truth, CNA attempts to deflect and distract from compelling grounds for stay relief by going on the offensive. In one breath it claims it "does not seek to preclude any attorney in this case from making any legal argument they believe is necessary to zealously advance their clients interests." Dkt. 2969 at 4. In the next it seeks to silence and sanitize written submissions regarding the irreparably severe harms to survivors—and the benefits to CNA—from the delay in these proceedings that justifies stay relief. Stunningly, it also seeks an admonition from the Court against statements to the media about CNA that offends CNA—whose chilling effect implicates a de facto, broad, one-sided prior restraint on speech in CNA's favor.

The Marsh/PCVA Claimants and their counsel take their legal, ethical, and moral obligations with the utmost seriousness. Nothing in CNA's motion calls that into question. If anything, CNA's filing of a legally and factually unfounded motion emphasizes their point of how CNA has leveraged and will continue to attempt to leverage this proceeding to its benefit.

It is telling that CNA requests this sweeping relief without mentioning its extraordinary nature. It does so while omitting its exceedingly high burden for overcoming the constitutionally rooted, strong presumption of public access to documents filed in bankruptcy courts. It fails to address that *neither* of the Bankruptcy Code provisions it cites allow the sealing of statements derived from public documents or relating to a business entity like CNA. And it provides no legal standards for its extraordinary relief nor any attempt to meet them.

It is no surprise why. Its hyperbolic misrepresentations of the Marsh/PCVA Claimants' arguments and its baseless, false equivocation between (1) the deplorable, externally-directed homicidal impulses of the United Health assassin and (2) the avoidant, paralyzing trauma of sexual

3

abuse survivors do not come remotely close to justifying such extraordinary relief. At best, it is potential evidence of how CNA may view sexual abuse survivors: as mentally unstable, irrational threats (rather than human beings with legitimate concerns, justified frustrations with the delay in these proceedings, and reasonable settlement demands).

It is not the Court's role to manage, filter, or sanitize truth or legitimate, relevant advocacy that CNA is unable to handle or silence counsel for survivors simply because CNA takes offense. Lacking any legal or factual support, CNA's motion arguably is "a self-serving document designed to counter what [it] perceived as negative information that came to light" in this proceeding. *In re Matter of Certain Claims & Noticing Agents' Receipt of Fees in Connection With Unauthorized Arrangements With Xclaim Inc.*, 647 B.R. 269, 284–85 (Bankr. S.D.N.Y. 2022). At a minimum, its motion must be denied.

## FACTS

### A. CNA Grossly Misrepresents the Lift-Stay Motion's Statements

Identifying at least four specific statements in the Lift Stay Motion, CNA grossly mischaracterizes them as: arguing that "CNA is harming survivors on purpose and wants them to die so that its profits are protected"; making an "explicit threat" of "real consequences" of physical violence; arguing CNA is "single-handedly responsible for the fact that claimants have died"; and blaming CNA for "all the delay in a multi-party, complex Chapter 11 bankruptcy case"; blaming CNA for "having caused or invited actual harm to individual claimants in this case, including by purposefully inflicting trauma or by causing their deaths or illnesses because of delays in this bankruptcy case"; and attempting to incite survivors to acts of violence against CNA's representatives, counsel, and employees. Dkt. 2969 at 6-7, 9-11.

A passing glance at the four cited statements dispels CNA's hyperbolic distortions. Dkt. 2969 at 6. None name or even reference any CNA representative, counsel, or employee. None

4

make threats of physical violence toward anyone. Neither do they expressly or implicitly invite, condone, or suggest physical violence against anyone. None claim that CNA is the *sole* reason for all delay in these proceedings. And none claim that CNA intends to harm survivors and wants them to die.

Instead, the statements observe that the simple fact that as a result of the delay in these proceedings, survivors continue to face irreparable harm—death before any recovery on their claims—while CNA has enjoyed multiple benefits, including profit. They also observe the fact that CNA has multiple potential incentives, normally absent in the tort system, to continue delaying the payment of hundreds of sexual abuse claims as long as possible. They observe the fact that CNA has indicated that it will likely continue to delay the resolution of this proceeding. And it observes the fact that CNA would experience the "real consequences" of *legal liability* were it returned to the tort system through stay relief – the whole purpose of claimant's stay relief motion before this Court.

CNA's dislike of these facts, the sum of their parts, and the starkness of the inequities survivors have suffered and will continue to suffer without stay relief harshness makes them no less true. Nor does it transmute them into express threats of or calls to violence against anyone.

**B.      PCVA Attorneys Provided Responses Months Ago to a Legitimate Inquiry from the Press Initiated by the Press Regarding This Matter of Public Interest**

CNA cites a recent Law360 article—submitted by the Marsh/PCVA Claimants in support of the Lift-Stay Motion—interviewing a PCVA attorney, Anelga Doumanian, as "evidence" of "a concerted effort by the  Pfau Cochran firm and other State Court Counsel to stir up survivors against [CNA]." Dkt. 2969 at 7.

This is false. Declaration of Anelga Doumanian ("Doumanian Decl.") ¶ 3; *id.* Exhibit 1. The article was the result of responses months ago to legitimate inquiries from the press initiated

by the press on a matter of public interest, particularly given that these proceedings are taking place across the country.   Doumanian Decl. ¶¶ 3-12; *id.* Ex. 1.

Specifically, in November 2024, a Law360 reporter requested an interview regarding an article he was researching regarding the facts that this proceeding has been pending for a length amount of time; professionals had received large fees while survivors had received nothing; a survivor Committee member, Kevin Higley, had passed away during these proceedings; and the "bankruptcy system can contribute to additional suffering in cases like this." *Id.* ¶¶ 5-6; Ex. 1. During the interview, the reporter requested additional information, including regarding the number of survivors represented by PCVA who have died during these proceeding. *Id.* ¶ 8. The reporter did not provide an anticipated publication date for the article and advised he was in the process of speaking with others for his story. *Id.* ¶ 9. Months after that last contact, on February 4, 2025, the reporter advised that the article was scheduled to publish on February 8, 2025. *Id.* ¶ 11; *id.* Ex. 1.

**C.   Judge Chimes Has Twice Ordered a Trial-Readiness Date in Scott Yerger's Case After Judge Bucki Granted Stay Relief**

CNA further argues that Judge Chimes has not ordered a trial readiness date in Scott Yerger's case for less than one year after Judge Bucki granted stay relief in *In re Diocese of Buffalo*, No. 20-10322 (Bankr. W.D.N.Y.). This, too, is false.

First, one month after Judge Bucki granted stay relief, Judge Chimes directed Mr. Yerger to file a Note of Issue and the parties to be trial ready by July 31, 2025. Declaration of Lucas B. Franken ("Franken Decl.") ¶ 2. CNA omits the portion of the state court docket reflecting this deadline. *Id.* Ex. 1. After the defendants objected and asked for more time for discovery, Judge Chimes extended that existing, ordered deadline by *one month* to August 29, 2025. *Id.* ¶ 3; Ex. 2.

/////

6

## ARGUMENT

**A. CNA Does Not Attempt to Meet the Actual, Extremely High Burden for the Extraordinary Relief It requests Because It Cannot**

CNA attempts to evade the actual legal standard for its requested relief by misdirecting the Court to general, nebulous New York State civil rules and Western District general orders regarding civility. It is no surprise why. CNA bears an exceedingly high burden for its requested relief. It does not even attempt to meet it because it cannot.

11 U.S.C. 107(a) codifies "a strong presumption and public policy in favor of public access to court records . . . 'rooted in the in the public's First Amendment right to know about the administration of justice.'" *In re Rapid American Corp.,* 2017 WL 6459348, at *1 (Bankr. S.D.N.Y. Dec. 15, 2017) (quoting *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.),* 21 F.3d 24, 26 (2d Cir.1994)).

This presumption of open access exists because "'public monitoring is an essential feature of democratic control'" and is "'based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice.'" *Geltzer v. Andersen Worldwide, S.C.,* 2007 WL 273526, at *2 (S.D.N.Y. Jan. 30, 2007) (quoting *United States v. Amodeo,* 71 F.3d 1044, 1048 (2d Cir.1995)). "This governmental interest is of special importance in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among creditors regarding the fairness of the bankruptcy system." *In re Gitto Global Corp.*, 422 F.3d 1, 7 (1st Cir. 2005); *see also In re Bell & Beckwith*, 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984) ("This policy of open inspection, established in the Bankruptcy Code itself, is fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised.")

7

The presumption of public access applies most forcefully to "any document which is presented to the court to invoke its powers." *In re Anthracite Cap., Inc.*, 492 B.R. 162, 173 (Bankr. S.D.N.Y. 2013). That is because "[t]he public interest in openness of court proceedings is at its zenith when issues concerning the integrity and transparency of bankruptcy court proceedings are involved." *In re Food Mgmt. Grp., LLC*, 359 B.R. at 553. Requests to seal documents on which the Court is relying to make a decision go "to the very core of the constitutionally-embedded presumption of openness in judicial proceedings" because "[t]he press and public could hardly make an independent assessment of the facts underlying a judicial disposition, or assess judicial impartiality or bias, without knowing the essence of what the court has approved." *Geltzer*, 2007 WL 273526, at *2, *4.

CNA requests sealing or redaction under § 107(b)(2) and § 107(c). Although § 107(b) and § 107(c) provide exceptions to the public's presumptive right of access, limiting it in any way remains an "extraordinary measure" given the constitutional and statutory imperatives impacted. *In re Anthracite Cap., Inc.*, 492 B.R. at 170–71. Indeed, **this** Court has recognized such relief as an "exceptional act." *In re Thomas*, 2016 WL 386143, at *4 (Bankr. W.D.N.Y. Jan. 29, 2016) (addressing § 107(c) relief). Given the constitutional issues implicated and the Bankruptcy Code's strong presumption of public access, "[a] court's ability to limit the public's right to access remains an extraordinary measure that is warranted only under rare circumstances." *In re Anthracite Cap., Inc.*, 492 B.R. at 170–71.

Accordingly, courts "narrowly construe[]" § 107(b)(2) and § 107(c)'s exceptions to public access. *Id.* at 176; *In re Endo Int'l plc*, 2022 WL 16640880, at *8 (Bankr. S.D.N.Y. Nov. 2, 2022) (quoting *In re French*, 401 B.R. 295, 306 (Bankr. E.D. Tenn. 2003)) (alteration in original) ("the sole purpose [of] § 107(c) was to establish public access to court documentation with very limited

8

exceptions"). CNA bears the burden of demonstrating a sufficient basis of overcoming the presumption and public policy in favor of public access to court records. *See In re Food Mgmt. Grp., LLC*, 359 B.R. at 561. CNA's burden is exceedingly heavy. To meet it, CNA "must show extraordinary circumstances and a compelling need for protection." *In re Anthracite Cap., Inc.*, 492 B.R. at 174. "Only the most compelling reasons justify sealing court records." *Id.* As such, the Court must "'carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need.'" *Id.* (quoting *Orion Pictures Corp.*, 21 F.3d at 27). As discussed below, CNA cannot meet its actual, exceedingly high burden nor does it even attempt to do so.

**B.      § 107(b)(2) Does Not Authorize CNA's Requested Relief to Seal Relevant Statements and Inferences Derived from Public Records and Documents**

 1.      § 107(b) is inapplicable to public documents and information derived from public documents

First, as a threshold issue, "[d]espite the mandates of § 107(b), the Court **has no authority** to seal **public documents** or **information derived from public documents**." *In re Anthracite Cap., Inc.*, 492 B.R. at 171 (emphasis added) (citing *In re Chase*, 2008 WL 2945997, at *7 (Bankr. S.D.N.Y. Jul. 25, 2008); *see also In re Overmyer*, 24 B.R. 437, 442 (Bankr.S.D.N.Y.1982) ("matter[s] of public record [are] not within the protection afforded by . . . 107(b)(2)); *In re Food Mgmt. Group, LLC,* 359 B.R. at 565 (denying motion to seal because bankruptcy courts lack "authority to seal information derived from public documents").

For example, in *In re Overmyer*, the debtor moved to strike certain portions of a filing alleging the debtor's difficult "attitude toward the judicial system." 24 B.R. at 441 (internal citations omitted). The Court denied sealing of the allegation "describing the debtor's attitude toward the judicial system" because it was "drawn from" a public record—a judicial opinion. *Id.*

Likewise, in *In re Food Management Group, LLC*, the defendants moved to require filing of an adversary complaint under seal because it alleged various violations of court rules and fiduciary duties. 359 B.R. at 551-552. The court concluded it lacked authority to seal the complaint because the "vast majority of the facts on which the Trustee bases the allegations in the adversary complaint are already part of the public record . . . ." *Id.* at 565.

Here, the statements, allegations, and arguments CNA seeks to seal fall into the following categories: (1) CNA's possible, profit-based motivations for delaying resolution of this proceeding; (2) CNA's conduct, positions, and actions during this proceeding; (3) the fact that survivor claimants have died during this proceeding; and (4) the fact that CNA would face the "real consequences" of monetary damages and other ***legal penalties*** for any insurance bad faith misconduct should the Court grant stay relief. Dkt. 2969 at 5-6. As even CNA partially concedes, however, such statements were based on "matter[s] of public record" that are "well-known." Dkt. 2969 at 5, 12; *see also* Dkt. 2950 at 7-28 (containing extensive citation to supporting public documents, statements, and matters); Dkt. 2952-1 at 1-143 (exhibits containing supporting public records and statements). That the inferences and statements derived from them offends CNA's sensibilities is irrelevant. Where they are drawn from public records and public matters, including CNA's own press releases touting its profits to current and potential investors, § 107(b) provides no authority for sealing them.

    2.    <u>CNA fails to demonstrate the factual statements or inferences derived from these public documents are "scandalous" under § 107(b)(2)</u>

Second, CNA gives a single, passing nod to its burden to demonstrate any of the statements to which it objects are "scandalous" under § 107(b) without further elaborating on what that actually requires. Dkt. 2969 at 9-10. Here, too, its silence is telling.

"Inherent in the language of § 107(b) is the requirement that the party requesting the extraordinary relief provide the court **with specific factual and legal authority** demonstrating that a particular document at issue is properly classified as . . . 'scandalous.'" *In re Anthracite Cap., Inc.*, 492 B.R. at 171 (emphasis added). "Since the sealing of records runs contrary to the strong policy of public access, only **clear evidence** of impropriety can overcome the presumption and justify protection . . . ." *In re Genesis Glob. Holdco, LLC*, 652 B.R. 618, 630 (Bankr. S.D.N.Y. 2023) (internal quotations omitted) (emphasis added). "That information might 'conceivably' or 'possibly' fall within a protected category is not sufficient to seal documents." *In re Anthracite Cap., Inc.*, 492 B.R. at 176 (internal quotations and citations omitted); *see also United States v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 150 B.R. 334, 340–41 (D.Del.1993) (refusing to seal documents based on "nothing more than the mere possibility" that they contained defamatory information).

CNA does not bother to support its requested extraordinary relief with any legal authority regarding the meaning of "scandalous" or "let alone that the challenged statements fall within them. For that reason alone the extraordinary act of sealing is unjustified.

Nor do CNA's argumentative assertions of improper motive meet the actual standard for demonstrating a "scandalous" statement. Bankruptcy courts look to the Second Circuit's "strict interpretation" of the same term under Fed. R. Civ. Pro. 12(f)'s requirements for striking statements in a pleading. *In re Anthracite Cap., Inc.*, 492 B.R. at 176. Under that standard, "the truthfulness of the alleged offensive statements" is irrelevant; "relevance to the proceedings is the standard for determining whether or not something is scandalous." *Id.* (citing *In re Food Mgmt. Grp., LLC,* 359 B.R. at 558). "'[C]ourts will not strike . . . statements that offend the sensibilities of the objecting party if the challenged allegations describe acts or events *relevant* to the action.'"

*In re Anthracite Cap., Inc.*, 492 B.R. at 176 (quoting *In re Food Mgmt. Grp., LLC,* 359 B.R. at 558).

For example, the challenged statements in *In re Anthracite Cap., Inc.* were remarkably allegations in an adversary complaint filed against BlackRock, Inc., and the Debtor, Anthracite, derived from facts that the court characterized as "editorial comments." 492 B.R. at 176. Specifically, the allegations were remarkably similar to those challenged by CNA here:

- "Anthracite's story provides a window into the Wall Street greed that caused the real estate collapse of the last several years that took the economy with it."

- "Seduced by perverse incentives that BlackROck itself put in place at Anthracite's inception . . . "

- BlackRock did not want to "kill its cash cow"

- BlackRock's actions "[lit] the fuse"

- BlackRock "'doubled down'—not with its own money, of course, but with that of Anthracite's investors"

*Id.* Although it characterized the language as "flowery," the court concluded sealing the allegations was unjustified where they were relevant to the complaint's causes of action. *Id.*

As discussed above, CNA wholly misrepresents that the challenged statements were "hostile, violent, and intimidating." Dkt. 2969 at 4. Even setting that aside, the Marsh/PCVA Claimants requested stay relief under the *Sonnax* factors. Those factors include whether relief would partially or fully resolve issues, the interests of judicial economy and expeditious resolution of the litigation, and the balance of harms. Each challenged statement is relevant to explaining why stay relief is warranted under these factors, particularly the balance of harms—survivors have died and will continue to die before receiving any relief from these proceedings while CNA has

enjoyed multiple benefits from the automatic stay, including the ability to invest funds that might otherwise be sued to pay sexual abuse claims and, in its own words, record income.

Finally, CNA alleges "impropriety" based on a single fact—a Law360 article regarding the fact that survivors have died during this and other sexual abuse mass tort Chapter 11 proceedings and CNA's potential, profit-based motives to delay this proceeding. But its unfounded assertions regarding an improper motive to "incite" survivors to violence is not only devoid of any factual basis, it is teetering on defamatory conduct on its part (particularly considering that both the article itself and the information provided in it were a result of journalistic investigation into a matter of public interest, not some improper "concerted effort" to incite survivors to violence against CNA).

   3.   CNA fails to demonstrate the factual statements or inferences derived from these public documents are "scandalous" under § 107(b)(2)

Finally, CNA likewise gives only a passing nod to its requirement to show that the challenged statements were "defamatory" backed only by its unfounded assertions, not actual legal authority. Even overlooking this insurmountable hurdle to its motion, statements are only "defamatory" under § 107(b)(2) when they "can be clearly shown to be untrue without the need for discovery or a mini-trial." *In re Anthracite Cap., Inc.*, 492 B.R. at 177. "Potentially untrue statements are not defamatory." *Id.*

It is unclear whether CNA actually takes the position that these statements are "untrue" or whether it simply doesn't like them because they underscore why stay relief is warranted here: (1) that the state court ordered plaintiff Scott Yerger's case be trial-ready by the end of July, 2025, less than one year after Judge Bucki granted stay relief; (2) that CNA bears some blame for the delay in these proceedings; (3) that "mediation efforts have concluded without a settlement with CNA and the other parties are moving forward with a joint proposed plan"; and (4) CNA is "over

13

$100,000,000 apart from what the parties' disclosure statement would be required to reasonably and meaningfully participate in a settlement."

But just because CNA may not agree with the wording doesn't make the above "not true." First, the state court initially directed the parties to be trial-ready by the end of July, 2025; subsequently entered an order extending that deadline by one month to August 29, 2025, after the defendants objected; and at all times has ordered trial readiness in Mr. Yerger's case for less than one year after Judge Bucki granted stay relief. CNA's quibbling attempts to manufacture a "falsehood" only emphasizes the truth of the Marsh/PCVA Claimants' representations: that Judge Chimes is keeping CVA cases relieved of the stay on a tight leash and on a fast track to trial.

Second, CNA argues that *some* of its actions in this proceeding indicate that it has not sought to delay these proceedings. Dkt. 2969 at 12. But it also does not—and cannot—dispute many of its actions that indisputably ***have*** delayed these proceedings. Nor does it dispute that it is the insurance carrier with the largest financial exposure to sexual abuse claims in these proceedings, has an incentive to delay its exposure to those claims, and will continue to delay these proceedings' resolution by objecting to and appealing any confirmed plan. At worst, CNA's counterfactuals demonstrate only that the statements regarding its motives and intent are potentially untrue. Discovery would be required to prove them—and the Marsh/PCVA Claimants welcome the opportunity to do so by taking their claims to a judgment against the Debtor and subsequently pursuing claims for insurance bad faith against CNA. But where the truth of those facts requires discovery and proof, they are not "defamatory" under § 107(b)(2).

Finally, and as CNA well knows, it is undeniably true that all other parties have moved forward with a settlement and joint proposed plan without CNA—with CNA failing to come even close to the $171 million settlement offer within the publicly filed plan. Perhaps because it is faced

14

with these inconvenient facts, CNA resorts to shaming the Marsh/PCVA Claimants for their inadvertent mathematical error. To that the Marsh/PCVA Claimants concede that the difference between $171,000,000 million and $75,000,000 million is $96,000,000 (a four million dollar difference). The math stands corrected for the public record. In that respect, the Marsh/PCVA Claimants stand corrected and now maintain: after over five years, CNA's valuation of the sexual abuse claims remains ***nearly*** $100,000,000 apart from an amount the survivors consider reasonable, meaningful compensation.

**C.    § 107(c) Does Not Authorize CNA's Requested Relief to Seal True Statements and Inferences Derived from Public Records and Documents**

1.      § 107(c) does not protect identification of business entities like CNA

Like its unfounded request to seal under § 107(b), CNA improperly invokes § 107(c) to protect public access to statements identifying ***it***. § 107(c) protects "individuals" from the disclosure of information that would create an undue risk of identity theft or other unlawful injury to them or their property. Courts have rejected an interpretation of "individual" in section 107(c) that encompasses business entities like CNA. *In re Celsius Network LLC*, 644 B.R. 276, 294 (Bankr. S.D.N.Y. 2022). "The type of information protected under section 107(c) includes information 'that may be used, alone or in conjunction with any other information, to identify a specific individual.'" *In re Celsius Network, LLC*, 644 B.R. at 294 (quoting 18 U.S.C. § 1028(d)) (citing *In re Barbaran*, No. 06-00457-ELG, 2022 WL 1487066, at *4 (Bankr. D.D.C. May 9, 2022); *In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 748 (Bankr. D. Del. 2018)); *see also* 11 U.S.C. § 101(41A) (personally identifiable information includes information provided by or concerning an "individual," such as their name, address, phone number, social security number, birth date, birth or adoption certificate number, or place of birth, that, "if disclosed, will result in contacting or identifying such individual physically or electronically").

CNA seeks to seal statements identifying it, not any specific employee, representative, or any other person. But it is a business entity, not an individual. It does not fall within § 107(c)'s narrow exception to public access.

2. CNA's baseless aspersions, gross mischaracterizations, false equivalencies, and aspersions regarding sexual abuse survivors cannot justify sealing filings from public view under § 107(c)

Even overlooking § 107(c)'s inapplicability to business entities like CNA, it completely fails to meet its burden under that provision. It cannot meet its burden "'simply by speculating "that disclosure 'may,' as opposed to 'would' as the statutory language requires, create undue risk of identity theft or other unlawful injury.'" *In re Endo Int'l plc*, 2022 WL 16640880, at *8 (quoting *In re Celsius Network LLC*, 2022 WL 4492928 at *10). But that is all CNA does: "[i]t is not difficult ***to imagine*** such an emotionally fragile [survivor] who is told that a particular insurance company is to blame for all delay in a multi-party, complex Chapter 11 bankruptcy case taking violent action." Dkt. 2969 at 9 (emphasis added). Attacking the Marsh/PCVA Claimants and suggesting that they are so "unstable" and "emotionally" broken is, frankly, difficult to respond to.

Ironically, CNA has been named and singled out countless times throughout the thousands of filings in this proceeding. Those filings—including CNA's own—have identified it in conjunction with many of the facts stated in the Lift Stay Motion, such as the fact that it is the sole, non-settling insurer; it has taken multiple actions in these proceedings that have resulted in delaying and will continue to delay resolution of this proceeding; and CNA's positions . Yet, CNA offers no actual evidence that it or its employees or representatives have been or are being targeted for violence despite its identity, role, and positions in this proceeding being publicly well-known. Not only can it not demonstrate (nor does it offer any evidence) that its representatives, counsel, or employees would be targeted for violence by sexual abuse survivors if the

16

objectionable statements are not sealed, but its unfounded assertions are, again, teetering on inappropriate conduct. *See*, e.g., *In re Celsius Network, LLC*, 644 B.R. at 295 (movant failed to demonstrate disclosure of "names alone . . . presents an imminent risk of harm" where hundreds of docket entries contained names yet there was no showing that any identified individuals "have been the target of any acts [the movants] argue is imminent upon disclosure").

CNA's false equivocation of the deplorable, homicidal, externally directed intent of the United Health assassin with the paralyzing, avoidant trauma of sexual abuse survivors is not evidence of anything other than how CNA may misperceive, misunderstand, and view sexual abuse survivors as mentally unstable and irrational. But its perception of these survivors and its attacks on the Marsh/PCVA Claimants is not evidence that such a survivor poses a threat to CNA's counsel, employees, representatives, or any other individual. CNA's ill-founded projections of its own fears onto and misrepresentations of sexual abuse survivors is not evidence of any threat

**D. The Court Must Reject CNA's Request to Impose an Unconstitutional Prior Restraint on The Marsh/PCVA Claimants' Counsel**

CNA's baseless request to this Court for censorship on the Marsh/PCVA Claimants and their counsel is also difficult to understand, particularly where CNA makes no effort to meet its burden in justifying this extraordinary relief including failing to provide any evidence that would warrant this authoritarian decree.

"The special vice of a prior restraint is that all communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973). For this reason they are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 556

(1976).  Accordingly, any prior restraint on expression "'bear[s] a heavy presumption against its constitutional validity.'"  *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971).

Like its request for sealing, CNA neither provides nor attempts to meet the standards for overcoming this heavy presumption.  Nor, as discussed above, could CNA's hyperbolic mischaracterizations of the challenged statements, as well as against sexual abuse survivors, meet its burden.  That is particularly true where CNA seeks to chill statements that are true: where its actions have delayed these proceedings, and such delays have resulted in the deaths of survivors during the course of this proceeding without being able to see final resolution of this case.  Perhaps CNA fails to meet its burden because it tacitly recognizes that its request for censorship is unfounded. Dkt. 2969 at 11 n. 17.

## CONCLUSION

For the above reasons, the Marsh/PCVA Claimants request the Court deny CNA's motion in full.

Dated:    February 28, 2025

Respectfully submitted,

PFAU COCHRAN VERTETIS AMALA, PLLC

By      */s/ Jason P. Amala*
          Jason P. Amala (*admitted pro hac vice*)
          Christopher E. Love (*pro hac vice forthcoming*)
          31 Hudson Yards
          11th Floor Suite 36
          New York, NY 10001
          Phone:  206-462-4339
          Email:    jason@pcvalaw.com
                       chris@pcvalaw.com

          Attorneys for Claimants Mark Gooden and Miguel Labrador

18

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Case No. 19-20905 |
| The Diocese of Rochester, | Chapter 11 |
| Debtor. | |

### ORDER DENYING CONTINENTAL INSURANCE
### COMPANY'S EMERGENCY MOTION TO PLACE LIFT-STAY
### MOTION UNDER SEAL AND FOR ADDITIONAL RELIEF

Upon *Continental Insurance Company's Emergency Motion to Place Lift-Stay Motion Under Seal and for Additional Relief* (the "Motion"); the Court having reviewed and considered the support for the Motion provided at the record and at the hearing at the Motion; the Court finding that (a) the Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, (b) venue is proper in this district under 28 U.S.C. §§ 1408 and 1409, (c) this is a core proceeding under 28 U.S.C. §§ 157(b)(2), (d) notice of the Motion and hearing was sufficient under the circumstances, and (e) the Court having determined that the legal and factual bases set forth in the Motion and hearing further establish just cause for the relief granted;

/////

/////

/////

/////

/////

/////

/////

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is DENIED in full.

Dated: _____

_____
HONORABLE PAUL R. WARREN
UNITED STATES BANKRUPTCY JUDGE