# EXHIBIT E

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NEW YORK

In re:

The Diocese of Buffalo, N.Y.,

Debtor.

Chapter 11

Case No. 1-20-10322-CLB

## CONTINENTAL'S MOTION TO COMPEL CLAIMANTS' ATTORNEYS TO MAKE MANDATORY RULE 2019 DISCLOSURES

The Continental Insurance Company hereby moves the Court for entry of an order (i) compelling all law firms that represent multiple claimants in this bankruptcy case to file the disclosures required by Bankruptcy Rule 2019 within ten days after entry of the Court's order and (ii) barring non-compliant law firms from negotiating or settling on behalf of claimants, disallowing all proofs of claim filed by the law firms, and issuing other relief as authorized by Rule 2019(e).

In support of this motion, Continental states as follows:

Compliance with Rule 2019 is mandatory, and its requirements are self-effectuating. Claimants' counsel know they are required to comply with the Rule—they have been ordered to do so in other cases—and they know how to comply with the Rule, as their disclosures in other cases demonstrate. Yet, more than four years into this case, not a single claimants' law firm has deigned to comply with their legal obligations under the Rule.

The fact that compliance with Rule 2019 is mandatory is sufficient by itself to justify grant of this motion and entry of an order providing the relief requested. However, Rule 2019 exists to promote transparency where a single law firm represents multiple clients in a Chapter 11 case, and that transparency is essential here. Debtor commenced this bankruptcy by

acknowledging "its moral obligation to compensate victims of abuse fairly and equitably."[1] Equitably compensating abuse victims may result in some claimants—for example, those who suffered more severe abuse—receiving higher settlement offers from a claimant trust (assuming a plan is eventually confirmed) than other claimants. Where, as here, claimants with different interests are jointly represented by a single law firm charged with negotiating the terms of a plan for their different claimant clients to vote on, the possibility of conflicts is obvious. It is exactly for this reason that Rule 2019 exists and mandates the disclosures required therein.

Compounding the need for Rule 2019 disclosure are the likely fee arrangements between claimants and counsel, which would give the lawyers a direct economic stake in the outcome of this bankruptcy case. In other diocesan bankruptcies, firms who also represent claimants in this case filed Rule 2019 disclosures revealing contingency fee percentages of 35% (*Archdiocese of Saint Paul & Minneapolis*) and up to 33% (*Diocese of Rochester* and *Diocese of Camden*). Moreover, attorneys (rather than claimants themselves) signed substantial numbers of proofs of claim forms submitted in this bankruptcy, providing no assurance that the individual claimants reviewed or approved the filings, or even knew about them. Given the economic incentives the law firms have in this case, disclosure under the Rule is a must.

At least one law firm representing hundreds of claimants in this case also has litigation financing arrangements. The firm, Jeff Anderson & Associates, P.A. (the "Anderson firm"), was ordered by the court in *In re Diocese of Rochester* to disclose "financial arrangements including, but not limited to, litigation financing" pursuant to Bankruptcy Rule 2019.[2] That

---

[1]      Dkt. No. 8 (first-day declaration of Debtor's Vicar General, Peter J. Karalus), ¶ 64.

[2]      *In re Diocese of Rochester*, Case No. 19-20905, Hrg Tr. at 9:15-17 (Bankr. W.D.N.Y. Apr. 19, 2023), attached as Exhibit A. *See also id.* at 9:8-25, 10:21-11:16; Order Granting Motion by Continental under

- 2 -

court explained that, "to the extent there are problematic arrangements out there, if any, that needs to be disclosed under 2019."[3] The same interpretation of what the rule requires is appropriate here, and disclosure of all relevant financial arrangements should be ordered.

## Jurisdiction and Venue

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408. The predicate for the relief requested herein is Bankruptcy Rule 2019.

## Relevant background

The United States Trustee appointed seven creditors to serve on the Committee of Unsecured Creditors (the "Committee").[4] The Committee itself is represented by counsel that was approved by this Court on the basis of an application disclosing information about the terms of its engagement and compensation and affirming no conflicts.[5]

Each of the six current Committee members is represented by so-called State Court Counsel. The State Court Counsel firms are: the Anderson Firm; Chiacchia & Fleming LLP; the Law Offices of Mitchell Garabedian; the Merson Law Firm; and Pfau Cochran Vertetis Amala PLLC and the Marsh Law Firm. All of these firms represent multiple non-Committee members in addition to their Committee-member clients, and some represent dozens or

---

Bankruptcy Rule 2019, *In re Diocese of Rochester*, Case No. 19-20905-PRW (May 23, 20233) (annexing the agreed protocol for the production of the Anderson firm's litigation financing agreement).

[3]     *See* Amended Appointment of Committee of Unsecured Creditors [Docket No. 2034].

[4]     *See* Dkt. Nos. 92 (UST's Appointment of Committee of Unsecured Creditors), 2034 (UST's Amended Appointment of Committee of Unsecured Creditors) (omitting one of the seven original Committee members).

[5]     Dkt. Nos. 195 (Committee's application to employ the Pachulski firm as counsel), 359 (order appointing the Pachulski firm as counsel).

- 3 -

hundreds of claimants. Many other firms also represent in excess of ten claimants, including Lipsitz Green Scime Cambria LLP, Slater Slater Schulman LLP, Herman Law, Phillips & Paolicelli LLP, and Fanizzi & Barr P.C. Yet, not a single one of these law firms have filed Rule 2019 disclosures.

More than 1000 sexual abuse proofs of claim were filed in this bankruptcy case. Certain law firms, including the Anderson firm, which represents hundreds of individual claimants, signed 100 percent of the claims on behalf of its clients. Its clients signed none.

## Argument

Continental seeks an order from this Court mandating compliance with Rule 2019. The Rule is self-effectuating and requires disclosure, in the interests of complete transparency.[6]

### A. Rule 2019 requires broad disclosures, including disclosure of any economic interests affected by a claim's disposition.

Rule 2019 "is the Bankruptcy Code's mechanism for keeping tabs on multiple representation of creditors"[7] and, in the mass tort context, "to root out conflicts of interest."[8]

Bankruptcy Rule 2019(b)(1) states:

In a chapter 9 or 11 case, a verified statement setting forth the information

---

[6] Continental unquestionably has standing to seek this relief. *See, e.g., Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 160 (D.N.J. 2005) ("the information sought in the Rule 2019 disclosures, does indeed bear on the overall fairness of this Plan, it is clear that Insurers have standing to raise these Rule 2019 compliance issues"). Further, the orders requiring compliance with Rule 2019 that were entered in *Diocese of Camden* and *Diocese of Rochester* were entered in response to motions filed by insurers. *See generally Truck Ins. Exchange v. Kaiser Gypsum*, 602 U.S. ___ (2024) (insurers are parties in interest with standing in Chapter 11 cases involving their policies).

[7] *See* Nancy B. Rapoport, *Turning and Turning in the Widening Gyre: The Problem of Potential Conflicts of Interest in Bankruptcy*, 26 CONN. L. REV. 913, 939-40 (1994).

[8] *Baron & Budd*, 321 B.R. at 168. *See also In re F&C Int'l, Inc.*, 1994 Bankr. LEXIS 274, at *8 (Bankr. S.D. Ohio Feb. 18, 1994) (failure to comply with Rule 2019 creates a danger that "parties purporting to act on another's behalf may not be authorized to do so and may receive distributions to which they are not entitled").

- 4 -

specified in subdivision (c) of this rule **shall be filed by** every group or committee that consists of or represents, and **every entity that represents, multiple creditors** or equity security holders **that are (A) acting in concert to advance their common interests**, and (B) not composed entirely of affiliates or insiders of one another.[9]

Rule 2019(c) dictates that the "verified statement **shall** include:"

(1) the **pertinent facts and circumstances** concerning:

(A) with respect to a group or committee, . . . the formation of the group or committee, including the name of each entity at whose instance the group or committee was formed or for whom the group or committee has agreed to act; or

(B) with respect to an entity, the employment of the entity, including the name of each creditor or equity security holder at whose instance the employment was arranged;

(2) if not disclosed under subdivision (c)(1), with respect to an entity, and with respect to each member of a group or committee:

(A) name and address;

(B) **the nature and amount of each disclosable economic interest held in relation to the debtor** as of the date the entity was employed or the group or committee was formed; . . .

(3) if not disclosed under subdivision (c)(1) or (c)(2), with respect to each creditor or equity security holder represented by an entity, group, or committee . . . :

(A) name and address; and

(B) the nature and amount of each disclosable economic interest held in relation to the debtor as of the date of the statement; and

(4) **a copy of the instrument, if any, authorizing the entity, group, or committee to act on behalf of creditors or equity security holders**.[10]

The Rule is clear, unambiguous, and mandatory. Its purpose is to hold lawyers

involved in Chapter 11 bankruptcies "to certain ethical standards and approach all

---

[9]    Emphasis added.

[10]   Emphases added.

reorganization related matters openly and subject to the scrutiny of the court."[11]  To fulfill this purpose, the scope of Rule 2019 is, "on its face, . . . extremely broad."[12]  It "applies to a group of creditors or equity security holders that act in concert to advance common interests . . . even if the group does not call itself a committee."[13]  Law firms that file proofs of claim on behalf of multiple claimants are subject to Rule 2019 and must file a verified statement complying with the rule.[14]  As the *Collier* treatise explains:

> The need in Chapters 9 and 11 for policing creditor groups and those who act on their behalf is greater than under other relief chapters.  [Rule 2019] is part of the disclosure scheme of the Bankruptcy Code and is designed to foster the goal of reorganization plans which deal fairly with creditors and which are arrived at openly.[15]

In other words, Rule 2019 is meant "to further the Bankruptcy Code's goal of complete disclosure during the business reorganization process" and "was designed to cover entities which, during the bankruptcy case, act in a fiduciary capacity to those they represent, but are not otherwise subject to control of the court."[16]

---

[11]     *Baron & Budd*, 321 B.R. at 165 (citations omitted).

[12]     *City of Lafayette v. Okla. P.A.C. First Ltd. P'ship (In re Okla. P.A.C. First Ltd. P'ship)*, 122 B.R. 387, 390 (Bankr. D. Ariz. 1990).

[13]     Rule 2019, Committee Notes on Rules—2011 Amendment.

[14]     *See, e.g.*, *Baron & Budd*, 321 B.R. at 168 (law firms representing multiple tort creditors must disclose information required under Rule 2019); *In re Wash. Mut., Inc.*, 419 B.R. 271, 275 (Bankr. D. Del. 2009) (members of an ad hoc committee must make Rule 2019 disclosures because they represent "multiple creditors holding similar claims," "filed pleadings and appeared in these chapter 11 cases collectively, not individually," and retained common counsel "that has never advised this Court that it is representing less than all the Group"); *In re N. Bay Gen. Hosp., Inc.*, 404 B.R. 443, 452 (Bankr. S.D. Tex. 2009) ("Any entity seeking to represent more than one creditor in a Chapter 11 case must file an application that conforms with" these requirements); *In re CF Holding Corp.*, 145 B.R. 124, 126 (Bankr. D. Conn. 1992) (an attorney representing multiple creditors must file a copy of the document empowering the attorney to act on the creditors' behalf).

[15]     *Baron & Budd*, 321 B.R. at 165, quoting 9 COLLIER ON BANKRUPTCY ¶ 2019.01 (emphasis added).  *See also In re Northwest Airlines Corp.*, 363 B.R. 701, 704 (Bankr. S.D.N.Y. 2007) ("The Rule is long-standing, and there is no basis for failure to apply it as written").

[16]     *In re CF Holdings*, 145 B.R. at 126, citing 8 COLLIER ON BANKRUPTCY ¶ 2019.03 at 2019-4 (15th ed. 1992).

The requirements of the Rule are defined broadly, consistent with its purpose. For example, the term "disclosable economic interest" means "**any** claim, interest, pledge, lien, option, participation, derivative instrument, or any other right or derivative right granting the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest."[17] As the advisory committee notes to the Rule indicate, the term "is intended to be sufficiently broad to cover any economic interest that could affect the legal and strategic positions a stakeholder takes in a chapter 9 or chapter 11 case."[18] Similarly, questions of professional responsibility related to fee arrangements "qualify as pertinent facts and circumstances in connection with the employment of counsel, because they may have a direct bearing on both good faith and the fairness of the plan's classification system."[19] Finally, the Rule "requires that an entity must file an instrument which empowers the entity to act on behalf of the creditors. This includes an executed power of attorney authorizing counsel to file a proof of claim in this case."[20]

**B.**    **Rule 2019 disclosures are required to guard against the potential for conflicts and to ensure all parties are fully informed when a law firm represents multiple creditors in a Chapter 11 bankruptcy.**

In addition to Rule 2019 imposing mandatory requirements, compliance with the

---

[17]    Rule 2019(a)(1) (emphasis added).

[18]    Rule 2019, Committee Notes on Rules—2011 Amendment.

[19]    *Baron & Budd*, 321 B.R. at 165 (cleaned up); *In re Okla. P.A.C. First*, 122 B.R. at 393 (Rule 2019 was designed for courts to "play a role in ensuring that lawyers adhere to certain ethical standards").

[20]    *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 852 (Bankr. S.D.N.Y. 1989). *See also In re N. Bay Gen. Hosp., Inc.*, 404 B.R. at 453 ("Bankruptcy Rule 2019(a) also requires that the entity provide a copy of the instrument, if any, whereby the entity, committee, or indenture trustee is empowered to act on behalf of creditors") (internal citation and quotation marks omitted); *In re Enron Corp.*, 326 B.R. 497, 499 (S.D.N.Y. 2005) (noting that an entity's "failure to submit the required disclosures under Bankruptcy Rule 2019 raises the question of whether these unidentified [claimants] in fact have consented to this agency relationship in relation to the bankruptcy").

Rule is imperative because of the need for transparency and to avoid conflicts. There are dozens of law firms that represent multiple claimants who have filed proofs of claim in this bankruptcy case. The claims vary in terms of settlement value for many reasons, including severity and duration of the alleged abuse, degree of evidentiary support, legal defenses to liability, and available insurance coverage. Depending on how or to what extent a settlement trust is funded and how awards are allocated, claimants may effectively compete with one another for compensation. More immediately, as demonstrated in Continental's contemporaneously filed joinder to the Debtor's objection to 17 claimant lift-stay motions, certain claimants are seeking to litigate their claims now and obtain judgments, thereby obtaining preferential status while other claimants remain subject to the automatic stay. The interests of all these claimants appear to be in direct conflict, yet they are represented by the same counsel.

In addition to conflicts among claimants themselves, the claimants' law firms have their own interests in how compensation is allocated, depending on their fee arrangements, which raise the potential of conflicts with some or all of their clients. This reality is the reason behind Rule 2019's requirement that law firms' economic stakes, which in this case are undoubtedly significant, be disclosed. Assuming all or most of the firms representing claimants in this case are working on contingency, the lawyers potentially could claim the right to be paid millions of dollars in fees. For example, the Anderson firm filed more than 200 proofs of claim on behalf of claimants. As the bankruptcy judge noted while granting a similar Rule 2019 motion in *In re Archdiocese of Saint Paul & Minneapolis*, because the Anderson firm represented hundreds of claimants in that case on contingency, the law firm had "a bigger economic

Case 21-20903-PRW    Doc 3205    Filed 05/04/25    Entered 05/04/25 22:50:13,
Description Main Exhibit E, Page 9 of 91

interest" than anyone else in the case.[21]  Other firms have filed dozens of claims in this case and their respective stakes could be similarly substantial.

Finally, the instruments authorizing the law firms to act on behalf of their clients must be disclosed.  Certain firms signed 100% of the proofs of claim filed on behalf of claimants, rather than each claimant signing their own submission.  Nothing has been disclosed demonstrating these firms' authorization to sign proofs of claim on behalf of clients.  Rule 2019(c)(4) explicitly calls for disclosure of this information.  Nor is there any indication as to how each firm verified the facts of the claims, or even if any verification took place.

### C.  This case presents exactly the situation the Rule is designed to address.

In *In re Archdiocese of Saint Paul & Minneapolis*, another diocesan sex abuse bankruptcy, the court granted the debtor's Rule 2019 motion and ordered the law firms involved—including the Anderson firm—to comply with Rule 2019, noting that counsel should have done so voluntarily.[22]  As Judge Kressel explained to the firms, "you may not have set out to create a group, but you have a group.  You have a group of clients who are acting in concert through you," and "there are different interests or different motivations or just different things going on, and so we need to know that.  That's something the entire body of people, the court and lawyers need to understand."[23]  In sum, "the rule, ***this is exactly the situation it's designed to***" address.[24]

---

[21]  *In re Archdiocese of Saint Paul & Minneapolis*, Case No. 15-30125, Dkt. No. 987, Hr'g Tr. 36:8-12 (Bankr. D. Minn. Feb. 23, 2017), attached as Exhibit B.

[22]  *Id.* at 46:20-47:5 ("I mean this is not a new issue and the rule . . . is self-effectuating.  We don't need an order.  The Anderson firm should have complied with it two years ago[,] and they should have complied with it a year ago and six months ago.  The fact that we're here now on the motion doesn't mean they no longer have to comply with the rule, so I think they have to comply . . . with the rule").

[23]  *Id.* at 48:23-49:3.

[24]  *Id.* at 48:13-15 (emphasis added).

- 9 -

In the *Diocese of Camden* case, a motion to compel Rule 2019 disclosures was filed out of similar necessity because the claimants' law firms, including five of the six State Court Counsel here, had not filed any of the requisite disclosures.[25] There, the claimants' attorneys did not even oppose the relief requested, and filed their disclosures shortly after a motion was filed seeking compliance with the Rule.[26]

In the *Diocese of Rochester* case, the court expressed surprise that "we're nearly four years into this case and not one of the state court personal attorneys have complied with Rule 2019."[27] The court then ordered disclosures under Bankruptcy Rule 2019 and specifically defined the required disclosures to include "financial arrangements including, but not limited to, litigation financing."[28]

In other words, the State Court Counsel know they are required to comply with Rule 2019 is required, they know what they need to do to comply with the Rule, but they have chosen to ignore the Rule. This motion should be completely unnecessary, but it is necessary here because of State Court Counsel's utter lack of compliance.

**D.    The Rule 2019 disclosures are critical to ensuring compliance with New York ethical rules applicable to interdependent, aggregate settlements.**

The Rules of Professional Conduct governing New York attorneys negotiating aggregate settlements on behalf of multiple clients underscore that the disclosures required by

---

[25]    *In re Diocese of Camden, New Jersey*, Case No. 20-21257-JNP, Dkt. No. 1311, Joint Motion to Compel the Claimants' Attorneys to Submit the Disclosures Required by Rule 2019 (Bankr. D.N.J. Mar. 14, 2022).

[26]    *See, e.g.*, Verified Rule 2019 Disclosure of Jeff Anderson & Associates, P.A., Dkt. No. 1350, *In re Diocese of Camden, New Jersey*, Case No. 20-21257-JNP (Bankr. D.N.J. Mar. 22, 2022). *See also* Rule 2019 Disclosure of Jeff Anderson & Associates, P.A., Dkt. No. 974, *In re Archdiocese of Saint Paul & Minneapolis*, Case No. 15-30125, (Bankr. D. Minn. Feb. 17, 2017).

[27]    *In re Diocese of Rochester*, No. 19-20905, Hr'g Tr. 7:1-3 (Bankr. W.D.N.Y. Apr. 19, 2023).

[28]    *Id.* at 9:15-17.

- 10 -

Rule 2019 are needed here.  Rule 1.8 of the Rules of Professional Conduct provides that lawyers may not represent two or more clients "in making an aggregate settlement of the claims of or against the clients, absent court approval, unless each client gives informed consent in a writing signed by the client."[29]  The comments to the rules recognize that aggregate settlements

> inherently creat[e] conflicts for lawyers and prevent[ ] lawyers from obtaining settlements covering multiple clients without receiving the approval of each client. If a group settlement is to be achieved by compromising one client's claim for a lesser amount than would have been possible had that client's claim been settled separately, the lawyer has a conflict in deciding which client to favor and the client who may be making this sacrifice should know and consent.[30]

Formal Opinion 2020-3 of the New York Committee on Professional and Judicial Ethics is also crystal clear that the prohibition against aggregate settlements without consent applies to negotiations, not just settlements themselves.

A lawyer may not avoid the informed consent requirement through a claim of waiver:  "a client may not waive her individual right to approve the terms of a proposed aggregate settlement that would, if accepted, bind her along with other parties jointly represented by the same counsel."[31]  Under Rule 2019, disclosure around client consent should be part of the "pertinent facts and circumstances" in the claimants' counsel's verified statements.

### Relief requested

**A.    Claimants' counsel must disclose their fee arrangements, instruments authorizing them to act, and other pertinent facts and circumstances.**

This Court should order claimants' counsel to comply with all of the

---

[29]    New York Rule of Prof'l Conduct 1.8(g).  *See also* Model Rule of Prof'l Conduct 1.8(g).

[30]    *Id.*, citing N.Y. Rule of Prof'l Conduct 1.8, cmt. [13].

[31]    New York Committee on Professional and Judicial Ethics, Formal Opinion 2009-6.  *See also* ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 06-438 (2006) ("the informed consent required by the rule generally cannot be obtained in advance of the formulation of such an offer or demand").

- 11 -

requirements of Rule 2019 within ten days after entry of the Court's order, including by disclosing the following information:

(i) a verified statement listing all of the counsel's clients in this case, describing the pertinent facts and circumstances of the retentions, and attaching the engagement letters between the lawyer and clients;[32]

(ii) a certification by lawyers who signed proofs of claim on behalf of clients that they are authorized to do so, and attaching bankruptcy-specific powers of attorney or other instruments providing the authorization;[33]

(iii) disclosure of the fee arrangements between the lawyer and clients and any other pertinent facts or circumstances regarding "the nature and amount of each disclosable economic interest held" by each law firm in relation to the debtor;[34]

(iv) information about fee-sharing, co-counsel, retainer, referral, or other arrangements;[35]

(v) attaching, for each claimant, a copy of the instrument authorizing the law firm to act on behalf of the claimant; and

(vi) disclosing financial arrangements, including without limitation litigation financing agreements.

---

[32] Rule 2019(c).

[33] *In re Ionosphere Clubs*, 101 B.R. at 853.

[34] Rule 2019(c); *In re Archdiocese of Saint Paul & Minneapolis*, Dkt. No. 987, Hrg Tr. at 49:25–50:5 (requiring disclosure of "fee arrangement with each of those clients, whether it's hourly or contingent, includes costs and expenses . . . so that we can know what it is for each one of those clients"); *In re Semel*, 411 F.2d at 197 ("the conditions of employment and the amount of the fee do not come within the privilege of the attorney-client relationship").

[35] Rule 2019(c)(1), (4); *In re Archdiocese of Saint Paul & Minneapolis*, Dkt. No. 984, Order at 1. *See also Baron & Budd*, 321 B.R. at 167 (finding these documents and the "precise nature of these relationships falls well within the literal language of the Rule as well as the Judge's discretion to apply the rule in these circumstances").

- 12 -

This information is consistent with disclosures required in *Archdiocese of St. Paul & Minneapolis* and *Diocese of Rochester* and made in both of those cases and *Diocese of Camden*, and should be provided here.

**B.  Counsel that refuse to comply should be subject to sanctions under Rule 2019(e).**

Rule 2019(e) specifies the relief that a bankruptcy court may grant if an attorney fails to comply with the disclosure requirements of Rule 2019:

(2) If the court finds such a failure to comply, it may:

(A) refuse to permit the entity, group, or committee to be heard or to intervene in the case;

(B) hold invalid any authority, acceptance, rejection, or objection given, procured, or received by the entity, group, or committee; or

(C) grant other appropriate relief.

Rule 2019(e) authorizes this Court to bar noncompliant law firms from participating in negotiations and settlements on behalf of their claimant clients.  "If there is a failure to comply with the disclosure provisions of Bankruptcy Rule 2019, the Court may, *inter alia*, refuse to permit the entity acting on behalf of the parties from being heard further in a Chapter 11 case."[36]  In addition, the Court should disallow proofs of claim filed by any attorney that fails to timely comply with Rule 2019.[37]

## Conclusion

For the reasons set forth above, Continental respectfully requests that this Court

---

[36]  *Okla. P.A.C.*, 122 B.R. at 390.  *See also CF Holdings*, 145 B.R. at 127 (requiring supplemental filing).

[37]  *See In re Vestra Indus., Inc.*, 82 B.R. 21, 22 (Bankr. D.S.C. 1987) (disallowing claims filed *en masse* by a union for failure to comply with Rule 2019, unless defects were cured); *In re Elec. Theatre Rests. Corp.*, 57 B.R. at 149 (upholding a claim objection because the entity filing the claim had not shown that it was authorized to act on behalf of claimants).

- 13 -

enter an order compelling the all law firms that represent multiple claimants in this case to file

their required Rule 2019 disclosures within ten days after entry of the Court's order, (ii) if the

law firms do not comply, applying Rule 2019(e) by, *inter alia*, barring them from negotiating or

settling on behalf of claimants and disallowing all proofs of claim filed by the law firms, and (iii)

granting such other and further relief as is just and proper.

DATED:  October 8, 2024                    Respectfully submitted,

                                           By:  ___/s/ Jeffrey A. Dove_____
                                           Jeffrey A. Dove
                                           BARCLAY DAMON LLP
                                           Barclay Damon Tower
                                           125 East Jefferson Street
                                           Syracuse, New York  13202
                                           Telephone: (315) 413-7112
                                           Facsimile: (315) 703-7346
                                           jdove@barclaydamon.com

                                           Mark D. Plevin (admitted *pro hac vice*)
                                           PLEVIN & TURNER LLP
                                           580 California Street, Suite 1200
                                           San Francisco, California 94104
                                           Telephone:  (202) 580-6640
                                           Email:  mplevin@plevinturner.com

                                           David Christian (admitted *pro hac vice*)
                                           DAVID CHRISTIAN ATTORNEYS LLC
                                           105 West Madison Street, Suite 2300
                                           Chicago, Illinois 60602
                                           Telephone:  (312) 282-5282
                                           Email:  dchristian@dca.law

                                           Miranda H. Turner (admitted *pro hac vice*)
                                           PLEVIN & TURNER LLP
                                           1701 Pennsylvania Avenue, N.W., Suite 200
                                           Washington, DC 20006
                                           Telephone:  (202) 580-6640
                                           Email:  mturner@plevinturner.com

                                           *Attorneys for The Continental Insurance Company,*
                                           *successor by merger to Commercial Insurance Company of*

- 14 -

*Newark, New Jersey and Firemen's Insurance Company of
Newark, New Jersey*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------x
In Re:                            Case No.:2-19-20905-PRW
                                  Chapter 11

 The Diocese of Rochester
  aka The Roman Catholic Diocese of Rochester

                    Debtor,       Tax ID: 16-0755765
-------------------------------------------------x
The Diocese of Rochester,          A.P. No.: 19-02021(PRW)
                    Plaintiff,
vs.
The Continental Insurance Company, et al.,
                    Defendants.    Rochester, New York
-------------------------------------------------x
**Hearing Held on April 19, 2023**

                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE PAUL R. WARREN
              UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:          STEPHEN A. DONATO, ESQ.
                      SHANNON ANNE SCOTT, ESQ.
                      ILAN D. SCHARF, ESQ.
                      TIMOTHY LYSTER, ESQ.
                      JEFFREY ANDERSON, ESQ.
                      MICHAEL FINNEGAN, ESQ.
                      JEFFREY DOVE, ESQ.
                      MATTHEW OBIALA, ESQ.












TRANSCRIBER:          Diane S. Martens
                      (585) 613-4311

1                    **P R O C E E D I N G S**

2

3

4        **THE COURT:**  It's 11:00.  We'll go ahead and get started

5   with the matters related to the Diocese of Rochester,

6   Chapter 11, case number 19-20905 and the adversary proceeding

7   by the Diocese against a number of insurance carriers seeking

8   declaratory relief at ECF 19-2021.

9        I've heard a number of appearances this morning.

10        Let me just quickly tell you the order in which I intend

11   to go through things today.  And then, so the record's clear,

12   if you'd like, I'll let you put your appearances on the

13   record as we get to the matters in which you are appearing.

14        The first matter the Court will address is the motion in

15   the Adversary proceeding at ECF 216, which is a motion by CNA

16   to terminate the judicially imposed stay and the mediation

17   order to which the Diocese and the Committee have objected at

18   ECF 229 and 230.

19        The next matter the Court would touch on is the motion

20   in the main case at ECF 1960.  That's the motion by CNA

21   seeking compliance with Rule 2019.

22        Following that, to the extent we need to talk about it,

23   the motion at ECF 1959, which is CNA's motion to compel a

24   2004 exam.

25        And then, last, is a housekeeping matters I understand

1  the parties at least want to talk about the scheduling of the

2  claim objections filed by CNA and the Committee's motion that

3  was filed at ECF 2063, seeking to dismiss those objections.

4       With that, I'll go through the appearances.

5       I have Mr. Scharf for the Committee.

6       Ms. Scott for the U.S. Trustee.

7       Mr. Obiala on behalf of London Market.

8       Mr. Lyster for the parishes.

9       Messrs Anderson and Finnegan for the Anderson law firm.

10       Mr. Dove and Mr. Plevin for CNA.

11       And Mr. Donato for the Diocese.

12       I know a couple other attorneys mentioned their

13  appearances for carriers that are involved in the Adversary

14  proceeding but that have not filed papers.

15       So, with that, does anybody have a problem with the

16  order of the day that the Court has laid out in terms of how

17  we'll handle or address the motions before the court?

18       **MR. WINSBERG:**  Your Honor, I don't have an opposition to

19  the Order.

20       I just wanted to point out, your Honor, that we were the

21  ones -- not CNA -- that filed the Motion to Lift the Stay in

22  the Adversary proceeding.

23       **THE COURT:**  Oh, I'm sorry.  I'm sorry about that.

24       With respect to the Motion to Lift the Judicial Stay --

25  and, again, I stand corrected -- by Interstate Fire &

1  Casualty, I've read the motion papers.  I've read, obviously,

2  the motion and the objections.  I don't feel the need to hear

3  oral argument.  I've read your papers and my inclination is

4  to simply tell you I'll take this under submission and issue

5  a written decision as quickly as possible, within the next

6  week or two.

7      Does anybody wish to be heard in response to that

8  proposal?

9      **MR. WINSBERG:**  Your Honor, we were prepared a short

10  remark, rather than file a reply, short remark to the

11  response that were filed and the issues raised.

12      If your Honor wants to take it on the papers without

13  oral argument, I don't have an issue with that.  We'll defer

14  to your Honor but if that's the case, could we put a short

15  reply on by tomorrow?

16      **THE COURT:**  I really don't need it.  I think the

17  papers -- both the motion and the responses -- frame the

18  issues up very clearly for the Court.

19      You know, as I said, I've spent a considerable period of

20  time on all these matters over the last couple weeks.  So I

21  don't think that that will help the Court's decision making

22  one way or the other, nor do I think it will harm the parties

23  one way or the other.  I think you've all done a fine job

24  presenting the arguments of your various constituencies and I

25  understand what the issues are.  So I'm going to politely

1  decline your request.

2  **MR. WINSBERG:**  Thank you, your Honor.

3  **THE COURT:**  You're welcome.

4  Turning to ECF 1960, that's the motion seeking

5  compliance with respect to Rule 2019 of the bankruptcy rules.

6  That motion, I think, was CNA's motion.  And based on

7  submissions to the docket this morning, it appears that there

8  may be a proposed revised order between CNA and the Committee

9  resolving this motion.

10  And this, Mr. Dove and Mr. Scharf, I probably could use

11  your help in understanding where we are.

12  **MR. PLEVIN:**  Your Honor, this is Mark Plevin for

13  Continental, if I could take this.

14  **THE COURT:**  Of course.

15  **MR. PLEVIN:**  This issue.  We did file the Rule 2019

16  motion.  There were no oppositions filed and, therefore, you

17  know, the Court issued the order that we had filed with our

18  solument (phonetic) to the motion.

19  Nevertheless, Mr. Scharf and I have spoken several times

20  this week and late last week and Mr. Scharf asked for some

21  modifications to the Order and we agreed to those

22  modifications.  And, so, at my request, Mr. Dove this morning

23  filed the errata sheet style with further revised proposed

24  order which reflects the changes that Mr. Scharf and I agreed

25  to yesterday.

1    I'd rather just say for the benefit of the Court that

2    the most significant change to the Order is that we agreed to

3    allow lawyers and law firms who have to comply with Rule 2019

4    to submit exemplar engagement agreements rather than

5    individual agreements with each claimant but they do have to

6    let us know which of their clients signed each type of

7    exemplar.

8    And by way of example, in the Camden case, the Anderson

9    law firm filed a 2019 statement where they attached four

10   different exemplar engagement agreements that they had

11   entered into with their clients and then they filed a list

12   that allowed us to identify -- not us, because we're not in

13   that case -- but a lot of parties to identify which of the

14   clients involved signed which of the four engagement letters.

15   And so that's what we've agreed to with respect to exemplars.

16   The other thing I would note is that the parties also

17   agree that if Continental feels that there's still an

18   information gap once the 2019 statements have been filed,

19   then we will have the right to pursue (phonetic) additional

20   information if we think that's necessary.

21   And, otherwise, I think the order speaks for itself

22   unless the Court has any questions.

23   **THE COURT:**  Well, I guess I'm just going to make an

24   observation I guess in the form of a question to Mr. Scharf

25   to answer on behalf of state court personal injury attorneys.

In Re The Diocese of Rochester - 19-20905

1    How is it that we're nearly four years into this case

2    and not one of the state court personal attorneys have

3    complied with rule 2019?

4       **MR. SHARF:**  Your Honor, I don't have an answer

5    (indiscernible) to that.  I think that there is an argument

6    to be made -- I will say that there's an argument to be made,

7    your Honor, that Rule 2019 talks about parties acting in

8    concert and it's really designed for when you have, for

9    example, a group of bondholders who hire an attorney, a

10   financial adviser and come into a Chapter 11 case have to

11   disclose what their economic interest is in the debtor and

12   who was acting in concert.

13      Here, your Honor, the reality is that while these

14   clients are represented by the same party, I think there's an

15   argument to be said that they're not acting in concert.

16      In addition, your Honor, aside from engagement letters,

17   the proofs of claim identify which clients are represented by

18   which counsel.  So we understand what they are asserting.

19   And, frankly, these are all unliquidated claims so it's not

20   like we need to know who bought what proportion of debt and

21   who has what voting power with respect to a particular hedge

22   (phonetic) of securities.

23      So, there's an argument to be made that it's unnecessary

24   to file these things at this stage of the case.  It's

25   unnecessary given the information comes in in the proofs of

1   claim.  But -- and that they're not, they don't fit squarely

2   within Rule 2019.  Rather than have that cite, we conferred

3   with state court counsel and they will file these -- the

4   statements.

5       I would ask for one modification, your Honor.  I did

6   raise this with Mr. Plevin.  And since the first statement

7   has been filed this morning as the hearing was beginning by

8   Jeff Anderson and Associates and they disclosed by claimant

9   number rather than claimant's initials.  I hope that that

10  satisfies the CNA and the Court because it provides the

11  information sort of rather than requiring people to file

12  initials and claimant number, we can just use the claimant

13  number.  But they do disclose exemplars of about eight

14  different fee agreements, the date of the agreements, and

15  these exemplars are attached.

16      And the other state court counsel will comply and we'll

17  move forward.

18      **THE COURT:**  Mr. Plevin.

19      **MR. PLEVIN:**  Your Honor, I saw that email from Mr.

20  Scharf this morning.  As you know, it's early out here in

21  California so I didn't have a chance to study it or respond

22  to him.

23      Our interest is in understanding the representation

24  information required by Rule 2019.  So, I guess if the claim

25  numbers are sufficient to give us some identifying

1   information, then I guess we have access to the proofs of

2   claim under the charge of the Court's protective order.  That

3   may be adequate subject to our right to seek additional

4   information as the order already provides.

5       **THE COURT:**  Okay.  In paragraph 2D, it ends with the

6   phrase "or other arrangements when talking about fee sharing

7   cocounsel retainer referral and the like".

8       Before you all submitted either late last night or early

9   this morning the, I guess, settled Order, proposed settled

10  Order, I had already marked up the Order with my requirements

11  and I was inclined -- and I will float this out there, I

12  suspect Mr. Scharf's not going to like it and I suspect

13  Mr. Plevin is going to like it -- is to put a fine point on

14  what "other arrangements" means.

15      And my addition would say:  Or other financial

16  arrangements including, but not limited to, litigation

17  financing with third-parties providing in any way for the

18  payment of the fees or costs of the lawyers and law firms

19  described in Paragraph 2 above, together with copies of any

20  documents that were signed in conjunction with creating that

21  relationship or arrangement.  And that seems to be consistent

22  with what the District Court in New Jersey affirmed the

23  Bankruptcy Court's order in the Burns case.

24      Why don't we put a finer point on what other

25  arrangements we're talking about.

1    **MR. SHARF:**  Your Honor, in terms of those litigation

2   financing agreements -- and, you know, we'll turn to what we

3   mean by litigation financing I guess shortly -- I mean are we

4   talking about physical lines of credit that a law firm may

5   have with a bank or are we talking about something more

6   direct?  And there's different types of litigation finance --

7   this, frankly, I don't think is a very big issue in this

8   case.  I think if we're going to be asked to be able to

9   disclose financing arrangements -- which I think probably

10  are, arguably, outside the scope of 2019 -- we should give

11  them an opportunity to respond to that.  Anecdotally or

12  colloquially, I really don't think that that's a major issue

13  in this case if we're talking about, you know, hedge funds

14  that come in and say I am loaning you a hundred dollars

15  secured by X, Y, Z case and I'm expecting to get double my

16  money back at the end of the case, I just don't think that's

17  a big issue here.  It was an issue in other cases.  It's

18  often an issue in more mass tort type cases.

19       But I think the law firm should have the right to review

20  that and respond to it if it's going to go in the order.

21       **THE COURT:**  Then that would be my suggestion is if it's

22  not a big deal in this case, then tell me what it is.  And I

23  don't mean right now.  I mean, if they want to think about

24  it.  It's been suggested to me that it might be a big deal in

25  this case.  I don't know whether it is or not because,

1   frankly, I mean, you all have way more experience with mass

2   tort cases than I do.  I've not run into it before.  So I

3   don't know whether it's a big deal here.  I'd like to know if

4   it's out there, if to the extent it exists, it's, it's a

5   nonstarter or whether it's a problem.

6        So, I'll throw that out there for you all to think about

7   and if you need to put definitional terms on what that means

8   for purposes of this order, that's fine.  And maybe the way

9   to do this is, you know, to mark 1960 as settled, stipulated

10  order to follow, and you all put in whatever parameters you

11  think are fair and reasonable for me to consider.

12       But I don't know what will the -- as the Order currently

13  exists, I don't know what the phase "other arrangements"

14  means.  And I'd like to know if there's, if there are

15  problematic, or potentially problematic, arrangements out

16  there, I'd like to know what they are.

17       So would you like me to mark 1960 as settled, order to

18  follow and if you can't agree on an order, then you contact

19  Ms. Folwell and ask that the matter be restored to the

20  calendar for a further hearing?

21       **MR. SHARF:**  I think that would work from the Committee's

22  perspective.

23       **MR. PLEVIN:**  Your Honor, I think that would work from

24  our perspective as, well.

25       But is there some way that we can get the language that

1    you dictated because I wasn't able to write it down.

2        **THE COURT:**  Sure.  Mrs. Siriani will provide that when

3    we get through, unless somebody wants to take a shot and I

4    can try to read it more slowly.  Is someone adept --

5        **MR. PLEVIN:**  If she can send it to Mr. Dove, I think

6    that would be adequate from our perspective.

7        **THE COURT:**  Okay.  So I'm going to mark 1960 as settled,

8    stipulated order to follow, subject to restoration on request

9    of any party in interest.

10        Which takes us, at least briefly, to 1959 which is the

11    request for a 2004 exam primarily of the Anderson firm.  And

12    here's at least what I'm inclined to do today.

13        And in Page 4 of the motion, it indicates -- I think

14    this is your motion, Mr. Plevin -- that this is with respect

15    to the litigation financing, such information arguably must

16    be disclosed by state court counsel under Bankruptcy Rule

17    2019.  To forestall any arguments about whether disclosure of

18    financing arrangements are or are not within the scope of the

19    required disclosures under Rule 2019, Continental is seeking

20    authorization under 2004 to serve each state court counsel

21    with subpoenas for document production.

22        So, I guess my view of the motion at ECF 1959 is that

23    motion seems premature to consider today.  I'd like to see

24    what gets filed under 2019 by each of the personal injury

25    lawyers, including any litigation financing agreements that

1   are relevant.  And then have you tell me why, based on what

2   gets filed, a 2004 exam's necessary.

3       But based on where we are today, I think your motion at

4   ECF 1959's presupposing that the only way to get at this

5   information is through 2004.  And I'm suggesting, to the

6   extent there are problematic arrangements out there, if any,

7   that needs to be disclosed under 2019.  And that your motion

8   should be adjourned for tracking to see what gets filed and

9   then if additional discovery is necessary or sought, I

10  presume you would file an amended motion narrowing the scope

11  of what you're looking for and explaining to me why a

12  deposition or document production is necessary, given what is

13  actually filed after today.

14      **MR. PLEVIN:**  Your Honor, I think that's fair.  The

15  language you read I guess is explaining that this motion is

16  sort of a belt and suspenders motion and given how you're

17  construing Rule 2019, I guess the suspenders are not needed.

18  The belt is sufficient.

19      And certainly if there's any failure to comply with the

20  language the Court suggested, we can come back to the Court.

21  If there's any need for a deposition, whether it's to

22  authenticate documents or ask questions about the documents

23  that are disclosed or the financing that's disclosed, we can

24  come back with another motion at that time.  So I think

25  that's a --

1    **THE COURT:**  And you wouldn't even --

2    **MR. PLEVIN:**  -- reasonable suggestion.

3    **THE COURT:**  -- need another motion, Mr. Plevin.

4    What I'd suggest is just for tracking purposes we

5    adjourn your motion for 30 days or so.  And then subject to a

6    further adjournment, if you need it, then you would only need

7    to file an amended motion presumably narrowing or putting a

8    finer focus on exactly what you need further information

9    about in reaction to what gets filed.  That would make at

10   least my review of that motion a lot more surgically precise.

11   **MR. PLEVIN:**  That's acceptable, your Honor.

12   **THE COURT:**  How about for tracking purposes we adjourn

13   that motion at ECF 1959 to 11 a.m. on May 24, if that works

14   for everyone for tracking purposes.

15   **MR. SHARF:**  Your Honor the only issues with that day is

16   I think a lot of us are going to be in a mediation in the

17   Diocese of Buffalo case.

18   **THE COURT:**  Okay.

19   **MR. SHARF:**  I suppose we can take a break and all dial

20   in at 11 a.m., if that's appropriate.  So I think I think

21   that works.

22   **THE COURT:**  I hate to do Fridays, just out of respect

23   for your -- I know a lot of you travel and it's difficult, I

24   think, catching planes and going where you need to go.  But

25   I've got openings on that Thursday.  We don't have a motion

In Re The Diocese of Rochester - 19-20905

1  term so I could do the 25th at 11 or the 26th at 11 but

2  that's the Friday before Memorial Day.

3      **MR. DONATO:**  Your Honor --

4      **MR. SHARF:**  Your Honor -- Sorry.

5      I think personally I'd prefer to keep it on the 24th.  I

6  think we'll all be, a lot of us will be in the same building

7  that day.  The 25th I think is actually going to be a travel

8  day for people going back to Buffalo and the 26th happens to

9  be a Jewish holiday that I'll be available.

10      **THE COURT:**  Okay.  Let's do this on the 24th.  I'll put

11  it on for 11 but I'll be completely flexible so if somebody

12  touches base with chambers and says, hey, look, it's going to

13  be more like 1:00 when we have a ten-minute break to talk,

14  we'll be available.  I'll do it at 11 for tracking and then

15  we'll keep our calendar open and we'll adjust to your

16  schedule so that we can accommodate you.

17      **MR. DONATO:**  Thank you, your Honor.

18      **MR. SHARF:**  Thank you, your Honor.

19      **THE COURT:**  So it's May 24 at 11 for tracking and,

20  again, on a sliding scale depending on what needs to happen

21  that day, given your other commitments.

22      So, as far as I can tell --

23      **MR. PLEVIN:**  And your Honor --

24      **THE COURT:**  Yes.

25      **MR. PLEVIN:**  Just so that that 30-day period works, I'm

1  going to work with Mr. Scharf as soon as possible to try to

2  settle the order and so we can get these Rule 2019 statements

3  in and that way I can do the review that you suggested I

4  should do, you know, either narrow this or withdraw the

5  motion if there's been compliance.  So --

6      **THE COURT:**  Okay.

7      **MR. PLEVIN:**  -- I just wanted to note that I'll be

8  looking forward to working with Mr. Scharf on this and

9  getting an order into the Court on the previous matter, the

10  Rule 2019 motion as soon as possible.

11      **THE COURT:**  Thank you.

12      So I think that takes care of the three motions that

13  were actually scheduled for today.

14      But I know that, based on what got filed, I think this

15  morning, with respect to the claim objections by CNA, and the

16  Committee's motion at ECF 2063 to dismiss those claim

17  objections, I know there was a letter filed and I have it in

18  front of me, with respect to scheduling that I think you

19  wanted to chat about briefly today.

20      I looked at the motion.  I looked at your letter and let

21  me tell you what I'm inclined to do.

22      Your May 1st date where CNA's going to respond to the

23  motion is fine with me.

24      May 4, the letter suggests that the Court will hear the

25  motion.  I'll hear the motion on the papers.  We're not going

1 | to have a hearing.

2 | If you haven't figured this out yet, I really, for the

3 | most part, don't find oral argument at the trial court level

4 | particularly helpful.  If, after reviewing the response, I

5 | need oral argument, we will immediately let you know that.

6 | That May 4 at 11 will be for my edification to ask any

7 | questions that I had in terms of amplification of what's been

8 | submitted.

9 | The next paragraph says May 4 at 11 or as soon

10 | thereafter as the Court wishes.  I just wrote "no" under

11 | May 4 at 11 and put a box around "as soon thereafter as the

12 | court wishes".

13 | What I'm going to do is as quickly as possible after

14 | May 4th is get you a written decision on the standing issue

15 | and in that decision set a date for the status conference

16 | which would probably be very quickly or at least ordering you

17 | all to confer and suggest dates that you're available for a

18 | status conference so that we can set discovery orders and the

19 | like, assuming I find standing.  Does that work for you?

20 | **MR. PLEVIN:**  Your Honor, it does.  We want to keep this

21 | process moving.  We understood the logic of the Committee's

22 | position that the standing issue is a gating issue and should

23 | be heard first.  And so based on that, we were amenable to

24 | adjourning the merits of the claims objections from May 4,

25 | which is when they were scheduled, so that we could address

1   the standing issue first.

2       But if your Honor does find that we have standing --

3   which obviously we think you should find -- we would want to

4   have a status conference shortly thereafter so that we can

5   keep this thing moving.

6       **THE COURT:** Right. Assuming, assuming a decision finds

7   there's standing -- and I haven't studied it yet -- the last

8   sentence of the decision would say, you know, the parties

9   should meet and confer promptly to suggest available dates

10  for a prompt status conference.

11      You know, having been in front of me now for three and a

12  half years, I think you all know when I take things under

13  submission, you don't wait a very long time for a decision

14  and you should expect that to be the case here. There will

15  be a decision issued very promptly after the May 4th date

16  comes and goes -- actually the May 1st date comes and goes.

17      Does that work for you?

18      **MR. PLEVIN:** Your Honor, just to clarify, then, there

19  will not be a hearing on May 4 --

20      **THE COURT:** I don't --

21      **MR. PLEVIN:** -- unless we hear otherwise from the Court?

22      **THE COURT:** I really don't at this point. It's hard for

23  me to imagine that I would need to hear oral argument after

24  your papers are submitted. I've read the motion. It's very

25  clear what the Committee's position is and I have no doubt

1   your papers will be very clear in what CNA's position is.

2       Again, you know, again, as a trial judge, my view of

3   oral argument is really at the appellate level.  And the

4   appellate judges won't tell you this, but the reason they

5   like oral argument is to convince their colleagues on the

6   panel that their view of the issue is the correct view.  It's

7   to persuade the other judges.  That's my view of oral

8   argument at the appellate level.

9       At the trial court level, you know, I'll let you know if

10  we need oral argument, if an issue's just not been made clear

11  enough.  But my experience with the lawyers in this case,

12  I've yet to see an issue that hasn't been well-presented both

13  pro and con on any issue we've seen so far.  So I would be

14  surprised if I felt the need for oral argument on this issue.

15      So why don't we do that.  Then your May 1 date at 11

16  a.m., I'll expect to see CNA's response to the Committee's

17  motion that was filed at 2063 and we'll get going on that

18  issue.

19      In the meantime, the motion at ECF 216 in the Adversary

20  proceeding is under submission and the Court will get a

21  written decision out as quickly as humanly possible on that

22  issue, as well.

23      With that, I think we've covered everything that was on

24  today's agenda.  Does someone wish to be heard on a matter

25  that I've not yet covered or that I missed?

1    (No response.)

2    **THE COURT:**  Okay.  Well, then, I want to thank you all

3 for participation today and for the papers that you

4 submitted.  They've been quite helpful in helping the Court

5 at least focus on these issues.

6    I hope you all have a good rest of the day and, again,

7 I'll get a decision out on the 216 motion in the Adversary as

8 quickly as possible and look forward to seeing the papers

9 that are filed on May 1st or before May 1st.  With that I

10 hope you all have a good day and thank you for participating,

11 we will be in recess and off the record.

12    Thank you, everyone.

13    (Parties say thank you.)

14    (WHEREUPON, proceedings recessed.)

15

16

17

18

19

20

21

22

23

24

25

1

2                    *            *            *

3                CERTIFICATE OF TRANSCRIBER

4

5          In accordance with 28, U.S.C., 753(b), I

6    certify that this is a true and correct record of proceedings

7    from the official electronic sound recording of the

8    proceedings held in the United States Bankruptcy Court

9    for the Western District of New York before the

10   Honorable Paul R. Warren on April 19, 2023.

11

12

13   S/ Diane S. Martens

14   Diane S. Martens
     Transcriber
15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT B**

1

1          UNITED STATES BANKRUPTCY COURT

2             DISTRICT OF MINNESOTA

3    ---------------------------------------------------

4    In Re:

5      The Archdiocese of Saint Paul and Minneapolis,

6                          File No. 15-30125

7    ---------------------------------------------------

8                  BEFORE THE HONORABLE

9                  ROBERT J. KRESSEL

10             United States Bankruptcy Judge

11                       * * *

12             TRANSCRIPT OF PROCEEDINGS

13                 February 23, 2017

14                       * * *

15

16

17    Proceedings recorded by digitally recording,

18    transcript prepared by Court Reporting service.

19

20

21          NEIL K. JOHNSON REPORTING AGENCY
                     Suite 2625
22             322 Minnesota Street
             Saint Paul, Minnesota 55101
23

24                 NEIL K. JOHNSON

25

     (651) 681-8550 phone     1-877-681-8550 toll free
              www.johnsonreporting.com

1                     APPEARANCES

2

3              MR. BENJAMIN E. GURSTELLE, and

4     MR. CHARLES B. ROGERS, Attorneys at Law,

5     Suite 2200, 80 South Eighth Street,

6     Minneapolis, Minnesota 55402 appeared

7     on behalf of Debtor.

8

9              MR. ROBERT T. KUGLER, Attorney

10    at Law, Suite 2300, 150 South Fifth

11    Street, Minneapolis, Minnesota 55402,

12    appeared on behalf of Unsecured

13    Creditors Committee.

14

15

16              MS. ELIN M. LINDSTROM, Attorney

17    at Law, Suite 100, 366 Jackson Street,

18    Saint Paul, Minnesota 55101, appeared on

19    behalf of Creditors.

20

21

22              MR. DENNIS D. O'BRIEN, Attorney

23    at Law, Suite 400, 401 Second Avenue

24    North, Minneapolis, Minnesota 55401,

25    appeared on behalf of Creditors.

        (651) 681-8550 phone     1-877-681-8550 toll free
                www.johnsonreporting.com

```
 1                    APPEARANCES (Cont'd)

 2

 3              MS. MARY JO JENSEN CARTER,

 4      Attorney at Law, 1257 Gun Club Road,

 5      White Bear Lake, Minnesota 55110,

 6      appeared on behalf of Certain Parishes.

 7

 8

 9              MR. JOSHUA WEINBERG, Attorney at

10      Law, Suite 600, 1875 K Street NW,

11      Washington, DC 20006, appeared via

12      telephone on behalf of Hartford

13      Insurance.

14

15

16              MR. JEFF D. KAHANE, Attorney at

17      Law, Suite 3100, 865 Figueroa Street,

18      Los Angeles, California 90017, appeared

19      via telephone on behalf of London Market.

20

21

22              MR. JAMES A. LODOEN, Attorney at

23      Law, Suite 4200, 80 South Eighth Street,

24      Minneapolis, Minnesota 55402 appeared on

25      behalf of Our Lady of Grace.
```

```
1                    APPEARANCES (Cont'd)

2

3                MS. CONNIE A. LAHN, Attorney at

4    Law, Suite 2800, 225 South Sixth Street,

5    Minneapolis, Minnesota 55402, appeared on

6    behalf of Catholic Mutual Relief Society.

7

8

9                MR. MARK J. KALLA, Attorney at

10   Law, Suite 2500, 120 South Sixth Street,

11   Minneapolis, Minnesota 55402, appeared on

12   behalf of St. Dominic and certain other

13   parishes.

14

15

16               MS. PAMELA J. TILLMAN, Attorney

17   at Law, 19th Floor, 111 East Kilbourn

18   Avenue, Milwaukee, Wisconsin 53202

19   appeared via telephone on behalf of

20   TIG Insurance.

21

22

23

24

25
```

```
 1                    REPORTER'S DISCLAIMER

 2

 3             The proceedings contained herein were

 4   transcribed via stenographic means from the official

 5   court audio file.

 6

 7             There was no court reporter present in

 8   order to capture the proceedings live and obtain

 9   clarifications, etc.

10

11             The spellings of case names and citations

12   contained herein are taken from the official court

13   docket produced in the matter to be utilized for

14   transcription purposes and may not be the correct

15   spellings and/or citations.

16

17             Any portions of the transcript identified

18   as "UNINTELLIGIBLE" are proceedings where the audio

19   file is not clear enough to understand the actual

20   spoken words, which may be due to distance from a

21   microphone, or other audio interference.

22

23             Every attempt has been made to produce the

24   most accurate transcript possible considering the

25   above limitations.
```

         (651) 681-8550 phone     1-877-681-8550 toll free
                    www.johnsonreporting.com

```
 1                      P R O C E E D I N G S

 2

 3                      THE COURT:  Why is everybody

 4      sitting down there?  Are we actually choosing

 5      up teams?  Is that what we're doing?

 6              There are a couple motions this

 7      morning in the case of the Archdiocese of

 8      Saint Paul and Minneapolis.

 9              I guess I'm going to keep with my

10      custom of rather than have you pop up and

11      give appearances, going down my list, will

12      the attorneys for the Debtor?

13

14              (Counsel present noted their appearance)

15

16                      THE COURT:  Good morning.

17              Creditors committee?

18

19              (Counsel present noted their appearance)

20

21                      THE COURT:  Personal injury

22      creditors.

23

24              (Counsel present noted their appearance)

25
```

1

2                          THE COURT:  Parish committee?

3            Parish group.

4

5            (Counsel present noted their appearance)

6

7                          THE COURT:  Okay.  Is anyone

8      appearing here or on the phone for Hartford

9      insurance?

10                         MR. WEINBERG:  Good morning,

11     Your Honor.

12            Joshua Weinberg on behalf of

13     Hartford.

14                         THE COURT:  And London Market

15     Insurers?

16                         MR. KAHANE:  Good morning, Your

17     Honor.

18            Jeff Kahane on behalf of London

19     Market Insurers.

20                         THE COURT:  Thank you.

21            Is there someone appearing for the

22     Catholic Finance Corp, Church of St. Thomas

23     Becket?

24            Mr. Iannacone?

25            Anybody appearing for Our Lady of

1       Grace?

2              Okay.  Catholic Mutual Relief

3       Society, anybody appearing for them?

4

5              (Counsel present noted their appearance)

6

7                    THE COURT:  The old St.

8       Margaret's and others?

9              I've got another page here.

10             Catholic Services Appeal?

11      Archdiocese Medical Benefits Plan?  North

12      American Banking?  Saint Charles Borromeo?

13      Saint Patrick?  Saint Dominic and Saint

14      Stevens?  De LaSalle?

15             Travelers?  Anybody appearing for

16      Travelers this morning?

17             Or for TIG Insurance?

18                    MS. TILLMAN:  On the phone,

19      Pamela Tillman on behalf of TIG.

20                    THE COURT:  How about Liberty

21      Mutual?  Anybody appearing for Liberty

22      Mutual?

23             Anybody I've missed.  Anybody

24      appearing on behalf of somebody who isn't on

25      my list?

```
 1              Okay.  Let's take up first the motion

 2      by the Debtor dealing with the solicitation

 3      procedures and the ballot.

 4                   MR. GURSTELLE:  Good morning,

 5      Your Honor.  Ben Gurstelle on behalf of the

 6      Debtor.

 7              We brought this motion in an effort

 8      to try to kick start the solicitation

 9      process.

10              A good deal of the proposed order

11      that we attached to the motion was

12      negotiated with the UCC and run by the clerk

13      of court prior to filing the motion.

14              We filed the motion after

15      negotiations on some of the remaining issues

16      kind of stalled out.

17              We have made actually since filing

18      the motion a couple more changes to the

19      proposed order after further discussions

20      with the UCC.

21              Those changes are --

22              Do you have the other copy of the

23      order?

24              Paragraph seven of the order, we have

25      deleted the first sentence which said,
```

1      counsel for holders of class six claims will

2      converse separately with each client

3      regarding --

4                  THE COURT:  I'm sorry.  You're

5      really mumbling and talking very fast.

6                  MR. GURSTELLE:  We have deleted

7      the first sentence which says, counsel for

8      holders of class six claims will confer

9      separately with each client regarding the

10     plans and the client's ballot.

11          We have deleted that.  We don't think

12     it's necessary because we believe that it's

13     an obligation of counsel to do anyway.

14          Then also in Paragraph 7 we have

15     changed the power of attorney being executed

16     by a lawyer to being executed by any

17     individual with capacity to execute and be a

18     power of attorney.

19          So with those changes, we believe the

20     order is agreeable to the UCC with two

21     exceptions:  Those are in paragraph two the

22     30-day timeline to get the solicitation

23     packages up -- deadline rather, to get the

24     solicitation packages out the door.

25                  The UCC wants it to be a 20-day

1    deadline.

2         We plan, the Archdiocese plans, to do

3    this process as quickly as possible.

4         We want to get the solicitation

5    packages out the door very, very quickly so

6    our motivation and intention is to get these

7    out within 20 days, and hopefully even

8    sooner, but there are certain aspects of the

9    process that we do not control entirely.

10         We just don't want to set ourselves

11    up for failure in the event that the

12    packages get out the door on day 21 rather

13    than day 20.

14         As the Court knows, this is -- the

15    solicitation package is going to include

16    both the Debtor's plan and the Committee's

17    plan and so we just don't want to set

18    ourselves up so that all plan proponents are

19    in violation of the court order so that's

20    why we have the 20 day -- or 30 day rather

21    outside deadline rather than 20 days.

22         One of the issues that we foresee as

23    being an issue that may require us to take

24    more time to do it is that we haven't

25    ordered the flash drives that we plan to put

```
 1          the plan that's in the disclosure statements

 2          on yet because we haven't gotten an order

 3          from the Court to do it.

 4              I know that at the last hearing you

 5          indicated that a flash drive would be a good

 6          idea, but this is a very large purchase.  We

 7          have to buy in bulk several hundred flash

 8          drives and it's going to cost approximately

 9          $5,000 to get these flash drives and we just

10          didn't want to make the purchase until we

11          had a court order okaying it.  We have been

12          on shifting sand in this case before.

13              And also we have as a provision in

14          the order that we're authorized to serve the

15          disclosure statement and plans on counsel

16          for the tort claimants just one flash drive

17          and then that would be distributed by

18          counsel for tort claimants to their

19          respective clients.

20              If we had to do an individual flash

21          drive for each claimant that would up our

22          order significantly by several hundred

23          drives and so we haven't placed the order

24          until we have clearance from the Court in a

25          court order.
```

(651) 681-8550 phone    1-877-681-8550 toll free
www.johnsonreporting.com

1           We're going to do that order

2     immediately upon entry, the order for the

3     drives immediately upon entry of an order by

4     this Court and we've taken -- we've already

5     gotten votes and we have an express delivery

6     with the drives being preloaded with the

7     documents that should take approximately ten

8     days, is what the vendor says, although, you

9     know, we don't control that and I don't want

10    to be caught in a situation where we're

11    rushing and we miss something because we

12    have a 20-day deadline and we haven't gotten

13    the drives yet.

14          The second issue, probably the more

15    pressing issue as expressed by the

16    committee, is the inclusion of a convenience

17    claim election on the ballot.

18          We think that is the only remaining

19    issue with the ballot, is whether that

20    convenience claim is in there.

21          We acknowledge that Your Honor wants

22    the ballot to be simple and that the

23    inclusion of this option adds something

24    extra to the ballot, but we believe the

25    inclusion of the convenience option makes

1          sense, is efficient and is important for how

2          this case goes forward.

3                  So why do we think it's necessary?

4                  First we want people to know that

5          this option for a $10,000 payment pretty

6          much immediately after confirmation is there

7          and that they consider that in making their

8          decision to vote on the plans, and under the

9          Debtor's plan, making that election now is

10         how it would work best under our process.

11                 The UCC plan has a different process

12         for making a convenience election that takes

13         place later in the process of the tort

14         reviewing -- tort reviewer in the trust.

15                 Second, we believe strongly that

16         this --

17                     THE COURT:  I'm sorry.  If

18         there are two different processes, how can

19         you put it on the ballot?

20                 Are you going to put both processes

21         on, yours and the committee's on the ballot?

22                     MR. GURSTELLE:  Well, Your

23         Honor, in reviewing the committee's plan,

24         it's unclear to us how the convenience

25         election works for them.

               (651) 681-8550 phone      1-877-681-8550 toll free
                          www.johnsonreporting.com

1          Our process is that we make the

2      election as part of your vote and then you

3      would be entitled to that $10,000 payment

4      after a really initial cursory review of the

5      claim and see if there is a prima facie

6      case.

7          With the UCC's plan, if they don't

8      need to have that election made so that that

9      process can take place and those payments

10      can be made out, then it doesn't need to be

11      on the ballot.

12          If they want to put that on the

13      ballot as well, I suppose that would be fine

14      and we would include both elections on the

15      ballot and both elections would probably

16      affect how each plan plays out through

17      confirmation.

18          We do think it has an affect on

19      confirmation because it will help in

20      calculating the amount of money that will go

21      into the convenience class versus the amount

22      of money that would go into the full review

23      part of the class six claimants.

24          That would affect the per claimant

25      value.

1              So we think it's important and it's

2        material and it's likely to be important to

3        many members of the class.

4              We assume from the UCC --

5                    THE COURT:  Of course, this is

6        all in the disclosure statement?

7                    MR. GURSTELLE:  That's right.

8                    THE COURT:  You just want to

9        bring out one little bit of the disclosure

10       statement and put it on the ballot?

11                   MR. GURSTELLE:  We do think it

12       is a material part of how voting would work,

13       and although it isn't electing into a

14       separate sub class, it is electing a separate

15       type of treatment for that claimant and we

16       think it's important that those claimants be

17       allowed to make that decision at the outset

18       and we think that it is material and we

19       assume from the UCC's opposition to it that

20       they think it is too.

21             This is about fairness and openness

22       in the process, and at a minimum we think

23       that if that election was included, that the

24       ballot should include at least a sentence

25       alerting creditors to the fact they will

1      have the option to make that convenience

2      election.

3              Ultimately we believe that the

4      inclusion of this election makes sense.  It

5      will speed up the process in terms of both

6      initial distribution and will help the Court

7      assess the relative merits of the game

8      plans.

9              And so why does the UCC oppose it?

10     They say it will cause confusion and

11     prejudice.

12             With respect, we believe it would be

13     more confusing to have class six claimants

14     make a determination on voting for the plan

15     and have to make a second determination

16     later.

17             We think that doing it in one place

18     makes the most sense.  We don't think that

19     the language in the election is confusing

20     and we think it will be efficient.

21             As to alleged prejudice, the UCC

22     states that making an election would give

23     insight to Debtor and other parties into the

24     propensity for settlement in the event that

25     one of the plans is not confirmed.

1           First, the Archdiocese' goal, as it

2     has always been, is to confirm this plan,

3     which we believe is fair and achieves a

4     great result for creditors.

5           And again with respect, this case has

6     been in settlement talks for two years and

7     the parties are vigorously represented.  The

8     creditors want closure and are willing to

9     elect a convenience payment to get that

10    closure.  It's exactly the type of

11    information that would help get this case

12    across the finish line.

13          That's why we want the convenience

14    election in the ballot.  We think it makes

15    sense.  It does make sense for at least the

16    Debtor's plan.  We don't think it's

17    confusing and we don't think it's

18    prejudicial.

19          Other than that, I think the proposed

20    order has, like I said earlier, been agreed

21    to by the committee, and if you have any

22    questions I'll answer them.

23                THE COURT:  Mr. Kugler?

24                MR. KUGLER:  Thank you, Your

25    Honor.

```
 1              To the ballot issue first, I think

 2      that we all should want a clear and

 3      unambiguous ballot and I think that the

 4      inclusion of the convenience claim election

 5      has the potential to make the ballots

 6      confusing, particularly at the ballot

 7      tabulation stage.

 8              I can envision scenarios where a

 9      party might accept both plans, not check a

10      box regarding preference and then elect to

11      have their claim treated as a convenience

12      claim.

13              I'm not quite sure how that ballot

14      would be interpreted.  I'm sure that the

15      Archdiocese might have an interpretation

16      that is different than the interpretation

17      that the committee might have and that's

18      going to lead to further fights, further

19      expense, further delay.

20              Similarly, I could envision a

21      situation where a claimant rejects both

22      plans and then does not execute on the box

23      with a preference but then elects to have

24      their convenience claim treated as a

25      convenience claim, the claim treated as a
```

1      convenience claim.

2            Again, I'm not quite sure what that

3      would mean, but I know that there would be

4      multiple interpretations.

5            I think for that reason alone it

6      ought to be left off the ballot.  There will

7      be plenty of time after confirmation for a

8      convenience claim treatment to be afforded,

9      folks who want to have their claim treated

10     in that fashion, and so I think that that

11     ought to be excluded from the ballot.

12            With respect to the timing, it seems

13     like a small nit, Your Honor, but the

14     committee wants to move forward in this case

15     quickly.

16            We didn't ask for 20 days, we asked

17     for ten days.  We agreed to resolve it at

18     the 20 days and that was rejected by the

19     Archdiocese.

20            I can tell you that the counsel for

21     the survivors has ordered 500 flash drives.

22     They ordered them, and for an $80 charge

23     they got them the next day.

24            This doesn't take weeks and weeks and

25     weeks.  They can have the flash drives

1     tomorrow and they can load the stuff on.  It

2     can be ready to go in ten days.

3           So I'm not sure why there is interest

4     in delay.  I'm kind of surprised we're here

5     today.  I thought that after the last

6     go-round we would have had ballots out by

7     now and I would urge the Court to require

8     that the Archdiocese get this stuff out in

9     the next ten days.

10          Thank you.

11            THE COURT:  Anyone else that's

12    want's to be heard on this motion?

13          Did you want to respond at all?

14          Mr. Gurstelle.

15            MR. GURSTELLE:  Thank you, Your

16    Honor.

17          Ben Gurstelle again for the Debtor.

18          Again, we don't think the convenience

19    class election is confusing.

20          With respect to the scenario Mr.

21    Kugler just mentioned, I don't think a

22    convenience claim election would affect the

23    situation where no preference is checked on

24    the two plans.

25          The convenience claim election is

1     about treatment under the Debtor's plan, so

2     if they had accepted the Debtor's plan, they

3     accepted treatment as a convenience

4     claimant, then that's sort of the end of

5     that story.  I don't think it would be

6     confusing in tabulation.

7          With respect to an allegation we're

8     trying to delay the process, it's just the

9     opposite.  We brought this motion to jump

10    start the process and to try to get the

11    solicitation process lined up and under way.

12         And again I want to stress that we do

13    want to do this as quickly as possible.

14         The only reason we're asking for the

15    30-day outside deadline is we don't want to

16    be in violation of the court order on some

17    technicality.

18         Thank you.

19            THE COURT:  Well, let's turn to

20    the last one first, the ten or 20 or 30 days.

21         To describe it as a nit is an

22    understatement.  I can't believe you're here

23    either, Mr. Kugler, arguing about that.

24    You've been working at this for months and

25    months and the case is over two years old,

```
 1        and whether we lose either another ten or 20

 2        days in this process, because after

 3        balloting it's going to go on for months

 4        besides so this little period of time, this

 5        arguing over is beyond silly.

 6              I'll allow the 30 days.

 7              And I understand it might not just be

 8        the drives.  There is a lot of stuff that

 9        can go wrong and a lot of technicalities and

10        a lot of things to do and I think we need to

11        allow the Debtor plenty of time to get all

12        those things done.

13              So I'll keep the 30 days in.

14              On the ballot, my view on the ballot

15        is a ballot is a ballot.  It's not a place

16        to put disclosure, it's not a place to

17        solicit.  The solicitation is in the

18        disclosure statement itself.

19              It is explained in the disclosure

20        statement, but the part about the plan is

21        explained in the plan, their opportunity to

22        make the election.

23              Unlike many plans which have a

24        convenience class, so you need to make the

25        election as part of the balloting because
```

1       you need to know which class to count the

2       ballot in, that is not this situation.

3       You're all in the -- all the victims are in

4       one class.

5               So putting that election at that

6       point it has the potential for confusion and

7       with no real upside that I can see so I'm

8       going to deny that part of the Debtor's

9       motion.

10              And you can redo the ballot and the

11      order and submit it, but with that language

12      taken out of the ballot.

13              Let's turn to the Debtor's motion,

14      the area where compliance with bankruptcy

15      Rule 2019.

16                      MR. GURSTELLE:  Thank you, Your

17      Honor.

18              Ben Gurstelle again for the Debtor.

19              This is a motion to compel Jeff

20      Anderson & Associates to comply with Rule

21      2019 in full.

22              This motion is all about fairness.

23      Transparency equates with fairness and the

24      rule requires it.

25              Rule 2019 requires that certain

1       disclosures are made when an entity such as

2       a law firm --

3                       THE COURT:  You're talking

4       louder, but you're still talking really fast.

5       Please slow down a little bit.

6                       MR. GURSTELLE:  I'll slow down.

7               Rule 2019 requires that an entity

8       such as a law firm that represents multiple

9       non-insider creditors who are acting in

10      concert to advance their common interest

11      make certain disclosures.

12              The disclosures are laid out in the

13      rule and our motion is to have the Anderson

14      firm comply with that rule.

15              We don't think that the Anderson firm

16      has complied with the rule and so we don't

17      think our motion is moot.

18              First, the Anderson firm has argued

19      that the rule does not apply do it because

20      although it represents 383 tort claimants,

21      or approximately 85 percent of the class six

22      claimants, the firm has not represented

23      these claimants acting in concert.

24              That assertion, Your Honor, frankly I

25      think, is impossible to square with reality.

1          Since the very beginning of this case

2     the Anderson firm has appeared at almost

3     every single hearing on behalf of certain

4     abuse survivors, never on behalf of any

5     individual survivor, and they have also

6     filed many, many motions in this case,

7     responses, filed an appeal, the subcon

8     order, all on behalf of certain abuse

9     survivors, always acting selectively to

10    advance their common interests.

11         The only thing that the Anderson firm

12    has done on behalf of any individual

13    claimant is file proofs of claim.

14         So to say that they are not acting on

15    behalf of creditors in concert to advance

16    their common interests is just not true.

17    Clearly the rule applies to the Anderson

18    firm.

19         Second, the Anderson firm has argued

20    that it's met its obligations under Rule

21    2019 by its submission of a document last

22    Friday purporting to be a Rule 2019

23    disclosure.

24         With respect, this document is not a

25    proper 2019 disclosure and it doesn't comply

1    with the rule.

2         First, the disclosure does not

3    explain the facts and circumstances

4    concerning the formation of the abuse

5    survivor group as required by Rule

6    2019(c)(1)(A), so the questions we would

7    have are was the group as a result of

8    solicitations by the firm, did it come

9    together through specific referrals or did

10   the entire group simply form organically and

11   then seek to have the entity, the firm,

12   represent it.

13        We don't know because it's not

14   disclosed.

15        Second, the document does not

16   disclose the nature or amount of the

17   Anderson firm's own economic interest in the

18   outcome of this bankruptcy case as required

19   by Rule 2019(c)(2)(B).

20        Now, we assume, but we do not know

21   for certain because it hasn't been

22   disclosed, that the Anderson firm may have

23   various contingency fee arrangements with

24   its clients, but not all of the Anderson

25   firm's clients are similarly situated.  Some

1          are strong claims, some are weak claims,

2          some have multiple claims and some are

3          claims that are just not cognizable.

4              How does the Anderson firm's own

5          economic interest in this case affect how

6          its counsel -- how it will counsel its

7          clients regarding voting.

8              Have the Anderson firm's clients been

9          given informed consent as to possible

10         conflicts that these differences could lead

11         to?

12             We don't know because it hasn't been

13         disclosed.

14             And this brings us to the third major

15         deficiency, which is that Rule 2019 requires

16         that the disclosure include a copy of any

17         instruments authorizing that entity to act

18         on behalf of its client creditors.

19             Or its creditor clients.

20             This is very important to us.  It's

21         very important to the case.

22             While the Archdiocese is not seeking

23         the disclosure, we're not seeking the

24         disclosure of any personally-identifying

25         information of any of the clients, we don't

1        want their names, we don't want their

2        addresses, we're looking for the information

3        about the firm's economic interest and the

4        other information required by Rule 2019.

5             There is no exception to the rule for

6        any other part of the disclosure for the

7        Anderson firm.

8             It's important that this grievance be

9        public so that the Court and all parties in

10       interest may review them in light of the

11       competing plans and the impending votes to

12       be passed.

13            Now, this is especially true because

14       one of the plans is currently being promoted

15       and championed by the Anderson firm.

16           Finally, the Anderson firm has argued

17       that it's unfair for the Archdiocese to

18       demand that the Anderson firm make the

19       disclosure when it hasn't made the same

20       demands of other firms representing multiple

21       creditors.

22          First, the Archdiocese believes that

23       the rule is the rule and it applies across

24       the board and that anyone appearing in this

25       case on behalf of multiple creditors ought

1      to comply with it.  The rule is

2      self-effecting.

3              So we don't believe that we should

4      have to make any motion for disclosure in

5      the first place, but we have made this

6      motion with respect to the Anderson firm

7      because, frankly, we think that the Anderson

8      firm's disclosure is more important.

9              The Anderson firm has a different

10     type of interest in this case than other

11     firms do.

12             The Anderson firm has its own

13     disclosable economic interest as defined

14     under the rule that will be determined by

15     the outcome of this case.

16             The term "disclosable economic

17     interest" includes any other right or

18     derivative right granting the holder an

19     economic interest that is affected by the

20     value, acquisition or disposition of a claim

21     or interest.

22             Because its fee arrangements, or we

23     assume its fee arrangements, the Anderson

24     firm, unlike other firms, has that interest

25     and that we believe that it is important to

1        know how that will affect the process going

2        forward.

3               We think it's appropriate right now

4        before the solicitation stage to get that

5        disclosure.

6               In at least two other diocese cases

7        that disclosure has been made at or about

8        the solicitation stage.

9               And in the Delaware case, the

10       Wilmington case in Delaware, it was

11       specifically tied to solicitation.

12              Your Honor, we're not after the

13       survivors, we're not after Jeff Anderson.

14       We are trying to get to transparency and

15       fairness so that the process can move

16       forward in a way that is fair to everyone

17       and that's why we want the disclosure.

18              Thank you.

19                  THE COURT:  Okay.

20          Ms. Lindstrom?

21                  MS. LINDSTROM:  Good morning,

22       Your Honor.

23          Elin Lindstrom on behalf of Jeff

24       Anderson & Associates.

25              Mr. Finnegan and Mr. Anderson are

1     noticeably absent today.  This is an

2     important issue to our firm and they were,

3     unavoidably, out of the state so they

4     apologize for their absence.

5          I'm not going to belabor the points

6     raised in our response memorandum, but there

7     are a few points raised in the Archdiocese

8     reply brief that I would like to touch on

9     today.

10          Bringing this rule up now can only be

11    viewed as an attempt to call into question

12    the integrity of both the voting process and

13    of our firm's representation of these

14    survivors.

15          By focusing on this 2019 disclosure

16    now, the Archdiocese seems to be setting up

17    for some potential argument they may have

18    about our firm's participation in the voting

19    process if the survivors opt to rejection

20    the Archdiocese' plan.

21          The way the Archdiocese has framed

22    their argument makes it seem like our firm

23    is voting for our clients on their behalf,

24    and that is simply not the case.

25          Our firm is not participating in the

1    vote.

2          We will, as their attorneys, advise

3    these clients individually based on their

4    individual circumstances of the risks and

5    benefits of each plan, and we have a duty

6    and obligation under the rules of ethics and

7    under this court to do that.

8          Based on that advice, it will be our

9    client who cast the vote, not us.

10          It is unclear what our retainer

11    agreement or information in that agreement

12    has to do with this voting process or what

13    we would advise our clients about the vote

14    and the plans.

15          The Archdiocese seems to even be

16    going beyond the Rule 19 requirements under

17    the rule by requesting our fee agreement and

18    seemingly trying to step into the attorney/

19    client relationship that we have with our

20    clients and almost possibly interfering with

21    our privileged information and privileged

22    conversations that we have with our clients.

23          There was a provision in the ballot

24    order that was stricken by the Archdiocese

25    regarding us having an obligation to talk to

1      our clients.

2            We know we have that obligation.   We

3      don't need to be told by the Archdiocese

4      what to do in this voting process.

5            We think this is inappropriate.   We

6      are aware of the rules of ethics and will

7      continue to comply with those rules.

8            Further, Your Honor, while we

9      disagree that this rule applies to our firm,

10      we have filed a Rule 2019 disclosure, but

11      the Archdiocese is requesting two additional

12      requirements under the rule that we just do

13      not think are applicable here:   First,

14      regarding a copy of the instrument required

15      under Rule 2019(c)(4), the type of document

16      contemplated by this provision in this rule

17      is not our retainer agreement.

18            It would be an agreement made between

19      the claimants to coordinate their actions

20      and act in concert.

21            In some cases this may be a power of

22      attorney.   In some cases it may be a power

23      of attorney allowing the firm to cast a

24      proxy vote on behalf of an entire group of

25      claimants.

1          This just does not exist in this

2     case.

3          And the Archdiocese has called the

4     group of survivors exactly that, a group,

5     that we formed a group of creditors.

6          As I said of about, each of these

7     people and survivors is voting individually

8     and there simply is no group here and there

9     is no documents giving authority or giving

10     rise to such a group.

11          In terms of appearing on the case on

12     behalf of all the claimants, so far all the

13     motions in this case, Your Honor, have

14     applied to all of our claimants.

15          It simply did not make sense for us

16     to come up here to the microphone 383 times

17     or to file 383 pleadings.

18          Further, Your Honor, the Archdiocese'

19     contention that Jeff Anderson & Associates

20     needs to comply and provide its own economic

21     interests under the 2019 rule is simply --

22     it's not a requirement under the rule.

23          The rule actually states that it is a

24     disclosable economic interest as it relates

25     to the Debtor.

1          Jeff Anderson & Associates has no

2     economic interest in the Debtor.  We are not

3     a creditor in this case and we are not a

4     claimant.

5          We represent individuals who are

6     creditors and have economic interests in the

7     Debtor.

8               THE COURT:  You have a huge

9     economic interest in the case, however,

10     probably the biggest one.

11          No one has a bigger economic interest

12     in the case than you.

13          "You" being the Anderson firm, not

14     you personally.

15               MS. LINDSTROM:  The Anderson

16     firm may get paid.  There are other attorneys

17     in this room that will get paid in this case

18     and have gotten paid.

19               THE COURT:  Well, depending on

20     what your fee arrangement is, which we don't

21     know but many of us have speculated is a

22     contingency, the firm, depending on what plan

23     is confirmed, stands to collect 20,

24     $30 million in fees.

25               MS. LINDSTROM:  We would

1      collect fees, Your Honor.  It is a

2      contingency basis.

3          But the Archdiocese --

4              THE COURT:  Well, it's a huge

5      economic interest in the case, like I said,

6      bigger than anyone else.

7          No one has a bigger interest than

8      Anderson & Associates.

9              MS. LINDSTROM:  I would

10     respectfully disagree with Your Honor or with

11     the Archdiocese that that rule requires us to

12     disclose our economic interest because, as

13     again, it says it's as it relates to the

14     Debtor.

15         And to insinuate, or the Archdiocese'

16     insinuation that we will somehow influence

17     our clients votes in order to up our fees or

18     our payment is absolutely insulting.

19         Your Honor, for these reasons, we

20     would ask to find that Jeff Anderson &

21     Associates has complied with the Rule 2019

22     motion.

23         If, however, the Court is inclined to

24     grant the Archdiocese further request for

25     further compliance, we would ask the Court

        (651) 681-8550 phone      1-877-681-8550 toll free
                www.johnsonreporting.com

1    to allow us to do it in a way that does not

2    disclose any of our clients' identifying

3    information.

4        I know there are some asbestos cases

5    where even when exemplars or fee

6    agreements --

7        Sorry.  Excuse me, not fee

8    agreements, but where documents were filed

9    under seal in court, those were later

10   unsealed and the identities of those

11   individuals made public.

12       So if we are to comply with this

13   rule, that we can do so in a way that

14   protects the identities of the survivors,

15   and also that all the professionals in this

16   case that fall under this rule also have to

17   comply.

18       Thank you.

19            THE COURT:  Anyone else want to

20   be heard on the motion?

21       Mr. O'Brien.

22            MR. O'BRIEN:  Thank you, Your

23   Honor.

24       The parish committee did put in a

25   response simply supporting the 2019 motion

1        brought by the Debtor.

2               I'm not going to argue what the rule

3        requires.  I have never been faced with

4        having to deal with this rule when I was on

5        the bench, not a single time.

6               I read the rule once and then I put

7        it down and I picked it up and I read it

8        again and I read it again and I'm still is

9        not sure exactly what it means, but I'm sure

10       you know what it means and I'm sure you're

11       going to tell us all what it means.

12              What I want to just briefly talk

13       about here is the unique nature of this case

14       and perhaps the way the rule fits in to the

15       unique nature of this case.

16              I was some what surprised when I read

17       the initial response by Mr. Jeff Anderson to

18       the motion by claiming that this was

19       motivated by an attempt to intimidate

20       Mr. Anderson and his firm.

21              I don't know Mr. Anderson very well,

22       but in getting to know him in this case, he

23       impresses me as somebody who is not

24       intimidated by anything.

25              And then when the response, the 2019

1       was filed, you look at it and there is

2       absolutely nothing in there that would

3       intimidate anybody about anything.

4              So I wonder what else is going on

5       here.

6              You know, this is a rather unique

7       situation in that, as you pointed out and as

8       has been pointed out by others here, Mr.

9       Anderson and his firm are the -- they have a

10      unique position in this case that no other

11      professional has, and that is that they have

12      a substantial personal financial interest in

13      the outcome of this case, a substantial

14      stake.

15             Now, if their compliance with the

16      rule by filing that document that they

17      filed, if that's the compliance with the

18      rule, then there needs to be some other, in

19      my view, transparency here that will satisfy

20      the integrity of the voting process.

21             This is not an attempt to interfere

22      with or to call into question the integrity

23      of the voting process.

24             This is an extremely unique situation

25      where this firm, which has a financial stake

1     in this case that is very substantial, is

2     going to take control and possession of the

3     ballots of the overwhelming number of

4     clients that it has and the overwhelming

5     number of people who make up the unsecured

6     creditors class.

7         There is nothing wrong with that, but

8     under those circumstances it seems to me

9     that in order to protect, rather than call

10    into question, the integrity of the process,

11    there has got to be some sort of perhaps

12    maybe extraordinary, then, if the rule has

13    been complied with, some other extraordinary

14    transparency.

15        It's not a matter of, well, we don't

16    trust you or we think you're being evil.

17    It's the old situation of trust but verify.

18        You know, there has got to be some

19    process here that will make up for what is

20    otherwise not a normal process in a Chapter

21    11 case.

22        I would suggest that if other

23    financial disclosures cannot be or will not

24    be made in this case, that the ballots of

25    the unsecured claimants be turned over not

1       to Mr. Anderson but to the unsecured

2       creditors committee.

3            The unsecured creditors committee

4       represents these people, as well as

5       Mr. Anderson does individually, and they

6       have got a fiduciary responsibility that is

7       much broader than Mr. Anderson's and there

8       is no reason in my mind why they can't, why

9       Mr. Kugler's office cannot fulfill the

10      responsibility to the unsecured creditors

11      through the committee by doing the same kind

12      of handling and securing the votes of these

13      members that could be done by Mr. Jeff

14      Anderson.

15           Again, it's not a matter of

16      disparaging Mr. Jeff Anderson.  You know,

17      it's a matter of either recognizing what are

18      the required procedures and processes in a

19      situation like this or to come up with some

20      alternative that protects the integrity of

21      the voting process.

22           Thank you.

23                THE COURT:  Thank you.

24           Anyone else?  Anybody else want to be

25      heard on the motion?

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

1           Mr. Gurstelle.

2                   MR. GURSTELLE:  Thank you, Your

3       Honor.

4           Ben Gurstelle again for the Debtors.

5           Just a couple of responses.

6           Number one, I think the rule is clear

7       and it requires the information that we laid

8       out in our brief.

9           Next, the retainer agreement is --

10                  THE COURT:  Well, let me stop

11      you there.

12          Assuming that's true, is there some

13      reason to require them to disclose how many

14      clients they have?

15          I lost track of the number, 200

16      and --

17                  MR. GURSTELLE:  How many

18      claimants?

19                  THE COURT:  That they

20      represent.

21                  MR. GURSTELLE:  383.

22          We think --

23                  THE COURT:  You need 383 copies

24      of the retainer agreement?

25                  MR. GURSTELLE:  Your Honor, I

1     don't think we need every single retainer

2     agreement if there is a form agreement.

3          We would want to see, and I think the

4     rule would require, disclosure of any

5     different types of retainer agreements that

6     Mr. Anderson's firm may have.

7          For example, some of his clients were

8     retained before this case started and they

9     had ongoing litigation and some clients

10    signed up well into the course of this case.

11         There may be different retainer

12    agreements for those types of clients with

13    different fee arrangements.

14         We think the retainer agreement is

15    absolutely contemplated by the rule and has

16    set out in the Baron & Budd case that we

17    cited.

18         It's not a confidential document,

19    it's a document that is required to be

20    disclosed by the rule and there is a

21    discussion of that in Baron & Budd.

22         And it is important for the Court to

23    know the fee arrangement for the Anderson

24    firm because, as the Court pointed out, the

25    Anderson firm does have a distinct economic

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

1        interest in the outcome of the case and it

2        is a disclosable economic interest as

3        defined in Part A of the rule and it is

4        dependent on how these claims turn out.

5              You know, I can envision a situation

6        where the Anderson firm may believe that it

7        can get more money for the firm in a

8        situation where the case is dismissed or

9        where litigation ensues and that certain

10       claimants may do better in that situation

11       but certain claimants may not and that gives

12       rise to potential conflicts of interest.

13             Can those conflicts be waived?

14       Perhaps.  But it's important that the Court

15       and other parties in interest who are

16       invested in the solicitation process know

17       that.

18             So we believe that it's very

19       important that the rule be complied with.

20             Then as to Mr. O'Brien's comments, I

21       don't think we have a position on that, but

22       I do think that whether or not the ballots

23       go to the committee or to the Anderson firm,

24       the rule requires disclosure and it should

25       be complied with.

(651) 681-8550 phone     1-877-681-8550 toll free
www.johnsonreporting.com

```
 1              Thank you.
 2                     THE COURT:  Ms. Lindstrom?
 3              Well, actually I would like you to
 4      step up.  I just have a question or two to
 5      ask you.
 6              Just generically, without talking
 7      about any individual client, how many
 8      different forms of retainer agreements would
 9      you have?
10              I'm guessing they are virtually
11      identical for most of them.
12                     MS. LINDSTROM:  Most of them
13      are virtually identical.  I can't say for
14      certain how many different examples we have
15      to date.  I think most of them are the same,
16      though.
17                     THE COURT:  Thank you.
18              Well, as to the why this is here now,
19      I mean we've nibbled around the edge of this
20      for two years.  I mean this is not a new
21      issue and the rule, to use the word of the
22      Debtor, is self-effectuating.
23              We don't need an order.  The Anderson
24      firm should have complied with it two years
25      ago and they should have complied with it a
```

1    year ago and six months ago.

2        The fact that we're here now on the

3    motion doesn't mean they no longer have to

4    comply with the rule, so I think they have

5    to comply, it has to comply with the rule.

6        If there is some sort of insult there

7    or distrust there, it's a distrust by the

8    Supreme Court who promulgated the rule, not

9    by the parties here or me.  The rule is the

10    rule is the rule.

11        And you might speculate that there is

12    some cynicism, if not distrust, behind the

13    rule of disclosure.

14        I really dislike the current trendy

15    word "transparency", but it's sort of

16    applicable here.

17        Bankruptcy sort of operates on

18    everybody knowing what's going on, me in

19    particular, but everybody knowing what's

20    going on, and this is one of those elements

21    that people, at least the Supreme Court

22    thought everyone should know.

23        So I think the Anderson firm must

24    comply with the rule.

25        One, it needs to be verified.  That's

1    easily taken care of.

2        It wasn't.  The thing that you filed

3    wasn't verified.  The rule certainly

4    requires that.

5        I'm sorry.  I just give no credence

6    to the suggestion that they are not acting

7    in concert.  Clearly you are.

8        I mean you may not have set out to

9    create a group, but you have a group.  You

10   have a group of clients who are acting in

11   concert through you, and the Anderson firm

12   is the representative of 383 people and the

13   rule, this is exactly the situation it's

14   designed to -- or one of the many situations

15   the rule is designed to tend to.

16       And I read the rule clearly as well,

17   and I think one of the important points of

18   the rule is to disclose the economic

19   interest in the case, what does the

20   representative have to gain.  That's the

21   point of the rule here.

22       So for whatever reasons we can

23   understand that there are different

24   interests or different motivations or just

25   different things going on, and so we need to

1    know that.  That's something the entire body

2    of people, the court and lawyers need to

3    understand.

4         So I'm going to order among the

5    things that I think you --

6         And I think sort of one of the other

7    things of the group and one of the unique

8    dynamics of this case from the beginning has

9    been the Anderson firm represents a majority

10   of the members of the creditors committee,

11   so it's certainly my perspective of this

12   case that Jeff Anderson has been the

13   creditors committee.

14        That's sort of the dynamic here

15   that's at work here and so it makes it all

16   the more important, it seems to me, that

17   this rule be complied with.

18        So I think you need to go back and

19   comply with the rule.

20        Obviously no one has asked for and

21   I'm certainly not going to include the

22   requirement to disclose any names.

23        I think the list that you've done

24   with the name by claimant number is perfect,

25   but I think you also have to disclose the

(651) 681-8550 phone    1-877-681-8550 toll free
www.johnsonreporting.com

1          fee arrangement with each of those clients,

2          whether it's hourly or contingent, includes

3          costs and expenses, whatever, so that we can

4          know what it is for each one of those

5          clients.

6                    And that would include --

7                    And the reason I ask, I was hoping

8          this wasn't going to be too onerous, but I

9          don't want you to -- clearly don't want to

10         file the actual retainer agreements with

11         anybody's name in them, but somehow it seems

12         to me you should be able to have exemplars

13         that say here is the retainer agreement

14         exactly in this form that was signed with

15         claimants number one, two, three, four, 16,

16         18, 20, whatever, and if there is another

17         one, these five people signed this different

18         retainer agreement, so that at least we can

19         look at them and figure out what the fee

20         arrangement is and other arrangements for

21         representation are with each one of your

22         clients.

23                    Did I cover what we're looking for

24         here?

25                    I mean you need a little bit of time.

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

1       I'll give you about maybe a week from

2       tomorrow as the deadline to comply with the

3       order.

4              [UNINTELLIGIBLE]

5              I can pick Friday because then you

6       can't make your staff work on weekends.

7              [UNINTELLIGIBLE]

8              Sure.  Now it's gotten longer.  It's

9       not the following Monday, it's the following

10      Thursday?

11             [UNINTELLIGIBLE]

12             Okay.  Two weeks from today.

13

14                        * * *

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF MINNESOTA)

 2                        ss.

 3   COUNTY OF DAKOTA  )

 4

 5        BE IT KNOWN, that I transcribed the digitally

 6   recorded proceedings held at the time and place set

 7   forth herein;

 8

 9        That the proceedings were recorded

10   electronically and stenographically transcribed

11   into typewriting, that the transcript is a true

12   record of the proceedings, to the best of my

13   ability;

14

15        That I am not related to any of the parties

16   hereto nor interested in the outcome of the action;

17

18

19        IN EVIDENCE HEREOF, WITNESS MY HAND AND SEAL.

20

21

22

23                        _____

24                        NEIL K. JOHNSON

25
```

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NEW YORK

In re:

The Diocese of Buffalo, N.Y.,

Debtor.

Chapter 11

Case No. 1-20-10322-CLB

## [PROPOSED] ORDER GRANTING MOTION BY CONTINENTAL UNDER BANKRUPTCY RULE 2019

The Court has considered the motion filed by the Continental Insurance Company seeking, among other things, to compel compliance with Bankruptcy Rule 2019 by the attorneys representing sexual abuse claimants in this bankruptcy case. Good cause having been established, IT IS HEREBY ORDERED as follows:

1.      The motion is GRANTED.

2.      All lawyers and/or law firms representing multiple creditors, including those holding sexual abuse claims against the Debtor, shall, within ten days after the entry of this Order, fully comply with the requirements of Rule 2019 and electronically file on the docket the following information:

   a. a verified statement listing all of the counsel's clients, stating the pertinent facts and circumstances of the retention, and attaching the engagement letters between the lawyer and clients;

   b. a certification by all lawyers who signed proofs of claim on behalf of clients that such lawyers are authorized to do so, and attaching bankruptcy-specific powers of attorney or other instruments providing the authorization;

   c. disclosure of the fee arrangements between the lawyer and clients and any other pertinent facts or circumstances regarding "the nature and amount of each disclosable economic interest held" by each law firm in relation to the debtor;

   d. information about fee-sharing, co-counsel, retainer, referral, or other arrangements;

e.  for each claimant, a copy of the instrument authorizing the law firm to act on behalf of the claimant; and

f.  disclosing financial arrangements, including without limitation litigation financing agreements.

3.  Any entity filing a verified statement in accordance with this Order shall amend or supplement such statement, as necessary, every 60 days, disclosing any material changes of fact occurring since the filing of the lawyer's or law firm's most recent amended or supplemental filing.

4.  If the Court finds, *sua sponte* or at the request of any party in interest in this bankruptcy case, that a lawyer or law firm has failed to comply with the requirements of Bankruptcy Rule 2019 and this Order, the Court may, in accordance with Bankruptcy Rule 2019(e):  (a) refuse to permit the entity, group, or committee to be heard or to intervene in the case; (b) hold invalid any authority, acceptance, rejection, or objection given, procured, or received by the entity, group, or committee; or (c) grant other appropriate relief.

5.  The Court retains jurisdiction with respect to such matters and with respect to the interpretation and enforcement of this Order.  Continental may make further application to the Court to ensure compliance with this Order.

Dated: _____, 2024
Buffalo, New York

_____
Hon. Carl L. Bucki
Chief United States Bankruptcy Judge