# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

IN RE:                       .    Case No. 20-30663-WAK
                             .
THE ROMAN CATHOLIC           .    100 S. Clinton Street
DIOCESE OF SYRACUSE,         .    Syracuse, NY 13261
NEW YORK,                    .
          Debtor.            .    November 7, 2024
. . . . . . . . . . . . .         10:26 a.m.

TRANSCRIPT OF HEARING ON:

DOC. NO. 859 - SECTION 105(a) STATUS CONFERENCE

DOC. NO. 204 - MOTION SEEKING AUTHORITY PURSUANT TO RULE 2004
TO SUBPOENA DOCUMENTS AND TESTIMONY FILED BY OFFICIAL COMMITTEE
OF UNSECURED CREDITORS (MERRITT LOCKE)

DOC. NO. 2178 - MOTION FOR ENTRY OF AN ORDER APPROVING
DISCLOSURE STATEMENT; APPROVING SOLICITATION PACKAGES AND
DISTRIBUTION PROCEDURES; APPROVING THE FORMS OF BALLOTS AND
ESTABLISHING PROCEDURES FOR VOTING ON FOURTH AMENDED JOINT PLAN
AND CONSENTING TO THIRD PARTY RELEASES; APPROVING THE FORM,
MANNER AND SCOPE OF CONFIRMATION NOTICES; ESTABLISHING CERTAIN
DEADLINES IN CONNECTION WITH APPROVAL OF THE DISCLOSURE
STATEMENT AND CONFIRMATION OF FOURTH AMENDED JOINT PLAN; AND
GRANTING RELATED RELIEF FILED BY THE ROMAN CATHOLIC DIOCESE OF
SYRACUSE, NEW YORK (STEPHEN DONATO)

DOC# 1027 - MOTION AUTHORIZING THE COMMITTEE TO SUBPOENA THE
PRODUCTION OF DOCUMENTS FILED BY OFFICIAL COMMITTEE OF
UNSECURED CREDITORS (ROBERT KUGLER)

DOC# 2011 - MOTION TO SEAL AND/OR REDACT CERTAIN INFORMATION
CONTAINED IN OBJECTIONS TO ABUSE PROOFS OF CLAIM FILED BY
LONDON MARKET INSURERS (RUSSELL ROTEN)

                    (Continued)

          BEFORE HONORABLE WENDY A. KINSELLA
          UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

(Continued)

DOC# 2014 - MOTION TO COMPEL THE ATTORNEYS REPRESENTING THE
TORT CLAIMANTS TO SUBMIT THE DISCLOSURES REQUIRED BY FEDERAL
RULE OF BANKRUPTCY PROCEDURE 2019 FILED BY LONDON MARKET
INSURERS

DOC# 2086 - SECTION 105(A) HEARING ON ORAL ARGUMENT RE: TRUCK
INSURANCE EXCHANGE V. KAISER GYPSUM, CO., INC.

DOC# 2018 - MOTION TO STRIKE LONDON MARKET INSURERS MOTION TO
SEAL AND/OR REDACT CERTAIN INFORMATION CONTAINED IN OBJECTIONS
TO ABUSE PROOFS OF CLAIM 2011 FILED BY OFFICIAL COMMITTEE OF
UNSECURED CREDITORS (ROBERT KUGLER)

DOC# 297 — SECTION 105(A) CONFERENCE

- - -

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Bond Schoeneck & King, PLLC |
| | By:  STEPHEN DONATO, ESQ. |
| | CHARLES J. SULLIVAN, ESQ. |
| | GRAYSON WALTER, ESQ. |
| | SARA TEMES, ESQ. |
| | BRENDAN SHEEHAN, ESQ. |
| | One Lincoln Center |
| | Syracuse, NY 13202 |
| | |
| | Blank Rome LLP |
| | By:  JAMES S. CARTER, ESQ. |
| | 1825 Eye Street NW |
| | Washington, D.C.  20006 |
| For the Official Committee of Unsecured Creditors: | Stinson LLP |
| | By:  ROBERT T. KUGLER, ESQ. |
| | LOGAN R. KUGLER, ESQ. |
| | EDWIN CALDIE, ESQ. |
| | ANDREW GLASNOVICH, ESQ. |
| | 50 South Sixth Street, Suite 2600 |
| | Minneapolis, MN 55402 |
| For William K. Harrington, United States Trustee: | Office of the United States Trustee |
| | By:  ERIN CHAMPION, ESQ. |
| | 105 U.S. Courthouse, 10 Broad Street |
| | Utica, NY 13501 |

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 3 of 172

APPEARANCES (Cont'd):

| | |
|---|---|
| For William K. Harrington, United States Trustee: | Office of the United States Trustee<br>By:  JOSEPH W. ALLEN, ESQ.<br>300 Pearl Street, Suite 401<br>Buffalo, NY  14202 |
| | Office of the United States Trustee<br>By:  LISA M. PENPRAZE, ESQ.<br>11A Clinton Avenue, Room 620<br>Albany, NY  12207 |
| For Interstate Fire & Casualty Company, et al.: | Parker, Hudson, Rainer & Dobbs LLP<br>By:  HARRIS WINSBERG, ESQ.<br>303 Peachtree Street, NE Suite 3600<br>Atlanta, GA 30308 |
| | Parker, Hudson, Rainer & Dobbs LLP<br>By:  TODD JACOBS, ESQ.<br>Two N. Riverside Plaza, Suite 1850<br>Chicago, IL  60606 |
| For National Catholic Risk Retention Group: | Womble Bond Dickinson (US) LLP<br>By:  DAVID BANKER, ESQ.<br>950 Third Avenue, Suite 2400<br>New York, NY 10022 |
| For London Market Insurers: | Duane Morris LLP<br>By:  RUSSELL ROTEN, ESQ.<br>     NATHAN REINHARDT, ESQ.<br>865 S. Figueroa Street, Suite 3100<br>Los Angeles, CA 90017 |
| | Clyde & Co US LLP<br>By:  CATALINA J. SUGAYAN, ESQ.<br>55 West Monroe Street, Suite 3000<br>Chicago, IL 60603 |
| For Parish Steering Committee: | Elsaesser Anderson Chtd.<br>By:  J. FORD ELSAESSER, ESQ.<br>414 Church Street, Suite 201<br>Sandpoint, ID 83864 |
| | Woods Oviatt Gilman, LLP<br>By:  TIMOTHY LYSTER, ESQ.<br>1900 Bausch & Lomb Place<br>Rochester, NY 14604 |

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 4 of 172

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Committee, Special Insurance Counsel: | Burns Bair<br>By:  JESSE BAIR, ESQ.<br>10 E. Doty Street, Suite 600<br>Madison WI 53703 |
| For Certain Personal Injury Creditors: | LaFave, Wein & Frament, PLLC<br>By:  CYNTHIA S. LaFAVE, ESQ.<br>2400 Western Avenue<br>Guilderland, NY 12084 |
| | Jeff Anderson & Associates<br>By:  MICHAEL FINNEGAN, ESQ.<br>     TAYLOR STIPPEL SLOAN, ESQ.<br>366 Jackson Street, Suite 100<br>St. Paul, MN 55101 |
| For Hartford Fire Insurance Company: | Ruggeri Parks Weinberg LLP<br>By:  JOSHUA D. WEINBERG, ESQ.<br>1875 K St NW, Suite 600<br>Washington DC, 20006 |
| For Travelers: | Dentons US LLP<br>By:  SAMANTHA M. RUBEN, ESQ.<br>233 South Wacker Drive, Suite 5900<br>Chicago, IL  60606 |
| For TIG Insurance Company: | Kennedys CMK LLP<br>By:  JILLIAN G. DENNEHY, ESQ.<br>120 Mountain View Boulevard<br>Basking Ridge, NJ 07920 |
| For Catholic Mutual Relief Society of America: | ArentFox Schiff LLP<br>By:  BRETT D. GOODMAN, ESQ.<br>1301 Avenue of the Americas, 42nd Fl.<br>New York, NY 10019 |
| For Hanover Insurance Company: | Rivkin Radler LLP<br>By:  BRIAN R. ADE, ESQ.<br>25 Main Street<br>Court Plaza North, Suite 501<br>Hackensack, NJ 07601 |
| For Utica Mutual Insurance Company: | Rivkin Radler LLP<br>By:  STUART I. GORDON, ESQ.<br>926 RXR Plaza<br>Uniondale, NY 11556 |

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,<br>Description: Exhibit G, Page 5 of 172

APPEARANCES (CONT'D):

For Merchants Mutual          Hurwitz & Fine PC
Insurance Company:            By:  BRIAN D. BARNAS, ESQ.
                              1300 Liberty Building
                              Buffalo, NY 14202


ECRO:                         Rachel Sugrue

                                   - - -

1          THE CLERK:  (In progress) 10:00 a.m. calendar,

2  Case 20-30663, the Roman Catholic Diocese of Syracuse, New

3  York.  We have several matters on the calendar.  Docket 859,

4  Section 105, status conference; Docket 204, motion seeking

5  authority pursuant to Rule 2004 to subpoena documents and

6  testimony; Document 2178, motion for entry of an order

7  approving disclosure statement, approving solicitation packages

8  and distribution procedures; Docket 1027, motion authorizing

9  the Committee to subpoena the production of documents;

10  Docket 2011, motion to seal and/or redact certain information

11  contained in objections to abuse proofs of claim; Docket 2014,

12  motion to compel the attorneys representing the Tort Claimants

13  to submit the disclosures; Docket 2086, Section 105(a) hearing

14  on oral argument regarding Truck Insurance Exchange v. Kaiser

15  Gypsum Company, Inc.; Docket 2018, motion to strike London

16  Market Insurers motion to seal and/or redact certain

17  information contained in objections; Docket 297, Section 105(a)

18  conference.

19          Please note your appearances for the record.

20          MR. DONATO:  Good morning, Your Honor.  Steve Donato,

21  Charles Sullivan, Sara Temes, Grayson Walter, and Brendan

22  Sheehan are here on behalf of the Diocese of Syracuse.  We're

23  all from Bond, Schoeneck & King.  On the phone is James Carter

24  from Blank Rome.  As you know, he is our special insurance

25  counsel.  Also, we have the Diocese Chancellor and CFO and the

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 7 of 172

1  Bishop here in the courtroom today.

2         I'm not sure how you want to proceed, but we're going

3  to break this up a little bit.  And so if there's discovery

4  issues, Brendan Sheehan is going to address that.  When we get

5  into the actual arguments in regard to the balloting soliciting

6  issues raised by the U.S. Trustee, Mr. Walter will address

7  that.  And then I'll handle the rest of it.

8         So just wanted the Court to be aware of that.

9         THE COURT:  Thank you, Mr. Donato.

10         MR. DONATO:  Thank you.

11         MR. KUGLER:  Good morning, Your Honor.  Robert Kugler

12  from Stinson on behalf of the Committee.  With me today is my

13  partner, Ed Caldie, my partner, Drew Glasnovich, and our

14  associate, Logan Kugler.  Also present in the courtroom is our

15  Committee Chair, Dr. Kevin Braney.  Also present on the phone

16  is Committee member Chris Simons.  We also will be splitting up

17  duties today, and so you'll see various of us popping up at

18  various points in the motions.

19         THE COURT:  Thank you, Mr. Kugler.  Good morning.

20         MR. KUGLER:  Thank you, Your Honor.

21         MS. CHAMPION:  Good morning, Your Honor.  Erin

22  Champion for the United States Trustee.  Here with me in the

23  courtroom are my colleagues, Joseph Allen, the Assistant United

24  States Trustee in the Buffalo office, and Lisa Penpraze, the

25  Assistant United States Trustee in Albany.  I will be covering

1  all of today's arguments and they're here for moral support.

2          Thank you.

3          THE COURT:  Thank you.

4                      (Laughter)

5          MR. WINSBERG:  Good morning, Your Honor.  Harris

6  Winsberg, Parker, Hudson, Rayner, and Dobbs on behalf of

7  Interstate, and I believe Mr. Jacobs is on the phone as well.

8          Thank you.

9          THE COURT:  Good morning.

10          MR. WINSBERG:  Good morning.

11          MR. ROTEN:  Good morning, Your Honor.

12          MR. BANKER:  Good morning, Your Honor.  David Banker,

13  Womble Bond, on behalf of National Catholic Risk Retention

14  Group.

15          THE COURT:  I'm sorry, sir.  We're still taking

16  appearances in Court, and then we'll turn to the phone.  If you

17  could just hold on for just another couple of minutes, please.

18          MR. ROTEN:  Good morning, Your Honor.

19          MR. BANKER:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. ROTEN:  Russell Roten from Duane Morris

22  representing the London Market Insurers.  Nate Reinhardt is

23  here with me today.  Cathy Sugayan from Clyde & Co. is on the

24  phone.  She handles the insurance issues.  I'll be dealing with

25  the disclosure statement issues and Mr. Reinhardt will be

1  dealing with the other two matters that affect us.

2          Good morning.

3          THE COURT:  Thank you.  Good morning.

4          Other appearances in the courtroom?

5          MR. ELSAESSER:  Good morning, Your Honor.  Ford

6  Elsaesser along with Timothy Lyster for the parishes and

7  schools and other affiliates.

8          THE COURT:  Good morning, Mr. Elsaesser.

9          MR. BAIR:  Good morning, Your Honor.  Jesse Bair from

10  Burns Bair, special insurance counsel for the Committee.

11          THE COURT:  Good morning.

12          MS. LaFAVE:  Good morning, Your Honor.  Cynthia

13  LaFave, LaFave, Wein & Frament.  I work with Jeff Anderson &

14  Associates.  We represent a number of the survivors who have

15  brought claims against the Diocese.

16          Thank you.

17          THE COURT:  Good morning.

18          MR. FINNEGAN:  Good morning, Your Honor.  Mike

19  Finnegan with Jeff Anderson & Associates.  And also on the

20  phone with us is Taylor Sloan, and with Ms. LaFave, we

21  represent a number of abuse survivors in this case.

22          THE COURT:  Good morning.

23          MR. FINNEGAN:  Good morning.

24          THE COURT:  Any other appearances in the courtroom?

25                          (No audible response)

1          THE COURT:  Hearing none, we'll now move on to the

2     appearances on the telephone.

3          MR. BANKER:  Good morning, Your Honor.  David Banker,

4     Womble Bond, on behalf of National Catholic Risk Retention

5     Group.

6          THE COURT:  Good morning.

7          MR. BANKER:  Thank you, Your Honor.

8          MS. RUBEN:  Good morning, Your Honor.

9          MR. WEINBERG:  Good morning, Your Honor.  Joshua

10    Weinberg -- sorry.

11         Good morning, Your Honor.  Joshua Weinberg, on behalf

12    of Hartford Fire Insurance Company.

13         THE COURT:  Good morning.

14         MS. RUBEN:  Good morning, Your Honor.  This is

15    Samantha Ruben from Dentons on behalf of Travelers.

16         THE COURT:  Good morning.

17         MS. DENNEHY:  Good morning, Your Honor.  This is Jill

18    Dennehy on behalf of TIG Insurance Company.

19         THE COURT:  Good morning.

20         MR. ADE:  Good morning, Your Honor.

21         MR. GOODMAN:  Good morning, Your Honor.  Brett

22    Goodman, ArentFox --

23         MR. ADE:  Brian Ade, Rivkin Radler.  And I'm sorry,

24    go ahead.

25         MR. GOODMAN:  Good morning, Your Honor.  Brett

1  Goodman, ArentFox Schiff, for Catholic Mutual.

2         THE COURT:  Good morning.

3         MR. ADE:  Good morning, Your Honor.  This is Brian

4  Ade, Rivkin Radler.  I represent Hanover Insurance Company.

5         THE COURT:  Good morning.

6         MR. GORDON:  Good morning, Your Honor.  Stuart

7  Gordon, Rivkin Radler, on behalf of Utica Mutual Insurance

8  Company.

9         THE COURT:  Good morning, Counselor.

10        MR. BARNAS:  Good morning, Your Honor.  Brian Barnas

11 from Hurwitz Fine for Merchants Insurance.

12        THE COURT:  Good morning.

13        Any other appearances on the phone?

14              (No audible response)

15        THE COURT:  Hearing none, before we get started,

16 Mr. Donato, the Court wants to thank everyone for their

17 patience and apologize for the technical difficulties.  I

18 always try to be very respectful of everyone's time and

19 obviously tried to move to a different courtroom that has

20 different recording capabilities.  They usually have a

21 stenographer.  We need recording.  So we ran into a little

22 glitch today.  I apologize for the delay and the movement.

23        But with that said, why don't we get started?

24        MR. DONATO:  Thank you, Your Honor.

25        Obviously, there's many motions before you today.  I

1  don't know if we should seek to dispense or dispose with some

2  of those motions.  The main event, of course, is the disclosure

3  statement, which we're prepared to argue.

4         Do you have a preference?  Do you want to go over the

5  calendar?  I think there are some things that have just been

6  carried.

7         THE COURT:  There are a few things that have been

8  carried.  Why don't we start with the general 105(a),

9  Mr. Donato.  You can give the Court any update on anything and

10 then we can move into some of the other things that I think

11 just need to be adjourned.

12        MR. DONATO:  Absolutely.

13        So, as far as updates, the primary update, besides

14 the thousands of pages of papers that everybody's filed and

15 been reviewing and arguing, is that the mediators are up and

16 running.  So the mediators have already had some sessions.

17 They've been not in person or anything, but sessions with us.

18        I understand they've had sessions with carriers, the

19 Committee, et cetera.  So we're pleased that that process is

20 moving.  I did communicate with the mediators yesterday to just

21 get an idea of where we are, and I told them that we were

22 hoping to have a confirmation hearing during the latter part of

23 January.

24        They indicated that they understood that time frame.

25 They thought that that was okay, meaning that they would be

1 able to get in-person sessions and try to move this thing

2 along. We understand there's a tension here. Obviously, we're

3 anxious to try to get this case resolved. It's been a long

4 time.

5 The survivors at this stage have been extremely

6 patient. But I understand, if we can solve something through

7 mediation, we might remove half the people in this courtroom

8 who are trying to block us moving forward. So we fully

9 understand that. We're fully committed. And I think all the

10 parties are. So I wanted to update you on that piece.

11 Besides that, I don't think there's much to update

12 besides everything that's before you today.

13 THE COURT: Thank you.

14 Did anyone else wish to add anything to that brief

15 overview?

16 (No audible response)

17 THE COURT: Okay. Hearing none, why don't we

18 dispense of the 2004 exams? I believe we have Docket 204,

19 which was the motion seeking authority pursuant to Rule 2004 to

20 subpoena documents and testimony filed by the Committee. And I

21 think we have the corresponding motion authorizing the

22 Committee to subpoena the production of documents filed by the

23 Committee.

24 Mr. Kugler, are you able to advise the Court? Are

25 those, I assume, being adjourned?

1    MR. KUGLER:  Yes.  Yeah, I think that's the right

2 thing to do is adjourn both of those.  Time frame, I guess I'm

3 not sure.  It kind of depends what time frames get set today,

4 but I think that corresponding with whatever time frames get

5 set today, they would be mooted, obviously, by a confirmed

6 plan.  So we could adjourn it until after a proposed

7 confirmation date once that's determined.

8    THE COURT:  Why don't we adjourn those out to

9 January 16th at one o'clock, just as a control date, and then

10 we'll see where we stand at that point.  So Docket 204 and

11 Docket 1027 are adjourned.  That's a regular Chapter 7 and 11

12 case calendar.  At one o'clock is the Diocese time slot.  And

13 obviously, if a letter needs to be filed further adjourning

14 those or the Court needs to issue a text order, we can kind of

15 work around those with that.

16    Why don't we then move on to the 2019, the motion to

17 compel the attorneys representing the tort plaintiffs to submit

18 the disclosures required by FRBP 2019 filed by LMI.  I'm

19 saving, Mr. Donato, the disclosure statement for the end.  I

20 assume that will take up the vast majority of the argument

21 today.

22    So to the extent that we've already heard on that,

23 but Mr. Roten, that was your motion.  Was there anything

24 further that you had wanted to add on that before the Court

25 rules?

1          MR. ROTEN:  Mr. Reinhardt will be arguing that, Your

2  Honor.

3          THE COURT:  Oh, thank you.

4          MR. REINHARDT:  Yeah.

5          Good morning, Your Honor.  Nate Reinhardt on behalf

6  of Duane Morris on behalf of London Market Insurers.  I'll try

7  to keep this brief because I know we have a lot going on.

8          LMI had directed the motion to compel certain

9  entities to comply with what I'll refer to as Rule 2019.

10  Specifically, Jeff Anderson & Associates; Merson Law; Pfau

11  Cochran Vertetis & Amala, I'll refer to them as PCVA; and

12  LaFave, Wein & Frament.  And, collectively, I'll refer to them

13  all as the respondents.

14          Now, we recognize that the respondents filed

15  Rule 2019 statements, but still assert that those statements

16  are insufficient and do not include any litigation financing

17  agreements, which we have shown apply to at least some of the

18  respondents.  As to the arguments raised in the oppositions,

19  there is no dispute that compliance with Rule 2019 is

20  mandatory, and there is no explanation from the respondents as

21  to how compliance will delay progress of this case.  We think

22  these are separate and distinct from plan confirmation and the

23  mandatory compliance with Rule 2019.

24          Now, LMI may also bring this motion pursuant to

25  Kaiser Gypsum, which I won't belabor because we've heard ad

1  nauseam the amount of briefing on that, but just to say that

2  LMI are parties in interest.

3          Now we think Rule 2019 applies to the respondents

4  because their clients are acting in concert.  It requires

5  counsel representing more than one creditor to file a verified

6  statement identifying them and disclosing specified information

7  about their disclosable economic interests.  That is why

8  outlined in LMI's motion, Rule 2019 is applicable to each

9  respondent because the respondents' clients coordinated and

10  sought relief in this bankruptcy.

11          For instance, among others outlined in LMI's motion,

12  this includes the request by Anderson, LaFave, and PCVA to

13  issue demand letters through a stay relief motion, as well as

14  other filings.  As to this point, it does not matter that the

15  respondents could have asserted their pleadings as individual

16  motions, but chose not to for convenience.  The fact is they

17  did, and even if they had filed individually those motions,

18  that does not transform the fact that the respondents filed

19  their motions on behalf of their clients collectively.

20          Now, as to the actual Rule 2019 statements filed by

21  Anderson, LaFave, and PCVA, we submit that those are deficient.

22  And it's because Rule 2019(c)(4) requires an entity to file a

23  copy of the instrument authorizing the entity, group, or

24  committee to act on behalf of creditors.  And we would submit

25  this includes an executed power of attorney authorizing counsel

1  to file a proof of claim in this case.

2          Thus, or hence, Rule 2019 requires an entity to

3  disclose its express authorization to file a proof of claim and

4  represent multiple creditors in bankruptcy.  For this reason,

5  Anderson, LaFave, and PCVA fail to comply with Rule 2019

6  because the attached exemplars do not expressly provide that

7  these entities have authority to file proofs of claims or act

8  on behalf of their clients.

9          Each exemplar, for instance, states that Anderson and

10  LaFave have authority to represent a claimant in investigating

11  and pursuing claims for injuries and damages arising from

12  sexual abuse against the Diocese of Syracuse, but that is

13  insufficient.  Moreover, there's additional exemplars that do

14  not relate to the debtor's case at all.

15          Lastly, Merson Law filed a declaration stating that

16  it does not have any litigation financing agreements and

17  offering to produce the retainer agreements confidentially to

18  LMI.  And while we appreciate this offer, the declaration

19  itself does not comply with Rule 2019, that is filing a

20  verified statement publicly with exemplars attached for all

21  parties to review and, of course, redacting sensitive

22  information as necessary.

23          Now, a minor point as to the litigation financing

24  agreements themselves, which none of the respondents provided,

25  we're seeking those as well, if applicable.  And we would

1  submit that under Rule 2019, an entity must disclose the nature

2  and amount of each disclosable interest held in relation to the

3  debtor as of the date the entity was employed or the group or

4  committee was formed.  Rule 2019(a) defines a disclosable

5  economic interest as any claim, interest, pledge, lien, option,

6  and it goes on, granting the holder an economic interest that

7  is affected by the value, acquisition, or disposition of a

8  claim or interest.

9       That is why Judge Warren concluded in the <u>Diocese of</u>

10  <u>Rochester</u> to order the production of the litigation financing

11  agreement.  That order forms the basis of LMI's request in its

12  motion, which I attempted to take nearly verbatim in our

13  motion.

14       THE COURT:  Excuse me just one minute, Mr. Reinhardt.

15       Would whoever is on the phone who has us on hold --

16  thank you, Ms. Johnson.

17       THE COURT:  Continue Mr. Reinhardt.

18       MR. REINHARDT:  As to that point, the mere disclosure

19  of the respondent's retention agreements do not adequately

20  represent their economic interest if they have pledged those

21  interests as security for litigation financing.  And our motion

22  shows that at least some of the respondents, including

23  Anderson, have financing agreement arrangements with litigation

24  funders that expressly or implicitly provide the litigation

25  funders with security interest in either contingency fees or

proceeds of abuse claims, necessarily including such claims against the debtor.

Now, I would submit, alternatively, the Court may also order the production of these under Section 105(a), as disclosure and transparency of these agreements is consistent with the Bankruptcy Code. We cited authority for that in our proposition, I mean, in our reply, so I won't belabor that point. I only have a few remaining points.

We believe that the Committee lacks authority to oppose the motion, and for that reason alone, the Court should overrule the Committee's objection. The motion was directed only at the respondents which the Committee do not represent, and they cannot represent the individual creditors for which those respondents act for.

Finally, Rule 2019 does not apply to LMI, as the Committee asserts, because LMI are not creditors. LMI have not filed proofs of claims in this case, and LMI do not hold a claim as defined in Section 101(5). And while it's true that LMI have asserted affirmative defenses that allege that the debtor breached the duty to cooperate, which would preclude coverage, LMI do not contend that the debtor's breach entitles LMI to a right of payment as defined by Section 101(5).

Rather, LMI's position is that the debtor's breach relieves LMI of any coverage obligations for LMI to pay to the debtor, which is not a claim for recovery against the debtor.

1  This is why LMI do not hold a claim against the estate.

2  Further, LMI are not creditors under Section 101(10), as those

3  requirements are clearly inapplicable, and I won't talk about

4  them because I think it's self-evident.

5       So to sum everything up, LMI assert that the Court

6  should grant LMI's motion.  And unless Your Honor has any

7  questions for me, I will cede the podium.

8       THE COURT:  No, Mr. Reinhardt, I don't believe so.

9       Thank you.

10      MR. FINNEGAN:  Good morning, again, Your Honor.  Mike

11 Finnegan with Jeff Anderson & Associates, on behalf of certain

12 survivors.

13      LMI's motion should be denied for four reasons, Your

14 Honor.  First, they should not be allowed to use Rule 2019 at

15 this stage of the case when they've known since 2020, more than

16 four years ago when this case started, who we represent, the

17 names of each survivor, what their claims are, what their

18 economic interests are as to the debtor.  And they've known for

19 over a year, since July 7, 2023, that we had filed a 2019

20 statement.  After that, there was no motion, no call, no letter

21 to us until they filed this motion.

22      And, now, after we voted on a plan that had 99

23 percent of the survivors vote for it, the ones that voted, they

24 bring this motion.  They shouldn't be allowed to use 2019 this

25 way.

1    The second reason their motion should be denied, Your

2 Honor, is that Rule 2019 does not apply to lawyers like us who

3 are representing individual survivors, individual creditors

4 with claims against the Diocese.  We have separate retainer

5 agreements, which you've seen in our 2019, with each survivor.

6 Each has a different case.

7    There's no agreement amongst the survivors.  The vast

8 majority of the survivors don't even know each other.  And so

9 the key to all that is that they're not acting in concert

10 together.  They don't know each other.  They couldn't be, so it

11 doesn't apply.  And as the American Bar Institute Journal

12 stated, with the changes that added that portion in 2011 the

13 acting in concert, that does not apply to law firms like us.

14    I think if you look at the specific penalties or the

15 sanctions that are in 2019 at (e)(2)(A) and (e)(2)(B), both of

16 those, the penalties that they're talking about, is not letting

17 the group as a group be heard or the group as a block, voting.

18 That's not happening here.  We represent individual survivors,

19 speak on behalf of individual survivors.  Each survivor voted

20 on their own and that's what we anticipate again.

21    That's one of the most important things for

22 survivors, Your Honor, is to have their individual voices heard

23 in this.  So it's not a situation like the Boy Scout case where

24 they had a coalition of thousands and thousands of survivors

25 that nobody in that case knew exactly who was in that

1  coalition.  And so in that setting, it makes sense who is in
2  that coalition.

3        There's no mystery around who we represent.  That's
4  been known since the beginning.  And it's also not a situation
5  where we are doing one vote on behalf of all of our survivors
6  that we represent, so it shouldn't apply.

7        The third reason, Your Honor, is that even though we
8  strongly believe that it doesn't apply, we have complied with
9  the Rule, and so we filed and we made the same decision in the
10 Archdiocese of Saint Paul, Minneapolis, with Judge Kressel.
11 And what he had said in his order and in the transcript there
12 is that you need to have the claim number of each survivor, the
13 fee agreement with exemplars of each, and the date that each
14 was signed.  That's what we provided here as well.

15       And if we look at the Rule 2019, what it requires, it
16 requires when the group was formed.  Again, there's no group
17 here, but we did give our relationship with each survivor as
18 the date of the retainer, the name of each creditor that's in
19 the proof of claims, the entities and each member's economic
20 interest in relation to the debtor.  We have none.  I'll go
21 over that in a minute, as well.

22       And the survivors, none of them were allowed to go to
23 a jury trial where they could get a judgment so all their
24 economic interest, the extent of their interest is outlined in
25 the proof of claim, but they're not at a point of having an

1 actual judgment, a dollar figure, on it yet. And then the date

2 of the economic interest that the survivors each obtained is in

3 the proof of claims when they were abused.

4       The fourth reason, Your Honor, that 2019 shouldn't

5 apply, at least to the business loans here, is that the key

6 piece that LMI left out when they argued is that the economic

7 interest is in relation to the debtor. So if you look at the

8 Rule 2019, it's not just any economic interest. It's what's

9 the economic interest in relation to the debtor. Our law firm

10 has none. We have no claims. Personal claims that Jeff

11 Anderson & Associate has against the debtor, we didn't file a

12 proof of claim. Never. We couldn't sue him before this. We

13 have no economic stake, us, in the debtor at all.

14       What that means is that Rule 2019 doesn't provide a

15 basis for disclosure of our business loans. And it's no

16 different than any of the law firms here that have business

17 loans that they have. And they can have the same argument that

18 their business loan operates on them in some way that means

19 that they have to do something or they're -- but that's not --

20 all of us are officers of the Court. We take our ethical

21 responsibilities serious and it has nothing to do with what

22 we're doing here.

23       The one point that was raised, Your Honor, as well

24 was the proof of claims and the official 410 allows us --

25 explicitly says that attorneys can sign the proof of claim.

1  And then if we look at Rule 9010 also explicitly states that a

2  creditor may appear and act by an attorney authorized to

3  practice in the court.

4       And then, Rule 9010(b) makes it clear that executing

5  and filing a proof of claim is excepted from the requirement to

6  show a power of attorney to act.  In the alternative to that,

7  Your Honor, all of this would hurt survivors and cut off their

8  rights.

9       And so in sum, Your Honor, LMI should not be able cut

10  off survivors votes here because of 2019 and it does not apply

11  to us.  So we're asking for an order denying the motion because

12  2019 doesn't apply or, alternatively, denying the motion

13  because we have already complied.

14       Thank you.

15       THE COURT:  Thank you.

16       MR. CALDIE:  Good morning, Your Honor.  Edwin Caldie

17  on behalf of the Committee.

18       Your Honor, just to echo a couple of things as my

19  computer warms itself up here.  A couple of arguments that

20  Mr. Finnegan just made to the Court actually dispose of this

21  issue entirely, and it's the language of 2019 itself.

22       Number one, I also noticed that in 2019(c)(2)(B), the

23  Rule applies to disclosure of each disclosable economic

24  interest held in relation to the debtor.  I think that disposes

25  of the issue entirely.

1    Secondly, there's an issue raised about whether or
2  not the exemplars provided to the Court under disclosures
3  already made actually suffice to show that there's authority.
4  Under Rule 2019(a)(2), the term "represent" is defined and it
5  is defined in a way that absolutely makes clear that those
6  exemplars authorize survivor counsel to represent them in the
7  case in every way that they have been, including the ways
8  questioned or discussed here today.

9    It's been more than four years, as Mr. Finnegan
10 mentioned, since this case was filed.  We spent that time
11 working our tails off, to speak euphemistically, to find a
12 resolution with all parties interested in settlement.  Our
13 efforts with many insurers, including the certain underwriters
14 of Lloyd's, whoever they are, were not successful.  But now in
15 the midst of extended plan confirmation efforts, LMI asks us to
16 focus on a sudden, apparently urgent need for a few select
17 survivor attorneys to make Rule 2019 disclosures.

18    The motion is based on nothing more than insinuation,
19 a conspiracy theory with no provided support.  The survivor
20 firms focused on by LMI, they're not plan proponents.  The
21 debtor and the Committee are.  And there is no basis for the
22 insinuation that these plaintiffs firms are some sort of puppet
23 master in connection with the plan process.  They are not.  The
24 interests of survivor claimants were represented by an
25 unusually devoted and engaged group of survivor claimants in

1  this case.

2          They drove the bus.  They continue to drive the bus.
3  And they're going to continue to drive the bus.  Any suggestion
4  to the contrary is not just simply fiction.  It's more than
5  that.  It's offensive to the degree that it ignores the
6  substantial investments and engagement of the Committee members
7  in this case.

8          On the substance of this motion, Your Honor, we don't
9  think that Rule 2019 applies to counsel for survivor claimants.
10 We agree with the reading espoused by survivor counsel already.
11 Argument on that point, however, is set forth in our brief
12 response at Docket 20, or excuse me, 2090, so I won't spend
13 time rehashing it.

14         In any event, we believe the filings made by the
15 Anderson & Associates firm in this case and others, which are
16 if not substantial, they're similar if not substantially
17 identical to those deemed sufficient in other Courts, including
18 by Judge Kressel in Minnesota.  And we think that they more
19 than satisfy the requirements in the spirit of 2019, assuming
20 it applies at all.

21         The Committee is also confident, Your Honor, that the
22 insurers do not have standing to seek the requested relief
23 under 2019 for reasons, again, recited in our brief, and
24 reasons that we articulated in a much more lengthy way the last
25 time that we were together, and we appreciate the Court's ear

1  on that.  That was the <u>Truck</u> issue, of course.  I'll simply

2  adopt those arguments by reference today to save time.

3        What isn't detailed as thoroughly in our brief are

4  some of the practical real-world perspectives on this, those

5  sorts of considerations.  First of all, Your Honor, I would

6  draw an analogy to the disinterestedness test, the one that is

7  applied to Committee counsel every time that we file an

8  employment application in one of these cases or the employment

9  application of debtor's counsel every time that there's a new

10  Chapter 11 filed.  That requires a determination, Your Honor,

11  that the attorneys for the debtor and the Committee do not hold

12  an interest adverse to the estate.  It's very similar to

13  Rule 2019.

14        However, I would argue that it is a more deeply

15  probing, more exacting standard because it applies to literally

16  everything that comes up in the case, so those firms must be

17  examined at the beginning to determine that they don't hold an

18  interest in relation to the debtor.  Your Honor, in my years of

19  practice, I've never seen an inquiry under the

20  disinterestedness inquiry extend to law firm financing.  And by

21  the way, we all do it.

22        In most firms, at the end of the year, every dollar

23  goes out.  If it's a partnership, every dollar goes out.  It's

24  paid to partners.  So if you're following a calendar year, on

25  January 1st there is zero dollars in your bank account.

1    However, you still have to pay vendors, you still have to pay

2    your landlord, you still have to pay the lights, everything.

3    And how do we do that?  In virtually every instance for a

4    private firm, we do that through law firm financing.  We have a

5    line of credit.  It's routine.  Firms do it all the time.

6         But in the beginning of the cases, when employment

7    applications are filed, I have never heard of an instance where

8    the production of documents to probe the terms of that line of

9    credit is required.  The lenders are not deposed.  They're not

10   even identified.  It's never even discussed.  The notion that

11   it's somehow different here, more concerning here, because it

12   pertains to plaintiff's attorneys, is unfounded to say the

13   least.

14        The fact is, Your Honor, that there is nothing

15   different, there's nothing more shadowy at all about the

16   financing agreements of plaintiff's counsel.  The tort system

17   has operated in exactly the same way for decades.  The

18   contingency fee is completely appropriate.  That structure is

19   completely appropriate.  The claimants get paid.  The attorneys

20   take a percentage of the recovery.  It's that simple.

21        So it's always been the case that plaintiff's counsel

22   has a stake in getting a return, and as large a return as they

23   can for their clients.  That's not new.  That's not somehow

24   different here.  And there's no way in which a financing

25   agreement underlying all that, in the same way that Bond

1  Schoeneck likely does it.  I don't know.  And the same way that

2  Stinson likely does it.  Actually, I don't know that either,

3  but I'm fairly sure.  But it doesn't make a difference.  The

4  incentives remain exactly the same for survivor attorneys.  The

5  same as they've always been.

6          And I have to say, the basis for argument to the

7  contrary sounds very loudly in the history of these cases, the

8  claims that are at issue in this case.  Since the early 1980s,

9  when the first case alleging child sexual assault was initiated

10 against a Catholic entity -- and by the way, that was done by

11 the Anderson & Associates firm -- the primary deflection that

12 has been employed by those with liability for sexual assault

13 is, there's nothing to see here, this really isn't about us.

14 It's really just a bunch of greedy plaintiff's attorneys trying

15 to get as much money as they can.  Pay no attention to the

16 underlying accusations.

17         But that narrative has been proven definitively false

18 by thousands of people who came forward to share very bravely,

19 frankly, the truth of what happened to them.  And my point,

20 Your Honor, is that this is a kind of, what we're hearing in

21 the argument in support of the 2019 motion, from our

22 perspective, is kind of a tattered dog whistle of sorts.  It

23 asks us to focus our skepticism on the plaintiff's attorneys

24 instead of where it belongs, on parties like LMI with financial

25 responsibility to survivors.

1    It's the core of what we view LMI is trying to invoke
2 here. There's no articulated substance to this concern. There
3 is just an insinuation that we should be deeply skeptical of
4 the shadowy motives of survivor attorneys. But in our view,
5 Your Honor, it's the motives of the insurers in connection with
6 this motion, not survivor attorneys, that should be
7 scrutinized. The real purpose of this motion is they want to
8 see estimates of claim values that might be reflected in
9 financing documents.

10    In other words, the 2019 motion is no more than a
11 vehicle to gain undue, unequal bargaining leverage by seeing
12 what lenders might have said in terms of valuing confidential
13 claims of survivors when they decided to finance them. They
14 want to get underneath and view that negotiation process
15 between survivor attorneys and their lenders.

16    And, finally, Your Honor, if the plaintiff's
17 attorneys have to make disclosure, LMI should have to do it as
18 well. They have argued strenuously that they're entitled to
19 party-in-interest status. We disagree with that but that is
20 their position. And as they acknowledged here today, it
21 remains their answer in the declaratory judgment action. There
22 is the suggestion that they may be creditors.

23    If that weren't enough, in their objections to the
24 disclosure statement, they state that there are claims that are
25 being released. They rely yet again on this idea that they

Case 2-19-20905-PRW, Doc 3116-7, Filed 05/14/25, Entered 05/14/25 22:50:13, Description: Exhibit G, Page 31 of 172

1  have claims that are being released through the plan.

2       Well, from our perspective, if you're in, you're in.

3  And if you get to see the equivalent of plaintiff's attorneys'

4  loss reserve information, those discussions with their lenders,

5  then you should have to cough up the same for everyone else to

6  see.  How are we to know about the shadowy relationships that

7  hide within LMI's so-called market?  What is a market?  Who are

8  the various partners?  Who owns those entities?  Who invests in

9  them?  Do they have lenders?  Shouldn't we be able to see what

10 motivates these people who are apparently acting in concert?

11 Just because there's a construct of a market there doesn't make

12 it different.

13      So who are these people?  If we're going to go for

14 transparency, then let's do it.  If we're worried about shadowy

15 relationships that could lead to improper incentives, look no

16 further than this market of interrelated parties that fund, or

17 often refuse to fund, claims.

18      Behind this motion and a potential impact of granting

19 the motion, the next step, Your Honor, could be an attempt to

20 disenfranchise a wide swath of survivor creditors in this case.

21 Mr. Finnegan spoke about that.  That would obviously be a moral

22 tragedy.

23      It's not just one of the most important things for

24 survivors to be able to vote.  For the vast majority of these

25 people, the Committee was -- that smaller group of survivors

1  got to have counsel come and speak with you.  The other

2  survivors don't.  They have one moment when they get to voice

3  their perspective in this case.  One moment.  That's it.

4          They didn't get to choose whether this bankruptcy was

5  filed.  They just have to sit by and watch another institution,

6  which is challenging for them, decide what their rights are

7  going to be.  And then they have to trust this other group of

8  survivors in the end.  But they get to voice their own

9  perspective through a vote.  If that was taken away, it would

10 be nothing less than a moral tragedy.

11          But it would also give rise to a host of complex

12 legal issues that would then be dumped, without an obvious path

13 to resolution, on survivor claimants and on the doorstep of

14 this Court, thoroughly and further complicating an already

15 complicated confirmation process.

16          From our view, Your Honor, the 2019 motion is just an

17 attempt to create delay and undue leverage.  The filings by

18 survivor attorneys to date are sufficient and the motion should

19 be denied.

20          Thank you.  Any questions, Your Honor?

21          THE COURT:  No, Mr. Caldie.  Thank you.

22          MS. LaFAVE:  Your Honor, Cynthia LaFave, LaFave,

23 Wein & Frament.  I'm one of the attorneys that has been asked

24 to provide information in this case.

25          I am a plaintiffs personal injury attorney.  I have

1  been since 1984.  Of all of the attorneys in this courtroom, I

2  think Michael Finnegan and myself are the only ones that are

3  not being paid for being here.  Everybody else either is

4  getting paid by the hour, gets a salary, or something.  But we

5  are contingency attorneys.  We take risks to do the kind of

6  work that we are doing.

7        As a plaintiffs personal injury contingency attorney,

8  even if you are well respected and you work hard and you never

9  take your eye off the ball, you can't always be flush with

10 cash.  Regardless of the success I have had in my business of

11 plaintiff's personal injury, there have been times when I have

12 had no money to keep my business going.  It is never a straight

13 line.  It is never consistent income.

14       And no matter what accolades you receive in this

15 career, there are mouths to feed.  Whether it is your own home

16 or your employees salaries, there always has to be an escape

17 hatch in plaintiffs personal injury work.  And let us not

18 forget that even the IRS does not allow a plaintiffs personal

19 injury attorney to write off expenses at the time they are

20 expended on a case.  You can only write them off when you get

21 money on that case.

22       So if I've been doing these cases since the window

23 opened, all of those expenses are actually income to me and I'm

24 paying tax on that and I will not get those expenses back until

25 finally we get paid on these cases.  And that is when there is

1  a recovery.  The IRS takes the position that plaintiffs
2  personal injury attorneys should not be able to write those
3  expenses off.  Thus, you have to recognize early and often as a
4  plaintiffs personal injury attorney that there are no
5  guaranties.

6          In 1984, I hung a shingle out because I wanted to go
7  out into the world and try cases for people who might not be
8  able to afford me.  I did not want to be trying cases for
9  people who could pay me.  I wanted to try cases for people who
10 needed me.  And I would take the risk to do that and I would do
11 it over again.  I've had a long career and I would do it over
12 again no matter how hard it might sometimes be as far as income
13 goes.

14         I've consistently worked 40, 50, 60 hours a week.
15 Although I do try hard not to do that now, I'm still doing
16 that.  But it is work that I care passionately about.  I was
17 asked to take a case in the very early 1990s, and I represented
18 a young woman who was sexually abused by her father.  It was a
19 Colony police officer.  The case was tried in Saratoga County.

20         I got a verdict of $93.5 million dollars.  It was the
21 highest personal injury verdict in the entire United States
22 that year.  However, I didn't get paid.  But what we did is we
23 made a statement and we changed something.  And it was
24 important for us to do that.

25         THE COURT:  Ms. LaFave.

1          MS. LaFAVE:  The abuse will --

2          THE COURT:  Ms. LaFave, can I have your circle back

3   around, please, to the 2019 motions?  I do appreciate this

4   history.  And I know it's interwoven.  It's just we do have

5   quite a few matters.

6          MS. LaFAVE:  I'll go as fast as I can.

7          What I need you to know is that my office has been

8   funding my time as I go forward, and recompense is not part of

9   that equation.  What's being implied here is that I will try to

10  hold out until I can get the most money.  What I'm telling you

11  is if I were doing this for my own benefit, I would settle as

12  quickly as possible so that I could pay off whatever loans I

13  might have.

14         I will tell you that my office does have to borrow

15  money and does have to sometimes weigh things.  It is part of

16  that business of contingency fees.  But it's nobody else's

17  business because you can't question what my motives are.  I've

18  spent 40 years in this business and I am not doing this for me.

19  I am doing it as a career to help other people.

20         And as a plaintiffs personal injury attorney, I don't

21  represent people because I want to get paid the most I can get

22  for me.  I want to get what is fair and reasonable for every

23  one of those persons.

24         We do what we do because we want the world to be a

25  safer place.  We know we are representing people who need to

1  have their voices heard.  We know that ultimately their voices

2  will be heard and we want to change how America does business.

3         When money is paid out on child sex abuse cases, it

4  does matter.  Not just to our clients, but to the entire United

5  States.  We represent a lot of people who have gained a voice

6  through the Child Victims Act and they tell us over and over

7  again that they are doing this to make the world safer for

8  other children who may not even be born yet.

9         The work we have taken on is hard financially, and we

10  do have to do something to finance that.  What we do is no

11  different than what anybody else does to finance their cases or

12  run their business.

13         Now, the insurance companies who have an obligation

14  under the law and under all that is right to pay these claims

15  under the policies that were bought and paid for fight every

16  move to close this chapter.  Just this month, we were informed

17  that another one of our clients has passed away.  It is

18  excruciating to see that another client of ours will not see

19  justice.

20         But now the insurance companies want to climb into my

21  business and see my books and see how I run my business, which

22  has nothing to do with me as an attorney and how I act and how

23  ethical I am.  Our manner of conducting financial stability is

24  our own business.  I think that the insurance companies, if

25  they would like to make this argument about us, we should be

1  able to see their reserves.

2         We should be able to see what they said in their

3  board of directors minutes that were meant to be secret.  We

4  should be able to see from them what they ask for from us.

5         As licensed attorneys, we are entitled to the respect

6  to be presumed to be acting in our clients' best interests.

7  This motion says we are not.  And, in fact, if we were only

8  concerned with ourselves, we would be lining up to take the

9  first offer, the second offer, the third offer, so that we

10 could take care of interest that might be accruing on loans

11 that we have.

12        We choose this lifestyle, yes.  We believe in what we

13 do.  But how we run our business should never be the subject of

14 a court order requiring disclosure without any indication that

15 we are acting unethically or working for ourselves instead of

16 our clients.  And there is no indication of that here.

17        I have been here at every hearing that I can make.  I

18 have been in the courtrooms.  I have been on the phone.  I have

19 appeared, even though I only represent some of the survivors.

20 If we were looking to make an easy buck, we would have done

21 that a long time ago.  I assure you we would never do that,

22 regardless of the manner of how it affects us in our

23 businesses.

24        Thank you.

25        THE COURT:  Thank you, Ms. LaFave.

1       MS. CHAMPION:  Your Honor, if I could just be heard

2   on this matter very briefly.

3       THE COURT:  Certainly.

4       MS. CHAMPION:  Erin Champion for the United States

5   Trustee.

6       The U.S. Trustee, Your Honor, didn't file a response

7   to this motion.  But to the extent that it's helpful, I just

8   want to note that, and Your Honor may already be aware, that

9   this issue was argued also in the <u>Diocese of Buffalo</u> last week,

10  and in which case the U.S. Trustee did take a position that the

11  financing agreement is subject to Rule 2019, just as a matter

12  of financial disclosure and nothing more.

13      I think before Your Honor is just that issue.  It's

14  not if there's any implication by that agreement.  It's just

15  that it does fall under the scope as the parties having an

16  economic interest of the debtor.  So we would take that same

17  position here, Your Honor.

18      THE COURT:  Thank you.

19      MS. CHAMPION:  Thank you, Your Honor.

20      THE COURT:  Mr. Reinhardt, anything further?

21  Briefly.

22      MR. REINHARDT:  Yeah, briefly.

23      Just a few points echoing the same thing.  This is

24  merely a disclosure pursuant to the rules, pursuant to

25  bankruptcy.  There's nothing insinuating about it.  And the

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 39 of 172

1  basis provided by Judge Warren's decision in <u>Rochester</u>, which I

2  didn't hear any contravention to that authority.  LMI filed

3  this motion in good faith.  We attempted to mediate in

4  settlement this case, but it was unproductive, and so we're

5  just looking for transparency and to valuate any proper

6  influence from third parties.

7          My second point is that Rule 2019 applies when acting

8  in concert, meaning when you take a proactive, coordinated

9  position in bankruptcy, and that's what some of the filings by

10  the various respondents did.  I would only also say that when

11  they were talking about a claim held by the debtor, the first

12  part of that is a disclosable economic interest held by the

13  debtor, which is, as I said, a right granting the holder an

14  economic interest that is affected by the value, acquisition,

15  or disposition of a claim or interest.  And we would submit

16  that applies to those financing agreements.

17          Last point is we're not looking to cut off votes

18  here.  We simply want to see the agreements.  That was just

19  stated that if they were unwilling to produce that, that's what

20  follows.  I would also submit that the disinterestedness of an

21  employment application is irrelevant.  We're talking about

22  Rule 2019.

23          With that, I'll take my leave.

24          THE COURT:  Thank you, Mr. Reinhardt.

25          Anyone else?  Anyone on the phone wish to be heard?

1  I believe all the parties who responded have already spoken.

2  (No audible response)

3  THE COURT:  Hearing none, the Court has reviewed the

4  motion, the memorandum in opposition to the motion filed by

5  Jeff Anderson & Associates and LaFave, Wein & Frament with the

6  declaration of Mr. Finnegan at Document Number 2067 and 2073;

7  the joinder to opposition filed by the PCVA Law survivor

8  claimants, Docket 2088; and the response to the motion filed by

9  the Official Committee of Unsecured Creditors at Docket 2090;

10  also, the omnibus reply in support of the motion filed by LMI

11  at Docket 2167.

12  The Court has also reviewed the 2019 statements filed

13  by Jeff Anderson & Associates, Docket 1323; LaFave, Wein &

14  Frament, PLLC, at Docket 2010; the Marsh Law Firm, and Pfau

15  Cochran Vertetis Amala PLLC, at Docket 2060; and Merson Law,

16  PLLC, at Docket 2164, which the Court believes constitutes the

17  full record in this particular motion.

18  The Court recognizes Rule 2019 and shares that all

19  parties that are a group or committee of multiple creditors or

20  equity security holders and their counsel will make disclosures

21  of economic interests that are relevant to the bankruptcy case

22  into which they are appearing.  9 Collier on Bankruptcy,

23  Section 2019-01.

24  Rule 2019 is self-effectuating and requires

25  compliance if there is a group acting in concert, which we have

here, where attorneys are actively involved in a case and
representing multiple creditors.  Collier specifically states
that if a group seeks to, *inter alia*, modify the stay, the
entity representing the group must comply with Rule 2019.

Indeed, each of the law firms identified by movant
LMI have filed pleadings and appeared in this case representing
their respective clients as a group.  Given that each law firm
has appeared on behalf of a group, Rule 2019(b) applies and
requires a verified statement to be filed by that entity
representing creditors acting in concert towards a common goal.

After careful review, the Court finds that the
current 2019 verified statements filed by Jeff Anderson &
Associates, Docket 1323, and LaFave, Wein & Frament, Doc. 2010,
are sufficient to comply with Rule 2019 requirements in light
of the various confidentiality protections that are in place
here.  They have provided the proof of claim number, which
confidentially identifies their client claimant; their address
and the nature and the amount of the claim asserted, as
required by the Rule; and the claimant's exemplars of the
engagement agreements that identify the fee agreement and the
sharing of those fees with other counsel with prospective
client waiver language that are attached to the verified
statements.

The Court finds the 2019 affidavit of Marsh Law Firm
and Pfau Cochran Vertetis Amala PLLC is sufficient for the same

1   reasons identified, except that counsel there, who is not

2   present today, is directed to obtain conflict waivers from each

3   creditor and file an affirmation advising that each client has

4   waived any potential conflict arising from joint representation

5   of multiple creditors in this case.

6           The Court has reviewed the declaration filed by

7   Merson Law sexual abuse claimants and finds that it fails to

8   meet the requirements of FRBP 2019.  Although Merson states

9   that it is willing to provide redacted fee agreements

10  confidentially, that is not enough to satisfy the Rule.

11          The declaration fails to include pertinent

12  information such as proof of claim numbers for claimants from

13  the exemplars of the engagement agreements that identify the

14  fee arrangement and, if applicable, the sharing of those fees

15  with other counsel, together with prospective conflict waiver

16  language.  In light of this, Merson is directed to file an

17  amended 2019 statement with this information and documentation.

18          LMI contends that a specific power of attorney

19  authorizing counsel to sign a proof of claim must be disclosed

20  and suggests that failure to comply should result in, among

21  other things, the invalidation of ballots cast by survivors

22  represented by counsel.  This Court disagrees.

23          A power of attorney or other authorization permitting

24  counsel to act on behalf of their clients is not required by

25  Rule 2019 and will not be required by this Court.  The Court

looks to the Southern District of New York in In Re Ionesphere
Clubs, Inc., 101 B.R. 844, which held that an entity need only
file an instrument that empowers the entity to act on behalf of
creditors and that, although this may include an executed power
of attorney, an executed power of attorney is not the sole
means of fulfilling Rule 2019.

It's been represented by Jeff Anderson & Associates
that its clients' proof of claim were each individually
detailed and set out the specific nature of the claim and the
ballots were individually signed by the survivors, which
overwhelmingly supported the fair and amended plan.

With respect to the disclosure of the litigation
funding documents, the Court respectfully disagrees with Judge
Warren and the U.S. Trustee and finds that they do not pertain
to an economic interest held in relation to the debtor as
described in Rule 2019. They are two separate arrangements.
You have a survivor claimant with an economic interest held in
relation to the debtor via a filed proof of claim and that
claimant in turn has granted counsel a right to a percentage of
that economic interest in exchange for representation as
identified in the engagement letters.

Then, separately, you have a security interest
granted by counsel in that recovery to counsel's lenders as a
source of funding the litigation, which is not a direct
economic interest in the debtor. As the law firms correctly

stated, they have no specific claim against the debtor here. And to find to the contrary, quite frankly, would produce a whole host of trickle-down issues with attorneys representing claimants in these bankruptcy cases.

The 2019 statements provide the pertinent facts and circumstances regarding counsel's interest held in relation to the debtor. While not in the bankruptcy context, the Court notes that disclosure of third-party litigation funding documents is strongly disfavored in New York. The Eastern District of New York explained the rationale behind the policy against the disclosure.

Defendants' arguments that they are entitled to understand the litigation funder's ability to intervene and dictate the legal strategies or settlement discussions is just a series of conclusory and irrelevant assertions. A defendant is not entitled to learn any of these things in any case, absent some special need or showing. One party to litigation is not entitled, absent some contractual or other relationship like an indemnification agreement, to know why the adverse party chooses to make certain strategic decisions in a case or avoid settlement.

Many such considerations are privileged, and if they are not, they are irrelevant and outside the scope of what a party needs to defend or prosecute its claim. Benitez v. Lopez, 2019 U.S. Dist. LEXIS 64532.

1    In sharing these concerns, the Court also denies

2 LMI's request to compel production of litigation funding

3 documents pursuant to Section 105(a).  Compelling production of

4 those documents would improperly confer upon LMI a right that

5 LMI does not have under the Bankruptcy Code or New York law,

6 which protects the confidentiality of such agreements.

7    The Court does not see any relevance or other

8 contractual grounds to compel their disclosure when the Court

9 finds it outside of Rule 2019 requirements.  There has been no

10 special need or showing.

11    Indeed, the Southern District of New York recognized

12 courts in the circuit have rejected claims for litigation

13 funding documents when the only asserted relevance is that they

14 will permit the requesting party to peer into its adversary's

15 strategy, the adversary's reasons pursuing what the requesting

16 party might believe is baseless litigation, and the adversary's

17 rationale for accepting or rejecting settlement offers.

18 Eastern Profit Corp. v. Strategic Vision, 2020 U.S. Dist. LEXIS

19 239663.

20    As noted, the purpose of Rule 2019 disclosures is to

21 make disclosures of economic interests that are relevant to the

22 bankruptcy case in which the group or equity security holders

23 are appearing.  The Court concludes these goals have been

24 accomplished by the Anderson and LaFave disclosures.

25    As previously noted, the Marsh Law Firm and Pfau

1 Cochran Vertetis Amala PLLC, jointly are directed to obtain

2 conflict waivers from each client and file an affirmation with

3 the Court within 45 days advising if each client has waived any

4 potential conflict arising from joint representation of

5 multiple creditors.

6 Finally, Merson Law's declarations failed to meet the

7 requirements laid out in Rule 2019, even though it has appeared

8 in this case through Sarah R. Cantos, Esquire, by the filing of

9 a motion for relief from the automatic stay on September 7,

10 2023. As such, Merson is directed to file an amended Rule 2019

11 statement that includes a list of the claimant it represents in

12 this case, identifying each claimant by claim number only, the

13 nature and amount of disclosable economic interests each claim

14 holds in relation to the debtor, an exemplar engagement or

15 retainer agreement between Merson and its claimants, and fee

16 sharing agreements, if any, with any other law firms, along

17 with an affirmation advising that each claimant has waived any

18 potential conflict arising from joint representation of

19 multiple creditors in this case.

20 The Court denies all other requests contained in the

21 motion, as well as the Official Committee of Unsecured

22 Creditors' counter-motion, and the Court will draft a summary

23 order that will be entered and will make sure that that is

24 served on the law firms that are not actually appearing here

25 today.

1      Thank you.

2      Let's now move on.  As I indicated, the disclosure

3 statement I would like to take last, unless Mr. --

4      MR. DONATO:  Yeah.  Oh, no.  Your Honor, I didn't

5 mean to interrupt you.  There were other matters on the

6 calendar, so I'll just follow your lead.

7      THE COURT:  Yes, we have.  Let's go to an easy one,

8 first.  We're kind of skipping around here, Mr. Donato, but

9 since you stood up, the Court would like to jump to the

10 Adversary Proceeding 105(a) and the mediation order in light

11 of -- this will be a quick one -- in light of the resignation

12 of Mr. Van Osselaer.

13      Mr. Sullivan.

14      MR. SULLIVAN:  Yes, thank you, Your Honor.

15      Good morning, Your Honor.  Charles Sullivan, Bond,

16 Schoeneck & King, on behalf of the Diocese of Syracuse.

17      Your Honor, following the submission of the proposed

18 order to the Court, Mr. Van Osselaer reached out to us and

19 indicated his unwillingness to continue in the capacity that

20 was set forth in the order.  And, Your Honor, just by way of

21 background, that capacity had specifically been requested by

22 counsel for the National Catholic Risk Retention Group, which

23 was one of the insurers who had entered into a settlement

24 agreement that involved the Diocese, the parishes, the

25 Committee, just to be able to remain on to button that down.

1      Your Honor, in my view, that continuing involvement

2  was unnecessary, but we were willing to put it in the draft

3  order.  And it was my understanding that Mr. Van Osselaer was

4  on board with that.  That understanding was corrected, Your

5  Honor, after communicating with Mr. Van Osselaer.

6      So, I'm a little uncertain about the status of that

7  order at this point, Your Honor.  We could submit a revised

8  order with that portion stricken, or we could let Mr. Van

9  Osselaer's resignation stand on the -- I would like some

10 guidance from the Court on that, Your Honor.

11      THE COURT:  Certainly, Mr. Sullivan.

12      The Court will do an amended order that simply

13 removes that portion, except with respect to assisting the

14 parties to finalize settlement agreements with the previously

15 settled insurers.  So to simply just terminate him in

16 accordance with his termination, that will simply conclude his

17 role.  The Court assumed when it was on consent that he was on

18 board with that, and I would like to thank him.

19      Certainly, the Court apologizes and accepts his

20 resignation with tremendous gratitude for his efforts in

21 reaching the global, or the resolution between the debtor and

22 the Committee, as well as the three settlements that have not

23 yet been teed up.  So the Court certainly is prepared to do

24 that.

25      The other issue that was not incorporated in the

1 order on consent, and the Court hesitates to make any changes

2 to orders on consent when the parties aren't before it.  The

3 Court also had ordered a stay on the prior motions in the

4 adversary proceeding pending further order of the Court and the

5 Court is going to include some language in that regard with

6 respect to an amended order.  So the Court will file that,

7 accepting his resignation in total, as well as tolling it until

8 further order of the Court.

9      And we'll adjourn the status conference to

10 January 16th as kind of a control date to see where we are,

11 whether it makes sense to proceed with those motions, or

12 whether or not we're headed more towards a global resolution

13 with the insurance companies.

14      MR. SULLIVAN:  Understood, Your Honor.

15      And, certainly, I apologize, Your Honor, for

16 misunderstanding Mr. Van Osselaer's position on that.

17      Also, Your Honor, the proposed order we submitted

18 does -- pardon me, incorporate by reference the prior mediation

19 orders that does include the stay, Your Honor.  So that's how

20 we were attempting to achieve it.  But I do think that the

21 Court's suggestion of having that be expressly stated in this

22 order is probably preferable.

23      THE COURT:  Certainly.

24      And, again, we'll adjourn the 105(a) on the adversary

25 to January 16th at one o'clock.  And unless there's somebody

1  else that wishes to be heard on that, I think that wraps up

2  that matter on the calendar.

3          MR. SULLIVAN:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          Is there anybody else who wishes to jump in on that?

6                  (No audible response)

7          THE COURT:  Okay.  Moving right along.

8          Why don't we move to the motion to seal and/or

9  redact?  And then we'll do the disclosure statement last.

10          MR. REINHARDT:  Good morning, again, Your Honor.

11  Nate Reinhardt on behalf of London Market Insurers.

12          The motion to seal is straightforward.  It requests

13  permission to seal and redact information and claim objections

14  that LMI intend to file.  I think the real question for the

15  Court is whether the Court prefers over approximately 70

16  motions to seal alongside our intended claim objections or if

17  the Court wants a single motion to seal.

18          We do not believe this is controversial.  As stated,

19  LMI are parties-in-interest under Kaiser Gypsum, and adopt all

20  those arguments previously.  To support LMI's objections, LMI

21  will rely on documents or information that are subject to

22  certain confidentiality provisions, including a bar date order

23  at Docket Number 214 and a separate confidentiality agreement

24  relating to discovery received by LMI.

25          To protect this confidential information, LMI propose

1 an order that their objections will be sealed and redacted and

2 that LMI do not need to file a separate motion to seal for each

3 claim objection.  If there are issues with the form of the

4 order or if the parties have objections to the order, then we

5 can revise it accordingly.  And as stated, if the Court

6 prefers, LMI can submit individualized motions to seal for each

7 claim objection that it intends to file.

8         But to be clear, the motion to seal does not seek to

9 establish procedures for objecting to survivor claims or any of

10 the same relief that LMI initially sought in August 2023 and

11 again in March 2024.  Notably, no opposition disputes or

12 contends that certain documents do not fall or information do

13 not fall within the scope of Section 107(b) of the Bankruptcy

14 Code, which protects confidential information.

15         And if the Court makes the determination that this

16 information is confidential, under Second Circuit law, the

17 Court is required to protect a requesting interested party and

18 has no discretion to deny the application.  Hence, there is no

19 dispute that the information on which LMI intend to rely fall

20 within the scope of Section 107(b) of the Bankruptcy Code.

21         Instead, the oppositions to the motion seem to

22 conflate LMI's prior relief in the two procedures motions with

23 the current motion before the Court and dispute LMI's right to

24 file claim objections.  As stated, we are not seeking any of

25 the same relief and the merits of the claim objections

1 themselves, including whether LMI have a right to file claim
2 objections are not before the Court.

3      In July, Your Honor adjudicated Hartford's motions to
4 seal as well as Interstate's motions to seal relating to
5 ongoing discovery issues involving plan confirmation.  And I
6 recall at those hearings, Your Honor raised concern about
7 appropriately redacting all confidential information, including
8 any information that could implicitly lead to confidential
9 information and to be overly cautious about that.  Those are my
10 words.

11      We take those redactions and the protection of
12 confidential information very seriously and would take care to
13 redact all appropriate information.  To illustrate, and I
14 believe in this case we filed individualized motions, LMI
15 similarly filed redacted objections in the Roman Catholic
16 Diocese of Harrisburg to protect this confidential information.
17 And I believe we cited that case in the docket numbers where we
18 submitted those.

19      LMI would also provide the debtor, Committee, and the
20 claimants who are subject to the objection and the claimants'
21 counsel with unredacted copies of the objection.

22      And with that, I don't think there's really any more
23 that needs to be said.  I'll cede the podium.

24      THE COURT:  Mr. Reinhardt, did you want to respond
25 because the corresponding motion is obviously the motion to

1 strike the LMI motion?  Is there anything in particular you

2 wanted to hit on for that before we hear from the Committee?

3          MR. REINHARDT:  Actually, and I wasn't sure if they

4 were going to go first, but it makes sense to address it now.

5          As to that motion, I think a lot of the same

6 arguments apply.  We're parties-in-interest and so we have a

7 right under Kaiser Gypsum.  We also believe that that motion is

8 procedurally improper under the rules because when you're

9 talking about a motion to strike, there are certain documents

10 or motions, or excuse me, certain documents or pleadings that

11 are listed but motions is not one of them.  And I would submit,

12 as stated in our motion, or excuse me, in our opposition to our

13 motion to strike.

14          THE COURT:  Thank You.

15          MR. KUGLER:  Thank you, Your Honor.  Robert Kugler on

16 behalf of the Committee.

17          The question that's posed by this motion is whether

18 the Court has the authority to control its case and its docket

19 and determine how the case should go forward.  This is their

20 third attempt to foment claim objections in this case, and the

21 Court has wisely on two prior occasions denied motions that are

22 anticipating that and has instead opted to shepherd the

23 bankruptcy process forward towards a plan and a confirmation

24 process.  And in my opinion, that was wise.

25          The Court has, on numerous occasions in this case,

1  turned away from efforts to propel litigation aspects of this

2  case forward, most recently at the last hearings when various

3  parties were interested in having the adversary proceeding on

4  the coverage issues go forward.  There will be a time and a

5  place for litigation.  Hopefully, it'll be post-confirmation.

6  It won't be during the pendency of the case.

7        But it certainly has no compelling reason at this

8  stage to engage in the claim objection process.  And, in fact,

9  I would say there will never be a compelling reason or any

10  reason to engage in a claim objection process that will have no

11  impact whatsoever on LMI, a party who has not accepted one cent

12  of financial responsibility for anything in this case.

13        So there's no reason to go forward with the claim

14  objections.  And, frankly, that process will be mooted

15  ultimately through a settlement.  Or, if it has to go forward,

16  it will go forward in the proper place, which is state court in

17  the tort system.

18        And so, we feel that the law of the case here is

19  pretty clear pretty clearly so, that the Court has opted not to

20  go forward with the claim objection process prior to

21  confirmation, at least at this time.  We think it's the wise

22  thing to do to continue to take that perspective, and we think

23  the motion ought to be denied.  How it gets dressed up is

24  really not the point.  The motion to seal is moot if claim

25  objections aren't going forward.

1    So we would ask that the motion be denied, or in the

2 alternative, that the motion be stricken because the law of the

3 case determines that it should be stricken.

4    THE COURT:  Thank you.

5    MR. KUGLER:  Thank you, Your Honor.

6    MR. FINNEGAN:  Good morning, again, Your Honor.  Mike

7 Finnegan with Jeff Anderson & Associates.

8    There are multiple reasons why LMI's motion should be

9 denied.  And we agree with Committee counsel that this is

10 really a motion for reconsideration of their attempts to do

11 claim objections.

12    First, the reconsideration standard is much higher

13 than anything else and they haven't met that high standard,

14 that high burden.

15    Second, Your Honor, everything that the insurers want

16 to object to, that's all things that they retain the rights to,

17 to litigate when we get to state court.  And the difference is

18 when we get to state court is both sides have the full rights

19 of discovery to litigate those cases, which is what will

20 happen.  So they're not losing anything here by not being able

21 to do claim objections at this point.

22    Third reason, Your Honor, is that claim objections at

23 this stage will delay this case and it could cost millions of

24 dollars.  And the reason why is because if you look at their

25 actual claim objections or what they've said in other cases,

1 one of the claim objections that they want to take is, just an

2 example, is they want to argue about whether a religious order

3 priest who was working in the Diocese, if the Diocese is

4 responsible for that priest. So that would be -- an example

5 would be there are religious orders like the Jesuits or the

6 Salesians. And they have a priest that comes in, works in the

7 Diocese of Syracuse, and the objection would be that the

8 Diocese isn't responsible for that priest. We disagree with

9 that.

10 But what happens then with that, on that one single

11 claim objection is, each survivor would have to request

12 documents from the Diocese, from the parish, and from the

13 religious order. Most of the time when that happens, there are

14 fights about what's produced and what's not produced, so

15 there's motions to compel. Then you move to the next phase of

16 taking depositions.

17 Take a deposition of the bishop, of the records

18 custodian at the Diocese. You take at the parish, the parish

19 priest, records custodian there. For the religious order,

20 their top person is usually called the provincial. You take of

21 the provincial and other people at that religious order. And

22 that's all to resolve one factual claim objection.

23 And so we went through this with Judge Glenn in

24 Rockville Centre that cost millions of dollars and didn't get

25 us any closer to getting done. It actually delayed the case

1  significantly, I thought.

2  And the result of that, Your Honor, the other thing

3  that's true in this case, and it was true in <u>Rockville Centre</u>

4  as well, is at least for the survivors that we represent, and I

5  think most of the survivors, have cases against both a parish

6  and the Diocese.  And so what happened in <u>Rockville Centre</u> was

7  they did claim objections on the party that was in this Court,

8  the (indiscernible) in that court, in Judge Glenn's court, and

9  the Diocese.  So there's a claim objection as to the claim

10  against the Diocese.

11  The survivors still, in state court, had their parish

12  lawsuits that were there.  And so there's all kinds of

13  litigation around this, around the Diocese portion of it.  Some

14  got appealed, some the survivors won, and some the Diocese won

15  on those.

16  But then what happened when there was an ultimate

17  resolution was all of those cases, even the ones that had been

18  sustained on the claim objection, because they had the parish

19  lawsuits and the insurance covers both the Diocese and the

20  parish, all of those survivors were forced to come back into

21  the settlement and to the resolution because they had

22  insurance.

23  And so the insurers would not allow those survivors

24  to keep going.  They had to be involved in this.  And so that's

25  another reason why, as a practical matter, it doesn't make

1 sense to do claim objections here.

2 And lastly, Your Honor, the fourth point is that if

3 they're allowed to do claim objections, we will be forced to

4 bring motions for relief from stay in each one of the cases and

5 send these back to state court to have these litigated. And I

6 don't think that given where this case is at right now, that

7 that's the best use of our time at this point and our energy.

8 And I believe that that should be spent on focusing on

9 confirmation and saving all the litigation issues until we get

10 back to state court.

11 Thank you.

12 THE COURT: Thank you.

13 Mr. Sullivan, yes.

14 MR. SULLIVAN: Your Honor, Charles Sullivan, Bond,

15 Schoeneck & King on behalf of the Diocese.

16 Your Honor, as has been already said, this is at

17 least the third attempt by LMI to crack open the door on

18 objecting to claims. I agree with the suggestion advanced by

19 both Mr. Kugler and Mr. Finnegan that this is a thinly-veiled

20 request for reconsideration.

21 One point that I did want to address is that LMI

22 seems to be hinging its request to shoehorn this open on the

23 question of standing. That that was an issue that was not

24 specifically addressed by this Court, which was the case. In

25 the prior decisions denying the request to establish procedures

1  for objecting to claims, the Court specifically stated that it

2  was not considering the question of standing.

3       And I respectfully point out to the Court that this

4  Court can deny LMI's request without even engaging in the

5  question of standing for exactly the reason that was described

6  by Mr. Kugler.  To quote the transcript of the hearing where

7  the Court denied LMI's second procedures motion, which appears

8  at Docket Number 1887, the Court repeats its previous finding

9  that allowing a claim objection process to proceed now would be

10 distracting, time-consuming, and expensive, and may impair or

11 delay confirmation.

12      So because the Court was able to deny the process

13 previously without engaging the standing question, it doesn't

14 have to decide that issue now, is my submission to the Court.

15 And with regard to LMI's standing arguments, I would point out

16 that LMI has continued to fail to identify a single instance

17 where a carrier has been authorized to pursue claims

18 objections.  And in response to any argument that Kaiser Gypsum

19 vs. Truck may change that, Your Honor, we incorporate by

20 reference the arguments that have previously been submitted to

21 the Court on that question.

22      Thank you, Your Honor.

23      THE COURT:  Thank you.

24      Mr. Reinhardt, did you want to reply?

25      MR. REINHARDT:  Yes, Your Honor.  Two brief comments.

1      The prior two motions were denied and, admittedly,

2 because it would be confusing to plaintiffs, as to the

3 procedures that were being proposed therein.  There's nothing

4 like that in this motion here.  It's just whether or not there

5 should be a general order for a motion to seal for all these

6 claims objections that we intend to file.

7      We don't think this is a reconsideration because it's

8 different relief being requested.  But, again, if Your Honor

9 feels differently, we can go ahead and file individualized

10 motions to seal for all the claim objections.  The actual

11 merits of whether LMI have the right to file claim objections

12 was not before the Court in the two prior motions and is not

13 before the Court in this motion at all.

14      As to why we keep asserting this, I was trying to

15 look for it in the plan and I couldn't.  I didn't have enough

16 time.  I recall that once confirmed, the plan removes LMI's

17 right to file claim objections under the Bankruptcy Code.

18 That's why we keep trying to assert this now before plan

19 confirmation.

20      Thank you, Your Honor.

21      THE COURT:  Thank you.

22      Anyone else?  Anyone on the phone?

23          (No audible response)

24      THE COURT:  Hearing none, the Court has reviewed all

25 of the papers as well as the corresponding motion to strike the

1  LMI motion.  In light of the parties' return to mediation,

2  which the Court notes was at the request of the insurers, the

3  Court is adjourning the motions to January 16th at one o'clock,

4  at which time the Court will hear from the parties if the

5  motions need to be pursued and decision needs to be issued, or

6  if that will help advance the ball in the mediation for a

7  global resolution with LMI and the other insurers, or if

8  mediation has stalled, if LMI wishes the Court to proceed with

9  issuing a judgment.

10       The Court recognizes that LMI disagrees with that

11  approach, but that's the Court's decision, managing its docket,

12  as well as the time, expense, and distraction of a claims

13  objection process.  So the Court is adjourning the motion to

14  seal along with the motion to strike to January 16th at one

15  o'clock, and we'll treat that day as a report back.  And if the

16  parties wish the Court to issue a decision at that time, the

17  Court will take that under advisement.

18       Okay.  I think that leaves the disclosure statement.

19       MR. DONATO:  Yes.  The only other is there's the --

20  it carried on the calendar, is the 105 arguments concerning

21  Truck.

22       THE COURT:  Correct.  Yes.  The Court is in the

23  process, I don't even know how many dozens of pages the

24  decision is yet, but we are in the process of issuing a

25  decision on Truck that also has a second part that has all the

1  discovery disputes.  That is a work in progress, a constant

2  work in progress.

3          I don't want to make a promise and not be able to

4  deliver that, but the Court does expect in the next few weeks

5  that that would be issued.  That will hopefully streamline the

6  confirmation process and perhaps give some more assistance in

7  reaching a global resolution.  So that's the 105(a).  We can

8  adjourn that to January 16th for control purposes.  But the

9  Court thoroughly expects to have a written decision out in the

10 next few weeks.

11         MR. DONATO:  Thank you.

12         MR. WINSBERG:  Your Honor, Harris Winsberg on behalf

13 of Interstate just briefly on that.

14         We submitted, Your Honor, one page notice of

15 supplemental authority from Judge Goldblatt.  I just want to

16 make the Court aware of that.

17         THE COURT:  Yes, thank you.  Judge Goldblatt is

18 making authority all over the place.  He's very good at that,

19 so.

20                        (Laughter)

21         MR. WINSBERG:  Every day.

22         THE COURT:  Every day.  Every day.

23         Yes.

24         MR. WINSBERG:  Although, Your Honor, I would point

25 out to the Court, I don't think that's a reported decision nor

1  is it a decision.  I think the parties have not, in that case,

2  have not had an opportunity to brief the question.

3       THE COURT:  Understood.  Understood.  The Court

4  obviously follows all of those decisions very carefully as well

5  and appreciates that the -- to make the Court aware of

6  developing case law.  Obviously, this is a constantly evolving

7  situation in light of the Supreme Court's decisions in both

8  Truck and Purdue, so certainly appreciates that.

9       Was there anything else that anyone wanted to comment

10 with respect to the Truck 105(a)?  We'll just adjourn that for

11 control purposes to January 16th at one o'clock and expect that

12 there will be a decision prior to that time.

13      MR. DONATO:  Good morning, again.  Steve Donato,

14 Bond, Schoeneck & King, for the Diocese of Syracuse.

15      Before the Court today is the Diocese solicitation

16 motion along with the request to approve the fourth amended

17 disclosure.  Well, excuse me, the disclosure statement

18 concerning the fourth amended plan.  That disclosure statement

19 is at Docket 2173.

20      At the outset, there is an inconsistency, this is a

21 minor point, although a million dollars I guess is not minor.

22 There is an inconsistency in the disclosure statement with the

23 plan.  I just want to point it out.  We will fix it.

24      At Definition 1.1.444, there is a definition that

25 provides a participating party.  So the non-diocesan affiliates

1   are going to be contributing $49 million.

2          In the disclosure statement, there's a reference at

3   Paragraph 16 that the participating party contribution will be

4   50, and that is correct.  So we will fix the definition at

5   1.1.444 to provide that the participating party contribution is

6   5-0 instead of 49.

7          After _Purdue_, Your Honor obviously had several

8   hearings and we determined, the Court agreed, that we needed to

9   file a further amended plan and disclosure statement to address

10  the _Purdue_ directions as set forth by the Supreme Court.  And

11  we did that.  And that's the pending disclosure statement and

12  plan.  Plan is at Docket 2172.  Disclosure statement, as I

13  said, is at 2173.

14         And we filed the amendments.  But I guess just to

15  take a step back, I'd say 90, 95 percent of the disclosure

16  statement has already been fully vetted.  It's the same

17  language.  You've already approved that.  We'll talk about it

18  in a little while.  Some of my adversaries thought that maybe

19  this was Groundhog's Day or a do-over so that they just raised

20  many of the issues that you had already ruled upon.  So we'll

21  talk about that.

22         But I guess the point I'm trying to get across is

23  here, the lion's share, the large majority of this document has

24  already been approved by you over fierce objections by all my

25  adversaries here trying to block moving forward.  We need to

1  kind of take a step back.  We are trying to implement a

2  settlement of $100 million where the Diocese and the

3  participating parties have agreed to contribute $100 million.

4  That deal is two years old.  And every time we've brought it --

5  and, of course, the Supreme Court knocked us off stride as

6  well.

7        But every time we come to try to get to consummate

8  that deal, to take care financially of the survivors -- I know

9  there's way more than money, and we fully recognize that.  But

10  this is about money right now.  This is not a commercial case.

11  This is a case of just trying to get financial recompense to

12  the victims.  And the Diocese and the Committee and the

13  parishes have had a settlement for a long time.

14        So respectfully, even though there's lots of

15  objections, the lion's share of what's before you, you've

16  already seen, and you've already approved, and I'm just asking

17  that, if nothing else, we kind of corral whatever the issues

18  are today to the Purdue issue, since the other parts of the

19  disclosure statement are exactly as they were, and they've

20  already been approved by you.

21        Our goal is to get to the main event.  There's been

22  more trees, there's been more paper, there's been more anything

23  that I can imagine in this case.  This stage of the case is

24  about disclosure.  We have it.  The insurers know more about

25  this case than I do, okay.  There's so much information that

1  has been provided.

2  From an 1125 standpoint, respectfully submit, we

3  have, there is more than enough.  We've got to get to the main

4  event.  We've got to get past the disclosure statement.

5  What did we do?  Well, we obviously read the

6  teachings of the five-to-four decision by the Supreme Court,

7  and we added provisions into the plan and disclosure statement

8  that allow abuse claimants -- not allow -- recognizes their

9  absolute right to basically be a non-participating abuse

10  claimant.  What does that mean?  It means that they have the

11  right to object to a release of the participating parties.

12  The Diocese is in Chapter 11.  The Diocese, assuming

13  it does what it's supposed to do, will hopefully confirm a plan

14  and receive its appropriate relief under 1141.  This is third

15  parties.  And as we know, the Supreme Court's decision was very

16  narrow, pretty spirited, too, an interesting dissent as well.

17  But it was very narrow.

18  All it said is non-consensual third-party releases

19  don't work.  That's it.  There are no questions about what is

20  consent, things like that.  They were very clear.  They said

21  this is a narrow decision.

22  So, before us is what we believe we have addressed

23  the Purdue issues.  We've put them in the plan and disclosure

24  statement.  As I indicated, it specifically modifies the plan

25  to confirm the right of each survivor to decide whether to

1  agree to third-party releases.

2         So we think that the teachings of <u>Purdue</u> have been

3  incorporated into the plan and disclosure statement.  And as I

4  indicated, we think they're small.  It's a small part.  It's an

5  important part.  Obviously, the Supreme Court changed the

6  rules.  But it's still a small part of the entire document

7  before you today.

8         So I guess I'll make an initial statement.  You had

9  indicated that, of course, you're reviewing the <u>Truck</u> standing

10 issues and the carriers apparently think they've got some

11 super-duper discovery -- excuse me, standing rights.  The

12 bottom line, though, is I ask that many of the objections that

13 were raised by the carriers that the Court consider the

14 standing issues.

15        Certain carriers made objections, which I'll talk

16 about in a minute.  LMI made objections, as I indicated.  But

17 clearly, they raised just about every issue that you've already

18 disposed of.  I reference specifically the chart on Pages 9 and

19 10 of Docket 2281.  That's our reply.  That's the diocesan

20 reply.  And as you know, we're working with the Committee on

21 this, so actually, the Committee did an excellent job on this

22 as well.  But we put in a chart.

23        It was actually Mr. Logan Kugler who did it, but

24 cross-referenced every repeat.  And I just wanted to reference

25 it.  I think it was nicely done.  And I think it's pretty clear

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 68 of 172

1  in those pages, Pages 9 and 10, that frankly, LMI, they've just

2  got a kitchen sink approach.  If they can get away with it, why

3  not?  Let's ask for claim objections for the third time, even

4  though you said no.  Why don't we, Judge, refile all our

5  objections that we filed for the last two and a half years and

6  see if Judge Kinsella, well, maybe she'll grab one.

7       So what I'm asking for, we've got to get past those

8  kinds of games.  We've got to stay focused on what's before the

9  Court right now.

10      I'll make another observation, because again, some of

11 this is going to involve what is consent and things like that.

12 But most of these survivors, as you just heard, they're

13 represented by highly experienced, sophisticated counsel,

14 right.  I mean, they know what's going on.  These people have

15 been in more cases than I have.

16      And so I think that's something the Court should just

17 consider as we're working through disclosure statement

18 approval.  Survivors, they're not commercial banks.  But they

19 have excellent, sophisticated counsel, which I think can help

20 provide the guidance that's necessary to help them work through

21 an 1125 document as leaning towards making a decision on the

22 plan.

23      I also observed that there was overwhelming creditor

24 support for the plan that we filed, right.  We only got two

25 objections.  There were non-votings.  But for all voting

1  creditors, we only had two objections.

2         Now, I think it matters, because although we're going

3  to put in the _Purdue_ option, and that means that some of these

4  entities will have the right to disagree with the third-party

5  release, their actions are suggesting that they want to get to

6  the end of the road here.  And I respectfully submit the Court

7  should consider the fact that we had an overwhelming 99 percent

8  acceptance.  Just a factor to consider when looking at 1125 and

9  trying to move forward with this case.

10         THE COURT:  Mr. Donato, is the Court's recollection

11  correct.  There was approximately 100 people who didn't vote?

12         MR. DONATO:  Yes.  Yes.  I think it was actually 100

13  non-voters.  And obviously, we will have to address that.

14         So I just want to make a couple more general

15  observations.  We were troubled a little bit by the United

16  States Trustee's objections, just the general thing, okay.  I

17  know they got their big _Purdue_ victory and everybody's all

18  happy about that, and that's all fine.  But why would the U.S.

19  Trustee enter now and cause more delay?  Why would they delay?

20         We just heard Ms. LaFave talk about the fact that

21  survivors are dying.  We say it every day, okay.  We've been

22  together with this creditors Committee for a long time.  And

23  the fact that people are passing away, we've got to get moving.

24  And why the U.S. Trustee would now delay, get in the middle of

25  this and try to slow it down.  We know why the carriers are

1  doing it.  The carrier's job is to keep their money in their

2  pocket, notwithstanding the fact that they profess that they

3  want to settle and to do all this other stuff.

4          As you know, none of the main carriers have even come

5  close to settle.  So it's just kind of an interesting

6  situation.  But I don't know why the U.S. Trustee would seek to

7  slow down recoveries for these victims.  And I think that

8  that's something the Court should consider.

9          The U.S. Trustee objection, obviously, has quite a

10  few points to it.  As I indicated, in regard to the ballot and

11  solicitation, I'm going to ask Mr. Walter to address it.  But I

12  want to make a couple of quick observations.  Kind of summing

13  up what the U.S. Trustee, because of course the ballot is the

14  key thing, right.  Opt-in or out, we're talking about

15  solicitation.  That's one of the -- frankly, I think if I take

16  a step back and I was trying to think because I mentioned that

17  we are hoping to have a confirmation hearing like third week of

18  January.

19          I mean we've got to get moving on this and we're

20  suggesting 21, 22.  We've already talked to the Creditors

21  Committee about that.  We've got to get moving on that piece.

22  And so I think there's probably two things that need to be

23  resolved but most of the U.S. Trustee objections are

24  confirmation objections, okay.

25          They say that it contains improper third-party

releases, confirmation.  Judge Glenn just ruled yesterday and

he approved the disclosure statement and dismissed all of the

U.S. Trustee objections, I believe -- not dismissed them, but

said they're confirmation hearing objections.

So as far as the U.S. Trustee's continued statement

that there still are third-party release issues, it's a

confirmation issue.  Issues concerning treatment of

non-participation claimants, confirmation issue.  U.S. Trustee

fees, of course I always enjoy this, right.  The U.S. Trustee

is a watchdog, but they've got to get their money, confirmation

issue.

Releases, exculpation, confirmation issue.  There's

only one issue that the U.S. Trustee has raised that's an issue

that we've got to resolve now and that's the ballot and

solicitation issue.

What I'd like to do is just ask Mr. Walter to address

the Court on that piece and then I will continue.

THE COURT:  Thank you.

MR. WALTER:  Thank you, Your Honor.  Grayson Walter

on behalf of the Diocese.

Your Honor, we recognize that the lessons of Purdue

are still kind of reverberating through the case law and the

courts are doing their best to determine how broadly or

narrowly to interpret that decision.

We're proposing an opt-out process here which has

1  been used in the Second Circuit for a long time solely for

2  practical purposes.  As Mr. Donato mentioned, based on the

3  prior voting, we're highly confident that there will be few, if

4  any, survivors who will make the choice to withhold their

5  consent from the third-party releases in the plan.

6        Those are third-party releases that, as you've heard

7  earlier, unlock an additional $50 million in additional value

8  for survivors.  The opt-in mechanism that the U.S. Trustee is

9  proposing, we would submit is simply unworkable in a case like

10  this.  Due to any number of factors, we have survivors that are

11  just not responsive, whether that is because they've passed

12  away and they're tied up with estate matters.  We've had at

13  least one motion before Your Honor to appoint an estate as a

14  representative.

15        Whether there are survivors that may have difficulty

16  just engaging with the Court process, that want to rely on

17  their lawyers to kind of advise them but don't want to engage.

18  Survivors that may have moved over the course of the four-year

19  period and may not be immediately locatable.  There will be a

20  certain number that don't return a ballot.  And we need to find

21  a mechanism to address that lack of response.

22        We disagree with the U.S. Trustee's assertion that

23  that kind of inaction in this case with these facts should be

24  presumed to be a rejection of the releases contained in the

25  plan.  It would be difficult, if not potentially impossible, as

1  I mentioned, to track down each and every survivor who may have

2  filed a proof of claim. Therefore, we're asking the Court to

3  approve an opt-out procedure similar to what's been approved in

4  the past by many courts in the Second Circuit.

5       I note at the outset that there's nothing in the

6  Supreme Court's Purdue decision that suggests it's intended to

7  overrule a substantial body of Second Circuit case law, finding

8  that under the proper circumstances, a failure to opt out can

9  constitute consent.

10      In fact, the Supreme Court's Purdue decision

11  expressly declines to weigh in on what is or is not consent.

12  We submit that Purdue should be read narrowly and applied only

13  to the specific holding of the case, prohibiting non-consensual

14  third-party releases and that any issues of consent should be

15  dealt with consistent with established case law.

16      We recognize that there are cases that go in both

17  directions, but we think the weight of the pre-Purdue case law

18  favors construing a failure to opt out as consent, at least

19  when it's in the face of clear and conspicuous notice that the

20  plan contains such third-party release provisions. As

21  authority, I direct the Court's attention to the LATAM Airlines

22  case that we cite in our brief at 2022 WL 2206829, and the

23  cases collected in Footnote 91 thereto.

24      As we noted in our brief, LATAM Airlines was decided

25  after Judge Drain approved the Purdue plan with third-party

1  releases. But then, the Southern District reversed that

2  finding that he had no authority under the Bankruptcy Code to

3  approve non-consensual releases.

4       So while it predates the Supreme Court's decision,

5  the status of play under which the <u>LATAM</u> court was laboring is

6  effectively the same post-<u>Purdue</u> paradigm. And under that

7  paradigm, Judge Garrity distinguished the releases found to be

8  non-consensual in <u>Purdue</u> because <u>Purdue</u> didn't even provide an

9  opt-out mechanism. Judge Garrity had no difficulty finding

10 that the provision of an opt-out was sufficient to establish

11 consent to third-party releases under long-established Second

12 Circuit law.

13      Your Honor, I would observe that the cases that

14 reject an opt-out process tend to do so as a result of concerns

15 that lead the Court to question whether consent can be inferred

16 under the specific facts present in those cases. For instance,

17 the U.S. Trustee cites to the <u>SunEdison</u> and <u>Tonawanda Coke</u>

18 cases. In both of those cases, the court was faced with a plan

19 that would pay a *de minimis*, if any, dividend to unsecured

20 creditors.

21      Where there's little or no recovery on the horizon,

22 it's reasonable that courts might anticipate a certain amount

23 of creditor apathy about whether or not to engage with a

24 100-page plan, right, whether they're going to read to Page 86

25 and see a third-party release. And there seems to be a concern

1  from the Court that creditors will have kind of written that
2  debtor off and will just get the plan and throw it in the trash
3  and they're concerned about somebody inadvertently being deemed
4  to agree to a third-party release.

5       Your Honor, I think there's very little likelihood
6  that survivors are going to ignore completely a plan that's
7  proposing a $100 million contribution from the Catholic family,
8  especially given the substantial publicity surrounding this
9  case.  Moreover, in both the SunEdison and Tonawanda Coke
10 cases, as well as, as far as I can ascertain in the Smallhold
11 case out of Delaware, the courts were being asked to approve
12 third-party releases for no additional consideration being paid
13 by the releasees.

14      Again, where the third-party release is essentially
15 gratuitous, we would concede that there may be reason for a
16 court to pause before inferring consent from an action.  In
17 fact, Judge Bucki's decision in Tonawanda Coke essentially
18 turns on this lack of consideration as he cites to and
19 interprets New York State General Obligation Law Section 5-1103
20 to require that such a gratuitous release for no consideration
21 be granted in writing.

22      Your Honor, General Obligation Law 5-1103
23 specifically speaks to releases given without consideration.
24 It does not purport to impose a riding requirement in order to
25 make a release in exchange for valuable consideration

Case 2-19-20905-PRW,    Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 76 of 172

1  enforceable under New York law.

2  So in contrast to those cases, here, survivors are
3  being presented with a plan that represents a comprehensive
4  integrated settlement between the Diocese, the other
5  participating parties, the members of the Catholic family, and
6  survivors.  That comprehensive settlement was negotiated by the
7  Committee on behalf of survivors, specifically in contemplation
8  that the participating parties would be making a significant
9  contribution to the overall settlement fund.

10  Based on the Committee's efforts, survivors are being
11  presented with an opportunity to tap into an additional $50
12  million from the participating parties.  These are hardly the
13  kind of free-rider gratuitous releases found to be problematic
14  in the cases cited by the U.S. Trustee.

15  Moreover, there's every reason for the Court to
16  anticipate that survivors will not only understand that the
17  joint plan proposes third-party releases but that they will
18  expect such provisions.  Throughout the case, the Diocese and
19  the participating parties have made clear that they intended to
20  pursue a global settlement strategy that would include a
21  channeling injunction and third-party releases.

22  In fact, the confidential abuse claim supplement that
23  survivors were asked to return with their proof of claim in
24  this case specifically requested information regarding any
25  related abuse claims that a survivor might have against

affiliated entities by asking claimants to identify "any
church, parish, school, or diocesan organization that their
abuser may have been affiliated with."

Lastly, most if not all of the abuse claimants, as
Mr. Donato already mentioned, are represented by sophisticated
counsel who can and will advise their client as to the plan's
third-party release provisions and the impact of failing to opt
out.  Because the facts of the <u>SunEdison</u>, <u>Tonawanda Coke</u>, and
<u>Smallhold</u> cases are so distinguishable, we believe that the
Court can approve an opt-out under the circumstances of this
case consistent with existing case law.

The U.S. Trustee, however, argues that in the wake of
<u>Purdue</u>, the only permissible way to determine whether someone
has consented to release their claim is to undertake a state
law contract analysis.  We disagree.  We think that existing
case law is clear that a failure to take action when put on
notice can suffice.  But even under a contract-based analysis,
we believe that an opt-out procedure is permissible in this
case.

Both the <u>SunEdison</u> case, cited extensively in the
U.S. Trustee's brief, as well as the <u>Russell v. Raynes</u>
<u>Associate</u> case, which is in our brief, recognize that under New
York law, silence can be deemed to constitute acceptance of an
offer in the face of an offer where there's a duty to speak on
behalf of the offeree.  Your Honor, we would respectfully

1  submit that such a duty exists here.

2          In this case, the Committee's participation in
3  negotiating the settlement terms and its status as a joint plan
4  proponent is critical.  In the decision rendered by Judge Bucki
5  in the Diocese of Buffalo case, which is reported at 623 B.R.
6  354, Judge Bucki grappled with the question of, and I quote,
7  "whether the Committee can stipulate to an agreement that
8  affects actions brought by abuse claimants in state court."

9          Now, Judge Bucki was dealing with what we have
10  referred to before Your Honor as the parish stay, right.
11  Whether state court litigation against parishes and other
12  affiliated entities could go forward and whether the Committee,
13  acting on behalf of abuse claimants, had the ability to enter
14  into stipulation to temporarily pause that litigation.

15          Judge Bucki ultimately determined that the committee
16  indeed did have such an ability, subject to the right of
17  claimants to reject the stipulation.  In his decision, Judge
18  Bucki observed that in addition to granting a creditors
19  committee the right to participate in the formulation of a
20  plan, Section 103 of the Code also authorizes such a committee
21  to "perform such other services as are in the interest of those
22  represented."

23          Applying the general rules of agency, Judge Bucki
24  found that Section 103 empowers the committee to enter into
25  negotiations on behalf of its constituent creditors, again,

1  subject to the right of the creditors, upon proper notice, to

2  reject the resolution resulting from such negotiations.

3  　　　　Accordingly, in that case, Judge Bucki found that the

4  voluntary stay of parish litigation negotiated by the committee

5  would, in fact, be binding on all creditors, all survivors,

6  other than a small handful of those who specifically objected

7  to the relief being requested.

8  　　　　We have a similar situation here where the Committee

9  negotiated a resolution involving both claims against the

10  Diocese and state court abuse actions, again, subject to

11  possible rejection by abuse claimants.  From the first days of

12  this case, the Committee in consultation with attorneys

13  representing the majority of survivors, has taken upon itself

14  the mantle of spokesperson and primary negotiator for all

15  survivors.

16  　　　　We now have a comprehensive settlement embodied in

17  the plan that much like Buffalo, the Committee has taken a lead

18  role in negotiating and crafting for and on behalf of its

19  constituency of survivors.  We would respectfully submit that

20  consistent with Judge Bucki's decision in <u>Buffalo</u>, the

21  Committee here was negotiating effectively as an agent for

22  survivors consistent with its duties under Section 1103 of the

23  Bankruptcy Code, and that the global settlement with the entire

24  Catholic family is the product of these negotiations.

25  　　　　Your Honor, under these circumstances, we

1  respectfully submit that any survivor that wishes not to

2  consent to the settlement negotiated by the Committee,

3  including those third-party releases that are being given in

4  exchange for an additional $50 million from the participating

5  parties, may properly be deemed under New York contract law

6  principles to have a duty to voice their objections if they

7  intend to countermand the acts of the Committee acting as their

8  fiduciary.

9       So, accordingly, and consistent with Judge Bucki's

10 decision in Buffalo, we believe that an opt-out mechanism that

11 allows for that rejection by a creditor but otherwise defaults

12 to the solution negotiated by survivors agents is appropriate

13 under the circumstances of this case, and that it will avoid

14 the logistical difficulties of chasing down each and every

15 survivor that might, for whatever reason, not respond to our

16 solicitation and our balloting consistent with New York law and

17 prior case law in the Second Circuit.

18      So, unless Your Honor has specific questions for me,

19 I would turn it back over to Mr. Donato.

20      THE COURT:  No.  I'm sure I'll want to hear from you

21 after the U.S. Trustee weighs in.

22      MR. WALTER:  Thank you, Your Honor.

23      MR. DONATO:  Thank you, Your Honor.

24      So in addition to the U.S. Trustee objections, which

25 as I indicated I think the others that I referenced are all

confirmation objections, the carriers also filed some
objections.  I had observed that LMI filed objections, and as I
indicated, I think most of their objections are just a
regurgitation of prior determinations that you've already read.

It was kind of interesting because the certain
carriers that they call themselves also include LMI.  So we
were somewhat surprised.  I mean, why would the carriers file a
big objection with LMI and then LMI has to file its own too.
So I don't really understand that.  Again, as I indicated, it
seems like a lot of what LMI is doing is old news.  I don't
know if the other carriers recognize that that's a kitchen sink
approach.

The certain carriers, however, do raise a couple of
issues and one of the issues they raise is they say that they
have _Purdue_ rights.  Now, counsel for Interstate, I don't know,
it must have been, it was probably this year, excuse me, I'm
sorry about that.  After _Purdue_, counsel for Interstate wrote a
quick letter to the Judges and said, "Hey, just so you know,
it's not only creditors or not only victims or survivors who
have _Purdue_ rights, we've got them too."

But it was interesting because I read the letter
about 18 times, and, of course, it didn't say what kind of
claim they had.  So what's getting cut off?  All right.  And we
had to kind of cajole it out of them, and, frankly, we had to
file a reply that kind of guessed as to what they were talking

about.  But it appears that what they're talking about is the
inbound contribution claims and they're apparently talking
about what they would assert are contribution claims.

So, first of all, I guess I would reference that, as
far as the inbound contribution claims, if the carriers, and we
put this in our reply.  If the carriers are suggesting they're
going to go after their own insurer or go after a parish or
things like that, I mean, that's barred by the New York State's
anti-segregation rule.

And, as I indicated, Mr. Carter was on the line here.
So as a bankruptcy lawyer, I'll do the best I can, but he may
have to answer some questions as well.  But the bottom line is,
at least in regard to the purported or suggested, and, again,
it's kind of a shadow because I don't know exactly if they've
articulated it, but it appears that they are saying, well, wait
a minute here, if we go through litigation and we have a
contribution claim and you're trying to cut that off, that's a
Purdue right.

And so what did we do?  The first thing we observed
is that you can't sue your own insurer.  You can't pursue your
own insurer.  So the carriers will never get that opportunity.

The carriers may say, well, wait a minute, maybe it's
a situation where I have a settling insurer and then I'm in
litigation as a litigating carrier.  And then I think I have a
contribution right against the settling insurer, okay.  And so

1  in that context, they can say, wait a minute, but the settling

2  insurer is getting protection and therefore I can't do that.

3          The plan contains a judgment reduction clause.  The

4  judgment reduction clause is at Sections 12 -- I'm sorry, hold

5  on.  The judgment reduction clause is at 12.2.  I'm so sorry.

6  12.2 and a couple sections following that.

7          And what the judgment reduction clause says is that

8  if that fact pattern occurs where there is a litigating carrier

9  and that carrier asserts a viable contribution claim against a

10  settling insurer, its express language says that the litigating

11  insurer gets the benefit of that contribution, meaning if --

12  I'll do it by example.

13          If a judgment came in at $10 million -- thank you.

14  And thank you.

15          Counsel is telling me Section 12.5.2.

16          So that if a judgment was obtained for, say, $100 and

17  the insurer then said, well, wait a minute, I may have $100

18  liability, but I have a contribution claim against a settling

19  carrier.  Working through the provisions in Section 12 of the

20  plan and disclosure statement, basically the litigating carrier

21  gets the benefit of the reduction, and it's provided right

22  there.  This was worked out with the Creditors Committee and

23  the participating parties.  So there's no harm, no foul.

24          There's never going to be a position where any

25  contribution claim is cut off because they have protections.

1 Either they can't pursue it because they can't sue their own

2 insurer under the anti-segregation rule. Or, if they do have a

3 right to pursue it, the plan provides them a vehicle to receive

4 full credit for an alleged contribution claim.

5 THE COURT: So, Mr. Donato, is that the CPLR in the

6 general obligations law sections? Is that what you're

7 referring to?

8 MR. DONATO: No, because I think that's --

9 THE COURT: It's separate. That's separate.

10 MR. DONATO: -- dealing more with the allocation

11 issues, except I'm prepared to talk about that, but I'm not

12 talking about that at this point.

13 When we studied these certain insurer's objections,

14 that was their big objection, right. We got the letter and all

15 that stuff. Purdue protects us. We think that the plan and

16 disclosure statement provide the protections for the litigating

17 carriers so that they are not in a position where they're

18 having any Purdue rights cut off.

19 We think that the combination of the anti-segregation

20 rule and the judgment reduction provision, respectfully, we

21 think that that addresses any concerns that a litigating

22 carrier has in regard to an alleged potential contribution

23 claim.

24 One other quick comment. These certain insurers have

25 also raised some concerns about 8.8.3, which is a provision

1  that limits affirmative claims by the insured.  So let's just

2  boil this down, okay.  All we're saying is, nothing in the plan

3  creates an affirmative insurer claim against the Diocese for

4  activity done during the Chapter 11.  That's it, okay.

5        The insurers don't have affirmative claims against

6  their insurer.  They have a right to deny coverage.  Now,

7  Mr. Roten, or somebody, when they filed a response, they said

8  wait a minute, what about declaratory judgment?  And in that

9  context, declaratory judgment, I think we'd be okay with that.

10 What we don't want is, and we don't think that insurers have

11 any right, and it's all derived from the activity in this case,

12 and so it's directly, I believe, right before you, and I think

13 you can make that determination.

14        And 8.8.3 just provides, as I said, nothing in the

15 plan creates an affirmative insurer claim against the Diocese

16 concerning its activities in the Chapter 11 case.  So they

17 don't make a lot of it, but they did make an observation, so I

18 wanted to comment on that.

19        THE COURT:  My recollection of that provision,

20 Mr. Donato, is that it limited them to affirmative defenses or

21 contractual that they could deny coverage.  This Court isn't

22 ruling -- in my opinion, that's a policy in another forum that

23 would be making those on a policy-by-policy, case-by-case basis

24 what the claimant's rights are and what the insurance policies

25 say.

1          MR. DONATO:  Right.

2          THE COURT:  So my recollection of that language was

3  it would be not as generic as you're saying on the record, but

4  it's a specific limitation on what they can recover,

5  notwithstanding what insurance law says they can or can't or

6  the policies say.

7          MR. DONATO:  Okay.  I see.

8          THE COURT:  But that it was actually, I read that as

9  a limitation that was certainly something that the insurers

10  would be concerned about.  But you're saying that wasn't what

11  it was intended to be.

12          MR. DONATO:  That's not the intent of it.  The intent

13  is what I said, and we can surely fix that, I think, with some

14  additional verbiage.

15          You asked about, or you made a reference to the

16  allocation piece.  That's Section 4.4.4.  And I first observed

17  that.  I think the only one that made an objection to this is

18  LMI.  I also would observe that LMI doesn't have any standing

19  to do this, no matter what type of standing they think they

20  have, they just don't.

21          This doesn't affect them.  This has nothing to do

22  with them.  So in that context, I would just observe that the

23  only entity that objected is standing.

24          The purpose of this section is to implement

25  Article 16 under the CPLR and New York General Obligation Law.

1       The first provision says that, to the extent that a
2  perpetrator is involved, the perpetrator is at least 51 percent
3  liable.  The other provisions all end up saying that the
4  Diocese is 51 percent liable.  We negotiated that with the
5  participating parties.

6       We don't think this hurts anyone.  We don't think
7  this affects anybody.  And we also don't think, again, as I
8  indicated, that LMI absolutely doesn't have any standing to
9  assert or raise this issue.  But we don't think this hurts
10  anyone, and we thought that this made sense in order to set
11  this up as an initial piece coming out of the Chapter 11.

12       THE COURT:  Mr. Donato, let me stop you right there.

13       That's binding on the survivors unless they file an
14  objection to confirmation.  Is that's the Court's --

15       MR. DONATO:  That's correct.

16       THE COURT:  -- understanding of that?

17       MR. DONATO:  That is correct.

18       THE COURT:  So that to me seems like that's kind of a
19  little gotcha, even though there may not be an application.
20  Isn't that, again, something that should be in another forum to
21  the extent that these survivors need to have their claims
22  established?  That would be subject -- I mean, the CPLR and
23  General Obligations Law is what it is, and that would be
24  decided in the context of another as opposed to going to a
25  state court saying Judge Kinsella already approved these

1  allocations when that's really not something that's here.  It's

2  more of a default.  And that's more of an issue of protection

3  for the survivors, but I don't know what the implications are

4  for that.

5          MR. DONATO:  I see.

6          THE COURT:  But to have that kind of buried in a

7  disclosure statement and plan and have that go into some other

8  litigation at some point to be binding, I don't know that the

9  Court's comfortable notwithstanding any issues on standing of

10 LMI.

11         MR. DONATO:  I see.  Okay.

12         THE COURT:  The Court has its own concerns on that.

13         MR. DONATO:  Okay.  Sure.  Understood.  Understood.

14 We think it's appropriate, but we do understand your comments.

15         Obviously, there's going to be a lot of people

16 talking about the fact that you shouldn't approve the

17 disclosure statement today, but I would just respectfully

18 submit that the survivors have waited.  They've waited enough

19 time.

20         There's been more curve balls in this case.  No one

21 could have ever anticipated the Supreme Court would change the

22 key aspect of the law.  I mean, we knew it was there, but we

23 didn't know what they would do.

24         So we were ready to go to confirmation.  Frankly, I

25 think confirmation was going to be today.  It was around early

1  November. And then we got the curve ball from the Supreme

2  Court, which is fine. We're addressing it, et cetera. But I

3  really believe at this point, as far as disclosure, there is

4  just no issue. Like I said, I think my adversaries know more

5  about this case than I do.

6         I mean, everybody knows every issue. That's what's

7  before you today. Just is there enough disclosure so we can

8  move forward to a confirmation hearing? We think that we

9  absolutely have established that.

10        I guess I'll just make one additional comment, which

11 is there are some steps that I think we have to take to get to

12 confirmation. And I think it's probably the two that I was

13 referencing before. The form of the ballot, the solicitation

14 issue that obviously Mr. Walter was addressing and Ms. Champion

15 will be addressing.

16        And then, the other is what discovery is going to be

17 authorized. And I understand. You indicated you worked on

18 that. I fully understand that.

19        I guess what we're asking for is approval today and

20 we're asking for a confirmation hearing in the third week of

21 January. We think that it's appropriate. As I said, I did

22 cover this with the mediators. I want to make certain that we

23 give a good shot at trying to get this done. But I don't think

24 the survivors should be made to wait any longer.

25        I'd like just to reserve an opportunity for rebuttal

1  concerning any of the arguments, and I thank the Court for its
2  time.

3          THE COURT:  Certainly.  Thank you.

4          Mr. Kugler, before we hear from the objecting
5  parties.

6          MR. KUGLER:  Just some brief comments, Your Honor.
7  First of all, we agree really with the comments from Mr. Donato
8  and the debtor.  It's unusual in these cases for the committee
9  to be so simpatico with the debtor under these circumstances.
10 And we have been for months, or a year, longer and we continue
11 to be.  And in the face of that, we really need to find a way
12 to move forward.  We have a deal and the survivors support the
13 deal.  They supported it 303 out of 305 ballots already.  And
14 they are going to support the next one in the same way.

15         I put my self in the shoes of survivors and it's
16 almost absurd to try talk with them about CPLR provisions and
17 judgment reductions.  They're like, What are you talking
18 about? We understand.  If the plan gets confirmed, that's it.
19 We're going to get some money.  We can't tell how much yet, but
20 we're going to get some money.  And it's done.  It's done.

21         I was talking to a survivor at a conference last
22 week.  They're not focused on any of this.  The finality of it
23 is crazy.  One survivor told me that they got the check, and it
24 sat on her kitchen counter for three months.  She couldn't open
25 it.  She couldn't hardly look at it because it represented so

1  much in terms of what she had carried her whole life.

2        That's what survivors are focused on.  They're not

3  focused on all this stuff that all these smart attorneys in

4  this room are fighting about.  And I think we need to get it

5  done because of that.  We need to go there.  And I just -- I --

6  you know, so I think about Purdue and what Purdue says.

7        When we got the last ballots, we contacted one of the

8  two folks who had balloted against.  We said, "What do you --

9  what's -- what are you opposed to?  Or whatever.  And they're

10 like, "Oh, we don't care about the releases.  We don't care --

11 we don't care about any of that.  We just are never, ever going

12 to be able to ballot in favor of something from the Diocese

13 after what happened to us."

14        I respect that.  I get it.  That's okay.  It is got

15 nothing to do with opt-in, opt-outs.  It's got nothing to do

16 with the Sacklers and opioid crisis and all that.  It's got to

17 do with them and what they're dealing with.  So it's really

18 hard for us in this courtroom, as professionals and thoughtful

19 attorneys, to try to create these provisions and stuff, and

20 then transport it to the survivors in a way that has any

21 meaning to them at all.

22        And so I think we have to keep that in mind.  And

23 I -- two things, and then I'll sit down real quickly.  Another

24 one of the Committee members is on the phone, Kevin Lawrence.

25 I want to recognize him because he's been one of the very, very

committed survivors in this case.  And so he's on the phone as

well.  And so -- and I would also ask that the Court --

Dr. Kevin Braney and the chair of the Committee's here -- he'd

like to get up and make a brief statement, just sharing the

survivor perspective.  I know the Court gets it, but I think it

helps to hear from survivors because we can get ourselves way

off track.  And we're going to hear a whole lot from the

insurance companies that's going to go way down a whole bunch

of paths that no survivor's ever going to understand or care

about.

They want the case done.  They want to have that

moment when they're looking at the check on the counter.  Maybe

they can cash it, maybe they can't.  Maybe they can open it,

maybe they can't.  But they want to have that moment.  And I

don't think there's any quarrel about that.  So that's all I

have to say, Your Honor.

THE COURT:  Thank you, Mr. Kugler.  How many how many

of the survivors are represented by counsel?  Somebody had

referenced a large percentage before.  I didn't think the

number was that I thought it was -- if you don't know, I

understand.  I just --

MR. ROBERT KUGLER:  I don't know.  It's a large,

large percentage.  But whether they're represented by counsel

or not, these are seriously damaged people, and some of them

are just never going to get there.  And it's not because they

1  care about third-party releases.  It's not because they care

2  about any of it.  They're just never going to get there.

3  We did really well on the first go round, with 303

4  out of 305, and that was without knowing we had to reach out to

5  the remainder and urge them to vote.  So I'm still pretty

6  confident we're going to do pretty good.  So -- but there's

7  going to be just some that, between us and their own counsel,

8  we're just never going to get to.  I mean, I can just about

9  name them.  I've talked to them enough.  I know.

10  So, anyway, yeah, I don't know the exact percentage,

11  but it's a high percentage.

12  THE COURT:  Thank you.

13  MR. ROBERT KUGLER:  Thank you.

14  MR. WALTER:  Your Honor, I -- we -- the attorneys

15  representing just the Committee members collectively represent

16  north of 60 percent of the survivors in the case.  And I know

17  there are other survivors as well, just to give you --

18  THE COURT:  Thank you.

19  MR. WALTER:  -- some perspective.

20  THE COURT:  Thank you.

21  Mr. Elsaesser, before we hear from the objectors, I

22  forgot we have the participating parties in the room as well.

23  So please come up.

24  MR. GLASNOVICH:  Thank you, Your Honor.  And I'll be

25  brief.  I concur with all of the -- on behalf of the Parishes,

1 I concur with all of the comments from Mr. Kugler and

2 Mr. Donato and counsel -- and counsel for the Diocese.

3 But -- and the I -- know that the frustration level

4 for the delays from -- for the survivors. Nothing that the

5 Parishes have suffered from the delay remotely compares to

6 what's happened. Of course, again, we heard today about

7 another death. And it's -- but the Parishioners are continuing

8 to pay the entire freight for the case. And in bankruptcy, we

9 do a lot of work on tracing funds, but one thing we know is

10 that every dollar that covers the administrative expenses of

11 the case, and every dollar that is in the settlement pool

12 overwhelmingly can be traced directly back to a parishioner

13 within the Diocese -- the Diocese of Syracuse.

14 And the Parishes, while certainly have nothing in the

15 way of a comparison as far as suffering, as far as the -- its

16 survivors have, they're anxious to rebuild and reconcile, and

17 they're anxious to go back to the work of executing the mission

18 of the church and building back their finances, which will be

19 dramatically impacted, of course, by the ultimate funding of

20 the settlement on the effective date of the plan.

21 And in Spokane and Northern Alaska and the Jesuits in

22 Helena, Great Falls, Billings, Duluth, Agana, also known as

23 Guam, and Santa Fe -- just, by the way, the biggest temperature

24 drop I've ever experienced traveling from Duluth to Guam was

25 118 degrees, which is really something when you get off the

1   plane.

2          But in all of the -- the importance of all of those

3   cases is that they were all under <u>Purdue</u>.  <u>Because</u> in the Ninth

4   Circuit and in the Tenth Circuit, we lived under -- the same --

5   they -- that the -- American Hardwoods and <u>Lowenschuss</u> and

6   whatever the case was in the Tenth Circuit -- we've lived

7   through this.  And I was just talking with the Mr. Roten

8   yesterday; we were talking about -- yeah, in Helena, we had 387

9   claims, and we had unanimous consent in Helena.  But in all of

10  those cases, we were within a circuit, or circuits, that

11  prohibited non-consensual releases.

12          And just as an example, in the Helena case, Mr. Roten

13  and Ms. Sugayan, who I believe represented Great American at

14  that time, insisted on a buyback provision as well as a

15  channeling injunction because of the concerns of the cases in

16  the Ninth Circuit that were basically, essentially, the same as

17  <u>Purdue</u>.  So it's just not as big a deal as people are making it

18  out to be.  And the risk of a -- of this being perceived as

19  some sort of coerced consent or default consent just doesn't

20  make any rational sense in the context of what we know the

21  facts are on the ground, which is that there that there has

22  been and will continue to be ample disclosure and ample

23  attention.

24          And if we get two non-votes or six non-votes,

25  we'll -- you know, our work isn't done; we'll deal with that.

1 But to delay this further, even though I strongly -- on behalf

2 of the Parishes, we are as strongly as everyone else is that we

3 think it's -- I -- we owe a debt of gratitude for -- to

4 Mr. Winsberg for immediately bringing the mediation approach to

5 the attention of the Court before the last hearing, which had a

6 steamroller effect. And there's just simply no reason that we

7 can't get into substantive mediation with the carriers. We've

8 all done this before numerous times. We have a lot more

9 information now because of the settlements and what's occurred

10 in Rockville Center and the -- beginning to occur in other

11 cases.

12 And I -- because all of our prior cases all involve

13 settlement of insurance, I couldn't -- we -- certainly, on

14 behalf of the Parishes, none of us want the post-confirmation

15 hangover of not having the insurance carriers resolved. But we

16 have to go with what we have until we don't. And so I would --

17 you know, I can assure the Court on -- certainly, on behalf of

18 the Parishes that we'll do everything possible in mediation to

19 encourage resolution with the carriers. But we believe that

20 there should really be no further -- we don't need to go out to

21 March or April for a confirmation hearing. There's ample time

22 within the mediation.

23 These cases have an enormous emotional impact beyond

24 what you see in other bankruptcy cases. It just does,

25 including other mass tort cases. It's -- it is -- it ending it

1 and getting through this process and getting the non-monetary

2 covenants in place and getting the archive in place, and all of

3 those things bring an amount of closure that everyone in this

4 room, I think even maybe Your Honor, would love to see.

5            And so I urge you to approve the disclosure statement

6 with, obviously, the input that you've already given Mr. Donato

7 on the points that may need some adjustment to be more clear in

8 what the treatments are.  But I've had a chance to see, in all

9 of these cases, what happens on the other side.  And it's just

10 great.  It's hard to say "It's just great."  I don't mean to do

11 that -- but in any way minimize the -- to the -- to survivors.

12 But the -- just exactly what Mr. Kugler was describing occurs,

13 and it's a -- it's something that we all are aiming for.  And

14 so I would urge you to approve the disclosure statement with

15 what additional conditions or changes that you feel are

16 appropriate, but also to set the confirmation hearing.  And I

17 am sure that Judge Chapman and Mr. Finn appreciate, and

18 certainly, all the counsel and all of their families appreciate

19 the urgency of these matters.  Once we received -- we reached

20 agreement in Santa Fe, the judge set the confirmation hearing

21 for two days after Christmas, and no one complained about

22 having to rearrange their travel and so forth to do that.  So

23 please set a confirmation hearing soon.  And on behalf of the

24 Parishes, schools, and other affiliates, thank you.

25            THE COURT:  Thank you.

1          MR. ROBERT KUGLER:  Your Honor, I have some
2     statistics for you --

3          THE COURT:  Thank you.

4          MR. ROBERT KUGLER:  -- responsive to your question.
5     There's 433 claims, which includes duplicates and late claims.
6     Only 24 are not represented.  So that's 5.5 percent by our
7     lawyer math at our table.  So that's what we know.

8          THE COURT:  Thank you.  That's very helpful.  Thank
9     you, Mr. Kugler.

10         MR. ROBERT KUGLER:  You're welcome.

11         MS. TEMES:  Your Honor, I apologize.  So only 11 of
12    those did not respond.

13         THE COURT:  Thank you.

14         Before we turn to the objections, is there anyone
15    else who wishes to be heard in support of the motion to approve
16    the disclosure statement and solicitation procedures?

17                    (No audible response)

18         THE COURT:  I think this may be a good -- oh, I'm --

19         MR. ROBERT KUGLER:  I was going to ask if we could
20    take a break.

21         THE COURT:  I was just going to say, this might be a
22    good time to take a break.  Again, we have a cafeteria on the
23    fifth floor.  I'd say 30 minutes, ten after 1:00.  Grab a quick
24    snack, and then we'll all regroup, recognizing that we have a
25    lot of material to cover this afternoon.  And court is

1  adjourned until 1:10.

2          THE CLERK:  All rise.  Court is adjourned.

3      (Recess at 12:40:41 p.m./Reconvened at 1:13:30)

4          THE CLERK:  All rise.  You may be seated.  Continuing

5  with today's calendar, the Diocese case, 20-30663, the Roman

6  Catholic Diocese of Syracuse, New York.

7          THE COURT:  Thank you.  We heard, prior to the break,

8  the presentation of the plan proponents in support of the

9  approval of the disclosure statement as well as the

10  solicitation procedures.  And now we'll hear the objections to

11  those.

12          Ms. Champion, you're sitting closest, so why don't we

13  start with you, and then we'll move through the insurers as

14  well.

15          MS. CHAMPION:  Thank you, Your Honor.  Erin Champion

16  for the United States Trustee.  At the outset, I just want to

17  say that the United States Trustee is a -- it's an easy target

18  here to blame for delay.  You know, and we've done nothing to

19  delay by objecting in this case.  But in reality, Your Honor,

20  we're really trying to move this case along, you know, under

21  applicable law.  It's not that we're trying to delay payment to

22  survivors; we do recognize the importance of that.

23          And for the United States Trustee not to object here

24  to what the plan proponents propose would be to sign on for

25  this Court creating a whole different and entirely different

1 standard of consent and what that means, and it would be a
2 sliding scale with every future case that comes before the
3 Court.  And the United States Trustee has an obligation to make
4 sure that that doesn't happen, and, of course, we're going to
5 object, and it's not meant to delay the case.  And it's -- you
6 know, we're an easy scapegoat, I think, there, and that's --
7 it's unfair.

8        Your Honor, it's now been made clear by the United
9 States -- excuse me -- Supreme Court.

10        MR. ROBERT KUGLER:  I'm sorry.  I'm sorry.  We
11 understand that there's some technical difficulties and people
12 on the phone are unable to hear.

13        MS. CHAMPION:  Oh.

14        MR. ROBERT KUGLER:  They think you're muted or
15 something.  They're telling me they can't hear anything.

16        THE COURT:  Okay.  Hold on a second.  Yep.

17        MR. ROBERT KUGLER:  I'm sorry.

18        THE COURT:  Hold that thought.

19        MS. CHAMPION:  Okay.

20        Thank you, Mr. Kugler.  I appreciate that.

21                    (Pause)

22        AUTOMATED VOICE:  Welcome to the audio conferencing
23 center.  Please enter a conference ID followed by pound.  You
24 are now joining the meeting.

25        THE COURT:  Can the parties on the phone hear the

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 101 of 172

1  Court?

2  AUTOMATED VOICE:  You've been muted.  To unmute

3  yourself, press star six.  You are no longer muted.

4  THE COURT:  Can the parties on the phone hear the

5  Court now?  If you could email your attorneys.

6  Ms. LaFave, I believe one of your clients is on the

7  phone.  Or if someone on the phone can unmute and say that they

8  can hear the Court to confirm.

9  MR. ROBERT KUGLER:  We can hear.  Thank you.

10  THE COURT:  Thank you.  Thank you.

11  Ms. Champion, if you'd continue.

12  Thank you, Mr. Kugler.

13  MS. CHAMPION:  Thank you, Your Honor.  As I was

14  saying, the United States Trustee here is not trying to delay

15  this case.  Completely to the contrary, we want to move this

16  along, but in accordance with the law.  It's the debtor that

17  chose this forum.  It's the debtor that's in bankruptcy and

18  must follow the rules of the Bankruptcy Court.  And it was

19  their choice to do that.  And now has -- that debtor has to

20  follow the rules, which we know now from the Supreme Court, is

21  that a debtor can only provide a third-party non-debtor release

22  with consent.

23  And, Your Honor, that consent requires an affirmative

24  expression of assent.  And the impact of that decision in

25  Purdue in this case should be addressed today, as it really is

1 at the center of the plan proponents' plan that the disclosure

2 statement describes. And I would urge -- and I think all the

3 parties agree -- we don't want to put these issues off until

4 confirmation. We want to move this case along. This is not a

5 confirmation issue. This is -- issue is in direct relation to

6 the disclosure statement because the disclosure statement

7 cannot have unconfirmed provisions. And as it stands right

8 now, the plan is unconfirmed -- unconfirmable.

9 And, Your Honor, if we delay that issue, it's going

10 to be too late. By then, again, we will have spent potentially

11 millions of additional dollars litigating these issues, which

12 could ultimately result in another failed confirmation attempt.

13 The solicitation of an unconfirmed plan already costs the

14 estate hundreds of thousands of dollars. Let's not make that

15 same mistake again.

16 And that, Your Honor, is why it's worth making sure

17 that this is done correctly and within the parameters of the

18 Supreme Court's ruling in <u>Harrington v. Purdue Pharma</u>. And,

19 Your Honor, there is a simple, easy solution for that, and that

20 is to require the debtor to obtain actual affirmative consent.

21 Your Honor, there's essentially three overall reasons

22 why the Court should deny the debtor's motion -- the plan

23 proponents' motion and not approve the disclosure statement.

24 First of all, as I said, the disclosure statement describes a

25 plan that's unconfirmable because it contains actual

1  non-consensual third-party releases, which I'll get to

2  explaining those.  It also provides third-party releases that

3  aren't being -- that wouldn't be approved on affirmative

4  consent.  And the third -- and the Code does not allow for

5  that.  And the third point, Your Honor, is that the plan

6  proponents are inappropriately attempting to guarantee that

7  consent through coercive and punitive language.

8         So addressing the first point, Your Honor, that the

9  terms of the plan are in direct contradiction to the

10 U.S. Supreme Court's holding.  In the ruling, the Supreme Court

11 held that neither Code Sections 105(a) or 1123(b)(6) authorizes

12 non-consensual, non-debtor releases.  The Court reasoned that

13 1123(b)(6) instructs that the plan provisions cannot be

14 inconsistent with applicable Code provisions.

15        So where does that leave us?  That leaves us -- you

16 have to look to state law because it just simply isn't in the

17 Code.  Here, Your Honor, this disclosure statement describes a

18 plan that contains provisions that are, indeed, inconsistent

19 with applicable Code provisions because there is none.  A party

20 seeking to include such non-debtor releases, Your Honor, in a

21 bankruptcy plan, must show that they're consensual, which, as I

22 mentioned under state law is what we have to look to.  It

23 requires that third parties come forward and state that --

24 state their consent affirmatively.

25        Your Honor, in the Tonawanda Coke Corp. case from the

1  Western District, Judge Buckeye was very clear and succinct in

2  applying a contract model to establish the required consent.

3  And that's not a hyper-technical argument, as what was alleged

4  in the plan proponents' memorandum and reply, I think.  To the

5  contrary, it's very simple:  There's just simply no authority

6  in the Code to authorize it, and, therefore, you have to find

7  it somewhere else.  And that is in state law.

8          In the plan proponents' reply, Your Honor, they do

9  rely on several pre-Purdue cases, where a plan was confirmed

10  with opt-out third-party releases.  But that's no longer the

11  standard; that landscape has completely changed.  And that was

12  noted by Judge Goldblatt, Your Honor, in the Smallhold case.

13          After Purdue, there does not appear to be a

14  principled basis for authorizing opt-out third-party releases,

15  even if such releases might be supported by strong policy

16  arguments, which in a case like this, could be relevant.  But

17  even with those arguments, Your Honor, it still can't be

18  approved.  Judge Goldblatt even acknowledged that his own

19  pre-Purdue decisions in allowing an opt-out mechanism would not

20  be appropriate now.

21          So, effectively, Your Honor, there are no more rare

22  and exceptional cases under the old standard of Metromedia.

23  There's no sliding scale of cases.  There's no "Well, because

24  this case has a hundred million dollars to distribute versus in

25  Tonawanda Coke, 400,000" -- that is not relevant to the

analysis.  There cannot be a different standard depending on
what kind of debtor becomes -- or what kind of debtor is before
the Court.  It's one uniform standard, and that is:  Consent
has to be manifested with an intentional affirmation.

Also noted, Your Honor, by Judge Buckeye in <u>Tonawanda</u>
<u>Coke</u>, adequate information, again, includes a representation
that the proposed plan is one that can be confirmed.  I don't
know how the plan, as described by the disclosure statement,
could be confirmed under the standards, and therefore, it
should be denied.

Your Honor, next I want to turn to certain plan
provisions that meet the actual literal definition of a
non-consensual third-party release.  As noted in the
U.S. Trustee's objection under Plan Section 12.7, all holders
of channel claims -- and that includes all abuse claims, but
also other stakeholders such as Medicare claims and extra
contractual claims or claims against settling insurers -- are
subject to the release provisions in the plan.  The Medicare
claims, Your Honor, as defined in the plan, relates to payments
in respect of any abuse claimant -- any abuse claim, including
claims for reimbursements made to abuse claimants and claims
relating to reporting obligations.  But there doesn't appear to
be any mechanism for notice let alone voting for the Medicare
government agencies.  Yet they are still subject to control the
trust and whether the trust makes the determination to pay them

1  or not.  And they are, Your Honor, bound by the releases as a
2  channel claim under the terms of the plan.  This is the very
3  definition of a non-consensual third-party release that's not
4  permissible under the law, and the Court has no authority to
5  approve that.

6        Your Honor, it also includes inbound contribution
7  claims under channel -- under the definition of channel
8  claims -- who are not entitled to vote, and they're not
9  entitled to even receive a copy of the plan and disclosure
10  statement, but they're deemed to consent to the release and
11  injunction provisions.  And the debtor might argue, well,
12  they're being paid in full, or you know, they -- their claim is
13  not unimpaired.  But how can it not be unimpaired if they're
14  agreeing to something like a release that's affecting their
15  claim?  By that very nature, it makes them impaired, Your
16  Honor.

17        And this is the same -- this is also true for extra
18  contractual claims defined under the plan, and that's claims
19  against settling insurers for damages with respect to settling
20  insurers' handling of claims, bad faith, various conduct.  And,
21  Your Honor, although there are a limited number of exceptions
22  to the channel claims -- and for reference, Your Honor -- for
23  Your Honor, it's Section 12.2.2(a) and 12.2.2(b).  Those
24  exceptions do not extend to the supplemental insurer
25  injection -- injunction -- sorry -- which provides that holders

of all channel claims, with no exception for participating or
non-participating abuse claimants, are enjoined from taking
action against settling insurers.

In other words, Your Honor, the opt-out mechanism
doesn't even impact that injunction. There's no way around
that other than to say that is a classic non-consensual
third-party release that cannot be approved by this Court. And
any approval relative to those releases, Your Honor, would be
subject to review by the District Court under Stern v.
Marshall. And that should be explained in the disclosure
statement and plan, and it's not.

My next point, Your Honor, that the plan proponents'
attempt to get around Purdue by asking the Court to treat
inaction or silence or inadvertence as an expression of
consent. Your Honor, the plan's inclusion of a "optional form"
to opt out the releases does not provide a true opportunity to
affirmatively and unambiguously demonstrate their consent to
third-party releases. If the claimant doesn't return the
optional form, the claimant is compelled to release its ability
to even bring a claim against certain non-debtor parties.
That's not affirmative consent for a claimant to just not fill
out a form that's actually titled "optional" for that to be
considered consent.

Judge Buckeye rejected that approach in Tonawanda
Coke Corp., as I'm sure Your Honor is aware. He found that any

proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent. And with no authority provided for under the Bankruptcy Code, a proposal for a non-debtor release is governed by state law. Judge Buckeye did not limit his ruling in any way, did not say "just because of the facts of this case." That's because this is a binary analysis. There is either consent or there is not, and you don't have to go into the various facts of the case to justify whether a consent is appropriate, because that just simply is no longer the standard before the Court. And while Judge Buckeye did reference the dollar amount of the distribution under the plan, it was in the facts section; it was not part of his analysis whatsoever.

Your Honor, Judge Buckeye's decision was also bolstered by Judge Goldblatt's analysis in the Smallhold case. And it was raised in the plan proponents' memo of law in response to the U.S. Trustee's objection that we pull selective things that we liked from the Smallhold case in support of our position. That's not really quite true. While we may have disagreed with the ultimate holding in that case, Judge Goldblatt analysis is spot on. It's the only case that has an extensive, thorough analysis consistent with Purdue, and that should also be applied here.

According to Judge Goldblatt in the Smallhold case, the theory that state law can be disregarded on a default

theory applied in some cases pre-<u>Purdue</u> can no longer be applied. "In the post-<u>Purdue</u> world" -- this is a quote from Judge Goldblatt -- "the non-consensual third-party release is now per se unlawful." And in the absence of that default theory of consent, there's no other justification for treating the failure to opt out as consent to the release that could stand any analytic scrutiny, because, again, it's "per se unlawful." And that relief is just not -- and, therefore, you know, the relief isn't even available as a matter of law, Your Honor.

Again, you know, it was the holding, not the analysis, that we disagree with. And this is because in the holding -- Judge Goldblatt's holding, he -- the act of voting on a plan while remaining silent relative to a non-debtor release was a sufficient expression of consent. But our position on that, Your Honor, is that it looked like Judge Goldblatt relied on cases that really didn't support such a finding. And -- but rather, those cases that he cited emphasized the importance of notice as a prerequisite to consent. But it's the United States Trustee's position that whether is a -- whether there's sufficient notice is an entirely distinct question from whether there's been a manifestation of an -- of intent. And here, there has not been -- or there's -- under the mechanism proposed by the plan proponents, there would not be.

1     Your Honor, he -- Judge Goldblatt also, though, did
2  reject certain post-_Purdue_ decisions relied on by the plan
3  proponents in their responsive papers, including _Robertshaw_,
4  _BowFlex_, and _Invitae_.  And he rejected those because they
5  didn't really have a sufficient analysis, which is why in the
6  _Smallhold_ decision the analysis is so important.  It's really
7  the only case that goes into the extent and the details of the
8  _Purdue_ case and the analysis on that -- on the case before him.
9     Judge Goldblatt said that the part of the analysis
10 that those decisions -- referring to _Robertshaw_, _BowFlex_, and
11 _Invitae_ -- the part that they omit is the obligation of a
12 party -- is that the obligation of a party served with
13 pleadings to appear and protect its rights is limited to those
14 circumstances in which it would be appropriate for a court to
15 enter a default judgment if a litigant failed to do so.  And
16 again, that is no longer the case in the context of third-party
17 releases.  Instead, Your Honor, Judge Goldblatt found the _Ebix_
18 court analysis from the Northern District of Texas analysis to
19 be more persuasive.  In that case, Your Honor, the bankruptcy
20 Court found that the release of the non-debtor's claim against
21 another was more accurately construed as one of a contract.
22 And as a result, that court -- even though it confirmed a plan,
23 it did so, in all respects, except for the releases, making a
24 point that they were just not permissible under the law.
25     And, Your Honor, as we've -- as you've heard before

already this morning, you know, the issue of whether an opt-out
mechanism is a form of consent is not a novel one.  Courts
prior to Purdue, however, still rejected that notion in some
cases, that silence could be a manifestation of consent.  And
two of those cases, Your Honor, are the In re Congoleum
Corp. case and the Emerge Energy Services case.  And it's cited
in our papers, Your Honor.  And based on those reasonings in
those cases and the reasonings that we have before us from
Judge Buckeye and the Smallhold case, the Court should also
reject as such a notion here that silence could somehow be
considered consent.

Your Honor, moving to my next point, the Court should
also deny the motion and approval of the disclosure statement
because the plan proponents seek to extract consent by
coercion.  Under the proposed plan, a claimant has the option
to opt out of releases for the benefit of third parties, as I
mentioned, by submitting a separate form from the ballot that
itself is entitled "optional."  There's lots of reasons why a
claimant might not fill that out:  "It says 'optional.'  Okay.
I can toss this in the garbage; I don't need to look at this."
They might not even read it.  In addition, Your Honor, the
language contained on the optional form discourages any
claimant from electing to opt out.

Rather than incentivizing claimants to opt in, the
proposed plan actually punishes claimants for wanting to retain

their rights.  It's unlikely that any claimant would want to
check that box, based on the language that's proposed.  And the
effect, Your Honor, is that the plan proponents are almost
guaranteeing that no claimant will elect to opt out.  And,
indeed, Your Honor, Judge Goldblatt, again, in <u>Smallhold</u>, noted
that the issue of coercion is a very serious one because the
concern is that such a practice discourages creditors from
voting, and it might distort the process.  And that's exactly
what could happen in this case if the Court were to approve
this type of ballot and optional form.

So in the plan before Your Honor, if claimants vote
in favor of the plan, or if they don't vote for the plan at all
and are bound by their inaction, or if they even vote to reject
the plan but don't elect to opt out of the releases, they're
bound to accept it.  So they get X plus Y; they get debtor's
assets, and they get participating party's assets, for
simplistic argument, Your Honor.  And in exchange for that,
they surrender their property rights against the joint tort
feasors.

However, if the claimants check the box on the
optional form, indicating they wish to be treated as a
non-participating abuse claimant, they actually get less than
X; they get less than what they would normally be entitled to
from the debtor's -- from the estate assets.  And not only,
Your Honor, is that entirely unfair and punitive, it results in

1  different treatment within the same class of creditors, in

2  violation of 1129(a)(4). And if that's -- if the plan

3  proponents submit that that's not the case and that's not how

4  that works, that should be very clearly spelled out in the

5  disclosure statement, and it is not.

6       Your Honor, it also begs the question whether the

7  respective contributions of participating parties -- do they

8  change depending on whether claimants choose to opt out. And

9  so how? That should also be addressed in the disclosure

10 statement: what the impact is if certain parties do elect to

11 opt out.

12      Your Honor, I do want to make a few additional

13 points -- additional considerations for the Court to consider

14 in denying the motion and the approval of the disclosure

15 statement. Again, not that the United States Trustee has to

16 justify why we objected to the disclosure statement. For one,

17 obviously, it doesn't comply with the law, and, you know, we're

18 obligated to do that. But also, Your Honor, it's important

19 that the Court consider the potential impact of the decision in

20 this case on all future cases in the Northern District of New

21 York that come before Your Honor.

22      As I said, under the terms of the plan, there's

23 really no standard for consent because there just isn't a basis

24 to know whether someone consented unless there is some showing

25 of an affirmative expression of assent in an opt-in format or

1 something akin to an opt-in format.

2        As I said earlier, the rules of opt-out can't change
3 case-by-case.  What constitutes consent should not vary by the
4 facts of the case, including the amount of money to be
5 distributed.  Your Honor, absent that, you know, the floodgates
6 could open with all types of provisions that debtors might try
7 to sneak past creditors.  To require an opt-in or similar
8 mechanism, that's the ultimate gatekeeper.

9        An example of why this -- how this could play out:
10 In a case where you have just a basic, very simple -- maybe a
11 Subchapter 5 case, where you have a principal, who was also
12 obligated on guarantees, wants to discharge the principal's
13 liabilities under that guarantee -- you could easily put that
14 in the plan in an opt-out mechanism, and no suspecting creditor
15 might see that, and a creditor could be bound to that term by
16 just not looking at it.

17        Your Honor, moreover, it -- this case in particularly
18 is appropriate for an opt-in mechanism.  We've heard already
19 that we have a known group of claimants of approximately 400 or
20 so that are nearly all represented -- I think maybe all but 10
21 or 15, I think was said.  And in response to the solicitation
22 of the third amended plan, claimants voted in favor of the
23 plan.  And as was indicated, you know, there was overwhelming
24 support -- over 300 creditors and -- 300 survivors.  That
25 demonstrates that the survivors are very capable and very

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 115 of 172

involved in this case.  And I think that was even said by
Mr. Walter.  This is not a case of apathy.  The survivors here
are very involved in the stakes in this case.  And there's no
reason to believe that they wouldn't equally -- be equally
capable and involved in voicing their consent to the releases.

     And I think it was Mr. Donato maybe that said that
those survivors -- they have excellent and sophisticated
counsel to help them.  And like we said, all -- nearly almost
all of them have that protection of counsel.

     I do want to address a footnote that was raised in
the plan proponents' reply.  It was noted that Judge Sotomayor
pointed out the practical impossibility of successfully
confirming a mass tort case in an opt-out -- per -- in
confirming mass tort cases in an opt-out procedure -- I'm
sorry -- in an opt-in procedure.  But that's not quite --
exactly -- that was not the whole story of what she asked at
the hearing.  She actually did ask, "What does consent look
like?"  But she also acknowledged -- and this is a quote:  "You
have states, and so they could consent.  They're an identified
party.  But there's, I don't know, thousands if not hundreds of
thousands, maybe millions of personal injury claims."  Like
those identified parties that Judge -- Justice Sotomayor
pointed to, we have identifiable, quantifiable parties here
that can and that have already proven their ability to
participate in the plan process.

1    And just a couple of brief notes on some other issues

2 that were raised in the U.S. Trustee's objection before I

3 conclude.  And, Your Honor, one of them is with the -- with

4 respect to the exculpation provisions that are impermissibly

5 broad.  And again, the plan provides no basis for the breadth

6 and scope and -- of those exculpation provisions and,

7 therefore, violates 1129(a)(1) and (3).

8    The range of those parties -- it's so broad that it

9 likely includes parties who performed no duties whatsoever or

10 at all in related to the case or the plan.  And again,

11 inappropriately, like the first disclosure -- or the third

12 amended disclosure statement, extends to post-effective date

13 activity.  But exculpation should only extend to conduct that

14 occurs between the petition date and the effective date.

15    And, Your Honor, this is not Groundhog Day here, as

16 Mr. Donato pointed out.  This is also, likewise, in

17 contradiction to Purdue because certain non-debtor parties are

18 exculpated under the plan without consent of affected parties.

19 And, therefore, Your Honor, on that basis, we would also ask

20 the Court to deny the approval of the disclosure statement

21 unless those provisions are appropriately narrowed.

22    And then, finally, Your Honor for the -- with respect

23 to the United States Trustee fees, I mean, obviously we're not

24 in this case to get paid our fees.  That's a statutory

25 provision; that's not our motivation.  And to be honest, it's a

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 117 of 172

little bit offensive to hear that, you know, that we just want
to get our fees in this case. It's absolutely not the case.

Your Honor, what we're looking for in any type of
approved disclosure statement or plan with respect to
U.S. Trustee fees is that the reorganized debtor has the
obligation to pay quarterly fees based on all monies
distributed or paid under the plan, and that the plan --

Oh, the plan also provides further that payments made
to the trust by anyone other than the Diocese and by the trust
to anyone are not to be considered disbursements. Your Honor,
that's not appropriate. It does not comply with
28 U.S.C. 1930(a)(6) because it doesn't require payment of
quarterly fees on all qualifying disbursements. And the term
"disbursements," Your Honor, while it's not defined in the
statute, it must all -- it must include all post-confirmation
distributions from the bankruptcy estate to creditors. And,
you know, the debtor's choice -- or the debtor's choice to
utilize a plan-created entity, like the trust, to effectuate
the payments to certain creditors doesn't alter the debtor's
obligation -- the statutory obligation to pay quarterly fees
that are -- that accrue and are imposed as a result of the
monies that must be paid under the plan.

So, Your Honor, also in that same respect, the
definition in the disclosure statement with respect to
Chapter 11 quarterly fees -- they are statutory rather than

1  administrative claims and are not subject to the same

2  obligations of administrative creditors.

3  Your Honor, for all of these reasons, the United

4  States Trustee respectfully submits that the disclosure

5  statement should not be approved because of the plan provisions

6  that contain unconfirmable provisions.  And to continue on such

7  a path would be just a fruitless exercise and a waste of State

8  resources.  We're asking the Court to get to that issue right

9  away so that can be corrected and the debtor can get the

10 affirmative votes that it needs.  It -- from what was heard --

11 what was said in court today, it sounds like there will be a

12 lot of support for this plan.  And with all these very

13 sophisticated, excellent attorneys involved in this case,

14 there's no reason why the debtor can't find some way to get the

15 necessary votes and the necessary consent for these releases.

16 Thank you, Your Honor.

17 THE COURT:  Thank you.  Ms. Temes, just a couple

18 questions.  So reading between the lines, so it's the

19 U.S. Trustee's position that for -- if the $100 million was

20 approved, that you're entitled to quarterly fees on that

21 $100 million because it's being funneled through the trust

22 that's created through the bankruptcy plan; is that right?

23 MS. TEMES:  Right.  That's correct.

24 THE COURT:  And how do you respond to the plan

25 proponents' correct statement that the Court specifically said

1  in Purdue that we are not opining as to what consent is?

2      MS. TEMES:  Right.  Your Honor, that's -- then

3  they -- there's no -- under Purdue, it just says, "You can't

4  have the non-consensual third-party releases, but we're not

5  saying what consent is."  So we have other resources before the

6  Court -- the Tonawanda Coke decision, the Smallhold decision --

7  that say look to state law for that consent.  And that's what I

8  would rely on, Your Honor, not Purdue.  Purdue just stands for

9  the proposition that non-consensual third-party releases are no

10  longer acceptable.

11      THE COURT:  Thank you.

12      MS. TEMES:  Thank you, Your Honor.

13      THE COURT:  Thank you.

14      Mr. Winsberg, you're up next.

15      MR. WINSBERG:  Thank you, Your Honor.  Harris

16  Winsberg on behalf of Interstate.  For purposes today, just for

17  the record, we incorporated our previous disclosure statement

18  objections into this disclosure statement objection.  You've

19  already -- Mr. Donato's right:  A lot of those objections were

20  overruled.  But just for purposes of the record, we just

21  carried them forward.  I'll focus mainly on the Purdue issues.

22      THE COURT:  Thank you.

23      MR. WINSBERG:  I read -- Your Honor, I read the

24  omnibus reply brief and the supporting memorandum of law that

25  the plan proponents put together in this case.  And this case

needs to be resolved in mediation if the plan proponents want
to achieve their stated purpose to exit bankruptcy in a timely
manner -- or, as Mr. Donato calls, the main event.  What
they've come up with today is not going to achieve that stated
goal.

        The structure doesn't work, and I'll get to why.  But
there is a structure that does work, and it's in Rockville
Center.  And Your Honor, is probably aware of that, that we
filed -- there's a disclosure statement.  There's a plan.
There's a motion for 363 buybacks with the insurers.  Judge
Glenn ruled in the disclosure statement how that's going to
proceed very quickly, and that structure works.

        And by the way, in that structure, the ballots don't
have opt-in or opt-outs.  And so, like I -- a lot of these
issues that we were talking about today can be avoided through
a constructive global resolution.  And so I just wanted to
raise that while we're going through the -- I'm sorry, Your
Honor.  You have a question?

        THE COURT:  Mr. Winsberg, they have the prepackaged
scenario down in the Southern District of New York that we
don't have up here in New York -- Upstate New York, in the
Northern District.  So I guess I would just throw that out as
a -- as kind of a wrinkle in that there's a really quick,
easy -- avoiding opt-in and opt-out in the Northern District is
much different than the Southern District.

1          MR. WINSBERG:  Understand, Your Honor, but it doesn't
2     mean that similar type of process -- maybe not on the
3     rapid-fire, so to speak, that they have down there.  I
4     understand that they don't have that here, Your Honor.  But,
5     Your Honor, has been -- makes yourself very available to the
6     parties in this case on expedited schedules over time.  And I
7     am sure, with all the legal talent in this room, that -- maybe
8     not over the course of a month and a half, but it could be
9     done; it is achievable.  And it's done in a way that is
10    compliant with Purdue, and you don't get into a lot of these
11    issues that we're -- that you're wrestling with right now.

12         So here, they've contested our right as a
13    party-in-interest under Kaiser Gypsum.  They criticized us for
14    citing to the transcript of Kaiser, where the judges actually
15    talked about Article III and the like, but then they're citing
16    Purdue Pharma transcripts as support for consent.  So which is
17    it?

18         We were not -- we were excluded from the drafting
19    process in this -- and with this plan.  Your Honor has under
20    advisement the discovery disputes.  They've resisted -- at
21    least at that -- a couple hearings, they resisted doing an
22    updated proposed confirmation order.  Your Honor took that
23    under advisement, said, "I'm not prepared" -- I think you said
24    you weren't prepared to rule on it.  But that proposed order
25    that's on the docket, indisputably, doesn't comply with your

1  prior orders.

2          The Diocese successfully persuaded the Court to stay

3  the coverage case.  The Committee -- in fairness, Committee

4  wanted to move it forward, but the Diocese proposed to stay

5  that case.  And now, when we -- when they're faced with like a

6  straightforward Purdue objection, that there's no statutory

7  authority to release any claims we may have against over 200

8  non-debtor entities and their related persons, which is like

9  friends and family, very broadly defined under the plan, they

10 come back, and their answer isn't to remove that language --

11 and we haven't consented -- to remove the injunctions and

12 releases as to the insurers, but to say that that our claims

13 are weak, are speculative, and that it's actually permitted

14 here.

15         So we're left with -- basically, what they're asking

16 the Court to do -- and I was thinking about this last night --

17 is they're really asking you for declaratory relief -- through

18 the plan, on a process Mr. Donato has said he wants end of

19 January or wherever he wants the confirmation to be.

20         On that time frame, to conclude that our rights as a

21 third party are terminated -- over 200 non-debtors and

22 affiliates, friends and family -- that's contrary to Purdue.

23 I'm not sure the Court has subject matter jurisdiction to do

24 that.  I don't believe the Court could even do it in a --

25 through a plan process.  It'd have to do it through a lawsuit

1  if it -- if the Court concluded it had -- it would have to be

2  related to -- I don't think the Court has jurisdiction,

3  frankly, on it.

4          And it's done in a way that's -- just complete --

5  violates due process of law.  I mean, it's going to set up a

6  massive issue on appeal, a legal issue.  And for what reason?

7  If the claims are so weak and speculative, why are they in the

8  releases and injunction provisions?

9          And I'm not even sure, Your Honor, the matter's ripe,

10 because, as Your Honor noted at the last couple hearings, the

11 abuse claims haven't been resolved yet.  And so to have the

12 claims that we're talking about that have been addressed in

13 here -- the underlying abuse claims have to get resolved, then

14 you have to go to the coverage case and determine -- make a

15 coverage determination.  And it's at that point in time you

16 have an understanding about who's got claims against whom.

17         So they're asking you, basically, for an advisory

18 opinion, assuming you have jurisdiction, which we don't think

19 you do, and assuming you could do it through a plan, which we

20 definitely do not think you have the power to do.

21         We also have a right to a jury trial.  So the notion

22 that all these things are going to get wiped away from 200-plus

23 entities at the end of January through a plan is just -- it's

24 fictional.  It's not going to -- it's unconfirmable as a matter

25 of law.

1    But even if you get past those arguments, I'm not

2 sure -- on the anti-subrogation argument that they put in

3 their -- on their -- under New York law, it's premised that

4 everybody that's getting a release is a part of the insured --

5 of their additional insureds.  We don't even think that's the

6 case.  We do think there are entities that are not insured

7 under our policy.  So I don't -- the factual premise, I'm not

8 even sure is true.

9    It also doesn't account for intentional conduct.  I'm

10 not saying anybody -- I mean, we're all professionals, but to

11 release us from what someone may do in the future that's

12 intentional -- it doesn't account for that either.  We can come

13 up -- if Your Honor wants a brief on it -- but I was walking --

14 so I was thinking about the structure and their arguments and

15 what their solution is.  It's inconsistent with trying to get a

16 quick resolution and an exit from bankruptcy.

17    And if you look at 8.83, which is denial of coverage

18 as sole remedy, it says, "Notwithstanding anything to the

19 contrary above an 8.82, the sole remedy of a non-settling

20 insurer for the failure of the Diocese or organized Diocese or

21 participating parties to satisfy their obligations after the

22 bankruptcy -- after the confirmation shall be limited to

23 asserting any defense to providing insurance coverage under

24 applicable -- under the applicable policies."  And we'll stop

25 with that.

1       And then it goes on to say -- and then it's kind

2 of -- I guess it's disjunctive. And then, "Nothing in the plan

3 or any acts or admissions by the plan proponents and their

4 related persons" -- that's pretty broad -- "as part of the

5 case, can't serve as a basis for granting affirmative relief

6 against those parties."

7       Now, putting aside the <u>Purdue</u> issues for a moment,

8 our policies -- imagine this is not the Diocese of Syracuse;

9 It's a basic commercial case in front of Your Honor. And you

10 have a contract. There's -- the debtor has a contract with a

11 non-debtor party. And the debtor can assume that contract, it

12 can reject that contract, it can assume or assign it. Or if

13 it's non-executory, it can assign it under 363. Those are

14 basically the options of the parties. Imagine if the debtor

15 would come to you and say -- as to a contract, not -- like,

16 here's the language we want to -- how we're going to treat the

17 contract. It's unconfirmable. You can't do any of this. And

18 the law -- There's no difference -- there -- the Bankruptcy

19 Code does not distinguish an insurance policy from any other

20 contract. And I think that gets lost in this plan. There's

21 lots of provisions in this plan about what to do with

22 insurance. It is a contract. So the notion that you can put

23 language in here that -- it just -- it's not confirmable.

24       THE COURT: And I think I addressed that with

25 Mr. Donato earlier, that I wasn't --

1          MR. WINSBERG:  Yeah.

2          THE COURT:  -- I wasn't going to approve that.

3          MR. WINSBERG:  Yeah.  I -- yes, Your Honor.

4          THE COURT:  The insurance policies and the law are
5  what they are, in another form, for another day.

6          MR. WINSBERG:  That's correct, Your Honor.  You know,
7  if you go to page 84 on the exculpation -- I think there was an
8  argument in their brief about -- that it's not really a
9  release, or something to that effect.  I read it late.  I
10 apologize.  I'm running on fumes today, Your Honor.

11         THE COURT:  I get it, yeah.

12         MR. WINSBERG:  But it starts off with, "From and
13 after the effective date, none of the exculpated parties shall
14 have or incur any liability for any claim."  That sounds like a
15 release to me.  It's kind of like the -- what _Purdue_ talked
16 about.  So -- and "Well, it's not a discharge, it's something
17 different."  Well, no, it -- a spade's a spade.  You can call
18 it what you want.  You may not use the word "release."  That's
19 a release.

20         THE COURT:  So, Mr. Winsberg, is it the insurer's
21 position the exculpations are not permissible in any stretch or
22 that they should be limited to the parties under the plan and
23 the time frames as outlined by the U.S. Trustee?

24         MR. WINSBERG:  We have not go far -- we have not gone
25 as far to say they can never be approved, Your Honor.  I mean,

1   that was the <u>Highland Capital</u> decision.  The Supreme Court

2   denied cert on it after <u>Purdue</u>.

3            THE COURT:  Uh-huh.

4            MR. WINSBERG:  So they left the law on the land, at

5   least in the Fifth Circuit.  And our perspective is you could

6   have an exculpation, but it's got to be very limited, and it's

7   certainly got to be limited to estate fiduciaries.  And I think

8   that's what we said in our brief.  I don't think we took the

9   position that they're per se invalid.  They just have to be

10  paired back.

11           THE COURT:  Thank you.

12           MR. WINSBERG:  Yeah.  There was an argument in --

13  about the judgment reduction clause, something that -- I'm

14  going to have post-traumatic stress disorder about judgment

15  reduction clauses; it's been my life for the last month.  But

16  if you look at 12.5.2, which is -- Mr. Donato is correct --

17  there is a judgment reduction clause.  This deals with settling

18  insurers.  This deals with -- Your Honor, has the power -- and

19  we briefed this in front of Judge Glenn -- you do have the

20  power under 363 Sale -- 363(f) is the statutory source that can

21  give you authority issue, a supplemental insurer injunction.

22  And we didn't object to the supplemental insurer injunction in

23  this plan because that is the law.  And there's a case out of

24  the Eleventh Circuit called <u>Bird Global</u> that talks about this

25  issue.  It's not a <u>Purdue</u> issue to do a buyback.  Under 363(f),

1 You can do that and issue a supplemental insurer injunction.

2 There's an issue how far that injunction goes.  The

3 U.S. Trustee in the Southern District has objected to it, and

4 Judge Glenn has cited to the <u>Manville</u> decision about how he

5 feels about how far the injunction can go, about what can be

6 enjoined and what cannot be enjoined, which turns on whether a

7 claim is really estate property or whether it's really

8 somebody's individual claim.

9 And so we don't take issue with that.  And we don't

10 take issue with the judgment reduction clause, at least for

11 today, because it only applies to settling insurers, and we

12 didn't object to it.  So the judgment reduction clause is fine,

13 but it doesn't fix the issue because it doesn't apply to the

14 participating parties; it only applies to settling insurers.

15 And that's why we didn't object to it -- or it doesn't deal

16 with it.

17 The last part I would say, Your Honor, is we really

18 can't understand that this is the path that's going to be

19 pursued if the stated purpose is to get money in survivors'

20 hands.  And I have sat quietly over the last couple of

21 hearings.  I've heard some pretty, you know, incendiary things

22 said about my client and about other clients.  And I would just

23 note, I don't want to impugn anybody's integrity, and I'm not

24 going to do that.  I will just state in my place that we have

25 now settled two Diocese cases.  We have on file a structure in

1 front of Judge Glenn that works. And the insurance program

2 here is the same identical insurance program in Rockville and

3 in Rochester.

4 So rather than go back and forth about who said what,

5 I would just ask the Court to consider the facts: that we're

6 not into delay, we're into constructive solution. This is not

7 it. And we need to go -- that's why I filed the mediation

8 letter, and Mr. Elsaesser agrees with me. We all agree, it

9 needs to go through mediation, because this plan to go

10 forward -- even if Your Honor were to confirm it, there are

11 significant legal hurdles that it's going to face, whether in

12 this Court and in the other Court, and upon appeal.

13 So with that, Your Honor, we respectfully submit the

14 disclosure statement should be denied or substantially modified

15 before it went out. Otherwise I'm happy to answer any

16 questions Your Honor has.

17 THE COURT: No, I think that's it.

18 MR. WINSBERG: Thank you, Your Honor.

19 THE COURT: Thank you, Mr. Winsberg.

20 MR. ROBERT KUGLER: Your Honor, If I could address

21 one thing that Mr. Winsberg said. And I know he was speaking

22 hypothetically about his PTSD, but among my constituency is

23 people suffering real PTSD, and it's easy to be colloquial and

24 whatever about it, but it's not appropriate, given the

25 constituency I have.

1           MR. WINSBERG:  I didn't mean to say it that way, and

2  I apologize if it came out that way.

3           THE COURT:  Certainly.

4           MR. WINSBERG:  I have utmost respect and -- for the

5  lawyers in this case, and I'm sorry if I -- if it offended

6  anybody.  I didn't mean it that way.

7           THE COURT:  Thank you, Mr. Winsberg.

8           MR. WINSBERG:  Okay.

9           THE COURT:  And the Court certainly didn't take it

10  that way.

11           MR. WINSBERG:  Yeah.

12           THE COURT:  But certainly, duly noted.

13           Thank you, Mr. Kugler.  Thank you.

14           MR. ROTEN:  Russell Roten for London Market Insurers.

15  First of all, Your Honor, we would also incorporate the

16  previous objections we made to the previous plan; otherwise,

17  we'll waive them if we don't.  And that's why we make the same

18  ones over and over again.

19           THE COURT:  Understood.

20           MR. ROTEN:  And we join in the points that Interstate

21  made, and I'll try not to repeat anything they said.

22           Your Honor, there's -- in my view, there's kind of a

23  negative feeling that's coming into this case in the last two

24  or three hearings.  There have been negative comments about my

25  clients, LMI.  And there have been negative comments generally

1   about the insurers and what our objectives are and all that

2   sort of thing.  And I think that's inappropriate.

3          The insurer's not responsible for any delays in this

4   case, Your Honor.  We are here -- we didn't bring this case.

5   We're here defending our contractual rights.  If there's a --

6   if there's a delay caused by us defending our contractual

7   rights, it's a responsibility of the people who are attacking

8   our contractual rights.  It's not our responsibility.  We have

9   the right to defend ourselves.

10         Your Honor, we -- the insurers didn't do anything to

11  the abuse victims.  The insurers didn't have any relationship

12  with the abuse victims.  That was the Diocese, not the

13  insurers.  The insurers have a relationship with the Diocese,

14  and it's regulated by the insurers' contracts.  And I'd like to

15  bring the focus of this back to those contracts.  That's why

16  the insurers are here.  It's what the contract says.  If there

17  are no insurance contracts, we're not here.  We don't have any

18  independent duties to anybody.

19         So the insurers did not agree to guarantee the

20  conduct of the debtor, no matter how egregious or how horrible

21  or how many damage -- how much damages it caused.  We didn't

22  agree to do that.  And twice this morning, there were

23  statements that the insurers owed money to the abuse claimants.

24  We don't have any relationship with the abuse claimants.  Our

25  relationship is with the Diocese, and it's governed by the

1  contracts.

2       Another thing that really bothered me today, Your

3  Honor, was when the debtor said all the insurers want to do is

4  keep the money in their pockets.  And I want to -- I want to

5  deal with that.  We settled with the Diocese years ago.  The

6  Diocese and all the insurers agreed that we would buy back our

7  policies, that we reached a final number.  We all talked to the

8  people we wanted to talk to.  We had a deal.  The -- these

9  abuse claims could have been paid years ago, but the debtor

10 reneged on that deal.

11      We've been trying to -- we've been trying to settle

12 for years, Your Honor.  And we've settled a lot of cases.

13 We've settled -- I just -- Mr. Elsaesser mentioned one, in

14 Helena.  We've settled cases in St. Paul, Minneapolis; Winona;

15 Portland, Oregon; Wilmington, Delaware; Harrisburg,

16 Pennsylvania.  We got the Rochester case settled.  We got the

17 Rockville Center case settled.  We don't have all the paperwork

18 done in Rockville Center; I've spent the last week and a half

19 doing that.  And we found a way in that context to get around

20 this problem.

21      But it is in our interest to settle these cases.

22 It's -- we don't want to keep the money in our pocket.  We want

23 to settle, pay the money, get the money to the victims of the

24 abuse, and get out of here.  That's why we're here.  And it's

25 not right to say that we're the ones causing the delay or that

1  we're responsible for this.  It's not right.  I'd like to get

2  that out of the discussion, and deal with the Bankruptcy Code

3  and that sort of thing.

4          Our objections, Your Honor, are based on the

5  non-confirmability of the plan.  I'm not going to go through

6  everything that's in our objections.  But Your Honor's familiar

7  with how our insurance policies work.  I think you've heard

8  that over and over and over again.  We pay ultimate net loss.

9  After the debtor does everything, they send us a bill; if it's

10 covered, we pay our shares.

11         The debtor has to comply with the conditions

12 precedent to settlement, or we don't have any obligations

13 whatsoever.  There are a number of conditions precedent to

14 settlement.  The debtor has to defend the cases.  And

15 initially, we couldn't discern from the plan whether the debtor

16 was actually going to defend.  We were objecting to Your Honor

17 that we couldn't tell who was going to do what.

18         Under the plan now, it appears that the debtor will

19 defend, but the cost of the defense is going to be reimbursed

20 by the trust, up to a point.  And the -- there's a reserve fund

21 set up to do that.  And when the reserve fund runs out, then

22 nobody's going to be defending.  And the plan -- the debtor has

23 asked you to exonerate them from any liability, them and the

24 trust -- if they just breach their conditions to coverage, and

25 they're off -- completely off the hook.

1     Your Honor, I would agree with what Your Honor said

2 earlier about limiting the remedies that Mr. Winsberg just

3 discussed with you and Mr. -- excuse me -- Donato discussed

4 with you earlier.  The same idea applies here.  This is a

5 insurance contract interpretation issue.  It's a State Court

6 issue.  It's a jury trial issue.

7     Another problem, Your Honor, with this plan is that

8 the payment for liability and defense costs of the

9 non-participating abuse claims is not allowed; it's only paid

10 up to the amount of the SIR.  And so with respect to those

11 claims, which presumably will go into litigation, it just, on

12 its face, eliminates any duty to defend and pay defense costs.

13     THE COURT:  I'm sorry, Mr. Roten, would you repeat

14 that, please?

15     MR. ROTEN:  It's the non-participating abuse claims.

16 And there's no duty -- the plan allows the debtor not to pay

17 the liability and defense costs.  They just pay up to the limit

18 of the SIR.

19     There's also a concept in the plan, Your Honor, where

20 if the trust suspects that the debtor is not going to perform

21 its conditions precedent to coverage, that the debtor can file

22 a lawsuit, and they can litigate that here.  And what I would

23 suggest, Your Honor, is that is a classically collusive

24 lawsuit.  They would litigate that neither one of them has to

25 pay anything; they would agree on that.  And they would achieve

1   the same illegal objective they're trying to achieve by saying

2   they don't have any liability if they don't perform under the

3   policies.

4            I also agree with Mr. Winsberg -- the judgment

5   reduction clause has nothing to do with any of these issues.

6            Another problem, Your Honor, is the -- part of the

7   plan -- a crucial part of the plan is an assignment of the

8   participating parties' property interest, under the LMI

9   policies to the trust.  And that's not property of the estate.

10  And this Court does not have the jurisdiction to allow that or

11  require that.  That's something -- somebody's got to do on

12  their own.  And the Bankruptcy Code allows the Court to assign

13  insurance policies of our property -- of the estate under

14  certain conditions.  But those -- that ability to do that

15  doesn't apply if it's not property of the estate.  And all of

16  the participating parties' assignments are prohibited by the

17  contract itself.  So the policies say they can't assign without

18  permission.  We're not giving permission; so there's no vehicle

19  for those policies to be assigned.  So the participating

20  parties' contribution cannot be a part of this plan.  And it's

21  hinged $50 million on those contributions, and it can't happen.

22           Your Honor, I wanted to touch on the allocation of

23  liability argument that Your Honor went into this morning.  And

24  the response was, Well, it doesn't matter; it doesn't affect

25  the insurers.  Well, their allocations involve the

1  participating parties. If their policies can't be assigned,

2  and there's no money coming in, or their participation is

3  unclear, then this allocation mechanism could affect how claims

4  come to -- through to the insurers for coverage. So it

5  potentially affects the insurers, and then, we think it's

6  inappropriate.

7        We -- the Trustee mentioned that the plan treats

8  consenting and non-participating abuse claimants differently;

9  so I won't get through that -- arguing that.

10        We oppose the attorney-in-fact argument, Your Honor.

11  It's in our brief. We don't think the Committee can act as

12  attorney-in-fact. There are conflicting interests. The

13  Committee represents all the unsecured creditors, and we don't

14  think that it's appropriate for them to do that. And one of

15  the fundamental problems you've heard from me, Your Honor, for

16  years now is the Committee is not doing anything to get the

17  invalid claims out of this. The debtor and the Committee are

18  both happy to pay invalid claims. We're trying to object to

19  those claims. The plan proponents don't want us to. And in

20  the plan -- in this plan, it says that once the plan's

21  confirmed, we can no longer object; only they can. So when

22  they were talking this morning about, "Well, let's put that

23  off; we'll deal with that later" -- that's a little bit

24  dishonest maybe.

25        THE COURT: Mr. Roten, wouldn't you agree that

1  pursuant to the allocation protocol, there's not to be payment

2  on duplicative or fraudulent claims?

3       MR. ROTEN:  The allocation protocol should not pay

4  fraudulent claims.

5       THE COURT:  I believe that's in there.

6       MR. ROTEN:  The -- and, Your Honor, the -- there's a

7  conflict of interest that we pointed out in our briefs of the

8  Trustee.  The Trustee is taking the money that comes from the

9  debtor and using that money to pay the claimants, and they have

10 a fiduciary duty to those claimants.  At the same time, they're

11 taking the same fund, reimbursing the debtor for opposing those

12 claims.  It's a direct conflict of interest.  We think it's

13 inappropriate; we think it's inappropriate under New York law.

14      We have some other arguments, Your Honor.  Some are

15 pretty specific in their wording issues and things of that

16 nature, but those are the main arguments we want to make.  Does

17 the Court have any questions?

18      THE COURT:  No, I've asked them as we went on.

19      MR. ROTEN:  Thank you.

20      THE COURT:  Thank you, Mr. Roten.

21      Are there any other parties who wish to be heard in

22 opposition to the motion to approve the disclosure statement?

23      Anyone on the phone who wishes to be heard?

24      MS. RUBEN:  Yes, Your Honor.  This is Samantha on

25 behalf of Travelers on the phone.  First, I just want to state

1 for the record that we join in the arguments in -- of the other

2 insurers that have spoken today. And like the other insurers,

3 we want to incorporate our previous objections to the prior

4 versions of the disclosure statement.

5 Second, I want to discuss a few points. And I won't

6 repeat arguments because I think counsel for Interstate and LMI

7 did a good job of hitting the high notes. We understand that

8 the debtors want to move forward and finalize the disclosure

9 statement and plan and eventually provide recovery to

10 survivors. But from our perspective, there's still remaining

11 issues in the plan, including many that affect the insurers,

12 including Travelers. And we're certainly not trying to delay

13 here or avoid payment, but we do need to make sure that our

14 rights are protected. And I want to reiterate that we're

15 willing to work with the plan proponents on those issues and,

16 you know, remain open to discussion.

17 That said, I want to raise one point on the

18 participating parties' contributions, which we've discussed in

19 our objection. We agree with the debtors, as they point out in

20 their joint omnibus reply, that the question is whether the

21 participating parties have provided consideration or not. And

22 that's on page 23 at Docket 2281. But where we see an issue is

23 it's impossible to tell, you know, what, if any, each

24 participating party has individually contributed as

25 consideration. We understand there's a pot of money they're

1  contributing, but you know, is each participating party

2  contributing money?

3         And among other things, the Supreme Court said in

4  Purdue that the Sacklers needed to put everything on the table

5  to receive a release.  And as the plan stands -- as the

6  disclosure statement stands, it's unclear that the

7  participating parties are doing so.  And we don't believe that

8  contributing liabilities, like potential insurance claims,

9  et cetera, would be considered.  But that's all for now, Your

10 Honor.

11        THE COURT:  Thank you.

12        Is there anyone else on the phone who wishes to be

13 heard?

14        MR. BANKER:  Hi, Your Honor.  David Banker, Womble

15 Bond, on behalf of National Catholic Risk Retention Group.  We

16 had filed a limited objection enjoinder in certain of the other

17 insurers' objections at Docket 2263.  We certainly don't need

18 to reiterate any of the objections that were asserted today,

19 but we certainly wanted to note that we were one of the two

20 insurers that had settled -- or we thought it settled with the

21 with the debtors as well as with the Parishes, Committee, other

22 parties.

23        Regrettably, because of the Purdue decision, that

24 kind of was thrown into flux; the settlement agreement hadn't

25 been finalized, and, certainly, with regards to the Purdue

 1  issue, other issues were thrown into play.  We certainly want

 2  to throw out there that we are -- you know, we put out a round

 3  number that was supposed to resolve all issues and allow

 4  parties to walk away.  With Purdue, That seems to be in

 5  question.  But we're ready, willing, and able to settle with

 6  the amount that we that we put out there, and we have a

 7  settlement agreement that seems to be almost done.  So, you

 8  know, we're here, we're waiting and we're willing to talk with

 9  the relevant parties and see if we can figure out something

10  that allows everyone to finalize the deal that we previously

11  agreed to.

12          THE COURT:  Thank you.

13          Is there anyone else?

14              (No audible response)

15          MR. BANKER:  Thanks, Your Honor.

16          THE COURT:  Thank you.

17          Is there anyone else on the phone who wishes to be

18  heard before we turn back to the courtroom?

19              (No audible response)

20          THE COURT:  Okay.  Hearing none.

21          I believe Mr. Roten wanted to make one last point,

22  and then we'll turn back to the plan proponents.

23          MR. ROTEN:  One clarification in my argument, Your

24  Honor.  That was the Diocese of Rochester case that we had

25  settled, and the debtor decided not to go along with that

1  settlement, and then we went back into the delay of the case.

2          THE COURT:  Thank you.

3          MR. ROTEN:  So my apologies.

4          THE COURT:  Certainly.

5          Any other opposition?

6                    (No audible response)

7          THE COURT:  Hearing none.

8          Mr. Donato?  Mr. Kugler?

9          MR. DONATO:  Your Honor, I'll have Mr. Walter address

10 the balloting issues.

11         THE COURT:  Certainly.

12         MR. WALTER:  Thank you.  Grayson Walter, Your Honor,

13 again, on behalf of the Diocese.  Just a couple points in

14 response to the U.S. Trustee's position, again, on opt-in

15 versus opt-out.

16         The U.S. Trustee got up here and said, you know,

17 based on the Smallhold and the Tonawanda decision, you have to

18 have -- you absolutely have to have an affirmative indication

19 of consent.  She said that is binary.  Neither of those

20 decisions, respectfully, require that.  Your Honor, I think

21 what the U.S. Trustee is really arguing to the Court is that in

22 the absence of separate authority under the Bankruptcy Code, we

23 need to default to state law provisions to fill in the gap and

24 determine what does or does not constitute consent.  We

25 already -- I already argued before that I think some of the

1  prior Second Circuit case law still applies, but even under the

2  U.S. Trustee's construct, there are elements of state law that

3  would allow us to impute consent even without this opt-in

4  process.

5       And again, I cited to the -- we cited to the

6  SunEdison case as well as the Russell v. Raynes Associate case

7  for proposition that -- for the proposition that where there is

8  a duty to respond to an offer, under New York law, you can

9  impute consent -- you can impute acceptance of that offer if --

10 in the face of silence, under appropriate circumstances.

11 Again, building on Judge Buckeye's decision in Buffalo, where

12 you have a committee operating as an agent for all claimants

13 and negotiating on their behalf, it is appropriate to assume

14 that consent in the absence of an affirmative objection.

15      And none of the cases cited by the U.S. Trustee

16 countermand that.  They focus on what is admittedly the more

17 usual scenario, where -- with a contractual formation:  We have

18 an offer and an affirmative acceptance.  But they don't

19 preclude this Court from imputing acceptance based on silence

20 in the face of a duty to accept.

21      Moreover, to the extent that the U.S. Trustee

22 suggests that the Tonawanda Coke decision does not actually

23 address the amount being paid for the release, I think that's

24 just incorrect.  Your Honor, the -- just reading from Judge

25 Buckeye's decision, he says, "Any payment under the plan serves

as consideration for pre-petition obligations.  No further

consideration is given on account of the separate liabilities

of the non-debtor beneficiaries through the releases."  Indeed,

the plan contemplates the same distribution, whether or not a

creditor opts out of the release -- very different than our

scenario.  "Essentially, creditors are being asked to give

releases to third parties for no consideration.  Consent for

this arrangement is therefore governed by the following

provisions of the New York General Obligations law."  And

there, he quotes the section of general obligations law that

says, "Where there's a release for no consideration, it has to

be in writing."  That is not -- that is not contradictory to

what we're saying.  We have releases in exchange for $50

million of consideration, and it -- releases that were

negotiated by the Committee.

         Your Honor, the U.S. Trustee made the provision --

the argument that survivors in this case, by and large, are

represented by sophisticated lawyers, who can explain the plan

provisions and counsel their clients to opt in as easily as opt

out.  Your Honor, we think that cuts both ways.  And as the

Committee has previously argued, we're dealing with a

population of people that are working under, you know,

sometimes severe limitations, and we don't think it's

appropriate for the U.S. Trustee to require those folks, if

they would prefer to remain silent and go along with the flow,

1  to step in and engage with this process at all.  If they can

2  work with their counsel, they can get advice.  And if they

3  truly want to oppose these releases, their counsel can do that

4  on their behalf.  But we think it's inappropriate to require

5  them to step forward and do that as an affirmative step when

6  the Committee has been operating on their behalf all along

7  here.

8          Your Honor, I would just similarly note that the

9  Smallhold case, similarly to Judge Buckeye's decision in

10  Tonawanda, simply assumes that that default judgment is the

11  only way to get to implied consent.  We would submit under New

12  York law, there's a another path to get there, and that

13  silence, under appropriate circumstances, where there's a duty

14  to oppose, is tantamount to consent.

15          Barring any questions Your Honor has, that's all I

16  have.

17          THE COURT:  I do.  Can you address, please -- the

18  Court shared very similar concerns with the U.S. Trustee in

19  terms of the -- what I call the doomsday language and the

20  placement of the opt-out on the class 5 ballot in terms of if

21  you don't -- if you choose this -- and I have a couple

22  questions on what they get in terms of the executive summary

23  that we'll get to a minute -- but --

24          MR. WALTER:  Sure.

25          THE COURT:  -- if you choose this, not only do you

1  get virtually nothing, it's kind of, Would you like to get this

2  great, happy recovery?  Or if you don't, here's all the bad

3  things that could not only happen with respect to you, and a

4  reduced recovery --

5       MR. WALTER:  Uh-huh.

6       THE COURT:  -- but to also, you know, go against the

7  whole plan and make sure that no survivors get any money.

8       MR. WALTER:  Uh-huh.

9       THE COURT:  So it's really a doomsday -- I read that

10  ballot as a very doomsday scenario for a survivor out there

11  trying to say, "Well, do I want to opt out?"  Or "I don't want

12  to opt out."  And so that kind of goes to the coercion and

13  duress.  If you're going to convince the Court the opt-out is

14  on consent, how do you deal with that language?

15       MR. WALTER:  So, Your Honor, we're just trying to be

16  honest with the people that are engaging in this process of

17  what would happen if we have a significant number of opt-outs.

18  Right?  I mean, we have participating parties that are putting

19  $50 million on the table.  If they're not going to get the

20  value of the releases that they've bargained for, they're not

21  going to, you know, be able to move forward with the plan.  And

22  in that scenario, the plan may fail.

23       THE COURT:  And going to the U.S. Trustee objection

24  again -- and the Court had -- is there a number where that

25  kicks in that's not being disclosed in the executive summary,

1 that there's -- if a certain percentage or a certain -- is that

2 on a claim-by-claim basis?

3        MR. WALTER:  No, Your Honor.  We really don't have

4 any good way of predicting that in advance.  I mean, we don't

5 know -- there may be a very limited number of claims that the

6 Diocese and the participating parties would be limit -- would

7 be willing to accept.  But I think even that would require some

8 negotiation with the Committee, and as far as the scope of

9 what's being pumped into the plan and what the protections

10 available for any protected party or participating parties who

11 were being carved out of the third-party release are.

12        That being said, you know, every claim has different

13 characteristics.  Some are more meritorious than others.  Some

14 are meritorious but not -- don't present that large liability

15 exposure.  Some are insured, some are not.  So that would have

16 to be a decision that we would evaluate once the balloting is

17 back.  If we see that we have opt-outs, we would have to

18 evaluate, you know, who they are, what the characteristics of

19 their claim are, and whether the participating parties are

20 still comfortable putting $50 million or some other number into

21 this plan to make this plan work.

22        So, no, there's nothing that -- there's nothing --

23 there's no line in the sand that's been drawn that has not been

24 disclosed to the Court.  You know, our position is that this

25 settlement was negotiated under the assumption that there was

1   going to be a full release of all abuse claims against both the
2   Diocese and all participating parties.  That is still the goal
3   that we hope to achieve.  And we think we will.  We think we'll
4   get a hundred percent or nearly a hundred percent survivor
5   acceptance.
6           THE COURT:  Thank you.  That answers that.
7           This is probably more a question perhaps for
8   Mr. Donato.  But the way that I was reading the opt-out -- the
9   non-participating opt-out claimants, they get a thousand
10  dollars, and then their claim against the participant -- I'm
11  sorry -- against participating parties is preserved; is that
12  correct?
13          MR. WALTER:  That's not all they get, Your Honor.
14          THE COURT:  Okay.
15          MR. WALTER:  So they get a thousand dollars cash in
16  the barrelhead.  They get the opportunity to pursue their claim
17  against the participating parties, or whoever their
18  non-diocesan defendant may be, in State Court.  And they also
19  have the opportunity to prove up their claim against the
20  Diocese.  So if they also succeed in proving liability against
21  the Diocese, then they are entitled to share in the lesser of
22  whatever the amount of judgment they get against the Diocese in
23  State Court, or the amount that they would be entitled to under
24  the allocation protocol, but limited to the percentage -- the
25  $50 million that the Diocese is contributing.  Right?

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 148 of 172

1          So if they had -- their claims will still get scored
2   through the allocation protocol.  And if their claim is
3   assigned -- and I'm just using random numbers -- 30 points, and
4   30 points equates to a $300,000 payout, if they successfully
5   litigate and establish liability against the Diocese, that they
6   would be entitled to that amount of payout from the limited
7   fund being contributed by the Diocese.  They're not entitled to
8   share in the settlement fund being put up by the participating
9   parties because they've opted out of that.  So that --
10  that's --
11          THE COURT:  Okay.  So that answers the Court's
12  concern.  It looked like they were being penalized that they
13  weren't sharing in the other Diocese -- the settling insurers
14  and all of those things.  They're still being involved in that
15  process.
16          MR. WALTER:  So they're able to share in the amount
17  being contributed by the Diocese, not -- if there are settling
18  insurers -- again, in order to settle with the insurers, we
19  need a release against those settling insurers.  Right?  People
20  that are opting out are not granting that release.  So we are
21  not -- at this point, the plan does not provide for them to
22  share in insurance settlement proceeds because they haven't
23  agreed to participate in the settlement.
24          THE COURT:  Okay.  And were you -- I read the omnibus
25  reply, that the plan does not extinguish or reduce the

1 non-settling insurers' contribution claims, if any. Is that --

2 did I read that correctly?

3      MR. WALTER: I believe that's right. I mean, so

4 the -- we don't think they have any, in the first instance,

5 but --

6      THE COURT: Whatever they are, they are, but --

7      MR. WALTER: Whatever they are, they are. I believe

8 it simply -- I believe it would be run through that judgment

9 reduction clause such that it would net out at zero, whatever

10 they may be. So to the extent there is a contribution claim, I

11 believe it would be whatever their liability to a claimant

12 would be after they've gone through the liability phase of the

13 trial and also the coverage phase, that that coverage liability

14 would be reduced by the amount of their insurance contribution

15 claim such that they're economically less in the same position.

16 That's the intent, at least.

17      THE COURT: Maybe I didn't put the question

18 correctly, because I just want to make sure -- so the plan

19 doesn't extinguish or reduce the non-settling insurers'

20 contribution claims, if any, through the channeling injunction

21 regarding participating parties -- that that does not apply to

22 the non-settling insurers? And I believe I'm taking that from

23 the reply, but I just -- I was not clear on --

24      MR. WALTER: So, Your Honor, I -- could you say that

25 one more time? I --

1          THE COURT:  Sure.

2          MR. WALTER:  -- just want to make sure I understand.

3          THE COURT:  The plan doesn't extinguish or reduce

4    non-settling insurers' contribution claims, if any, and that

5    the channeling objection regarding the participating parties

6    does not apply to them.

7          MR. WALTER:  Your Honor, can I just consult --

8          THE COURT:  Sure.  I realize that's a very technical

9    question.

10          MR. WALTER:  Yeah, I -- and I did not author the

11    response, so I --

12          THE COURT:  Understood.

13          MR. BAIR:  Your Honor could we take a crack at that?

14          THE COURT:  Sure, absolutely.

15          MR. BAIR:  Okay.

16          MR. WALTER:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          MR. BAIR:  Good afternoon, Your Honor.  Jesse Bair,

19    special insurance counsel for the Committee.  So before I get

20    to Your Honor's exact question, I did want to touch on

21    something that I think is important to the insurers' argument

22    about the contribution claim.

23          THE COURT:  Yes.

24          MR. BAIR:  As I read their brief, they don't appear

25    to be taking issue one way or the other with the opt-in,

1  opt-out framework.  That's in Footnote 1 of Certain Insurers'

2  omnibus objection.  It says they're not taking a position on

3  that.  But what their brief says is that they have a problem

4  with the treatment of their purported contribution claims

5  because they don't have an opportunity to manifest consent one

6  way or the other to that.

7          But they actually do in the plan, and that may be a

8  misunderstanding.  Under Section 12.2.2(b), the insurance

9  companies have an opportunity to object to the plan, and if

10 they do, they can opt out of having their insurance

11 contribution claims channeled to the trust.  So if they don't

12 want the benefit of the judgment reduction clause -- and I

13 think it is a benefit; it applies automatically -- they don't

14 have to have that.  They can opt out, and they can preserve

15 what we believe to be non-existent contribution claims against

16 additional insureds.  So they have a way around it.  If they

17 want to opt out, they can object to that plan on the basis, and

18 under section 12.2.2(b), they would preserve their insurer

19 contribution claims, if any.

20          THE COURT:  Thank you.  I assume none of these cases

21 have ever provided an insurance company with just a generic

22 opt-out form as opposed to requiring them to actually file a

23 confirmation objection?

24          MR. BAIR:  What was that, Your Honor?

25          THE COURT:  I said I assume there's never been a case

1  where they send a little opt-out -- even though it's not a

2  ballot -- to an insurance company to allow them to check the

3  box as opposed to an affirmative obligation to file an

4  objection?

5          MR. BAIR:  I --

6          THE COURT:  Never happened?

7          MR. BAIR:  I am not familiar with one, but

8  obviously --

9          THE COURT:  These are --

10         MR. BAIR:  -- they're uniquely situated.

11         THE COURT:  Yeah.

12         MR. BAIR:  They have excellent counsel, who are here

13 today in the room.  They're already, essentially, objecting to

14 this; so I'm sure they'd be able to, you know, manifest that

15 lack of consent if they needed to.

16         THE COURT:  Understood.  So -- understood and agreed.

17         MR. BAIR:  But -- thank you, Your Honor.

18         THE COURT:  Let me just check my notes here.  I think

19 that answers my specific questions, although I do have some

20 additional issues.

21         Mr. Donato, did you want to address any of the

22 objections?

23         MR. DONATO:  Listening to a lot of the carrier

24 objections -- as I indicated, we already heard these, and

25 you've already kind of ruled on them.  But now I understand

1 they put it in this in order to preserve the record or

2 something like that.  They might have put a note in there so I

3 didn't spend so much time reliving all this stuff.

4         Mr. Winsberg thinks it's a good idea -- let's just

5 put all the Parishes into a Chapter 11.  So as you observed,

6 and while we are hoping it doesn't have to happen, the

7 Rockville Center case is setting that up.  But as you observed,

8 they have rapid pre-pack rules.  These Parishes are supposed to

9 be in chapter for about 48 hours.  Whether that actually

10 happens or not is a different issue.

11         But of course, in Rockville Center, everybody's

12 kumbaya, right?  There's a global settlement.  So all this

13 is -- I mean, you know, as Trustee's objective -- but as far as

14 creditors, participants -- everybody's on the same table, you

15 know.  And we're involved in the hearing, so they're all

16 sitting at the same table.  So there's quite a bit of

17 difference.  And just to come up here and say, "I got an idea.

18 Why don't you just flush all the Parishes?" -- respectfully,

19 that's a -- for this argument is inappropriate at this time.

20         THE COURT:  While we're on that topic, Mr. Donato,

21 how do you respond to the situation -- or the issue raised in

22 terms of, Well, (A) I don't believe that we have an updated

23 list of participating parties.  I think that was actually in

24 accordance with a third amended plan; so the record is missing

25 that.  Everyone's kind of going under the assumption it would

1  be the same list -- that there's been no disclosure, even

2  though <u>Purdue</u> obviously put a wrinkle in that -- that there

3  needs to be a disclosure of the contributions of those hundreds

4  of participating parties who are supposed to be getting a

5  release so a consideration analysis can be done -- and the fact

6  that their insurance -- I can't direct that their non-541

7  property gets assigned to the trust.

8          MR. DONATO:  Right.  Okay.  So let's kind of unpack

9  that because we had -- you had three different questions, I

10 think.

11         THE COURT:  I think so too.

12         MR. DONATO:  Okay.  So, okay.  So your first

13 question -- let's just go over that, just so I can make sure I

14 answer it.  What exactly are you asking me?

15         THE COURT:  I assume you're going to file an updated

16 list or --

17         MR. DONATO:  Yes.

18         THE COURT:  Okay.

19         MR. DONATO:  So we have spent quite a bit of time

20 finalizing the list.  It is substantially the same.  You know,

21 what happens in these things -- and you have like closed

22 Parishes -- you know, Parishes that were merged, you know, 40

23 years ago -- you know, that kind of thing.  And so there has

24 been a challenge from the standpoint of tracking the history

25 and making sure that we got all the proper protected parties on

1  the list.  We have, I believe, completed it.  It absolutely

2  will be filed well before any solicitation so that everybody

3  will know all of the parties that will be on the Exhibit A --

4  protected parties.  But I'm happy to report, it's substantially

5  the same as the prior one that we filed, I think, with the

6  third amended plan.

7          THE COURT:  And then there was a indication that

8  there should be a list of what everyone's contributing,

9  especially if there's going to be any type of a contractual

10  analysis --

11          MR. DONATO:  Right.

12          THE COURT:  -- under New York state law.

13          MR. DONATO:  I don't think it's relevant anymore.  I

14  think it's simply:  What is the proposal and what did the --

15  each of the survivors do in regard to their right to accept or

16  not.  So it's binary.  I think -- consider -- when I read

17  Travelers' objection, I, frankly, thought they were talking

18  about, you know, pre-<u>Purdue</u> time.  I don't think -- at one

19  time, we were all geared up to do that because we --

20  absolutely.  And we -- as I said, I think we're all going to be

21  here today for the confirmation hearing.

22          I don't think that's relevant anymore.  I think that

23  the plan sets forth the proposal.  The survivors make their

24  determination.  It's either up or down.  If they -- you know,

25  they -- either participating or not participating.  I think

1 we're -- I think consideration is not relevant anymore.

2      THE COURT:  Okay.  And -- well, I've forgotten my

3 third question.  Oh, the assignment --

4      MR. DONATO:  So did I.

5      THE COURT:  I know.  Sorry.  The assignment of the --

6      MR. DONATO:  Yes.

7      THE COURT:  -- participating parties' insurance

8 rights, claims, policies, whatever the --

9      MR. DONATO:  Yes, yes, yes.  Okay.  So this is one of

10 those redos.  We've covered this only about 15 times, and

11 Mr. Roten knows it.  We're not assigning the policies; we're

12 assigning the right to the claims.  Once the claims are -- once

13 they are liquidated, we have the ability -- there's no

14 question -- then we have the ability to assign those claims.

15 We're not assigning the insurance policies.  The insurance

16 policies are not executory.  You made that determination when

17 you overruled this six months ago.  So same answer today.

18      THE COURT:  But those will be voluntary assignments

19 by the participating parties as opposed to the Court blessing

20 those without jurisdiction over --

21      MR. DONATO:  If there's a -- if the Court has an

22 issue concerning whether it has the authority to do so,

23 absolutely.  Then it says -- it's a contractual transfer.  I

24 totally agree.

25      THE COURT:  Thank you.

1          MR. DONATO:  So I don't really have much else to say.

2    I mean, I think, frankly, whatever issue I wrote -- I talk

3    about, you'll have already heard 25 arguments on it.  I just

4    point out that regurgitating old objections is just not

5    appropriate this -- at this time.  And that's really all I

6    have.  It's time.  January '21, '22.  It's time.  We've got to

7    go to confirmation.  Thank you very much.

8          THE COURT:  Thank you.  Sorry, Mr. Donato.  One more

9    question.

10         MR. DONATO:  Yep.

11         THE COURT:  Is it the debtor's intention that the

12   payment -- that the liabilities and defense costs for

13   non-participating abuse claims are being paid from the

14   post-effective date cost reserves?

15         MR. DONATO:  I have to check on that.

16         THE COURT:  Okay.  I don't think that's clear from

17   the -- all right.

18         It looks like the Committee may have an answer to

19   that.  Go ahead.

20         MR. DONATO:  Okay.  Good.

21              (Counsel confer briefly)

22         MR. DONATO:  Go ahead.

23         MS. CHAMPION:  You want me to get it?  I'll take a

24   stab at answering that.

25              (Counsel confer briefly)

1     MR. WALTER:  Your Honor -- Your Honor, yes.  The --

2 and I've -- I'm going to forget the name of the -- or the fine

3 term, but I -- you -- post-effective date --

4     THE COURT:  Cost reserve.

5     MR. WALTER:  -- cost reserve -- is it --

6     MR. WINSBERG:  I think it's just for coverage.

7     MR. WALTER:  -- is intended to cover -- yes, any

8 pre-conditions to coverage that need to be satisfied as we go

9 through with the litigation post-confirmation.

10     THE COURT:  Okay.  Thank you.

11     MR. DONATO:  That's all I have, Your Honor.  Thank

12 you.

13     THE COURT:  Thank you.

14     MR. WALTER:  Thank you, Your Honor.

15     THE COURT:  Ms. Champion.

16     MS. CHAMPION:  Thank you, Your Honor.  Erin Champion

17 for the United States Trustee.  I just wanted to clarify

18 something that Mr. Walter raised with respect to the Tonawanda

19 Coke case and the general obligations law and the State Court

20 case that was cited in their papers.  Your Honor, the point of

21 Tonawanda Coke is that you have to look to state law.  And

22 state law requires acceptance of an offer.  And if you don't

23 have a duty, which -- a duty to speak -- and that's the

24 distinction here.  In this case, there is no duty to vote or a

25 duty to speak; so you can't have acceptance by silence.  The

1  case that they cite, <u>Russell v. Raynes Associates</u>, says,

2  "Although generally intent to accept an offer may not be in

3  inferred from silence.  Party silence will be deemed an

4  acquiescence where he or she is under a duty to speak."

5       But we don't have that here.  And that's really kind

6  of the point of <u>Purdue</u> also, because if a non-voting creditor

7  can be bound by a plan vis-a-vis debtor, that's under the Code.

8  But nothing in the Code points to silence or failure to vote as

9  sufficient to adjust property rights between a non-debtor and

10  third parties.  So I think that's the key distinction that I

11  just wanted to make with <u>Tonawanda Coke</u> and the case that was

12  cited by Mr. Walter and the general obligations law.  There

13  really is no duty here to vote.

14       THE COURT:  Thank you.

15       MR. WALTER:  Your Honor, may I just address that

16  briefly?

17       THE COURT:  Certainly.  And then we'll hear from the

18  insurers.

19       MR. WALTER:  Your Honor, the whole point here is that

20  where you have an agent acting on behalf of its principal, and

21  that agent has acted and has essentially assented through the

22  Committee to these releases, that it is incumbent upon the

23  principal to then take an affirmative action to reject that

24  action by the agent.  And that is the duty here.  That's our

25  argument there.  Thank you.

1        MR. WINSBERG:  Real briefly, Your Honor.  Harris

2   Winsberg on behalf of Interstate.  I appreciate Mr. Bair's

3   pointing to that provision.  I had passed over that originally,

4   that 12.2.2(b), but then I went back and I looked at it, and I

5   think we did look at this provision.  And maybe it's an issue

6   of drafting or not, but it -- that provision references the

7   injunction -- 12.21 and 12.13 is what it references.  But it

8   doesn't reference, among other things -- and again, this is not

9   exhaustive -- 12.7, which is a release for channel claims.  I

10  just wanted to point that out to Your Honor.

11       THE COURT:  Thank you.

12       MR. WINSBERG:  Thank you.

13       THE COURT:  Is there anyone else who wishes to be

14  heard?

15                  (No audible response)

16       THE COURT:  Anyone on the phone?

17                  (No audible response)

18       THE COURT:  Okay.  We're going to take a 20-minute

19  recess, and we will regroup.  It is about 2:50 right now; so we

20  will regroup at 3:10.

21       THE CLERK:  All rise.  The court will take a brief

22  recess.

23       (Recess at 2:47:19 p.m./Reconvened at 3:12:23 p.m.)

24       THE CLERK:  All rise.  You may be seated.

25       MR. ROBERT KUGLER:  I think the sound is muted again.

1          THE COURT:  The sound is muted.  He thinks the sound
2    is muted.

3          THE CLERK:  Continuing with the Roman Catholic
4    Diocese of Syracuse, New York, Case 20-30663.

5          THE COURT:  Thank you.  After the brief recess, the
6    Court is going to take the matter under advisement and have a
7    telephone conference one week from today, at which time the
8    Court will issue its decision and also be prepared to have a
9    written decision in that regard at that time as well.

10          The hearing -- that's a regular Chapter 7 and 11
11    calendar in the morning, and we can do that at one o'clock in
12    the afternoon telephonically only; so there's no need for
13    anyone to travel, because there won't be any further oral
14    argument.  It will just be for the Court's decision in that
15    regard, and then we'll figure out what our next steps when the
16    Court issues its decision.  Thank you.

17          Was there anything further?

18          Oh, Mr. Kugler?

19          MR. ROBERT KUGLER:  Your Honor there's -- earlier, I
20    mentioned the desire of Dr. Kevin Braney to share kind of the
21    survivor perspective of the Court.  Is this a good time now?  I
22    know we're all tired.

23          THE COURT:  Well, it's not that it's not a good time.
24    These proceedings are being recorded, and generally, then, the
25    testimony would -- everybody would have to be live; there

1 wouldn't be any telephonic.  The Court conference rules require

2 that if there's actually testimony, that there's -- no

3 telephonic appearances are permitted; it all has to be in

4 person.  So that was why I kind of hesitated before we circled

5 around.  I know, Mr. Kugler, we've had conversations about

6 having some testimony in the context of the confirmation

7 hearing, because those would be specifically in person, without

8 telephonic appearances.  And the Court just doesn't want to run

9 afoul of any of the Conference rules, so to speak, but

10 certainly understands that Dr. Braney is present, and obviously

11 supports all of your presentation today.

12         And also, quite frankly, we haven't given the other

13 side an opportunity if they wanted to weigh in on hearing that

14 or not.  There's a lot of differing views as to whether or not

15 that should be permissible and the vehicle for that.  So --

16         MR. ROBERT KUGLER:  Yeah.  I understand, Your Honor,

17 and thank you for that.  I just want to make clear, it's not

18 really intended to be testimony.  It's not meant to be part of

19 the record.  It's not meant to be evidence.  It's not meant to

20 be anything other than to help the Court and, frankly, all the

21 parties understand the perspective of survivors at this stage

22 of the -- but I'm not quarreling with your ruling.

23         THE COURT:  Well, if it's not -- if it's not

24 testimony and it's just in lieu of an affidavit in support --

25 or actually, it wouldn't even be an affidavit; that would be

1 somewhat testimony.

2          MR. ROBERT KUGLER:  Yeah.

3          THE COURT:  Does anyone have any objection to a few

4 minutes from Dr. Braney?

5          MR. WALTER:  We do not.

6          THE COURT:  Any of the insurers?  It's not for

7 evidentiary purposes or --

8          MR. ROTEN:  No, Your Honor.  If -- we don't have

9 objection.

10        THE COURT:  Recognizing that it's not meant to be

11 anything but a support of the disclosure statement approval.

12        Certainly.  So you may call Mr. -- Dr. Braney.

13        MR. ROBERT KUGLER:  Would you like Mr. Braney to sit

14 up here?

15        THE COURT:  I would.  Yes, please.

16        MR. ROBERT KUGLER:  Okay.  We're still going to

17 record this.  Yes.  This --

18        Yes, please.

19            (Participants confer briefly)

20        THE COURT:  Did you have a prepared statement?

21        DR. BRANEY:  Yes, I do.

22        THE COURT:  Certainly.  Please proceed.

23        DR. BRANEY:  Thanks for the opportunity, Your Honor.

24 I appreciate it.  I know it's been a long day for everybody,

25 and I'll keep my comments brief.

1          THE COURT:  Thank you.

2          DR. BRANEY:  You're welcome.  Thank you.

3          First, I just want to acknowledge two things.  One,

4   this statement -- this brief statement that I'm about to read

5   has had input from Kevin Lawrence, our Committee treasurer, and

6   Chris Simons, vice chair as well.  So they're reflective from

7   our Committee, and I wanted to acknowledge that.  And I also

8   wanted to acknowledge as well that -- there's just two spots in

9   here that I wanted to acknowledge they're reflective of my

10  prior experiences as a survivor, not all specific to Bishop

11  Lucia, who I found to be incredibly hopeful and compassionate

12  and thoughtful.

13         So very briefly, obviously, I was sexually abused in

14  this Diocese.  I'm also a father of Jack, Ali, Trigg, and,

15  Ethan, as I know many of my fellow survivors are as well, as

16  parents, grandparents, and what have you.  And this

17  Committee -- I just wanted to take a moment to acknowledge your

18  work and the work of everyone and all the professionals in this

19  room and the unique position that's before us to resolve a

20  really hard, complex bankruptcy case.

21         And I just as well wanted to acknowledge the fact

22  that we're all here today because of the failure of leaders

23  from multiple institutions all over Syracuse community.  And

24  they allowed it and enabled it, and the trauma that came from

25  it to metastasize.

1          For the 400 creditors, we've been patient, but -- I
2  know I'm not supposed to say this, honestly -- but we're tired.
3  And we recognize everyone's a professional in this room and has
4  a job to do, but there are survivors out there who can't even
5  go to their mailbox for fear of what might be in there, because
6  they haven't told their spouses or partners about their abuse,
7  and that's why they can't vote.  We're a little tired of all
8  the processing.  We recognize that's the job of the Court and
9  the experts and the legal folks in this room.  That's what you
10 guys do, and you do it extremely well.  As it's been said
11 several times today, you're all brilliant and exceptional at
12 what you do, and you are.  But we're tired.  And we just wanted
13 to take a moment to step back and just name four things that
14 I'll share, and then I'll be done.

15          Institutions are the building blocks of civil
16 society.  They're crucial to our well-being, and we depend on
17 our government, courts, police, churches, schools, hospitals to
18 protect us and enrich our lives.  Betrayal comes when these
19 institutions don't protect us from harm, or enable the harm.
20 And it's never an individual.  It's the institution that
21 allowed it to happen.  There's a lot of individuals who want to
22 do the right thing.  The unbearable pain and loss that I can't
23 even quantify in this moment -- it's the foundation of this
24 case, because we're all so different -- has been carried for
25 decade after de decade, and it lives with all of our family,

1 friends, children, and neighbors.

2        A lot of people failed, and it's not -- I'm not here
3 to talk about that.  And I'm not here to talk about -- maybe
4 someday we can talk about how -- and it doesn't just happen
5 with the church, but at times, the victim becomes the offender.
6 The real victim becomes the person who's putting forward a
7 fraudulent claim or an invalid claim.  And those words are hard
8 to hear from the my own stories let alone the stories of all
9 the people.  And I'm fortunate to represent -- and I'll just
10 kind of cut to the end of this, I guess.

11        The physical, emotional, and spiritual damage that's
12 out there -- like I said, it's in our -- my brother, my
13 sisters -- and I know my Committee members have talked about
14 this, how it lives in our families and our friends and our
15 neighbors.  And that secondary trauma is pervasive.  And I want
16 to do these things without ever tearing up because I want a
17 soldier on.  But I -- when I'm in this room, I live in the
18 present here with all of you, but I also live from in -- what
19 happened in 1989 and 1990, when I was a student at Manlius High
20 School and at St. Ann's Church.  And I have been -- this is the
21 first time after over a decade -- when I first met the Diocese
22 to put forward a complaint in 2013 that I've had a chance to
23 formally speak.  So for that, I'm grateful.

24        Just please know that as you're thinking about
25 calendars and relief and what people need, the Jesuit Catholic

<u>Magazine</u> wrote the following: "Known survivors of sexual abuse

in childhood or adolescence are two to four times more likely

to complete suicide.  The likelihood of suicide is correlated

to early sexual trauma, when the abuse is repetitive.  And I

just want to acknowledge the fact that the stuff that we're

trying to hold on to as we get through this case and it runs

its court (sic) is really painful, and it carries a huge burden

on all of us.  And for us, we're still working on finding the

version of God that we all hold so dear, that is that

protective factor in our lives that somehow some -- for many of

us, we lost that.

        And I'd -- the third thing was just to make mention

of institutional courage.  This is really harder than I thought

it would be.  I'm so sorry.

        THE COURT:  No apology.

        MR. ROBERT KUGLER:  You're doing good.

        THE COURT:  Yep, you're doing great.

        DR. BRANEY:  The commitment to seek the truth and

engage in moral action, despite unpleasantness, risk, and

short-term cost, is institutional courage.  It's a pledge to

protect and care for those who depend on the institution.  It

is a compass orientated to the common good of individuals and

institutions in the world.  It is a force that transforms

institutions in more accountable, equitable, and effective

places for everyone.  It's my hope, it's the Committee's hope

1 that somehow all the institutions that are in this room today
2 come together to help us move forward.

3      We will never be done with our drama.  We will get
4 better.  I have complex PTSD.  I've gotten a lot better, but
5 it's still a part of my life journey forever, and it doesn't go
6 away.  And this Committee is proud of who we are.  We've never
7 talked about "I" or "me"; always "us" and "we."  And we're
8 Committee sometimes we think people haven't counted on.  We're
9 in this for the long haul.  And if we have to move forward and
10 find ourselves in a space in a courtroom where we have to start
11 over -- maybe -- I don't know.  I don't understand everything
12 that's happened today.  We'll do that.  And it's not because of
13 this Court.  This is just a hard thing to do.  It's a hard
14 thread and a hard thing to do to get through this.  And that's
15 okay.

16      Many of us want to be in court, in front of a jury to
17 tell our story.  We're tired of being told that we lied and we
18 made it up or whatever that might be, and we'd love to have the
19 opportunity to have a jury hear our case.  We're not afraid of
20 the challenges that lay ahead.  We're a resilient group, and we
21 are determined to make our fellow survivors whole.  We don't
22 want them to feel hollow.  And I'm not saying they do today.
23 We're just tired.  But that doesn't mean we're not resilient.

24      And lastly, I guess maybe two things.  One is Marcus
25 Aurelius once said, "Often, injustice lies in what we aren't

1  doing, not only in what we are doing." And we survivors have
2  walked for a really time -- a long time with God alone while
3  historically being shunned by our church and our community.
4  And I know that's changing, but it's time to get to walk in the
5  light. And if we need to fight more, we will. We will. But
6  we don't want anyone to walk away from this journey that we've
7  all been on feeling like they weren't seen, they're not whole,
8  and justice wasn't served. So thank you. I appreciate your --
9  the opportunity to provide a brief reflection.

10            THE COURT: Thank you.

11            DR. BRANEY: Thank you.

12            THE COURT: Thank you very much. And thank you

13  for -- to your council members as well, who contributed to that

14  and who have participated both in person and on the phone

15  through all these proceedings. I know that they can be very

16  difficult, and certainly from a non-lawyer. They're difficult

17  for the lawyers in the room --

18            DR. BRANEY: Understood.

19            THE COURT: -- who, as you said, do a wonderful job.

20  And I can understand the frustration. So thank you.

21            DR. BRANEY: Thank you, Your Honor. I appreciate it.

22            MR. ROBERT KUGLER: Thank you, Your Honor.

23            THE COURT: Thank you, Mr. Kugler.

24            Is there anything else?

25                      (No audible response)

1           THE COURT:  Okay.  So we'll have a telephonic

2   conference at one o'clock next Thursday.  I look forward to

3   seeing -- speaking with everyone.

4           MR. DONATO:  Thank you, Your Honor.

5           THE COURT:  Thank you.

6           THE CLERK:  All rise.  Court is adjourned.

7               (Proceedings adjourned at 3:27:05 p.m.)

8                       * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2-19-20905-PRW,   Doc 3116-7,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit G, Page 171 of 172

**C E R T I F I C A T I O N**

We, KAREN K. WATSON and KAREN SCHOUEST, court-approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Karen K. Watson

KAREN K. WATSON


/s/ Karen Schouest

KAREN SCHOUEST

J&J COURT TRANSCRIBERS, INC.          DATE:  November 13, 2024