# EXHIBIT I

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 20-12345-mg

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6

7  THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

8

9      Debtor.

10 - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11          United States Bankruptcy Court

12          One Bowling Green

13          New York, NY 10004-1408

14

15          Thursday, February 8, 2024

16          9:32 AM

17

18

19

20

21 B E F O R E :

22 HON. MARTIN GLENN

23 U.S. BANKRUPTCY JUDGE

24

25 ECRO: KAREN

1    HEARING re Hybrid Status Conference Re: Claim(s) of Scott

2    Davidson

3

4    HEARING re Hybrid Disclosure Statement Hearing. (Doc ##

5    2828, 2829, 2834, 2855 to 2859, 2867, 2873, 2874, 2885,

6    2697, 2707, 2752, 2754, 2755, 2786 to 2790, 2793, 2794,

7    2812, 2813, 2818, 2825, 2826, 2891, 2892, 2896, 2897

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    JONES DAY

4         Attorneys for Debtor

5         250 Vessey Street

6         New York, NY 10281-1047

7

8    BY:  ANDREW M. BUTLER, ESQ.

9         CORINNE BALL, ESQ.

10        BEN ROSENBLUM, ESQ.

11

12   PACHULSKI STANG ZIEHL JONES LLP

13        Attorneys for Official Committee of Unsecured Creditors

14        780 Third Avenue, 34th Floor

15        New York, NY 10017

16

17   BY:  KAREN B. DINE, ESQ.

18        JAMES I. STANG, ESQ.

19

20

21

22

23

24

25

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorney for the United States Trustee

3        One Bowling Green, Suite 739

4        New York, NY 10004-1408

5

6   BY:  GREG ZIPES, ESQ.

7        MARK BRUH, ESQ.

8

9   ALSO PRESENT:

10       SCOTT DAVIDSON

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2              CLERK:  All rise.

 3              THE COURT:  Please be seated.  Good morning.

 4              MR. DAVIDSON:  Good morning.

 5              THE COURT:  All right.  The first matter we're

 6    going to take up is a continuation of the hearing with

 7    respect to Mr. Davidson.  Why don't you come on up, Mr.

 8    Davidson.  You can sit.  Go ahead.  Sit next to Mr. Butler.

 9    So first, Mr. Butler, maybe you can tell me what you've

10    learned since we were here.

11              MR. BUTLER:  Good morning, Your Honor.  Andrew

12    Butler, with Jones Day, for the debtor.

13              THE COURT:  Good morning.

14              MR. BUTLER:  Your Honor, we spoke with the claims

15    agent in this case shortly after the hearing on Tuesday, and

16    what happened was when they received what is now Claim

17    Number 20079, it included with it as an attachment a proof

18    of claim.  They filed that attachment, which is now Claim

19    Number 20078 as its own separate proof of claim.

20              So we've spoken with Mr. Davidson.  From the

21    debtor's perspective, we've filed an objection to a

22    duplicate proof of claim, and so we've told him, whether

23    he'd like 90182, what was filed by Mr. Garabedian, or 20078,

24    that was filed as an attachment to his (indiscernible) proof

25    of claim, we're happy for him to have either of them.  We
```

1  just need to decide which one is which.

2         We've spoken with Mr. Davidson yesterday about

3  that.  Ms. Dine and I did by phone.  We don't have a

4  decision yet from Mr. Davidson.  We've offered him an amount

5  of time to make that decision, and I believe he'd like to

6  address Your Honor.

7         THE COURT:  Sure.  Thank you very much, Your

8  Honor.

9         Come on up to the microphone.  Good morning, Mr.

10 Davidson.

11        MR. DAVIDSON:  Good morning, Judge.

12        THE COURT:  So tell me what you want to do.  And

13 if you haven't made your mind up yet, I'll give you a couple

14 of days to figure it out.

15        MR. DAVIDSON:  Well, I don't think a couple of

16 days is going to make much of a difference.  I really don't

17 know from a legal standpoint what the difference is between

18 the two claims.  However, what I do know is that the 12-page

19 proof of claim dated 7/15/21, certified mail

20 7019297000157394862, which I sent to Mr. Garabedian on that

21 same date, July 15, 2021, was sent because Mr. Garabedian

22 told me that this is the way that we proceed.  Sign the

23 document, then we proceed.

24        I signed the document.  I sent it back to Mr.

25 Garabedian.  Mr. Garabedian is the one who generated that

1  document.  I did not generate it.  Based on that

2  information, Mr. Garabedian told me that the claim number

3  assigned to that original proof of claim, not the one

4  wrongfully generated by Epiq, was Claim Number 90182.  This

5  is the claim I would like to remain.

6          THE COURT:  That you would like to what?

7          MR. DAVIDSON:  To remain.

8          THE COURT:  Okay.  That's the original claim?

9          MR. DAVIDSON:  The original claim, which Mr.

10  Garabedian filed.  He received from me and signed for it on

11  the 19th of July.

12          THE COURT:  Okay.  Well, let me just ask, because

13  I'm fine with your decision, okay?  What I saw as -- and I

14  understand Epiq shouldn't have done it without at least

15  talking to someone first.  They did.  I understand why they

16  did it, because you had attached the report for yourself to

17  the claim you filed for your brother, your deceased brother.

18          MR. DAVIDSON:  I did.

19          THE COURT:  So I think this was an honest mistake

20  on their part that has led to this confusion.  Okay.

21          MR. DAVIDSON:  I agree.

22          THE COURT:  Let me inquire.  So at this point, you

23  know, the report -- the medical report is -- the debtor has

24  it, the committee has it.  It's not public, but they have it

25  because you attached it to your brother's -- to the claim

Veritext Legal Solutions
212-267-6868                                          516-608-2400

1    you were filing on behalf of your brother.

2              MR. DAVIDSON:  Yes.

3              THE COURT:  Okay.  You told me earlier this week

4    that you disagreed with Mr. Garabedian as to whether you

5    should use that report.  You indicated you wanted to.  Okay.

6    It's not attached to your original claim.

7              MR. DAVIDSON:  No, it's not.

8              THE COURT:  So I'm fine whichever you choose.  If

9    you use the original claim that's without the report, if

10   it's the later filed claim that's with the report.  I didn't

11   see any difference.  I didn't study every line and page.  It

12   didn't look to me there was any difference in the claims

13   other than the attachment of the report.  Here's what I

14   would suggest.  You talk to Ms. Dine and Mr. Butler

15   separately or together --

16             MR. DAVIDSON:  Together.

17             THE COURT:  And you decide.  Whatever that

18   decision is, maybe I'd ask Ms. Dine just prepare a

19   stipulation that whichever one he chooses, that's the

20   surviving claim.  Okay.  There's only going to be one claim.

21   You pick which one, okay?  You're telling me now you want it

22   to be your original claim.  That's fine with me.  But I

23   think the way to do that is just a stipulation.

24             Let me just say I am going to grant Mr.

25   Garabedian's motion to withdraw, and that's granted and I'll

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,   Description: Exhibit W   Page 9 of 240

1    enter an order today doing that.  With respect to that, you

2    need to decide whether to find new counsel.  Okay.  I think

3    one of the things that was made clear on the record earlier

4    this week, I wanted to be sure that you weren't prejudiced

5    by Mr. Garabedian saying that, well, he has an attorney's

6    lien on -- if you have it by settlement or judgment,

7    however, if you recover, he has no claim to any of the

8    amounts that you recover.  If you retain new counsel, you'll

9    have to do an engagement with them.  But my suggestion is

10   talk with the committee's counsel before you do that.  But

11   the one thing, I just want the record in this case clear as

12   to which your claim is, okay?

13             MR. DAVIDSON:  Okay, sir.

14             THE COURT:  All right.

15             MR. DAVIDSON:  Whenever I speak with the

16   committee, should opposing counsel be present?

17             THE COURT:  They don't have to be.

18             MR. DAVIDSON:  Oh, okay.

19             THE COURT:  I mean, the committee represents the

20   unsecured creditors.  But the survivors --

21             MR. DAVIDSON:  Yes.

22             THE COURT:  -- are unsecured creditors in the

23   case.  While you individually are not represented by the

24   committee, they're more aligned with your interests than the

25   debtor is.  I mean, Mr. Butler's being entirely fair about

1  it, and I appreciate his having checked out what happened so

2  we got to the bottom of that.

3            MR. DAVIDSON:  Yes.

4            THE COURT:  Okay.  So I would just ask, Ms. Dine,

5  whatever Mr. Davidson's decision is, just put it in the form

6  of a stipulation, okay?

7            MS. DINE:  Your Honor, Karen Dine, Pachulski Stang

8  Ziehl & Jones, on behalf of the committee.  My only question

9  on that is a slightly procedural one, given that the first

10  claim was disallowed by order --

11            THE COURT:  Well, just put in -- vacate the order

12  disallowing that claim as a duplicate claim --

13            MS. DINE:  -- just put in it as vacated.  Okay.

14            THE COURT:  Whichever, so there's one claim.

15            MS. DINE:  Right.  I just wanted to ask

16  procedurally how you wanted us to address that.

17            THE COURT:  Yeah, and if he decides that he wants

18  that original claim, we'll just vacate the expungement of

19  his duplicate claim and the later filed claim would just be

20  a nullity.  Okay?

21            MS. DINE:  We're happy to assist Mr. Davidson.

22            THE COURT:  All right.  Thank you very much, Mr.

23  Davidson.

24            MR. DAVIDSON:  Thank you, sir.

25            THE COURT:  Okay.  All right.  The court is going

1    to be in recess until 10:00 for the scheduled disclosure

2    statement hearing.  You're welcome to stay or leave,

3    whichever you choose, Mr. Davidson, okay?

4                MR. DAVIDSON:  Yes.

5                THE COURT:  All right.  I'm glad we got to the

6    bottom of what happened at least resolved now for the day,

7    okay?  All right.  So the court will be back at 10:00

8        (Recess)

9                CLERK:  All rise.

10                THE COURT:  Please be seated.  Good morning,

11    everyone.  We're here in the Roman Catholic Diocese of

12    Rockville Centre, New York, 20-12345.  This is the hearing

13    with respect to the disclosure statement.  So I received a

14    lot of paper, including some very recently.  First, somebody

15    on behalf of the debtor, just give me an update before we

16    start going into the disclosure statement itself.  I don't

17    know who wants to do that.

18                MS. BALL:  Good morning, Your Honor.  Corinne Ball

19    of Jones Day, on behalf of the debtor.

20                THE COURT:  Good morning.

21                MS. BALL:  Well, Your Honor, cutting to the chase

22    and the reason for all the paper, we and the committee very

23    carefully complied with your order of January 18.  I think

24    where we are now, we have limited the disclosure issues, we

25    have limited the disagreements and maximized the agreements

1    on the solicitation motion and yesterday Your Honor should

2    have received the committee's letter.

3              THE COURT:  I did.

4              MS. BALL:  We saw it slightly before then, just

5    the evening before.  So depending on what happens today,

6    Your Honor, I think the fourth amended disclosure statement

7    that was filed -- excuse me, Your Honor, that was filed on

8    February 6th at Docket 2885 is what we're working from.  I

9    would only stop to point out to Your Honor that all the

10   exhibits, save a new Exhibit 7, are appended to the

11   disclosure statement that we filed on the 29th --

12             THE COURT:  And I brought that out.

13             MS. BALL:  -- which is Docket Number 2858.  But I

14   think that the committee has also responded, Your Honor, to

15   your order of -- your order of January 30 regarding their

16   position in another case.  They filed their response

17   February 1, essentially pointing out that the committee

18   favored procedures that supported litigation against the

19   debtor and the trust by survivors, but not litigation

20   brought by or on behalf of the debtor or the trust against

21   survivors, which I think is reflected in the TD -- what

22   we'll call the trust distribution procedures, or TDPs, of

23   the case to which Your Honor referred, the open diocesan

24   case that is in Rochester.

25             THE COURT:  I'll make no secret, Judge Warren and

1    I speak to each other from time to time.  So that's how I

2    first became aware of what appeared to be the committee's

3    support for provisions in the plan in Rochester, which it

4    was opposing here.

5            MS. BALL:  Your Honor, it's interesting.  If we

6    would just take a step back and probably the most relevant

7    open diocesan cases, which have been a source of concern for

8    us and a great contributor to our plan structure, are

9    clearly Rochester, Syracuse and Camden.

10           I stop there, Your Honor, to say, each one of

11   those, as much or more than a year ago, and all of them are

12   older or the same day as this case, reached an agreement

13   with the committee on terms of the plan.  Since that time,

14   we've had a decision in Camden, we've had several

15   adjournments in Rochester and we are expecting an opinion

16   from Judge Kinsella in Syracuse.  Essentially, those three

17   cases are mired in litigation, primarily with the insurers -

18   -

19           THE COURT:  Yeah.  I mean, one of the --

20           MS. BALL:  -- regarding the trust distribution

21   procedures to be used in claims.

22           THE COURT:  Sure.  But one of the big differences

23   I see is settlements with insurers, not all of them, but

24   some of them -- here we don't have any -- makes a big

25   difference.

Veritext Legal Solutions
212-267-6868                                                          516-608-2400

1          MS. BALL:  Your Honor, it's very interesting.  In

2     each of those cases, the committee reached an agreement with

3     the debtor, in fact, in two of the three leaving behind a

4     deal with the insurer, which were the facts of Rochester and

5     Camden, to reach a deal with the committee.  No deal with

6     the insurer was reached until after the new plan with the

7     new trust distribution procedures were filed.  In that case,

8     after continuing litigation, particularly in Rochester, they

9     were able to get the support of some, but not all the

10    insurers.

11          THE COURT:  Was there one -- one insurer --

12          MS. BALL:  That was not the case in Syracuse or

13    Camden.

14          THE COURT: -- one insurer that they haven't been

15    able to get on board?

16          MS. BALL:  Yes, and unfortunately, it happens to

17    be the largest and the primary, as I understand the CNA.

18    But critically, the sequencing -- we'll deal with the

19    insurers later.  We're in the same place.  But we would not

20    like to be mired in litigation over the bias or unfairness,

21    or the lack of review of fees or claims in our trust

22    distribution or other procedures.

23          Not surprisingly, Your Honor, there is not

24    uniformity of committee counsel in all those cases.

25    Pachulski is in Rochester.  Special insurance counsel is

1    also a special insurance council of the committee in two of

2    the three cases, Syracuse and Rochester.  But what's

3    interesting is some of the same state court counsel who Mr.

4    Stang refers to as having significant number of claims is

5    present in all three cases.  So the continuity in process

6    and the approach to the TDP shouldn't be a surprise.

7            THE COURT:  But I also gather from, I think, what

8    Judge Warren told me, there has not been a stay in place on

9    state court litigation in Rochester for some time.  But

10   nobody seems anxious to push ahead with state court

11   litigation on behalf of claimants in Rochester.

12           MS. BALL:  That's our understanding, Your Honor.

13   Also, while objections to claims were filed in Rochester,

14   they were never prosecuted.  So both sides stood down.  So

15   litigation continues.  And what I hear from our client is,

16   please, do something.  We don't want to be like Rochester,

17   Camden or Syracuse.

18           THE COURT:  Well, where you may be is without a

19   bankruptcy case and facing a lot of litigation in state

20   court.  That's where you may wind up being.  I think I

21   commented that one or two drafts ago, you included the

22   toggle to dismissal if you didn't get the requisite votes.

23   And I was chagrined when the committee objected to that

24   after having made the motion to dismiss the case.  You've

25   now changed that it's not automatic.  You have to make a

1   motion.

2           MS. BALL:  We have taken on that burden, Your

3   Honor.  We still believe --

4           THE COURT:  Well, it's not much of a burden,

5   frankly.  I mean, as frustrated as I've been in this case, I

6   think I've made clear I'm not going to sua sponte dismiss

7   the case.  If somebody moves to dismiss, and whether or not

8   it's opposed, I mean, if it's a meritorious motion, that'd

9   be the result, but I'm not going to do it sua sponte.  So I

10  don't know whether we're all engaged in a dance here as to

11  how this case will proceed.

12          Let me just say generally, and I don't know

13  whether you're going to argue the disclosure statement

14  issues or one of your colleagues is going to stand to do

15  that.  I am very pleased that I think that the principal

16  concerns that I raised at the last hearing, to have a plain

17  English explanation of what was really happening here, I

18  think you've largely accomplished that.  I still have a

19  problem with the ballot.  I think the U.S. trustee has

20  objected to that.  Let me make clear by these preliminary

21  comments, I'm not saying that the disclosure statement as is

22  written right now is going to be approved.  But you've made

23  really substantial progress.  And I appreciate, in my view,

24  the committee was professional and responded to my direction

25  to do that, to provide comments, most of which have been

1   accepted.  This last iteration, in fact, after they filed an

2   objection to what you had filed, you incorporated most of

3   what they did.

4           MS. BALL:  We did.

5           THE COURT:  That's frankly how the process, at

6   least of the disclosure statement, is supposed to work.  So

7   I'm appreciative of all of you for that.  There are a couple

8   of -- and I don't know whether you want to deal with this or

9   one of your colleagues.  There's a couple of things I don't

10  understand about how this process would unfold if the

11  disclosure statement is approved, solicited and somehow you

12  got the votes, which is going to be quite an uncertain task.

13          But assuming all that happened, someone tell me

14  how the claims against the diocese-related parties who are

15  release parties would be dealt with in administering this

16  case.  I ask that because you filed a lot of claims

17  objections.  I ruled on all of them.  Claims got expunged,

18  some with leave, some without.  The plan and disclosure

19  statement say that if claims are expunged, people don't get

20  to vote.  I think at the last hearing, I was told, oh, but

21  they'll still have the ability to receive $50,000 if they

22  have CVA claims in state court.  How will it work?  What's

23  the proposal for how it will work with respect to objections

24  to CVA claims?

25          MS. BALL:  We are prepared to deal with that this

1   morning, Your Honor.  Indeed, we have -- to burden you or

2   your clerks with a slide presentation, which I think will

3   walk through it, expunged claims are not getting any minimum

4   consideration.  Disallowed claims that are still alive

5   definitely are.  And if I may approach, Your Honor?

6           THE COURT:  Yeah, sure.  Have you already given

7   the committee a copy of what you're --

8           MS. BALL:  Yes, I have.

9           MALE:  (indiscernible) served, Your Honor.

10          THE COURT:  Thank you.  I'm sure you'll explain.

11  I don't understand what you just told me about -- so I

12  expunged -- I don't know what the total number of claims

13  was, but I did.  There's some appeals pending.  I don't

14  know.  So let's focus on the ones that have CVA lawsuits

15  that are also pending.  If I understand the plan correctly,

16  if the plan is confirmed, the effect would be to release the

17  parishes and schools that are debtor-related parties.  But

18  the claimants would remain -- I think remain eligible for

19  minimum distributions.

20          MS. BALL:  Only if their CVA claim were ultimately

21  allowed, Your Honor.

22          THE COURT:  Well, that's what I need to

23  understand.  They're state court claims.  They're not claims

24  here.  They're not claims against the debtor.  Who decides

25  whether the claims are allowed, if they're disallowed?

1   Who's making that decision?  Who challenges it?  It just

2   seems strange to me that for non-debtor parties' state court

3   cases, who's going to decide that?

4           MS. BALL:  Your Honor, why don't we focus just for

5   a moment, and it's on Page 10 of this booklet, on the 130

6   claims that we have identified as litigating abuse claims.

7   This is the new Exhibit 7, Your Honor, which really is an

8   addendum to the claims list on Exhibit 6, which identifies

9   for every claimant whether they're a litigating abuse claim

10  or a settled claim.  Everyone that is not a litigating abuse

11  claim is in the trust distribution procedures, including

12  with their state court actions.

13          MALE:  (indiscernible)

14          MS. BALL:  Excuse me?

15          MALE:  (indiscernible)

16          MS. BALL:  On the litigating abuse claim, Your

17  Honor, these are the omnibus objections that we made.

18  Here's how they worked out.  And here also is the number of

19  litigating abuse claims.  There are five kinds of litigating

20  abuse claims.  We tend to know a lot about four of the five

21  kinds.  There are those, which are those 110 claims which we

22  have objected to that have been disallowed, some of which

23  still have lawsuits against a covered party, which you'll

24  see here, that list --

25          THE COURT:  Seventy-seven of them.

1          MS. BALL:  That's right, Your Honor.  That's one

2     category is that 110.

3          THE COURT:  Just where I got that number from, I'm

4     on Page 10 of the --

5          MS. BALL:  Yes, of the demonstrative --

6          THE COURT:  -- presentation, the demonstrative.

7     It's exhibit -- litigating abuse claims disclosure

8     statement, Exhibit 7.  When I look all to the right column,

9     number of litigating abuse claims against covered party

10    other than the debtor, 77 is the number at the bottom.

11         MS. BALL:  So not surprisingly, Your Honor,

12    they're dominated by the two notice claims, which, not

13    surprising, there are 46 of those all told between the 8th

14    and the 13th omnibus.

15         THE COURT:  Just so the record is clear, you're

16    indicating that when the court ruled on the 8th and 13th

17    omnibus objections, there are 24 with respect to the 8th

18    omnibus objection.  Of those claimants, 24 of them had CVA

19    actions.  And as to the 13th, 22 of them had CVA actions.

20    Do I understand that correctly?

21         MS. BALL:  Yes, Your Honor.  And in the Exhibit 7,

22    that's actually appended to our most recent plan at 2885.

23    We have a docket of all your decisions listed.  So the date

24    and where we can find them.  For simplicity's sake, I did

25    not put them here.  But let's look at so we have 110

1    litigating abuse claims that resulted from the objections

2    that we made.  We have another 20 claims, Your Honor, which

3    are CVA actions that do not have a proof of claim, which is

4    how we get to the total of 130.  I will come back to what's

5    in there.

6         We then have, in addition to those two categories,

7    we have as litigating abuse claims, we have the indirect

8    abuse claims.  The parish's indirect abuse claim has already

9    been disallowed and they're getting released.  So it's not

10   them.  But there are eight other parties that filed indirect

11   abuse claims which are listed on Page 11.

12        THE COURT:  Just so I can be sure to understand

13   it, the next to last column, number of litigating abuse

14   claims, the total is 130.  The line above that has 20.

15        MS. BALL:  Those are the CVAs that have no proof

16   of claim was filed.

17        THE COURT:  So there's no claim against the

18   debtor, but there were 20 CVA actions.  I don't know whether

19   against schools or parishes, whatever they were.

20        MS. BALL:  There are 16 named schools or parishes.

21   But the quality of those claims, Your Honor, like the

22   quality, we believe, of 110 claims is something else.

23        THE COURT:  Well, let me -- but they're not

24   creditors in this case.  Are you proposing to release their

25   claims?  They're not creditors here.  They don't get to

1   vote.

2           MS. BALL:  Those 16.

3           THE COURT:  Don't get to vote.

4           MS. BALL:  Right.

5           THE COURT:  They don't get to vote.  Does the plan

6   release their claim?  They're not creditors in this case.

7   And you propose to discharge and release their claims

8   against the parishes, right?

9           MS. BALL:  We propose to channel their claims to

10  the trust.

11          THE COURT:  How do you do that, though?  They're

12  not -- they haven't filed claims here.  They're not before

13  me.  They chose for whatever reason, maybe because they

14  think they've got a slam dunk case against the parish.  I'm

15  sure you disagree with that, but assume they have slam dunk

16  cases against the parish.  They say, why should I bother

17  with the diocese?  I've got a parish with a lot of assets

18  and I'll proceed against them.  I'm not going to bother with

19  this bankruptcy.  The parish is not in bankruptcy.  I'm just

20  going to go against them.  How do you -- what's the

21  authority to release or discharge claims of non-creditors?

22          MS. BALL:  That would be the only group, Your

23  Honor.

24          THE COURT:  I'm sorry?

25          MS. BALL:  These 17, 16 (indiscernible) --

1          THE COURT:  No, but tell me what's the authority

2    to do that.

3          MS. BALL:  Your Honor, the only way to reach them

4    is really an extension, frankly, of the property of the

5    debtor, which is the insurance.  These same claims are co-

6    insureds.

7          THE COURT:  These are -- I don't remember the

8    percentage now, but in a prior opinion, I wrote that, what

9    was it, that the parishes paid like 80 percent of the

10   premium.  They are -- yeah, they're co-insureds.  But you

11   paid -- you, the diocese, paid a small percentage of the

12   premiums.  The parish -- I don't know how many parishes are

13   involved with these 16 claims.  Do you know?

14         MS. BALL:  Sixteen, I would believe, Your Honor.

15   But let's talk about what's there.  What's there, many of

16   those lawsuits, let's see, there are IRCP releases signed

17   for three of them.  But --

18         THE COURT:  So do you know are they before Judge

19   Steinman?  Judge Steinman will decide what to do --

20         MS. BALL:  Most of them are before Judge Steinman.

21   Not all of them.

22         THE COURT:  Okay.

23         MS. BALL:  And obviously, some of them are stayed,

24   Your Honor, because of the Arrowood injunction.

25         THE COURT:  Sure.  But I don't understand -- can

1  you --

2       MS. BALL:  They have Boy Scout releases in some of

3  those.

4       THE COURT:  Look --

5       MS. BALL:  They weren't creditors there either,

6  Your Honor.

7       THE COURT:  They may well, if there are valid

8  releases, the parish will have a good defense before Justice

9  Steinman or another state court judge.  They'll have good

10  defenses to it.

11       MS. BALL:  So, Your Honor, we think there will be

12  only a handful and maybe --

13       THE COURT:  Well, focus on this handful.  Look,

14  let me put something --

15       MS. BALL:  I understand your concern --

16       THE COURT:  -- make something clear about -- maybe

17  I can be persuaded otherwise, but --

18       MS. BALL:  If we are looking --

19       THE COURT:  Stop.  I'm searching for my words.

20       MS. BALL:  Okay.

21       THE COURT:  I'll tell you when I'm done.  Am I

22  correct that there are 110 claims that have been disallowed

23  or expunged by the court?  How many of them reflect a final

24  order of this court, as opposed to whether appeals or leave

25  to amend?  Do you know the answer to that?

Veritext Legal Solutions
212-267-6868                                                        516-608-2400

1          MS. BALL:  Your Honor, the ones that are still

2     alive, frankly, Your Honor, are the 31 which was on appeal.

3     That brief was filed late last week that Your Honor was the

4     -- did not supervise objection and decision that Your Honor

5     raised.  That appeal is pending in front of Judge Oetken.

6     So of the ones that --

7          THE COURT:  So let's just take --

8          MS. BALL:  -- and there are no live actions in any

9     of those against a covered party, Your Honor.

10          THE COURT:  Let's just take that.  It's in

11     response to the 6th and 16th omnibus objection.

12          MS. BALL:  Right.

13          THE COURT:  There are 31 claimants who don't have

14     a right to vote.

15          MS. BALL:  They do have their codefendants, Your

16     Honor.

17          THE COURT:  I understand, but they don't get to

18     vote on a plan that would -- as to those 31, they'd have the

19     ability to recover some minimum --

20          MS. BALL:  If they are allowed on appeal, they

21     would have the ability to get minimum consideration if those

22     claims are resolved in their favor.  But there is no covered

23     party.  There is no -- Your Honor's jurisdictional concern

24     doesn't apply.  And at least as to voting --

25          THE COURT:  There's no CVA claim against a covered

1   party for those --

2           MS. BALL:  No.

3           THE COURT:  That's what you're telling me.

4           MS. BALL:  No.

5           THE COURT:  But what --

6           MS. BALL:  And by the way, Your Honor, as part of

7   our agreement on the solicitation motion, we are having all

8   of the litigating abuse claims -- provisionally those --

9   they are voting provisionally.  And in essence, we will sort

10  out the 3018 issue, if they have to make a motion, be

11  allowed for voting only if indeed we're going forward.  We

12  don't see reason for either party to be saddled with that

13  expense if we're not going to go forward.  So all of those,

14  at least 110, are voting provisionally.  So we're only

15  talking about, frankly, the 16th.

16          THE COURT:  So the 13th omnibus objection, the

17  notice issue, 22 of the 27 --

18          MS. BALL:  Have claims against covered parties.

19          THE COURT:  Covered parties.  And are they going

20  to get to vote or not?

21          MS. BALL:  Yes, 27 are going to get to vote, Your

22  Honor, provisionally.  That is our proposal.

23          THE COURT:  Well --

24          MS. BALL:  Yes.

25          THE COURT:  So let's just assume that, on appeal,

1   my decision is affirmed and they're finally disallowed.  If

2   that happens before voting, then you don't count votes,

3   right?

4           MS. BALL:  Well, the issue of whether those votes

5   should count would be resolved once we know whether or not

6   their votes make a difference and after the voting

7   calculations are in.  We're nowhere close, Your Honor.  And

8   we are hoping to reach the global settlement we all believe

9   is in the best interest of everyone.  We won't have to deal

10  with it.  We will have to deal with it if we're making

11  progress on a global settlement.  But all 110 will be

12  voting.  Most of them do not have claims against covered

13  parties.  The Boy Scouts --

14          THE COURT:  On the 13th, 22 of them do.

15          MS. BALL:  Well, Your Honor, it's more than that.

16  The ones that I would suggest, and we have to get to the

17  process for them, are the 46.  If you were to add both the

18  24 from the 8th --

19          THE COURT:  Right.

20          MS. BALL:  -- and the 22 from the 13th, those

21  still have state court actions that have to be resolved.

22  Pursuant to our plan, their recovery is against the trust

23  and resolution under Section 8 of our trust distribution

24  procedures says the bankruptcy claim gets resolved first.

25  Then, since they've already chosen their forum, we will

1   restart the litigation against the covered parties.  But

2   recovery will be channeled to the trust.  But they will be

3   in that state court forum with all the rights and rules that

4   apply there, which, Judge, we're all very sensitive,

5   particularly on the notice issue, to how that might work

6   out.  But it would be against a covered party in a parish,

7   and the notice issues may be very different there.

8            THE COURT:  If the decision to expunge their claim

9   became final before ballots are counted.  They don't count,

10  correct?

11           MS. BALL:  Your Honor, that's an issue we have

12  decided to defer on dealing with.

13           THE COURT:  Well, I haven't.

14           MS. BALL:  No, no.  We, the committee, have asked

15  you to defer dealing with that.  One, March 15th is the

16  voting deadline, if we were to be able to go out shortly.

17           THE COURT:  It's not going to happen by March

18  15th.

19           MS. BALL:  Okay.

20           THE COURT:  Okay.  Even if you're successful

21  today.

22           MS. BALL:  Your Honor, we would expect that those

23  appeals will be continued.

24           THE COURT:  Look, I'll just say I think you've

25  made substantial progress.  I'm not ready to sign off on a

1   disclosure statement yet.  But assuming that that happens in

2   the next couple of weeks, it can't be March 15th.  I mean,

3   the claimants need more time to be able to --

4           MS. BALL:  Fair enough, Your Honor.

5           THE COURT:  I think it's complicated.  It's very

6   complicated.

7           MS. BALL:  Your Honor, as someone who struggled,

8   when the team started out based on the precedent in other

9   diocesan cases, this was not -- what you saw the first time

10  was very much in line with that.  The challenge you set for

11  us --

12          THE COURT:  Those others got through without a

13  plain English explanation of what was happening?

14          MS. BALL:  It was very much based on the prior

15  diocesan cases, with a heavy sprinkling of Boy Scouts

16  precedent.  But the challenge you set for us, plain English,

17  and with the admonition --

18          THE COURT:  I didn't invent the --

19          MS. BALL:  -- it must not have complicated charts

20  --

21          THE COURT:  I didn't invent the concept of

22  actually writing in plain English.

23          MS. BALL:  No, you didn't.  So we hope, and we'd

24  love to go back and walk you through how we tried to meet

25  that challenge.  And even though you asked us to avoid

1　complicated charts, at the end of the day, even if we were -

2　- and I think in our executive summary, we really did

3　respond to everyone's points about funding, timing, funding,

4　who's released, funding, who's providing it and the classes,

5　we still came to the conclusion, which is why we have this

6　section called the roadmap that I think is the first slide,

7　the roadmap to the -- the abuse claim information roadmap,

8　Your Honor, which appears --

9　　　　　　THE COURT:  Which page is that?

10　　　　　　MS. BALL:  -- at page -- I think it's Page 13,

11　Your Honor, of the revised disclosure statement.

12　　　　　　THE COURT:  Hold on.

13　　　　　　MS. BALL:  Thirteen of 255 of 2885.  It's also

14　reproduced on Page 3 of the slides.

15　　　　　　THE COURT:  Thirteen of 255?

16　　　　　　MS. BALL:  Yes, Your Honor.

17　　　　　　THE COURT:  Okay.  Hold on.  Let me reread it.

18　And I have read the whole thing, but it's still long.

19　　　　　　MS. BALL:  I have no doubt, Your Honor.

20　　　　　　THE COURT:  Let me reread it.  So you're talking

21　about on that page, which is Page 6 of the disclosure

22　statement, 13 of 255, the abuse claim information roadmap.

23　Let me read it to myself.

24　　　　　　MS. BALL:  So Your Honor, for ease of your

25　reference, the charts that they would go to are in that

1    slide presentation.

2            THE COURT:  Okay.

3            MS. BALL:  Just to give you --

4            THE COURT:  I've brought out the charts and --

5            MS. BALL:  Just to give you an ease --

6            THE COURT:  I'm still reading.  So on the page on

7    the abuse claim information roadmap, under 4(a), explain to

8    me what makes the claim eligible for minimum consideration

9    on the effective date or only upon allowance.

10           MS. BALL:  Okay, Your Honor.  If you were just to

11   look at, (indiscernible) Slide 4, we'd ask them to go to

12   Exhibit 6, which is Slide 4 in the presentation --

13           THE COURT:  Okay.

14           MS. BALL:  -- that I just gave you.

15           THE COURT:  I'm looking at the screen here.

16           MS. BALL:  If they are a litigating abuse claim,

17   that's the 110 we just talked about, they are allowed to --

18   their minimum compensation is only payable upon allowance or

19   resolution of their covered party action.  Everyone else

20   that is a settling abuse claim, roughly 500, are entitled to

21   minimum consideration on the effective date.  And this tells

22   the claimant, what do you particularly get.  How is -- where

23   are your lawsuits?  And by the way, who else can you keep

24   suing?

25           THE COURT:  Just if you would, just coming back,

1  I'm back on this Paragraph 4(a).  It's on Page 6 or Page 13

2  of 255.  What does a -- explain to me how plain -- you know,

3  an abuse survivor reading this knows that when it says

4  whether it is eligible for minimum consideration on the

5  effective date or only upon allowance, how do they figure

6  that out?  What tells them how to figure that out?

7          MS. BALL:  Let me just -- when we describe the

8  offer in the plan, which is on Page 2 of the disclosure

9  statement, Your Honor, we are clear that it's payable on the

10  effective date for settling abuse claims.  So if you are

11  identified, which is why we thought we still needed a

12  roadmap and charts, as a settling abuse claim, you get it on

13  the effective date.

14          THE COURT:  Point me.  I want to see the language

15  in the disclosure statement --

16          MS. BALL:  All right.  If we go to the executive

17  summary --

18          THE COURT:  Just can I -- could you wait until I

19  finish speaking before you respond?

20          MS. BALL:  Oh, sorry.  Sorry, Your Honor.

21          THE COURT:  Look, what I'm trying to be sure of is

22  that a layman reads this --

23          MS. BALL:  I understand.

24          THE COURT:  And I understand it's complicated, but

25  I want them to understand.  Okay?  So if they see this

Veritext Legal Solutions
212-267-6868                                           516-608-2400

1   language on Page 6, 4(a), whether it is eligible for minimum

2   consideration on the effective date, or only upon allowance

3   --

4           MS. BALL:  Maybe we need to change (indiscernible)

5   --

6           THE COURT:  -- they know where else they have to

7   look.  Okay?  But show me where it explains that.  Okay?

8           MS. BALL:  Your Honor, if we go to the very

9   beginning of the disclosure statement, which is the

10  executive summary, the very first paragraph tells you what

11  class you're in.

12          THE COURT:  Where is that?

13          MS. BALL:  The very first paragraph.

14          THE COURT:  I'm on --

15          MS. BALL:  If your injuries, in all or in part,

16  before October 1, 1976, you're class four.  If your

17  allegations are of injury after that date, you're in class

18  five.

19          THE COURT:  Okay.

20          MS. BALL:  Okay.  We then go on to talk about what

21  is available under the plan.  And if we turn to the offer,

22  which starts on Page 2 of the disclosure statement, the

23  offer in the plan has several major elements.  Right above

24  that, Your Honor, you see a paragraph, which is --

25          THE COURT:  Right above what?

1          MS. BALL:  Right above the bullet that starts with

2     the offer.

3          THE COURT:  Yes.

4          MS. BALL:  It says disputed claims are litigating

5     abuse claims that will have to be resolved through a court

6     of competent jurisdiction.  All other abuse claims are

7     settling abuse claims unless they elect to be litigating.

8     And if you're in doubt whether an abuse claim is either a

9     litigating abuse claim or a settling abuse claim is on

10    Exhibit 6.  So you know what class you're in by the date of

11    your allegations.  And if your claim has not been disputed,

12    you're a settling abuse claim.  If it's been disputed,

13    you're a litigating abuse claim.

14         THE COURT:  So coming back to Page 6, 4(a), the

15    words whether it is eligible for minimum consideration on

16    the effective date or only upon allowance, what you're

17    telling me, if it's a settling abuse claim --

18         MS. BALL:  (indiscernible) changes.

19         THE COURT:  -- it's entitled to minimum

20    consideration.

21         MS. BALL:  If it's settling, maybe we need to say

22    that again here and change this language.  I take your

23    point.

24         THE COURT:  Okay.  I'm just -- look, the problem,

25    late last night I'm flipping through pages going back and

1   forth to understand.  I'm not trying to give you a hard time

2   about this.

3         MS. BALL:  I understand.

4         THE COURT:  I just want to be sure --

5         MS. BALL:  That people --

6         THE COURT:  -- that when a layman reads this, or

7   at least it tells them under whether you're eligible for

8   minimum consideration on the effective date --

9         MS. BALL:  We may --

10        THE COURT:  -- with a parentheses, see page so and

11   so, I just --

12        MS. BALL:  Or maybe we just should say settling

13   claim, effective date, litigating claim and allowance.

14        THE COURT:  Even if you put the settling claims

15   in, it's not self-evident to somebody exactly what that

16   means.

17        MS. BALL:  Okay.

18        THE COURT:  But it just --

19        MS. BALL:  The chart will identify for them what

20   they are and the plan describes why.  But we will redo the

21   roadmap to lengthen --

22        THE COURT:  In the roadmap, without winding up

23   making it too long, is where they've got to go to see

24   whether --

25        MS. BALL:  I understand.

 1              THE COURT:  Okay.

 2              MS. BALL:  I think we have to clarify Section 4.

 3              THE COURT:  I'm just trying to make this so that

 4      it's really --

 5              MS. BALL:  (Indiscernible)

 6              THE COURT:  I haven't heard from Mr. Stang or Ms.

 7      Dine yet.  But right now I'm just focused on when someone

 8      reads it, do they understand what it is they're going to

 9      get, what hurdles they're going to have to go through in

10      order to collect?  When you tell somebody you're eligible

11      for minimum consideration, $50,000 or $100,000, okay, they

12      want to know, yeah, I'm eligible for that.  Okay, and then,

13      okay, what do I have to do if I want more than that?  Okay.

14      Go ahead.

15              MS. BALL:  We tried to address that, Your Honor,

16      in describing the offer.  If we go back to that Page 2, you

17      say there's minimum consideration, payable and settling

18      abuse claims on the effective date and upon allowance for

19      litigating abuse claims, roadmap, see it, go to Exhibit 6.

20      So for class four --

21              THE COURT:  Even in a parenthetical, see settling

22      abuse claims, Page 2.

23              MS. BALL:  We can do that.  We can do that.  Got

24      it.

25              THE COURT:  It's already long.  I'm not trying to

Veritext Legal Solutions
212-267-6868                                                                516-608-2400

1  create a monster.  But I just --

2          MS. BALL:  We're very sympathetic.  Having tried

3  to meet your challenge, we are extremely sympathetic.  If

4  you look to the second sub-bullet, class four abuse claims.

5          THE COURT:  Which page are you now?

6          MS. BALL:  Same page describing the offer that's

7  in the plan made to every claimant.

8          THE COURT:  Page 2.

9          MS. BALL:  Page 2.

10          THE COURT:  Page 2.  Go ahead.

11          MS. BALL:  Under the offer and the plan, the first

12  bullet is minimum consideration.  You made a suggestion

13  there, and we certainly will take it.  For class four abuse

14  claims, maybe again we need to say for those alleging injury

15  before October 1, 1976, if that's you, there's a right to

16  pursue additional recoveries, exclusive of punitive damages.

17  Thank you, Your Honor (indiscernible) your suggestion.

18          THE COURT:  Well, I am pleased that you took out

19  the no economic loss.

20          MS. BALL:  We do listen.

21          THE COURT:  Well, I thank Mr. Stang --

22          MS. BALL:  For raising it.

23          THE COURT:  -- for raising that issue.  This is

24  not limited to this case.  What I always worry about are

25  things that haven't jumped out.  This is really complex.  If

1    you'll excuse me, it was buried in the trust distribution

2    procedures, not in the plan, not in the disclosure

3    statement.  I worry about what else is hidden or buried that

4    has real consequences, substantive effect.

5              MS. BALL:  Actually, in preparing the

6    presentation, Your Honor, I tried to go through all those

7    things that the creditors' committee helpfully identified.

8    We did do a page turn.  I think we adjusted to most things

9    that they were concerned about from a disclosure point of

10   view.

11             But getting back to the offer, they can get --

12   they can pursue additional recoveries from the trust.  And

13   then for settling abuse claimants, the next bullet describes

14   what they would have to do.  They have to provide a detailed

15   submission for review by the trustee.  The trustee will

16   review it in light of two sets of criteria.  We talked about

17   those before, Your Honor, one regarding liability and

18   severity of the abuse factors, and the other addressing

19   impacts such as underemployment, et cetera, and that will

20   result in a point award.

21             THE COURT:  So this concept, this construct, which

22   confirmed cases has it been used in?

23             MS. BALL:  The idea of a trustee submission was

24   used in Boy Scouts, and it was exactly this construct, Your

25   Honor.

Veritext Legal Solutions
212-267-6868                                                                516-608-2400

 1                THE COURT:  Was it used in any of the diocese

 2     cases?

 3                MS. BALL:  No.  No.

 4                THE COURT:  Mr. Stang, do you know?

 5                MS. BALL:  The idea of a trustee submission was

 6     not used.  It was based on the proof of claim in the

 7     diocesan cases.

 8                MR. STANG:  Your Honor, that is not correct.  Each

 9     one of the TDPs provided for the additional submission to

10     the trustee.

11                THE COURT:  So just on this point, do you agree

12     that this construct has successfully been used in confirmed

13     plans in other cases?

14                MR. STANG:  Not exactly this one.  I think this is

15     a two-step process that they're utilizing (indiscernible)

16     submission and the trustee evaluates it, and then the

17     trustee then does another evaluation for points.  My

18     recollection is that in the other TDPs, it was just all one

19     process for the trustee to decide whether (indiscernible)

20     get zero or you get (indiscernible) --

21                THE COURT:  Do you object to the two-step process

22     versus the one-step process?  I mean --

23                MR. STANG:  We think it's unnecessarily

24     complicated and time-consuming and expensive, but --

25                THE COURT:  Well, it's not -- you don't --

1          MR. STANG:  It's not against my -- it's not

2     against any (indiscernible) that we've found, Your Honor.

3          THE COURT:  Okay.

4          MR. STANG:  But it is unnecessary (indiscernible)

5     expensive.

6          THE COURT:  I've looked at plans in a couple of

7     other cases.  I haven't read ever any either contested or

8     ultimately successful plans.  I'm trying to understand.

9     That doesn't mean it has to be exactly the same, but I'm

10    just trying to understand what's been used and what's

11    worked.

12         MR. STANG:  The general concept of the trustee

13    getting additional submissions so that -- I'm sorry, the

14    claims reviewer, so that the claims reviewer can make an

15    overall determination of the claim, be it awarded zero

16    points or whatever the maximum is, it's generally consistent

17    with what they're doing here.  I just think the multiple

18    steps are unnecessary.

19         THE COURT:  All right.  Thank you, Mr. Stang.  Go

20    ahead.

21         MS. BALL:  Your Honor, the reason for the multiple

22    steps are a robust process to review claims, which, as Your

23    Honor should be aware, is the basic thrust of the litigation

24    in Camden, Rochester and Syracuse.  And if the claimants

25    that are settling these claims, then on the next bullet,

1    they don't like what the trustees done, they have the option

2    on payment of a fee to go into the independent review

3    process with the neutral.  There are provisions --

4            THE COURT:  How much is the --

5            MS. BALL:  -- to waive the fee --

6            THE COURT:  How much is the fee going to be?

7            MS. BALL:  $10,000?

8            MR. ROSENBLUM:  It's 20.  No, 10.

9            MS. BALL:  It's ten to start, and if you proceed

10   through, it's another ten.  But there is a process in the

11   TDPs for the trustee to waive it.

12           MR. STANG:  Your Honor, all costs and fees are to

13   be borne by the claimants, and the $20,000 is only as

14   against that, that it's not a cap on what the claimant may

15   have to pay as part of the process.  This plan is very

16   clear.  All fees and costs are borne by the survivors.

17           THE COURT:  What's been done in other cases?

18           MR. STANG:  Well, the Boy Scouts did have a fee.

19   It was borne by the survivors.  The Boy Scouts process of

20   reaching that consensus was very complicated.  In the other

21   cases, there was no additional fee unless there was a

22   request for reconsideration.  In those cases, I think it was

23   -- my general recollection is not more than $1,000.

24           THE COURT:  Not more than what?

25           MR. STANG:  $1,000.  That was for the

Veritext Legal Solutions
212-267-6868                                                        516-608-2400

1  reconsideration of the points by the reviewer.  But there

2  was no additional fee.  This (indiscernible) concept is, to

3  the best of my recollection in terms of confirmed plans,

4  only in the Boy Scouts.  It is in other proposed plans.  I

5  honestly don't remember what we had in Rochester.  The other

6  cases we were not involved in.  But Ms. Ball's been talking

7  about Syracuse and (indiscernible) --

8           THE COURT:  Just to take this point, did you seek

9  to negotiate with the debtor about what, if any, fee there

10  should be?

11           MR. STANG:  No, Your Honor.  We're not negotiating

12  with the debtor on the plan provisions.  We don't accept the

13  plan.  We've negotiated with them on the adequacy of the

14  disclosure statement.  We've tried to draw a very clear line

15  as to what we are willing to talk to them about, and they

16  said this is their best and final, and we're taking them at

17  their word.  It's unfortunate that we didn't

18  (indiscernible).

19           MR. ZIPES:  Your Honor?

20           THE COURT:  Go ahead, Mr. Zipes.

21           MR. ZIPES:  Greg Zipes, with the U.S. trustee.

22           THE COURT:  Have you tried to negotiate this?

23           MR. ZIPES:  No, Your Honor.  I just wanted to

24  point out my colleague Mark Bruh is involved with the

25  Rochester case, and I believe that it's pending.  That issue

1   that you're describing is pending.  My office did object,

2   and the judge is considering whether there should be any fee

3   at all.  But in that case, it was $500 and $1,000, something

4   along those lines.

5                   THE COURT:  Mr. Bruh?

6                   MR. BRUH:  Your Honor, Mark Bruh, with the United

7   States trustee.  Yeah, there were the competing plans.  I

8   think one plan had it at $1,000, another plan had it at

9   $500.  I suggested zero.  Why did it have to be borne by the

10  survivor, and it was one of the points we raised at that

11  hearing.

12                  MR. STANG:  Mr. Bruh refreshes my recollection.

13  The committee plan said $1,000.  The CNA plan, which is the

14  --

15                  THE COURT:  The insurance company.

16                  MR. STANG:  -- said $500.  And I believe that was

17  just for the reconsideration.

18                  MS. BALL:  That's for reconsideration, not the

19  independent review (indiscernible) --

20                  MR. BRUH:  Right.

21                  MR. STANG:  And Ms. Dine has reminded me, there's

22  no IRO in the Rochester (indiscernible) we're really dealing

23  with apples and oranges a lot of time --

24                  MR. ZIPES:  We understand that.

25                  MR. STANG:  -- other cases, Your Honor, which is

Veritext Legal Solutions
212-267-6868                                               516-608-2400

 1   part of our chart objection in the disclosure statement.

 2           THE COURT:  It doesn't -- well, I should say it

 3   doesn't strike me as a disclosure statement issue, but you

 4   may be stealing your fate because if a survivor who's been

 5   waiting 20 years to recover suddenly says, now I've got to

 6   pay another 20 -- I got to pay $20,000 to be sure that I'm

 7   getting a fair shake, I may say, forget this.  Again, this

 8   point is not a disclosure statement issue.

 9           MS. BALL:  I understand, Your Honor.  We will --

10           THE COURT:  Okay.  It rubbed me the wrong way.

11           MS. BALL:  We hear you.

12           THE COURT:  But I'm not -- this disclosure

13   statement is not going to rise or fall on this issue.

14           MS. BALL:  I understand, Your Honor.  The

15   inclusion of the independent review option was really

16   designed because we're in this world of this so-called new

17   paradigm where we don't engage with insurers until after we

18   have a plan and trust distribution procedures.  That is how

19   we have been directed.  Now, if a plan is on file and we go

20   out, maybe, maybe, maybe we can change that.

21           THE COURT:  I'm going to jump to a different --

22   has there been any progress in any of the four insurance --

23   well, one of them is stayed.

24           MS. BALL:  One of them is stayed.

25           THE COURT:  In the other insurance coverage cases?

Veritext Legal Solutions
212-267-6868                                                          516-608-2400

1          MS. BALL:  Your Honor, there is a great fear

2     largely engendered, and they're present today, by what

3     happened in Camden and Rochester, to engage with the debtor

4     and not to have the committee on board.  The sequencing of

5     how you get to agreement in Camden, Rochester, Syracuse and

6     ostensibly here has been the committee wants to come to

7     agreement with the insureds first and then deal with the

8     insurers, which a lot of litigation.  We're still hoping

9     that will happen.  It may never happen, but we're trying to

10    make sure that we don't have unnecessary litigation with the

11    insurers, which is why the IRO is here.  So that's where the

12    insurers, Your Honor, participate in the process.  That's

13    where they get to be heard.

14          THE COURT:  In the independent review.

15          MS. BALL:  In the independent review option.

16    That's the point of it, is to bring the insurers into the

17    picture and not have them on the outside looking in saying,

18    this is totally against our insurance coverage requirements.

19    It's why it was put into Boy Scouts.  It's why it is here.

20    This is where the insurers get to have an option.  It's also

21    where the three parties, the insured, the insurer and the

22    plaintiff can try to reach a settlement, which is another

23    area that the committee asked us to explain, and we did,

24    and, if we went in order, about how that might work.  But

25    that's the focal point --

 1                THE COURT:  Is there any --

 2                MS. BALL:  And the neutral, by the way, Your

 3      Honor, is a panel of retired judges.  We've been speaking to

 4      several.

 5                THE COURT:  I'll ask Mr. Stang this question.  Is

 6      there any argument that the fees paid for the independent

 7      review are added to any claim against the insurer?

 8                MR. STANG:  I'm sorry.  I didn't catch the last

 9      piece of that, Your Honor.

10                MS. BALL:  Is there an argument to be made

11      (indiscernible) --

12                THE COURT:  If somebody pays $10,000 or $20,000 to

13      go through this independent review and winds up with an

14      allowed claim, is there an argument that that should be, at

15      the end of the day --

16                MS. BALL:  It's a cost (indiscernible) --

17                THE COURT:  -- against the insurer?

18                MR. STANG:  There is a provision in the disclosure

19      statement that says that that amount might be recouped from

20      the insurer.

21                MS. BALL:  It would be the trustee's obligation,

22      Your Honor, to seek it.

23                MR. STANG:  How do you ever figure that out as

24      part of their settlement is beyond me.  But it says that can

25      be recouped.  So I doubt the insurance companies are going

Veritext Legal Solutions
212-267-6868                                                    516-608-2400

1   to say, well, this amount is for that, this amount is for

2   that.

3          THE COURT:  I understand.

4          MR. STANG:  But it does say in the disclosure

5   statement that that's a possibility.

6          THE COURT:  Thank you.  All I could say to the

7   debtor is be sure you don't shoot yourself in the foot by --

8          MS. BALL:  (Indiscernible)

9          THE COURT:  $10,000 or $20,000 is a lot of money,

10  a lot of money from people who've been waiting, in some

11  cases, decades to get anything.

12         Mr. Stang?

13         MR. STANG:  Your Honor, it's my understanding that

14  the Boy Scouts matter, it is a significant matter, and in

15  fact, there have been discussions about, and there are

16  pleadings in the record in BSA regarding the timing of the

17  IRO deadline vis-à-vis Purdue and whether people are going

18  to be asked to put up -- I'll use the number $20,000 because

19  that seems to be the (indiscernible) Boy Scouts, $20,000,

20  when the plan might get blown up.  And how do you get that

21  money back from Judge Hauser, who's the settlement trustee,

22  has a question on it.

23         THE COURT:  All right.

24         MR. STANG:  So, yes, it is not an insignificant

25  amount of money for these folks individually or, frankly,

1  from state court counsel (indiscernible) expenses when they

2  have a lot of funds.

3         THE COURT:  Okay.  Go ahead.  Go ahead, Ms. Ball.

4         MS. BALL:  Your Honor, just pointing out that in

5  the trust distribution procedures, the trustee does have the

6  authority to waive it based on the circumstances of the

7  abuse claimant.  Your point as to the amount we will take to

8  (indiscernible) --

9         THE COURT:  Look, it's not a disclosure statement

10  issue.  But it's bugging me.  Okay.  Go ahead.

11         MS. BALL:  Your Honor, so I think we have spelled

12  out how a settling claimant may get more through the -- by a

13  written submission to the trustee.  They have the option

14  (indiscernible) the independent review option, and if they

15  still want, they have the option to restart litigation.

16         But this gets me to some of the other points that

17  the committee asked us to address that we have tried to

18  address, Your Honor, if I may.  If you were to just bear

19  with us, we also added, and it's on Slide 5, Your Honor,

20  beyond the charts and the roadmap, which were intended to

21  tell the claimant, based on the date of the allegations of

22  injury in your complaint, that's the starting point, here's

23  your class, here's your sub-fund, here's what you're

24  entitled to.  Here's your non-release parties you can keep

25  suing.  We also have retained the concept, Your Honor, of

1       the choice still here.  We have taken on the burden of

2       dismissal.  And in response to your questions, actually,

3       Your Honor, about the parishes and the parish exposure, we

4       did add another bullet to that that you've seen before, and

5       this actually appears, Your Honor, this goes to the

6       allocation issue that we talked about under the CPLR that we

7       talked about with you.  We have tried to put it in plain

8       English under the choice.  And this appears, Your Honor, on

9       Page 5.

10              THE COURT:  I'm on Page 5.

11              MS. BALL:  So far, the claimant would know where

12      they stand and, as they look at the chart on Page 4, what

13      bucket they're in.  They know what minimum consideration

14      they're entitled to.  They should understand, we hope, the

15      offer, and they have a choice to make.  And the only thing I

16      think we need to change is this (indiscernible) --

17              THE COURT:  So if Judge Steinman -- if Justice

18      Steinman tries a case that -- well, let's say he tries a

19      case that doesn't have the diocese as a defendant, the

20      parish tries the empty chair defense.  They blame the

21      diocese.  So the parish is going to ask a jury to decide

22      whether the parish is more than 50 percent responsible.  Is

23      that how this would work out?

24              MS. BALL:  That's how the parishes believe it

25      would work out, yes, Your Honor, and it's obviously --

1          THE COURT:  It'd be really interesting to see,

2     have some of these cases tried by Justice Steinman, and this

3     all would be a lot clearer.  But you don't want to do that.

4          MS. BALL:  Well, Your Honor, given the timing --

5          THE COURT:  There may well be trials before you

6     get to know whether you have a confirmed plan.

7          MS. BALL:  Well, we need -- I think, Your Honor,

8     we're all trying, and the committee has been very

9     constructive with us on this point, Ms. Dine in particular,

10    to try to defer confirmation issues and expenses associated

11    with them till we know where we're going, if the vote fails,

12    and I commend the committee for working with us on that

13    principle.  Let's see where the vote goes.  But I just want

14    to --

15         THE COURT:  I'm only going to raise it now because

16    you just talked about where the vote goes, and this is the

17    point about whether 75 percent, assuming that Purdue, the

18    circuit decision remains governing law in this circuit.

19         MS. BALL:  True, Your Honor.

20         THE COURT:  I thought that you tried too hard to

21    hedge your bets as to whether it's two-thirds or 75 percent.

22    I think this needs a very clear -- I don't remember what

23    page this is on.  This needs a very clear statement that

24    under current law in the Second Circuit, a vote of at least

25    75 percent of any class giving a third-party release is

1  required for the court to consider whether to approve -- to

2  confirm the plan.  Whether that's the exact language, I'm

3  sure Mr. Stang has his view about.

4           MS. BALL:  Your Honor, if I may, on the same page,

5  if you're looking at Page 4 of the disclosure statement, we

6  do say if it's not accepted by two-thirds, we'll move to

7  dismiss.  We don't say if it is accepted by two-thirds, it

8  will be confirmed.

9           THE COURT:  Well --

10          MS. BALL:  And what we attempted was open --

11          THE COURT:  -- I think it needs to say that under

12  current law in the Second Circuit, in order to confirm a

13  plan with third-party releases, at least 75 percent of the

14  classes that would provide third-party releases must vote in

15  favor of the plan.  You can --

16          MS. BALL:  Whether we move to dismiss, Your Honor,

17  may turn --

18          THE COURT:  Well, it may --

19          MS. BALL:  -- on the two-thirds, just to give us a

20  chance to get more.

21          THE COURT:  Well --

22          MS. BALL:  That's the point here.

23          THE COURT:  I'm sorry, Ms. Ball.  The law in this

24  circuit, which I am bound to follow, requires at least 75

25  percent in favor.  If the law changes, you can ask me to

1  change it, but --

2            THE COURT:  We can add that sentence, Your Honor.

3            MS. BALL:  The creditors are entitled to know when

4  they're asked to vote, that under the law of this circuit --

5  this is not my ruling, it's the circuit's ruling.  Under the

6  law of the circuit, at least 75 percent of the affected

7  classes have voted in favor for the court to consider.

8  There may be other factors, but --

9            MS. BALL:  One of the seven.

10           THE COURT:  -- as one of the factors, at least 75

11 percent.  That's just a statement of existing law within the

12 circuit.  I think the creditors are entitled to know that

13 when they're asked to vote.

14           MS. BALL:  We will add that sentence, Your Honor.

15 I had just wanted to point out to you our commitment to move

16 to dismiss may not be the same.

17           THE COURT:  Well, it may not.

18           MS. BALL:  And that was the point of the way we

19 worded it.  It was intentional.  But we certainly can add a

20 sentence regarding the 75 percent.

21           MR. ZIPES:  Your Honor, I believe it's in the

22 disclosure statement, but it's buried.

23           THE COURT:  I'm sorry.  Say again, Mr. Zipes?

24           MR. ZIPES:  I'm sorry.  Greg Zipes, the U.S.

25 trustee's office.

Veritext Legal Solutions
212-267-6868                                              516-608-2400

1          THE COURT:  Just identify yourself.

2          MR. ZIPES:  It is in the disclosure statement --

3          MS. BALL:  It is.

4          MR. ZIPES:  -- because my office was looking, but

5    it is buried in the disclosure statement.  I think --

6          MS. BALL:  It's not in the executive summary, and

7    there is a reference to two-thirds, which is why I wanted to

8    point out to Your Honor where (indiscernible) --

9          THE COURT:  It was the two-thirds that bothered

10   me.

11         MS. BALL:  Yes, that's why I went directly to

12   that.  And it was in that context.

13         THE COURT:  Okay.  All right.  You'll all confer

14   and make sure you come up with the language on this point.

15   I'm not trying to be difficult on this.  This is just --

16         MS. BALL:  No, no, no.

17         THE COURT:  It's the law of the circuit.

18         MS. BALL:  Oh, we have it in the disclosure

19   statement.

20         THE COURT:  You'll be very happy if it remains the

21   law of the circuit.

22         MS. BALL:  At least.  At least.

23         THE COURT:  We'll see.

24         MS. BALL:  We did submit an amicus on this point.

25         THE COURT:  I didn't read your brief.  I read some

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit v, Page 54 of 240

```
 1   of the briefs.  But I didn't --

 2              MS. BALL:  We did, not on behalf of the diocese,

 3   on behalf --

 4              THE COURT:  I know.

 5              MS. BALL:  -- of the U.S. Catholic Conference of

 6   Bishops.  So just as a reminder, Your Honor, if we now know

 7   the general plan, this is just to remind the creditors where

 8   you end up.  Again, class four, injury before October 1,

 9   class five, injury after October 1.  Settling abuse

10   claimant, you get minimum consideration on the effective

11   date.  This is where all the money goes and where it ends

12   up.  And by this point, you would know exactly what bucket

13   you're in, particularly if we amend the roadmap the way you

14   ask.

15              MR. ZIPES:  Ms. Ball, could I -- Your Honor, I

16   promise I won't interrupt too much --

17              THE COURT:  Go ahead, Mr. Zipes.  Just identify

18   yourself.

19              MR. ZIPES:  While we're on this point --

20              THE COURT:  Identify yourself.

21              MR. ZIPES:  Greg Zipes, with the U.S. trustee's

22   office.  On this point, we did have one question, because

23   this pre-'76, post-'76 is fairly unique to this case, and

24   for a survivor to decide, they might straddle that, they

25   might be pre and post and --
```

 1              THE COURT:  And it has the straddle language, but
 2    whether it's understandable, it's just --
 3              MR. ZIPES:  Yes.  We want --
 4              THE COURT:  What are you suggesting?
 5              MR. ZIPES:  Your Honor, as long as it's clear to
 6    the court.  But I --
 7              THE COURT:  But I'm not -- you know, clear to me,
 8    I'm --
 9              MR. ZIPES:  Well --
10              MS. DINE:  It's not the same.
11              THE COURT:  I'm wearing two hats.  One, is it
12    clear to me?  And then I'm trying to think, is it going to
13    be clear to the people who are asked to vote.
14              MR. ZIPES:  And, Your Honor, we were reading it in
15    that way as well.  And so I'm just bringing that up right
16    now, that I know that that was addressed or (indiscernible)
17    --
18              MS. BALL:  We used the -- the terminology on it
19    was used in the injunction.  If you have any Arrowood
20    exposure, you're enjoined.  That's how they looked at it.
21    That's how we used it.  But yes, the trustee, and we'll get
22    to who we propose be the trustee to deal with this, the two
23    trustees must address straddle claims because they're clear
24    that some have injury in both.  But this really comes down
25    to what the New York Security Fund and Liquidation Bureau is

Veritext Legal Solutions
212-267-6868                                                     516-608-2400

1    statutorily obligated to guarantee.  That's the cutting

2    point.

3                 THE COURT:  I understand that.  And that's why I

4    didn't --

5                 MS. BALL:  Just quickly --

6                 THE COURT:  I don't know.  Do you have language,

7    Mr. Zipes, on this point?  Is there particular language you

8    think --

9                 MS. BALL:  Would you like us to (indiscernible)

10   straddle?

11                THE COURT:  -- is required to clarify this point?

12   This is not a controversial point.

13                MR. ZIPES:  Your Honor, I hate to bring up a point

14   that's not controversial among the parties, but it was a

15   question that we had as we read it and --

16                THE COURT:  When I said it's not controversial,

17   it's not controversial because it's a result of what's

18   happened to Arrowood.

19                MR. ZIPES:  I think --

20                THE COURT:  It just needs to be adequately

21   explained so that a layperson understands why we've got

22   these two --

23                MS. BALL:  But perhaps then, Your Honor, we will

24   add that the trustee is responsible for obtaining recoveries

25   for those claimants who straddle -- whose injuries straddle.

1          THE COURT:  Okay.

2          MR. ZIPES:  Thank you, Mr. Zipes.  We'd be happy

3     to add that.

4          THE COURT:  All right.  Let me move to --

5          MS. BALL:  We want to go to the committee's

6     concerns next.

7          THE COURT:  All right.  Go ahead.

8          MS. BALL:  I think it comes as no surprise to Your

9     Honor that the committee is very concerned about litigating

10    abuse claims.

11         THE COURT:  That didn't get any -- you know, Mr.

12    Stang, the use of the term didn't get any traction with me.

13    I know you objected to the use of the term litigation abuse

14    claims.

15         MS. BALL:  But --

16         THE COURT:  I didn't have a problem with it.

17         MR. STANG:  We took your order to reflect a

18    misunderstanding of what was going on here versus what was

19    going on in Rochester.  They're totally different

20    situations, and we think it's a misleading term.  But when

21    you issued that order, I took it as castigating us for

22    trying to play both sides.

23         THE COURT:  I was castigating you for playing both

24    sides.  But it wasn't necessarily the terminology that gave

25    rise to my concern.

1          MR. STANG:  Your Honor, one is a consensual plan

2     and one isn't.  One has a debtor attacking survivors and one

3     doesn't.  So there's a world of difference between them.

4          MS. BALL:  A 130 of 630 claims, Your Honor, is

5     what we're talking about.

6          THE COURT:  No, no, no.  Let's --

7          MR. STANG:  You know what?  It's an objection to a

8     survivor claim.  That's what they're doing.  And there's a

9     difference between what they're doing here and what they're

10    doing in Rochester.  And that's what we thought the

11    confusion was, and that's why we can't tell you

12    (indiscernible) --

13         THE COURT:  Let me ask you this while you're

14    standing.  Would you like a sentence in the disclosure

15    statement the first time that litigating abuse claims is

16    used, either in a footnote or a parenthetical, that refers

17    to claims that are disputed?  Does it say that clearly?  If

18    there's defined terms, it ought to be -- it needs to be

19    defined in a -- there needs to be something that explains to

20    the layperson that's what it means by litigating abuse

21    claims.  It's claims that the diocese has or may object to.

22         MR. STANG:  Your Honor --

23         MS. BALL:  It's on the first page, Your Honor.

24         MR. STANG:  Your Honor, labels matter.

25         THE COURT:  I understand.

1          MR. STANG:  And you've spoken, and I think

2     authentically, to what a non-lawyer survivor may have to

3     struggle with to get through this.  Why the debtor is so

4     insistent on calling these litigated claims, which make it

5     sound like this is at the election of the survivor.  Now,

6     you can go from a settling claimant to a litigating

7     claimant.

8          But the starting point is that they are

9     designating who they're going to continue fighting with, who

10    they're going to continue attacking.  So I don't get why

11    they're so insistent on their label other than, hey, it's

12    our label.  Yes, and it's our plan and we get to say what we

13    want.  It was confusing.  Frankly, I thought there was

14    confusion by the court.  I thought the order you issued

15    indicated confusion, that you're comparing two plans and

16    they're totally different in terms of the posture of the

17    (indiscernible) --

18          THE COURT:  I read the plan.  I'm not sure it's --

19    anyway, that's --

20          MR. STANG:  So I just think labels do matter.  And

21    saying to someone now, well, go look at the definition and

22    you'll figure it out, I think it's confusing and I think

23    it's unnecessary.

24          MS. BALL:  Well --

25          MR. STANG:  This is part of (indiscernible) --

1          THE COURT:  Can I just -- let me just --

2          MS. BALL:  I'd like --

3          THE COURT:  Stop.  I'm not ruling on this

4   objection yet.  But did you suggest an alternative term to

5   use?

6          MR. STANG:  Yes.  Contested claim.  It's in our

7   redline, which, by the way, we gave to them days before this

8   hearing and not handed to us at 10:00 in the morning as this

9   hearing started.

10         THE COURT:  And you don't want to use the

11  contested claims because of what reason, Ms. Ball?  Again,

12  I'm not ruling on it.  I just want to hear what your

13  response is on that.

14         MS. BALL:  Your Honor, on that I defer to Mr.

15  Rosenbaum -- Rosenblum.

16         MR. ROSENBLUM:  Your Honor --

17         THE COURT:  Do you have your ego tied up with this

18  term litigating abuse?  I didn't mean -- excuse me.  I was

19  being flippant.  Excuse me.

20         MR. ROSENBLUM:  For the record, Ben Rosenblum, for

21  the debtor.  Your Honor, we didn't think that the term was

22  confusing.  We had it in our original plan a year ago.  It

23  wasn't until after last hearing that the committee had a

24  problem with it.  It's something that you also can elect to

25  be.  So we didn't think contested claim made sense.  We just

1  don't think it's confusing.  And we didn't want to go

2  through every single document, including every plan exhibit,

3  to change it.  It's not necessary.

4          THE COURT:  It's really easy with a word processor

5  to change it.  So don't -- that is the least compelling

6  reason I've heard.

7          MR. ROSENBLUM:  Fair enough, Your Honor.  More

8  blacklines is fine.  But it's something that you can elect

9  to be, and we didn't think it was confusing.  So we think

10  contested is not (indiscernible) --

11          THE COURT:  Did you try and see whether you could

12  agree on a slightly different term?

13          MR. ROSENBLUM:  Yes, Your Honor.

14          THE COURT:  Did you?

15          MR. ROSENBLUM:  We can talk about it.  But they

16  suggested contested --

17          THE COURT:  If it's changed, it's a global search

18  and replace.  It's not rocket science.  Even I could do it.

19          MR. ROSENBLUM:  Fair enough, Your Honor.

20          THE COURT:  I haven't ruled on it yet.  Okay.

21          MR. ROSENBLUM:  I'm not going to quibble with the

22  court on --

23          THE COURT:  I can't believe the two of you going

24  to the mat over whether it's contested claim or litigation

25  claim.  I just -- okay.  Go on to the next point, Ms. Ball.

1          MS. BALL:  (indiscernible) the only additional

2     comment, Your Honor, is it is our understanding of what's

3     going on and Judge Poslusny's decision in Camden that not

4     having a robust process to challenge claims, and we've

5     already started it, Your Honor, when we thought of minimum

6     consideration.  You couldn't even conceive of that unless we

7     reviewed every single proof of claim, all the CVA actions

8     which, if we continue, we'll get through to this, to assess

9     which ones will not survive a motion to dismiss and which

10    ones clearly will survive a motion to dismiss.

11          THE COURT:  Under whose standards?

12          MS. BALL:  Your Honor, we had to look at both

13    because we have actions that are still out there, but

14    certainly under the federal standard.  That's the infamous

15    46, Your Honor, which we're going to get back to.  We're

16    going to get back to.

17          THE COURT:  All right.  Go ahead.

18          MS. BALL:  On the litigating abuse claims, Your

19    Honor, the obsession with the committee has been on

20    expenses.

21          THE COURT:  It's been what?

22          MS. BALL:  About the expenses associated with it.

23    This is the language that they asked us to put in.

24          THE COURT:  Again, just on the expenses?

25          MS. BALL:  They put it in -- we put it in at 250 a

1   claim.  We think that's not really the case where you hold

2   IRCP releases, when you have people that are

3   extraterritorial and not entitled to it.  Your Honor, if we

4   get back to it, it's kind of, again, the 46 and arguably the

5   six actions.

6           THE COURT:  Go ahead.

7           MS. BALL:  But we put it in.

8           THE COURT:  Go ahead.

9           MS. BALL:  And we put it in in all these different

10  places.

11          THE COURT:  Go ahead.

12          MS. BALL:  So we think we addressed that.  But it

13  caused us to do something else, which was to add our view.

14  And our view says, well, gee, while this risk exists, we

15  don't believe it's likely, and these are the reasons why.

16  Also, Your Honor, sadly, the significant amount of expense

17  associated with these claims already been incurred and will

18  be incurred before the effective date.  And I think, Your

19  Honor, we've seen -- what are we talking about?  We're

20  talking about the claims that you already saw on Exhibit 7.

21  And when you think about going to state court with a

22  release, I don't think it's going to be 250,000.  When you

23  think about going, saying you've already been paid, I don't

24  think it's going to be 240,000 when it's IRCP released.

25  It's not going to be that much money.  You don't have a

1    claim against a covered party.

2           THE COURT:  Basically, on this point, the

3    committee and the debtor disagree on the level expenses --

4           MS. BALL:  On the level of expenses.

5           THE COURT:  -- about what the level of expenses

6    are.  And the disclosure statement will reflect the fact

7    that there's a disagreement --

8           MS. BALL:  There's a disagreement.

9           THE COURT:  -- about it.

10          MS. BALL:  Your Honor, there also is --

11          THE COURT:  That's all that -- from the standpoint

12   of the disclosure statement --

13          MS. BALL:  That's it.

14          THE COURT:  -- that's what's required, in my

15   opinion.

16          MS. BALL:  That's all that's required.

17          THE COURT:  Okay.

18          MS. BALL:  Your Honor, there also, in their

19   supplemental objection, is concern that the number of claims

20   may be extreme.  We've already counted them, 110, subject to

21   objection, 20 CVAs without a proof of claim.  The indirect

22   abuse claims, they have to file a proof of claim.  We know

23   exactly what they are.  And, Your Honor, depending on how

24   they are resolved, if we have no responsibility, those

25   claims go away.  As you know, Catholic Health's already

1   waived their claim.  Their indirect abuse claim is part of

2   the settlement that you approved already.  The remainder, if

3   we have no responsibility, and that goes to some of the

4   decisions on the Diocese of Brooklyn, not all of them.

5   These will not materialize, but they're limited.

6           THE COURT:  Are there cases pending in state court

7   against the Diocese of Brooklyn, abuse claims?

8           MR. STANG:  I think there are a lot of them --

9           THE COURT:  (indiscernible)

10          MS. BALL:  Yeah.

11          THE COURT:  Including by the ones who also file

12  claims here?

13          MR. STANG:  I don't know, Your Honor.

14          THE COURT:  Okay.  Do you know, Ms. Ball?  I mean,

15  I had to rule on one of the ominous objections.

16          MS. BALL:  Yes.  You remember Franciscan Brothers

17  of Brooklyn.

18          THE COURT:  Right.

19          MS. BALL:  You remember Little Flower.  Yes.

20  Brooklyn has cases that are before (indiscernible) --

21          THE COURT:  But did the claimants who filed claims

22  against the diocese here have litigation pending against the

23  Brooklyn diocese?

24          MS. BALL:  Yes, that does happen, Your Honor.

25          THE COURT:  I think I was told yes, but I don't --

Veritext Legal Solutions
212-267-6868                                                          516-608-2400

 1              MS. BALL:  The answer to that is yes.  And let me

 2    give you an example.  We had claimants who alleged a cause

 3    of action against the Diocese of Rockville Centre for

 4    injuries that occurred in 1951 or '52.  It didn't exist --

 5              THE COURT:  Right, and I expunged those claims.

 6              MS. BALL:  But they named Rockville Centre,

 7    Brooklyn and a parish.

 8              THE COURT:  I think it was appealed.

 9              MS. BALL:  So their lawsuit against Brooklyn

10    survives and the parish.

11              THE COURT:  But they have a lawsuit.

12              MS. BALL:  Yes.

13              THE COURT:  They have a lawsuit against Brooklyn.

14              MS. BALL:  Yes, they do.

15              THE COURT:  Okay.

16              MS. BALL:  Yes, they do.

17              THE COURT:  All right.

18              MS. BALL:  And their lawsuit, there's six of them

19    against a parish, which will also continue.

20              MR. STANG:  Your Honor?

21              THE COURT:  Go ahead, Mr. Stang.

22              THE COURT:  May I ask you a question regarding

23    these indirect (indiscernible) --

24              THE COURT:  Sure.

25              MR. STANG:  The trust advisory committee is made

1    up of abuse claimants.  Abuse claimants definition includes

2    indirect abuse claimants.  So I have two questions.  One is,

3    are these eight people, seven (indiscernible) eligible to be

4    on the advisory committee because they're within the

5    definition of the abuse claimant?  My second question is,

6    are the insurance companies' claims, to the extent they

7    might seek reimbursement from the debtor for expenses

8    they've advanced, that they went under coverage action?

9    They have indirect abuse claims.  It's within the

10   definition.  And are they eligible to serve on the advisory

11   committee?  Those are my two questions.

12             THE COURT:  Well, who appoints the committee?

13             MR. STANG:  The plan provides for the creation of

14   the committee.  Ms. Ball, has asked us repeatedly, who would

15   you like to have on the advisory committee?  We have not

16   responded to that on the theory of we're not negotiating the

17   plan with you.  But I think survivors should know if any of

18   these seven entities are eligible to be on the advisory

19   committee, eligible, and second, whether the insurance

20   companies are proposing that they hold the direct abuse

21   claims and would be eligible.  So three people on the

22   advisory, three positions on the advisory committee.

23             THE COURT:  Well, who appoints them?  I mean, it's

24   one thing to be eligible and another thing to be selected.

25             MS. BALL:  Go ahead.

1          MR. ROSENBLUM:  Your Honor, Ben Rosenblum, for the

2   debtor.  It's part of a plan supplement.  The debtor

3   designates them.  It's not limited to claimants.  There's

4   nothing in the eligibility that restricts any of these

5   people from serving.  But the debtor is not going to

6   designate an insurer or an indirect abuse claimant to the

7   trust advisory committee.

8          THE COURT:  Really?  You heard it, Mr. Stang.

9          MR. STANG:  I did.  Thank you, Your Honor.  Thank

10  you, Counsel.

11         THE COURT:  Did we clear up that issue?

12         MR. STANG:  We did.

13         THE COURT:  Okay.

14         MS. BALL:  They asked us if it's going to be the

15  bishop.  I assure you it will not be the bishop either.

16         THE COURT:  Okay.  Go ahead.  You know, there may

17  be --

18         MR. STANG:  He's not an abuse claimant.

19         THE COURT:  I can't believe an insurer would

20  actually want somebody on that committee, but it might not

21  be a bad idea.  But that's my view.

22         MS. BALL:  Going on, the committee also, going

23  back to slide -- I guess it's slide -- where we left off on

24  litigating abuse claim, Slide 8, where we were.  We're not

25  at Slide 9.  This is something else that both Your Honor and

1    the committee asked us about.  Great minds think alike.

2    You'll see that note to draft.  What does it mean for these

3    covered party people?  Slide 10, I think it is, Your Honor.

4    My apologies.  No, 11.  The next one you see where it says

5    note to draft.  They asked the same question you asked, Your

6    Honor.  And we've done a number of things.

7              THE COURT:  Where does it say note to draft?  I'm

8    just --

9              MS. BALL:  NTD.

10             THE COURT:  Okay.

11             MS. BALL:  Do you see it?

12             THE COURT:  Yeah.

13             MS. BALL:  Disclose whether we're changing the

14   forum or whatever else.  We added a footnote because what

15   our plan says is that the bankruptcy proof of claim and

16   objection has to be resolved first.  But other than that,

17   they have chosen the forum.  That forum's rules will govern.

18             THE COURT:  Okay.

19             MS. BALL:  So I think that we did -- and I just

20   brought in that part of what would happen.  The committee

21   then asked us to talk about trust distribution procedures,

22   and they asked us a series of questions.  These are the

23   questions that they asked, which were basically, how does it

24   work?  And although it's very difficult to read for those

25   who are Zooming --

1          THE COURT:  I have it on my screen here.

2          MS. BALL:  Okay.  Mostly the questions related to

3    the IRO for settling abuse claimants, which I think Your

4    Honor highlighted them.  But we did provide an answer.  That

5    answer appears in the disclosure statement under test

6    distribution procedures.  It's on Slide 14.  And we have put

7    in what we believe are the answers to their questions.

8          THE COURT:  Are you satisfied with the answers?

9          MR. STANG:  We are not, Your Honor.

10          THE COURT:  Okay.  All right.  Go ahead, Ms. Ball.

11    You'll --

12          MS. BALL:  Well, please give us the words that you

13    would like.

14          MR. STANG:  It's not --

15          THE COURT:  Well, we're looking at this now.  Tell

16    me --

17          MR. STANG:  Do you (indiscernible) --

18          THE COURT:  Yeah, I do.  I want to hear it.

19          MR. STANG:  Two things, Your Honor.

20          THE COURT:  Just identify yourself by name for the

21    record.

22          MR. STANG:  James Stang, for the committee.  Two

23    things.  They don't talk about Ecclesia here.  Ecclesia is

24    putting up its $15 million.  It's done.  It's going to, I

25    guess, the general settlement trust.  Yet there are all

1     these provisions for IROs and restarting litigation, but

2     they need to make clear that it doesn't -- they say they

3     don't think they will -- that anyone would choose it if

4     you're an Ecclesia person.  But I don't know how Ecclesia

5     pays out any money above and beyond the 15 that they would

6     have funded as part of the initial funding of the trust.

7         So I think they need to make clearer that Ecclesia

8     claimants don't have this process readily available to them

9     practically because Ecclesia is never paying more money.

10    The second thing is they really don't address -- they do it

11    rather cryptically, I think, on the Arrowood issue.  They

12    say, maybe it's a footnote, that there's this court opinion

13    where in a claim objection, an appeal has been allowed to go

14    forward vis-à-vis Arrowood.  This is a little different than

15    that.  And I think they need to be very clear that the risk

16    that Arrowood's stay stops this --

17         THE COURT:  May I -- okay.  Have you given the

18    debtor's counsel specific language that you believe should

19    be included to satisfy the disclosure requirements?

20         MR. STANG:  We have not.  But we have asked them,

21    and it's in our objection to address the issue.  And we

22    don't think that what Ms. Ball is putting up on the screen

23    is doing that.  But we can come back and provide that.

24         THE COURT:  I'm not ruling from the bench today.

25    On this issue, please engage with the debtor's counsel,

Veritext Legal Solutions
212-267-6868                                                        516-608-2400

1   because it sounds to me we're talking one or two sentences

2   that you would like added to this language.  Is that the

3   gist?

4           MR. STANG:  (indiscernible) those are our concerns

5   for now.

6           THE COURT:  Okay.

7           MR. STANG:  (indiscernible)

8           MS. BALL:  Your Honor, we will be happy --

9           THE COURT:  For disclosure statement purposes --

10          MR. STANG:  Yes, yes.

11          THE COURT:  -- adding a couple of sentences that

12  address this concern that was raised by the committee I

13  think is appropriate.  Here's what I'm going to ask you to

14  do.  Try and do that with respect to this point.  If you

15  can't, then I'll rule based on just what I have in front of

16  me.  Okay?

17          MS. BALL:  Your Honor, happy to.  I see that the

18  paragraph that Mr. Stang accurately referred to isn't on the

19  screen, but it's the very next paragraph where we do say,

20  and you might find it in your disclosure statement.  It's on

21  Page 49.

22          THE COURT:  Let me turn to the page.  Okay.  Which

23  is the -- it doesn't look like it's on 49.

24          MS. BALL:  This should be in the redline, Your

25  Honor.

1              THE COURT:  I'm looking at the --

2              MS. BALL:  The clean one?

3              THE COURT:  The clean, clear copy.

4              MS. BALL:  It's just above the commencement of

5    Section 4 of the disclosure statement.  It's the last --

6              THE COURT:  Just give me a page with it.

7              MS. BALL:  Okay.

8              THE COURT:  Clean copy of the disclosure

9    statement.

10             MS. BALL:  180 of 255 is what I --

11             THE COURT:  Which is it?  What of 255?

12             MS. BALL:  180.

13             MR. STANG:  Your Honor, I did see that.  I just

14   meant that -- we'll address whether earlier on in the

15   statement that should be --

16             THE COURT:  Okay.

17             MR. STANG:  -- defined because (indiscernible) --

18             THE COURT:  All I can say is this ought to be

19   resolved.

20             MR. STANG:  Yeah.  You're right.  You're right.

21             THE COURT:  Okay.

22             MS. BALL:  Your Honor, we'd love to.

23             THE COURT:  Go ahead.  Okay.

24             MS. BALL:  We will work on it.  I only wanted to

25   point out to Your Honor that --

1          THE COURT:  Okay.  That's fine.

2          MS. BALL:  -- this is unprecedented on this scale.

3   We did get a ruling.  Indeed, we got a ruling from the

4   district court on the appeal that the Arrowood injunction

5   does not affect bankruptcy processes.  And that opinion is

6   what we put here as.  That's what we're guiding that to the

7   extent -- and that's why I wanted you to look at it.

8          THE COURT:  What page is that on?

9          MS. BALL:  That was 180 of 255.  No, 54 of 255 in

10  the clean, Your Honor.

11         THE COURT:  Okay.  Hold on.

12         MS. BALL:  If that's easier --

13         THE COURT:  I want to look --

14         MS. BALL:  The paragraph beginning with respect to

15  the hourly --

16         THE COURT:  Yes.  Let me read it.  Okay.  I see

17  it.

18         MS. BALL:  You see it?

19         THE COURT:  I do.

20         MS. BALL:  I just wanted to be sure that we were

21  all clear that we certainly were not ignoring our esteemed

22  colleagues.  We appreciate it, if that is in question.

23         THE COURT:  I'm sure you don't ignore Mr. Stang.

24  Okay.

25         MS. BALL:  No, not at all.  So we did put that in

 1   and, Your Honor, that's the only guidance that we really

 2   have.

 3            THE COURT:  Okay.  Do me a favor.  Work this out.

 4            MS. BALL:  Okay.  If we move right along to the

 5   next issues that seem to trouble the committee the most, it

 6   is minimum consideration.  Your Honor, I'm going through

 7   these because they come up in the committee letter, which

 8   we'll get to.  We have been clear.  They asked us.  We got a

 9   disclosure statement that minimum consideration is not

10   refundable.  If you've gotten it, you've gotten it.  We've

11   also been clear that to the extent they do not -- the

12   litigating claims are not resolved, they're resolved against

13   the claimant, that reserved, goes back to the trust, the

14   relative trust.  We've clarified that.  We've added that

15   provision.

16            As I said before, Your Honor, the point of our

17   review of every claim and every CVA action was to really

18   isolate those that were legally deficient.  And the standard

19   we use is what claims were likely to survive a motion to

20   dismiss.  And if they did, we didn't consider issues that

21   are expensive to litigate.  Credibility.  Medical expert.

22   We looked at those that really flawed a case, and those are

23   the ones that are getting minimum consideration, and they're

24   not waiting.  They're not waiting for a trust procedure.  I

25   think Your Honor, from our reply, is aware that the fastest

1      claims review we could figure out was somewhere in seven

2      months to a year, once the claim review process started.

3      The other belief that we have about minimum consideration

4      that I wanted to share with Your Honor is our plan now

5      contains an offer for every -- I'll use the word claim

6      that's not disputed, since we don't know what's going to be

7      contested, litigating or where that might end up.

8            So every counsel has an offer of minimum

9      consideration, which is a standard frequently used where you

10     have plaintiffs with multiple clients.  When they go talk to

11     their clients, it may trigger their obligation to speak to

12     each client.  That was another motive for minimum

13     consideration, was to make sure that every claimant was

14     aware that there was an offer outstanding to them.  Moving

15     along, the two trusts, Your Honor, I think this is really a

16     product of where we are with the Arrowhead situation.  We

17     have been unable to find precedent of anything on this

18     scale.

19           Your Honor is likely aware it's not only this

20     diocese that is Arrowood, it's also Brooklyn.  When we

21     started off, this diocese came out of Brooklyn, and that is

22     the primary reason we view the trustee in Arrowood, which

23     you'll get to when we propose for that, as really focused on

24     recovering those claims.  It is true we have allocated value

25     between the trust based on per capita.  But we also know

1   there has to be a straddle reallocation because it's

2   imperfect at best, given the absolute cleavage that the

3   Arrowood insolvency has caused.  Part of the separate trust

4   is a trustee who's only responsible for people the New York

5   State Security Fund is responsible to, and also is

6   expensive.  The reimbursement that he's going to seek, and

7   it is a he, in our view, Your Honor, is strictly for

8   Arrowood expenses.

9           So it really is to promote and maximize the

10  recovery.  Indeed, maybe it's no good deed goes unpunished,

11  but it was truly intended to maximize that asset for

12  creditors.  And let me show you why we think it's important.

13  Next slide.  This is why, Your Honor, and you've probably

14  seen this tower before.  Put enough of those together, and

15  it's a big claim.  You're rarely going to see such a

16  cleavage in insurance coverage with just one insurer for so

17  many claims.

18          And some of them, Your Honor, are going to be

19  small.  Those coverages, the guarantee is for the lesser of

20  coverage or a million dollars per claim per policy period.

21  Somehow we think a consolidated trustee who has actually

22  looked at all these claims, reviewed them, made

23  determinations, is really best positioned to go to New York

24  state.  And the lesser amount of complications he has to

25  explain, we think the better off it would be.  If we were to

1    move on, Your Honor --

2              THE COURT:  Let's not move on yet.

3              MS. BALL:  Okay.  Let's go back to the towers.

4              THE COURT:  No, let's talk about what is it that

5    you think the disclosure statement should say on this point,

6    Mr. Stang?

7              MR. STANG:  Your Honor, we're satisfied with the

8    inserts that we put in.  But there's something on this slide

9    that, not this slide but the one before it, that raises a

10   question in my mind that I don't think I was sensitive to

11   before.

12             THE COURT:  All right.  Let's go back to the slide

13   just before this one.

14             MR. STANG:  It's the first paragraph of the

15   debtor's response, and it says the fund is limited in making

16   payments on account of claims, okay, and reimbursing only

17   payments made to Arrowood claimants.  So my question that I

18   think creditors should know is if the trust is paid out to

19   Arrowood claimants $100,000, is that the limit on what the

20   New York Guarantee Fund is required to pay?  Because the

21   limits are -- we know there's a cap of million dollars on

22   its liability.  But as a survivor, I've only been paid

23   $100,000 --

24             THE COURT:  As a minimum payment.

25             MS. BALL:  As a minimum.

Veritext Legal Solutions
212-267-6868                                                    516-608-2400

 1              THE COURT:  With the ability to seek more.

 2              MR. STANG:  Right.  But is the reimbursement -- is

 3      the obligation of the Guarantee Fund based on reimbursing

 4      the trust on what it's been paid --

 5              MS. BALL:  No --

 6              MR. STANG:  Well, this --

 7              THE COURT:  Hold on.  Just a --

 8              MS. BALL:  This is -- excuse me.

 9              THE COURT:  Don't talk over each other.

10              MR. STANG:  And this is why I'm asking.

11              THE COURT:  Go ahead.

12              MR. STANG:  It says reimbursing the payments made

13      to the Arrowood claimants.  This trust is going to pay

14      whatever it's going to pay out to claimants and so my

15      question is --

16              THE COURT:  Would you be satisfied if it said NYS

17      Security Fund is limited to making payments on account of

18      claims insured by Arrowood and (i) reimbursing payments made

19      to Arrowood claimants and (ii) any additional amounts?

20              MR. STANG:  Yeah.  I don't actually know where

21      this language shows up, Your Honor, in the redline.  But I

22      was just curious as to what they thought (indiscernible) --

23              THE COURT:  Okay.  No, but does that -- don't take

24      my words as being the exact, but I don't think there's a

25      disagreement between you --

Veritext Legal Solutions
212-267-6868                                                    516-608-2400

 1              MS. BALL:  No.  I don't --

 2              THE COURT:  -- and Ms. Ball that, yes, if the

 3      trust has paid $100,000, that has to be reimbursed.  But if

 4      the claimant then succeeds in recovering more, that too is

 5      subject to reimbursement.  That's the point.

 6              MS. BALL:  That's the point.  That's the point.

 7              MR. STANG:  I (indiscernible) --

 8              MS. BALL:  That's an item (indiscernible) --

 9              THE COURT:  Make the -- you're not disagreeing?

10      Okay.

11              MS. BALL:  -- on that.

12              THE COURT:  Just fix the language so that it's

13      clear.  Okay.

14              MS. BALL:  We will do that.

15              MR. STANG:  My other comment is we have been

16      asking the debtor for months to explain why there have to be

17      two trusts.

18              THE COURT:  Okay.

19              MR. STANG:  She's given an explanation.  I don't

20      think it's a disclosure statement issue anymore.  Survivors

21      just see this as another unnecessary expense.

22              THE COURT:  Well, I think --

23              MR. STANG:  They're entitled to do what they want

24      --

25              THE COURT:  Maybe I've been bamboozled, but I

1    think I understand why there's a necessity for two trusts

2    because the insurance fund is not going to pay anything that

3    isn't related to the Arrowood policies.

4              MR. STANG:  I understand that that is true.  I

5    don't understand why there has to be a whole separate

6    structure for it.  But it is their plan.

7              THE COURT:  Okay.

8              MR. STANG:  They have to sell it.

9              THE COURT:  Right.  Okay.

10             MR. STANG:  And we don't get it.  I mean, that's

11   (indiscernible) --

12             THE COURT:  But you'll clarify the language so

13   that it's reimbursement --

14             MS. BALL:  Plus.

15             THE COURT:  Plus

16             MS. BALL:  Plus.

17             THE COURT:  Okay.

18             MS. BALL:  That is true, Your Honor.

19             THE COURT:  Next point.

20             MS. BALL:  Happy to do that.  Your Honor, the next

21   slide just highlighted the decision that we actually went

22   over with you already, which we added to the disclosure

23   statement.  Here it is.  We added that to try to clarify

24   that the bankruptcy process works.  Whether you can go back

25   to state court, that may be more difficult.  That may be

1    more difficult.  They may have to wait.

2          THE COURT:  Do you have a problem with this

3    language, Mr. Stang?

4          MR. STANG:  No.

5          THE COURT:  Go ahead, Ms. Ball.

6          MS. BALL:  We also want to share with, Your Honor,

7    our proposed candidates for trustees.  Each of these

8    gentlemen has agreed that they would like this appointment.

9    They feel they're qualified to do it.  We do not have in our

10   proposal a separate claim reviewer.  Both these gentlemen

11   have experience in mass tort, certainly have experience in a

12   lot of claims.  We have shared these names in the past with

13   the committee.  But this is not a negotiation mode.  But

14   that's where we are.  We continue to search for neutrals,

15   but that clearly is a process we would like to get more

16   traction on with the vote before we go on.

17          The last point was the committee asked for a lot

18   more disclosure about SEMCO and what I neglected, Your

19   Honor, in highlighting is the committee also asked us to

20   reflect that they brought a lawsuit.  We did put that

21   language in as well.  It's not highlighted on this slide for

22   you, but we have done it, and we have put in their exact

23   language regarding how much to seek, how much the lawsuit

24   sought.  So I think we've resolved what they wanted to hear

25   about SEMCO.

Veritext Legal Solutions
212-267-6868                                                      516-608-2400

1       What I highlighted on this slide, Your Honor, is

2   the countervailing view.  So we have put in what they asked

3   for about the lawsuit.  This would be the cemetery's view.

4   It's just another view of the same lawsuit.  Lawsuits always

5   have two sides.  That's why we come to gentlemen like

6   yourself.

7       THE COURT:  Mr. Stang, on this point, are you

8   satisfied with the debtor's proposed language?

9       MR. STANG:  Yes, Your Honor.

10      THE COURT:  Okay.  Next point.

11      MS. BALL:  All right.  The next point was, Your

12  Honor, I think we already went over it.  It was the non-

13  economic damages which was raised in our last hearing.

14      THE COURT:  I was glad to see it taken out.

15      MS. BALL:  That's all done.

16      THE COURT:  Let me make clear.  I raised it.  It

17  was a substantive point, and I thought it had to be in the

18  plan and the disclosure statement.  I didn't say you

19  couldn't do it, but I've made the point.  Anyway.

20      MS. BALL:  Your Honor, in fairness, we took it

21  from Boy Scouts.

22      THE COURT:  Okay.  It's done.  It's done.

23      MS. BALL:  We have adjusted.

24      THE COURT:  Okay.

25      MS. BALL:  Moving on, here's where we find

1    ourselves, Your Honor.  And I do want to come back to the

2    committee letter.  We talked about the first one.  I don't

3    think we need to say anything more.  The charts, Your Honor,

4    those are the diocesan cases that have a confirmed plan.  We

5    believe it is relevant.  We believe it's additional

6    information.

7              THE COURT:  You know, I asked both committee and

8    the debtor a long time ago whether you had estimates of the

9    value of the claims outside of bankruptcy.  And each of you

10   told me you had experts.  Yes, you did.  But you weren't

11   revealing what those were.  If those charts remain, then I

12   think it needs to be supplemented with information about the

13   value of claims.  You're grimacing.

14             MS. BALL:  Because we looked.  There's

15   (indiscernible) --

16             THE COURT:  Let me tell you why.  Because when

17   people vote, they have to know what they're -- if you're

18   going to do this, if you're going to head down the road of

19   saying what people have recovered in other diocese cases,

20   then I think they're also entitled to know what people have

21   recovered in non-bankruptcy cases, in litigation.

22             MS. BALL:  Oh, so you're talking about --

23             THE COURT:  I'm saying, look, you've got these

24   nice charts, color charts of what people have recovered.

25   And if you want those charts in, then I'm going to want

1    information about, outside of bankruptcy, what recoveries

2    have been for, including punitive damages because when

3    people are being asked to vote, they may say, hey, look,

4    I've got a really good claim against a parish that's got a

5    lot of assets, and I'm better off outside of bankruptcy.  So

6    I'm going to vote against the plan.  But if you're going to

7    put a chart about what recoveries in bankruptcy have been,

8    they're also entitled to know what the recoveries outside of

9    bankruptcy have been.  You may not want to do -- you may

10    just decide to take the charts out.

11           MS. BALL:  Your Honor, we will look into that.

12    Your point is understood.

13           THE COURT:  Mr. Stang?

14           MR. STANG:  Your Honor, it's a point well taken.

15    These charts are about as relevant as anything I can think

16    of.

17           THE COURT:  Well, yes and no.  I mean, look --

18           MR. STANG:  It has nothing to do with this case

19    and whether creditors should vote based on the assets and

20    liabilities of this case.  Fairbanks, Alaska is not a basis

21    for comparing Long Island, New York.  Nor is Davenport.  I'm

22    not going to repeat Judge Abbot's comment about we have a

23    view of the Pacific.

24           THE COURT:  Okay.  Okay.  All right.

25           MR. STANG:  They are totally different situations.

1    THE COURT:  Look, I don't have a list of what the

2    recoveries outside of bankruptcy, what jury verdicts have

3    been.  There's been some enormous verdicts.

4    MR. STANG:  There's a verdict in California

5    against a school district for two people that I believe was

6    over under $130 million.

7    THE COURT:  Well, did it survive?

8    MR. STANG:  I don't know.  But right now it's out

9    there.  So are we going to start mincing the charts about

10   (indiscernible) --

11   THE COURT:  Let me make this point.  I don't think

12   -- I think including just the chart that you included is

13   misleading.  And I don't think you really want to go down

14   the road of having to put together a chart comparing what

15   judgments have been.  Whether it's recovered or not is a

16   different issue -- have been outside of bankruptcy.

17   MR. STANG:  Your Honor, I'll say the Jesuits,

18   Oregon province filed some (indiscernible).  It covered five

19   states.  Alaska was one of those states.  The Diocese of

20   Fairbanks filed bankruptcy.  There was almost 100 percent

21   overlap between the people who filed claims in Fairbanks and

22   the ones that filed in the Jesuit case.  Spokane, part of

23   the Oregon province.  Montana cases, part of the Oregon

24   province.  Breaking them down separately is totally --

25   THE COURT:  But I --

1    MR. STANG:  It is such a false comparison, it gets

2    to the point of being misleading.

3    THE COURT:  I understand your point, and what I'm

4    saying is I'll add to the false comparison by saying, what

5    was the verdict in Westchester County?

6    MS. BALL:  $28 million (indiscernible).

7    THE COURT:  Okay, and what was the verdict in --

8    MS. BALL:  Monroe?

9    THE COURT:  Monroe.

10    MS. BALL:  Ninety-five.

11    THE COURT:  Okay.  Do you really -- I mean, it's

12    still --

13    MS. BALL:  Your point, we hear.

14    THE COURT:  Okay.

15    MS. STANG:  (indiscernible) are we going to do New

16    York?  Are we going to do (indiscernible) --

17    THE COURT:  Stop.  We're going to take it out is

18    what we're going to do.  We're taking it out.  It's either

19    coming out -- I hear Ms. Ball saying they're going to take

20    it out, because otherwise there's going to be a more

21    fulsome, irrelevant comparison to judgments elsewhere.

22    Okay.  You're taking it out or you want to --

23    MS. BALL:  I have homework to do, but I hear you.

24    THE COURT:  Or do you want to fight this battle?

25    MS. BALL:  It's a question of whether we add more

1    or it comes out.  And the more, in my view, may be equally

2    misleading.  And, of course, I do want to remind Mr. Stang

3    that the orders that are present here and (indiscernible)

4    are not being released.  So people can continue to chase

5    them.

6                    THE COURT:  Okay.

7                    MS. BALL:  But I hear your point.

8                    THE COURT:  I'm not ruling yet.  If you're going

9    to stand on your position that the charts go in, I am going

10   to insist that it include information on --

11                   MS. BALL:  Verdicts.

12                   THE COURT:  -- on verdicts.  Okay.  You'll let me

13   know.

14                   MS. BALL:  We will, Your Honor.

15                   THE COURT:  When we finish today --

16                   MS. BALL:  The difficulty I'm having is the vast

17   majority of cases as came out in Camden are settlement

18   values.  But the biggest difference, which I'm surprised Mr.

19   Stang hasn't raised, all the cases in those charts had

20   insurance (indiscernible) which the charts show.  This whole

21   plan is structured around trying to get to that point.  But

22   that leaves us with the third issue, Your Honor, on

23   disclosure.

24                   THE COURT:  And I -- you know, let me flip it.

25   I've got some other issues that haven't been addressed.

1            MR. STANG:  I have a few too.

2            THE COURT:  I bet you do.  I bet you do.

3            MS. BALL:  I think we did try to cover everything

4      that committee redline shared with us.

5            THE COURT:  Let me just -- stop.  Some time ago,

6      multiple hearings ago, without ruling, I said that -- words

7      to the effect that the parishes should have to disclose

8      their contributions.  Explain to me why you don't think the

9      parishes should have to disclose what they're -- you've said

10     all the parishes are contributing and they're jointly and

11     severally liable.  Tell me why the parishes shouldn't have

12     to disclose what each parish is contributing.

13           MS. BALL:  Your Honor, in our minds, it's a

14     question of when does that have to happen.  Purdue says it

15     has to happen.  I'm not -- but we think it's part of our

16     burden on confirmation.  Let's step back, Your Honor, just a

17     minute.  If they vote in favor of this plan, they know what

18     they're getting.  If they choose to litigate, they know what

19     every parish has, at least in terms of its current assets

20     and the location of its real estate.  So it seems that it is

21     not relevant to the vote.  But I understand it may be

22     relevant on the Purdue factors.

23           But let me just share Judge Kressel's view.  The

24     trouble that we're having -- the trouble that we're having

25     with this, and I am reminded of his decision in the St. Paul

1   case.  I don't know if Your Honor is familiar with it.  It's

2   reported at 58 B.R. 821 (sic).

3              THE COURT:  Let me -- hold on.  I'm not.  58 B.R.

4   821.  Okay.

5              MS. BALL:  It was a decision where he denied

6   confirmation of a plan.  And let me share with you what he

7   said.  He said, while the creditors' committee seeks

8   retribution for the wrong suffered by the victims, none of

9   those who committed the abuse in the first place or

10  exacerbated it in the second place will suffer.  The

11  financial cost of compensation falls not on any of these

12  people, but on a completely different group.  The cost will

13  fall on Catholic schools and their parents, students of

14  Catholic schools and their parents.  It will fall on

15  thousands of parishioners, the benefits of charity.  And he

16  goes on to say, this case is about people.  We are asking

17  you, Your Honor -- and of course, as a footnote, Judge

18  Kessel was one of the first to challenge high contingency

19  fees.  But returning to our case --

20             THE COURT:  But not the only one who has.

21             MS. BALL:  Not at all, Your Honor.  It seems to be

22  a trend.  Judge Kinsella even suggested a fee examiner.  We

23  are asking you, and it really is for the benefit of

24  survivors, to let us maintain the ability to marshal funding

25  for the resolution of this harm as part of an ongoing

1   mission.  The way parishes are sharing this reflects a sense

2   of moral responsibility.  Rather than subjecting the

3   parishes and, hand in hand with the parishes, the survivors,

4   it's a great difficulty in raising this money.  If we are

5   moving forward, if we are heading towards confirmation, then

6   parishes, their students, everyone has a sense of purpose to

7   get this done and to disclose whatever is necessary to get

8   there because you're seeing an end to it.

9         THE COURT:  So let me just -- I just want to be

10   sure.  So you're giving as the first reason to not require

11   disclosure of each parish contribution --

12         MS. BALL:  At this time.

13         THE COURT:  -- maintaining the ability to marshal

14   funds by not disclosing each parish contribution.

15         MS. BALL:  Your Honor, because many of them are

16   not responsible at all.  There could be an absolute outrage

17   among those parishes and those Catholic schools.  Why are we

18   doing that if we're never going forward?

19         THE COURT:  Give me -- what's the next -- are

20   there more reasons?

21         MS. BALL:  Yes, Your Honor.  We are going to ask

22   you, because, as you know, this is a plan where funding is a

23   mission shared by all parishes, really, without regard to

24   legal liability and managing the inability in particular,

25   and if you studied our exhibit, roughly half of the parishes

Veritext Legal Solutions
212-267-6868                    516-608-2400

1    to fund anything, it's being approached not as a question of

2    legal responsibility.  It's being approached as part of

3    wanting to end this terrible chapter.  If we find that our

4    creditors have elected the world of chaos -- why don't you

5    go to the next slide -- they have elected -- then we're

6    really talking about legal responsibility.  And the paradigm

7    is totally different at the parish level.  There will be

8    survivors --

9            THE COURT:  If I understand what you're saying is

10   one of the concerns you're expressing is backlash against

11   parishes that are contributing, that have few, if any --

12           MS. BALL:  Or none.

13           THE COURT:  Or none, abuse claims.

14           MS. BALL:  And they will be -- they're reaching

15   into their pockets at the expense -- and those pockets have

16   to be refilled by parishes to keep schools open.

17   Parishioners.  Why are we creating that blowback when we

18   don't know if we are going ahead with this shared mission?

19   They may choose to go to the legally responsible mission, in

20   which case, half the parishes will likely not be at risk.

21   So why are we doing it?  We understand Purdue, Your Honor.

22           THE COURT:  Okay.  So when is it that you think

23   you would be required to disclose that information?

24           MS. BALL:  As part of moving forward to confirm a

25   plan.

Veritext Legal Solutions
212-267-6868                                                    516-608-2400

1    THE COURT:  If you get the votes and it moves to

2    confirmation.

3    MS. BALL:  If we go to confirm a plan, it will

4    have to be disclosed.  It's our burden, we think, at that

5    point.  We think Purdue says, and you have to assess fair,

6    that that would be part of it.  Then that's a burden we'll

7    have to meet.  But we are urging you not to level this

8    dissension unnecessarily at this time.

9    THE COURT:  Remind me that the aggregate

10   contribution of the parishes is how much.

11   MS. BALL:  By or on behalf of the parishes is

12   $78.1 million and Catholic Charities is (indiscernible) --

13   THE COURT:  I'm not saying that I'm with you on

14   this point.  Are you prepared to disclose -- I mean, if I

15   order it in the order, you'll do it or not, but if you

16   don't, then it's a different problem.  But range, median,

17   something that would disclose the contributions, the $78.1

18   million reflects contributions from parishes in the range of

19   X to Y, without disclosing at this stage how much each

20   parish is disclosing.

21   MS. BALL:  We could do that.  It may be a little

22   complicated because of the sharing that we're forcing on

23   them for those liability.  But let us think about doing

24   something like that, Your Honor.

25   THE COURT:  I haven't heard Mr. Stang yet.  I'm

1    exploring.  I'm not --

2              MS. BALL:  This is --

3              THE COURT:  So you're just --

4              MS. BALL:  It's more from parishes.

5              THE COURT:  If you got to the point of the votes

6    to confirm, the explosion from parishioners doesn't occur

7    until the information you know you're going to have to

8    disclose.

9              MS. BALL:  But Judge, let me say it's a different

10   circumstance.  We would not be presuming that, because we're

11   prepared to move forward with confirmation, that you would

12   do it.  But we would all be, everyone on the substantial

13   contribution side, rowing in the same direction to get to

14   the end and it would not have the same impact at all.

15             THE COURT:  I'm going to hear from -- but go on.

16   I'm sure I'm going to hear from Mr. Stang on this point.

17             MS. BALL:  Your Honor, the last --

18             THE COURT:  I mean, look, I made those statements

19   because at that point in the case, you had not publicly

20   disclosed --

21             MS. BALL:  Their financials.

22             THE COURT:  -- their assets, their financials.

23   Okay.  That's now in your exhibits.

24             MS. BALL:  That is there.

25             THE COURT:  So I expressed the view that they

Veritext Legal Solutions
212-267-6868                                                516-608-2400

1  should be required to disclose what they're contributing,

2  and I also talked about what their assets are.  You've now

3  disclosed their assets.  I understand Mr. Stang is still

4  raising the issue about real estate values.  I think even

5  when I raised it, I recognized that I don't know who's got

6  appraisals, and book value is not a true measure.  Whatever.

7  But now I can see.  I looked at what each parish has and how

8  much cash, what real estate, et cetera.  So I'm reserving on

9  this point.  I do want to hear from Mr. Stang.

10          MS. BALL:  I wanted to be consistent, Your Honor.

11  The parish financial information is critical to the choice

12  that they're making because if they revert from a plan

13  choice, which is, from our point of view, a collective

14  global solution to a horrible problem, to, no, we'd rather

15  sue, and it's legal liability, they have a lot of the

16  information that would educate that choice.

17          THE COURT:  Go on to your next point.

18          MS. BALL:  Okay.

19          THE COURT:  I understand your position.  I'm not

20  ruling.  I want to hear -- I mean, look, from prior comments

21  in the case, I was where Mr. Stang is on this issue.  Okay.

22  But I understand you're raising it as a question of timing.

23          MS. BALL:  We are, Your Honor.  And the different

24  motive and impact it will have depending on that timing.

25          THE COURT:  Okay.  Next point?

1          MS. BALL:  The next point that we wanted to make,

2     Your Honor, it's kind of the last one.  Just as a reminder,

3     the committee letter which was filed yesterday, I'm sure

4     Your Honor has seen it.

5          THE COURT:  I've read it.  I have it here.

6          MS. BALL:  But not to go back over the complicated

7     charts earlier in this year, but here we are, Judge.  The

8     smaller firms, the pro se, those are the ones that will be

9     left behind in the choice.  Large state court counsel, if

10    you look to those charts, you can see it's not an issue for

11    them.  These are the ones that we keep hearing about control

12    the vote, in many other cases, very critical in controlling

13    the trusts.

14          But at least now in their letter in the very back

15    end, they acknowledge there's a risk, a big risk, and what

16    we find very compelling.  Not only the risk for those who

17    don't have a CVA, but when you think about the trial timing,

18    Your Honor, the timing of the 50 that are active being

19    first, the 200 new diocese cases, two-thirds of which are

20    Arrowood, so let's say one-third of those being filed next,

21    67, and then all the Arrowood cases behind that, it has to

22    be true that there are survivors that are really not going

23    to get anything.

24          THE COURT:  Here's what I want to happen, because

25    I just got this.  I'm going to give you, I don't know, a day

1   or two to file a response with a blackline.  Look, I made

2   clear before I am going to permit and require that a

3   committee letter be attached to the disclosure statement.

4   Okay.  You've already put within the disclosure statement

5   many of the --

6             MS. BALL:  Their position as we understood it.

7             THE COURT:  -- positions that (indiscernible).

8   But I am going to -- the committee's view is important.

9   They're the fiduciary for the unsecured creditor.

10            MS. BALL:  For everyone.

11            THE COURT:  Okay, and, I mean, I won't go through

12  it now.  I had some problems with some things that they

13  stuck into this letter.  I'm sure they knew that when they

14  sent it in.  Put it right up front, basically.  Okay.  But

15  this just came in.  I want to give you a chance to mark it

16  up, if you will.  Okay.

17            MS. BALL:  Thank you, Your Honor.

18            THE COURT:  Just as examples, the diocese

19  "headlines," the diocese offer or proposal of a settlement

20  of $200 million grossly overstates or how much survivors

21  will get out of settlement.  Take the word headlines out.  I

22  mean, it's just, you know, you're --

23            MR. STANG:  Your Honor?  Your Honor, we'll wait to

24  see it.  But I have to tell you, when you say the number is

25  200, but you admit on Page 12 of your disclosure

1   (indiscernible) --

2           THE COURT:  I know you do.

3           MR. STANG:  -- that it's 170, that's a headline.

4           THE COURT:  Okay.

5           MR. STANG:  That's a headline.

6           THE COURT:  Just put the facts in.  Okay?

7           MR. STANG:  Well, their --

8           THE COURT:  No, stop.

9           MR. STANG:  Their disclosure statement isn't

10  entirely facts.  They have lots of opinion in their

11  disclosure statement.

12          THE COURT:  Look, I'm letting you put in a letter.

13  Okay?

14          MR. STANG:  I'm not --

15          THE COURT:  Tone it down, okay?

16          MR. STANG:  I'd also ask, Your Honor, that it be a

17  freestanding letter and not attached to the back of the

18  (indiscernible) disclosure statement.

19          THE COURT:  Where do you want it?

20          MR. STANG:  In the solicitation package as a

21  separate piece of paper, not attached as an exhibit to

22  (indiscernible) --

23          THE COURT:  Okay.  I'll let you put -- I'll

24  require it go in the solicitation package.  Okay?  You'll

25  get your wish.  Would you please take out the diocese is not

1    doing anything to improve its policies and procedures to

2    protect children?  I mean, come on.

3         MR. STANG:  The diocese's plan does not have a

4    word regarding child protection.  Not a word.  It doesn't

5    have a -- this is written (indiscernible) --

6         THE COURT:  I will just tell you that's coming

7    out.  That bullet point is coming out.

8         MR. STANG:  Your Honor --

9         THE COURT:  Have you taken discovery?  Are there -

10   - can I ask you this?  Are there postpetition lawsuits

11   against parishes that have been filed for postpetition abuse

12   claims against the parishes?

13        MR. STANG:  I don't know.

14        MS. BALL:  There are, Your Honor.  And the

15   policies and protocols are on the diocese website.

16        MR. STANG:  Your Honor, there's not a word in that

17   plan or disclosure statement about protecting children.

18   They don't even talk about what they're doing, much less

19   what they will do.  Creditors need to know that.

20        THE COURT:  That bullet point is coming out.  I

21   will not approve a letter with that bullet point in it.

22        MR. STANG:  Your Honor, I want you to know that

23   when we talk to committees, this one or any of them, when

24   they talk about what is most important to them, it is the

25   protection of children.  There's not a word in this, in all

1   of this paper about what they do to protect children.  Not a

2   word.  People want to know that.

3              THE COURT:  I will review the diocese's markup of

4   the letter, and I'll resolve it without a further hearing.

5              MS. BALL:  Your Honor, (indiscernible), we will

6   address it, but of course, it's on the website, Your Honor.

7   It has been.  It has been.

8              THE COURT:  Fine.

9              MS. DINE:  Your Honor, if I may (indiscernible) --

10             THE COURT:  Ms. Dine, go ahead.

11             MS. DINE:  Sorry.  Karen Dine, for (indiscernible)

12  --

13             THE COURT:  I think we're not picking you up on

14  the microphone.  Just move that microphone.  You can stay

15  there.

16             MS. DINE:  Your Honor, and I don't know what the

17  timing of things is going to be based on the outcome of this

18  hearing, but if there is time, just as we have provided

19  comments in advance of filing anything with the court, I

20  would ask that the debtor give us their comments first, that

21  we have a chance to consider them and make any changes.

22             THE COURT:  Fine.

23             MS. BALL:  Of course, Your Honor.

24             THE COURT:  Fine.  Maybe you'll obviate -- you'll

25  agree on what will be in, what will be out (indiscernible).

Veritext Legal Solutions
212-267-6868                                          516-608-2400

1    Okay.  That would be much preferred.

2            MS. BALL:  Your Honor, we have one other area we

3    haven't covered today, but I don't think we're getting that

4    far today.  But I would share with Your Honor, and we're

5    prepared to talk --

6            THE COURT:  There's a lot of day left.

7            MS. BALL:  (indiscernible)

8            THE COURT:  Not mine, but, you know --

9            MS. BALL:  Well, then in that case, I'll be very

10   quick about it.  There's a lot to be said about the

11   solicitation and the agreements that have been reached.  I

12   don't know if Your Honor wants to hear that, the agreements

13   there.  Disagreements are very narrow.

14           THE COURT:  Let me -- before you do that, finish

15   up.  Are there any other disclosure statement issues you

16   want to raise?

17           MS. BALL:  No, Your Honor.  I think I've covered

18   them.

19           THE COURT:  Okay.  Let me raise a few of my own.

20           MS. BALL:  Thank you, Your Honor.

21           THE COURT:  All right.  The second committee

22   objection, Exhibit A at Page 2, the bullet point is

23   disclosures in the executive summary regarding "whether the

24   litigation rights, including forum/venue selection or right

25   to jury trial will be impacted or whether parties retain all

1  existing litigation rights."  That's quote from their

2  objection.

3          MS. BALL:  Yes, Your Honor.  We had it on the

4  screen, you may recall.

5          THE COURT:  Okay, and your response to that?

6          MS. BALL:  Our response to that is that Section 8

7  of the trust distribution procedure says the bankruptcy

8  piece goes forward first.  Thereafter, the parties will

9  confer to restart their litigation in the forum they

10  originally chose with the rules of that forum.

11          THE COURT:  Could you put it in the disclosure

12  statement?

13          MS. BALL:  We did, Your Honor.  We put it in a

14  footnote.  But if you'd like it in the body, we will.

15          THE COURT:  Mr. Stang or Ms. Dine, do you want it

16  in the text or do you want it in a footnote?  I thought the

17  point was a valid point.

18          MS. BALL:  That's why we shared it with you.

19          MS. DINE:  Your Honor, again, Karen Dine, on

20  behalf of the committee.  I think we think it should be in

21  the text.  And of course, one of the issues we're getting at

22  is whether there may be remand or other venue issues that

23  are raised in those litigations (indiscernible) --

24          THE COURT:  Without adding more than a paragraph

25  or two at the most, the point you raised in the second

 1   objection is a valid one, and I think you want it in the

 2   text, it's a long document, you'll work it out and put it in

 3   the text.

 4           Look, Ms. Ball, we've gone through a bunch of

 5   points today.  There are changes that have been agreed to be

 6   made.  I'm expecting to see a further -- a new redline,

 7   blackline --

 8           MS. BALL:  I understand, Your Honor.

 9           THE COURT:  -- against what I have.

10           MS. BALL:  And I'm assuming you're expecting us to

11   try to work it out first.

12           THE COURT:  I do.

13           MS. BALL:  Of course.

14           THE COURT:  I do.  This you want to be able to

15   work out.  There are bigger fish to fry than this.  It's

16   important.

17           MS. BALL:  One more thing.  One more thing.

18           THE COURT:  Okay.  In that same second committee

19   objection, they raised the point, the executive summary

20   should address the impact of the Arrowood liquidation,

21   including impact of the Arrowood liquidation on timing for

22   resolution of all litigating abuse claims is basically the

23   point.  Ms. Dine, maybe you could tell me.  What is it that

24   you want the disclosure statement to say?

25           MS. DINE:  So Your Honor, particularly as it goes

Veritext Legal Solutions
212-267-6868                                           516-608-2400

1    to the litigating abuse claims, given that no litigating

2    abuse claim can receive any recovery until after the

3    resolution of all litigating abuse claims, I think it's

4    important that there be very clear disclosure about just how

5    long (indiscernible) --

6            THE COURT:  Ms. Ball, are you prepared to put

7    that, work out the language to put in to do that?

8            MS. BALL:  Yes,  Yes, Your Honor.

9            THE COURT:  Okay.  You've won on that point too.

10           MS. BALL:  Particularly true with the Arrowood

11   trust, Karen?

12           MS. DINE:  (indiscernible)

13           THE COURT:  That same second committee objection,

14   you wanted additional language specifying, one, the total

15   amount of minimum consideration payments to be made; two,

16   the amount reserved for trust expenses; and three, you want

17   clarity over how judgments resulting from the independent

18   review option will be paid.

19           MR. STANG:  Well, in particular, Your Honor --

20           THE COURT:  Mr. Stang, just identify yourself for

21   the record.

22           MR. STANG:  James Stang, for the committee.  More

23   quantification is better, but one of the things they don't

24   discuss is, except in I think it's a footnote, that the

25   trust -- the trust that has the LMI/Interstate policies may

1  have to reserve for self-insured retention up to $100,000

2  per claim.  And there's no discussion of that additional

3  reserve at all in the prospect that there are going to be

4  additional distributions beyond the minimum consideration.

5  When you look at the draft with all --

6          THE COURT:  Let me -- Ms. Ball, are you prepared

7  to try and add language to the disclosure statement to --

8          MS. BALL:  We're prepared to try and work that one

9  out, Your Honor.

10          THE COURT:  You want to be able to work it out.

11  Let me give you the next one.  They want additional language

12  clarifying the timing of distributions from the litigation

13  of the use claim supp fund and making clear that the Debtor

14  cannot predict how many litigating abuse claims there will

15  be or when resolution of such claims will be completed.

16          MS. BALL:  In terms of when resolution will be

17  completed, we will commit to work out language.

18          THE COURT:  Okay.  You ought to be able to work

19  out the language.  That same objection, they want inclusion

20  of some foreseeable hypotheticals like those the Committee

21  suggested, which should assist a holder of an abuse claim in

22  understanding how his or her claim may be treated under the

23  plan.  I thought you added some hypotheticals.

24          Is this still an issue, Ms. Dine or Mr. Stang?

25  Because they did add hypotheticals.

1          MS. DINE:  They did add a further description

2     particularly of the IRO process.  So I think at this point

3     we are not going to press on additional hypotheticals.

4          THE COURT:  Okay, fine.  Then that's resolved.  So

5     with respect to parish real estate.

6          MS. DINE:  I'm sorry, Your Honor, if I may.

7          THE COURT:  Go ahead, Ms. Dine.

8          MS. DINE:  As I sit here thinking about the

9     discussion of litigating abuse claims, it may be helpful,

10    particularly given this point about retaining their rights

11    in litigation, to have a hypothetical if you are this kind

12    of claimant, this is how --

13         THE COURT:  You've got a hypothetical.  I'm sure

14    you'll work it out to put it in.  Okay?

15         MS. BALL:  I think we can do that, Your Honor.

16         THE COURT:  Let me just -- with respect to the

17    parish real estate, have you confirmed -- have you inquired

18    and determined that parishes do or don't have appraisals of

19    their real property?

20         MS. BALL:  We have asked every parish, and there

21    are no appraisals that we are aware of.

22         THE COURT:  Okay.  And they've all responded to

23    the inquiry?

24         MS. BALL:  There are two.  And they're in the

25    exhibit.

1         THE COURT:  Okay.  And I saw that.  But I just

2  want --

3         MS. BALL:  But that's all.

4         THE COURT:  What wasn't clear to me is that you've

5  asked all whether they have any, and they've said other than

6  the two, no.

7         MS. BALL:  No.

8         MR. STANG:  We're done with the real estate.

9         THE COURT:  Okay, we're done with the real estate.

10  I do want to hear Mr. Stang in a few minutes on the

11  contributions of each parish.  So we'll get to that in a

12  second.

13         I want to hear -- on Page 30 of the disclosure

14  statement, I think it's still at Page 30, there is the

15  following sentence.  "Since the Debtor plan of

16  reorganization allocates abuse claims into two trusts, abuse

17  claimants may receive different distributions depending on

18  many factors, including but not limited to the nature of

19  their claim, whether they are a litigating abuse claim or a

20  settling abuse claim, and which trust their respective claim

21  is allocated to."

22         It seems to me that that disclaimer, if you will,

23  should be included as a risk factor or otherwise included in

24  the executive summary of the amended disclosure statement.

25         MS. BALL:  We can do that, Your Honor.

1          THE COURT:  I think the Committee has -- whether

2     that's worked out with Mr. Stang and Ms. Dine where and what

3     language to put -- I think --

4          MS. BALL:  It's possible, I agree.

5          THE COURT:  You can't control that.  Neither of

6     you can control it.  It may happen, it may not happen.  I

7     don't know.  But it's a risk.  Okay?

8          Ms. Dine, would you be satisfied with working out

9     something on that point?

10          MS. DINE:  Yes, Your Honor.  We just -- it's about

11     disclosure.

12          THE COURT:  I think that there needs to be in an

13     appropriate place a risk factor of parish insolvency.

14     Absent a confirmed plan, if parishes go to trial, they

15     potentially risk significant plumes of damage awards.  I

16     mean, this is a two-edged sword.  Many abuse claimants may

17     be left high and dry.  They may have good claims, but if

18     somebody recovers a big judgement first and includes

19     putative damages.  So I think there needs to be a couple of

20     sentences added as a risk factor in the event of parish

21     insolvency.  And outside of the confirmed plan, claimants

22     may seek actual and putative damages.  I (indiscernible)

23     language, but I think you ought to be able to -- I think

24     it's a real risk.

25          MS. BALL:  Well, Your Honor, it's also a

Veritext Legal Solutions

212-267-6868                                                     516-608-2400

1    consideration that most parishes at this point would be

2    eligible for Subchapter V with a contingent debt.  So that

3    risk is probably more prevalent than you suggest.

4          THE COURT:  So this issue about the liquidation

5    analysis.  The liquidation analysis presently estimates

6    "maximum of approximately $46 million --" I'll add the word

7    will, "-- be available to general unsecured creditors of

8    which approximately $15 million to $43 million --" I'll add

9    again will be, available to abuse claimants depending on the

10   amount of allowed abuse claims.  In reaching that

11   conclusion, the Debtor provide that "value of the Debtor's

12   plan for purposes of this liquidation analysis has been

13   adjusted downward to approximately $97 million based on

14   excluding the contributions from entities other than the

15   Debtor but does not include the value the Debtor expects to

16   recover from avoidance actions."  That ends the quote.

17         The question I have is does the liquidation

18   analysis fail to appropriately capture the amended plan as

19   presently proposed and fails to offer creditors a proper

20   comparison between the plan and what their potential

21   recoveries would be in a hypothetical Chapter 7 liquidation.

22   It's the initial Committee objection at Paragraph 21.  Are

23   you still pressing that objection, Ms. Dine?

24         MS. DINE:  So, Your Honor, our objection to the

25   liquidation analysis is that it seemed to us to be a non-

1   apples-to-apples comparison and, again, not including the

2   information regarding the parishes and the other people

3   contributing.  And then to sort of take that out of the

4   analysis but then not have any analysis of what the

5   recoveries might be, the recoveries from those third parties

6   that this analysis as a disclosure matter is not

7   particularly helpful.  At the end of the day it may be more

8   of a confirmation issue in terms of a best interest test.

9   But --

10          THE COURT:  Let me ask -- that raises the

11  question.  Are you satisfied with the disclosure statement

12  and you want to reserve the issue for confirmation?

13          MS. DINE:  If the parish contributions are being

14  disclosed now, I think that we would be willing -- and so

15  that's clear in the disclosure statement.  And so even if

16  they cannot apply it for the liquidation analysis, they can

17  have some sense of what is available to them.

18          THE COURT:  And if I wind up ruling that I'll

19  require them to not disclose each parish contribution, but

20  the range amounts of parish contributions?

21          MS. DINE:  Again, Your Honor, I think we think as

22  a disclosure issue, it would be the liquidation analysis

23  should provide some analysis of the recoveries from third

24  parties that are available if they were being released.  So

25  I think that that was really a fundamental problem with the

1   liquidation analysis.

2           MS. BALL:  Your Honor, if I may.

3           THE COURT:  Go ahead.

4           MS. BALL:  This is an issue that Judge Silverstein

5   dealt with in Boy Scouts.  The debate really got off and

6   running with the Quigley case here in New York with Judge

7   Bernstein.  That took a very specific detour in Ditech with

8   Judge Garrity on the issue of, well, you have to sell under

9   363 so you need to apply those rules.

10          The most recent iteration of this was really in

11  Boy Scouts with Judge Silverstein.  And her reaction to --

12  it's about the Calbert disclosure about the assets.  It's

13  about the Calbert disclosure about the assets of third

14  parties so that people will know to make their choice

15  whether to keep their lawsuits alive.

16          That was how she thought this issue should be

17  resolved.  And she actually ruled on it, and I can give Your

18  Honor the cites.  I didn't think it was coming up today.

19  And she was affirmed specifically on that point.

20          THE COURT:  You now have an exhibit that shows

21  cash on hand, real property.  So more or less the value of

22  the parishes is now publicly disclosed.  I'm right about

23  that?

24          MS. BALL:  Certainly the current assets and

25  liabilities, Your Honor.

Veritext Legal Solutions
212-267-6868                                          516-608-2400

1              MS. DINE:  Your Honor, if I may.

2              THE COURT:  Go ahead, Ms. Dine.

3              MS. DINE:  Again, Karen Dine on behalf of the

4    Committee.  I think again a distinction here from BSA and

5    other cases is while they have taken the dismissal toggle

6    off of the table, they are still presenting this as if you

7    are deciding between the dismissal of this case and

8    receiving these recoveries.  And that is part of why we have

9    emphasized the importance of this information.

10             THE COURT:  I can't stop -- I won't stop them if

11   they decide to move to dismiss.  I mean, Ms. Ball has

12   expressed that they've run out of money to keep this case

13   alive absent a confirmed plan.  That's her decision and her

14   client's decision, not my decision.

15             MS. DINE:  No, understood, Your Honor.

16             THE COURT:  I've said I won't sua sponte dismiss

17   this case.

18             MS. DINE:  And all I am saying is if what you are

19   saying to the abuse claimants is here is your choice, that

20   if you do not accept this plan, you may face dismissal of

21   the case, that the information about what the recovery may

22   be from those third parties in the event of dismissal is

23   more important as a disclosure issue than say Boy Scouts.

24   That was really the point.

25             THE COURT:  So they've now disclosed the assets.

1   Are you saying the liquidation analysis should include one

2   or several sentences that explain in the event of dismissal

3   of the case, upon liquidation this is, you know, what you

4   may recover and you still have your claims against the

5   parishes.  Their information has now been disclosed in

6   exhibit-so-and-so.  Does that resolve -- go ahead, Mr.

7   Stang.

8           MR. STANG:  James Stang for the Committee.  I

9   think we pointed this out at the last hearing.  While I

10  have indicated how much of their cash is restricted, they

11  have not indicated how much of their investments, or I think

12  there's a category in the chart of other assets

13  unrestricted, nor have they said in the real estate chart,

14  while they have indicated the use, whether they think those

15  assets are restricted by donative intent or through some

16  religious freedom defense.  And so it is true that they have

17  made disclosures regarding their financial condition.

18          When it comes to the ability to execute on a

19  judgement, there are still deficiencies that we pointed out

20  previously.

21          THE COURT:  So add a sentence that yes, they

22  disclosed and we add a sentence that parishes have disclosed

23  aggregate assets of X.  You know, it may be delaying.

24  People can see which parish has which assets.  But put the

25  caveat that you've just given.

Veritext Legal Solutions
212-267-6868                                                          516-608-2400

1          So I guess where I come out, I agree that the

2    liquidation analysis needs to be supplemented to address the

3    concerns that you and Ms. Dine have raised.  I'm probably

4    not prepared to go quite as far as you want.  But I do think

5    -- I mean, I've gone through all of your objections and I've

6    tried to pick up the ones that, yes, I agree there needs to

7    be changes for.  Okay?  So could you try and work out the --

8    this case is not going to rise or fall on this language.

9    That's just -- okay?

10          MS. BALL:  We are committed to do so, Your Honor.

11          THE COURT:  All right.  Let me flip back.  I've

12    got a long memo.  I think between what you covered and what

13    I've raised since I think -- and what I'm going to propose

14    is -- there are some pro se parties who have asked to be

15    heard.  And I'll hear them now.  Because we're going to take

16    a lunch break and come back and I'm going to hear Mr. Stang.

17    But if any of the pro se parties want to be heard now, I

18    want to hear them.  Okay?  Because I was told that there

19    were several who were coming today who did want to be heard.

20    And I don't know whether they're on Zoom or in the

21    courtroom.  But if there's anybody other than the lawyers

22    sitting at the front table who wants to be heard, I want to

23    hear you.

24          So let me ask first in the courtroom, is there

25    anybody in the courtroom who wants to be heard?  No.

Veritext Legal Solutions
212-267-6868                                              516-608-2400

1          Is there anybody on Zoom who wishes to be heard

2    about the disclosure statement?

3          Deanna -- and there is a hand raise function on

4    Zoom.  I can't see it in the courtroom, but my courtroom

5    deputy does see it.  So if anybody wishes to be heard,

6    either unmute and speak or do the hand raise function and my

7    courtroom deputy will see it and she'll alert me to it.

8    It's important, very important to me that I hear from

9    anybody who wants to be heard with respect to what's

10   happening in this case and whether a disclosure statement is

11   ultimately approved.

12         Deanna, is anybody raising a hand?

13         CLERK:  I do not see any raised hands, Judge.

14         THE COURT:  Okay.  And just one more time, is

15   there anybody in the courtroom who I've not hear from yet

16   who wants to be heard?  All right.

17         So it's 12:36.  Tell me how long you want for

18   lunch, Mr. Stang.  You're up next.  You and Ms. Dine, or

19   I'll let you tag-team.

20         MR. STANG:  1:30, Your Honor?

21         THE COURT:  Okay.  Is that all right?  We'll

22   resume at 1:30.  Look, I basically have said I'm not ruling

23   today.  There needs to be further work done on the

24   disclosure statement.  I wish you would all come to your

25   senses.  Mr. Zipes?

1          MR. ZIPES:  Your Honor, I don't want to add to

2     this, the time here.  But we have one specific issue that we

3     did want to raise as well.

4          THE COURT:  Go ahead.  What is it?

5          MR. ZIPES:  And we could wait until the end or --

6          THE COURT:  Please, go ahead and do it now.

7          MR. ZIPES:  Your Honor, I think our one issue that

8     has not been specifically addressed by the Debtor or the

9     Committee is Judge Mastando's decision in Luftig and

10    specifically his finding that he couldn't have a final

11    ruling on Purdue-type issues and --

12         THE COURT:  On what?

13         MR. ZIPES:  On Purdue-type issues and that he

14    could only issue findings of fact and conclusions of law for

15    the district court as a risk factor that could delay the

16    confirmation of the plan.  And we think it's important to --

17         THE COURT:  I think you can come up with some

18    language that's not going to be disputed.  Thank you, Mr.

19    Zipes.  It is a risk factor.  All right.

20         We'll come back at 1:30.

21         MR. ZIPES:  Your Honor, can I just -- I'm sorry,

22    on a scheduling matter.  I have something at 2:00 and I'm

23    going to get coverage for that.  But I think that --

24         THE COURT:  I have something at 2:00 as well, but.

25         MR. ZIPES:  But I do believe that we made almost

1    all our points, Your Honor, just for the Court's reference.

2            THE COURT: All right.  You know, I'll make some

3    last comments.  And I may be totally wrong about what's

4    going to happen here.  I just envision in my mind -- I'm

5    going to approve the disclosure statement.  You've got to

6    rewrite the solicitation.  It's just not plain English.  I'm

7    going to approve it.  It's going to go out for a vote.  Mr.

8    Stang and Ms. Ball are going to get serious about

9    negotiations.  And one of the things you objected to was

10   whether the Debtor alone could move the dates out.  You

11   know, want them to consult.  But this has happened -- I

12   haven't had a case as difficult as this one, but I think

13   cases where yeah, you know, it happened in Celsius.  A

14   disclosure statement gets approved and goes out for votes

15   and they finally get serious about working out some issues.

16   And as long as there are no adverse effects on creditors --

17   I'm not assuming that would be the ruling here, but when a

18   plan has been changed and there's no adverse effect on

19   creditors, there's a lot of caselaw that says you don't have

20   to resolicit.

21           But I just -- you know, is this what it's going to

22   take to get you to really resolve this?  Don't answer me.

23   I'll see you at 1:30.

24           (Recess)

25           THE COURT:  All right, please be seated.  I think

1    I briefly indicated that I had a 2:00 hearing.  I pushed it

2    to 3:30.  So before I turn to the Committee's counsel, is

3    there any other counsel who wishes to be heard.  Either

4    insurer's counsel or -- come on up, please.

5              MR. ROTEN:  Good afternoon, Your Honor.  I am

6    Russell Roten.

7              THE COURT:  Can you tell me your last name again?

8              MR. ROTEN:  Roten, R-o-t-e-n.  I'm at Duane

9    Morris.  And our firm represents the London market insurers

10   and Cathy Sugayan of Clyde & Co. is on the phone.  She is

11   insurance counsel.

12             MR. ROTEN:  Your Honor, it's two subjects I'm

13   going to talk about.

14             THE COURT:  Yeah, go ahead.

15             MR. ROTEN:  One is the letter that the Committee

16   wishes to have attached to the solicitation.

17             THE COURT:  Yes.

18             MR. ROTEN:  Ms. Sugayan and Mr. Stang negotiated

19   some revised wording to that.

20             THE COURT:  I was going to require that.  It

21   wasn't -- you know, did you work it out?  Have you worked

22   out language?

23             MR. ROTEN:  Yes.

24             THE COURT:  And you shared it with the Debtor as

25   well?

1          MR. ROTEN:  No, we just did it.

2          THE COURT:  Okay.

3          MR. STANG:  Yes, Your Honor, I gave Ms. Ball a

4    copy before the hearing started.

5          THE COURT:  Okay.  Ms. Ball, is the revised

6    language satisfactory to the debtors?

7          MS. BALL:  If I could just confirm with insurance

8    counsel, but I suspect the answer is yes.

9          MS. SUGAYAN:  Your Honor, this is Cathy Sugayan

10   from Clyde & Co.  I also circulated an email to Ms. Ball,

11   Ms. Kramer, and Mr. Stang with the language that I believe

12   we've agreed to.

13         THE COURT:  Is this the same?

14         MR. STANG:  I haven't seen that email.  I

15   handwrote out, gave it to Ms. Ball.  I handwrote it out and

16   gave it to Mr. Roten.  Ms. Sugayan and I read it to each

17   other twice on the phone.

18         MR. ROTEN:  Your Honor, if there's some slight

19   wording difference, I'm sure we can figure it out.

20         THE COURT:  It sounds like this is going to get

21   worked out.  Ms. Ball is raising her thumbs up.  Her

22   insurance counsel is -- I'm sure it's going to get

23   satisfactory.  The disclosure statement is not being

24   approved today.  There's going to be a further blackline

25   done.  The committee's letter has got to be revised.  This

1    will get done.  Okay?  Work out agreeable language and just

2    confirm that whatever is submitted to the Court has been

3    agreed to.  Okay?

4            MR. ROTEN:  Your Honor, we have a number of

5    objections to the disclosure statement, but we were able to

6    resolve almost all of those consensually with the debtor.

7    And we appreciate the debtor working with us on that.

8            But there are two objections that we made that I

9    haven't heard the Court discuss already, and I want to just

10   go through those briefly.

11           The first one, Your Honor, has to do with the

12   rights under the insurance policies that are -- that cover

13   the related parties, the non-debtors.  Those insurance

14   rights are not property of the estate.

15           THE COURT:  No, that's wrong.  The policies are

16   property of the estate.  You are incorrect.

17           MR. ROTEN:  Okay.

18           THE COURT:  It may be that proceeds of policies

19   are shared, but the policies are property of the estate.

20           MR. ROTEN:  Your Honor, we had a ruling in Camden

21   to the contrary.

22           THE COURT:  That's nice, but you don't have a

23   ruling here.

24           MR. ROTEN:  No, I understand.  I'm just trying to

25   make that point that that's our objection.  Okay?

Veritext Legal Solutions
212-267-6868                                                    516-608-2400

1           THE COURT:  Okay, overruled.

2           MR. ROTEN:  Okay.  And the second one, we have a -

3   - there's a couple of related problems.

4           THE COURT:  Please mute your microphone if you're

5   on Zoom, please.

6           Go ahead, Mr. Roten.

7           MR. ROTEN:  Your Honor, the description of the

8   assignment process doesn't describe the assignment of the

9   obligations under the insurance policies.  The main one

10  we're concerned with is the duty to defend.  But there are a

11  number of obligations that the Debtor had under the

12  insurance policies.  These are not typical liability

13  policies; they are indemnity policies where the debtors are

14  self-insured.  And the plan doesn't and the disclosure

15  statement doesn't describe how those obligations are going

16  to be performed after the assignment.  So we don't know who

17  is going to be obligated under the policies to do what.  And

18  of course that's a problem for us.

19          THE COURT:  May I ask this?  There's a lot of

20  state court litigation before Judge Steinman --

21          MR. ROTEN:  There is.

22          THE COURT:  Let me finish my question.  Have the

23  LMI carriers agreed to defend and are they providing a

24  defense in any of the actions?

25          MR. ROTEN:  They don't the duty to defend, Your

 1  Honor.

 2          THE COURT:  Well, then what are you asking me

 3  about then?  You just said they don't have a duty to defend.

 4          MR. ROTEN:  No, I'm saying the question is who

 5  defends.  It's not LMI, now it's the diocese.

 6          THE COURT:  Well, it's not your problem, is it?

 7          MR. ROTEN:  It is our problem.

 8          THE COURT:  Why is it your problem?  You say you

 9  don't have a duty to defend.  Somebody has got to defend the

10  cases.

11          MR. ROTEN:  Yes.  And they have a duty to

12  cooperate with us to use a claims administration, and they

13  have to work --

14          THE COURT:  Well, I'm sure that if the cases go

15  back to litigation, somebody will defend.  And if they want

16  insurance coverage, they have a duty to cooperate.

17          MR. ROTEN:  We're trying to find out who that is,

18  Your Honor.

19          THE COURT:  Well, maybe they don't know who it is

20  yet.

21          MR. ROTEN:  Well, if the plan --

22          THE COURT:  Tell me this.  Is there something that

23  says they have to notify you today who will defend the

24  actions?

25          MR. ROTEN:  No.

 1                   THE COURT:  Okay.  So when the time comes, you'll

 2      be notified.

 3                   MR. ROTEN:  Well, we're objecting to the

 4      disclosure statement on the grounds that it doesn't contain

 5      that information, which we think is important.

 6                   THE COURT:  Well, you just said -- do they have to

 7      tell you today who is defending?

 8                   MR. ROTEN:  No.

 9                   THE COURT:  Then I don't understand your

10      objection.  There's no duty on anybody's part to tell you

11      who is defending the actions at this stage.  And if and when

12      someone is defending the actions, they'll tell you.

13                   MR. ROTEN:  Yes, Your Honor.  But before that

14      happens, we need to know who it is so that we can work with

15      them on --

16                   THE COURT:  Well, when the time comes, they'll let

17      you know.  Because nobody is going to want to blow the

18      insurance coverage.

19                   MR. ROTEN:  I understand.

20                   THE COURT:  And, Ms. Ball, am I missing something

21      here?  Or you have insurance counsel here?  I don't know who

22      wants --

23                   MS. BALL:  I think you have it right, Your Honor.

24                   THE COURT:  Your rights are not affected.  Your

25      objection is overruled.

Veritext Legal Solutions
212-267-6868                                                         516-608-2400

1          MR. ROTEN:  Also, Your Honor, the wording is so

2     vague that we can't tell --

3          THE COURT:  Which wording?

4          MR. ROTEN:  The wording about the assignment.

5          THE COURT:  Point specifically to the wording that

6     you're objecting to.  Do you have it in front of you?

7          MR. ROTEN:  No, I don't.  It's the assignment.

8          THE COURT:  Well, if you have an objection to

9     language, you have to give me the language.

10         MR. ROTEN:  Well, I'm trying to give the Court the

11    concept.

12         THE COURT:  No, I don't want the concept.  I want

13    the language, just the way I ask others to point

14    specifically to the language in various documents.  Concept

15    doesn't do anything for me.  Language does.  If you have an

16    objection to the language, I will consider it.  When you

17    find it, you'll tell me where it is and I will open it up

18    and look at it.

19         MR. ROTEN:  Yes.  I don't have it with me, Your

20    Honor.

21         THE COURT:  Well then your objection is overruled.

22    You don't have any language you're objecting to.  If you

23    come to my court and you have an objection to something, you

24    have to point specifically to what you're objecting to, not

25    a concept, but language.  Just the way I've gone through and

1   required the Debtor or the Committee to provide different

2   language, you can't come up and tell me you object to a

3   concept but can't point to the language.

4           MR. ROTEN:  Well, we did in our brief, Your Honor.

5           THE COURT:  Well, then look at your -- do you have

6   your brief on your computer?

7           MR. ROTEN:  No, Judge.

8           THE COURT:  No.

9           MR. ROTEN:  So we'll just stand on our brief then.

10          THE COURT:  Well, no.  Your objection is

11  overruled.  This is the argument.  This is the time.  Okay?

12  If you have an objection to specific language in the

13  disclosure statement or in the -- the plan is premature.  If

14  you have objection to specific language in the disclosure

15  statement, this is the disclosure statement hearing, this is

16  the time you're required to specifically make your

17  objection.  Not a concept.

18          MR. ROTEN:  Let me see if I can find it, Your

19  Honor.

20          THE COURT:  Somebody wants to help you.  Tell me

21  what it is you're looking at.

22          MR. ROTEN:  This is --

23          MS. BALL:  It's your objection.

24          THE COURT:  I need to know what the language in

25  the disclosure statement is that you're objecting to.

1                    MR. ROTEN:  It's on Page 40 through 41.

2                    THE COURT:  Of the most recent?

3                    MR. ROTEN:  Yes.

4                    THE COURT:  Okay.  Bear with me.  Okay?

5                    MR. ROTEN:  At least I believe it's the most

6     recent.  Yeah, we don't have the latest version.

7                    THE COURT:  I didn't hear that.

8                    MR. ROTEN:  We don't have the recent one here.

9     This is a prior draft.

10                   THE COURT:  Well, I just happen to have it here.

11    Page what?

12                   MR. ROTEN:  40 through 41.

13                   THE COURT:  What's the ECF document that you're

14    looking at?

15                   MR. ROTEN:  Bear with me for a moment, Your Honor.

16                   THE COURT:  Please don't mumble.  You have to

17    articulate out loud so I have a clear record.

18                   MR. ROTEN:  I'm sorry.

19                   THE COURT:  When you speak, you have to speak

20    clearly.  Because there is a transcript that can be

21    prepared.  So you can't mumble.

22                   MR. ROTEN:  Your Honor, I can't find it.  So

23    that's all I have.

24                   THE COURT:  Well, if you can't find it, if there's

25    language you want me to look at and you can't find it, your

1    objection is overruled.  I'm giving you a chance to make

2    your objection.

3              MR. ROTEN:  I understand.  I can't find that

4    wording.  That's my response.

5              THE COURT:  Does anybody else know what he's

6    talking about?

7              MR. ZIPES:  Your Honor, I believe it's now on Page

8    42 is what he's referring to.  On Page 42 rather than 41.

9              THE COURT:  Of the current disclosure statement?

10             MR. ZIPES:  Under the new -- but, Your Honor, I'm

11   sorry, I'm just flying off the cuff as well.  So I apologize

12   if I'm not right about that.

13             MR. ROTEN:  No, Your Honor, that's not the wording

14   I'm looking for.  Okay?  So I understand the Court's ruling.

15             THE COURT:  Okay.  I want a clear record of this.

16   I am giving you a chance to show me the language in the

17   disclosure statement as to which you are objecting.  You

18   have not been able to do so.  Am I correct so far?

19             MR. ROTEN:  Yes.  I don't have the wording.

20             THE COURT:  Okay.  And the objection is overruled.

21   Okay.

22             Anybody else wish to speak?

23             MR. ROTEN:  Your Honor, I might be able to find it

24   if you can just --

25             THE COURT:  Well, find it now.  Now is the time.

1    You know, we've been at it since 10:00 this morning.

2             Anybody on the Debtor's team able to help?  I

3    would much prefer to rule on the merits rather than because

4    of counsel's inability.  Ms. Ball wants to help you, Mr.

5    Roten.

6             Ms. Ball, tell me where we are.

7             MR. ROTEN:  Page 34.

8             THE COURT:  Of the current disclosure statement?

9             MR. ROTEN:  Third modified --

10            THE COURT:  Hold -- hold.

11            MS. BALL:  And the fourth is roughly the same,

12   Your Honor.  Just a minute.  Blackline Number 4, Your Honor.

13   It's on Page 36, which is 157 of 255.  167, sorry, of 255.

14   And that's Docket Number 2885.

15            THE COURT:  Okay, just a second.  All right.  I am

16   in ECF 2885, Page 167 of 255.

17            MR. ROTEN:  Is that --

18            MS. BALL:  That's the same --

19            MR. ROTEN:  Is that Section 10?  Insurance

20   assignment and other insurance policies, Your Honor?

21            THE COURT:  Yes.

22            MS. BALL:  Yes.

23            THE COURT:  What's your objection.

24            MR. ROTEN:  Yes.  Under this insurance assignment

25   and other insurance policies, there is no description of who

1   the assignee is.  So there is a statement that the insurance

2   rights as made to the trust.  That's in Section A.  It's

3   made to the trust free and clear of all claims and so forth.

4   So assuming that the wording that we consider to be vague is

5   resolved.

6           THE COURT:  Which is the words that you consider

7   to be vague?

8           MR. ROTEN:  The entire description doesn't say who

9   the assignee is.

10          THE COURT:  I'm looking at the paragraph on

11  insurance assignment and other policies.  It's Paragraph 10.

12          MR. ROTEN:  Yes.

13          THE COURT:  And there are subparagraphs A through

14  H.  And is there a particular -- and it continues on for

15  several pages after that.

16          MR. ROTEN:  Yes, that's right.

17          THE COURT:  And is there a particular place that

18  you think the language in the disclosure statement is

19  deficient?

20          MR. ROTEN:  Yes.

21          THE COURT:  Where?

22          MR. ROTEN:  In C and D.  It says the trust is

23  responsible for satisfying premiums, deductibles, self-

24  insured retentions, and fronting obligations.

25          THE COURT:  Hold on.  Let me read it.  So in 10C,

1    it says the Arrowood Settlement Trust and the General

2    Settlement Trust shall be solely responsible for satisfying

3    to the extent required under applicable law any premiums,

4    deductibles, self-insured retentions, and fronting

5    obligations arising in any way out of any and all abuse

6    claims.

7            What's ambiguous about that?  It says specifically

8    that the two trusts are solely responsible.  What is not

9    clear about that?

10           MR. ROTEN:  Well, you need to read D as well.

11           THE COURT:  Well, for what -- are you satisfied

12   with C?

13           MR. ROTEN:  All I'm trying to tell the Court is

14   that there are a number of obligations under the insurance

15   policies and this only deals with a limited number --

16           THE COURT:  Okay, just answer my question now.  Do

17   you have any objection to Paragraph 10C?  Yes or no?

18           MR. ROTEN:  As far as it goes, no.

19           THE COURT:  You know, are you having trouble

20   understanding what I'm saying?  Please tell me what is the

21   deficiency in Paragraph 10C that you are objecting to?  What

22   should Paragraph 10C say that it doesn't say?

23           MR. ROTEN:  It should say what all the contractual

24   obligations are and what happens to them.  It only picks a

25   select few.  That's the deficiency.

1          THE COURT:  What contractual obligations do you

2    believe must be specifically addressed in the disclosure

3    statement?

4          MR. ROTEN:  The duty to defend cases.

5          THE COURT:  What else?

6          MR. ROTEN:  The duty to use a claims

7    administrator.

8          THE COURT:  I'm sorry, say that again?

9          MR. ROTEN:   Sorry.  The duty to use a claims

10   administrator.

11         THE COURT:  Yes.  Anything else?

12         MR. ROTEN:  The duty to cooperate with the

13   insurers in the litigation and settlement of cases.

14         THE COURT:  Anything else?

15         MR. ROTEN:  Give me a second.  The duty to produce

16   books and records for examination.

17         THE COURT:  Anything else?

18         MR. ROTEN:  Duty to pay the self-insured

19   retentions.

20         THE COURT:  That's specifically in here.  Look at

21   the language.  Look at the language.  Look at 10C.

22         MR. ROTEN:  Oh, I see that.  Thank you.

23         THE COURT:  "To the extent required under

24   applicable law, any premiums, deductibles, self-insured

25   retentions, and fronting obligations."

```
 1              MR. ROTEN:  I see that.

 2              THE COURT:  What else?

 3              MR. ROTEN:  That's all I can think of right now.

 4              THE COURT:  Did you have an objection to 10D?

 5              MR. ROTEN:  No.  That covers notice.  And that was

 6   --

 7              THE COURT:  You don't have an objection to 10D?

 8              MR. ROTEN:  No.

 9              THE COURT:  So the only paragraph that you have an

10   objection to is 10C.

11              MR. ROTEN:  C and D name specific obligations that

12   are assigned --

13              THE COURT:  Stop.  Do you have any objections to

14   what's in 10D?  Yes or no?

15              MR. ROTEN:  No.

16              THE COURT:  All right.  So 10C is the only

17   paragraph as to which you have an objection.  Is that

18   correct?

19              MR. ROTEN:  As to obligations, yes.

20              THE COURT:  Do you have objection -- look.  Tell

21   me all of your objections.  I can't rule on them if you just

22   say, and other things.

23              MR. ROTEN:  That's it.  I'm just talking about

24   obligations being assigned.

25              THE COURT:  Are there any -- tell me specifically
```

1  -- you've given me a list of four things.  Duty to defend,

2  duty to use claim administrator, duty to cooperate in

3  litigation and settlement of case, duty to produce books and

4  records for examination.  Is there anything else?

5          MR. ROTEN:  I can't think of anything else.

6          THE COURT:  I want to be sure you've got all of

7  your objections on the record.

8          MR. ROTEN:  Well, may I ask Ms. Sugayan if I

9  missed anything?  She is on the phone.

10          THE COURT:  Yes.  Go ahead and ask.

11          MR. ROTEN:  Ms. Sugayan, do you have any

12  additional obligations you'd like to have on the record?

13          THE COURT:  You're on mute.

14          MS. SUGAYAN:  Sorry about that.  The only thing I

15  didn't hear you say was the right to associate.

16          THE COURT:  Right to associate what?

17          MS. SUGAYAN:  In the defense.

18          THE COURT:  Okay.  And either or both of you now

19  told me all of the things as to which you are objecting to

20  in the disclosure statement.

21          MR. ROTEN:  I believe so.

22          THE COURT:  Ms. Sugayan, is there anything else?

23          MS. SUGAYAN:  Well, the Debtor is not to make

24  false or fraudulent claims.

25          THE COURT:  That needs to be in the disclosure

1    statement?

2         MS. SUGAYAN:  No, I was just reading what was in

3    the brief.  I think just the right to associate is all I

4    would add, Your Honor.  Thank you.

5         THE COURT:  Thank you.  All right.  Ms. Ball or

6    one of your colleagues wish to respond?

7         MR. ROSENBLUM:  Your Honor, Benjamin Rosenblum

8    from Jones Day on behalf of the Debtor.

9         Your Honor, the documents say what they say and

10   LMI is not voting on the plan.  So as a disclosure --

11        THE COURT:  Sorry, I'm having a little hearing

12   you.

13        MR. ROSENBLUM:  I'm sorry, Your Honor.  I'll speak

14   up.  The documents say what they say, and LMI is not voting

15   on the plan.  So as a disclosure matter, we put an objection

16   in as to their standing to complain about disclosures.

17   Notwithstanding that, a very nice page on 2885, it's Page 36

18   carrying over into 37, has a long list of LMI contentions

19   that we included at their request, which you will see

20   largely mirror what Mr. Roten went through.  And then to the

21   extent that there's any lack of clarity, obviously the

22   insurers have taken the position that the insurance policies

23   are executory contracts.  We dispute that.  And to the

24   extent there are obligations, there's no mystery as to who

25   those obligations would attach to.

1          THE COURT:  May I ask did you include in the

2  disclosure statement the LMI contention that the insurance

3  contracts are executory contracts?

4          MR. ROSENBLUM:  Yes, Your Honor.  I believe it's

5  in the pages I just referenced.  Sorry, Your Honor.  It's in

6  the blackline on 187, 255.

7          THE COURT:  187 of 255?

8          MR. ROSENBLUM:  That was 187 of 255.  It's Page 56

9  of the disclosure statement.  LMI Interstate Associate

10  International and Lexington Insurance Company contend that

11  their policies are executory and that the trusts --

12          THE COURT:  And that the Debtor must assume the

13  policies.  And it goes on from there.  All right.

14          Mr. Roten, do you see that language?

15          MR. ROTEN:  Yes.  The executory contract is one of

16  the issues we had resolved before today.

17          THE COURT:  Well, then why is Ms. Sugayan raising

18  the issue about the executory contracts if it's been

19  resolved?  I want to know what are the open issues.

20          MR. ROTEN:  I only have one more comment, Your

21  Honor.

22          THE COURT:  Go ahead.

23          MR. ROTEN:  The -- because of the sections that I

24  just went through, and we talked about those sections that

25  are unclear, there is nowhere in that Section 10 that

1    specifies, as I say it, who is going to perform the

2    contracts.  However, it does say contractual rights,

3    insurance rights are assigned to the two different trusts.

4    So one can infer from that that at least something is going

5    to be assigned to the two trusts.

6              So what will happen is you have a situation where

7    the trustee, if the trustee is the assignee, will have

8    contractual duties to LMI that they have to perform in order

9    to keep the insurance in effect, including --

10             THE COURT:  The one thing I can be certain of is

11   you will raise every objection you possibly can to providing

12   coverage.  This is a disclosure statement.  At the time of

13   confirmation, I am sure there will be appropriate agreements

14   and you will complain loudly or argue that it results in a

15   loss of coverage.  This is a disclosure statement to

16   creditors.  Mr. Roten, come back up.

17             MR. ROTEN:  I'm trying to make the objection, Your

18   Honor, but you've cut me off --

19             THE COURT:  You made your objection already.

20             MR. ROTEN:  I haven't made this objection.

21             THE COURT:  They why did you sit down if you

22   hadn't -- I asked you did you have any other objections and

23   you gave me and I wrote down a list of them.  You only get

24   to speak once.  Tell me -- I want -- you're standing there.

25   Tell me every objection you have.  And if you leave anything

1    out, it's too bad.  Okay?  Are there anything in addition to

2    what I've already written down?

3              MR. ROTEN:  Yes.  I was trying to do my last

4    point.

5              THE COURT:  Hurry up.

6              MR. ROTEN:  So if the trustee has contractual

7    obligations to the insurers, then the trustee has to defend

8    and oppose the claim.  On the other hand, if the trustee is

9    a fiduciary to the claimant, the trustee has to try to

10   recover as much as possible on behalf of the claimant.  So

11   the disclosure statement doesn't say anywhere that there is

12   this conflict that the trustee is faced with between its

13   contractual duties to the insurers and its fiduciary

14   obligations to the claimants.

15             And if I were a claimant, I would certainly want

16   to know that the guy representing me has contractual

17   obligations to oppose my claim.  That's the disclosure

18   statement objection.  That's in our papers.

19             THE COURT:  Are you now finished?

20             MR. ROTEN:  Yeah.

21             THE COURT:  Then sit down.

22             Mr. Rosenblum, are you going to respond or is

23   someone else going to respond?

24             MR. ROSENBLUM:  I'll respond to that.  Your Honor,

25   Ben Rosenblum from Jones Day for the Debtor.

1          I just want to seize on Mr. Roten's last words.

2     He said if I were a claimant.  He is not.  He can't -- we

3     have this cited in our briefs, but he can't complain about

4     other people's rights.  He doesn't have standing to do that.

5          With respect to the particular objections, we've

6     included all the contentions that they want about threats

7     regarding coverage.  And there's no mystery as to what is

8     being assigned to the trust.

9          I'm sorry, Your Honor, with respect to his

10    argument that there is an irreconcilable conflict because

11    the trustee has a fiduciary duty to claimants to maximize

12    insurance value and also defends the claim.  One, it's a

13    confirmation objection if anything.  Two, it's exactly the

14    same position that the estate is in now.  So under Mr.

15    Roten's argument, all insurance coverage would be

16    eviscerated upon a bankruptcy filing, which is not the law.

17         And then finally this is a regular course in mass

18    tort cases.  And coming from long-ago asbestos cases,

19    insurance rights get assigned to trusts that are required to

20    divvy out the insurance proceeds and other assets to

21    claimants all the time.  So there's no irreconcilable

22    conflict.  Thank you, Your Honor.

23         THE COURT:  Mr. Rosenblum, let me ask.  If the

24    plan is confirmed and the policy is assigned, who will have

25    the duty to defend?

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit I Part 9, Page 139 of 240

Veritext Legal Solutions
212-267-6868                                                      516-608-2400

1          MR. ROSENBLUM:  Your Honor, to the extent that

2     there's duties -- and our plan provides for not the policy

3     to be assigned, but the chosen action to assign the

4     proceeds.  But to the extent that there are any obligations

5     or conditions to the insurance, it's up to the trust to

6     comply with that.

7          And, Your Honor, I would just add -- and again, 36

8     and 37 of the disclosure statement, we concluded Mr. Roten's

9     contentions.

10          THE COURT:  Which pages, 36 and 37?

11          MR. ROSENBLUM:  Thirty-six and 37 of 2885.

12          THE COURT:  Let me get there.

13          MR. ROSENBLUM:  ECF page is 43 of 255.

14          THE COURT:  Tell me this.  Assuming the plan is

15     confirmed, what further agreements or documentation and

16     between whom will have to be entered into to effect the

17     transfer of rights, privileges, et cetera, under the

18     policies?

19          MR. ROSENBLUM:  Your Honor, I mean, the trust

20     documents.  I believe that's all that we contemplated at

21     this time.

22          THE COURT:  And have those trust documents been

23     drafted already?

24          MR. ROSENBLUM:  They have, Your Honor.

25          THE COURT:  And where is the language in the trust

Veritext Legal Solutions
212-267-6868                                                          516-608-2400

1    documents that deal with insurance?

2             MR. ROSENBLUM:  Your Honor, the trust document are

3    at 2857.

4             THE COURT:  I'm not sure -- read me the language

5    that you are relying on there with respect to it.

6             MR. ROSENBLUM:  So, Your Honor, the actual

7    operative assignment language is the assignment language in

8    the plan.  And then -- but the trust agreements --

9             THE COURT:  Which is the operative language in the

10   plan?

11            MR. ROSENBLUM:  Your Honor, I believe it was the

12   language that Mr. Roten was reading from.  In the disclosure

13   statement it's 2885 Page 35.  It talks about the insurance

14   assignment.  And there's comparable language in the plan.

15   And then the trust documents --

16            THE COURT:  Tell me specifically which language

17   you're relying on?

18            MR. ROSENBLUM:  So going to 10A, "The covered

19   parties shall have irrevocably transfer grant and assigned

20   to the (indiscernible) settlement trust and the general

21   settlement trust shall receive and accept any and all

22   insurance rights."

23            And Ms. Ball is pointing out that it's Article 4G

24   of the plan.

25            THE COURT:  When the covered parties irrevocably

1   transfer and grant and assign to the trusts any and all

2   insurance rights, do the trusts assume whatever obligations

3   arise under the policies?

4           MR. ROSENBLUM:  To the extent of any obligations

5   or conditions, yes.  We're not assigning the policies, but

6   we are assigning the chosen action.  And to the extent that

7   they have to comply with it, it is the trust's obligation to

8   the extent they have to comply with cooperation or --

9           THE COURT:  So what I would like then is a

10  sentence added to the disclosure statement that says -- I'm

11  not giving you the exact words, but upon the assignment --

12  upon the transfer grant and assignment to the trusts, the

13  trust shall have whatever obligations arising

14  (indiscernible).  I mean, does that -- I mean, he's

15  complaining, but there's nothing in here that says that the

16  obligations get assigned.

17          MR. ROSENBLUM:  Your Honor, that's fine, Your

18  Honor.  I would point out that on 37 we included it as a

19  contention.  But we're fine to do that.

20          THE COURT:  Did you intend something else?  I want

21  to be as certain as one can be that if this plan goes

22  effective, that the insurers don't have a defense to

23  coverage because they think there was some language missing.

24          MR. ROSENBLUM:  Your Honor, we will include that.

25          THE COURT:  Okay.  So what I would like you to od

1   is consult with the Committee's counsel.  And I've given you

2   the gist.  Those won't be the exact words, but what I hear

3   as the objection is there was nothing that said anybody had

4   these rights to have these duties to defend, use a claim

5   administrator, et cetera.  And I won't go through that whole

6   list.

7               Mr. Stang?

8               MR. STANG:  Your Honor --

9               THE COURT:  Just make sure you're protecting...

10              MR. STANG:  I'm going to speak clearly and

11  distinctly.

12              I'm getting lots of texts from our insurance

13  counsel as this is going on.  And I'm told, be careful

14  because we may want to argue that the assignment of the

15  rights is different than the assignment of the policies and

16  that whether these duties and obligations come over is

17  something that can still be debated.  We can as a disclosure

18  matter say this is what they contend, but we don't want to

19  be in a position by virtue of the language to concede the

20  point.

21              THE COURT:  That's fine.  Come up with the Debtor

22  with some language to put in that states what their

23  contention is and leaves it open.  I don't want to suddenly

24  create a defense that wouldn't be there.

25              MR. STANG:  Understood.

1          THE COURT:  And if your legal position is right,

2     that's fine.

3          MR. STANG:  Got it.

4          THE COURT:  Okay?

5          MR. STANG:  Thank you.

6          THE COURT:  All right.  So you'll confirm with the

7     Debtor about that.  All right.  Anybody else from -- go

8     ahead, Mr. Rosenblum?  Do you want me --

9          MR. ROSENBLUM:  No.  I was just going to say thank

10    you.  We will do that.  And I was trying to be careful to

11    say if any each time I say...

12         THE COURT:  That's fine.  Make sure it has the

13    words "if any".  All right.

14         Anybody else wish to be heard?  Go ahead, Mr.

15    Stang.

16         MR. STANG:  Last call.

17         THE COURT:  I won't say that you're going to get

18    the final word, but you'll get your word.

19         MR. STANG:  No, no, no.  I meant last call for

20    anyone else.

21         And, Your Honor, when I marked this up, I did it

22    on the blackline.  And so I would refer to the PDF pages of

23    Document 2885.  So the first part of 2885 is the clean --

24         THE COURT:  I have those -- I've got the blackline

25    in front of me as well.

1          MR. STANG:  So I'm at Page 132 of 255.

2          THE COURT:  Let me turn there.  Okay, I am there.

3          MR. STANG:  This is one of those global cut and

4    paste changes, Your Honor.  This is about how much the

5    Debtor is actually contributing.  They say they are

6    contributing $200 million, 2.5 of which is coming from what

7    they characterize as a rebate of my firm's fees.

8          When I was here last, you teased me a little bit

9    saying, well, so you have that thin of a skin that it's

10   somehow being credited to them.  And the answer is it's not

11   a matter of having a think skin or a thick skin.  It's a

12   matter of correct and what is true.  They are not -- unless

13   the fees that my firm has received on an interim basis are

14   considered still property of the estate.  They are not

15   contributing $200 million.  They are contributing $197.5

16   million.  And it is simply not true when they say at the

17   third bullet point on Page 132 that the cash funding, which

18   is what they say the diocese and the covered parties are

19   putting up, includes the $2.5 million fee rebate.  They are

20   not making that contribution.  And I think every time they

21   say 200, it should be changed to 197.5.  That's...

22         THE COURT:  Let me get a response on that and then

23   I'll turn it back to you.

24         MR. STANG:  Okay.

25         MR. ROSENBLUM:  Your Honor, Ben Rosenblum from

1    Jones Day again.

2            So as an initial matter, we put Mr. Stang's

3    contention on Page 7 of the disclosure statement under the

4    Committee's contentions.  And we dropped a note that that's

5    their position.  It's the Debtor's position that the fee

6    reduction, which is how it's framed in their retention

7    documents, is a discount and that it's discussed in their

8    retention as instead of giving a discount that would go to

9    the estate, we want to make sure that our individual

10   creditors get it.  And that's how it's framed.

11           And they did propose language to us -- and it's in

12   their objection -- that this was a voluntary agreement.  But

13   it's in lieu of a discount which other professionals are

14   given.  And, frankly, it avoids the holdback.  And it's --

15   in these cases, they've given discounts.  I mean, the

16   Pachulski firm charges a fraction of what it charges in this

17   case in the upstate diocese cases.  I'm not saying that

18   that's improper.  But it is a discount that would ordinarily

19   go to the estate.

20           THE COURT:  And tell me the amount again?

21           MR. ROSENBLUM:  It's a ten percent discount --

22           THE COURT:  No, but what's the total dollar

23   amount?

24           MR. ROSENBLUM:  It's approximately $2.5 million.

25           THE COURT:  Okay.  And where in the disclosure

1    statement does it have that?  Which page?

2              MR. STANG:  Your Honor, if I might.

3              THE COURT:  Yeah.

4              MR. STANG:  On the blackline it's on 138 of 255 as

5    Footnote 34.

6              THE COURT:  Okay.

7              MR. ROSENBLUM:  That's right.  And accompanies --

8              THE COURT:  Stop.  Now I've lost the page.  Where

9    does it say the $200 million again?  Give me the page

10   number.

11             MR. STANG:  Where does it have the amount, Your

12   Honor?  Where does it have the amount?

13             THE COURT:  Yeah, the $200 million.

14             MR. STANG:  Oh, it's throughout the document.

15             THE COURT:  Yeah, but the first --

16             MR. STANG:  Oh, I'm sorry.

17             THE COURT:  Where you were referring to.  You read

18   me the sentence.

19             MR. STANG:  The executive summary, Your Honor.

20             THE COURT:  Okay.  Just what page?

21             MR. STANG:  It's on Page 132 of 255 --

22             THE COURT:  Okay.

23             MR. STANG:  The first sentence.

24             THE COURT:  Stop.

25             MR. STANG:  I'm sorry, second sentence.

1          THE COURT:  I'll give you your choice, Mr.

2  Rosenblum.  Either put in a parenthetical or a footnote and

3  say the amount includes $2,500,000 reduction in fees by the

4  Committee's counsel.  I'll give you your choice.  Put it

5  parentheses right after the $200 million or just put a

6  footnote and put it at the bottom of the page.

7          MR. ROSENBLUM:  That's fine, Your Honor.

8          THE COURT:  Which are you going to do?

9          MR. ROSENBLUM:  I'm sorry, a parenthetical --

10          THE COURT:  A parenthetical or a footnote.

11          MR. ROSENBLUM:  We'll drop a footnote, Your Honor.

12          THE COURT:  You --

13          MR. ROSENBLUM:  We'll drop a footnote, Your Honor.

14          THE COURT:  Put a footnote.

15          What's your next objection, Mr. Stang?

16          MR. STANG:  Your Honor, on Page 133 of 255, new

17  Footnote 3.  "If a claim objection is a litigated claim."

18  Page 133 of 255.

19          THE COURT:  Yes.

20          MR. STANG:  Third footnote.  This is what I don't

21  understand.  There are -- my general lack of comprehension

22  is are we talking about matters in front of Judge Steinman?

23  We know there are at least two lawsuits pending before Judge

24  Steinman that are against, I believe it's high schools.  And

25  there's been a debate about whether that should have been on

1    the preliminary injunction release list or not.  I can't

2    tell who it is they're talking about here.  And if there are

3    specific lawsuits currently pending before Judge Steinman

4    that in effect are now doing to be stayed again because of

5    this footnote, I think they should say who they are.

6    Because I can't quite figure out what they're talking about.

7              THE COURT:  I don't understand exactly what you're

8    saying.  I'm reading the footnote.

9              MR. STANG:  If a claim objection to a litigation

10   abuse claim is pending, the claim objection will be heard

11   before any other litigation proceeds.

12             THE COURT:  Will be resolved prior to any

13   litigation proceeding.

14             MR. STANG:  Right.  So I guess I would like to

15   know is there a specific matter before Judge Steinman that

16   they believe will be stayed pending the resolution of the

17   claim objection.  That's what I don't understand.  I read

18   the words, but I don't know who they're talking about.  And

19   if they're talking about someone in particular, I think they

20   should tell that person.

21             THE COURT:  Well, let me find out.  What is the

22   meaning of Footnote 3 on Page 133 of 255?

23             MR. ROSENBLUM:  Your Honor, so the purpose of that

24   footnote was in response to a committee comment asking about

25   choice of forum.  And our procedures do provide that if

1    there is a pending claim objection, then it gets -- that

2    gets resolved before the state court litigation.  That

3    procedure is also -- now, there's never going to be a claim

4    objection where the Diocese is a party to the CVA because we

5    don't have that.  But where there is a --

6              THE COURT:  When you say you don't have it, I

7    don't know what -- what are you telling me?

8              MR. ROSENBLUM:  So...

9              THE COURT:  Right now the actions which the

10   Diocese and a covered party are defendants is stayed.

11             MR. ROSENBLUM:  Right, right.

12             THE COURT:  So I'm struggling to understand what

13   you were telling me.

14             MR. STANG:  I'm struggling to understand what

15   they're saying --

16             THE COURT:  Wel, let's do one at a time.

17             MR. STANG:  Okay.

18             MR. ROSENBLUM:  In terms of choice of forum,

19   because the cases before Judge Steinman do not involve the

20   debtor --

21             THE COURT:  For now.

22             MR. ROSENBLUM:  For now, there is no situation

23   where both the Diocese and the parish are in front of Judge

24   Steinman.  So there are parallel -- there is a situation

25   where there's a case in front of Judge Steinman where

1    there's a covered party and not the diocese and there is a

2    claim objection.  And this provides that for litigating

3    abuse claims, the claim objection finishes its course.

4              THE COURT:  What?

5              MR. ROSENBLUM:  The claim objection has to be

6    resolved first.  It doesn't adjudicate the case in front of

7    Judge Steinman --

8              THE COURT:  The claim objection can only be with

9    respect to a claim filed in this case.

10             MR. ROSENBLUM:  Correct.

11             THE COURT:  There may be a motion to dismiss or

12   something with respect to the claim that's against the

13   covered party that's before Judge Steinman.  That's not

14   here.

15             MR. ROSENBLUM:  Correct.

16             THE COURT:  And so what are you saying?  If

17   there's a -- there are no outstanding claim objections.  I

18   think I've decided everything that's been presented to me.

19             MR. ROSENBLUM:  Your Honor, it includes claims

20   that are on appeal.

21             THE COURT:  Right.  So what you're saying is to

22   the extent there are -- you're not contemplating new claim

23   objections, are you, before me?

24             MR. ROSENBLUM:  Your Honor, we have in our

25   solicitation procedures said we have until February 22nd to

 1    bring those on.

 2            THE COURT:  Well, I'm asking you a question now.

 3            MR. ROSENBLUM:  Yeah, I was -- I'm sorry, Your

 4    Honor.  Your Honor, I think there's about a dozen claims

 5    that we contemplate objecting to.

 6            THE COURT:  I guess what you're trying to say is

 7    if there's an objection to claim, claim against the diocese,

 8    I'll be the one burdened with resolving it.

 9            MR. ROSENBLUM:  Right.  Or the district court or

10    the Second Circuit.

11            THE COURT:  In the first instance I'll have to

12    resolve it.

13            MR. ROSENBLUM:  That's correct, Your Honor.  If

14    you haven't already.

15            THE COURT:  And the footnote says what -- that has

16    to be resolved before -- in other words, if the plan is

17    confirmed, I've got to resolve any claim objection against

18    the Diocese before the litigation in the non-bankruptcy

19    forum goes forward.

20            MR. ROSENBLUM:  That's correct, Your Honor.

21            THE COURT:  What's wrong with that, Mr. Stang?

22            MR. STANG:  Well, there's nothing -- well, for

23    today there's nothing wrong with it.  I think people who are

24    in that position should know that their state court

25    litigation is going to be stopped if they file --

1          THE COURT:  It sure doesn't take me very long to

2    rule on claim objections.

3          MR. STANG:  Well, you're moving along with great

4    speed and alacrity.  But I'm just saying that if there are

5    any claims before Judge Steinman that are affected by this

6    footnote, then people should know that.

7          THE COURT:  Why would they be affected by this

8    footnote?  Judge Steinman can do everything he wants to do

9    with respect to the non-debtor party.

10         MR. STANG:  It says, "The claim objection will be

11   resolved prior to any litigation proceeding with respect to

12   such alleged abuse."

13         THE COURT:  Okay.

14         MR. STANG:  It doesn't say --

15         THE COURT:  It shouldn't.  I agree with you.  It

16   shouldn't.  It should say litigation with respect to the

17   Debtor should not proceed until the claim objection is

18   resolved.

19         MR. STANG:  That's what I didn't understand, Your

20   Honor.

21         THE COURT:  Do you disagree with that?  This is

22   all very theoretical because it's...

23         MS. BALL:  Your Honor, we're just conferring.  And

24   we're back to the slide I showed you where you had

25   litigating abuse claims, the 110.  You have claim objections

1    and some 46 of them also state court actions --

2                THE COURT:  Let me ask this --

3                MS. BALL:  So that's it.  The bankruptcy goes

4    first.

5                THE COURT:  If a claim objection -- if an

6    objection to claim against the diocese arises in a -- is

7    pending in a litigation abuse claim, the objection to the

8    claim against the diocese will be resolved in the bankruptcy

9    court.

10               MS. BALL:  Ahat would be fine, Your Honor.

11               THE COURT:  Is that all right?

12               MS. BALL:  That would be fine.

13               MR. STANG:  That I can understand.

14               THE COURT:  Okay.

15               MS. BALL:  That would be fine.

16               MR. STANG:  I didn't understand that.

17               MR. ROSENBLUM:  We'll clarify that, Your Honor.

18               THE COURT:  I don't have the exact words, but we

19   get the -- I think it's clear.  Okay?  Resolved?

20               MR. STANG:  It sounds like it.

21               THE COURT:  Okay.

22               MR. STANG:  The next issue, Your Honor, is on Page

23   135 of 255.  It is -- I don't know what to call these.

24   Diagrams?

25               THE COURT:  Yes.

1          MR. STANG:  Okay.  In this document there are

2     statements that after you've gotten your minimum payment,

3     there is the opportunity to get more from the trusts.  And

4     what they put -- and it's small font for me.  When you look

5     at these bubbles, there is a settlement sub fund.  For the

6     Class Five forty -- there's a -- six million dollars.

7          THE COURT:  $49,660,100.

8          MR. STANG:  There is a suggestion there that

9     that's the amount that the trust can distribute above and

10    beyond the minimum payments.  But that's not correct because

11    there are various reserves including all these self-insured

12    retentions that Mr. Roten was talking about, plus other

13    expenses.

14         I would suggest there be a footnote somewhere

15    inside this diagram so that creditors are advised that these

16    numbers that are in the -- maybe all the sub funds -- are

17    subject to trust expenses.

18         THE COURT:  Mr. Rosenblum?

19         MS. BALL:  That's accurate, Your Honor.  So we

20    will adjust that.

21         MR. STANG:  Good.

22         THE COURT:  You won again.  You're on a roll.

23         MR. STANG:  I'm doing great, Judge.

24         THE COURT:  I think I agreed with virtually all of

25    the objections you've made.

Veritext Legal Solutions
212-267-6868                                                    516-608-2400

 1          MR. STANG:  No, I'm serious.  The next one is risk

 2     factors.  This is Page 137 of 255.  And it's building on

 3     something that Ms. Ball was saying in connection with the

 4     disclosure of the individual parish contributions.  And from

 5     my notes, which he was telling you, was that they are in

 6     process of pulling together contributions from the parishes.

 7     And if people find out --

 8          THE COURT:  They're in the process of getting

 9     commitments from the parishes.

10          MR. STANG:  Yes.  And if the secret sauce recipe

11     is disclosed, maybe some parishes will go, oh, I don't want

12     to pay that much.

13          THE COURT:  I think what I heard was the

14     parishioners will be up in arms if they find out that my

15     parish is paying that much money when we have only one sex

16     abuse claim.

17          MR. STANG:  I was trying to say it in plain

18     English.  But yes, that's exactly what she was saying.  They

19     don't have those commitments.  They don't --

20          THE COURT:  Wait, wait, wait.  That ought to be

21     clear.  Do you have the commitments, Mr. Ball?

22          MS. BALL:  Your Honor, we have sourced each dollar

23     in the 78.1 with a party.  We are worried about

24     parishioners, parents of Catholic school children.

25          THE COURT:  Let's just --

1          MS. BALL:  But yes, the answer is yes.

2          MR. STANG:  I heard the answer to that is no.

3          THE COURT:  No.  You have the commitments,

4    correct?

5          MS. BALL:  We do, Your Honor.

6          MR. STANG:  I heard she -- well, if she says they

7    have the commitments from the parishes to fully fund, then

8    I'm done with it.  But that's not what I heard.  I heard --

9          THE COURT:  Let me ask the question.

10         MR. STANG:  Fine.

11         THE COURT:  Do you have the commitments from the

12   parishes to fully fund the amount that's described in the --

13         MS. BALL:  We have the commitments to fully fund

14   the $78.1 million by and on behalf of parishes.

15         MR. STANG:  Thank you.

16         THE COURT:  You won another one.

17         MR. STANG:  That's not a win or loss.  I mean,

18   that's actually -- I don't know where that falls.  Okay.

19         Your Honor, Page 142 of 255, which is a discussion

20   regarding the limited exculpations.  And particularly it is

21   the next-to-last paragraph of that sort of boxed-in chart.

22         THE COURT:  Counsel representing Official

23   Committee members have not filed a disclosure?

24         MR. STANG:  Well, no, there's nothing -- but what

25   they say is the Committee professionals are not getting an

1    exculpation.  They do not explain why.  The explanation they

2    give is to why the state court counsel are not getting

3    exculpations.

4         So first, they don't explain why any of the

5    Committee professionals are carved out.  I think that they

6    should do that.

7         Second, this is a totally gratuitous attack

8    specifically on Mr. Anderson.  Because he is the one they

9    are referring to when they talk about the 9019 -- I'm sorry,

10   the 2019 statement in connection with -- I guess is it the -

11   - one of the cases.  I think it might be the Syracuse.  I'm

12   not sure which one it is.  Rochester.

13        It has nothing to do with this case.  If they want

14   to ask you to impose some kind of remedy for people who do

15   not file 2019 statements by a date certain, then let them

16   bring that to you and ask for your consideration.  This has

17   nothing to do with this case.

18        THE COURT:  Does it have anything to do with this

19   case, Ms. Ball, Mr. Rosenblum?  One of you.

20        MS. BALL:  Your Honor, we submit --

21        MR. ROSENBLUM:  Your Honor, the public UCCs filed

22   by Mr. Anderson's firm confirmed that he has leaned up

23   diocesan cases which include this case.  And our statement

24   is not that he is doing anything necessarily wrong, but it's

25   our plan and for us to go out and seek exculpation for him

1    when we don't know what state court counsel are doing and we

2    know that they've leaned up --

3              THE COURT:  Take out anything related to any other

4    case.  You pick up, in Chapter 11 cases filed by other Roman

5    Catholic diocese where counsel have filed 2019 statements,

6    parties have raised questions concerning -- we're not going

7    into what's happening elsewhere.

8              MR. ROSENBLUM:  Okay.

9              THE COURT:  So does that take out that whole

10   paragraph?  Which language comes out?

11             MR. STANG:  The first sentence may be true.  I'm

12   not sure it is, but we can check the docket to see if

13   anything was filed, a 2019 statement.

14             MR. ROSENBLUM:  No one has filed a 2019 statement.

15             THE COURT:  You're saying it's an accurate

16   statement in this case that -- the sentence counsel

17   representing other official -- well, representing official

18   committee members have not filed disclosure statements

19   pursuant to Bankruptcy Rule 2019 in this case.  That's an

20   accurate statement?

21             MR. ROSENBLUM:  That's an accurate statement.

22             THE COURT:  Okay.  What about the rest of that

23   paragraph?

24             MR. ROSENBLUM:  The last sentence, we're not

25   seeking exculpation for the professionals at this time.

1          THE COURT:  All right.  Mr. Stang?

2          MR. STANG:  Yes, that's fine, Your Honor.

3          THE COURT:  Okay.  Let's just -- we've got enough

4    to worry about with this case without opening up to what's

5    going on elsewhere.

6          MR. STANG:  Your Honor, Page 144 of 255.  The

7    third full paragraph.  And it's really a question I've got

8    as opposed to alternative language.

9          THE COURT:  Hold on, hold on.  144.  I'm there

10   not.

11         MR. STANG:  Okay.  What this says is that --

12         THE COURT:  Which paragraph are you talking about?

13         MR. STANG:  Third full paragraph.  It's

14   interlineated.  It starts, "Litigating abuse claims will

15   receive no distribution until all litigating abuse claims

16   have been fully resolved."

17         My question is are the indirect abuse -- this is

18   what I'm concerned about.  I am concerned that the insurance

19   companies have indirect abuse claims.  Because if their

20   coverage position is sustained, they may have claims against

21   the Diocese on account --

22         THE COURT:  If they pay on a parish, they may have

23   claims against the diocese, is that what --

24         MR. STANG:  Well, no.  If it's determined they

25   have no coverage exposure at all and they've paid out any

1    defense costs.  That would probably be more -- potentially

2    Arrowood.  I don't know if they get attorney's fees if they

3    win their coverage action.

4         I guess my point is this.  We all understand now

5    litigating abuse claims in the context of -- or maybe

6    contested abuse claims -- in the context of the Diocese

7    making a challenge to a claim.  But this defined term

8    encompasses indirect abuse claims as well.

9         We know there are seven entities that -- those

10   seven that were listed that are indirect abuse claims that I

11   -- I don't know if those -- all indirect abuse claims are

12   litigation abuse claims.  They are included in the

13   definition.  So we know there are the seven that were

14   listed.  And I don't know if the insurance companies are

15   part of the indirect abuse claim terminology as well.

16        And so it's simply that -- you know, to say they

17   have been fully resolved --

18        THE COURT:  Is it an accurate statement to say

19   there is a risk that the expenses of litigating and

20   litigating abuse claims either or both settlement trusts may

21   exceed the amount of funds in the applicable sub fund?

22        MR. STANG:  Absolutely.

23        THE COURT:  That statement is here, right?

24        MR. STANG:  Yes.  I'm thinking more about the

25   timing than I am about whether there's anything to

Veritext Legal Solutions
212-267-6868                                    516-608-2400

1   distribute.  They can't distribute a dollar out of those sub

2   funds until all of the litigation abuse claims have been

3   resolved.

4           THE COURT:  So you want it to say litigating abuse

5   claims will receive no distribution from the applicable

6   litigating claim sub fund until all litigating abuse claims,

7   including --

8           MR. STANG:  It's a matter about who are we talking

9   about.  And if we're talking about the insurance coverage

10  actions as well, that is something that I think survivors

11  should know.  Because my first read of this was, oh, well,

12  they're talking about their claims objections.

13          But because litigation of abuse claims includes

14  indirect abuse claims, it would include any counterclaims

15  for contribution that the seven have.  And I'm asking does

16  it include claims that the insurance companies might have.

17  That's really my question.  Because it's not clear to me

18  whether the insurance companies are indirect abuse

19  claimants.  And I think if they are, people should know that

20  given the pendency of the coverage actions.

21          MR. ROSENBLUM:  Your Honor, I don't believe any of

22  the insurance companies have filed proofs of claim, but we

23  are -- I think indirect abuse claims would cover them to the

24  extent they had claims.  So we can include language.

25          MR. STANG:  There are numerous insurance companies

1    that (indiscernible).

2              THE COURT:  Just add the -- work out the

3    additional -- it's another clause I think.

4              MR. ROSENBLUM:  We're happy to include them.

5              MR. STANG:  Oaky.

6              THE COURT:  You won again.

7              MR. STANG:  I'm doing great.  Let's see.  On Page

8    145 of 255, the paragraph above the one that starts,

9    "litigating abuse claims".

10             THE COURT:  I'm sorry, it starts...

11             MR. STANG:  Okay.  So if you go to the bottom,

12   you'll see there is in italicization, "litigating abuse

13   claims".

14             THE COURT:  Yes.

15             MR. STANG:  Okay.  The paragraph above that.

16             THE COURT:  Yes.

17             MR. STANG:  And it talks about how you can get a

18   point advancement.  They should specify --

19             THE COURT:  Let me read it to myself first.

20             MR. STANG:  Okay.  Your Honor, it's a long

21   paragraph.

22             THE COURT:  It's not that long.

23             MR. STANG:  Okay.

24             THE COURT:  Hold on.  Okay, go ahead.

25             MR. STANG:  To the exclusion of any ecclesial

1    claimants.  Because they've said before that ecclesial

2    claimants can't do this.

3              THE COURT:  Add a clause.

4              MR. STANG:  Okay.

5              THE COURT:  Do you agree, Ms. Ball?

6              MS. BALL:  Technically no, Your Honor.  But I

7    think --

8              THE COURT:  Technically no?

9              MS. BALL:  -- common sense would suggest that no

10   one with an ecclesia claim would do it.  Because there's no

11   insurance settlement on the horizon from ecclesia, so why do

12   it?  We agree on --

13             MR. STANG:  There actually would be a reason to do

14   it, but I'm not sure I want to say it public.  I can tell

15   Ms. Ball afterwards why we think it should be clear whether

16   ecclesia people can do this or not.

17             THE COURT:  Could you work out the language to

18   add?  May be unnecessary, but...

19             MR. STANG:  Okay.  Next, Your Honor, 146 of 255.

20             THE COURT:  Hold on.

21             MR. STANG:  I'll wait for you to get to the page.

22             THE COURT:  Going the wrong way.  Okay.

23             MR. STANG:  It is under sub-point D as in dog.

24   The second paragraph.  And if you would read the first two

25   sentences, please.

 1                THE COURT:  Okay.

 2                MR. STANG:  Starting with "under the plan".

 3                THE COURT:  Okay.

 4                MR. STANG:  This to me is a risk factor.  And I

 5     don't know whether we have gone beyond the material

 6     extension.  You have said that a mid-March voting deadline

 7     is not going to happen.  And so they said that they're okay

 8     for the $16 million so long as the plan confirmation

 9     timeline is not materially extended.

10                I guess I would like to hear from the Debtor what

11     they think a material extension would be and if we're in a

12     position of having to make a statement in risk factors

13     regarding --

14                THE COURT:  Tell me this.

15                MR. STANG:  Are you talking to me or --

16                THE COURT:  You, Mr. Stang.

17                MR. STANG:  Yes, sir.

18                THE COURT:  I'm sorry, Mr. Stang.

19                MR. STANG:  No, no.  I just didn't know who you

20     were pointing to.

21                THE COURT:  When somebody reads a transcript, they

22     don't see what's going on.  Okay?

23                You think that creditors need more time to be able

24     to digest all this stuff and vote, right?

25                MR. STANG:  Yes.  We thought that their time

1    deadline was too short.

2              THE COURT:  How much time do you think it should

3    be?

4              MR. STANG:  I believe we agreed that --

5              MS. DINE:  We had agreed to the March 15th date to

6    try and move -- Your Honor, Karen Dine on behalf of the

7    Committee.  We actually have -- to the extent that this is

8    going out for a vote, the Committee and others are getting

9    anxious that it just gets moving.  So we had actually on an

10   assumption that if this were approved today it would go out

11   on the 13th had agreed to the March 15th deadline.  But I

12   think --

13             THE COURT:  It's not getting approved today.  I'm

14   not trying to -- let me interrupt you.  I want to get this

15   done.  I know you're objecting.

16             MR. STANG:  But we want votes out, too.  We really

17   do.

18             THE COURT:  I'm going to get another blackline.

19   There are things that you've got to work out language.  The

20   sooner I get it, the sooner I can act.  What I would say is

21   if you think on the assumption that it was approved today,

22   March 15th works.  Just move March 15th by the number of

23   days before there is an order anywhere.

24             MR. STANG:  I guess what I'm really saying to the

25   Debtor and to the Court is they have kind of a floor of an

Case 2-19-20905-PRW   Doc 3116-9   Filed 05/14/25   Entered 05/14/25 22:50:13   Description: Exhibit I   Page 166 of 240

1    amount of money they have to have, $16 million, in order to

2    be able to fund their share of the 200.  They say but if the

3    timeline is materially extended, we're not sure that the 200

4    is -- our piece of the 200 is going to be there.

5              So I would just like the Debtor to keep in mind

6    that they do have this reservation.  And if the ultimate

7    timeline changes, that should be something the disclosure

8    statement should reflect.

9              THE COURT:  Ms.  Ball?

10             MR. STANG:  Just a cautionary statement perhaps.

11             MS. BALL:  Your Honor, we'll work on it.

12             THE COURT:  Okay.

13             MS. BALL:  But we're really thinking it's a 30-day

14   vote and we're hoping to get guidance from you on exactly

15   what you just said about getting you the revised pages and

16   getting the Committee's language.  Next week.  Love to be in

17   front of you next Friday and submit everything to you

18   Wednesday.

19             THE COURT:  Why Friday?

20             MS. BALL:  Because I'm assuming the Committee can

21   get us theirs by Monday.  We'll get you everybody's by

22   Wednesday.  And if you're available Thursday and you're

23   willing to act overnight, that was all.  But we'll do it

24   Thursday if that's what you want.

25             THE COURT:  Okay.  Mr. Zipes, did you want to say

1   something?

2           MR. ZIPES:  Your Honor, I don't want to say

3   anything about the timeline.  Greg Zipes with the U.S.

4   Trustee's Office.  I did have a comment about the ballot.

5   And I'll --

6           THE COURT:  We'll get to the ballot.  The ballot

7   needs to be redone.  I said that earlier today.  Go ahead,

8   Mr. Stang.

9           MR. STANG:  Your Honor, I'm almost...

10          THE COURT:  I'm interrupting you.  Mr. Zipes, have

11  you given the Debtor proposed language changes for the

12  ballot?

13          MR. ZIPES:  Your Honor --

14          THE COURT:  I know you objected to the ballot.

15          MR. ZIPES:  We objected to it for a specific

16  reason that we think is clear.  And to our knowledge, the

17  ballot has not been changed.  But I can just raise --

18          THE COURT:  Look.  I think we're headed to an

19  approved disclosure statement, soliciting material, ballot,

20  everything.  The sooner we get there, the better.  Everyone

21  has to cooperate in fine-tuning the language.  Reserve all

22  your objections and all of that.

23          Go ahead, Mr. Stang, I'm sorry.

24          MR. STANG:  Your Honor, I have one more comment.

25  And I'm sorry, I'm going to ask you to go backwards.  But

Veritext Legal Solutions
212-267-6868                                                                  516-608-2400

 1   it's only one time.  Page 135 of 255.  Actually, it shows up

 2   twice.  But it's the caption under "the choice".

 3           THE COURT:  Hold on.  Wait, wait.

 4           MR. STANG:  I'm sorry.  I apologize.  It's 135 of

 5   255.  And this --

 6           THE COURT:  Wait one...

 7           MR. STANG:  Sorry.

 8           THE COURT:  Just so you're all clear, I'm here

 9   Monday through Thursday of next week.  I want to get this

10   done.  Now I've got -- we will -- it may be early or late in

11   the day.  Whatever hearings you need, you'll get.  Okay?

12   Let's get it done by Thursday.

13           MS. BALL:  Thank you, Your Honor.  We will work

14   with the Committee to try to get you something opening

15   business Wednesday, and hopefully a hearing Thursday.

16           THE COURT:  Go ahead.

17           MR. STANG:  Okay.

18           THE COURT:  Come on, Mr. Stang.

19           MR. STANG:  No, no, no.  It's fine.  135 of 255.

20   The bold letters below the graphs.

21           THE COURT:  The choice?

22           MR. STANG:  Yes.  The choice is not vote for the

23   plan or choose dismissal, it's --

24           THE COURT:  I agree, it's not.

25           MR. STANG:  -- vote for the plan or risk

1    dismissal.

2              MS. BALL:  We can do that.

3              MR. STANG:  And then that shows up -- and this is

4    my last comment.

5              THE COURT:  Go ahead.

6              MR. STANG:  137 of 255 is the second line on that

7    page.  It says, "The alternative here, dismissal of this

8    bankruptcy case."  It should say in the alternative -- an

9    alternative, the risk of dismissal.

10             MS. BALL:  I'm sorry, I don't know where you are,

11   Mr. Stang.  Okay, thank you.

12             MR. STANG:  It should say an alternative here, the

13   risk of dismissal in this bankruptcy case.

14             THE COURT:  Okay.

15             MR. STANG:  With that, Your Honor, I'm going to

16   sit down.  Ms. Dine may have comments.

17             THE COURT:  Ms. Dine, you know, usually I only

18   want to hear one counsel.  But let's get everything on the

19   table.

20             MS. DINE:  Including the solicitation procedures,

21   Your Honor?

22             THE COURT:  Yes.  Let's move to the solicitation

23   procedures.  You did a wonderful job putting the disclosure

24   statement in plain English.  Not so wonderful job with

25   respect to the ballot.

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit I, Page 170 of 240

1          MS. DINE:  Your Honor, Karen Dine, Pachulski Stang

2     Ziehl & Jones, on behalf of the Committee.

3          With respect to the solicitation procedures, we

4     did not raise specific comments on the ballot.  And

5     certainly to the extent Your Honor has comments -- and we

6     can work with the Debtor on changes to the ballot.  We did

7     though want to be included in the process and receive

8     updated reports as the Debtor gets them of the balloting to

9     have at least some consultation or consent rights to the

10    extent that they are extending the voting line or with

11    respect to defective ballots and examining those.  And so we

12    had asked for those and been told no.  And the other --

13         THE COURT:  Am I correct that creditors have the

14    right to change their vote up to the deadline?  That's what

15    typically is provided.  And my comments earlier, wishful

16    thinking on my part.  You're finally going to get serious

17    about negotiating when the package goes out, solicitation

18    and voting.  And, you know, it should only happen sooner.

19    But I've seen this, you know, request to extend the voting

20    deadline and then the plan gets tinkered with and votes

21    suddenly change.  And I'm sorry if this is down to a game of

22    chicken now.  Look, I really do think this is a terrible

23    result for everybody.  For the survivors, for the diocese,

24    the parishes.  It's a terrible result if this case winds up

25    being dismissed.

Veritext Legal Solutions
212-267-6868                                                    516-608-2400

1        I think, you know, survivors who wind up at the

2   end of -- first off, you're going to wind up with parishes

3   in bankruptcy and survivors who wind up at the end of the

4   line.  We're going to be adding (indiscernible) them.  But

5   you'll all do what you're going to do.  But I just -- you

6   know, I said this earlier this morning.  I kind of have this

7   feeling this dance is going on.  Let's get this step out of

8   the way.  And I suddenly envision -- maybe it's not going to

9   happen.  I don't know.  But there are going to be requests

10  to extend the voting deadline.

11        Ms. Ball, do you object to consulting with the

12  Committee about extending the date, the voting deadline?

13        MS. BALL:  Your Honor, extending a date when we're

14  all in the same room, getting notice through yourself, I

15  have no objection.  The other consent rights were far more

16  troubling, remembering they will be actively soliciting

17  rejection of the plan.

18        THE COURT:  I know they're going to have town hall

19  meetings and...

20        MS. BALL:  And that changes votes can be a product

21  of saying counsel in so many cases, I'm big, you're small,

22  how can you do this.

23        So, Your Honor, there's a lot of opportunity for

24  mischief here.  But actually I would like to defer these

25  questions to Mr. Rosenblum, who is responsible for the

1    solicitation.

2           THE COURT:  What are you objecting to on

3    consultation with the committee?

4           MR. ROSENBLUM:  Your Honor, we can consult with

5    the Committee.  But what they asked for were consent rights

6    over everything.  And the procedures contemplate that

7    everything is subject to contrary order of the Court.  So if

8    they think we're doing something inappropriate, they can get

9    a court order.  But for them to be able to unilaterally

10   block things we don't think is appropriate.

11          THE COURT:  Well, none of you are going to do this

12   unilaterally, period.  If you want to extend the voting

13   deadline, you've got to get mt to say the voting deadline is

14   extended.  I just do that in all my -- I don't let the

15   parties -- I don't let the parties do it.  I don't require

16   formal motions.  I require a letter or a telephone call, we

17   set up a conference call.  I don't hold the process up, but

18   I don't give the parties unilateral right to do those

19   important things.

20          MS. BALL:  That's fine, Your Honor.

21          MS. DINE:  Understood, Your Honor.  And just to

22   say one of our concerns -- and I don't know if this goes to

23   Ms. Ball's point -- was just a concern that if defective

24   ballots came in or ballots they viewed as defective came in

25   before the voting deadline, we wanted to be kept abreast of

Veritext Legal Solutions
212-267-6868                                                            516-608-2400

1   that.  And whether that's working with the Debtor to reach

2   out together to any claimants to try and make sure that they

3   have the full opportunity to vote as -- certainly the

4   ballots are very complicated and --

5           THE COURT:  Do you have any objection to that, Ms.

6   Ball?  Look, transparency and openness is the only way this

7   case is going to work.

8           MS. BALL:  Your Honor, I would remind that it's

9   the voting tabulation agent that declares it defective.  So

10  it's not us.

11          THE COURT:  But you'll find out for the defective

12  --

13          MS. DINE:  And our issue isn't that it may well be

14  defective and they're concerned maybe that we take that as

15  an opportunity and calling somebody to try and get them to

16  correct it, to correct it the way we want.  So if there's a

17  way we could at least coordinate that -- what we want to be

18  sure of is that everybody actually gets their chance to

19  vote.  And the fact that they, you know, marked two boxes,

20  that they get the chance to go back and mark just the one

21  box, for example.

22          MS. BALL:  Your Honor, there has to be a way to

23  deal with our concern and theirs.  And so far, we've tried

24  to work on this solicitation and it has been very

25  productive.  Can you let us --

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit I, Page 174 of 240

 1                 THE COURT:  Yes.

 2                 MS. BALL:  -- take a shot at how -- sharing this

 3     information is not the issue.  It's the outreach that

 4     concerns us.

 5                 THE COURT:  Okay.  I should have raised this point

 6     earlier, voting.  This doesn't necessarily have to be the

 7     final language.  Any claimant who also has a CVA lawsuit

 8     pending against a covered party shall be entitled to vote on

 9     the plan.  If the claim against the diocese has been

10     expunged, whether or not the decision is final, the claimant

11     shall have a claim for voting purposes of one dollar.

12                 I believe it's improper to remove the right to

13     vote from any claimant who has a CVA action that's pending.

14                 MS. BALL:  That would be (indiscernible), Your

15     Honor.

16                 THE COURT:  I'm sorry?

17                 MS. BALL:  You're referring to the CVA actions

18     against covered party that we propose --

19                 THE COURT:  Against covered party, yes.

20                 MS. BALL:  -- could cause insurance to be

21     channeled.

22                 THE COURT:  It is.  Okay.  I don't want to get

23     into this issue of, well, you know, appeals are final and

24     their claim against the diocese is expunged, they don't get

25     to vote.  What I want to be clear is if they have a claim

1   against a lawsuit, a CVA lawsuit against a covered party,

2   they get to vote.  What's the amount of the other votes?  Is

3   everything one dollar?

4           MS. BALL:  That's fine, Your Honor.

5           THE COURT:  Is everything one dollar?

6           MR. STANG:  Yes.

7           THE COURT:  That's what I thought.  They get the

8   same one dollar.  It's not affecting a large number of

9   claims.  I just don't want anybody with a CVS lawsuit to

10  feel that they were disenfranchised from voting on the plan.

11  There may be different issues when we get to confirmation.

12  I want to be clear.  I'm not citing any confirmation issues.

13  But they shouldn't feel that they were disenfranchised from

14  voting on a plan that affects their rights.  Okay.

15          So the only thing that's change from what I can

16  propose is -- if I understood you earlier today, if the

17  expungement is final, they don't get to vote.  Am I right

18  about that?

19          MS. BALL:  Yes.

20          THE COURT:  Okay.  So that's the only change I am

21  making.  I wrote this language down a little while ago.

22  Find where it goes.  And it doesn't have to be working out

23  exactly -- I just want to be sure that anybody with a CVA

24  action against a covered party...

25          MS. BALL:  Votes.

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit I,  Page 176 of 240

1          THE COURT:  Votes.

2          MS. BALL:  Understood, Your Honor.

3          THE COURT:  Okay.  Go ahead.  I'm sorry, Ms. Dine,

4    I interrupted you.  I wrote it down on a piece of paper and

5    I forgot to raise it.

6          MS. DINE:  Thank you, Your Honor.  that's very

7    helpful.  And I really only had one last item, which may be

8    a little more appropriate to take up when we have a sense of

9    the new schedule.  But in terms of the timing of a hearing

10   on the motion to dismiss, the Committee's request would be

11   that after the tabulation of the votes are in, which may

12   then toggle which direction the Debtor decides to go, that

13   there would be at least 14 days for the Committee to respond

14   to any such motion.

15         THE COURT:  I will follow my usual practice,

16   asking the Committee and the Debtor to work out a schedule.

17   They can file their motion, but it doesn't necessarily mean

18   it's heard on the 14th day.  Okay?  If we unfortunately

19   reach that eventuality, you will work out -- I'm not going

20   to drag this out, but I'm going to give you time to respond.

21   It's one thing to file the motion.  It's another thing to

22   get the hearing and the ruling.  I'm trying to schedule

23   things very promptly and not let things linger.

24         MS. DINE:  Understood.  And I believe Ms. Ball had

25   mentioned this earlier.  Again, our concern is just we don't

1   think that the parties should be spending time, expending

2   effort.  You know, for example, preparing for a plan

3   confirmation hearing or a dismissal hearing until we really

4   know what direction this is going to go.

5           THE COURT:  Would you please -- is there any

6   mediation going on again or not?

7           MR. STANG:  Nothing scheduled, Your Honor.

8           THE COURT:  It seems to me that when I sign the

9   order approving the disclosure statement, it's time to

10  mediate again.  Because I think the clock really starts

11  running.  There's a voting deadline.  And if it doesn't get

12  extended, the votes, that's it.  You're shaking your head,

13  Mr. Stang.

14          MR. STANG:  Your Honor, I'm not sure that the day

15  after it goes out is the time to start.  I think both sides

16  need to see how the voting is coming out.  If I get a -- if

17  there's a big block of votes that we had counted as a no

18  that come out as a yes -- because we're constantly thinking

19  about who is going to do what -- then that would make us go,

20  well, there's some risk here.  And vice versa.

21          THE COURT:  Yeah.  You've got to play your cards

22  close to the vest.

23          MR. STANG:  Well, we both are, Your Honor.

24          THE COURT:  You are.  That's right.

25          MR. STANG:  I mean, Ms. Ball comes in here time

1    after time telling you that there are state court counsel

2    just waiting for her return phone call because they want to

3    sign on.  But she's never told us how many people are doing

4    that, who they are --

5                    THE COURT:  Let's leave that out.  Okay?

6                    MR. STANG:  Well, I'm just saying.  But both of us

7    are playing it pretty close to the vest.

8                    MS. DINE:  With that, Your Honor, I think I'll sit

9    down.

10                   MR. STANG:  Mr. Roten and I are going to go sit

11   next to each other.

12                   THE COURT:  Mr. Zipes, on the ballot.  Let's talk

13   about the ballot.

14                   MR. ZIPES:  Your Honor --

15                   THE COURT:  I didn't -- you know, I don't have a

16   copy of it written and marked.  I just thought, ugh -- I

17   don't know what a transcript says for this.

18                   MR. ZIPES:  Your Honor, my comment is just one at

19   this point.  And I don't think we need the ballot in front

20   of us.  It's reflected in our objection.  And, Your Honor,

21   the ballot has a specific box where the attorney can check

22   the ballot on behalf of the survivor.

23                   THE COURT:  They are agents.

24                   MR. ZIPES:  As an agent.  And, Your Honor, we

25   believe in this case and in other diocese cases we've made

1    this argument as well, that the survivor, him or herself,

2    should be signing -- this is not a public document, but

3    there should be some acknowledgement that the survivor has

4    actually reviewed everything and understands what's

5    happening given the nature of this case.  But we're

6    concerned that the attorneys may have too much control.  Too

7    much control might be the wrong word for it.

8             THE COURT:  Attorneys have obligations.  They

9    represent clients.

10             MR. ZIPES:  They do.

11             THE COURT:  They have a fiduciary duty to their

12    client.  If they do something contrary -- if they don't have

13    authority to do what they did, they could have their ticket

14    pulled at some point.  Potentially the risk of it.  I

15    just...

16             MR. ZIPES:  Your Honor, I understand your point.

17    And in a normal case I would agree with you.  In this case,

18    we think there's maybe some language that the attorneys

19    specifically verifies that he or she has gone over --

20             THE COURT:  I see everybody rising on this one.

21    Go ahead, Mr. Stang.  It's  your constituency.

22             MR. STANG:  Thank you, Your Honor. Well, their

23    clients are.

24             For the last 20 years I've worked with many of the

25    law firms we're talking about.  And I think Mr. Geremia can

Veritext Legal Solutions
212-267-6868                                                           516-608-2400

1    attest some of them are working -- is he here -- very, very

2    hard in state court and being very aggressive

3    representatives of their clients.  And references to there

4    may be mischief going on, which I think is what Ms. Ball

5    said, and this concern that somehow these lawyers are

6    somehow less ethical or less responsible than any other,

7    frankly is offensive.  It just is.  These people work very

8    hard --

9              THE COURT:  I didn't understand Mr. Zipes to say

10   that.

11             MR. STANG:  Says in this case they need

12   verification.

13             THE COURT:  I didn't understand Mr. Zipes to say

14   that.

15             MR. STANG:  Okay.  Well, Ms. Ball did the mischief

16   work.  I mean, what is going on here that everyone is taking

17   potshots at these lawyers who are giving a voice to

18   survivors who were silenced for years by the legislature and

19   are now in my opinion trying to be silenced by the Debtor.

20             So I'm just a little tired of having them beaten

21   up on.

22             THE COURT:  Stop.  I have your point.  The lawyers

23   are the agents for their client with respect to the ballot,

24   and I understand the argument you're making, Mr. Zipes, but

25   it's overruled.

1          MR. STANG:  Thank you.

2          THE COURT:  But I don't have the ballot in front

3  of me.  I just felt it wasn't sufficiently clear for what it

4  is people were voting on and what they had to do.

5          Bear with me a second.

6          MR. ZIPES:  Your Honor, if you do want to see the

7  -- if that is the question that you want to see the ballot,

8  it's Docket -- there are several ballots.  I'm sorry.

9          MS. BALL:  That said, Judge, we are committed to

10  work with the Committee on cleaning up solicitation and the

11  ballot.  But if you have guidance that you would like to

12  share, we are all ears.

13          THE COURT:  I don't.  Work with the Committee in

14  clearing it up.

15          MS. BALL:  All right.  We will --

16          THE COURT:  It's in both your interests that it be

17  as clear as possible.

18          MS. BALL:  Totally agree.  Totally agree.  If

19  there's any guidance, we welcome it. But we will commit to

20  do that.

21          THE COURT:  All right.  It's been a long day.

22          MS. BALL:  Anything...

23          THE COURT:  I don't have -- I gave you my issues.

24          MS. BALL:  Back to the timeline.  Back to the

25  timeline.  Is Your Honor available on Thursday afternoon?

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit I, Page 182 of 240

1          THE COURT:  3:00.

2          MS. BALL:  Thank you, Your Honor.  We will

3   endeavor to get you something on the day before.  And let us

4   work with the Committee on how we get there.

5          THE COURT:  Okay.  So Deanna is listening as well.

6   Thursday, February 15th, 3:00.

7          MS. BALL:  Thank you, Your Honor.

8          THE COURT:  All right.  Anything else anybody has

9   to raise for today?  Okay.  We are adjourned.

10          (Whereupon these proceedings were concluded at

11   3:13 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya M. Ledanski Hyde

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  February 16, 2024

| & |
| --- |
| **&** 10:8 118:10 119:10 170:2 |

| 1 |
| --- |

**1** 12:17 33:16 37:15 54:8,9
**1,000** 41:23,25 43:3,8,13
**10** 19:5 20:4 41:8 69:3 128:19 129:11 135:25
**10,000** 41:7 46:12 47:9
**100** 86:20
**100,000** 36:11 78:19,23 80:3 105:1
**10004-1408** 1:13 4:4
**10017** 3:15
**10281-1047** 3:6
**10a** 140:18
**10c** 129:25 130:17,21,22 131:21 132:10 132:16
**10d** 132:4,7,14
**11** 21:11 69:4 158:4
**110** 19:21 20:2 20:25 21:22 24:22 26:14 27:11 31:17 64:20 152:25

**11501** 183:23
**12** 6:18 97:25
**12151** 183:6
**12:36** 115:17
**13** 30:10,22 32:1
**130** 19:5 21:4 21:14 58:4 86:6
**132** 144:1,17 146:21
**133** 147:16,18 148:22
**135** 153:23 168:1,4,19
**137** 155:2 169:6
**138** 146:4
**13th** 20:14,16 20:19 26:16 27:14,20 165:11
**14** 70:6 176:13
**142** 156:19
**144** 159:6,9
**145** 162:8
**146** 163:19
**14th** 176:18
**15** 6:21 70:24 71:5 109:8
**157** 128:13
**15th** 28:15,18 29:2 165:5,11 165:22,22 182:6
**16** 21:20 22:2 22:25 23:13

164:8 166:1 183:25
**167** 128:13,16
**16th** 25:11 26:15
**17** 22:25
**170** 98:3
**18** 11:23
**180** 73:10,12 74:9
**187** 135:6,7,8
**1951** 66:4
**197.5** 144:15
**197.5.** 144:21
**1976** 33:16 37:15
**19th** 7:11
**1:30** 115:20,22 116:20 117:23

| 2 |
| --- |

**2** 32:8 33:22 36:16,22 37:8 37:9,10 101:22
**2,500,000** 147:3
**2.5** 144:6,19 145:24
**20** 21:2,14,18 41:8 44:5,6 64:21 179:24
**20,000** 41:13 44:6 46:12 47:9,18,19
**20-12345** 1:3 11:12
**200** 96:19 97:20,25 144:6

144:15,21 146:9,13 147:5 166:2,3,4
**20078** 5:19,23
**20079** 5:17
**2019** 157:10,15 158:5,13,14,19
**2021** 6:21
**2024** 1:15 183:25
**21** 109:22
**22** 20:19 26:17 27:14,20
**22nd** 150:25
**24** 20:17,18 27:18
**240,000** 63:24
**250** 3:5 62:25
**250,000** 63:22
**255** 30:13,15 30:22 32:2 73:10,11 74:9 74:9 128:13,14 128:16 135:6,7 135:8 139:13 144:1 146:4,21 147:16,18 148:22 153:23 155:2 156:19 159:6 162:8 163:19 168:1,5 168:19 169:6
**2697** 2:6
**27** 26:17,21
**2707** 2:6
**2752** 2:6

Veritext Legal Solutions
212-267-6868 516-608-2400

**2754** 2:6
**2755** 2:6
**2786** 2:6
**2790** 2:6
**2793** 2:6
**2794** 2:6
**28** 87:6
**2812** 2:7
**2813** 2:7
**2818** 2:7
**2825** 2:7
**2826** 2:7
**2828** 2:5
**2829** 2:5
**2834** 2:5
**2855** 2:5
**2857** 140:3
**2858** 12:13
**2859** 2:5
**2867** 2:5
**2873** 2:5
**2874** 2:5
**2885** 2:5 12:8
20:22 30:13
128:14,16
134:17 139:11
140:13 143:23
143:23
**2891** 2:7
**2892** 2:7
**2896** 2:7
**2897** 2:7
**29th** 12:11
**2:00** 116:22,24
118:1

**3**

**3** 30:14 147:17
148:22
**30** 12:15
107:13,14
166:13
**300** 183:22
**3018** 26:10
**31** 25:2,13,18
**330** 183:21
**34** 128:7 146:5
**34th** 3:14
**35** 140:13
**36** 128:13
134:17 139:7
139:10
**363** 111:9
**37** 134:18
139:8,10,11
141:18
**3:00** 182:1,6
**3:13** 182:11
**3:30** 118:2

**4**

**4** 31:7,11,12
32:1 33:1
34:14 36:2
49:12 51:5
73:5 128:12
**40** 126:1,12
**41** 126:1,12
127:8
**42** 127:8,8
**43** 109:8
139:13

**46** 20:13 27:17
62:15 63:4
109:6 153:1
**49** 72:21,23
**49,660,100**
154:7
**4g** 140:23

**5**

**5** 48:19 49:9,10
**50** 49:22 96:18
**50,000** 17:21
36:11
**500** 31:20 43:3
43:9,16
**52** 66:4
**54** 74:9
**56** 135:8
**58** 90:2,3

**6**

**6** 19:8 30:21
31:12 32:1
33:1 34:10,14
36:19
**630** 58:4
**67** 96:21
**6th** 12:8 25:11

**7**

**7** 12:10 19:7
20:8,21 63:20
109:21 145:3
**7/15/21** 6:19
**7019297000...**
6:20
**739** 4:3
**75** 50:17,21,25
51:13,24 52:6

52:10,20
**76** 54:23,23
**77** 20:10
**78.1** 93:12,17
155:23 156:14
**780** 3:14

**8**

**8** 1:15 27:23
68:24 102:6
**80** 23:9
**821** 90:2,4
**8th** 20:13,16,17
27:18

**9**

**9** 68:25
**90182** 5:23 7:4
**9019** 157:9
**97** 109:13
**9:32** 1:16

**a**

**abbot's** 85:22
**ability** 17:21
25:19,21 79:1
90:24 91:13
113:18
**able** 14:9,15
28:16 29:3
103:14 105:10
105:18 108:23
120:5 127:18
127:23 128:2
164:23 166:2
172:9
**above** 21:14
33:23,25 34:1
71:5 73:4

154:9 162:8,15
**abreast** 172:25
**absent** 108:14
112:13
**absolute** 77:2
91:16
**absolutely**
160:22
**abuse** 19:6,9
19:10,16,19,20
20:7,9 21:1,7,8
21:8,11,13
26:8 30:7,22
31:7,16,20
32:3,10,12
34:5,6,7,8,9,9
34:12,13,17
36:18,19,22
37:4,13 38:13
38:18 48:7
54:9 57:10,13
58:15,20 60:18
62:18 64:22
65:1,7 67:1,1,2
67:5,9,20 68:6
68:18,24 70:3
90:9 92:13
99:11 103:22
104:1,2,3
105:14,21
106:9 107:16
107:16,19,20
108:16 109:9
109:10 112:19
130:5 148:10
150:3 152:12
152:25 153:7

155:16 159:14
159:15,17,19
160:5,6,8,10
160:11,12,15
160:20 161:2,4
161:6,13,14,18
161:23 162:9
162:12
**accept** 42:12
112:20 140:21
**accepted** 17:1
51:6,7
**accompanies**
146:7
**accomplished**
16:18
**account** 78:16
79:17 159:21
**accurate**
154:19 158:15
158:20,21
160:18 183:4
**accurately**
72:18
**acknowledge**
96:15
**acknowledge...**
179:3
**act** 165:20
166:23
**action** 31:19
66:3 67:8
75:17 139:3
141:6 160:3
174:13 175:24
**actions** 19:12
20:19,19 21:3

21:18 25:8
27:21 62:7,13
63:5 109:16
121:24 122:24
123:11,12
149:9 153:1
161:10,20
174:17
**active** 96:18
**actively** 171:16
**actual** 108:22
140:6
**actually** 20:22
29:22 38:5
49:2,5 68:20
77:21 79:20
81:21 111:17
144:5 156:18
163:13 165:7,9
168:1 171:24
173:18 179:4
**add** 27:17 49:4
52:2,14,19
56:24 57:3
63:13 87:4,25
105:7,25 106:1
109:6,8 113:21
113:22 116:1
134:4 139:7
162:2 163:3,18
**added** 46:7
48:19 69:14
72:2 75:14
81:22,23
105:23 108:20
141:10

**addendum**
19:8
**adding** 72:11
102:24 171:4
**addition** 21:6
137:1
**additional**
37:16 38:12
39:9 40:13
41:21 42:2
62:1 79:19
84:5 104:14
105:2,4,11
106:3 133:12
162:3
**address** 6:6
10:16 36:15
48:17,18 55:23
71:10,21 72:12
73:14 100:6
103:20 114:2
**addressed**
55:16 63:12
88:25 116:8
131:2
**addressing**
38:18
**adequacy**
42:13
**adequately**
56:20
**adjourned**
182:9
**adjournments**
13:15
**adjudicate**
150:6

**adjust** 154:20
**adjusted** 38:8
  83:23 109:13
**administering**
  17:15
**administration**
  122:12
**administrator**
  131:7,10 133:2
  142:5
**admit** 97:25
**admonition**
  29:17
**advance**
  100:19
**advanced** 67:8
**advancement**
  162:18
**adverse** 117:16
  117:18
**advised** 154:15
**advisory** 66:25
  67:4,10,15,18
  67:22,22 68:7
**affect** 74:5
**affected** 52:6
  123:24 152:5,7
**affecting** 175:8
**affects** 175:14
**affirmed** 27:1
  111:19
**afternoon**
  118:5 181:25
**agent** 5:15
  173:9 178:24
**agents** 178:23
  180:23

**aggregate** 93:9
  113:23
**aggressive**
  180:2
**ago** 13:11
  15:21 60:22
  84:8 89:5,6
  138:18 175:21
**agree** 7:21
  39:11 61:12
  100:25 108:4
  114:1,6 152:15
  163:5,12
  168:24 179:17
  181:18,18
**agreeable**
  120:1
**agreed** 82:8
  103:5 119:12
  120:3 121:23
  154:24 165:4,5
  165:11
**agreement**
  13:12 14:2
  26:7 45:5,7
  145:12
**agreements**
  11:25 101:11
  101:12 136:13
  139:15 140:8
**ahat** 153:10
**ahead** 5:8
  15:10 36:14
  37:10 40:20
  42:20 48:3,3
  48:10 54:17
  57:7 62:17

63:6,8,11
  66:21 67:25
  68:16 70:10
  73:23 79:11
  82:5 92:18
  100:10 106:7
  111:3 112:2
  113:6 116:4,6
  118:14 121:6
  133:10 135:22
  143:8,14
  162:24 167:7
  167:23 168:16
  169:5 176:3
  179:21
**alacrity** 152:4
**alaska** 85:20
  86:19
**alert** 115:7
**aligned** 9:24
**alike** 69:1
**alive** 18:4 25:2
  111:15 112:13
**allegations**
  33:17 34:11
  48:21
**alleged** 66:2
  152:12
**alleging** 37:14
**allocated** 76:24
  107:21
**allocates**
  107:16
**allocation** 49:6
**allowance** 31:9
  31:18 32:5
  33:2 34:16

35:13 36:18
**allowed** 18:21
  18:25 25:20
  26:11 31:17
  46:14 71:13
  109:10
**alternative**
  60:4 159:8
  169:7,8,9,12
**ambiguous**
  130:7
**amend** 24:25
  54:13
**amended** 12:6
  107:24 109:18
**amicus** 53:24
**amount** 6:4
  46:19 47:1,1
  47:25 48:7
  63:16 77:24
  104:15,16
  109:10 145:20
  145:23 146:11
  146:12 147:3
  154:9 156:12
  160:21 166:1
  175:2
**amounts** 9:8
  79:19 110:20
**analysis** 109:5
  109:5,12,18,25
  110:4,4,6,16
  110:22,23
  111:1 113:1
  114:2
**anderson**
  157:8

**anderson's**
157:22
**andrew** 3:8
5:11
**answer** 24:25
66:1 70:4,5
117:22 119:8
130:16 144:10
156:1,2
**answers** 70:7,8
**anxious** 15:10
165:9
**anybody**
114:21,25
115:1,5,9,12
115:15 127:5
127:22 128:2
142:3 143:7,14
175:9,23 182:8
**anybody's**
123:10
**anymore** 80:20
**anyway** 59:19
83:19
**apologies** 69:4
**apologize**
127:11 168:4
**appeal** 25:2,5
25:20 26:25
71:13 74:4
150:20
**appealed** 66:8
**appeals** 18:13
24:24 28:23
174:23
**appeared** 13:2

**appears** 30:8
49:5,8 70:5
**appended**
12:10 20:22
**apples** 43:23
110:1,1
**applicable**
130:3 131:24
160:21 161:5
**apply** 25:24
28:4 110:16
111:9
**appointment**
82:8
**appoints** 67:12
67:23
**appraisals** 95:6
106:18,21
**appreciate**
10:1 16:23
74:22 120:7
**appreciative**
17:7
**approach** 15:6
18:5
**approached**
92:1,2
**appropriate**
72:13 108:13
136:13 172:10
176:8
**appropriately**
109:18
**approve** 51:1
99:21 117:5,7
**approved**
16:22 17:11

65:2 115:11
117:14 119:24
165:10,13,21
167:19
**approving**
177:9
**approximately**
109:6,8,13
145:24
**area** 45:23
101:2
**arguably** 63:4
**argue** 16:13
136:14 142:14
**argument** 46:6
46:10,14
125:11 138:10
138:15 179:1
180:24
**arises** 153:6
**arising** 130:5
141:13
**arms** 155:14
**arrowhead**
76:16
**arrowood**
23:24 55:19
56:18 71:11,14
74:4 76:20,22
77:3,8 78:17
78:19 79:13,18
79:19 81:3
96:20,21
103:20,21
104:10 130:1
160:2

**arrowood's**
71:16
**article** 140:23
**articulate**
126:17
**asbestos**
138:18
**asked** 28:14
29:25 45:23
47:18 48:17
52:4,13 55:13
62:23 67:14
68:14 69:1,5,5
69:21,22,23
71:20 75:8
82:17,19 83:2
84:7 85:3
106:20 107:5
114:14 136:22
170:12 172:5
**asking** 79:10
80:16 90:16,23
122:2 148:24
151:2 161:15
176:16
**assess** 62:8
93:5
**asset** 77:11
**assets** 22:17
85:5,19 89:19
94:22 95:2,3
111:12,13,24
112:25 113:12
113:15,23,24
138:20
**assign** 139:3
141:1

**assigned** 7:3
132:12,24
136:3,5 138:8
138:19,24
139:3 140:19
141:16
**assignee** 129:1
129:9 136:7
**assigning**
141:5,6
**assignment**
121:8,8,16
124:4,7 128:20
128:24 129:11
140:7,7,14
141:11,12
142:14,15
**assist** 10:21
105:21
**associate**
133:15,16
134:3 135:9
**associated**
50:10 62:22
63:17
**assume** 22:15
26:25 135:12
141:2
**assuming**
17:13 29:1
50:17 103:10
117:17 129:4
139:14 166:20
**assumption**
165:10,21
**assure** 68:15

**attach** 134:25
**attached** 7:16
7:25 8:6 97:3
98:17,21
118:16
**attachment**
5:17,18,24
8:13
**attack** 157:7
**attacking** 58:2
59:10
**attempted**
51:10
**attest** 180:1
**attorney** 4:2
178:21
**attorney's** 9:5
160:2
**attorneys** 3:4
3:13 179:6,8
179:18
**authentically**
59:2
**authority**
22:21 23:1
48:6 179:13
**automatic**
15:25
**available** 33:21
71:8 109:7,9
110:17,24
166:22 181:25
**avenue** 3:14
**avoid** 29:25
**avoidance**
109:16

**avoids** 145:14
**award** 38:20
**awarded** 40:15
**awards** 108:15
**aware** 13:2
40:23 75:25
76:14,19
106:21

**b**

**b** 1:21 3:17
**b.r.** 90:2,3
**back** 6:24 11:7
13:6 21:4
29:24 31:25
32:1 34:14,25
36:16 38:11
47:21 62:15,16
63:4 68:23
71:23 75:13
78:3,12 81:24
84:1 89:16
96:6,14 98:17
114:11,16
116:20 122:15
136:16 144:23
152:24 173:20
181:24,24
**backlash** 92:10
**backwards**
167:25
**bad** 68:21
137:1
**ball** 3:9 11:18
11:18,21 12:4
12:13 13:5,20
14:1,12,16
15:12 16:2

17:4,25 18:8
18:20 19:4,14
19:16 20:1,5
20:11,21 21:15
21:20 22:2,4,9
22:22,25 23:3
23:14,20,23
24:2,5,11,15
24:18,20 25:1
25:8,12,15,20
26:2,4,6,18,21
26:24 27:4,15
27:20 28:11,14
28:19,22 29:4
29:7,14,19,23
30:10,13,16,19
30:24 31:3,5
31:10,14,16
32:7,16,20,23
33:4,8,13,15
33:20 34:1,4
34:18,21 35:3
35:5,9,12,17
35:19,25 36:2
36:5,15,23
37:2,6,9,11,20
37:22 38:5,23
39:3,5 40:21
41:5,7,9 43:18
44:9,11,14,24
45:1,15 46:2
46:10,16,21
47:8 48:3,4,11
49:11,24 50:4
50:7,19 51:4
51:10,16,19,22
51:23 52:3,9

52:14,18 53:3
53:6,11,16,18
53:22,24 54:2
54:5,15 55:18
56:5,9,23 57:5
57:8,15 58:4
58:23 59:24
60:2,11,14
61:25 62:1,12
62:18,22,25
63:7,9,12 64:4
64:8,10,13,16
64:18 65:10,14
65:16,19,24
66:1,6,9,12,14
66:16,18 67:14
67:25 68:14,22
69:9,11,13,19
70:2,10,12
71:22 72:8,17
72:24 73:2,4,7
73:10,12,22,24
74:2,9,12,14
74:18,20,25
75:4 78:3,25
79:5,8 80:1,2,6
80:8,11,14
81:14,16,18,20
82:5,6 83:11
83:15,20,23,25
84:14,22 85:11
87:6,8,10,13
87:19,23,25
88:7,11,14,16
89:3,13 90:5
90:21 91:12,15
91:21 92:12,14

92:24 93:3,11
93:21 94:2,4,9
94:17,21,24
95:10,18,23
96:1,6 97:6,10
97:17 99:14
100:5,23 101:2
101:7,9,17,20
102:3,6,13,18
103:4,8,10,13
103:17 104:6,8
104:10 105:6,8
105:16 106:15
106:20,24
107:3,7,25
108:4,25 111:2
111:4,24
112:11 114:10
117:8 119:3,5
119:7,10,15,21
123:20,23
125:23 128:4,6
128:11,18,22
134:5 140:23
152:23 153:3
153:10,12,15
154:19 155:3
155:21,22
156:1,5,13
157:19,20
163:5,6,9,15
166:9,11,13,20
168:13 169:2
169:10 171:11
171:13,20
172:20 173:6,8
173:22 174:2

174:14,17,20
175:4,19,25
176:2,24
177:25 180:4
180:15 181:9
181:15,18,22
181:24 182:2,7
**ball's** 42:6
172:23
**ballot** 16:19
167:4,6,6,12
167:14,17,19
169:25 170:4,6
178:12,13,19
178:21,22
180:23 181:2,7
181:11
**balloting** 170:8
**ballots** 28:9
170:11 172:24
172:24 173:4
181:8
**bamboozled**
80:25
**bankruptcy**
1:1,11,23
15:19 22:19,19
27:24 69:15
74:5 81:24
84:9,21 85:1,5
85:7,9 86:2,16
86:20 102:7
138:16 151:18
153:3,8 158:19
169:8,13 171:3
**based** 7:1 29:8
29:14 39:6

48:6,21 72:15
76:25 79:3
85:19 100:17
109:13
**basic** 40:23
**basically** 64:2
69:23 97:14
103:22 115:22
**basis** 85:20
144:13
**battle** 87:24
**bear** 48:18
126:4,15 181:5
**beaten** 180:20
**beginning** 33:9
74:14
**behalf** 8:1 10:8
11:15,19 12:20
15:11 54:2,3
93:11 102:20
112:3 134:8
137:10 156:14
165:6 170:2
178:22
**belief** 76:3
**believe** 6:5
16:3 21:22
23:14 27:8
42:25 43:16
49:24 52:21
61:23 63:15
68:19 70:7
71:18 84:5,5
86:5 116:25
119:11 126:5
127:7 131:2
133:21 135:4

139:20 140:11
147:24 148:16
161:21 165:4
174:12 176:24
178:25
**ben** 3:10 60:20
68:1 137:25
144:25
**bench** 71:24
**benefit** 90:23
**benefits** 90:15
**benjamin**
134:7
**bernstein**
111:7
**best** 27:9 42:3
42:16 77:2,23
110:8
**bet** 89:2,2
**bets** 50:21
**better** 77:25
85:5 104:23
167:20
**beyond** 46:24
48:20 71:5
105:4 154:10
164:5
**bias** 14:20
**big** 13:22,24
77:15 96:15
108:18 171:21
177:17
**bigger** 103:15
**biggest** 88:18
**bishop** 68:15
68:15

**bishops** 54:6
**bit** 144:8
**blackline** 97:1
103:7 119:24
128:12 135:6
143:22,24
146:4 165:18
**blacklines** 61:8
**blame** 49:20
**block** 172:10
177:17
**blow** 123:17
**blowback**
92:17
**blown** 47:20
**board** 14:15
45:4
**body** 102:14
**bold** 168:20
**book** 95:6
**booklet** 19:5
**books** 131:16
133:3
**borne** 41:13,16
41:19 43:9
**bother** 22:16
22:18
**bothered** 53:9
**bottom** 10:2
11:6 20:10
147:6 162:11
**bound** 51:24
**bowling** 1:12
4:3
**box** 173:21
178:21

**boxed** 156:21
**boxes** 173:19
**boy** 24:2 27:13
29:15 38:24
41:18,19 42:4
45:19 47:14,19
83:21 111:5,11
112:23
**break** 114:16
**breaking** 86:24
**brief** 25:3
53:25 125:4,6
125:9 134:3
**briefly** 118:1
120:10
**briefs** 54:1
138:3
**bring** 45:16
56:13 151:1
157:16
**bringing** 55:15
**brooklyn** 65:4
65:7,17,20,23
66:7,9,13
76:20,21
**brother** 7:17
7:17 8:1
**brother's** 7:25
**brothers** 65:16
**brought** 12:12
12:20 31:4
69:20 82:20
**bruh** 4:7 42:24
43:5,6,6,12,20
**bsa** 47:16
112:4

**bubbles** 154:5
**bucket** 49:13
54:12
**bugging** 48:10
**building** 155:2
**bullet** 34:1
37:4,12 38:13
40:25 49:4
99:7,20,21
101:22 144:17
**bunch** 103:4
**burden** 16:2,2
18:1 49:1
89:16 93:4,6
**burdened**
151:8
**bureau** 55:25
**buried** 38:1,3
52:22 53:5
**business**
168:15
**butler** 3:8 5:8,9
5:11,12,14
8:14
**butler's** 9:25

| c |
|---|

**c** 3:1 5:1
129:22 130:12
132:11 183:1,1
**calbert** 111:12
111:13
**calculations**
27:7
**california** 86:4
**call** 12:22
143:16,19
153:23 172:16

Case 2-19-20905-PRW,    Doc 3116-9,    Filed 05/14/25,    Entered 05/14/25 22:50:13,
Description: Exhibit I, Page 192 of 240

172:17 178:2
**called** 30:6
44:16
**calling** 59:4
173:15
**camden** 13:9
13:14 14:5,13
15:17 40:24
45:3,5 62:3
88:17 120:20
**candidates**
82:7
**cap** 41:14
78:21
**capita** 76:25
**caption** 168:2
**capture** 109:18
**cards** 177:21
**careful** 142:13
143:10
**carefully** 11:23
**carriers** 121:23
**carrying**
134:18
**carved** 157:5
**case** 1:3 5:15
9:11,23 12:16
12:23,24 13:12
14:7,12 15:19
15:24 16:5,7
16:11 17:16
21:24 22:6,14
37:24 42:25
43:3 49:18,19
54:23 63:1
75:22 85:18,20
86:22 90:1,16

90:19 92:20
94:19 95:21
101:9 111:6
112:7,12,17,21
113:3 114:8
115:10 117:12
133:3 145:17
149:25 150:6,9
157:13,17,19
157:23 158:4
158:16,19
159:4 169:8,13
170:24 173:7
178:25 179:5
179:17,17
180:11
**caselaw** 117:19
**cases** 13:7,17
14:2,24 15:2,5
19:3 22:16
29:9,15 38:22
39:2,7,13 40:7
41:17,21,22
42:6 43:25
44:25 47:11
50:2 65:6,20
84:4,19,21
86:23 88:17,19
96:12,19,21
112:5 117:13
122:10,14
131:4,13
138:18,18
145:15,17
149:19 157:11
157:23 158:4
171:21 178:25

**cash** 95:8
111:21 113:10
144:17
**castigating**
57:21,23
**catch** 46:8
**categories** 21:6
**category** 20:2
113:12
**catholic** 1:7
11:11 54:5
64:25 90:13,14
91:17 93:12
155:24 158:5
**cathy** 118:10
119:9
**cause** 66:2
174:20
**caused** 63:13
77:3
**cautionary**
166:10
**caveat** 113:25
**celsius** 117:13
**cemetery's**
83:3
**centre** 1:7
11:12 66:3,6
**certain** 136:10
141:21 157:15
**certainly** 37:13
52:19 62:14
74:21 82:11
111:24 137:15
170:5 173:3
**certified** 6:19
183:3

**cetera** 38:19
95:8 139:17
142:5
**chagrined**
15:23
**chair** 49:20
**challenge**
29:10,16,25
37:3 62:4
90:18 160:7
**challenges** 19:1
**chance** 51:20
97:15 100:21
127:1,16
173:18,20
**change** 33:4
34:22 44:20
49:16 52:1
61:3,5 170:14
170:21 175:15
175:20
**changed** 15:25
61:17 117:18
144:21 167:17
**changes** 34:18
51:25 100:21
103:5 114:7
144:4 166:7
167:11 170:6
171:20
**changing** 69:13
**channel** 22:9
**channeled** 28:2
174:21
**chaos** 92:4
**chapter** 92:3
109:21 158:4

**characterize**
144:7
**charges** 145:16
145:16
**charities** 93:12
**charity** 90:15
**chart** 35:19
44:1 49:12
85:7 86:12,14
113:12,13
156:21
**charts** 29:19
30:1,25 31:4
32:12 48:20
84:3,11,24,24
84:25 85:10,15
86:9 88:9,19
88:20 96:7,10
**chase** 11:21
88:4
**check** 158:12
178:21
**checked** 10:1
**chicken** 170:22
**child** 99:4
**children** 99:2
99:17,25 100:1
155:24
**choice** 49:1,8
49:15 95:11,13
95:16 96:9
111:14 112:19
147:1,4 148:25
149:18 168:2
168:21,22
**choose** 8:8 11:3
71:3 89:18

92:19 168:23
**chooses** 8:19
**chose** 22:13
102:10
**chosen** 27:25
69:17 139:3
141:6
**circuit** 50:18
50:18,24 51:12
51:24 52:4,6
52:12 53:17,21
151:10
**circuit's** 52:5
**circulated**
119:10
**circumstance**
94:10
**circumstances**
48:6
**cited** 138:3
**cites** 111:18
**citing** 175:12
**claim** 2:1 5:16
5:18,18,19,22
5:25 6:19 7:2,3
7:4,5,8,9,17,25
8:6,9,10,20,20
8:22 9:7,12
10:10,12,12,14
10:18,19,19
18:20 19:9,10
19:11,16 21:3
21:8,16,17
22:6 25:25
27:24 28:8
30:7,22 31:7,8
31:16,20 32:12

34:8,9,9,11,12
34:13,17 35:13
35:13 39:6
40:15 46:7,14
58:8 60:6,25
61:24,25 62:7
63:1 64:1,21
64:22 65:1,1
68:24 69:15
71:13 75:17
76:2,5 77:15
77:20 82:10
85:4 104:2
105:2,13,21,22
107:19,19,20
107:20 133:2
137:8,17
138:12 142:4
147:17,17
148:9,10,10,17
149:1,3 150:2
150:3,5,8,9,12
150:17,22
151:7,7,17
152:2,10,17,25
153:5,6,7,8
155:16 160:7
160:15 161:6
161:22 163:10
174:9,11,24,25
**claimant** 19:9
31:22 37:7
41:14 48:7,12
48:21 49:11
54:10 59:6,7
67:5 68:6,18
75:13 76:13

80:4 106:12
137:9,10,15
138:2 174:7,10
174:13
**claimants**
15:11 18:18
20:18 25:13
29:3 38:13
40:24 41:13
56:25 65:21
66:2 67:1,1,2
68:3 70:3 71:8
78:17,19 79:13
79:14,19
107:17 108:16
108:21 109:9
112:19 137:14
138:11,21
161:19 163:1,2
173:2
**claims** 5:14
6:18 8:12
13:21 14:21
15:4,13 17:14
17:16,17,19,22
17:24 18:3,4
18:12,23,23,24
18:25 19:6,6,8
19:19,20,21
20:7,9,12 21:1
21:2,7,8,11,14
21:21,22,25
22:7,9,12,21
23:5,13 24:22
25:22 26:8,18
27:12 32:10
34:4,5,6,7

Veritext Legal Solutions
212-267-6868                                                                           516-608-2400

35:14 36:18,19
36:22 37:4,14
40:14,14,22,25
55:23 57:10,14
58:4,15,17,21
58:21 59:4
60:11 62:4,18
63:17,20 64:19
64:22,25 65:7
65:12,21 66:5
67:6,9,21
75:12,19 76:1
76:24 77:17,22
78:16 79:18
82:12 84:9,13
86:21 92:13
99:12 103:22
104:1,3 105:14
105:15 106:9
107:16 108:17
109:10 113:4
122:12 129:3
130:6 131:6,9
133:24 150:3
150:19 151:4
152:5,25
159:14,15,19
159:20,23
160:5,6,8,10
160:11,12,20
161:2,5,6,12
161:13,14,16
161:23,24
162:9,13 175:9
**clarified** 75:14
**clarify** 36:2
56:11 81:12,23

153:17
**clarifying**
105:12
**clarity** 104:17
134:21
**class** 33:11,16
33:17 34:10
36:20 37:4,13
48:23 50:25
54:8,9 154:6
**classes** 30:4
51:14 52:7
**clause** 162:3
163:3
**clean** 73:2,3,8
74:10 143:23
**cleaning**
181:10
**clear** 9:3,11
16:6,20 20:15
24:16 32:9
41:16 42:14
50:22,23 55:5
55:7,12,13,23
68:11 71:2,15
73:3 74:21
75:8,11 80:13
83:16 97:2
104:4 105:13
107:4 110:15
126:17 127:15
129:3 130:9
153:19 155:21
161:17 163:15
167:16 168:8
174:25 175:12
181:3,17

**clearer** 50:3
71:7
**clearing**
181:14
**clearly** 13:9
58:17 62:10
82:15 126:20
142:10
**cleavage** 77:2
77:16
**clerk** 5:2 11:9
115:13
**clerks** 18:2
**client** 15:15
76:12 179:12
180:23
**client's** 112:14
**clients** 76:10
76:11 179:9,23
180:3
**clock** 177:10
**close** 27:7
177:22 178:7
**clyde** 118:10
119:10
**cna** 14:17
43:13
**codefendants**
25:15
**colleague**
42:24
**colleagues**
16:14 17:9
74:22 134:6
**collect** 36:10
**collective**
95:13

**color** 84:24
**column** 20:8
21:13
**come** 5:7 6:9
21:4 45:6
53:14 71:23
75:7 83:5 84:1
99:2 114:1,16
115:24 116:17
116:20 118:4
124:23 125:2
136:16 142:16
142:21 168:18
177:18
**comes** 55:24
57:8 88:1
113:18 123:1
123:16 158:10
177:25
**coming** 31:25
34:14 87:19
99:6,7,20
111:18 114:19
138:18 144:6
177:16
**commencem...**
73:4
**commend**
50:12
**comment** 62:2
80:15 85:22
135:20 148:24
167:4,24 169:4
178:18
**commented**
15:21

**comments**
16:21,25 95:20
100:19,20
117:3 169:16
170:4,5,15
**commit** 105:17
181:19
**commitment**
52:15
**commitments**
155:9,19,21
156:3,7,11,13
**committed**
90:9 114:10
181:9
**committee**
3:13 7:24 9:16
9:19,24 10:8
11:22 12:14,17
13:13 14:2,5
14:24 15:1,23
16:24 18:7
28:14 38:7
43:13 45:4,6
45:23 48:17
50:8,12 57:9
60:23 62:19
64:3 66:25
67:4,11,12,14
67:15,19,22
68:7,20,22
69:1,20 70:22
72:12 75:5,7
82:13,17,19
84:2,7 89:4
90:7 96:3 97:3
101:21 102:20

103:18 104:13
104:22 105:20
108:1 109:22
112:4 113:8
116:9 118:15
125:1 148:24
156:23,25
157:5 158:18
165:7,8 166:20
168:14 170:2
171:12 172:3,5
176:13,16
181:10,13
182:4
**committee's**
9:10 12:2 13:2
57:5 97:8
118:2 119:25
142:1 145:4
147:4 166:16
176:10
**committees**
99:23
**common** 163:9
**companies**
46:25 67:6,20
159:19 160:14
161:16,18,22
161:25
**company** 43:15
135:10
**comparable**
140:14
**comparing**
59:15 85:21
86:14

**comparison**
87:1,4,21
109:20 110:1
**compelling**
61:5 96:16
**compensation**
31:18 90:11
**competent**
34:6
**competing**
43:7
**complain**
134:16 136:14
138:3
**complaining**
141:15
**complaint**
48:22
**completed**
105:15,17
**completely**
90:12
**complex** 37:25
**complicated**
29:5,6,19 30:1
32:24 39:24
41:20 93:22
96:6 173:4
**complications**
77:24
**complied** 11:23
**comply** 139:6
141:7,8
**comprehensi...**
147:21
**computer**
125:6

**concede** 142:19
**conceive** 62:6
**concept** 29:21
38:21 40:12
42:2 48:25
124:11,12,14
124:25 125:3
125:17
**concern** 13:7
24:15 25:23
57:25 64:19
72:12 172:23
173:23 176:25
180:5
**concerned** 38:9
57:9 121:10
159:18,18
173:14 179:6
**concerning**
158:6
**concerns** 16:16
57:6 72:4
92:10 114:3
172:22 174:4
**concluded**
139:8 182:10
**conclusion**
30:5 109:11
**conclusions**
116:14
**condition**
113:17
**conditions**
139:5 141:5
**confer** 53:13
102:9

Case 2-19-20905-PRW,    Doc 3116-9,    Filed 05/14/25,    Entered 05/14/25 22:50:13,
212-267-6868    Description: Exhibit I, Page 196 of 240                         516-608-2400

conference  2:1
54:5 172:17
conferring
152:23
confirm  51:2
51:12 92:24
93:3 94:6
119:7 120:2
143:6
confirmation
50:10 89:16
90:6 91:5 93:2
94:11 110:8,12
116:16 136:13
138:13 164:8
175:11,12
177:3
confirmed
18:16 38:22
39:12 42:3
50:6 51:8 84:4
106:17 108:14
108:21 112:13
138:24 139:15
151:17 157:22
conflict  137:12
138:10,22
confusing
59:13,22 60:22
61:1,9
confusion  7:20
58:11 59:14,15
connection
155:3 157:10
consensual
58:1

consensually
120:6
consensus
41:20
consent  170:9
171:15 172:5
consequences
38:4
consider  51:1
52:7 75:20
100:21 124:16
129:4,6
consideration
18:4 25:21
31:8,21 32:4
33:2 34:15,20
35:8 36:11,17
37:12 49:13
54:10 62:6
75:6,9,23 76:3
76:9,13 104:15
105:4 109:1
157:16
considered
144:14
considering
43:2
consistent
40:16 95:10
consolidated
77:21
constantly
177:18
constituency
179:21
construct
38:21,24 39:12

constructive
50:9
consult  117:11
142:1 172:4
consultation
170:9 172:3
consulting
171:11
consuming
39:24
contain  123:4
contains  76:5
contemplate
151:5 172:6
contemplated
139:20
contemplating
150:22
contend  135:10
142:18
contention
135:2 141:19
142:23 145:3
contentions
134:18 138:6
139:9 145:4
contested  40:7
60:6,11,25
61:10,16,24
76:7 160:6
context  53:12
160:5,6
contingency
90:18
contingent
109:2

continuation
5:6
continue  59:9
59:10 62:8
66:19 82:14
88:4
continued
28:23
continues
15:15 129:14
continuing
14:8
continuity  15:5
contract
135:15
contracts
134:23 135:3,3
135:18 136:2
contractual
130:23 131:1
136:2,8 137:6
137:13,16
contrary
120:21 172:7
179:12
contributing
89:10,12 92:11
95:1 110:3
144:5,6,15,15
contribution
91:11,14 93:10
94:13 110:19
144:20 161:15
contributions
89:8 93:17,18
107:11 109:14
110:13,20

155:4,6
**contributor**
  13:8
**control** 96:11
  108:5,6 179:6
  179:7
**controlling**
  96:12
**controversial**
  56:12,14,16,17
**cooperate**
  122:12,16
  131:12 133:2
  167:21
**cooperation**
  141:8
**coordinate**
  173:17
**copy** 18:7 73:3
  73:8 119:4
  178:16
**corinne** 3:9
  11:18
**correct** 24:22
  28:10 39:8
  127:18 132:18
  144:12 150:10
  150:15 151:13
  151:20 154:10
  156:4 170:13
  173:16,16
**correctly** 18:15
  20:20
**cost** 46:16
  90:11,12
**costs** 41:12,16
  160:1

**council** 15:1
**counsel** 9:2,8
  9:10,16 14:24
  14:25 15:3
  48:1 68:10
  71:18,25 76:8
  96:9 118:2,3,4
  118:11 119:8
  119:22 123:21
  142:1,13 147:4
  156:22 157:2
  158:1,5,16
  169:18 171:21
  178:1
**counsel's** 128:4
**count** 27:2,5
  28:9
**counted** 28:9
  64:20 177:17
**counterclaims**
  161:14
**countervailing**
  83:2
**country** 183:21
**county** 87:5
**couple** 6:13,15
  17:7,9 29:2
  40:6 72:11
  108:19 121:3
**course** 88:2
  90:17 100:6,23
  102:21 103:13
  121:18 138:17
  150:3
**court** 1:1,11
  5:3,5,13 6:7,12
  7:6,8,12,19,22

8:3,8,17 9:14
9:17,19,22
10:4,11,14,17
10:22,25,25
11:5,7,10,20
12:3,12,25
13:19,22 14:11
14:14 15:3,7,9
15:10,18,20
16:4 17:5,22
18:6,10,22,23
19:2,12,25
20:3,6,15,16
21:12,17,23
22:3,5,11,24
23:1,7,18,22
23:25 24:4,7,9
24:13,16,19,21
24:23,24 25:7
25:10,13,17,25
26:3,5,16,19
26:23,25 27:14
27:19,21 28:3
28:8,13,17,20
28:24 29:5,12
29:18,21 30:9
30:12,15,17,20
31:2,4,6,13,15
31:25 32:14,18
32:21,24 33:6
33:12,14,19,25
34:3,5,14,19
34:24 35:4,6
35:10,14,18,22
36:1,3,6,21,25
37:5,8,10,18
37:21,23 38:21

39:1,4,11,21
39:25 40:3,6
40:19 41:4,6
41:17,24 42:8
42:20,22 43:5
43:15 44:2,10
44:12,21,25
45:14 46:1,5
46:12,17 47:3
47:6,9,23 48:1
48:3,9 49:10
49:17 50:1,5
50:15,20 51:1
51:9,11,18,21
51:23 52:2,7
52:10,17,23
53:1,9,13,17
53:20,23,25
54:4,17,20
55:1,4,6,7,11
56:3,6,11,16
56:20 57:1,4,7
57:11,16,23
58:6,13,25
59:14,18 60:1
60:3,10,17
61:4,11,14,17
61:20,22,23
62:11,17,21,24
63:6,8,11,21
64:2,5,9,11,14
64:17 65:6,6,9
65:11,14,18,21
65:25 66:5,8
66:11,13,15,17
66:21,22,24
67:12,23 68:8

Case 2-19-20905-PRW,    Doc 3116-9,    Filed 05/14/25,    Entered 05/14/25 22:50:13,
Description: Exhibit I, Page 198 of 240

| | | | |
|---|---|---|---|
| 68:11,13,16,19 | 100:8,10,13,19 | 127:25 128:8 | 151:9,11,15,21 |
| 69:7,10,12,18 | 100:22,24 | 128:10,15,21 | 151:24 152:1,7 |
| 70:1,8,10,15 | 101:6,8,14,19 | 128:23 129:6 | 152:13,15,21 |
| 70:18,20 71:12 | 101:21 102:5 | 129:10,13,17 | 153:1,2,5,9,11 |
| 71:17,24 72:6 | 102:11,15,24 | 129:21,25 | 153:14,18,21 |
| 72:9,11,22 | 103:9,12,14,18 | 130:11,13,16 | 153:25 154:7 |
| 73:1,3,6,8,11 | 104:6,9,13,20 | 130:19 131:1,5 | 154:18,22,24 |
| 73:16,18,21,23 | 105:6,10,18 | 131:8,11,14,17 | 155:8,13,20,25 |
| 74:1,4,8,11,13 | 106:4,7,13,16 | 131:20,23 | 156:3,9,11,16 |
| 74:16,19,23 | 106:22 107:1,4 | 132:2,4,7,9,13 | 156:22 157:2 |
| 75:3 78:2,4,12 | 107:9 108:1,5 | 132:16,20,25 | 157:18 158:1,3 |
| 78:24 79:1,7,9 | 108:12 109:4 | 133:6,10,13,16 | 158:9,15,22 |
| 79:11,16,23 | 110:10,18 | 133:18,22,25 | 159:1,3,9,12 |
| 80:2,9,12,18 | 111:3,20 112:2 | 134:5,11 135:1 | 159:22 160:18 |
| 80:22,25 81:7 | 112:10,16,25 | 135:7,12,17,22 | 160:23 161:4 |
| 81:9,12,15,17 | 113:21 114:11 | 136:10,19,21 | 162:2,6,10,14 |
| 81:19,25 82:2 | 115:14,21 | 137:5,19,21 | 162:16,19,22 |
| 82:5 83:7,10 | 116:4,6,12,15 | 138:23 139:10 | 162:24 163:3,5 |
| 83:14,16,22,24 | 116:17,24 | 139:12,14,22 | 163:8,17,20,22 |
| 84:7,16,23 | 117:2,25 118:7 | 139:25 140:4,9 | 164:1,3,14,16 |
| 85:13,17,24 | 118:14,17,20 | 140:16,25 | 164:18,21 |
| 86:1,7,11,25 | 118:24 119:2,5 | 141:9,20,25 | 165:2,13,18,25 |
| 87:3,7,9,11,14 | 119:13,20 | 142:9,21 143:1 | 166:9,12,19,25 |
| 87:17,24 88:6 | 120:2,9,15,18 | 143:4,6,12,17 | 167:6,10,14,18 |
| 88:8,12,15,24 | 120:22 121:1,4 | 143:24 144:2 | 168:3,6,8,16 |
| 89:2,5 90:3,20 | 121:19,20,22 | 144:22 145:20 | 168:18,21,24 |
| 91:9,13,19 | 122:2,6,8,14 | 145:22,25 | 169:5,14,17,22 |
| 92:9,13,22 | 122:19,22 | 146:3,6,8,13 | 170:13 171:18 |
| 93:1,9,13,25 | 123:1,6,9,16 | 146:15,17,20 | 172:2,7,9,11 |
| 94:3,5,15,18 | 123:20,24 | 146:22,24 | 173:5,11 174:1 |
| 94:22,25 95:17 | 124:3,5,8,10 | 147:1,8,10,12 | 174:5,16,19,22 |
| 95:19,25 96:5 | 124:12,21,23 | 147:14,19 | 175:5,7,20 |
| 96:9,24 97:7 | 125:5,8,10,20 | 148:7,12,21 | 176:1,3,15 |
| 97:11,18 98:2 | 125:24 126:2,4 | 149:2,6,9,12 | 177:5,8,21,24 |
| 98:4,6,8,12,15 | 126:7,10,13,16 | 149:16,21 | 178:1,5,12,15 |
| 98:19,23 99:6 | 126:19,24 | 150:4,8,11,16 | 178:23 179:8 |
| 99:9,20 100:3 | 127:5,9,15,20 | 150:21 151:2,6 | 179:11,20 |

180:2,9,13,22
181:2,13,16,21
181:23 182:1,5
182:8
**court's** 117:1
127:14
**courtroom**
114:21,24,25
115:4,4,7,15
**cover** 89:3
120:12 161:23
**coverage** 44:25
45:18 67:8
77:16,20
116:23 122:16
123:18 136:12
136:15 138:7
138:15 141:23
159:20,25
160:3 161:9,20
**coverages**
77:19
**covered** 19:23
20:9 25:9,22
25:25 26:18,19
27:12 28:1,6
31:19 64:1
69:3 86:18
101:3,17
114:12 140:18
140:25 144:18
149:10 150:1
150:13 174:8
174:18,19
175:1,24
**covers** 132:5

**cplr** 49:6
**create** 37:1
142:24
**creating** 92:17
**creation** 67:13
**credibility**
75:21
**credited**
144:10
**creditor** 97:9
**creditors** 3:13
9:20,22 21:24
21:25 22:6,21
24:5 38:7 52:3
52:12 54:7
77:12 78:18
85:19 90:7
92:4 99:19
109:7,19
117:16,19
136:16 145:10
154:15 164:23
170:13
**criteria** 38:16
**critical** 95:11
96:12
**critically** 14:18
**cryptically**
71:11
**cuff** 127:11
**curious** 79:22
**current** 50:24
51:12 89:19
111:24 127:9
128:8
**currently**
148:3

**cut** 136:18
144:3
**cutting** 11:21
56:1
**cva** 17:22,24
18:14,20 20:18
20:19 21:3,18
25:25 62:7
75:17 96:17
149:4 174:7,13
174:17 175:1
175:23
**cvas** 21:15
64:21
**cvs** 175:9

**d**

**d** 5:1 129:22
130:10 132:11
163:23
**damage** 108:15
**damages** 37:16
83:13 85:2
108:19,22
**dance** 16:10
171:7
**date** 6:21 20:23
31:9,21 32:5
32:10,13 33:2
33:17 34:10,16
35:8,13 36:18
48:21 54:11
63:18 157:15
165:5 171:12
171:13 183:25
**dated** 6:19
**dates** 117:10

**davenport**
85:21
**davidson** 2:2
4:10 5:4,7,8,20
6:2,4,10,11,15
7:7,9,18,21 8:2
8:7,16 9:13,15
9:18,21 10:3
10:21,23,24
11:3,4
**davidson's**
10:5
**day** 3:3 5:12
11:6,19 13:12
30:1 46:15
96:25 101:6
110:7 134:8
137:25 145:1
166:13 168:11
176:18 177:14
181:21 182:3
**days** 6:14,16
60:7 165:23
176:13
**deadline** 28:16
47:17 164:6
165:1,11
170:14,20
171:10,12
172:13,13,25
177:11
**deal** 14:4,5,5
14:18 17:8,25
27:9,10 45:7
55:22 140:1
173:23

**dealing** 28:12
28:15 43:22
**deals** 130:15
**dealt** 17:15
111:5
**deanna** 115:3
115:12 182:5
**debate** 111:5
147:25
**debated** 142:17
**debt** 109:2
**debtor** 1:9 3:4
5:12 7:23 9:25
11:15,19 12:19
12:20 14:3
18:17,24 19:2
20:10 21:18
23:5 42:9,12
45:3 47:7 58:2
59:3 60:21
64:3 67:7 68:2
68:2,5 80:16
84:8 100:20
105:13 107:15
109:11,15,15
116:8 117:10
118:24 120:6,7
121:11 125:1
133:23 134:8
135:12 137:25
142:21 143:7
144:5 149:20
152:9,17
164:10 165:25
166:5 167:11
170:6,8 173:1
176:12,16

180:19
**debtor's** 5:21
71:18,25 78:15
83:8 109:11
128:2 145:5
**debtors** 119:6
120:13 121:13
**decades** 47:11
**deceased** 7:17
**decide** 6:1 8:17
9:2 19:3 23:19
39:19 49:21
54:24 85:10
112:11
**decided** 28:12
150:18
**decides** 10:17
18:24 176:12
**deciding** 112:7
**decision** 6:4,5
7:13 8:18 10:5
13:14 19:1
25:4 27:1 28:8
50:18 62:3
81:21 89:25
90:5 112:13,14
112:14 116:9
174:10
**decisions** 20:23
65:4
**declares** 173:9
**deductibles**
129:23 130:4
131:24
**deed** 77:10
**defective**
170:11 172:23

172:24 173:9
173:11,14
**defend** 121:10
121:23,25
122:3,9,9,15
122:23 131:4
133:1 137:7
138:25 142:4
**defendant**
49:19
**defendants**
149:10
**defending**
123:7,11,12
**defends** 122:5
138:12
**defense** 24:8
49:20 113:16
121:24 133:17
141:22 142:24
160:1
**defenses** 24:10
**defer** 28:12,15
50:10 60:14
171:24
**deficiencies**
113:19
**deficiency**
130:21,25
**deficient** 75:18
129:19
**defined** 58:18
58:19 73:17
160:7
**definitely** 18:5
**definition**
59:21 67:1,5

67:10 160:13
**delay** 116:15
**delaying**
113:23
**demonstrative**
20:5,6
**denied** 90:5
**department**
4:1
**depending**
12:5 64:23
95:24 107:17
109:9
**deputy** 115:5,7
**describe** 32:7
121:8,15
**described**
156:12
**describes**
35:20 38:13
**describing**
36:16 37:6
43:1
**description**
106:1 121:7
128:25 129:8
**designate** 68:6
**designates** 68:3
**designating**
59:9
**designed** 44:16
**detailed** 38:14
**determination**
40:15
**determinations**
77:23

Veritext Legal Solutions
212-267-6868                                                    516-608-2400

**determined**
106:18 159:24
**detour** 111:7
**diagram**
154:15
**diagrams**
153:24
**difference** 6:16
6:17 8:11,12
13:25 27:6
58:3,9 88:18
119:19
**differences**
13:22
**different** 28:7
44:21 57:19
59:16 61:12
63:9 71:14
85:25 86:16
90:12 92:7
93:16 94:9
95:23 107:17
125:1 136:3
142:15 175:11
**difficult** 53:15
69:24 81:25
82:1 117:12
**difficulty** 88:16
91:4
**digest** 164:24
**dine** 3:17 6:3
8:14,18 10:4,7
10:7,13,15,21
36:7 43:21
50:9 55:10
100:9,10,11,11
100:16 102:15

102:19,19
103:23,25
104:12 105:24
106:1,6,7,8
108:2,8,10
109:23,24
110:13,21
112:1,2,3,3,15
112:18 114:3
115:18 165:5,6
169:16,17,20
170:1,1 172:21
173:13 176:3,6
176:24 178:8
**diocesan** 12:23
13:7 29:9,15
39:7 84:4
157:23
**diocese** 1:7
11:11 17:14
22:17 23:11
39:1 49:19,21
54:2 58:21
65:4,7,22,23
66:3 76:20,21
84:19 86:19
96:19 97:18,19
98:25 99:15
122:5 144:18
145:17 149:4
149:10,23
150:1 151:7,18
153:6,8 158:5
159:21,23
160:6 170:23
174:9,24
178:25

**diocese's** 99:3
100:3
**direct** 67:20
**directed** 44:19
**direction** 16:24
94:13 176:12
177:4
**directly** 53:11
**disagree** 22:15
64:3 152:21
**disagreed** 8:4
**disagreeing**
80:9
**disagreement**
64:7,8 79:25
**disagreements**
11:25 101:13
**disallowed**
10:10 18:4,25
19:22 21:9
24:22 27:1
**disallowing**
10:12
**discharge** 22:7
22:21
**disclaimer**
107:22
**disclose** 69:13
89:7,9,12 91:7
92:23 93:14,17
94:8 95:1
110:19
**disclosed** 93:4
94:20 95:3
110:14 111:22
112:25 113:5
113:22,22

155:11
**disclosing**
91:14 93:19,20
**disclosure** 2:4
11:1,13,16,24
12:6,11 16:13
16:21 17:6,11
17:18 20:7
29:1 30:11,21
32:8,15 33:9
33:22 38:2,9
42:14 44:1,3,8
44:12 46:18
47:4 48:9 51:5
52:22 53:2,5
53:18 58:14
64:6,12 70:5
71:19 72:9,20
73:5,8 75:9
78:5 80:20
81:22 82:18
83:18 88:23
91:11 97:3,4
97:25 98:9,11
98:18 99:17
101:15 102:11
103:24 104:4
105:7 107:13
107:24 108:11
110:6,11,15,22
111:12,13
112:23 115:2
115:10,24
117:5,14
119:23 120:5
121:14 123:4
125:13,14,15

125:25 127:9
127:17 128:8
129:18 131:2
133:20,25
134:10,15
135:2,9 136:12
136:15 137:11
137:17 139:8
140:12 141:10
142:17 145:3
145:25 155:4
156:23 158:18
166:7 167:19
169:23 177:9
**disclosures**
101:23 113:17
134:16
**discount** 145:7
145:8,13,18,21
**discounts**
145:15
**discovery** 99:9
**discuss** 104:24
120:9
**discussed**
145:7
**discussion**
105:2 106:9
156:19
**discussions**
47:15
**disenfranchi...**
175:10,13
**dismiss** 15:24
16:6,7 51:7,16
52:16 62:9,10
75:20 112:11

112:16 150:11
176:10
**dismissal** 15:22
49:2 112:5,7
112:20,22
113:2 168:23
169:1,7,9,13
177:3
**dismissed**
170:25
**dispute** 134:23
**disputed** 34:4
34:11,12 58:17
76:6 116:18
**dissension** 93:8
**distinction**
112:4
**distinctly**
142:11
**distribute**
154:9 161:1,1
**distribution**
12:22 13:20
14:7,22 19:11
27:23 38:1
44:18 48:5
69:21 70:6
102:7 159:15
161:5
**distributions**
18:19 105:4,12
107:17
**district** 1:2
74:4 86:5
116:15 151:9
**ditech** 111:7

**divvy** 138:20
**doc** 2:4
**docket** 12:8,13
20:23 128:14
158:12 181:8
**document** 6:23
6:24 7:1 61:2
103:2 126:13
140:2 143:23
146:14 154:1
179:2
**documentation**
139:15
**documents**
124:14 134:9
134:14 139:20
139:22 140:1
140:15 145:7
**dog** 163:23
**doing** 9:1
40:17 58:8,9
58:10 71:23
91:18 92:21
93:23 99:1,18
148:4 154:23
157:24 158:1
162:7 172:8
178:3
**dollar** 145:22
155:22 161:1
174:11 175:3,5
175:8
**dollars** 77:20
78:21 154:6
**dominated**
20:12

**donative**
113:15
**doubt** 30:19
34:8 46:25
**downward**
109:13
**dozen** 151:4
**draft** 69:2,5,7
105:5 126:9
**drafted** 139:23
**drafts** 15:21
**drag** 176:20
**draw** 42:14
**drop** 147:11,13
**dropped** 145:4
**dry** 108:17
**duane** 118:8
**dunk** 22:14,15
**duplicate** 5:22
10:12,19
**duties** 136:8
137:13 139:2
142:4,16
**duty** 121:10,25
122:3,9,11,16
123:10 131:4,6
131:9,12,15,18
133:1,2,2,3
138:11,25
179:11

|  e  |
| --- |

**e** 1:21,21 3:1,1
5:1,1 118:8
183:1
**earlier** 8:3 9:3
73:14 96:7
167:7 170:15

Veritext Legal Solutions
212-267-6868                                                    516-608-2400

171:6 174:6
175:16 176:25
**early** 168:10
**ears** 181:12
**ease** 30:24 31:5
**easier** 74:12
**easy** 61:4
**ecclesia** 70:23
70:23 71:4,4,7
71:9 163:10,11
163:16
**ecclesial**
162:25 163:1
**ecf** 126:13
128:16 139:13
**economic**
37:19 83:13
**ecro** 1:25
**edged** 108:16
**educate** 95:16
**effect** 18:16
38:4 89:7
117:18 136:9
139:16 148:4
**effective** 31:9
31:21 32:5,10
32:13 33:2
34:16 35:8,13
36:18 54:10
63:18 141:22
**effects** 117:16
**effort** 177:2
**ego** 60:17
**eight** 21:10
67:3
**either** 5:25
24:5 26:12

34:8 40:7
58:16 68:15
87:18 115:6
118:3 133:18
147:2 160:20
**elect** 34:7
60:24 61:8
**elected** 92:4,5
**election** 59:5
**elements** 33:23
**eligibility** 68:4
**eligible** 18:18
31:8 32:4 33:1
34:15 35:7
36:10,12 67:3
67:10,18,19,21
67:24 109:2
**email** 119:10
119:14
**emphasized**
112:9
**empty** 49:20
**encompasses**
160:8
**endeavor**
182:3
**ends** 54:11
109:16
**engage** 44:17
45:3 71:25
**engaged** 16:10
**engagement**
9:9
**engendered**
45:2
**english** 16:17
29:13,16,22

49:8 117:6
155:18 169:24
**enjoined** 55:20
**enormous** 86:3
**enter** 9:1
**entered** 139:16
**entire** 129:8
**entirely** 9:25
98:10
**entities** 67:18
109:14 160:9
**entitled** 31:20
34:19 48:24
49:14 52:3,12
63:3 80:23
84:20 85:8
174:8
**envision** 117:4
171:8
**epiq** 7:4,14
**equally** 88:1
**esq** 3:8,9,10,17
3:18 4:6,7
**essence** 26:9
**essentially**
12:17 13:16
**estate** 89:20
95:4,8 106:5
106:17 107:8,9
113:13 120:14
120:16,19
138:14 144:14
145:9,19
**esteemed** 74:21
**estimates** 84:8
109:5

**et** 38:19 95:8
139:17 142:5
**ethical** 180:6
**evaluates**
39:16
**evaluation**
39:17
**evening** 12:5
**event** 108:20
112:22 113:2
**eventuality**
176:19
**everybody**
170:23 173:18
179:20
**everybody's**
166:21
**everyone's**
30:3
**evident** 35:15
**eviscerated**
138:16
**exacerbated**
90:10
**exact** 51:2
79:24 82:22
141:11 142:2
153:18
**exactly** 35:15
38:24 39:14
40:9 54:12
64:23 138:13
148:7 155:18
166:14 175:23
**examination**
131:16 133:4

**examiner**
 90:22
**examining**
 170:11
**example** 66:2
 173:21 177:2
**examples**
 97:18
**exceed** 160:21
**except** 104:24
**excluding**
 109:14
**exclusion**
 162:25
**exclusive** 37:16
**exculpation**
 157:1,25
 158:25
**exculpations**
 156:20 157:3
**excuse** 12:7
 19:14 38:1
 60:18,19 79:8
**execute** 113:18
**executive** 30:2
 32:16 33:10
 53:6 101:23
 103:19 107:24
 146:19
**executory**
 134:23 135:3
 135:11,15,18
**exhibit** 12:10
 19:7,8 20:7,8
 20:21 31:12
 34:10 36:19
 61:2 63:20

 91:25 98:21
 101:22 106:25
 111:20 113:6
**exhibits** 12:10
 94:23
**exist** 66:4
**existing** 52:11
 102:1
**exists** 63:14
**expect** 28:22
**expecting**
 13:15 103:6,10
**expects** 109:15
**expending**
 177:1
**expense** 26:13
 63:16 80:21
 92:15
**expenses** 48:1
 50:10 62:20,22
 62:24 64:3,4,5
 67:7 77:8
 104:16 154:13
 154:17 160:19
**expensive**
 39:24 40:5
 75:21 77:6
**experience**
 82:11,11
**expert** 75:21
**experts** 84:10
**explain** 18:10
 31:7 32:2
 45:23 77:25
 80:16 89:8
 113:2 157:1,4

**explained**
 56:21
**explains** 33:7
 58:19
**explanation**
 16:17 29:13
 80:19 157:1
**exploring** 94:1
**explosion** 94:6
**exposure** 49:3
 55:20 159:25
**expressed**
 94:25 112:12
**expressing**
 92:10
**expunge** 28:8
**expunged**
 17:17,19 18:3
 18:12 24:23
 66:5 174:10,24
**expungement**
 10:18 175:17
**extend** 170:19
 171:10 172:12
**extended** 164:9
 166:3 172:14
 177:12
**extending**
 170:10 171:12
 171:13
**extension** 23:4
 164:6,11
**extent** 67:6
 74:7 75:11
 130:3 131:23
 134:21,24
 139:1,4 141:4

 141:6,8 150:22
 161:24 165:7
 170:5,10
**extraterritorial**
 63:3
**extreme** 64:20
**extremely** 37:3

**f**

**f** 1:21 183:1
**face** 112:20
**faced** 137:12
**facing** 15:19
**fact** 14:3 17:1
 47:15 64:6
 116:14 173:19
**factor** 107:23
 108:13,20
 116:15,19
 164:4
**factors** 38:18
 52:8,10 89:22
 107:18 155:2
 164:12
**facts** 14:4 98:6
 98:10
**fail** 109:18
**fails** 50:11
 109:19
**fair** 9:25 29:4
 44:7 61:7,19
 93:5
**fairbanks**
 85:20 86:20,21
**fairly** 54:23
**fairness** 83:20
**fall** 44:13
 90:13,14 114:8

| | | | |
|---|---|---|---|
| **falls** 90:11 156:18 | **fighting** 59:9 | **find** 9:2 20:24 | 29:9 30:6 |
| **false** 87:1,4 133:24 | **figure** 6:14 32:5,6 46:23 59:22 76:1 119:19 148:6 | 72:20 76:17 83:25 92:3 96:16 122:17 124:17 125:18 126:22,24,25 127:3,23,25 148:21 155:7 155:14 173:11 175:22 | 33:10,13 37:11 45:7 58:15,23 69:16 78:14 84:2 90:9,18 91:10 96:19 100:20 102:8 103:11 108:18 114:24 120:11 143:23 146:15 146:23 150:6 151:11 153:4 157:4 158:11 161:11 162:19 163:24 171:2 |
| **familiar** 90:1 | | | |
| **far** 49:11 101:4 114:4 127:18 130:18 171:15 173:23 | **file** 44:19 64:22 65:11 97:1 151:25 157:15 176:17,21 | | |
| **fastest** 75:25 | **filed** 5:18,21,23 5:24 7:10,17 8:10 10:19 12:7,7,11,16 14:7 15:13 17:1,2,16 21:10,16 22:12 25:3 65:21 86:18,20,21,22 96:3,20 99:11 150:9 156:23 157:21 158:4,5 158:13,14,18 161:22 | | |
| **fate** 44:4 | | **finding** 116:10 | |
| **favor** 25:22 51:15,25 52:7 75:3 89:17 | | **findings** 116:14 | |
| **favored** 12:18 | | **fine** 7:13 8:8,22 61:8 74:1 100:8,22,24 106:4 141:17 141:19 142:21 143:2,12 147:7 153:10,12,15 156:10 159:2 167:21 168:19 172:20 175:4 | |
| **fear** 45:1 | | | |
| **february** 1:15 12:8,17 150:25 182:6 183:25 | | | |
| **federal** 62:14 | | | **fish** 103:15 |
| **fee** 41:2,5,6,18 41:21 42:2,9 43:2 90:22 144:19 145:5 | | | **five** 19:19,20 33:18 54:9 86:18 87:10 154:6 |
| | **filing** 8:1 100:19 138:16 | | **fix** 80:12 |
| **feel** 82:9 175:10,13 | **final** 24:23 28:9 42:16 116:10 143:18 174:7,10,23 175:17 | | **flawed** 75:22 |
| | | **finish** 32:19 88:15 101:14 121:22 | **flip** 88:24 114:11 |
| **feeling** 171:7 | | | **flippant** 60:19 |
| **fees** 14:21 41:12,16 46:6 90:19 144:7,13 147:3 160:2 | | **finished** 137:19 | **flipping** 34:25 |
| | | **finishes** 150:3 | **floor** 3:14 165:25 |
| | **finally** 27:1 117:15 138:17 170:16 | **firm** 118:9 144:13 145:16 157:22 | **flower** 65:19 |
| **felt** 181:3 | | | **flying** 127:11 |
| **fiduciary** 97:9 137:9,13 138:11 179:11 | **financial** 90:11 95:11 113:17 | **firm's** 144:7 | **focal** 45:25 |
| | | **firms** 96:8 179:25 | **focus** 18:14 19:4 24:13 |
| **fight** 87:24 | **financials** 94:21,22 | **first** 5:5,9 7:15 10:9 11:14 13:2 27:24 | **focused** 36:7 76:23 |
| | | | **folks** 47:25 |

**follow** 51:24
176:15
**following**
107:15
**font** 154:4
**foot** 47:7
**footnote** 58:16
69:14 71:12
90:17 102:14
102:16 104:24
146:5 147:2,6
147:10,11,13
147:14,17,20
148:5,8,22,24
151:15 152:6,8
154:14
**forcing** 93:22
**foregoing**
183:3
**foreseeable**
105:20
**forget** 44:7
**forgot** 176:5
**form** 10:5
**formal** 172:16
**forth** 35:1
129:3
**forty** 154:6
**forum** 27:25
28:3 69:14,17
101:24 102:9
102:10 148:25
149:18 151:19
**forum's** 69:17
**forward** 26:11
26:13 71:14
91:5,18 92:24

94:11 102:8
151:19
**found** 40:2
**four** 19:20
33:16 36:20
37:4,13 44:22
54:8 133:1
**fourth** 12:6
128:11
**fraction** 145:16
**framed** 145:6
145:10
**franciscan**
65:16
**frankly** 16:5
17:5 23:4 25:2
26:15 47:25
59:13 145:14
180:7
**fraudulent**
133:24
**free** 129:3
**freedom**
113:16
**freestanding**
98:17
**frequently**
76:9
**friday** 166:17
166:19
**front** 25:5
72:15 97:14
114:22 124:6
143:25 147:22
149:23,25
150:6 166:17
178:19 181:2

**fronting**
129:24 130:4
131:25
**frustrated** 16:5
**fry** 103:15
**full** 159:7,13
173:3
**fully** 156:7,12
156:13 159:16
160:17
**fulsome** 87:21
**function** 115:3
115:6
**fund** 48:23
55:25 77:5
78:15,20 79:3
79:17 81:2
92:1 105:13
154:5 156:7,12
156:13 160:21
161:6 166:2
**fundamental**
110:25
**funded** 71:6
**funding** 30:3,3
30:4 71:6
90:24 91:22
144:17
**funds** 48:2
91:14 154:16
160:21 161:2
**further** 100:4
103:6 106:1
115:23 119:24
139:15

**g**

**g** 5:1
**game** 170:21
**garabedian**
5:23 6:20,21
6:25,25 7:2,10
8:4 9:5
**garabedian's**
8:25
**garrity** 111:8
**gather** 15:7
**gee** 63:14
**general** 40:12
41:23 54:7
70:25 109:7
130:1 140:20
147:21
**generally**
16:12 40:16
**generate** 7:1
**generated** 6:25
7:4
**gentlemen** 82:8
82:10 83:5
**geremia**
179:25
**getting** 18:3
21:9 38:11
40:13 44:7
75:23 89:18
101:3 102:21
142:12 155:8
156:25 157:2
165:8,13
166:15,16
171:14

Case 2-19-20905-PRW    Doc 3116-9    Filed 05/14/25    Entered 05/14/25 22:50:13,
Description: Exhibit I, Page 207 of 240

**gist** 72:3 142:2
**give** 6:13 11:15
  31:3,5 35:1
  51:19 66:2
  70:12 73:6
  91:19 96:25
  97:15 100:20
  105:11 111:17
  124:9,10
  131:15 146:9
  147:1,4 157:2
  172:18 176:20
**given** 10:9 18:6
  50:4 71:17
  77:2 80:19
  104:1 106:10
  113:25 133:1
  142:1 145:14
  145:15 161:20
  167:11 179:5
**giving** 50:25
  91:10 127:1,16
  141:11 145:8
  180:17
**glad** 11:5 83:14
**glenn** 1:22
**global** 27:8,11
  61:17 95:14
  144:3
**go** 5:8 22:20
  26:13 28:16
  29:24 30:25
  31:11 32:16
  33:8,20 35:23
  36:9,14,16,19
  37:10 38:6
  40:19 41:2

42:20 44:19
46:13 48:3,3
48:10 54:17
57:5,7 59:6,21
61:1,25 62:17
63:6,8,11
64:25 66:21
67:25 68:16
70:10 71:13
73:23 76:10
77:23 78:3,12
79:11 81:24
82:5,16 86:13
88:9 92:5,19
93:3 94:15
95:17 96:6
97:11 98:24
100:10 106:7
108:14 111:3
112:2 113:6
114:4 116:4,6
117:7 118:14
120:10 121:6
122:14 133:10
135:22 142:5
143:7,14 145:8
145:19 155:11
157:25 162:11
162:24 165:10
167:7,23,25
168:16 169:5
173:20 176:3
176:12 177:4
177:19 178:10
179:21
**goes** 49:5 50:13
  50:16 54:11

65:3 75:13
77:10 90:16
102:8 103:25
117:14 130:18
135:13 141:21
151:19 153:3
170:17 172:22
175:22 177:15
**going** 5:6 6:16
  8:20,24 10:25
  11:16 16:6,9
  16:13,14,22
  17:12 19:3
  22:18,20 26:11
  26:13,19,21
  28:17 34:25
  36:8,9 41:6
  44:13,21 46:25
  47:17 49:21
  50:11,15 55:12
  57:18,19 59:9
  59:10 61:21,23
  62:3,15,16
  63:21,22,23,24
  63:25 68:5,14
  68:22,22 70:24
  72:13 75:6
  76:6 77:6,15
  77:18 79:13,14
  81:2 84:18,18
  84:25 85:6,6
  85:22 86:9
  87:15,16,17,18
  87:19,20 88:8
  88:9 91:18,21
  92:18 94:7,15
  94:16 96:22,25

97:2,8 100:17
105:3 106:3
114:8,13,15,16
116:18,23
117:4,5,7,7,8
117:21 118:13
118:20 119:20
119:22,24
121:15,17
123:17 136:1,4
137:22,23
140:18 142:10
142:13 143:9
143:17 147:8
149:3 151:25
158:6 159:5
163:22 164:7
164:22 165:8
165:18 166:4
167:25 169:15
170:16 171:2,4
171:5,7,8,9,18
172:11 173:7
176:19,20
177:4,6,19
178:10 180:4
180:16
**good** 5:3,4,11
  5:13 6:9,11
  11:10,18,20
  24:8,9 77:10
  85:4 108:17
  118:5 154:21
**gotten** 75:10
  75:10 154:2
**govern** 69:17

| governing | h | 81:20 162:4 | hearing 2:1,4,4 |
|---|---|---|---|
| 50:18 | | hard 35:1 | 5:6,15 11:2,12 |
| grant 8:24 | h 129:14 | 50:20 180:2,8 | 16:16 17:20 |
| 140:19 141:1 | half 91:25 | harm 90:25 | 43:11 60:8,9 |
| 141:12 | 92:20 | hate 56:13 | 60:23 83:13 |
| granted 8:25 | hall 171:18 | hats 55:11 | 96:11 100:4,18 |
| graphs 168:20 | hand 91:3,3 | hauser 47:21 | 113:9 118:1 |
| gratuitous | 111:21 115:3,6 | head 84:18 | 119:4 125:15 |
| 157:7 | 115:12 137:8 | 177:12 | 134:11 168:15 |
| great 13:8 45:1 | handed 60:8 | headed 167:18 | 176:9,22 177:3 |
| 69:1 91:4 | handful 24:12 | heading 91:5 | 177:3 |
| 152:3 154:23 | 24:13 | headline 98:3,5 | hearings 89:6 |
| 162:7 | hands 115:13 | headlines | 168:11 |
| green 1:12 4:3 | handwrote | 97:19,21 | heavy 29:15 |
| greg 4:6 42:21 | 119:15,15 | health's 64:25 | hedge 50:21 |
| 52:24 54:21 | happen 28:17 | hear 15:15 | help 125:20 |
| 167:3 | 45:9,9 65:24 | 44:11 60:12 | 128:2,4 |
| grimacing | 69:20 89:14,15 | 70:18 82:24 | helpful 106:9 |
| 84:13 | 96:24 108:6,6 | 87:13,19,23 | 110:7 176:7 |
| grossly 97:20 | 117:4 126:10 | 88:7 94:15,16 | helpfully 38:7 |
| grounds 123:4 | 136:6 164:7 | 95:9,20 101:12 | hey 59:11 85:3 |
| group 22:22 | 170:18 171:9 | 107:10,13 | hidden 38:3 |
| 90:12 | happened 5:16 | 114:15,16,18 | high 90:18 |
| guarantee 56:1 | 10:1 11:6 | 114:23 115:8 | 108:17 147:24 |
| 77:19 78:20 | 17:13 45:3 | 115:15 126:7 | highlighted |
| 79:3 | 56:18 117:11 | 133:15 142:2 | 70:4 81:21 |
| guess 68:23 | 117:13 | 164:10 169:18 | 82:21 83:1 |
| 70:25 114:1 | happening | heard 36:6 | highlighting |
| 148:14 151:6 | 16:17 29:13 | 45:13 61:6 | 82:19 |
| 157:10 160:4 | 115:10 158:7 | 68:8 93:25 | hold 30:12,17 |
| 164:10 165:24 | 179:5 | 114:15,17,19 | 63:1 67:20 |
| guidance 75:1 | happens 12:5 | 114:22,25 | 74:11 79:7 |
| 166:14 181:11 | 14:16 27:2 | 115:1,5,9,16 | 90:3 128:10,10 |
| 181:19 | 29:1 123:14 | 118:3 120:9 | 129:25 159:9,9 |
| guiding 74:6 | 130:24 | 143:14 148:10 | 162:24 163:20 |
| guy 137:16 | happy 5:25 | 155:13 156:2,6 | 168:3 172:17 |
| | 10:21 53:20 | 156:8,8 176:18 | |
| | 57:2 72:8,17 | | |

Veritext Legal Solutions

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
212-267-6868   Description: Exhibit I, Page 209 of 240                    516-608-2400

**holdback**
145:14
**holder** 105:21
**homework**
87:23
**hon** 1:22
**honest** 7:19
**honestly** 42:5
**honor** 5:11,14
6:6,8 10:7
11:18,21 12:1
12:6,7,9,14,23
13:5,10 14:1
14:23 15:12
16:3 18:1,5,9
18:21 19:4,7
19:17 20:1,11
20:21 21:2,21
22:23 23:3,14
23:24 24:6,11
25:1,2,3,4,9,16
26:6,22 27:7
27:15 28:11,22
29:4,7 30:8,11
30:16,19,24
31:10 32:9,20
33:8,24 36:15
37:17 38:6,17
38:25 39:8
40:2,21,23
41:12 42:11,19
42:23 43:6,25
44:9,14 45:1
45:12 46:3,9
46:22 47:13
48:4,11,18,19
48:25 49:3,5,8

49:25 50:4,7
50:19 51:4,16
52:2,14,21
53:8 54:6,15
55:5,14 56:13
56:23 57:9
58:1,4,22,23
58:24 60:14,16
60:21 61:7,13
61:19 62:2,5
62:12,15,19
63:3,16,19
64:10,18,23
65:13,24 66:20
68:1,9,25 69:3
69:6 70:4,9,19
72:8,17,25
73:13,22,25
74:10 75:1,6
75:16,25 76:4
76:15,19 77:7
77:13,18 78:1
78:7 79:21
81:18,20 82:6
82:19 83:1,9
83:12,20 84:1
84:3 85:11,14
86:17 88:14,22
89:13,16 90:1
90:17,21 91:15
91:21 92:21
93:24 94:17
95:10,23 96:2
96:4,18 97:17
97:23,23 98:16
99:8,14,16,22
100:5,6,9,16

100:23 101:2,4
101:12,17,20
102:3,13,19
103:8,25 104:8
104:19 105:9
106:6,15
107:25 108:10
108:25 109:24
110:21 111:2
111:18,25
112:1,15
114:10 115:20
116:1,7,21
117:1 118:5,12
119:3,9,18
120:4,11,20
121:7 122:1,18
123:13,23
124:1,20 125:4
125:19 126:15
126:22 127:7
127:10,13,23
128:12,12,20
134:4,7,9,13
135:4,5,21
136:18 137:24
138:9,22 139:1
139:7,19,24
140:2,6,11
141:17,18,24
142:8 143:21
144:4,25 146:2
146:12,19
147:7,11,13,16
148:23 150:19
150:24 151:4,4
151:13,20

152:20,23
153:10,17,22
154:19 155:22
156:5,19
157:20,21
159:2,6 161:21
162:20 163:6
163:19 165:6
166:11 167:2,9
167:13,24
168:13 169:15
169:21 170:1,5
171:13,23
172:4,20,21
173:8,22
174:15 175:4
176:2,6 177:7
177:14,23
178:8,14,18,20
178:24 179:16
179:22 181:6
181:25 182:2,7
**honor's** 25:23
**hope** 29:23
49:14
**hopefully**
168:15
**hoping** 27:8
45:8 166:14
**horizon** 163:11
**horrible** 95:14
**hourly** 74:15
**hurdles** 36:9
**hurry** 137:5
**hybrid** 2:1,4
**hyde** 2:25
183:3,8

**hypothetical**
106:11,13
109:21
**hypotheticals**
105:20,23,25
106:3

**i**

**idea** 38:23 39:5
68:21
**identified** 19:6
32:11 38:7
**identifies** 19:8
**identify** 35:19
53:1 54:17,20
70:20 104:20
**ignore** 74:23
**ignoring** 74:21
**ii** 79:19
**impact** 94:14
95:24 103:20
103:21
**impacted**
101:25
**impacts** 38:19
**imperfect** 77:2
**importance**
112:9
**important**
77:12 97:8
99:24 103:16
104:4 112:23
115:8,8 116:16
123:5 172:19
**impose** 157:14
**improper**
145:18 174:12

**improve** 99:1
**inability** 91:24
128:4
**inappropriate**
172:8
**include** 88:10
109:15 113:1
135:1 141:24
157:23 161:14
161:16,24
162:4
**included** 5:17
15:21 71:19
86:12 107:23
107:23 134:19
138:6 141:18
160:12 170:7
**includes** 67:1
108:18 144:19
147:3 150:19
161:13
**including**
11:14 19:11
61:2 65:11
85:2 86:12
101:24 103:21
107:18 110:1
136:9 154:11
161:7 169:20
**inclusion** 44:15
105:19
**incorporated**
17:2
**incorrect**
120:16
**incurred** 63:17
63:18

**indemnity**
121:13
**independent**
41:2 43:19
44:15 45:14,15
46:6,13 48:14
104:17
**indicated** 8:5
59:15 113:10
113:11,14
118:1
**indicating**
20:16
**indirect** 21:7,8
21:10 64:21
65:1 66:23
67:2,9 68:6
159:17,19
160:8,10,11,15
161:14,18,23
**indiscernible**
5:24 18:9
19:13,15 22:25
31:11 33:4
34:18 36:5
37:17 39:15,19
39:20 40:2,4
42:2,7,18
43:19,22 46:11
46:16 47:8,19
48:1,8,14
49:16 53:8
55:16 56:9
58:12 59:17,25
61:10 62:1
65:9,20 66:23
67:3 70:17

72:4,7 73:17
79:22 80:7,8
81:11 84:15
86:10,18 87:6
87:15,16 88:3
88:20 93:12
97:7 98:1,18
98:22 99:5
100:5,9,11,25
101:7 102:23
104:5,12
108:22 140:20
141:14 162:1
171:4 174:14
**individual**
145:9 155:4
**individually**
9:23 47:25
**infamous**
62:14
**infer** 136:4
**information**
7:2 30:7,22
31:7 84:6,12
85:1 88:10
92:23 94:7
95:11,16 110:2
112:9,21 113:5
123:5 174:3
**initial** 71:6
109:22 145:2
**injunction**
23:24 55:19
74:4 148:1
**injuries** 33:15
56:25 66:4

injury 33:17
37:14 48:22
54:8,9 55:24
inquire 7:22
inquired
106:17
inquiry 106:23
inserts 78:8
inside 154:15
insignificant
47:24
insist 88:10
insistent 59:4
59:11
insolvency
77:3 108:13,21
instance
151:11
insurance
14:25 15:1
23:5 43:15
44:22,25 45:18
46:25 67:6,19
77:16 81:2
88:20 118:11
119:7,22
120:12,13
121:9,12
122:16 123:18
123:21 128:19
128:20,24,25
129:1,11
130:14 134:22
135:2,10 136:3
136:9 138:12
138:15,19,20
139:5 140:1,13

140:22 141:2
142:12 159:18
160:14 161:9
161:16,18,22
161:25 163:11
174:20
insured 45:21
79:18 105:1
121:14 129:24
130:4 131:18
131:24 154:11
insureds 23:6
23:10 45:7
insurer 14:4,6
14:11,14 45:21
46:7,17,20
68:6,19 77:16
insurer's 118:4
insurers 13:17
13:23 14:10,19
44:17 45:8,11
45:12,16,20
118:9 131:13
134:22 137:7
137:13 141:22
intend 141:20
intended 48:20
77:11
intent 113:15
intentional
52:19
interest 27:9
110:8
interesting
13:5 14:1 15:3
50:1

interests 9:24
181:16
interim 144:13
interlineated
159:14
international
135:10
interrupt
54:16 165:14
interrupted
176:4
interrupting
167:10
interstate
104:25 135:9
invent 29:18
29:21
investments
113:11
involve 149:19
involved 23:13
42:6,24
ircp 23:16 63:2
63:24
iro 43:22 45:11
47:17 70:3
106:2
iros 71:1
irreconcilable
138:10,21
irrelevant
87:21
irrevocably
140:19,25
island 85:21
isolate 75:18

issue 26:10,17
27:4 28:5,11
37:23 42:25
44:3,8,13
48:10 49:6
68:11 71:11,21
71:25 80:20
86:16 88:22
95:4,21 96:10
105:24 109:4
110:8,12,22
111:4,8,16
112:23 116:2,7
116:14 135:18
153:22 173:13
174:3,23
issued 57:21
59:14
issues 11:24
16:14 28:7
50:10 75:5,20
88:25 101:15
102:21,22
116:11,13
117:15 135:16
135:19 175:11
175:12 181:23
it'd 50:1
italicization
162:12
item 80:8
176:7
iteration 17:1
111:10

Case 2-19-20905-PRW, Doc 3116-9, Filed 05/14/25, Entered 05/14/25 22:50:13, Description: Exhibit I, Page 212 of 240

**j**

**james** 3:18
70:22 104:22
113:8
**january** 11:23
12:15
**jesuit** 86:22
**jesuits** 86:17
**job** 169:23,24
**jointly** 89:10
**jones** 3:3,12
5:12 10:8
11:19 134:8
137:25 145:1
170:2
**judge** 1:23
6:11 12:25
13:16 15:8
23:18,19,20
24:9 25:5 28:4
43:2 47:21
49:17 62:3
85:22 89:23
90:17,22 94:9
96:7 111:4,6,8
111:11 115:13
116:9 121:20
125:7 147:22
147:23 148:3
148:15 149:19
149:23,25
150:7,13 152:5
152:8 154:23
181:9
**judgement**
108:18 113:19

**judges** 46:3
**judgment** 9:6
**judgments**
86:15 87:21
104:17
**july** 6:21 7:11
**jump** 44:21
**jumped** 37:25
**jurisdiction**
34:6
**jurisdictional**
25:23
**jury** 49:21 86:2
101:25
**justice** 4:1 24:8
49:17 50:2

**k**

**karen** 1:25
3:17 10:7
100:11 102:19
104:11 112:3
165:6 170:1
**keep** 31:23
48:24 92:16
96:11 111:15
112:12 136:9
166:5
**kept** 172:25
**kessel** 90:18
**kind** 63:4 96:2
106:11 157:14
165:25 171:6
**kinds** 19:19,21
**kinsella** 13:16
90:22
**knew** 97:13

**know** 6:17,18
7:23 11:17
16:10,12 17:8
18:12,14 19:20
21:18 23:12,13
23:18 24:25
27:5 32:2 33:6
34:10 36:12
39:4 49:11,13
50:6,11 52:3
52:12 54:4,6
54:12 55:7,16
56:6 57:11,13
58:7 64:22,25
65:13,14 67:17
68:16 71:4
76:6,25 78:18
78:21 79:20
84:7,17,20
85:8 86:8
88:13,24 89:17
89:18 90:1
91:22 92:18
94:7 95:5
96:25 97:22
98:2 99:13,19
99:22 100:2,16
101:8,12 108:7
111:14 113:3
113:23 114:20
117:2,11,13,21
118:21 121:16
122:19 123:14
123:17,21
125:24 127:5
128:1 130:19
135:19 137:16

147:23 148:15
148:18 149:7
151:24 152:6
153:23 156:18
158:1,2 160:2
160:9,11,13,14
160:16 161:11
161:19 164:5
164:19 165:15
167:14 169:10
169:17 170:18
170:19 171:1,6
171:9,18
172:22 173:19
174:23 177:2,4
178:15,17
**knowledge**
167:16
**knows** 32:3
**kramer** 119:11
**kressel's** 89:23

**l**

**label** 59:11,12
**labels** 58:24
59:20
**lack** 14:21
134:21 147:21
**language** 32:14
33:1 34:22
51:2 53:14
55:1 56:6,7
62:23 71:18
72:2 79:21
80:12 81:12
82:3,21,23
83:8 104:7,14
105:7,11,17,19

Veritext Legal Solutions
212-267-6868 516-608-2400

108:3,23 114:8
116:18 118:22
119:6,11 120:1
124:9,9,13,14
124:15,16,22
124:25 125:2,3
125:12,14,24
126:25 127:16
129:18 131:21
131:21 135:14
139:25 140:4,7
140:7,9,12,14
140:16 141:23
142:19,22
145:11 158:10
159:8 161:24
163:17 165:19
166:16 167:11
167:21 174:7
175:21 179:18
**large** 96:9
175:8
**largely** 16:18
45:2 134:20
**largest** 14:17
**late** 25:3 34:25
168:10
**latest** 126:6
**law** 50:18,24
51:12,23,25
52:4,6,11
53:17,21
116:14 130:3
131:24 138:16
179:25
**lawsuit** 66:9,11
66:13,18 82:20

82:23 83:3,4
174:7 175:1,1
175:9
**lawsuits** 18:14
19:23 23:16
31:23 83:4
99:10 111:15
147:23 148:3
**lawyer** 59:2
**lawyers** 114:21
180:5,17,22
**layman** 32:22
35:6
**layperson**
56:21 58:20
**leaned** 157:22
158:2
**learned** 5:10
**leave** 11:2
17:18 24:24
136:25 178:5
**leaves** 88:22
142:23
**leaving** 14:3
**led** 7:20
**ledanski** 2:25
183:3,8
**left** 68:23 96:9
101:6 108:17
**legal** 6:17
91:24 92:2,6
95:15 143:1
183:20
**legally** 75:18
92:19
**legislature**
180:18

**lengthen** 35:21
**lesser** 77:19,24
**letter** 12:2 75:7
84:2 96:3,14
97:3,13 98:12
98:17 99:21
100:4 118:15
119:25 172:16
**letters** 168:20
**letting** 98:12
**level** 64:3,4,5
92:7 93:7
**lexington**
135:10
**liabilities** 85:20
111:25
**liability** 38:17
78:22 91:24
93:23 95:15
121:12
**liable** 89:11
**lien** 9:6
**lieu** 145:13
**light** 38:16
**likely** 63:15
75:19 76:19
92:20
**limit** 78:19
**limited** 11:24
11:25 37:24
65:5 68:3
78:15 79:17
107:18 130:15
156:20
**limits** 78:21
**line** 8:11 21:14
29:10 42:14

169:6 170:10
171:4
**lines** 43:4
**linger** 176:23
**liquidation**
55:25 103:20
103:21 109:4,5
109:12,17,21
109:25 110:16
110:22 111:1
113:1,3 114:2
**list** 19:8,24
86:1 133:1
134:18 136:23
142:6 148:1
**listed** 20:23
21:11 160:10
160:14
**listen** 37:20
**listening** 182:5
**litigate** 75:21
89:18
**litigated** 59:4
147:17
**litigating** 19:6
19:9,10,16,19
19:19 20:7,9
21:1,7,13 26:8
31:16 34:4,7,9
34:13 35:13
36:19 57:9
58:15,20 59:6
60:18 62:18
68:24 75:12
76:7 103:22
104:1,1,3
105:14 106:9

107:19 150:2
152:25 159:14
159:15 160:5
160:19,20
161:4,6,6
162:9,12
**litigation** 12:18
12:19 13:17
14:8,20 15:9
15:11,15,19
28:1 40:23
45:8,10 48:15
57:13 61:24
65:22 71:1
84:21 101:24
102:1,9 105:12
106:11 121:20
122:15 131:13
133:3 148:9,11
148:13 149:2
151:18,25
152:11,16
153:7 160:12
161:2,13
**litigations**
102:23
**little** 65:19
71:14 93:21
134:11 144:8
175:21 176:8
180:20
**live** 25:8
**llp** 3:12
**lmi** 104:25
121:23 122:5
134:10,14,18
135:2,9 136:8

**location** 89:20
**london** 118:9
**long** 30:18
35:23 36:25
55:5 84:8
85:21 103:2
104:5 114:12
115:17 117:16
134:18 138:18
152:1 162:20
162:22 164:8
181:21
**look** 8:12 20:8
20:25 24:4,13
28:24 31:11
32:21 33:7
34:24 37:4
48:9 49:12
59:21 62:12
72:23 74:7,13
84:23 85:3,11
85:17 86:1
94:18 95:20
96:10 97:1
98:12 103:4
105:5 115:22
124:18 125:5
126:25 131:20
131:21,21
132:20 154:4
167:18 170:22
173:6
**looked** 40:6
55:20 75:22
77:22 84:14
95:7

**looking** 24:18
31:15 45:17
51:5 53:4
70:15 73:1
125:21 126:14
127:14 129:10
**loss** 37:19
136:15 156:17
**lost** 146:8
**lot** 11:14 15:19
17:16 19:20
22:17 43:23
45:8 47:9,10
48:2 50:3 65:8
82:12,17 85:5
95:15 101:6,10
117:19 121:19
171:23
**lots** 98:10
142:12
**loud** 126:17
**loudly** 136:14
**love** 29:24
73:22 166:16
**luftig** 116:9
**lunch** 114:16
115:18

**m**

**m** 3:8
**made** 6:13 9:3
15:24 16:6,22
19:17 21:2
28:25 37:7,12
46:10 60:25
66:25 77:22
78:17 79:12,18
83:19 94:18

97:1 103:6
104:15 113:17
116:25 120:8
129:2,3 136:19
136:20 154:25
178:25
**mail** 6:19
**main** 121:9
**maintain** 90:24
**maintaining**
91:13
**major** 33:23
**majority** 88:17
**make** 6:5,16
12:25 15:25
16:20 24:16
26:10 27:6
36:3 40:14
45:10 49:15
53:14 59:4
71:2,7 76:13
80:9 83:16
86:11 96:1
100:21 111:14
117:2 120:25
125:16 127:1
133:23 136:17
142:9 143:12
145:9 164:12
173:2 177:19
**makes** 13:24
31:8
**making** 19:1
27:10 35:23
78:15 79:17
95:12 105:13
144:20 160:7

175:21 180:24
**male** 18:9
19:13,15
**managing**
91:24
**march** 28:15
28:17 29:2
164:6 165:5,11
165:22,22
**mark** 4:7 42:24
43:6 97:15
173:20
**marked** 143:21
173:19 178:16
**market** 118:9
**markup** 100:3
**marshal** 90:24
91:13
**martin** 1:22
**mass** 82:11
138:17
**mastando's**
116:9
**mat** 61:24
**material** 164:5
164:11 167:19
**materialize**
65:5
**materially**
164:9 166:3
**matter** 1:5 5:5
47:14,14 58:24
59:20 110:6
116:22 134:15
142:18 144:11
144:12 145:2
148:15 161:8

**matters** 147:22
**maximize** 77:9
77:11 138:11
**maximized**
11:25
**maximum**
40:16 109:6
**mean** 9:19,25
13:19 16:5,8
29:2 39:22
40:9 60:18
65:14 67:23
69:2 81:10
85:17 87:11
93:14 94:18
95:20 97:11,22
99:2 108:16
112:11 114:5
139:19 141:14
141:14 145:15
156:17 176:17
177:25 180:16
**meaning**
148:22
**means** 35:16
58:20
**meant** 73:14
143:19
**measure** 95:6
**median** 93:16
**mediate** 177:10
**mediation**
177:6
**medical** 7:23
75:21
**meet** 29:24
37:3 93:7

**meetings**
171:19
**members**
156:23 158:18
**memo** 114:12
**mentioned**
176:25
**meritorious**
16:8
**merits** 128:3
**mg** 1:3
**microphone**
6:9 100:14,14
121:4
**mid** 164:6
**million** 70:24
77:20 78:21
86:6 87:6
93:12,18 97:20
109:6,8,8,13
144:6,15,16,19
145:24 146:9
146:13 147:5
154:6 156:14
164:8 166:1
**mincing** 86:9
**mind** 6:13
78:10 117:4
166:5
**minds** 69:1
89:13
**mine** 101:8
**mineola** 183:23
**minimum** 18:3
18:19 25:19,21
31:8,18,21
32:4 33:1

34:15,19 35:8
36:11,17 37:12
49:13 54:10
62:5 75:6,9,23
76:3,8,12
78:24,25
104:15 105:4
154:2,10
**minute** 89:17
128:12
**minutes** 107:10
**mired** 13:17
14:20
**mirror** 134:20
**mischief**
171:24 180:4
180:15
**misleading**
57:20 86:13
87:2 88:2
**missed** 133:9
**missing** 123:20
141:23
**mission** 91:1
91:23 92:18,19
**mistake** 7:19
**misundersta...**
57:18
**mode** 82:13
**modified** 128:9
**moment** 19:5
126:15
**monday**
166:21 168:9
**money** 47:9,10
47:21,25 54:11
63:25 71:5,9

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit M Page 216 of 240

91:4 112:12
155:15 166:1
**monroe** 87:8,9
**monster** 37:1
**montana** 86:23
**months** 76:2
80:16
**moral** 91:2
**morning** 5:3,4
5:11,13 6:9,11
11:10,18,20
18:1 60:8
128:1 171:6
**morris** 118:9
**motion** 8:25
12:1 15:24
16:1,8 26:7,10
62:9,10 75:19
150:11 176:10
176:14,17,21
**motions** 172:16
**motive** 76:12
95:24
**move** 51:6,16
52:15 57:4
75:4 78:1,2
94:11 100:14
112:11 117:10
165:6,22
169:22
**moves** 16:7
93:1
**moving** 76:14
83:25 91:5
92:24 152:3
165:9

**mt** 172:13
**multiple** 40:17
40:21 76:10
89:6
**mumble**
126:16,21
**mute** 121:4
133:13
**mystery**
134:24 138:7

**n**

**n** 3:1 5:1 118:8
183:1
**name** 70:20
118:7 132:11
**named** 21:20
66:6
**names** 82:12
**narrow** 101:13
**nature** 107:18
179:5
**necessarily**
57:24 157:24
174:6 176:17
**necessary** 61:3
91:7
**necessity** 81:1
**need** 6:1 9:2
18:22 29:3
33:4 34:21
37:14 49:16
50:7 71:2,7,15
84:3 99:19
111:9 123:14
125:24 130:10
164:23 168:11
177:16 178:19

180:11
**needed** 32:11
**needs** 50:22,23
51:11 56:20
58:18,19 84:12
108:12,19
114:2,6 115:23
133:25 167:7
**neglected**
82:18
**negotiate** 42:9
42:22
**negotiated**
42:13 118:18
**negotiating**
42:11 67:16
170:17
**negotiation**
82:13
**negotiations**
117:9
**neither** 108:5
**neutral** 41:3
46:2
**neutrals** 82:14
**never** 15:14
45:9 71:9
91:18 149:3
178:3
**new** 1:2,7,13
3:6,15 4:9 9:2
9:8 11:12
12:10 14:6,7
19:7 44:16
55:25 77:4,23
78:20 85:21
87:15 96:19

103:6 111:6
127:10 147:16
150:22 176:9
**nice** 84:24
120:22 134:17
**night** 34:25
**ninety** 87:10
**non** 19:2 22:21
48:24 59:2
83:12 84:21
109:25 120:13
151:18 152:9
**normal** 179:17
**note** 69:2,5,7
145:4
**notes** 155:5
**notice** 20:12
26:17 28:5,7
132:5 171:14
**notified** 123:2
**notify** 122:23
**notwithstand...**
134:17
**ntd** 69:9
**nullity** 10:20
**number** 5:17
5:19 7:2,4
12:13 15:4
18:12 19:18
20:3,9,10
21:13 47:18
64:19 69:6
97:24 120:4
121:11 128:12
128:14 130:14
130:15 146:10
165:22 175:8

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit I, Page 217 of 240

**numbers**
154:16
**numerous**
161:25
**ny** 1:13 3:6,15
4:4 183:23
**nys** 79:16

**o**

**o** 1:21 5:1
118:8 183:1
**oaky** 162:5
**object** 39:21
43:1 58:21
125:2 171:11
**objected** 15:23
16:20 19:22
57:13 117:9
167:14,15
**objecting**
123:3 124:6,22
124:24 125:25
127:17 130:21
133:19 151:5
165:15 172:2
**objection** 5:21
17:2 20:18
25:4,11 26:16
44:1 58:7 60:4
64:19,21 69:16
71:13,21
101:22 102:2
103:1,19
104:13 105:19
109:22,23,24
120:25 123:10
123:25 124:8
124:16,21,23

125:10,12,14
125:17,23
127:1,2,20
128:23 130:17
132:4,7,10,17
132:20 134:15
136:11,17,19
136:20,25
137:18 138:13
142:3 145:12
147:15,17
148:9,10,17
149:1,4 150:2
150:3,5,8
151:7,17
152:10,17
153:5,6,7
171:15 173:5
178:20
**objections**
15:13 17:17,23
19:17 20:17
21:1 65:15
114:5 120:5,8
132:13,21
133:7 136:22
138:5 150:17
150:23 152:2
152:25 154:25
161:12 167:22
**obligated** 56:1
121:17
**obligation**
46:21 76:11
79:3 141:7
**obligations**
121:9,11,15

129:24 130:5
130:14,24
131:1,25
132:11,19,24
133:12 134:24
134:25 137:7
137:14,17
139:4 141:2,4
141:13,16
142:16 179:8
**obsession**
62:19
**obtaining**
56:24
**obviate** 100:24
**obviously**
23:23 49:25
134:21
**occur** 94:6
**occurred** 66:4
**october** 33:16
37:15 54:8,9
**od** 141:25
**oetken** 25:5
**offensive** 180:7
**offer** 32:8
33:21,23 34:2
36:16 37:6,11
38:11 49:15
76:5,8,14
97:19 109:19
**offered** 6:4
**office** 43:1
52:25 53:4
54:22 167:4
**official** 3:13
156:22 158:17

158:17
**oh** 9:18 17:20
32:20 53:18
84:22 131:22
146:14,16
155:11 161:11
**okay** 7:8,12,13
7:20 8:3,5,20
8:21 9:2,12,13
9:18 10:4,6,13
10:20,25 11:3
11:7 23:22
24:20 28:19,20
30:17 31:2,10
31:13 32:25
33:7,7,19,20
34:24 35:17
36:1,11,12,13
36:13 40:3
44:10 48:3,10
53:13 57:1
61:20,25 64:17
65:14 66:15
68:13,16 69:10
69:18 70:2,10
71:17 72:6,16
72:22 73:7,16
73:21,23 74:1
74:11,16,24
75:3,4 78:3,16
79:23 80:10,13
80:18 81:7,9
81:17 83:10,22
83:24 85:24,24
87:7,11,14,22
88:6,12 90:4
92:22 94:23

Veritext Legal Solutions
212-267-6868 516-608-2400

95:18,21,25
97:4,11,14,16
98:4,6,13,15
98:23,24 101:1
101:19 102:5
103:18 104:9
105:18 106:4
106:14,22
107:1,9 108:7
114:7,9,18
115:14,21
119:2,5 120:1
120:3,17,25
121:1,2 123:1
125:11 126:4,4
127:14,15,20
127:21 128:15
130:16 133:18
137:1 141:25
143:4 144:2,24
145:25 146:6
146:20,22
149:17 152:13
153:14,19,21
154:1 156:18
158:8,22 159:3
159:11 162:11
162:15,20,23
162:24 163:4
163:19,22
164:1,3,7,22
166:12,25
168:11,17
169:11,14
174:5,22
175:14,20
176:3,18 178:5

180:15 182:5,9
**old** 183:21
**older** 13:12
**ominous** 65:15
**omnibus** 19:17
20:14,17,18
25:11 26:16
**once** 27:5 76:2
136:24
**ones** 18:14
25:1,6 27:16
62:9,10 65:11
75:23 86:22
96:8,11 114:6
**ongoing** 90:25
**open** 12:23
13:7 51:10
92:16 124:17
135:19 142:23
**opening** 159:4
168:14
**openness** 173:6
**operative**
140:7,9
**opinion** 13:15
23:8 64:15
71:12 74:5
98:10 180:19
**opportunity**
154:3 171:23
173:3,15
**oppose** 137:8
137:17
**opposed** 16:8
24:24 159:8
**opposing** 9:16
13:4

**option** 41:1
44:15 45:15,20
48:13,14,15
104:18
**oranges** 43:23
**order** 9:1
10:10,11 11:23
12:15,15 24:24
36:10 45:24
51:12 57:17,21
59:14 93:15,15
136:8 165:23
166:1 172:7,9
177:9
**orders** 88:3
**ordinarily**
145:18
**oregon** 86:18
86:23,23
**original** 7:3,8,9
8:6,9,22 10:18
60:22
**originally**
102:10
**ostensibly** 45:6
**ought** 58:18
73:18 105:18
108:23 155:20
**outcome**
100:17
**outrage** 91:16
**outreach** 174:3
**outside** 45:17
84:9 85:1,5,8
86:2,16 108:21
**outstanding**
76:14 150:17

**overall** 40:15
**overlap** 86:21
**overnight**
166:23
**overruled**
121:1 123:25
124:21 125:11
127:1,20
180:25
**overstates**
97:20
**own** 5:19
101:19

| p |
|---|

**p** 3:1,1 5:1
**pachulski** 3:12
10:7 14:25
145:16 170:1
**pacific** 85:23
**package** 98:20
98:24 170:17
**page** 6:18 8:11
19:5 20:4
21:11 30:9,10
30:10,14,21,21
31:6 32:1,1,8
33:1,22 34:14
35:10 36:16,22
37:5,6,8,9,10
38:8 49:9,10
49:12 50:23
51:4,5 58:23
72:21,22 73:6
74:8 97:25
101:22 107:13
107:14 126:1
126:11 127:7,8

Veritext Legal Solutions
212-267-6868 516-608-2400

128:7,13,16
134:17,17
135:8 139:13
140:13 144:1
144:17 145:3
146:1,8,9,20
146:21 147:6
147:16,18
148:22 153:22
155:2 156:19
159:6 162:7
163:21 168:1
169:7
**pages** 34:25
129:15 135:5
139:10 143:22
166:15
**paid** 23:9,11,11
46:6 63:23
78:18,22 79:4
80:3 104:18
159:25
**panel** 46:3
**paper** 11:14,22
98:21 100:1
176:4
**papers** 137:18
**paradigm**
44:17 92:6
**paragraph**
32:1 33:10,13
33:24 72:18,19
74:14 78:14
102:24 109:22
129:10,11
130:17,21,22
132:9,17

156:21 158:10
158:23 159:7
159:12,13
162:8,15,21
163:24
**parallel** 149:24
**parentheses**
35:10 147:5
**parenthetical**
36:21 58:16
147:2,9,10
**parents** 90:13
90:14 155:24
**parish** 22:14
22:16,17,19
23:12 24:8
28:6 49:3,20
49:21,22 66:7
66:10,19 85:4
89:12,19 91:11
91:14 92:7
93:20 95:7,11
106:5,17,20
107:11 108:13
108:20 110:13
110:19,20
113:24 149:23
155:4,15
159:22
**parish's** 21:8
**parishes** 18:17
21:19,20 22:8
23:9,12 49:3
49:24 89:7,9
89:10,11 91:1
91:3,3,6,17,23
91:25 92:11,16

92:20 93:10,11
93:18 94:4
99:11,12
106:18 108:14
109:1 110:2
111:22 113:5
113:22 155:6,9
155:11 156:7
156:12,14
170:24 171:2
**parishioners**
90:15 92:17
94:6 155:14,24
**part** 7:20 26:6
33:15 41:15
44:1 46:24
59:25 65:1
68:2 69:20
71:6 77:3
86:22,23 89:15
90:25 92:2,24
93:6 112:8
123:10 143:23
160:15 170:16
**participate**
45:12
**particular** 50:9
56:7 91:24
104:19 129:14
129:17 138:5
148:19
**particularly**
14:8 28:5
31:22 54:13
103:25 104:10
106:2,10 110:7
156:20

**parties** 17:14
17:15 18:17
19:2 21:10
26:18,19 27:13
28:1 45:21
48:24 56:14
101:25 102:8
110:5,24
111:14 112:22
114:14,17
120:13 140:19
140:25 144:18
158:6 172:15
172:15,18
177:1
**party** 19:23
20:9 25:9,23
26:1,12 28:6
31:19 50:25
51:13,14 64:1
69:3 149:4,10
150:1,13 152:9
155:23 174:8
174:18,19
175:1,24
**past** 82:12
**paste** 144:4
**paul** 89:25
**pay** 41:15 44:6
44:6 78:20
79:13,14 81:2
131:18 155:12
159:22
**payable** 31:18
32:9 36:17
**paying** 71:9
155:15

Case 2-19-20905-PRW,    Doc 3116-9,    Filed 05/14/25,    Entered 05/14/25 22:50:13,
Description: Exhibit I, Page 220 of 240

payment 41:2
78:24 154:2
payments
78:16,17 79:12
79:17,18
104:15 154:10
pays 46:12
71:5
pdf 143:22
pendency
161:20
pending 18:13
18:15 25:5
42:25 43:1
65:6,22 147:23
148:3,10,16
149:1 153:7
174:8,13
people 17:19
35:5 47:10,17
55:13 63:2
67:3,21 68:5
69:3 77:4
84:17,19,20,24
85:3 86:5,21
88:4 90:12,16
100:2 110:2
111:14 113:24
151:23 152:6
155:7 157:14
161:19 163:16
178:3 180:7
181:4
people's 138:4
percent 23:9
49:22 50:17,21
50:25 51:13,25

52:6,11,20
86:20 145:21
percentage
23:8,11
perform 136:1
136:8
performed
121:16
period 77:20
172:12
permit 97:2
person 71:4
148:20
perspective
5:21
persuaded
24:17
phone 6:3
118:10 119:17
133:9 178:2
pick 8:21 114:6
158:4
picking 100:13
picks 130:24
picture 45:17
piece 46:9
98:21 102:8
166:4 176:4
place 14:19
15:8 90:9,10
108:13 129:17
places 63:10
plain 16:16
29:13,16,22
32:2 49:7
117:6 155:17
169:24

plaintiff 45:22
plaintiffs 76:10
plan 13:3,8,13
14:6 17:18
18:15,16 20:22
22:5 25:18
27:22 32:8
33:21,23 35:20
37:7,11 38:2
41:15 42:12,13
43:8,8,13,13
44:18,19 47:20
50:6 51:2,13
51:15 54:7
58:1 59:12,18
60:22 61:2
67:13,17 68:2
69:15 76:4
81:6 83:18
84:4 85:6
88:21 89:17
90:6 91:22
92:25 93:3
95:12 99:3,17
105:23 107:15
108:14,21
109:12,18,20
112:13,20
116:16 117:18
121:14 122:21
125:13 134:10
134:15 138:24
139:2,14 140:8
140:10,14,24
141:21 151:16
157:25 164:2,8
168:23,25

170:20 171:17
174:9 175:10
175:14 177:2
plans 39:13
40:6,8 42:3,4
43:7 59:15
play 57:22
177:21
playing 57:23
178:7
pleadings
47:16
please 5:3
11:10 15:16
70:12 71:25
98:25 116:6
117:25 118:4
121:4,5 126:16
130:20 163:25
177:5
pleased 16:15
37:18
plumes 108:15
plus 81:14,15
81:16 154:12
pm 182:11
pockets 92:15
92:15
point 7:22 12:9
32:14 34:23
38:9,20 39:11
42:8,24 44:8
45:16,25 48:7
48:22 50:9,17
51:22 52:15,18
53:8,14,24
54:12,19,22

56:2,7,11,12
56:13 59:8
61:25 64:2
72:14 73:25
75:16 78:5
80:5,6,6 81:19
82:17 83:7,10
83:11,17,19
85:12,14 86:11
87:2,3,13 88:7
88:21 93:5,14
94:5,16,19
95:9,13,17,25
96:1 99:7,20
99:21 101:22
102:17,17,25
103:19,23
104:9 106:2,10
108:9 109:1
111:19 112:24
120:25 124:5
124:13,24
125:3 137:4
141:18 142:20
144:17 160:4
162:18 163:23
172:23 174:5
178:19 179:14
179:16 180:22
**pointed** 113:9
113:19
**pointing** 12:17
48:4 140:23
164:20
**points** 30:3
39:17 40:16
42:1 43:10

48:16 103:5
117:1
**policies** 81:3
99:1,15 104:25
120:12,15,18
120:19 121:9
121:12,13,13
121:17 128:20
128:25 129:11
130:15 134:22
135:11,13
139:18 141:3,5
142:15
**policy** 77:20
138:24 139:2
**position** 12:16
88:9 95:19
97:6 134:22
138:14 142:19
143:1 145:5,5
151:24 159:20
164:12
**positioned**
77:23
**positions** 67:22
97:7
**poslusny's** 62:3
**possibility** 47:5
**possible** 108:4
137:10 181:17
**possibly**
136:11
**post** 54:23,25
**postpetition**
99:10,11
**posture** 59:16

**potential**
109:20
**potentially**
108:15 160:1
179:14
**potshots**
180:17
**practically**
71:9
**practice**
176:15
**pre** 54:23,25
**precedent** 29:8
29:16 76:17
**predict** 105:14
**prefer** 128:3
**preferred**
101:1
**prejudiced** 9:4
**preliminary**
16:20 148:1
**premature**
125:13
**premium**
23:10
**premiums**
23:12 129:23
130:3 131:24
**prepare** 8:18
**prepared**
17:25 93:14
94:11 101:5
104:6 105:6,8
114:4 126:21
**preparing** 38:5
177:2

**present** 4:9
9:16 15:5 45:2
88:3
**presentation**
18:2 20:6 31:1
31:12 38:6
**presented**
150:18
**presenting**
112:6
**presently**
109:5,19
**press** 106:3
**pressing**
109:23
**presuming**
94:10
**pretty** 178:7
**prevalent**
109:3
**previously**
113:20
**primarily**
13:17
**primary** 14:17
76:22
**principal** 16:15
**principle** 50:13
**prior** 23:8
29:14 95:20
126:9 148:12
152:11
**privileges**
139:17
**pro** 96:8
114:14,17

Case 2-19-20905-PRW,   Doc 3116-9,   Filed 05/14/25,   Entered 05/14/25 22:50:13,
Description: Exhibit I, Page 222 of 240

**probably** 13:6
77:13 109:3
114:3 160:1
**problem** 16:19
34:24 57:16
60:24 82:2
93:16 95:14
110:25 121:18
122:6,7,8
**problems**
97:12 121:3
**procedural**
10:9
**procedurally**
10:16
**procedure**
75:24 102:7
149:3
**procedures**
12:18,22 13:21
14:7,22 19:11
27:24 38:2
44:18 48:5
69:21 70:6
99:1 148:25
150:25 169:20
169:23 170:3
172:6
**proceed** 6:22
6:23 16:11
22:18 41:9
152:17
**proceeding**
148:13 152:11
**proceedings**
182:10 183:4

**proceeds**
120:18 138:20
139:4 148:11
**process** 15:5
17:5,10 27:17
39:15,19,21,22
40:22 41:3,10
41:15,19 45:12
62:4 71:8 76:2
81:24 82:15
106:2 121:8
155:6,8 170:7
172:17
**processes** 74:5
**processor** 61:4
**produce**
131:15 133:3
**product** 76:16
171:20
**productive**
173:25
**professional**
16:24
**professionals**
145:13 156:25
157:5 158:25
**progress** 16:23
27:11 28:25
44:22
**promise** 54:16
**promote** 77:9
**promptly**
176:23
**proof** 5:17,19
5:22,24 6:19
7:3 21:3,15
39:6 62:7

64:21,22 69:15
**proofs** 161:22
**proper** 109:19
**property** 23:4
106:19 111:21
120:14,16,19
144:14
**proposal** 17:23
26:22 82:10
97:19
**propose** 22:7,9
55:22 76:23
114:13 145:11
174:18 175:16
**proposed** 42:4
82:7 83:8
109:19 167:11
**proposing**
21:24 67:20
**prosecuted**
15:14
**prospect** 105:3
**protect** 99:2
100:1
**protecting**
99:17 142:9
**protection** 99:4
99:25
**protocols**
99:15
**provide** 16:25
38:14 51:14
70:4 71:23
109:11 110:23
125:1 148:25
**provided** 39:9
100:18 170:15

**provides** 67:13
139:2 150:2
**providing** 30:4
121:23 136:11
**province** 86:18
86:23,24
**provision**
46:18 75:15
**provisionally**
26:8,9,14,22
**provisions** 13:3
41:3 42:12
71:1
**public** 7:24
157:21 163:14
179:2
**publicly** 94:19
111:22
**pulled** 179:14
**pulling** 155:6
**punitive** 37:16
85:2
**purdue** 47:17
50:17 89:14,22
92:21 93:5
116:11,13
**purpose** 91:6
148:23
**purposes** 72:9
109:12 174:11
**pursuant** 27:22
158:19
**pursue** 37:16
38:12
**push** 15:10
**pushed** 118:1

Case 2-19-20905-PRW, Doc 3116-9, Filed 05/14/25, Entered 05/14/25 22:50:13, Description: Exhibit I, Page 223 of 240

put 10:5,11,13
20:25 24:14
35:14 45:19
47:18 49:7
62:23,25,25
63:7,9 70:6
74:6,25 77:14
78:8 82:20,22
83:2 85:7
86:14 97:4,14
98:6,12,23
102:11,13
103:2 104:6,7
106:14 108:3
113:24 134:15
142:22 145:2
147:2,4,5,6,14
154:4
putative
108:19,22
putting 70:24
71:22 144:19
169:23

**q**

qualified 82:9
quality 21:21
21:22
quantification
104:23
question 10:8
46:5 47:22
54:22 56:15
66:22 67:5
69:5 74:22
78:10,17 79:15
87:25 89:14
92:1 95:22

109:17 110:11
121:22 122:4
130:16 151:2
156:9 159:7,17
161:17 181:7
questions 49:2
67:2,11 69:22
69:23 70:2,7
158:6 171:25
quibble 61:21
quick 101:10
quickly 56:5
quigley 111:6
quite 17:12
114:4 148:6
quote 102:1
109:16

**r**

r 1:21 3:1 5:1
118:8 183:1
raise 50:15
101:16,19
115:3,6 116:3
136:11 167:17
170:4 176:5
182:9
raised 16:16
25:5 43:10
72:12 83:13,16
88:19 95:5
102:23,25
103:19 114:3
114:13 115:13
158:6 174:5
raises 78:9
110:10

raising 37:22
37:23 91:4
95:4,22 115:12
119:21 135:17
range 93:16,18
110:20
rarely 77:15
rather 71:11
91:2 95:14
127:8 128:3
reach 14:5
23:3 27:8
45:22 173:1
176:19
reached 13:12
14:2,6 101:11
reaching 41:20
92:14 109:10
reaction
111:11
read 30:18,23
40:7 53:25,25
56:15 59:18
69:24 74:16
96:5 119:16
129:25 130:10
140:4 146:17
148:17 161:11
162:19 163:24
readily 71:8
reading 31:6
32:3 55:14
134:2 140:12
148:8
reads 32:22
35:6 36:8
164:21

ready 28:25
real 38:4 89:20
95:4,8 106:5
106:17,19
107:8,9 108:24
111:21 113:13
reallocation
77:1
really 6:16
16:17,23 19:7
23:4 30:2 36:4
37:25 43:22
44:15 50:1
55:24 61:2
63:1 68:8
71:10 75:1,17
75:22 76:15,23
77:9,23 85:4
86:13 87:11
90:23 91:23
92:6 96:22
110:25 111:5
111:10 112:24
117:22 159:7
161:17 165:16
165:24 166:13
170:22 176:7
177:3,10
reason 11:22
22:13 26:12
40:21 60:11
61:6 76:22
91:10 163:13
167:16
reasons 63:15
91:20

**rebate** 144:7
  144:19
**recall** 102:4
**receive** 17:21
  104:2 107:17
  140:21 159:15
  161:5 170:7
**received** 5:16
  7:10 11:13
  12:2 144:13
**receiving** 112:8
**recent** 20:22
  111:10 126:2,6
  126:8
**recently** 11:14
**recess** 11:1,8
  117:24
**recipe** 155:10
**recognized**
  95:5
**recollection**
  39:18 41:23
  42:3 43:12
**reconsiderati...**
  41:22 42:1
  43:17,18
**record** 9:3,11
  20:15 47:16
  60:20 70:21
  104:21 126:17
  127:15 133:7
  133:12 183:4
**records** 131:16
  133:4
**recouped**
  46:19,25

**recover** 9:7,8
  25:19 44:5
  109:16 113:4
  137:10
**recovered**
  84:19,21,24
  86:15
**recoveries**
  37:16 38:12
  56:24 85:1,7,8
  86:2 109:21
  110:5,5,23
  112:8
**recovering**
  76:24 80:4
**recovers**
  108:18
**recovery** 27:22
  28:2 77:10
  104:2 112:21
**redline** 60:7
  72:24 79:21
  89:4 103:6
**redo** 35:20
**redone** 167:7
**reduction**
  145:6 147:3
**refer** 143:22
**reference**
  30:25 53:7
  117:1
**referenced**
  135:5
**references**
  180:3
**referred** 12:23
  72:18

**referring** 127:8
  146:17 157:9
  174:17
**refers** 15:4
  58:16
**refilled** 92:16
**reflect** 24:23
  57:17 64:6
  82:20 166:8
**reflected** 12:21
  178:20
**reflects** 91:1
  93:18
**refreshes** 43:12
**refundable**
  75:10
**regard** 91:23
**regarding**
  12:15 13:20
  38:17 47:16
  52:20 66:22
  82:23 99:4
  101:23 110:2
  113:17 138:7
  156:20 164:13
**regular** 138:17
**reimbursed**
  80:3
**reimbursement**
  67:7 77:6 79:2
  80:5 81:13
**reimbursing**
  78:16 79:3,12
  79:18
**rejection**
  171:17

**related** 17:14
  18:17 70:2
  81:3 120:13
  121:3 158:3
**relative** 75:14
**release** 17:15
  18:16 21:24
  22:6,7,21
  48:24 50:25
  63:22 148:1
**released** 21:9
  30:4 63:24
  88:4 110:24
**releases** 23:16
  24:2,8 51:13
  51:14 63:2
**relevant** 13:6
  84:5 85:15
  89:21,22
**religious**
  113:16
**relying** 140:5
  140:17
**remain** 7:5,7
  18:18,18 84:11
**remainder**
  65:2
**remains** 50:18
  53:20
**remand** 102:22
**remedy** 157:14
**remember**
  23:7 42:5
  50:22 65:16,19
**remembering**
  171:16

Case 2-19-20905-PRW,    Doc 3116-9,    Filed 05/14/25,    Entered 05/14/25 22:50:13,
                      Description: Exhibit I Page 225 of 240

**remind** 54:7
88:2 93:9
173:8
**reminded**
43:21 89:25
**reminder** 54:6
96:2
**remove** 174:12
**reorganization**
107:16
**repeat** 85:22
**repeatedly**
67:14
**replace** 61:18
**reply** 75:25
**report** 7:16,23
7:23 8:5,9,10
8:13
**reported** 90:2
**reports** 170:8
**represent**
179:9
**representatives**
180:3
**represented**
9:23
**representing**
137:16 156:22
158:17,17
**represents**
9:19 118:9
**reproduced**
30:14
**request** 41:22
134:19 170:19
176:10

**requests** 171:9
**require** 91:10
97:2 98:24
110:19 118:20
172:15,16
**required** 51:1
56:11 64:14,16
78:20 92:23
95:1 125:1,16
130:3 131:23
138:19
**requirements**
45:18 71:19
**requires** 51:24
**requisite** 15:22
**reread** 30:17
30:20
**reservation**
166:6
**reserve** 105:1,3
110:12 167:21
**reserved** 75:13
104:16
**reserves**
154:11
**reserving** 95:8
**resolicit** 117:20
**resolution**
27:23 31:19
90:25 103:22
104:3 105:15
105:16 148:16
**resolve** 100:4
113:6 117:22
120:6 151:12
151:17

**resolved** 11:6
25:22 27:5,21
27:24 34:5
64:24 69:16
73:19 75:12,12
82:24 106:4
111:17 129:5
135:16,19
148:12 149:2
150:6 151:16
152:11,18
153:8,19
159:16 160:17
161:3
**resolving** 151:8
**respect** 5:7 9:1
11:13 17:23
20:17 72:14
74:14 106:5,16
115:9 138:5,9
140:5 150:9,12
152:9,11,16
169:25 170:3
170:11 180:23
**respective**
107:20
**respond** 30:3
32:19 134:6
137:22,23,24
176:13,20
**responded**
12:14 16:24
67:16 106:22
**response** 12:16
25:11 49:2
60:13 78:15
97:1 102:5,6

127:4 144:22
148:24
**responsibility**
64:24 65:3
91:2 92:2,6
**responsible**
49:22 56:24
77:4,5 91:16
92:19 129:23
130:2,8 171:25
180:6
**rest** 158:22
**restart** 28:1
48:15 102:9
**restarting** 71:1
**restricted**
113:10,15
**restricts** 68:4
**result** 16:9
38:20 56:17
170:23,24
**resulted** 21:1
**resulting**
104:17
**results** 136:14
**resume** 115:22
**retain** 9:8
101:25
**retained** 48:25
**retaining**
106:10
**retention** 105:1
145:6,8
**retentions**
129:24 130:4
131:19,25
154:12

| | | | |
|---|---|---|---|
| **retired** 46:3 | 66:5,17 70:10 | **rise** 5:2 11:9 | **roll** 154:22 |
| **retribution** | 73:20,20 75:4 | 44:13 57:25 | **roman** 1:7 |
| 90:8 | 78:12 79:2 | 114:8 | 11:11 158:4 |
| **return** 178:2 | 81:9 83:11 | **rising** 179:20 | **room** 171:14 |
| **returning** | 85:24 86:8 | **risk** 63:14 | **rosenbaum** |
| 90:19 | 97:14 101:21 | 71:15 92:20 | 60:15 |
| **revealing** | 101:24 111:22 | 96:15,15,16 | **rosenblum** |
| 84:11 | 114:11 115:16 | 107:23 108:7 | 3:10 41:8 |
| **revert** 95:12 | 115:21 116:19 | 108:13,15,20 | 60:15,16,20,20 |
| **review** 14:21 | 117:2,25 | 108:24 109:3 | 61:7,13,15,19 |
| 38:15,16 40:22 | 123:23 127:12 | 116:15,19 | 61:21 68:1,1 |
| 41:2 43:19 | 128:15 129:16 | 155:1 160:19 | 134:7,7,13 |
| 44:15 45:14,15 | 132:3,16 | 164:4,12 | 135:4,8 137:22 |
| 46:7,13 48:14 | 133:15,16 | 168:25 169:9 | 137:24,25 |
| 75:17 76:1,2 | 134:3,5 135:13 | 169:13 177:20 | 138:23 139:1 |
| 100:3 104:18 | 143:1,6,7,13 | 179:14 | 139:11,13,19 |
| **reviewed** 62:7 | 146:7 147:5 | **road** 84:18 | 139:24 140:2,6 |
| 77:22 179:4 | 148:14 149:9 | 86:14 183:21 | 140:11,18 |
| **reviewer** 40:14 | 149:11,11 | **roadmap** 30:6 | 141:4,17,24 |
| 40:14 42:1 | 150:21 151:9 | 30:7,7,22 31:7 | 143:8,9 144:25 |
| 82:10 | 153:11 159:1 | 32:12 35:21,22 | 144:25 145:21 |
| **revised** 30:11 | 160:23 164:24 | 36:19 48:20 | 145:24 146:7 |
| 118:19 119:5 | 170:14 172:18 | 54:13 | 147:2,7,9,11 |
| 119:25 166:15 | 174:12 175:17 | **robust** 40:22 | 147:13 148:23 |
| **rewrite** 117:6 | 177:24 181:15 | 62:4 | 149:8,11,18,22 |
| **right** 5:5 9:14 | 181:21 182:8 | **rochester** | 150:5,10,15,19 |
| 10:15,22,25 | **rights** 28:3 | 12:24 13:3,9 | 150:24 151:3,9 |
| 11:5,7 16:22 | 101:24 102:1 | 13:15 14:4,8 | 151:13,20 |
| 20:1,8 22:4,8 | 106:10 120:12 | 14:25 15:2,9 | 153:17 154:18 |
| 25:12,14 27:3 | 120:14 123:24 | 15:11,13,16 | 157:19,21 |
| 27:19 32:16 | 129:2 136:2,3 | 40:24 42:5,25 | 158:8,14,21,24 |
| 33:23,25 34:1 | 138:4,19 | 43:22 45:3,5 | 161:21 162:4 |
| 36:7 37:15 | 139:17 140:22 | 57:19 58:10 | 171:25 172:4 |
| 40:19 43:20 | 141:2 142:4,15 | 157:12 | **roten** 118:5,6,8 |
| 47:23 53:13 | 170:9 171:15 | **rocket** 61:18 | 118:8,12,15,18 |
| 55:15 57:4,7 | 172:5 175:14 | **rockville** 1:7 | 118:23 119:1 |
| 62:17 65:18 | | 11:12 66:3,6 | 119:16,18 |

120:4,17,20,24
121:2,6,7,21
121:25 122:4,7
122:11,17,21
122:25 123:3,8
123:13,19
124:1,4,7,10
124:19 125:4,7
125:9,18,22
126:1,3,5,8,12
126:15,18,22
127:3,13,19,23
128:5,7,9,17
128:19,24
129:8,12,16,20
129:22 130:10
130:13,18,23
131:4,6,9,12
131:15,18,22
132:1,3,5,8,11
132:15,19,23
133:5,8,11,21
134:20 135:14
135:15,20,23
136:16,17,20
137:3,6,20
140:12 154:12
178:10
**roten's** 138:1
138:15 139:8
**roughly** 31:20
91:25 128:11
**rowing** 94:13
**rubbed** 44:10
**rule** 65:15
72:15 128:3
132:21 152:2

158:19
**ruled** 17:17
20:16 61:20
111:17
**rules** 28:3
69:17 102:10
111:9
**ruling** 52:5,5
60:3,12 71:24
74:3,3 88:8
89:6 95:20
110:18 115:22
116:11 117:17
120:20,23
127:14 176:22
**run** 112:12
**running** 111:6
177:11
**russell** 118:6

**s**

**s** 2:1 3:1 5:1
**saddled** 26:12
**sadly** 63:16
**sake** 20:24
**satisfactory**
119:6,23
**satisfied** 70:8
78:7 79:16
83:8 108:8
110:11 130:11
**satisfy** 71:19
**satisfying**
129:23 130:2
**sauce** 155:10
**save** 12:10
**saw** 7:13 12:4
29:9 63:20

107:1
**saying** 9:5
16:21 45:17
59:21 63:23
84:19,23 87:4
87:4,19 92:9
93:13 112:18
112:19 113:1
122:4 130:20
144:9 145:17
148:8 149:15
150:16,21
152:4 155:3,18
158:15 165:24
171:21 178:6
**says** 27:24 32:3
34:4 44:5
46:19,24 63:14
69:4,15 78:15
79:12 89:14
93:5 102:7
117:19 122:23
129:22 130:1,7
141:10,15
151:15 152:10
156:6 159:11
169:7 178:17
180:11
**scale** 74:2
76:18
**schedule** 176:9
176:16,22
**scheduled** 11:1
177:7
**scheduling**
116:22

**school** 86:5
155:24
**schools** 18:17
21:19,20 90:13
90:14 91:17
92:16 147:24
**science** 61:18
**scott** 2:1 4:10
**scout** 24:2
**scouts** 27:13
29:15 38:24
41:18,19 42:4
45:19 47:14,19
83:21 111:5,11
112:23
**screen** 31:15
70:1 71:22
72:19 102:4
**se** 96:8 114:14
114:17
**search** 61:17
82:14
**searching**
24:19
**seated** 5:3
11:10 117:25
**second** 37:4
50:24 51:12
67:5,19 71:10
90:10 101:21
102:25 103:18
104:13 107:12
121:2 128:15
131:15 146:25
151:10 157:7
163:24 169:6
181:5

| | | | |
|---|---|---|---|
| **secret** 12:25 | **seeking** 158:25 | **sentences** 72:1 | 40:25 48:12 |
| 155:10 | **seeks** 90:7 | 72:11 108:20 | 54:9 59:6 70:3 |
| **section** 27:23 | **seem** 75:5 | 113:2 163:25 | 107:20 |
| 30:6 36:2 73:5 | **seemed** 109:25 | **separate** 5:19 | **seven** 19:25 |
| 102:6 128:19 | **seems** 15:10 | 77:3 81:5 | 52:9 67:3,18 |
| 129:2 135:25 | 19:2 47:19 | 82:10 98:21 | 76:1 160:9,10 |
| **sections** 135:23 | 89:20 90:21 | **separately** 8:15 | 160:13 161:15 |
| 135:24 | 107:22 177:8 | 86:24 | **seventy** 19:25 |
| **security** 55:25 | **seen** 49:4 63:19 | **sequencing** | **several** 13:14 |
| 77:5 79:17 | 77:14 96:4 | 14:18 45:4 | 33:23 46:4 |
| **see** 8:11 13:23 | 119:14 170:19 | **series** 69:22 | 113:2 114:19 |
| 19:24 23:16 | **seize** 138:1 | **serious** 117:8 | 129:15 181:8 |
| 26:12 32:14,25 | **select** 130:25 | 117:15 155:1 | **severally** 89:11 |
| 33:24 35:10,23 | **selected** 67:24 | 170:16 | **severity** 38:18 |
| 36:19,21 50:1 | **selection** | **serve** 67:10 | **sex** 155:15 |
| 50:13 53:23 | 101:24 | **served** 18:9 | **shake** 44:7 |
| 61:11 69:2,4 | **self** 35:15 | **serving** 68:5 | **shaking** 177:12 |
| 69:11 72:17 | 105:1 121:14 | **set** 29:10,16 | **share** 76:4 82:6 |
| 73:13 74:16,18 | 129:23 130:4 | 172:17 | 89:23 90:6 |
| 77:15 80:21 | 131:18,24 | **sets** 38:16 | 101:4 166:2 |
| 83:14 95:7 | 154:11 | **settled** 19:10 | 181:12 |
| 96:10 97:24 | **sell** 81:8 111:8 | **settlement** 9:6 | **shared** 82:12 |
| 103:6 113:24 | **semco** 82:18,25 | 27:8,11 45:22 | 89:4 91:23 |
| 115:4,5,7,13 | **sense** 60:25 | 46:24 47:21 | 92:18 102:18 |
| 117:23 125:18 | 91:1,6 110:17 | 65:2 70:25 | 118:24 120:19 |
| 131:22 132:1 | 163:9 176:8 | 88:17 97:19,21 | **sharing** 91:1 |
| 134:19 135:14 | **senses** 115:25 | 130:1,2 131:13 | 93:22 174:2 |
| 158:12 162:7 | **sensitive** 28:4 | 133:3 140:20 | **she'll** 115:7 |
| 162:12 164:22 | 78:10 | 140:21 154:5 | **shoot** 47:7 |
| 177:16 179:20 | **sent** 6:20,21,24 | 160:20 163:11 | **short** 165:1 |
| 181:6,7 | 97:14 | **settlements** | **shortly** 5:15 |
| **seeing** 91:8 | **sentence** 52:2 | 13:23 | 28:16 |
| **seek** 42:8 46:22 | 52:14,20 58:14 | **settling** 31:20 | **shot** 174:2 |
| 67:7 77:6 79:1 | 107:15 113:21 | 32:10,12 34:7 | **show** 33:7 |
| 82:23 108:22 | 113:22 141:10 | 34:9,12,17,21 | 77:12 88:20 |
| 157:25 | 146:18,23,25 | 35:12,14 36:17 | 127:16 |
| | 158:11,16,24 | 36:21 38:13 | |

**showed** 152:24
**shows** 79:21
   111:20 168:1
   169:3
**sic** 90:2
**side** 94:13
**sides** 15:14
   57:22,24 83:5
   177:15
**sign** 6:22 28:25
   177:8 178:3
**signature**
   183:6
**signed** 6:24
   7:10 23:16
**significant**
   15:4 47:14
   63:16 108:15
**signing** 179:2
**silenced** 180:18
   180:19
**silverstein**
   111:4,11
**simplicity's**
   20:24
**simply** 144:16
   160:16
**single** 61:2
   62:7
**sir** 9:13 10:24
   164:17
**sit** 5:8,8 106:8
   136:21 137:21
   169:16 178:8
   178:10
**sitting** 114:22

**situation** 76:16
   136:6 149:22
   149:24
**situations**
   57:20 85:25
**six** 63:5 66:18
   139:11 154:6
**sixteen** 23:14
**skin** 144:9,11
   144:11
**slam** 22:14,15
**slide** 18:2 30:6
   31:1,11,12
   48:19 68:23,23
   68:24,25 69:3
   70:6 77:13
   78:8,9,12
   81:21 82:21
   83:1 92:5
   152:24
**slides** 30:14
**slight** 119:18
**slightly** 10:9
   12:4 61:12
**small** 23:11
   77:19 154:4
   171:21
**smaller** 96:8
**solely** 130:2,8
**solicitation**
   12:1 26:7
   98:20,24
   101:11 117:6
   118:16 150:25
   169:20,22
   170:3,17 172:1
   173:24 181:10

**solicited** 17:11
**soliciting**
   167:19 171:16
**solution** 95:14
**solutions**
   183:20
**somebody**
   11:14 16:7
   35:15 36:10
   46:12 68:20
   108:18 122:9
   122:15 125:20
   164:21 173:15
**sonya** 2:25
   183:3,8
**sooner** 165:20
   165:20 167:20
   170:18
**sorry** 22:24
   32:20,20 40:13
   46:8 51:23
   52:23,24
   100:11 106:6
   116:21 126:18
   127:11 128:13
   131:8,9 133:14
   134:11,13
   135:5 138:9
   146:16,25
   147:9 151:3
   157:9 162:10
   164:18 167:23
   167:25 168:4,7
   169:10 170:21
   174:16 176:3
   181:8

**sort** 26:9 110:3
   156:21
**sought** 82:24
**sound** 59:5
**sounds** 72:1
   119:20 153:20
**source** 13:7
**sourced** 155:22
**southern** 1:2
**speak** 9:15
   13:1 76:11
   115:6 126:19
   126:19 127:22
   134:13 136:24
   142:10
**speaking** 32:19
   46:3
**special** 14:25
   15:1
**specific** 71:18
   111:7 116:2
   125:12,14
   132:11 148:3
   148:15 167:15
   170:4 178:21
**specifically**
   111:19 116:8
   116:10 124:5
   124:14,24
   125:16 130:7
   131:2,20
   132:25 140:16
   157:8 179:19
**specifies** 136:1
**specify** 162:18
**specifying**
   104:14

| | | | |
|---|---|---|---|
| **speed** 152:4 | 58:1,7,22,24 | 144:24 146:2,4 | 181:1 |
| **spelled** 48:11 | 59:1,20,25 | 146:11,14,16 | **stang's** 145:2 |
| **spending** 177:1 | 60:6 65:8,13 | 146:19,21,23 | **start** 11:16 |
| **spokane** 86:22 | 66:20,21,25 | 146:25 147:15 | 41:9 86:9 |
| **spoke** 5:14 | 67:13 68:8,9 | 147:16,20 | 177:15 |
| **spoken** 5:20 | 68:12,18 70:9 | 148:9,14 | **started** 29:8 |
| 6:2 59:1 | 70:14,17,19,22 | 149:14,17 | 60:9 62:5 76:2 |
| **sponte** 16:6,9 | 70:22 71:20 | 151:21,22 | 76:21 119:4 |
| 112:16 | 72:4,7,10,18 | 152:3,10,14,19 | **starting** 48:22 |
| **sprinkling** | 73:13,17,20 | 153:13,16,20 | 59:8 164:2 |
| 29:15 | 74:23 78:6,7 | 153:22 154:1,8 | **starts** 33:22 |
| **st** 89:25 | 78:14 79:2,6 | 154:21,23 | 34:1 159:14 |
| **stage** 93:19 | 79:10,12,20 | 155:1,10,17 | 162:8,10 |
| 123:11 | 80:7,15,19,23 | 156:2,6,10,15 | 177:10 |
| **stand** 16:14 | 81:4,8,10 82:3 | 156:17,24 | **state** 15:3,9,10 |
| 49:12 88:9 | 82:4 83:7,9 | 158:11 159:1,2 | 15:19 17:22 |
| 125:9 | 85:13,14,18,25 | 159:6,11,13,24 | 18:23 19:2,12 |
| **standard** 62:14 | 86:4,8,17 87:1 | 160:22,24 | 24:9 27:21 |
| 75:18 76:9 | 87:15 88:2,19 | 161:8,25 162:5 | 28:3 48:1 |
| **standards** | 89:1 93:25 | 162:7,11,15,17 | 63:21 65:6 |
| 62:11 | 94:16 95:3,9 | 162:20,23,25 | 77:5,24 81:25 |
| **standing** 58:14 | 95:21 97:23 | 163:4,13,19,21 | 96:9 121:20 |
| 134:16 136:24 | 98:3,5,7,9,14 | 163:23 164:2,4 | 149:2 151:24 |
| 138:4 | 98:16,20 99:3 | 164:15,16,17 | 153:1 157:2 |
| **standpoint** | 99:8,13,16,22 | 164:18,19,25 | 158:1 178:1 |
| 6:17 64:11 | 102:15 104:19 | 165:4,16,24 | 180:2 |
| **stang** 3:12,18 | 104:20,22,22 | 166:10 167:8,9 | **statement** 2:4 |
| 10:7 15:4 36:6 | 105:24 107:8 | 167:23,24 | 11:2,13,16 |
| 37:21 39:4,8 | 107:10 108:2 | 168:4,7,17,18 | 12:6,11 16:13 |
| 39:14,23 40:1 | 113:7,8,8 | 168:19,22,25 | 16:21 17:6,11 |
| 40:4,12,19 | 114:16 115:18 | 169:3,6,11,12 | 17:19 20:8 |
| 41:12,18,25 | 115:20 117:8 | 169:15 170:1 | 29:1 30:11,22 |
| 42:11 43:12,16 | 118:18 119:3 | 175:6 177:7,13 | 32:9,15 33:9 |
| 43:21,25 46:5 | 119:11,14 | 177:14,23,25 | 33:22 38:3 |
| 46:8,18,23 | 142:7,8,10,25 | 178:6,10 | 42:14 44:1,3,8 |
| 47:4,12,13,24 | 143:3,5,15,16 | 179:21,22 | 44:13 46:19 |
| 51:3 57:12,17 | 143:19 144:1,3 | 180:11,15 | 47:5 48:9 |

Case 2-19-20905-PRW, Doc 3116-9, Filed 05/14/25, Entered 05/14/25 22:50:13,
212-267-6868   Description: Exhibit I, Page 231 of 240                  516-608-2400

50:23 51:5
52:11,22 53:2
53:5,19 58:15
64:6,12 70:5
72:9,20 73:5,9
73:15 75:9
78:5 80:20
81:23 83:18
97:3,4 98:9,11
98:18 99:17
101:15 102:12
103:24 105:7
107:14,24
110:11,15
115:2,10,24
117:5,14
119:23 120:5
121:15 123:4
125:13,15,15
125:25 127:9
127:17 128:8
129:1,18 131:3
133:20 134:1
135:2,9 136:12
136:15 137:11
137:18 139:8
140:13 141:10
145:3 146:1
157:10,23
158:13,14,16
158:20,21
160:18,23
164:12 166:8
166:10 167:19
169:24 177:9
**statements**
94:18 154:2

157:15 158:5
158:18
**states**  1:1,11
4:1,2 43:7
86:19,19
142:22
**status**  2:1
**statutorily**
56:1
**stay**  11:2 15:8
71:16 100:14
**stayed**  23:23
44:23,24 148:4
148:16 149:10
**stealing**  44:4
**steinman**  23:19
23:19,20 24:9
49:17,18 50:2
121:20 147:22
147:24 148:3
148:15 149:19
149:24,25
150:7,13 152:5
152:8
**step**  13:6 39:15
39:21,22 89:16
171:7
**steps**  40:18,22
**stipulation**
8:19,23 10:6
**stood**  15:14
**stop**  12:9 13:10
24:19 60:3
87:17 89:5
98:8 112:10,10
132:13 146:8
146:24 180:22

**stopped**  151:25
**stops**  71:16
**straddle**  54:24
55:1,23 56:10
56:25,25 77:1
**strange**  19:2
**street**  3:5
**strictly**  77:7
**strike**  44:3
**structure**  13:8
81:6
**structured**
88:21
**struggle**  59:3
**struggled**  29:7
**struggling**
149:12,14
**stuck**  97:13
**students**  90:13
91:6
**studied**  91:25
**study**  8:11
**stuff**  164:24
**sua**  16:6,9
112:16
**sub**  37:4 48:23
154:5,16
160:21 161:1,6
163:23
**subchapter**
109:2
**subject**  64:20
80:5 154:17
172:7
**subjecting**  91:2
**subjects**
118:12

**submission**
38:15,23 39:5
39:9,16 48:13
**submissions**
40:13
**submit**  53:24
157:20 166:17
**submitted**
120:2
**subparagraphs**
129:13
**substantial**
16:23 28:25
94:12
**substantive**
38:4 83:17
**succeeds**  80:4
**successful**
28:20 40:8
**successfully**
39:12
**suddenly**  44:5
142:23 170:21
171:8
**sue**  95:15
**suffer**  90:10
**suffered**  90:8
**sufficiently**
181:3
**sugayan**
118:10,18
119:9,9,16
133:8,11,14,17
133:22,23
134:2 135:17
**suggest**  8:14
27:16 60:4

109:3 154:14
163:9
**suggested** 43:9
61:16 90:22
105:21
**suggesting**
55:4
**suggestion** 9:9
37:12,17 154:8
**suing** 31:24
48:25
**suite** 4:3
183:22
**summary** 30:2
32:17 33:10
53:6 101:23
103:19 107:24
146:19
**supervise** 25:4
**supp** 105:13
**supplement**
68:2
**supplemental**
64:19
**supplemented**
84:12 114:2
**support** 13:3
14:9
**supported**
12:18
**supposed** 17:6
**sure** 6:7 9:4
13:22 18:6,10
21:12 22:15
23:25 32:21
35:4 44:6
45:10 47:7

51:3 53:14
59:18 66:24
74:20,23 76:13
91:10 94:16
96:3 97:13
106:13 119:19
119:22 122:14
133:6 136:13
140:4 142:9
143:12 145:9
152:1 157:12
158:12 163:14
166:3 173:2,18
175:23 177:14
**surprise** 15:6
57:8
**surprised**
88:18
**surprising**
20:13
**surprisingly**
14:23 20:11
**survive** 62:9,10
75:19 86:7
**survives** 66:10
**surviving** 8:20
**survivor** 32:3
43:10 44:4
54:24 58:8
59:2,5 78:22
178:22 179:1,3
**survivors** 9:20
12:19,21 41:16
41:19 58:2
67:17 80:20
90:24 91:3
92:8 96:22

97:20 161:10
170:23 171:1,3
180:18
**suspect** 119:8
**sustained**
159:20
**sword** 108:16
**sympathetic**
37:2,3
**syracuse** 13:9
13:16 14:12
15:2,17 40:24
42:7 45:5
157:11

---

**t**

**t** 118:8 183:1,1
**table** 112:6
114:22 169:19
**tabulation**
173:9 176:11
**tag** 115:19
**take** 5:6 13:6
25:7,10 34:22
37:13 42:8
48:7 79:23
85:10 87:17,19
97:21 98:25
110:3 114:15
117:22 152:1
158:3,9 173:14
174:2 176:8
**taken** 16:2
49:1 83:14
85:14 99:9
112:5 134:22
**talk** 8:14 9:10
23:15 33:20

42:15 61:15
69:21 70:23
76:10 78:4
79:9 99:18,23
99:24 101:5
118:13 157:9
178:12
**talked** 31:17
38:16 49:6,7
50:16 84:2
95:2 135:24
**talking** 7:15
26:15 30:20
42:6 58:5
63:19,20 72:1
84:22 92:6
127:6 132:23
147:22 148:2,6
148:18,19
154:12 159:12
161:8,9,12
164:15 179:25
**talks** 140:13
162:17
**task** 17:12
**td** 12:21
**tdp** 15:6
**tdps** 12:22 39:9
39:18 41:11
**team** 29:8
115:19 128:2
**teased** 144:8
**technically**
163:6,8
**telephone**
172:16

| | | | |
|---|---|---|---|
| **tell** 5:9 6:12 | 59:16 89:19 | **things** 9:3 17:9 | 78:5,10,18 |
| 17:13 23:1 | 105:16 110:8 | 37:25 38:7,8 | 79:24 80:20,22 |
| 24:21 36:10 | 149:18 176:9 | 69:6 70:19,23 | 81:1 82:24 |
| 48:21 58:11 | **terrible** 92:3 | 97:12 100:17 | 83:12 84:3,12 |
| 70:15 84:16 | 170:22,24 | 104:23 117:9 | 84:20 85:15 |
| 89:11 97:24 | **test** 70:5 110:8 | 132:22 133:1 | 86:11,12,13 |
| 99:6 103:23 | **text** 102:16,21 | 133:19 165:19 | 89:3,8,15 |
| 115:17 118:7 | 103:2,3 | 172:10,19 | 92:22 93:4,5 |
| 122:22 123:7 | **texts** 142:12 | 176:23,23 | 93:23 95:4 |
| 123:10,12 | **thank** 6:7 | **think** 6:15 7:19 | 96:17 100:13 |
| 124:2,17 125:2 | 10:22,24 18:10 | 8:23 9:2 11:23 | 101:3,17 |
| 125:20 128:6 | 37:17,21 40:19 | 12:6,14,21 | 102:20,20 |
| 130:13,20 | 47:6 57:2 68:9 | 15:7,20 16:6 | 103:1 104:3,23 |
| 132:20,25 | 68:9 97:17 | 16:15,18,19 | 106:2,15 |
| 136:24,25 | 101:20 116:18 | 17:20 18:2,18 | 107:14 108:1,3 |
| 139:14 140:16 | 131:22 134:4,5 | 22:14 24:11 | 108:12,19,23 |
| 145:20 148:2 | 138:22 143:5,9 | 28:24 29:5 | 108:23 110:14 |
| 148:20 163:14 | 156:15 168:13 | 30:2,6,10 36:2 | 110:21,21,25 |
| 164:14 | 169:11 176:6 | 38:8 39:14,23 | 111:18 112:4 |
| **telling** 8:21 | 179:22 181:1 | 40:17 41:22 | 113:9,11,14 |
| 26:3 34:17 | 182:2,7 | 43:8 48:11 | 114:4,12,13 |
| 149:7,13 155:5 | **that'd** 16:8 | 49:16 50:7,22 | 116:7,16,17,23 |
| 178:1 | **theirs** 166:21 | 51:11 52:12 | 117:12,25 |
| **tells** 31:21 32:6 | 173:23 | 53:5 55:12 | 123:5,23 |
| 33:10 35:7 | **theoretical** | 56:8,19 57:8 | 129:18 132:3 |
| **ten** 41:9,10 | 152:22 | 57:20 59:1,20 | 133:5 134:3 |
| 145:21 | **theory** 67:16 | 59:22,22 60:21 | 141:23 144:11 |
| **tend** 19:20 | **thick** 144:11 | 60:25 61:1,9,9 | 144:20 148:5 |
| **term** 57:12,13 | **thin** 144:9 | 63:1,12,18,21 | 148:19 150:18 |
| 57:20 60:4,18 | **thing** 9:11 | 63:22,23,24 | 151:4,23 |
| 60:21 61:12 | 30:18 49:15 | 65:8,25 66:8 | 153:19 154:24 |
| 160:7 | 67:24,24 71:10 | 67:17 69:1,3 | 155:13 157:5 |
| **terminology** | 103:17,17 | 69:19 70:3 | 157:11 161:10 |
| 55:18 57:24 | 133:14 136:10 | 71:3,7,11,15 | 161:19,23 |
| 160:15 | 175:15 176:21 | 71:22 72:13 | 162:3 163:7,15 |
| **terms** 13:13 | 176:21 | 75:25 76:15 | 164:11,23 |
| 42:3 58:18 | | 77:12,21,25 | 165:2,12,21 |

Case 2-19-20905-PRW, Doc 3116-9, Filed 05/14/25, Entered 05/14/25 22:50:13, Description: Exhibit I, Page 234 of 240

167:16,18
170:22 171:1
172:8,10 177:1
177:10,15
178:8,19
179:18,25
180:4
**thinking** 106:8
160:24 166:13
170:16 177:18
**third** 3:14
50:25 51:13,14
88:22 96:20
110:5,23
111:13 112:22
128:9 144:17
147:20 159:7
159:13
**thirds** 50:21
51:6,7,19 53:7
53:9 96:19
**thirteen** 30:13
30:15
**thirty** 139:11
**thought** 32:11
50:20 58:10
59:13,14 62:5
79:22 83:17
102:16 105:23
111:16 164:25
175:7 178:16
**thousands**
90:15
**threats** 138:6
**three** 13:16
14:3 15:2,5
23:17 45:21

67:21,22
104:16
**thrust** 40:23
**thumbs** 119:21
**thursday** 1:15
166:22,24
168:9,12,15
181:25 182:6
**ticket** 179:13
**tied** 60:17
**till** 50:11
**time** 6:5 13:1,1
13:13 15:9
29:3,9 35:1
39:24 43:23
58:15 84:8
89:5 91:12
93:8 100:18
115:14 116:2
123:1,16
125:11,16
127:25 136:12
138:21 139:21
143:11 144:20
149:16 158:25
164:23,25
165:2 168:1
176:20 177:1,9
177:15,25
178:1
**timeline** 164:9
166:3,7 167:3
181:24,25
**timing** 30:3
47:16 50:4
95:22,24 96:17
96:18 100:17

103:21 105:12
160:25 176:9
**tinkered**
170:20
**tired** 180:20
**today** 9:1 12:5
28:21 45:2
71:24 88:15
101:3,4 103:5
111:18 114:19
115:23 119:24
122:23 123:7
135:16 151:23
165:10,13,21
167:7 175:16
182:9
**together** 8:15
8:16 77:14
86:14 155:6
173:2
**toggle** 15:22
112:5 176:12
**told** 5:22 6:22
7:2 8:3 15:8
17:20 18:11
20:13 65:25
84:10 114:18
133:19 142:13
170:12 178:3
**tone** 98:15
**took** 37:18
57:17,21 83:20
111:7
**tort** 82:11
138:18
**total** 18:12
21:4,14 104:14

145:22
**totally** 45:18
57:19 59:16
85:25 86:24
92:7 117:3
157:7 181:18
181:18
**towards** 91:5
**tower** 77:14
**towers** 78:3
**town** 171:18
**traction** 57:12
82:16
**transcribed**
2:25
**transcript**
126:20 164:21
178:17 183:4
**transfer**
139:17 140:19
141:1,12
**transparency**
173:6
**treated** 105:22
**trend** 90:22
**trial** 96:17
101:25 108:14
**trials** 50:5
**tried** 29:24
36:15 37:2
38:6 42:14,22
48:17 49:7
50:2,20 114:6
173:23
**tries** 49:18,18
49:20

| | | | u |
|---|---|---|---|
| **trigger** 76:11 | 38:23 39:5,10 | 137:3 143:10 | |
| **trouble** 75:5 | 39:16,17,19 | 151:6 155:17 | **u.s.** 1:23 16:19 |
| 89:24,24 | 40:12 41:11 | 165:14 176:22 | 42:21 52:24 |
| 130:19 | 42:21 43:7 | 180:19 | 54:5,21 167:3 |
| **troubling** | 47:21 48:5,13 | **tuesday** 5:15 | **uccs** 157:21 |
| 171:16 | 55:21,22 56:24 | **tuning** 167:21 | **ugh** 178:16 |
| **true** 50:19 | 76:22 77:4,21 | **turn** 33:21 | **ultimate** 166:6 |
| 76:24 81:4,18 | 136:7,7 137:6 | 38:8 51:17 | **ultimately** |
| 95:6 96:22 | 137:7,8,9,12 | 72:22 118:2 | 18:20 40:8 |
| 104:10 113:16 | 138:11 | 144:2,23 | 115:11 |
| 144:12,16 | **trustee's** 46:21 | **twice** 119:17 | **unable** 76:17 |
| 158:11 183:4 | 52:25 54:21 | 168:2 | **uncertain** |
| **truly** 77:11 | 167:4 | **two** 6:18 14:3 | 17:12 |
| **trust** 12:19,20 | **trustees** 41:1 | 15:1,21 20:12 | **unclear** 135:25 |
| 12:22 13:20 | 55:23 82:7 | 21:6 38:16 | **under** 27:23 |
| 14:7,21 19:11 | **trusts** 76:15 | 39:15,21 50:21 | 31:7 33:21 |
| 22:10 27:22,23 | 80:17 81:1 | 51:6,7,19 53:7 | 35:7 37:11 |
| 28:2 38:1,12 | 96:13 107:16 | 53:9 55:11,22 | 49:6,8 50:24 |
| 44:18 48:5 | 130:8 135:11 | 56:22 59:15 | 51:11 52:4,5 |
| 66:25 68:7 | 136:3,5 138:19 | 61:23 67:2,11 | 62:11,14 67:8 |
| 69:21 70:25 | 141:1,2,12 | 70:19,22 72:1 | 70:5 86:6 |
| 71:6 75:13,14 | 154:3 160:20 | 76:15 80:17 | 105:22 111:8 |
| 75:24 76:25 | **try** 45:22 50:10 | 81:1 83:5 86:5 | 120:12 121:9 |
| 77:3 78:18 | 61:11 72:14 | 96:19 97:1 | 121:11,17 |
| 79:4,13 80:3 | 81:23 89:3 | 102:25 104:15 | 127:10 128:24 |
| 102:7 104:11 | 103:11 105:7,8 | 106:24 107:6 | 130:3,14 |
| 104:16,25,25 | 114:7 137:9 | 107:16 108:16 | 131:23 138:14 |
| 107:20 129:2,3 | 165:6 168:14 | 118:12 120:8 | 139:17 141:3 |
| 129:22 130:1,2 | 173:2,15 | 130:8 136:3,5 | 145:3 163:23 |
| 138:8 139:5,19 | **trying** 32:21 | 138:13 147:23 | 164:2 168:2 |
| 139:22,25 | 35:1 36:3,25 | 163:24 173:19 | **underemploy...** |
| 140:2,8,15,20 | 40:8,10 45:9 | **type** 116:11,13 | 38:19 |
| 140:21 141:13 | 50:8 53:15 | **typical** 121:12 | **understand** |
| 154:9,17 | 55:12 57:22 | **typically** | 7:14,15 14:17 |
| **trust's** 141:7 | 88:21 120:24 | 170:15 | 17:10 18:11,15 |
| **trustee** 4:2 | 122:17 124:10 | | 18:23 20:20 |
| 16:19 38:15,15 | 130:13 136:17 | | 21:12 23:25 |

Veritext Legal Solutions

24:15 25:17
32:23,24,25
35:1,3,25 36:8
40:8,10 43:24
44:9,14 47:3
49:14 56:3
58:25 81:1,4,5
87:3 89:21
92:9,21 95:3
95:19,22 103:8
120:24 123:9
123:19 127:3
127:14 147:21
148:7,17
149:12,14
152:19 153:13
153:16 160:4
179:16 180:9
180:13,24
**understandable**
55:2
**understanding**
15:12 47:13
62:2 105:22
130:20
**understands**
56:21 179:4
**understood**
85:12 97:6
112:15 142:25
172:21 175:16
176:2,24
**unfairness**
14:20
**unfold** 17:10
**unfortunate**
42:17

**unfortunately**
14:16 176:18
**uniformity**
14:24
**unilateral**
172:18
**unilaterally**
172:9,12
**unique** 54:23
**united** 1:1,11
4:1,2 43:6
**unmute** 115:6
**unnecessarily**
39:23 93:8
**unnecessary**
40:4,18 45:10
59:23 80:21
163:18
**unprecedented**
74:2
**unpunished**
77:10
**unrestricted**
113:13
**unsecured** 3:13
9:20,22 97:9
109:7
**update** 11:15
**updated** 170:8
**upstate** 145:17
**urging** 93:7
**use** 8:5,9 47:18
57:12,13 60:5
60:10 75:19
76:5 105:13
113:14 122:12
131:6,9 133:2

142:4
**used** 13:21
38:22,24 39:1
39:6,12 40:10
55:18,19,21
58:16 76:9
**usual** 176:15
**usually** 169:17
**utilizing** 39:15

**v**

**v** 109:2
**vacate** 10:11
10:18
**vacated** 10:13
**vague** 124:2
129:4,7
**valid** 24:7
102:17 103:1
**value** 76:24
84:9,13 95:6
109:11,15
111:21 138:12
**values** 88:18
95:4
**various** 124:14
154:11
**vast** 88:16
**venue** 101:24
102:22
**verdict** 86:4
87:5,7
**verdicts** 86:2,3
88:11,12
**verification**
180:12
**verifies** 179:19

**veritext** 183:20
**versa** 177:20
**version** 126:6
**versus** 39:22
57:18
**vessey** 3:5
**vest** 177:22
178:7
**vice** 177:20
**victims** 90:8
**view** 16:23
38:10 51:3
63:13,14 68:21
76:22 77:7
83:2,3,4 85:23
88:1 89:23
94:25 95:13
97:8
**viewed** 172:24
**virtually**
154:24
**virtue** 142:19
**vis** 47:17,17
71:14,14
**voice** 180:17
**voluntary**
145:12
**vote** 17:20 22:1
22:3,5 25:14
25:18 26:20,21
50:11,13,16,24
51:14 52:4,13
55:13 82:16
84:17 85:3,6
85:19 89:17,21
96:12 117:7
164:24 165:8

Veritext Legal Solutions
212-267-6868                516-608-2400

166:14 168:22
168:25 170:14
173:3,19 174:8
174:13,25
175:2,17
**voted** 52:7
**votes** 15:22
17:12 27:2,4,6
93:1 94:5
117:14 165:16
170:20 171:20
175:2,25 176:1
176:11 177:12
177:17
**voting** 25:24
26:9,11,14
27:2,6,12
28:16 134:10
134:14 164:6
170:10,18,19
171:10,12
172:12,13,25
173:9 174:6,11
175:10,14
177:11,16
181:4

**w**

**wait** 32:18 82:1
97:23 116:5
155:20,20,20
163:21 168:3,3
168:6
**waiting** 44:5
47:10 75:24,24
178:2
**waive** 41:5,11
48:6

**waived** 65:1
**walk** 18:3
29:24
**want** 6:12 8:21
9:11 15:16
17:8 32:14,25
35:4 36:12,13
48:15 50:3,13
55:3 57:5
59:13 60:10,12
61:1 68:20
70:18 74:13
80:23 82:6
84:1,25,25
85:9 86:13
87:22,24 88:2
91:9 95:9,20
96:24 97:15
98:19 99:22
100:2 101:16
102:15,16
103:1,14,24
104:16 105:10
105:11,19
107:2,10,13
110:12 114:4
114:17,18,19
114:22 115:17
116:1,3 117:11
120:9 122:15
123:17 124:12
124:12 126:25
127:15 133:6
135:19 136:24
137:15 138:1,6
141:20 142:14
142:18,23

143:8 145:9
155:11 157:13
161:4 163:14
165:14,16
166:24,25
167:2 168:9
169:18 170:7
172:12 173:16
173:17 174:22
174:25 175:9
175:12,23
178:2 181:6,7
**wanted** 8:5 9:4
10:15,16 42:23
52:15 53:7
73:24 74:7,20
76:4 82:24
95:10 96:1
104:14 172:25
**wanting** 92:3
**wants** 10:17
11:17 45:6
101:12 114:22
114:25 115:9
115:16 123:22
125:20 128:4
152:8
**warren** 12:25
15:8
**way** 6:22 8:23
23:3 26:6
31:23 44:10
46:2 52:18
54:13 55:15
60:7 91:1
124:13,25
130:5 163:22

171:8 173:6,16
173:17,22
**we've** 5:20,21
5:22 6:2,4
13:14,14 40:2
42:13,14 46:3
56:21 62:4
63:19 64:20
69:6 75:10,14
75:14 82:24
103:4 119:12
128:1 138:5
159:3 173:23
178:25
**wearing** 55:11
**website** 99:15
100:6
**wednesday**
166:18,22
168:15
**week** 8:3 9:4
25:3 166:16
168:9
**weeks** 29:2
**wel** 149:16
**welcome** 11:2
181:19
**went** 45:24
53:11 67:2
81:21 83:12
134:20 135:24
**westchester**
87:5
**whichever** 8:8
8:19 10:14
11:3

who've 47:10
willing 42:15
110:14 166:23
win 156:17
160:3
wind 15:20
110:18 171:1,2
171:3
winding 35:22
winds 46:13
170:24
wish 98:25
115:24 127:22
134:6 143:14
wishes 115:1,5
118:3,16
wishful 170:15
withdraw 8:25
won 104:9
154:22 156:16
162:6
wonderful
169:23,24
word 42:17
61:4 76:5
97:21 99:4,4
99:16,25 100:2
109:6 143:18
143:18 179:7
worded 52:19
wording
118:19 119:19
124:1,3,4,5
127:4,13,19
129:4
words 24:19
34:15 70:12

79:24 89:6
129:6 138:1
141:11 142:2
143:13 148:18
151:16 153:18
work 17:6,22
17:23 28:5
45:24 49:23,25
69:24 73:24
75:3 103:2,11
103:15 104:7
105:8,10,17,18
106:14 114:7
115:23 118:21
120:1 122:13
123:14 162:2
163:17 165:19
166:11 168:13
170:6 173:7,24
176:16,19
180:7,16
181:10,13
182:4
worked 19:18
40:11 108:2
118:21 119:21
179:24
working 12:8
50:12 108:8
117:15 120:7
173:1 175:22
180:1
works 81:24
165:22
world 44:16
58:3 92:4

worried 155:23
worry 37:24
38:3 159:4
writing 29:22
written 16:22
48:13 99:5
137:2 178:16
wrong 44:10
90:8 117:3
120:15 151:21
151:23 157:24
163:22 179:7
wrongfully 7:4
wrote 23:8
136:23 175:21
176:4

**x**

x 1:4,10 93:19
113:23

**y**

y 93:19
yeah 10:17
13:19 18:6
23:10 36:12
43:7 65:10
69:12 70:18
73:20 79:20
117:13 118:14
126:6 137:20
146:3,13,15
151:3 177:21
year 13:11
60:22 76:2
96:7
years 44:5
179:24 180:18

yesterday 6:2
12:1 96:3
york 1:2,7,13
3:6,15 4:4
11:12 55:25
77:4,23 78:20
85:21 87:16
111:6

**z**

zero 39:20
40:15 43:9
ziehl 3:12 10:8
170:2
zipes 4:6 42:19
42:20,21,21,23
43:24 52:21,23
52:24,24 53:2
53:4 54:15,17
54:19,21,21
55:3,5,9,14
56:7,13,19
57:2,2 115:25
116:1,5,7,13
116:19,21,25
127:7,10
166:25 167:2,3
167:10,13,15
178:12,14,18
178:24 179:10
179:16 180:9
180:13,24
181:6
zoom 114:20
115:1,4 121:5
zooming 69:25

Case 2-19-20905-PRW,    Doc 3116-9,    Filed 05/14/25,    Entered 05/14/25 22:50:13,
Description: Exhibit I, Page 239 of 240

| à |
|---|
| **à**  47:17 71:14 |

Veritext Legal Solutions
212-267-6868                                                                                          516-608-2400