**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| THE DIOCESE OF ROCHESTER, | ) | Case No. 19-20905 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**OMNIBUS REPLY OF
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO OBJECTIONS TO EIGHTH AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION FOR THE DIOCESE OF ROCHESTER**

The Official Committee of Unsecured Creditors (the "**Committee**") of the Diocese of Rochester (the "**Diocese**" or the "**Debtor**") files this reply (this "**Reply**") in response to the (i) *Objection of the United State Trustee (the "UST") to Confirmation of Eighth Amended Joint Plan* [Docket No. 3248] (the "**UST Objection**"), and (ii) *Objection to Confirmation and Reservation of Rights Filed Pursuant to Plan ¶12.2.2.b* filed by the Sisters of Saint Joseph of Rochester, Inc. (the "**SSJ**") [Docket No. 3246] (the "**SSJ Objection**") and in further support of the *Eighth Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester* (the "**Joint Plan**") attached as Exhibit 1 to the Bankruptcy Court approved *Disclosure Statement in Support of Eighth Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester* dated March 14, 2025 [Docket No. 3027] (the "**Disclosure Statement**"). In support of this Reply, the Committee respectfully states:

**PRELIMINARY STATEMENT**

1. The Joint Plan reflects the settlement of Abuse Claims by the Debtor, its parishes and certain other non-debtor affiliates of the Diocese (collectively, the "**Diocese Parties**"). The Joint Plan further incorporates the settlement and buyback of certain insurance policies of the Diocese and the Co-Insured Parties that the Bankruptcy Court approved after a contested hearing.

The Joint Plan creates a settlement trust (the "**Trust**") that will be funded with at least $126.35 million for the payment of Abuse Claims from the settlements with insurers and the Diocese Parties.

2. The Diocese and each of the Participating Parties receiving a release under the Joint Plan are making a meaningful contribution to resolve Abuse Claims after extensive negotiations among the parties in the form of a cash payment and/or consent to the sale of it insurance policies. Holders of Abuse Claims are deemed to consent to the releases being granted under the Plan unless the Abuse Claimant affirmatively opted out of the release. These terms were clearly described in the Disclosure Statement and the ballot served on Abuse Claimants and other parties in interest.

3. As of the Voting Deadline for acceptance or rejection of the Joint Plan, the Abuse Claimants overwhelmingly accepted the Joint Plan. No Abuse Claimants voted to reject the Joint Plan and 100% of voting Abuse Claimants voted to accept the Plan. The Abuse Claimants, who are the economic parties in interest in this case, have been waiting almost six years for resolution of this case, and decades for acknowledgment and compensation for the horrific abuse they suffered as children. The Abuse Claimants have demonstrated their overwhelming support for the Joint Plan, and it is time for the Joint Plan to be confirmed.

4. Neither the UST nor SSJ have an economic stake in the outcome of this case. Neither is an Abuse Claimant. SSJ is not even a creditor of the Debtor. The UST and SSJ raise meritless objections to the Joint Plan, arguing, among other things, that the Abuse Claimants are being treated unfairly or are not truly consenting to the Third-Party Releases, and so should be deprived of the benefits of the Joint Plan that creates a Settlement Trust with over $123 million dollars to compensate them. These stake-less objectors should not be allowed to pull the rug out from under the Abuse Claimants just as they are about to finally achieve resolution in this case.

5.	The UST's primary objection to confirmation is that the Joint Plan provides for non-debtor third party releases that it says are not consensual under the Supreme Court's decision in *Harrington v. Purdue Pharma, L.P.,* 144 S. Ct. 2071 (2024) ("**Purdue**") because the Abuse Claimants do not have to affirmatively opt-in to the Third-Party Releases.  While the UST has repeatedly raised this objection to plans, such as this one, that rely on an opt-out mechanism for consent to third-party releases, the UST has repeatedly lost this objection, including in other Diocesan cases.

6.	The Joint Plan should be no exception.  In fact, the Court determined[1] this issue when it approved the Disclosure Statement and Solicitation Procedures.[2] In the Disclosure Statement Order, the Bankruptcy Court expressly found that the opt-out mechanism proposed by the Plan Proponents satisfied the consent requirements of *Purdue*.  Disclosure Statement Order ¶ H.

7.	The Disclosure Statement Order goes on to make clear that failing to submit a timely Ballot or not affirmatively electing to be treated as a Non-Consenting Class 4 Claimant shall be deemed consent to the Third-Party Releases in the Joint Plan:

> Any Class 4 Claimant who: (i) votes to accept the Joint Plan; (ii) votes to reject the Joint Plan, but does not affirmatively elect treatment as a Non-Consenting Class 4 Claimant in "Item 3" of the Class 4 Ballot; or (iii) fails to submit a timely Ballot, shall be deemed to consent to the Third-Party Releases in the Joint Plan unless they file a timely objection to confirmation of the Joint Plan indicating that they are withholding their consent to the Third-Party Releases.

Disclosure Statement Order ¶ 28.

---

[1] Notwithstanding that the Court has already ruled on this issue, the UST attempts to relitigate the matter arguing that in the Disclosure Statement Order the Court expressly reserved confirmation objections.  UST Obj  fn 2.

[2] *Order (I) Approving Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving the Form of Ballots and Establishing  Procedures for Voting on Eighth Amended Joint Plan and for Electing to Grant or Withhold Consent to Third-Party Releases; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Eighth Amended Joint Plan; and (VI) Granting Related Relief* [Docket No. 3031] (the "**Disclosure Statement Order**").

8. For its part, SSJ's rambling and, at times, incoherent, objection primarily complains that somehow SSJ's rights as a co-defendant in outstanding state court litigation may be impaired under the Joint Plan.[3] However, this is incorrect because Section 15.11 of the Joint Plan states quite clearly that SSJ and other defendants in litigation retain their state law rights regarding apportionment of liability and will retain the rights they would have had in any litigation where the plaintiff settles with a co-defendant. The Joint Plan goes to great lengths to avoid limiting any rights of a non-settling party.

9. Under New York law, nothing prevents a plaintiff from settling with one defendant (or more) in a multi-party tort action and resolving that defendant's liability. The Joint Plan does nothing more than effectuate a settlement between the Abuse Claimant plaintiffs and the Protected Parties. It does not affect SSJ's treatment or rights any more than any settlement in a multi-party tort case. Here, the Protected Parties are all making meaningful contributions to the Joint Plan in order to settle their liability in those actions. The Joint Plan expressly preserves SSJ's rights, whatever they may actually be, under New York law, including, but not limited to, General Obligations Law §15-508.

10. As with the UST, SSJ also takes upon itself the unasked role of objecting on behalf of Abuse Claimants. The Abuse Claimants spoke with their votes. 100% of those voting voted to accept the Joint Plan. The Third Party Releases in the Joint Plan are consensual and do not violate the Supreme Court's ruling in *Purdue*.

11. The other objections of the UST and SSJ, as will be discussed below, are equally meritless and should be overruled.

---

[3] Given the difficulty in deciphering SSJ's objection, the Committee reserves the right to address or clarify arguments about SSJ's objection at the confirmation hearing.

# ARGUMENT

B. **The UST Objection**

12. The UST's fundamental objection to the Joint Plan, including the settlements with the Settling Insurers (which, as the UST acknowledges, the Court has already approved), is that the Joint Plan provides for non-debtor third-party releases in violation of *Purdue*.

13. This Court, after full briefing and argument on the issue, determined that the Third-Party Releases being granted through the Joint Plan are consensual. Disclosure Statement Order ¶ 28. It is now law of the case that the opt-out mechanisms in the Solicitation Procedures met the standard of *Purdue* for consent to the Third-Party Releases in the Joint Plan, and the Court should not entertain the UST's attempt to re litigate the consent issue.

14. The Court's ruling is consistent and in-line with a number of courts that have addressed this precise issue (and these precise objections) following *Purdue*.

15. In the bankruptcy case of the Diocese of Syracuse, the bankruptcy court determined that "the opt-out mechanism proposed in this case does not violate [Purdue]." *In re Roman Catholic Diocese of Syracuse,* 667 B.R. 628, 632-636 (Bankr. N.D.N.Y. 2024) (the "**Syracuse Decision**"). The *Syracuse* Court reviewed substantial Second Circuit case law and held, under the facts and circumstances of the Roman Catholic Diocese of Syracuse case, which are very close to the facts here, an opt-out mechanism (identical to the opt-out mechanism approved in the Disclosure Statement Order) was an appropriate method of determining whether an Abuse Claimant could be deemed to consent to the injunctive and release provisions of the plan. *Id.* at 636.

16. Through its Objection, the UST attempts to advance a theory of consent that is impractical, unworkable, and at odds with a substantial body of caselaw. It is noteworthy that the

Supreme Court in *Purdue* expressly declined to weigh in on the question of how bankruptcy courts should ascertain consent, and thus *Purdue* offers no support for the UST's position.

17. The court likewise approved an opt-out procedure in the *Spirit Airlines* case pursuant to a memorandum decision that undertook a thorough examination of the relevant pre- and post-*Purdue* case law, including citing liberally and approvingly to the Syracuse Decision to ultimately conclude that the choice of whether to accept an opt-out procedure as indicative of consent should be left to the sound discretion of the bankruptcy court in consideration of the specific facts and circumstances of each case. *In re Spirit Airlines, Inc.*, 668 B.R. 689, 706-711 (Bankr. S.D.N.Y. 2025).

18. Similarly, Judge Glenn recently followed and expanded on the *Spirit Airlines* reasoning in overruling similar objections by the UST and finding third party releases consented to through an opt-out mechanism to be consensual, rejecting the UST's arguments that state contract law should govern the question of consent:

> There is a more fundamental reason why federal, not state, law applies to releases. It is because of the nature of the right at stake. The right which creditors are giving up by consensually releasing claims against third parties in a bankruptcy court is the right to have their claims heard by an Article III court, which, when they submit to releases, the creditors are waiving. This is a personal constitutional right which is protected by federal Constitutional law, and which is therefore subject to waiver.

*In re GOL Linhas Aéreas Inteligentes S.A.*, No. 24-10118 (MG), 2025 Bankr. LEXIS 1250, at *72 (Bankr. S.D.N.Y. May 22, 2025).

19. Judge Glenn went on to rule that, given the court's approval of the release mechanism, the plan's injunction provisions were also wholly appropriate and within the court's jurisdiction. *Id.* at *89-90.

20. Moreover, any reversal of the Court's prior decision at this point would subject the Diocese and Abuse Claimants to severe prejudice as, at a minimum, it would require the

expenditure of significant resources and additional delay to again revise the Joint Plan, Disclosure Statement and balloting materials (which have already been revised, redistributed, and revoted once in light of *Purdue*), and to resolicit votes to accept or reject a Joint Plan that has already been overwhelmingly approved by Abuse Claimants on two occasions.

21. The UST also takes issue with the channeling of Medicare Claims[4] and Extra-Contractual Claims.[5] Extra-Contractual Claims, however, are not claims against the Diocese or the Participating Parties but instead are potential claims that the Diocese and/or Participating Parties hold against insurers for failure to properly handle Claims for coverage. To the extent those claims exist against Settling Insurers, the Joint Plan provides for the protection of the Settling Insurers by channeling those Extra-Contractual Claims to the Trust. But the Diocese and the Participating Parties are expressly consenting to that channeling injunction.

22. The Committee respectfully submits, as this Court has already determined, that the Joint Plan properly employs an opt-out mechanism to establish the Abuse Claimants' consent, and none of the injunctions or releases provided for in the Joint Plan run afoul of *Purdue*. Accordingly, the Court should overrule all *Purdue*-based objections in their entirety.

**C. The SSJ Objection**

23. The SSJ Objection appears to raise the following primary objections[6] to the Joint Plan: (i) SSJ's rights as a co-defendant under New York General Obligations Law 15-108 and

---

[4] Medicare Claims are claims that a division of the federal government may have against individual Abuse Claimants or Settling Insurers seeking to recoup prior Medicare payments to those Abuse Claimants. Medicare Claims will be paid in full by the Trust or the implicated Abuse Claimant from the settlement funds allocated to that claimant, and thus the channeling of a Medicare Claim to the Trust does not violate *Purdue*. To the extent a Medicare Claim is asserted against a Settling Insurer, such claim is properly channeled to the Trust in aid of the section 363(f) buyback of the Settling Insurer's policy free and clear of all liens, claims and interests.

[5] The UST included these objections in the UST DS Objection (as defined in the UST Objection) and incorporated those objections in its current objection.

[6] The Committee may not have responded to every issue raised by the SSJ as the Committee believes that many of the issues raised by SSJ do not warrant discussion. However, in not responding, the Committee is not waiving any

other state law protections for co-defendants are impaired under the Joint Plan, (ii) Claimants in Class 5 of the Joint Plan are not being treated fairly, (iii) SSJ's Class 5 Claim is not being treated fairly and is subject to unfair discrimination, (iv) the Joint Plan does not provide equal treatment of Class 4 Claimants, (v) SSJ's rights against the Diocese's insurance policies are being impermissibly impaired; and (vi) the Joint Plan is not proposed in good faith. All of SSJ's objections lack merit.

D.  **SSJ'S Objections Should be Overruled**

24.   *First*, the Joint Plan expressly preserves the rights of SSJ and other co-defendants in state court litigation. Section 15.11 of the Joint Plan provides that nothing in the Plan and related documents:

- shall be deemed to affect in any way the ability of any Tort Defendant to exercise any claims, demands, causes of action, powers, defenses, setoffs, and other limitations, rights, remedies, and privileges of any nature or description ("Litigation Rights") that such Tort Defendant may have under applicable state and federal law in connection with any Tort Action;[7]

- shall prevent any Tort Defendant from asserting in any Tort Action that any distribution made by, on behalf of the Diocese or a Protected Party or made by reason or because of or related to this Plan to or on account of an Abuse Claimant should be treated as a payment by a joint tortfeasor to settle the Abuse Claimant's Claim for purposes of New York law, including, but not limited to General Obligations Law ("GOL") 15-108 and Civil Practice Law and Rules ("CPLR") Articles 14 and 16.

- shall prevent any Tort Defendant from seeking discovery and/or testimony from the Diocese, the Protected Parties, the Abuse Claims Reviewer (including, for the avoidance of doubt, in connection with a Supplemental Submission to the Abuse

---

arguments with respect to SSJ's Objection and will be prepared to respond at the hearing to any issues raised by the SSJ that the Court believes merit argument.

[7] This does protect the settlement of the Protected Parties' liability for the Abuse Claims provided for by the Joint Plan, as would be the case if the Protected Parties were settling such claims under state law. *See, e.g. George S. Kaufman Charitable Found. v. Kearns*, 2022 N.Y. Misc. LEXIS 3816 (May 16, 2022), 2022 NY Slip Op 31595(U), ¶ 2 (Sup. Ct.). The impact of such settlement on the apportionment of liability or any judgment reduction is preserved. Similarly, SSJ's assertions (SSJ Obj. ¶¶ 34-35) that the Joint Plan violates *Stern v. Marshall*, 664 U.S. 462 (2011) are baseless as the Bankruptcy Court is ***not*** making any determination of the underlying tort liability of any party to any Abuse Claimant.

> Claims Reviewer), the Trustee, or any Abuse Claimant in connection with any Tort Action, in accordance with applicable rules of civil procedure.

Joint Plan § 15.11 (emphasis added).

25. Indeed, the general purpose of the NY General Obligations Law "is to encourage settlements," and to "permit a defendant to settle with plaintiff without fear of being brought back into the action by another defendant seeking contribution." *George S. Kaufman Charitable Found. v. Kearns*, 2022 N.Y. Misc. LEXIS 3816 *2-3.

26. *Second*, SSJ is not a creditor of the Diocese at all, and it has not filed or asserted a Class 4 or Class 5 Claim against the Debtor. SSJ therefore has no standing to object to the treatment of creditors in those Classes.

27. SSJ never filed a claim in the Bankruptcy Case and so any purported claim is now barred pursuant to the Bar Date Order.[8] Moreover, SSJ itself admitted that it failed to file a proof of claim and that any such claim "could not be allowed in the first instance." [Docket No. 2434] at ¶ 12.

28. *Third*, SSJ has no rights to any Diocese insurance policy and so it has no rights that are impaired by Diocese's settlement with the Settling Insurers. SSJ's convoluted argument in support of this assertion does not make any sense.

29. . To the best the Committee can discern, SSJ argues that it is entitled to insurance coverage because certain unnamed Abuse Claimants have allegedly asserted alter-ego or veil-piercing type arguments in connection with SSJ, the Debtor, and the Participating Parties. SSJ Obj. ¶ 100.[9] Importantly, however, SSJ is ***not*** named as an insured under the Debtor's polices. And, it

---

[8] Additionally, any such claim based on indemnity or contribution from the Diocese would be disallowed pursuant to section 502(e)(1)(B) of the Bankruptcy Code, as an unliquidated and contingent claim for reimbursement or contribution.

[9] *Id.* ("If Abuse Claimants can prevail in establishing the SSJ and a Protected Party are one and the same, then the SSJ is the insured or an additional insured and, at the very least, entitled to be defended by the insurers providing policies implicated by Abuse Claimant's assertions in joint tortfeasor actions.").

cannot become an insured simply because an alter ego argument has been raised. *See, e.g., Kaufman & Broad Home Corp. v. Emps. Mut. Cas. Co.*, No. 2-06-383-CV, 2008 WL 281530, at *3 (Tex. App. Jan. 31, 2008) ("The fact that one non-insured entity is purportedly sued for the actions of another insured entity does not magically metamorphose a non-insured into an insured. This is a logic-challenged idea."); *Certain Underwriters at Lloyd's, London, Subscribing to Pol'y No. 501/NB03ACMD v. Nance*, 506 F. Supp. 2d 700, 715 (D.N.M. 2007) (refusing to enlarge coverage based on alter-ego theory).

30. Even if SSJ could manufacture some colorable basis to assert an interest in the Diocese's insurance policies, the Bankruptcy Court has already approved the Diocese's settlement with the Settling Insurers after notice and hearing. SSJ failed to file or raise any objection to the settlement with the Settling Insurers and should be estopped from now challenging the terms of those settlements now.

31. *Finally*, the Joint Plan is being proposed in good faith after lengthy and arms-length negotiations among the key constituencies. The fact that the Plan Proponents have not made the changes requested by SSJ does not mean that the Joint Plan is not being proposed in good faith. As will be demonstrated at the confirmation hearing, all of the provisions of the Joint Plan have been carefully drafted and are in accordance with the Bankruptcy Code such that any impact the Joint Plan may have on an actual right of SSJ with respect to the Diocese or Participating Parties will be in accordance with applicable law.

32. All of SSJ's objections to confirmation of the Joint Plan should be overruled.

## **CONCLUSION**

**WHEREFORE**, the Committee respectfully requests that the Court overrule the UST Objection and the SSJ Objection and confirm the Joint Plan.

Date: July 22, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Ilan D. Scharf*
James I. Stang (admitted *pro hac vice*)
Ilan D. Scharf
Karen B. Dine
Jeffrey M. Dine
1700 Broadway, 36th Floor
New York, NY 10019
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Email: ischarf@pszjlaw.com
kdine@pszjlaw.com
jdine@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

**BURNS BAIR LLP**
Timothy W. Burns (admitted *pro hac vice*)
Jesse J. Bair (admitted *pro hac vice*)
Nathan M. Kuenzi (*pro hac vice* pending)
10 E. Doty Street, Suite 600
Madison, WI 53703
Telephone: (608) 286-2302
Email: tburns@burnsbair.com
jbair@burnsbair.com
nkuenzi@burnsbair.com

*Special Insurance Counsel to the Official Committee of Unsecured Creditors*