UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

THE DIOCESE OF ROCHESTER, Debtor.

Case No. 19-20905

Chapter 11 Case

**THE DIOCESE OF ROCHESTER'S REPLY TO OBJECTIONS TO CONFIRMATION OF THE EIGHTH AMENDED JOINT CHAPTER 11 PLAN FOR THE DIOCESE OF ROCHESTER FILED BY THE UNITED STATES TRUSTEE AND THE SISTERS OF ST. JOSEPH OF ROCHESTER, INC.**

The Diocese of Rochester, (the "Diocese"), by and through its undersigned counsel, hereby respectfully submits this reply to the objections to confirmation of the *Eighth Amended Joint Chapter 11 Plan for The Diocese of Rochester* [Docket No. 3026] (the "Plan")[1] filed by the United States Trustee (the "UST") [Docket No. 3248] and The Sisters of St. Joseph of Rochester, Inc. ("SSJ") [Docket No. 3246]. As and for its reply, and in support of confirmation of the Plan, the Diocese respectfully represents as follows:

**A) THE UST OBJECTION**

1. The UST raises four primary objections. First, the UST argues that the Plan impermissibly contains non-consensual third-party releases in violation of the Supreme Court's decision in *Harrington v. Purdue Pharma*, 603 U.S. 204 (2024). Second, and relatedly, the UST challenges this Court's jurisdiction to issue a permanent injunction in support of the Plan's third-party release provisions. Third, the UST complains that the Plan's exculpation provisions are overly broad. Fourth, the UST argues, in self-interested fashion, that it should be allowed to assess

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

fees on distributions made by non-debtor entities from funds that the Diocese does not control.[2] Each of the UST objections should be overruled for the reasons set forth below:

**(i) <u>Creditors who have not opted out of third-party releases are deemed to consent</u>**

2. The UST's objection with respect to third-party releases is essentially an attempt to re-litigate the UST's policy position that such releases are non-consensual absent an affirmative manifestation of consent made in accordance with state-law contract principles. This Court previously rejected that argument in connection with approving the Diocese's disclosure statement and solicitation procedures when it joined the growing number of bankruptcy courts who have found, post-*Purdue*, that an opt-out mechanism can be used to confirm consent to third-party releases under appropriate facts and circumstances. Specifically, this Court found that:

> The procedures proposed in the Motion for confirming a Class 4 Claimant's consent to the Joint Plan's Third-Party Releases, including the procedures for a Class 4 Claimant to elect alternative treatment as a Non-Consenting Class 4 Claimant and to withhold their consent to the Third-Party Releases, are fair and equitable. The materials to be contained in the Solicitation Packages will provide each Class 4 Claimant with sufficient notice and information to make a determination whether to consent to the Third-Party Releases or withhold their consent and elect treatment as a Non-Consenting Class 4 Claimant.

*See Order (I) Approving Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving the Form of Ballots and* ***Establishing Procedures for Voting on Eighth Amended Joint Plan and for Electing to Grant or Withhold Consent to Third-Party Releases****; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of Eighth Amended Joint Plan; and (VI) Granting Related Relief*, Docket No. 3031

---

[2] The UST also asserts a preemptive objection to a waiver of the 14 day stay of a Confirmation Order imposed by Bankruptcy Rule 3020(c), however, as the UST acknowledges, no such waiver has been requested.

(the "Solicitation Procedures Order") at p.3 ¶ H (emphasis added). The Solicitation Procedures Order further approved an opt-out mechanism to determine whether Class 4 Claimants consent to the Plan's releases:

> **Any Class 4 Claimant who: (i) votes to accept the Joint Plan; (ii) votes to reject the Joint Plan, but does not affirmatively elect treatment as a Non-Consenting Class 4 Claimant in "Item 3" of the Class 4 Ballot; or (iii) fails to submit a timely Ballot, shall be deemed to consent to the Third-Party Releases in the Joint Plan unless they file a timely objection to confirmation of the Joint Plan indicating that they are withholding their consent to the Third-Party Releases.**

*Id*. at p.13 ¶ 27 (emphasis in original).

3. The UST did not appeal the Solicitation Procedures Order, nor did the UST seek reconsideration of the Court's determination that an opt-out process is sufficient to determine consent. Accordingly, the Diocese respectfully submits that the Court's findings and conclusions in the Solicitation Procedures Order are now law of the case and the UST should be estopped from attempting to relitigate those findings and conclusions in connection with confirmation.[3]

4. Moreover, the Diocese has now expended considerable time and resources pursuing confirmation of the Plan in accordance with, and in reliance upon, the terms of the Solicitation Procedures Order, and it would be inequitable for the Court to now reverse its earlier determination and require re-solicitation of the Plan. This is especially true because over 99% of Class 4 Claimants who returned ballots have affirmatively accepted the Plan and there can therefore be no question as to whether those claimants have given consent.

---

[3] Indeed, the UST acknowledges that its objections regarding the opt-out procedure have been overruled. *See* UST Objection at p. 15, Solicitation Procedures Order at p. 4 ¶ 2. Although the Court did preserve certain confirmation-related objections, the Diocese respectfully submits that the Solicitation Procedures Order settled the opt-in/opt-out debate in this Chapter 11 Case, and any confirmation objections relating to consent for third party releases must be evaluated in the context of the opt-out process that the Court has already approved.

5. Even if the Solicitation Procedures Order could be interpreted to preserve for the UST a challenge to the opt-out process, the UST's arguments that state-law contract principles require an affirmative opt-in to third-party releases is misguided, and has been rejected by courts both before and after the Supreme Court's *Purdue* decision.

6. Most notably, Judge Kinsella recently held that an opt-out procedure was appropriate to ascertain consent of abuse claimants to third-party releases of parishes and other non-debtor Catholic entities who were alleged to share liability for such abuse in another diocesan chapter 11 case involving facts almost identical to this Chapter 11 Case. *In re Roman Catholic Diocese of Syracuse*, 667 B.RT. 628 (Bankr. N.D.N.Y. 2024). Judge Kinsella noted that pre-*Purdue* case law within the Second Circuit supported opt-out releases under appropriate circumstances, and that the Supreme Court in *Purdue* expressly declined to weigh in on how to measure consent. *Id.* at 632-33 (citing to *In re LATAM Airlines Grp. S.A.*, Case No. 20-11254 (JLG), 2022 Bankr. LEXIS 1725 (Bankr. S.D.N.Y. June 18, 2022) for the proposition that "courts in this district routinely approve opt out release language in cases in which creditors and interest holders have been provided with a clear and prominent explanation of the opt out procedure[,]" and *In re Avianca Holdings S.A.*, 632 B.R. 124, 137 (Bankr. S.D.N.Y. 2021) which held that "[i]f a creditor with a right to vote is sent a ballot that clearly explains that the ballot must be returned and the opt-out box checked if the creditor elects not to approve the third-party release, the release is effective as to that creditor.")). Judge Kinsella also analogized the situation before her to a class action, and found that a creditors' committee comprised entirely of survivors of abuse could serve as a representative for all abuse survivors, subject to each survivor being given notice and the opportunity to opt out. *Id.* at 634; *see also Diocese of Buffalo v. JMH 100 Doe (In re Diocese of Buffalo)*, 623 B.R. 354, 357-58 (Bankr. W.D.N.Y. 2020) (holding that section 1103 of the

Bankruptcy Code empowers a creditors' committee to act as an agent for abuse claimants in negotiating an agreement regarding the treatment of claims against non-debtor related entities, subject to each survivor's right to receive notice and reject the committee's agreed resolution.).

7. In *Spirit Airlines*, Judge Lane cited Judge Kinsella's decision in *Syracuse* approvingly and similarly rejected the UST's argument that consent may only be governed by state-law contract principles. *In re Spirit Airlines*, 668 B.R. 689 (Bankr. S.D.N.Y. 2025). In doing so, Judge Lane observed that "the question about whether a creditor has agreed to certain treatment is a matter of federal bankruptcy law, with an already existing and well-developed body of case law on consent in the context of a collective bankruptcy proceeding." *Id*. at 716. Notwithstanding his primary holding that consent can be determined by reference to federal bankruptcy law, Judge Lane went further in his analysis and found that, even if he were to apply state-law contact principles, most classes of creditors before him could be deemed to consent to the plan's releases through their inaction. *Id*. at 717-21 (citing to the Restatement (Second) of Contracts § 69, cmt. a (1981) and identifying "circumstances where silence and inaction will operate as an acceptance[.]").

8. The UST's state-law contract arguments were dealt a further blow only a few months later when Judge Glenn again overruled the UST's objections to an opt-out process and affirmed that consent may be determined in accordance with federal bankruptcy law. *In re Gol Linhas Aéreas Inteligentes S.A.*, __ B.R. __, 2025 Bankr. LEXIS 1250 (Bankr. S.D.N.Y. May 22, 2025). In doing so, Judge Glenn observed that, while the Fifth Circuit has long prohibited non-consensual third-party releases, courts in that circuit "have long allowed releases via opt-outs, and they continue to do so post-*Purdue*." *Id*. at *69 (citing *In re Robershaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024)). Judge Glenn found that:

> In short, the caselaw strongly indicates that court[s] in the Fifth Circuit find that bankruptcy courts have authority under *federal* law, most likely section 1123(b)(6), to grant consensual third-party releases, as they assess the validity of those releases under a federal, not state, law rubric. This logic existed prior to *Purdue* and survives it.

*Id*. at *71.[4] Judge Glenn buttressed his analysis by harmonizing the tension between the holding in *Purdue* and the Supreme Court's prior decision in *United States v. Energy Resources Co.*, 495 U.S. 545 (1990). As noted by the *Purdue* dissent:

> The plan provision in *Energy Resources* operated akin to a non-debtor release: It reduced the potential liability of a non-debtor (the debtor's officers) to another non-debtor (the IRS). *Energy Resources* therefore further demonstrates that plan provisions under §1123(b)(6) can affect creditor–non-debtor relationships."

*Purdue*, 603 U.S. at 265-66 (dissent). Judge Glenn therefore reasoned:

> Aware, because of the dissent, of the tension between *Energy Resources* and its holding, the *Purdue* majority could have overruled *Energy Resources* entirely. The fact that it did not, but instead let stand a case that is best read as permitting chapter 11 plans to affect creditor-non-debtor relationships, suggests that the majority at the Supreme Court would permit plans to feature consensual releases pursuant to section 1123(b)(6) – *i.e.*, that a consensual third-party release can be *part of a chapter 11 plan* and need not be a standalone contract.

*Gol Linhas*, 2025 Bankr. LEXIS at * 65 (emphasis in original). Judge Glenn went on to explain that:

> the best reading of *Energy Resources* and *Purdue* is that third parties *can* be released from creditors' claims *by operation of law* – by entry of a chapter 11 plan by a bankruptcy court – pursuant to section 1123(b)(6), so long as there is *consent to the bankruptcy court's jurisdiction over the claim.*

* * *

[4] Judge Glenn also astutely observed that "[a]pplying state contract law would lead to chaos" because there is no clear answer as to what state's law should apply. *Id*. at *74.

> If the creditor has consented to the bankruptcy court's jurisdiction over non-core claims, the court can issue a final order and thereby release the claim.

*Id*. at *77-80 (emphasis in original). Lastly, Judge Glenn found that, under applicable Supreme Court precedent, consent to the bankruptcy court's jurisdiction may be implied, rather than express. *Id.* at *80-85 (citing to *Roell v. Withrow*, 538 U.S. 580 (2003)).[5]

9. The Diocese respectfully submits that the Court should not revisit its prior, and correct, determination that consent to the third-party releases set forth in the Diocese's Plan may be appropriately determined by use of the opt-out procedure approved in the Solicitation Procedures Order. Even if that issue was still open and awaiting resolution, however, there is ample case law, both pre- and post-*Purdue*, confirming that the UST's position requiring an affirmative opt-in process is not required.

**(ii) <u>The Court has both jurisdiction and a proper basis to issue injunctive relief</u>**

10. The UST argues that "[b]ecause the third-party releases are non-consensual, this Court may not approve the injunction that implements them." UST Objection at p.19. This argument fails for several reasons. As demonstrated above, the UST begins from the false premise that the third-party releases are non-consensual; rather, here all, or nearly all, third-party releases contemplated in the Plan are *consensual* releases, which are not constrained by *Purdue* in any way. Moreover, to the limited extent any claims released under the Plan could be characterized as being released on a non-consensual basis, the Court has the jurisdiction and authority to issue an injunction enjoining such claims notwithstanding the holding in *Purdue*. This is because such releases and injunctions are necessary to support and effectuate settlements between and among

---

[5] The UST appealed Judge Glenn's decision in *Gol Linhas*, however, the District Court for the Southern District of New York denied the UST's application for a stay pending appeal. 2025 U.S. Dist. LEXIS 109199 (S.D.N.Y. June 5, 2025).

the Diocese, the Participating Parties and the Settling Insurers, including the Settling Insurers' repurchase of their policies free and clear of liens, claims or other interests pursuant to clear statutory authority under section 363(f) of the Bankruptcy Code and/or because the Plan provides for the full satisfaction of such enjoined third-party claims.

11. Just last month, this Court overruled these same flawed jurisdictional arguments when they were advanced by the UST in opposition to the Diocese's motion for approval of its insurance settlement agreements.[6] In doing so, the Court joined several other courts that have held that bankruptcy courts can issue injunctive relief in support of a sale "free and clear" of claims or other interests pursuant to section 363(f) of the Bankruptcy Code. *See, e.g., In re Commercial Express*, ___ B.R. ___, 2025 Bankr. LEXIS 1261 at *21 (Bankr. M.D. Fla. May 22, 2025) ("*Purdue* did not address sales of estate property and did not involve injunctive relief necessary to a settlement involving estate property . . . . Section 363(f) expressly authorizes sales free and clear of any interest if such interest is in bona fide dispute, § 363(f)(4), or if the holder of the interest could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest, § 363(f)(5)."); *In re Hopeman Bros., Inc.*, 667 B.R. 101, 106-108 (Bankr. E.D. Va. 2025) (citing *Markland v. Davis (In re Centro Grp., LLC)*, 2021 U.S. App. LEXIS 32962 (11th Cir. Nov. 5, 2021) in distinguishing injunctions that are integral to the settlement and buy-back of insurance policies from general injunctions in aid of a debtor's reorganization and noting that "the Court has not found, and has not been pointed to, any decision extending *Purdue's* decision to § 363 sales"); *In re Roman Catholic Diocese of Rockville Centre*, 665 B.R. 71, 88-89 (Bankr. S.D.N.Y. 2024) (noting that courts routinely grant injunctive relief without requiring an adversary proceeding as

---

[6] *See Objection of The United States Trustee to the Motion for Entry of Orders Pursuant to Sections 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement Agreements and Policy Buy-Backs with Certain Insurers and Granting Related Relief* [Docket No. 3169].

part of a "free and clear" sale); *In re Bird Global, Inc.*, Case No. 23-bk-20514-CLC (Bankr. S.D. Fla. Aug. 2, 2024) (approving bar order and channeling injunction related to insurance settlement and policy buy-back), *aff'd sub nom Wright v. Bird Global, Inc.*, Case No. 24-cv-23086, 2025 U.S. Dist. LEXIS 111111 (S.D. Fla. June 11, 2025).

12. There is also no merit to the UST's contention that "the Settling Insurer Injunction was not provided to creditors when they voted on the Plan."[7] Although the actual language of the Settling Insurer Injunction is set forth in the Court's orders approving the insurance settlement agreements, the scope and impact of the Settling Insurer Injunction was fully discussed and disclosed in the Disclosure Statement that each voting creditor received with their ballot.[8]

13. Lastly, the UST's complaint that the Plan improperly releases direct claims against Settling Insurers is a red herring. As the Court acknowledged in connection with approving the insurance settlements, New York law does not generally allow personal injury plaintiffs to proceed directly against an alleged tortfeasor's insurer. *Lang v. Hanover Ins. Co.*, 3 N.Y. 3d 350 (N.Y. 2004). Such direct actions may only be brought derivatively to enforce the rights of an insured for coverage after a plaintiff obtains a judgment, serves the defendant with notice of entry of such

---

[7] UST Objection at p. 20.

[8] *See Disclosure Statement in Support of Eighth Amended Joint Chapter 11 Plan of Reorganization for The Diocese of Rochester* dated March 14, 2025 [Docket No. 3027] at pp. 43-44 (". . . the Channeling Injunction and Settling Insurer Injunction respectively prohibit any Person (including all Litigation Claimants) from asserting, enforcing, or attempting to assert or enforce any Channeled Claim or Barred Claim against any Settling Insurer Releases, any Settling Insurer's Related Persons, or the assets or property of either of the foregoing (including Purchased Property)."), p. 44 ("Consenting Class 4 Claimants may not under any circumstance recover any Channeled Claims (including Abuse Claims) or Barred Claims from any Settling Insurer Releasees, any Settling Insurer's Related Persons, or the assets or property of either of the foregoing (including Purchased Property); all such Claims are subject to the Channeling Injunction and Settling Insurer Injunction and are released as set forth in the Plan."), p. 86 (". . . subject to and upon payment of a Settling Insurer's Insurance Settlement Amount, such Settling Insurer shall have no liability whatsoever for any Channeled Claim or Barred Claim, and the Channeling Injunction and Settling Insurer Injunction prohibit any Person (including all Litigation Claimants) from asserting, enforcing, or attempting to assert or enforce any Channeled Claim or Barred Claim against any such Settling Insurer, its corresponding Settling Insurer Releasees, its Related Persons, or the assets or property of any of the foregoing (including the Purchased Property of such Settling Insurer).").

judgment, and the judgment remains unsatisfied for thirty days. N.Y. INSURANCE LAW § 3420(b)(1); *D'Arata v. New York Cent. Mur. Fire Ins. Co.*, 76 N.Y. 2d 659 (N.Y. 1990) (plaintiff proceeding under § 3420(b)(1) "'stands in the shoes of the insured' . . . . as subrogee of the insured's rights. . . ."). None of the Abuse Actions against the Diocese or other Participating Parties have progressed to the point of judgment, much less gone unsatisfied for thirty days. Accordingly, the only parties who could conceivably hold Extra-Contractual Claims or other direct action claims against the Settling Insurers are the Diocese and the Participating Parties, all of whom support the Plan and its injunctive provisions with respect to such claims.

**(iii) <u>The Plan's exculpation provisions are appropriate</u>**

14. "Exculpation provisions are designed to 'insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring.'" *In re Genesis Global Holdco, LLC*, 660 B.R. 439, 527 (Bankr. S.D.N.Y. 2024) (quoting *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019)). "[U]nder the proper circumstances, exculpation is not limited to estate fiduciaries." *Id*.

> [A] proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions. If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations.

*Aegean Marine*, 599 B.R. at 721. Where a non-estate fiduciary has been actively involved in, and made significant contributions to, the resolution of a chapter 11 case, they are entitled to benefit from a broad exculpation provision. *LATAM Airlines*, 2022 Bankr. LEXIS at *159.

15. The Plan defines "Exculpated Parties" as "the Diocese, the Reorganized Diocese, the Diocese's Professionals, the Committee, the Committee's Professionals, the Mediators, and

the Participating Parties." Plan at § 1.1.83. The UST objects to the Plan's exculpation provision applying to the Reorganized Diocese and its agents and advisors based upon the mistaken belief that these are "parties that do not yet even exist as of confirmation." That is simply not the case here. As drafted, the Plan contains an option for the Diocese to form a new entity to serve as the Reorganized Diocese. The Diocese has elected not to form a new entity. Therefore, under the Plan, the "Reorganized Diocese" is simply the existing Diocesan corporation, on and after the Effective Date, after giving effect to the operative provisions of the Plan. *See* Plan at § 1.1.165. Accordingly, inclusion of the Reorganized Diocese and its agents and advisors as Exculpated Parties is entirely proper.

16. It is not clear to the Diocese if the UST is also objecting to exculpation of the Participating Parties, however they are also appropriately included within the scope of the Plan's exculpation provision. The non-debtor Participating Parties were integrally involved in the mediation process that led to the Plan's formulation and they are also making substantial contributions of money and insurance rights, without which the Plan would not be feasible. The Participating Parties are thus precisely the type of non-estate fiduciary that Courts have found to be entitled to exculpation. *See, e.g.*, *Genesis Global*, 660 B.R. at 529 ("Parties who made substantial contributions to the reorganization process and whose inclusion in the exculpation provision was a critical component in forming a plan have been found to be entitled to exculpation.") (citing cases).

17. Lastly, the UST's assertion that New York's rules of professional conduct require a limitation on exculpation for counsel is misguided and any objection on that basis should be overruled. As the *LATAM* court held:

> Finally, the Court finds no merit to the U.S. Trustee's request that the Court should carve out attorneys' violations of N.Y. Comp.

> Codes R. & Res. Tit. 22 § 1200.8 Rule 1.8(h)(1). That rule prohibits a lawyer from making an agreement prospectively limiting the lawyer's liability to a client for malpractice. However, it has no bearing on the standard of care established in the Exculpation Provision. Accordingly, the Court overrules the U.S. Trustee's objection.

*LATAM Airlines*, 2022 Bankr. LEXIS at *160; *see also In re Stearns Holdings, LLC,* 607 B.R. 781, 791 (Bankr. S.D.N.Y. 2019) (finding UST's requested revision to be "neither warranted nor required.").

**(iv) <u>The UST is not entitled to assess fees on distributions from non-Estate assets</u>**

18. Section 2.1.5 of the Plan provides that all U.S. Trustee Fees payable under 28 U.S.C. § 1930 that are due and owing but not paid prior to the Effective Date will be paid on the Effective Date. The Plan goes on to clarify, however, that payments made to the Trust by Persons other than the Diocese, and payments by the Trust to any Person, shall not be considered to be a "disbursement" for purposes of calculating U.S. Trustee Fees under § 1930. Judge Sontchi's analysis in *Paragon* is apt:

> The word "disbursements" is commonly understood in this context to apply to payments made with the funds generated from the liquidation of the debtor's assets. Although courts have taken different approaches to interpreting section 1930(a)(6), the common thread that appears to bind many of those decisions together is the fact that the debtor had some interest in, or control over, the money disbursed.

*In re Paragon Offshore PLC,* 629 B.R. 227, 230-31 (Bankr. D. Del. 2021) (internal quotations omitted.

19. The UST asserts that, in addition to the $25 million Diocese Cash Contribution, U.S. Trustee fees should also be assessable against (i) the $30 million Participating Parties' Cash Contribution paid directly to the Trust, (ii) over $71 million in insurance settlement proceeds paid directly by the Settling Insurers to the Trust, and (iii) post-Effective Date payments by the Trust.

20. As an initial matter, the $30 million being contributed by Participating Parties and paid to the Trust is comprised of funds owned by those Participating Parties, which the Diocese has no interest in or control over. Moreover, those funds are being contributed by the Participating Parties for the purpose of obtaining a channeling injunction and settling their own independent liability for Abuse Claims. Accordingly, none of those funds are appropriately treated as "disbursements" for purposes of § 1930.

21. Similarly, the payments to be made to the Trust by the Settling Insurers represent a settlement of the insurance rights of more than 100 Participating Parties in addition to those of the Diocese. To the extent U.S. Trustee Fees are chargeable at all against such settlement payments (which the Diocese does not concede), they should be calculated only with respect to the portion allocable to the Diocese's insurance claims and causes of action, not the portion allocable to Participating Parties.

22. Even if the UST were to prevail on its arguments with respect to these first two categories, as a practical matter the UST would gain little, if anything, in terms of additional U.S. Trustee Fees. It is likely that U.S. Trustee Fees for the calendar quarter in which the Plan Effective Date occurs will hit the statutory maximum of $250,000 based upon the Diocese's historical disbursements and the $25 million Diocese Cash Contribution to the Trust. Because the Participating Parties' Cash Contribution and the insurance settlement payments will all happen contemporaneously with the Effective Date of the Plan, including those amounts in the calculation of "disbursements" would not impact the U.S. Trustee Fees payable in that quarter in any meaningful way, if at all.

23. Most concerning, however, is the UST's suggestion in his objection to the Diocese's Disclosure Statement (which is incorporated by reference in his confirmation objection),

that the UST intends to tax post-Effective Date payments by the Trust. First, as discussed above, the majority of Trust assets will come from sources other than the Diocese. Moreover, to the extent that the Diocese does have an interest in, or control over, any assets contributed to the Trust, the UST will already have extracted U.S. Trustee Fees with respect to the disbursement of such assets from the Diocese to the Trust on the Effective Date of the Plan. Payments by the Trust to its beneficiaries are neither made from the Diocese's bankruptcy estate nor made on behalf of the Diocese. The position advocated by the UST is thus precisely the kind of "double-dipping" that Judge Sontchi held to be impermissible in *Paragon*:

> By distributing the corpus of the Litigation Trust Pro Rata to the beneficiaries of the Litigation Trust, the Trust is not paying expenses on behalf of any debtors. Rather, all "disbursements" related to any of the Debtors' obligations to the Trust beneficiaries and the claims against Noble occurred at the Effective Date in 2017.

*Paragon*, 629 B.R. at 231. The cases cited by the UST in support of his argument to the contrary are unconvincing. Both *Atna Resources* and *Home Centers* involved a liquidating trust that was effectively the successor to, and acquired substantially all assets of, the debtor, whereas here, like in *Paragon*, the Debtor is reorganizing and continuing in business, and the Plan transfers only discrete assets to the Trust for the benefit of certain claimants. *See In re Health Diagnostic Lab'y, Inc.*, 2023 Bankr. LEXIS 8, *12 (Bankr. E.D. Va. Jan. 4, 2023) (distinguishing *Paragon* as a reorganization case from cases involving "pour over" trusts that "step into the shoes and acquire all the duties of the debtors.").

**B) <u>THE SSJ OBJECTION</u>**

24. SSJ is a separately-incorporated religious order that operates within the geographical boundaries of the Diocese but independent of the ecclesiastical jurisdiction of the Bishop of Rochester. SSJ is not and has never been a participant in the Diocese's insurance

program, nor, upon information and belief, is SSJ a named insured or co-insured with respect to any insurance policy available to the Diocese or any Participating Party to respond to any Abuse Claims.

25. Individual nuns affiliated with SSJ ("Sisters") may, from time to time, have conducted ministries at, or in conjunction with, facilities owned and operated by the Diocese or other Participating Parties. Specifically, certain Sisters may have served at catholic schools or social services organizations affiliated with the Diocese and/or other Participating Parties in various capacities, including as teachers, counselors or administrators.[9]

26. SSJ is named as a co-defendant with the Diocese and/or other Participating Parties in approximately 20 Abuse Actions. None of the Abuse Actions where SSJ is a co-defendant with the Diocese or any Participating Party name an individual Sister as a defendant, although several Abuse Actions do allege that a Sister was the perpetrator of the claimed Abuse.

27. SSJ has not filed a proof of claim in this Chapter 11 Case. The Diocese therefore respectfully submits that, despite insinuation to the contrary in its objection, SSJ does not hold a valid Inbound Contribution Claim against the Diocese, nor is SSJ a Class 5 Claimant under the Plan. Moreover, to the extent SSJ purports to object to confirmation not just on its own behalf, but also for the benefit of certain insurers and "other" Class 5 Claimants, SSJ lacks standing. *See*, *e.g.*, *In re Roman Catholic Diocese of Syracuse*, 665 B.R. 866, 877-881 (Bankr. N.D.N.Y 2024) (collecting cases holding that prudential standing considerations prevent an objecting party from challenging portions of a plan that do not affect its direct interests).

[9] Notwithstanding SSJ's assertions, the Diocese does not concede, and there is no admissible evidence presently before the Court, that any individual Sisters were employees, or under the control or supervision, of the Diocese and/or the Participating Parties, or that such individual Sisters are entitled to coverage under any insurance policy owned or maintained by the Diocese or the Participating Parties.

28. Even if SSJ had filed a timely proof of claim asserting an Inbound Contribution Claim, that claim would be subject to disallowance as a matter of law pursuant to section 502(e)(1)(B) of the Bankruptcy Code, as any allegations of SSJ liability for an Abuse Action are unproven and speculative, and any claim SSJ may have for contribution is therefore, at best, contingent and contested.

29. SSJ is not a creditor in this Chapter 11 Case. Accordingly, SSJ cannot invoke the cramdown protections of section 1129(b) of the Bankruptcy Code to defeat confirmation. Rather, the Court may confirm the Plan over SSJ's objection unless SSJ is able to establish that the Plan Proponents have failed to comply with the applicable requirements for confirmation set forth in section 1129(a) of the Bankruptcy Code, and have done so in a manner that directly and adversely affects an interest of SSJ.

30. SSJ advances a long list of meandering objections, which in many instances are not clearly articulated and lack factual support.[10] The Diocese nevertheless has attempted to address the major points raised by SSJ below and respectfully submits that none of SSJ's objections have merit or should prevent confirmation of the Plan.

**(i) SSJ's rights are effectively preserved under the Plan**

31. SSJ complains that the Plan includes injunctions that would protect the Participating Parties from contribution claims from Joint Tortfeasors, including SSJ to the extent it may be found to be liable in an Abuse Action. First, both the Diocese and the Participating

[10] SSJ suggests at various points throughout its objection that the Plan Proponents have failed to dispute or refute certain factual or legal assertions that SSJ has made in its many voluminous filings. The fact that the Plan Proponents have, to date, focused their pleadings in this case on addressing points that are actually germane to the contested issues before the Court, and have chosen not to engage with all assertions made by SSJ, which are, in large part, irrelevant and in many instances difficult to decipher, should not be taken as an admission that the Plan Proponents admit or agree with any of SSJ's factual assertions or legal conclusions. Given the lack of clarity in SSJ's written submissions, the Diocese further reserves the right to respond to any additional arguments SSJ may assert at the confirmation hearing.

Parties deny any liability to SSJ, and SSJ has adduced no evidence to suggest that its imagined contribution claims have any merit whatsoever. Second, even if there were any merit to such claims, they are satisfied in full through the Plan, consistent with *Purdue*.

32. Notably, the Supreme Court in *Purdue* declined to extend its holding to releases of third-party claims where such claims were satisfied under the terms of a chapter 11 plan:

> As important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan . . . . Nor do we have occasion today to . . . pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.

*Purdue*, 603 U.S. at 226. Courts have since acknowledged that, following *Purdue*, even "a nonconsensual third-party release might be appropriate in a 'paid-in-full plan.'" *See, e.g., In re Smallhold, Inc.*, 665 B.R. 704, 723 (Bankr. D. Del. 2024). Courts evaluating the issue prior to *Purdue* reached the same conclusion. *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (third party releases deemed "consensual" as to creditors whose claims were "paid in full and have therefore received consideration for the releases"); *In re Spansion, Inc.*, 426 B.R. 114, 144-45 (Bankr. D. Del. 2010) (overruling objection to third-party release to the extent of claims that were "paid in full" and thus "received adequate consideration for the release").

33. Section 15.11 of the Plan provides a mechanism to ensure that SSJ, and all other Tort Defendants, retain their Litigation Rights, including all rights under CPLR Articles 14 and 16, and GOL 15-108 to reduce or offset against any judgment any portion of liability allocable to the Diocese or the Participating Parties. Accordingly, SSJ will only be responsible for paying its allocable share of liability, even though the Plan may enjoin the collection of contribution claims against the Participating Parties. Because the Plan ensures that SSJ will suffer no adverse

economic impact as a result of the release of its claims against the Participating Parties, it may be confirmed consistent with *Purdue*.

**(ii) The insurance settlements contemplated by the Plan are proper**

34. SSJ erroneously asserts that the insurance settlements contemplated in the Plan are impermissible fraudulent transfers.

35. First, this Court entered an order approving the form and manner of notice of the Diocese's motion to approve the insurance settlements [Docket No. 3100] (the "Settlement Notice Order"). The Settlement Notice Order established June 9, 2025 as the deadline for parties to file objections to the proposed insurance settlements, and set a hearing on the Diocese's motion for June 18, 2025. The Settlement Notice Order was served on counsel to SSJ. *See* Docket No. 3104. Moreover, the notice of motion and objection deadline approved by the Settlement Notice Order was served on counsel to SSJ, and on SSJ at its corporate offices. *See* Docket No. 3135.

36. SSJ failed to file any objection to the insurance settlement motion, nor did SSJ appear at the hearing to oppose the motion. The Court verbally approved the insurance settlement motion at the June 18, 2025 hearing, and entered orders approving the proposed settlements on July 21, 2025 [Docket Nos. 3264-67] (the "Insurance Settlement Approval Orders"). Accordingly, having failed to raise any timely objections, SSJ should be estopped from now attempting to collaterally attack the Insurance Settlement Approval Orders in connection with confirmation of the Plan.

37. Moreover, as set forth above, apart from bald assertions, there is no evidence in the record to suggest that SSJ has any interest in the Settling Insurer Policies, and to the extent any such interest may exist, it is at best subject to *bona fide* dispute and therefore still subject to a sale free and clear of such interest under section 363(f) of the Bankruptcy Code.

38.     Lastly, the Insurance Settlement Approval Orders include findings that the Settlement Amounts to be paid by the Settling Insurers represent fair consideration for the policies being settled and sold, and there can be no credible allegation that the Diocese is proposing the Plan and entering into the insurance settlements with an actual intent to hinder, delay or defraud any legitimate creditor.  Accordingly, any suggestion that the insurance settlements are fraudulent transactions fails.

**(iii)     <u>The Plan has been proposed in good faith</u>**

39.     SSJ advances several novel arguments to argue that the Plan has not been proposed in good faith in accordance with section 1129(a)(3) of the Bankruptcy Code.  In doing so, SSJ attempts to expand the "good faith" standard well beyond what prevailing authority suggests is required.  SSJ invokes an expansive conception of section 1129(a)(3) to lodge a hodgepodge of grievances, many of which have no factual basis in reality, and none of which indicate any lack of good faith on the part of the Plan Proponents.

40.     Section 1129(a)(3) of the Bankruptcy Code requires a plan to have been "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The good faith standard requires a showing that the plan "was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.)*, 528 F.3d 162, 174 (2d Cir.2008) (quoting *In re Koelbl*, 751 F.2d 137, 139 (2d Cir.1984)); *Manville I*, 843 F.2d at 649; *In re Texaco, Inc.*, 84 B.R. 907 ("[A] plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.") (*quoting Hanson v. First Bank of S.D.*, 828 F.2d 1310 (8th Cir. 1987)).  In determining whether a plan has been proposed in good faith, courts have recognized that they should avoid applying any

hard and inflexible rules but should instead evaluate each case on its own merits. *See In re Century Glove*, 1993 WL 239489, at *4 (good faith should be evaluated in light of the totality of circumstances surrounding confirmation); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (same).

41. Accordingly, bankruptcy courts have held that the good faith requirement is satisfied if the plan has been proposed for the purpose of preserving the value of the bankruptcy estate and distributing that value to creditors. *In re Source Enters, Inc.*, No. 06-11707 (AJG), 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007) (the good faith requirement was satisfied in plan filed with the legitimate and honest purposes of maximizing value of estate and effectuating equitable distribution), aff'd, 392 B.R. 541 (S.D.N.Y. 2008). A plan is deemed filed in good faith "when the plan has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate, and delivering that value to creditors." *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014).

42. SSJ offers no evidence that the Plan has been proposed for a purpose other than preserving the value of the Diocese's bankruptcy estate and distributing that value to creditors and cannot conceivably do so. Indeed, SSJ's primary complaints with respect to the issue of "good faith" seem to center around a concern that the Plan, as proposed, provides too much value to the Diocese's actual creditors, rather than protecting legally infirm, speculative and contingent contribution claims of SSJ. As explained below, SSJ's allegations that its interests may be impacted by certain Plan provisions, without more, is wholly insufficient to establish a lack of good faith under established precedent within the Second Circuit.

**(iv) <u>"Litigation neutrality" is not a requirement for confirmation</u>**

43. Prior to the Supreme Court's decision in *Truck Insurance Exchange v. Kaiser Gypsum Company, Inc.*, 602 U.S. 268 (2024), some courts denied insurers standing to contest

confirmation of a chapter 11 plan where the plan was deemed to be "insurance neutral." However, as the Supreme Court held in *Truck*: "[t]his approach, known as the "insurance neutrality" doctrine . . . . conflates the merits of an objection with the threshold party in interest inquiry." *Id*. at 269-70. Accordingly, to the extent anything remains of the insurance neutrality doctrine following *Truck*, achieving insurance neutrality should be understood not as a requirement for confirmation under section 1129, but as a justification to overrule any objections to confirmation raised by an insurer whose rights have been determined, after a hearing, to be unaffected by the plan. In other words, so long as an insurer is given standing to contest confirmation, a finding that the plan at issue does not impact the insurer's interests should defeat that insurer's objections to confirmation. But the inverse is not necessarily true. Nothing in section 1129 requires, as a baseline for confirmation, that a debtor either (i) obtain the consent and approval of each and every non-creditor entity that may be impacted (either directly or indirectly) by a chapter 11 plan or (ii) propose a plan that has no impact whatsoever on such entities. Indeed, any such requirement would defeat the reorganizational goals of chapter 11 and would have the absurd effect of giving non-creditors greater rights to defeat a disfavored plan than those afforded to a debtor's actual creditors who may be subject to non-consensual confirmation via cram-down. As the Supreme Court recognized in *Truck*, non-creditor parties in interest have limited rights to oppose a chapter 11 plan and are entitled to only "an opportunity to be heard – <u>not a vote or a veto in the proceedings</u>." *Id*. at 270 (emphasis added).

44. Against this backdrop, SSJ suggests that the Diocese's Plan must be "litigation neutral" to be confirmed. Importantly, SSJ has not identified, nor has the Diocese been able to locate, any reported decisions where a Court denied or otherwise conditioned confirmation of a chapter 11 plan on the basis that its confirmation might alter the litigation prospects of a co-

defendant joint tortfeasor. Nor does the Diocese agree that the Plan negatively impacts any rights of SSJ. Moreover, in light of the Supreme Court's decision in *Truck*, the Diocese submits that SSJ has the argument backwards: subject to allowing SSJ an opportunity to present its case, if the Plan is found to be litigation neutral, the Court must overrule SSJ's objection. However, even if the Plan is not litigation neutral, so long as SSJ is afforded an opportunity to be heard, and so long as the Plan is otherwise confirmable in accordance with the requirements set forth in section 1129, the Court may still confirm the Plan.

**(v) <u>SSJ has not established any right to claim against insurance</u>**

45. SSJ states that certain Abuse Claimants have advanced alter ego and veil-piercing theories in an attempt to disregard the corporate separateness of the Diocese, the Participating Parties, and SSJ. SSJ then jumps to the conclusion that, based merely upon the assertion of these alter ego and veil-piercing arguments, the Diocese and its insurers should simply presume that such unproven (and unfounded) allegations have merit and immediately rush to defend and indemnify SSJ as if SSJ were the actual insured, before any determination has even been made on the plaintiffs' arguments to disregard the corporate form. SSJ offers no support for the proposition that mere allegations set forth in a complaint can alter factual reality in such a way as to provide SSJ with a claim for coverage under the Diocese's policies. Notably, SSJ does not suggest that it agrees with plaintiffs' contentions that it is one and the same with the Diocese. SSJ is not rushing to disclose its assets or to contribute them to the Plan to assist in resolving this Chapter 11 Case. The Diocese adamantly submits that there is no basis for veil-piercing here, and SSJ has no right to coverage under the Diocese's insurance policies.

46. SSJ also suggests that section 3420 of the New York Insurance Law provides it with the right to pursue a direct cause of action against the Diocese's insurers for SSJ's supposed

contribution claims. As demonstrated above, and as the Court has previously held, Insurance Law § 3420 allows a claimant with an unsatisfied judgment against the insured to step into the insured's shoes and to sue the insurer for coverage. Here, SSJ has no judgment against the Diocese or any Participating Party in respect of its purported contribution claims, and the Court has already approved the sale of the Diocese's insurance rights to the Settling Insurers free and clear of any interests, including any disputed interest that SSJ may have. SSJ failed to raise any objection to that sale, and should not now be able to use it as a basis to oppose confirmation.

47. SSJ's arguments that insurance coverage may be available to individual Sisters fails for similar reasons. First, as indicated above, the Diocese does not concede that any individual Sisters were employees or agents, or under the supervision or control of the Diocese or any of the Participating Parties, and therefore contests whether such Sisters could claim to be additional insureds, especially in light of the recently-approved insurance settlements. Second, none of the Abuse Actions implicating SSJ name any individual Sisters as defendants, so there is no basis for liability to be established against an individual Sister, nor vicariously against SSJ. SSJ cannot bootstrap a claim for additional insured status as it attempts to do here.

**(vi) <u>SSJ has no refuge in the cramdown provisions of § 1129(b)</u>**

48. SSJ improperly attempts to assert the rights of Class 5 Claimants by suggesting that the Plan violates the absolute priority rule of section 1129(b)(1) by allowing the Diocese to retain property without paying anything to Class 5 Claimants.

49. At the outset, the Diocese reiterates that SSJ is not a creditor in this Chapter 11 Case, having submit a timely proof of claim or even to articulate a legally cognizable basis for the assertion of an allowable claim. Accordingly, SSJ has no standing to invoke the cramdown

protections for creditors set forth in section 1129(b) of the Bankruptcy Code, because such protections do not relate to any protectable interest of SSJ. *See Syracuse*, 665 B.R. at 877-881.

50. Even if SSJ did not have a standing problem, however, its suggestion that the Plan's treatment of Class 5 Claims is improper has no merit. By their nature, all Class 5 Claims are contingent claims for contribution that are subject to disallowance as a matter of law under section 502(e). Accordingly, the Plan properly disallows and provides no recovery for Class 5 Claims.

51. Moreover, with respect to unsecured claims like Class 5 Claims, the absolute priority rule requires only that if such claims are not paid in full, no holder of a junior claim or interest may receive or retain any property under the plan. Here, the Diocese is a not-for-profit corporation with no equity interest holders and no class of claims junior to Class 5 Claims is receiving any property under the Plan, accordingly, retention of property by the Diocese does not violate the absolute priority rule. *See, e.g.*, *In re Wabash Valley Power Ass'n*, 72 F.3d 1305 (7th Cir. 1995); *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 454-59 (Bankr. E.D. Ca. 1999).

52. SSJ is also mistaken in asserting that the Plan unfairly discriminates between unsecured creditors with unliquidated claims in Class 4 and unsecured creditors with unliquidated claims in Class 5. Again here, SSJ deliberately glosses over the fact that Class 5 Claims are required to be disallowed by Section 502(e) of the Bankruptcy Code, while Class 4 Claims are not. Accordingly, while SSJ has no standing to raise confirmation objections on behalf of Class 5 Claimants (or any creditor), even if it did have standing the complaints asserted in SSJ's objection are without any merit.

## C) CONCLUSION

53. For the reasons set forth herein, the Diocese respectfully submits that there is no merit to any of the objections raised by either the UST or SSJ to confirmation of the Plan. Accordingly, the Diocese requests that the Court overrule such objections in their entirety and enter an order confirming the Plan.

Dated: July 22, 2025
Syracuse, New York

Respectfully submitted,

**BOND, SCHOENECK & KING, PLLC**

By: */s/ Grayson T. Walter*

Stephen A. Donato, Esq.
Charles J. Sullivan, Esq.
Grayson T. Walter, Esq.
Office and Post Office Address:
110 West Fayette Street
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8000
Facsimile: (315) 218-8100
Email: donatos@bsk.com
sullivc@bsk.com
walterg@bsk.com

*Counsel to The Diocese of Rochester*